**JUDGE FURMAN**

**12 CV 8852**

Brett D. Jaffe
bjaffe@cohengresser.com
Alexis G. Stone
astone@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue
New York, New York 10022
Telephone:  (212) 957-7600
Facsimile:  (212) 957-4514
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------X

ATLANTICA HOLINDGS, INC., BALTICA
INVESTMENT HOLDING, INC., BLU FUNDS,
INC., Allan KIBLISKY, Anthony KIBLISKY, and
Jacques GLIKSBERG,

          *Plaintiffs,*

     – against –

SOVEREIGN WEALTH FUND "SAMRUK-
KAZYNA" JSC,

     a/k/a "National Welfare Fund 'Samruk-
     Kazyna,'"

          *Defendant.*

------------------------------------------------X

Civ. No. _____

**ECF CASE**

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiffs Atlantica Holdings, Inc., Baltica Investment Holding, Inc., Blu Funds Inc.,

Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs"), as and for

their Complaint against Defendant Sovereign Wealth Fund "Samruk-Kazyna" JSC, also known

as "National Welfare Fund 'Samruk-Kazyna'" ("Defendant" or "S-K Fund"), allege based on

knowledge as to their own individual conduct and information and belief as to the conduct of

others, as follows:

## INTRODUCTION

1.      This action arises from a massive scheme orchestrated by non-party BTA Bank

JSC ("BTA Bank") and its controlling shareholder, Defendant S-K Fund, to induce Plaintiffs and

other creditors of BTA Bank to acquire subordinated debt securities as part of a corporate debt

restructuring of BTA Bank that began in April 2009 and was finalized in approximately August

2010 (the "2010 Restructuring"), and thereafter to purchase tens of millions of dollars of

additional subordinated debt securities issued by BTA Bank.

2.      The 2010 Restructuring was carried out pursuant to an information memorandum

issued by BTA Bank and distributed to existing creditors of BTA Bank, as well as potential

purchasers of BTA Bank securities to be issued as part of the 2010 Restructuring (the

"Information Memorandum").  The Information Memorandum, which expressly incorporated a

deed of undertaking executed by S-K Fund (the "Deed of Undertaking"), painted a rosy picture

of BTA Bank's prospects following the 2010 Restructuring.  Among other things, the

Information Memorandum lauded BTA Bank's ability to attract new capital from depositors, due

to its purportedly improved financial position as a result of the 2010 Restructuring.

3.      Most critically, the Information Memorandum and Deed of Undertaking

emphasized that S-K Fund – whose equity ownership of BTA Bank would increase from

approximately 75% to approximately 81% as a result of the 2010 Restructuring – had agreed,

with very limited exceptions, to accept no dividends or distributions from BTA bank.

4.      The Information Memorandum was false and misleading, and/or contained

material omissions, because – unbeknownst to Plaintiffs and concealed in the Information

Memorandum – S-K Fund and BTA Bank had devised a scheme to circumvent the express

restriction on dividends to which S-K fund purportedly agreed.  The scheme was implemented

by BTA Bank, paying S-K Fund interest on its deposits at an exorbitant above-market rate of

approximately 10% per annum, while simultaneously using the funds deposited by S-K Fund to purchase bonds issued by S-K Fund (the "S-K Bonds") that paid BTA Bank only approximately 4% interest. The resulting annual "negative carry" of approximately 6% – on $5 billion of BTA Bank's asset base – doomed any hope for a successful restructuring from the outset.

5.     This undisclosed scheme has resulted in net interest payments to S-K Fund of more than $300 million since the 2010 Restructuring, yet in the Information Memorandum, BTA Bank falsely and misleadingly disclosed that for the most recent period for which results were available, it had *earned* approximately KZT 20 billion in interest on the S-K Bonds and paid approximately KZT 4 billion in interest to "shareholders" on their deposits. These disclosures – all false and misleading when made – created the false impression that BTA Bank's relationship with S-K was and would be profitable rather than a drain on BTA Bank's assets that would make failure of the 2010 Restructuring inevitable.

6.     As a result of these false and misleading statements and material omissions, set forth in detail below, S-K Fund has violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). BTA Bank has violated Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Exchange Act. S-K Fund is liable for BTA Bank's violations as a control person under Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

## PARTIES AND RELEVANT NON-PARTIES

7.     Plaintiff Atlantica Holdings, Inc. ("Atlantica") is a corporation formed under the laws of the Republic of Panama. Atlantica acquired its initial investment in BTA Bank subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum. Atlantica unconditionally committed to the 2010 Restructuring by a communication to its broker in the Miami, Florida, office of UBS Financial Services, and

thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States. Thereafter, Atlantica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein. It made these purchases by placing orders with its broker in the Miami, Florida, office of UBS Financial Services. UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where the transaction was completed. Therefore, Atlantica incurred irrevocable liability to pay for the subordinated debt in the United States.

