Brett D. Jaffe
bjaffe@cohengresser.com
Scott D. Thomson
sthomson@cohengresser.com
Alexis G. Stone
astone@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 957-7600
Facsimile: (212) 957-4514
*Attorneys for Plaintiffs*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------X

ATLANTICA HOLINDGS, INC., BALTICA
INVESTMENT HOLDING, INC., BLU FUNDS,
INC., Allan KIBLISKY, Anthony KIBLISKY, and
Jacques GLIKSBERG,

          *Plaintiffs*,

       – against –

SOVEREIGN WEALTH FUND "SAMRUK-
KAZYNA" JSC,

        a/k/a "National Welfare Fund 'Samruk-
        Kazyna,'"

          *Defendant*.

-------------------------------------------------X

Civ. No. 12 CV 8852 (JMF)

**ECF CASE**

**AMENDED COMPLAINT**

     Plaintiffs Atlantica Holdings, Inc., Baltica Investment Holding, Inc., Blu Funds Inc.,

Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs"), as and for

their Complaint against Defendant Sovereign Wealth Fund "Samruk-Kazyna" JSC, also known

as "National Welfare Fund 'Samruk-Kazyna'" ("Defendant" or "S-K Fund"), allege based on

knowledge as to their own individual conduct and information and belief as to the conduct of

others, as follows:

## INTRODUCTION

1.        This action arises from a massive scheme orchestrated by non-party BTA Bank JSC ("BTA Bank") and its controlling shareholder, Defendant S-K Fund, to induce Plaintiffs and other creditors of BTA Bank to acquire subordinated debt securities as part of a corporate debt restructuring of BTA Bank that began in April 2009 and was finalized in approximately August 2010 (the "2010 Restructuring"), and thereafter to purchase tens of millions of dollars of additional subordinated debt securities issued by BTA Bank.

2.        The 2010 Restructuring was carried out pursuant to an information memorandum issued by BTA Bank and distributed to existing creditors of BTA Bank, as well as potential purchasers of BTA Bank securities to be issued as part of the 2010 Restructuring (the "Information Memorandum"). The Information Memorandum, which expressly incorporated a deed of undertaking executed by S-K Fund (the "Deed of Undertaking" or "S-K Undertaking"), painted a misleadingly optimistic picture of BTA Bank's prospects following the 2010 Restructuring. Among other things, the Information Memorandum lauded BTA Bank's ability to attract new capital from depositors, due to its purportedly improved financial position as a result of the 2010 Restructuring.

3.        Most critically, the Information Memorandum and Deed of Undertaking emphasized that S-K Fund – whose equity ownership of BTA Bank would increase from approximately 75% to approximately 81% as a result of the 2010 Restructuring – had agreed, with very limited exceptions, to accept no dividends or distributions from BTA Bank.

4.        The Information Memorandum was false and misleading, and/or contained material omissions, because – unbeknownst to Plaintiffs and concealed in the Information Memorandum – S-K Fund and BTA Bank had devised a scheme to circumvent the express restriction on dividends to which S-K fund purportedly agreed. The scheme had several parts.

2

BTA Bank was directed to purchase S-K Fund bonds (the "S-K Bonds") that paid the bank an effective interest rate of just 2%. At the same time BTA Bank paid S-K Fund interest on its deposits at an exorbitant above-market rate of approximately 10% per annum. At S-K Fund's direction, BTA Bank also entered into a repo arrangement with the National Bank of Kazakhstan ("NBK"), collateralized by the S-K Bonds, that required it to pay 7.0% interest. The resulting "negative carry" of approximately $280 million annually (Kazakhstan tenge ("KZT") 42 billion annually) doomed any hope for a successful restructuring from the outset.

5.      This undisclosed scheme has resulted in net interest payments to S-K Fund of more than KZT 45 billion ($300 million) since the 2010 Restructuring. Yet, in the Information Memorandum, BTA Bank falsely and misleadingly disclosed that for the most recent period for which results were available, it had *earned* approximately KZT 20 billion ($137 million) in interest on the S-K Bonds and paid approximately KZT 4 billion ($28 million) in interest to customers (principally S-K Fund) on their deposits. These disclosures – all false and misleading when made – created the false impression that BTA Bank's relationship with S-K Fund was and would be profitable rather than a drain on BTA Bank's assets that would make failure of the 2010 Restructuring inevitable.

6.      As a result of these false and misleading statements and material omissions, set forth in detail below, S-K Fund has violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). BTA Bank has also violated Section 10(b) of the Exchange Act, and S-K Fund is liable for BTA Bank's violations as a control person under Section 20(a) of the Exchange Act.

## PARTIES AND RELEVANT NON-PARTIES

7.      Plaintiff Atlantica Holdings, Inc. ("Atlantica") is a corporation formed under the laws of the Republic of Panama. Atlantica acquired its initial investment in BTA Bank

subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum. Atlantica unconditionally committed to the 2010 Restructuring by a communication to its broker in the Miami, Florida, office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States. Thereafter, Atlantica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein. It made these purchases by placing orders with its broker in the Miami, Florida, office of UBS Financial Services. UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where funds from an account Atlantica maintained with UBS were transferred internally to UBS's back office, where the order was filled and the transaction was completed. Therefore, Atlantica incurred irrevocable liability to pay for the securities at issue in the United States.

