UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

ATLANTICA HOLDINGS, INC., BALTICA     :
INVESTMENT HOLDING, INC., BLU FUNDS,   :
INC., Allan KIBLISKY, Anthony KIBLISKY, and  :
Jacques GLIKSBERG,         :
                  *Plaintiffs*,    :
                         :
      - against -        :
                         :    No. 12-CV-8852
SOVEREIGN WEALTH FUND "SAMRUK-   :
KAZYNA" JSC,         :
                         :
     a/k/a "National Welfare Fund 'Samruk  :
     Kazyna,'"         :
                         :
             *Defendant*.    :

-------------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SOVEREIGN WEALTH FUND "SAMRUK KAZYNA" JSC'S <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## TABLE OF CONTENTS

Page No.

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................... 5

    A.   The 2010 Restructuring.......................................................................... 5

    B.   The New Notes Issued in Connection with the 2010 Restructuring ............. 7

    C.   The 2012 Restructuring of BTA Bank .................................................... 9

    D.   Alleged Misstatements and Omissions ................................................... 9

    E.   Plaintiffs' Acquisition of Subordinated Notes ....................................... 11

ARGUMENT .............................................................................................. 12

I.    S-K FUND IS ENTITLED TO SOVEREIGN IMMUNITY AND THEREFORE
    THIS COURT LACKS SUBJECT MATTER AND PERSONAL
    JURISDICTION ................................................................................... 12

II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FEDERAL
    SECURITIES LAWS BECAUSE IT FAILS TO ALLEGE  ANY SECURITIES
    TRANSACTIONS IN THE UNITED STATES ............................................ 26

    A.   Plaintiffs Atlantica and Baltica Have Not Pled a Domestic Transaction  in
        Connection with Their Alleged Initial Investment in Subordinated Notes ... 27

    B.   Plaintiffs Have Not Pled a Domestic Transaction in Connection with  Their
        Alleged Purchases of Subordinated Notes in the Secondary Market .......... 29

III.  PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED RELIANCE ......................... 32

    A.   Plaintiffs Have Not Adequately Alleged Reliance on  Alleged Misstatements
        Regarding the Negative Carry Swap ..................................................... 33

    B.   Plaintiffs Have Not Adequately Alleged Reliance on Alleged Misstatements in
        2011 Regarding a Second Restructuring .................................................. 36

    C.   Plaintiffs Have Not Adequately Alleged Reliance on  Alleged Misstatements
        Regarding the Recovery Units .............................................................. 37

IV.  PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED LOSS CAUSATION........... 38

V.   PLAINTIFFS HAVE NOT ALLEGED SCIENTER WITH PARTICULARITY ....... 39

    A.   The Complaint Fails to Allege That S-K Fund Acted with Scienter With
        Respect to the Negative Carry Swap..................................................... 39

B.    The Complaint Fails to Allege Scienter With Respect to  Statements in 2011 Regarding Post-Restructuring Prospects ....................................................................... 41

C.    The Complaint Fails to Allege Scienter with  Particularity With Respect to the Recovery Units ............................................................................................................. 42

**VI.   PLAINTIFFS FAIL TO ALLEGE A SECTION 20(a) VIOLATION ........................... 42**

**CONCLUSION** ...................................................................................................................... **44**

## **TABLE OF AUTHORITIES**

<u>Cases</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ........................................................... 26, 27

*Antares Aircraft L.P. v. Federal Republic of Nigeria*,
    999 F.2d 33 (2d Cir. 1993),
    *cert. denied*, 510 U.S. 1071 (1994)................................................ 15, 24

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)........................................................................ 12

*ASTI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ............................................................ 32, 38

*Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co.*,
    466 F. Supp. 1133 (S.D.N.Y. 1979) .................................................. 17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................ 32

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
    No. 12-1776-cv, 2012 WL 6621391 (2d Cir. Dec. 20, 2012)................. 41

*Carey v. Nat'l Oil Corp.*,
    592 F.2d 673 (2d Cir. 1979) ............................................................ 25

*Colonial Bank v. Compagnie Generale*,
    645 F. Supp. 1457 (S.D.N.Y. 1986) .................................................. 15

*Cornwell v. Credit Suisse Grp.*,
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) .............................................. 28, 31

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................ 38

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d. Cir. 2009) ........................................................... 41

*Faulkner v. Verizon Comm'ns, Inc.*,
    189 F. Supp. 2d 161 (S.D.N.Y. 2002) .............................................. 41

*Fir Tree Capital Opportunity Master Fund, LP*,
    No. 11 Civ. 0955, 2011 WL 6187077 (S.D.N.Y. Nov. 28, 2011) ........... 18

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009) ........................................................... 24

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010) .............................................. 41

*Gosain v. State Bank of India*,
    414 Fed. Appx. 311 (2d Cir. 2011).................................................. 18, 21

*GSS Grp. Ltd v. Nat'l Port Auth.*,
   680 F.3d 805 (D.C. Cir. 2012) ........................................................................... 24

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
   602 F.3d 69 (2d Cir. 2010),
   *cert. denied*, 131 S. Ct. 1475 (2011) .................................................... 14, 15, 24

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*,
   936 F.2d 759 (2d Cir. 1991) ................................................................................ 5

*In re Global Crossing Ltd. Secs. Litig.*,
   No. 02 Civ. 910, 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ........................... 43

*In re JP Morgan Chase Secs. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................... 41

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010) ..................................................... 32, 33, 36, 37

*In re Merrill Lynch Auction Rate Secs. Litig.*,
   765 F. Supp. 2d 375 (S.D.N.Y. 2011) .......................................................... passim

*In re Merrill Lynch Auction Rate Secs. Litig.*,
   851 F. Supp. 2d 512 (S.D.N.Y. 2012) ............................................................... 39

*In re Societe Generale Sec. Litig.*,
   No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ....................... 31

*In re UBS AG Secs. Litig.*,
   No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................. 40, 42

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) .............................................................................. 41

*Kensington Int'l Ltd. v. Itoua*,
   505 F.3d 147 (2d Cir. 2007) ..................................................................... 13, 15, 24

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .............................................................................. 38

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*,
   No. 11 Civ. 398, 2012 WL 4616958 (S.D.N.Y. Sept. 28, 2012) ......................... 42

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996),
   *cert. denied*, 519 U.S. 1006 (1996) .................................................................. 25

*Morrison v. Nat'l Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ............................................................................... passim

*O & G Carriers, Inc. v. Smith*,
   799 F. Supp. 1528 (S.D.N.Y. 1992) ................................................................... 32

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
   753 F. Supp. 2d 166 (S.D.N.Y. 2010) ........................................................... 31, 41

*Press v. Quick & Reilly,*
   No. 96 CIV 4278, 1997 WL 458666 (S.D.N.Y. Aug. 11, 1997) ............................................ 40

*Republic of Argentina v. Weltover, Inc.,*
   504 U.S. 607 (1992) ................................................................................... 2, 14, 15, 25

*Ruff v. Genesis Hldgs. Corp.,*
   728 F. Supp. 225 (E.D.N.Y. 1990) ........................................................................... 40

*S.E.C. v. Benger,*
   No. 09 C 676, 2013 WL 593952 (N.D. Ill. Feb. 15, 2013) .................................................. 29

*S.E.C. v. Tourre,*
   No. 10 Civ. 3229, 2012 WL 5838794  (S.D.N.Y. Nov. 19, 2012) ......................................... 29

*Sable v. Southmark/Envicon Capital Corp.,*
   819 F. Supp. 324 (S.D.N.Y. 1993) ...................................................... 32, 33, 35, 40

*Saudi Arabia v. Nelson,*
   507 U.S. 349 (1993) ........................................................................... 12, 14, 17, 23

*Shields v. Citytrust Bancorp., Inc.,*
   25 F.3d 1124 (2d Cir. 1994) ................................................................................. 41

*Starr v. Georgeson S'holder, Inc.,*
   412 F.3d 103 (2d Cir. 2005) ................................................................................. 32

*Tellabs, Inc. v. Makor Issue & Rights, Ltd.,*
   425 U.S. 308 (2007) ......................................................................................... 39

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,*
   204 F.3d 384 (2d Cir. 2000),
   *cert. denied,* 532 U.S. 904 (2001) ...................................................................... 13, 14

*United World Trade, Inc. v. Mangyshlaknaft Oil Prod. Ass'n,*
   33 F.3d 1232 (10th Cir. 1994),
   *cert. denied,* 513 U.S. 1112 (1995) ...................................................................... 15

*Virtual Countries, Inc. v. Republic of South Africa,*
   300 F.3d 230 (2d Cir. 2002) ........................................................................... 13, 15

*Wahba v. Nat'l Bank of Egypt,*
   457 F. Supp. 2d 721 (E.D. Tex. 2006) ............................................................ 14, 16, 18, 20

*World-Wide Volkswagen Corp. v. Woodson,*
   444 U.S. 286 (1980) ......................................................................................... 25

## <u>Statutes</u>

15 U.S.C. § 78j .................................................................................................... 1

15 U.S.C. § 78j(b) ......................................................................................... passim

15 U.S.C. § 78t(a) ...................................................................................... 1, 4, 42

15 U.S.C. § 78u .................................................................................................. 1

15 U.S.C. § 78u-4(b)(1)-(3)(A) ................................................................................ 4

15 U.S.C. § 78u-4(b)(2) ........................................................................................ 39

28 U.S.C. § 1330(b) ........................................................................................ 12, 24

28 U.S.C. § 1601 *et seq* ........................................................................................ 2

28 U.S.C. § 1604 ................................................................................................ 12

28 U.S.C. § 1605(a)(2) ............................................................................ 2, 14, 24, 25

28 U.S.C. § 1608 ................................................................................................ 24

## Federal Rules

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 1

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1

Fed. R. Civ. P. 9(b) ........................................................................................ 4, 39

## Federal Regulations

17 C.F.R. § 230.144A ................................................................................ 6, 8, 19

17 C.F.R. § 230.501(a) ........................................................................................ 6

17 C.F.R. § 230.901 *et seq* ................................................................................ 8

17 C.F.R. § 230.902(k)(1) .................................................................................... 8

17 C.F.R. § 230.902(k)(2) .................................................................................... 8

Defendant Sovereign Wealth Fund "Samruk Kazyna" JSC ("S-K Fund") respectfully submits this memorandum of law in support of its Motion to Dismiss Plaintiffs' Amended Complaint in its entirety, pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, 12(b)(2) for lack of personal jurisdiction, 12(b)(6) for failure to state a claim, and 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)-(3)(A) for failure to plead fraud with particularity.[1]

## PRELIMINARY STATEMENT

This action has virtually no connection to, or impact on, the United States.  It involves mainly foreign plaintiffs who purchased debt securities of a foreign bank in transactions which are described by the Amended Complaint in deliberately ambiguous terms but which, in all likelihood, took place abroad.  And the defendant is a foreign sovereign which engaged in no activity in the United States and whose actions had no legally cognizable effects here.  Simply put, this Court lacks both subject matter and personal jurisdiction and, in any event, the United States securities laws do not apply.