8.      Plaintiff Baltica Investment Holding, Inc. ("Baltica") is a corporation formed under the laws of the Republic of Panama. Baltica acquired its initial investment in BTA Bank subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum. Baltica unconditionally committed to the 2010 Restructuring by a communication to its broker in the Miami, Florida, office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States. Thereafter, Baltica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein. It made this purchase by placing an order with its broker in the Miami, Florida, office of UBS Financial Services. UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where the transaction was completed. Therefore, Baltica incurred irrevocable liability to pay for the subordinated debt in the United States.

9.      Plaintiff Blu Funds, Inc. ("Blu Funds") is a corporation formed under the laws of the Republic of Panama. After the 2010 Restructuring, Blu Funds purchased subordinated debt

of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum.  It made this purchase by placing an order with its broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where the transaction was completed.  Therefore, Blu Funds incurred irrevocable liability to pay for the subordinated debt in the United States.

10.    Plaintiff Allan Kiblisky resides in Miami, Florida.  After the 2010 Restructuring, Allan Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  He made this purchase by placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where the transaction was completed.  Therefore, Allan Kiblisky incurred irrevocable liability to pay for the subordinated debt in the United States.

11.    Plaintiff Anthony Kiblisky resides in Miami, Florida.  After the 2010 Restructuring, Anthony Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  He made this purchase by placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where the transaction was completed.  Therefore, Anthony Kiblisky incurred irrevocable liability to pay for the subordinated debt in the United States.

12.     Plaintiff Jacques Gliksberg ("Gliksberg") resides in Highland Park, Illinois. After the 2010 Restructuring, Gliksberg purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein. He made these purchases by placing orders with his broker in the Miami, Florida, office of UBS Financial Services. UBS Financial Services then transmitted the orders to its broker-dealer in New York, New York, where the transaction was completed. Therefore, Gliksberg incurred irrevocable liability to pay for the subordinated debt in the United States.

13.     Annexed hereto as Exhibit A is a chart showing the date and amount of each Plaintiff's investment in the subordinated debt of BTA Bank.

14.     Defendant S-K Fund is a sovereign wealth fund formed under the laws of the Republic of Kazakhstan and owned entirely by the Republic of Kazakhstan. Founded in 2008 following a merger of two predecessor funds, S-K Fund owns and invests in various enterprises in Kazakhstan, including transportation, pharmaceutical, and energy companies. S-K Fund is not immune from suit in this Court because S-K Fund's actions outside the territory of the United States in connection with a commercial activity of S-K elsewhere caused a direct injury in the United States, giving rise to this action.

15.     Non-party BTA Bank is a joint-stock company organized under the laws of the Republic of Kazakhstan. It was formed in 1997 by decree of the Republic of Kazakhstan as a combination of two predecessor institutions, Turanbank Joint-Stock Bank and Alem Bank Kazakhstan. BTA Bank is not named as a defendant herein because, as a result of the scheme described in this Complaint, BTA Bank is currently undergoing a second restructuring (the "2012 Restructuring"). In connection with the 2012 Restructuring, BTA Bank has filed a

petition under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action because it arises under Section 15 of the Securities Act, Sections 10(b) and 20(a) of the Exchange Act (together with the Securities Act and the Exchange Act, the "Federal Securities Laws").

17.     The Court has jurisdiction over the Plaintiffs' claims arising under the Federal Securities Laws pursuant to 28 U.S.C. § 1331, as well as Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22(a) of the Securities Act, 15 U.S.C. § 77v, because Defendant directed misstatements and omissions – and knowingly assisted and participated in BTA Bank's omissions and transmissions of misstatements – towards Plaintiffs and their agents in this District.  Defendant knew that its public representations regarding BTA Bank's financial condition would be disseminated throughout the United States, and especially in this District, which is widely recognized as a hub of the global financial markets.

19.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because substantial acts in furtherance of the alleged fraud and of its effects have occurred within this District.  Specifically, Defendant and BTA Bank offered securities for sale in this District. Defendant also directed misstatements and omissions – and knowingly participated in BTA Bank's omissions and transmissions of misstatements – towards purchasers of BTA Bank securities within this District.

20.     In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), because Defendant is subject to this Court's personal jurisdiction.

21.     In connection with the acts alleged herein, Defendant used the means and instrumentalities of interstate commerce, including but not limited to the United States mails and interstate and international telecommunications networks.