8.      Plaintiff Baltica Investment Holding, Inc. ("Baltica") is a corporation formed under the laws of the Republic of Panama. Baltica acquired its initial investment in BTA Bank subordinated debt in connection with the 2010 Restructuring and in reliance on the Information Memorandum. Baltica unconditionally committed to the 2010 Restructuring by a communication to its broker in the Miami, Florida, office of UBS Financial Services, and thereby incurred irrevocable liability to accept the subordinated debt in the 2010 Restructuring in the United States. Thereafter, Baltica purchased additional subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein. It made this purchase by placing an order with its broker in the Miami, Florida, office of UBS

4

Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in

New York, New York, where funds from an account Baltica maintained with UBS were

transferred internally to UBS's back office, where the order was filled and the transaction was

completed.  Therefore, Baltica incurred irrevocable liability to pay for the securities at issue in

the United States.

       9.      Plaintiff Blu Funds, Inc. ("Blu Funds") is a corporation formed under the laws of

the Republic of Panama.  After the 2010 Restructuring, Blu Funds purchased subordinated debt

of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in

reliance on the Information Memorandum.  It made this purchase by placing an order with its

broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then

transmitted the order to its broker-dealer in New York, New York, where funds from an account

Blu Funds maintained with UBS were transferred internally to UBS's back office, where the

order was filled and the transaction was completed.  Therefore, Blu Funds incurred irrevocable

liability to pay for the securities at issue in the United States.

      10.     Plaintiff Allan Kiblisky resides in Miami, Florida.  After the 2010 Restructuring,

Allan Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in

connection with the 2010 Restructuring and in reliance on the Information Memorandum and

certain other false and misleading statements described herein.  He made this purchase by

placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS

Financial Services then transmitted the order to its broker-dealer in New York, New York, where

funds from an account Allan Kiblisky maintained with UBS were transferred internally to UBS's

back office, where the order was filled and the transaction was completed.  Therefore, Allan

Kiblisky incurred irrevocable liability to pay for the securities at issue in the United States.

11.     Plaintiff Anthony Kiblisky resides in Miami, Florida.  After the 2010 Restructuring, Anthony Kiblisky purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  He made this purchase by placing an order with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where funds from an account Anthony Kiblisky maintained with UBS were transferred internally to UBS's back office, where the order was filled and the transaction was completed.  Therefore, Anthony Kiblisky incurred irrevocable liability to pay for the securities at issue in the United States.

12.     Plaintiff Jacques Gliksberg ("Gliksberg") resides in Highland Park, Illinois.  After the 2010 Restructuring, Gliksberg purchased subordinated debt of BTA Bank traceable to securities issued in connection with the 2010 Restructuring and in reliance on the Information Memorandum and certain other false and misleading statements described herein.  He made these purchases by placing orders with his broker in the Miami, Florida, office of UBS Financial Services.  UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where funds from an account Gliksberg maintained with UBS were transferred internally to UBS's back office, where the order was filled and the transaction was completed.  Therefore, Gliksberg incurred irrevocable liability to pay for the securities at issue in the United States.

13.     Annexed hereto as Exhibit A is a chart showing the date and amount of each Plaintiff's investment in the subordinated debt of BTA Bank.

14.    Defendant S-K Fund is a sovereign wealth fund formed under the laws of the Republic of Kazakhstan and owned entirely by the Republic of Kazakhstan. It was founded in 2008 following a merger of two predecessor funds, Kazakhstan Holding for the Management of State Assets "Samruk" and "Kazyna" Sustainable Development Fund. According to the Fund's own public statements, it controls more than 500 companies "in the key areas of the national economy," including banking, oil and gas, mining, chemicals, transport and communication, and electricity. S-K Fund describes itself as an "active business model" whose primary purpose is investment in commercial activities:

> [S-K Fund] plays a key role in modernization and diversification of the economy of Kazakhstan; it is actively involved in the rapid industrialization of the country, implements a number of large projects and plans new ones. The total investment program of the Fund has 157 investment projects for $101 billion, of which 74 investment projects are currently being implemented for $54 billion.

"Kazakhstan Sovereign Wealth Fund Expands the Investment Horizons," PR Newswire Jan. 29, 2013.

15.    Pursuant to 28 U.S.C.A. §1605(a)(2), S-K Fund is not immune from suit in this Court. As described herein, S-K Fund's actions outside the territory of the United States in connection with a commercial activity of S-K elsewhere caused a direct injury in the United States. Moreover, at all relevant times S-K Fund so controlled and dominated BTA Bank that BTA Bank's commercial activities can be imputed to S-K Fund.

16.    Non-party BTA Bank is a joint-stock company organized under the laws of the Republic of Kazakhstan. It was formed in 1997 by decree of the Republic of Kazakhstan as a combination of two predecessor institutions, Turanbank Joint-Stock Bank and Alem Bank Kazakhstan. BTA Bank is not named as a defendant herein because, as a result of the scheme described in this Complaint, BTA Bank is currently undergoing a second restructuring (the "2012 Restructuring"). In connection with the 2012 Restructuring, BTA Bank has filed a

petition under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court of the Southern District of New York to protect itself from creditors in the United States, including holders of BTA Bank's debt securities.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this action because it arises under Sections 10(b) and 20(a) of the Exchange Act.