Plaintiffs are three Panamanian corporations and three American residents[2] all of whom allegedly purchased debt securities of a Kazakhstan bank, BTA Bank JSC ("BTA Bank" or the "Bank"), in reliance upon alleged misstatements and omissions by BTA Bank and Defendant S-K Fund.  Plaintiffs have brought claims against S-K Fund pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and u.  S-K Fund, which is the controlling shareholder of BTA Bank, is a corporation formed under the laws of the Republic of Kazakhstan ("Kazakhstan"), is Kazakhstan's sovereign wealth fund and is 100% owned by the Government

---

[1] Defendant S-K Fund attests that it has complied with the Court's Individual Rules and Practices in Civil Cases, Section 3(B)(i) regarding Special Rules for Motions to Dismiss.

[2] Of the approximately $76 million of securities allegedly purchased by Plaintiffs, only $760,000 were purchased by the United States individuals.

of Kazakhstan.[3]  Accordingly, S-K Fund is an agency or instrumentality of a foreign state as

defined in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1601 *et seq*., and is

presumptively immune from the jurisdiction of the courts of the United States.

Plaintiffs do not contest that S-K Fund is a foreign state, but assert that their

claims fall within an exception to foreign state immunity because these claims are based "upon

an act outside the territory of the United States in connection with a commercial activity of the

foreign state elsewhere and that act cause[d] a direct effect in the United States."  *See* 28 U.S.C.

§ 1605(a)(2).  However, the "direct effects" Plaintiffs identify as a basis for jurisdiction are not

effects at all, but acts by BTA Bank and S-K Fund alleged to have occurred in the United States.

By definition, those acts cannot support jurisdiction under the "direct effect" clause of Section

1605(a)(2), which assumes that the act forming the basis of the claim occurred outside the United

States and which requires a direct effect in the United States.  Furthermore, Plaintiffs' claims are

not based on those alleged acts, which could not support jurisdiction under the FSIA in any

event.

Indeed, Plaintiffs cannot show that S-K Fund took any action in this case that

would subject it to jurisdiction in the United States, even under principles of due process which

the Supreme Court has considered as "an aid in interpreting the direct effect requirement."

*Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618 n.2 (1992).  S-K Fund has no offices

in the United States and does not hold any assets in the United States.  All of the allegedly false

and misleading statements were made in Kazakhstan.  Both the issuance and subsequent resales

of the BTA Bank debt securities Plaintiffs allegedly acquired were structured to take place, and

did take place, wholly outside of the United States.  While Plaintiffs allege that BTA Bank debt

---

[3]  *See* Am. Compl. ¶14; Decl. of Talgat Sarsenbayev, Managing Director and Member of Board of S-K Fund, dated May 3, 2013, ¶5 (hereinafter "Sarsenbayev Decl."), attached as Ex. A to the Decl. of Joseph D. Pizzurro, dated May 6, 2013 (hereinafter "Pizzurro Decl.").

securities were marketed in the United States, the documents that Plaintiffs cite in the Amended Complaint were not made available to these Plaintiffs in the United States and stated on their face that they should not be relied upon in connection with any offer or sale of a security.  Thus, Plaintiffs' allegations cannot support any exception to S-K Fund's presumptive immunity under the FSIA.

Plaintiffs' Amended Complaint should also be dismissed for failure to state a claim.  Plaintiffs cannot show that they acquired the BTA Bank debt securities on a domestic exchange or in a domestic transaction, as required by the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).  Plaintiffs' conclusory allegation that each of them "incurred irrevocable liability to pay for the securities at issue in the United States" by placing an order with a broker in Miami, Florida is insufficient to show the existence of a domestic transaction for purposes of Section 10(b).  Plaintiffs must plead sufficient detail to indicate that each order was completed in the United States in order to establish the existence of a domestic transaction.  They have not done so here.  The BTA Bank debt securities Plaintiffs allegedly purchased were traded on exchanges in Kazakhstan and Luxembourg, and were never traded on any U.S. exchange.  They were held by a common depository in London for accountholders in clearing systems located in Europe.  Any transaction in the securities could only have been executed, cleared and settled through, or in accounts, in clearing systems in Europe.  Because Plaintiffs cannot show that they purchased a security in a domestic transaction, their claims under the Exchange Act should be dismissed.

There are additional deficiencies that warrant dismissal of the Amended Complaint.  Plaintiffs have failed to adequately plead reliance and loss causation, both of which are essential elements of their Section 10(b) claims.  Plaintiffs do not and cannot allege that they

relied on certain of the allegedly false and misleading statements.  A number of Plaintiffs'
alleged purchases occurred before the statements were made.  In other instances, Plaintiffs'
alleged reliance is not reasonable because the facts that Plaintiffs allege were concealed were
disclosed in the very documents Plaintiffs cite.  Plaintiffs also cannot show that the alleged
misstatements and omissions caused any loss on their investments.  They concede that they made
most of their purchases after the "true facts" regarding the alleged misstatements and omissions
were disclosed to the market, and after the price of the BTA Bank debt securities had already
substantially declined.  In fact, it is apparent from the Amended Complaint that Plaintiffs
purchased the vast majority of their BTA Bank debt securities at a time in 2012 after BTA Bank
had already defaulted on its debt obligations.

Furthermore, Plaintiffs have failed to allege scienter with particularity, as required
by Fed. R. Civ. P. 9(b) and the PSLRA.  The financial relationship between BTA Bank and S-K
Fund that Plaintiffs allege was concealed was in fact disclosed, undermining any inference that
S-K Fund acted with fraudulent intent.  S-K Fund also had no economic motive to jeopardize its
substantial investment in BTA Bank by "siphoning" funds from BTA Bank.  The fraudulent
scheme that Plaintiffs allege makes no economic sense if, as Plaintiffs allege, S-K Fund knew it
"would doom the Bank to failure" and thus could result in S-K Fund losing its $5.7 billion equity
interest in the Bank as well as the more than $2 billion in deposits it held at the Bank.

Finally, Plaintiffs' Section 20(a) claims should be dismissed.  Plaintiffs' failure to
adequately plead the underlying Section 10(b) claim is fatal to their Section 20(a) claim.
Plaintiffs also fail to allege sufficient facts demonstrating that S-K Fund was a culpable
participant in the alleged misstatements and omissions, as required to establish a Section 20(a)
violation.

## STATEMENT OF FACTS

### A.    The 2010 Restructuring

BTA Bank was one of many banks severely impacted by the 2008 global financial crisis.  In the autumn of 2008, S-K Fund commenced negotiations with BTA Bank regarding the terms of a possible capital injection by S-K Fund to support the Bank's liquidity.  (FFB Decl., Ex. 1 at 151.)[4]  On February 2, 2009, S-K Fund invested approximately $1.4 billion into BTA Bank, receiving equity in return which increased its interest in the Bank to 75% of the total share capital.[5]  (*Id.* at 152.)

Despite S-K Fund's capital injection, BTA Bank announced in April 2009 that it had received notices from creditors accelerating by reason of default the indebtedness owed to those creditors.  (FFB Decl., Ex. 3.)  As a result, BTA Bank decided to cease all principal and interest payments on its existing indebtedness until it could reach agreement with creditors on a program for managing its debt position.  (FFB Decl., Ex. 4.)

Following months of discussions in London and in Kazakhstan, the Bank and its creditors agreed on terms of a proposed restructuring (the "2010 Restructuring Plan"), which were set forth in an Information Memorandum published in May 2010.  (FFB Decl. ¶8.)  BTA Bank published the Information Memorandum to creditors by making it available on the BTA website.  (*Id.* ¶10.)  The Information Memorandum was available only to investors who certified on the website either that they (i) were outside the United States and non-U.S. residents; or (ii)

---

[4] The Information Memorandum is attached as Exhibit 1 to the Declaration of Francis Fitzherbert-Brockholes of the law firm White & Case LLP, dated May 1, 2013, which represented BTA Bank in connection with the restructuring proceedings completed in 2010 (hereinafter "FFB Decl.").  The Information Memorandum was distributed in connection with the 2010 Restructuring of BTA Bank and is referred to throughout the Amended Complaint as a source of the alleged misstatements.  Therefore, on a motion to dismiss the Court may consider facts set forth in that Information Memorandum.  *See I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991).

[5] Unless otherwise stated, all amounts stated in United States dollars are based on the exchange rate provided in the Information Memorandum of U.S.$1.00 = KZT 150.95.  (FFB Decl., Ex. 1 at 112.)

were within the United States and were either "Accredited Investors" as defined in the Securities Act[6] or "Qualified Institutional Buyers" ("QIBs") as defined in Rule 144A.[7]  (*Id.*).  Additionally, the Information Memorandum on its face stated that it should be relied upon for no purpose other than making a decision regarding the 2010 Restructuring Plan.  (FFB Decl., Ex. 1 at ii.)

The proposed 2010 Restructuring Plan would reduce the financial debt of BTA Bank from approximately $11.4 billion to approximately $4.4 billion by, among other things, converting existing debt into equity and new debt securities in the Bank.  (FFB Decl., Ex. 1 at 10.)  As part of that Plan, holders of existing debt securities ("Euronotes") would receive "New Notes" (as defined in the Information Memorandum) issued by BTA Bank.  (*Id.*)  These Euronotes were the only outstanding debt securities whose holders were entitled to receive New Notes as part of the 2010 Restructuring Plan.  (FFB Decl. ¶12.)  In addition, as part of the recapitalization of the Bank, S-K Fund agreed to increase its deposits with the Bank ("S-K Deposits") by approximately $1.04 billion, bringing its total deposits with the Bank to $2.46 billion.  (FFB Decl., Ex. 1 at 123.)

As set forth in the Information Memorandum, S-K Fund also agreed to accept $4.3 billion of bonds issued by BTA Bank ("BTA Bonds") in exchange for an equal face amount of bonds issued by S-K Fund ("S-K Bonds"), which BTA Bank then used as collateral to obtain additional financing from the National Bank of Kazakhstan ("NBK").  (*Id.* at 176.)  S-K Fund guaranteed that financing and BTA Bank paid S-K Fund a guarantee fee of 2%.[8]  As a result of the 2010 Restructuring, S-K Fund agreed to convert its $4.3 billion interest in BTA Bonds to

---

[6] Regulation D of the Securities Act defines an "Accredited Investor" to include, among other things, "natural persons whose net worth, or joint net worth with that person's spouse . . . exceeds $1,000,000."  17 C.F.R. § 230.501(a).

[7] Rule 144A defines a "QIB" as an entity that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity.  17 C.F.R. § 230.144A.

[8] This is the "repo" transaction with NBK described in the Amended Complaint.  (Am. Comp. ¶41.)

equity in BTA Bank, becoming an 81% shareholder in the Bank and bringing its equity interest to a value of over $5.7 billion.  (*Id.* ¶3.)