### FACTUAL ALLEGATIONS

#### Background to the 2010 Restructuring

22.     BTA Bank is one of Khazakstan's largest banking institutions.  BTA Bank has an international presence, with offices in the Russian Federation, United Arab Emirates, Great Britain and China.  BTA Bank offers a range of traditional corporate and retail banking products and services to its customers.

23.     Prior to the 2010 Restructuring, Plaintiffs purchased debt securities issued by BTA Bank.

24.     On February 3, 2009, Defendant S-K invested KZT 212 billion (approximately $1.5 billion in United States currency) in BTA Bank, receiving a 75.1% stake in the common stock of BTA Bank in exchange.  That same day, an S-K Fund representative was appointed to BTA Bank's Management Board.

25.     In April 2009, BTA Banks announced that it had ceased payment of principal on all outstanding BTA Bank financial obligations.

26.     Thereafter, BTA Bank, at the direction of its controlling shareholder, S-K Fund, undertook to restructure BTA Bank's debt and overall capital structure.  The product of that effort was the 2010 Restructuring.

27.     In support of the 2010 Restructuring, BTA Bank distributed the Information Memorandum to BTA Bank's creditors, including Plaintiffs and other debt holders.  BTA Bank represented that the Information Memorandum comprehensively detailed the terms of the 2010 Restructuring, and the intended effect of the 2010 Restructuring on BTA Bank's future

8

operations.  Defendant's extensive participation in the negotiation of the terms of the 2010

Restructuring and the inclusion of certain statements from S-K Fund by reference establish that

S-K Fund was involved in the production of the Information Memorandum and was aware of its

contents.

28.     On May 28, 2010, in reliance upon the Information Memorandum, BTA Bank's

creditors, including Plaintiffs, approved the terms of the 2010 Restructuring as presented by

BTA Bank.

29.     Under the terms of the 2010 Restructuring, Defendant received additional equity

in BTA Bank and now owns more than 80% of the common stock of BTA Bank.

30.     In accordance with the terms of the 2010 Restructuring, BTA Bank issued equity

and debt securities to pre-restructuring holders of its debt.  In the United States, BTA Bank

issued subordinated debt securities (the "Subordinated Notes") in an exempt offering.  Resale of

the Subordinated Notes to certain qualified purchasers in the United States, including Plaintiffs,

was permitted pursuant to United States Securities and Exchange Commission Rule 144A (the

"Rule 144A Offering").

31.     In reliance on the Information Memorandum, Atlantica and Baltica accepted

Subordinated Notes pursuant to the Rule 144A Offering, in exchange for their prior interest as

creditors of BTA Bank.

32.     In reliance on the misrepresentations contained in the Information Memorandum,

Allan Kiblisky, Anthony Kiblisky, Gliksberg, Atlantica, Baltica, and Blu Funds purchased

Subordinated Notes and Recovery Units, which were traceable to securities issued by BTA Bank

in the Rule 144A Offering.

<u>The Information Memorandum Contains Material Misstatements</u>
<u>and Omissions</u>

33.     While Plaintiffs relied on the Information Memorandum in connection with their acquisition of the Subordinated Notes as part in the course of the 2010 Restructuring and in the post-restructuring Rule 144A Offering, they did so without knowledge of material misstatements and omissions in the Information Memorandum.

34.     As a threshold matter, the Information Memorandum disseminated in connection with the Rule 144A Offering contained a number of material misstatements concerning BTA Bank's post-restructuring prospects, and the role that S-K Fund would play in ensuring BTA Bank's future viability.  Among other things, the Information Memorandum expressly represented that:

a.     "The Bank believes that the Restructuring will allow the Bank to continue as a going concern."

b.     "The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and *liquidity support to be provided by [S-K Fund]*." (emphasis added).

c.     "[S-K Fund's] primary objective is to manage [BTA Bank] with *a goal of maximizing long term value* and increasing competitiveness of such legal entities in world markets."  (emphasis added).

35.     Each of these statements was false and, at the time they were made, BTA Bank and S-K Fund knew they were false.  Contrary to the representations made in the Information

Memorandum, BTA Bank and S-K Fund knew that the 2010 Restructuring would doom BTA

Bank to failure, enriching S-K Fund at the expense of Plaintiffs and other BTA Bank creditors.

### S-K Fund and BTA Bank Devise the Negative Carry Swap to Funnel Cash to S-K Fund

36.     The Information Memorandum incorporated by reference a Deed of Undertaking

executed by Defendant in favor of all creditors participating in the 2010 Restructuring.  This

Deed of Undertaking contained a number of materially false and misleading misstatements.

Most significantly, the Information Memorandum stated that "[n]o dividend other than a

Permitted Dividend shall be paid on the Shares," in BTA Bank held by S-K Fund.