18.     The Court has jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     The Court has jurisdiction over the Plaintiffs' claims because Defendant's extraterritorial activity caused a direct effect in the United States. 28 U.S.C.A. § 1605(a)(2). Among other things, Defendant's conduct caused the following direct effects on the United States:

- As part of the 2010 Restructuring and at S-K's direction, BTA Bank issued, *inter alia*, Senior Dollar Notes, Dollar Original Issue Discount Notes, and Dollar Subordinated Notes (such Dollar Subordinated Notes, the "Subordinated Notes"). All of these notes were denominated in U.S. dollars.

- The Information Memorandum provided that principal and interest payments on all of these securities, including the Subordinated Notes at issue here, were to be made at the payee's bank in New York City.

- BTA Bank and S-K Fund represented in the Information Memorandum that the 2010 Restructuring was effective in the United States (among other jurisdictions), marketed the securities extensively in the United States, and directed that marketing to U.S. investors.

- Following the 2010 Restructuring, BTA Bank and S-K Fund representatives traveled to the United States to meet with investors and describe the bank's activities.

- At S-K Fund's direction, BTA Bank defaulted on its debt securities, including the Subordinated Notes, such that payments that were supposed to have been delivered in the United States were not made to Plaintiffs.

- S-K Fund made false and misleading statements regarding BTA Bank that it reasonably understood would be disseminated in the United States and upon which United States investors would rely.

- S-K Fund established a subsidiary for the purpose of marketing S-K Fund's investment in BTA Bank to potential investors including, on information and belief, investors in the United States.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Defendant directed misstatements and omissions – and knowingly assisted and participated in BTA Bank's omissions and transmissions of misstatements – towards Plaintiffs and their agents in this District.  Defendant knew that its public representations in the Deed of Undertaking and regarding BTA Bank's financial condition would be disseminated throughout the United States, and especially in this District, which is widely recognized as a hub of the global financial markets.

21.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because substantial acts in furtherance of the alleged fraud and of its effects have occurred within this District.  Specifically, Defendant and BTA Bank offered securities for sale in this District, and payments on those securities were made and were to be made in this District.  Defendant also

directed misstatements and omissions – and knowingly participated in BTA Bank's omissions and transmissions of misstatements – towards purchasers of BTA Bank securities within this District.

22.     In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3), because Defendant is subject to this Court's personal jurisdiction.

23.     In connection with the acts alleged herein, Defendant used the means and instrumentalities of interstate commerce, including but not limited to the United States mails and interstate and international telecommunications networks.

### FACTUAL ALLEGATIONS

### Background to the 2010 Restructuring

24.     BTA Bank is one of Kazakhstan's largest banking institutions.  BTA Bank has an international presence, with offices in the Russian Federation, United Arab Emirates, Great Britain, and China.  BTA Bank offers a range of traditional corporate and retail banking products and services to its customers.

25.     Prior to the 2010 Restructuring, several Plaintiffs purchased debt securities issued by BTA Bank.

26.     On February 3, 2009, Defendant S-K Fund invested KZT 212 billion (approximately $1.5 billion) in BTA Bank, receiving a 75.1% stake in the common stock of BTA Bank in exchange.  That same day, an S-K Fund representative was appointed to BTA Bank's Management Board.

27.     In April 2009, BTA Bank announced that it had ceased payment of principal on all outstanding BTA Bank financial obligations.

28.     Thereafter, BTA Bank, at the direction of its controlling shareholder, S-K Fund, undertook to restructure BTA Bank's debt and overall capital structure. The product of that effort was the 2010 Restructuring.

29.     In support of the 2010 Restructuring, BTA Bank distributed the Information Memorandum to BTA Bank's creditors, including Plaintiffs and other debt holders. BTA Bank represented that the Information Memorandum comprehensively detailed the terms of the 2010 Restructuring, and the intended effect of the 2010 Restructuring on BTA Bank's future operations. Defendant's dominance of and control over BTA Bank, extensive participation in the negotiation of the terms of the 2010 Restructuring, and the inclusion in the Information Memorandum of certain statements from S-K Fund by reference establish that S-K Fund was involved in the production of the Information Memorandum and was aware of its contents.

30.     On May 28, 2010, in reliance upon the Information Memorandum, BTA Bank's creditors, including Plaintiffs, approved the terms of the 2010 Restructuring as presented by BTA Bank.

31.     Under the terms of the 2010 Restructuring, Defendant received additional equity in BTA Bank such that it came to own more than 80% of the common stock of BTA Bank.

32.     In accordance with the terms of the 2010 Restructuring, BTA Bank issued equity and debt securities to pre-restructuring holders of its debt. In the United States, BTA Bank issued, *inter alia*, the Subordinated Notes in an exempt offering. Resale of the Subordinated Notes to certain qualified purchasers in the United States, including Plaintiffs, was permitted pursuant to United States Securities and Exchange Commission Rule 144A (the "Rule 144A Offering"). Eighty percent of the securities issued in connection with the 2010 Restructuring were denominated in U.S. dollars. According to a presentation prepared by BTA Bank for

foreign investors, 25% of the Notes issued in the 2010 Restructuring were purchased by investors in the United States.