**B.**     **The New Notes Issued in Connection with the 2010 Restructuring**

In order to effectuate the terms of the 2010 Restructuring Plan, holders of each series of Euronotes were required to meet and vote on the proposed Plan.  (FFB Decl., Ex. 1 at 86.)  Additionally, all of the other creditors in the Bank were required to meet and vote on the proposed Plan.  (*Id.* at 9.)  If the 2010 Restructuring Plan was approved at both meetings, it would be submitted to the specialized financial court of Almaty (the "Court") in Kazakhstan for final approval.  Each condition for effectuation of the 2010 Restructuring Plan was required to be met before holders of Euronotes could exchange those notes for New Notes.  (*Id.*)

In May 2010, the Restructuring Plan was approved at the meetings of Euronote holders held in London and at the meeting of other creditors held in Almaty, Kazakhstan.  (FFB Decl. ¶¶18-19.)  On July 1, 2010, the Court in Kazakhstan approved the Plan and, shortly thereafter, the existing Euronotes were cancelled and their holders received New Notes.  (*Id.* ¶¶20-21.)  The New Notes were the only form of debt securities provided to holders of Euronotes and were issued through Euroclear Bank SA/NV ("Euroclear Bank"), and Clearstream Banking SA ("Clearstream Banking"), which are clearing systems in Europe.  (*Id.*)  Only accountholders in these clearing systems, referred to as "Direct Participants," could receive New Notes in the 2010 Restructuring.  (*Id.* ¶21.)  Direct Participants were generally large financial institutions which held interests in the New Notes for their own accounts or for the accounts of their customers.  (*Id.*)

The New Notes were at all times represented by global note certificates and held by The Bank of New York Mellon, acting through its offices in London, as common depositary (the "Common Depositary") for Euroclear Bank and Clearstream Banking.  (*Id.* ¶22.)  The New

Notes were listed on the Kazakhstan Stock Exchange and, after February 22, 2011, on the official list of the Luxembourg Stock Exchange.  (*Id.* ¶23)  The New Notes were never listed on any United States exchange.  (*Id.*)

Because the New Notes were not listed on a United States exchange and would not be registered under the Securities Act or with any securities regulatory authority in the United States, the New Notes were subject to certain transfer restrictions.  (FFB Decl., Ex. 1 at 310-13.)  As set forth in the Information Memorandum, the New Notes were transferable only to (i) QIBs in a transaction meeting the requirements of Rule 144A, or (ii) non-U.S. Persons as defined in Regulation S[9] of the Securities Act in a transaction meeting the requirements of Regulation S.  (*Id.* at 311-12.)  Each subsequent purchaser or transferee would be deemed to have represented that it was either a QIB or a non-U.S. Person.  (*Id.*)  A U.S. Person who was not a QIB was prohibited from purchasing the New Notes in the secondary market, and the Information Memorandum provided that any "transfer in violation of the foregoing [transfer restrictions] will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee." (*Id.* at 311.)

The New Notes were held at all relevant times in the Common Depository in London and any beneficial interest in the New Notes could only be transferred through accounts held by Direct Participants in Euroclear Bank or Clearstream Banking in a transaction that complied with the transfer restrictions.  (FFB Decl. ¶¶26-28.)  A Direct Participant in one of these clearing systems could transfer interests in the New Notes to another Direct Participant in the clearing system.  (*Id.*)  Euroclear Bank and Clearstream Banking also maintained an

---

[9] Rule 902 of Regulation S defines a "U.S. Person" to include any natural person resident in the U.S. and any partnership or corporation organized or incorporated under the laws of the U.S.  *See* 17 C.F.R. § 230.902(k)(1).  An example of a non-U.S. person is a corporation incorporated under the laws of a foreign jurisdiction having no branch or agency in the United States.  17 C.F.R. § 230.902(k)(2).

electronic "bridge" between them that allowed for transfer of interests in New Notes between participants in the two clearing systems.  (*Id.*)  Thus, transfers of interests in the New Notes could only have been executed, cleared and settled through or in clearing systems located in Europe.

## C.    The 2012 Restructuring of BTA Bank

Despite the successful completion of the 2010 Restructuring, BTA Bank's performance continued to suffer in 2011 and 2012.  In January 2012, the Bank defaulted on its debt obligations again and began proceedings for a second restructuring.  (Am. Compl. ¶57.)  The 2012 Restructuring was approved by the Court in Kazakhstan in December 2012.  Under the terms of the 2012 Restructuring Plan, holders of the New Notes agreed to exchange those Notes for new notes issued by BTA Bank.  As part of the 2012 Restructuring, $1.2 billion of S-K Fund's deposits with BTA Bank were converted into equity, increasing S-K Fund's equity interest to 97%.  (*Id.*)

## D.    Alleged Misstatements and Omissions

Plaintiffs allege that from July 2010 through October 2012 they each acquired New Notes, specifically Subordinated Notes of BTA Bank, in reliance upon allegedly false and misleading statements by BTA Bank and S-K Fund.  The allegedly false and misleading statements fall within three categories.

First, Plaintiffs allege that the Information Memorandum failed to disclose a transaction Plaintiffs call the "Negative Carry Swap."  (*Id.* ¶41.)  According to Plaintiffs, at the time of the 2010 Restructuring, S-K Fund directed BTA Bank to purchase $4.3 billion of S-K Bonds paying BTA Bank an effective interest rate of 2%, while at the same time S-K Fund received interest rates as high as 10.9% on billion of deposits S-K Fund had with BTA Bank. (*Id.*)  Plaintiffs allege that the transaction constituted an impermissible dividend to S-K Fund, in

contravention of the terms of the Information Memorandum. (*Id.* ¶¶38-39.) Although Plaintiffs allege that information regarding the Negative Carry Swap was not disclosed to the market until May 2011, when the transaction was referenced in a BTA Bank presentation, the components of this transaction were fully disclosed in the Information Memorandum published in May 2010. (*See* FFB Decl., Ex. 1 at 41, 123, 175-78, 232-34.)

Second, Plaintiffs allege that S-K Fund made false and misleading statements in 2011 regarding the prospect of a second restructuring. Plaintiffs cite statements S-K Fund representatives made to reporters in Kazakhstan regarding the possibility of governmental support to avoid a second restructuring of BTA Bank. (Am. Compl. ¶52.) These statements were included in news reports regarding BTA Bank that were published by Reuters, Bloomberg and other news agencies. (*Id.*) Plaintiffs allege that S-K Fund made these statements without any basis in fact because S-K Fund knew that, as a result of the Negative Carry Swap, a second restructuring would be necessary. (*Id.* ¶54.) There is no allegation, however, that any Plaintiff relied on any of these statements in connection with any acquisition of Subordinated Notes.

Finally, Plaintiffs allege that BTA Bank made misstatements and omissions regarding BTA Bank's liability for "Recovery Units" which were issued in connection with the 2010 Restructuring and which provided for additional payments to their holders in the event that BTA Bank recovered funds allegedly embezzled by former management. (*Id.* ¶¶59-60.) While Plaintiffs allege that BTA Bank and S-K Fund failed to disclose the Bank's potential liability for the Recovery Units, all of the terms of the Recovery Units, including the potential that the Bank could be liable for the full amount of the Recovery Units in the event of the Bank's default, were set forth in detail in the Information Memorandum. (FFB Decl., Ex. 1 at 580-81.)

E.      **Plaintiffs' Acquisition of Subordinated Notes**

Plaintiffs include three Panamanian corporations, Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica") and Blu Funds, Inc. ("Blu Funds") (collectively, the "Panamanian Plaintiffs") and three individuals who reside in the United States, Allan Kiblinsky, Anthony Kiblinsky and Jacques Gliksberg (collectively, the "Individual Plaintiffs").  (Am. Compl. ¶¶7-12.)

Plaintiff Atlantica allegedly acquired approximately $600,000 of Subordinated Notes in connection with the 2010 Restructuring, and allegedly purchased an additional $68 million of Subordinated Notes in the secondary market in late 2010 and in 2012.  Notably, Atlantica's final purchases, totaling over $59 million and representing the majority of all of the Plaintiffs' purchases of Subordinated Notes, all occurred after January 2012, well after the time when even Plaintiffs allege the "true facts" regarding the Negative Carry Swap were disclosed to the market, and after BTA Bank had again defaulted on its obligations.  (*Id.* ¶¶7, 48, 58; Ex. A.)

Plaintiff Baltica allegedly acquired approximately $340,000 of Subordinated Notes in connection with the 2010 Restructuring, and purchased approximately $2.8 million of Subordinated Notes in the secondary market in 2010.  (Ex. A to Am. Compl.)

The remaining Plaintiffs all allegedly purchased Subordinated Notes in the secondary market after the 2010 Restructuring.  Plaintiff Blu Funds purchased $3 million of Subordinated Notes in April 2012.  (*Id.*)  The Individual Plaintiffs collectively purchased less than $1 million of Subordinated Notes.  Plaintiffs Anthony Kiblinksy and Alan Kiblinsky purchased $200,000 and $100,000 of Subordinated Notes, respectively, on January 7, 2011.  (*Id.*) Plaintiff Jacques Gliksberg purchased approximately $60,000 of Subordinated Notes in September 2010 and an additional $400,000 in 2011.  (*Id.*)

Each Plaintiff alleges that it purchased their interest in Subordinated Notes by placing an order with a broker in the Miami, Florida office of a Swiss bank, UBS Financial Services.  Each Plaintiff alleges that "UBS Financial Services then transmitted the order to its broker-dealer in New York, New York, where funds from an account [Plaintiff] maintained with UBS were transferred internally to UBS's back office, where the order was filled and the transaction was completed."  (Am. Compl. ¶¶7-12.)  Each Plaintiff makes the conclusory allegation that they "incurred irrevocable liability to pay for the securities at issue in the United States."  (*Id.*)  Though each Plaintiff alleges to have paid for their purchases from funds in accounts with the Swiss bank UBS, Plaintiffs do not identify where those accounts were located.  Similarly, Plaintiffs fail to state where UBS's back office is located or where or how in fact UBS "filled" their orders, even though the only exchanges on which the Subordinated Notes were listed were in Kazakhstan and Luxembourg.  (FFB Decl. ¶23.)  And there is no allegation as to where title to the securities passed to the Plaintiffs.

## ARGUMENT

I.   **S-K FUND IS ENTITLED TO SOVEREIGN IMMUNITY AND THEREFORE THIS COURT LACKS SUBJECT MATTER AND PERSONAL JURISDICTION**

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."  *Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993) (*quoting Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443 (1989)).  Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies. . . ."  *Nelson,* 507 U.S. at 355; *see also* 28 U.S.C. § 1604.  If one of the exceptions applies, the court has subject matter jurisdiction, and, if the court has subject matter jurisdiction and there is effective service of process, the court acquires personal jurisdiction.  28 U.S.C. § 1330(b).

On a motion to dismiss under the FSIA, the defendant must first make a *prima facie* showing that it is a "foreign state" or an "agency or instrumentality of the foreign state." *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007).  Once the defendant makes that showing, the plaintiff has the burden of going forward with evidence showing that an exception to immunity under the FSIA applies.  *See id.*  The ultimate burden of persuasion rests with the foreign state claiming immunity.  *See id.*

Here, there is no issue that S-K Fund is a foreign state – Plaintiffs have alleged it in their Amended Complaint.  (Am. Compl. ¶14; *see* Sarsenbayev Decl. ¶5.)  Thus, S-K Fund is presumptively immune from jurisdiction in this case unless an exception to immunity applies. None does.