37.     The term "Permitted Dividend" was defined in the Information Memorandum to

include only "a dividend or distribution by the Bank to its Shareholders:  (a) at any time after the

New Notes have been irrevocably repaid in full; (b) at any time after the New Notes have been

irrevocably repaid in full *provided that* [certain conditions would have been met], or (c) at any

time after the date falling seven years after the Restructuring date *provided that* [certain other

conditions would have been met]."  None of these restrictions were satisfied at any point after

the 2010 Restructuring, yet during the 2010 Restructuring, Defendant used its position as the

controlling shareholder to extract the equivalent of an impermissible dividend from BTA.

38.     The Deed of Undertaking was executed "in favour of the Restructuring Creditors

(and, for the avoidance of doubt, their direct or indirect transferees) and the New Notes

Trustees."  Therefore, Defendant and BTA Bank were aware of and intended that their

undertakings and representations would be relied upon by potential purchasers of the securities

issued in connection with the 2010 Restructuring.

39.     But wholly undisclosed in the Information Memorandum was that the real

purpose of the 2010 Restructuring was to enable Defendant to siphon hundreds of millions of

dollars from BTA Bank at the expense of other creditors including those, like several of the plaintiffs, who already saw their debt position significantly reduced in connection with the 2010 Restructuring. Specifically, under the terms of the 2010 Restructuring, BTA Bank was directed to purchase KZT 645 billion in Defendant's debt securities paying a return of 2% per year to BTA Bank. Shortly before the 2010 Restructuring, S-K Bank deposited KZT 245 billion with BTA Bank (the "S-K Deposit"). The S-K Deposit earned a 10.9% rate of return. The net result of this arrangement (the "Negative Carry Swap") was that S-K Fund received interest from BTA Bank on its deposits far above market rates in the period following the 2010 Restructuring, while BTA Bank received minimal interest payments from S-K Bank. This Negative Carry Swap resulted in material declines in BTA Bank's cash flow.

40.     During and after the 2010 Restructuring, BTA Bank and Defendant knew of the Negative Carry Swap, and were specifically aware of the strongly negative impact that this arrangement had on BTA Bank's cash flow after the 2010 Restructuring.

41.     Additional disclosures in the Information Memorandum were false and misleading in that they further obscured the Negative Carry Swap and the deleterious effect of that transaction on BTA Bank's cash flow and prospects. The Information Memorandum stated that as of September 30, 2009, BTA Bank's total related-party interest income for the nine months' prior was KZT 20,502,000,000, and that its related-party interest expenses for the nine months' prior was KZT 4,214,000,000. This misstatement was misleading because, as discussed above with respect to the Negative Carry Swap, at the time that the 2010 Restructuring was approved, related party interest expenses far exceeded related party interest income.

42.     In addition, the Information Memorandum falsely and misleadingly disclosed that "current accounts generally bear no interest," when in fact S-K Fund had at least KZT 100

billion in current account deposits with BTA Bank, and was receiving interest payments as high as 10.9%. On an annual basis, BTA Bank paid S-K Fund approximately KZT 71.2 million in interest on its deposits, while receiving only KZT 25.8 million in bond interest payments from S-K Fund.

43.      The misstatements contained in the Information Memorandum described above, including those incorporated by reference into the S-K Undertaking, were false and misleading because they were intended to create and did create the false impression that the 2010 Restructuring would preserve BTA Bank's status as a going concern and its ability to make future payments on its debt obligations. Defendant and BTA Bank knew that the 2010 Restructuring was only a temporary fix and that under any realistic projection of BTA Bank's future cash flows, an additional restructuring would be necessary, and intentionally concealed these facts during the 2010 Restructuring to enable Defendant to obtain hundreds of millions of dollars from the Negative Carry Swap at the expense of BTA Bank's creditors, including Plaintiffs.

44.      BTA Bank was motivated to negotiate terms favorable to Defendant in the 2010 Restructuring that appeared fair to BTA Bank's creditors and potential investors, but in fact concealed that BTA Bank would pay extraordinary interest payments after the 2010 Restructuring, particularly from the Negative Carry Swap. Omitting information about the Negative Carry Swap from the Information Memorandum, and misrepresenting its relationship with S-K Bank as one intended to "maximize[e] long term value and increase[e] [BTA Bank's] competitiveness . . . in world markets," improved the appearance of BTA Bank as a going concern, thereby increasing the likelihood that creditors would approve the 2010 Restructuring

and that potential investors, including Plaintiffs, would purchase Subordinated Notes. This allowed BTA Bank to continue to provide Defendant with a steady flow of funds.

45.     Prior to acquiring or purchasing the Subordinated Notes, Plaintiffs (or the agents of the Plaintiffs) read the Information Memorandum and the S-K Undertaking and were informed about the public misstatements made by BTA Bank and Defendant during investor presentations through media reports.