33.    In reliance on the misrepresentations contained in the Information Memorandum, Atlantica and Baltica accepted Subordinated Notes pursuant to the Rule 144A Offering, in exchange for their prior interest as creditors of BTA Bank.

34.    In reliance on the misrepresentations contained in the Information Memorandum, Allan Kiblisky, Anthony Kiblisky, Gliksberg, Atlantica, Baltica, and Blu Funds purchased Subordinated Notes, which were traceable to securities issued by BTA Bank in the Rule 144A Offering.

<u>The Information Memorandum Contains Material Misstatements<br>and Omissions</u>

35.    While Plaintiffs relied on the Information Memorandum in connection with their acquisition of the Subordinated Notes in the course of the 2010 Restructuring and in the post-restructuring Rule 144A Offering, they did so without knowledge of material misstatements and omissions in the Information Memorandum.

36.    As a threshold matter, the Information Memorandum disseminated in connection with the Rule 144A Offering contained a number of material misstatements concerning BTA Bank's post-restructuring prospects, and the role that S-K Fund would play in ensuring BTA Bank's future viability.  Among other things, the Information Memorandum expressly represented that:

        a.    "The Bank believes that the Restructuring will allow the Bank to continue as a going concern."

        b.    "The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by

virtue of the economic gain it will achieve from the reduction of the

principal amount of the Bank's indebtedness, conversion of certain debt

into Shares and *liquidity support to be provided by [S-K Fund]*."

(emphasis added).

c.    "[S-K Fund's] primary objective is to manage [BTA Bank] with *a goal of*

*maximizing long term value* and increasing competitiveness of such legal

entities in world markets." (emphasis added).

37.    Each of these statements was false and, at the time they were made, BTA Bank

and S-K Fund knew they were false.  Contrary to the representations made in the Information

Memorandum, BTA Bank and S-K Fund knew that the 2010 Restructuring would doom BTA

Bank to failure, enriching S-K Fund at the expense of Plaintiffs and other BTA Bank creditors.

<u>S-K Fund and BTA Bank Devise the Negative Carry Swap to</u>
<u>Funnel Cash to S-K Fund</u>

38.    The Information Memorandum incorporated by reference a Deed of Undertaking

executed by Defendant in favor of all creditors participating in the 2010 Restructuring.  This

Deed of Undertaking contained a number of materially false and misleading misstatements.

Most significantly, the Information Memorandum stated that "[n]o dividend other than a

Permitted Dividend shall be paid on the Shares," in BTA Bank held by S-K Fund.

39.    The term "Permitted Dividend" was defined in the Information Memorandum to

include only "a dividend or distribution by the Bank to its Shareholders:  (a) at any time after the

New Notes [a collective term for all the securities issued pursuant to the 2010 Restructuring,

including the Subordinated Notes] have been irrevocably repaid in full; (b) at any time after the

New Notes have been irrevocably repaid in full *provided that* [certain conditions would have

been met], or (c) at any time after the date falling seven years after the Restructuring date

*provided that* [certain other conditions would have been met]." None of these restrictions were satisfied at any point after the 2010 Restructuring, yet Defendant nevertheless used its position as the controlling shareholder to extract the equivalent of an impermissible dividend from BTA Bank.

40.    The Deed of Undertaking was executed "in favour of the Restructuring Creditors (and, for the avoidance of doubt, their direct or indirect transferees) and the New Notes Trustees." Therefore, Defendant and BTA Bank were aware of and intended that their undertakings and representations would be relied upon by potential purchasers of the securities issued in connection with the 2010 Restructuring.

41.    But wholly undisclosed in the Information Memorandum was that the real purpose of the 2010 Restructuring was to enable Defendant to siphon hundreds of millions of dollars from BTA Bank at the expense of other creditors including those, like several of the Plaintiffs, who already saw their debt position significantly reduced in connection with the 2010 Restructuring. Specifically, under the terms of the 2010 Restructuring, BTA Bank was directed to purchase KZT 645 billion ($4.3 billion) of S-K Bonds paying a nominal return of 4% per year to BTA Bank. BTA Bank also was required to pay 2% on this sum in exchange for a guarantee from the S-K Fund, so that the effective interest rate on the S-K Bonds was only 2%. This minimal return was more than offset by two extremely unfavorable related transactions. Shortly before the 2010 Restructuring, S-K Fund deposited KZT 245 billion ($1.6 billion) with BTA Bank (the "S-K Deposit"). The S-K Deposit earned variable but extremely high rates of interest, reaching 10.9%. In addition, at the S-K Fund's direction, BTA Bank entered into a repo transaction with NBK on approximately KZT 400 billion ($2.7 billion) that required it to pay 7% interest to the national bank. The net result of this arrangement (the "Negative Carry Swap")

was that S-K Fund received interest from BTA Bank on its deposits far above market rates in the period following the 2010 Restructuring, while BTA Bank received minimal interest payments from S-K Fund. This Negative Carry Swap resulted in material declines in BTA Bank's cash flow.