The sole exception to immunity upon which Plaintiffs rely is the "commercial activity" exception to immunity, specifically the last clause of 28 U.S.C. §1605(a)(2), known as the "direct effect" clause.  (Am. Compl. ¶19.)  In order for Plaintiffs' claims to fit within the "direct effect" exception to immunity, Plaintiffs must show that their claims are "(1) based … upon an act outside the territory of the United States; (2) that was taken in connection with a commercial activity of [the foreign state] outside this country; and (3) that caused a direct effect in the United States."  *Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 236 (2d Cir. 2002) (citation omitted; internal alteration in original).  Unless all of these elements of the "direct effects" exception exist, Plaintiffs' claims must be dismissed.  *See*, *e.g.*, *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 391 (2d Cir. 2000), *cert. denied*, 532 U.S. 904 (2001).

First, the act upon which the claim is based must take place outside of the United States.  If the alleged act in fact occurred within the United States, the plaintiff cannot rely upon

the "direct effect" clause of Section 1605(a)(2).  *See Wahba v. Nat'l Bank of Egypt*, 457 F. Supp.

2d 721, 733 (E.D. Tex. 2006) (disregarding allegations of defendant's activity "taken in the

United States [because] the pertinent language of the exception requires the court to focus on

acts that occurred abroad"); *see also Transatlantic*, 204 F.3d at 388 ("direct effect" clause of

§1605(a)(2) requires an act *outside the United States* in connection with a commercial activity of

the foreign state that causes a direct effect in the United States).

Next, the plaintiff's claims must be "based upon" the act alleged to have caused

the direct effect in the United States.  *See Nelson*, 507 U.S. at 357 (the term "based upon" is

"read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to

relief under his theory of the case"); *see also Transatlantic*, 204 F.3d at 389 ("[I]t is not enough

to find that the defendant committed some act 'in connection with a commercial activity of the

foreign state elsewhere and that act caused a direct effect in the United States.'  We must also

find that the plaintiff's suit in U.S. courts is 'based upon' that act.").  The Second Circuit

characterizes this as a "legally significant acts" test.  Thus, for an act to support a "direct effect"

exception to immunity, it must directly bear on whether the plaintiff can recover on its cause of

action.  *See Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 76-81 (2d Cir. 2010), *cert.*

*denied*, 131 S. Ct. 1475 (2011).

Finally, the act upon which the claim is based must cause a "direct effect" in the

United States.  An effect is "direct" if it follows as an immediate consequence of the defendant's

activity.  *See Weltover, Inc.,* 504 U.S. at 618.  If the alleged effect in the United States is merely

fortuitous or incidental, playing only a tangential role in the lawsuit, the standard for "direct

effect" is not met and the court will dismiss the claims against the foreign state defendant for

lack of jurisdiction.  *See, e.g., Antares Aircraft L.P. v. Federal Republic of Nigeria*, 999 F.2d 33,

36 (2d Cir. 1993), *cert. denied*, 510 U.S. 1071 (1994); *United World Trade, Inc. v. Mangyshlaknaft Oil Prod. Ass'n*, 33 F.3d 1232, 1237-38 (10th Cir. 1994), *cert. denied*, 513 U.S. 1112 (1995).  Similarly, if the effect is the result of an intervening event and not the act of the foreign state, the effect is by definition indirect.  *See Guirlando*, 602 F.3d at 74-75; *Virtual Countries*, 300 F.3d at 237-38.

The purpose of the "direct effect" requirement is to ensure a sufficient nexus between the foreign sovereign's act and the United States to justify the court's exercise of jurisdiction.  *See Antares,* 999 F.2d at 36; *Colonial Bank v. Compagnie Generale,* 645 F. Supp. 1457, 1465 (S.D.N.Y. 1986).  The Supreme Court has explained that the FSIA "ensures that jurisdiction may not be predicated on purely trivial effects in the United States."  *Weltover*, 504 U.S. at 618.  "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."  *Virtual Countries*, 300 F.3d at 236 (citation omitted).

An allegation that plaintiffs suffered a financial loss in the United States alone is insufficient to constitute a direct effect in the United States for purposes of the FSIA.  *See Kensington*, 505 F.3d at 158.  Plaintiffs must allege a "direct effect" independent from the economic loss resulting from a defendant's act.  *See Guirlando*, 602 F.3d at 78-79 ("If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states.") (quoting *Antares*, 999 F.2d at 36).  *See also Antares,* 999 F.2d at 36 ("[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.").

Plaintiffs' initial Complaint contained only a bare allegation that S-K Fund's acts caused a "direct injury" to Plaintiffs in the United States. (Compl. ¶14.) During the pre-motion exchange of correspondence required by the Court's Rules, counsel for S-K Fund pointed out that such allegations could not establish jurisdiction as a matter of law. Plaintiffs thereupon amended the Complaint to add seven alleged "direct effects." Yet these newly alleged direct effects are not effects at all. Rather, Plaintiffs have identified acts by BTA Bank and S-K Fund which they allege occurred within the United States and that therefore, by definition, cannot support the "direct effects" exception. *See Wahba*, 457 F. Supp. 2d at 733. Moreover, Plaintiffs cannot show that their claims are based on any of these alleged acts.

Paragraph 19 of the Amended Complaint lists Plaintiff's newly alleged direct effects in the United States, each of which can be addressed in turn:

- **As part of the 2010 Restructuring and at S-K's direction, BTA Bank issued, inter alia, Senior Dollar Notes, Dollar Original Issue Discount Notes, and Dollar Subordinated Notes (such Dollar Subordinated Notes, the "Subordinated Notes"). All of these notes were denominated in U.S. dollars.**

This allegation is not a "direct effect" at all, but an act. To the extent Plaintiffs allege that the Subordinated Notes were issued in the United States, that activity cannot, as a matter of law, support a "direct effect" exception to immunity. *See Wahba*, 457 F. Supp. 2d at 733.

However, as set forth in the Information Memorandum and supporting documents, the act of "issuing" the Subordinated Notes did not occur in the United States. Following the effectuation of the 2010 Restructuring, the pre-existing Euronotes were canceled and their holders received New Notes, which included Subordinated Notes. (FFB Decl. ¶¶ 21-22; FFB Decl. Ex. 1 at 9, 108.) The New Notes were issued to Direct Participants through

Euroclear Bank and Clearstream Banking, who held the New Notes for their own accounts or for the accounts of their customers.  (*Id.* at 108.)  Thus, the "issuance" of Subordinated Notes occurred through the designated clearing systems in Europe, not the United States.  *See Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co.*, 466 F. Supp. 1133, 1144 (S.D.N.Y. 1979) ("issuance" of a security under the U.C.C. "refers to the first delivery [of the security] to a holder or remitter").

Furthermore, the "issuance" of Subordinated Notes occurred solely as part of the 2010 Restructuring and only two Plaintiffs, Atlantica and Baltica, received Subordinated Notes, approximately $600,000 and $340,000 respectively, in connection with the 2010 Restructuring. These Plaintiffs are both Panamanian entities that could not have been issued Subordinated Notes in the United States.  Notably, neither alleges to have accepted Subordinated Notes in the United States.  (*See* Am. Compl. ¶33.)  Thus, the issuance of Subordinated Notes is irrelevant to the determination whether Plaintiffs have satisfied their burden of showing an exception to immunity based on the "direct effect" clause.

Significantly, Atlantica and Baltica made the vast majority of their alleged purchases of Subordinated Notes in the secondary market, and all of the remaining Plaintiffs allegedly made their purchases in the secondary market and not in connection with the 2010 Restructuring.  Plaintiffs' claims for these purchases in the secondary market are therefore not based on the issuance of Subordinated Notes.  *See Nelson*, 507 U.S. at 357.

- **The Information Memorandum provided that principal and interest payments on all of these securities, including the Subordinated Notes at issue here, were to be made at the payee's bank in New York City.**

This allegation fails to satisfy the "direct effect" test because Plaintiffs' claims are not "based upon" any failure to pay principal and interest on the Subordinated Notes.  In fact, it

was BTA Bank, not S-K Fund, that had the obligation to pay principal and interest on the

Subordinated Notes and therefore Plaintiffs could not have asserted a claim for failure to pay

against S-K Fund.  Plaintiffs assert claims for securities fraud, not breach of contract, and seek

damages based on the decline in price of the Subordinated Notes.  (*See* Am. Compl. ¶57.)  The

Second Circuit has held that where plaintiff's claims were "not based on any denial of payment,"

but rather on other conduct that harmed the plaintiff, the failure to make payment cannot

constitute a "direct effect."  *Gosain v. State Bank of India*, 414 Fed. Appx. 311, 313 (2d Cir.

2011); *see also Fir Tree Capital Opportunity Master Fund, LP*, No. 11 Civ. 0955, 2011 WL

6187077, at *19 (S.D.N.Y. Nov. 28, 2011) ("While courts have found that the failure to remit

funds payable in the United States meets the 'direct effect' requirement, . . . there is no claim of

non-payment here.")(internal citations omitted).

- **BTA Bank and S-K Fund represented in the Information Memorandum that the 2010 Restructuring was effective in the United States (among other jurisdictions), marketed the securities extensively in the United States, and directed that marketing to U.S. investors.**

This allegation does not describe a "direct effect," but again describes multiple

acts, all of which are alleged to have occurred in the United States and which therefore by

definition cannot support jurisdiction under the "direct effect" provision of section 1605(a)(2).

*See Wahba*, 457 F. Supp. 2d at 733.  Moreover, none of Plaintiffs' claims is based on these

alleged acts.  Any statement that "the 2010 Restructuring was effective in the United States,"

whatever that means, is irrelevant to any claim asserted by Plaintiffs.  Furthermore, Plaintiffs do

not contend that they purchased Subordinated Notes based on marketing efforts in the United

States.

The only alleged "marketing" that is referenced in the Amended Complaint is the allegation that the Information Memorandum was distributed to creditors of BTA Bank in connection with the 2010 Restructuring.[10]  (Am. Compl. ¶2.)  Plaintiffs Atlantica and Baltica are the only Plaintiffs who allege to have been creditors of the Bank prior to the 2010 Restructuring and therefore are the only Plaintiffs who would have received the Information Memorandum in connection with the 2010 Restructuring.  But both of these Plaintiffs are Panamanian corporations who would have received the Information Memorandum outside of the United States.