46.     Information about the Negative Carry Swap began to be leaked to the marketplace in or about May 2011. BTA Bank issued a set of PowerPoint slides entitled the "Investor Call Presentation" on May 17, 2011, in which they disclosed on page 24 of a 24-page presentation that one of the outstanding issues that needed to be addressed was "negative carry." Even then, however, BTA Bank disclosed in writing only that its yield on all assets averaged 5.5% while its average cost for all liabilities was 8.6% – but it did not disclose that the driving force behind its overall negative carry was the Negative Carry Swap with S-K Fund.

47.     The following day, May 18, 2011, J.P. Morgan published a research report providing limited additional details concerning the Negative Carry Swap. Specifically, J.P. Morgan reported that on a conference call with investors on May 17, 2011, BTA Bank disclosed that the average interest rate on deposits held by the S-K Fund was 9.8%, both of which were significantly more than the interest rate BTA Bank earned on its assets.

48.     In response to these disclosures, the price of BTA Bank debt, including the Subordinated Notes, dropped significantly. The Subordinated Notes, which had been trading for approximately 70% of face value prior to the May 17 and 18 disclosures, immediately fell to less than 60% of face value and continued their downward slide to approximately 40% of face value by the end of June 2011 and to less than 10% of face value by January 2012.

S-K Fund Makes Additional False and
Misleading Statements in 2011

49.     After the sharp drop in the price of its debt following the initial disclosure of the

Negative Carry Swap in May 2011, S-K Fund made numerous additional public misstatements

on its own behalf, which were directed at potential purchasers of the Subordinated Notes, in an

effort to prop up the price of the Subordinated Notes and other BTA debt securities.  These

statements materially misrepresented Defendant's intent to provide additional and ongoing

financial support to BTA Bank in order to prevent a second debt reorganization.

50.     These false and misleading statements included the following:

a.     According to a statement published in this District and elsewhere in by

*Bloomberg* on July 7, 2011, in an interview of July 5, 2011, Aidan

Karibzhanov ("Karibzhanov"), a Deputy Chief Executive Officer at

Defendant with the authority to speak for S-K Fund, stated that, "I don't

think BTA Bank will have to restructure debt or face bankruptcy, but we

will provide financing to BTA Bank if needed."  With regard to public

allegations that S-K and the Republic of Kazakhstan were paying lower

than market rates on money borrowed from BTA Bank – allegations now

known to be true, and a key component of the Negative Carry Swap

Scheme – Karibzhanov further said that Defendant would "sort out the

situation with the bonds," and that Defendant would "not let [BTA Bank]

get into trouble."

b.     According to a statement published in this District and elsewhere in by

*Bloomberg* on October 4, 2011, in response to public concerns about a

potential BTA Bank default, the Chairman of Defendant publicly stated that "BTA Bank will certainly be supported by the government."

c.      According to a statement published in this District and elsewhere in by Interfax, Reuters, NewsKaz, and Zakon on November 30, 2011, Karibzhanov, stated that Defendant would work out support measures for BTA Bank and, while recognizing that BTA Bank would need to raise additional capital, also represented that Defendant was working to develop "a clear plan for restoring BTA Bank's capital."

d.      According to a statement published in this District and elsewhere by Reuters on November 30, 2011, Karibzhanov stated that Defendant and BTA Bank were working on a business plan to "reload" the bank.

e.      According to a statement published in this District and elsewhere by Interfax on December 15, 2011, Peter House, a managing director at Defendant, publicly represented that Defendant was not considering a potential bankruptcy for BTA Bank.

51.      Defendant made these statements with knowledge and intent that they would be published internationally and in this District.

52.      Defendant made these statements without any basis in fact, and with actual knowledge that a second restructuring would be necessary because, due in part to the deleterious cash flow impact of the Negative Carry Swap, BTA Bank was unable to continue as a going concern or to satisfy its debt obligations and the S-K Fund in fact had no intent to provide the financing necessary for BTA to survive.

53.     The misrepresentations were material because they created the false impression that the 2010 Restructuring was intended to and would result in the repayment of creditors according to the terms approved by the creditors and by the Specialized Financial Court of Kazakhstan.  In making a decision to invest in Subordinated Notes of the reorganized BTA Bank, a reasonable investor would have considered statements and undertakings by BTA Bank itself, as well as those of Defendant, its largest shareholder.

54.     As noted above, however, these misstatements delayed but did not prevent the significant drop in value of BTA Bank's Subordinated Notes, which had fallen to less than 10% of face value by January 2012.