42.     During and after the 2010 Restructuring, BTA Bank and Defendant knew of the Negative Carry Swap, and were specifically aware of the strongly negative impact that this arrangement had on BTA Bank's cash flow after the 2010 Restructuring.

43.     Additional disclosures in the Information Memorandum were false and misleading in that they further obscured the Negative Carry Swap and the deleterious effect of that transaction on BTA Bank's cash flow and prospects. The Information Memorandum stated that as of September 30, 2009, BTA Bank's interest income on the S-K Bonds for the nine months prior was KZT 20,502,000,000 ($137 million), and that its interest expense on amounts due to customers (principally S-K Fund) for the nine months prior was KZT 4,214,000,000 ($28 million). This misstatement was misleading because, as discussed above with respect to the Negative Carry Swap, at the time that the 2010 Restructuring was approved, interest expenses due to S-K Fund far exceeded interest income received from S-K Fund.

44.     In addition, the Information Memorandum falsely and misleadingly disclosed that "current accounts generally bear no interest," when in fact S-K Fund had current account deposits in excess of KZT 245 billion with BTA Bank, and was receiving interest payments as high as 10.9%. On an annual basis, BTA Bank paid approximately KZT 68 billion ($453 million) in interest on S-K deposits, the S-K guarantee, and the NBK repo transaction, while receiving only KZT 26 billion ($173 million) in bond interest payments from S-K Fund, resulting in an annual negative carry of KZT 42 billion ($280 million).

45.     The misstatements contained in the Information Memorandum described above, including those incorporated by reference into the S-K Undertaking, were false and misleading because they were intended to create and did create the false impression that the 2010 Restructuring would preserve BTA Bank's status as a going concern and its ability to make future payments on its debt obligations.  Defendant and BTA Bank knew that the 2010 Restructuring was only a temporary fix and that under any realistic projection of BTA Bank's future cash flows, an additional restructuring would be necessary, and intentionally concealed these facts during the 2010 Restructuring to enable Defendant to obtain hundreds of millions of dollars from the Negative Carry Swap at the expense of BTA Bank's creditors, including Plaintiffs.

46.     BTA Bank was motivated to negotiate terms favorable to Defendant in the 2010 Restructuring that appeared fair to BTA Bank's creditors and potential investors, but in fact concealed that BTA Bank would make extraordinary interest payments after the 2010 Restructuring, particularly from the Negative Carry Swap.  Omitting information about the Negative Carry Swap from the Information Memorandum, and misrepresenting its relationship with S-K Fund as one intended to "maximiz[e] long term value and increas[e] [BTA Bank's] competitiveness . . . in world markets," improved the appearance of BTA Bank as a going concern, thereby increasing the likelihood that creditors would approve the 2010 Restructuring and that potential investors, including Plaintiffs, would purchase Subordinated Notes.  This allowed BTA Bank to continue to provide Defendant with a steady flow of funds.

47.     Prior to acquiring or purchasing the Subordinated Notes, Plaintiffs (or the agents of the Plaintiffs) read the Information Memorandum and the S-K Undertaking and were

informed about the public misstatements made by BTA Bank and Defendant during investor presentations through media reports.

48.     Information about the Negative Carry Swap began to be leaked to the marketplace in or about May 2011.  BTA Bank issued a set of PowerPoint slides entitled the "Investor Call Presentation" on May 17, 2011, in which it disclosed on page 24 of a 24-page presentation that one of the outstanding issues that needed to be addressed was "negative carry."  Even then, however, BTA Bank disclosed in writing only that its yield on all assets averaged 5.5% while its average cost for all liabilities was 8.6% – but it did not disclose that the driving force behind its overall negative carry was the Negative Carry Swap.

49.     The following day, May 18, 2011, J.P. Morgan published a research report providing limited additional details concerning the Negative Carry Swap.  Specifically, J.P. Morgan reported that on a conference call with investors on May 17, 2011, BTA Bank disclosed that the average interest rate on deposits held by the S-K Fund was 9.8%, which was significantly more than the interest rate BTA Bank earned on its assets.

50.     In response to these disclosures, the price of BTA Bank debt, including the Subordinated Notes, dropped significantly.  The Subordinated Notes, which had been trading for approximately 70% of face value prior to the May 17 and 18 disclosures, immediately fell to less than 60% of face value and continued their downward slide to approximately 40% of face value by the end of June 2011 and to less than 10% of face value by January 2012.

S-K Fund Makes Additional False and
Misleading Statements in 2011

51.     After the sharp drop in the price of BTA Bank's debt following the initial disclosure of the Negative Carry Swap in May 2011, S-K Fund made numerous additional public misstatements on its own behalf, which were directed at potential purchasers of the Subordinated

Notes, in an effort to prop up the price of the Subordinated Notes and other BTA Bank debt securities. These statements materially misrepresented that Defendant intended to provide additional and ongoing financial support to BTA Bank in order to prevent a second debt reorganization.