The Individual Plaintiffs and Blu Funds do not allege to have been creditors of BTA Bank prior to the 2010 Restructuring and thus would not have received the Information Memorandum in connection with the Restructuring.  Each of these Plaintiffs allege that they purchased Subordinated Notes in the secondary market in reliance on the Information Memorandum, but the Information Memorandum makes clear that it should relied upon for no purpose other than making a decision regarding the 2010 Restructuring Plan.  (FFB Decl. Ex. 1 at ii.)  Therefore, the dissemination of the Information Memorandum cannot constitute marketing of the Subordinated Notes in any regard, much less marketing in the United States.  The Information Memorandum also provides that the Subordinated Notes should not be offered, sold or otherwise transferred in the secondary market in the United States except to QIBs in a transaction that complied with Rule 144A.  (*Id.* at 310-13.)  The Individual Plaintiffs are not QIBs and therefore could not be the targets of marketing in the United States.  Blu Funds, like Atlantica and Baltica, is a Panamanian corporation and therefore would not have received the Information Memorandum in the United States.

---

[10] The Information Memorandum was only available in the United States to investors who certified that they were either Accredited Investors or QIBs.  (FFB Decl. ¶10.)

None of the other activities attributed to S-K Fund in the Amended Complaint are alleged to have occurred in the United States and would not constitute marketing activities in any event. (*See, e.g.,* Am. Compl. ¶¶52, 63-64.)

- **Following the 2010 Restructuring, BTA Bank and S-K Fund representatives traveled to the United States to meet with investors and describe the bank's activities.**

Here, again, Plaintiffs' allegation describes "acts" by BTA Bank and S-K Fund in the United States, as opposed to "effects" in the United States resulting from any alleged act. This alone renders the allegation insufficient to satisfy the direct effect exception as a matter of law. *See Wahba*, 457 F. Supp. 2d at 733. Moreover, Plaintiffs do not allege that any of their claims are based on any of these acts. Plaintiffs do not allege that BTA Bank and S-K Fund representatives traveled to the United States in connection with the 2010 Restructuring, the Subordinated Notes Plaintiffs allegedly purchased, or the transactions engaged in by Plaintiffs. Plaintiffs do not allege that they themselves met with representatives of BTA Bank or S-K Fund or that they purchased BTA Bank securities based on meetings or discussions with BTA Bank or S-K Fund. Plaintiffs do not allege any details in support of this allegation, such as when exactly BTA Bank and S-K Fund representatives traveled to the United States, which "investors" they met, what "bank activities" they described or whether these alleged trips had anything at all to do with sales of BTA Bank securities. The allegations are irrelevant to Plaintiffs' claims and insufficient to support a "direct effect" exception to immunity.

- **At S-K Fund's direction, BTA Bank defaulted on its debt securities, including the Subordinated Notes, such that payments that were supposed to have been delivered in the United States were not made to Plaintiffs.**

This allegation merely restates Plaintiffs' second alleged "direct effect" regarding BTA Bank's payment obligations. For all the same reasons, this allegation is insufficient.

Plaintiffs do not assert a cause of action for failure to make payments on the Notes and, in fact, would have no cause of action against S-K Fund for BTA Bank's failure to make payments on the Subordinated Notes.[11]  Plaintiffs assert claims for securities fraud under the Exchange Act and allege losses based on the decline in the price of their securities after the disclosure of the alleged fraud.  (*See* Am. Compl. ¶¶57, 77, 86.)  Because a failure to pay principal and interest is not an element of their claims, Plaintiffs cannot establish jurisdiction based on an alleged failure to pay.  *See Gosain*, 414 Fed. Appx. at 313.

- **S-K Fund made false and misleading statements regarding BTA Bank that it reasonably understood would be disseminated in the United States and upon which United States investors would rely.**

This allegation again describes acts in the United States, not direct effects in the United States.  Moreover, there is no allegation anywhere in the Amended Complaint that any Plaintiff relied on an allegedly false and misleading statement in the United States.

The Information Memorandum, which Plaintiffs allege was false and misleading, was made available only in connection with the 2010 Restructuring Plan, and in the United States, only to investors who certified that they were Accredited Investors or QIBs.  It specifically provided that nothing in it "should be relied on for any other purpose other than to make a decision on the 2010 Restructuring Plan."  (FFB Decl., Ex. 1 at ii.)  The Information Memorandum also provided that any transfer of New Notes in the secondary market to a U.S. Person that is not a QIB would be void *ab initio*.  Thus, the Individual Plaintiffs who allegedly only acquired Subordinated Notes in the secondary market could not have relied upon the document that prohibited their transactions and stated on its face that it should not be relied upon

---

[11] In any event, the Trust Deed provided that any dispute based on non-payment on the Subordinated Notes would have to be brought in London.  (FFB Decl. ¶30.)

in connection with any transaction other than the 2010 Restructuring.  The Panamanian Plaintiffs each allege to have relied upon the Information Memorandum in making their decision to acquire Subordinated Notes, but all of these Plaintiffs reside outside of the United States and therefore would not have received, or relied upon, the Information Memorandum --or any alleged misstatement or omission-- in the United States.

Plaintiffs allege that S-K Fund made false and misleading statements in 2011 in Kazakhstan regarding the potential for a second restructuring of BTA Bank, yet only Atlantica and Blu Funds allegedly purchased Subordinated Notes after these statements were made.  Thus, none of the other Plaintiffs could have relied upon those statements in connection with their alleged purchases of Subordinated Notes.  (*See* Am. Compl. ¶52, Ex. A.)  Atlantica and Blu Funds reside in Panama, and could not have relied upon any of these statements in the United States.  Indeed, neither alleges that it reviewed the 2011 statements prior to its alleged purchases.

Plaintiffs' third category of allegedly false and misleading statements relate to investor presentations by BTA Bank from early 2012 that discuss the Bank's exposure on the Recovery Units.  (*See id.* ¶¶63-64.)  Here again Atlantica and Blu Funds are the only Plaintiffs who allegedly purchased Subordinated Notes after these statements were made, and neither alleges that it relied upon those statements in the United States.  In sum, none of these allegations form the basis of any of Plaintiffs' claim and therefore they cannot support an exception to immunity under the FSIA.

- **S-K Fund established a subsidiary for the purpose of marketing S-K Fund's investment in BTA Bank to potential investors, including, on information and belief, investors in the United States**

Once again Plaintiffs allege an act in the United States, not a "direct effect" in the United States.  Additionally, it is an alleged act that has no relevance to Plaintiffs' claims.

Plaintiffs do not allege that they purchased S-K Fund's investment in BTA Bank.  Nor do they allege that they purchased anything from S-K Fund or its subsidiaries.  This allegation is not a basis of Plaintiffs' securities fraud claims and therefore cannot support a "direct effect" exception to immunity.  *See Nelson*, 507 U.S. at 357.  Moreover, the allegation is not supported by any other allegations in the Amended Complaint or by any of the documents referenced in the Amended Complaint.  In fact, S-K Fund does not have any offices or subsidiaries in the United States.  (*See* Sarsenbayev Decl. ¶7.)

In sum, Plaintiffs cannot show that any of these seven newly alleged "direct effects" are in fact effects, let alone direct effects, on Plaintiffs in the United States.  Nor have they shown that these allegations have any relevance to their claims, much less satisfy the "legally significant acts" test applied in the Second Circuit.  None of the alleged acts are a basis of Plaintiffs' claims.  In asserting their claims, Plaintiffs do not rely on any allegation regarding place of payment on the Subordinated Notes, marketing of the securities, or any meetings between Plaintiffs and BTA Bank or S-K Fund.  Accordingly, these new allegations should be disregarded in determining whether jurisdiction exists in this case.

The only alleged effect in the United States contained in the Amended Complaint is set forth in paragraph 15 (which was paragraph 14 of the original Complaint):  "S-K Fund's actions outside the territory of the United States in connection with a commercial activity of S-K elsewhere caused a direct injury in the United States."  (Am. Compl. ¶15.)  The injury alleged by Plaintiffs is the decline in the price of the BTA Bank Subordinated Notes that they allegedly purchased.  (*Id.* ¶¶50, 77, 86.)  This alleged injury, however, cannot satisfy the "direct effect" requirement for purposes of the FSIA.

First, Plaintiffs do not and cannot allege that the Panamanian Plaintiffs, who made the overwhelming majority of Plaintiffs' purchases of Subordinated Notes, suffered any injury in the United States.  It is well-established that alleged financial losses suffered by foreign entities outside of the United States cannot constitute a "direct effect in the United States" for purposes of § 1605(a)(2).  *See Kensington*, 505 F.3d at 158 (financial loss suffered by foreign corporation plaintiff outside the United States does not meet the  "direct effect in the United States" standard).

The same holds true for the Individual Plaintiffs.  The case law is clear that mere financial loss in the United States is insufficient to constitute a direct effect in the United States for purposes of the FSIA.  *See id.*; *Guirlando*, 602 F.3d at 78-79; *Antares,* 999 F.2d at 36.  Plaintiffs cannot support a "direct effects" exception simply by alleging a "direct injury" in the United States.

That Plaintiffs cannot demonstrate the existence of a direct effect within the meaning of Section 1605(a)(2) is further demonstrated by the fact that the exercise of jurisdiction under the circumstances of this case would not comport with due process, to which S-K Fund, as a foreign corporation, is entitled.  *See GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012) (a state-owned corporation is entitled to "all the due process protections available to private corporations") (citing *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 400 (2d Cir. 2009).

Due process is directly related to, and must be part of, any direct effect analysis.  If the "direct effect" exception to immunity applies and service of process is proper under Section 1608, the court has both subject matter and personal jurisdiction over the foreign state.  *See* 28 U.S.C. § 1330(b).  Thus, any such finding also must be consistent with the constitutional

protections of the Due Process Clause.  *See Weltover*, 504 U.S. at 619-20 & n.2 (considering due process "as an aid in interpreting the direct effect requirement").  If the sovereign defendant's contacts with the United States are insufficient to satisfy due process, *a priori* these contacts cannot satisfy the direct effect clause of section 1605(a)(2).  *See, e.g.*, *Carey v. Nat'l Oil Corp.*, 592 F.2d 673, 676-677 (2d Cir. 1979) (affirming dismissal under the FSIA where plaintiff's allegations did not fulfill the minimum contacts requirement of *International Shoe*).

       Plaintiffs here cannot show that S-K Fund had sufficient contacts with the United States to meet the requirements of due process.  S-K Fund has no offices or subsidiaries in the United States and does not hold any assets in the United States.  (Sarsenbayev Decl. ¶¶7-8.) Moreover, it would be highly unreasonable for S-K Fund to be subject to personal jurisdiction in the United States given the deliberate steps taken to limit both the dissemination of the Information Memorandum in the United States and trading in the Subordinated Notes in the United States.  *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 297 (1980); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996), *cert. denied*, 519 U.S. 1006 (1996) (due process requires a plaintiff to allege not only that a defendant has "minimum contacts" with the forum, but that the exercise of jurisdiction is reasonable under the circumstances of the particular case).  The Information Memorandum was made available in the United States only to investors who certified they were either Accredited Investors or QIBs. (FFB Decl. ¶10.)  Additionally, the Subordinated Notes were subject to transfer restrictions that prohibited any offer, sale or transfer to a U.S. Person who was not a QIB.  Any transfer in violation of the transfer restrictions was void *ab initio*.  (FFB Decl., Ex 1 at 311.)  Thus, at no time did S-K Fund purposely avail itself of the privilege of conducting business in the United States.  *See Carey*, 592 F.2d at 676.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE FEDERAL SECURITIES LAWS BECAUSE IT FAILS TO ALLEGE ANY SECURITIES TRANSACTIONS IN THE UNITED STATES

In *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), the Supreme Court held that the federal securities laws apply only to securities transactions that take place in the United States.  Reading the language of Section 10(b) to exclude extraterritorial application, the Court adopted a "transactional test" to limit the reach of Section 10(b) of the Exchange Act to (1) the purchase or sale of a security listed on an American stock exchange, and (2) the purchase or sale of any other security in the United States.  *Id.* at 2888 (dismissing Section 10(b) claims based on investor's stock purchases outside the U.S.).