55.     Although publicly claiming that the 2010 Restructuring would strengthen BTA Bank and allow it to continue as a going concern, less than 18 months after the 2010 Restructuring was finalized, BTA Bank defaulted on its debt obligations, for the first time signaling that might be unable to continue as a going concern and that it would not be able to satisfy its debt obligations.  BTA Bank is currently undergoing a second restructuring (the "2012 Restructuring").

BTA Bank Makes Additional
False and Misleading Statements in 2012

56.     Following BTA Bank's default on its debt obligations, certain of the Plaintiffs purchased additional Subordinated Notes in the first quarter of 2012.  Those purchases were made based upon an examination of BTA Bank's reported balance sheet and other financial information, and an analysis of the value of the Subordinated Notes in the event of a second restructuring or a liquidation.

57.     Throughout this time period, however, BTA Bank misrepresented critical financial information to Plaintiffs and other investors and potential investors.  Most significantly,

BTA Bank misrepresented the impact "Recovery Units" issued in connection with the 2010 Restructuring could have on its total liquidation.

58.     The purpose of the Recovery Units, issued to various creditors in connection with the 2010 Restructuring, was to provide those creditors an interest in BTA Bank's efforts to recovery approximately $10 billion in BTA Bank assets unlawfully diverted from BTA Bank by BTA Bank's former management prior to the 2010 restructuring.  Under the terms of the Recovery Units, holders of the Recovery Units and BTA bank would each be entitled to 50% of all funds recovered (net of expenses) from BTA Bank's previous management.

59.     Additionally, the Recovery Units provided that in the event of BTA Bank's default on its post-restructuring Senior Debt, the Recovery Units (which bore a notional $5 billion reference amount, representing approximately 50% of the assets sought to be recovered from BTA Bank's prior management) could be accelerated by holders of the Recovery Units and become an unconditional $5 billion obligation of BTA Bank *pari passu* to BTA Bank's Senior Debt.

60.     Yet in 2012, even though the Recovery Units issued in 2010 Restructuring could be accelerated upon a default by BTA Bank on its senior debt, and the full approximately $5 billion reference amount of the Recovery Units could then become an unconditional obligation of BTA Bank with the same level of priority as the senior debt, BTA Bank intentionally failed to disclose its liability for the Recovery Units.

61.     In a January 2012 PowerPoint presentation made in connection with the 2012 Restructuring, BTA Bank identified its *total* external liabilities – which included the approximately $2 billion in senior debt and $850 million in Subordinated Notes – as approximately $4.8 billion.  Thus, despite knowing that the full approximately $5 billion

reference amount of the Recovery Units would be accelerated and due and owing upon its

default on its senior debt, BTA Bank intentionally concealed its liability for the Recovery Units

in its January 2012 presentations made in connection with the 2012 Restructuring.

62.     Indeed, as late as March 19, 2012, BTA Bank represented in a PowerPoint

presentation to the Steering Committee for the 2012 Restructuring that its total liability for debt

securities issued –included the senior debt and Subordinated Notes, as well as the Recovery

Units – declined by 6.5% in its preliminary audited financial statements from previously issued

estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion).  BTA Bank

further misrepresented that this purported decrease in its liabilities was the result of a KZT 46

billion ($306 million) decrease in its liability on the Recovery Units.  In fact, BTA Bank knew at

the time it issued the PowerPoint presentation that it was liable for the full $5 billion reference

amount of the Recovery Units because it had defaulted on its senior debt and Subordinated

Notes.

63.     Once the true facts concerning BTA Bank's liability for the Recovery Units was

disclosed, the price of the Subordinated Notes declined even further, reflecting this additional $5

billion of liabilities senior to the Subordinated Notes in BTA Bank's capital structure.

## At All Relevant Times, S-K Exercised Control Over BTA Bank

64.     Prior to the 2010 Restructuring, Defendant owned at least a 75% interest in BTA

Bank's outstanding common stock.  As a result of its ownership of a substantial majority of the

outstanding common stock, Defendant had at all relevant times the power to direct and control

the affairs of BTA Bank.

65.     Defendant participated in and negotiated the terms of the 2010 Restructuring, and

was therefore aware of the information BTA Bank communicated to its debt holders and later, to

those who acquired securities issued through the Rule 144A Offering.  Defendant also controlled

BTA Bank in 2012, at the time of the 2012 Restructuring and BTA Bank's false and misleading statements and/or omissions concerning the impact of the Recovery Units on BTA Bank's total liabilities.

66.     Defendant was motivated to increase its own recovery in connection with the 2010 Restructuring and thereafter by negotiating restructuring terms that appeared fair to BTA Bank's creditors and potential investors, but in fact concealed that Defendant would receive extraordinary interest payments after the 2010 Restructuring, particularly from the Negative Carry Swap.  Omitting information about the Negative Carry Swap from the Information Memorandum increased the likelihood that creditors would approve the 2010 Restructuring and that potential investors, including Plaintiffs, would purchase Subordinated Notes, providing a steady flow of funds from BTA Bank to Defendant.