52.     These false and misleading statements included the following:

a.     According to a statement published in this District and elsewhere by *Bloomberg* on July 7, 2011, in an interview of July 5, 2011, Aidan Karibzhanov ("Karibzhanov"), a Deputy Chief Executive Officer at Defendant with the authority to speak for S-K Fund, stated that, "I don't think BTA Bank will have to restructure debt or face bankruptcy, but we will provide financing to BTA Bank if needed." With regard to public allegations that S-K and the Republic of Kazakhstan were paying lower than market rates on money borrowed from BTA Bank – allegations now known to be true, and a key component of the Negative Carry Swap Scheme – Karibzhanov further said that Defendant would "sort out the situation with the bonds," and that Defendant would "not let [BTA Bank] get into trouble."

b.     According to a statement published in this District and elsewhere by *Bloomberg* on October 4, 2011, in response to public concerns about a potential BTA Bank default, the Chairman of Defendant publicly stated that "BTA Bank will certainly be supported by the government."

c.     According to a statement published in this District and elsewhere by Interfax, Reuters, NewsKaz, and Zakon on November 30, 2011,

Karibzhanov stated that Defendant would work out support measures for BTA Bank and, while recognizing that BTA Bank would need to raise additional capital, also represented that Defendant was working to develop "a clear plan for restoring BTA Bank's capital."

d.   According to a statement published in this District and elsewhere by Reuters on November 30, 2011, Karibzhanov stated that Defendant and BTA Bank were working on a business plan to "reload" the bank.

e.   According to a statement published in this District and elsewhere by Interfax on December 15, 2011, Peter House, a managing director at Defendant, publicly represented that Defendant was not considering a potential bankruptcy for BTA Bank.

53.   Defendant made these statements with knowledge and intent that they would be published internationally and in this District.

54.   Defendant made these statements without any basis in fact, and with actual knowledge that a second restructuring would be necessary because, due in part to the deleterious cash flow impact of the Negative Carry Swap, BTA Bank was unable to continue as a going concern or to satisfy its debt obligations, and S-K Fund in fact had no intent to provide the financing necessary for BTA Bank to survive.

55.   The misrepresentations were material because they created the false impression that the 2010 Restructuring was intended to and would result in the repayment of creditors according to the terms approved by the creditors and by the Specialized Financial Court of Kazakhstan.  In making a decision to invest in Subordinated Notes of the reorganized BTA

Bank, a reasonable investor would have considered statements and undertakings by BTA Bank itself, as well as those of Defendant, its controlling shareholder.

56.     As noted above, however, these misstatements delayed but did not prevent the significant drop in value of BTA Bank's Subordinated Notes, which had fallen to less than 10% of face value by January 2012.

57.     Although publicly claiming that the 2010 Restructuring would strengthen BTA Bank and allow it to continue as a going concern, BTA Bank defaulted on its debt obligations in January 2012 (less than 18 months after the 2010 Restructuring was finalized), for the first time signaling that might be unable to continue as a going concern and that it would not be able to satisfy its debt obligations.  BTA Bank is currently undergoing the 2012 Restructuring.  As a result of the 2012 Restructuring, S-K Fund has become a 97 percent owner of BTA Bank.

BTA Bank Makes Additional
False and Misleading Statements in 2012

58.     Following BTA Bank's default on its debt obligations, certain of the Plaintiffs purchased additional Subordinated Notes in the first quarter of 2012.  Those purchases were made based upon an examination of BTA Bank's reported balance sheet and other financial information, and an analysis of the value of the Subordinated Notes in the event of a second restructuring or a liquidation.

59.     Throughout this time period, however, BTA Bank misrepresented critical financial information to Plaintiffs and other investors and potential investors.  Most significantly, BTA Bank misrepresented the impact "Recovery Units" issued in connection with the 2010 Restructuring could have on its total liquidation.

60.     The purpose of the Recovery Units, issued to various creditors in connection with the 2010 Restructuring, was to provide those creditors an interest in BTA Bank's efforts to

20

recover approximately $10 billion in BTA Bank assets unlawfully diverted from BTA Bank by BTA Bank's former management prior to the 2010 Restructuring. Under the terms of the Recovery Units, holders of the Recovery Units and BTA Bank would each be entitled to 50% of all funds recovered (net of expenses) from BTA Bank's previous management.

61.     Additionally, the Recovery Units provided that in the event of BTA Bank's default on its senior debt issued in the 2010 Restructuring, the Recovery Units (which bore a notional $5 billion reference amount, representing approximately 50% of the assets sought to be recovered from BTA Bank's prior management) could be accelerated by holders of the Recovery Units and become an unconditional $5 billion obligation of BTA Bank *pari passu* to BTA Bank's senior debt.

62.     Yet in 2012, even though the Recovery Units issued in the 2010 Restructuring could be accelerated upon a default by BTA Bank on its senior debt, and the full approximately $5 billion reference amount of the Recovery Units could then become an unconditional obligation of BTA Bank with the same level of priority as the senior debt, BTA Bank intentionally failed to disclose its liability for the Recovery Units.

63.     In a January 2012 PowerPoint presentation made in connection with the 2012 Restructuring, BTA Bank identified its *total* external liabilities – which included the approximately $2 billion in senior debt and $850 million in Subordinated Notes – as approximately $4.8 billion. Thus, despite knowing that the full approximately $5 billion reference amount of the Recovery Units would be accelerated and due and owing upon its default on its senior debt, BTA Bank intentionally concealed its liability for the Recovery Units in its January 2012 presentations made in connection with the 2012 Restructuring.