In establishing the transactional test for Section 10(b), the Supreme Court focused on the location of the plaintiff's purchase or sale of the security, and not on the place where the alleged misstatements were made or relied upon by investors.  *Id.* at 2884.  The Court found allegations regarding the defendant's conduct in the United States insufficient to support the application of Section 10(b) when the relevant transactions occurred offshore: "it is a rare case . . . that lacks *all* contact with the territory of the United States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case."  *Id.* (emphasis in original).

Under *Morrison*, in order to adequately plead a Section 10(b) claim, a plaintiff must allege facts either that the securities were purchased on a domestic exchange or that the securities were otherwise acquired in a domestic transaction.  *Id.*  While the Supreme Court in *Morrison* did not provide guidance on what constitutes a "domestic transaction," the Second Circuit has interpreted the holding to require a showing either that (1) irrevocable liability was incurred in the United States or (2) title passed within the United States.  S*ee Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012).  The plaintiff must plead

sufficient factual detail to create a plausible inference that the transactions occurred in the United States and cannot rely on conclusory allegations regarding the existence of a domestic transaction.  *Id.*

Plaintiffs' allegations concerning the details of their alleged investments in BTA Bank securities fall within two categories.  Plaintiffs Atlantica and Baltica allege that they acquired a small amount of Subordinated Notes in the initial exchange of existing BTA Bank debt securities for New Notes in the 2010 Restructuring:  $600,000 and $340,000 respectively. The remaining purchases by these Plaintiffs, and all of the purchases by the other Plaintiffs, were accomplished in the secondary market.  Plaintiffs do not and cannot allege that any of their purchases occurred on a domestic exchange- the Subordinated Notes were listed on exchanges in Kazakhstan and Luxembourg and never listed on a United States exchange.  (FFB Decl. ¶23.) Instead, Plaintiffs rely on cursory and conclusory allegations to assert that they each incurred irrevocable liability to pay for the securities in the United States.  These allegations are patently insufficient to satisfy the requirements of *Morrison*, as fleshed out by the Second Circuit in *Absolute Activist*.

A.   **Plaintiffs Atlantica and Baltica Have Not Pled a Domestic Transaction in Connection with Their Alleged Initial Investment in Subordinated Notes**

Plaintiffs Atlantica and Baltica allege that they acquired their initial investments in Subordinated Notes by "unconditionally committing" to the 2010 Restructuring through a "communication" to their UBS broker in Miami, Florida and "thereby incurred irrevocable liability to accept the subordinated debt" in the United States.  (Am. Compl. ¶¶7-8.)  This conclusory allegation is insufficient to support the existence of a domestic transaction.  *Absolute Activist*, 677 F.3d at 70 ("mere assertion that transaction 'took place in the United States' is insufficient to adequately plead the existence of a domestic transaction"); *Cornwell v. Credit*

*Suisse Grp.*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010) (allegations that plaintiffs made investment decision and initiated order in the United States insufficient to establish a domestic transaction).

Indeed, Atlantica and Baltica could not have incurred irrevocable liability to accept the Subordinated Notes when they committed to the 2010 Restructuring by a communication to their UBS broker in the United States.  The Information Memorandum provides that there were several conditions that would have to be met before holders of Euronotes could exchange their prior interests for New Notes, including Subordinated Notes.  (FFB Decl., Ex. 1 at 9.)  After holders of each series of Euronotes met and voted on the proposed 2010 Restructuring Plan, all of the other creditors in the Bank were also required to meet and vote on the proposed Plan.  (*Id.*)  These meetings occurred in London and Kazakhstan.  (*Id.*)  Only if the Plan was approved at both meetings, would it be submitted to the Court in Kazakhstan.  (*Id.* at 322.)  Then that Court was required to approve the Plan before it could become effective and any exchange of Euronotes for New Notes could occur.  (*Id.*)

Accordingly, Atlantica and Baltica did not incur irrevocable liability for the Subordinated Notes when they allegedly provided their commitment to the 2010 Restructuring to their broker in Miami.  Rather, their liability to purchase the Subordinated Notes became irrevocable only after all of the conditions precedent required to effectuate the 2010 Restructuring were met.  Those conditions precedent were met in Europe and Kazakhstan, including the final approval by the Court in Kazakhstan.  (*Id.*)  When intervening events are necessary to consummate a security transaction, and when all of these events occur abroad, there can be no domestic transaction.  *See S.E.C. v. Benger*, No. 09 C 676, 2013 WL 593952, at *12

(N.D. Ill. Feb. 15, 2013) (finding no domestic transaction when, under the express terms of the contract, buyer and seller did not incur irrevocable liability until seller accepted offer in Brazil).

Moreover, Atlantica and Baltica, each of whom apparently held interests in Euronotes prior to the 2010 Restructuring, could have only acquired their interests in BTA Bank Subordinated Notes in a transaction occurring in Europe.  Following the effectuation of the 2010 Restructuring Plan, the Euronotes were cancelled and New Notes, including Subordinated Notes, were issued to Direct Participants in Euroclear Bank and Clearstream Banking, who held the New Notes for their own accounts or for the accounts of their customers.  (*Id.* at ¶21.)  The New Notes were the only form of debt securities provided to holders of Euronotes and only Direct Participants in these designated clearing systems could receive New Notes in the 2010 Restructuring.  (*Id.*)  Accordingly, beneficial interests in New Notes, including Subordinated Notes, could only be acquired through or in the accounts of Direct Participants in the designated clearing systems in Europe.  (*Id.*)  Any such transaction would not qualify as a domestic transaction under *Morrison*.  *See S.E.C. v. Tourre*, No. 10 Civ. 3229, 2012 WL 5838794, at *2 (S.D.N.Y. Nov. 19, 2012) (transactions settled through Euroclear were not domestic transactions).

**B.     Plaintiffs Have Not Pled a Domestic Transaction in Connection with
Their Alleged Purchases of Subordinated Notes in the Secondary Market**

The remaining purchases of Subordinated Notes by Atlantica and Baltica, and all of the purchases by the other Plaintiffs, occurred in the secondary market.  (Am. Compl., Ex. A.) With respect to these purchases, Plaintiffs allege that each Plaintiff purchased Subordinated Notes by placing an order with a broker in the Miami, Florida office of UBS Financial Services, who "then transmitted the order to its broker-dealer in New York, New York, where funds from an account [Plaintiff] maintained with UBS were transferred internally to UBS's back office,

where the order was filled and the transaction was completed." (*Id.* ¶¶7-12.) Plaintiffs allege, based on this convoluted description of the transactions at issue, that each Plaintiff "incurred irrevocable liability to pay for the securities at issue in the United States." (*Id.*)

Plaintiffs' allegations fall well short of showing that Plaintiffs in fact acquired the Subordinated Notes in a domestic transaction. Indeed, the allegations are vague and purposefully ambiguous. Plaintiffs are well aware of the requirements of *Morrison* --in the pre-motion correspondence required by the Court, counsel for S-K Fund identified Plaintiffs' failure to plead the existence of a domestic transaction in the original Complaint-- yet Plaintiffs have failed again to plead sufficient detail in the Amended Complaint regarding their transactions in BTA Bank securities to meet *Morrison*'s stringent requirements.

All of the relevant facts regarding the location of their purchases are within Plaintiffs' knowledge or control, yet they fail to provide these facts in the Amended Complaint. Plaintiffs know that UBS is a Swiss bank, and know or can easily determine the location of "UBS's back office, where the order was filled and the transaction was completed." But Plaintiffs have deliberately phrased their allegations to avoid specifying the location of the "back office." Plaintiffs' allegations are also ambiguous as to the location of their accounts with UBS. Plaintiffs fail to distinguish whether their accounts were located in New York or whether the funds were "transferred internally" in New York from accounts located elsewhere. Tellingly, Plaintiffs do not identify where or how the broker-dealer filled the order or where title passed, facts that they could easily obtain from UBS.

By failing to include these critical facts, Plaintiffs have made it impossible to determine where their purchases actually took place. Instead, Plaintiffs make only conclusory allegations regarding where they initiated their purchase orders, which are clearly insufficient to

support the existence of a domestic transaction.  *See In re Societe Generale Sec. Litig.*, No. 08

Civ. 2495, 2010 WL 3910286 at *6 (S.D.N.Y. Sept. 29, 2010); *Cornwell*, 729 F. Supp. 2d at 622.

What is known is that the Subordinated Notes were only listed on foreign

exchanges in Kazakhstan and Luxembourg.  (FBB Decl. ¶ 23.)  Thus, the most plausible

inference to draw from the vague allegations in the Amended Complaint is that Plaintiffs' orders

were "filled" through foreign purchases on a foreign exchange in Kazakhstan or Luxembourg.

But placing an order with a United States broker to purchase securities on an exchange in

Kazakhstan or Luxembourg does not constitute a domestic transaction under *Morrison.  See*

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166,

178 (S.D.N.Y. 2010) (placing an order with a Chicago broker to purchase securities on a foreign

exchange was not a domestic transaction).

Additionally, the New Notes, including the Subordinated Notes, were held by a

Common Depository in London for Direct Participants in Euroclear Bank and Clearstream

Banking.  (FFB Decl. ¶26.)  Any transfers in interests in the New Notes could only occur

through or in the accounts held by Direct Participants in these clearing systems in Europe.  (*Id.*)

While Plaintiffs might have been able to place an order for Subordinated Notes in the United

States, the order must have been executed, cleared and settled through, or reflected in accounts

with Direct Participants, in clearing systems located in Europe.  (*Id.*)

Because Plaintiffs have not alleged the existence of a domestic transaction, their

claims under the Exchange Act must be dismissed for failure to state a claim.  *See Plumbers'*

*Union Local No. 12 Pension Fund*, 753 F. Supp. 2d at 178-79 (dismissing section 10(b) claim

under *Morrison* where plaintiffs placed an order with United States brokers to purchase

securities on a foreign exchange and settled order on a foreign trading platform); *Cornwell*, 729

F. Supp. 2d at 622 (dismissing section 10(b) claim under *Morrison* where purchases occurred on foreign exchanges).

## III.     PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED RELIANCE

An essential element of Plaintiffs' §10(b) claims is reliance.  *See ASTI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007).  A plaintiff who purchases before an alleged misstatement is made cannot allege reliance upon the alleged misstatement.  *See In re Merrill Lynch Auction Rate Secs. Litig. ("Merrill II")*, 765 F. Supp. 2d 375, 384 n.9 (S.D.N.Y. 2011); *O & G Carriers, Inc. v. Smith*, 799 F. Supp. 1528, 1539 (S.D.N.Y. 1992).  A plaintiff also cannot establish reliance in the absence of allegations that he or she actually reviewed the documents containing the alleged misstatement or omission.  *See In re Merrill Lynch Auction Rate Sec. Litig. ("Merrill I")*, 704 F. Supp. 2d 378, 399 (S.D.N.Y. 2010).