## CLAIMS FOR RELIEF

### COUNT I:  Control-Person Liability Under Section 15
### of the Securities Act for BTA Bank's Violation of Section 12
### of the Securities Act

67.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

68.     As stated above, BTA Bank made a number of material misstatements and omissions of material fact to potential acquirers of its Subordinated Notes in connection with the 2010 Restructuring and in the Information Memorandum disseminated by BTA Bank and in subsequent presentations to purchasers of those securities issued through the Rule 144A Offering.  These statements were false when made.

69.     These statements are not subject to the Safe Harbor for Forward Looking Statements provision of the Securities Act, 15 U.S.C. § 77z–2, because the misstatements were material and were unaccompanied by meaningful cautionary language.

20

70.     As stated above, Plaintiffs Atlantica and Baltica acquired Subordinated Notes through the Rule 144A Offering.

71.     In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the Information Memorandum and BTA Bank's presentations to potential acquirers of the Subordinated Notes.  Additionally, the material information BTA Bank omitted from the Information Memorandum and its investor presentations would have altered Plaintiffs' decision to acquire the Subordinated Notes.

72.     Plaintiffs' reliance was reasonable because BTA Bank's misstatements and omissions concerned information that would have influenced a reasonable investor.  Specifically, a reasonable investor in debt securities would consider the existence of the Negative Carry Swap, whether the issuer would continue as a going concern, and whether it would have sufficient cash flow to satisfy its debt obligations to be material to the investment decision.

73.     Subsequent to Plaintiffs' purchases of the Subordinated Notes, the Subordinated Notes lost substantially all of their value.

74.     At all relevant times, Defendant controlled more than 75% of the outstanding voting shares of BTA Bank.

75.     Defendant participated in negotiations for and substantially directed the terms of the 2010 Restructuring, in particular the Negative Carry Swap, which was a cause of BTA Bank's violation of § 12 of the Securities Act.

76.     As a control person of BTA Bank at all relevant times, Defendant is liable for BTA Bank's violations of § 12 of the Securities Act.

## COUNT II:  Defendant's Violations of Section 10(b) of the
## Exchange Act

77.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

78.     As set forth above, Defendant made a number of material misstatements and omissions of material fact in the S-K Undertaking, which was incorporated by reference into the Information Memorandum and disseminated to purchasers of securities issued through the Rule 144A Offering, as well as in post-offering public statements.

79.     These statements are not subject to the Safe-Harbor for Forward Looking Statements provisions of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements were material, were unaccompanied by meaningful cautionary language, and made with actual knowledge that the statement was false or misleading.

80.     These misrepresentations were made in connection with the Rule 144A Offering.

81.     Defendant made these misrepresentations with scienter.  Specifically, S-K Fund (i) made the misrepresentations with the intent to defraud Plaintiffs or did so recklessly; and (ii) had motive and opportunity to engage in the wrongful conduct, as set forth in Paragraphs 64 through 66, *supra*.

82.     These misrepresentations were made by means of the mails and interstate and international telecommunications networks.

83.     As stated above, Plaintiffs Atlantica and Baltica acquired Subordinated Notes through the Rule 144A Offering.  Additionally, after the 2010 Restructuring, all Plaintiffs acquired Subordinated Notes traceable to securities offered through the Rule 144A Offering.

84.     In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the S-K Undertaking and in Defendants' subsequent public statements.  Plaintiffs' reliance

was reasonable because Defendant's misstatements concerned information that would have influenced a reasonable investor.  Specifically, in making an investment decision, a reasonable investor in debt securities would consider the undertakings and public statements of the largest shareholder in the issuer, in addition to whether the issuer would continue as a going concern and whether it would have sufficient cash flow to satisfy its debt obligations.

85.     Subsequent to Plaintiffs' purchases the Subordinated Notes, the Subordinated Notes lost substantially all of their value.

### COUNT III:  Control-Person Liability Under Section 20 of the Exchange Act for BTA Bank's Violations of Section 10(b) of the Exchange Act

86.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

87.     As set forth above, BTA Bank made a number of material misstatements and omissions of material fact in the Information Memorandum disseminated to purchasers of securities issued through the Rule 144A Offering and in presentations made to its creditors after the offering and in connection with the 2012 Restructuring.

88.     These statements are not subject to the Safe-Harbor for Forward Looking Statements provisions of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements were material, were unaccompanied by meaningful cautionary language, and made with actual knowledge that the statement was false or misleading.