64.     Indeed, as late as March 19, 2012, BTA Bank represented in a PowerPoint presentation to the Steering Committee for the 2012 Restructuring that its total liability for debt securities issued – including the senior debt and Subordinated Notes, as well as the Recovery Units – declined by 6.5% in its preliminary audited financial statements from previously issued estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion).  BTA Bank further misrepresented that this purported decrease in its liabilities was the result of a KZT 46 billion ($306 million) decrease in its liability on the Recovery Units.  In fact, BTA Bank knew at the time it issued the PowerPoint presentation that it was liable for the full $5 billion reference amount of the Recovery Units because it had already defaulted on its senior debt and Subordinated Notes.

65.     Once the true facts concerning BTA Bank's liability for the Recovery Units was disclosed, the price of the Subordinated Notes declined even further, reflecting this additional $5 billion of liabilities senior to the Subordinated Notes in BTA Bank's capital structure.

At All Relevant Times, S-K Fund Exercised Control Over BTA Bank

66.     Prior to the 2010 Restructuring, Defendant owned at least a 75% interest in BTA Bank's outstanding common stock.  As a result of its ownership of a substantial majority of the outstanding common stock, Defendant had at all relevant times the power to direct and control the affairs of BTA Bank.  Defendant exercised that control and, at all relevant times, dominated and controlled BTA Bank.

67.     Defendant participated in and negotiated the terms of the 2010 Restructuring, and was therefore aware of the information BTA Bank communicated to its debt holders and later, to those who acquired securities issued through the Rule 144A Offering.  Defendant also controlled BTA Bank in 2012, at the time of the 2012 Restructuring and BTA Bank's false and misleading

statements and/or omissions concerning the impact of the Recovery Units on BTA Bank's total liabilities.

68.     Defendant was motivated to increase its own recovery in connection with the 2010 Restructuring and thereafter by negotiating restructuring terms that appeared fair to BTA Bank's creditors and potential investors, but in fact concealed that Defendant would receive extraordinary interest payments after the 2010 Restructuring, particularly from the Negative Carry Swap. Omitting information about the Negative Carry Swap from the Information Memorandum increased the likelihood that creditors would approve the 2010 Restructuring and that potential investors, including Plaintiffs, would purchase Subordinated Notes, providing a steady flow of funds from BTA Bank to Defendant. Similarly, Defendant was motivated to make false and misleading statements in 2012 in order to prop up the value of the Subordinated Notes and other BTA Bank securities, and to ensure the completion of the 2012 Restructuring.

**CLAIMS FOR RELIEF**

**COUNT I:  Defendant's Violations of Section 10(b) of the
Exchange Act**

69.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

70.     As set forth above, Defendant made a number of material misstatements and omissions of material fact in the S-K Undertaking, which was incorporated by reference into the Information Memorandum and disseminated to purchasers of securities issued through the Rule 144A Offering, as well as in post-offering public statements. BTA Bank also made a number of material misstatements and omissions of material fact in the Information Memorandum and elsewhere. Because Defendant dominated and controlled BTA Bank, Defendant is liable for BTA Bank's misstatements and omissions, as well as its own.

23

71.     These statements are not subject to the Safe-Harbor for Forward Looking Statements provisions of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements were material, were unaccompanied by meaningful cautionary language, and made with actual knowledge that the statement was false or misleading.

72.     These misrepresentations were made in connection with the Rule 144A Offering, as well as the subsequent purchase and sale of the Subordinated Notes.

73.     Defendant made these misrepresentations with scienter.  Specifically, S-K Fund (i) made the misrepresentations with the intent to defraud Plaintiffs or did so recklessly; and (ii) had motive and opportunity to engage in the wrongful conduct, as set forth in Paragraphs 66 through 68, *supra*.

74.     These misrepresentations were made by means of the mails and interstate and international telecommunications networks.

75.     As stated above, Plaintiffs Atlantica and Baltica acquired Subordinated Notes through the Rule 144A Offering.  Additionally, after the 2010 Restructuring, all Plaintiffs acquired Subordinated Notes traceable to securities offered through the Rule 144A Offering.

76.     In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the S-K Undertaking and in Defendant's subsequent public statements.  Plaintiffs' reliance was reasonable because Defendant's misstatements concerned information that would have influenced a reasonable investor.  Specifically, in making an investment decision, a reasonable investor in debt securities would consider the undertakings and public statements of the controlling shareholder in the issuer, in addition to whether the issuer would continue as a going concern and whether it would have sufficient cash flow to satisfy its debt obligations.

77.     Subsequent to Plaintiffs' purchases, the Subordinated Notes lost substantially all of their value.

### COUNT II:  Control-Person Liability Under Section 20 of the Exchange Act for BTA Bank's Violations of Section 10(b) of the Exchange Act

78.     Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

79.     As set forth above, BTA Bank made a number of material misstatements and omissions of material fact in the Information Memorandum disseminated to purchasers of securities issued through the Rule 144A Offering and in presentations made to its creditors after the offering and in connection with the 2012 Restructuring.