Yet a plaintiff must do more than simply allege that he or she reviewed the documents at issue; a plaintiff must also show that reliance on the alleged misstatements or omissions in those documents was reasonable.  *See Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005).  A plaintiff who purchases after the "true facts" regarding the alleged misstatement have been disclosed to the market cannot allege reasonable reliance on the alleged misstatement.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988).  Similarly, when documents contain the very facts that the plaintiff alleges were concealed, the plaintiff cannot show reasonable reliance.  *See Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud.").

Plaintiffs allege three categories of false and misleading statements.  First, Plaintiffs allege that the Information Memorandum did not disclose the existence of a transaction

Plaintiffs call the "Negative Carry Swap." (Am. Compl. ¶¶34-35.) Second, Plaintiffs allege that S-K Fund representatives made false and misleading statements in 2011 regarding the potential for a second restructuring of the Bank. (*Id.* ¶52.) Third, Plaintiffs allege that BTA Bank failed to disclose its liability for Recovery Units in investor presentations that the Bank made in early 2012. (*Id.* ¶63-64.) Yet Plaintiffs have failed to adequately allege reliance with respect to any of these statements.

**A.    Plaintiffs Have Not Adequately Alleged Reliance on Alleged Misstatements Regarding the Negative Carry Swap**

Plaintiffs assert that the Information Memorandum[12] published in May 2010 failed to disclose the alleged Negative Carry Swap. But Plaintiffs concede that in May 2011, "information about the Negative Carry Swap began to leak into the marketplace" and that on May 18, 2011, J.P. Morgan published a research report with additional details regarding the Negative Carry Swap, which allegedly resulted in a significant drop in the price of Subordinated Notes. (Am. Compl. ¶¶48-50.) Accordingly, no transaction in Subordinated Notes that occurred after these disclosures could have been done in reliance on any alleged misstatement or omission regarding the Negative Carry Swap. Significantly, the vast majority of Plaintiffs' purchases, representing over 80% of the value of all of the alleged purchases of Subordinated Notes, occurred after May 18, 2011. Therefore, no claim based on these purchases can survive a motion to dismiss. *See Merrill I*, 704 F. Supp. 2d at 402.

As for the purchases they allegedly made before May 18, 2011, Plaintiffs cannot allege reasonable reliance on any alleged misstatement or omission regarding the Negative Carry

---

[12] Significantly, the Information Memorandum states that "Nothing in this Information Memorandum . . . should be relied on for any purpose other than to make a decision on the Restructuring Plan." (FFB Decl., Ex. 1 at ii.) Accordingly, no Plaintiff who allegedly purchased Subordinated Notes in the secondary market could have reasonably relied upon the Information Memorandum in connection with that alleged purchase. *Sable*, 819 F. Supp. at 339 (plaintiffs could not allege reasonable reliance in light of express warnings in the offering memoranda).

Swap because the Information Memorandum, which Plaintiffs allege they reviewed, disclosed all of the facts that Plaintiffs assert were concealed regarding the alleged transaction.  *See Merrill II*, 765 F. Supp. 2d at 384.

Plaintiffs allege that in connection with the 2010 Restructuring, BTA Bank was directed to purchase $4.3 billion of S-K Bonds paying a nominal interest rate of 4% per year, but that BTA Bank paid S-K Fund a 2% fee in exchange for a guarantee on this sum from S-K Fund so that the effective interest rate on the S-K Bonds was only 2%.  (Am. Compl. ¶41.)  Plaintiffs allege that, at the same time, S-K Fund received interest rates as high as 10.9% on "current account" deposits S-K Fund held with BTA Bank, resulting in an alleged "Negative Carry Swap."  (*Id.*)  Plaintiffs further allege that this transaction constituted an impermissible dividend to S-K Fund, in contravention of the terms of the Information Memorandum, and that the purpose of the transaction, allowing S-K Fund "to siphon hundreds of millions of dollars from BTA Bank at the expense of other creditors," was "wholly undisclosed."  (*Id.*)  Yet each aspect of the alleged "Negative Carry Swap" was set forth in the Information Memorandum, which described the financial relationship between S-K Fund and BTA Bank in detail.

The Information Memorandum includes a separate section describing S-K Fund's efforts to provide liquidity to the Bank.  (FFB Decl., Ex. 1 at 174-78.)  Here, the Information Memorandum disclosed that S-K Fund agreed to accept $4.3 billion of BTA Bonds in exchange for an equal face amount of S-K Bonds.  (*Id.* at 175-76, 178.)  The Information Memorandum explained that BTA Bank used the S-K Bonds as collateral to obtain additional financing from NBK and that S-K Fund guaranteed the Bank's obligations under that loan for a fee of up to 2%

of the face value of the S-K Bonds. [13]  (*Id.* at 8)  The Information Memorandum further provided

that S-K Fund paid BTA Bank an interest rate of 4% on the S-K Bonds, and listed the amount of

interest S-K Fund paid to BTA Bank on these bonds.  (*Id.* at 41, 189.)

       Moreover, the Information Memorandum stated that over 54% of the Bank's total

deposits were held by S-K Fund.  (*Id.* at 233.)  According to the Information Memorandum, S-K

Fund held $1.42 billion in deposits at BTA Bank prior to acquiring a 75% equity interest in the

Bank, and, as part of the liquidity support provided to the Bank in 2009, S-K Fund deposited an

additional $1.04 billion, which included amounts deposited pursuant to the State Finance

Programmes.  (*Id.* at 123, 176-78; 197.)  The Information Memorandum disclosed that S-K

Fund's deposits consisted of both current and term accounts, that these accounts were on the

same terms as the accounts of BTA Bank's other depositors, and that term accounts paid interest

rates ranging from 4% to 12.5%.  (*Id.* at 175, 233.)  Plaintiffs cannot allege reasonable reliance

on a failure to disclose the alleged Negative Carry Swap when the Information Memorandum

disclosed each of the components of the alleged Negative Carry Swap.  *Merrill II*, 765 F. Supp.

2d at 384; *Sable*, 819 F. Supp. at 339.

       Indeed, any reasonable investor would have realized from the disclosures in the

Information Memorandum that, rather than siphoning hundreds of millions of dollars from BTA

Bank, S-K Fund actually invested *billions* of dollars in BTA Bank.  For example, in 2009, BTA

Bank suffered severe outflows of customer deposits.  (FFB Decl. Ex. 1 at 123.)  S-K Fund

responded by increasing its deposits with BTA Bank from $1.42 billion in December 2008 to

over $2.46 billion in September 2009.  (*Id.*)  And the Information Memorandum specifically

---

[13] The "repo" transactions with NBK are discussed at length in the Information Memorandum.  (*See, e.g.,* FFB Decl., Ex. 1 at 8, 15, 42, 121, 155, 178.)  In any event, Plaintiffs allege that interest payments on the NBK transactions were paid to NBK and not S-K Fund.  (Am. Compl. ¶¶4, 41.)

cautioned that these deposits were critical to BTA Bank's ability to continue as a going concern. (*Id.*)

**B.      Plaintiffs Have Not Adequately Alleged Reliance on
          Alleged Misstatements in 2011 Regarding a Second Restructuring**

Plaintiffs allege that in 2011 S-K Fund representatives made statements to reporters in Kazakhstan that a second restructuring could be avoided when, in fact, S-K Fund allegedly knew a second restructuring was necessary. (Am. Compl. ¶52.) Only Atlantica and Blu Funds purchased after these alleged misstatements in 2011. The other Plaintiffs made all of their purchases before the statements were made, and therefore could not have relied on these statements in connection with their alleged purchases. Similarly, Atlantica could not have relied on the 2011 statements with respect to its alleged acquisition of Subordinated Notes in the 2010 Restructuring and alleged purchases in the secondary market in 2010.

Moreover, none of the Plaintiffs can show reasonable reliance on the alleged misstatements in 2011. Plaintiffs allege that BTA Bank defaulted on its debt obligations in January 2012, "signaling that [it] might be unable to continue as a going concern and that it would be unable to satisfy its debt obligations." (*Id.* ¶57.) Plaintiffs did not purchase a single Subordinated Note between the time the statements were made in 2011 and January 2012 when BTA Bank announced the default. Indeed, Atlantica and Blu Funds, the only Plaintiffs who purchased Subordinated Notes after the alleged 2011 misstatements, did so in 2012 after BTA Bank had already defaulted and when Plaintiffs concede a second restructuring was inevitable. (Am. Compl. ¶57). Thus, these Plaintiffs could not have reasonably relied on statements from 2011 that a second restructuring was not necessary. *See Merrill I*, 704 F. Supp. 2d at 402.

**C.      Plaintiffs Have Not Adequately Alleged Reliance on
Alleged Misstatements Regarding the Recovery Units**

Plaintiffs allege that BTA Bank and S-K Fund failed to disclose the Bank's

potential liability for Recovery Units in investor presentations BTA Bank made in early 2012.

(Am. Compl. ¶¶63-64.)  Only Atlantica and Blu Funds allege to have purchased Subordinated

Notes after the dates of these presentations.  Thus, the other Plaintiffs, and Atlantica to the extent

it purchased before the presentations, could not have relied on these presentations in connection

with their alleged purchases of Subordinated Notes.

Moreover, neither Atlantica nor Blu Funds even alleges that it reviewed the

presentations in connection with its alleged purchases of Subordinated Notes.  Thus, neither can

allege that it relied on the presentations.[14]  However, Atlantica and Blu Funds do allege that they

reviewed the Information Memorandum, which sets forth all of the terms of the Recovery Units,

including the potential that the Recovery Units could be accelerated and become an

unconditional obligation of BTA Bank.  (FFB Decl., Ex. 1 at 580.)  Thus, Atlantica and Blu

Funds cannot show reasonable reliance with respect to any alleged failure by BTA Bank or S-K

Fund to disclose the Bank's liability for Recovery Units.  *See Merrill I*, 704 F. Supp. 2d at 400

("Plaintiffs cannot establish reasonable reliance if, through minimal diligence, they could have

discovered" the allegedly undisclosed information).

---

[14] If they had reviewed the 2012 investor presentations, Atlantica and Blu Funds would have seen that the Bank's liability for Recovery Units was specifically discussed in those presentations.  (*See, e.g.,* Pizzurro Decl., Ex. C at 42.)