89.     These misrepresentations were made in connection with the Rule 144A Offering.

90.     BTA Bank made these misrepresentations with scienter.  Specifically, BTA Bank made the misrepresentations with the intent to defraud Plaintiffs or did so recklessly; and (ii) had motive and opportunity to engage in the wrongful conduct, as set forth in Paragraphs 39 and 44, *supra*.

91.     These misrepresentations were made by means of the mails and interstate and international telecommunications networks.

92.     As stated above, Plaintiffs Atlantica and Baltica acquired Subordinated Notes through the Rule 144A Offering.  Additionally, after the 2010 Restructuring, all Plaintiffs acquired Subordinated Notes traceable to securities offered through the Rule 144A Offering.

93.     In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the Information Memorandum and BTA Bank's subsequent presentations to its creditors after the offering and in connection with the 2012 Restructuring.  Plaintiffs' reliance was reasonable because BTA Bank's misstatements and omissions concerned information that would tend to influence a reasonable investor.  Specifically, a reasonable investor in debt securities would consider whether the issuer would continue as a going concern and whether it would have sufficient cash flow to satisfy its debt obligations, as well as the value of the Subordinated Notes in BTA Bank's capital structure.

94.     After Plaintiffs purchased the Subordinated Notes, the Subordinated Notes have lost substantially all of their value.

95.     At all relevant times, Defendant controlled over 75% of the outstanding voting shares of BTA Bank.

96.     Defendant participated in negotiations for and substantially directed the terms of the 2010 Restructuring, in particular the Negative Carry Swap, as well as BTA Bank's public statements in connection with the 2012 Restructuring , each of which was a cause of BTA Bank's violations of § 10(b) of the Exchange Act.

97.     As a control person of BTA Bank at all relevant times, Defendant is liable as a control person for BTA Bank's violations of § 10(b) of the Exchange Act.

24

## RELIEF REQUESTED

In consideration of the forgoing, Plaintiffs pray for relief and judgment:

      a.      awarding all damages and other remedies set forth in the Securities Act and the Exchange Act in favor of Plaintiffs against Defendant in an amount to be proven at trial, including interest thereon; and

      b.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: December 5, 2012

Respectfully submitted,

_____

Brett D. Jaffe
bjaffe@cohengresser.com
Alexis G. Stone
astone@cohengresser.com
COHEN & GRESSER LLP
800 Third Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 957-7600
Facsimile:   (212) 957-4514

*Attorneys for Plaintiffs Atlantica Holdings, Inc.,
Baltica Investment Holding, Inc., Blu Funds, Inc.,
Allan Kiblisky, Anthony Kiblisky, and Jacques
Gliksberg*

25

# Exhibit A

## EXHIBIT A
### Plaintiffs' Purchases of BTA Bank Subordinated Debt Securities

| Client | Purchase Date | Quantity |
|---|---|---|
| Atlantica Holdings, Inc. | 2010 Restructuring | $603,816 |
| | 9/8/2010 | $5,808,722 |
| | 9/9/2010 | $3,191,278 |
| | 9/21/2010 | $96,184 |
| | 2/3/2012 | $4,000,000 |
| | 2/7/2012 | $6,000,000 |
| | 2/13/2012 | $3,500,000 |
| | 2/16/2012 | $750,000 |
| | 2/27/2012 | $9,208,000 |
| | 3/7/2012 | $13,000,000 |
| | 3/23/2012 | $11,000,000 |
| | 3/26/2012 | $5,000,000 |
| | 3/30/2012 | $5,000,000 |
| | 10/16/2012 | $2,000,000 |
| | TOTAL | $69,158,000 |
| | | |
| Baltica Investment Holding, Inc. | 2010 Restructuring | $342,325 |
| | 9/9/2010 | $2,800,000 |
| | 9/21/2010 | $7,675 |
| | TOTAL | $3,150,000 |
| Blu Funds, Inc. | 4/4/2012 | $1,000,000 |
| | 4/10/2012 | $500,000 |
| | 4/13/2012 | $1,500,000 |
| | TOTAL | $3,000,000 |
| | | |
| Gliksberg, Jacques | 9/9/2010 | $6,847 |
| | 9/9/2010 | $50,000 |
| | 9/28/2010 | $3,153 |
| | 1/7/2011 | $200,000 |
| | 5/24/2011 | $100,000 |
| | 5/25/2011 | $100,000 |
| | TOTAL | $460,000 |
| | | |
| Kiblisky, Anthony | 1/7/2011 | $200,000 |
| | TOTAL | $200,000 |
| | | |
| Kiblisky, Allan | 1/7/2011 | $100,000 |
| | TOTAL | $100,000 |
| | | |
| | Total Purchases | $109,246,913 |