80.     These statements are not subject to the Safe-Harbor for Forward Looking Statements provisions of the Exchange Act, 15 U.S.C. § 78u-5(c), because the misstatements were material, were unaccompanied by meaningful cautionary language, and made with actual knowledge that the statement was false or misleading.

81.     These misrepresentations were made in connection with the Rule 144A Offering, as well as the subsequent purchase and sale of the Subordinated Notes.

82.     BTA Bank made these misrepresentations with scienter.  Specifically, BTA Bank (i) made the misrepresentations with the intent to defraud Plaintiffs or did so recklessly; and (ii) had motive and opportunity to engage in the wrongful conduct, as set forth in Paragraphs 41 through 46 *supra*.

83.     These misrepresentations were made by means of the mails and interstate and international telecommunications networks.

84.     As stated above, Plaintiffs Atlantica and Baltica acquired Subordinated Notes through the Rule 144A Offering.  Additionally, after the 2010 Restructuring, all Plaintiffs acquired Subordinated Notes traceable to securities offered through the Rule 144A Offering.

85.     In acquiring the Subordinated Notes, Plaintiffs reasonably relied on the statements in the Information Memorandum and BTA Bank's subsequent presentations to its creditors after the offering and in connection with the 2012 Restructuring.  Plaintiffs' reliance was reasonable because BTA Bank's misstatements and omissions concerned information that would tend to influence a reasonable investor.  Specifically, a reasonable investor in debt securities would consider whether the issuer would continue as a going concern and whether it would have sufficient cash flow to satisfy its debt obligations, as well as the value of the Subordinated Notes in BTA Bank's capital structure.

86.     After Plaintiffs purchased the Subordinated Notes, the Subordinated Notes have lost substantially all of their value.

87.     At all relevant times, Defendant controlled over 75% of the outstanding voting shares of BTA Bank.

88.     Defendant participated in negotiations for and substantially directed the terms of the 2010 Restructuring, in particular the Negative Carry Swap, as well as BTA Bank's public statements in connection with the 2012 Restructuring, each of which was a cause of BTA Bank's violations of § 10(b) of the Exchange Act.

89.     As a control person of BTA Bank at all relevant times, Defendant is liable as a control person for BTA Bank's violations of § 10(b) of the Exchange Act.

## RELIEF REQUESTED

In consideration of the forgoing, Plaintiffs pray for relief and judgment:

a.   awarding all damages and other remedies set forth in the Exchange Act in favor of Plaintiffs against Defendant in an amount to be proven at trial, including interest thereon; and

b.   such other and further relief as the Court may deem just and proper.

Dated:  April 4, 2012                              Respectfully submitted,

_____
Brett D. Jaffe
bjaffe@cohengresser.com
Scott D. Thomson
sthomson@cohengresser.com
Alexis G. Stone
astone@cohengresser.com
COHEN & GRESSER LLP
800 Third Avenue, 21st Floor
New York, NY  10022
Telephone:  (212) 957-7600
Facsimile:   (212) 957-4514

*Attorneys for Plaintiffs Atlantica Holdings, Inc.,
Baltica Investment Holding, Inc., Blu Funds, Inc.,
Allan Kiblisky, Anthony Kiblisky, and Jacques
Gliksberg*

# EXHIBIT A

**EXHIBIT A**
**Plaintiffs' Purchases of BTA Bank Subordinated Debt Securities**

| Client | Purchase Date | Quantity |
|---|---|---|
| Atlantica Holdings, Inc. | 2010 Restructuring | $603,816 |
| | 9/8/2010 | $5,808,722 |
| | 9/9/2010 | $3,191,278 |
| | 9/21/2010 | $96,184 |
| | 2/3/2012 | $4,000,000 |
| | 2/7/2012 | $6,000,000 |
| | 2/13/2012 | $3,500,000 |
| | 2/16/2012 | $750,000 |
| | 2/27/2012 | $9,208,000 |
| | 3/7/2012 | $13,000,000 |
| | 3/23/2012 | $11,000,000 |
| | 3/26/2012 | $5,000,000 |
| | 3/30/2012 | $5,000,000 |
| | 10/16/2012 | $2,000,000 |
| | TOTAL | $69,158,000 |
| | | |
| Baltica Investment Holding, Inc. | 2010 Restructuring | $342,325 |
| | 9/9/2010 | $2,800,000 |
| | 9/21/2010 | $7,675 |
| | TOTAL | $3,150,000 |
| Blu Funds, Inc. | 4/4/2012 | $1,000,000 |
| | 4/10/2012 | $500,000 |
| | 4/13/2012 | $1,500,000 |
| | TOTAL | $3,000,000 |
| | | |
| Gliksberg, Jacques | 9/9/2010 | $6,847 |
| | 9/9/2010 | $50,000 |
| | 9/28/2010 | $3,153 |
| | 1/7/2011 | $200,000 |
| | 5/24/2011 | $100,000 |
| | 5/25/2011 | $100,000 |
| | TOTAL | $460,000 |
| | | |
| Kiblisky, Anthony | 1/7/2011 | $200,000 |
| | TOTAL | $200,000 |
| | | |
| Kiblisky, Allan | 1/7/2011 | $100,000 |
| | TOTAL | $100,000 |
| | | |
| | Total Purchases | $76,068,000 |