## IV.      PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED LOSS CAUSATION

The plaintiff must allege a "causal connection between the material misrepresentation and the [plaintiff's] loss," otherwise known as "loss causation."  Failure to do so mandates dismissal of the claim.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *ASTI Commc'ns, Inc.*, 493 F.3d at 106.  To avoid dismissal, a plaintiff must allege facts sufficient to support an inference that it was the defendant's alleged fraud and not other market factors that caused the plaintiff's loss.  *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-74 (2d Cir. 2005).

Plaintiffs here fail to allege sufficient facts to support an inference that their losses were caused by S-K Fund and not other factors affecting BTA Bank.  Indeed, the Amended Complaint identifies a number of factors unrelated to S-K Fund's alleged conduct that caused the decline in the value of the Subordinated Notes, including BTA Bank's default in January 2012 and the announcement of a second restructuring shortly thereafter.  (Am. Compl. ¶57.) Additionally, the documents cited in the Amended Complaint list a number of negative factors affecting BTA Bank that were unrelated to S-K Fund.  The investor presentations that BTA Bank made in early 2012 discuss in detail the level of non-performing loans and deposit outflows that led the Bank to pursue a second restructuring.  (Pizzurro Decl., Ex. B at 20, and Ex. C at 30-40.) Notably, the vast majority of Plaintiffs' purchases, totaling approximately $62.5 million, occurred after the second default in January 2012 and the discussions regarding a second restructuring that began shortly thereafter.  (Am. Compl. ¶50; Ex. A.)  Plaintiffs have not alleged any facts to support loss causation for the securities they purchased after these events.

V.      **PLAINTIFFS HAVE NOT ALLEGED SCIENTER WITH PARTICULARITY**

In addition to meeting the pleading requirements of Rule 9(b), a plaintiff in a private securities fraud action must meet the pleading requirements of the PSLRA, which require that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference of fraudulent intent or "scienter" must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Tellabs, Inc. v. Makor Issue & Rights, Ltd.*, 425 U.S. 308, 314 (2007).  Plaintiffs here fail to allege facts that give rise to any inference of fraudulent intent, much less the strong inference of fraudulent intent required by the PSLRA.

A.      **The Complaint Fails to Allege That S-K Fund Acted with Scienter With Respect to the Negative Carry Swap**

When the defendant has disclosed the very practices that the plaintiff claims were fraudulent and intentionally omitted, the plaintiff cannot establish a strong inference of scienter.  *See Merrill II*, 765 F. Supp. 2d at 387.  "When adequate disclosures are made, it cannot be said that a defendant's conduct is highly unreasonable and represents an extreme departure from the standards of ordinary care."  *In re Merrill Lynch Auction Rate Secs. Litig. ("Merrill III")*, 851 F. Supp. 2d 512, 529 (S.D.N.Y. 2012).

Here Plaintiffs allege that S-K Fund failed to disclose the alleged Negative Carry Swap, which S-K Fund knew "would doom BTA Bank to failure, enriching S-K Fund at the expense of Plaintiffs and other BTA Bank creditors."  (Am. Compl. ¶37.)  Yet the Information Memorandum disclosed the components of the Negative Carry Swap that Plaintiffs allege were

concealed.[15]  The details of the alleged transaction, including the different interest rates BTA

Bank paid to and received from S-K Fund, are set forth in detail in the Information

Memorandum.  (FFB Decl., Ex. 1 at 41, 176-78.)  The amount of interest that the Bank paid to

and received from S-K Fund is also set forth in the Information Memorandum.  (*Id.* at 189, 279.)

Because these components of the allegedly concealed Negative Carry Swap were fully disclosed

in the Information Memorandum, Plaintiffs have not pled facts supporting a strong inference of

scienter.  *See Press v. Quick & Reilly*, No. 96 CIV 4278, 1997 WL 458666, at *5 (S.D.N.Y. Aug.

11, 1997); *In re UBS AG Secs. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *15 (S.D.N.Y.

Sept. 28, 2012).

> Plaintiffs further allege that the real and undisclosed purpose of the alleged

Negative Carry Swap was to allow S-K Fund to siphon funds from BTA Bank.  (Am. Compl.

¶41.)  However, that supposed scheme makes no economic sense whatsoever.  Plaintiffs are

alleging that S-K Fund entered into a scheme to siphon off hundreds of millions of dollars from

the Bank, and also allege that S-K Fund knew this scheme would "doom the Bank to failure."

(*Id*. ¶37.)  Thus, Plaintiffs allege that S-K Fund entered into a scheme that could result in the

total loss of its $5.7 billion equity stake in BTA Bank as well as its more than $2.46 billion in

deposits in order to obtain relatively short term gains.  But the law is clear that Plaintiffs cannot

establish a strong inference of scienter based on allegations of fraudulent intent that are

economically implausible.  *See Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where

'plaintiff's view of the facts defies economic reason, …[it] does not yield a reasonable inference

---

[15] The Information Memorandum also provided that it should be relied on for no other purpose that to make a decision on the Restructuring Plan.  (FFB Decl., Ex. 1 at ii.)  Courts have found plaintiffs have failed to plead scienter where the allegedly fraudulent document disclaims reliance.  *See Sable*, 819 F. Supp. 337 (plaintiffs failed to allege scienter where offering memoranda contained stringent cautionary language); *see also Ruff v. Genesis Hldgs. Corp.*, 728 F. Supp. 225, 228 (E.D.N.Y. 1990) (allegations of fraudulent intent were belied by cautionary language in offering memorandum).

of fraudulent intent.'") (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)); *see also In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (allegations that the defendant risked substantial sums of money by participating in an allegedly fraudulent scheme yielding nominal returns defy economic reason and do not give rise to a plausible inference of scienter), *aff'd sub. nom. ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d. Cir. 2009).

## B.     The Complaint Fails to Allege Scienter With Respect to Statements in 2011 Regarding Post-Restructuring Prospects

Statements of corporate optimism and predictions of future performance do not support a strong inference of scienter. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, No. 12-1776-cv, 2012 WL 6621391, at *3-4 (2d Cir. Dec. 20, 2012); *Gissin v. Endres*, 739 F. Supp. 2d 488, 511 (S.D.N.Y. 2010); *Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 172 (S.D.N.Y. 2002). Without specific allegations showing the defendant knew or should have known that the statement was false and misleading, a plaintiff cannot establish scienter based on statements regarding the prospects of a corporate endeavor. *Shields*, 25 F.3d at 1129-30.

Accordingly, Plaintiffs cannot establish a strong inference of fraudulent intent based on statements in the Information Memorandum and in news reports attributed to S-K Fund concerning BTA Bank's post-restructuring prospects. Statements such as "the Bank believes the Restructuring will allow the Bank to continue as a going concern" and S-K Fund will "not let [BTA Bank] get into trouble" are nothing more than immaterial expressions of corporate optimism and predictions of future performance that do not support any inference of fraudulent intent. *See id.* at 1129 ("misguided optimism is not a cause of action, and does not support an inference of fraud"); s*ee also Plumbers' Union Local 12 Pension Fund v. Swiss Reinsurance*

*Co.*, 753 F. Supp. 2d 166, 185 (S.D.N.Y. 2010) ("Because … plaintiffs have failed to allege false

or materially misleading statements, they have also failed to raise a strong inference of conscious

misbehavior or recklessness"); *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, No. 11 Civ.

398, 2012 WL 4616958, at *8 (S.D.N.Y. Sept. 28, 2012) (optimistic statements were insufficient

to raise a strong inference of scienter).

C.     **The Complaint Fails to Allege Scienter with**
       **<u>Particularity With Respect to the Recovery Units</u>**

      Plaintiffs also have not pled facts showing that S-K Fund acted with fraudulent

intent with respect to the Recovery Units.  Plaintiffs allege that BTA Bank made two

presentations to creditors in connection with the 2012 Restructuring that failed to disclose a

potential $5 billion liability relating to certain Recovery Units.  (Am. Compl. ¶¶ 63-64.)

However, BTA Bank's potential liability on the Recovery Units had already been specifically

disclosed in the Information Memorandum.  (FFB Decl., Ex 1 at 497-515.)  Moreover, the

investor presentation from March 2012 expressly cautions that BTA Bank could potentially

become liable for the full reference amount of the Recovery Units of $5.2 billion.  (Pizzurro

Decl., Ex. C at 42, 45.)  Therefore, the allegations in the Amended Complaint that BTA Bank

failed to disclose its liability on the Recovery Units cannot give rise to a strong inference of

scienter because BTA Bank's liability on the Recovery Units was publicly disclosed.  *See*

*Merrill II*, 765 F. Supp. 2d at 387; *In re UBS AG Secs. Litig.*, 2012 WL 4471265, at *15.

VI.     **<u>PLAINTIFFS FAIL TO ALLEGE A SECTION 20(a) VIOLATION</u>**

      Plaintiffs' Section 20(a) claim against S-K Fund is wholly derivative of its

Section 10(b) claims related to the activity of BTA Bank and S-K Fund.  Thus, Plaintiffs' failure

to adequately plead a violation of Section 10(b), including their failure to adequately plead the

existence of a domestic transaction, as set forth *supra* (pp. 26-42) must result in a dismissal of Plaintiffs' Section 20(a) claims.

Plaintiffs have failed to allege other elements of a Section 20(a) violation as well. Plaintiffs must allege that S-K Fund was, in some meaningful way, a culpable participant in any purported fraud or alleged misstatement. *See In re Global Crossing Ltd. Secs. Litig. ("Global Crossing")*, No. 02 Civ. 910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005). They have failed to do so here.

The sole allegations in the Amended Complaint in support of Plaintiff's Section 20(a) claims are that S-K Fund owns more than 75% of BTA Bank and that "S-K Fund directed the terms of the 2010 Restructuring." (Am. Compl. ¶88.) But those allegations alone are insufficient to plead culpable participation. *See Global Crossing,* 2005 WL 1907005, at *12 ("For Section 20 claims . . . culpable participation is an element . . . and plaintiffs must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.") Plaintiffs have not allege facts giving rise to a strong inference that S-K Fund knew or should have known that BTA Bank was engaged in fraud. Indeed, Plaintiffs have failed even to show that BTA Bank was engaged in fraud. Plaintiffs' Section 20(a) claim should be dismissed.

## CONCLUSION

As set forth above, S-K Fund is entitled to sovereign immunity in this case, and thus the Court lacks both subject matter and personal jurisdiction.  Furthermore, the Amended Complaint has failed to state a claim because Plaintiffs have not adequately alleged the existence of a domestic transaction to which the United States securities laws could apply.  Finally, even if those laws did apply, Plaintiffs have failed to meet their burden of pleading any violation.  The Amended Complaint should be dismissed in its entirety.

Dated: New York, New York
        May 6, 2013

                              Respectfully submitted,

                              CURTIS, MALLET-PREVOST,
                                COLT & MOSLE LLP

                              By:   /s/ *Joseph D. Pizzurro*
                              Joseph D. Pizzurro
                              Jonathan J. Walsh
                              101 Park Avenue
                              New York, NY 10178
                              Tel:  (212) 696-6000
                              Fax:  (212) 697-1559

                              *Attorneys for Defendant S-K Fund*