# Exhibit 1
# Part A

**THIS INFORMATION MEMORANDUM IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.** If you are in any doubt as to the action you should take, you are recommended to immediately seek advice from your own appropriately authorised independent financial adviser.

---

**INFORMATION MEMORANDUM AS AMENDED AND RESTATED TO REFLECT THE CHANGES SET OUT IN ANNEX 1 OF THE SUPPLEMENT DATED 19 MAY 2010 AND THE SUPPLEMENT DATED 27 MAY 2010**

*Prepared for the information of the holders of certain financial indebtedness of JSC BTA Bank and its subsidiaries in connection with the Restructuring Plan referred to herein.*



# JSC BTA BANK

*(a joint stock company incorporated in the Republic of Kazakhstan with registered number 39031900 AO)*

---

**An investment in the New Notes, Shares and GDRs involves a high degree of risk.  See "*Risk Factors*".**

A meeting of the Claimants to consider the Restructuring Plan will be held on 28 May 2010 at 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36 Kurmangazy Street, Almaty 050021, Republic of Kazakhstan.  The Notice of the Claimants' Meeting is set out in Schedule 3 (*Notice of Claimants' Meeting*).  Whether or not relevant Claimants intend to attend the Claimants' Meeting they are requested to complete, execute and return the Claim Form and Form of Proxy included in this Information Memorandum in accordance with the instructions set out herein as soon as possible but, in any event, to be received no later than 5:00 p.m. (Almaty time) on 19 May 2010, except for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute (who have until 10:00 a.m. (Almaty time) on 26 May 2010), and as otherwise provided herein.   Claim Forms and Forms of Proxy are available on the Bank's website (www.bta.kz/en/investor).

Meetings of the holders of each series of Euronotes will be held on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW to consider and if thought fit to pass an Extraordinary Resolution approving, among other things, the Restructuring Plan and an instruction to the Trustee to vote the full principal amount of each Series at the Claimants' Meeting.  The Notices of the Euronoteholders' Meetings are set out in Schedule 5 (*Notices of Euronoteholders' Meetings*).  Euronoteholders are requested to submit Electronic Instruction Forms so that they are received no later than 10:00 a.m. (London time) on 5 May 2010.

A meeting of the shareholders of (including the holder of the Perpetual Securities issued by) BTA Finance Luxembourg was held on 22 April 2010 to consider and if thought fit to pass an extraordinary resolution, *inter alia*, to amend the articles of association of BTA Finance Luxembourg and to approve the Restructuring Plan.  A copy of each of the notice convening the meeting and the notice to beneficial owners of the Perpetual Securities is set out in Schedule 6 (*BTA Finance Luxembourg S.A. Notices*).  The meeting approved the Restructuring Plan but was otherwise inquorate in respect of part of the resolutions proposed, and was adjourned to 25 May 2010.

Beneficial owners of those CHF Notes which are held in Euroclear or Clearstream are required to submit electronic voting instructions appointing The Bank of New York Mellon to vote as proxy at the Claimants' Meeting and to submit a Claim Form on their behalf.  Holders of CHF Notes in individual certificated form must submit Claim Forms and Forms of Proxy directly to the Bank.

The Bank published a non-exhaustive Preliminary Debt List on 22 April 2010, an updated version of which is set out at Schedule 1 (*The Restructuring Plan*), Annex 1 (*Preliminary Debt List*), specifying the amount and classification applicable to certain Claims subject to the Restructuring Plan.  See Schedule 1 *(The Restructuring Plan)* — "*Verification of Quantum and Classification and Admission of Claims*" for further information.

If Claimants do not submit a Claim Form to the Bank on or prior to the Claims Submission Date, their Claims will be cancelled, but the Bank may, in its sole and absolute discretion, admit such Claims.  Euronoteholders are not required to submit a Claim Form in respect of their Euronotes.  The Trustee will instead submit on their behalf a Claim Form in respect of the outstanding Euronotes in accordance with the instructions of the relevant Euronoteholders.  Each lender under a syndicated or bilateral loan facility must submit its own Claim Form.

If Claimants approve the Restructuring Plan at the Claimants' Meeting, a hearing before the Court will be necessary in order to approve the Restructuring Plan.  All Claimants are entitled to attend the Court hearing in person or through counsel to support or oppose the Court approval of the Restructuring Plan.  The Bank will announce the date and location of such hearing on a Regulatory Information Service and the Bank's website (www.bta.kz/en/investor) at least 14 days in advance of such hearing.

The New Notes, Shares and GDRs have not been and will not be registered under the United States Securities Act of 1933, as amended (the "**Securities Act**").  As a result, Claimants who are in the United States or who are U.S. persons within the meaning of Regulation S of the Securities Act (each a "**U.S. Person**") will be eligible to participate in the Restructuring Plan only if they are either "qualified institutional buyers" ("**QIBs**") as defined in Rule 144A or "accredited investors" ("**Accredited Investors**") as defined in Rule 501(a) of Regulation D unless the Bank in any instance otherwise agrees.  Offers and issuances of New Notes, Shares and GDRs to persons outside the United States who are not U.S. Persons will be made in reliance on Regulation S subject to the conditions otherwise provided herein.

No person has been authorised by the Bank to give any information or make any representation other than those contained in this Information Memorandum and the accompanying documents and, if given or made, such information or representation must not be relied upon as having been so authorised.

This Information Memorandum is, subject to certain restrictions, available on the Bank's website (www.bta.kz/en/investor).

2 June 2010

**IMPORTANT NOTICE**

You must read the following before continuing.  The following applies to the Information Memorandum, and you are therefore advised to read this carefully before reading, accessing or making any other use of the Information Memorandum.  In accessing the Information Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

THIS INFORMATION MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED OTHER THAN AS PROVIDED BELOW AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER.  ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORISED.  FAILURE TO COMPLY WITH THIS NOTICE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**THE NEW NOTES, SHARES AND GDRS ARE BEING OFFERED, AND WILL BE ISSUED ONLY TO, CLAIMANTS (I) OUTSIDE THE UNITED STATES THAT ARE NOT U.S. PERSONS OR (II) WITHIN THE UNITED STATES (IN PRIVATE TRANSACTIONS PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT) THAT ARE EITHER ACCREDITED INVESTORS OR QIBs (EACH AN "ELIGIBLE INVESTOR") UNLESS THE BANK IN ANY INSTANCE OTHERWISE AGREES.  ONLY ELIGIBLE INVESTORS AND CLAIMANTS WHO ARE OUTSIDE THE UNITED STATES, ARE NOT U.S. PERSONS AND ARE OTHERWISE ELIGIBLE, AS PROVIDED HEREIN, ARE AUTHORISED TO ACCESS OR RECEIVE THIS INFORMATION MEMORANDUM.**

**THIS INFORMATION MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY.  NONE OF THE SECURITIES REFERRED TO IN THIS INFORMATION MEMORANDUM SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**The New Notes, Shares and GDRs are subject to restrictions on transferability and resale and may not be transferred or resold except in accordance with the Securities Act and other applicable securities laws, pursuant to registration or an exemption therefrom.  See "*Issuance and Transfer Restrictions*".**

**CONFIRMATION OF YOUR REPRESENTATION:** By accessing this Information Memorandum you shall be deemed to represent that you are either (i) a person other than a U.S. Person and have received this Information Memorandum outside the United States or (ii) an Eligible Investor that is acquiring the New Notes, Shares or GDRs for its own account or the account of another person that is an Eligible Investor.

If you wish to participate in the Restructuring Plan and you are a Claimant who is a U.S. Person and is not an Eligible Investor, please contact the Bank by emailing zhaisanov@bta.kz or calling +7 727 3124671.

Lazard Frères and UBS Limited are acting as Financial Advisers to the Bank and to no one else in connection with the Restructuring and will not be responsible to anyone other than the Bank for providing the protections afforded to clients of Lazard Frères or UBS Limited nor for giving advice in relation to the Restructuring.

You should not construe the contents of this Information Memorandum as legal, tax or financial advice.  You are recommended to consult your own professional advisers as to legal, tax, financial or other matters relevant to the action you should take in connection with the Restructuring Plan.  This Information Memorandum has been prepared to assist Claimants and Euronoteholders to decide

whether and how to vote on the Restructuring Plan. Pursuant to Clause 2.3 of the Restructuring Plan, various provisions of the Information Memorandum form an integral part of the Restructuring Plan.

The summary of the principal provisions of the Restructuring Plan contained in this Information Memorandum is qualified in its entirety by reference to the Restructuring Plan itself, the full text of which is set out in Schedule 1 (*The Restructuring Plan*). Each Claimant and Euronoteholder is advised to read and consider carefully the full text of the Restructuring Plan.

The distribution of this Information Memorandum and the distribution of New Notes, Shares and GDRs may be restricted by law in certain jurisdictions. The Bank makes no representation that this Information Memorandum or the New Notes, Shares or GDRs may be lawfully distributed in any jurisdiction or assumes any responsibility for facilitating any such distribution. Accordingly, neither this Information Memorandum nor any other offering material may be distributed or published, and none of the New Notes, Shares or GDRs may be distributed, in any jurisdiction, except under circumstances that will result in compliance with all applicable laws and regulations. Persons into whose possession this Information Memorandum may come must inform themselves about, and observe any such restrictions on the distribution of this Information Memorandum and the distribution of the New Notes, Shares and GDRs.

Claimants entitled to the distribution of New Notes, Shares or GDRs under the Restructuring Plan must comply with all laws and regulations applicable to them in force in any jurisdiction and must obtain any consent, approval or permission required to be obtained by them under the laws and regulations applicable to them in force in any jurisdiction to which they are subject and the Bank shall not have any responsibility therefor.

Nothing in this Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan. In particular and without limitation, nothing in this Information Memorandum or any other document issued with or appended to it should be relied on in connection with the purchase of any shares (other than under the Restructuring Plan), or assets of the Bank. This Information Memorandum has been prepared in connection with the proposal in relation to the Restructuring Plan of the Bank under the Restructuring Law.

The information contained in this Information Memorandum has been prepared based upon information available to the Bank. To the best of the Bank's knowledge, information and belief, the information contained in this Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information. The Bank has taken all reasonable steps to ensure that this Information Memorandum contains the information reasonably necessary to enable Claimants and Euronoteholders to make an informed decision about the Restructuring Plan. None of the Bank's legal, financial or tax advisers, the members of the Steering Committee, the Steering Committee's legal, financial, tax or other advisers, the Trustee or the Trustee's legal advisers have authorised the contents of this Information Memorandum or any part of it nor do they accept any responsibility for the accuracy, completeness or reasonableness of the statements contained within it.

None of the Bank's legal, financial, tax or other advisers, the members of the Steering Committee, the Steering Committee's legal, financial, tax or other advisers, the Trustee or the Trustee's legal advisers have verified that the information contained in this Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information and each of those persons expressly disclaims any responsibility for such information.

Nothing contained in this Information Memorandum shall be deemed to be a forecast, projection or estimate of the Bank's future financial performance except where otherwise specifically stated. This Information Memorandum contains certain statements, statistics and projections that are, or may be, forward-looking. See *"Forward-Looking Statements"*. By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future. Although the Bank believes that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to be correct.

Claimants should inform themselves about and observe any legal requirements applicable in their own jurisdictions to the participation in the Restructuring Plan and the receipt of any New Notes, Shares or GDRs and should consult their professional advisers and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection therewith, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in all applicable jurisdictions.  Any failure to comply with these restrictions may constitute a violation of the securities law of any such jurisdiction.

Claimants and Euronoteholders should consult their own financial, legal and tax advisers with respect to the financial, legal and tax consequences of the Restructuring Plan in light of their particular circumstances.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).  No member of the Steering Committee expresses any opinion as to the merits of the Restructuring Plan.  The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.

The Bank has been required by the members of the Steering Committee to make public in this document all inside information, material non-public information or information that is price sensitive which has been supplied to the members of the Steering Committee by the Bank.  The Bank believes that it has performed this obligation and that, following the publication of this Information Memorandum, the members of the Steering Committee have no wider information, material, non-public information or information that is price sensitive which has been supplied to them by the Bank.  None of the members of the Steering Committee or the Steering Committee's legal, financial or tax advisers have verified such assertion and each of those persons expressly disclaims any responsibility for such assertion.

## NO ADMISSION OF LIABILITY OR WAIVER

All the statements in this Information Memorandum are made solely in connection with the Restructuring Plan.  Accordingly, they do not constitute, and should not be deemed to be, admissions of liability on the part of the Bank or any other party.  Nothing herein shall prejudice any right of the Bank in any pending or future legal or other proceedings to dispute the claim of any person in respect of or in connection with any indebtedness or the amounts of such indebtedness or to bring any claim or counterclaim against any Person and nothing herein shall imply that any person described herein as a Claimant or Euronoteholder or having the benefit of a claim has a valid claim against the Bank or any other party nor shall the payment of any Distributions constitute a waiver or relinquishment of any claim available to the Bank against any Person.

## NOTICE TO CLAIMANTS IN THE UNITED STATES

THE NEW NOTES, SHARES AND GDRS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION IN THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS.  NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE NEW NOTES, SHARES AND GDRS NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE NEW NOTES, SHARES, GLOBAL DEPOSITARY RECEIPTS OR THE ACCURACY OR ADEQUACY OF THIS INFORMATION MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE IN THE UNITED STATES.

**NOTICE TO CLAIMANTS IN THE EUROPEAN ECONOMIC AREA**

This Information Memorandum is only addressed to and directed at persons in member states of the European Economic Area (the "**EEA**") who are "Qualified Investors" within the meaning of Article 2(1)(e) of the Prospectus Directive.  The New Notes, Shares and GDRs are only available to Qualified Investors, unless in any instance the Bank otherwise agrees.   This Information Memorandum and its contents should not be acted upon or relied upon in any member state of the EEA by persons who are not Qualified Investors.  The expression "**Prospectus Directive**" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

**NOTICE TO CLAIMANTS IN THE REPUBLIC OF KAZAKHSTAN**

The New Notes, Shares and GDRs may only be distributed in Kazakhstan to institutions or individuals in Kazakhstan, including banks, brokers, dealer participants, pension funds and collective investments institutions, as well as central government, large international and supranational organisations, other institutional investors and other parties, including treasury departments of commercial enterprises, which as an ancillary activity regularly invest in securities.

**TABLE OF CONTENTS**

Page

EXPECTED SEQUENCE OF PRINCIPAL EVENTS .......................................................................3
LETTER FROM THE CHAIRMAN OF THE MANAGEMENT BOARD OF THE BANK ..............5
KEY TERMS AND DEFINITIONS...............................................................................................13
TERMS OF THE RESTRUCTURING PACKAGES ....................................................................46
ALLOCATION MECHANISM .....................................................................................................56
PART II – ALLOCATION OF AGREED OFFICIAL GOVERNMENT SECTOR DEBT
    BETWEEN SENIOR PACKAGES 1 AND 2 .....................................................................58
PART III – EURONOTEHOLDERS ............................................................................................60
BANK CREDITOR SPVS...............................................................................................................61
THE GDR PROGRAMME ..............................................................................................................64
UNDERTAKINGS BY THE BANK AND SAMRUK-KAZYNA.................................................69
SHARE DISTRIBUTION AND RIGHTS OF MINORITY SHAREHOLDERS ...........................75
INFORMATION FOR CLAIMANTS..............................................................................................86
PRESENTATION OF FINANCIAL AND OTHER INFORMATION .........................................111
FORWARD-LOOKING STATEMENTS ......................................................................................114
EXCHANGE RATES AND EXCHANGE CONTROLS ..............................................................116
ENFORCEMENT OF FOREIGN JUDGMENTS AND ARBITRAL AWARDS ..........................118
RISK FACTORS ...........................................................................................................................119
PRO FORMA FINANCIAL INFORMATION .............................................................................145
THE BANK ....................................................................................................................................150
SELECTED CONDENSED CONSOLIDATED FINANCIAL DATA .........................................187
MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS
    AND FINANCIAL CONDITION ...................................................................................191
SELECTED STATISTICAL AND OTHER INFORMATION .....................................................220
ASSET AND LIABILITY MANAGEMENT ...............................................................................240
MANAGEMENT AND CORPORATE GOVERNANCE ............................................................256
RELATED PARTY TRANSACTIONS.........................................................................................277
PRINCIPAL SHAREHOLDERS..................................................................................................281
THE BANKING SECTOR IN KAZAKHSTAN...........................................................................284
DESCRIPTION OF SHARE CAPITAL AND CERTAIN MATTERS OF KAZAKHSTAN
    LAW..................................................................................................................................295
TAXATION ...................................................................................................................................307
ISSUANCE AND TRANSFER RESTRICTIONS ........................................................................310
FORM OF THE NON-TENGE NEW NOTES AND PROVISIONS RELATING TO SUCH
    NOTES IN GLOBAL FORM ..........................................................................................314
ADDITIONAL INFORMATION ..................................................................................................321
SCHEDULE 1 — THE RESTRUCTURING PLAN......................................................................322
    ANNEX 1 — PRELIMINARY DEBT LIST .....................................................................337
    ANNEX 2 — CALCULATION OF ENTITLEMENTS.....................................................349
    ANNEX 3 — FORM OF DEED OF RELEASE ...............................................................350
SCHEDULE 2 — CLAIM FORM .................................................................................................353
SCHEDULE 3 — NOTICE OF CLAIMANTS' MEETING .........................................................364
SCHEDULE 4 — FORM OF PROXY ..........................................................................................365
SCHEDULE 5 — NOTICES OF EURONOTEHOLDERS' MEETINGS .....................................369
SCHEDULE 6 — BTA FINANCE LUXEMBOURG S.A. NOTICES .........................................485
    ANNEX 1 — NOTICE OF SHAREHOLDERS' MEETING.............................................486
    ANNEX 2 — NOTICE FROM REGISTERED HOLDER TO BENEFICIAL OWNERS OF
        PERPETUAL SECURITIES ...............................................................................493
    ANNEX 3 — CORRECTION TO NOTICE OF SHAREHOLDERS' MEETING....................498
SCHEDULE 7 — TURANALEM FINANCE B.V. DRAFT PLAN OF COMPOSITION ..............499
SCHEDULE 8 — NOTICE TO BENEFICIAL OWNERS OF CHF NOTES .................................502

SCHEDULE 9 — TERMS AND CONDITIONS OF THE NEW NOTES AND THE RCTFF ........ 510
   ANNEX 1 — TERMS AND CONDITIONS OF THE SENIOR DOLLAR NOTES ................ 510
   ANNEX 2 — TERMS AND CONDITIONS OF THE DOLLAR ORIGINAL ISSUE
       DISCOUNT NOTES ....................................................................... 528
   ANNEX 3 — TERMS AND CONDITIONS OF THE EURO ORIGINAL ISSUE
       DISCOUNT NOTES ....................................................................... 546
   ANNEX 4 — TERMS AND CONDITIONS OF THE RECOVERY UNITS............................ 564
   ANNEX 5 — TERMS AND CONDITIONS OF THE DOLLAR SUBORDINATED NOTES . 588
   ANNEX 6 — TERMS AND CONDITIONS OF THE EURO SUBORDINATED NOTES ...... 602
   ANNEX 7 — SUMMARY OF TENGE NEW NOTES ............................................. 616
   ANNEX 8 — TERMS AND CONDITIONS OF THE RCTFF ....................................... 618
SCHEDULE 10 — REPRESENTATIONS AND WARRANTIES OF THE BANK ..................... 632
SCHEDULE 11 — COVENANTS OF THE BANK ...................................................... 638
SCHEDULE 12 — CONDITIONS PRECEDENT TO THE RESTRUCTURING PLAN
  BECOMING EFFECTIVE .............................................................................. 655
INDEX TO FINANCIAL STATEMENTS ...................................................................... F1

## CATEGORIES OF CLAIMANTS

The Restructuring Plan will involve all Claimants in respect of any obligations of the Bank or its Finance Subsidiaries arising directly or indirectly in relation to Designated Financial Indebtedness. Designated Financial Indebtedness is defined under "*Key Terms and Definitions*" and consists broadly of all financial indebtedness of the Bank and its Subsidiaries and any guarantee or surety made or given by the Bank in relation to such financial indebtedness but does not include Excluded Debt.

The following persons are examples of categories of Claimants that must take action in respect of the Restructuring Plan:

- Trustees on behalf of the Euronoteholders;

- holders of notes denominated in Russian Roubles ("**Rouble Noteholders**") which have the benefit of a surety given by the Bank;

- holders of Tenge-denominated securities issued by the Bank (including Kazakhstan pension funds) ("**Domestic Noteholders**");

- counterparties in respect of derivatives contracts and with residual swap exposures;

- trade finance creditors (including Non-OGSC Eligible Trade Finance Creditors);

- Official Government Sector Creditors;

- financial creditors holding Perpetual Securities (and all related Claims under the Support Agreement);

- syndicated and bilateral lenders;

- counterparties under Shariah-compliant arrangements; and

- any other financial creditors who have Claims on the Bank.

The following persons are "**Excluded Creditors**":

(a)    ordinary trade creditors of the Bank (including providers of overnight funds on the money markets);

(b)    creditors with respect to Self-Liquidating Trade Finance Transactions;

(c)    Official Government Sector Creditors with contingent claims (or parts thereof) against the Bank that have not crystallised, matured or fallen due prior to 30 June 2010;

(d)    trade finance creditors which would be Non-OGSC Eligible Trade Finance Creditors but for the proviso in paragraph (iv) of the definition of Non-OGSC Eligible Trade Finance Debt;

(e)    all holders of current accounts, correspondent accounts and deposits with the Bank (including the BV Deposits);

(f)    the Government of Kazakhstan and any of its agencies (including the NBK and municipalities) in respect of Government Funding of up to KZT125 billion (plus accrued interest) for transactions entered into prior to 1 March 2010 and the Government of Kazakhstan and any of its agencies (including the NBK and municipalities) in respect of Government Funding for transactions entered into on and after 1 March 2010;

(g)    holders of Financial Indebtedness not exceeding U.S.$125 million incurred in relation to transactions entered into after 14 April 2009 or entered into before that date and not then funded or which are fully cash collateralised or including a U.S.$6.25 million standby letter of credit to be issued by the Bank and confirmed by Bank of New York Mellon in favour of

VISA International and any cash collateral securing the Bank's obligations in relation to that letter of credit;

(h)     employees of the Bank in respect of claims *qua* employee;

(i)     the Steering Committee, the advisers to the Steering Committee and the advisers to the Bank, but only to the extent such claims relate to outstanding fees, costs and expenses payable by the Bank under the relevant appointment or engagement letters;

(j)     the Supervisor, the Adjudicator, the Independent Auditor, the Recovery Assets Auditor and the Creditor Directors; and

(k)     the trustees for the Euronoteholders in respect of their indemnity rights against the Group.

**Any liability of the Bank to a Related Party (other than Excluded Debt) will be (unless otherwise specified in the Restructuring Plan) cancelled on the Restructuring Date.  Related Parties are entitled to submit Claim Forms and to vote at the Claimants' Meeting but, other than as specifically provided in relation to the Finance Subsidiaries, are not eligible to receive Distributions.**

## EXPECTED SEQUENCE OF PRINCIPAL EVENTS

Claimants and Euronoteholders should observe the deadlines set by any institution or settlement system through which they hold any Designated Financial Indebtedness to ensure that their Electronic Instruction Form or Form of Proxy is delivered on time for the purposes of voting at the applicable Euronoteholders' Meeting or the Claimants' Meeting, as the case may be.

**Dates specified for particular events relating to the Restructuring in this Information Memorandum are indicative only and are subject to change.**  The date of the final approval of the Restructuring Plan by the Court and of the Euronoteholders' and Claimants' meetings have not been finally settled, although they are expected to occur on or about the dates indicated.  The Bank reserves the right to revise this timetable and will give appropriate notice thereof to Claimants.

Key dates relating to the process of adjudication of trade finance Indebtedness and Official Government Sector Debt) are set out at "*Information for Claimants — Trade Finance Creditors and Official Government Sector Creditors*".  Other key dates are as follows:

| | |
|---|---|
| Preliminary Debt List published | 22 April 2010 |
| Meeting of Shareholders of BTA Finance Luxembourg | 12.00 noon (Central European time), 22 April 2010 |
| Adjudication Submission Expiry Date (last date for Claimants to notify the Bank of disagreement with classification or quantum of Claims in Preliminary Debt List) | 28 April 2010 |
| Voting Instructions Deadline for Euronotes | 10:00 a.m. (London time), 5 May 2010 |
| Scheduled Supervisor Determination Date (last date for Supervisor to make determinations in respect of Disputed Claims) | 6 May 2010 |
| Euronoteholders' Meetings | 7 May 2010, 21 clear days after notice to Euronoteholders |
| Claims Submission Date (deadline for submission of Claim Forms and Forms of Proxy) | 5:00 p.m. (Almaty time), 19 May 2010 |
| Voting Instructions Deadline for adjourned Euronoteholders' Meetings | 10:00 a.m. (London time), 21 May 2010 |
| Completion of good faith negotiations to agree final and binding amounts by reference to all non-Minor Quantum Discrepancies and disputes as to classification of Disputed Claims and satisfaction of pre-Euronoteholders' Meetings Conditions Precedent | 23 May 2010 |
| Adjourned Euronoteholders' Meetings (if necessary) | 24 May 2010 |
| Adjourned meeting of shareholders of BTA Finance Luxembourg | 25 May 2010 |

| | |
|---|---|
| Deadline to submit Claim Forms for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute on the Claims Submission Date | 10:00 a.m. (Almaty time), 26 May 2010 |
| Register of Agreed Claims established by the Bank and recalculation of coupons, discounts and coefficients of Restructuring Packages | 26 May 2010 |
| Registration for Claimants' Meeting | from 10:00 a.m. (Almaty time), 27 May 2010 until 10:00 a.m. (Almaty time), 28 May 2010 |
| Claimants' Meeting | 28 May 2010 |
| Minutes of the Claimants' Meeting published by the Bank | 31 May 2010 |
| Submission to the FMSA of the Restructuring Plan approved by the Claimants to ensure conformity with the Restructuring Plan originally submitted to the FMSA | 31 May 2010 |
| Submission of the Restructuring Plan and minutes of Claimants' Meeting to the Court for approval | 4 June 2010 |
| Notice of the Court's final hearing regarding the Restructuring Plan to Claimants | At least 14 days in advance of the final hearing |
| Settlement Instructions Deadline (for submission of all Settlement Instructions) | 25 June 2010 |
| Bank satisfies remaining Conditions Precedent | 30 June 2010 |
| Hearing of the Court to approve the Restructuring Plan and the approval of the Restructuring Plan by the Court | 2 July 2010 |
| The Bank publishes details of the Court's decision | 9 July 2010 |
| Restructuring Date (distribution of cash, New Notes, Shares and GDRs and Listing of the New Notes on an Approved Stock Exchange and the KASE as applicable) | 14 July 2010 |
| The Court's order confirming that the Restructuring Plan has been carried out and the Restructuring is complete | 23 July 2010 |
| Deadline for Listing the GDRs on an Approved Stock Exchange | 14 January 2011 |

If there are any changes to the above times and/or dates, the revised times and/or dates will be notified to Claimants in a Regulatory Information Service Announcement and will be published on the Bank's website (www.bta.kz/en/investor).

**LETTER FROM THE CHAIRMAN OF THE MANAGEMENT BOARD OF THE BANK**

1 May 2010

Dear Stakeholders,

**Introduction**

I am writing to give you notice of the meeting of the Claimants to be held on 28 May 2010 at The Dostyk Hotel, 36 Kurmangazy Street, Almaty 050021, Kazakhstan.

This letter and the recommendation from the Management Board is part of an Information Memorandum distributed to you for the reasons set out below and is qualified in its entirety by the more detailed information contained in the Information Memorandum.

The Bank and its advisers believe that a restructuring of the Bank's balance sheet is in the best interest of all of the Bank's creditors.  If a financial restructuring is not completed, the Bank is likely to enter into conservation and/or bankruptcy under Kazakhstan law.  If the Bank enters into conservation and/or bankruptcy, given its financial position and the fact that statutory claimants in Kazakhstan would have first claim on substantially all of the Bank's assets, the proceeds available to Claimants and Euronoteholders could be reduced to a level considerably below the value of the cash, New Notes, Shares and GDRs they would receive under the Restructuring Plan.

The terms of the Restructuring Plan are complex and I have summarised the key points in this letter.  I urge you, however, to read the entire Information Memorandum with care, since it contains a great deal of important information.  In particular, please see "*Risk Factors*" for a discussion of the risks associated with the Bank, the Restructuring and the New Notes, Shares and GDRs.

In this letter and in the Information Memorandum I use many defined terms, which have initial capital letters.  A list of these terms and their definitions can be found in "*Key Terms and Definitions*" in the Information Memorandum.

**Background to Restructuring and Significant Events**

Please see "*The Bank — Background to the Restructuring*" for information relating to the background to and reasons for the Restructuring.  Certain significant events relating to the Restructuring are set out below:

- On 2 February 2009, the Government, citing concerns over the state of the Kazakhstan economy and the Bank's ability to provision adequately for its debts, issued a directive requesting a mandatory increase of the Bank's share capital.

- On 3 February 2009, Samruk-Kazyna acquired 25,246,343 newly issued shares in the capital of the Bank for KZT 212 billion thereby obtaining a controlling stake of 75.1 per cent. in the Bank.

- At a meeting of the Board of Directors held on 3 February 2009, the Bank appointed a representative of Samruk-Kazyna to the Management Board.

- On 23 April 2009, the Bank stated that in order to treat all creditors equally, it had imposed a moratorium, ceasing to make all principal repayments (including scheduled maturities) and only servicing the interest repayments under its financial obligations.  This moratorium was stated to last indefinitely until the Bank had agreed and implemented with its creditors and investors a transparent and efficient programme for managing its current debt position.

- On 24 April 2009, the Bank announced that it had received notices up to 23 April 2009 from several creditors accelerating any debts owed to them by reason of default.

- On 3 July 2009, the Bank announced that in order to ensure the successful realisation of its restructuring programme it would not be distributing the net profit of the Bank for the fiscal year ending 31 December 2008 and would not be making any annual dividends.

- On 21 July 2009, the Bank retained the services of KPMG LLP London to conduct financial due diligence on the Bank primarily focusing on the Bank's loan portfolio and its other financial investments.

- On 21 July 2009, the Bank announced that a Steering Committee of its financial creditors was in the process of being established.

- On 22 July 2009, the Bank announced that the moratorium on its financial indebtedness was being extended to interest repayments as well.

- On 23 July 2009, the Bank made a presentation in London to certain creditors and investors (members of the proposed Steering Committee) concerning the Bank's financial position and future strategy.

- On 18 August 2009, the Bank made a presentation to its creditors and investors on its asset recovery strategy.

- On 27 August 2009, the Bank commenced legal proceedings against members of the former management of the Bank to recover assets it believes are owed to it.  This was on the basis of evidence put to the court that some members of the former management have allegedly defrauded the Bank of approximately U.S.$300 million through a series of questionable agreements entered into previously in favour of off-shore companies in which these members of the former management are alleged to have held an interest.

- On 3 September 2009, the Bank formally appointed a Steering Committee of its financial creditors after agreeing on an Outline of Restructuring Principles with them.  Currently, the Steering Committee comprises The Royal Bank of Scotland N.V. (formerly known as ABN AMRO Bank N.V.), Commerzbank Aktiengesellschaft, the D. E. Shaw Group, Euler Hermes Kreditversicherungs AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, The Bank of Singapore Limited (formerly ING Asia Private Bank Limited), KfW (representing its affiliates DEG — Deutsche Investitions — und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wells Fargo Bank N.A. (formerly known as Wachovia Bank N.A.).

- On 8 September 2009, following a recently completed internal review of its credit exposures coupled with KPMG's external review, the Bank announced an increase in its loan loss provisions to KZT 400 billion.

- Between 14 September and 17 September 2009, meetings took place in London between the Bank's advisers and the Steering Committee following which on 21 September 2009, the Bank signed a Memorandum of Understanding with the Steering Committee which outlined the general principles of the restructuring and two proposals for options to be offered to creditors.

- The Bank's application to the Court to initiate the restructuring was accepted by the Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's Creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

- Following further discussions between the Steering Committee and the Bank, on 7 December 2009, the Bank and the Steering Committee signed a Principal Commercial Terms Sheet setting out the principal commercial terms of the Restructuring.

- On 17 March 2010 a Principal Commercial Terms Sheet Amendment Letter was signed between the Bank and the Steering Committee setting out amendments to the key commercial terms (as originally set out in the Principal Commercial Terms Sheet) of the Restructuring and the Bank published a news release relating to the commencement of adjudication of trade finance and Official Government Sector Creditor claims.

- On 18 April 2010 the Bank and the Steering Committee signed a Summary of Key Terms and Conditions of the Restructuring, setting out the detailed terms of the Restructuring (the "**Detailed Term Sheet**").  The offer made in this Information Memorandum does not vary in any material respect from the Term Sheet.

- On 22 April 2010 the Bank published the Preliminary Debt List, which is reproduced (as subsequently updated on 30 April 2010) at Schedule 1 *(The Restructuring Plan)*, Annex 1 *(Preliminary Debt List)*.

**Loan Loss Provisions**

Please refer to "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*" for information regarding an increase in the Bank's loan loss provisions.

**Principal Elements of the Restructuring**

The Bank's proposed Restructuring Plan (set out in Schedule 1 (*The Restructuring Plan*)) will be effected through the allocation of new consideration in exchange for the cancellation or restructuring of the debts represented by the Designated Financial Indebtedness.

If the Restructuring Plan becomes effective Claimants will receive one or more of the following forms of Entitlement depending on which Restructuring Package or Packages their Claims are allocated to:

- Cash, Senior Notes, Subordinated Notes, Shares (or GDRs) and Recovery Units under Senior Package 1;

- OID Notes, Subordinated Notes, Shares (or GDRs) and Recovery Units pursuant to Senior Package 2;

- Participation in the RCTFF pursuant to Senior Package 3;

- Subordinated Notes pursuant to Junior Package 1; and

- Shares or GDRs pursuant to Junior Package 2.

The Restructuring Packages are described under "*Terms of the Restructuring Packages*".

Claimants may elect to receive their Non-Tenge New Notes (other than the Recovery Units) through a special purpose company which will hold such Non-Tenge New Notes (see "*Bank Creditor SPVs*").

Legal restrictions in certain jurisdictions may prevent distribution of the New Notes, Shares or GDRs. Claimants in those jurisdictions will receive the net proceeds of the sale of the New Notes, Shares or GDRs to which they would otherwise be entitled.  Further details are set out in "*Information for Claimants — Entitlement to and Distribution of Cash, New Notes and/or Shares and/or GDRs*".

**Shares and GDRs**

Upon completion of the Restructuring, the Shares of the Bank will be held as follows: approximately 81.5 per cent. less the Residual Minority Shareholder Percentage will be held by Samruk-Kazyna,14 per cent. will be held by Claimants restructured under Senior Packages 1 and 2 and 4.5 per cent. will be held by Claimants allocated to Junior Package 2. Shares allocated to Claimants may be delivered to such Claimants in the form of GDRs in respect of Claimants who are

non-Kazakh residents (unless the Claimant so elects in its Claim Form to receive Shares) and in respect of Kazakh residents, Shares.

The Bank will list the GDRs on an Approved Exchange no later than six months after the Restructuring Date.  See "*The GDR Programme*" for further information in relation to the rights of Restructuring Creditors receiving Shares or GDRs including minority protection rights.

***Drag-Along and Tag-Along Rights***

GDRs and Shares allocated to Restructuring Creditors under the Restructuring Plan will be subject to and benefit from minority protections including drag-along and tag-along rights.  See "*The GDR Programme*".

In addition, Creditor Shareholders will enjoy the benefit of various other minority protection rights which will be set out in undertakings by Samruk-Kazyna and BTA, in the Bank's Charter and the Deposit Agreement (see "*Undertakings by the Bank and Samruk-Kazyna – Share Distribution and Rights of Minority Shareholders*" and "*The GDR Programme*").

**Interest**

Interest accrued but unpaid to 30 June 2010 (calculated in accordance with "*Information for Claimants — Information for all Claimants*") will be included in the Restructuring for purposes of voting at the Claimants' Meeting and allocation of Entitlements.

**Samruk-Kazyna**

Samruk-Kazyna has a Claim against the Bank (which we refer to as the SK Claim) in the amount of KZT 671 billion (including accrued interest through 31 March 2010) in relation to the Bank Bonds. Samruk-Kazyna will therefore vote at the Claimants' Meeting in respect of its Claim but will not be allocated into a Restructuring Package.  Instead, Samruk-Kazyna's Claim in relation to the Bank Bonds will be cancelled in consideration of the issuance to it of such number of Shares so that after the Restructuring its shareholding in the Bank will be 81.5 per cent. of the total issued Shares of the Bank.

In addition, Samruk-Kazyna shall issue a guarantee to the NBK for a duration of no less than ten years in respect of the obligations of the Bank to the NBK under any BTA/NBK Repo Transaction, in consideration of which the Bank will pay a guarantee fee semi-annually to Samruk-Kazyna equal to 50 per cent. of the interest paid from time to time by Samruk-Kazyna to the Bank on any outstanding Samruk-Kazyna Bonds (i) held by the Bank or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease on the fourteenth anniversary of the date of the Restructuring Date.

**Related Party Debt**

On the Restructuring Date, Related Party Debt (other than Excluded Debt) shall be cancelled in full and no further payment on such Related Party Debt shall be made by the Bank and, save as set out in the Restructuring Plan, no Related Party shall be entitled to any Distribution in respect of such cancelled Related Party Debt.  The mechanisms for dealing with the Designated Financial Subsidiaries of Claimants which are Finance Subsidiaries is set out in "*Information for Claimants*".

**The Board of Directors**

Immediately after the Restructuring Date, the Board of Directors shall consist of nine directors comprising four Samruk-Kazyna Directors, two Creditor Directors and three Independent Directors. See "*Management and Corporate Governance*" for further information.

**The Restructuring Law and the Restructuring Plan**

The Restructuring Plan will be effected by the Bank under the Restructuring Law.  The Restructuring Plan is a formal process under which the Bank will be released from claims of certain creditors (i.e., holders of Designated Financial Indebtedness) in return for certain Claimants' entitlement to receive cash, New Notes, Shares or GDRs or a participation in the RCTFF under the Restructuring Plan.

If Claimants holding at least two-thirds by value of the Designated Financial Indebtedness vote in favour of the Restructuring Plan it will be binding on all Claimants and Related Parties.

A meeting of the Claimants to consider and, if thought fit, to approve the Restructuring Plan is scheduled to take place on 28 May 2010 in Almaty.  If the Restructuring Plan is approved at the Claimants' Meeting, the Restructuring Plan will take effect once it has received the final approval of the FMSA and the Court and provided certain conditions precedent set out in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) have been met or waived.

If the Bank determines that the Information Memorandum does not contain all material information reasonably necessary to enable all interested parties to make an informed decision about the Restructuring Plan or that any of the procedures comprised or terms relating to in the Restructuring Plan need to be amended in advance of the Approval Date in order more efficiently or effectively to complete the Restructuring, the Bank will publish a revised Information Memorandum or a supplement thereto.  In addition, the Bank reserves the right to change the date on which the Claimants' Meeting is held or on which other events are to occur so long as it provides adequate notice to Claimants via a Regulatory Information Service.

**Kazakhstan Taxation Considerations**

A number of Kazakhstan tax considerations for Claimants in relation to the Restructuring are set out in the Information Memorandum under "*Taxation*".  The comments are of a general, non-exhaustive nature, are included for information purposes only and are not intended to be legal or tax advice. Claimants should therefore consult their own advisers with respect to the possible tax consequences of receiving cash, New Notes and/or Shares or GDRs in the Restructuring.

**Action to be Taken by Claimants**

On 17 March 2010 the Bank issued a press release announcing a process for the adjudication of trade finance and Official Government Sector Creditor Claims, the purpose of which was to categorise the trade finance-related and Official Government Sector Creditor Claims and to adjudicate the principal amounts (but not interest) relating to those Claims in advance of the Claimants' Meeting.  See the full text of the press release at *"Information for Claimants — Information for Trade Finance Creditors and Official Government Sector Creditors"*.

On 22 April 2010 the Bank issued a press release relating to the verification of amounts of Claims and their classification and published the Preliminary Debt List based on its records, specifying in each case the total principal amount outstanding of each debt, as well as a calculation (or good faith estimate) of interest accrued to 30 June 2010.  See the full text of the press releases and the procedures and rules described in "*Information for Claimants — Information for all Claimants*" and in Schedule 1 (*The Restructuring Plan*) for information on what action must be taken by Claimants, including information relating to restrictions on set-offs by creditors.

In addition, all Claimants must complete and return a Claim Form and, if applicable, a Form of Proxy, contained at Schedule 2 (*Claim Form*) and Schedule 4 (*Form of Proxy*), respectively by electronic mail or facsimile in accordance with "*Information for Claimants – Information for all Claimants – Details for Return of Claim Forms*" **by 5:00 p.m. (Almaty time) 19 May 2010**.[1]  However, the

---

[1] Trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute may submit Claim Forms until 10:00 a.m. (Almaty time) on 26 May 2010.

mechanisms for indirect participation in the Restructuring applicable to Euronoteholders, holders of CHF Notes and holders of Perpetual Securities are described in "*Information for Claimants*".

Claimants are entitled to attend and vote at the Claimants' Meeting, either in person or by proxy.

Claimants with questions relating to the quantum or classification of their Claim or the completion of Claim Forms should contact:

Mr. Asset Zhaisanov, Investor Relations Department
Tel: +7 727 3124671
E-mail: zhaisanov@bta.kz

Ms. Dinara Adil, Loan and Capital Markets Department
Tel: +7 727 266 26 07
E-mail: d_adil@bta.kz

The Bank may dispute the validity of a Claim at any time and may assert its rights in relation thereto notwithstanding completion of the Restructuring.

**Advantages of the Restructuring**

The Bank believes that the Restructuring will allow the Bank to continue as a going concern.  It is expected that:

- the Restructuring will provide the Bank's business with a new, sustainable capital structure;

- the Bank will be recapitalised by approximately U.S.$11.25 billion through (i) an injection of capital by way of the conversion of the debt owed to Samruk-Kazyna into Shares and (ii) the discharge and/or cancellation of Claims in exchange for new consideration;

- based on the Bank's pro-forma calculations, and its current estimate of the obligations to be cancelled pursuant to the Restructuring, the financial debt of the Bank will be reduced from approximately U.S.$11.39 billion as adjusted at 30 September 2009 to approximately U.S.$4.378 billion upon the restructuring becoming effective;

- Samruk-Kazyna will remain as the majority shareholder in the Bank, which the management of the Bank believes will restore confidence in its viability as a financial institution; and

- the strengthening of the Bank's financial position will also enable senior management to focus its efforts on further improving the operating performance of the Bank, and to provide additional stability to the Bank's customers, employees and other stakeholders.

**Disadvantages of the Restructuring**

As a result of the Restructuring, Claimants will generally have to accept significant discounts to the value of their existing Claims, which will be cancelled or restructured in exchange for the Entitlements deliverable under the Restructuring Plan.

**Consequences of the Restructuring Not Being Implemented**

The Restructuring is necessary to ensure the survival of the Bank.  If the Restructuring is not implemented, the ultimate return to creditors will be severely diminished as the Bank is expected to go into conservation or bankruptcy or may be subject to other procedures under applicable law.  See "*Risk Factors — Risks Relating to the Restructuring — If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank*".

The Bank understands that those financial institutions based in Kazakhstan that have been placed into conservation or bankruptcy in the past have made only limited repayments to creditors.  Under Kazakhstan law, certain creditors have priority of payment or repayment upon the bankruptcy of a bank.  These include, in order of priority, expenses related to the bankruptcy, payments for tort claims involving death or health, payments due to employees, payments to the KDIF and payments due to individual depositors.  Unsecured claims of creditors and subordinated claims are the last to be paid out on bankruptcy.  The Bank believes that no Kazakhstan bank placed into conservation or bankruptcy has had sufficient assets to make any payments to creditors ranking below the KDIF.

The Bank therefore believes that if the Bank is placed into conservation or bankruptcy creditors are likely to receive severely reduced returns on their Claims or no return at all.

**Other Relief Sought**

Recognition of the proceedings relating to the Restructuring was obtained:

- on 18 December 2009 in the United Kingdom as a foreign main proceeding in accordance with the Model Insolvency Law as set out in Schedule 1 to the Cross Border Insolvency Regulations 2006;

- on 2 March 2010 in the United States as a foreign main proceeding under Chapter 15 of the U.S. Bankruptcy Code; and

- on 17 February 2010 in the Ukraine by virtue of a decision of the Solomensky District Court of Kiev which came into force on 23 February 2010.

Recognition of the proceedings relating to the Restructuring is also being sought in Russia but a Russian court has declined to grant recognition prior to the final decision of the Court and there is no guarantee that, in any event, that ultimately such recognition will be obtained.

**Other Matters**

You are urged to read the Information Memorandum of which this letter forms a part as it contains detailed information on the Bank, the risks to be considered concerning the Bank's business and the Restructuring, financial information in relation to the Bank and details of the Restructuring Plan.  In particular, please see "*Risk Factors*" for a description of certain risks regarding the Bank and the Restructuring.

**Recommendations of the Bank's Management**

The terms of the Restructuring are complex and you are urged to read the Information Memorandum with care, since it contains a great deal of important information.  If you are in any doubt as to the action you should take, you are recommended immediately to seek advice from your independent adviser.

The Bank believes that the Restructuring is in the best interests of the Bank and its stakeholders taken as a whole and represents the best available compromise among all creditors, Samruk-Kazyna and the financial authorities in Kazakhstan and therefore urges Claimants to attend the Claimants' Meeting and, Euronoteholders to attend Euronoteholders' meetings, and in each case, to vote or instruct the Trustee to vote in favour of the Restructuring Plan.

The Bank may, without the consent of creditors or other interested parties, make a modification to the Restructuring Plan or any procedures to complete the Restructuring, in each case which are of a minor or technical nature or to correct a manifest error and/or to postpone particular events or deadlines by which particular aspects of the Restructuring need to be completed so long as the postponement is not materially prejudicial to interested parties and if it does do so will give appropriate notice.

Yours faithfully,

Anvar Saidenov

Chairman of the Management Board
JSC BTA Bank

## KEY TERMS AND DEFINITIONS

In this Information Memorandum:

"**Acceptable Bank**" means (a) a bank or financial institution which has a rating for its long term unsecured and non credit-enhanced debt obligations of BBB or higher by S&P or Fitch or B3 or higher by Moody's or a comparable rating from an internationally recognised credit rating agency or (b) any other bank or financial institution approved by the New Notes Trustee;

"**Account Designation**" means the designation as specified in the Settlement Instructions of an Existing Account, Designated Account or Local Account into which a Claimant with an Agreed Claim instructs deliveries under its Entitlement to be credited;

"**Accredited Investor**" means an accredited investor as defined in Rule 501(a) of Regulation D;

"**Accrued Interest**" means, in respect of Designated Financial Indebtedness, all accrued but unpaid interest or Late Payment Donations up to and including 30 June 2010 (in each case excluding all default interest or the default element of any Late Payment Donation) and calculated in accordance with "*Information for Claimants – Information for all Claimants*";

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively co-operate, through the acquisition directly or indirectly of shares in the Bank or any of assets by any of them, either directly or indirectly, to obtain or consolidate control of the Bank;

"**ADB**" means Asian Development Bank;

"**Adjudicator**" means Watson, Farley & Williams LLP, appointed as adjudicator of trade finance related Claims;

"**Advisers**" means Lazard Frères, UBS Limited, Deloitte, White & Case LLP, White & Case Kazakhstan LLP, White & Case LLC, Baker & McKenzie LLP, Baker & McKenzie CIS Limited, Field Fisher Waterhouse LLP, Lovells, Allen & Overy LLP, NautaDutilh N.V., NautaDutilh Avocats Luxembourg and their respective Affiliates and Subsidiaries and any other adviser to the Bank, its Subsidiaries, the Government, the NBK, the FMSA, Samruk-Kazyna or the Steering Committee appointed in relation to the Restructuring

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, that person;

"**Agreed Claim**" means a Claim, the amount of which is liquidated in amount and has either been agreed to by the Bank or otherwise been determined by the Supervisor in accordance with the provisions of the Restructuring Plan;

"**Agreed Claimant**" means a Claimant (other than a Related Party) with an Agreed Claim.  For the avoidance of doubt, if a Claimant has both an Agreed Claim and a Claim which has not yet been agreed, it shall be treated for the purposes of this Restructuring Plan as an Agreed Claimant only in respect of its Agreed Claim;

"**Agricultural State Finance Programme**" means the KZT 120,000 million programme adopted by the Government in July 2008 aimed at ensuring the stability and development of the agricultural sector of the Kazakhstan economy;

"**ALCO**" means the Bank's Asset and Liability Management Committee;

"**Allocation Mechanism**" has the meaning as set out in *"Allocation Mechanism"*;

13

"**Annual Financial Statements**" means the audited consolidated financial statements of the Bank as at and for the years ended 31 December 2007, 2008 and 2009 contained in this Information Memorandum;

"**Approval Date**" means the date of the Claimants' Meeting which approves the Restructuring Plan;

"**Approved Stock Exchange**" means a recognised stock exchange established in any member state of the European Economic Area;

"**Associate**" means an entity more than 20 per cent. and less than 50 per cent. of whose equity capital is owned by the Bank, directly or indirectly through one or more intermediaries;

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, permit, exemption, filing, notarisation or registration including the Bank's Banking Licence, required in connection with the business of the relevant person or in connection with the Restructuring, the Deeds of Covenant and/or Restructuring Documents;

"**Bank**" means JSC BTA Bank;

"**Bank Bonds**" means the 9 per cent. bonds issued by the Bank in an aggregate amount of KZT 645 billion in March 2009 to Samruk-Kazyna in exchange for all of the SK Bonds;

"**Bank Creditor Loan Agreement**" has the meaning as set out in *"Bank Creditor SPVs"*;

"**Bank Creditor SPV**" means each special purpose company established for the benefit of the Restructuring Creditors who have elected to receive their allocation of applicable Non-Tenge New Notes under Senior Package 1 and/or Senior Package 2 indirectly;

"**Bank Group**" means the Bank and the Finance Subsidiaries;

"**Banking Law**" means the law of the Republic of Kazakhstan On Banks and Banking Activity in the Republic of Kazakhstan dated 31 August 1995, as amended;

"**Banking Licence**" means the licence and/or permits to carry out banking operations and other operations permitted by applicable legislation;

"**Base Case Model**" means the financial model titled "BTA Bank — BP — Revised PCTS@ 18 04 2010 — Sent Deloitte" sent to Deloitte at 8.00 p.m. on 18 April 2010;

"**Basel Accord**" means the 1988 Capital Accord adopted by the Basel Committee on Banking Supervision, then known as the Basel Committee on Banking Regulations and Supervisory Practices;

"**Basel II Report**" means the report titled "International Convergence of Capital Measurement and Capital Standards: A Revised Framework" of the Basel Committee on Banking Supervision;

"**Beneficial Owner**" has the meaning set out in "*Information for Claimants — Information for Euronoteholders*";

"**BIS**" means the Bank for International Settlements;

"**BIS Guidelines**" means the guidelines adopted by the Basel Committee on Banking Regulations and Supervisory Practices of the Bank for International Settlements;

"**Board of Directors**" or the "**Board**" means the board of directors of the Bank from time to time; "**Borrower**" means the Bank;

"**BTA Armenia**" means CJSC BTA Bank, a closed joint stock company incorporated under the laws of the Republic of Armenia on 1 June 1991;

14

"**BTA Belarus**" means JSC BTA (Belarus), a joint stock company formed under the laws of Belarus on 25 April 2002;

"**BTA DPR Finance Company**" means BTA DPR Finance Company, a public limited company formed under the laws of the Cayman Islands on 2 September 2007;

"**BTA Finance Luxembourg**" means BTA Finance Luxembourg S.A. affiliated company of JSC BTA Bank, a wholly owned subsidiary of the Bank incorporated in Luxembourg;

"**BTA Georgia**" means Joint Stock Company BTA Bank, a joint stock company incorporated under the laws of Georgia on 14 March 2000;

"**BTA Insurance**" means BTA Insurance JSC Subsidiary company of BTA Bank, a joint stock company formed under the laws of Kazakhstan on 8 September 1998;

"**BTA Ipoteka**" means JSC BTA Ipoteka Subsidiary Mortgage company of JSC BTA Bank, a joint stock company formed under the laws of Kazakhstan on 20 November 2000;

"**BTA Kazan**" means Joint Stock Commercial Bank BTA-Kazan (Tatarstan) (open joint stock company), a joint stock company incorporated under the laws of the Russian Federation on 3 October 1992;

"**BTA Kyrgyzstan**" means CJSC BTA Bank (Kyrgyzstan), a closed joint stock company formed under the laws of Kyrgyzstan on 2 December 1996;

"**BTA/NBK Repo Transaction**" means any securities repurchase or resale agreement, securities borrowing agreement (or other agreement between the Bank and the NBK which is similar in legal and commercial effect to any of the foregoing) pursuant to which liquidity is made available by the NBK to the Bank against the SK Bonds;

"**BTA Orix Leasing**" means JSC "BTA Orix Leasing", a joint stock company incorporated under the laws of Kazakhstan on 31 August 2000;

"**BTA Pension Fund**" means JSC Subsidiary of JSC BTA Bank Accumulative Pension Fund BTA Kazakhstan, previously known as JSC Pension Fund Kurmet Kazakhstan, a joint stock company formed under the laws of Kazakhstan and reregistered on 30 December 2005;

"**BTA Russia**" means AMT Bank limited liability company, formerly known as BTA Bank limited liability company (Russia), which was formerly known as Slavinvestbank, a limited liability company incorporated under the laws of the Russian Federation on 10 May 1994;

"**BTA Securities**" means BTA Securities JSC, a joint stock company formed under the laws of Kazakhstan on 17 October 1997;

"**BTA Ukraine**" means OJSC BTA Bank, (Ukraine), formerly known as Ukrainian Credit and Trade Bank, an open joint stock company created under the laws of Ukraine on 10 December 1992;

"**BTA Undertaking**" means the deed poll to be executed by the Bank prior to the Restructuring Date covering (without limitation) compliance with the New Charter;

"**BTA Zabota**" means JSC Subsidiary insurance company of BTA Bank BTA Zabota, a joint stock company formed under the laws of Kazakhstan on 10 September 1996;

"**BTA Zhizn**" means JSC Subsidiary Life Insurance company of BTA Bank BTA Zhizn, a joint stock company formed under the laws of Kazakhstan on 22 July 1999;

"**Business Plan**" means, at any time, the Bank's business plan then in effect duly approved by a Qualified Majority;

"**BV Deposit**" means any deposit held by the Bank for the account of TuranAlem Finance in relation to a series of Euronotes together with all accrued interest thereon (excluding the accrued but unpaid tax margin);

"**BV Scheme**" means the a plan of composition (*akkoord*) offered by TuranAlem Finance under the Dutch Bankruptcy Act (*Faillissementswet*);

"**BVI Proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — BVI Proceedings*";

"**BYR**" means the Belarusian Ruble, the legal currency of Belarus;

"**Called Principal**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) or of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Capital**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Financial Covenants of the Bank*);

"**Cash Coefficient**" has the meaning set out in "*Terms of the Restructuring Packages — Senior Package 1*";

"**Cash Equivalent Investments**" means at any time:

(a)     overnight bank deposits, time deposit accounts, certificates of deposit, banker's acceptances and money market deposits maturing within one year after the relevant date of calculation and issued by an Acceptable Bank or the NBK;

(b)     any investment in marketable debt obligations issued or guaranteed by the government of the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State or by an instrumentality or agency of any of them having an equivalent credit rating, maturing within one year after the relevant date of calculation and not convertible or exchangeable to any other security;

(c)     commercial paper not convertible or exchangeable to any other security:

  (i)     for which a recognised trading market exists;

  (ii)    issued by an issuer incorporated in the United States of America, the United Kingdom, Canada, Switzerland, any member state of the European Economic Area or any Participating Member State;

  (iii)   which matures within one year after the relevant date of calculation; and

  (iv)   which has a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or higher by Moody's, or, if no rating is available in respect of the commercial paper, the issuer of which has, in respect of its long-term unsecured and non-credit enhanced debt obligations, an equivalent rating;

(d)     Tenge bills of exchange eligible for rediscount at the NBK and accepted by an Acceptable Bank (or their dematerialised equivalent);

(e)     any investment in money market funds which (i) have a credit rating of either A-1 or higher by S&P or F1 or higher by Fitch or P-1 or by Moody's Investor Services Limited, (ii) which invest substantially all their assets in securities of the types described in paragraphs (a) to (d) above and (iii) can be turned into cash on not more than 30 days' notice; or

(f)     re-purchase obligations with a term of not more than seven days for underlying securities of the types described in paragraphs (a) to (d) above entered into with any financial institution meeting the qualifications specified in sub-paragraphs (c)(ii) and (iv) above;

(g)     money market funds at least 95 per cent. of the assets of which constitute Cash Equivalent Investments of the kinds described in paragraphs (a) through (f) of this definition;

(h)     any other debt security approved by an Extraordinary Resolution and to which any member of the Group is alone (or together with other members of the Group) beneficially entitled at that time and which is not issued or guaranteed by any member of the Group or subject to any Security;

"**Cash Management Agreement**" has the meaning set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) to this Information Memorandum;

"**Change of Control**" means:

(a)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

     (i)     the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

     (ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank; or

(b)     Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "control" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

     (i)     appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

     (ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply;

     *provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the New Note Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "control" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee;

"**Charter**" means the current charter of the Bank;

"**CHF**" means the Swiss Franc, the legal currency of Switzerland;

"**CHF Notes**" means the CHF 200,000,000 Floating Rate Senior Notes due 2017 issued by the Bank on 7 August 2007;

"**Chrysopa**" means Chrysopa Holdings BV, a Dutch company;

"**Chrysopa Loan**" means the purported loan for U.S.$ 120 million from the Bank to Chrysopa on 1 August 2008 that is the subject of the Chrysopa Proceedings;

"**Chrysopa proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — Chyrsopa Proceedings*";

"**Civil Code**" means the General Part of the Civil Code of the Republic of Kazakhstan dated 27 December 1994 (as amended) and/or the Special Part of the Civil Code of the Republic of Kazakhstan dated 1 July 1999 (as amended);

"**Claim**" means any amount which is claimed to be owed (actually or contingently) by a member of the Bank Group arising out of any Designated Financial Indebtedness;

"**Claim Form**" means the form set out in Schedule 2 (*Claim Form*) to this Information Memorandum;

"**Claimant**" means any person having a Claim including, but not limited to, Rouble Noteholders, Domestic Noteholders, Non-OGSC Eligible Trade Finance Creditors, Official Government Sector Creditors, Euronoteholders and/or the Trustee on their behalf, derivatives counterparties and syndicated and bilateral creditors of the Bank, but does not include Excluded Creditors or (except with respect to attending or voting at the Claimant's Meeting and the submission of any Form of Proxy and, in certain cases, Entitlements) Related Parties;

"**Claimants' Meeting**" means the meeting of Claimants (including the Trustee) convened in accordance with the Initial Order to consider and, if thought fit, approve the Restructuring Plan, including any adjournment thereof;

"**Claims Submission Date**" means 5:00 p.m. (Almaty time) on 19 May 2010[2] or such other date as shall be notified to Claimants by announcement on a Regulatory Information Service or on the Bank's website at www.bta.kz;

"**Clearing System**" means each or all of DTC, Euroclear or Clearstream, as appropriate and, in relation to the Tenge New Notes, KDC;

"**Clearstream**" means Clearstream Banking, société anonyme, Luxembourg;

"**Coefficients**" means each of the Cash Coefficient, the Senior Debt Coefficient, the SP1 Subordinated Debt Coefficient, the SP2 Subordinated Debt Coefficient and the OID Coefficient, as set out in "*Terms of the Restructuring Packages*";

"**Coercive Practice**" means impairing or harming or threatening to impair or harm, directly or indirectly, any party or its property or to influence improperly the actions of another party;

"**Collection Account**" has the meaning set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) to this Information Memorandum;

"**Collusive Practice**" means an arrangement between two or more parties designed to achieve an improper purpose, including influencing improperly the actions of another party;

---

[2] Except for trustees on behalf of Euronoteholders, BTA Finance Luxembourg and Claimants whose Claims remain in dispute who may submit Claim Forms until 10:00 a.m. (Almaty time) on 26 May 2010 and subject as provided in the Restructuring Plan.

"**Common Depositary**" means The Bank of New York Depository (Nominees) Limited in its capacity as book-entry depositary for the Euronotes and any successor thereto;

"**Competition Agency**" means the Agency of the Republic of Kazakhstan for the Protection of Competition;

"**Condition Precedent**" means a condition precedent to the Restructuring becoming effective as described in Schedule 12 (Conditions Precedent to the Restructuring Plan Becoming Effective);

"**Construction State Finance Programme**" means the KZT 240 billion programme adopted by the Government on 6 October 2007 aimed at providing financing for the completion of unfinished facilities and creation of favourable living conditions for the population of Kazakhstan;

"**Cooperation Agreement**" means the Agreement on Cooperation and Mutual Activity with respect to Questions of the Granting of Bank Loans by the National Bank No. 77NB dated as of 17 February 2009, as amended by an additional agreement No. 1/171 N.B dated 3 March 2010, by and among the Bank, the NBK and the FMSA;

"**Corporate Governance Code**" means the current corporate governance code of the Bank which shall be amended or replaced on or before the Restructuring Date by the New Corporate Governance Code;

"**Corrupt Practice**" means with respect to any person the offering, giving, receiving or soliciting, directly or indirectly, anything of value to influence improperly its actions or the actions of another party including any of its directors, managers or employees;

"**Court**" means the Specialised Financial Court in the City of Almaty;

"**Creditor Directors**" means the two directors nominated by the Steering Committee (one appointed on behalf of the holders of the Senior [Dollar][3] Notes and one appointed on behalf of the holders of the OID Notes) or any replacement Creditor Director appointed in accordance with "*Undertakings by the Bank and Samruk-Kazyna – The Samruk-Kazyna Undertaking – Board of Directors*");

"**Creditor Shareholders**" means Claimants who receive Shares or GDRs in the Bank through allocation to Senior Package 1, Senior Package 2 or Junior Package 2;

"**Custodian**" means the person appointed by the Depositary to act as custodian in respect of the Shares held through the GDR Programme;

"**Cut-off Date**" means 30 June 2010;

"**Damu Fund**" means JSC Fund for Development of Entrepreneurship Damu;

"**DBA**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*".

"**DBK**" means the Development Bank of Kazakhstan;

"**Deed of Release**" means the deed to be entered into by the Bank following the Restructuring Date on behalf of Claimants and Related Parties pursuant to the Restructuring Plan, substantially in the form set out in Schedule 1 (*The Restructuring Plan*), Annex 3 (*Form of Deed of Release*) to this Information Memorandum;

"**Deeds of Covenant**" means the deeds of covenant to be provided by the Bank in respect of certain amounts payable by the Bank to the Bank Creditor SPVs and arising out of or in relation to the Bank Creditor Loan Agreements;

"**Deeds of Undertaking**" means the BTA Undertaking and the Samruk-Kazyna Undertaking;

---

[3] To be deleted if the governing law of the Tenge Notes is changed to English law.

"**Default**" means an Event of Default under any of the Restructuring Documents or any event or circumstance (as specified, in the case of each of the New Notes, in the relevant Annexes of Schedule 9 *(Terms and Conditions of the New Notes and RCTFF)* to the Information Memorandum which would (with the expiry of a grace period, the giving of notice, the making of any determination under the relevant Restructuring Documents or any combination of any of the foregoing) be an Event of Default;

"**Default Interest**" means the interest payable on overdue amounts under any financial obligation which accrues from the due date of the overdue amount up to the date of the actual payment;

"**Definitive Holder**" means the registered holder of a Euronote in definitive form;

"**Deposit Agreement**" means the deposit agreement to be entered into between the Bank and the Depositary in relation to the GDRs;

"**Depositary**" means a leading international provider of depositary services;

"**Deposited Shares**" shall have the meaning set out under "*The GDR Programme*";

"**Designated Account**" means the account specified by a Claimant in the Settlement Instructions into which deliveries under such Claimant's Entitlement shall be deposited;

"**Designated Financial Indebtedness**" means any Liability (whether incurred as principal or surety and whether present or future and whether actual or contingent) of the Bank and/or its Finance Subsidiaries in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions (whether authorised or not and whether or not the debit balance arose by reason of unilateral action by the relevant institution);

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent) or other trade-related finance;

(c)     any note purchase facility, bonds, notes, debentures, perpetual securities, redeemable shares, loan stock or any similar instruments;

(d)     Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under FMSA Methodology);

(f)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition;

(g)     an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 90 days after the date of supply;

(h)     any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under FMSA Methodology;

(i)     Shariah-compliant instruments or arrangements;

(j)     swaps and other derivative instruments, transactions or arrangements;

(k)     any guarantee, surety, security, indemnity, support, responsibility or anything analogous thereto in respect of the obligations of any other person under arrangements listed in (a) to (j) above; and

(l)     the Subordinated Loan and any other amounts owing or payable by the Bank to the Finance Subsidiaries (excluding the BV Deposits),

including, without limitation, the obligations set out in Schedule 1 (*The Restructuring Plan*), Annex 1 (*Preliminary Debt List*) to this Information Memorandum) or as otherwise published on the Bank's website from time to time, but excluding Excluded Debt and *provided that*, for the avoidance of doubt, Designated Financial Indebtedness shall not include any obligation of the Bank under any BTA/NBK Repo Transaction;

"**Detailed Term Sheet**" means the termsheet signed by the Bank and the Steering Committee on 18 April 2010, outlining the terms of the Bank's proposed financial restructuring;

"**Development Organisation**" means any of Asian Development Bank, European Bank for Reconstruction and Development, International Bank for Reconstruction and Development, International Finance Corporation, Nederlandse Financierings Maatschappij voor Ontwikkelingslanden N.V. or Deutsche Investitions und Entwicklungsgesellschaft GmbH or any other development finance institution established or controlled by one or more states and any other person which is a, or is controlled by any, Kazakhstan governmental body acting on behalf of or funded in relation to the relevant Financial Indebtedness by one or more of the foregoing development finance institutions;

"**Direct Official Government Sector Debt**" means a direct loan to a member of the Group made by an Official Government Sector Creditor falling within paragraph (a) of the definition thereof;

"**Direct Participant**" means an accountholder in DTC, Euroclear or Clearstream;

"**Discounted Value**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Discrepancy**" means a discrepancy between the Bank's and the Claimant's calculation as to the quantum or classification of a Disputed Claim which the Supervisor is unable to resolve by the Scheduled Supervisor Determination Date;

"**Disputed Claim**" means a Claim which has not been agreed by the Bank and the Claimant by 3 May 2010 and which is referred to the Supervisor for determination as to its amount or classification by the Scheduled Supervisor Determination Date;

"**Distressed Assets Fund**" means the Distressed Assets Fund established by the Government for the purpose of purchasing the doubtful assets of commercial banks;

"**Distribution**" means in the Restructuring Plan, the distribution of cash, New Notes, Shares and/or GDRs or other deliverables in accordance with any Entitlement or Net Proceeds of Sale in respect of Agreed Claims;

"**Distribution Agent**" means an agent to be appointed by the Bank as soon as practicable after the Approval Date to assist the Bank with the distribution of cash, New Notes, GDRs and/or Shares in accordance with the Restructuring Plan;

"**Distribution Agent Agreement**" means the agreement to be entered into between the Bank and the Distribution Agent pursuant to which the Distribution Agent will assist the Bank in the distribution of cash, New Notes, Shares and GDRs;

"**Dollar OID Notes**" means original issue discount notes issued by the Bank denominated in U.S. Dollars under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Dollar Subordinated Notes**" means the subordinated notes issued by the Bank denominated in U.S. Dollars under Senior Package 1 and Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Domestic Noteholders**" means holders of Tenge denominated securities issued by the Bank;

"**Drag-Along Notice**" has the meaning set out in "*The GDR Programme*";

"**Drag-Along Price**" has the meaning set out in "*The GDR Programme*";

"**Drag-Along Purchaser**" has the meaning set out in "*The GDR Programme*";

"**Drey**" means Drey Associates Limited, a United Kingdom company;

"**Drey Proceedings**" means the legal proceedings initiated by the Bank as described in "*The Bank — Asset Recovery — Drey Proceedings*";

"**DTC**" means the Depository Trust Company of New York, a New York corporation;

"**EBRD**" means the European Bank for Reconstruction and Development;

"**ECA**" means Claimants that are export credit agencies or other government sector entities;

"**EEA**" means the European Economic Area;

"**Electronic Instruction Form**" refers to the means by which Direct Participants and Beneficial Owners inform the Registered Holder to complete and sign a Form of Proxy to be used at the relevant Euronoteholder Meeting;

"**Entitlement**" means the entitlement to cash, New Notes, participation in the RCTFF, GDRs and/or Shares (or in the case of a Claimant with a Relevant Contingent Claim making an election under Clause 4.3(b)(ii) of the Restructuring Plan either (a) the assignment of any relevant security rights or collateral which the obligor of the underlying debt conferred on or placed with the Bank in relation to the relevant debt or (b) the certification from the Bank that no Security rights or collateral exists) of each Claimant (other than as regards Samruk-Kazyna) with an Agreed Claim pursuant to the terms of the Restructuring Plan;

"**Escrow Account**" means an account into which Entitlements payable to certain Related Parties as specified in the Restructuring Plan may be placed;

"**Euro**" or "**€**" means the lawful currency of the Member States of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on the European Union and as further amended by the Treaty of Amsterdam;

"**Euronoteholder**" means a person with the ultimate economic interest in any of the Euronotes and holding such interest through one of the Clearing Systems from time to time, unless specifically stated otherwise;

"**Euroclear**" means Euroclear Bank SA/NV;

"**Euronotes**" means each of the notes issued by TuranAlem Finance pursuant to any of the Trust Deeds;

"**Euronoteholders' Meeting**" means a meeting of the Euronoteholders to consider and if thought fit, to approve the Extraordinary Resolution;

"**Euro OID Notes**" means original issue discount notes issued by the Bank denominated in Euro under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Euro Subordinated Notes**" means the subordinated notes issued by the Bank denominated in Euro under Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Event of Default**" has the meaning set out in the relevant terms and conditions of the New Notes;

"**Excluded Creditors**" has the meaning set out in *"Categories of Claimants";*

"**Excluded Debt**" means any amount owed by any member of the Group to an Excluded Creditor;

"**Excluded Related Party**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Existing Account**" means the account in any of the Clearing Systems through which a Euronoteholder holds Euronotes;

"**Exposure**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Extraordinary Resolution**" means the extraordinary resolution to be proposed at the relevant Euronoteholders' Meeting to approve the Restructuring Plan, requiring a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, save where such term is used in Schedule 9 (*Terms and Conditions of New Notes and the RCTFF*), in which case "Extraordinary Resolution" shall have the meaning as set out in the relevant New Notes Trust Deed;

"**Finance Leases**" means any lease or hire purchase contracts which would, in accordance with FMSA Methodology, be treated as a finance or capital lease;

"**Finance Subsidiaries**" means BTA Finance Luxembourg, TuranAlem Finance and TuranAlem Finance (Russia);

"**Financial Advisers**" means Lazard Frères and UBS Limited, financial advisers to the Bank in connection with the Restructuring;

"**Financial Indebtedness**" means any obligation (whether incurred as principal or surety), whether present or future, actual or contingent, for or in respect of:

(a)     moneys borrowed and debit balances at banks or other financial institutions;

(b)     any acceptance under any acceptance credit or bill discounting facility (or dematerialised equivalent);

(c)     any note purchase facility or the issue of bonds, notes, debentures, loan stock or any similar instrument;

(d)     the amount of any liability in respect of Finance Leases;

(e)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis and meet any requirement for de-recognition under FMSA Methodology);

(f)     any Treasury Transaction (and, when calculating the value of that Treasury Transaction, only the marked to market value (or, if any actual amount is due as a result of the termination or close-out of that Treasury Transaction, that amount) shall be taken into account);

(g)     any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of (i) an underlying liability of an entity which is not a member of the Group which liability would fall within one of the other paragraphs of this definition or (ii) any liabilities of any member of the Group relating to any post-retirement benefit scheme;

(h)      any amount raised by the issue of redeemable shares which are redeemable (other than at the option of the issuer) before the final redemption or repayment date under the relevant New Notes or Recovery Units or are otherwise classified as borrowings under the FMSA Methodology);

(i)      any amount of any liability under an advance or deferred purchase agreement if (i) one of the primary reasons behind entering into the agreement is to raise finance or to finance the acquisition or construction of the asset or service in question or (ii) the agreement is in respect of the supply of assets or services and payment is due more than 90 days after the date of supply;

(j)      any amount raised under any other transaction (including any forward sale or purchase, sale and sale back or sale and leaseback agreement) having the commercial effect of a borrowing or otherwise classified as borrowings under the FMSA Methodology; and

(k)      the amount of any liability in respect of any guarantee for any of the items referred to in paragraphs (a) to (j) above;

"**Financial Statements**" means the Annual Financial Statements and the Unaudited Interim Financial Statements;

"**Financial Year**" means the annual accounting period of the Group ending on or about 31 December in each year;

"**Financing of Terrorism**" means the act of providing or collecting funds with the intention that they be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

"**First Choice Election**" has the meaning set out in "*Allocation Mechanism*";

"**First Choice Claim Remainder Amount**" has the meaning set out in "*Allocation Mechanism*";

"**First Kazakh Securitisation Company**" means First Securitisation Company of Kazakhstan, a public limited company formed under the laws of The Netherlands on 8 December 2005;

"**Fitch**" means Fitch Ratings Ltd.;

"**FMSA**" means the Agency of the Republic of Kazakhstan on the Regulation and Supervision of the Financial Market and Financial Organisations;

"**FMSA Agreement**" means the agreement between the Bank and the FMSA dated as of 30 June 2009, as amended;

"**FMSA Asset Classification Rules**" means the rules of asset classification issued by FMSA, dated 25 December 2006;

"**FMSA Guidance**" means "Instruction about norm values and calculation methodology of prudential norms for second tier banks" approved by Resolution of the Board of the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Market and Financial Organisations" dated 30 September 2005, #358, as amended, supplemented or updated from time to time;

"**FMSA Methodology**" means unaudited IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Foreign Currency**" means any currency other than Tenge;

"**Foreign Currency Assets**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Foreign Currency Liabilities**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Foreign Currency Open Position**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Form of Proxy**" means the Form of Proxy for Claimants accompanying this Information Memorandum for use at the Claimants' Meeting set out in Schedule 4 (*Form of Proxy*) to this Information Memorandum;

"**Fraudulent Practice**" means an act or omission, including a misrepresentation, that knowingly or recklessly misleads, or attempts to mislead, a party to obtain a financial or other benefit or to avoid an obligation;

"**Fully Accreted Principal Amount**" means the amount equal to the principal amount of Designated Financial Indebtedness in respect of which the OID Notes are allocated less the amount of any prepayments or repayments of principal made in relation to the OID Notes;

"**GDP**" means the gross domestic product of Kazakhstan;

"**GDR Holder**" means any person holding a GDR from time to time;

"**GDR Programme**" means the global depositary receipt programme to be established prior to the Restructuring Date in respect of the Shares of the Bank;

"**GDRs**" means global depositary receipts relating to Deposited Shares;

"**Global Note**" means either a Restricted Global Note or an Unrestricted Global Note;

"**Government**" means the government of the Republic of Kazakhstan;

"**Government Funding**" means (i) the Group's Indebtedness to the Government or any of its agencies (including the NBK and municipalities in Kazakhstan) to fund or support state-sponsored lending programmes plus (ii) any customer accounts of the Government or any of its agencies (including the NBK and such municipalities) placed with any member of the Group to fund or support state-sponsored lending programmes;

"**Group**" means the Bank and each of its Subsidiaries from time to time;

"**Guarantee**" means any guarantee or other financial support given by the Bank in favour of the Trustee in respect of a series of Euronotes;

"**Holding Company**" means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary;

"**IFRS**" means International Financial Reporting Standards;

"**IMF**" means the International Monetary Fund;

"**IMF Charter**" means the charter of the International Monetary Fund;

"**Impaired Recovery Asset**" has the meaning set out in Schedule 9 *(Terms and Conditions of the New Notes and the RCTFF)*, Annex 4 (*Terms and Conditions of the Recovery Units*);

"**Indebtedness Guarantees**" means, in relation to any Financial Indebtedness of any Person, any obligation of another Person to pay such Financial Indebtedness, including (without limitation) (i) any obligation to purchase such Financial Indebtedness, (ii) any obligation to lend money, to purchase or subscribe to shares or other securities or to purchase assets or services in order to provide funds for the payment of such Financial Indebtedness, (iii) any indemnity against the consequences of a default in the payment of such Financial Indebtedness, (iv) any other agreement to be responsible for repayment of such Financial Indebtedness, including bonds, standby letters of credit or bank guarantees or other similar instruments issued in connection with the performance of contracts and (v) any Financial Indebtedness of another Person secured by a security interest over any of the

first-mentioned Person's assets, the amount of such Financial Indebtedness being the lesser of the value of such assets and the amount of Financial Indebtedness so secured;

"**Independent Auditor**" means any of Deloitte, PricewaterhouseCoopers, KPMG or Ernst & Young LLP appointed to carry out the annual corporate governance review of the Bank;

"**Independent Directors**" means the three independent directors nominated by the Corporate Management and Appointments Committee of the Bank;

"**Indirect Official Government Sector Debt**" means Official Government Sector Debt which is not Direct Official Government Sector Debt;

"**Industrial Innovation Programme**" means the programme of the Government proposed to be implemented over a five-year period beginning in 2010 aimed at developing new industries, industrial complexes and innovative products;

"**Initial Order**" means the order of the Court dated 16 October 2009 which initiated the Restructuring in accordance with the Restructuring Law;

"**Intermediary**" means any broker, dealer, bank, trust company or other nominee or custodian that holds Euronotes on behalf of Beneficial Owners;

"**Islamic Finance Claimant**" means a financial creditor of the Bank Group whose relationship with the Bank Group is governed by a Shariah-compliant debt instrument;

"**Joint Venture**"means any joint venture entity, whether a company, unincorporated firm, undertaking, association, joint venture or partnership or any other entity;

"**JPY**" means the Japanese Yen, the lawful currency of Japan;

"**JSC Law**" means the law of the Republic of Kazakhstan On Joint Stock Companies dated 13 May 2003, as amended;

"**Junior Package 1**" means the Restructuring Package outlined in "*Terms of the Restructuring Packages-Junior Package 1*";

"**Junior Package 2**" means the Restructuring Package outlined in "*Terms of the Restructuring Packages — Junior Package 2*";

"**KASE**" means the Kazakhstan Stock Exchange;

"**Kazakh Residents' Share Entitlement**" means those Shares required to be transferred on the Restructuring Date to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are resident in Kazakhstan, comprising part of the total Restructuring Creditors' Shares Entitlement;

"**Kazakhstan**" means the Republic of Kazakhstan;

"**KCD**" means Joint Stock Company Central Securities Depositary, a central depositary in Kazakhstan;

"**KDIF**" means Joint Stock Company Kazakhstan Deposit Insurance Fund;

"**KGS**" means the Kyrgyzstan Som, the legal currency of Kyrgyzstan;

"**KMC**" means JSC Kazakhstan Mortgage Company;

"**Late Payment Donation**" means any sum payable by the Bank upon the default of the Bank in its payment obligations to any Islamic Finance Claimant, the proceeds of which, other than those sums required to compensate the lenders for any actual loss suffered, are donated to charity;

"**LCIA**" means the London Court of International Arbitration;

"**Legal Reservations**" means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts 1980 and the Foreign Limitation Periods Act 1984, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction as those referred to in paragraphs (a) and (b) above (to the extent applicable in that Relevant Jurisdiction); and

(d)     any other matters which are set out as qualifications or reservations as to matters of law of general application in any of the legal opinions to be delivered pursuant to Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) of this Information Memorandum;

"**Liability**" or "**Liabilities**" means any debt, liability or obligation whatsoever whether it is incurred as principal or surety or is present, future, prospective or contingent, whether or not its amount is fixed or undetermined, whether or not it involves the payment of money or the performance of an act or obligation and whether it arises at common law, in equity or by statute, or in any other manner whatsoever, but excluding any liability which is barred by statute or is otherwise unenforceable or arises under a contract which is void or, being voidable, has been duly voided;

"**LIBOR**" means the London Inter-Bank Offered Rate as determined by the British Bankers' Association;

"**Litigation Recoveries**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*), Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Local Account**" means the account specified by a Claimant in the applicable Settlement Instructions into which such Claimant's Entitlement shall be deposited *provided that* such account is eligible to hold Tenge, Tenge New Notes and/or Shares;

"**Lux**" means Lux Investing Limited, a British Virgin Islands company;

"**Major Restructuring Documents**" means the Deeds of Undertaking, the Deposit Agreement and the Bank Creditor Loan Agreements;

"**Make Whole Amount**" has the meaning set out in Condition 8(f) of Annex I (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Management Board**" means the management board of the Bank from time to time;

"**Management Contract**" means a contract by which an independent third person agrees to manage any matters relating to the affairs of any member of the Group;

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, operations, property, condition (financial or otherwise) or prospects of the Group taken as a whole; or

(b)     the ability of the Bank or the Group (taken as a whole) to perform its obligations under the relevant Restructuring Documents; or

(c)     the total equity or long-term debt of the Bank; or

(d)     the validity or enforceability of, or the effectiveness or ranking of any Security granted or purporting to be granted pursuant to, any of the Restructuring Documents or the rights or remedies of any holder or lender of or under any New Instruments or under any of the Restructuring Documents;

"**Material Jurisdiction**" means any jurisdiction in which the Bank has assets with a value in excess of U.S.$300 million;

"**Material Subsidiary**" means at any relevant time a Subsidiary of the Bank:

(a)     whose total assets, pre-tax profits or gross revenues (or, where the Subsidiary in question prepares consolidated accounts, whose total consolidated assets or gross consolidated revenues, as the case may be) attributable to the Bank represent not less than five per cent. of the total consolidated assets or pretax profits or the gross consolidated revenues of the Bank, all as calculated by reference to the then latest audited accounts (or, if none, its then most recent management accounts or consolidated accounts, as the case may be) of such Subsidiary and the then latest audited consolidated accounts of the Group; or

(b)     to which is transferred all or substantially all of the assets and undertaking of a Subsidiary which immediately prior to such transfer is a Material Subsidiary.

"**Memorandum of Understanding**" means the memorandum of understanding between the Bank and the Steering Committee dated 21 September 2009 with respect to the Restructuring;

"**Minimum Face Value**" has the meaning set out in "*Bank Creditor SPVs*";

"**Minor Quantum Discrepancy**" has the meaning set out in Clause 4.2(n) of Schedule 1 (*The Restructuring Plan*);

"**Minority Protection Expiry Date**" means the later of:

(a)     the date falling three years after the Restructuring Date; and

(b)     (if the GDRs are not so listed within six months of the Restructuring Date) the date on which the GDRs have been accepted for listing on an Approved Stock Exchange;

"**Model Insolvency Law**" means the 1997 UNCITRAL Model Law on Cross-Border Insolvency;

"**Money Laundering**" means:

(a)     the conversion or transfer of property, knowing it derived from a criminal offence, for the purpose of concealing or disguising its illegal origin or of assisting any person who is involved in the commission of the crime to evade the legal consequences of its actions which assistance has led or would be likely to, in the opinion of any New Notes Trustee, lead to a sanction, fine or reprimand from a competent authority or finding of guilt or liability by a competent court;

(b)     the concealment or disguise of the true nature, source, location, disposition, movement, rights with respect to, or ownership of, property knowing that it is derived from a criminal offence; or

(c)     the acquisition, possession or use of property knowing at the time of its receipt that it is derived from a criminal offence;

"**Moody's**" means Moody's Investors Service, Inc.;

"**Mortgage State Finance Programme**" means the KZT 120 billion programme adopted by the Government in February 2009 aimed at reducing the current interest rate on mortgage loans to between 9 and 11 per cent., converting foreign currency loans into Tenge and extending loan maturities up to 20 years;

"**NBK**" means the National Bank of Kazakhstan, the central bank of Kazakhstan;

"**NBK Agreement**" means the agreement between Samruk-Kazyna and the NBK in relation to the BTA/NBK Repo Transactions;

"**Net Assets**" means Total Assets less Total Liabilities;

"**Net Book Value**" means the outstanding amount of a loan minus the provisions relating thereto, each calculated in accordance with the FMSA Asset Classification Rules;

"**Net Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Net Non-Performing Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Net Proceeds of Sale**" means the proceeds of sale of the relevant New Notes and Shares net of all associated commissions, transfer taxes and other costs, including the expenses and compensation of the Distribution Agent or the Bank, as the case may be, in effecting such sale;

"**New Net Non-Performing Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**New Charter**" means the Charter of the Bank as amended to reflect the principles set out in the Detailed Term Sheet;

"**New Corporate Governance Code**" means the new corporate governance code of the Bank to be adopted prior to the Restructuring Date reflecting the principles agreed to by the Bank and the Steering Committee in the Term Sheet;

"**New Instruments**" means the New Notes, GDRs, Shares and the RTCFF;

"**New Net Loans**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**New Notes**" means the Senior Notes, the OID Notes, the Subordinated Notes and the Recovery Units;

"**New Notes Trustee**" means the trustee appointed under the provisions of a trust deed in respect of Non-Tenge New Notes issued on the Restructuring Date;

"**New Notes Trust Deed**" means each of the trust deeds constituting the New Notes;

"**Nominated Recipient**" means the person specified as such in the Settlement Form;

"**non-Kazakhstan holders**" has the meaning as set out in "*Taxation*";

"**Non-Kazakh Residents Share Entitlement**" means those Shares required to be issued on the Restructuring Date to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan or the Depositary on behalf of Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan, comprising part of the total Restructuring Creditors' Share Entitlement;

"**Non-OGSC Eligible Trade Creditor**" means a Claimant to whom non-OGSC Eligible Trade Finance Debt is owed;

"**Non-OGSC Eligible Trade Finance Debt**"[4] means any Financial Indebtedness of the Bank to a Restructuring Creditor incurred in respect of the sale and purchase of goods and/or services financed or supported by the Bank, including:

(a)     under any documentary letters of credit issued by the Bank;

(b)     by way of discounting of documentary letters of credit issued by the Bank and/or negotiable instruments issued in relation thereto;

(c)     under any standby letters of credit or guarantees issued by the Bank;

(d)     by way of any other provision of finance by the Bank; and

(e)     pursuant to the refinancing of any Financial Indebtedness as described in paragraphs (a) to (d) (inclusive) above,

    but, excluding any such Financial Indebtedness of the Bank to a Restructuring Creditor:

    (i)     that constitutes Official Government Sector Debt;

    (ii)    incurred for general purposes, in particular on-lending to customers of the Bank where there was either no reference to a particular underlying trade transaction or where such customer as borrower was not identified in the relevant financing documentation;

    (iii)   under any standby letter of credit or guarantee provided by the Bank in support of a payment obligation of any of its customers under a credit agreement with a financial institution; and

    (iv)    under any contingent liability of the Bank that does not also constitute a guarantee falling within paragraph (iii) above, arising from any of the transactions described in paragraphs (a) to (e) (inclusive) above that has not crystallised, matured or fallen due prior to 30 June 2010.

"**Non-Tenge New Notes**" means the OID Notes, the Senior Dollar Notes, the Recovery Units, the Euro Subordinated Notes and the Dollar Subordinated Notes;

"**Note Certificates**" means Restricted Note Certificates and Unrestricted Global Note Certificates;

"**Noteholders**" means holders of some, or as the case may be, all of the New Notes;

"**NSA**" means the National Statistics Agency of Kazakhstan;

"**Obstructive Practice**" means:

(a)     deliberately destroying, falsifying, altering or concealing evidence material to an investigation, or making false statements to investigators, in order to materially impede an investigation by such investigators into allegations of a Coercive Practice, Collusive Practice, Corrupt Practice or Fraudulent Practice, and threatening, harassing or intimidating any party to prevent it from disclosing its knowledge of matters relevant to an investigation or from pursuing an investigation into such matters; or

(b)     acts intended to materially impede the exercise of any New Notes Trustee's contractual rights or access to information under the relevant Restructuring Documents;

"**OECD**" means the Organisation for Economic Co-operation and Development;

---

[4] Please note that this definition is unique to the Restructuring and is not intended by any Financial Creditor to define trade finance or any category of trade finance or what treatment it should be entitled to in any broader sense or for any wider purpose.

"**Official Government Sector Creditors**" means holders of Financial Indebtedness of the Bank Group:

(a)     which are:

    (i)     export credit agencies; or

    (ii)    multi-lateral or state-owned financial institutions specifically mandated to provide finance and promote investments in developing countries and emerging markets; or

    (iii)   direct or indirect wholly-owned Subsidiaries (not being commercial banks) of institutions not falling within paragraph (ii) above; or

    (iv)    other official government sector bodies; or

(b)     whose Claims are covered in whole or in part by an export credit agency or other official government sector body;

"**Official Government Sector Debt**" means Financial Indebtedness owed to or guaranteed or otherwise covered by Official Government Sector Creditors, with the whole amount of any Financial Indebtedness in respect of which such a guarantee or other cover has been provided constituting the Official Government Sector Debt, not merely the part (if only guaranteed or covered in part) to which such guarantee or cover relates;

"**OID Coefficient**" has the meaning set out in "*Terms of the Restructuring Packages — Senior Package 2*";

"**OID Noteholder**" means a holder of OID Notes;

"**OID Notes**" means the Dollar OID Notes and the Euro OID Notes;

"**Operating Expenses**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Operating Income**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank)*;

"**Ordinary Claim**" means a Claim which does not relate to Non-OGSC Eligible Trade Finance Debt, Official Government Sector Debt or Excluded Debt;

"**Ordinary Debt**" means Designated Financial Indebtedness other than Non-OGSC Eligible Trade Finance Debt, Official Government Sector Debt and Excluded Debt;

"**Original Business Plan**" means the original business plan prepared by the Bank dated 4 September 2009;

"**Overhead Ratio**" has the meaning given to it in Clause 2.1 (*Financial Covenant Definitions*) of Schedule 11 (*Covenants of the Bank*);

"**Participating Member State**" means any member state of the European Communities that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Community relating to Economic and Monetary Union;

"**PCTS**" means the Principal Commercial Terms Sheet signed by the Bank and the Steering Committee on 7 December 2009 setting out the commercial terms of the Restructuring;

"**PCTS Amendment Letter**" means the Principal Commercial Terms Sheet Amendment Letter which was signed by the Bank and the Steering Committee on 17 March 2010 amending the PCTS;

"**Permitted Acquisition**" means:

(a)     an acquisition by a member of the Group of an asset sold, leased, transferred or otherwise disposed of by another member of the Group in circumstances permitted by paragraph (i) (*Disposals*) of Clause 3 (*Other Covenants*) of Schedule 11 (*Covenants of the Bank*);

(b)     the incorporation of a company with limited liability which on incorporation becomes a member of the Group, but only if that company is incorporated in the European Union, the United States of America or Kazakhstan and is engaged in a business substantially the same as that carried on by the Group with limited liability;

(c)     an acquisition for cash (including deferred cash) consideration, of (A) the issued share capital of a limited liability company or (B) (if the acquisition is made by a limited liability company whose sole purpose is to make the acquisition) a business or undertaking carried on as a going concern, but only if:

   (i)     no Default is continuing on the closing date for the acquisition or would occur as a result of the acquisition;

   (ii)    the acquired company, business or undertaking is engaged in a business substantially the same as that carried out by the Group;

(d)     any acquisition the aggregate consideration payable in respect of which (when aggregated with all other such acquisitions and Permitted Joint Ventures in the same Financial Year of the Bank) does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered in accordance with paragraph (a) of Clause 1 (*Financial and Other Information Provisions*) of Schedule 11 (*Covenants of the Bank*);

(e)     any acquisition by any member of the Group of any asset(s) secured in its favour pursuant to any enforcement of, or foreclosure under, any security interest granted in its favour by or in relation to any of its customers or their Subsidiaries in connection with the acceleration of any Financial Indebtedness owing by any such customer to such member of the Group; or

(f)     any other acquisition to which the New Notes Trustee has given its prior written consent.

"**Permitted Dividend**" means a dividend or distribution by the Bank to its Shareholders:

(a)     at any time after the New Notes have been irrevocably repaid in full; or

(b)     at any time after the date falling four years after the Restructuring Date up to and including the date falling seven years after the Restructuring Date *provided that*:

   (i)     the Bank has positive operating cashflow post debt service for the year;

   (ii)    the Bank's tier 2 capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

   (iii)   the aggregate distribution does not exceed 25 per cent. of cumulative net income or 25 per cent. of net operating cash flow after debt service;

   (iv)    at the same time as the Bank pays such distribution, it prepays the Senior Notes and the OID Notes in the same amount in aggregate as such distribution (such payment to be applied between the Senior Notes and the OID Notes *pro rata* to their face value on the Restructuring Date (and in the case of the Senior Notes to their applicable redemption price (being par plus the Make Whole Amount (if any) plus accrued (but unpaid) interest) and in the case of the OID Notes to their Fully Accreted Principal

Amount (plus accrued (but unpaid) interest) as at the date of its last repayment instalment); and

    (v)    no Default has occurred and is continuing on both the date the dividend is declared and when it is paid; or

(c)    at any time after the date falling seven years after the Restructuring Date *provided that*:

    (i)    the Bank has positive operating cashflow post debt service for the year;

    (ii)    the Bank's tier 2 capital (as shown in its most recently delivered financial statements) is above 15 per cent.;

    (iii)    the aggregate distribution does not exceed 50 per cent. of cumulative net income or 50 per cent. of net operating cash flow after debt service; and

    (iv)    no Default has occurred and is continuing on both the date the dividend is declared and when it is paid;

"**Permitted Joint Venture**" means any investment in any Joint Venture where:

(a)    the Joint Venture is incorporated, or established, and carries on its principal business, in the European Union, the United States of America or Kazakhstan;

(b)    the Joint Venture is engaged in a business substantially the same as that carried on by the Group with limited liability; and

(c)    in any financial year of the Bank, the aggregate of: (i) all amounts subscribed for shares in, lent to, or invested in all such Joint Ventures by any member of the Group; (ii) the contingent liabilities of any member of the Group under any guarantee given in respect of the liabilities of any such Joint Venture; and (iii) the market value of any assets transferred by any member of the Group to any such Joint Venture, when aggregated with all other such acquisitions and Permitted Joint Ventures in the same financial year, does not exceed 10 per cent. of the Net Assets of the Bank (by reference to, in the first financial year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements);

"**Permitted Security**" means:

(a)    any lien arising by operation of law and in the ordinary course of trading and not as a result of any default or omission by any member of the Group;

(b)    any netting or set-off arrangement entered into by any member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(c)    any Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to a member of the Group in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any member of the Group;

(d)    any Security entered into pursuant to any Restructuring Documents (including any Security granted in respect of the Collection Account and the RCTFF Collection Account);

(e)    any Security arising pursuant to any agreement (or other applicable terms and conditions) which is standard or customary in the relevant market (and not for the purpose of raising credit or funds for the operation of any member of the Group other than on a short-term basis as part of its liquidity management activities), in connection with (i) contracts entered into simultaneously for sales and purchases at market prices of precious metals or securities, (ii) the establishment of margin deposits and similar securities in connection with interest rate

and foreign currency hedging operations and trading in securities or (iii) the foreign exchange dealings or other proprietary trading activities including, without limitation, Repos, of any member of the Group;

(f)     any Security *provided that* at the same time or prior to the creation of such Security, the Bank provides prior-ranking Security or the benefit of such other Security in favour of the holders of the Senior Notes and OID Notes, in each case in form and substance satisfactory to the New Notes Trustee (acting on the instructions of an extraordinary resolution of holders of the Senior Notes and OID Notes);

(g)     granted in favour of the Bank by any Material Subsidiary to secure Financial Indebtedness or other obligations owed by such Material Subsidiary to the Bank;

(h)     arising in the ordinary course of the Bank's or a Material Subsidiary's trading activities and which is necessary in order to enable the Bank or such Material Subsidiary to comply with any mandatory or customary requirement imposed on it by a banking or other regulatory authority in connection with the Bank's or such Material Subsidiary's business;

(i)     on property acquired (or deemed to be acquired) under a Finane Lease, or claims arising from the use or loss of or damage to such property, *provided that* any such encumbrance secures only rentals and other amounts payable under such lease;

(j)     granted by the Bank in favour of a Development Organisation to secure Financial Indebtedness owed by the Bank to such Development Organisation pursuant to any loan agreement or other credit facility entered into between the Bank and such Development Organisation, *provided that* the amount of Financial Indebtedness so secured pursuant to this paragraph (j) shall not exceed in aggregate an amount in any currency or currencies equivalent to six per cent. of the Bank's Net Assets calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology;

(k)     arising out of the refinancing, extension, renewal or refunding of any Financial Indebtedness secured by Security permitted by any of the above exceptions, *provided that* the Financial Indebtedness thereafter secured by such Security does not exceed the amount of the original Financial Indebtedness and such Security is not extended to cover any property not previously subject to such Security;

(l)     not included in any of the above exceptions, in aggregate securing Financial Indebtedness with an aggregate principal amount at any time not exceeding U.S.$25 million (or its equivalent in other currencies) at that time; or

(m)     any other Security to which the New Notes Trustee has given its prior written consent;

"**Permitted Transaction**" means:

(a)     any Financial Indebtedness or Indebtedness Guarantee or Security incurred or given, or other transaction arising, under the Deeds of Covenant or the Restructuring Documents;

(b)     any transaction (other than (i) any acquisition, sale, lease, license, transfer or other disposal and (ii) the granting or creation of Security or the incurring or permitting to subsist of any Financial Indebtedness or Indebtedness Guarantee) conducted in the ordinary course of trading on arm's length terms and not in contravention of any of the provisions set out in Clause 3 (*Other Covenants*) of Schedule 11 (*Covenants of the Bank*); and

(c)     the solvent liquidation or reorganisation of a Subsidiary of the Bank so long as (i) any payments or assets distributed as a result of such liquidation or reorganisation are distributed (to the extent of that member of the Group's interest therein) to another member of the Group, (ii) the value or percentage of any minority interest in any member of the Group held by any person which is not a member of the Group is not increased and (iii) such liquidation or

reorganisation does not and could not reasonably be expected to have a Material Adverse Effect;

"**Permitted Transferee**" means a person which (a) is (i) a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country or (ii) a sovereign wealth fund from any such country or as may otherwise be approved by a Qualified Majority decision of the Board; (b) has (in the case of a bank or other financial institution) a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (c) has a minimum paid up share capital and reserves (in the case of a bank or other financial institution) or assets (in the case of a sovereign wealth fund) of at least U.S.$7 billion; and (d) is not affiliated with any of the present or former shareholders or managers of the Bank;

"**Perpetual Securities**" means the U.S.$400 million perpetual preferred securities issued by BTA Finance Luxembourg;

"**Plan Meeting**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**Plan of Composition**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**PLN**" means the Polish Zloty, the legal currency of Poland;

"**Preliminary Indebtedness List**" has the meaning as set out in "*Information for Claimants*";

"**Principal Paying Agent**" means The Bank of New York Mellon;

"**Pro Forma Financial Information**" means the unaudited *pro forma* financial information of the Bank as at 30 September 2009 as set out in "*Pro Forma Financial Information*" adjusted to reflect the Restructuring as described and subject to the assumptions and limitations set forth herein;

"**Pro-Rata Tag-Along Proportion**" has the meaning set out in "*The GDR Programme*";

"**Proceeding**" means any process, action, or other legal proceeding (including, without limitation, any demand, arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture, re-entry, lien, enforcement of judgment or enforcement of any security);

"**Prospectus Directive**" means Directive 2003/7I/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading and amending Directive 2001/34/EC;

"**Qualified Majority**" means in relation to a decision of the Board, a majority of the Board including both of the Creditor Directors and at least one of the Independent Directors;

"**Qualified Majority Approval**" has the meaning given to it in *"Share Distribution and Rights of Minority Shareholders — Charter of the Bank";*

"**Qualified Majority Item**" shall have the meaning set out under "*Undertakings by the Bank and SamrukKazyna — the Samruk-Kazyna Undertaking*";

"**Quarterly Recovery Assets Management Report**" has the meaning given to it in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**QIBs**" means qualified institutional buyers, as defined in Rule 144A under the Securities Act;

"**RCTFF**" means the new U.S.$700 million revolving committed trade finance facility to be extended to the Bank by Claimants who are subject to participation in the RCTFF and to be used by the Bank for the funding of new trade finance transactions, the terms of which are set out in Annex 8 (*Terms*

*and conditions of the RCTFF*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) to this Information Memorandum;

"**RCTFF Agreement**" means the agreement setting out the terms of the RCTFF;

"**RCTFF Collection Account**" means the account held by the Borrower into which all amounts owing to it by each Eligible Customer or Approved Buyer (or its bank) with respect to any Eligible Trade Transaction are to be credited;

"**RCTFF Collection Account Pledge**" means a pledge agreement in respect of the RCTFF Collection Account in favour of the security trustee (on behalf of the RCTFF Lenders);

"**Recoveries**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets Auditor**" has the meaning set out in "*Terms and Conditions of the Recovery Units*";

"**Recovery Assets Opening Report**" means an initial due diligence report on the Recoveries Assets carried out by the Recovery Assets Auditor covering and/or establishing methodologies for:

(a)     identification of Recoveries Assets based on agreed criteria (including a loan-by-loan analysis of each Impaired Recovery Asset as at 30 June 2009 and details of all loans written off as at or prior to 30 June 2009);

(b)     movement of Recoveries Assets to a separate system, module or tagging of Recoveries Assets within existing systems as Recoveries Assets;

(c)     quarterly reconciliation of Recoveries Assets as identified in the Quarterly Recovery Assets Management Report (defined below) to those identified in the Recoveries Assets Opening Report;

(d)     quarterly reconciliation of all accounting and cash Recoveries.

(e)     system access controls to prevent unauthorised journals or inappropriate changes or removals being made to Recoveries Assets;

(f)     daily bank reconciliations of Recovery Units Collection Account;

(g)     allocation of staff responsibilities as regards Recoveries Assets and non-Recoveries Assets, and Recoveries;

(h)     dual controls over payments (including input and/or verification controls on payment systems and dual signatories on cheques) with respect to Recoveries Assets; and

(i)     provision of training to staff in those newly adopted key processes;

"**Recovery Assets Replacement Loan**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Recovery Sub-Committee**" means the sub-committee of the Management Board entitled the "Strategy Committee" on which shall sit a Creditor Director;

"**Recovery Unit Payment Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Recovery Unitholder**" means the holder of a Recovery Unit from time to time;

36

"**Recovery Units**" means the recovery units deliverable under the Restructuring Plan, the terms and conditions of which shall be substantially in the form set out in Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Redemption Date**" means the date on which any New Note is redeemed, either in whole or in part;

"**Reference Amount**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Reference Rate**" means, for the purposes of calculating the aggregate quantum of Agreed Claims in Tenge for the purposes of voting at the Claimants' Meeting and for Distribution of Entitlements, the average rate over the twenty-two trading days immediately preceding the Claimants' Meeting shown on the applicable Bloomberg pages for conversion of the relevant currency into Tenge;[5]

"**Registrar**" means registrar under the relevant Euronotes;

"**Regulation D**" means Regulation D under the Securities Act;

"**Regulation S**" means Regulation S under the Securities Act;

"**Regulatory Information Service**" means any of: Business Wire Regulatory Disclosure provided by Business Wire; FirstSight provided by Romeike; Announce provided by Hugin ASA; New Release Express provided by CCNMatthews UK Limited; PR Newswire Disclose provided by PRNewswire; Bloomberg News provided by Bloomberg LP or any other international newswire service used by the Bank from time to time and other media as set out in the documentation constituting the Rouble Notes and the Domestic Notes;

"**Reinvestment Yield**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Related Party**" means any Affiliate of the Bank, any officer, director or manager of the Bank or its Affiliates, any member of the management board or supervisory board as at 31 December 2008 and the spouse, parents, siblings and children of any such person which is a natural person (and for these purposes SamrukKazyna and any entity owned by Samruk-Kazyna shall be treated as a Related Party) and any other person who is "connected" to any such person within the meaning of the Insolvency Act 1986;

"**Related Party Debt**" means all Financial Indebtedness owed by any member of the Bank Group to Related Parties (other than (i) to an Excluded Related Party; (ii) Financial Indebtedness owed by the Bank Group to members of the Group (excluding the Bank Group);(iii) Euronotes owned by any Related Party), whether or not such liability is off balance sheet and whether or not the liability is disclosed in the financial statements of the Bank; and (iv) the Subordinated Loan;

"**Related Party Exposure**" means the aggregate consolidated Exposure to all Related Parties (other than Excluded Related Parties);

"**Relevant Contingent Claim**" has the meaning set out in Clause 4.3(b) of the Restructuring Plan;

"**Relevant Creditor**" means the Restructuring Creditors, creditors in relation to Related Party Debt and Samruk-Kazyna;

"**Relevant Event**" means a Change of Control and/or any disposals (excluding ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements);

---

[5] With regard to the calculation of Entitlements, discussions continue with the Steering Committee as to whether claims are to be converted into Tenge or U.S. Dollars.

"**Relevant Excluded Debt**" means Financial Indebtedness which constitutes Excluded Debt owing to Excluded Creditors falling within paragraphs (b) to (d) (inclusive) of that definition;

"**Relevant Jurisdiction**" means, in relation to a member of the Group:

(a)     its jurisdiction of incorporation;

(b)     any jurisdiction where any asset subject to or intended to be subject to the transaction Security to be created by it is situated;

(c)     any jurisdiction where it conducts its business;

"**Remaining Average Life**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Remaining Scheduled Payments**" has the meaning set out in Condition 8(f) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) as applicable;

"**Repo**" means a securities repurchase or resale agreement or reverse repurchase and resale agreement, a securities borrowing agreement or any agreement relating to securities which is similar in effect to any of the foregoing and, for the purposes of this definition, "**securities**" means any capital stock, share, debenture or other debt or equity instrument, or other derivative, whether issued by any private or public company, any government or agency or instrumentality thereof or any supranational, international or multilateral organisation;

"**Residual Amount**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Residual Minority Shareholder Percentage**" means the percentage of the Shares of the Bank collectively held by the pre-existing minority shareholders of the Bank immediately following the issue of Shares by the Bank prior to the Restructuring Date as described under "*The GDR Programme*";

"**Restricted Global Note**" means a permanent global note representing beneficial interest in Non-Tenge New Notes offered and issued to QIBs or Accredited Investors or subsequently sold in reliance on Rule 144A;

"**Restricted Note Certificate**" means a note certificate in definitive form which may be issued by DTC in exchange for a Restricted Global Note in accordance with the conditions of the relevant Non-Tenge New Notes;

"**Restructuring**" means the proposed overall restructuring and/or cancellation of certain of the debts and other financial obligations of the Bank pursuant to, *inter alia*, the Restructuring Plan;

"**Restructuring Creditors**" means those financial creditors whose debt is being restructured via the facilities provided for in: Senior Package 1, Senior Package 2, Senior Package 3, Junior Package 1, and Junior Package 2 (excluding Samruk-Kazyna and Related Parties);

"**Restructuring Creditors Share Entitlement**" means the Shares (corresponding to 18.5 per cent. of the total issued share capital of the Bank) required to be transferred or issued to Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 or to the Depositary on behalf of Restructuring Creditors under Senior Packages 1 and 2 and Junior Package 2 who are not resident in Kazakhstan on the Restructuring Date;

"**Restructuring Date**" means a date which is not more than ten Business Days after the date on which the Steering Committee notifies to the Bank that the conditions precedent listed in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information

Memorandum are satisfied (for which purpose the Steering Committee shall be entitled to rely without further investigation on the officer's certificate and supporting evidence provided pursuant to paragraph (r) of Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information Memorandum);

"**Restructuring Documents**" means:

(a)     The Restructuring Plan;

(b)     The Information Memorandum;

(c)     The Trust Deed and Paying Agency Agreement in relation to the Non-Tenge New Notes;

(d)     Cash Management Agreement;

(e)     RCTFF Agreement and the RCTFF Collection Account Pledge;

(f)     The Deposit Agreement in respect of the GDRs;

(g)     The SK Guarantee;

(h)     The Deeds of Undertaking;

(i)     The Deed of Release;

(j)     The Bank's New Charter;

(k)     The Bank's New Corporate Governance Code and;

(l)     Appointment letters and indemnities (from the Bank) for the Supervisor, the Adjudicator, the Independent Auditor, the Recovery Assets Auditor and the Creditor Directors.

"**Restructuring Law**" means the Law of the Republic of Kazakhstan dated 11 July 2009 On Amendments and Additions to Certain Legislative Acts of the Republic of Kazakhstan on Money Payments and Transfers, Accounting and Financial Reporting of Financial Organisations, Banking Activities, and activities of the National Bank of Kazakhstan;

"**Restructuring Packages**" means each of Senior Package 1, Senior Package 2, Senior Package 3, Junior Package 1 and Junior Package 2;

"**Restructuring Plan**" means the plan to restructure the Designated Financial Indebtedness between the Bank, the Claimants, the Euronoteholders and the Related Parties in the form set out at Schedule 1 (*The Restructuring Plan*) to this Information Memorandum or with any modification, addition or condition approved by the Claimants, the Euronoteholders and the Related Parties in accordance with clause 7.2 of the Restructuring Plan which the Court may think fit to approve or impose;

"**REUEL**" means REUEL Limited, a British Virgin Islands company;

"**RFCA**" means the Regional Financial Centre of Almaty;

"**RIROil**" means RIROil Sarl (now known as TANIL Sarl), a Swiss Company;

"**Rotterdam Court**" has the meaning as set out in "*Information for Claimants — Information for Creditors of TuranAlem Finance — Scheme of Compositon under Dutch Law*";

"**Rouble Noteholders**" has the meaning set out in "*Categories of Claimants*";

"**Rouble Notes**" means RUB 3 billion 7.8 per cent. notes due October 2009 issued by TuranAlem Finance (Russia) in October 2005 supported by a surety issued by the Bank;

"**RUB**" or "**Russian Roubles**" means the lawful currency of the Russian Federation;

"**Rule 144A**" means Rule 144A under the Securities Act;

"**S&P**" means Standard & Poor's Rating Services, a division of The McGraw Hill Companies;

"**Samruk-Kazyna**" means joint-stock company Sovereign Wealth Fund "Samruk-Kazyna";

"**Samruk-Kazyna Directors**" means the directors which Samruk-Kazyna appoints to the Board from time to time;

"**Samruk-Kazyna Undertaking**" means the deed poll to be executed by Samruk-Kazyna prior to the Restructuring Date;

"**Scheduled Supervisor Determination Date**" means 6 May 2010;

"**Second Choice Election**" has the meaning set out in "*Allocation Mechanism*";

"**Second Kazakh Securitisation Company**" means Second Securitisation Company of Kazakhstan, a public limited company formed under the laws of The Netherlands on 25 September 2007;

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference share) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange;

"**Securities Act**" means the United States Securities Act of 1933, as amended;

"**Securities Entitlement**" means the entitlement to New Notes, Shares and GDRs of each Claimant with an Agreed Claim pursuant to the terms of the Restructuring Plan;

"**Securities Market Law**" means the law of the Republic of Kazakhstan On the Securities Market dated 2 July 2003, as amended;

"**Security**" means any mortgage, charge, pledge, lien, encumbrance or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect;

"**Senior Debt**" means the Senior Notes, OID Notes and the RCTFF;

"**Senior Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Dollar Notes**" means the notes denominated in U.S. Dollars issued by the Bank under Senior Package 1 as set out in "*Terms of the Restructing Packages*";

"**Senior Package 1**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Package 1 Eligible Debt**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**Senior Package 2**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**Senior Package 2 Eligible Debt**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**Senior Package 3**" means the Restructuring Package outlined in *"Terms of the Restructuring Packages — Senior Package 3"*;

"**Senior Tenge Notes**" means the notes denominated in Tenge issued by the Bank under Senior Package 1 as set out in "*Terms of the Restructuring Packages*";

"**Sekerbank**" means Sekerbank T.A.S., a bank incorporated under the laws of Turkey;

"**Self-Liquidating Trade Finance Transaction**" means a transaction which:

(a)        would constitute Non-OGSC Eligible Trade Finance Debt; or

(b)        would constitute Official Government Sector Debt,

in connection with which the exposure of the Restructuring Creditor has been reduced by reason of performance of the obligations of any other party to that transaction (including the Bank) with respect thereto, to the extent of such reduction.

"**Senior Dollar Noteholder**" means a holder of Senior Dollar Notes;

"**Senior Tenge Notes**" means the senior notes issued by the Bank denominated in Tenge under Senior Package 1;

"**Senior Note Restructuring Documents**" means each Restructuring Document issued or entered into in connection with the Senior Notes or the OID Notes;

"**Settlement Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Senior Notes**" means the Senior Dollar Notes and the Senior Tenge Notes;

"**Settlement Instructions**" means the instructions to be given by all Claimants with Agreed Claims specifying such information as is necessary for the Distribution Agent or the Bank to distribute a Claimant's Entitlement, including Designated Account details, details of Nominated Recipient (if applicable), and whether the Claimant elects to receive GDRs (if applicable);

"**Settlement Instructions Deadline**" means such date as the Bank may in due course announce on a Regulatory Information Service as being the date by which all Claimants with Agreed Claims must have submitted their completed Settlement Instructions to the Distribution Agent;

"**Share Conversion Debt**" means the portion of Designated Financial Indebtedness in respect of which Shares or GDRs will be issued under the Restructuring (being that portion restructured under Senior Packages 1 and 2 and Junior Package 2 which will not be paid in cash or exchanged for New Notes);

"**Shareholder**" means a registered holder of Shares;

"**Shares**" means the common shares of the Bank;

"**Single Party**" means any counterparty and all Connected Parties of such counterparty (if any);

"**Single Party Exposure**" means the aggregate consolidated Exposure to any Single Party (including any interbank exposure);

"**SK Bonds**" means 4 per cent. bonds issued by Samruk-Kazyna in a total principal amount of KZT 645 billion, each with a denomination of KZT 1,000, and which Samruk-Kazyna issued in March 2009 and sold to the Bank in consideration for the issue by the Bank and sale to Samruk-Kazyna of the Bank Bonds with identification numbers KZP01Y06D392, KZP02Y07D398, KZP03Y08D394, KZP04Y09D390, KZP05Y10D395, KZP06Y11D391, KZP07Y12D397, KZP08Y13D393, KZP09Y14D399, KZP10Y15D394, KZP11Y06D391, KZP12Y07D397, KZP13Y08D393, KZP14Y09D399, KZP15Y10D394, KZP16Y11D390, KZP17Y12D396, KZP18Y13D392, KZP19Y14D398 and KZP20Y15D393;

"**SK Claim**" means the Claim that Samruk-Kazyna has against the Bank in the amount of KZT671 billion in relation to the Bank Bonds;

"**SK Guarantee**" means the guarantee which Samruk-Kazyna shall issue to the NBK for a duration of no less than ten years beginning from the first BTA/NBK Repo Transaction in respect of the obligations of the Bank to the NBK under any BTA/NBK Repo Transaction, in consideration of which the Bank will pay the SK Guarantee Fee when due;

"**SK Guarantee Fee**" means the semi-annual fee to be paid by the Bank to Samruk-Kazyna equal to fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this payment fee, will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of the completion of the Restructuring;

"**SK/NBK Agreement**" means an undated agreement executed between Samruk-Kazyna and the NBK in respect, *inter alia*, of the guaranteeing of the Bank's obligations to the NBK under the BTA/NBK Repo Transactions;

"**SME**" means small and medium-sized enterprises with assets of no more than KZT 459 million, annual sales of no more than U.S.$25 million, no more than 250 employees and with a financing limit no higher than U.S.$10 million;

"**SME State Finance Programme**" means the KZT 305,200 million programme (disbursed in four tranches) adopted by the Government in 2007 aimed at providing financing to SMEs for the acquisition of new, and the modernisation of existing, material assets, the provision of working capital and the refinancing of existing loans made to SMEs by the Bank or other credit organisations;

"**SP Subordinated Notes**" means the Dollar Subordinated Notes, the Euro Subordinated Notes and the Subordinated Tenge A Notes;

"**SP1 Subordinated Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 1"*;

"**SP2 Subordinated Debt Coefficient**" has the meaning set out in *"Terms of the Restructuring Packages — Senior Package 2"*;

"**State Finance Programmes**" means the SME State Finance Programme, the Mortgage State Finance Programme, the Construction State Finance Programme, the Agricultural State Finance Programme and other state finance programmes established by the Government;

"**Steering Committee**" means the steering committee from time to time of certain Claimants, as at the date hereof consisting of The Royal Bank of Scotland N.V. (formerly known as ABN AMRO Bank N.V.) (supported by members of The Royal Bank of Scotland plc's Global Restructuring Group), Commerzbank Aktiengesellschaft, the D. E. Shaw Oculus International, Inc., Euler Hermes Kreditversicherungs AG (acting for and on behalf of the Federal Republic of Germany), Fortis Investment Management UK Limited, Gramercy Advisors LLC, The Bank of Singapore Limited (formerly ING Asia Private Bank Limited), KfW (representing its affiliates DEG — Deutsche Investitions — und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH), Standard Chartered Bank, Export-Import Bank of the United States and Wells Fargo Bank N.A.;

"**Subordinated Loan**" means the U.S.$400 million subordinated loan made pursuant to a subordinated loan agreement dated 20 January 2006 between TuranAlem Finance and the Bank;

"**Subordinated Non-Tenge Notes**" means the Dollar Subordinated Notes and the Euro Subordinated Notes;

"**Subordinated Notes**" means Dollar Subordinated Notes, Euro Subordinated Notes, Subordinated Tenge A Notes and Subordinated Tenge B Notes;

"**Subordinated Tenge A Notes**" means the subordinated notes issued by the Bank denominated in Tenge under Senior Package 1 and Senior Package 2 as set out in "*Terms of the Restructuring Packages*";

"**Subordinated Tenge B Notes**" means the subordinated notes issued by the Bank denominated in Tenge under Junior Package 1 as set out in "*Terms of the Restructuring Packages*";

"**Subsidiary**":

(a)     an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 per cent. of the voting capital or similar right of ownership (and "control" for this purpose means the power to direct the management and policies of the entity whether through the ownership of voting capital, by contract or otherwise); or

(b)     an entity whose financial statements are, in accordance with applicable law and IFRS, consolidated with those of another person,

and for these purposes, when determining whether an entity is a "Subsidiary" of another, the registration of any shares in such "Subsidiary" in the name of any nominee or any other person holding security over such shares shall be ignored so that such entity is deemed to be the Subsidiary of the person who created that security or on whose behalf the nominee holds the relevant shares (as the case may be), and, in respect of the Bank, includes those entities listed in "*The Bank — Subsidiaries and Associates of the Bank — Subsidiaries*";

"**Subsidiary Subordinated Loan**" means the U.S.$400 million subordinated loan made pursuant to a loan agreement between TuranAlem Finance and BTA Finance Luxembourg dated 20 January 2006 using the net proceeds of the issue of the Perpetual Securities;

"**Supermajority**" means in respect of a relevant matter, that matter requires:

(a)     the approval of 75 per cent. or more of the total number of Shares; and

(b)     *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Supermajority Approval**" means that the relevant matter requires:

(a)     the approval of 75 per cent. or more of the total number of Shares; and

(b)     *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Supermajority Item**" means any matter listed as requiring a Supermajority Approval under "*Undertakings by the Bank and Samruk-Kazyna*";

"**Supervisor**" means the supervisor appointed by the Bank, which shall initially be Watson, Farley & Williams LLP, or otherwise an independent third party considered fit and proper by the Bank and the Steering Committee, or failing agreement, an individual nominated by the LCIA, for the purpose of adjudicating Disputed Claims;

"**Support Agreement**" means the support agreement in respect of the Perpetual Securities between BTA Finance Luxembourg and the Bank dated 25 January 2006;

"**Tabulation Agent**" means The Bank of New York Mellon;

"**Tag-Along Acceptance**" has the meaning set out in "*The GDR Programme*";

"**Tag-Along Offer**" has the meaning set out in "*The GDR Programme*";

"**Tag-Along Purchaser**" has the meaning set out in "*The GDR Programme*";

"**Tag Price**" has the meaning set out in "*The GDR Programme*";

"**Tagged Shareholder**" has the meaning set out in "*The GDR Programme*";

"**TARGET Day**" means day on which the Trans European Automated real-time Gross Settlement Express Transfer payment system which utilises a single shares platform (and which was launched on 19 November 2007) is open for the settlement of payments in Euro;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Tax Assets**" shall have the meaning given in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Tax Code**" means the code of the Republic of Kazakhstan On Taxes and Other Obligatory Payments to the Budget dated 10 December 2008, as amended;

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under any of the New Notes;

"**Temir Capital B.V.**" means Temir Capital B.V., a limited liability company formed under the laws of The Netherlands on 29 May 2001;

"**Temirbank**" means JSC Temirbank, a joint stock company formed under the laws of Kazakhstan on 26 March 1992;

"**Temirleasing**" means JSC Temirleasing, a joint stock company incorporated under the laws of the Republic of Kazakhstan on 5 March 2001;

"**Tenge**" or "**KZT**" means the Kazakhstan Tenge, the lawful currency of Kazakhstan;

"**Tenge New Notes**" means the Senior Tenge Notes, the Subordinated Tenge A Notes and the Subordinated Tenge B Notes;

"**Term Sheet**" means the PCTS, as amended by the PCTS Amendment Letter as further amended by the Detailed Term Sheet signed by the Bank and the Steering Committee outlining the terms of the Bank's proposed financial restructuring;

"**Tier 1 Capital**" means the Bank's Tier 1 Capital as such term is defined in the FMSA Guidance, unless otherwise stated;

"**Tier 2 Capital**" means the Bank's Tier 2 Capital as such term is defined in the FMSA Guidance, unless otherwise stated;

"**Trade Finance Facilities**" has the meaning as set out in "*Selected Statistical Information*";

"**Treasury Transaction**" means any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price;

"**Trust Deeds**" means the list of trust deeds as specified in "*Information for Claimants — Information for Euronoteholders*";

"**Trustee**" means BNY Corporate Trustee Services Limited, or any successor trustee appointed in accordance with the provisions of the Trust Deeds;

"**TuranAlem Finance**" means TuranAlem Finance B.V., a wholly owned subsidiary of the Bank incorporated in the Netherlands;

"**TuranAlem Finance (Russia)**" means LLP TuranAlem Finance, a limited liability company formed under the laws of the Russian Federation on 22 June 2004;

"**UAH**" means the Ukranian Grivna, the legal currency of the Ukraine;

"**Unaudited Interim Financial Statements**" means the reviewed interim consolidated financial statements of the Bank for the nine-month period ended 30 September 2009 contained in this Information Memorandum;

"**United Kingdom**" means the United Kingdom of Great Britain and Northern Ireland;

"**United States**" or the "**U.S.**" means the United States of America, its territories and possessions, any State of the United States of America and the District of Columbia;

"**Unrestricted Global Note**" means a permanent global note representing beneficial interest in Non-Tenge New Notes offered and issued in reliance on Regulation S;

"**Unrestricted Note Certificate**" means a note certificate in definitive form which may be issued by DTC in exchange for an Unrestricted Global Note in accordance with the conditions of the relevant Non-Tenge New Notes;

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code;

"**U.S. Dollars**", "**Dollars**", "**$**" or "**U.S.$**" means United States Dollars, the lawful currency of the United States;

"**U.S. GAAP**" means accounting principles generally accepted in the United States;

"**U.S. Holder**" means a beneficial owner of the New Notes, Shares or GDRs that is (i) a U.S. citizen or resident, (ii) a corporation, partnership or other business entity organised under the laws of the United States, (iii) a trust subject to the control of a U.S. Person and the primary supervision of a U.S. court or (iv) an estate the income of which is subject to U.S. federal income tax regardless of its source;

"**U.S. Person**" means a U.S. person as defined in Regulation S;

"**Usarel**" means Usarel Investments Limited, a Cyprus company;

"**Valuation Date**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Valuation Rejection Notice**" has the meaning set out in Annex 4 (*Terms and Conditions of the Recovery Units*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*);

"**Voting Instructions**" means the instructions given to a proxy in respect of a Euronoteholders' Meeting;

"**Voting Instructions Deadline**" shall be the dates specified in "*Expected Sequence of Principal Events*";

"**£**" means pounds sterling, the lawful currency of the United Kingdom.

## TERMS OF THE RESTRUCTURING PACKAGES

Depending on the nature of their Claim, Restructuring Creditors will be allocated to a Restructuring Package or given the right to elect which package they are allocated to in accordance with the procedures set out in "*Allocation Mechanism*".

**Claimants with Claims denominated in Tenge are only eligible to receive Entitlements denominated in Tenge, Recovery Units and Shares.  Non-Kazakh residents may elect to receive GDRs instead of Shares.  All other Claimants shall receive Entitlements denominated in U.S. Dollars (unless, in the case of Entitlements under Senior Package 1 and 2, they elect to receive Entitlements denominated in Tenge) other than those Claimants allocated into (or who elect to be allocated into) Senior Package 2, who may receive Entitlements in Euro.  Recovery Units shall be denominated in U.S. Dollars.  Senior Claims are, depending on their nature, eligible for Senior Packages 1, 2 or 3.  Subordinated Claims are, depending on their nature, eligible for Junior Packages 1 or 2.  Holders of BTA Finance Luxembourg's Perpetual Securities will automatically be allocated to Junior Package 2.**

### Restrictions on Resale of the New Notes, Shares and GDRs

The New Notes, Shares and GDRs that are being allocated are not and will not be registered under the Securities Act, and therefore, the New Notes, Shares and GDRs will be subject to restrictions on transfer.  Any transfer or resale of the New Notes, Shares and GDRs must comply with the restrictions contained under the heading "*Issuance and Transfer Restrictions*".

### Eligibility to Participate

By electing to participate, a Claimant will be required, unless in any instance the Bank agrees otherwise, to acknowledge and represent to the Bank, *inter alia*, that it is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and that either:

- it is an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

  - is acquiring the New Notes, Shares or GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

  - invests in or purchases securities similar to the New Notes, Shares or GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

  - is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares or GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period;

or

- it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB;

or

- it is not a U.S. Person or participating for the account or benefit of a U.S. Person and it is located offshore in accordance with Regulation S.

See *"Issuance and Transfer Restrictions"*.

The terms of the Restructuring Packages are set out below.  The Terms and Conditions of the New Notes and the RCTFF are set out in Schedule 9 (*Terms and Conditions of the New Notes and the*

*RCTFF*).  See "*Description of Share Capital and Certain Matters of Kazakhstan Law*" in this Information Memorandum for a description of the Shares.  See "*The GDR Programme*" for a description of the GDRs.

All figures (including principal and interest) and categorisations included in the following summaries relating to amounts of debt are estimates and are based on information supplied by the Bank and have not been capable of verification by the Steering Committee.

The final figures and categorisations will change once all Claims have been reconciled and as a result of the allocation of Non-OGSC Eligible Trade Finance Debt and Official Government Sector Debt between the Restructuring Packages in accordance with the Allocation Mechanism.  As this Information Memorandum was finalised before completion of the reconciliation and adjudication process and allocation of Agreed Claims to Restructuring Packages, adjustments will be made, once final numbers are known for each Restructuring Package, to the Coefficients, coupons, discount rates, etc. on the basis of the Base Case Model in consultation between the Steering Committee and the Bank prior to the Claimants' Meeting.

**<u>Senior Package 1</u>**

| | |
|---|---|
| Terms | Claims of Restructuring Creditors to be restructured in Senior Package 1 include U.S.$8.376 million of principal plus U.S.$628 million of interest as at 30 June 2010 and any Excess Non-OGSC Eligible Trade Finance allocated to Senior Package 1 less any Official Government Sector Debt allocated into Senior Package 2 in accordance with the Allocation Mechanism. |
| | Claimants shall have the option to have their entitlement to Senior Dollar Notes and Dollar Subordinated Notes under Senior Package 1 to be issued directly by the Bank to them directly or to a Bank Creditor SPV.  See "*Bank Creditor SPVs*" for further details of this option |
| | Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 1 and its Claim is denominated in a currency other than Tenge, such Restructuring Creditor may elect in its Claim Form to receive Entitlements (other than Recovery Units) denominated in Tenge.  If such Restructuring Creditor fails to make an appropriate election in its Claim Form, it will receive Entitlements under Senior Package 1 denominated in U.S. Dollars.  Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 1 and its Claim is denominated in Tenge, such Restructuring Creditor will receive Entitlements in Tenge (other than Recovery Units which will be denominated in U.S. Dollars). |

**Senior Package 1**

| | |
|---|---|
| Claims eligible for Senior Package 1 (the "**Senior Package 1 Eligible Debt**") | Senior financial creditors (including (i) most bonds, (ii) most bank loans, (iii) Claims falling within paragraphs (ii) and (iii) of the definition of Non-OGSC Eligible Trade Finance Debt, (iv) any Excess Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 1 and (v) up to U.S.$750 million of Official Government Sector Debt allocated to Senior Package 1) other than: |

- Samruk-Kazyna;

- Excluded Creditors;

- Non-OGSC Eligible Trade Finance Creditors save to the extent set out in (iv) above; and

- Official Government Sector Debt save to the extent set out in (v) above.

| | |
|---|---|
| Write-off | 55.80 per cent. of the Designated Financial Indebtedness allocated to Senior Package 1 will be written-off. |

Restructuring Package Components:

| | |
|---|---|
| Cash | Agreed Claimants are to receive a *pro rata* share of cash equal to 11.07 per cent. (the "**Cash Coefficient**") of principal and interest restructured.

U.S.$1 billion of cash is available for Claims allocated into Senior Package 1. |
| Senior Notes | Agreed Claimants are to receive a *pro rata* share of Senior Notes equal to 27.01 per cent. (the "**Senior Debt Coefficient**") of principal and interest restructured in the form of Senior Dollar Notes or Senior Tenge Notes.

The Senior Notes have an eight-year tenor with a four-year grace period on amortisation of principal.  After the fourth year principal shall be amortised semi-annually in eight equal instalments.

The Senior Notes are callable at any time (in whole only) at the option of the Bank on 30 days' notice at par plus accrued interest plus, if positive, the Make-Whole Amount, if any.

The Senior Notes will include a put option at par (plus accrued interest) in the event of a Relevant Event.

The Senior Dollar Notes will accrue interest from 1 July 2010 (regardless of the date of issue) payable in cash semi-annually at a rate of 10.75 per cent. per annum for the first five semi-annual payments, and 12.5 per cent. per annum thereafter. |

**<u>Senior Package 1</u>**

The Senior Tenge Notes will accrue interest from 1 July 2010 (regardless of the date of issue) payable in cash in semi annual instalments at a rate of 14.75 per cent. for the first five Semi annual payments and 16.5 per cent. per annum thereafter.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 1 (*Terms and Conditions of the Senior Notes*) and Annex 7 (*Summary of Tenge New Notes*) for further details of the Senior Notes.

Subordinated Notes

Agreed Claimants are to receive a *pro rata* share of SP

Subordinated Notes equal to 6.12 per cent. (the "**SP1 Subordinated Debt Coefficient**") of principal and interest restructured under Senior Package 1.

The SP Subordinated Notes have a 15-year tenor with a ten-year grace period on amortisation of principal. After the tenth year the principal shall be amortised semi-annually in ten equal instalments.

The Dollar Subordinated Notes will accrue interest payable in cash semi-annually at a rate of 7.2 per cent. per annum.

The Subordinated Tenge A Notes will accrue interest payable in cash semi-annually at a rate of 11.20 per cent. per annum.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 5 (*Terms and Conditions of the Dollar Subordinated Notes*) and Annex 7 (*Summary of Tenge New Notes*) to this Information Memorandum for further details of the Subordinated Notes.

Equity

Agreed Claimants to receive a *pro rata* share of 12.55 per cent. of the issued share capital of the Bank (as such coefficient may be increased to take into account additional equity allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 1).

Equity will be issued in the form of GDRs to Claimants who are non-Kazakh residents (unless they elect in the Claim Form to receive Shares) and in the form of Shares to Claimants who are Kazakh residents.

Recovery Units

Agreed Claimants to receive a *pro rata* share of 89.61 per cent. of the aggregate principal amount of the Recovery Units (as such coefficient may be increased to take into account additional Recovery Units allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 1).

**<u>Senior Package 1</u>**

|  |  |
|---|---|
|  | Recovery Units shall have a ten-year (or if extended, 12-year) tenor and will be valued at maturity for the purposes of redemption. |
|  | Payments made under the Recovery Units will amount to 50 per cent. of all recoveries made.   The remaining 50 per cent. will go to the Bank. |
|  | Amounts payable under the Recovery Units will be calculated on: |

- recoveries realised in 2009 (post 30 June 2009), 2010 and 2011 to the extent they exceed the projected recoveries in such years in the Base Case Model (being KZT 36 billion, KZT 134 billion and KZT 103 billion, respectively); and

- all recoveries realised on or after 1 January 2012.

Any payment due to Recovery Note holders arising solely as a result of an accounting recovery will be deferred until the Bank receives the cash benefit thereof.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) for further details of the Recovery Units.

|  |  |
|---|---|
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |
| Base Case Model | For the purposes of illustration only, the Base Case Model assumes an allocation of U.S.$33 million of Excess Non-OGSC Eligible Trade Finance Debt to Senior Package 1 and U.S.$288 million Senior Package 2 and the Coefficients mentioned below have been calculated on that basis.   This should not be taken as an indication that Excess Non-OGSC Eligible Trade Finance Debt will be allocated in this proportion to Senior Package 1 and Senior Package 2 which will depend on the outcome of the allocation process set out in "*Allocation Mechanism*".   Accordingly, the Cash Coefficient, the Senior Debt Coefficient and the SP1 Subordinated Debt Coefficient will be adjusted upon the result of the actual allocation. |

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 1, the Coefficients would be adjusted as follows:

Cash Coefficient: 10.72 per cent.
Debt Coefficient: 27.43 per cent.
SP1 Subordinated Debt Coefficient: 6.22 per cent.

**Senior Package 1**

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 2, the Coefficients would be adjusted as follows:

Cash Coefficient: 11.11 per cent.
Debt Coefficient: 26.96 per cent.
SP1 Subordinated Debt Coefficient: 6.11 per cent.

The Excess Non-OGSC Eligible Trade Finance Debt is in total entitled to an allocation of 0.48 per cent. of Shares and 3.43 per cent. of Recovery Units.

**Senior Package 2**

Terms

Claims to be restructured in Senior Package 2 are U.S.$650 million of principal plus U.S.$11 million of interest as at 30 June 2010 of Official Government Sector Debt and such amount of principal and interest of any Excess Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 2 plus such amount of principal and interest of Official Government Sector Debt additionally allocated to Senior Package 2.

Claimants shall have the option to have their entitlement to OID Notes, Dollar Subordinated Notes and Euro Subordinated Notes under Senior Package 2 to be issued directly by the Bank to them or to a Bank Creditor SPV. See "*Bank Creditor SPVs*" for further details of this option.

Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 2 and its Claim is denominated in a currency other than Tenge, such Restructuring Creditor may elect in its Claim Form to receive Entitlements (other than Recovery Units and OID Notes) denominated in Tenge or, in the case of a Claim denominated in Euro, Euro.  If such Restructuring Creditor fails to make an appropriate election in its Claim Form, it will receive Entitlements under Senior Package 2 denominated in U.S. Dollars.   Where all or any part of a Restructuring Creditor's Agreed Claim is allocated to Senior Package 2 and its Claim is denominated in Tenge, such Restructuring Creditor will receive Entitlements in Tenge (other than Recovery Units and OID Notes which will be denominated in U.S. Dollars or Euros).

Claims eligible for Senior Package 2 (the "**Senior Package 2 Eligible Debt**").

(i)    Official Government Sector Creditors of up to U.S.$650 million;

(ii)   Non-OGSC Eligible Trade Finance Debt not allocated into Senior Package 3; and

**Senior Package 2**

|  |  |
|---|---|
| | (iii)   to the extent that less than U.S.$288 million of Non-OGSC Eligible Trade Finance Debt is allocated to Senior Package 2, an additional amount of Official Government Sector Creditors may be allocated into Senior Package 2. |

Restructuring package components

OID Notes

Agreed Claimants to receive a *pro rata* share of OID Notes issued with an original issue discount of 54.33 per cent. and a Day-1 value of 45.67 per cent. (the "**OID Coefficient**") of principal and interest restructured.

The OID Notes shall have an 11-year tenor with a seven-year grace period and straight line accretion over eleven years. After the seventh year, principal shall be repaid in eight semi-annual instalments, each of which shall be a fraction of the remaining accreted principal amount on the relevant date for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The OID Notes will include a put option at their then current accreted value (plus accrued interest) upon the occurrence of a Relevant Event.

The OID Notes will include a call option at their Fully Accreted Principal Amount plus accrued interest in the event of a change in or in the application of tax laws or treatment but are otherwise non-callable.

In respect of the Dollar OID Notes, interest shall be paid in cash semi-annually at 3.70 per cent. per annum during the seven-year grace period and 3.30 per cent. per annum thereafter.

In respect of the Euro OID Notes, interest shall be paid in cash semi-annually at 3.14 per cent. per annum during the seven-year grace period and 2.74 per cent.[6] per annum thereafter.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 2 (*Terms and Conditions of the Dollar Original Issue Discount Notes*) and Annex 3 (*Terms and Conditions of the Euro Original Issue Discount Notes)* to this Information Memorandum for further details of the OID Notes.

Subordinated Notes

Agreed Claimants to receive a *pro rata* share of SP Subordinated Notes equal to 6.46 per cent. (the "**SP2 Subordinated Debt Coefficient**") of principal and interest restructured under Senior Package 2.

---

[6] Euro OID Notes coupon will be updated to reflect prevailing market rates.

**Senior Package 2**

|  |  |
|---|---|
|  | SP Subordinated Notes shall have the same terms and conditions as set out under Senior Package 1 — "*Subordinated Notes*". |
|  | The Euro Subordinated Notes will accrue interest payable in cash semi-annually at a rate of 6.75 per cent. per annum. |
|  | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 5 (*Terms and Conditions of the Subordinated Notes*), Annex 6 (*Terms and Conditions of the Euro Subordinated Notes*) and Annex 7 (*Summary of Tenge New Notes*) for further details of the Subordinated Notes. |
| Equity | Claimants to receive a *pro rata* share of 0.97 per cent. of the issued share capital of the Bank (as it may be increased to take into account additional equity allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 2). |
|  | Equity will be issued in the form of GDRs to Claimants who are non-Kazakh residents (unless they elect in their Claim Form to receive Shares) and Shares to Kazakh residents. |
| Recovery Units | Claimants to receive a *pro rata* share of 6.96 per cent. of the aggregate principal amount of the Recovery Units (as it may be increased to take into account additional Recovery Units allocated to Excess Non-OGSC Eligible Trade Finance and Official Government Sector Debt allocated to Senior Package 2). |
|  | Recovery Units shall have the same terms as set out under Senior Package 1 *"Recovery Units"*. |
|  | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*) for further details of the Recovery Units. |
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |
| Base Case Model | For purposes of illustration only, the Base Case Model assumes an allocation of U.S.$33 million of Excess Non-OGSC Eligible Trade Finance Debt to Senior Package 1 and U.S.$288 million Senior Package 2 and the Coefficients mentioned below have been calculated on that basis. This should not be taken as an indication that Excess Non-OGSC EligibleTrade Finance Debt will be allocated in this proportion to Senior Package 1 and Senior Package 2, which depends on the outcome of the allocation process set out in the Allocation Mechanism. |
|  | Accordingly, the OID Coefficient and the SP2 Subordinated Debt Coefficient will be adjusted upon the result of the actual allocation. |

**Senior Package 2**

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 2, the Coefficients would be adjusted as follows:

OID Coefficient: 45.68 per cent.
SP2 Subordinated Debt Coefficient: 6.45 per cent.

In case of a full allocation of the Excess Non-OGSC Eligible Trade Finance Debt into Senior Package 1, the Coefficients would be adjusted as follows:

OID Coefficient: 45.30 per cent.
SP2 Subordinated Debt Coefficient: 6.56 per cent.

The Excess Non-OGSC Eligible Trade Finance Debt is, in total, entitled to an allocation of 0.48 per cent. of Shares and 3.43 per cent. of Recovery Units.

**Senior Package 3**

Terms

Claims of Restructuring Creditors to be restructured in Senior Package 3 include U.S.$700 million of principal of Non-OGSC Eligible Trade Finance Debt.

Claims eligible for Senior Package 3

Non-OGSC Eligible Trade Finance Debt up to U.S.$700 million.

The balance of Non-OSGC Eligible Trade Finance shall be allocated to Senior Package 1 or Senior Package 2 as further described under "*Allocation Mechanism — Part 1*".

Restructuring package components

Revolving Committed Trade Finance Facility:

U.S.$700 million of principal of the Non-OGSC Eligible Trade Finance Debt to be settled by the RCTFF.

See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 8 (*Terms and Conditions of the RCTFF*) for the principal terms of the RCTFF.

**Junior Package 1**

Terms

Claims of Restructuring Creditors to be restructured in Junior Package 1 include KZT 28 billion or U.S.$186 million equivalent of principal and U.S.$16 million of interest restructured as of 30 June 2010 of Subordinated Claims.

Claims eligible for Junior Package 1

Subordinated Claims owed to Kazakhstani pension funds.

Restructuring package components

**Junior Package 1**

| | |
|---|---|
| Subordinated Tenge B Notes | Agreed Claimants will receive a *pro rata* share of Subordinated Tenge B Notes with a face value of KZT 28 billion or U.S.$186 million equivalent (denominated in Tenge). |
| | The Subordinated Tenge B Notes shall have a 20-year tenor with a 15-year grace period.  Following the grace period, principal shall be amortised semi-annually in ten equal instalments.  Interest will be payable in cash semi-annually at a rate of 8.0 per cent. per annum. |
| | The Subordinated Tenge B Notes will not include any call option or put option. |
| | See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 7 (*Summary of Tenge New Notes*) for the terms of the Subordinated Tenge Notes. |
| Interest accrual date on new debt instruments (regardless of date of issue) | 1 July 2010 |

**Junior Package 2**

| | |
|---|---|
| Terms | Claims of Restructuring Creditors to be restructured in Junior Package 2 include U.S.$1.156 billion of principal and U.S.$115 million of interest restructured as of 30 June 2010 of Subordinated Claims. |
| Claims eligible for Junior Package 1 | All Subordinated Claims and Perpetual Securities (other than Subordinated Claims owed to Kazakhstani pension funds). |
| Restructuring package components Equity | Agreed Claimants to receive a *pro rata* share of 4.50 per cent. of the issued share capital of the Bank in the form of GDRs to non-Kazakh residents (unless they elect in their Claim Form to receive Shares) and Shares to Kazakh residents. |

**ALLOCATION MECHANISM**

**PART I – ALLOCATION OF AGREED NON-OGSC ELIGIBLE TRADE FINANCE DEBT BETWEEN SENIOR PACKAGES 1, 2 AND 3**

(a)     Restructuring Creditors submitting Claim Forms in respect Non-OGSC Eligible Trade Finance Debt shall be invited in such Claim Forms:

    (i)     to indicate:

        (A)     to which of Senior Packages 1, 2 and/or 3 they would wish their Agreed Claims in respect of Non-OGSC Eligible Trade Finance Debt to be allocated; and

        (B)     if they elect for a combination of Senior Packages, the amount of their Agreed Claim they would want allocated to each Senior Package they elect for (*provided that* the aggregate amounts so elected must equal the total amount of their Agreed Claim),

    (each a "**First Choice Election**"); and

    (ii)     (should the aggregate amount of First Choice Elections for Senior Package 3 exceed U.S.$700 million) to which of Senior Packages 1 or 2 they would wish their Agreed Claims (to the extent not allocated to Senior Package 3) to be allocated (each a "**Second Choice Election**").

(b)     If the aggregate amount of First Choice Elections for Senior Package 3 equals or exceeds U.S.$700 million:

    (i)     first, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Package 3 in the amount of U.S.$700 million in aggregate shall be allocated to Senior Package 3 on a *pro rata* basis such that a portion of each such Restructuring Creditor's Claims admitted as Non-OGSC Eligible Trade Finance Debt and so elected shall be allocated to Senior Package 3 in the proportion which U.S.$700 million bears to all such First Choice Elections (the balance of such Restructuring Creditor's Agreed Claim so elected which is not thereby allocated to Senior Package 3 is referred to as its "**First Choice Claim Remainder Amount**");

    (ii)     secondly,

        (A)     Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Packages 1 and/or 2 shall be allocated to those packages in accordance with those elections;

        (B)     the First Choice Claim Remainder Amounts shall be allocated to Senior Packages 1 or 2 in accordance with the Second Choice Elections of the relevant Restructuring Creditors; and

        (C)     Agreed Claims of Restructuring Creditors in respect on Non-OGSC Eligible Trade Finance Debt who failed to make a First Choice Election and/or a Second Choice Election shall be allocated to Senior Package 1

(c)     If the aggregate amount of First Choice Elections for Senior Package 3 is less than U.S.$700 million:

    (i)     first, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Package 3 shall to the extent so elected be allocated to Senior Package 3;

(ii)    secondly, Agreed Claims of Restructuring Creditors in respect of Non-OGSC Eligible Trade Finance Debt who failed to make a First Choice Election and/or a Second Choice Election shall be allocated first to Senior Package 3 and, if the amount allocated to Senior Package 3 then reaches U.S.$700 million, the balance shall be allocated to Senior Package 1; and

(iii)   thirdly, if U.S.$700 million has not following the operation of paragraphs (i) and (ii) been allocated to Senior Package 3, Agreed Claims of Restructuring Creditors who made First Choice Elections for Senior Packages 1 and/or 2 shall (by reference to the amounts so elected for Senior Packages 1 and/or 2) be allocated to Senior Package 3 on a *pro rata* basis such that (as a result of the operation of paragraphs (i), (ii) and this paragraph (iii)) U.S.$700 million in aggregate is allocated to Senior Package 3, following which the remainder of their Agreed Claims shall be allocated to Senior Packages 1 and/or 2 in accordance with their First Choice Elections.

**PART II – ALLOCATION OF AGREED OFFICIAL GOVERNMENT SECTOR DEBT
BETWEEN SENIOR PACKAGES 1 AND 2**

(a)    Restructuring Creditors submitting Claim Forms in respect of Official Government Sector Debt shall be invited in such Claim Forms to indicate to which of Senior Packages 1 and/or 2 they wish their Agreed Claims in respect of Official Government Sector Debt to be allocated, and where they indicate more than one Senior Package the amount of their Agreed Claim they wish to allocate to each Senior Package indicated (provided that the aggregate amount of a Creditor's election(s) in this regard must  equal the total amount of its Agreed Claim).

(b)    The Bank shall allocate Agreed Claims admitted as Official Government Sector Debt between Senior Package 1 and Senior Package 2 as elected by the relevant Restructuring Creditor in its Claim Form provided that:

    (i)    subject to sub-paragraph (iii) below, if the aggregate Claims of Restructuring Creditors admitted as Official Government Sector Debt electing for Senior Package 2 exceeds U.S.$650 million, the Agreed Claims of such Restructuring Creditors (so electing) shall be allocated on a *pro rata* basis to Senior Package 2 in the proportion which U.S.$650 million bears to all such Agreed Claims, and the balance thereof shall be allocated to Senior Package 1;

    (ii)    if the aggregate Agreed Claims of Restructuring Creditors admitted as Official Government Sector Debt electing or deemed to elect for Senior Package 2 is less than U.S.$650 million (the difference between the actual amount electing or deemed to elect for Senior Package 2 and U.S.$650 million being, the "**Shortfall**"), then:

        (A)    first, Official Government Sector Debt which Restructuring Creditors elected, or have been deemed to elect for Senior Package 2 shall (to the extent of such elections) be allocated to Senior Package 2; and

        (B)    secondly, the Restructuring Creditors' Agreed Claims in respect of Official Government Sector Debt electing for Senior Package 1 shall instead be allocated on a *pro rata* basis to Senior Package 2 in the proportion which the Shortfall bears to the total of all such Agreed Claims electing for Senior Package 1, and the balance thereof shall be allocated to Senior Package 1;

    (iii)    if less than U.S.$288 million of Excess Non-OGSC Eligible Trade Finance Debt is allocated to Senior Package 2 in accordance with  Part I above, then the balance of U.S.$288 million less the Excess Non-OGSC Eligible Trade Finance Debt elected for Senior Package 2 shall be available for allocation to Official Government Sector Debt, such that there would be no mandatory re-allocation under sub-paragraph (i) above of Official Government Sector Debt to Senior Package 1 unless the aggregate amount of Official Government Sector Creditors electing for Senior Package 2 exceeded U.S.$650 million plus the portion (the "Unutilised Portion") of U.S.$288 million Excess Non-OGSC Eligible Trade Finance Debt unutilised by Excess Non-OGSC Eligible Trade Finance Debt, in which case:

        (A)    allocation to Senior Package 2 of Agreed Claims admitted as Official Government Sector Debt under sub-paragraph (i) shall be made on a *pro rata* basis in the proportion which (x) the aggregate of U.S.$650 million plus the Unutilised Portion bears to (y) the aggregate amount of Official Government Sector Creditors electing for Senior Package 2 and the Unutilised Portion; and

        (B)      the Agreed Claims of such Official Government Sector Creditors not thereby allocated to Senior Package 2 shall be re-allocated on a *pro-rata* basis to Senior Package 1; and

(iv)     where no election is made in the Claim Form, such Restructuring Creditor's Claims admitted as Official Government Sector Debt shall:

        (A)      where there is a Shortfall, be deemed allocated to Senior Package 2; and

        (B)      otherwise, be deemed allocated to Senior Package 1.

(c)     All amounts of principal and interest set out in this Information Memorandum are estimates. The final numbers are subject to the results of the adjudication and admission of Claims processes described herein and the elections of certain Restructuring Creditors and this Allocation Mechanism.  Following finalisation of the total Agreed Claims and their allocation between the Restructuring Packages, on the basis of the Base Case Model, the Bank and the Steering Committee shall (prior to the Claimants' Meeting) consult with a view to amending the coupons, discount rates and percentages of Designated Financial Indebtedness allocated to various types of Entitlements within a Restructuring Package to take into account the final numbers.

## PART III – EURONOTEHOLDERS

The Trustee on behalf of Euronoteholders will, unless it receives other instructions from Euronoteholders by 26 May 2010, make the following elections when submitting Claim Forms:

(a)     Entitlements to be received in U.S. Dollars;

(b)     Senior Dollar Notes and Dollar Subordinated Notes to be received directly from the Bank (as opposed to through a Bank Creditor SPV); and

(c)     GDRs to be received (as opposed to Shares).

**BANK CREDITOR SPVS**

Pursuant to the Restructuring Plan, each Restructuring Creditor which is allocated to either Senior Package 1 or Senior Package 2 (other than a Restructuring Creditor holding Tenge-denominated debt instruments) may elect that, instead of receiving the applicable Non-Tenge New Notes under such Senior Package itself, the relevant amount of Non-Tenge New Notes shall be issued to a Bank Creditor SPV who will hold such Non-Tenge New Notes on their behalf.  Restructuring Creditors who elect to have their allocation of relevant Non-Tenge New Notes issued to a Bank Creditor SPV will instead receive an equivalent participation in nominal/principal amount in a syndicated loan agreement with equivalent economic terms between the relevant Bank Creditor SPV and the relevant Restructuring Creditors making such elections (see "*Bank Creditor Loan Agreements*" below).

It is proposed that three Bank Creditor SPVs be established to hold the following classes of New Notes on behalf of relevant creditors:

(i)     Senior Dollar Notes issued to Restructuring Creditor under Senior Package 1;

(ii)    OID Notes issued to Restructuring Creditors under Senior Package 2; and

(iii)   Dollar Subordinated Notes and Euro Subordinated Notes issued to Restructuring Creditors under Senior Packages 1 and 2.

**Minimum Face Value**

A Bank Creditor SPV will only be established if Restructuring Creditors entitled to receive the relevant NonTenge New Notes with an aggregate principal amount of U.S.$50 million or higher (the "**Minimum Face Value**") elect for their relevant Non-Tenge New Notes to be issued to that Bank Creditor SPV.  Where applicable, the Bank Creditor SPVs will be incorporated, prior to the Restructuring Date, in a jurisdiction which is acceptable to the Steering Committee.  Each Bank Creditor SPV shall be established as an orphan company and will be managed for the benefit of the Restructuring Creditors who have opted to receive the relevant Non-Tenge New Notes indirectly as part of their Entitlement.

**Bank Creditor Loan Agreements**

Each Bank Creditor SPV shall enter into a syndicated loan agreement with the relevant Restructuring Creditors (each such loan agreement, a "**Bank Creditor Loan Agreement**").  The Bank Creditor Loan Agreements shall be on the same terms as the relevant Non-Tenge New Notes (save for such administrative and technical changes as are necessary to recognise the differing type of debt instrument).  Each relevant Restructuring Creditor shall participate under such Bank Creditor Loan Agreements in principal amounts equal to their entitlement to the relevant Non-Tenge New Notes under the Restructuring Plan.

Each Bank Creditor SPV shall hold any and all rights (including, without limitation, voting rights) attaching to the relevant Non-Tenge New Notes on behalf of the Restructuring Creditors from time to time under the relevant Bank Creditor Loan Agreement.  The Bank Creditor Loan Agreement will require the Bank Creditor SPV to cast a split vote in any meeting of holders of the relevant Non-Tenge New Notes based on the instructions of each Restructuring Creditor under such Bank Creditor Loan Agreement.

**Fees and Expenses in relation to Bank Creditor SPVs**

The Bank will be responsible for (and will covenant in the New Notes Trust Deed to pay) payment of the following fees and expenses relating to the Bank Creditor SPVs:

(i)     all properly documented fees, costs and expenses in relation to the establishment of any Bank Creditor SPV up to, in aggregate, EUR75,000 (plus VAT and disbursements);

(ii)    (for so long as any relevant Non-Tenge New Notes are held by any Bank Creditor SPV), the Bank will pay all properly documented fees, costs and expenses in relation to the maintenance and running costs of any Bank Creditor SPV up to, in aggregate, EUR100,000 (plus VAT and disbursements) per annum; and

(iii)   properly documented legal, agent, security agent or trustee fees, costs and expenses incurred in relation to the loans entered into, and security granted by, any Bank Creditor SPV to the relevant Restructuring Creditors.

Where a Bank Creditor SPV has been required, pursuant to the terms of a Bank Creditor Loan Agreement, to increase any amount payable by it as a result of deduction or withholding for or on account of tax from a payment under such Bank Creditor Loan Agreement, the Bank will indemnify the Bank Creditor SPV for any amount actually paid by it *provided that* the relevant Restructuring Creditor has not failed to take such steps as would avoid the need to make and/or reduce the amount of such tax deduction or withholding in accordance with mitigation obligations contemplated by Loan Market Association ("**LMA**") standard documentation. The relevant terms of the Bank Creditor Loan Agreement will be based on LMA standard documentation and in form and substance satisfactory to the Bank, acting reasonably.

Where a tax deduction or withholding has been made by a Bank Creditor SPV, the Bank may in its sole discretion elect to redeem such relevant principal amount of relevant Non-Tenge New Notes held by the Bank Creditor SPV at, in the case of the Senior Notes, their principal amount outstanding plus accrued interest as well as, if positive a Make Whole Amount or, in the case of the OID Notes, at their Fully Accreted Principal Amount plus accrued interest. Upon any such redemption taking place, the Bank Creditor SPV will prepay the relevant portion of the Bank Creditor Loan Agreement made by the relevant Restructuring Creditor.

**Limited Recourse**

The recourse of the Restructuring Creditors under a Bank Creditor Loan Agreement against any Bank Creditor SPV shall be limited to net recoveries under the applicable Non-Tenge New Notes issued to such Bank Creditor SPV and each Bank Creditor SPV will grant security over the relevant Non-Tenge New Notes held by it, any accounts held by it and, to the extent possible, any of its other assets in favour of a security trustee on behalf of the relevant lenders under the Bank Creditor Loan Agreement from time to time.

**Issue of New Notes on Restructuring Date**

***Minimum Face Value obtained***

On the Restructuring Date the applicable number and amount of Non-Tenge New Notes will be issued directly to Restructuring Creditors who, pursuant to the terms of the relevant Restructuring Packages, have opted to receive relevant Non-Tenge New Notes directly from the Bank. Where applicable, and provided the Minimum Face Value of the relevant class of Non-Tenge New Notes has been reached, such Non-Tenge New Notes will be issued to the relevant Bank Creditor SPVs, respectively, in the number and amount corresponding to the elections of the Restructuring Creditors under such Restructuring Packages. Each Bank Creditor Loan Agreement (and related security documents) shall be entered into between the relevant Restructuring Creditors and the relevant Bank Creditor SPV prior to the issue of the Non-Tenge New Notes. Pursuant to such Bank Creditor Loan Agreement the relevant Restructuring Creditors shall receive a participation under such Bank Creditor Loan Agreements in principal amount equivalent to their entitlement to Non-Tenge New Notes under the relevant Restructuring Package.

***Minimum Face Value not obtained***

In the event that eligible Restructuring Creditors electing that a Bank Creditor SPVs should receive their entitlement of relevant Non-Tenge New Notes would, in aggregate, receive relevant Non-Tenge New Notes with a face value of less than U.S.$50 million then, as described above, that Bank Creditor

SPVs shall not be established and the relevant Restructuring Creditors shall instead receive the relevant Non-Tenge New Notes directly from the Bank.  The Bank shall promptly notify the affected Restructuring Creditors (and in any event prior to the Claimants' Meeting) if this is the case.  For the avoidance of doubt, failure to reach the Minimum Face Value for one Bank Creditor SPV shall not preclude the establishment of the other Bank Creditor SPVs which meet the Minimum Face Value.

## THE GDR PROGRAMME

Prior to the Restructuring Date, the Bank shall establish the GDR Programme.  The GDRs shall be tradable in Euroclear, Clearstream and DTC from the Restructuring Date.  The Bank shall procure the listing of the GDRs on an Approved Stock Exchange within six months of the Restructuring Date.

On or immediately prior to the Restructuring Date, the Bank shall issue to Samruk-Kazyna a sufficient number of Shares to enable the Bank to comply with the requirements relating to the distribution of Shares and GDRs on the Restructuring Date as required under the Restructuring Packages.  The consideration payable in respect of the issue of such new Shares shall be paid by Samruk-Kazyna.

On or immediately prior to the Restructuring Date, following issue of the Shares, Samruk-Kazyna shall transfer such number of Shares to the Bank for transfer by the Bank, credited as fully paid, to (i) the Depositary under the GDR Programme representing the Non-Kazakh Residents Share Entitlement (less such number of Shares (being the "**Non-Resident Election Shares**") which non-Kazakh residents have elected in their Claim Forms to receive instead of GDRs) (the "**Deposited Shares**") and (ii) the Restructuring Creditors resident in Kazakhstan entitled to Shares under the Restructuring Packages representing the Kazakh Residents' Share Entitlement and (iii) the Restructuring Creditors not resident in Kazakhstan entitled to Shares/GDRs under the Restructuring Packages who have elected in their Claim Forms to receive Shares instead of GDRs, the Non-Resident Election Shares, such that the total amount of Shares of the Bank held by the Restructuring Creditors (or the Depositary (or Custodian)) amounts to 18.5 per cent. of the share capital of the Bank.

### Distribution of Shares and GDRs on the Restructuring Date

Following the receipt of the Shares from the Bank, the Depositary shall issue, for no consideration, GDRs to the Restructuring Creditors who are non-Kazakh residents entitled to the corresponding Shares under Senior Packages 1 and 2 and Junior Package 2 (who have not elected in their Claim Forms to receive Shares instead of GDRs), such that each such non-Kazakh resident Restructuring Creditor shall receive a number of GDRs calculated *pro-rata* to the amount of Share Conversion Debt owed to that Restructuring Creditor.

On the Restructuring Date, the Bank shall transfer the Share Entitlements of Kazakh residents and non-Kazakh residents which have elected to receive Shares rather than GDRs to those Restructuring Creditors  such that each shall receive a number of Shares calculated pro-rata to the amount of Share Conversion Debt owed to that Restructuring Creditor.

The aggregate amount of Shares in respect of which GDRs will be issued to Restructuring Creditors is, at the date of this Supplemental Information Memorandum expected to be approximately 7,735,470,493 Shares corresponding to 14 per cent. of the share capital of the Bank under Senior Packages 1 and 2 and 2,486,401,230 Shares corresponding to 4.5 per cent. of the share capital of the Bank under Junior Package 2.  It is expected that each GDR will represent 500 Shares.  The foregoing numbers of Shares and GDRs expected to be issued to Restructuring Creditors are based on the assumptions that (i) all Restructuring Creditors allocated to Senior Packages 1 and 2 are non-Kazakh residents; (ii) all Restructuring Creditors allocated to Junior Package 2 are non-Kazakh residents; and (iii) all non-Kazakh residents choose GDRs, and are therefore subject to change.  Following the Restructuring the Residual Minority Shareholder Percentage is expected to be approximately 0.02 per cent.

### Rights of GDR Holders in respect of Deposited Shares

The following is a summary of the rights of GDR Holders pursuant to the GDR Programme.  The Deposit Agreement and the terms and conditions of the GDRs shall be described in a supplement to this Information Memorandum and the following summary is subject in all respects to, and shall be superseded by, the terms of the Deposit Agreement.

*Right to receive Shares*

Any GDR Holder may request the withdrawal of, and the Depositary shall relinquish, the Deposited Shares attributable to the GDRs held by that GDR Holder.  Such GDR Holder will be required to produce evidence of entitlement to the relevant GDRs and a certificate in the required form certifying that the person to whom the deposited Shares are to be delivered is not prohibited from holding Shares in the Bank pursuant to Article 17.5 of the Kazakhstan Laws on Banks and Banking Activity.  See "*Description of Share Capital of the Bank and Certain Matters of Kazakhstan Law – Disclosure of Beneficial Ownership*".  In addition payment of taxes and reasonable fees may be required as applicable.

*Dividends*

GDR Holders will be entitled to receive an amount equivalent to any dividends or other proceeds payable on, or with respect to, the deposited Shares corresponding to its GDRs (less any withholding or other tax or duty incurred or payable in connection therewith) as soon as practicable after the dividends are paid.  The Bank and Samruk-Kazyna will each undertake, in the BTA Undertaking and the Samruk-Kazyna Undertaking respectively, that no dividend other than a Permitted Dividend shall be payable on the Shares.  See "*Undertakings by the Bank and Samruk-Kazyna*".

*Bonus issues of Shares*

Upon any free or bonus issues of Shares, the Depositary shall issue additional GDRs to the then existing GDR Holders in proportion to the number of deposited Shares corresponding to the GDRs held by each GDR Holder, or if the Depositary determines that such distribution is not practical or lawful, the Depositary shall sell the additional Shares and distribute the proceeds to the GDR Holders.

*Further deposits of Shares*

Other than the Shares which Samruk-Kazyna is required to transfer to the Bank for deposit in respect of the GDR Programme, neither Samruk-Kazyna nor any direct or indirect transferee of any Share held by SamrukKazyna shall be permitted to deposit any Share held by it from time to time with the Depositary to be included in the GDR Programme established by the Bank.

*Rights attaching to Shares*

If any rights (including but not limited to options to acquire further Shares) attaching to the Deposited Shares become exercisable, the Depositary shall send a notice to each GDR Holder's address, informing the GDR Holder of such rights.  The GDR Holder may request the Depositary to exercise such rights which the Depositary must then exercise *provided that* it considers, in its reasonable opinion, that it is lawful and reasonably practicable to exercise such rights and, where applicable, the relevant GDR Holder has put the Depositary in funds to pay the relevant subscription price together with any applicable fees and taxes.

Any issue of further Shares or other derivative assets following the exercise of such rights shall be held by the Depositary on the same terms as the existing Deposited Shares and the Depositary shall issue additional GDRs to the relevant GDR Holders in respect of such further deposited Shares or derivative assets.

If the Depositary considers in its reasonable opinion that it is not lawful or not reasonably practicable to exercise such rights or to distribute the Shares or other securities, the Depositary shall either sell such rights or exercise such rights and then sell the additional Shares or other securities and distribute the proceeds to the GDR Holders.

*Consolidation or restructuring of Shares*

Upon any consolidation or restructuring of Shares, the Depositary may issue additional GDRs to reflect the change in the share capital in the Bank held by the Depositary or require the exchange of

the existing GDRs for new GDRs which reflect the new number of Shares corresponding to each GDR, in each case as the Depositary shall determine appropriate.

*Voting Rights*

GDR Holders will have voting rights with respect to the corresponding Deposited Shares of the Bank. However, such voting rights shall be subject to Article 17.5 of the Kazakhstan Law on Banks and Banking Activity.  See "*Description of the Share Capital and Certain Matters of Kazakhstan Law – Disclosure of Beneficial Owners*".

*Shareholder Meetings*

The Bank shall promptly provide the Depositary with all notices of meetings of shareholders of the Bank and provide the Depositary with an agenda for such meeting including details of any resolution proposed to be put to a general meeting of the Bank.  The Depositary shall send all such notices and agenda to each GDR Holder together with a request for each GDR Holder who is eligible to vote to provide instructions to the Depositary as to whether such GDR Holder wishes to vote in favour of, against or abstain in respect of the relevant resolution.  To be eligible to provide voting instructions, each GDR Holder must certify that it is not prohibited from voting pursuant to Article 17.5 of the Kazakhstan Law on Banks and Banking Activity.

Each GDR Holder that is eligible to vote is entitled, in respect of each GDR that it holds, to one vote for each Deposited Share represented by such GDR and shall be entitled to provide instructions to the Depositary as to how the Depositary is to exercise such vote on a particular resolution of a general meeting of the Bank.

In respect of any resolution put to the Bank's shareholders, the Depositary aggregates all votes for and against such resolution received from GDR Holders eligible to vote and all abstentions of GDR Holders.  The Depositary shall then vote the corresponding number of Share for or against the resolution accordingly and abstain in respect of the remainder.

The Depositary shall have the right and obligation to requisition an extraordinary general meeting of the Bank upon receiving instructions from GDR Holders holding GDRs corresponding to Deposited Shares which in aggregate amount to 5 per cent. or more of the outstanding Shares of the Bank.

To the extent permitted by applicable law, each GDR Holder shall have the right to attend and speak at any general meeting of shareholders of the Bank.

*Tag-Along Rights*

Each GDR Holder (each a "**Tagged Shareholder**") shall have the following tag-along rights up to and including the Minority Protection Expiry Date in respect of the Shares corresponding to their GDRs:

(a)     where Samruk-Kazyna (whether acting alone or in concert) is disposing of less than 30 per cent. of the Shares, each Tagged Shareholder shall be entitled to a *pro-rata* tag-along in respect of all or part (at its discretion) of the Shares corresponding to the GDRs held by it. The percentage of Shares (corresponding to a Tagged Shareholder's GDRs) up to which such Tagged Shareholder may elect to tag-along shall be equal to the percentage of Shares held by Samruk-Kazyna on the date of sale being sold by SamrukKazyna (and any persons with whom it is acting in concert) ("**Pro-rata Tag-Along Proportion**")); and

(b)     where Samruk-Kazyna (and any persons with whom it is acting in concert) is disposing of 30 per cent. or more of the Shares (either in one or more transactions and for which purpose all sales made by Samruk-Kazyna on or following the Restructuring Date shall be aggregated), each Tagged Shareholder shall be entitled to tag-along in respect of all or part (at its discretion) of the Shares corresponding to the GDRs held by it.

The tag-along sale price per Share (the "**Tag Price**") payable to the Tagged Shareholders shall be the average price per Share as paid to Samruk-Kazyna and any persons with whom it is acting in concert in connection with the relevant sale transaction.

Where Samruk-Kazyna wishes to dispose of any of its Shares to one or more persons (each a "**Tag-Along Purchaser**") then Samruk-Kazyna shall serve a notice (a "**Tag-Along Offer**") on each Tagged Shareholder specifying the total number of Shares being sold, the Tag Price and any other material terms of the proposed Share disposal no less than 21 days prior to the completion of such disposal (in the event of a private sale) and no less than two business days prior to completion of such disposal (in the event of a disposal by way of public offering, provided no less than 21 days prior notice of an intended public offering has been given).

Within 21 days of service of the Tag-Along Offer (and subject to completion of the disposal of Shares by Samruk-Kazyna), any Tagged Shareholder may serve a notice ("**Tag-Along Acceptance**") on Samruk-Kazyna and the Bank specifying that it wishes to exercise its tag-along right.

If any GDR Holder (i) in the case of a disposal other than by way of public offering has given a Tag-Along Acceptance, Samruk-Kazyna shall not dispose of any Shares to a Tag-Along Purchaser unless either the Tag-Along Purchaser or Samruk-Kazyna, as the case may be, makes an offer, that is capable of acceptance, to acquire, and acquires, all or the Pro-rata Tag-Along Proportion (as applicable) of the Shares corresponding to each such Tagged Shareholder's GDRs at the same time; or (ii) in the case of a disposal by way of public offering, SamrukKazyna makes an offer, that is capable of acceptance, to acquire, and acquires, all or the Pro-rata Tag-Along Proportion (as applicable) of the Shares corresponding to each such Tagged Shareholder's GDRs, at the Tag Price within 21 days of the date of the public offer.

Where a GDR Holder withdraws its deposited Shares, any holder (and any subsequent transferee) of such Shares shall be entitled to tag-along rights equivalent to those enjoyed by the GDR Holders at the Tag Price.

Where tag-along rights described above become exercisable by the GDR Holders, the Bank shall notify the Depositary and provide details including the proposed Tag Price and whether the tag-along rights are exercisable in respect of all of the Shares or only a proportion of the Shares.   The Depositary shall then provide such information to each GDR Holder.

The GDR Holders may elect to either exercise the tag-along right or not exercise the tag-along right. If a GDR Holder elects to exercise their tag-along right, this will result in the sale of all or a proportion of the Shares corresponding to that GDR Holder's GDRs, depending on the percentage of Shares which Samruk-Kazyna is disposing.  The Depositary shall cancel the GDRs corresponding to Shares sold pursuant to the tag-along and shall distribute the proceeds from such sale to the relevant GDR Holders.

### *Drag-Along Rights*

If Samruk-Kazyna (whether acting alone or in concert) wishes to transfer a majority of the Shares in the Bank under a *bona fide* arm's length offer to one or more persons ("**Drag-Along Purchaser**"), then Samruk-Kazyna shall have the option (subject to certain conditions) to require GDR Holders to transfer all of the Shares corresponding to their GDRs to the Drag-Along Purchaser. Samruk-Kazyna's drag-along rights may be enforced against any GDR Holder.

Where the consideration for the sale of such shares is in a form other than cash, Samruk-Kazyna must procure that an amount in cash equivalent to the value determined by an independent expert is undertaken (by a party with a credit rating of BBB- or better from Standard & Poor's) to be paid to Restructuring Creditors holding GDRs issued pursuant to the Restructuring on completion of such sale or transfer (such undertaking to be in a form satisfactory to the Depositary and to be provided as a condition precedent to the effectiveness of such transfer).

The exercise of the drag-along right shall be subject to:

(a)     the condition that the Drag-Along Price is equal to or better than the fair market arms-length value as determined by an independent expert (being one of Deloitte, PricewaterhouseCoopers, KPMG or Ernst & Young or an international investment bank) appointed by Samruk-Kazyna and whose costs and expenses shall be borne by the Bank;

(b)     the condition that the each relevant GDR Holder receives no less than the price per Share received by Samruk-Kazyna; and

(c)     the sale price per Share is payable exclusively in cash or in a form immediately convertible into cash which the independent expert confirms is of at least equal value to the consideration provided to Samruk-Kazyna per Share and such consideration is paid or delivered at completion of such transfer.

Samruk-Kazyna may exercise the drag-along right by giving a written notice (a "**Drag-Along Notice**") to the Depositary specifying the proposed drag-along sale price per Share the ("**Drag-Along Price**") at least 45 days prior to completion of such transfer.  The Depositary shall then provide such information to the GDR Holders.

Upon exercise of the drag-along rights and transfer of the relevant Shares to the Drag-Along Purchaser, the Depositary shall cancel the GDRs corresponding to such Shares and shall distribute the proceeds from such sale to the relevant GDR Holders.  The Drag-Along Rights described above will also apply to Shares allocated to the Restructuring Creditors under the Restructuring Plan.

### *Deposit Agreement*

The Deposit Agreement between the Bank and the Depositary shall be on terms as described above and otherwise include such terms as are ordinarily included in deposit agreements in respect of similar GDR Programmes.

Each GDR holder shall have the right by virtue of a deed poll to enforce the relevant provisions of the Deposit Agreement as if it was a party to the Deposit Agreement.

In order to become a GDR Holder, Restructuring Creditors will need to certify that they are not related to former management of the Bank.  GDR Holders who are related to the former management of the Bank will not be entitled to vote their GDRs and will have their GDRs cancelled.

### *The BTA Undertaking and the Samruk-Kazyna Undertaking*

The Bank and Samruk-Kazyna will execute the BTA Undertaking and the Samruk-Kazyna Undertaking, for the benefit of the GDR Holders.  Such undertakings shall be effective as of the Restructuring Date.

## UNDERTAKINGS BY THE BANK AND SAMRUK-KAZYNA

Prior to the Restructuring Date the Bank and Samruk-Kazyna will each execute undertakings in favour of the Restructuring Creditors (and, for the avoidance of doubt, their direct or indirect transferees) and the New Notes Trustees.  The Undertakings shall be governed by the laws of England and Wales and will become effective on the Restructuring Date and shall cease to be of effect, save with respect to rights accrued as at such date, on the Minority Protection Expiry Date.  The key terms of each of the BTA Undertaking and the Samruk-Kazyna Undertaking are set out below.

**The BTA Undertaking**

***General Covenants***

The Bank shall undertake to:

(a)     carry on its business in an effective and businesslike manner;

(b)     only enter into service or management contracts or other arrangements (including any arrangements in respect of remuneration) with any of the members of the Board or the Bank's Chairman, Chief Executive Officer or Chief Financial Officer, with the prior approval of a Qualified Majority of the Board;

(c)     promptly deliver to the Depositary the information required under Section 1 of Schedule 11 (*Covenants of the Bank*) to be provided to the Depositary in English or accompanied by a certified translation into English, on the dates referred to therein;

(d)     prepare a draft Business Plan and budget for the Bank and the Group in respect of each Financial Year;

(e)     keep proper and up-to-date accounting and financial records in relation to its business;

(f)     comply, and procure that each member of the Group complies, with its constitutional documents (including the New Charter); and

(g)     procure annual independent reviews by an Independent Auditor in respect of:

(i)      compliance with the New Corporate Governance Code and internal procedures and controls; and

(ii)     the implementation of the Business Plan,

and the scope of each such review shall be approved by the Board.  The first such review shall be conducted on or about the date falling six months after the Restructuring Date, following it the Independent Auditor shall promptly report to the audit committee on the matters referred to above.  Any non-compliance identified in a review shall be remedied by the Bank within six months of the relevant review and shall be noted in the Bank's annual financial statements.  The Bank shall pay the costs and expenses of any Independent Auditor.

***Bank Covenants in favour of GDR Holders***

The Bank shall undertake:

(a)     to procure that all government or administrative authorisations, approvals, consents, permits or registrations are obtained or made which are required under any applicable Kazakhstan law or regulation in order for the Depositary to receive, hold and transfer the Shares and for the Restructuring Creditors to receive, hold and transfer the GDRs;

(b)     to pay all stamp duties and other taxes payable in Kazakhstan, Belgium, Luxembourg, Germany, the United Kingdom or the United States in connection with the issue and

distribution of the Shares or GDRs and the subsequent transfer of the Shares or GDRs from the Bank to the relevant Restructuring Creditors;

(c)     to comply with its obligations under the Deposit Agreement in connection with providing information in respect of any drag-along or tag-along notice and to facilitate the exercise of any drag-along and tagalong rights;

(d)     to comply with all its other obligations and undertakings under the Deposit Agreement;

(e)     to the extent that any matter arises which is a Supermajority Item, procure that the a general meeting of shareholders of the Bank be requisitioned and that approval of such Supermajority Item be proposed as a resolution to be voted on at the general meeting of shareholders;

(f)     not to agree to or allow any amendment to the Deposit Agreement which adversely affects the present or future interest or position of the GDR Holders to be made without the prior consent of at least two-thirds of the GDR Holders; and

(g)     to indemnify the GDR Holders in respect of any loss, liability, damage, expense or cost (including reasonably incurred and properly documented legal costs) arising or in connection with enforcement by the GDR Holders of its undertakings under the BTA Undertaking.

### Creditor Directors' Costs and Indemnity

The Bank shall undertake:

(a)     to pay the remuneration and expenses (including the cost of flights and reasonable accommodation costs) of the Creditor Directors;

(b)     to provide to each of the Creditor Directors appropriate directors' and officers' liability insurance; and

(c)     to the maximum extent permitted by law, to indemnify the Creditor Directors against all costs and expenses reasonably incurred or paid in relation to any claim or dispute or other proceedings which they may become involved in their capacity as a director.

### Management Board

The Bank shall undertake that the Management Board of the Bank shall consist of the Bank's Chairman and the persons fulfilling the roles of Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Compliance Officer, the Chief Risk Officer and such other officers as the Board of Directors shall determine appropriate.

### Dividends

The Bank will undertake that no dividend other than a Permitted Dividend shall be paid on the Shares.

**The Samruk-Kazyna Undertaking**

***Board of Directors***[7]

*Composition*

(a)     Immediately after the Restructuring Date, the Board of the Bank shall consist of nine directors comprising four Samruk-Kazyna Directors and, if then appointed, two Creditor Directors and three independent Directors.   A director is "independent" only if (unless, in the case of the initial Independent Directors, the Steering Committee otherwise agrees) he:

   (i)     has not been a director or an employee of the Bank or Samruk-Kazyna (or any Affiliate of either) within the five years prior to 6 March 2009;

   (ii)     has not had, within the last three years, a material business relationship with the Bank or Samruk-Kazyna (or any Affiliate of either);

   (iii)     has no close family ties with any of the (current or former) advisers, directors or senior employees of the Bank;

   (iv)     holds no cross-directorships or significant links with other directors through involvement in other companies or bodies.

Notwithstanding the restrictions listed above, Yurki Talvite and Konstantine Korishchenko will be deemed to be "independent".

(b)     Where the current Creditor Director appointed by holders of the Senior Dollar Notes has resigned or has been removed:

   (i)     the Bank shall give notice of such event to the relevant New Notes Trustee;

   (ii)     promptly thereafter, a meeting of the Senior Dollar Noteholders shall be called and the quorum for such meeting shall be Senior Dollar Noteholders holding in aggregate not less than 5 per cent. of the total Senior Dollar Notes then outstanding;

   (iii)     at such meeting any candidate nominated by any Senior Dollar Noteholder shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

   (iv)     provided the meeting of Senior Dollar Noteholders is quorate:

      (A)     if the candidate nominated by any Senior Dollar Noteholder is approved by Senior Dollar Noteholders present in person or by proxy holding 25 per cent. of the total number of Senior Dollar Notes held by all Senior Dollar Noteholders present in person or by proxy at the meeting (or if greater than 50 per cent. present are voting on such resolution a simple majority of those voting) then the relevant New Notes Trustee shall instruct the Bank and SamrukKazyna to elect such person to the Board of Directors; or

      (B)     if such number of Senior Dollar Noteholders do not approve the candidate nominated by the Noteholders (if any) then, unless Senior Dollar Noteholders holding 25 per cent. or more of the Senior Dollar Notes reject the candidate nominated by the Bank, then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect the Bank's nomination to the Board of Directors.

---

[7] If the governing law of the Tenge Notes is changed to English law, references to "Senior Dollar Notes" and "Senior Dollar Noteholders" shall be changed to "Senior Notes" and "Senior Noteholders" respectively.

(c)     Where the current Creditor Director appointed on behalf of holders of the OID Notes has resigned or has been removed:

    (i)     the Bank shall give notice of such event to the relevant New Notes Trustee;

    (ii)     promptly thereafter, a meeting of the OID Noteholders shall be called and the quorum for such meeting shall be OID Noteholders holding in aggregate not less than 5 per cent. of the total OID Notes then outstanding;

    (iii)     at such meeting any candidate nominated by any OID Noteholder shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

    (iv)     provided the meeting of OID Noteholders is quorate:

        (A)     if any candidate nominated by any OID Noteholder is approved by OID Noteholders present in person or by proxy holding 25 per cent. of the total number of OID Notes held by all OID Noteholders present in person or by proxy at the meeting (or if greater than 50 per cent. present are voting on such resolution a simple majority of those voting) then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect such person to the Board of Directors; or

        (B)     if such number of OID Noteholders do not approve the candidate nominated by the OID Noteholders (if any) then, unless OID Noteholders holding 25 per cent. or more of the OID Notes reject the candidate nominated by the Bank, then the relevant New Notes Trustee shall instruct the Bank and Samruk-Kazyna to elect the Bank's nomination to the Board of Directors.

(d)     In the event any OID Noteholder or Senior Noteholder meeting described in paragraphs (b) or (c) above does not produce a candidate to be elected as the replacement Creditor Director, a further meeting(s) shall be called and held on the same basis.

*Removal*

(a)     The New Notes Trustee on the instructions of the holders of the Senior Dollar Notes and OID Notes and Samruk-Kazyna, respectively, shall have the right to remove and replace any respectively nominated directors.

(b)     In the case of the Creditor Director appointed on behalf of the holders of the Senior Dollar Notes, such holders holding in aggregate more than 25 per cent. of the outstanding Senior Dollar Notes may by notice to the Notes Trustee require the resignation of that Creditor Director.

(c)     In the case of the Creditor Director appointed on behalf of the holders of the OID Notes, such holders holding in aggregate more than 25 per cent. of the outstanding OID Notes may by notice to the New Notes Trustee require the resignation of that Creditor Director.

*Term*

(a)     Each Creditor Director shall be appointed for a term lasting up to the Minority Protection Expiry Date unless that person resigns or is removed in accordance with the above paragraph "*Removal*".

(b)     Following the Minority Protection Expiry Date, a Creditor Director may be removed from the board without the consent of the New Notes Trustee and no replacement Creditor Director will be appointed.

*Conflicts of Interest*

A Director may not vote on or be counted in the quorum in relation to a resolution of the Board, or of any committee of the Board, concerning any contract, arrangement, transaction or proposal with the Bank or in which the Bank is otherwise interested and in which he, the Shareholder who appointed him or any Affiliate has an interest which may reasonably be regarded as likely to give rise to a material conflict of interest.  For the avoidance of doubt the Creditor Directors shall not be prevented from being counted in the quorum of any board meetings or committee meetings and shall not be excluded from voting at such meetings on matters relating to recoveries (whether such recoveries shall be paid out under the Recovery Units or otherwise) owing only to the interest of the Restructuring Creditors who appointed them in the recoveries.

**Samruk-Kazyna Undertakings**

Samruk-Kazyna shall undertake to the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it shall:

(a)     exercise its voting rights in relation to the Shares held by it in order to procure that the Creditor Directors as nominated by the Steering Committee or in relation to any replacement Creditor Director subsequently nominated by the New Notes Trustee are appointed to the Board;

(b)     not exercise its voting rights in relation to the Shares held by it in order to remove either Creditor Director other than for incapacity or gross misconduct, in which event Samruk-Kazyna shall use its reasonable endeavours to secure the prompt appointment of a replacement, nominated by the New Notes Trustee and no Qualified Majority decisions can be taken unless at least one Creditor Director is still a member of the Board; and

(c)     procure that no Samruk-Kazyna votes in respect of any item listed as requiring a Qualified Majority under "*Share Distribution and Rights of Minority Shareholders — Shareholder and Board Approvals*" (a "**Qualified Majority Item**") unless both Creditor Directors and at least one Independent Director have voted to approve the Qualified Majority Item, in which case the Samruk-Kazyna Directors may vote in favour of or against approving the Qualified Majority Item at their discretion.

**Voting at Shareholder Meetings**

Samruk-Kazyna shall undertake to the GDR Holders, Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it shall:

(a)     to the extent that any matter arises which listed as requiring a super-majority under "*Share Distribution and Rights of Minority Shareholders*" (a "**Supermajority Item**"), procure that the Samruk-Kazyna Directors propose that a general meeting of shareholders of the Bank be requisitioned and that approval of such matter be proposed as a resolution to be voted on at the general meeting of shareholders;

(b)     provided the total number of GDRs then in issue represents 5 per cent. or more of the total Shares of the Bank then in issue, in respect of any Supermajority Item, Samruk-Kazyna shall not exercise its voting rights in respect of such Supermajority Item unless more than two-thirds of the votes cast by or on behalf of the Depositary approve the Supermajority Item, in which case Samruk-Kazyna shall vote to approve or reject such Supermajority Item at its discretion; and

(c)     not deposit any Shares with the Depositary or purchase or hold (directly or indirectly) corresponding to any Shares deposited with the Depositary.

***Dividends***

Samruk-Kazyna will undertake that no dividend other than a Permitted Dividend shall be paid on the Shares.

*Tag-Along Rights*

The Samruk-Kazyna Undertaking will contain an undertaking with respect to the tag-along rights of GDR Holders as set out above under "*GDR Programme — Rights of GDR Holders in respect of Deposited Shares — Tag-Along Rights*".

*Drag-Along Rights*

The Samruk-Kazyna Undertaking will contain an undertaking with respect to the tag-along rights of GDR Holders as set out above under "*GDR Programme — Rights of GDR Holders in respect of Deposited Shares — Drag-Along Rights*".

***Accession***

Pursuant to the Samruk-Kazyna Undertaking, *provided that* the GDRs represent 5 per cent. or more of the Shares then in issue, if prior to the Minority Protection Expiry Date Samruk-Kazyna sells or transfers to any person or persons acting in concert (in any one or a series of transactions) where the result of such transfer would be that Samruk-Kazyna's holding of Shares would be less than 47.5 per cent. plus one Share, it shall be a condition precedent to such sale or transfer that the acquirer or acquirers accede to the Samruk-Kazyna Undertaking and become bound by the obligations of Samruk-Kazyna under it until the Minority Protection Expiry Date.

## SHARE DISTRIBUTION AND RIGHTS OF MINORITY SHAREHOLDERS

### Share Capital of the Bank as of the Restructuring Date

On the Restructuring Date, the aggregate share capital of the Bank shall be held as follows:

*Shares held by the Restructuring Creditors* – The Restructuring Creditors (and the Depositary (or Custodian) on behalf of some Restructuring Creditors) shall hold such number of Shares, so that together the Restructuring Creditors (and the Depositary (or Custodian) on behalf of Restructuring Creditors) have an aggregate shareholding representing 18.5 per cent. of the total Shares in issue.

*Shares held by Samruk-Kazyna* — Samruk-Kazyna shall hold such number of Shares, so that its total shareholding in the Bank represents 81.5 per cent. (less the Residual Minority Shareholder Percentage) of the Shares in issue.

### Charter of the Bank

The Bank will amend the Charter to reflect, among other things, changes to the composition of the Board of Directors, approval matters and required majorities.  Certain of the proposed amendments to the Charter are set out below.  Although the Bank has discussed the New Charter with the FMSA and has received in principle approval of certain provisions of the New Charter, the New Charter remains subject to official approval of the FMSA and of other relevant governmental bodies and therefore the types of approval matters and the other provisions as currently proposed by the New Charter may change.  Some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurance that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter and the Bank may have to prepare a further revised Charter.  Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.  See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the proposed New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the proposed New Charter described in this Information Memorandum*".

### Shareholder Rights and Approvals

The New Charter proposes that any Shareholder or Shareholders holding in excess of 5 per cent. of the total number of issued and outstanding Shares shall be entitled to require the calling of an extraordinary general meeting of the Bank and propose resolutions to be put to the vote at general meeting.  The quorum for a general meeting of the Bank shall be one or more Shareholders together holding more than 50 per cent. of the voting rights at the time any business is transacted.  Should any general meeting of the Bank be adjourned due to lack of quorum, the quorum at the subsequent adjourned general meeting of the Bank shall be one or more Shareholders holding 40 per cent. or more of the voting rights at the time any business is transacted.

Subject to the provisions relating to items requiring Supermajority Approval as set out below under "*Shareholder/Board Approvals*", decisions at general meetings shall be determined by a simple majority of votes cast on a poll.  Each Shareholder shall have one vote in respect of each Share held by the Shareholder, and the chairman shall not have any additional voting power (including any casting vote) by virtue of his position.  Each GDR Holder shall be entitled to attend and speak at any Shareholders' meeting.  The Depositary shall exercise its voting rights with respect to all valid voting instructions it receives from GDR Holders eligible to vote.

Matters which constitute Supermajority Items shall not have any effect unless and until such matters have been approved by a resolution passed at a duly convened Shareholders' meeting, at which a quorum is present, by the affirmative votes of:

(i)     Shareholders holding not less than 75 per cent. of the total Shares; and

(ii)    *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two-thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote.

**Board of Directors**

Immediately after the Restructuring Date, the Board of the Bank shall consist of nine directors comprising four Samruk-Kazyna Directors and, if then appointed, two Creditor Directors and three Independent Directors.

For ordinary meetings of the Board of Directors, the quorum for a Board meeting shall be at least half of the total number of directors, including a Samruk-Kazyna Director, and a Creditor Director.  For any meeting which is to consider a matter specified as requiring Qualified Majority Approval, as set out below under "*Shareholder/Board Approvals*" the quorum for such Board meeting shall be at least half of the total number of directors, including a Samruk-Kazyna Director and both Creditor Directors.  Should any meeting of the Board be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.

Each director shall have one vote, and the chairman shall not have any additional voting power (including any casting vote) by virtue of his position.

Resolutions listed as requiring Qualified Majority Approval, as set below, shall only be passed at a quorate Board meeting by a Qualified Majority.

**Board and Committee Meetings**

Board meetings will be held at least ten times per year until the second anniversary of the Restructuring Date and thereafter four times per year.  Board meetings shall be convened by the chairman of the Board upon the request of any director, the Bank's internal auditor, the Independent Auditor or any major shareholder who shall set forth in reasonable detail the reason for such request.

**Management Board**

The Management Board or any committee shall not have authority to consider and decide on any matters which are reserved for the Shareholders or the Board, either pursuant to the New Charter or the matters reserved for the Board under applicable laws.

**Shareholder/Board Approvals**

The table below sets out the matters which will be reserved for either Shareholder or Board Approval. Any matter listed in the "Approval Matter" column is reserved for the approval level specified in the "Reserved For" column and must be passed by the majority noted in the "Reserved For" column in order to become effective or be within a group of related or a basket of transactions approved by such majority.

In this table:

"**Qualified**" means that the relevant matter requires the approval of a majority of the Board including, subject as set out under "*Undertakings by the Bank and Samruk-Kazyna*", both of the Creditor Directors and at least one Independent Director;

"**Supermajority**" means that the relevant matter requires:

(a)    the approval of 75 per cent. or more of the total number of Shares; and

(b)    *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote;

"**Variable 1**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital, a decision of the management board;

(b)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 10 but less than 25 per cent. of the Bank's charter capital, a Qualified decision of the Board of Directors; and

(c)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 25 per cent. or more of the charter capital of the Bank, a Supermajority decision of the Bank's Shareholders;

"**Variable 2**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital (or where specified, Net Assets), a decision of a simple majority of the Board of Directors;

(b)    for transactions liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to more than 10 but less than 25 per cent. of the Bank's charter capital (or where specified, Net Assets), a Qualified decision of the Board of Directors; and

(c)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Bank's business which have a value of or amount to 25 per cent. or more of the Bank's charter capital (or where specified, Net Assets), a Supermajority decision of the Bank's Shareholders;

"**Variable 3**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital, a decision of a simply majority of the management board of the Bank; and

(b)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to more than 10 of the Bank's charter capital, a Qualified decision of the Board of Directors; and

"**Variable 4**" means:

(a)    for transactions, liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to 10 per cent. or less of the Bank's charter capital (or where specified, Net Assets), a decision of a simple majority of the Board of Directors; and

(b)  for transactions liabilities (individual or in aggregate), security interests or other changes to the Group's business which have a value of or amount to more than 10 of the Bank's charter capital (or where specified, Net Assets), a Qualified decision of the Board of Directors.

The list of the matters and/or voting requirements is in addition to, and not to replace, the statutory list of matters and/or voting requirements set out by applicable law.

Any matters included in the table which are supplemental to existing Kazakhstan law will be set out in an undertaking from Samruk-Kazyna by way of deed poll for the benefit of the Restructuring Creditors, GDR Holders and the New Notes Trustee and in the Bank's New Charter.  In any event, the full list of matters provided below will be set out in the Samruk-Kazyna Undertaking.

| APPROVAL MATTER | | RESERVED FOR: | |
| --- | --- | --- | --- |
| | | SHAREHOLDERS | BOARD OF DIRECTORS |
| | **CONSTITUTIONAL DOCUMENTS** | | |
| 1 | Alteration of the Bank's Charter. | Supermajority | |
| 2 | Any change to the Bank's Corporate Governance Code or, after its adoption, the New Corporate Governance Code. | Supermajority | |
| | **AUDITORS, ADVISERS AND PROCEDURES** | | |
| 3 | Any change of the Bank's Auditors or the Auditors' terms of reference. | Supermajority | |
| 4 | Any change of the special auditor (whose functions are to audit compliance of the Bank with the Bank's Corporate Governance Code and internal procedures and controls and implementation of the Bank's business plan, or any change to his terms of reporting and responsibilities. | | Qualified |
| 5 | Any change to the Bank's credit approval and decision-making procedures or lending policies or procedures. | | Qualified |
| 6 | Approval of any of the Bank's internal audit, risk management or compliance policies or procedures and amendments thereto. | | Qualified |
| | **SECURITIES ISSUANCE OR AMENDMENTS** | | |
| 7 | Voluntary de-listing of the Shares of the Bank or any member of the Group from the list of any stock exchange or adoption of decision to list the Shares. | Supermajority | |
| 8 | Issue of any ordinary or preference shares or securities or grant of any option to subscribe for shares or equity-linked securities or issue of convertible securities or entry into any agreement for the same. | | Qualified |
| 8A | Any increase in the Bank's authorised share capital. | Supermajority | |
| 9 | Purchase of its share capital or other securities or conversion of any of its shares or other securities other than as permitted under the terms of the New Instruments. | Supermajority | |
| 10 | Approval of any prospectus or any amendments to the prospectus for the issue of any ordinary or preference shares of the Bank. | | Qualified |
| | **ADDITIONAL DEBT** | | |
| 11 | Borrowing other than in the ordinary course of business and borrowing at rates above market rates. | | Qualified |

| **APPROVAL MATTER** | **RESERVED FOR:** | |
| --- | --- | --- |
| | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| 12   Increasing the Bank's liabilities by an aggregate amount in any 12-month period (by reference to, in the first Financial Year following the Restructuring Date, the aggregate liabilities described in the opening balance sheet delivered as a Condition Precedent and, thereafter, the Bank's more recent audited annual financial statements. | Variable 1 | Variable 1 |
| 13   To the extent not covered by item 12, increasing any of the Group's liabilities by an aggregate amount in any 12-month period (by reference to, in the first Financial Year following the Restructuring Date, the aggregate liabilities described in the opening balance sheet delivered as a Condition Precedent and, thereafter, the Bank Consolidated Group's most recent audited annual financial statements. | | Variable 3 |
| 14   Creating or causing to be created any Security upon the whole or any part of the Bank's present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness other than Permitted Security (excluding under (j) of that definition). | Variable 1 | Variable 1 |
| 15   To the extent not covered by item 14, creating or causing to be created any Security upon the whole or any part of the Group's present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness other than a Permitted Security (excluding under (j) of that definition). | | Variable 3 |
| 16   The Bank providing any form of financial support (including but not limited to the grant of any loan, guarantee, indemnity or Security) in connection with any Bank Subsidiary entering into a transaction described in items 13 or 22. | Variable 1 | Variable 1 |
| **BOARD/MANAGEMENT BOARD/EXECUTIVES** | | |
| 17   Changes to the absolute number of directors on the Board of the Bank. | Supermajority | |
| 18   Appointing or removing the Bank's Chairman, or any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer. | | Qualified |
| 19   Entering into and/or amending any contract of employment or appointment with the Bank's Chairman or approving or allowing the entry into and/or amendment of any contract of employment or appointment with any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer and the setting of salaries, terms of work, bonuses, incentives commissions and other emoluments of such persons. | | Qualified |

**APPROVAL MATTER**

| | | RESERVED FOR: | |
|---|---|---|---|
| | | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| 20 | Terminating the employment of the Bank's Chairman or approving or allowing the termination of employment of any member of the Bank's Management Board including the Chief Executive Officer, Chief Operating Officer, Chief Compliance Officer, Chief Risk Officer and/or Chief Financial Officer. | | Qualified |
| 21 | Acquisition by the Bank of any assets or property or shares/participatory interests in the charter capital of other entities or persons.  In determining which approval level is required, the total value (per transaction or when aggregated with all other such acquisitions in the same Financial Year of the Bank) as a percentage of Net Assets of the Bank shall be determinative. | Variable 2 | Variable 2 |
| | The value of Net Assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent to the Restructuring and, thereafter, its most recent audited annual financial statements. | | |
| 22 | Acquisition by any member of the Group other than the Bank itself of any assets or property or shares/ participatory interests in the charter capital of other entities or persons. In determining which approval level is required, the total value (per transaction or when aggregated with all other such acquisitions in the same Financial Year of the Bank) as a percentage of Net Assets of the Bank shall be determinative. | | Variable 4 |
| | The value of Net Assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements. | | |
| 23 | The Bank participating in entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract. | Variable 2 | Variable 2 |
| 24 | Any member of the Group other than the Bank participating in, entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract. | | Variable 4 |
| 25 | The Bank entering into any merger. | Variable 2 | Variable 2 |
| 26 | Any member of the Group other than the Bank entering into any merger. | | Variable 4 |
| 27 | Disposal by the Bank of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity, (excluding disposals made in the ordinary course of trading of the Bank) in any Financial Year (whether by one or more transactions) of more than 6.5 per cent. of the Bank's total consolidated gross assets. | Supermajority | |

| APPROVAL MATTER | | RESERVED FOR: | |
| --- | --- | --- | --- |
| | | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |
| | The value of gross assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements. | | |
| 28 | Disposal by any member of the Group other than the Bank itself of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity, (excluding disposals made in the ordinary course of trading) in any Financial Year (whether by one or more transactions) of more than 6.5 per cent. of the Group's total consolidated gross assets. | | Qualified |
| | The value of gross assets shall be determined by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered. | | |
| | **BUSINESS PLAN AND ACCOUNTS** | | |
| 29 | Making any material change to the nature or scope of the Group's business. | Supermajority | |
| 30 | The Bank adopting any new business plan or budget or making any material change to the bank's existing business plan or budget. | | Qualified |
| 31 | Otherwise than as required by law, materially amending its accounting or financial policies or reporting practices including but not limited to the provisioning, write-off policies and write-back practices. | | Qualified |
| | **CONTRACTS** | | |
| 32 | Entry into or completion of any interested-party transaction, that is a transaction with an "Affiliate" of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law. | | Qualified (comprised of disinterested directors with respect to the relevant Related Party Transaction) |
| 33 | To the extent not covered by item 32 above, entry into or completion of: | | Qualified |
| | (a)   any Significant Transaction with: | | |
| | (i)   an Affiliate of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law; | | |
| | (ii)   any shadow director or person exerting substantial influence over the Bank ("**Shadow Affiliate**"); | | |

| **APPROVAL MATTER** | **RESERVED FOR:** | |
| --- | --- | --- |
| | **SHAREHOLDERS** | **BOARD OF DIRECTORS** |

    (iii) any person who is related by blood, marriage, or adoption to an Affiliate or Shadow Affiliate including such person's spouse, civil partner, child, step-child or parent (each a "**Close Relative**") or any spouse, former spouse, civil partner, child, step-child, parent, niece, nephew, uncle, aunt, lineal descendent or lineal ancestor, of any the Affiliate or Shadow Affiliate or of the Affiliate's or Shadow Affiliate's Close Relatives (together the "**Relatives**"); or

    (iv) the trustees (acting as such) of any trust of which any Affiliate, Shadow Affiliate or any of the Affiliate's or Shadow Affiliate's Relatives is a beneficiary or discretionary object;

    (v) any body corporate which any Affiliate, Shadow Affiliate or any Relative of the Affiliate or Shadow Affiliate is a director or together with any of the other aforesaid persons controls or directly or indirectly holds more than 10 per cent. of the shares in such body corporate, or any body corporate in the same group as that body corporate;

    (vi) any partnership which any Affiliate, Shadow Affiliate or any Relative of the Affiliate or Shadow Affiliate is a partner,

other than a transaction involving SK or any of its Subsidiaries) which involves aggregate payments or value of U.S.$5 million or more; or

(b) any Significant Transaction involving SK or any of its Subsidiaries which involves aggregate payments or value of U.S.$75 million or more.

For these purposes, "**Significant Transaction**" means:

    (i) any intra-group borrowing or lending or guarantees, purchase, sale, transfer, assignment, lease, conveyance or exchange of any property or the rendering of any service or any similar transaction;

    (ii) any agreement not on bona fide arms' length terms;

    (iii) entry into any agreement (apart from an employment contract).

| | | |
| --- | --- | --- |
| 34 | Any sale of the whole or any part of the Bank's loan book (not constituting a Recovery Asset) at a discount. | Variable 1 | Variable 1 |
| 35 | To the extent not covered by item 34, any sale of the whole or any part of any of the Bank's Subsidiaries' loan books (not constituting a Recovery Asset) at a discount. | | Variable 3 |

| APPROVAL MATTER | RESERVED FOR: | |
| --- | --- | --- |
| | SHAREHOLDERS | BOARD OF DIRECTORS |

**LENDING PRACTICES**

| | | |
| --- | --- | --- |
| 36 | Entry into any lending arrangement on terms other than terms which achieve a proper commercial return to the Group when compared against terms offered in the market by corporations similar to the Bank engaged in similar types of business. | | Qualified |

**CAPITAL EXPENDITURE**

| | | |
| --- | --- | --- |
| 37 | Incurring or entering into any commitment to incur any capital expenditure if the estimated amount or aggregate value of capital commitments already incurred or contracted for by the Group when considered on a whole in that Financial Year exceeds the budgeted annual amount for that year by more than 5 per cent. | | Qualified |

**DIVIDENDS**

| | | |
| --- | --- | --- |
| 38 | Any Board decision to put a resolution before a general meeting of the Bank to approve the payment, making or declaring of any dividend in cash or in specie out of its profits, assets or reserves. | | Qualified |

**REORGANISATIONS AND WINDING-UP**

| | | |
| --- | --- | --- |
| 39 | The Bank entering into any scheme of arrangement, reorganisation, reconstruction or compromise or other arrangement with creditors. | Supermajority | |
| 40 | Taking any step to dissolve or wind-up the Bank or Material Subsidiary or to commence any other procedure an effect of which would be to create a general moratorium with respect to proceedings by its creditors. | Supermajority | |

**LITIGATION**

| | | |
| --- | --- | --- |
| 41 | Commence or discontinue the prosecution or defence of, or settle any litigation or arbitration proceedings or claim, in each case where the amount claimed exceeds U.S.$30 million (except in respect of debt collection in the ordinary course of business or applying for or defending an interim injunction where it is not practicable to obtain consent). | | Qualified |

## Corporate Governance Code

Prior to the Restructuring Date, the Bank shall adopt the New Corporate Governance Code. The Bank and the Shareholders shall procure that the Independent Auditor investigates and promptly reports on the Bank's compliance with the New Corporate Governance Code and internal procedures and controls to the Audit Committee) annually at the Bank's cost. Any non-compliance identified in the Independent Auditor's report shall be remedied by the Bank within six months of the date of the report. The New Corporate Governance Code shall include (without limitation) the matters set out in Section 3 of Schedule 11 (*Covenants of the Bank*), details, practices and procedures in relation to the issues set out below.

### *Directors' Roles and Responsibilities*

(a)     Independence of Directors — no one person, entity or group should be in a position to dictate or control the Board's decisions.

(b)     Disclosure of interests and avoidance of conflicts of interest.

(c)    Distinction of the roles and responsibilities of the Board of Directors from the roles and responsibilities of the Management Board and definition of the roles and responsibilities of the Chairman, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Compliance Officer, the Chief Risk Officer and the Independent Directors.

(d)    Independence of the Audit Committee.

(e)    Board responsibility for risks and controls, including scrutinising performance of management and board directors satisfying themselves as to the integrity of the Bank's financial information.

(f)    Provision of information to the Board, including all information required for the Board to carry out its duties and to supervise the management of the Bank should be provided in a succinct and timely manner, and access to independent advice to the Board necessary to discharge its responsibilities, the costs and expenses thereof to be for the account of the Bank.

(g)    Collective responsibility for results.

(h)    Clear policies for methodology of strategy formulation, controls relating incurrence of risk, and approval (including credit approval) mechanisms.

(i)    Robust terms of reference for key committees, key control functions (including risk management, legal and regulatory compliance and internal audit).

(j)    Succession planning.

***Competence and Remuneration Of Directors***

(a)    Selection and election of directors.

(b)    Training (induction and ongoing).

(c)    Evaluation of performance (individual and collective).

(d)    Rotation and re-appointment (subject to FMSA approval).

(e)    Remuneration of Directors — formal and transparent policies on determining remuneration of directors.

(f)    Independent remuneration committee.

***Internal Controls and Risk Management***

(a)    Sound system of internal controls and financial reporting.

(b)    Embedding of internal controls.

(c)    Risk-based management approach, including identification, measurement and control of risks and risk-based capital management, all as approved by the Chief Compliance Officer.

(d)    Quality of management information.

(e)    Restrictions on Related Party transactions.

(f)    Setting of approval and authorisation structures and limitations.

(g)    Audit and Risk Committees membership, role and responsibilities.

(h)    Relationship with Auditors.

(i)    Review of effectiveness of system of controls.

The New Corporate Governance Code shall provide that risk management controls will include principles on the Four Eyes Principle, Record Keeping, Know Your Customer and Anti-Money Laundering principles.   The Bank shall ensure that sufficient personnel with segregated responsibilities are retained to oversee and manage the above.

### *Disclosure and Reporting*

(a)     Subject to all applicable laws and regulations, the Bank shall communicate with its shareholders and external stakeholders and provide general disclosure as to business, including a fair, balanced and understandable assessment of the Bank's position and prospects, and avoiding selective disclosure of information to certain shareholders only or third parties save as otherwise permitted in favour of Samruk-Kazyna and/or the Depositary on behalf of the GDR Holders.

(b)     Board's activities and responsibilities.

(c)     Financial reporting.

(d)     Risk management and compliance reporting.

(e)     Reporting to regulators.

(f)     Evidence of embedded principles, standards and processes.

(g)     Director remuneration.

(h)     Annual General Meetings.

### *Relationship with Major Shareholders*

(a)     Dialogue with major shareholders.

(b)     Related Party transactions.

(c)     Independence from major shareholders.

## INFORMATION FOR CLAIMANTS

**If Claimants have any questions relating to this Information Memorandum or the completion of the Form of Proxy or the Claim Form they should contact Mr. Asset Zhaisanov or Ms. Dinara Adil at the Bank by emailing zhaisanov@bta.kz or d_adil@bta.kz by calling +7 727 3124671 or +7 727 266 2607.  Information regarding these forms is also available on the Bank's website at http://www.bta.kz/en/investor/**

**Overview**

- Section 1 contains information for Euronoteholders regarding how votes may be cast at the Euronoteholders' Meetings and the necessary approvals required to pass the Extraordinary Resolutions.

- Section 2 contains information for creditors of TuranAlem Finance.

- Section 3 contains information for holders of Perpetual Securities.

- Section 4 contains information relating to Non-OGSC Eligible Trade Finance Debt and Official Government Sector Debt.

- Section 5 contains information applicable to Rouble Noteholders.

- Section 6 contains information applicable to holders of CHF Notes.

- Section 7 contains information for Claimants with Relevant Contingent Claims.

- Section 8 contains information for all Claimants regarding the submission of Claim Forms, Forms of Proxy and voting at the Claimants' Meeting.

- Section 9 contains information regarding the distribution of Entitlements.

- Sections 10 and 11 discuss the Court approval and the Deed of Release to be signed on behalf of Claimants, respectively.

Details of the terms applicable to the Bank Creditor Loan Agreement(s) will be provided by way of a supplemental information memorandum.

## 1.      INFORMATION FOR EURONOTEHOLDERS

Euronoteholders will vote at the applicable Euronoteholders' Meeting on an Extraordinary Resolution approving, among other things, the Restructuring Plan and an instruction to the Trustee (i) upon the request of the Bank, to accelerate the Euronotes and demand payment under the relevant Guarantee and (ii) to vote at the Claimants' Meeting as described below, in accordance with the notices to Euronoteholders in Schedule 5 (*Notices of Euronoteholders' Meetings*) to this Information Memorandum.  The Extraordinary Resolution provides that the Bank can request acceleration of the Euronotes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.  The Trustee shall not be obliged to take any of the steps to accelerate the Euronotes or make a demand under the Guarantees until it has been indemnified or provided with security or pre-funded to its satisfaction.  The Trustee will submit a Claim Form in respect of the full outstanding principal amount plus Accrued Interest of each series of Euronotes.  The relevant Forms of Proxy will instruct the Chairman of the Claims' Meeting to vote in favour of or against the Restructuring Plan, as described below.

At the Claimants' Meeting, if the relevant Extraordinary Resolution is passed, the Trustee representing that class of Euronotes will be entitled to vote the full principal amount plus Accrued Interest of Euronotes outstanding in favour of or against the Restructuring Plan in the same proportions as the relevant Euronoteholders vote for or against the Restructuring

Plan at the relevant Euronoteholders' Meeting.  Euronoteholders will therefore not be permitted to vote at the Claimants' Meeting since their votes for or against the Restructuring Plan will be submitted at the Claimants' Meeting by the Trustee on their behalf.  In the event the relevant Extraordinary Resolution is not passed at a Euronoteholders' Meeting in respect of a series of Euronotes, the Bank will deem those votes cast in favour of or against the Extraordinary Resolution to have been cast in favour of or against the Restructuring Plan at the Claimants' Meeting and will deem the relevant Euronoteholders to have submitted a

Claim Form in respect of the relevant principal amount of Euronotes outstanding plus Accrued Interest specifying that it is submitted in respect of "notes issued by the Bank" designating the Distribution Agent as its contact.

If the Restructuring Plan becomes effective, under Kazakhstan law the Bank's obligation to repay the relevant BV Deposit of TuranAlem Finance will be set off in its entirety against TuranAlem Finance's obligation to reimburse the Bank for payments by the Bank under the relevant Guarantee.  The Finance Subsidiaries will not submit Claims in respect of their deposits with the Bank.

### *The Euronoteholders' Meetings*

Various Conditions Precedent which must be satisfied prior to the Euronoteholders meetings are set out in Part I of Schedule 12 (*Conditions Precedent to the Restructuring Plan becoming effective*).  The Euronoteholders' Meetings will be held in accordance with the provisions of the relevant Trust Deeds with respect to each series of Euronotes.  A copy of the Trust Deeds (certain relevant provisions of which are summarised below) and other relevant documents listed below are available for inspection by the relevant Euronoteholders during normal business hours at the office of the Trustee and the Principal Paying Agent.  In the case of any difference or inconsistency between these summaries and the provisions of the relevant Trust Deeds, the provisions of the Trust Deeds shall prevail.

The following documents are available for inspection at any time during normal business hours on any weekdays (Saturdays, Sundays and bank and other public holidays excepted) at the office of the Trustee and the Principal Paying Agent in advance of the Euronoteholders' Meetings:

(a)     Trust Deeds:

   (i)      Trust Deed dated 2 June 2003 constituting the Issuer's U.S.$225,000,000 7.875 per cent.  Notes due 2010 between TuranAlem Finance B.V. as Issuer, OJSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

   (ii)     the Supplemental Trust Deed dated 30 November 2004 constituting U.S.$375,000.000 7.875 per cent.  Notes due 2010 (supplementing the Trust Deed dated 2 June 2003) between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

   (iii)    the Trust Deed dated 24 March 2004 constituting the Issuer's U.S.$300,000,000 8 per cent.  Notes due 2014 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

   (iv)     the Supplemental Trust Deed dated 6 April 2004 constituting U.S.$100,000.000 8 per cent.  Notes due 2014 (supplementing the Trust Deed

dated 24 March 2004 constituting the Issuer's U.S.$300,000,000 8 per cent. Notes due 2014) between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(v)      the Trust Deed dated 10 February 2005 constituting U.S.$350,000.000 8.5 per cent. Notes due 2015 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) as Trustee;

(vi)     the Trust Deed dated 4 November 2005 between TuranAlem Finance B.V. as Issuer and JSC Bank TuranAlem as Guarantor and BNY Corporate Trustee Services Limited as Trustee in respect of the U.S.$3,000,000,000 Global Medium Term Note Programme; and

(vii)    the Amended and Restated Trust Deed dated 2 May 2007 (amending and restating the Trust Deed dated 4 November 2005) between TuranAlem Finance B.V. and JSC Bank TuranAlem and BNY Corporate Trustee Services Limited as Trustee in respect of the increase of the programme limit to U.S.$8,000,000,000.

(b)     Offering Circulars, Base Prospectuses and supplements dated:

(i)      Offering Circular dated 30 May 2003 with respect to TuranAlem Finance B.V.'s issue of U.S.$225,000,000 7.875 per cent. Notes due 2010 guaranteed by the Bank;

(ii)     Offering Circular dated 29 November 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$375,000,000 7.875 per cent. Notes due 2010 guaranteed by the Bank;

(iii)    Offering Circular dated 19 March 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$300,000,000 8 per cent. Notes due 2014 guaranteed by the Bank;

(iv)     Offering Circular dated 2 April 2004 with respect to TuranAlem Finance B.V.'s issue of U.S.$100,000,000 8 per cent. Notes due 2014 guaranteed by the Bank;

(v)      Offering Circular dated 9 February 2005 with respect to TuranAlem Finance B.V.'s issue of U.S.$350,000,000 8.5 per cent. Notes due 2015 guaranteed by the Bank;

(vi)     Base Prospectus dated 7 April 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme;

(vii)    Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme;

(viii)   Supplement to the Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme dated 8 December 2006;

(ix)    Supplement to the Base Prospectus dated 18 September 2006 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$3,000,000,000 Global Medium Term Note Programme dated 9 January 2007;

(x)    Base Prospectus dated 2 May 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme;

(xi)    Supplement to the Base Prospectus dated 2 May 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme dated 22 May 2007;

(xii)    Base Prospectus dated 25 June 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme; and

(xiii)    Supplement to the Base Prospectus dated 25 June 2007 with respect to JSC Bank TuranAlem and TuranAlem Finance B.V. U.S.$8,000,000,000 Global Medium Term Note Programme dated 8 October 2007.

(c)    Each Paying Agency Agreement relating to each series of Euronotes and the Global Medium Term Note Programme.

(d)    This Information Memorandum.

The Euronoteholders' Meetings will be convened to consider the Extraordinary Resolutions. The Extraordinary Resolutions may only be considered at the relevant Euronoteholders' Meeting if such Euronoteholders' Meeting is quorate. The quorum and voting requirements are set out in the Euronoteholders' Meeting provisions, and are summarised under "*Voting and Quorum*" below. The Bank has been advised that the Trustee is able to file a valid Claim at the Claimant's Meeting in respect of the Guarantee for each series of Euronotes notwithstanding the fact that no demand has been made by the Trustee under such Guarantee. However, no assurance can be given that such Claim will satisfy the requirements of the FMSA and the Court.

### Timing for Voting Instructions

No Voting Instructions will be accepted after the Voting Instructions Deadline except in relation to an adjourned meeting.

### No Brokerage Fees

Euronoteholders and Direct Participants will not be obliged to pay brokerage fees or commissions to the Financial Advisers, the Bank or TuranAlem Finance in connection with giving Voting Instructions or casting votes at the Euronoteholders' Meetings.

### Procedures at the Euronoteholders' Meetings

Euronoteholders should note the quorum requirements for each Euronoteholders' Meeting set out below. Euronoteholders should be aware that if Euronoteholders present or represented at a Euronoteholders' Meeting are insufficient to meet these quorum requirements then the Extraordinary Resolutions to be considered at such Euronoteholders' Meeting cannot be considered at such Euronoteholders' Meeting but will be considered at the relevant adjourned meeting, which will have lower quorum requirements; see "*Voting and Quorum*" below.

*Notices*

The Notices of Euronoteholders' Meetings are set out in Schedule 5 (*Notices of Euronoteholders' Meetings*) to this Information Memorandum.   The Notices of Euronoteholders' Meetings were issued on 15 April 2010.

*Chairman*

The chairman of each Euronoteholders' Meeting in respect of the relevant Euronotes (who may, but need not, be a Euronoteholder) will be nominated in writing by the Trustee.  If no such nomination is made or if the nominated chairman is not present at a Euronoteholders' Meeting in respect of the relevant Euronotes within 15 minutes of the time fixed for such Euronoteholders' Meeting, then the Euronoteholders or their proxies who are present at such Euronoteholders' Meeting shall choose a chairman from the Euronoteholders or proxies present at such meeting.  The chairman of an adjourned meeting does not have to be a Euronoteholder or an agent of a Euronoteholder or the same person as the chairman of the original meeting that was adjourned.

*Voting and Quorum*

The provisions governing the convening and holding of the Euronoteholders' Meetings are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Noteholders*), as the case may be, to the relevant Trust Deed, copies of which are available for inspection as described above.  The Euronotes are currently represented by global notes (the "**Global Notes**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, and Cede & Co. as common depository for DTC (together with Euroclear and Clearstream, the "**Clearing Systems**", and each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Euronotes, as shown in the records of DTC, Euroclear or Clearstream, or its accountholders ("**Direct Participants**"), should note that such person will not be a Euronoteholder for the purposes of the relevant Notice of Euronoteholders' Meeting and will only be entitled to attend and vote at the relevant Euronoteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Euronoteholder for the purposes of the relevant Notice of Euronoteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted Electronic Instruction Forms to the Clearing Systems in accordance with the procedures set out in this Information Memorandum need take no further action in relation to voting at the relevant Euronoteholders' Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the relevant Euronoteholder instructs the Registered Holder of such Euronotes to complete and sign a Form of Proxy (as defined below) in accordance with the relevant Trust Deed and in such Form of Proxy to authorise and instruct the Tabulation Agent to act as proxy and to vote in favour (or against, as the case may be) of the Extraordinary Resolutions and to instruct the Trustee to submit the Claim Form.

A Euronoteholder, Direct Participant or Beneficial Owner wishing to participate in the Restructuring must submit, or arrange to have submitted on its behalf, at or before the Voting Instructions Deadline and before the deadlines set by each Clearing System (unless the Restructuring is terminated earlier), a duly completed Electronic Instruction Form to the relevant Clearing System in accordance with the requirements of the relevant Clearing System and in the manner specified herein.  Euronoteholders and Beneficial Owners should check with their bank, securities broker or any other intermediary through which they hold their Euronotes whether such bank, securities broker or other intermediary will apply earlier

deadlines for submission to those set out in this Information Memorandum and, if so, should follow those deadlines.

The submission to Euroclear or Clearstream, by a Euronoteholder or a Direct Participant of a duly completed Electronic Instruction Form with respect to Euronotes prior to the applicable Voting Instructions Deadline will be deemed to constitute delivery of a vote with respect to such Euronotes by such Euronoteholder.  Each Euronoteholder or a Direct Participant agrees that an Electronic Instruction Form constitutes instruction to the Euronoteholder of record to complete and sign a Form of Proxy or Block Voting Instruction in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Holders*), as the case may be, to the relevant Trust Deed with respect to the Euronotes and in such Block Voting Instruction or Form of Proxy to authorise and instruct the applicable proxies to attend, and to cast the votes corresponding to such Euronotes in favour of or against the Extraordinary Resolutions.  It is intended that the Tabulation Agent (or an officer thereof) will act as proxy at the Euronoteholders' Meetings.

The instruction to the Euronoteholder of record holding Euronotes in Euroclear or Clearstream, to authorise the applicable Tabulation Agent to issue and complete a Block Voting Instruction in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) or Schedule J (*Provisions for Meetings of Noteholders*), as the case may be, to the relevant Trust Deed with respect to the Euronotes and to instruct the applicable proxies to attend, and to cast the votes corresponding to such Euronotes in favour of or against the Extraordinary Resolutions by a Euronoteholder or a Direct Participant will be deemed to have occurred upon receipt by the Euronoteholder of record as nominee for Euroclear and Clearstream, of a valid Electronic Instruction Form in accordance with the requirements of such Clearing System.  The receipt of such Electronic Instruction Form by the Euronoteholder of record as nominee for Euroclear and Clearstream, will be acknowledged in accordance with the standard practices of such Clearing System and will result in the blocking of Euronotes in the relevant Clearing System so that no transfers may be effected in relation to such Euronotes.

Euronoteholders and Direct Participants must take the appropriate steps through the relevant Clearing System to ensure that no transfers may be effected in relation to such blocked Euronotes until the conclusion of the Euronoteholders' Meeting, in accordance with the requirements of the relevant Clearing System and the deadlines required by such Clearing System.  By blocking its Euronotes in the relevant Clearing System, each Euronoteholder and Direct Participant will be deemed to consent to the relevant Clearing System providing details concerning such Euronoteholder's and/or Direct Participant's identity to the Tabulation Agent.

Only Direct Participants may submit Electronic Instruction Forms.  If a Euronoteholder or Beneficial Owner is not a Direct Participant, it must arrange for the Direct Participant through which it holds Euronotes to submit an Electronic Instruction Form on its behalf to the relevant Clearing System prior to the deadline specified by the relevant Clearing System and the Voting Instructions Deadline.

**EURONOTEHOLDERS WHOSE EURONOTES ARE HELD IN DTC SHOULD CONTACT THE TABULATION AGENT FOR THE RELEVANT PROCEDURES AND CONSULT THE APPLICABLE NOTICE.**

### *Revocation of Electronic Instruction Forms*

Electronic Instruction Forms from Beneficial Owners or Direct Participants (as defined below) shall be irrevocable *provided*, *however*, *that* in the event that the Bank, in its sole discretion, amends, terminates or withdraws the Restructuring Plan, at any time up to and including the applicable date on which the approval of the Restructuring Plan is announced, in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee, Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any

Electronic Instruction Forms delivered in relation thereto for a period of two business days (as defined in the relevant Trust Deed) from the date of notification of any materially adverse amendments to the terms and conditions of the Restructuring Plan.

With respect to the limited situations when an Electronic Instruction Form may be revoked as set out above, to be effective, any notice of revocation must indicate the relevant voting instructions to be revoked and must be received prior to the applicable Voting Instruction Deadline in the same manner as the original Electronic Instruction Forms.  With respect to Electronic Instruction Forms given in respect of Euronotes held in Euroclear or Clearstream, Beneficial Owners who are not Direct Participants must arrange either directly or through their Intermediary (as defined below) to contact the Direct Participant through which they hold the Euronotes to deliver notice of such revocation to the relevant Clearing System prior to the applicable Voting Instructions Deadline.

Such Beneficial Owners should give such directions to their Intermediary sufficiently in advance to ensure receipt by the Euroclear or Clearstream of any such notice of revocation prior to the Voting Instruction Deadline and within the time limit specified by such Clearing System.

Euronoteholders and Beneficial Owners of Euronotes that are held in the name of a broker, dealer, bank, trust company or other nominee or custodian (collectively, an "**Intermediary**") should contact such entity sufficiently in advance of the applicable Voting Instructions Deadline if they wish to vote for or against the Restructuring and procure that the Euronotes are blocked in accordance with the normal procedures of the relevant Clearing System and the deadlines imposed by such Clearing System.

The Registered Holder may by instrument in writing in the English language in the form available from the office of the relevant Registrar signed by the Registered Holder or, in the case of a corporation, executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised office of the corporation and delivered to the specified office of the relevant Registrar not less than 48 hours before the time fixed for the relevant Euronoteholders' Meeting with respect to the Euronotes, appoint any person (a "**Proxy**") to act on his or its behalf in connection with the relevant Euronoteholders' Meeting in relation to the Euronotes (or any adjourned such meeting).

A Proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the relevant Euronoteholders' Meeting in respect of the relevant Euronotes to be the holder of the Euronotes to which such appointment relates and the Registered Holder of the Euronotes shall be deemed for such purposes not to be the holder.

The Beneficial Owner can request through his Direct Participant to appoint the Tabulation Agent as Proxy to cast the votes relating to the Euronotes in which he has an interest at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting).

Alternatively, Beneficial Owners and Direct Participants who wish a different person to be appointed as their Proxy to attend and vote at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a Proxy in respect of the Euronotes in which they have an interest for the purposes of attending and voting at the relevant Euronoteholders' Meeting in respect of the Euronotes (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the relevant Euronoteholders' Meeting in relation to the Euronotes and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing

System to block the Euronotes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Tabulation Agent.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Euronoteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

Any Euronote(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the relevant Euronoteholders' Meeting (or, if later, the adjourned Euronoteholders' Meeting) and (ii) upon such Euronote(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Tabulation Agent to be held to its order or under its control.

### Irregularities

All questions as to the validity, form and eligibility (including the time of receipt) of any Electronic Instruction Form or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent, will be determined by the Bank in its sole discretion, which determination will be final and binding.  The Bank reserves the absolute right to reject any and all Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent not in proper form or for which any corresponding agreement by the Bank (on behalf of TuranAlem Finance and the Bank) to exchange would, in the opinion of the Bank, be unlawful.  The Bank also reserves the absolute right to waive any of the conditions of the Restructuring or defects in Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent with regard to any Euronotes.  None of TuranAlem Finance, the Bank, the Trustee or the Tabulation Agent shall be under any duty to give notice to Euronoteholders, Direct Participants or Beneficial Owners of any irregularities in Electronic Instruction Forms or such other document, with respect to Euronotes held in DTC, required by the Tabulation Agent, as applicable; nor shall any of them incur any liability for failure to give notification of any material amendments to the terms and conditions of the Restructuring.

The Extraordinary Resolutions may only be considered at the relevant Euronoteholders' Meeting if the relevant Euronoteholders' Meeting is quorate.  A Euronoteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Euronoteholder or as proxy) are present at the relevant Euronoteholders' Meeting who together hold or represent the requisite principal amount of outstanding Euronotes satisfying the quorum requirement as set out below.

Votes in favour of the Extraordinary Resolutions must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the relevant Euronoteholders' Meeting, a quorum is not present, such Euronoteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days as determined by the chairman of such Euronoteholders' Meeting and approved by the Trustee prior to the adjournment of such Euronoteholders' Meeting.  An adjourned Euronoteholders' Meeting will be subject to lower quorum requirements as set out below.

The quorum requirement for each Euronoteholders' Meeting is as follows:

| Euronoteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Euronoteholders' Meeting | One or more persons present in person holding Euronotes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Euronotes for the time being outstanding. |
| Adjourned Euronoteholders' Meeting | One or more persons present in person holding Euronotes or being proxies or representatives holding or representing in the aggregate not less than 25 per cent. in principal amount of the Euronotes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, TuranAlem Finance, the Bank, the Trustee or one or more persons representing 2 per cent. or more of the relevant Euronotes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

On a show of hands every person who is present in person and who produces a certificate of which he is the registered holder or is a Proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000, EUR 1,000, £1,000, PLZ50,000 or JPY1,000,000 principal amount, as the case may be, of Euronotes so produced or for which he is a Proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If an Extraordinary Resolution is not passed at a Euronoteholders' Meeting, but the Restructuring Plan is approved at the Claimants' Meeting, the relevant Euronoteholders will retain their claim against TuranAlem Finance but as part of the Restructuring Plan the relevant Guarantee will be deemed paid and satisfied and the Bank's obligation to repay the relevant BV Deposit will be set off in its entirety against TuranAlem Finance's obligation to reimburse the Bank for its deemed payment under the relevant Guarantee.  As a result, or as otherwise may be permitted by law, the relevant BV Deposit will be extinguished.  TuranAlem Finance will, in such case, be unable to repay the relevant Euronoteholders and its other creditors, if any, and its assets will be liquidated for the benefit of its creditors (including the relevant Euronoteholders) in a Dutch bankruptcy procedure, unless the BV Scheme is offered and approved as discussed below.

TuranAlem Finance is entitled to submit a Claim Form and Form of Proxy in relation to the Subordinated Loan provided it does not transfer the Subordinated Loan to BTA Finance Luxembourg.

2.    **INFORMATION FOR CREDITORS OF TURANALEM FINANCE — SCHEME OF COMPOSITION UNDER DUTCH LAW**

If any circumstances occur which, in the view of the managing board of TuranAlem Finance make it necessary or advisable to declare TuranAlem Finance bankrupt (*in staat van faillissement te verklaren*), TuranAlem Finance will file a request with the court at Rotterdam, the Netherlands (the "**Rotterdam Court**"), to so declare TuranAlem Finance bankrupt pursuant to Article 1 of the Dutch Bankruptcy Act (*Faillissementswet*) ("**DBA**").

By way of example and without limitation, such circumstances could in particular arise if:

- one or more of the Extraordinary Resolutions is not passed; or

- one or more of TuranAlem Finance's lenders (the "**Lenders**") under any of the facility agreements entered into by TuranAlem Finance do not voluntarily release TuranAlem Finance of its obligations thereunder subject only to the Restructuring Plan being approved at the Claimants' Meeting and approval of the Restructuring Plan by the competent Kazakh court.

Together with the request, TuranAlem Finance may file a draft plan of composition (*ontwerp van akkoord*) with the Rotterdam Court.  A copy of the draft plan of composition (the "**Plan of Composition**") is attached to this Information Memorandum at Schedule 7 (*TuranAlem Finance B.V. Plan of Composition*).

If accepted and sanctioned by the Rotterdam Court, the Plan of Composition will release TuranAlem Finance from all its debts towards its creditors, including all Euronoteholders.

It is expected that the Rotterdam Court will declare TuranAlem Finance bankrupt as requested and appoint a liquidator in bankruptcy (*curator*) to conduct the administration of TuranAlem Finance during the bankruptcy, and a supervisory judge (*rechter-commissaris*) to supervise the administration of TuranAlem Finance during the bankruptcy.  It is also expected that the Rotterdam Court will set a date for a meeting of the creditors of TuranAlem Finance (*verificatievergadering*) to establish the claims filed and to consider and, if thought fit, approve the Plan of Composition ("**Plan Meeting**").  TuranAlem Finance will inform its creditors of the court judgement and the exact date and location of the Plan Meeting via a Regulatory Information Service and the Bank will also publish this on its website at www.bta.kz.

### *The Plan of Composition*

The Plan of Composition provides, subject to the Restructuring Plan being approved at the Claimants' Meeting and approval of the Restructuring Plan by the competent Kazakh court, that the claims of all of TuranAlem Finance's financial creditors (other than BTA Finance Luxembourg) be cancelled in exchange for the transfer to those creditors of Entitlements as provided by the Restructuring Plan by reference to the type of debt subject to the Plan of Composition, and that TuranAlem Finance's creditors other than its financial creditors, whose claims in aggregate are expected to amount to less than U.S.$ 200,000, be paid in full.  If the Plan of Composition becomes effective, TuranAlem Finance will emerge from the bankruptcy without any indebtedness and equity which is expected to be approximately U.S.$ 7.5 million. If BTA Finance Luxembourg remains a creditor of TuranAlem Finance under the Subsidiary Subordinated Loan on the date at which TuranAlem Finance is declared bankrupt, the Plan of Composition will provide that its claim be cancelled in exchange for the transfer to it of any Entitlement, which TuranAlem Finance may receive under the Restructuring Plan in respect of the Subordinated Loan (except for any part of such Restructuring Consideration which relates to accrued interest under the Subordinated Loan in excess of accrued interest under the Subsidiary Subordinated Loan).  Please see the following section of this Information Memorandum (*Information for holders of Perpetual Securities*) for further information on the

contemplated transfer of the Subordinated Loan by TuranAlem Finance to BTA Finance Luxembourg, including information on certain consequences if such transfer does not take place.

***Procedural aspects***

Pursuant to article 145 DBA, the Plan of Composition will be approved if more than 50 per cent. of the recognised and admitted creditors present or represented at the Plan Meeting, together representing more than 50 per cent. of the recognised and admitted debt of TuranAlem Finance, vote in favour of the Plan of Composition.

TuranAlem Finance will publish the result of the Plan Meeting via a Regulatory Information Service and the Bank will do so on its website at www.bta.kz.

If the Plan of Composition is rejected at the Plan Meeting, the supervisory judge may – at the request of TuranAlem Finance or the liquidator in bankruptcy and by reasoned order – adopt the Plan of Composition as if it were approved, if:

- three-fourths of the recognised and admitted creditors who were present or represented at the Plan Meeting voted in favour of the Plan of Composition; and

- the rejection of the Plan of Composition resulted from one or more creditors having voted against it who, taking into account all circumstances and, in particular, the percentage which those creditors may be expected to receive in payment of their claim if the estate would be liquidated, could not have arrived at such voting conduct in all reason (Article 146 DBA).

If instructed pursuant to the relevant Extraordinary Resolution to do so, the Trustee is expected to file a claim with TuranAlem Finance's liquidator in bankruptcy for the benefit of the Euronoteholders in an amount equal to the amount outstanding under each series of Euronotes as per the date at which TuranAlem Finance is declared bankrupt. Euronoteholders will in such case not be permitted to file a claim with the liquidator in bankruptcy. It is expected that the claims filed by the Trustee will be recognised by the liquidator in bankruptcy in their full amount. If instructed pursuant to the relevant Extraordinary Resolution to do so, the Trustee is expected to release TuranAlem Finance from its obligations under the relevant trust deed, *provided that* the Trustee will only so release TuranAlem Finance upon written instruction of TuranAlem Finance where TuranAlem Finance proposes a Plan of Composition that does not become binding, in which case the Trustee should not release TuranAlem Finance.

At the Plan Meeting, provided the Extraordinary Resolution is adopted at the relevant Euronoteholders' meeting, the Trustee is expected to vote the claim filed by it in respect of the relevant series of Euronotes as instructed pursuant to the Extraordinary Resolution, i.e. in favour of or against the Plan of Composition in the same proportions as the relevant Euronoteholders vote in favour of or against the Extraordinary Resolution at the relevant Euronoteholders' Meeting. If in such case the competent court or the supervisory judge will not allow the Trustee to cast a split vote, the Trustee will vote the claim filed by it in respect of the relevant series of Euronotes in favour of the Plan of Composition. If the Extraordinary Resolution is adopted at a Euronoteholders' meeting, the relevant Euronoteholders will not be permitted to vote at the Plan Meeting in respect of their Euronotes.

If the Extraordinary Resolution is not adopted at a certain Euronoteholders' meeting, the Trustee is expected to neither file a claim with TuranAlem Finance's liquidator in bankruptcy in respect of the relevant series of Euronotes nor vote at the Plan Meeting for the benefit of the relevant Euronoteholders. In such case, there can be no certainty that the relevant Euronoteholders will be permitted to file a claim with the liquidator in bankruptcy or will be permitted to vote at the Plan Meeting.

The Plan of Composition, if approved at the Plan Meeting or adopted by the supervisory judge, is subject to sanctioning by the Rotterdam Court.  It is expected that the sanction hearing will not be held until the competent Kazakh court has approved the Restructuring Plan.  The liquidator in bankruptcy will notify the date of the sanction hearing to the creditors of TuranAlem Finance who have filed their claim, and the Issuer will publish the date of the sanction hearing via a Regulatory Information Service and the Bank will do so on it's website at www.bta.kz.

Pursuant to Article 153 DBA the competent court shall refuse sanction of a plan of composition:

● if the assets of the estate substantially exceed the amount offered in the plan of composition; and/or

● if performance of the plan of composition is insufficiently secured; and/or

● if the plan of composition was realised by fraudulent acts or undue preference of one or more creditors or other unfair means, regardless of whether the debtor or any other party co-operated therein; and/or

● if the liquidator in main insolvency proceedings under Article 3(1) of Council Regulation 1346/2000 withheld his consent to the plan of composition, unless the court is of the opinion that the plan of composition does not adversely affect the financial interests of the creditors in those main proceedings.

The competent court may also refuse sanction on other grounds and at its own initiative.

If the Rotterdam Court finds there are no grounds to refuse sanction, it will sanction the Plan of Composition.  The Issuer will publish the court order sanctioning the Plan of Composition or refusing to sanction the Plan of Composition via a Regulatory Information Service and on the Bank's website at www.bta.kz.

If the Rotterdam Court sanctions the Plan of Composition and no appeal is lodged against the relevant court order within eight days, or, after appeal, no appeal in cassation is lodged within eight days, the Plan of Composition will become effective and binding on all relevant creditors of TuranAlem Finance and the bankruptcy of TuranAlem Finance will end.  The liquidator in bankruptcy will publish the termination of the bankruptcy in the Official Gazette (Staatscourant) and TuranAlem Finance will publish the termination of the bankruptcy via a Regulatory Information Service and on the Bank's website at www.bta.kz.

If the Plan of Composition becomes effective, TuranAlem Finance will emerge from the bankruptcy without any indebtedness, and with equity which is expected to be approximately U.S.$ 7.5 million.  In such case, TuranAlem Finance may resume to do business unless the Bank decides to dissolve and liquidate TuranAlem Finance.

There are many legal uncertainties surrounding the Plan of Composition and the Plan Meeting, most of which relate to the fact that the concept of a trust as construed under English law does not exist under Netherlands' law.  These uncertainties include, without limitation, uncertainty about:

● how the Trustee will be treated for the purpose of calculating the number of creditors present or represented at the Plan Meeting;

● whether it is permitted under Netherlands' law to cast a split vote in the manner contemplated by the Extraordinary Resolutions and, if that is permitted, how such vote will be treated for the purpose of calculating the number of creditors who voted in favour of or against the Plan of Composition;

- whether Euronoteholders will be permitted to file a claim with the liquidator in bankruptcy or will be permitted to vote at the Plan Meeting if the Extraordinary Resolution is not adopted at a Euronoteholders' Meeting; and

- how the amount offered under the Plan of Composition and the value of the assets of TuranAlem Finance must be calculated and whether the assets of the estate substantially exceed the amount offered in the plan of composition, each for the purpose of Article 153 DBA.

Due to these legal uncertainties, it is possible that the Trustee will have to seek new instructions in respect of the Plan Meeting from Euronoteholders or that Euronoteholders will eventually be requested to file and vote their claims in respect of the Euronotes themselves. In addition, it is possible that the Plan of Composition may have to be changed, or that the Plan of Composition, if adopted at the Plan Meeting, will not be sanctioned by the Rotterdam Court.

If the Plan of Composition does not become effective, TuranAlem Finance's assets will be liquidated by the liquidator in bankruptcy for the benefit of its creditors.

TuranAlem Finance's major assets are its claims on the Bank under, *inter alia*, the BV Deposits. If the Restructuring Plan becomes effective, under Kazakhstan law the Bank's obligation to pay under each BV Deposit will be set off in its entirety (except for the accrued but unpaid tax margin) against TuranAlem Finance's obligation to reimburse the Bank for payment under the relevant Guarantee. Consequently, the BV Deposits will be extinguished if the Restructuring Plan becomes effective. TuranAlem Finance' s remaining assets in such case are unlikely to represent significant value and will comprise cash at bank as well as certain claims on BTA which will constitute Designated Financial Indebtedness and will be cancelled in the Restructuring without receiving any Entitlement. TuranAlem Finance will be entitled to submit a Claim Form and a Form of Proxy in order to vote in respect of any Designated Financial Indebtedness held by it. Accordingly, if TuranAlem Finance is liquidated, the liquidation proceeds are unlikely to enable the bankruptcy trustee to make significant liquidation payments to TuranAlem Finance's creditors.

If neither the Plan of Composition nor the Restructuring Plan becomes effective, the Bank is expected to go into conservation or insolvent liquidation (see "*Risk Factors — Risks Relating to the Restructuring — If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank*") and TuranAlem Finance's assets will be liquidated. In insolvency procedures, the Bank's assets would be sold. Due to the fact that proceeds from such sale would be unlikely to be sufficient to repay the outstanding indebtedness and other creditors of the Bank, TuranAlem Finance would likely receive insufficient compensation to repay its creditors or no compensation at all and, as a result, TuranAlem Finance's creditors would likely receive severely reduced returns on their claims or no return at all.

3.      **INFORMATION FOR HOLDERS OF PERPETUAL SECURITIES**

The Perpetual Securities issued by BTA Finance Luxembourg are governed by the articles of association of BTA Finance Luxembourg. The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") is the registered holder of Perpetual Securities as nominee for the Clearing Systems. Interests in the Perpetual Securities are directly or indirectly held by certain beneficial owners of the Perpetual Securities (the "**Beneficial Holders**").

BTA Finance Luxembourg initially advanced the proceeds of the issuance of the Perpetual Securities to TuranAlem Finance under a Subsidiary Subordinated Loan, and TuranAlem Finance in turn advanced the proceeds to the Bank under the Subordinated Loan. In addition, the Bank and BTA Finance Luxembourg entered into a Support Agreement under which the Bank agreed to procure that BTA Finance Luxembourg fulfills its obligations to the

Registered Holder.  The Registered Holder is in certain circumstances entitled to require BTA Finance Luxembourg to enforce its rights under the Support Agreement but the Registered Holder does not have a direct claim against the Bank under the Support Agreement.

In order to simplify the restructuring and allow BTA Finance Luxembourg to make a claim in respect of the Subordinated Loan, it is proposed that TuranAlem Finance transfers to BTA Finance Luxembourg its rights and obligations under the Subordinated Loan, and BTA Finance Luxembourg releases TuranAlem Finance of its obligations under the Subsidiary Subordinated Loan.   Following the transfer of the rights and obligations under the Subordinated Loan, BTA Finance Luxembourg will be entitled to submit a claim a Claim Form in respect of the Subordinated Loan.  That claim will fall to be restructured under Junior Package 2 and the corresponding Entitlements will be delivered to the Registered Holder through BTA Finance Luxembourg for onward transfer to the Beneficial Holders.

Conversely, if TuranAlem Finance cannot proceed to this transfer of its rights and obligations under the Subordinated Loan, TuranAlem Finance may need to transfer to BTA Finance Luxembourg any Entitlements which it may receive from the Bank in respect of the Subordinated Loan (except for any part of such Entitlements which correspond to accrued interest under the Subordinated Loan which is in excess of accrued interest under the Subsidiary Subordinated Loan).  This would be the case where a BV Scheme is offered to, and adopted and ratified by, the creditors of TuranAlem Finance (see "*Scheme of composition under Dutch law*" above).  Such a scheme will be necessary if, at the time that the transfer should take place, there is no reasonable expectation that TuranAlem Finance will otherwise be released by its financial creditors following the restructuring.

BTA Finance Luxembourg would be prevented, on the basis of its current articles of association, from making any distributions under the Perpetual Securities and the Entitlements so paid may not be distributed to Beneficial Holders.  Accordingly, certain amendments to the articles of association of BTA Finance Luxembourg are required so that it may pay on to the Registered Holder the Entitlements it receives under the Restructuring Plan (if approved) and in turn cancel all payment obligations under the terms of the Perpetual Securities.

For these purposes, BTA Finance Luxembourg, pursuant to a notice dated 12 April 2010, convened, on 22 April 2010 an extraordinary general meeting of its shareholders (the "**EGM**"), being the Registered Holder and the Bank (the "**Convening Notice**"), to (i) *inter alia*, approve the Restructuring Plan, document their support of the board of directors and authorise the board of directors to approve the above proposed transfers and to vote at the Claimants' Meeting (the "**First Resolutions**") and (ii) make the amendments to its articles of association required in order to implement the Restructuring Plan (the "**Second Resolutions**").   In turn, the Registered Holder sent a notice through the Clearing Systems seeking instructions from Beneficial Holders as to how to vote in respect of (i) and (ii) at the EGM (see Schedule 6, Annex 2 (*Notice from Registered Holder to Beneficial Holders of Perpetual Securities*) and received instructions from 23.10 per cent. of the Beneficial Holders.

At the EGM, the First Resolutions were adopted by simple majority at 98.9 per cent. of the votes cast, without the presence or representation of the Bank, while the meeting with respect to the Second Resolutions was adjourned to 25 May 2010 due to the EGM being inquorate with respect to the Second Resolutions.  At the adjourned EGM, the First Resolutions may be passed by simple majority, and the Second Resolutions may be passed with a two-thirds majority without a quorum requirement.  The First Resolutions will be put to vote again because of, *inter alia*, the low percentage of instructions received by the Registered Holder for the EGM.  The terms of the First Resolutions and Second Resolutions remain as set out in the Convening Notice.

A notice of the outcome of the first EGM and of the re-proposal of the First Resolutions has been given to the Registered Holder and to the Bank on Friday 23 April 2010. The Registered Holder on 27 April 2010 sent a notice through the Clearing Systems seeking instructions from Beneficial Holders as to how to vote in the adjourned EGM. Unless revoked, the Registered Holder will deem instructions that were received by it for the EGM to apply to the adjourned EGM. The adjourned EGM will be held at 12:00 noon (Central European Time) on 25 May 2010 at the offices of BTA Finance Luxembourg at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg. The date for the adjourned EGM was formerly set for 24 May 2010, but has been postponed to 25 May 2010 because 24 May 2010 is a public holiday in Luxembourg.

If the above proposed transfers will not take effect and no BV Scheme will be adopted and ratified while TuranAlem Finance is declared bankrupt and liquidated, TuranAlem Finance's assets (including the Subordinated Loan or the Entitlements) will be distributed by a liquidator and it is unlikely that in such case BTA Finance Luxembourg will receive any distribution from TuranAlem Finance or the Bank.

4.    **TRADE FINANCE CREDITORS AND OFFICIAL GOVERNMENT SECTOR CREDITORS**

On 17 March 2010, the Bank issued the following press release in relation to Trade Finance Claims:

"JSC BTA Bank (the "**Bank**") is commencing an adjudication process for trade finance claims (including those owed to or guaranteed or otherwise covered by export credit agencies ("**ECAs**")) in connection with the restructuring of the financial indebtedness of the Bank (the "**Restructuring**"). The adjudication process will be conducted by Watson, Farley & Williams LLP (the "**Adjudicator**"). The purpose of this adjudication is the categorisation of the claims of trade finance creditors of the Bank and the amounts of principal related thereto; it being understood that the Adjudicator will not make any determination, adjudication or assessment as to the validity of a creditor's claim. Interest and other sums that may be due and payable to creditors in relation to their claims will be assessed at a later date under a procedure to be agreed between the Bank and its creditors' steering committee (the "**Steering Committee**").

On 17 March 2010, the Bank signed a revised principal commercial terms sheet (the "**PCTS**") with the Steering Committee setting out the revised principal commercial terms of the Restructuring. Under the PCTS, certain trade finance claims will be eligible to be restructured by means of a Revolving Committed Trade Finance Facility (the "**RCTFF**"). Other trade finance claims which are not eligible for the RCTFF will be restructured separately. ECA and trade-related government sector creditor claims will be reviewed by the Adjudicator to confirm that these claims have been correctly classified as ECA or trade-related government sector creditors. The Bank's ECA creditors, trade-related government sector creditors and trade finance creditors who wish to submit their claims (the "**Claims**") to the Adjudicator should follow the steps set out in this notice and submit to the Adjudicator the documentation related to the submission of Claims specified on the Bank's website at http://www.bta.kz/en/investor. The Adjudicator will then review the documentation supplied to it by both creditors and the Bank. In the meantime, the Bank will promptly, and in any case not later than 19 March 2010, publish on its website a complete list of claims that its trade finance department has booked and that the Bank believes are owed to its creditors.

IN ORDER TO ENSURE THAT THE ADJUDICATION PROCESS IS CONDUCTED IN A TIMELY AND SUCCESSFUL MANNER, YOU ARE ENCOURAGED TO SUBMIT TO THE ADJUDICATOR AS SOON AS POSSIBLE A SEPARATE CLAIMS NOTICE (THE FORM OF WHICH IS SET OUT ON THE BANK'S WEBSITE) IN RELATION TO EACH

CLAIM THAT YOU HAVE TOGETHER WITH THE SUPPORTING DOCUMENTATION.

If you believe that you are a trade finance creditor, ECA creditor or trade-related government sector creditor of the Bank and wish to have your Claim considered by the Adjudicator, you must:

- by no later than 3:00 p.m. London time on 30 March 2010, submit a separate completed and signed Claims Notice for each Claim to the Adjudicator (via email: btaadjudication@wfw.com) together with the supporting documentation to be reviewed by the Adjudicator with a copy to the Bank (via email: tfadjudication@bta.kz). It will greatly facilitate the adjudication process if you submit with your Claims Notice a brief summary of the structure of the transaction underlying your Claim and an English translation of any document that is only available in a language other than English. Failure to do so may delay adjudication of your Claim.

After receipt of your Claims Notice, the Adjudicator will then send you a letter containing a Waiver & Release (the form of which, containing key definitions to be used in the adjudication process, is posted on the Bank's website and has been approved by the Steering Committee). For a Claim to be adjudicated, you must return the countersigned letter containing the Waiver & Release to the Adjudicator by no later than 11:00 a.m. London time on 7 April 2010.

Furthermore, if you are not an ECA or government sector creditor, as a condition to the Adjudicator's determination being released to you and for RCTFF eligibility, you must also have signed and returned to the Bank (via email: tfadjudication@bta.kz) a Co-operation Undertaking Letter (the form of which is posted on the Bank's website and has been approved by the Steering Committee) by no later than 7 April 2010. If you are not an ECA or government sector creditor and you do not provide the Bank with a signed Co-operation Undertaking Letter, to the extent you hold senior debt of the Bank, your Claim will be allocated into the Senior Package 1, which is the restructuring package for senior unsecured debt as set out in the PCTS, rather than the RCTFF. In the case of ECA creditors and trade-related government sector creditors, we would request that you also provide a Co-operation Undertaking Letter to the Bank no later than 7 April 2010.

The process thereafter is as follows:

- The Adjudicator will deliver its determination with respect to the categorisation of your Claim, on the basis set out in the above-mentioned Waiver & Release, by 14 April 2010. The determination of the Adjudicator in relation to a Claim will not include reasons. Furthermore, the Adjudicator will include the amount of principal of your Claim as submitted by you in the aggregate amount of the category in which your Claim will have been allocated in such determination. In parallel, where there is a discrepancy between your and the Bank's calculation of the principal amount owing to you, the Adjudicator will also indicate the amount of principal owing to you according to the Bank's records.

- If you or the Bank disagrees with the determination of the Adjudicator, you and the Bank will have the opportunity, by 12:00 noon London time on 23 April 2010, to supply further documentation and request the Adjudicator to review such determination.

- If the Adjudicator identifies a discrepancy between your and the Bank's calculation of the principal amount owing to you under a Claim, the Adjudicator will notify both you and the Bank and you may both supply further documentation in support of your calculations, you may both be requested to answer questions in clarification, explanation or corroboration of evidence submitted by you in respect of that Claim and you may both be requested to contact each other in an attempt to find a resolution to such discrepancy by 12:00 noon London time on 23 April 2010 (the "**Cut-Off Time**").

- To the extent that such discrepancy with respect to any particular Claim amounts to a difference between the amounts of principal submitted by you and the Bank that is equivalent to less than the lower of 5 per cent. of the principal amount submitted by the Bank and U.S. $100,000 (a "**Minor Discrepancy**"), then if no agreement is reached by you and the Bank by the Cut-Off Time, the Adjudicator will use the average of the discrepant figures provided to the Adjudicator by you and the Bank in such circumstances for its final determination.

- To the extent there are discrepancies which are not Minor Discrepancies and no agreement has been reached by you and the Bank in relation to such discrepancies by the Cut-Off Time, and:

    (a)   if the discrepancies in respect of which the Adjudicator cannot make a final determination are considered by the Steering Committee to be material, then such discrepancies will be settled by expert determination in accordance with a procedure the structure and terms of which will be settled by 6 May 2010; or

    (b)   if such discrepancies are not considered by the Steering Committee to be material, then you will both be requested to contact each other in an attempt to find a resolution to the discrepancy relating to your Claimed Amount by 12:00 noon London time on 23 May 2010.

- The Adjudicator will deliver its final determination on categorisation and, to the extent an adjudication can be made, on the principal amount of each Claim by 6.00 p.m. London time on 6 May 2010, such determination being final and binding.

If any of our trade finance creditors, ECA creditors or trade-related government sector creditors has any question relating to any of the documents required for the submission of a Claim to the Adjudicator or the adjudication process, it should contact Ms. Dinara Ibrayeva at the Bank (via email: DIbrayeva@bta.kz)."

Claims purporting to be Non-OGSC Eligible Trade Finance Debt or Official Government Sector Debt not notified to the Adjudicator in accordance with the above press release will, provided they are not claims in respect of Excluded Debt or Related Party Debt, be dealt with in the same manner as Ordinary Claims for adjudication and distribution of Entitlements.

Following completion of the adjudication process:

(a)   Claims confirmed by the Adjudicator as Non-OGSC Eligible Trade Finance Debt will be eligible to be restructured by means of the RCTFF as described under "*Terms of the Restructuring Packages*";

(b)   Claims confirmed by the Adjudicator as Official Government Sector Debt will be eligible to be restructured by means of Senior Package 2 as described under "Terms of the Restructuring Packages"; and

(c)   Claims confirmed as neither Non-OGSC Eligible Trade Finance Debt nor Official Government Sector Debt will (unless they are Excluded Debt or Related Party Debt) be eligible to be treated as Ordinary Claims.

Eligibility for allocation to the RCTFF and Senior Package 2 should be read in conjunction with the provisions of the Allocation Mechanism (which additionally permit Non-OGSC Eligible Trade Finance Creditors to elect to be allocated into Senior Package 1 or 2 and Official Government Sector Creditors to elect to be allocated into Senior Package 1, subject always to the conditions set out in the Allocation Mechanism).

5.      **ROUBLE NOTEHOLDERS**

Holders of Rouble Notes will have a Claim on the Bank under the surety issued by the Bank in respect of the Rouble Notes.  Rouble Noteholders must submit Forms of Proxy and Claim Forms in respect of their Claims under the Rouble Notes directly to the Bank.  If the Restructuring Plan is approved at the Claimants' Meeting all claims of Rouble Noteholders in respect of the Rouble Notes (whether against TuranAlem Finance (Russia), the Bank or any other Subsidiary of the Bank shall be cancelled.

6.      **INFORMATION FOR HOLDERS OF CHF NOTES**

A notice to beneficial owners of the CHF Notes was sent through the Clearing Systems (see Schedule 8 (*Notice to beneficial owners of CHF Notes*)).  Beneficial owners of CHF Notes held through the Clearing systems should make arrangements for the registered holder of the CHF Notes to submit a Claim Form and Form of Proxy in relation to Claims relating to the CHF Notes in accordance with the above notice.  Holders of CHF Notes in individual certificated form should submit Claim Forms directly to the Bank.

7.      **INFORMATION FOR CLAIMANTS WITH RELEVANT CONTINGENT CLAIMS**

Claimants with Relevant Contingent Claims may make certain elections as to how they intend to participate in the Restructuring with respect to their contingent claims against the Bank, as provided in paragraph 4.3(b) of Schedule 1 (*The Restructuring Plan*).

8.      **INFORMATION FOR ALL CLAIMANTS**

*Verification of amounts of Claims and classification*

On 22 April 2010, the Bank issued the following press release in relation to the Preliminary Debt List which was also published on that date:

"JSC BTA Bank (the "**Bank**") has published on its website (http://www.bta.kz/en/investor) a preliminary list of its outstanding financial indebtedness to be restructured under its restructuring plan (the "**Preliminary Indebtedness List**").  The Preliminary Indebtedness List states principal and notional accrued interest due as at 30 June 2010.  The Preliminary Indebtedness List was prepared by the Bank following extensive consultation with the relevant creditors and, as a result, the Bank hopes that the amounts set out therein are all agreed.

The publication of this Preliminary Indebtedness List is in accordance with the detailed term sheet between the Bank and the Steering Committee (on behalf of the Bank's creditors) signed on 18 April 2010 (the "**Detailed Term Sheet**").

Please note that the Preliminary Indebtedness List DOES NOT currently include the notional accrued interest due as at 30 June 2010 relating to trade finance claims.  The Preliminary Indebtedness List will be updated to include these amounts as soon as they are available.  Once available, creditors will be notified that the Preliminary Indebtedness List has been updated.

In addition, the classification of claims contained in the Preliminary Indebtedness List is indicative only.  The final classification of claims shall be determined by the adjudicator as described in our press release dated 17 March 2010.

The Preliminary Indebtedness List includes the following:

(i)      all financial indebtedness (including contingent indebtedness) which the Bank believes to be subject to the restructuring, specifying in each case the total principal amount outstanding of each debt, as well as a calculation of interest accrued to 30 June 2010 on the basis agreed with the Steering Committee;

(ii)     all financial indebtedness which constitutes Direct Official Government Sector Debt (as defined in the Detailed Term Sheet); and

(iii)    all financial indebtedness excluded from the restructuring in accordance with the Detailed Term Sheet

but currently EXCLUDES the notional accrued interest due as at 30 June 2010 relating to trade finance indebtedness subject to the restructuring.

***Procedure to be followed in relation to any Disputed Amounts***

If a creditor wishes to dispute the amount applicable to its claim stated in the Preliminary Indebtedness List or the classification of such claim, it must notify the Bank and provide its own calculations by 28 April 2010 (the "**Adjudication Submission Expiry Date**").   If a creditor fails to so notify the Bank by this date that it disputes the amount of the claim or the category of debt into which it is classified as stated on the Preliminary Indebtedness

List, the amount or classification so stated in the Preliminary Indebtedness List will (except in the case of a manifest error) be deemed to be the amount admitted in relation to the claim or the correct classification as its claim, regardless of anything stated on any subsequent claim form delivered to the Bank.

If a purported creditor does not notify the Bank that its claim does not appear on the Preliminary Indebtedness List by 28 April 2010, any such creditor may nevertheless submit a claim form in respect of its claim but if the Bank disputes such claim and the dispute is not resolved between the Bank and the creditor by 6 May 2010 then that creditor shall not receive any consideration until such time as the dispute is resolved in its favour by Watson, Farley & Williams LLP (the "**Supervisor**") or, if the Supervisor is unable to resolve the dispute, an arbitrator nominated by the London Court of International Arbitration.

Any such disputed amounts or classification, if not resolved between the Bank and the creditor within three business days (each a "**Disputed Claim**") shall be referred to the Supervisor for the purpose of adjudicating the dispute as to quantum or classification by 6 May 2010 (the "**Scheduled Supervisor Determination Date**").

**IN ORDER TO ENSURE THAT THE ADJUDICATION PROCESS IS CONDUCTED IN A TIMELY AND SUCCESSFUL MANNER, IN THE EVENT THAT YOU DISAGREE WITH THE AMOUNT APPLICABLE TO YOUR CLAIM STATED IN THE PRELIMINARY INDEBTEDNESS LIST OR THE CLASSIFICATION OF SUCH CLAIM, YOU ARE ENCOURAGED TO NOTIFY THE BANK AND PROVIDE YOUR OWN CALCULATIONS AS SOON AS POSSIBLE AND IN ANY CASE BEFORE 28 APRIL 2010 IN RELATION TO EACH DISPUTED CLAIM THAT YOU HAVE TOGETHER WITH SUPPORTING DOCUMENTATION**.

Once any Disputed Claim is referred to the Supervisor, it shall follow the process set out in the Term Sheet.

The Preliminary Indebtedness List and the Detailed Term Sheet are available on the Bank's website at http://www.bta.kz/en/investor."

Accrued Interest will be included in each Agreed Claim and is calculated as follows:

● *Fixed Rate*

Where a Claim accrues interest on a fixed rate basis and whether or not the current interest period ends before, on or after the Cut-off Date, interest shall be calculated on the principal amount of the Claim using the fixed rate currently applicable (calculated in

accordance with the relevant contract) from the last interest payment date through to and including the Cut-off Date.

- *Floating Rate*

  Where a Claim accrues interest on a floating rate basis and the current interest period ends before the Cutoff Date, it will be necessary to calculate the amount of interest for the period from the end of that interest period up to and including 30 June 2010 using a reference rate for the purposes of agreeing the total outstanding amount for purposes of voting at the Claimants' Meeting and for the distribution of Entitlements.

  Where the current interest period ends after the Cut-off Date, interest should be calculated on the principal amount using the currently applicable interest rate (calculated in accordance with the relevant contract) for the period up to and including the Cut-off Date.

Where the current interest period ends on or before the Cut-off Date, interest should be calculated on the principal amount using the currently applicable interest rate (calculated in accordance with the relevant contract) for the period up to and including the last day of the current interest period and thereafter the interest rate for the period up to and including 30 June 2010 shall be calculated on the assumption that such period is a new interest period starting on the last day of the current interest period and ending on and including the Cut-off Date and that the rate of interest that will apply to such period is calculated in accordance with the relevant contract as if 12 April 2010 was the day for determining/fixing the new interest rate (using the most closely comparable generally available screen-based floating rate for the relevant period).

The Restructuring Plan does not contemplate payment of any breakage costs incurred in relation to the shortening of any interest period.

Claimants should also read the section entitled *"Verification of Quantum and Classification and Admission of Claims"* in Clause 4 of Schedule 1 *(The Restructuring Plan)* relating to the verification of the amount of their Claim and their classification.

### Submission of Claim Forms

Subject as provided above in relation to certain categories of Claimants, all Claimants (whether their Claim is actual or contingent) must complete and submit to the Bank a Claim Form by the Claims Submission Date.  The Claim Form is contained at Schedule 2 (*Claim Form*) including notes on completing the Claim Form.[8]

### Details for Return of Claim Forms

The address, fax number and e-mail addresses of the Bank for the return of Claim Forms are specified on the Claim Form.

Claim Forms may be sent by electronic mail or fax to the Bank by the Claims Submission Date provided the original of such forms are mailed to and received by the Bank by 26 May 2010.  Service shall be effective upon receipt by the Bank (whether by fax, phone, email or post) on a Business Day in Almaty; *provided*, *however*, *that* (i) any such communication which would otherwise take effect after 6:00 p.m. on any particular day shall not take effect until 10:00 a.m. on the immediately succeeding business day in Almaty. Claimants (other than Excluded Creditors) are accordingly urged to contact the Bank by emailing zhaisanov@bta.kz or d_adil@bta.kz or by phone on +7 727 3124671 or +7 727 266 2607 in order to obtain confirmation from the Bank that their Claim Form has been received.

---

[8] BTA Finance Luxembourg, Trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute may submit Claim Forms until 10:00 am (Almaty time) on 26 May 2010.

***Consequences of failing to notify the Bank of Claims before the Claims Submission Date***

Claimants who have not notified the Bank of their Claims (and which are not Excluded Debt) on or prior to the Claims Submission Date will have their Claims cancelled and will receive no Entitlements, but the Bank may, in its sole and absolute discretion, admit such Claims.

***The Claimants' Meeting***

The Restructuring Plan is contained at Schedule 1 (*The Restructuring Plan*) and contains important information relating to all claims.  Claimants should read the Restructuring Plan carefully.  Before the Restructuring Plan can become effective and binding on the Bank and the Claimants and Euronoteholders, a resolution to approve the Restructuring Plan must be passed by Claimants holding at least two-thirds by value of the Designated Financial Indebtedness at the Claimants' Meeting convened by the order of the Court.

The notice convening the Claimants' Meeting is set forth in Schedule 3 *(Notice of Claimants' Meeting)*.  Each Claimant or its proxy will be required to register its attendance at the Claimants' Meeting prior to its commencement.  Registration will commence at 10:00 a.m. (Almaty time) on the day before the Claimants' Meeting.  Claimants or their proxies must be duly authorised to vote at the Claimants' Meeting.

The Claimants' Meeting will be chaired by Mr. Anvar Saidenov.

***Voting by Claimants***

All Claimants who wish to vote by proxy at the Claimants' Meeting will need to complete a Claim Form in respect of each Claim (*provided that* when a Claimant has more than one Claim of the same type these may be included in a single Claim Form) and a Form of Proxy even if they have previously notified the Bank of their Claims.

In order to expedite the procedure for voting at the Claimants' Meeting, please return any Claim Forms and Forms of Proxy to the address shown on those forms as soon as possible and in any event by no later than 5:00 p.m. (Almaty time) on 19 May 2010.  However, after this time, Forms of Proxy may be presented to the registration desk at the Claimants' Meeting or lodged with the Chairman, to be accepted at his sole discretion at any time prior to the Claimants' Meeting, provided they have been properly completed and signed.

If a Claimant wishes to appoint the Chairman to be its proxy, it must specifically direct the Chairman to vote either for, or against, the Restructuring Plan in the Form of Proxy.  If the Chairman is appointed as Proxy but is not given specific directions on how to vote, the amount of the Claim will be counted as an abstention.

If a Claimant wishes an authorised person to attend the Claimants' Meeting and vote on its behalf, that person must produce at the Claimants' Meeting a copy of the resolution or other appropriate documentation authorising him to do so.  The copy should be sealed by the authorised body or certified as a true copy by a director or by the company secretary or an authorised signatory.

***Form of Proxy***

Enclosed with this Information Memorandum at Schedule 4 (*Form of Proxy*) is the Form of Proxy.  Each Claimant (or its duly authorised agent) should ensure that the original Form of Proxy is completed and submitted in accordance with the notes printed on the Form of Proxy, regardless of whether such Claimant intends to be present at the Claimants' Meeting, in order to direct how votes attributable to its Claims should be exercised.

A Form of Proxy should be completed and submitted in respect of each Claim Form that is completed and submitted.

*Deadlines for Return of Forms of Proxy*

Claimants should ensure that the Bank receives their Form of Proxy by no later than the Claims Submission Date.  If not returned by this time, duly completed Forms of Proxy will only be accepted at the absolute discretion of the Chairman of the Claimants' Meeting at any time prior to the Claimants' Meeting and only upon production of appropriate, verifiable evidence that the person that completed that Form of Proxy is a Claimant and has the right to vote in respect of its Claim.

Once a Form of Proxy is submitted, it may only be withdrawn by application to the Bank.

If any changes are made to the Restructuring Plan as set out in this Information Memorandum which are materially adverse to Claimants, the Bank shall, in a supplement to this Information Memorandum in which such changes are published, inform Claimants that they are entitled to revoke their Forms of Proxy and the supplement will contain information relating to the deadline for the submission of new Forms of Proxy applicable to Claimants that have so revoked their Forms of Proxy.  Any notice of revocation must indicate the relevant Forms of Proxy to be revoked and must be received by the Bank in the same manner as the Forms of Proxy were required to be delivered originally.

The address, fax number and e-mail addresses of the Bank for the return of Forms of Proxy are specified on the Form of Proxy.

### Attendance at the Claimants' Meeting; Verification of Identity

Claimants wishing to attend and vote in person at the Claimants' Meeting should ensure that they indicate that this is their intention in the relevant part of the Form of Proxy.  Admittance to the Claimants' Meeting will only be permitted to the person named in the Form of Proxy on the production of proof of personal identity, and, in the case of a corporation, the Form of Proxy has been executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised officer or authorised signatory of the corporation.  If the person so named cannot produce an appropriate proof of personal identity (for example, a passport), he will not be permitted to attend and vote at the Claimants' Meeting.

The Bank has the right to request additional documentation to confirm that a person who has completed a Form of Proxy is a Claimant.  In the event that such additional documentation is not provided, or is insufficient, the Chairman may at his absolute discretion, for voting purposes only, reject a claim.

### Value of a Claimant's Claim for Voting Purposes

In no circumstances shall a Claim be admitted for voting purposes by the Bank or the Chairman for a value greater than the Agreed Claim amount as determined pursuant to Schedule 1 (*The Restructuring Plan*).

The quantum of a Claim for voting purposes shall be the Agreed Claim amount.  For voting purposes Claims denominated in currencies other than Tenge will be converted into Tenge at the Reference Rate.

### Questions

An opportunity will be given at the Claimants' Meeting for Claimants to raise any questions and to voice any objections they may have in relation to the Restructuring Plan.

### Final Hearing

All Claimants and Euronoteholders are entitled to appear at the hearing of the application to the Court to approve the Restructuring Plan.  The time and date of the hearing will be notified

to Claimants by an announcement on a Regulatory Information Service and on the Bank's websites at www.btainvestorrelations.com and www.bta.kz.

9.    **ENTITLEMENT TO AND DISTRIBUTION OF CASH, NEW NOTES AND/OR SHARES OR GDRS**

*Distribution Agent*

Before the Restructuring Date, the Bank will enter into the Distribution Agent Agreement appointing the Distribution Agent.

The Restructuring Plan provides that the Distribution Agent will be responsible for assisting with the distribution process on behalf of the Bank.  The Distribution Agent may also be responsible for holding cash, New Notes and/or Shares/GDRs on behalf of certain Claimants pending distribution under the terms of the Restructuring Plan.

*Distribution Agent Agreement*

On execution of the Distribution Agent Agreement, the Bank will, conditional on the Restructuring Plan becoming effective, deliver cash and New Notes and Shares or GDRs to the Distribution Agent to be held on behalf of certain Claimants in accordance with the terms of the Distribution Agent Agreement.

*Satisfaction of Entitlements*

Entitlements will be satisfied by the distribution to Claimants (other than Samruk-Kazyna and as regards claims to be allocated to the RCTFF) of the appropriate number of New Notes and Shares or GDRs and/or amount of cash, as the case may be.  Claimants with Non-OGSC Eligible Trade Finance Debt allocated to Senior Package 3 will participate as lenders in the RCTFF which will become effective on the Restructuring Date.

*Foreign Jurisdictions*

Cash, New Notes and/or Shares/GDRs will not be distributed pursuant to the Restructuring Plan where such distributions would be prohibited.  Claimants in certain jurisdictions should refer to the discussion in "*Issuance and Transfer Restrictions*" and "*Risk Factors – Restrictions apply to a holder of GDRs or Shares if it is incorporated or has affiliates in a Prohibited Jurisdiction*" to determine whether this may affect them.

*Procedure for the Admission and Rejection of Claimants' Claims*

Please see the clause entitled *"Verification of Quantum and Classification and Admission of Claims"* as included at Clause 4 of Schedule 1 *(The Restructuring Plan)* for a description of the procedure applicable to the verification, adjudication and admission of Claims.

*Calculation of Entitlements*

Details of the calculation of Entitlements are provided in Schedule 1 (*The Restructuring Plan*), Annex 2 (*Calculation of Entitlements*) to this Information Memorandum.

*Distribution of cash, New Notes and/or Shares or GDRs to Claimants*

*Distribution of New Notes and Shares or GDRs*

For all Agreed Claims, the Distribution Agent or the Bank, as the case may be, will transfer (or permit to be transferred) such number of New Notes and Shares/GDRs to either an Existing Account, a Designated Account or a Local Account specified in the Settlement Instructions.  In due course the Bank will make available Settlement Instructions for Claimants.  Each Settlement Instruction must contain such information as is required by the

Distribution Agent or the Bank, as the case may be, to transfer the appropriate cash, New Notes and/or Shares or GDRs to the relevant Claimant (or its Nominated Recipient).

*Direction to Sell New Notes, Shares or GDRs*

If, for any reason, a Claimant does not wish to, or is unable to, hold the New Notes and (i) Shares/GDRs to which it is entitled, it may direct the Distribution Agent or the Bank, as the case may be, to sell its Securities Entitlement and account to it for the Net Proceeds of Sale or (ii) to transfer the same to a third party who is not so affected.  The price, terms, timing and manner of such sale will be on the best terms reasonably available at the time using a transparent open market process and shall be for cash and shall take place as soon as reasonably practicable after the Restructuring Date, and neither the Bank, the Steering Committee nor any of their respective advisers, or any person acting on behalf of all or any of them, will have any Liability for any loss or alleged loss arising from such sale or a failure to procure any purchaser for such New Notes and Shares/GDRs (or any of them)).

*Transfers of New Notes, Shares or GDRs to Claimants may be restricted in Certain Jurisdictions*

The New Notes and Shares or GDRs will not be distributed to Claimants in jurisdictions where such distributions would be prohibited.  Instead, such persons will be entitled to receive the Net Proceeds of Sale of the New Notes and Shares or GDRs to which they would otherwise be entitled.  Payments to such persons shall be made in U.S. Dollars.

If in the reasonable opinion of the Bank (having taken appropriate legal advice), the transfer of New Notes and Shares/GDRs pursuant to the Restructuring Plan a Claimant, or a Claimant's Nominated Recipient, may be prohibited by any relevant law then the Distribution Agent shall, if so directed by the Bank, or the Bank shall, sell, or procure the sale of, the same and pay the Net Proceeds of Sale from the sale of such New Notes and Shares/GDRs to that Claimant, or that Claimant's Nominated Recipient, as the case may be, on the best terms reasonably available at the time using a transparent open market process and shall be for cash and shall take place as soon as reasonably practicable after the Restructuring Date, in full satisfaction of that Claimant's rights under the Restructuring Plan.

*Distribution of Cash*

Cash payments made under Senior Package 1 will be made by wire transfer to the Claimant in accordance with the account details as set out in their completed Settlement Instructions.

*Escrow Account*

In accordance with the Restructuring Plan the Bank is entitled to place Entitlements of certain Related Parties in the Escrow Account pending resolution of the Bank's enquiries.

10.     **APPROVAL BY THE FMSA AND THE COURT**

If the Restructuring Plan is approved at the Claimants' Meeting, the Bank must submit the approved plan to the FMSA in order to establish its conformity with the indicative restructuring and recapitalisation plan initially approved by the FMSA on 26 September 2009.

The Court must approve the Restructuring Plan before it can become effective and binding on all relevant parties.  Approval takes place at the Court hearing after the requisite majority of Claimants has approved the Restructuring Plan at the Claimants' Meeting.  The date of the Court hearing for approval of the Restructuring Plan will be announced on a Regulatory Information Service and on the Bank's websites at www.bta.kz at least 14 days in advance of such hearings.  Claimants, Euronoteholders and Related Parties are entitled to attend and make representations at the Court hearing.

Further conditions precedent to the Restructuring Plan becoming effective are set forth in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) to this Information Memorandum.

**11.     DEED OF RELEASE**

The terms of the Restructuring Plan provide for the Bank to be given the authority to enter into the Deed of Release on behalf of all Claimants and Related Parties releasing the Bank and other persons named therein from all Liabilities to Claimants and Euronoteholders as more fully set out in Schedule 1 *(The Restructuring Plan),* Annex 3 (*Form of Deed of Release*).

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

**Historical Financial and Other Information**

The Bank is required to maintain its books of account in Tenge in accordance with IFRS and with the relevant laws and regulations in Kazakhstan.  The Bank is also required to submit certain compliance reports prepared in accordance with the regulations of the FMSA.

The historical financial information of the Bank set forth herein has, unless otherwise indicated, been extracted without material adjustment from the Annual Financial Statements and the Unaudited Interim Financial Statements, prepared in accordance with IFRS. Ernst & Young LLP, independent auditors (acting as an auditor under licence No. 0000003, Type MFU-2, dated 15 July 2005 issued by the Ministry of Finance of Kazakhstan), 77/7, Al-Farabi Avenue, Esentai Tower, Almaty, 050060, Republic of Kazakhstan, have audited the Bank's Annual Financial Statements and their audit report is included in this Information Memorandum.  Ernst & Young LLP have also reviewed the Bank's Unaudited Interim Financial Statements for the nine months ended 30 September 2009 and their review report is included in this Information Memorandum.

The audit report issued by Ernst & Young LLP in respect of the Annual Financial Statements for the year ended 31 December 2008 and the review report issued by Ernst & Young LLP in respect of the Unaudited Interim Financial Statements for the nine months ended 30 September 2009 each expressed an unqualified opinion, but the audit report and review report did include emphasis of matter paragraphs in respect of the material uncertainty which exists in respect of the Bank continuing as a going concern.

**Investors should be aware that the Bank has not published any financial statements with respect to any period after 30 September 2009.  The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank as described in detail in this Information Memorandum, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009. Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.**

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank will publish, if practicable, a supplement to this Information Memorandum.  However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring.  If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof.  See *"Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs".***

Due to internal control weaknesses experienced by the Bank in the past, Claimants are advised to assess financial information presented in this Information Memorandum with caution.  See *"Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future"*.

Certain information presented in this Information Memorandum is prepared on the basis of FMSA Methodology.  Such information is not audited and is not directly comparable with the information presented in accordance with IFRS.  See *"Pro Forma Financial Information"* and *"Asset and Liability Management — Provisioning Policy"*.

In making an investment decision, Claimants must rely upon their own examination of the Bank, the terms of the Restructuring and the financial information included in this Information Memorandum, and should consult their own professional advisers for an understanding of the differences between IFRS, FMSA Methodology and U.S. GAAP and how these differences might affect the financial information in this Information Memorandum.

**Pro Forma Financial Information**

The financial information set forth herein also includes the Pro Forma Financial Information. The Pro Forma Financial Information was prepared by the Bank on the basis of FMSA Methodology and IFRS, as indicated, to illustrate the effect of the Restructuring as if the Restructuring had been completed as at 30 September 2009 and is based on data derived from the Unaudited Interim Financial Statements and management accounts prepared on the basis of FMSA Methodology. The Pro Forma Financial Information is unaudited and presented on an unconsolidated basis, and it is presented for illustrative purposes only.

The Bank's management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring and to select Restructuring Packages. The Pro Forma Financial Information is based upon certain assumptions and adjustments which the Bank's management believes are reasonable and necessary for a fair presentation of such information.

While the Bank has used all reasonable efforts to ensure that the Pro Forma Financial Information is correct, accurate and complete as at the date of this Information Memorandum, no representation or warranty (express or implied) is made as to the reliability, accuracy or completeness of the Pro Forma Financial Information. The assumptions and adjustments are based upon the Bank's preliminary analysis and based upon currently available information. The Pro Forma Financial Information does not take into account the potential adverse impact of certain negative developments since 30 September 2009, such as additional loan loss provisions and further operational losses resulting from the deteriorating financial condition of the Bank and instability aggravated by the ongoing restructuring process.

Claimants are cautioned that *pro forma* financial information is inherently unreliable and that the Pro Forma Financial Information is not necessarily indicative of how the Bank's consolidated capitalisation, balance sheet or capital adequacy information as at 30 September 2009 would have been presented had the Restructuring actually been completed at that the date, nor is it necessarily indicative of the Bank's consolidated capitalisation, balance sheet or capital adequacy as at any future date. The unaudited Pro Forma Financial Information should be read in conjunction with the Financial Statements included elsewhere in this Information Memorandum. See "*Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on consolidated financial statements prepared in accordance with IFRS*".

**Currency Translations**

Solely for the convenience of the reader, this Information Memorandum presents unaudited translations of certain Tenge amounts into U.S. Dollars at specified rates. Unless otherwise stated, any balance sheet data in U.S. Dollars is translated from Tenge at the applicable exchange rate on the date of such balance sheet (or, if no such rate was quoted on such date, the immediately preceding date) and any income statement data in U.S. Dollars is translated from Tenge into U.S. Dollars at the daily average exchange rate applicable to the period to which such income statement data relate, in each case calculated in accordance with the official exchange rates for U.S. Dollars on the KASE as reported by the NBK. Further details can be found in the section headed "*Exchange Rates and Exchange Controls*".

The Bank has translated the summary income statement and balance sheet information for the nine-month period ended 30 September 2009 and the year ended 31 December 2008 into U.S. Dollars at the rate of U.S.\$1.00 = KZT 150.95 and U.S.\$1.00 = KZT 120.79, respectively. See "*Exchange Rates and Exchange Controls*". As at 30 April 2010 (the latest practicable date prior to the date of

this Information Memorandum), the official KZT/U.S.$ rate of exchange reported by the NBK was KZT 146.43 = U.S.$1.00.

No representation is made that the Tenge or U.S. Dollar amounts in this Information Memorandum could have been converted into U.S. Dollars or Tenge, as the case may be, at any particular rate or at all.

Certain figures which appear in this Information Memorandum have been subject to rounding adjustments; accordingly, figures shown as totals in certain tables may not be the sum of the figures which precede them.

**Statistical and Market Information**

Certain statistical and market information presented in this Information Memorandum in the sections headed "*Risk Factors*", "*The Bank*", "*Management's Discussion and Analysis of Results of Operations and Financial Condition*", "*Selected Statistical and Other Information*" and "*The Banking Sector in Kazakhstan*" on such topics

as the Bank's competitors, the Kazakhstan banking sector, the Kazakhstan economy in general and other related subjects represents the Bank's calculations based on information and official data of the FMSA, the NBK, the NSA and other third party sources.  Specifically, information related to the Bank's industry ranking and market share is derived from figures published by the FMSA.  The Bank has accurately reproduced such information and, so far as the Bank is aware and is able to ascertain from information published by such third parties, no facts have been omitted that would render the reproduced information inaccurate or misleading.  The Bank has relied on the accuracy of this information without independent verification.  Claimants should note that some of the Bank's estimates are based on such third party information.  Claimants are advised to consider this data with caution.  Official data published by Kazakhstan governmental or regional agencies is substantially less complete and less thoroughly researched than that of more developed countries.  Further, official statistics, including those produced by the FMSA, the NBK and the NSA, may be produced on different bases than those used in more developed countries.  Any discussion of matters relating to Kazakhstan itself in this Information Memorandum is, therefore, subject to uncertainty due to concerns about the completeness or reliability of available official and public information.

## FORWARD-LOOKING STATEMENTS

Certain statements included herein may constitute forward-looking statements that involve a number of risks and uncertainties.  Such forward-looking statements can be identified by the use of forward-looking terminology such as "believes", "expects", "may", "are expected to", "intends", "will", "will continue", "should", "would be", "seeks", "approximately" or "anticipates" or similar expressions or the negative thereof or other variations thereof or comparable terminology.  These forward-looking statements include all matters that are not historical facts.  They appear in a number of places throughout this Information Memorandum and include statements regarding the Bank's intentions, beliefs or current expectations concerning, amongst other things, the Bank's results of operations, financial condition, liquidity, prospects, growth, strategies and the industry in which it operates.  By their nature, forward-looking statements involve risks and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future.

Claimants and Euronoteholders should be aware that forward-looking statements are not guarantees of future performance and that the Bank's actual results of operations, financial condition and liquidity, and the development of the industry in which it operates may differ materially from those statements made in or suggested by the forward-looking statements contained in this Information Memorandum.  In addition, even if the Bank's results of operations, financial condition and liquidity and the development of the industry in which it operates are consistent with the forward-looking statements contained in this Information Memorandum, those results or developments may not be indicative of results or developments in subsequent periods.  Important factors that could cause those differences include, but are not limited to:

● the Bank's ability to successfully restructure its indebtedness;

● the stability of the banking sector in Kazakhstan;

● the state of the Bank's retail, corporate and SME businesses;

● the quality and stability of its deposit base;

● future credit losses that the Bank may incur;

● expectations as to the impact of projects undertaken to improve cost efficiencies and enhance liquidity and revenues; and

● estimates and financial targets for increasing and diversifying the composition, as well as the quality, of the Bank's loan portfolio.

Factors that could cause actual results to differ materially from the Bank's expectations are contained in cautionary statements in this Information Memorandum and include, among other things, the following:

● overall economic and business conditions;

● effects of the global financial crisis and international economic conditions;

● the level of demand for the Bank's services;

● deposit outflows;

● competitive factors in the industries in which the Bank and its customers operate;

● changes in Government regulations and in the Government's or Samruk-Kazyna's policies regarding support for the banking sector in Kazakhstan;

● the timing, impact and other uncertainties of unrecognised guarantees and pledges, if any;

● the timing, impact and other uncertainties of unidentified related party transactions, if any;

- changes in tax requirements, including tax rate changes, new tax laws and revised tax law interpretations;

- results of litigation or arbitration;

- interest rate fluctuations and other changing conditions in the capital markets;

- exchange rate fluctuations;

- economic and political changes in international markets, including governmental changes;

- hostilities and restrictions on the ability to transfer capital across borders; and

- the impact of valuation of derivatives and property and equipment.

The sections of this Information Memorandum entitled "*Risk Factors*", "*Management's Discussion and Analysis of Results of Operations and Financial Condition*", and "*The Bank*" and "*Selected Statistical and Other Information*" contain a more complete discussion of the factors that could affect the Bank's future performance and the industry in which it operates.   In light of these risks, uncertainties and assumptions, the forward-looking statements described in this Information Memorandum may not occur.

The Bank is not obliged to, and does not undertake any obligation to, update or revise any forward-looking statement, whether as a result of new information, future events or otherwise.   All subsequent written and oral forward-looking statements attributable to the Bank or to persons acting on its behalf are expressly qualified in their entirety by the cautionary statements referred to above and contained elsewhere in this Information Memorandum.

## EXCHANGE RATES AND EXCHANGE CONTROLS

**Exchange Rates**

The currency of Kazakhstan is the Tenge, which was introduced in November 1993. Prior to 5 April 1999, the NBK maintained a managed floating exchange rate system with the rate being determined on the basis of market developments and the NBK's role in setting the exchange rate was limited to interventions in the domestic currency market in order to prevent exchange rate volatility caused by short-term changes in supply and demand. In April 1999, the NBK and the Government publicly announced that the NBK would cease to establish fixed exchange rates for the Tenge and permit the exchange rate to float freely, and that the NBK would continue to intervene in the foreign exchange market only where necessary to support the Tenge. This decision was supported by international financial organisations such as the IMF. As a result, the Tenge depreciated from a pre-announcement rate of KZT 88.00 per U.S. Dollar to a rate of approximately KZT 130.00 per U.S. Dollar by May 1999. For the next three years the Tenge generally continued to depreciate in nominal terms against the U.S. Dollar, although from 2002 to 2008 it strengthened overall against the U.S. Dollar as a result of export proceeds from oil, agricultural products and other commodities. On 4 February 2009, the NBK reduced its level of support for the Tenge/U.S. Dollar exchange rate from KZT 117 – KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.). This devaluation was due in part to recent pressure on the balance of payments of Kazakhstan as a result of a decline in commodity prices (in particular oil and gas) in the international markets and to prevent a significant decrease of Kazakhstan's gold and currency reserves. It was also intended to enhance export competitiveness. From 5 February 2010 a new exchange rate corridor began to operate. In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and – 15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar).

The following table sets out year-end, high, average and low Tenge/U.S. Dollar official exchange rates for each year from 2002 through 2009 and period-end, high, average and low Tenge/U.S. Dollar official exchange rates for the first nine months of 2009 and first one month, two months and three months of 2010, in each case as reported by the NBK:

| Period ended | Period end | High | Average[1] | Low |
|---|---|---|---|---|
| 31 December 2002 ................................................. | 155.60 | 155.60 | 153.28 | 150.60 |
| 31 December 2003 ................................................. | 144.22 | 155.89 | 149.52 | 143.66 |
| 31 December 2004 ................................................. | 130.00 | 143.33 | 136.05 | 130.00 |
| 31 December 2005 ................................................. | 133.77 | 136.12 | 132.86 | 129.83 |
| 31 December 2006 ................................................. | 127.00 | 133.85 | 126.10 | 117.25 |
| 31 December 2007 ................................................. | 120.30 | 127.00 | 122.56 | 118.79 |
| 31 December 2008 ................................................. | 120.79 | 120.87 | 120.29 | 119.48 |
| 30 September 2009 ................................................. | 150.95 | 151.40 | 146.88 | 120.79 |
| 31 December 2009 ................................................. | 148.46 | 151.40 | 147.59 | 120.79 |
| 31 January 2010 ................................................. | 148.21 | 148.46 | 148.13 | 147.88 |
| 28 February 2010 ................................................. | 147.32 | 148.46 | 147.96 | 147.32 |
| 31 March 2010 ................................................. | 146.98 | 148.46 | 147.67 | 146.89 |

———
Note:
(1) The weighted average rate reported by the NBK for each month, as applicable, during the relevant period.

On 30 April 2010 (the latest practicable date prior to the date of this Information Memorandum), the official KZT/U.S.$ rate of exchange as reported by the NBK was KZT 146.43 per U.S.$1.00.

The above rates may differ from the actual rates used in the preparation of the Financial Statements and other financial information appearing in this Information Memorandum. The inclusion of these exchange rates is not intended to suggest that the Tenge amounts actually represent such U.S. Dollar amounts or that such amounts could have been converted into U.S. Dollars at any particular rate, or at all.

**Exchange Controls**

Kazakhstan has accepted the conditions of paragraphs 2, 3 and 4 of Article VIII of the IMF Charter and, as a result, has agreed not to introduce or increase any exchange rate restrictions, introduce or modify any practice of multiple exchange rates, enter into any bilateral agreements violating Article VIII or impose any import restrictions.   In accordance with Article VIII, a new law on currency regulation was adopted in 1996.   According to this law, all current account operations, including transfers of dividends, interest and other investment income, may be made without restriction.   Only certain outflowing and inflowing capital account operations need to be licensed by, or registered with, the NBK.   Capital inflows are registered and monitored for statistical purposes only, but are not restricted.

Following the influx of U.S. Dollars into Kazakhstan due to, among other things, rising oil prices, a number of steps aimed at liberalising the currency control regime were undertaken in Kazakhstan from 2002 to 2004.   The Law on Currency Regulation and Currency Control and supporting regulations came into effect at the end of 2005, representing a significant milestone towards achieving the liberalisation of currency operations, extension of export of capital and elimination of double control in Kazakhstan.   Among other things, the new currency control rules substantially expanded the classes of Kazakhstan investors that can invest abroad and eased the requirements for international financing in Kazakhstan.

Since 1 January 2007, when certain provisions of the Law on Currency Regulation and Currency Control came into effect, it has become unnecessary to obtain an NBK licence for any foreign currency transactions, including the opening by Kazakhstan residents of accounts with foreign banks. Further, since 1 January 2007, most foreign currency transactions only require notification to the NBK, or are not subject to currency control at all.   Only financial loans (with a non-bank local counterparty), direct investments and certain other capital account operations require registration with the NBK.   With respect to most of their offshore operations, Kazakhstan banks are only obliged to notify the NBK as to the existence of such operations.

## ENFORCEMENT OF FOREIGN JUDGMENTS AND ARBITRAL AWARDS

The Bank is a joint stock company organised under the laws of Kazakhstan and substantially all of its operations are located in the Kazakhstan.  Most of its directors and executive officers reside in Kazakhstan and substantially all of the Bank's assets and the assets of such persons are located outside the United States.  As a result, it may not be possible for Claimants and Euronoteholders to effect service of process within the United States upon the Bank or such persons or to enforce against any of them judgements of U.S. federal or state courts, including judgements predicated upon civil liabilities under the securities laws of the United States or any state or territory within the United States.

The Non-Tenge New Notes and the New Notes Trust Deed will be governed by English law and will provide that any claims, disputes or differences regarding their existence, termination or validity or any non contractual obligations arising out of or in connection with such documents shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration.  The trustee will have an option to elect that such disputes shall be heard instead by the courts of England.

Kazakhstan is a signatory to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards 1958 and, to the extent that a foreign arbitral award is obtained, such award should generally be enforced by Kazakhstan courts (subject to conditions and qualifications provided in the Convention) upon compliance with civil procedures established by Kazakhstani laws on international commercial arbitration for the enforcement of foreign arbitration decisions.

Kazakhstan courts will not enforce any judgement obtained in a court established in a country other than Kazakhstan, unless there is in effect a treaty between such country and Kazakhstan providing for reciprocal enforcement of judgments and then only in accordance with the terms of such treaty.  There is no such treaty in effect between Kazakhstan and the United Kingdom or between Kazakhstan and the United States.

**RISK FACTORS**

*In addition to other information in this Information Memorandum, Claimants should carefully consider the following risk factors when considering the Restructuring Plan.  The risks and uncertainties described below are the principal risks relating to the Bank, the Restructuring, the Kazakhstan banking sector and other relevant matters, however, they are not the only ones the Bank faces.  Additional risks and uncertainties that the Bank is not aware of or that the Bank currently believes are immaterial may also adversely affect the Bank's business, financial condition or results of operations.  If any of the risks or uncertainties described below come to fruition, the Bank's business, financial condition or results of operations, among other things, could be materially and adversely affected.*

*The order in which these risk factors are presented does not necessarily reflect the likelihood of their occurrence or the magnitude of their potential impact on the Bank's business, financial condition, cash flows or results of operations.*

**Risks Relating to the Bank**

***The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs.***

Investors should be aware that the Bank has not published any financial statements with respect to any period after 30 September 2009.  The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or in this Information Memorandum for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009.  Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank, will publish, if practicable, a supplement to this Information Memorandum.  However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring.  If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof.  See "*Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs*".**

***Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank.***

The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA.  If the Restructuring is completed as planned, the Bank estimates that its Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations will be 5.3 per cent. and 11.2 per cent., respectively, as at 31 December 2010, compared to the minimum levels of 5.0 per cent. and 10.0 per cent. for Tier I and total capital, respectively, required under the FMSA regulations.  The Tier 1 capital adequacy ratio will further increase to 7.0 per cent. from 1 July 2012 and 8.0 per cent. from 1 July 2013.  Any further deterioration in the quality of the Bank's loan portfolio after the Restructuring and the consequent need to make impairment provisions may cause the Bank's capital adequacy ratios to fall below the minimum levels.

In the event that Samruk-Kazyna ceases to be at least a 10.0 per cent. shareholder in the Bank, the Bank may be subject to increased minimum Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations of 6.0 per cent. (increasing to 8.0 per cent. from 1 July 2012 and

to 9.0 per cent. from 1 July 2013) and 12.0 per cent., respectively. These minimum levels would further increase to 7.0 per cent. and 14.0 per cent. respectively, if the Bank does not have amongst its shareholders a physical person holding at least 10.0 per cent. of the Bank's shares. See "*The Banking Sector in Kazakhstan – Banking Supervision – Capital Adequacy*" for a discussion of the factors that may lead to increased minimum capital adequacy requirements.

Any failure to comply with the minimum capital adequacy ratios, whether because of the deterioration in the quality of the Bank's loan portfolio or an increase in minimum capital adequacy requirements, could lead to sanctions and other measures being applied by the FMSA, including forcing the Bank into conservation or mandatory liquidation.

***The Bank entered into an agreement with the FMSA which may restrict its ability to operate and conduct its business as a financial institution.***

In June 2009, the Bank announced it had recorded negative capital and consequently the Bank and the FMSA entered into the FMSA Agreement pursuant to which the Bank was obliged, among other things, to provide the FMSA with a restructuring plan and to enter into a Term Sheet with the Steering Committee and the FMSA undertook not to apply sanctions and enforcement measures against the Bank, including commencement of liquidation or conservation procedures against the Bank or withdrawal of the Bank's license. Pursuant to the FMSA Agreement, the Bank is restricted from undertaking any mass marketing campaigns. The deadline under the FMSA Agreement for delivery of the restructuring plan was subsequently extended to 18 September 2009 pursuant to Addendum No. 1 to the FMSA Agreement and the deadline for delivery of the Term Sheet was extended to 7 December 2009 under Addendum No. 2 to the FMSA Agreement. See "*The Bank — Background to the Restructuring*".

On 19 April 2010, the Bank and the FMSA entered into a further addendum to the FMSA Agreement whereby the FMSA agreed, among other things, (i) to require the implementation of the measures envisaged by the Restructuring Plan (including the conversion of securities into shares of the Bank) by 1 September 2010 and (ii) to extend until 1 September 2010 its agreement not to apply sanctions and enforcement measures against the Bank under the provisions of Articles 46 and 47 of the Banking Law. For a discussion of the measures that the FMSA may apply to banks under Articles 46 and 47 of the Banking Law, see "*The Banking Sector in Kazakhstan — The FMSA's Compulsory Measures under the Banking Law*".

In the event that the Bank does not comply with its obligations under the FMSA Agreement, the FMSA may apply sanctions and other measures to the Bank, including forcing the Bank into conservation or mandatory liquidation.

***The Bank will be controlled by Samruk-Kazyna, Kazakhstan's sovereign wealth fund, whose interests may differ from the interests of the Bank or the Claimants.***

As the Bank's majority shareholder with 81.5 per cent. (less the Residual Minority Shareholder Percentage) of the Bank's share capital following the Restructuring, Samruk-Kazyna, Kazakhstan's sovereign wealth fund, will be able to control or affect the composition of the Board of Directors, the outcome of any corporate transaction or other matter submitted to the Bank's shareholders for approval, including acquisitions, divestitures, financings or other transactions of the Bank, and could also prevent or cause a change in control. As the Government's sovereign wealth fund, with the goal of supporting and diversifying Kazakhstan's economy, the interests of Samruk-Kazyna may conflict with the interests of the Bank's other shareholders or the Claimants and there can be no assurance that Samruk-Kazyna will exercise influence over the Bank in a manner that is in the best interests of the Bank, the Bank's other shareholders or the Claimants. Although, as part of the Restructuring, a New Charter is to be introduced, the aim of which is to provide Restructuring Creditors who become Shareholders of the Bank with increased protection, some of the provisions expected to be incorporated in the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstani law. See "*Certain provisions of the New Charter may not comply*

*with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum.*"   In addition, being controlled by the Government may slow the Bank's decision-making process and may subject the Bank to the risk of bureaucracy, corruption and inefficiencies commonly attributed to state-controlled companies.   Furthermore, because Samruk-Kazyna is controlled by the Government, there is a risk that any change of administration in Kazakhstan may result in Samruk-Kazyna's policies changing as well, and such new policies may conflict with the interests of the Bank, its shareholders and the Claimants.   For a description of the ownership of the Bank, see "*Principal Shareholders*".

***The NBK provides funding support to the Bank but may withdraw its support and accelerate repayment of its loans if certain requirements are not met.***

On 17 February 2009, the Bank, the NBK and the FMSA entered into the Cooperation Agreement. Under the Cooperation Agreement, the Bank may apply to the NBK for two types of loans-special purpose loans and refinancing loans secured by the SK Bonds.   As at 30 September 2009, the Bank had borrowed KZT 404,938 million excluding interest as refinancing loans by way of entering into BTA/NBK Repo Transactions with the NBK (and no amounts as special purpose loans) under the Cooperation Agreement.   See "*The Bank — NBK Support*".

Pursuant to the Cooperation Agreement, the Bank is required by the NBK to:

- maintain daily balances of all claims it has against (including loans issued to) non-residents of Kazakhstan in Tenge and Tenge equivalent of foreign currency not higher than KZT 1,046 million (being the actual value of such assets as at 1 November 2007);

- reduce its claims against non-residents of Kazakhstan in respect of issued loans by at least 5 per cent. each quarter;

- not create or increase its share (in absolute values) in any subsidiary and dependent companies located outside Kazakhstan;

- maintain daily balances of its liabilities to non-residents of Kazakhstan in respect of (i) loans granted to it, (ii) deposits of special purpose organisations and (iii) bonds, in Tenge and Tenge equivalent of foreign currency not higher than KZT 1,554 million (being the actual value of such liabilities as at 1 November 2007);

- make efforts to increase the Bank's shareholders' equity; and

- adhere to a conservative credit policy and a moderate deposit policy.

In the event that the Bank breaches these requirements, the NBK may reduce the refinancing limit in relation to the refinancing loans or demand prepayment of the special purpose loans.

***Samruk-Kazyna may demand early repayment of funds allocated to the Bank through the State Finance Programmes if the Bank breaches conditions for the utilisation of the funds.***

The Group has been allocated significant funds by Samruk-Kazyna under the State Finance Programmes.   The Group has received KZT 126,453 million of Government Funding under the State Finance Programmes and, as at 30 September 2009, the Group had utilised KZT 114,097 million, returned to the Government the unutilised amount of KZT 11,771 million and retained for future lending KZT 584 million pursuant to the State Finance Programmes.   See "*The Bank — State Finance Programmes*".   Under the State Finance Programmes, SamrukKazyna has the right to demand early repayment of funds allocated to the Bank if: (i) the Bank does not make timely repayments of debt or interest; (ii) the Bank does not use the proceeds in compliance with their stated purpose; (iii) the Bank's credit rating is downgraded by Fitch, S&P or Moody's by two or more notches; (iv) the Bank infringes the FMSA's prudential requirements at least once in each of two consecutive months or its licence is suspended; (v) more than 10 per cent. of the shares in the Bank are sold or transferred and

such transfer has a negative impact on the Bank's financial condition; or (vi) the Bank reports negative financial results for two consecutive quarters.

If early repayment is demanded as a result of a breach of the requirements of the Bank under any of the above State Finance Programmes, this could have a material adverse effect on the Restructuring and the Bank's business, financial condition, results of operations and prospects generally.

***Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future.***

In early 2009, the newly appointed management of the Bank conducted a due diligence review of the Bank's loan portfolio, which uncovered numerous suspicious transactions between the Group and entities believed to be affiliated with former management of the Bank.  The Bank has uncovered a significant number of loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or non-existent.  In addition, the Bank has uncovered numerous examples of purported loans being granted that do not appear to have gone through the proper approval process within the Bank. Furthermore, certain loan documentation, including collateral and associated agreements, primarily relating to financing of projects outside Kazakhstan, is no longer available and many loans were unlawfully transferred to new borrowers often offshore and no collateral was provided by the new borrowers, so the loans are unsecured.

Under the previous management, the Bank had two regional credit committees, which were separate from the Bank's main credit committee but nevertheless approved loans that were to be granted by the Bank.  The Bank believes that many loans that were purportedly approved by these credit committees were granted applying practices which were wholly inadequate and which differed significantly from the practices typically used by the Bank's main credit committee.

A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank has been unable to monitor the collateral (if any) or their financial performance.  Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral secured by the loans.

The Bank had also entered into derivatives contracts with certain offshore companies, which exposed the Bank to excessive credit risk and have become uncollectible.  The offshore counterparties have ceased to respond to the Bank's inquiries.  The current management suspects that these contracts were entered into on behalf of the Bank through actions of the former management in contravention of then existing internal controls and in order to circumvent such controls.   The current management has decided to fully provision against receivables on these derivative contracts as at 31 December 2008 for KZT 16,298 million.  For a complete discussion of internal control weaknesses, see "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*".

Although the Bank has improved its systems to address the deficiencies in the internal control systems, there can be no assurance that such new systems will be effective and that the Bank will not suffer losses from the failure of these controls to detect or contain operational risk in the future. Similar to other Kazakhstan banks, the Bank is susceptible to, among other things, fraud by employees or outsiders, unauthorised transactions by employees and operational errors, including clerical or record keeping errors and errors resulting from faulty computer or telecommunications systems.  Given the Bank's high volume of transactions, errors may be repeated or compounded before they are discovered and rectified.  In addition, the Bank's IT systems do not fully support its operations and a number of transactions are not fully automated, which may further increase the risk that human error or employee tampering or manipulation will result in losses that may be difficult to detect.  Consequently, the inadequacy of the Bank's internal processes or systems may result in unauthorised transactions and errors not being detected.  Further, the Bank's insurance may not cover the Bank's losses from such transactions or errors, which may have a material adverse effect on the Bank's financial condition or results of operations.

***Transactions with unidentified Related Parties may cause future losses.***

Certain customers and counterparties of the Bank may not have been properly identified as related parties. The Bank was unable to obtain appropriate evidence as to whether certain entities are related parties as at 30 September 2009 and 31 December 2008 and cannot therefore be sure that all customers and counterparties that are related parties have been disclosed. Given the internal control weaknesses in the Bank, related party transactions with unusual terms not known as at the date of this Information Memorandum may be uncovered in the future and may have further adverse effects on the Bank's financial condition and recovery prospects.

***Declines in customer deposits, which are an important source of funding for the Group, have negatively affected and may continue to negatively affect the Group's funding base.***

The Group has experienced significant outflows of customer deposits since January 2009. The Group's retail deposits decreased by 40.3 per cent. from KZT 307,345 million as at 31 December 2008 to KZT 183,552 million as at 30 September 2009. The Group has also experienced a significant outflow of private corporate and SME deposits (i.e., deposits from entities other than Samruk-Kazyna and its subsidiaries) during the same period. Such deposits decreased by 64.9 per cent. from KZT 364,482 million as at 31 December 2008 to KZT 128,093 million as at 30 September 2009. Due to deposits totalling KZT 150,329 million which were placed in February 2009 and March 2009 by Samruk-Kazyna and throughout the period by subsidiaries of Samruk-Kazyna, the deposits by Samruk-Kazyna and its subsidiaries (which includes amounts deposited pursuant to the State Finance Programmes) increased by 73.5 per cent. from KZT 214,225 million as at 31 December 2008 to KZT 371,636 million as at 30 September 2009 and the Group's total deposits decreased by only 22.9 per cent. from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009.

If decreases in retail and corporate deposits continue after the Restructuring and/or if Samruk-Kazyna withdraws some or all of the deposits made by it with the Bank, the Group will face significant difficulties and may be unable to carry on its business as other sources of funding, both domestically and in the international markets, may not be readily available.

***Lower expected growth of Kazakhstan's GDP in 2010 could put increasing pressure on the ability of the Bank's existing borrowers to repay their loans.***

The Government expects the growth of Kazakhstan's GDP to remain slow throughout 2010 as a result of the slow economic recovery, unpredictable commodity prices, volatility in the real estate market, reduced access to credit for both corporates and households and the general weakening of business and consumer confidence in Kazakhstan. The Bank expects that lower GDP growth will put increasing pressure on the ability of its current borrowers to repay their existing loans and could therefore increase the Bank's losses from non-performing loans, which could adversely affect the Bank's business, financial condition, results of operations and prospects.

***Concentration of the Bank's loan portfolio subjects it to risks from exposure to particular sectors of the Kazakhstan economy.***

As at 30 September 2009 and 31 December 2008, the Group's ten largest borrowers accounted for 15.2 per cent. and 14.0 per cent., respectively, of gross loans and advances compared to 11.0 per cent. as at 31 December 2007. Although the Group's level of concentration in its lending base is relatively low when compared with its competitors, the Bank will need to monitor the concentration of its loan portfolio and if it does not do this effectively, its credit exposure could increase, which would have a material adverse effect on the Bank's business, results of operations and financial condition.

***Volatility in the real estate market in Kazakhstan has had and may continue to have an adverse effect on the Bank's asset quality and collateral value.***

Real estate prices in Kazakhstan and Russia, which increased rapidly from 2002 to 2007, have dropped sharply since June 2007 in Kazakhstan and 2008 in Russia. Such volatility in the real estate

market has had and may continue to have an adverse effect on the Bank's business, financial condition, results of operations and prospects.

Of the loans to the Group's ten largest borrowers, 37.0 per cent. were made to borrowers in the real estate sector (civil construction and real estate operations) as at 30 September 2009. In addition, a substantial number of the Bank's loans to customers are secured by real estate. As at 30 September 2009, 24.9 per cent. of net loans to customers of the Bank on an unconsolidated basis were collateralised by real estate. The recent declines in the price of real estate in Kazakhstan have increased the price volatility and consequently made it difficult to value certain collateral held by the Bank. The collateral value ultimately realised by the Bank in the event of foreclosure of these customer loans will depend on the fair value as determined at that time and may be materially different from the current or estimated fair value. Also, the real estate market in Kazakhstan suffers from low liquidity and the Bank may be unable to liquidate its real estate collateral in a reasonably short time frame. As a result, in the event that a portion of the Bank's loans to customers secured by real estate go into default, the Bank may not be able to recoup the full value of the loan by taking ownership and disposing of the underlying real estate, which may result in a material adverse impact on the Bank's results of operations and financial condition.

***The continuing decline in value of the Group's loan portfolio will likely lead to a gradual seasoning of the Group's loan portfolio which may increase the proportion of loan defaults.***

Because corporate banking relationships are relatively mature in Kazakhstan, the value of the Group's net loan portfolio decreased by 31.5 per cent. to KZT 1,107,241 million as at 30 September 2009 from KZT 1,617,063 million as at 31 December 2008, which in turn represented a decrease of 32.1 per cent. from KZT 2,379,810 million as at 31 December 2007. As the Group's loan portfolio is expected to continue to decline in value, it is likely to lead to a gradual seasoning of the Group's loan portfolio, with the concentration of older loans in the portfolio becoming more significant. There is some evidence that the likelihood of borrower default increases with the age of a loan. Therefore, as a result of the expected gradual seasoning of its loan portfolio, the Group could experience a further increase in the percentage of its loans which are non-performing after the Restructuring which could adversely affect the Bank's business, financial condition, results of operations and prospects.

***The Bank faces significant competition, which may increase in the future.***

The Bank is subject to significant competition from both domestic and foreign banks. As at 1 March 2010, there were 37 commercial banks in Kazakhstan (excluding Zhilstroysberbank), of which 19 were banks with foreign shareholders, including the subsidiaries of foreign banks. In addition, regulatory changes may make it easier for foreign banks to increase their market presence in Kazakhstan. As at 1 March 2010, the Bank's net assets constituted 17.0 per cent. of the total assets of the banking system in Kazakhstan.

There are relatively few large corporate customers that do not have established banking relationships, which means that competition is intense in the corporate sector.

In the past, the Bank has faced competition primarily from banks which focus on the corporate banking market, including Kazkommertsbank and ATF Bank. According to the FMSA, as at 1 March 2010, the Bank is currently the largest bank in Kazakhstan, as measured by the aggregate gross value of loans issued. As a result of the ongoing financial crisis, the Bank faces greater competition from other banks as larger banks in more stable financial positions will aim to increase their market shares in all sectors of the market. In particular, the Bank faces competition attracting and retaining individual depositors.

***Any failure of, interruption in, or breach of, the Bank's information systems, or any failure to properly implement or update such systems, may have a material adverse effect on the Bank's business, results of operations and financial condition.***

The Bank's information technology strategy focuses on the integration of its business needs and information technology capabilities, while maintaining cost effective and safe systems.  In recent years, the Bank has built a highly productive and reliable technology environment, located in two data centres in Almaty.  The Bank has also developed and implemented disaster recovery and backup strategy.  The Bank is certified under ISO 27001, an international quality standard.

The Bank relies heavily on information systems to conduct its business.  However, it has currently suspended implementation of non-critical information technology projects and implemented a moratorium on the purchase of property and equipment.  There can be no assurance that the Bank will resume implementation of these projects, that implementation of improved information technology systems, if resumed, will be developed according to schedule, that the new systems will address any shortcomings of the current systems or that they will be sufficient to meet the needs of the Bank's rapidly growing and changing business.

Due to the Bank's financial condition, the Bank has stopped work on the implementation of the new core banking system.  Despite the fact that the existing systems can handle the current volume of operations and have substantial reserves for processing as reflected in the Bank's business plan for the period until 2014, there is a risk that competitors may develop their information technologies faster and more successfully than the Bank.

Due to the degree of penetration of information technologies in the business processes of the Bank, any failure of, interruption in, or breach in security of, the Bank's systems could result in failures or interruptions in the Bank's risk management, deposit servicing and/or loan origination systems or errors in its accounting books and records.  The occurrence of any failures or interruptions or the failure to properly implement or upgrade any of the Bank's information technology systems could have a material adverse effect on the Bank's business, results of operations or financial condition.  Furthermore, the location of both of the Bank's data centres in Almaty subjects the Bank to risk of loss due to destruction from earthquakes.

***The Bank's risk management strategies and techniques expose the Bank to a number of unidentified or unanticipated risks.***

Although the Bank expects to invest substantial time and effort in improving and monitoring its risk management strategies and techniques, it may nevertheless fail to adequately manage risks under certain circumstances, particularly when it is confronted with risks that it has not identified or anticipated.  If circumstances arise that the Bank has not identified or anticipated in developing its statistical models, its losses could be greater than expected.  If its measures to assess and mitigate risk prove insufficient, or if its models yield inaccurate results or incorrect valuations, the Bank may experience material unexpected losses.  For example, assets that are not traded on public trading markets, such as derivative contracts between banks, may be assigned values using mathematical models which may be inadequate or imperfect and the values they generate may be incorrect.  The deterioration in value of assets like these could lead to losses that the Bank has not anticipated.

***The Bank is exposed to interest rate and foreign currency exchange risk and has significant exposure to foreign currency exchange rate fluctuations following the early termination of its swap transactions.***

The Bank, like other commercial banks in Kazakhstan, is exposed to risks resulting from mismatches between interest rates on its interest bearing liabilities and interest earning assets as well as risks resulting from fluctuations in the prevailing foreign currency exchange rates.

Between 2005 and 2008, the Group hedged its foreign currency and interest rate risks using cross-currency swaps and interest rate swaps.  As at 31 December 2008, the Group had cross-currency

swap transactions concluded with foreign banks with a total notional amount of KZT 136,115 million and interest rate swap transactions with foreign banks for a total notional amount of KZT 462,318 million.

In the first half of 2009, nearly all of the Group's cross-currency swap counterparties exercised their right to terminate the swaps early, as a result of which the Group incurred a total loss of KZT 2,210 million.  The Group's foreign currency exchange exposure increased immediately after the early termination of the cross-currency swaps.  Currently the Bank has significant exposure to foreign currency exchange rate fluctuations because it has not entered into new hedges.  The Bank anticipates that following the completion of the Restructuring it will enter into transactions to hedge against foreign currency exchange risk in order to comply with the NBK's and the FMSA's requirements related to the open foreign currency position of the Bank as required by the terms and conditions of the New Notes.

The notional amount of the Bank's interest rate swaps also decreased during the same period, by 48.3 per cent. from KZT 462,318 million as at 31 December 2008 to KZT 238,800 million as at 30 September 2009.

***The Bank's credit dossiers have serious gaps and many documents are missing.***

Regulations of the FMSA and the Bank's internal regulations set out certain requirements when creating credit dossiers in respect of borrowers of a bank.  See "*Asset and Liability Management — Lending Policies and Procedures — Credit Dossiers*".  In the course of its due diligence, the Bank's management has uncovered a significant number of purported loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or nonexistent.  In the Financial Statements for the year ended 31 December 2008 and the FMSA report provided in January 2009, the Bank and the FMSA, respectively, each noted that certain loan documentation, including collateral and associated agreements, primarily relating to financing of projects outside Kazakhstan, was no longer available.  The Bank attributes many of these gaps and missing documents to fraud and to the fact that, prior to February 2009, the credit dossiers for transactions involving purported projects outside Kazakhstan had been compiled on behalf of the Bank by associate banks such as BTA Russia and BTA Ukraine.  The Bank believes that there is a significant risk that, as these associate banks were and still are under the effective control of the previous management of the Bank, a number of documents may not become available to the Bank and that the veracity of documents which are or become available may be questionable.  Furthermore, deficiencies exist in the credit dossiers compiled by the Bank itself.  See "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*".  These gaps in credit dossiers seriously impede the Bank's ability to investigate and, if necessary, to issue claims relating to these purported loans.

***The Bank's success is dependent on the continued service of its key personnel and it may not be able to retain such personnel.***

The Bank appointed new senior management in 2009 to oversee implementation of its strategy and its day-to-day operations.  The banking industry is relatively new in Kazakhstan and there are a limited number of experienced banking managers in the country.  There is also a high level of competition for the services of these individuals.  While the Bank believes it has been successful in attracting skilled and motivated employees and officers, it may be at risk of losing qualified personnel in this increasingly competitive environment.  The loss of the Bank's senior management for any reason could have a material adverse effect on the Bank's business, results of operations and financial condition.

**Risks Relating to Operating within the Kazakhstan Banking Sector**

***It is not possible to predict the full impact on the Bank of the financial stability laws in Kazakhstan, which are currently in the early stages of implementation.***

On 23 October 2008, the Kazakhstan Parliament adopted the law "Introduction of Amendments and Addendums into certain Legislative Acts of the Republic of Kazakhstan Governing the Stability of the Financial System."  The law introduced numerous amendments to the Banking Law, the JSC Law and the Securities Market Law.

The main objectives of this new law are to improve mechanisms for the early detection of risks in the financial system, to provide powers to the Government to acquire shares in commercial banks that face financial problems and to generally improve the condition of financial institutions in Kazakhstan. The law also consolidates authority to oversee large second-tier Kazakhstan banks and provides additional mechanisms for supervising commitments made by banks and other financial institutions.

Under the new law, in the event of (i) a breach by a bank of capital adequacy or liquidity ratios or (ii) two or more breaches by a bank in any 12-month period of any other prudential or other mandatory requirements, the Government may, with the agreement of the FMSA, acquire, either directly or through the national management holding company (currently, Samruk-Kazyna), the authorised shares of such bank to the extent necessary (but not less than 10 per cent. of the total amount of issued and outstanding shares of such bank, including those to be acquired by the Government or the national management holding company) to improve such bank's financial condition and ensure compliance with prudential or other mandatory requirements.  The new law provides that capital increases required in order to accomplish such an acquisition do not require approval of the shareholders or the management and the existing shareholders of an affected bank do not have pre-emptive rights in relation to the newly issued shares.  Following such an acquisition, the state body authorised to manage state property, or the national management holding company, is authorised to appoint no more than 30 per cent. of the members of the board of directors and the management board of the affected bank.

Should the financial status of the affected bank improve resulting in compliance with prudential norms, the Government may take measures to sell the acquired shares by way of a direct addressed sale or auction at the stock exchange.  The financial system stability law is currently in the early stages of its implementation and it is not possible to predict its full impact on the Bank.

***Changes in the liquidity support for the Kazakhstan banking sector may have an adverse impact on the Bank.***

The NBK and the Government have taken steps, including the provision of short term liquidity support, to protect the Kazakhstan banking sector from the recent turmoil in the financial markets. Starting in the second half of 2008, the NBK adopted a number of measures aimed at providing additional liquidity to the banks.  In particular, with effect from 3 March 2009, the minimum level at which second tier banks must maintain reserves has been decreased from 2.0 per cent. to 1.5 per cent. with respect to domestic liabilities and from 3.0 per cent. to 2.5 per cent. with respect to other liabilities.  On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement applicable to the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until the Restructuring process is finalised.

Additional measures taken include the deposit into local commercial banks, of temporary excess cash of national companies, enterprises and joint stock companies which are wholly or partially owned by the State or controlled by the NBK and the establishment by the Government of a Distressed Assets Fund to buy doubtful assets of commercial banks.

If the NBK and the Government were to withdraw their liquidity support it would lead to decreased overall liquidity in the Kazakhstan banking sector.  This decreased liquidity would likely result in an

increase in the Bank's funding costs which would adversely affect the Bank's business, financial condition, results of business and prospects.

***Risks resulting from failures in Kazakhstan's banking industry could adversely affect the Bank.***

Since the peak of the banking crisis at the beginning of 2009, Alliance Bank, Temirbank and the Bank, which jointly owned 35.6 per cent. of the total assets of the banking system in Kazakhstan as at 1 January 2009, have defaulted on their contractual payments and breached certain regulatory requirements of the FMSA.  Astana Finance, which is a non-bank financial holding company that owns companies that provide lease financing and commercial and residential mortgages and is more than 26 per cent. owned by the state, announced a moratorium on the repayment of its debt in May 2009.

In April 2010, the Court issued an order confirming the completion of Alliance Bank's restructuring, making Alliance Bank the first bank in Kazakhstan to complete its restructuring.  Temirbank has announced that its restructuring plan was approved on 31 March 2010 by the requisite majority of its creditors.  The Kazakhstan banking system remains under stress with banks seeking to deleverage through partial repayments and debt restructurings.  Further defaults and debt restructuring cannot be ruled out.  This could in turn have an adverse effect on the Restructuring and the Bank's ability to receive support from Samruk-Kazyna, as the Government's resources may become strained and the Government may be required to allocate support and funds selectively.

***The ongoing crisis in the global financial markets and deterioration of general economic conditions have adversely affected the Bank's results of operations and financial condition and could continue to cause them to decline.***

The global economy and the global financial system have experienced a period of significant turbulence and uncertainty in recent years, particularly the severe disruption of the financial markets around the world that began in August 2007 and that has substantially worsened since September 2008 with adverse consequences for many large global commercial and investment banks, insurance companies and other financial institutions.  This disruption has severely impacted general levels of liquidity and the availability of credit together with the terms on which credit is available.  Governments around the world, including that of Kazakhstan, have sought to inject liquidity into banking systems and to recapitalise their banking sectors to reduce the risk of systemic failure and increase confidence in the financial markets.

This market disruption has also been accompanied by a slowdown in many economies including that of Kazakhstan.  These developments have already adversely affected the Bank's earnings and profits.  Continued general deterioration in the world economy, including plummeting production and services, business and consumer confidence, plunging pace of growth of household income, unemployment trends, the state of the housing market, the commercial real estate sector, equity markets, bond markets, foreign exchange markets, counterparty risk, inflation, the availability and cost of credit, lower transaction volumes in key markets, the liquidity of the global financial markets and market interest rates, would further reduce the level of demand for, and supply of, the Bank's products and services, would lead to lower realisations as well as writedowns and impairments of investments and negative fair value adjustments of assets, and could materially and adversely impact the Bank's operating results, financial condition and prospects.

The Kazakhstan banking sector has been particularly affected by the lack of availability of international wholesale debt financing and the volatility of deposits.  Kazakhstan banks have previously heavily relied on such financing and deposits as a source of funding.  The high dependence on capital market funding poses a significant refinancing risk for both individual banks and the banking system as a whole.  Wholesale debt financing has now become significantly more expensive.  If the availability of international wholesale debt financing continues to be limited or available at significantly higher costs or if the Bank suffers from increased volatility of its deposit base, this could adversely affect the Bank's business, financial condition, results of operations and prospects.  The

effect of any of these conditions may be exacerbated by the deterioration of the financial condition of other banks in Kazakhstan.

The full range and consequences of the risks faced by the Bank are difficult to predict and guard against in view of the fact that many of those risks are either partially or entirely outside the control of the Bank and may be exacerbated by the severity of the financial crisis.

***The Bank faces increased risks related to the devaluation of the Tenge.***

A large proportion of the Bank's funding base is made up of borrowings in currencies other than Tenge whereas the vast majority of its income is in Tenge. While the proportion of the Bank's funding base denominated in currencies other than Tenge will decrease after the Restructuring, it will remain significant.

On 4 February 2009, the NBK reduced its level of support for the Tenge/U.S. Dollar exchange rate from KZT 117 — KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.). This devaluation was due in part to recent pressure on the balance of payments of Kazakhstan as a result of a decline in commodity prices (in particular oil and gas) in the international markets. The devaluation of the Tenge was also intended to enhance the competitiveness of Kazakhstan goods in the export market. From 5 February 2010 a new exchange rate corridor began to operate. In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and -15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar). This policy decision makes the Tenge/U.S. Dollar exchange rate more difficult to predict in the immediate future and could lead to a further devaluation of the Tenge.

This devaluation increased the cost of foreign borrowings for the Bank. Further, the devaluation of the Tenge will likely affect the Bank's costs as the majority of the Bank's funding base is denominated in U.S. Dollars, whereas income from its loan portfolio is typically denominated in Tenge. A further devaluation or depreciation of the Tenge against the U.S. Dollar or other foreign currencies could negatively affect the Bank in a number of ways, including, among other things, by causing a further outflow of Tenge deposits, by increasing the actual cost to the Bank of financing its U.S. Dollar denominated liabilities and by making it more difficult for Kazakhstan borrowers to service their U.S. Dollar loans. Any of these developments may have a material adverse effect on the Bank's business, financial condition and results of operations.

***The lack of accurate statistical, corporate and financial information in Kazakhstan may limit the ability of the Bank to assess its credit risks accurately.***

Kazakhstan's system for gathering and publishing statistical information relating to the Kazakhstan economy generally, or specific economic sectors within it, or corporate or financial information relating to companies or other economic enterprises, is not as comprehensive as those of many countries with established market economies. Moreover, the Bank's customers, particularly in the SME sector, may not have detailed financial information regarding their creditworthiness. Under-reporting of income in Kazakhstan, which is common, also makes it more difficult for the Bank to make accurate credit assessments. Thus, the statistical, corporate and financial information, including annual financial statements and recognised debt rating reports, available to the Bank as well as other Kazakhstan banks relating to prospective and existing corporate borrowers or other clients makes the assessment of credit risk, including the valuation of collateral, more difficult. Although the Bank ordinarily estimates the net realisable value of collateral in determining any collateralisation requirements, the difficulties associated with accurately assessing the post-enforcement value of collateral may result in the Bank extending loans without the necessary collateral to support them.

The First Credit Bureau is a private company that was created on 29 July 2004 by the Bank, Kazkommertsbank, Bank CenterCredit, Halyk Bank, Tsesna Bank, ATF Bank, Alliance Bank, Astana Finance and the Association of Financiers of Kazakhstan pursuant to the "Law on Credit Bureaus and

Credit History" of Kazakhstan dated 6 July 2004.  The First Credit Bureau manages a database containing the credit histories of individuals and legal entities in Kazakhstan.  The FMSA requires all credit institutions to provide information about their borrowers to the First Credit Bureau.  Commercial banks can then purchase information about potential or existing borrowers from the First Credit Bureau.  The First Credit Bureau charges a case-by-case fee on each request made by a bank for information depending on the amount of detail requested by the bank with respect to the individual borrower.  Although the FMSA's requirement to provide information to the First Credit Bureau should ensure that the Bureau's records are comprehensive and up to date, there can be no assurance that all banks do indeed comply with this requirement or that the information is ultimately accurate and reliable.

***Banking regulations in Kazakhstan are not as developed as in many Western countries and any further changes thereto might adversely affect the Bank's business.***

The Bank operates in a highly regulated environment.  However, like most of Kazakhstan's legislation regarding business activities, Kazakhstan's laws regarding banks and banking activities have been adopted only relatively recently and are subject to change, which could be rapid and unexpected.  It is difficult to forecast how changes in banking and financial regulation may affect the Kazakhstan banking system, and no assurance can be given that the regulatory system will not change in a way that will impair the Bank's ability to provide a full range of banking and financial services, thus materially and adversely affecting the Bank's financial condition or results of operations.

In addition, Claimants should understand that regulatory standards applicable to banks in Kazakhstan and the oversight and enforcement thereof by the relevant regulators may differ from those applicable to banking operations in countries with more developed regulatory regimes.  As a result, Claimants may not have the benefit of all of the protections available in such other countries.

In February 2007, to reduce the risks associated with rapid growth in the external debt of Kazakhstan banks, the FMSA introduced certain amendments to Kazakhstan's capital adequacy regulations.  These regulations limit the total amount of foreign borrowings which a bank may incur to a multiple of such bank's regulatory capital.  Although the Bank fully complies with those particular regulations as of the date hereof, this limitation on the Bank's ability to access foreign lenders and the international capital markets may adversely affect the Bank's ability to secure adequate financing in the future.  See "*The Banking Sector in Kazakhstan*".

The future implementation by the FMSA of the recommendations of the Basel II Report may impose constraints on the Bank's business which may materially and adversely affect the Bank's business and financial condition or results of operations.  See "*The Banking Sector in Kazakhstan — Banking Supervision*".

**Risks Relating to Kazakhstan**

***Kazakhstan is subject to the risks associated with emerging markets generally.***

Emerging markets such as Kazakhstan are subject to greater risk than more developed markets, including in some cases significant legal, economic and political risks.  Claimants should also note that emerging economies such as that of Kazakhstan are subject to rapid change and that the information contained in this Information Memorandum may become outdated relatively quickly.  Accordingly, Claimants should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their decision is appropriate.  Claimants are urged to consult with their own legal and financial advisers before making any decision with respect to the Restructuring.

In addition, the availability of credit to entities operating within the emerging markets is significantly influenced by the level of investor confidence in such markets as a whole and as such any factors that affect investor confidence (for example, a decrease in credit ratings or state or central bank

intervention in one market) could affect the price or availability of funding for entities within any of these markets.

***The Kazakhstan corporate governance and disclosure laws which apply to the Bank are different from those generally applicable to corporations organised in the United States, the United Kingdom and other jurisdictions.***

The Bank's governance is regulated by the laws governing companies incorporated in Kazakhstan and by the Bank's Charter and Corporate Governance Code.  The Bank's corporate governance policies were not particularly sophisticated in the past, which contributed to deficiencies in the Bank's internal control and credit system.  See "*Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  The corporate governance regime in Kazakhstan is less developed than that in the United States and the United Kingdom and the rights of shareholders and the responsibilities of members of the board of directors and the management board under Kazakhstan law are different from those generally applicable to corporations organised in the United States, the United Kingdom and other jurisdictions.

A principal objective of the securities laws of the United States, the United Kingdom and certain other countries is to promote the full and fair disclosure of all material corporate information to the public. Although the Bank is subject to certain disclosure requirements under Kazakhstan law, these requirements are less stringent than the comparable requirements in the United States, the United Kingdom and certain other jurisdictions and, therefore, there is less information publicly available about the Bank than would be required if the Bank were organised in the United States, the United Kingdom or certain other jurisdictions.

The Government has stated that it intends to continue to reform the corporate governance regulations with a view towards increasing disclosure and transparency in the corporate sector in order to promote growth and stability.  However, the Government may not continue to pursue such a policy in the future or such policy, if continued, may not ultimately prove to be successful.  It is not possible to predict the effect of future legislative developments on the Bank.

The Bank is in the process of improving its corporate governance and will adopt a New Corporate Governance Code on or before the Restructuring Date.  The New Corporate Governance Code will include provisions on the role and responsibilities of the members of the Board of Directors, their selection procedures and the monitoring of their performance, the Bank's internal controls and risk management and the Bank's disclosure and reporting obligations to its shareholders following the Restructuring.  Following the Restructuring, the Bank will also arrange for an annual audit of the Bank's corporate affairs and governance policies by an Independent Auditor and remedy any identified non-compliance within six months of the date of such audit report.

While the planned improvements should bring the Bank's corporate governance standards closer to those in the United States and the United Kingdom, there can be no assurance that such amended governance standards will prove to be effective or that they will be implemented in a proper manner.

***The Bank may be subject to money laundering risks.***

The existence of "black" and "grey" market economies in Kazakhstan (typical in developing countries), inconsistent legislation and the lack of administrative guidance on its interpretation increase the risk of Kazakhstan's financial institutions being used as vehicles for money laundering.

The Parliament of Kazakhstan has recently adopted the Law of the Republic of Kazakhstan On the Prevention of Legalisation (Laundering) of Illegal Income and Terrorism Financing No. 191-IV dated 28 August 2009.  This law became effective on 8 March 2010.

The new law identifies various types of transactions that will be subject to financial monitoring and establishes thresholds for each of them, such as (i) exchanges of cash equalling or exceeding the equivalent of KZT 7 million, (ii) withdrawing funds from, or crediting funds to, bank accounts

equalling or exceeding the equivalent of KZT 7 million, (iii) insurance payments equalling or exceeding the equivalent of KZT 7 million, (iv) transactions in securities or immovable property equalling or exceeding the equivalent of KZT 45 million and (v) receiving funds, including in electronic form, through the proceeds of betting, gambling in a gaming establishment or lottery equal to or more than the equivalent of KZT 1 million. Banks, pension funds, insurance and reinsurance companies and certain other financial institutions and individuals are obliged to monitor any such transactions entered into by their clients by conducting due diligence as outlined in the law with respect both to the clients and the transaction. If it is not possible to conduct such due diligence, the financial institution must prevent their clients from entering into such a transaction. The law requires any suspicious transaction to be reported to an authorised state body within 24 hours.

The Bank has implemented measures aimed at preventing it from being used as a vehicle for money laundering, including "know your client" policies and the adoption of anti-money laundering and compliance procedures in all its branches. In particular, the Bank has created an office for the introduction of a financial monitoring and internal control system whose task is to develop an appropriate program to verify clients and other persons participating in bank operations, and a procedure for working with foreign public officials, to identify suspicious operations and operations requiring financial monitoring, and to provide training to employees of the Bank on anti-money laundering and financial terrorism issues. The Bank is currently not establishing business relationships with non-resident banks that do not have constantly active management bodies in the countries in which they are registered, is not opening accounts for potential clients who do not submit the necessary identification documents, and is closely monitoring relationships with residents of countries that have not fulfilled the Financial Action Task Force recommendations in full.

However, there can be no assurance that attempts to launder money through the Bank will not be made or that anti-money-laundering measures implemented by the Bank will be effective. If the Bank were associated with money laundering, albeit only through the failure of its anti-money laundering measures, or if it were unable to comply with all of the relevant laws and internal policies regarding financial assistance or money laundering, it could be subject to significant fines as well as harm to its reputation, and its business, financial condition and results of operations may be materially and adversely affected.

***Most of the Bank's operations are conducted, and most of its assets are located, in Kazakhstan. Accordingly, the Bank's financial position and its results of operations are substantially dependent on the legal, economic and political conditions prevailing in Kazakhstan.***

Kazakhstan became an independent sovereign state in 1991 as a result of the dissolution of the former Soviet Union. Since then, Kazakhstan has undergone significant change as it has emerged from a single party political system and a centrally controlled command economy to a market oriented, democratic model. The transition was initially marked by political uncertainty and tension, a recessionary economy marked by high inflation, instability of the local currency and rapid, but incomplete, changes in the legal environment.

Since 1992, Kazakhstan has actively pursued a programme of economic reform designed to establish a free market economy through privatisation of state enterprises. However, as with any transition economy, there can be no assurance that such reforms and other reforms described elsewhere in this Information Memorandum will continue or that such reforms will achieve all or any of their intended aims. Kazakhstan depends on neighbouring countries to access world markets for a number of its major exports, including oil, gas, steel, copper, ferro alloys, iron ore, aluminium, coal, lead, zinc and wheat. Kazakhstan is thus dependent upon good relations with its neighbours to ensure its ability to export and has taken various steps to promote regional economic integration among neighbouring countries. In September 2003, Kazakhstan signed an agreement with Ukraine, Russia and Belarus for the creation of a single economic zone, which was expected to result in common economic policies, harmonisation of legislation implementing such policies and the creation of a single commission on trade and tariffs. However, in practice this agreement has proved difficult to implement, particularly since the first half of 2008, when Ukraine's joining of the World Trade Organisation effectively

precluded it from joining this single economic zone.   Negotiations nevertheless continued on integrating the policies and legislation of the CIS countries and in 2009, Kazakhstan, Russia and Belarus created a customs union.   The aim of this customs union is to create a free customs area within which member countries would enjoy free movement of goods, services, capital and labour. The member countries also intend to harmonise their fiscal, credit and currency policies to support further economic integration with the CIS countries and to assure continued access to export routes. However, should access to export routes be materially impaired, this could adversely affect the economy of Kazakhstan.   Moreover, adverse economic factors in the markets of such member countries may adversely affect Kazakhstan's economy.

Although Kazakhstan has in the recent past enjoyed relative political stability, it could be adversely affected by political unrest in the Central Asian region.   Additionally, in common with other countries in Central Asia, Kazakhstan could be adversely affected by terrorism or by military or other action taken against sponsors of terrorism in the region.

According to figures compiled by the NSA, GDP grew in real terms following the adoption of a floating exchange rate policy in April 1999, increasing by 13.5 per cent. in 2001, 9.8 per cent. in 2002, 9.3 per cent. in 2003, 9.6 per cent. in 2004, 9.7 per cent. in 2005, 10.7 per cent. in 2006 and 8.9 per cent. in 2007. In 2008, GDP increased by only 3.3 per cent.  According to preliminary NSA data, GDP increased by 1.2 per cent. in 2009.

The beginning of 2010 saw certain positive economic signs: for instance, the rate of GDP growth for the first two months of 2010 according to preliminary data of the NSA was 6.4 per cent. higher than for the equivalent period of 2009.   However, the Kazakhstan economy remains heavily dependent upon the prices of commodities on world markets, which are currently volatile.

According to estimates of the NBK and the Government, a further reduction in inflation pressures is not expected for the remainder of 2010.   A planned rise in wages, social benefits and pensions may raise consumer demand.   In addition, it is conceivable that certain types of imported products could become more expensive because of a rise in customs duties on imports introduced as a result of the creation of the customs union between Kazakhstan, Russia and Belarus.   Although the condition of the financial market in Kazakhstan is expected to gradually improve throughout 2010, there is unlikely, given the lingering economic and financial risks, to be a sharp increase in the credit activity of banks or a material improvement in the quality of their credit portfolio, and the further development of the economy of Kazakhstan will depend on a variety of factors.   Were the economic situation to deteriorate further, consequences would include higher unemployment, reduced corporate profitability, increased corporate insolvency rates, increased personal insolvency rates and increased interest rates.   This in turn may reduce borrowers' ability to repay loans, cause prices of residential or commercial real estate or other asset prices to fall further, thereby reducing the value of the collateral securing many of the Bank's loans and increasing writedowns, and negatively affect the ability and willingness of companies and individuals to place deposits with domestic banks, including the Bank.

***The Kazakhstan economy is highly dependent on oil exports and, as a result, is affected by oil price volatility.***

Countries in the Central Asian region, including Kazakhstan, whose economies and state budgets rely in part on the export of oil, oil products and other commodities as well as the import of capital equipment and significant foreign investments in infrastructure projects, could be adversely affected by volatility in oil and other commodity prices and by any sustained fall in them or by the frustration or delay of any infrastructure projects caused by political or economic instability.   In addition, any fluctuations in the value of the U.S. Dollar relative to other currencies may cause volatility in earnings from U.S. Dollar denominated oil exports.   An oversupply of oil or other commodities in world markets or a general downturn in the economies of any significant markets for oil or other commodities or weakening of the U.S. Dollar relative to other currencies would have a material adverse effect on the Kazakhstan economy, which would, in turn, have an adverse effect on the business, financial condition and results of operations of the Bank.

The sharp drop in world prices for oil and other commodities since mid-2008 has had a negative impact on the growth prospects of the Kazakhstan economy.

The national budget for 2009–2011 initially projected revenues on the basis of world oil prices of U.S.$60 per barrel.  These projections have been subsequently revised to U.S.$40 per barrel in light of the continuing decline in world oil prices.  Although oil prices have recovered for the time being, there can be no assurance that further revisions of the national budget will not be required in light of continuing oil price volatility.

***The Kazakhstan regulatory and tax regime, as well as the judicial system, are not fully developed and therefore are unpredictable.***

Although a large volume of legislation has come into force since early 1995 (including a new tax codes in January 2002 and 2009 and laws relating to foreign arbitration in 2004, additional regulation of the banking sector and other legislation covering such matters as securities exchanges, economic partnerships and companies, state enterprise reform and privatisation), the legal framework in Kazakhstan is still in a relatively early stage of development compared to countries with established market economies.  The judicial system, judicial officials and other government officials in Kazakhstan may not be fully independent of external social, economic and political forces.  There have been instances of improper payments being made to public officials, administrative decisions have been inconsistent, and court decisions have been difficult to predict.

Further, due to numerous ambiguities in Kazakhstan's commercial legislation, in particular in its newly adopted tax legislation, the tax authorities may make arbitrary assessments of tax liabilities and challenge previous tax assessments, thereby rendering it difficult for companies to ascertain whether they are liable for additional taxes, penalties and interest.  As a result of these ambiguities, as well as the lack of any established system of precedent or consistency in legal interpretation, the tax risks involved in doing business in Kazakhstan are substantially more pronounced than in jurisdictions with a more developed tax system.

Although the Bank will obtain a letter from the Kazakhstani tax authorities with respect to the tax treatment of certain aspects of the Restructuring, such tax rulings are non-binding on the Kazakhstani tax authorities and, therefore, there can be no assurance that such authorities will not change the tax treatment of the restructuring and the structure of the New Instruments in a way that might adversely affect the interests of the Bank and of its creditors.

The Government may increase corporate tax rates in the future in order to address its budget deficit and, if it does so, such measures may result in significant additional taxes becoming payable.  Additional tax exposure could have a material adverse effect on the Bank's business and financial condition and on the results of operations of companies operating in Kazakhstan.  The new Tax Code, which entered into force on 1 January 2009, introduced numerous changes to the existing tax regime and it is not clear how this new legislation will be interpreted and applied.

***There are risks associated with the underdevelopment of Kazakhstan's securities markets.***

Kazakhstan has a less developed securities market than the United States, the United Kingdom and the rest of Western Europe, which may hinder the development of the Kazakhstan economy.  An organised securities market was established in Kazakhstan only in the mid to late 1990s and the procedures for settlement, clearance and registration of securities transactions may therefore be subject to legal uncertainties, technical difficulties and delays.  Although significant developments have occurred in recent years, the sophisticated legal and regulatory frameworks necessary for the efficient functioning of modern capital markets have yet to be fully developed in Kazakhstan.  In particular, legal protections against market manipulation and insider trading are not as well developed in Kazakhstan, or as strictly enforced, compared to the United States, the United Kingdom and the other Western European countries, and existing laws and regulations may be applied inconsistently.

*Kazakhstan's president, Nursultan Nazarbaev, has been in office since 1991 and, if he were to step down, Kazakhstan could become unstable.*

Kazakhstan's president, Nursultan Nazarbaev, has been in office since Kazakhstan became an independent sovereign state in 1991.  Under President Nazarbaev's leadership, the foundations of a market economy have taken hold, including the privatisation of state assets, liberalisation of capital controls, tax reforms and pension system development.  President Nazarbaev was re-elected for his most recent term of office in December 2005.  In May 2007, Kazakhstan's Parliament voted to amend Kazakhstan's constitution to allow President Nazarbaev to run in an unlimited number of elections.  While this amendment will allow President Nazarbaev to seek re-election at the end of his current term, there is no guarantee that he will remain in office.  Should he not complete his current term of office or should a new president be elected at the next election, Kazakhstan's political situation and economy could become unstable and the investment climate in Kazakhstan could deteriorate, which would have a material adverse effect on the Bank's business, results of operations and financial condition.  Conversely, although President Nazarbaev's remaining in office may contribute to stability in Kazakhstan, the constitutional amendment in May 2007 has raised some concerns regarding the democratic nature of reforms.  A lack of confidence in Kazakhstan's government could threaten the country's economic stability, which could have a material adverse effect on the Bank's business, results of operations and financial condition.

**Risks Relating to the Restructuring**

*The Restructuring Law has not been substantially tested in practice and there can be no assurance that any restructuring effected under such legislation, including the Restructuring, will be recognised internationally.*

Prior to July 2009, there was no law in Kazakhstan allowing for creditors' claims on Kazakhstan finance institutions to be restructured without the consent of all affected creditors.  The restructuring process set out in the Restructuring Law is designed to be fair to the affected creditors.  However, as at the date of this Information Memorandum, it has only been fully tested once before with the completion of the restructuring of Alliance Bank in April 2010.  The restructuring of Temirbank is currently underway.

The central proposition of the Restructuring Law is that creditors holding at least two-thirds of a bank's obligations by value subject to the restructuring may, through a fair and transparent process, approve a restructuring plan and that this approval will ultimately bind dissenting minority creditors.  In the meantime a compulsory restructuring arrangement will not bind foreign creditors in respect of assets held outside of Kazakhstan unless the local Kazakhstan restructuring is recognised in the countries where such creditors or assets are located.  Thus foreign creditors not wishing to participate in a restructuring may set off their claims against the Bank's assets or bring litigation in any jurisdiction where any of those assets are located.

The Restructuring Law was designed to be capable of international recognition in countries which have adopted legislation based on the Model Insolvency Law.  The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 April 2010 each issued an order recognising the Bank's restructuring proceedings in the Court as the main foreign proceeding in respect of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.  Furthermore, the Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October, 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.  The Bank also filed an application with the Moscow Court of Arbitration to obtain recognition in the Russian Federation of the ruling of the Court dated 16 October 2009 concerning the Restructuring.  However, there can be no assurance that the Restructuring, if approved, will be recognised by other courts abroad.  If the Restructuring is not capable of international recognition, the Bank's assets

outside Kazakhstan may be frozen by dissenting foreign creditors.  As a result, the Bank's business will be significantly affected and the Bank may be limited to entering into transactions only within Kazakhstan.

***Certain aspects of the Restructuring require the FMSA to take steps over which the Bank has no control and which could delay or frustrate the restructuring process.***

Under the Restructuring Law, if a restructuring plan has been approved by the requisite majority of the creditors, the FMSA reviews the plan to determine its conformity with the plan originally submitted for the FMSA's consideration.  Despite the FMSA's cooperation with the restructuring process to date, there can be no assurance that the FMSA will agree with a bank's restructuring plan in the form in which it is approved by the creditors.  Given that the Restructuring Law is in the early stages of implementation and there has only been one successful bank restructuring in Kazakhstan, that of Alliance Bank in April 2010, it is possible that the FMSA may take a substantial amount of time to familiarise itself with the Restructuring Plan or may have substantive comments to the Restructuring Plan, which would delay the restructuring process and could have a negative effect on the Bank's financial condition and the interests of the Claimants.

***Any indebtedness of the Bank cancelled as a result of the Restructuring may be subject to taxation in Kazakhstan if the Restructuring is not finalised by 1 January 2011.***

Under the current tax law of Kazakhstan, corporate income tax will not be assessed on the debt of a bank cancelled pursuant to the Restructuring during 2010.

Recent amendments to Kazakhstan tax legislation provide that for the purposes of calculation of taxable annual income during 2010, the Bank may exclude income from debt that is written off by its creditors *provided that* such debt is included in the list of restructured liabilities contained in the Restructuring Plan approved by the Court. Starting from 1 January 2011, the Bank may be required to record amounts for written off debt which is treated as a profit and may have to pay corporate income tax in respect of such amount.  Under the Tax Code, the applicable corporate income tax rate is 20 per cent. (this rate will be reduced to 17.5 per cent. from 1 January 2013 and 15 per cent. from 1 January 2014 onwards).

If the amount of the cancelled debt were to become subject to taxation, the Bank's capital following the Restructuring would likely be insufficient to meet the applicable capital adequacy requirements of the FMSA and the purposes of the Restructuring might not be achieved.

***The Base Case Model should not be relied upon as a forecast.***

The Base Case Model is a tool used by the Bank for illustrative modelling purposes, and no amounts included in it or derived from it should be construed as a forecast by the Bank or any other person of any results of the Bank.  The Bank accepts no responsibility for the Base Case Model or the Original Business Plan, and Claimants or investors should not form any decisions based upon either of these documents.

***The Bank has historically been unable to fund its operations and the Bank's substantial level of indebtedness after the Restructuring will significantly reduce available cash, impact its ability to obtain additional financing and limit its flexibility.***

The Bank historically has not been able to fund its operations and debt payment obligations and has therefore incurred substantial indebtedness.  After the Restructuring, on a *pro forma* consolidated basis, the Bank and its subsidiaries will have approximately KZT 717,704 million (or approximately U.S.\$4,755 million) of indebtedness outstanding as at 30 September 2009.  See "*Pro Forma Financial Information*".  The Bank's substantial consolidated level of indebtedness, and associated interest payment obligations, will:

●  limit its cash flow available for general corporate purposes, including any acquisitions;

- limit its ability to obtain necessary financing for working capital, capital expenditure or business opportunities and to implement its business strategies;

- limit its flexibility in reacting to competitive and other changes;

- expose it to the risk that a decrease in net cash flows due to economic developments or adverse developments in its business could make it difficult or impossible to meet senior debt payment obligations; and

- expose it to risks inherent in interest rate fluctuations.

Although interest payments will be significantly reduced after partial cancellation of the existing financial indebtedness of the Bank as a result of the Restructuring, it is possible that the Bank may continue to incur losses and may not achieve or sustain sufficient cash flow in the future for the payment of interest, principal and the meeting of expenditure needs or other purposes. If the Bank's cash flow is not sufficient to meet its expenses, debt payment obligations and other requirements, the Bank may be forced to raise cash or reduce expenses by doing one or more of the following:

- restructuring or refinancing its indebtedness prior to original maturity;

- delaying or reducing expenditures necessary to maintain its business and meet increased competition;

- disposing of some of its assets, possibly on unfavourable terms;

- revising or delaying the implementation of its strategic plans; or

- forgoing business opportunities.

The Bank could also be forced to seek additional equity capital, which could dilute the interests of the holders of its common shares. The Bank cannot be sure that any of the above actions would be sufficient to fund its operations in the future.

***The Bank's operations and financing activities will be restricted by covenants and undertakings in the Restructuring Documentation.***

The Restructuring Documentation to be entered into by the Bank will contain a number of significant restrictions and covenants that limit the Bank's and its subsidiaries' ability to:

- dispose of businesses or assets;

- enter into joint ventures, acquisitions, mergers and to incorporate subsidiaries;

- engage in intra-group lending or guarantees and related party lending or similar transactions;

- obtain new borrowings;

- pay dividends on common shares unless agreed conditions are satisfied; and

- enter into major transactions unless concluded at fair value and subject to certain conditions.

The Bank will be required to comply with specified financial ratios and performance covenants contained in the Restructuring Documentation. There will also be significant restrictions on the Bank's activities which could affect the Bank's ability to operate its business and may limit its ability to take advantage of potential business opportunities as they arise.

The Bank's ability to comply with the covenants and undertakings in the Deeds of Covenants and the Restructuring Documents will depend on a number of factors, including its operating performance and the level of interest rates, as well as other factors that it may have failed to anticipate or that are beyond its control.

If the Bank is unable to comply with the covenants and undertakings in the Deeds of Covenants or the Restructuring Documents, the Claimants could impose additional restrictions on the Bank or accelerate repayment of all amounts due under the New Notes.  If its indebtedness is accelerated, the Bank may not be able to repay its debt or borrow sufficient funds to refinance that debt.  In addition, any default under its New Notes, or agreements governing its other existing or future indebtedness, is likely to lead to an acceleration of indebtedness under any other debt instruments or loans that contain cross-acceleration or cross-default provisions.   If the indebtedness under the New Notes is accelerated, the Bank is unlikely to have sufficient assets to repay amounts due, or any other indebtedness then outstanding.

***Some provisions of the Restructuring Documents may discourage or prevent a takeover of the Bank, even if a takeover would be beneficial to its shareholders.***

The Restructuring Documents will include a number of provisions protecting the Bank's shareholders and creditors after the Restructuring if changes are made to the Bank's shareholding structure after the Restructuring.  Such provisions include granting a put option to holders of the Senior Notes and OID Notes if a Relevant Event occurs, granting tag-along rights to the Restructuring Creditors holding the Bank's equity after the Restructuring and granting drag-along rights to Samruk-Kazyna.   Such protections may have the effect of preventing an acquisition or merger in which the Bank is acquired and may discourage potential equity investors from investing in the Bank's shares.

***Adverse publicity relating to the Restructuring and the financial condition of the Bank may adversely affect the Bank's customer relationships and the market perception of its business.***

Adverse publicity relating to the Restructuring and the financial condition of the Bank may make it difficult to convince customers to maintain relationships with the Bank and to attract new customers, which could materially adversely affect the Bank's business.  Ongoing negative publicity may also have a long-term negative effect on the Bank's brand name, which could make it more difficult for the Bank to market its products and services in the future.

***Following the Restructuring, a significant percentage of the Bank's outstanding common shares may be held by a small number of shareholders who may have conflicts of interest.***

Following the Restructuring, it is anticipated that some of the Claimants will become significant shareholders of the Bank.  As a result of these relationships, if conflicts arise between the interests of these significant shareholders and the interests of the Bank's other shareholders, directors nominated by the affected significant shareholders may not be disinterested.  These shareholders may also from time to time make significant investments in other banks operating in Kazakhstan.  This may result in conflicts of interest.  Actions these shareholders take relating to those investments may conflict with the interests of the Bank and the Bank's other shareholders.

***Approval of the Restructuring is not assured and, even if Claimants approve the Restructuring Plan, there is a risk that the Restructuring may not be completed.***

The Restructuring is subject to a number of conditions and uncertainties, in addition to the approval of the Restructuring Plan by the Claimants, over which the Bank has limited control.  If any one of the conditions is not met, the Restructuring may not be completed, in which case the Claimants of the Bank may accelerate outstanding indebtedness, initiate bankruptcy proceedings and exercise other remedies.  Under these circumstances, the Bank may be forced into conservation or bankruptcy.

For additional information on the conditions to the completion of the Restructuring see Schedule 1 (*The Restructuring Plan*) to this Information Memorandum.

***If the Restructuring does not occur, the FMSA may institute proceedings for conservation or an insolvent liquidation of the Bank.***

The current management has been able to permit the Bank to continue to do business in large measure as a direct result of the continued support of the Bank's creditors (broadly, by not calling defaults or

accelerating their claims) and of the current management's belief that the Restructuring is likely to be implemented. However, the current management is not certain that the creditors will continue to refrain from declaring defaults if the Restructuring is not implemented or if it is not implemented in a timely manner. If the Bank loses the support of its creditors, the FMSA may be empowered to take certain actions in order to protect the Bank's assets for the benefit of the Bank's creditors pursuant to relevant legislation, including either conservation or insolvent liquidation.

Insolvency procedures would result in a sale of the Bank's assets. Proceeds from that sale would likely be insufficient to repay outstanding indebtedness to all classes of the Bank's creditors. Historically, institutional creditors and shareholders of banks that were liquidated through insolvency procedures in the Kazakhstan banking system have received no compensation as a result of such liquidation.

***The Bank has incurred, and will continue to incur, significant costs in connection with the Restructuring, substantially all of which must be paid regardless of whether the Restructuring occurs.***

The Bank has incurred significant costs in connection with the Restructuring and will continue to do so until the Restructuring is completed. These costs principally relate to fees payable to the Bank's financial, legal and accounting advisers as well as the advisers to significant stakeholders that have been affected by the Bank's need to restructure. Pursuant to the terms of engagement with these advisers, substantially all of these costs will be paid regardless of whether the Restructuring occurs. As at 30 September 2009, costs related to hiring external advisers and consultants in connection with the Restructuring were approximately U.S.$11.5 million. The Bank currently expects that, by the end of 2010, such costs in total will amount to approximately U.S.$90.60 million.

In the event that the Restructuring is not completed on the terms disclosed in this Information Memorandum, substantial additional costs may be incurred as a result of the likely need to petition for an insolvency procedure.

***The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS.***

The Pro Forma Financial Information has been prepared based on the Bank's historical unconsolidated management accounts, adjusted for selected IFRS accounting policies, and based on certain assumptions to reflect the effect of the Restructuring as if it had taken place on 30 September 2009.

Management may not have identified all adjustments to the management accounts used in the preparation of the Pro Forma Financial Information necessary to address differences in the Bank's accounting policies and rules applied in the preparation of such management accounts from IFRS accounting policies and principles. In addition, not all of the assumptions made in order to prepare the Pro Forma Financial Information may prove to be correct. Although the current management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring, Claimants should read such information with due regard to the limitations inherent in its preparation and analysis of financial information prepared on a non-IFRS basis should only be used as a complement to, and in conjunction with, the financial information presented in accordance with IFRS. See "*Presentation of Financial and Other Information*".

***Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum.***

As part of the proposed restructuring process, a New Charter is to be introduced, the aim of which is to provide Claimants who become shareholders of the post-restructured Bank with increased protection. Although the Bank has received, in principle, approval from the FMSA in respect of the draft form of the New Charter. Some of the provisions expected to be incorporated into the New

Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law. If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter. Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein. See "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring — New Charter*" and "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter*".

***Devaluation of the Tenge may render the Restructuring ineffective.***

In accordance with the terms of the Restructuring Packages, U.S.$1 billion of cash is available for Claims allocated into Senior Package 1. This amount is funded in Tenge with cash transferred to the Bank by the NBK under BTA/NBK Repo Transactions (consisting of refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds. The cash under Senior Package 1 is payable in U.S. Dollars or Tenge at the option of Claimants. It is likely that the majority of the Claimants will choose U.S. Dollars and the Bank may therefore need to purchase up to U.S.$1 billion with an amount in Tenge at the prevailing exchange rate prior to the Restructuring Date. If the Tenge depreciates against the U.S. Dollar prior to the Restructuring Date, it would become more expensive for the Bank to satisfy such obligations and the Restructuring may not be able to occur without the Bank providing the full amount in Dollars required under Senior Package 1.

***The Bank is reliant on the NBK's support of the Restructuring and may be unable to complete the Restructuring if the NBK's position changes.***

The Bank holds the SK Bonds and uses them as collateral for BTA/NBK Repo Transactions with the NBK. As at 30 September 2009, the Bank has received KZT 404,938 million from the NBK (based on internal management reports of the Bank) by way of refinancing loans under the Cooperation Agreement in the form of BTA/NBK Repo Transactions. To ensure that U.S.$1 billion is available for Claims allocated into Senior Package 1, the Bank will have to have obtained funding from the NBK under BTA/NBK Repo Transactions in exchange for all of the SK Bonds. If the NBK is unable to provide such funding to the Bank, the Bank will not have sufficient funds for Senior Package 1 and the Restructuring could not occur.

***The completion of the Restructuring is conditional upon the Bank successfully carrying out its proposed plan to release the required level of provisions.***

The completion of the Restructuring is conditional upon the FMSA being satisfied that the Bank will be in compliance with the regulatory capital requirements applicable to the Bank following the Restructuring Date. As described in "*Management's Discussion and Analysis of Results of Operations and Financial Condition – Recent Developments*", the Bank is currently not in compliance with such requirements and has set out a number of steps it intends to take to release the provisions necessary to become compliant once again by early September 2010. However, if the Bank is unable to successfully carry out those steps to the extent required and within the timeframe specified, such failure may have an adverse impact on the ability of the Bank to meet regulatory capital requirements and accordingly may result in the Restructuring failing to complete as anticipated or at all.

**Risks relating to the New Notes, Shares and GDRs**

***The market value of the New Notes, Shares and GDRs that the Claimants will receive in connection with the Restructuring may be less than the current value of the Claimants' Claims.***

The value of the New Notes, Shares and GDRs will depend on the public trading price of the New Notes, Shares and GDRs after the Restructuring. The New Notes, Shares and GDRs will not trade publicly until the Restructuring is completed. As a result, Restructuring Creditors will not know the market value of any New Notes, Shares and GDRs that they may receive in the Restructuring until the

Restructuring is completed.  There can be no assurance that the trading price of the New Notes, Shares and GDRs received by any Restructuring Creditor will be related to the value of its Claims.

***The large number of Shares eligible for public sale after the Restructuring could cause the market price of the Shares to decline and make it difficult for the Bank to issue equity securities in the future.***

When the Restructuring is complete, the Restructuring Creditors will own 18.5 per cent. of the Shares (in the form of Shares or GDRs).  Most of these Restructuring Creditors are not in the business of holding equity on a long-term basis.  Sales by these shareholders of a substantial number of Shares after the Restructuring may significantly reduce the market price of the Shares.  Moreover, the perception that these shareholders might sell significant amounts of Shares could depress the trading price of the Shares for a considerable period of time after the Restructuring.  Sales of these Shares, and the possibility of such sales, could make it more difficult for the Bank to sell equity or equity-related securities in the future at a time and price that the Bank considers appropriate.

***Due to the Bank's financial condition and the historical volatility in the price of shares in Kazakhstan banks, the market price of the New Notes and Shares is likely to be volatile.***

As a result of a number of factors, including the Bank's recent financial condition and its participation in markets that have experienced historical price volatility, the market price for the Bank's shares has historically been volatile and the market price for the New Notes, Shares and GDRs is also likely to be volatile, perhaps even more so than the stock market in general or the market for shares of other Kazakhstan banks.  Investors may not be able to sell their New Notes and Shares at the desired terms or at attractive prices as a result of such volatility.  Factors that could cause volatility in the market price for the New Notes, Shares and GDRs in the future may include, among other things:

- actual or anticipated variations in the Bank's operating results;

- new products or services, whether the Bank's or those of its competitors;

- changes in financial estimates by analysts covering the Bank;

- changes in the market valuations of other Kazakhstan banks;

- large increases or decreases in capital commitments;

- additions to, or departures of, its key personnel; and

- issues of Shares by the Bank.

Due to the Bank's troubled financial history and its participation in historically volatile markets, these factors may negatively affect the market price for the New Notes, Shares and GDRs to a greater extent than they would securities of other companies, in some cases regardless of the Bank's actual operating performance.

***Restrictions apply to a holder of GDRs or Shares if it is incorporated or has affiliates in a Prohibited Jurisdiction.***

Ownership of Shares is subject to certain legislative restrictions under Kazakhstan law.  Specifically (i) legal entities registered in any of the jurisdictions listed in "Disclosure of Beneficial Ownership" or which have affiliates registered in such jurisdictions or (ii) natural persons who are participants or shareholders in such legal entities, may not directly or indirectly own voting shares in the capital of a Kazakhstan bank.  Accordingly Claimants falling under (i) or (ii) may not be able to own, hold or dispose of the Shares.

Although the Bank has been advised that such restrictions would not prevent a holder of GDRs registered in any such jurisdiction (or which has an affiliate registered in such jurisdiction) from holding GDRs and exercising or benefiting from other rights (including the right to receive dividends

and pre-emptive rights in respect of the GDRs), the Shares corresponding to the GDRs held by persons registered in any such jurisdiction (or which has an affiliate registered in any such jurisdiction) may not be voted at any general meeting of the Bank. There is also no guarantee that the FMSA or any other relevant authority such as a Kazakhstan court will not take a view that persons registered in any such jurisdiction (or which has an affiliate registered in any such jurisdiction) should be prohibited from holding GDRs or that such holders should be restricted from exercising or benefiting from other shareholder rights.

***A person acquiring more than 10.0 per cent. of the voting Shares or equivalent requires prior FMSA approval.***

Any natural person or legal entity becoming a "major shareholder" or, for legal entities, a "bank holding" company in relation to the Bank must obtain prior written permission from the FMSA. A major shareholder or bank holding company means a person directly or indirectly owning or holding 10.0 per cent. or 25.0 per cent., respectively, of the voting shares of a bank or who can otherwise influence the decisions of such bank on the basis of an agreement or otherwise as set out in the FMSA regulations.

Any person acquiring 10.0 per cent. or more of the voting shares of a bank is considered an affiliate of such bank and must disclose its identity to such bank. Information about the identity of an affiliate is publicly available information.

A major shareholder of a bank also assumes certain obligations including (i) an obligation to support the bank in remedying any financial problems the bank may incur, (ii) an obligation to obtain a credit rating and (ii) ongoing reporting obligations.

***Subordinated Notes may not rank junior to Senior Notes and that Subordinated Debt will not qualify as Tier II Capital.***

Kazakhstan legislation neither expressly permits nor prohibits different classes of unsecured creditors or contractual subordination in bankruptcy proceedings. While it is the Bank's intention that the proceeds of issuance of the Dollar Subordinated Notes and the Euro Subordinated Notes will be included in its Tier II capital in accordance with the FMSA Guidance, there is no assurance that they will qualify as such. Under the FMSA Guidelines, debt securities of a bank may be included into Tier II capital only after the FMSA approves a report on the result of their placement in accordance with the precedure set out by Kazakhstani legislation. Currently, there is no such procedure for notes which are governed by laws other than the laws of Kazakhstan, such as the Dollar and Euro Subordinated Notes. Accordingly, there is no assurance that the report on the results of the placement of the Dollar and Euro Subordinated Notes will be approved by the FMSA and whether such Notes will qualify as Tier II capital of the Bank.

Kazakhstan legislation neither expressly permits nor prohibits contractual subordination of general unsecured creditors in bankruptcy. In practice, it is not uncommon for commercial banks to issue subordinated instruments, which are treated as Tier I or Tier II instruments for capital adequacy purposes in accordance with the FMSA Guidance. Although, to the Bank's knowledge, the FMSA has not in the past sought to challenge such treatment, the ranking of such subordinated debt has not been tested in bankruptcy proceedings or by the courts in the Republic of Kazakhstan. Therefore, it is unclear as to how the Subordinated Notes would be treated in bankruptcy proceedings by a liquidator and/or Kazakhstan court. If they are treated equally with other unsecured debt, including Senior Debt, this could materially adversely affect the interests of senior unsecured creditors under the Senior Notes.

Furthermore, the cash under Senior Package 1 is payable in Tenge or U.S. Dollars at the option of Claimants. It is likely that the majority of the Claimants will choose U.S. Dollars and the Bank may therefore need to purchase up to U.S.$1 billion with Tenge prior to the Restructuring Date.

The Bank may be unable to purchase U.S.$1 billion on the foreign currency market in Kazakhstan and may need to resort to the NBK to buy a sufficient amount of U.S. Dollars.  See Schedule 1 (*The Restructuring Plan*), Annex 2 (*Calculation of Entitlements*) to this Information Memorandum.

If the NBK were to withdraw support from the Bank, the Bank may not have sufficient cash in Tenge or may not be able to convert the requisite amount of Tenge into U.S. Dollars, and the Restructuring may not be completed.

In addition, if the Restructuring is successful, the Bank's debt following the Restructuring will be denominated primarily in U.S. Dollars.  The Bank's assets are primarily in Tenge.  Due to the limited access to hedging instruments in the market in Kazakhstan, the Bank may need the NBK's help in hedging.  See "*Risk Factors — Risks Relating to the Bank — The Bank is exposed to foreign currency exchange risk and significant exposure to foreign currency exchange rate fluctuations following the early termination of its swap transactions*".  As a condition precedent to the Restructuring, the NBK must deliver a confirmation that it will treat the Bank no less favourably than other second-tier banks in Kazakhstan.  See Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*).  Despite this confirmation, any change in the NBK's policy or support may lead to an increase in the Bank's funding costs or to the Bank being unable to comply with its regulatory requirements or currency positions and obligations under the New Notes, which would adversely affect the Bank's business, financial condition, results of business and prospects.

***In certain circumstances, the Trustee is entitled to be indemnified, secured or pre-funded and failure to do this may prejudice implementation of the Restructuring.***

If the Bank requests the Trustee to accelerate any series of Euronotes, as it will be authorised to do by the relevant Extraordinary Resolution, if passed, the Trustee retains the right to be indemnified, secured or pre-funded to its satisfaction.  The purpose of this is to permit Euronotes to be accelerated should the Bank determine that it is necessary to facilitate the implementation of the Restructuring Plan.  As at the date of this Information Memorandum, the Bank has not determined whether or not to request acceleration of any Euronotes and accordingly, no such indemnity, security or pre-funding has been provided to the Trustee.  Should the Bank determine to accelerate any series of Euronotes and the Trustee is not satisfactorily indemnified, secured or pre-funded, it may not be possible to implement the Restructuring Plan.

***The Bank may face litigation if the FMSA applies any of its compulsory restrictive measures to the Bank.***

The FMSA may apply a number of compulsory restrictive measures to second tier banks (commercial banks) in financial distress or in breach of prudential or other mandatory regulations.  See "*The Banking Sector in Kazakhstan — Financial Stability and Restructuring Reforms*" and "*The Banking Sector in Kazakhstan — The FMSA's Compulsory Measures under the Banking Law*" for a detailed description of such measures.

Were the FMSA to apply any such measures the Bank's shareholders, including investors holding the Shares in the form of GDRs and Claimants receiving the Shares in the Restructuring, could bring claims against the Bank and seek redress against the FMSA's actions.  Irrespective of the merit of such claims, if such shareholders' claims are successful, the Bank's financial position and the interests of the Claimants may be negatively affected.

***The Bank will be subject to various restrictions relating to Money Laundering, Corrupt Practices, Fraudulent Practices, Collusive Practices, Coercive Practices, Obstructive Practices and Financing of Terrorism that may be less onerous than restrictions in financings involving multilateral development banks.***

The Bank will be subject, in the New Notes Trust Deed, to various restrictions relating to Money Laundering, Corrupt Practices, Fraudulent Practices, Collusive Practices, Coercive Practices, Obstructive Practices and Financing of Terrorism (each as defined in Schedule 11 (*Covenants of the*

*Bank*) to this Information Memorandum).  Claimants should note that these restrictions are based upon, although not identical to and in certain respects less onerous than, restrictions commonly imposed on borrowers in financings involving multilateral development banks.  See Schedule 11 (*Covenants of the Bank*), Clause 3(b) (*Compliance with laws and other regulatory requirements*) to this Information Memorandum.

## PRO FORMA FINANCIAL INFORMATION

*The following information should be read in conjunction with "Presentation of Financial and Other Information — Pro Forma Financial Information", "Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS" and the Financial Statements included elsewhere in this Information Memorandum and the notes thereto.*

The Pro Forma Financial Information was prepared by the Bank on the basis of FMSA Methodology and IFRS to illustrate the effect of the Restructuring as if the Restructuring had been completed as at 30 September 2009 and is based on data derived from the Unaudited Interim Financial Statements and management accounts prepared on the basis of FMSA Methodology.  The Pro Forma Financial Information is unaudited and is presented for illustrative purposes only.  The Bank's management believes that the Pro Forma Financial Information may be useful in enabling Claimants to assess and understand the Restructuring and to select Restructuring Packages.

The key purpose of the Restructuring is to achieve compliance with the FMSA's regulatory capital adequacy requirements applicable to the Bank.  Therefore the Pro Forma Financial Information based on FMSA Methodology is more indicative of whether the purpose of the Restructuring is likely to be achieved.

The Pro Forma Financial Information is based upon certain assumptions and adjustments which the Bank's management believes are reasonable and necessary for a fair presentation of such information.  The assumptions and adjustments are based upon the Bank's preliminary analysis and based upon currently available information.  While the Bank has used all reasonable efforts to ensure that the Pro Forma Financial Information is correct, accurate and complete as at the date of this Information Memorandum, no representation or warranty is made (express or implied) as to the reliability, accuracy or completeness of the Pro Forma Financial Information.

The Pro Forma Financial Information does not take into account the potential adverse impact of certain negative developments since 30 September 2009, such as additional loan loss provisions and further operational losses resulting from the deteriorating financial condition of the Bank and instability aggravated by the ongoing restructuring process.

Claimants are cautioned that pro forma financial information is inherently unreliable and that the Pro Forma Financial Information is not necessarily indicative of how the Bank's consolidated capitalisation, statement of financial position or capital adequacy as at 30 September 2009 would have been presented had the Restructuring actually been completed at that date, nor is it necessarily indicative of the Bank's consolidated capitalisation, statement of financial position or capital adequacy as at any future date.  The unaudited Pro Forma unconsolidated Financial Information should be read in conjunction with the Financial Statements included elsewhere in this Information Memorandum.

See "*Risk Factors — Risks Relating to the Restructuring — The Pro Forma Financial Information would likely differ materially if it were based on financial statements prepared in accordance with IFRS*".

### Assumptions

The Pro Forma unconsolidated Financial Information is based on the following assumptions:

- the Restructuring had been completed as at 30 September 2009;

- there have been no material transactions concerning the Bank, other than the transactions discussed herein;

- External debt will be restructured through three senior packages and two junior packages;

- The first package (Senior Package 1) include approximately U.S.$8,376 billion of principal plus related interest plus such amount of principal and interest of Excess Non-OGSC Eligible Trade Finance Debt plus such amount of principal and interest of Official Government Sector Debt allocated into Senior Package 1. Debt of Senior Package 1 will be restructured as new debt instruments in the amount of U.S.$2,944 billion (U.S.$2,441 billion of senior debt securities and U.S.$553 million of subordinated instruments) and cash will be paid in the amount of U.S.$1 billion;

- The second package (Senior Package 2) includes approximately U.S.$650 million of principal plus related interest plus such amount of principal and interest of any Excess Non-OGSC Eligible Trade Finance Debt plus related interest plus such amount of principal and interest of Official Government Sector Debt additionally allocated to Senior Package 2. This package includes the issuance of special debt instrument, OID Notes.  Besides OID Notes, creditors of Senior Package 2 will receive about U.S.$62 million of 15-year subordinated instruments on the same conditions as in the first package;

- The third package (Senior Package 3) includes approximately U.S.$700 million of liabilities of trade finance (excluding those that were covered by export credit agencies, which will be restructured in accordance with second package) Third package, per se, includes refinancing of liabilities through a new 3-year renewable credit line (RCTFF);

- Two additional packages are for Kazakhstani pension funds and holders of Subordinated Notes and Perpetual Securities.   Debt of first package (Junior Package 1) is approximately KZT 28 billion or U.S.$186 million of principal plus related interest that will be prolonged for 20 years.  Holders of Subordinated Notes and Perpetual Securities (Junior Package 2) in a total amount of U.S.$1,156 billion of principal will receive about 4.5 per cent. of Shares of Bank;

- Bank Bonds bought by Samruk-Kazyna in amount KZT 645 billion (U.S.$4,273 million) of nominal value plus accrued interest (KZT 10 billion or U.S.$68.5 million), charged until 30 September 2009, will be converted at a nominal value into Shares of the Bank; and

- All amounts in U.S. Dollars are translated at the Tenge/U.S. Dollar exchange rate as at 30 September 2009, as reported by the NBK, of KZT 150.95 = U.S.$1.00.

**Pro Forma Unconsolidated Financial Information based on FMSA Methodology**

*Statement of Financial Position*

The following table sets out the Bank's unaudited unconsolidated historical and pro forma unconsolidated statement of financial position prepared based on FMSA Methodology as at 30 September 2009:

|  | Historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009 | |
|---|---|---|---|---|
|  | (KZT millions) | (U.S.$ millions) | (KZT millions) | (U.S.$ millions) |
| Cash and cash equivalents | 96,508 | 639 | 96,508 | 639 |
| Obligatory reserves | 3,959 | 26 | 3,959 | 26 |
| Financial assets at fair value through profit or loss | 712,392 | 4,719 | 712,392 | 4,719 |
| Investment securities | 44,540 | 295 | 44,540 | 295 |
| Amounts due from credit institutions | 53,998 | 358 | 53,998 | 358 |
| Loans to customers | 863,959 | 5,723 | 863,959 | 5,723 |
| Property and equipment | 9,308 | 62 | 9,308 | 62 |
| Investments in associates | 71,551 | 474 | 71,551 | 474 |
| Derivative financial assets | 45,427 | 301 | 45,427 | 301 |
| Other assets | 232,876 | 1,543 | 232,876 | 1,543 |
| **Total assets** | **2,134,516** | **14,141** | **2,134,516** | **14,141** |
| Amounts due to the NBK and the Government | 1,258 | 8 | 1,258 | 8 |
| Amounts due to clients | 610,042 | 4,041 | 610,042 | 4,041 |
| Total financial debt[4] | 2,057,392 | 13,630 | 1,104,183 | 7,315 |
| Bonds bought by Samruk-Kazyna[5] | 645,000 | 4,273 | — | — |
| Derivative financial liabilities | 36,234 | 240 | 36,234 | 240 |
| Reserves | 119,688 | 793 | 103,674 | 687 |
| Other liabilities | 51,948 | 344 | 51,948 | 344 |
| **(Accumulated deficit) Total shareholders' equity** | **(1,387,046)** | **(9,189)** | **227,178** | **1,505** |
| **Total liabilities and shareholders' equity** | **2,134,516** | **14,141** | **2,134,516** | **14,141** |

Notes:
(1)  Financial liabilities after restructuring will be U.S.$2,877 billion of new senior debt, U.S.$800 million of new subordinated debt and U.S.$700 million of RCTFF.
(2)  Bank Bonds bought by Samruk-Kazyna will be converted into Shares of the Bank.
(3)  Increase of capital will be done through income from debt discount and shares conversion.
(4)  Includes only nominal amount of due to TuranAlem Finance B.V. Discount & Premium is included within "Amounts due to clients".
(5)  Nominal amount of bonds bought by Samruk-Kazyna, net of accrued interest.

## Capital Adequacy

The following table gives information regarding the Bank's unconsolidated total, Tier I and Tier II capital and its capital adequacy ratios calculated based on FMSA Methodology:

|  | Historical unconsolidated As at 30 September 2009 | As Adjusted to Reflect the Restructuring As at 30 September 2009 |
|---|---|---|
|  | (KZT millions, except percentages) | (KZT millions, except percentages) |
| Total capital | (1,662,263) | 200,353 |
| Tier I capital | (1,428,481) | 185,742 |
| Tier II capital | — | 122,469 |
| K1 (Tier I capital to total assets) | (87.50)% | 5.84% |
| Total risk weighted assets | 2,569,604 | 1,918,153 |
| K2 (own capital to total assets weighted for risk) | (65.70)% | 10.45% |

**Pro Forma Financial Information based on Unaudited IFRS**

*Capitalisation*

The following table sets out the Group's unaudited historical and pro forma consolidated capitalisation in accordance with IFRS as at 30 September 2009:

| | Unaudited historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009 | |
|---|---|---|---|---|
| | *(KZT millions)* | *(U.S. (KZT $millions)[1]* | *(KZT millions)* | *(U.S.$ millions)* |
| Senior short- and long-term liabilities.................................... | 1,667,293 | 11,046 | 573,162 | 3,797 |
| Subordinated short- and long-term liabilities......................... | 110,831 | 734 | 144,542 | 958 |
| **Total short- and long-term liabilities**................................ | **1,778,224** | **11,780** | **717,704** | **4,755** |
| Share capital[2] ........................................................................ | 509,076 | 3,372 | 1,239,435 | 8,211 |
| Additional paid-in capital ....................................................... | (38,798) | (257) | (38,798) | (257) |
| Retained earnings and revaluation reserves[3] ........................ | (2,083,759) | (13,804) | (1,094,965) | (7,254) |
| Minority interests..................................................................... | (10,538) | (70) | (10,538) | (70) |
| **Total equity** ......................................................................... | **(1,624,019)** | **(10,759)** | **95,134** | **630** |
| **Total equity and short- and long-term liabilities**............... | **154,204** | **1,022** | **812,837** | **5,385** |

Notes:

(1)     See "*Presentation of Financial and Other Information*" for the method of calculation and presentation of U.S. Dollar amounts.

(2)     Share capital less shares held in treasury.

(3)     Includes available for-sale-investment securities revaluation reserve of KZT (2,868.1) million and foreign currency revaluation reserve of KZT (260) million.

*Statement of Financial Position*

The following table sets out the Group's unaudited historical statements of financial position based on IFRS as at 30 September 2009:

| | Unaudited historical As at 30 September 2009 | | As Adjusted to Reflect the Restructuring As at 30 September 2009[2] | |
|---|---|---|---|---|
| | *(KZT millions)* | *(U.S.$ millions)* | *(KZT millions)* | *(U.S.$ millions)* |
| Cash and cash equivalents .................................................... | 30,153 | 200 | 30,153 | 200 |
| Obligatory reserves ........................................................... | 43,003 | 285 | 43,003 | 285 |
| Financial assets at fair value through profit or loss................ | 120,648 | 799 | 120,648 | 799 |
| Investment securities .......................................................... | 22,244 | 147 | 22,244 | 147 |
| Amounts due from credit institutions..................................... | 31,439 | 208 | 31,439 | 208 |
| Shareholder's bonds ........................................................... | 511,097 | 3,386 | 511,097 | 3,386 |
| Loans to customers. .......................................................... | 1,107,241 | 7,335 | 1,107,241 | 7,335 |
| Property and equipment ....................................................... | 12,252 | 81 | 12,252 | 81 |
| Investments in associates .................................................... | 80,372 | 532 | 80,372 | 532 |
| Goodwill ............................................................................ | 4,556 | 30 | 4,556 | 30 |
| Derivative financial assets .................................................. | 31,346 | 208 | 31,346 | 208 |
| Deferred tax assets ............................................................. | 2,030 | 14 | 2,030 | 14 |
| Current income tax assets .................................................... | 5,590 | 37 | 5,590 | 37 |
| Other Assets....................................................................... | 46,156 | 306 | 46,156 | 306 |
| **Total Assets** .................................................................... | **2,048,127** | **13,568** | **2,048,127** | **13,568** |
| Amounts due to the NBK and the Government ...................... | 407,911 | 2,702 | 407,911 | 2,702 |
| Amounts due to customers................................................... | 683,281 | 4,527 | 683,281 | 4,527 |
| Amounts due to credit institutions ....................................... | 752,636 | 4,986 | 217,369 | 1,440 |
| Debt securities issued......................................................... | 1,670,588 | 11,067 | 500,335 | 3,315 |
| Derivative financial liabilities.............................................. | 2,308 | 15 | 2,308 | 15 |
| Reserves ............................................................................ | 120,600 | 799 | 106,968 | 709 |
| Other liabilities .................................................................. | 34,822 | 231 | 34,822 | 231 |
| **Total Liabilities** .............................................................. | **3,672,146** | **24,327** | **1,952,993** | **12,938** |
| Common shares .................................................................. | 515,551 | 3,416 | 1,245,910 | 8,254 |
| Treasury shares .................................................................. | (6,475) | (43) | (6,475) | (43) |
| Additional paid-in-capital ................................................... | (38,798) | (257) | (38,798) | (257) |
| Securities revaluation reserve ............................................. | (2,868) | (19) | (2,868) | (19) |
| Other revaluation reserves .................................................. | (260) | (2) | (260) | (2) |
| (Accumulated deficit)/related earning................................... | (2,080,631) | (13,784) | (1,091,836) | (7,234) |
| **Total shareholders' equity before minority interest** .......... | **(1,613,481)** | **(10,689)** | **105,672** | **700,045** |
| Minority interest ................................................................ | (10,538) | (70) | (10,538) | (70) |
| **Total shareholders' equity** ............................................... | **(1,624,019)** | **(10,759)** | **95,134** | **630** |
| **Total Liabilities and Equity** ............................................ | **2,048,127** | **13,568** | **2,048,127** | **13,568** |

Notes:
(1)    See "*Presentation of Financial and Other Information*" for the method of calculation and presentation of U.S. Dollar amounts.
(2)    Consolidated statement of financial position of Group as at 30 September 2009 taking into account of Bank and Temirbank restructuring.

## THE BANK

**Overview**

The Bank is a commercial bank operating in Kazakhstan, offering a full range of traditional corporate and retail banking products and services including deposit taking, lending, issuing of letters of credit, funds transfers, custodial services, issuing of payment cards and related services, foreign currency exchange, issuing of guarantees, cash operations, trust operations, collection operations, transactions with precious metals, leasing, broker dealer transactions, clearing operations and safe keeping operations.  The Bank also provides pension fund services and is engaged in certain insurance activities.

The Group is one of the leading banking groups in the CIS and has bank-partners in Russia, Ukraine, Belarus, Georgia, Armenia, Kyrgyzstan and Turkey.  In addition, the Bank maintains representative offices in Russia, Ukraine, China and the United Arab Emirates.  The Bank has one of the most advanced branch-office networks in the Republic of Kazakhstan and, as of 30 September 2009, operates 22 branches and 237 cash offices, 916 automated teller machines and 160 self-service terminals.   As at 30 September 2009, the Bank services 1,220,981 retail customers and 139,704 corporate customers.

The Bank has four principal business segments:

● Corporate Business (consisting of the Department of Analysis and Corporate Business Development, the Department of Credit Analysis of Corporate Business No. 1, the Department of Credit Analysis of Corporate Business No. 2, the Department of Credit Analysis of Corporate Business No. 3, the Department of Client Relations of Corporate Business No. 1, the Department of Client Relations of Corporate Business No. 2, Regional Directorate for Agriculture Business and the Department of CIS Countries Financing);

● SME Business (consisting of the Department of Small and Medium Business);

● Retail Business (consisting of the Department of Channel Sales (the department responsible for all retail sales) and Bank Cards Development, the Retail Marketing Department, the Retail Sales Department and the Project Office of Kastle ULS Implementation (a special office devoted to implementation of accounting software); and

● Investment Activities (consisting of the Treasury, the Section of Monitoring and Treasury Operations, the Division of Operations with Capital and Custody Services, the Representative Office in Shanghai (China), the Representative Office in Moscow (Russia), the Representative Office in Kiev (Ukraine), the Islamic Banking and Representative Office in Dubai (UAE), the Division of International Business Analysis, the Division of External Borrowing, the Division of International Activities Monitoring, the Department for Working with Investors and the Financial Institutions, Division of Structured and Trade Financing, Directorate of Global Treasury).

The Bank also has various departments providing global support services including accounting, monitoring and control, asset restructuring, problem loans, and credit and operational risk and collateral monitoring, among others.

**History**

The Bank was incorporated on 15 January 1997 as a closed joint stock company as part of the restructuring and merger between two state-owned banks, Alem Bank and Turan Bank, pursuant to the decision of the Government and the NBK.  On 30 December 2003, the NBK issued the Bank its current banking licence (No. N242).  The registered office and the head office of the Bank are located at 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Kazakhstan.

On 24 January 2008 Bank TuranAlem JSC changed its name to BTA Bank JSC. The Bank was issued certificate No. 3903-1900-JSC from the Registration Committee of the Ministry of Justice of Kazakhstan.

**Background to the Restructuring**

***Sequence of Significant Events before Samruk-Kazyna's Acquisition***

From 20 May 2005 to 2 February 2009, Mukhtar Ablyazov was the Chairman of the Board of Directors of the Bank. He replaced in this role Mr. Yerzhan Tatishev, who had been Chairman of the Board of Directors from 1997 until 19 December 2004, when he was killed in a hunting accident.

Mr. Ablyazov had been Minister for Energy, Industry and Trade in the Government from 1998 until he was imprisoned in May 2002. He was pardoned by President Nazarbayev in May 2003 after serving ten months of his sentence. Following his pardon, he moved to Moscow where he founded and became chairman of the Eurasia Industrial and Investment Group of companies, which appears at that time to have included Eurasia Real Estate, Eurasia Logistics (a logistics warehouse complex developer in Russia, Kazakhstan and Ukraine), Eurasia Capital (a fund management firm) and others. In May 2005, Mr. Ablyazov returned to Kazakhstan.

As Chairman of the Board of Directors, Mr. Ablyazov exercised management control over the Bank and was responsible for establishing and overseeing procedures within the Bank to avoid any conflicts of interest arising between shareholders, the Board of Directors and employees of the Bank and for settling any conflicts of interest on issues which other bodies within the Bank were unable to handle.

The Bank understands that, during the period that he was the Chairman of the Board of Directors, Mr. Ablyazov beneficially owned a significant portion of the shares of the Bank through intermediary companies, including Drey Associates Limited, Strident Energy Limited and InvestCapital Company LLC. See "*Principal Shareholders — The Bank's Shareholders Prior to the Restructuring*". There is no legal evidence of Mr. Ablyazov's ownership directly or indirectly in the Bank. Therefore, Mr. Ablyazov's beneficial interest in the Bank was not disclosed by Mr. Ablyazov or the Bank in the Bank's consolidated financial statements for the years 2006, 2007 or 2008 or nine months ended 30 September 2009.

In August 2008, the Government approached four banks — the Bank, Halyk Bank, Kazkommertsbank and Alliance Bank — which the Government viewed as "systemic" in the Kazakhstan financial system, to understand and address the financial difficulties facing these banks in light of the global financial crisis. In the autumn of 2008, Samruk-Kazyna, Kazakhstan's sovereign wealth fund, commenced negotiations with the Bank regarding the terms of a possible capital injection by Samruk-Kazyna into the Bank to support its liquidity following reports that the Bank was unable to meet withdrawal requests of customers and that the Bank failed to participate in rights offerings of two of its important subsidiaries, BTA Russia and BTA Ukraine. In October 2008, the Government and the FMSA announced a proposal to recapitalise the Bank as part of a broader plan to stabilise the financial system of Kazakhstan.

On 9 November 2008 the Bank, the NBK, the FMSA, Samruk-Kazyna and the Government (represented by the Ministry of Finance) entered into a memorandum of understanding pursuant to which the parties declared their intention to coordinate their efforts to stabilise the economy of Kazakhstan, use all reasonable endeavours to provide additional financial resources to the Kazakhstan economy and assist in the stabilisation of the financial system, including the maintenance by the Bank of an adequate level of liquidity and quality of the credit portfolio. At this time, Samruk-Kazyna was considering injecting approximately KZT 212,000 million into the Bank in exchange for 25 per cent. of the Bank's share capital.

At the same time that Samruk-Kazyna was negotiating the memorandum of understanding with the Bank, the FMSA was conducting an independent due diligence review of the Bank's business and operations. The FMSA issued a report dated 22 January 2009, which indicated that the Bank had

violated applicable banking legislation and incurred substantial risks through the actions of the Management Board and Board of Directors. The FMSA report specifically identified deficiencies in the credit dossiers prepared by the Bank, breaches of capital adequacy requirements and risky lending practices, particularly in respect of loans to persons resident outside of Kazakhstan. The report suggested downgrading KZT 294,803 million of loans classified as "prime loans" to certain categories of "problem loans" and KZT 189,441 million of "category 1 problem loans" to more impaired categories of problem loans. In addition, the FMSA sent a letter to the Bank dated 27 February 2009 in which it identified certain key issues relating to the Bank that it recommended be addressed, including (i) checking legal compliance issues and security taken, and assessing non-recovery risk, in relation to credits granted to non-residents of Kazakhstan, (ii) taking steps to save originals of security documentation kept at the Bank's premises and to compile an inventory of all property of the Bank and (iii) examining the Bank's stamps and headed paper and authorizing key personnel as the only officers of the Bank authorised to use them.

During late 2008 and early 2009, Samruk-Kazyna conducted its own independent analysis of the financial condition of the Bank in order to assess the value of the Bank's shares. In connection with this review, and following the release of the January 2009 FMSA report, Samruk-Kazyna re-evaluated the potential net losses of the Bank and determined that it was necessary to acquire a supermajority interest in the Bank in return for the approximately KZT 212,000 million that it was prepared to inject into the capital of the Bank.

In light of the increasing deterioration in the Bank's financial position, the FMSA instructed the Bank to increase its loan loss provisions to 24.9 per cent. by 1 February 2009. This increase would have caused the Bank to breach its capital adequacy requirements and so, on 2 February 2009, the Government accepted the recommendation of the FMSA to recapitalise the Bank pursuant to Articles 17 and 17-2 of the Banking Law through Samruk-Kazyna. On 2 February 2009, Samruk-Kazyna acquired a controlling shareholding in the Bank through the Bank's issuance of 25,246,343 new common shares constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

The Group incurred a net loss amounting to KZT 1,188,050 million (approximately U.S.$9.8 billion) during the year ended 31 December 2008.

***Factors Affecting Deterioration of the Bank's Loan Portfolio***

The investigation of the FMSA and Samruk-Kazyna prior to Samruk-Kazyna's investment into the Bank, and the Bank's internal due diligence conducted following the acquisition and the appointment of the new management team, have revealed a number of internal and external factors that the Bank believes led to the deterioration of the Bank's loan portfolio.

*Internal Factors*

The Bank has uncovered a significant number of purported loans that at present appear to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or non-existent. In addition, the Bank has uncovered numerous examples of purported loans being granted that do not appear to have gone through the proper approval process within the Bank. Credit committee decisions, as well as related documentation, reflecting the actual terms of the purported loans were often (but not always) marked "FOR SAFE DEPOSIT", which meant that they remained outside the proper filing system and were not provided to the auditors in the usual way. In some instances, a different version of each such decision, which, for example, might wrongly suggest that security had been taken before drawdown of a loan, was then put on file.

The Bank indicated in the Financial Statements for the year ended 31 December 2008 that the quality of the loan portfolio had significantly deteriorated as a result of circumstances and actions taken before the current management of the Bank were appointed by Samruk-Kazyna. The Bank indicated that certain loan documentation, including collateral and associated agreements, primarily relating to

financing of projects outside Kazakhstan, was no longer available.  In addition, the Bank noted, many loans were transferred to new borrowers often offshore and no collateral was provided by the new borrowers, so the loans were unsecured.  The Bank attributes many of these gaps and missing documents to fraud and to the fact that, prior to February 2009, the credit dossiers for transactions outside Kazakhstan had been compiled on behalf of the Bank (to the extent that they were compiled) by associate banks such as BTA Russia and BTA Ukraine.  The Bank believes that there is a significant risk that, as these associate banks were and still are under the effective control of the previous management of the Bank, a number of documents may not become available to the Bank, and that the veracity of documents which are or become available may be questionable.

The January 2009 FMSA report criticised the Bank's previous management for lending to borrowers in offshore jurisdictions without identifying the ultimate beneficiaries and for granting working capital loans including those for non-residents of Kazakhstan, despite the absence of current assets, business plans, the Bank's preliminary decisions to substantiate profitability and legitimacy of granting working capital loans, or any documents to confirm the intended use of the borrowed funds. The Bank believes that, in respect of some of these borrowers, former management used multi-layered credit schemes under which one company (usually offshore) would act as the borrower, then forward the loaned funds to a project manager (often a resident of Russia, Ukraine or another country), and a third person would provide security.  Such schemes have made it more difficult for the Bank to file legal proceedings and have necessitated engaging law enforcement bodies in various countries to assist in returning the funds.  See "*Asset Recovery*".

Furthermore, the Bank has noted that the Bank had two regional credit committees, which were separate from the Bank's main credit committee but nevertheless approved loans that were to be granted by the Bank.  The Regional Credit Committee for Russia was set up in March 2006, purportedly to consider and approve financing for projects falling within the geographical boundaries of Russia.  A separate Regional Credit Committee for non-Russian (non-Kazakh) CIS projects was set up two years later.  Mr. Ablyazov was the Chairman of both regional committees.  While the appointments to these committees required the approval of the Bank's Management Board and Board of Directors, decisions of the Russian Regional Credit Committee did not require further approval from either.  In its January 2009 report, the FMSA criticised the procedures followed by the regional committees, indicating that the Bank's compliance reports indicated that it was impossible to establish whether or not there were insider relations between the borrower and the Bank, which prevented the Bank from confirming that such loans complied with the requirements of Kazakhstan law.  The January 2009 FMSA report specifically indicated that Mr. Ablyazov's role on the Russian Regional Credit Committee and Board of Directors was bound to involve a conflict of interest and contradicted corporate management principles.  The Bank believes that the loans purportedly approved by the Russian Regional Credit Committee were granted based on practices which were wholly inadequate and which differed significantly from the practices typically used by the Bank's main credit committee.

A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank has been unable to monitor the collateral or their financial performance.  Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral secured by the loans.

During 2008, the Bank placed certain available-for-sale securities with a carrying amount of KZT 35,402 million with a custodian in an offshore jurisdiction.  The securities consisted of AAA-rated bonds.  In May 2008, at the direction of the former management of the Bank, the securities were transferred from the account of the existing custodian to a custodian account held by a different custodian.  Subsequent to 31 December 2008, the Bank received a statement from the custodian, indicating that these securities had been disposed of at the direction of the former management of the Bank by January 2009.  No consideration was received by the Bank from this disposal.  The Bank initiated an internal investigation with respect to the disposal and passed the information to the Procuracy of the Republic of Kazakhstan and the FMSA.  Management of the Bank believes that the circumstances above indicate that these securities were not recoverable as at

31 December 2008. Therefore, these securities have been fully written off as at 31 December 2008. The Bank is actively investigating the circumstances surrounding the transfer of these securities to third parties and is currently considering its options.

The Bank also was party to derivatives contracts with certain offshore companies, which exposed the Bank to excessive credit risk and have become uncollectible. The offshore counterparties have ceased to respond to the Bank's inquiries. The current management suspects that these contracts were entered into on behalf of the Bank through actions of the former management in contravention of then existing internal controls and in order to circumvent such controls. The current management has decided to fully provision against receivables on these derivative contracts as at 31 December 2008 for KZT 16,298 million.

*External Factors*

The Bank, like many other banks around the world, suffered from the global financial crisis beginning in August 2007. During the period from 2004 to 2007, the Bank's total assets increased more than four-fold, its loan portfolio increased about five-fold and its deposits increased more than two-fold. For the year ended 31 December 2007, the Bank's net profit equalled KZT 48,683 million. The Bank also expanded its branch network from 22 branches and 189 cash offices as at 31 December 2004 to 22 branches and 289 cash offices as at 31 December 2007.

The Bank's growth from 2004 to 2007 was primarily funded by short term bank borrowings and debt securities issues in the international capital markets and was aided by the ready availability of credit. The proportion of funding through customer deposits remained relatively low.

Following Kazakhstan's credit rating downgrade in October 2007 by S&P from BBB to BBB- and the general deterioration in the financial markets since August 2007, the Bank became unable to refinance its international debt, which in turn adversely affected its ability to make loans. In light of the global economic crisis, international lenders reduced their exposure to developing countries, including the Kazakhstan banking sector, which led to increased costs of funds. In connection with this, Kazakhstan banks, including the Bank, decreased lending activities to preserve liquidity in order to service their international debt.

At the beginning of the financial crisis in August 2007, the Bank was rated BB by S&P, BB+ by Fitch and Ba1 by Moody's. Since then, as a result of the Bank's rapidly deteriorating financial condition, suspension of repayments and its initiation of negotiations with the creditors concerning the Restructuring, the Bank's credit ratings have been downgraded a number of times. Between March and April 2009 the ratings agencies downgraded the Bank's short and long-term counterparty credit ratings in stages as follows: S&P's from BB to D; Fitch from BB to RD and Moody's from Ba1 to Caa3. As at the date of this Information Memorandum, the

Bank has been assigned an RD long-term issuer default rating by Fitch, a D long-term credit rating by S&P and Caa3 long-term deposit obligation rating by Moody's.

**Sequence of Significant Events Following Samruk-Kazyna's Acquisition**

As part of the efforts to restore the stability of the Bank, Samruk-Kazyna appointed Mr. Dunayev and Mr. Saidenov on 2 February 2009 to the Board of Directors. On 6 March 2009, the shareholders of the Bank replaced the remaining members of the Board of Directors, except Mr. Talvite. See "*Management and Corporate Governance — Current Management and Corporate Governance — Board of Directors*". All of the members of the Management Board were replaced between March 2009 and March 2010, except Mr. Zhumakhmetov, and most of the members of the Bank's management team were replaced in 2009 as well. See "*Management and Corporate Governance — Current Management and Corporate Governance — Management Board*" and "*Management and Corporate Governance — Management Team*".

In order to provide additional liquidity to the Bank, Samruk-Kazyna agreed to issue the SK Bonds and sell them to the Bank in exchange for the Bank Bonds. On 17 February 2009 the Bank, the NBK and

the FMSA entered into the Cooperation Agreement pursuant to which the Bank is entitled to obtain from the NBK refinancing loans and special purpose loans.  In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of KZT 300,000 million and KZT 345,000 million, respectively.    See "*Selected Statistical and Other Information — Debt Securities*".  On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of 300 million SK Bonds for consideration of KZT 300 billion, the other for the sale by the Bank to Samruk-Kazyna of 300 million Bank Bonds for consideration of KZT 300 billion.  On 18 March 2009, two further agreements were entered into one for the sale of 345 million SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of 345 million Bank Bonds for KZT 345 billion.

As of the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds.

In addition to the KZT 212,095 million capital injection mentioned above, the Government has provided additional liquidity support in the form of deposits and pursuant to loans under the State Finance Programmes.  As at the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds, KZT 310,495 million in deposits of SamrukKazyna and KZT 126,453 million under the State Finance Programmes.  See "*The Role of Samruk-Kazyna and the NBK — Liquidity Support*".

As at 1 January 2009, the Bank in its unaudited unconsolidated statement of financial position reported provisions on its loan portfolio of KZT 214,777 million (based on FMSA Methodology), representing 9.2 per cent. of its total loan portfolio including loans to credit institutions and reverse repurchase agreements as of such date.  Following its due diligence inspection of the Bank, the FMSA instructed the Bank to increase provisions on its loan portfolio to 24.9 per cent. of its loan portfolio by 1 February 2009.  The Bank partially responded to this request and increased its provisions on loans to KZT 518,272 million (based on FMSA Methodology) as at 1 March 2009, representing 19.9 per cent. of the total loan portfolio as at such date.

Based on the further due diligence conducted by the Bank and in light of its deteriorating loan portfolio, the Bank increased provisions to KZT 1,522,139 million in its unaudited unconsolidated statement of financial position as at 1 June 2009 (based on FMSA Methodology), representing 57.6 per cent. of its total loan portfolio as at such date.  This increase of provisions caused the Bank to breach its capital adequacy ratios on 1 June 2009.  As at 1 October 2009, the Bank had created KZT 1,958,899 million in its unaudited unconsolidated statement of financial position (based on FMSA Methodology) in provisions, representing 75.5 per cent. of its total loan portfolio.  Additional provisions required to be reported to the FMSA were recognised in the Bank's consolidated financial statements as at 31 December 2008 based on IFRS.  The Group recognised loan loss provisions in its audited consolidated financial statements equal to KZT 1,217,278 million as at 31 December 2008 (based on IFRS) and its unaudited consolidated financial statements equal to KZT 2,068,923 million as at 30 September 2009 (based on IFRS).  For a discussion of the differences between the determinations of loan loss provisions under FMSA Methodology and IFRS, see "*Asset and Liability Management — Provisioning Policy*".

During the nine months of 2009, the Kazakhstan banking system experienced a massive outflow of deposits and a so-called "run to quality".  The Group's deposits decreased from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009.  The Bank's market share of total deposits decreased from 17.6 per cent. as at 31 December 2008 to 10.6 per cent. as at 30 September 2009.  In light of the results of the Bank's internal due diligence and in response to the deteriorating market and the Bank's financial condition, the Bank continued downsizing its operating activities.  The Bank's branch network was reduced from 279 cash offices as at 31 December 2008 to 237 cash offices as at 30 September 2009, representing a 15.1 per cent. decrease.  As at 30 September 2009, the Bank further reduced its staff by 23.0 per cent. to 5,085 employees from 6,608 employees as

at 31 December 2008.  The Bank also reduced limits for representative costs, travel expenses and mobile phones, reduced social benefits for Bank employees except with respect to health insurance costs and instituted a hiring freeze and a moratorium on raising wages.  The Bank has also reduced costs on advertising, training and compensation for staff transfers to other localities.  The Bank suspended implementation of noncritical information technology projects and implemented a moratorium on the purchase of property and equipment and opening new offices.  The Bank terminated its plans to open offices in Japan and South Korea and decided to close its representative office in London.

Between February and April 2009, the Bank maintained a consistent position that it would continue to make scheduled payments on its indebtedness as long as creditors did not accelerate their debt, which would effectively cause all debt to be *pari passu*.  In keeping with this position, upon acceleration by certain lenders of the Bank of U.S.$500 million on 22 April 2009, the Bank declared a moratorium on all principal payments.  The Bank continued paying interest until 24 July 2009, when repayment of interest was suspended as well.

On 1 April 2009, the Bank breached the FMSA requirement that the Bank maintain an exposure of less than 10 per cent. of its equity capital with respect to any single borrower.  This was because its loans to Temirbank exceeded the 10 per cent. threshold due to the growth of funds appropriated for Temirbank.  The FMSA issued a letter to the Bank on 3 April 2009 notifying the Bank that it had identified a number of factors negatively impacting the financial position of the Bank and requiring the Bank to provide the FMSA with a plan for early reaction measures and further development forecasts.  Due to the Bank's failure to repay certain of its liabilities, the Bank also breached liquidity requirements of the FMSA in May 2009.  Following the Bank's breach of these regulatory requirements, the Bank entered into an agreement with the FMSA on 22 May 2009 which imposed certain restrictions on the Bank and required the Bank to develop and present to the FMSA a restructuring and recapitalisation plan by 10 June 2009.  The Bank submitted a preliminary plan of restructuring to the FMSA on 10 June 2009.

In June 2009 the Bank announced it had recorded negative capital and consequently the Bank and the FMSA entered into the FMSA Agreement on 30 June 2009 pursuant to which the Bank was obliged, among other things, to provide the FMSA with a restructuring plan not later than 3 August 2009 and the FMSA undertook not to apply sanctions and enforcement measures against the Bank, including commencement of liquidation or conservation procedures against the Bank or withdrawal of the Bank's license.   The deadline under the FMSA Agreement was subsequently extended to 18 September 2009 pursuant Addendum No. 1 to the FMSA Agreement dated as of 11 September 2009.

Since 1 July 2009, the Bank has failed to comply with the minimum reserve requirements of the NBK, which provide that second tier banks must maintain reserves equal to 1.5 per cent. of internal liabilities and 2.5 per cent. of other liabilities.  On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement applicable to the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until the Restructuring process is finalised.

On 18 September 2009, the Bank submitted an indicative restructuring and recapitalisation plan to the FMSA in accordance with the FMSA Agreement.  Following negotiations with the creditors during September 2009, the Bank and the Steering Committee of the creditors signed the Memorandum of Understanding on 21 September 2009.  The FMSA approved this plan on 26 September 2009.  On 5 October 2009, the Bank and the FMSA executed Addendum No. 2 to the FMSA Agreement which extended to 7 December 2009 the deadline for the Bank to enter into the Term Sheet with the Steering Committee.

Following the adoption of the Restructuring Law in Kazakhstan, which came into effect in August 2009, the Bank submitted an application to the Court on 7 October 2009 to formally initiate the restructuring process under the Restructuring Law.  The Bank's application was approved by the

Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.   Pursuant to the terms of the decision of the Court, the Restructuring must be completed by 5 September 2010.  The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 March 2010 each issued an order recognising the restructuring proceedings in the Court as the main foreign proceeding in respect of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.

The Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.

On 7 December 2009, the Bank and the Steering Committee signed the PCTS setting out key commercial terms of the Restructuring, certain restructuring options and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring.  On 17 March 2010, the Bank and the Steering Committee entered into the PCTS Amendment Letter, relating to the restructuring options and the conditions of the Restructuring process.  On 29 March 2010, the Bank and the FMSA entered into a further addendum to the FMSA Agreement whereby the FMSA agreed, among other things, (i) to require the implementation of the measures envisaged by the Restructuring Plan (including the conversion of securities into shares of the Bank) by 1 September 2010 and (ii) to extend until 1 September 2010 its agreement not to apply sanctions and enforcement measures against the Bank. On 18 April 2010, the Bank and the Steering Committee entered into the Detailed Term Sheet.

As at 30 September 2009, based on data published by the FMSA, the Bank was the second largest bank in Kazakhstan by total assets with a market share of 17.7 per cent.  This compares with a market share of 24.5 per cent. as at 31 December 2008 (when it was the largest bank in Kazakhstan by total assets) and 22.7 per cent. as at 31 December 2007 (when it was the second largest bank in Kazakhstan by total assets).

### Recovery Efforts

The Bank has assembled a team to investigate the circumstances behind the Bank's current financial position and the extent to which it is a result of what are believed to be fraudulent transactions entered into by, or on the instructions of, the former management, in particular, Mr. Ablyazov.  That team is made up of a combination of certain members of the Bank's new management and staff, as well as lawyers and accountants with international firms.  As part of the work of the Bank's asset recovery team, various legal proceedings have been commenced which are summarised below.  See "*Asset Recovery*".

### Strengths

A successful restructuring would provide the Bank with an advantage over other Kazakhstan banks. The Bank would be perceived as one of the first Kazakhstan financial institutions to have overcome the financial crisis as opposed to other banks operating in a generally distressed banking sector with limited funding sources.  The Bank believes that a successful restructuring would also boost client confidence, which would give the Bank an opportunity both to increase collections on existing assets and to attract new clients, including depositors.  After restructuring, the Bank intends to continue to capitalise on its historical strengths.

The Bank believes its historical strengths are:

- extensive network;

- highly skilled management and staff;

- "one-stop-shop" approach for clients;

- salary card programmes;

- advanced direct distribution channels infrastructure; and

- partnerships with money transfer businesses.

### Extensive network

The Bank enjoys one of the most extensive geographical branch networks among the banks in Kazakhstan with its 22 branches and 230 cash offices in 66 cities across the country as at 31 March 2010, representing the second most extensive network of cash offices and third most extensive network of branches in Kazakhstan.  The Bank ranks third in the country as at 31 March 2010 with 924 automated teller machines and 160 cash and pay self-service terminals as at 31 March 2010.  The Bank also provides 11 currency exchange terminals and 2,056 point of service units as at the date of this Information Memorandum.

### Highly skilled management and staff

In early 2009, the top management of the Bank was replaced with new highly skilled managers appointed to implement the new corporate strategy.  In particular, the Bank's new management has significant experience in the financial sector, in various local and foreign banks, accounting firms and governmental agencies.  See "*Management and Corporate Governance — Current Management and Corporate Governance — Management Team*".  Despite the changes in the Bank's top management in early 2009, the Bank retained its highly skilled and experienced staff.

### "One-stop-shop" approach for clients

The Bank provides a full range of products that makes the Bank a "one-stop-shop" for its retail, corporate and SME clients, including a combination of lending services with current account, payment processing and deposit services.  The Bank's highly competitive pricing and efficiency of processing payments of clients (e.g., the Bank processes on average 35,000 payments per day) also serves to strengthen the Bank's strong reputation and customer loyalty among retail, corporate and SME clients.  The staff has developed a loyal customer base among clients with a corporate and SME client base of over 28,000 and retail client base of over 650,000 as at 30 September 2009.

### Salary card programmes

The Bank launched its salary card programmes in the mid-1990s pursuant to which the Bank issues Visa and Mastercard cards to the staff of participating companies who, in return for signing a salary deposit agreement with the Bank, receive benefits (such as pre-approved credit lines) and reduced commissions on card payments.  As at 30 September 2009, the Bank operated salary card programmes with over 6,100 companies under which the Bank provided services to employees through over 680,000 issued and activated cards.  The salary card programmes encourage customer loyalty towards the Bank and provide cross-selling opportunities for the Bank's payment cards services and internet banking.  The Bank seeks to attract new customers and new deposits through the salary card programmes and is targeting an increase in the number of salary cards to 720,000 by the end of 2010.

### Advanced direct distribution channels infrastructure

The Bank has developed alternative distribution technologies, including through internet banking, SMS banking and telebanking.  The Bank provides a variety of over 50 services to more than 45,000 users and adds over 1,000 new user accounts each month to its internet banking platform.  During the first nine months of 2009, the Bank processed KZT 4.7 billion worth of transactions.  The Bank provides SMS banking services to over 46,000 users, including over 3,000 new user accounts each month.  The Bank furthermore seeks to improve payment channel availability and the range of services offered in order to increase market share in this segment (from 8 per cent. currently to

15 per cent. by the beginning of 2014). The Bank plans to focus on "non-credit" products to support all of its retail business infrastructure and to leverage the cross-selling potential of its vast existing client base. The Bank seeks to increase its market share of exchange transactions from 12 per cent. to 20 per cent. by the beginning of 2014.

***Partnerships with money transfer businesses***

The Bank seeks to provide its clients with prompt and reliable service. Clients can send or receive a money transfer in all cash settlement offices of the Bank. The Bank provides money transfers inside Kazakhstan and the CIS, international money transfers (SWIFT and Western Union) and interbank money transfers inside Kazakhstan. Since the beginning of 2009 and until 30 September 2009, the volume of transfers amounted to over KZT 162 billion. The Bank was the first among Kazakhstan banks to launch its own system of express money transfer without the need to open a bank account. In 2008, express transfers were available in all 279 cash offices of the Bank (as well 147 of the Bank's subsidiary, Temirbank's, cash offices) located in 14 regions of Kazakhstan. There are 250 outlets to service customers within the Faster system in nine CIS countries, Great Britain and the Czech Republic. The express transfers are designed to be effected in less than a minute and money can be transferred in KZT, Dollars, Russian Roubles and Euro.

**Strategy**

The Bank's principal strategies may be divided into general strategies of the Bank and specific strategies with respect to restructuring and recovery of troubled assets and future development of each of its corporate, SME and retail portfolios.

***General Strategies of the Bank***

The Bank's general strategies are as follows:

*Focus on Increasing Liquidity*

As of the date of this Information Memorandum, the Bank relies heavily on the liquidity support provided by Samruk-Kazyna. See "*The Role of Samruk-Kazyna and the NBK*". The Bank expects to increase its current liquidity by expanding its role in Government programmes, restructuring its portfolio, refinancing existing obligations, increasing cross-selling and attracting new clients. The Group has already utilised KZT 114,097 million and retained for future lending KZT 584 million as an agent under the existing State Finance Programmes. See "*State Finance Programmes*". The Bank will seek to expand its role under such programmes and become an agent under new programmes proposed by the Government.

The Bank and DBK have started discussion about developing a scheme to refinance the obligations of the Bank's borrowers. See "— *Other Potential Government Support*". The Bank plans to participate in these programmes if they are ultimately developed.

A successful debt restructuring would provide the Bank with an advantage over other Kazakhstan banks as the Bank would be perceived as one of the first Kazakhstan financial institutions to have overcome the financial crisis. The Bank believes that a successful restructuring would also boost client confidence, which would give the Bank an opportunity both to increase collections on existing assets, as well as to attract new clients, including depositors. After the Restructuring, the Bank will seek to capitalise on its historical strengths, including its network, customer base and experience in servicing state-sponsored programmes.

*Focus on Core Businesses and Client Segments*

The Bank's new management conducted an analysis of the Bank's subsidiaries and has decided to refocus the Bank's operations on the domestic market. In addition, the Bank has divided its subsidiaries into "core" (i.e., subsidiaries that the Bank intends to retain going forward) and "non-core" (i.e., subsidiaries and associates that the Bank intends to dispose of) based on the results of

this analysis. The Bank deemed a subsidiary or associate core if such entity was of strategic importance to servicing the Bank's key client segments and provided high growth and profitability potential where such subsidiary operates. All subsidiaries were determined to be "core" except BTA Georgia, BTA Armenia, Temirbank and BTA Ipoteka.

*Strengthen Corporate Structure and Governance*

Following Samruk-Kazyna's investment in the Bank in early 2009, Mr. Arman Dunayev was appointed Chairman of the Board of Directors. On 6 March 2009, Mr. Iskandirov, Mr. Aitekenov and Mr. Karibzhanov were further appointed to the Board of Directors by Samruk-Kazyna. On the same date, Mr. Wokurka, Dr. Korishchenko and Mr. Talvite were appointed as independent directors on the Board of Directors. Following these appointments, the Bank commenced a company-wide review and reform of its corporate governance policies and procedures. As a part of these reforms, the Board of Directors now meets three times per month and has increased its interaction with the Bank's management. Furthermore, new members were appointed to each of the remuneration committee and management board. The Bank is required to implement a corporate governance framework consistent with best international practices as part of the Restructuring.

*Improve Risk Management*

In order to improve its risk management, the Bank has created a new credit policy that describes key sectors on which the Bank is planning to focus, as well as requirements for client selection. The new credit policy gives priority to the SME loan business and key agricultural and industrial companies with a focus on vertically integrated businesses. The Bank will also focus on financing state-owned companies, export and highly efficient production industries, including through participation in state programmes that provide business support. As a part of its policy, the Bank will not offer loans to new real estate projects, start-up investment projects or non-residents (including off-shore companies). The Bank will also develop and introduce a maximum allowable concentration for its portfolio risks and implement a new borrower risk assessment system after the Restructuring.

On the retail side, the Bank's new policy will decrease the lending limits established for each loan product, require income confirmation of its retail borrowers and focus on lending to employees of corporate clients with deposits already held by the Bank through its salary card programmes. The Bank will also discontinue a number of its more risky retail lending programmes, including lending to the secondary auto market. Finally the new policy will require examination of clients' credit history through the credit history bureau, the First Credit Bureau.

The new credit policy will require that liquid collateral, including deposits, real estate, insured cars and equipment, comprise at least 70 per cent. of the overall collateral structure. The Bank will institute a limit of 30 per cent. on the proportion of collateral that may be comprised of land lots and subsurface use rights. Under the policy, the Bank will no longer accept as collateral immovable property under construction which is less than 80 per cent. completed, except with respect to "investment loans" (which under FMSA rules of classification must include the following terms: (i) a maturity of five or more years; (ii) restriction on prepayment in full; and (iii) a business plan that contemplates the creation, expansion and modernisation of material production, manufacturing or transport infrastructure. Further, any collateral proposed for loans in excess of U.S.$3 million must be reviewed by the Bank's Division of Expertise and Monitoring of Collateral.

Finally, the Board of Directors must approve (in some cases with a Qualified Majority) any loan involving (i) a borrower that has any type of special relationship with the Bank or is affiliated with the Bank, (ii) an exception from the Bank's credit policy or (iii) any type of Government interest.

*Build on Existing Banking Franchise*

Historically, the Bank has had a strong corporate banking franchise and that has only recently been negatively affected by the lending practices of former management. The Bank's new management expects to rectify the lending practices to build on the Bank's strong franchise following

Restructuring.  Further, the Bank's close relationship and support from the Government allows the Bank to participate in the State Finance Programmes and provides the Bank access to major domestic corporate clients.  The Bank's new strategy refocuses the Bank's business strategy on Kazakhstan customers and the retail and SME businesses.  The Bank believes its banking franchise is fundamentally a healthy business that should perform efficiently following the change in management and key shareholders of the Bank and abandonment of the deficient legacy lending practices.  The retail and SME business divisions have retained their core infrastructure and personnel despite the recent financial turmoil.  The SME and retail businesses will be further developed to enhance cross-selling opportunities.

*Strengthen Treasury Operations*

The Bank intends to strengthen its treasury operations to ensure that the Bank maintains current liquidity.  The Treasury department regulates the Bank's external cash flows to meet the Bank's client demands, as well as internal and regulatory liquidity standards.  Further, the Treasury department hedges the Bank's currency risks and engages in securities and derivatives trading.  The Bank intends to strengthen the Treasury department by adopting automated systems that will incorporate real time risk management for a wide range of the Treasury department's operations while enhancing further liquidity management.

*Improve Human Resources and Information Technology*

In order to reduce its costs, the Bank has decreased its headcount (on an unconsolidated basis) from 7,185 employees as at 31 December 2007 to 6,608 employees as at 31 December 2008 to 5,085 as at 30 September 2009.  Going forward, the Bank plans to increase the proportion of employees deployed in client-facing roles by improving efficiency in its back-office operations.  With respect to operations, the Bank plans to improve its customer service to differentiate itself from its competitors.

The Bank currently has one of the most modern and reliable information technology systems in the Kazakhstan banking sector.  The Bank intends to build on its infrastructure by increasing the quality of the data produced, providing consistent classification and resolving data-reconciliation issues.

*Optimise Branch Network*

The Bank's new management commenced a review and optimisation of the Bank's domestic branch network beginning in the fourth quarter of 2008.  As a part of the optimisation, the Bank has reduced its branch network to 22 branches and 230 cash offices in 66 cities across the country as at the date of 31 March 2010 from 22 branches and 279 cash offices as at 31 December 2008.  The Bank's branch network as at 30 September 2009 included 142 full service outlets offering a full range of products to corporate and retail clients, 37 specialised retail units servicing all types of retail clients and 58 cash offices providing payment services to retail clients.  The Bank believes that the optimisation is complete as of the date of this Information Memorandum and the Bank expects to increase its branch network going forward.

**Corporate Business Strategy**

*Restructuring and Recovery of Troubled Assets*

The Bank has analysed each of the loans in its corporate portfolio and, based on certain economic and legal factors, created a notional division to identify its troubled assets portfolio.  The economic factors that the Bank considered when deciding whether to identify a particular corporate loan asset as troubled included: (i) inability of the borrower to service the debt in accordance with the terms of the loan; (ii) delinquency of over 60 days; (iii) a change in provisions of between 50 per cent. and 100 per cent.; (iv) two or more loan extensions; (v) debt discharge at the end of the term; (vi) need for further investments to complete projects with no interim cash flows; and (vii) borrowers in certain "problem" sectors including construction and development (civil and industrial), property speculation, building materials production or trading and mining start-ups.  The legal factors that the Bank considered include: (a) suspected related party transactions; (b) no connection between the purpose of

the loan and the business of the borrower; (c) unresolved legal issues in respect of credit transactions; and (d) absence or discharge of a pledge.

As of 30 September 2009, the value of the Group's total corporate loans portfolio was KZT 2,443,296 million, of which KZT 1,838,280 million were loans segregated into the troubled assets portfolio.

After a loan is segregated into the troubled asset portfolio, the Bank pursues one of three strategies — recovery, write-off or restructuring and transfer to the performing loans portfolio. See "*Asset and Liability Management — Non-Performing Loans*" and "*Asset and Liability Management — Write-off Policy*".

*Development Strategy*

The Bank's development strategy with respect to its corporate portfolio will focus on corporate clients in Kazakhstan and on lending to corporates under the State Finance Programmes and the Industrial Innovation Programme. The Bank also seeks to improve its corporate lending procedures.

As an initial matter, the Bank plans to focus on corporate borrowers in Kazakhstan. The Bank plans to restore its reputation and thereby resume its relationships with former domestic corporate clients with the aim of replacing the corporate deposits lost since 2008. The Bank plans to provide loans to Kazakhstan-based companies through the State Finance Programmes and companies in key industries (including oil and gas, minerals, metallurgy, transport, communication and agriculture) and to provide guarantees to contractors and suppliers of SamrukKazyna's group companies.

As at 30 September 2009, the Group has utilised KZT 25,197 million pursuant to the Construction State Finance Programme and utilised KZT 8,160 million pursuant to the Agricultural State Finance Programme. See "*State Finance Programmes*". The Bank intends to continue its participation under these and similar programmes funded by the Government and other multilateral organisations and will covenant in the Trust Deed to use its reasonable efforts to remain eligible for participation in programmes sponsored by the Government or its agencies for funding the commercial banking sector and to participate in such programmes to the extent that such funding is available on reasonable commercial terms.

As a state-owned bank following the Restructuring, the Bank will play a crucial role in the national industrialisation programme, pursuant to which the Government has publicly stated that it plans to invest KZT 9.5 trillion into 368 projects over the next five years. The Bank believes that its involvement in this programme will improve the diversification of its corporate loan portfolio due to the programme's strict eligibility requirements.

With respect to its lending procedures, the Bank plans to establish more conservative risk limits for specific industries and to monitor more closely its credit risk compliance. The Bank will seek to ensure adequate diversification of the corporate loan portfolio, provide credit risk monitoring, including the calculation of capital level of an individual borrower, economic sector, country and product, more closely monitor risk concentration in the corporate portfolio by economic sectors and ensure monitoring of lending procedures in accordance with agreed bank rules and regulations.

**SME Business Strategy**

*Restructuring and Recovery of Troubled Assets*

The Bank relies on certain economic factors to identify loans that should be included in its SME troubled assets portfolio, including: (i) payment delinquency; (ii) financial performance of the borrower (if the borrower's financial condition is assessed as unsatisfactory or critical due to the borrower's inability to meet its obligations); (iii) collateral quality and (iv) other parameters, including misuse of previously loaned amounts, previous extensions of the maturity of the loans, presence of other outstanding obligations and the availability of a credit rating for the borrower. The

Bank does not evaluate any legal factors when determining whether a loan will be included in the SME troubled assets portfolio.

As at 30 September 2009, the value of the Group's total SME loans portfolio was KZT 235,512 million, of which KZT 58,003 million were loans segregated into the SME troubled assets portfolio.

The Bank reviews the troubled loans in the SME portfolio on a monthly basis to monitor the borrower's standing and conducts financial due diligence on each SME borrower twice per year. The Bank also undertakes a valuation of the collateral on an annual basis. Both the financial due diligence and collateral valuation must be approved by the Credit Committee of the Bank.

After a troubled SME loan becomes delinquent, the Bank's Department of Small and Medium Business pursues one of several strategies depending on the particular borrowing, including refinancing, requiring full or partial prepayment, obtaining additional collateral or collateral sale. Once a troubled loan becomes overdue by more than 60 days, the loan is handled by a dedicated department for further work on loan repayment with a focus on full recovery through enforcement and sale of security.

*Development Strategy*

As a part of its development strategy, the Bank seeks to regain market share in the SME sector and increase the proportion of its overall loan portfolio represented by SME loans to 30 per cent. As at 30 September 2009, the Bank's SME market share was 13.4 per cent. and SME loans comprised 7.4 per cent. of its total loan portfolio. As at 1 March 2009, the Bank's SME market share had decreased to 11.6 per cent. The Bank also seeks to increase its efficiency in the SME business in part by reducing the application processing time for an SME loan from 32 days to 16 days.

The Bank also seeks to expand its role in the SME State Finance Programmes. As at 30 September 2009, the Group had received KZT 39,800 million from the Government pursuant to the SME State Finance Programmes, of which it had utilised KZT 37,566 million. See "*State Finance Programmes*".

**Retail Business Strategy**

*Restructuring and Recovery of Troubled Assets*

The Bank uses the same analysis to identify the troubled assets in its retail portfolio that it uses for its SME portfolio.

As at 30 September 2009, the value of the Group's total retail loans portfolio was KZT 497,356 million, of which KZT 106,223 million were loans segregated into the retail troubled assets portfolio.

Once a retail loan is deemed to be a troubled asset (which occurs once payment is overdue for 31 days), the Department of Problem Loans of the Bank implements a three-tiered strategy for recovery. First, the Bank will attempt to prevent delays in repayment by making warning calls to borrowers of loans that are overdue, but not yet classified as non-performing. If the loan becomes non-performing, meaning overdue for 90 days, the Bank will attempt to restructure the loan by altering the repayment schedule, prolonging the maturity date and, for loans that qualify, provide refinancing through the Mortgage State Finance Programme. Finally, if these measures do not succeed, the Bank may exercise its rights over collateral, including conducting a collateral sale. If a particular company decides to terminate its salary card programme in which that company pays all employee salaries through the Bank by way of the issuance by the Bank to that company's employees of salary cards, then the Bank will classify any loans granted to employees of such company (which will no longer be secured by the salary cards and by the ability of the Bank to directly debit such cards) as "potential" troubled assets which are closely monitored.

*Development Strategy*

The Bank's goal with respect to its retail deposits is to attain a ranking within the top three of Kazakhstan banks by 2014, with market share of at least 15 per cent.  In order to achieve this goal, the Bank will focus on middle and mass segments of the population (as opposed to high-end customers) and improve customer relations through loyalty programmes with existing customers.  The Bank also intends to expand its credit card business and attract new corporate clients to salary card programmes.  Furthermore, the Bank will focus on non-credit products as a source of support for all retail business, including exchange transactions, payment transactions and transfers.  The Bank will expand its payment channel availability to facilitate this goal.

The Bank will seek to expand its role as an agent bank for the State Finance Programmes.  The Bank will also focus on lending to employees already participating in its salary card programmes and seek to increase the customers in its salary card programmes from approximately 640,000 to 720,000.  The Bank will further target borrowers that are employees of financially stable companies.  Finally, the Bank will seek to reduce the level of provisions to less than 11.5 per cent. of the overall retail loan portfolio by 2014.

## Business of the Bank

The Bank is a leading commercial bank in Kazakhstan.  Under the terms of the Bank's licence, the Bank is authorised to offer a full range of traditional corporate and retail banking products and services.  See "*Overview*".

The Bank services private commercial enterprises, state-owned enterprises and individual customers.  As at 30 September 2009, the Bank had 22 regional branches and 237 cash offices throughout Kazakhstan.  In addition, the Bank maintains representative offices outside Kazakhstan in Moscow, Russia; Kiev, Ukraine; Shanghai, China and Dubai, United Arab Emirates.

The Bank has four principal business activities, divided into various departments: corporate, SME, retail and investment activities.  See "*Principal Business Activities*".  The Bank has various ancillary departments that provide support services.

The following table presents a breakdown of the Group's net loan portfolio as at 30 September 2009 and as at 31 December 2008 and 2007:

| | As at 30 September | | | | As at 31 December | |
| | 2009 | | 2008 | | 2007 | |
| | *(KZT millions)* | *(per cent.)* | *(KZT millions)* | *(per cent.)* | *(KZT millions)* | *(per cent.)* |
| Corporate loans ...................................... | 507,339 | 45.8% | 897,681 | 55.5% | 1,558,146 | 65.5% |
| SME loans ........................................... | 180,375 | 16.3% | 235,671 | 14.6% | 277,094 | 11.6% |
| Retail loans .......................................... | 419,527 | 37.9% | 483,711 | 29.9% | 544,570 | 22.9% |
| **Total** ................................................... | **1,107,241** | **100.0%** | **1,617,063** | **100.0%** | **2,379,810** | **100.0%** |

The Bank offers its products and services through its own branch network as well as through alternative distribution channels.

## Principal Business Activities *Corporate Business*

As at 1 March 2010, the Bank serviced 598 corporate clients.  In order to provide high-quality client service, the Bank developed a dedicated team of personal managers with a high level of responsibility and professional skills.

The Bank's corporate business is comprised of two divisions responsible for long-term client relationships based on the location of the corporate customer (Department of Client Relations of Corporate Business No. 1, Department of Client Relations of Corporate Business No. 2), three divisions responsible for the quality of the corporate portfolio based on the economic sector of the corporate client (Department of Credit Analysis of Corporate Business No. 1, Department of Credit Analysis of Corporate Business No. 2, Department of Credit Analysis of Corporate Business No. 3),

one division responsible for credit analysis and recovery of existing loans made to businesses in CIS countries (Department of CIS Countries Financing), one division responsible for business development (Department of Analysis and Corporate Business Development) and a regional directorate for agricultural business.

A significant part of the corporate loan portfolio comprises trade financing, mostly in Tenge and in U.S. Dollars, including letters of credit, guarantees and working capital financing.  The corporate departments of the Bank provide a range of services that includes cash management control and online banking.  The Bank cross-sells a number of products and services to corporate clients, including payroll management services and corporate card services.  According to the FMSA, as of 1 March 2010, the Bank held a 29.2 per cent. share of the corporate lending market in Kazakhstan.

In July 2009, the Bank engaged an independent auditor to review the credit files of a portion of the borrowers in the Bank's corporate loan portfolio to assess, in conjunction with independent auditors engaged by the Steering Committee, the appropriate level of loan loss provisions as at 30 June 2009 based on FMSA Methodology.  This review resulted in a report dated 3 September 2009.  On 23 September 2009, the Bank and the Steering Committee again engaged their independent auditors to supplement and expand on their previous review of the corporate loan portfolio by reviewing the credit files of all of the borrowers in the Bank's corporate loan portfolio.  Pursuant to its report issued on 12 November 2009, the Bank's independent auditors in conjunction with the Steering Committee's independent auditors advised that the appropriate level of loan loss provisions on the corporate loan portfolio of the Bank was KZT 1,965 billion (based on FMSA Methodology) as at 30 June 2009.  For a discussion of the differences between FMSA Methodology and IFRS, see "*Pro Forma Financial Information*" and "*Asset and Liability Management — Provisioning Policy*".

As at 30 September 2009, the Group's corporate loan portfolio included KZT 2,443,296 million in loans to corporate customers (not including SME customers), representing 76.9 per cent. of its gross loan portfolio.  As at 30 September 2009, the Group posted KZT 1,935,957 million of provisions in respect of corporate loans (excluding SME loans).  Of the gross corporate loan portfolio, loans totalling KZT 1,838,280 million have been deemed troubled loans as at 30 September 2009.  See "*Strategy — Corporate Business Strategy — Restructuring and Recovery of Troubled Assets*".

The Bank's deposits of corporate clients (on an unconsolidated basis) decreased by 21.2 per cent. to KZT 330,095 million as at 30 September 2009 from KZT 418,823 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time.

The Bank also provides certain insurance services to its corporate clients, including borrowers' property insurance through its insurance subsidiary companies.  See "*Other Activities of the Bank — Insurance Services*".

### SME Business

The Department of Small and Medium Business provides banking services to SMEs, which are defined as legal entities with assets of no more than KZT 459 million, annual sales of no more than U.S.$25 million and no more than 250 employees.  The Bank sets a financing limit equal to no more than U.S.$10 million for SMEs.  The Department of Small and Medium Business consists of three divisions: Division of Loan Business, Division of Non-Loan Business and Division of SME Support.

The Bank offers cooperation to enterprises of all sectors of the economy and offers loans for various purposes, including:

● replenishment of working capital;

● purchase of raw materials;

● trade operations;

- purchase of equipment, real estate purchase and equity investments; and

- "investment loans," (which under FMSA guidelines means loans which include the following terms:

(i) a maturity of five or more years; (ii) restriction on prepayment in full; and (iii) a business plan that contemplates the creation, expansion and modernisation of material production, manufacturing or transport infrastructure).

The Bank offers different types of products to its SME clients: loans and credit lines, overdrafts, letters of credit, guarantees, promissory notes, bonds and factoring. The Bank also lends funds to SMEs through the SME State Finance Programme and Agricultural State Finance Programme, as well as through other Samruk-Kazyna stabilisation programmes. See "*State Finance Programmes*".

As at the date of this Information Memorandum, the Bank services approximately 52,039 SME clients in its 22 branches, including approximately 9,862 SME borrowers. The Bank evaluates the particular circumstances of each SME client and uses a tailored approach in servicing their loans supported by a full range of banking services. The Bank will provide certain discounts on certain products to customers who have been loyal to the Bank for many years or provide high turnover.

As at 30 September 2009, the Group's SME loan portfolio included KZT 235,512 million in loans to SME customers, which represents 7.4 per cent. of its gross loan portfolio. As at 30 September 2009, the Group posted KZT 55,137 million of provisions in respect of SME loans. Of the gross corporate loan portfolio, loans totalling KZT 58,003 million have been deemed troubled loans as at 30 September 2009. See "*Strategy — SME Business Strategy — Restructuring and Recovery of Troubled Assets*".

The Bank's deposits of SME clients (on an unconsolidated basis) decreased by 44.6 per cent. to KZT 69,438 million as at 30 September 2009 from KZT 125,374 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time.

As of 1 March 2010, the Bank's share (on an unconsolidated basis) of the SME market was 11.6 per cent. based on data of the NBK.

### Retail Business

The retail banking market is an important source of business for the Bank, and the current management believes the Bank is well placed to take advantage of its individual customer and depositor base. The Bank has benefited from its corporate banking relationships by extending retail banking services to the management and employees of its major corporate customers. As of 1 March 2010, the Bank (not including its subsidiaries) had over 1 million retail customer accounts, which includes term deposits, demand deposits and current accounts, aggregating KZT 162,946 million and over 1.1 million cards in circulation including both debit and credit cards.

Following the Bank's breach of capital adequacy requirements in June 2009, the FMSA has temporarily prohibited the Bank from conducting mass television or radio marketing campaigns to attract retail deposits.

The Bank offers a wide range of retail banking products and services, including current accounts, term deposits, credit and debit cards, money transfer services within Kazakhstan as well as to and from foreign countries, currency exchange services and automated teller machine services. The Bank has maintained its position as the second largest bank in Kazakhstan in terms of the number of retail customers (after Halyk Bank, which historically has led the retail banking market as Kazakhstan's former state-owned "savings" bank) principally because it has a large number of clients who still use salary cards issued by the Bank. The monetary value of retail deposits held with the Bank was the second largest in Kazakhstan at the beginning of 2009 with 19 per cent. of market share, but as of March 2010, the Bank's market share has fallen to 8 per cent., which places it fifth in Kazakhstan.

Since 1999, the Bank has continued to increase its penetration into the retail banking market and to expand its branch network in regions with a high potential for retail banking business, particularly eastern Kazakhstan and the Caspian Sea regions in the western part of the country. Since 2007, the Bank has invested heavily in automated teller machines and terminals throughout Kazakhstan, and now has the third most automated teller machines among banks in Kazakhstan after Halyk Bank and Alliance Bank.

The Bank offers a wide range of consumer lending products, including: mortgage loans (including through BTA Ipoteka), loans for purchasing automobiles and consumer goods, loans to employees of large corporate customers and loans to the Bank's personnel. As at 1 March 2010, total consumer loans were KZT 200,879 million. The Bank's policy is to focus on lending to retail customers through the salary card programme and to increase the retail client base through the issue of salary and other cards.

For the purpose of further developing mortgage lending, the Kazakhstan Mortgage Loan Guarantee Fund was established and the Bank joined this scheme in 2004. Participation in the Mortgage Loan Guarantee Fund entitles banks and mortgage companies to be protected from losses resulting from borrowers' defaults under mortgage loans. As of 1 March 2010, the Bank on an unconsolidated basis had received guarantees of the Fund on mortgage loans in the amount of KZT 2,423 million.

The Bank offers a wide range of card products to retail customers. As at the date of this Information Memorandum, the Bank has a leading market position in card products, with a 16.1 per cent. share of the market for active cards. The Bank offers different types of cards to its customers, including: Visa Electron, Visa Classic, Visa Gold, Visa Platinum, Visa Business, Visa Business Electron, Visa Virtuon, MasterCard Standard, MasterCard Gold, MasterCard Platinum, MasterCard Business and Maestro. As of 1 March 2010, the Bank has issued over 1,119,369 cards that are in circulation, 23,806 of which are credit cards; 440 corporate debit cards; 1,022,340 personal debit cards (including 87,618 individual debit cards, 713,359 salary debit cards, 221,363 other debit cards (which include, among others, debit cards given to individuals for receiving pension payments, debit cards for individuals making internet payments, debit cards for the payment of customs duties and debit cards for high-end clients)); and 72,783 domestic debit cards (i.e., Smart Alem cards). As of 1 March 2010, the Bank has issued 706,139 Visa cards, 340,447 Master Cards and 72,783 domestic Smart Alem cards. The Bank is a principal member of both Visa International and Master International payment systems. The Bank's card processing activities have been outsourced by the Bank to Alem Card Ltd., which acts as a processing centre.

As at 30 September 2009, the Group's consolidated retail loan portfolio included KZT 497,356 million in loans to retail customers, which represents 15.7 per cent. of its gross loan portfolio. As at 30 September 2009, the Group posted KZT 77,829 million of provisions in respect of retail loans. Of the gross corporate loan portfolio, loans totalling KZT 106,223 million have been deemed troubled loans as at 30 September 2009. See "*Strategy — Retail Business Strategy — Restructuring and Recovery of Troubled Assets*". Based on information provided by the NBK, as at 1 March 2010, the Bank had a 13.7 per cent. market share of retail loans compared to 13.9 per cent. as at 31 December 2008 and 9.6 per cent. as at 31 December 2007.

The deposits of retail clients of the Bank (on an unconsolidated basis) decreased by 44.6 per cent. to KZT 151,413 million as at 30 September 2009 from KZT 273,275 million as at 31 December 2008, primarily as a part of the overall significant deposit outflow in the Kazakhstan banking sector during that time. Based on information provided by the NBK, as at 1 March 2010, the Bank had a 8.4 per cent. market share of retail deposits compared to 19.4 per cent. as at 31 December 2008 and 18.5 per cent., as at 31 December 2007 respectively. The Bank had 1,234,313 retail deposit accounts as at 30 September 2009, compared to 1,206,917 as at 31 December 2008 and 1,014,679 as at 31 December 2007.

As at 1 March 2010, deposits of less than U.S.$10,000 accounted for 42.8 per cent. of the Bank's total deposits, deposits of an amount between U.S.$10,000 and U.S.$100,000 accounted for 39.7 per cent. and deposits in excess of U.S.$100,000 accounted for 17.5 per cent. of the Bank's total deposits.

The Bank provides additional services to its clients who use its card services, such as SMS banking, internet banking, utility bills payments through automated teller machines, transfers between cards, loan repayments and fund transfers to saving accounts.

The Bank also provides certain pension services through its subsidiary, BTA Pension Fund, and insurance services through its subsidiaries, Insurance Company London Almaty, BTA Zhizn, BTA Zabota and BTA Insurance.  See "*Other Activities of the Bank — Pension Fund Services*" and "*Other Activities of the Bank — Insurance Services*".

### Investment Activities

The Bank's investment activities include trading or investing financial assets and liabilities, financing and merger and acquisitions transaction support.  The Bank operates in local and foreign market operations through BTA Securities, its Treasury department and international operations support departments.

The Bank's Treasury department provides open-market operations in order to ensure the efficient management of the Bank's funds (for the Bank as a whole).  The Treasury department achieves this purpose using foreign exchange (FOREX) and money market operations, and operations with securities, taking into consideration the policy of efficient internal and external risk management.  In addition, the Bank is one of the leading traders of Government debt securities and one of the leading participants on the interbank money market.  See "*Asset and Liability Management — Treasury Operations*".

In 1997 the Bank created BTA Securities, a wholly owned subsidiary of the Bank.  BTA Securities offers its clients a wide range of services: broker services, individual trust management services, mutual fund services, issuance and placement of securities of its clients.  The Bank also renders services related to the organisation of mergers and take-overs.

BTA Securities also has a trading division that carries out brokerage operations, as well as trading operations for its own portfolio.  BTA Securities provides its clients with access to Kazakhstan and international securities markets.

The principal activities of BTA Securities include individual trust management, which is focused on institutional investors and their individual investment preferences and purposes, and mutual funds focused on preserving and increasing the capital of individuals and SMEs.  BTA Securities' clients include insurance companies, mutual funds of various types, real estate funds and other legal persons who are interested in the effective implementation of their investment aims by means of the financial market.  The cumulative investment portfolios of BTA Securities' clients consist of various financial instruments, such as equity and debt securities of Kazakhstan and international issuers and derivative financial instruments.

As a financial adviser and underwriter, BTA Securities offers its clients services related to the state registration of securities issuances, inclusion of securities on the KASE and placement of securities with investors.  BTA Securities also provides consulting services to assist issuers to obtain ratings by international rating agencies.

BTA Securities provides a range of investment banking products and services, including mergers and acquisitions, structured solutions and derivatives, for clients of all sizes and across all industries. BTA Securities' investment banking clients include local and foreign acquirers and target companies. Traditionally, BTA Securities' primary client was the Bank itself when acquiring businesses in Kazakhstan, Russia, Turkey, Ukraine, Georgia and Armenia.  Target company clients have generally not been related to the Bank.  The investor base for target company clients includes large foreign investment banks, their clients and local and foreign private equity funds.

The Bank has been historically active on the international markets and has regularly entered into various trade finance interbank facilities with foreign banks and Kazakhstan subsidiaries of foreign banks, pursuant to each of which the Bank is permitted to draw various amounts for on-lending funds for export-import operations of its clients in Kazakhstan and abroad.  Such facilities are drawn for the purposes of providing short term financing for export-import contracts for an average of two years and for providing medium and long term loans under guarantees of export-import banks and export credit agencies that usually cover imports of goods and services for a period of up to 12 years.

As at the date of this Information Memorandum, the Bank maintains Trade Finance Facilities with ABN AMRO Bank N.V., HSBC Bank, Bank Austria Creditanstalt AG (Austria), Bayerische Hypo-Und Vereinsbank Aktiengesellschaft (Germany), Exim India (India), JBIC (Japan), Exim China (Taiwan), Exim Korea (Korea), Credit Suisse (Switzerland), Wachovia Bank (United States of America), Mediobanca (Italy), Calyon (France), UBS (Switzerland), Deutsche Bank AG (Germany), Deere Credit Inc. (Switzerland) and BNP Paribas (France) and others.

The Bank has expanded its regional presence through the establishment of a network of representative offices.  As at 30 September 2009, the Bank maintained representative offices beyond Kazakhstan in Moscow, Russia; Kiev, Ukraine; China and Dubai, United Arab Emirates through which it intends to diversify its client base and the range of banking products in the areas of lending and international trade finance.

As of 30 September 2009, the Bank has 17 subsidiaries (entities in which it owns 50 per cent. or more of the equity interest) and eight associates (entities in which it owns more than 20 per cent. and less than 50 per cent. of the equity interest).  See "*Subsidiaries and Associates of the Bank*".  The Bank has significant shareholdings in a number of local commercial banks that it believes have the potential, in particular, of developing the Bank's trade finance business.  The Bank works with these banks to develop and coordinate loan policies, and implement risk management and operational systems.

The Bank is currently considering increasing its interest in BTA Georgia in order to ensure that the Bank does not lose its controlling interest in BTA Georgia, to preserve the Group's business in Georgia and to preserve and increase the attractiveness of the Bank for potential investors post-Restructuring.  As at the date of this Information Memorandum, the Bank has no immediate plans for increasing any particular investments in any other banks.

**Other Activities of the Bank**

The Bank also provides pension fund services and insurance services to support its corporate, SME and retail business segments.

*Pension Fund Services*

The provision of pension fund services is a growing business in Kazakhstan as a result of government reform in this area in 1998.  There are currently ten asset management companies, 13 private pension funds and one state run pension fund in Kazakhstan.  The Group is committed to becoming a leading provider of pension fund services and, as of 30 September 2009, owned 86.05 per cent. of the share capital of BTA Pension Fund.

As at 30 September 2009, BTA Pension Fund had KZT 212,800 billion in assets, representing a 12.1 per cent. share of the total pension assets in the overall Kazakhstan pension market.  BTA Pension Fund has a regional network and operates through 22 representative offices and 146 agency centres.  Its principal activities include collection of obligatory and voluntary pension fees, payments of pensions to clients and investments of pension assets within the framework provided under Kazakhstan law.  The Government caps the commission interest of accumulative pension funds to 15 per cent. of investment income and 0.05 per cent. of pension assets.

*Insurance Services*

The insurance market is developing rapidly in Kazakhstan due to changes in legislation, increased regulatory supervision and the general economic development in Kazakhstan over the past few years. As at the date of this Information Memorandum, there are 43 insurance companies operating in Kazakhstan.    As of 30 September 2009, these insurance companies had total capital of KZT 182.3 billion and total assets of KZT 307.2 billion.  The Bank has a controlling interest in each of Insurance Company London Almaty (99.54 per cent.), BTA Zhizn (100 per cent.), BTA Zabota (98.17 per cent.) and BTA Insurance (100 per cent.) through which it offers a broad range of insurance products.  The Bank is focused on furthering its penetration of the insurance market over the next few years.  Management believes the Bank is well positioned to capitalise on the expected growth in this sector during the next five years.

Insurance Company London Almaty focuses on services related to property and responsibility insurance, particularly for legal entities.  BTA Zhizn provides life insurance and annuities, primarily to individuals.  BTA Zabota specialises in medical insurance, primarily to legal entities, including social benefits to the employees of its corporate clients.  BTA Insurance provides voluntary property insurance and obligatory auto insurance.

## Subsidiaries and Associates of the Bank

### Subsidiaries

The Bank had 17 subsidiaries as at 30 September, 2009.  The financial results of these subsidiaries are consolidated with those of the Bank in the financial statements contained herein.  The following table sets out certain information relating to the Bank's subsidiaries as at 30 September 2009:

| Subsidiary | Per cent. owned | Country of incorporation | Date of incorporation | Industry | Date of acquisition |
|---|---|---|---|---|---|
| BTA Pension Fund | 86.05 | Kazakhstan | 11 December 1997 | Pension fund | 16 September 1998 |
| BTA Insurance | 100.00 | Kazakhstan | 8 September 1998 | Property and responsibility insurance | 21 December 2006 |
| BTA Ipoteka | 100.00 | Kazakhstan | 20 November 2000 | Consumer mortgage lending | 20 November 2000 |
| BTA Zhizn | 100.00 | Kazakhstan | 22 July 1999 | Life Insurance and annuity | 30 March 2001 |
| BTA Zabota | 98.17 | Kazakhstan | 10 September 1996 | Medical insurance | 4 April 2001 |
| Insurance Company London Almaty | 99.54 | Kazakhstan | 20 November 1997 | Property and responsibility insurance | 5 August 2004 |
| BTA Securities | 100.00 | Kazakhstan | 17 October 1997 | Securities trading and asset management | 13 December 1997 |
| TuranAlem Finance | 100.00 | Netherlands | 22 May 2001 | Capital markets | 22 May 2001 |
| TuranAlem Finance (Russia) | 100.00 | Russia | 22 June 2004 | Capital markets | 28 September 2004 |
| BTA Finance Luxembourg | 86.11 | Luxembourg | 5 January 2006 | Capital markets | 6 March 2006 |
| Temirbank[(1)] | 70.51 | Kazakhstan | 26 March 1992 | Banking | 29 December 2006 |
| TemirCapital B.V. | 100.00 | The Netherlands | 29 May 2001 | Operations on capital markets | 29 December 2006 |
| BTA Kyrgyzstan | 71.00 | Kyrgyzstan | 2 December 1996 | Banking | 19 November 2007 |
| BTA Belarus | 99.29 | Belarus | 25 April 2002 | Banking | 30 October 2008 |
| First Kazakhstan Securitisation Company | — | The Netherlands | 8 December 2005 | Securitisation of financial assets | — |
| Second Kazakhstan Securitisation Company | — | The Netherlands | 25 September 2007 | Securitisation of financial assets | — |
| BTA DPR Finance Company | — | Cayman Islands | 2 September 2007 | Financial services | 2 September 2007 |

Note:
_____

(1)    The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement.  See "*Management's Discussion and Analysis of Results of Operations and Financial Conditions — Recent Developments*".

Following are brief summaries relating to the status and operations of the Bank's subsidiaries. Financial information for each entity has been extracted from the Bank's Unaudited Interim Financial Statements as at 30 September 2009.

*BTA Pension Fund*

BTA Pension Fund, previously known as JSC Pension Fund Kurmet Kazakhstan, was registered on 30 December 2005.  BTA Pension Fund, located in Almaty, was established on 16 September 1998 as a result of the merger of two pension funds, JSC Pension Fund Kurmet and JSC Pension Fund Kazakhstan, each of which was established in 1998 as a closed joint stock company.  As of 30 September 2009, the Bank owned 86.05 per cent. of BTA Pension Fund's equity capital.  BTA Pension Fund is a non-state pension fund.  See "*The Bank — Other Activities of the Bank — Pension Fund Services*".  According to information provided by the FMSA as at 30 September 2009, BTA Pension Fund had a 12.1 per cent. share of the pension market in Kazakhstan.  As of 30 September 2009, BTA Pension Fund had share capital of KZT 12,984 million and assets of KZT 13,051 million.

*BTA Insurance*

BTA Insurance was established on 8 September 1998 as an open joint stock company.  BTA Insurance is a wholly owned subsidiary of the Bank.  It provides a full range of insurance services.  As of 30 September 2009, BTA Insurance had a 1.68 per cent. share of the overall insurance market in Kazakhstan, assets of KZT 22,824 million and equity capital of KZT 19,373 million.

*BTA Ipoteka*

BTA Ipoteka was established in November 2000 as an open joint stock company and is based in Almaty.  The Bank holds 100 per cent. of BTA Ipoteka's share capital.  BTA Ipoteka provides a wide range of services, including financing for the purchase, maintenance and construction of real estate.  According to information provided by the FMSA, as of 30 September 2009, it had a 6.9 per cent. share of the mortgage market in Kazakhstan.  As of 30 September 2009, BTA Ipoteka had equity capital of KZT 7,265 million and assets of KZT 62,239 million.  The Bank considers BTA Ipoteka a "non-core" subsidiary.  See "*— Strategy — General Strategies of the Bank — Focus on Core Businesses and Client Segments*".

*BTA Zhizn*

BTA Zhizn was established in July 1999 as a closed joint stock company and is based in Almaty.  As of 30 September 2009, the Bank held 100 per cent. of the share capital of BTA Zhizn.  BTA Zhizn provides life insurance services and was one of the first insurance companies in Kazakhstan to be licensed by the FMSA to provide such services.  As of 30 September 2009, BTA Zhizn had an 11.1 per cent. share of the voluntary individual insurance market in Kazakhstan.  As of 30 September 2009, BTA Zhizn had assets of KZT 8,320 million and its equity capital was KZT 3,371 million.

*BTA Zabota*

BTA Zabota was established in September 1996 as an open joint stock company.  As of 30 September 2009, the Bank held 98.17 per cent. of BTA Zabota's equity capital.  BTA Zabota provides a full range of insurance services and, at the date of this Information Memorandum, had a 4.1 per cent. share of the voluntary individual insurance market.  As of 30 September 2009, BTA Zabota had a 0.7 per cent. share of the overall insurance market in Kazakhstan, its total assets were KZT 1,753 million and its equity capital was KZT 1,157 million.

*Insurance Company London Almaty*

Insurance Company London Almaty was established in November 1997 as a closed joint stock company.  As of 30 September 2009, the Bank held 99.54 per cent. of its share capital.  Insurance Company London Almaty is located in Almaty and provides a wide range of services such as individual insurance and property insurance.  As at 30 September 2009, it had a 2.2 per cent. share of the insurance market in Kazakhstan, total assets of KZT 10,845 million and equity capital of KZT 5,880 million.

*BTA Securities*

BTA Securities was established on 17 October 1997 and it is a wholly owned subsidiary of the Bank. Its principal business areas include sales, investment banking, trading and underwriting of government, municipal and corporate securities in Kazakhstan. According to a new method of ranking of activity of operators in the stock exchange, bonds and repurchase transactions, during the first nine months of 2009, BTA Securities was first place on the stock market activity index, second place on the bond market activity index and eighth place on the repurchase transactions market activity index. As of 30 September 2009, BTA Securities' equity capital was KZT 54,902 million and it had assets of KZT 59,318 million.

*TuranAlem Finance*

TuranAlem Finance was established on 22 May 2001 in The Netherlands as a limited liability company. TuranAlem Finance may act as an issuer of notes under the Bank's notes programme.

*TuranAlem Finance (Russia)*

TuranAlem Finance was established on 22 June 2004 in Moscow, Russia as a limited liability company and is a wholly owned subsidiary of the Bank. It was created principally for the purpose of raising funds for the Bank through the issuance of Russian Rouble denominated bonds and promissory notes. As of 30 September 2009, TuranAlem Finance (Russia)'s assets of the company were KZT 15,941 million and its equity capital was KZT 187.7 million.

*BTA Finance Luxembourg*

BTA Finance Luxembourg was established in Luxembourg on 5 January 2006 as a public limited liability company (*société anonyme*). It is a special purpose vehicle established for the purpose of the Perpetual Securities. As of 30 September 2009, BTA Finance Luxembourg had assets of KZT 63,771 million and negative equity capital of KZT 62.2 million.

*Temirbank*

Temirbank was established on 26 March 1992. The head office of Temirbank is located in Almaty. As of 30 September 2009, Temirbank had total assets of KZT 240.5 billion and negative equity capital of KZT 40.8 billion. Temirbank is currently in the process of restructuring its financial indebtedness. The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Conditions — Recent Developments*".

*Temir Capital B. V.*

Temir Capital B.V. was incorporated on 29 May 2001 under the laws of The Netherlands and is a wholly owned subsidiary of the Bank. Its primary business consists of raising funds on the international capital markets and lending such funds to Temirbank. As of 30 September 2009, Temir Capital B.V. had assets of KZT 119,655 million and equity capital of KZT 639 million.

*BTA Kyrgyzstan*

BTA Kyrgyzstan was established on 2 December 1996. As of 30 September 2009, the Bank held 71 per cent. of the equity of BTA Kyrgyzstan. BTA Kyrgyzstan provides a wide range of services to its corporate and individual customers. As of 30 September 2009, BTA Kyrgyzstan has assets of KZT 15,416 million and equity capital KZT 4,907 million. Currently the Bank is involved in legal proceedings with respect to what it believes was an unlawful foreclosure against its Shares in BTA Kyrgyzstan. See "*Legal Proceedings — Litigation in respect of BTA Kyrgyzstan*".

*BTA Belarus*

BTA Belarus was established on 25 April 2002 and the Bank acquired its interest in BTA Belarus on 30 October 2008.  As of 30 September 2009, the Bank's share in the equity capital of BTA Belarus was 99.29 per cent.  BTA Belarus provides a wide range of services to its corporate and individual customers.  As of 30 September 2009, the assets of BTA Belarus were KZT 12,131 million and equity capital was KZT 1,727 million.  The Bank is currently seeking to invalidate three sale and purchase agreements entered into on 12 and 19 August 2008 for the acquisition by it of a 51.06 per cent. stake in BTA Belarus.  This forms part of the additional U.S.$ 106 million claim which has been brought in the Drey Proceedings by way of the Bank's proposed amendments to its particulars of claim.  See "*Asset Recovery – Drey Proceedings*".

*First Kazakh Securitisation Company*

The First Kazakh Securitisation Company was founded in The Netherlands on 8 December 2005 as a public limited company for the special purpose of pursuing securitisations of financial assets of the Group.  As of 30 September 2009 the assets of First Kazakh Securitisation Company were KZT 7,659 million and its equity capital was KZT 3.5 million.

*Second Kazakh Securitisation Company*

The Second Kazakh Securitisation Company was founded in The Netherlands on 25 September 2007 as a public limited company for the special purpose of pursuing securitisations of financial assets of the Group.  As of 30 September 2009, the assets of Second Kazakh Securitisation Company were KZT 14,190 million and its equity capital was KZT 3.8 million.

*BTA DPR Finance Company*

BTA DPR Finance Company was formed under the laws of the Cayman Islands on 2 September 2007 for the sole purpose of the Bank's DPR securitisation programme.  As of 30 September 2009, BTA DPR Finance Company held assets of KZT 75,000 and its equity capital was KZT 75,000.

***Associates***

The Bank has eight associates, which are entities in which the Bank owns more than 20 per cent. and less than 50 per cent. of such entity's share capital.  The Bank considers BTA Armenia and BTA Georgia "non-core" associates of the Bank.  See "*Strategy — General Strategies of the Bank — Focus on Core Businesses and Client Segments*".  The following sets out information relating to the Bank's associates as at 30 September 2009.

*BTA Armenia*

BTA Armenia is a bank located in Yerevan, Armenia.  BTA Armenia's principal activity is banking activities in Armenia.  The Bank holds a 48.93 per cent. interest in BTA Armenia.

*BTA Georgia*

BTA Georgia is a small bank located in Tbilisi, Georgia.  BTA Georgia's principal activity is banking activities in Georgia.  The Bank acquired a 49.00 per cent. equity interest in BTA Georgia in June 2005.  The Bank is currently considering increasing its interest in BTA Georgia in order to ensure that the Bank does not lose its controlling interest in BTA Georgia, to preserve the Group's business in Georgia and to preserve and increase the attractiveness of the Bank for potential investors post-Restructuring.

*BTA Kazan*

BTA Kazan is a small bank based in Tatarstan, Russia.  BTA Kazan's principal activity is banking activities in the Russian Federation.  The Bank acquired a 47.32 per cent. equity interest in BTA Kazan in October 2006.  It has been reported in the press that Rikas-Finance LLC, AMK-INVEST

Design-Construction Company LLC, DeltaTorg LLC and TuranAlem Capital, who own the remaining 52.68 per cent. stake in BTA

Kazan (who, the Bank believes, hold that stake on Mr. Ablyazov's behalf), have recently sold their stakes in BTA Kazan to Rusneftekhim, Bashpromreserve LLC and Nayada Development LLC.

*BTA Russia*

BTA Russia is a bank located in Moscow. BTA Russia's principal activity is banking activities in the Russian Federation. In July 2008, the Bank's equity interest in BTA Russia was increased to 52.84 per cent. from 14.2 per cent. In November 2008, the Bank's equity interest was decreased to 22.6 per cent. As of 30 September 2009, the Bank held a 22.26 per cent. equity interest in BTA Russia. The Bank is currently seeking to invalidate six sale and purchase agreements (all dated 6 June 2008) for the acquisition by it of an additional 38.63 per cent. shareholding in BTA Russia. This forms part of the additional U.S.$ 106 million claim which has been brought in the Drey Proceedings by way of the Bank's proposed amendments to its particulars of claim. See "*Asset Recovery – Drey Proceedings*".

*BTA Ukraine*

BTA Ukraine is a bank located in Kiev, Ukraine. BTA Ukraine's principal activity is banking activities in the Ukraine. The Bank acquired a 40.038 per cent. equity interest in BTA Ukraine in December 2008. BTA Ukraine has claimed that authorised persons of the Bank entered into an agreement dissolving the Bank's share purchase agreement for the acquisition of its 49.99 per cent. interest. As a result of this alleged agreement, the ownership of the Bank in BTA Ukraine was reduced in the register of BTA Ukraine down to 9.9 per cent. On 28 May 2009, Samruk-Kazyna and the public prosecutor on behalf of the Bank submitted a petition to the Court asking that the alleged agreement dissolving the share purchase agreements be recognised as invalid, and that the issuing of a power of attorney in respect of debiting the Bank's shares in BTA Ukraine be recognised as invalid. The Court satisfied Samruk-Kazyna's claims by absentee decision which entered into force on 3 December 2009. The decision recognised the transactions as invalid and obligated the defendants to return the shares to the Bank and to make the corresponding entry in the register of BTA Ukraine. On 18 January 2010 the Bank submitted to the Shevchenko district court of Kiev a request to have the decision of the court recognised in accordance with laws of Ukraine. The application was accepted on 26 February 2010 and a hearing is scheduled at the Kiev court for 28 April 2010.

*Temirleasing*

Temirleasing is located in Almaty, Kazakhstan. Temirleasing's principal activity is leasing. The Bank directly holds a 26.75 per cent. equity interest in Temirleasing, Temirbank holds a 18.88 per cent. equity interest in Temirleasing and BTA Securities holds a 0.17 per cent. equity interest in Temirleasing.

*BTA Orix Leasing*

BTA Orix Leasing is located in Almaty, Kazakhstan. BTA Orix Leasing's principal activity is leasing. The Bank directly holds a 45.00 per cent. equity interest in BTA Orix Leasing.

*Sekerbank*

Sekerbank is a bank located in Istanbul, Turkey. Sekerbank's principal activities are providing a range of individual and corporate banking services. The Bank holds a 33.98 per cent. indirect equity interest in Sekerbank through BTA Securities.

**The Role of Samruk-Kazyna and the NBK**

Samruk-Kazyna, Kazakhstan's sovereign wealth fund, is wholly owned by the Government and serves as the holding company for substantially all state enterprises. Samruk-Kazyna's primary

objective is to improve the competitiveness and stability of the Kazakhstan economy and alleviate the possible effects of changes in world markets on economic growth in Kazakhstan.

### Liquidity Support

Since January 2009, Samruk-Kazyna and the NBK have been providing liquidity support to the Group by way of the following:

- exchanging the Bank Bonds with SK Bonds for a total nominal value of KZT 645,000 million and allowing the Bank to use the SK Bonds as collateral under BTA/NBK Repo Transactions with the NBK totalling KZT 404,938 million excluding interest accrued as at 30 September 2009.  See also "*NBK Support*";

- depositing KZT 113,348 million in deposit accounts (both current and term) within the Group, such that deposits of Samruk-Kazyna and its subsidiaries equalled KZT 310,495 million as of 30 September 2009;

- providing funding to the Group pursuant to the State Finance Programmes under which the Group has received KZT 75,215 million since 31 December 2008, of which the Group has utilised KZT 72,215 million (and already repaid KZT 1,120 million thereof), and returned to the Government an unutilised amount of KZT 3,000 million.  Over all periods, the Group has received KZT 126,453 million under the State Finance Programmes and, as at 30 September 2009, the Group has utilised a total amount of KZT 114,097 million under the State Finance Programmes, returned to the Government the unutilised amount of KZT 11,771 million, retained KZT 584 million for future lending under the programme and repaid to the Government KZT 1,120 million.  See also "*State Finance Programmes*"; and

- acquiring the 25,246,343 new common shares of the Bank constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

As at the date of this Information Memorandum, the total support provided by Samruk-Kazyna and the NBK to the Group since January 2009 amounts to KZT 805,596 million.  The Group's obligations under the deposit agreements governing the demand deposits and term deposits with Samruk-Kazyna and other state-owned entities are on the same terms as the Bank's typical deposit agreements and do not require any additional security.

### Legal Framework

In October 2008, the Government and the FMSA announced a proposal to strengthen the capital of the Bank as part of a broader plan to stabilise the financial system of the Republic of Kazakhstan.  The plan was announced in a public statement entitled "On Further Measures to Stabilise the Banking Sector" dated 28 October 2008.

On 9 November 2008 the Bank, the NBK, FMSA, Samruk-Kazyna and the Ministry of Finance entered into a memorandum of understanding pursuant to which the parties declared their intention to coordinate their efforts to stabilise the economy of the Republic of Kazakhstan, use all reasonable endeavours to provide additional financial resources to the real sector of the economy and assist in the stabilisation of the financial system, including the maintenance of an adequate level of liquidity and quality of the credit portfolio.

Since 31 December 2008, Samruk-Kazyna and its subsidiaries have further deposited KZT 113,348 million in deposit accounts (both current and term) within the Group, such that deposits of Samruk-Kazyna and its subsidiaries equalled KZT 310,495 million as of 30 September 2009.  The deposits are pursuant to standard deposit agreements used generally for the depositors of the Bank.

In February 2009, Samruk-Kazyna acquired 25,246,343 newly issued shares in the Bank for KZT 212,095 million and obtained a controlling stake of 75.1 per cent. of the Bank's issued share capital.

In order to provide additional liquidity to the Bank, Samruk-Kazyna agreed to issue the SK Bonds and sell them to the Bank in exchange for the Bank Bonds. On 17 February 2009 the Bank, the NBK and the FMSA entered into the Cooperation Agreement pursuant to which the Bank is entitled to obtain from the NBK refinancing loans and special purpose loans. In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of KZT 300,000 million and KZT 345,000 million, respectively. See "*Selected Statistical and Other Information — Debt Securities*". On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of SK Bonds for consideration of KZT 300 billion, the other for the sale by Bank to Samruk-Kazyna of Bank Bonds for consideration of KZT 300 billion. On 18 March 2009, two further agreements were entered into one for the sale of SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of Bank Bonds for KZT 345 billion.

As of the date of this Information Memorandum, the Group has received liquidity support in the amounts of KZT 404,938 million from the NBK under seven BTA/NBK Repo Transactions (constituting refinancing loans under the Cooperation Agreement) against delivery of the SK Bonds.

The Cooperation Agreement is effective until the termination of the Restructuring.

**State Finance Programmes**

As of the date of this Information Memorandum, the Bank participates in four State Finance Programmes with Samruk-Kazyna and its subsidiaries. See the table of all amounts funded by the Government for the stabilisation of the Kazakhstan economy in "*The Banking Sector in Kazakhstan — Introduction*".

The Group has received KZT 39,800 million in aggregate in three tranches under the SME State Finance Programme, KZT 46,175 million under the Mortgage State Finance Programme, KZT 32,318 million under the Construction State Finance Programme, KZT 8,160 million under the Agricultural State Finance Programme. As at 30 September 2009, the Group has utilised KZT 114,097 million under the State Finance Programmes from Samruk-Kazyna or its wholly owned subsidiaries, returned to the Government the unutilised amount of KZT 11,771 million, retained KZT 584 million for future lending under the Construction State Finance Programme and repaid to the Government KZT 1,120 million under the Agricultural State Finance Programme. The Government provided an additional KZT 8,000 million to the Bank under a fourth tranche to the SME State Finance Programme in 2010.

*SME State Finance Programme*

The Bank and Temirbank are two of 12 agents under the SME State Finance Programme adopted by the Government in 2007. The SME State Finance Programme aims to provide financing to SMEs for the acquisition of new, and the modernisation of existing, material assets and the provision of working capital. The SME State Finance Programme funding can also be used to refinance existing loans previously made to SMEs by the Bank or Temirbank or other credit organisations provided the purpose of any loan being refinanced complies with the requirements of the programme.

Samruk-Kazyna and its subsidiary Damu Fund have provided to the Bank, for the purposes of financing and refinancing of small and medium size entities under the SME State Finance Programme, a total of KZT 39,200 million in three tranches: KZT 12,200 million on 14 December 2007, KZT 5,000 million on 13 August 2008 and KZT 22,000 million on 14 February 2009. Furthermore Damu Fund provided to Temirbank KZT 600 million under the SME State Finance Programme on 19 November 2008. As of 30 September 2009, the Group had utilised KZT 37,567 million of this amount and returned KZT 2,234 million to the Government.

As at 30 September 2009, the Government had allocated KZT 127,000 million under the third tranche of the SME State Finance Programme since 1 January 2009, and the following banks utilised the most support under the programme: ATF Bank (KZT 20,000 million), Alliance Bank

(KZT 18,000 million), Kazkommertsbank (KZT 16,000 million) and Halyk Bank (KZT 11,700 million). As at the date of this Information Memorandum, the Bank has no information about any further allocations in the future.

The interest rate on the Government funds advanced under the SME State Finance Programme is 8.0 per cent. per year. Damu Fund has the right to demand early repayment if (i) the Bank does not make timely repayments of debt or interest, (ii) the Bank does not use the proceeds in compliance with their stated purpose, (iii) the Bank's credit rating is downgraded by Fitch, S&P or Moody's by two or more notches, (iv) the Bank infringes the FMSA's prudential requirements at least once in each of two consecutive months or its licence is suspended, (v) more than 10.0 per cent. of the Shares in the Bank are sold or transferred and such transfer has a negative impact on the Bank's financial condition; or (vi) the Bank reports negative financial results for two consecutive quarters. Despite the Bank's infringement of the FMSA's prudential requirements in 1 April 2009 and the credit rating downgrade, Damu Fund has not demanded repayment under the SME State Finance Programme. See "*Risk Factors — Samruk-Kazyna may demand early repayment of funds allocated to the Bank for the State Finance Programmes if the Bank breaches conditions for the utilisation of the funds.*".

In addition to its right to demand early repayment of the funds, Damu Fund is also entitled to demand from the Bank a penalty of 15.0 per cent. on the amount of any funds used for purposes other than those permitted by the agreement under which the Bank obtained financing under the SME State Finance Programme.

### *Mortgage State Finance Programme*

The Bank is one of 11 agents under the Mortgage State Finance Programme adopted by the Government in February 2009. The Mortgage State Finance Programme aims at reducing the current interest rate on mortgage loans to between 9.0 and 11.0 per cent., converting foreign currency loans into Tenge and extending loan maturities up to 20 years. The total amount of investments to be made under the programme is KZT 120,000 million.

Under the Mortgage State Finance Programme, Samruk-Kazyna deposited KZT 40,000 million during 2009 with the Bank for the period of 20 years. As at 30 September 2009 the Bank had utilised KZT 37,000 million from the total amount of placed funds and returned the unutilised KZT 3,000 million to the Government. The Bank is permitted to provide mortgages under the Mortgage State Finance Programme to the extent it receives repayment proceeds of the previously made Mortgage State Finance Programme loans for a period of 36 months from the date it received the funds under the programme, after which time it will need to use the repayment proceeds to repay Samruk-Kazyna. The Bank pays interest to Samruk-Kazyna on the amounts provided under the Mortgage State Finance Programme of 5.7 per cent. on amounts lent by the Bank to certain vulnerable borrowers and 7.7 per cent. on the amounts lent to the remaining borrowers.

Of the 11 agents selected for the Mortgage State Finance Programme, the following banks utilised the most support under the programme: the Bank (KZT 37,000 million), Kazkommertsbank (KZT 24,000 million), Halyk Bank (KZT 20,500 million), Alliance Bank (KZT 10,900 million) and Bank CenterCredit (KZT 4,300 million).

### *Construction State Finance Programme*

The Bank is one of seven agents under the Construction State Finance Programme adopted by the Government on 6 October 2007. The Construction State Finance Programme aims at finishing incomplete constructions. The total amount of investments to be made under the programme is KZT 240 billion.

Under the Construction State Finance Programme, Samruk-Kazyna deposited KZT 23,640 million with the Bank during 2007 and 2008 for a period of three and a half years. As at 30 September 2009, the Bank had utilised approximately KZT 19,788 million from the total amount of placed funds, returned to the Government the unutilised amount of KZT 3,268 million and retained the unutilised

amount of KZT 584 million for future lending under the programme.  The Bank pays interest to Samruk-Kazyna on the amounts provided under the Construction State Finance Programme of 10.6 per cent. and 11.1 per cent.

Of the seven agents selected for the Construction State Finance Programme, the Government plans to provide the following amounts to the following banks under the programme: Kazkommertsbank (KZT 49,320 million), the Bank (KZT 26,695 million), Temirbank (KZT 5,431 million) and Kaspi Bank (KZT 4,258 million).

***Agricultural State Finance Programme***

The Bank is one of four agents under the Agricultural State Finance Programme adopted by the Government on 6 October 2007.  The Agricultural State Finance Programme aims at stabilising the agricultural sector of Kazakhstan.  The total amount of investments to be made under the programme is KZT 120,000 million.

Under the Agricultural State Finance Programme, Samruk-Kazyna deposited KZT 8,160 million with the Bank for the period from 28 April 2009 until 28 June 2010.  As at 30 September 2009, the Bank had utilised all of the placed funds and repaid the Government KZT 1,120 million of such placed funds.  The Bank pays interest to Samruk-Kazyna on the amounts provided under the Agricultural State Finance Programme of 9.05 per cent.

The four agents selected for the Agricultural State Finance Programme received the following amounts under the programme: the Bank (KZT 8,160 million), Bank CenterCredit (KZT 5,550 million), Nurbank (KZT 4,100 million) and Eurasian Bank (KZT 2,590 million).

**NBK Support**

On 17 February 2009 the Bank, the NBK and the FMSA entered into the Cooperation Agreement.  Under this agreement, the Bank may apply to the NBK for two types of loans.

The Bank may apply for refinancing loans (including secured short-term loans (not more than one month) and loans to banks and organisations carrying out banking activities (such as small credit houses), the interest rate of which equals the official refinance rate).  Every week, the NBK establishes refinancing limits in relation to refinancing loans which cannot be higher than 50 per cent. of the Bank's equity capital (the beginning of the current month and informs the Bank on the working day after it establishes such limit.  The refinancing limit includes total indebtedness of the Bank to the NBK under reverse repo transactions, swap transactions, deposits placed by the NBK with the Bank, and guarantees granted by the NBK to the Bank.  The BTA/NBK Repo Transactions form part of this refinancing limit.  The Bank can receive a further refinancing loan even if it has not repaid the earlier one, *provided that* it has provided security to the NBK for the further loan (or has sufficient funds in accounts with the NBK to secure the further loan).  As of the date of this Information Memorandum, the Bank has not provided special purpose loans pursuant to this agreement.

The Bank may also apply for special purpose loans (including secured and unsecured loans to banks and other legal entities having bank accounts opened with the NBK for a period not exceeding one year, the interest rate of which is established by the NBK Board).  The Bank can request a special purpose loan only once any existing special purpose loan has been repaid).

In March 2009, the Bank issued the Bank Bonds within the first and second obligation programs in the amounts of  KZT 300,000 million  and  KZT 345,000 million, respectively.    See  "*Selected Statistical and Other Information — Debt Securities*".  On 13 March 2009 two agreements were entered into by Samruk-Kazyna and the Bank, one for the sale by Samruk-Kazyna to the Bank of 300 million SK Bonds for consideration of KZT 300 billion, the other for the sale by the Bank to Samruk-Kazyna of 300 million Bank Bonds for consideration of KZT 300 billion.  On 18 March 2009, two further agreements were entered into one for the sale of 345 million SK Bonds for consideration of KZT 345 billion, the other for the sale by the Bank to Samruk-Kazyna of 345 million

Bank Bonds for KZT 345 billion.  See "*NBK Support*" for a further description of the Cooperation Agreement and the BTA/NBK Repo Transactions.

The Bank has been in breach of certain requirements under the Cooperation Agreement since the date it was executed, however, the NBK has not taken any actions in respect of such breach and has not indicated any intention to do so.  See "*Risk Factors — Risks Relating to the Bank — The NBK provides funding support to the Bank but may withdraw its support and accelerate repayment of its loans if certain requirements are not met.*".

**Other Potential Government Support**

According to the Government decree of Kazakhstan No. 1553 dated 9 October 2009, the Government's Distressed Assets Fund will start negotiations with second-tier banks, which includes the Bank, with a view to the possible repurchase of troubled assets of such banks.  The Bank plans to participate in this Government programme once rules and procedures are developed and subject to the obligations of the Bank under the Recovery Units.

In addition, the Bank and the DBK have started discussions about developing a scheme of refinancing of the obligations of the Bank's borrowers.  The Bank has identified those of its borrowers that it believes should receive refinancing loans under the scheme and reported to the DBK a list of proposed borrowers.  For some borrowers that have received a positive response from the DBK, the Bank and the DBK have started to negotiate the possible refinancing schemes and the Bank has been providing the necessary information to the DBK for making the examination.  As of the date of this Information Memorandum, the DBK has not provided any refinancing loans.

**Distribution Channels**

*Branch Network*

As at 30 September 2009, the Bank had 22 branches and 237 cash offices located throughout Kazakhstan, a decrease from 22 branches and 279 cash offices as at 31 December 2008.  The operations of each branch and cash office are subject to internal regulation and to oversight by the head office.  Certain types of activities, including control functions such as underwriting and credit administration are conducted by the Bank's head office only.  The branches have the authority to undertake all client functions and each branch has an authorised body capable of making certain credit decisions.

In comparison to branches, cash offices offer limited services appropriate to the geographical area in which they are located.  Each branch has different types of cash offices, including: centres of banking services (which provide consultations and cash settlement services for individuals and legal entities and deposit taking and lending to individuals and legal entities), centres of retail business (which provide consultations and cash settlement services for individuals and deposit taking and lending to individuals), universal offices (which have more limited lending authority to individuals and legal entities) and retail offices (which provide have more limited lending authority to individuals).

*ATM Network*

The Bank started establishing an automated teller machine network in 1994.  As at 30 September 2009, the Bank had 916 automated teller machines compared to 787 automated teller machines as at 31 December 2008, an increase of 16.4 per cent.  The Bank does not currently plan to increase its automated teller machines network globally, except in isolated instances in which there is an increase in card activity in a certain area.

**Competition**

As of 30 September 2009, there were 37 banks operating in Kazakhstan.  Commercial banks in Kazakhstan may be divided into three groups: major local banks with large total assets and a focus on the corporate market, such as the Bank and its principal competitor, Kazkommertsbank; banks under

foreign ownership, such as Sberbank, HSBC Bank Kazakhstan and Citibank Kazakhstan; and other local banks, including Halyk Bank, ATF Bank, Alliance Bank, Kaspi Bank and Bank CenterCredit, which are also among the Bank's competitors in Kazakhstan.  Although the Bank believes that it is well-positioned to compete in the nation's banking sector, it faces competition from a number of existing and prospective players and has suffered losses of customers and deposits as described in this Information Memorandum.  See "*Risk Factors — Risk Related to the Bank — The Bank faces significant competition, which may increase in the future.*"

Kazkommertsbank was established in July 1990.  As of 1 October 2009, Kazkommertsbank was the market leader in terms of total assets and the Bank's principal competitor in corporate and retail banking services.  As of 1 October 2009, Halyk Bank was the largest bank in Kazakhstan in terms of total deposits.

The following table sets out certain financial information relating to the Bank and the largest local and foreign banks which the Bank considers to be its major competitors in the Kazakhstan banking sector as of 30 September 2009 (information is unconsolidated and derived from financial statements prepared in accordance with FMSA Methodology):

|  | As of 30 September 2009 | | | |
|  | Total Assets | Total Gross | Customer Loans[1] Deposits[2] | Shareholders' Equity |
|---|---|---|---|---|
|  | *(million KZT)* | | | |
| The Bank ............................................................. | 2,134,516 | 2,593,728 | 630,288 | 516,598 |
| Kazkommertsbank ............................................... | 2,538,298 | 2,541,628 | 1,129,418 | 204,062 |
| Halyk Bank ......................................................... | 2,027,988 | 1,238,711 | 1,313,828 | 140,527 |
| Alliance Bank ..................................................... | 497,896 | 661,629 | 185,169 | 101,238 |
| ATF Bank ........................................................... | 1,210,585 | 877,678 | 502,718 | 106,879 |
| Bank CenterCredit ............................................... | 1,101,671 | 669,344 | 605,579 | 52,584 |
| Kaspi Bank ......................................................... | 322,820 | 246,030 | 191,567 | 16,892 |

_____
Source: Based on figures published by the KASE, the FMSA and company websites.
Notes:
(1)    Net, without reverse repurchase agreements.
(2)    Not including TuranAlem Finance or Kazkommertz International B.V. (a subsidiary of Kazkommertsbank).

## Property

The Group mainly leases its office space with certain exceptions.  The Bank owns nine buildings, and the land on which eight of the buildings stand, which it uses as cash offices.  Temirbank owns five buildings which it uses for its operations and a part of the building where its head office is situated. Additionally, BTA Belarus owns the building in which its head office is situated in Minsk.

## Asset Recovery

As part of the work of the Bank's asset recovery team, various legal proceedings have been commenced in England and the British Virgin Islands which are summarised below.  In relation to the Drey, Chrysopa, Tekhinvest and BVI Proceedings, the English and BVI Courts have imposed various restrictions on the publication and dissemination of information concerning the litigation.  The summaries below have been prepared having regard to those restrictions.

The Bank expects to issue further claims in jurisdictions such as England against former management of the Bank, and individuals and entities connected with them.

### *Drey Proceedings*

In August 2009, the Bank commenced proceedings in the Commercial Court (Claim No 2009 Folio 1099) against Mr. Ablyazov, Roman Solodchenko, Zhaksylyk Zharimbetov, Drey Associates Limited, Anthony Stroud, John Wilson and Sarah Wilson (the "**Drey Proceedings**").

In summary, the claim relates to the alleged misappropriation of funds belonging to the Bank totalling approximately U.S.$295 million pursuant to various "Compensation Agreements" entered into with

Drey Associates Limited ("**Drey**"), a UK company, between May and October 2008. Drey is also a shareholder of the Bank. See *"Principal Shareholders — The Bank's Shareholders Prior to the Restructuring"* and *"Principal Shareholders — The Bank's Shareholders Following the Restructuring"*.

Under the Compensation Agreements, the Bank paid Drey approximately U.S.$ 295 million. This money was purportedly paid in consideration for Drey procuring that certain existing shareholders of BTA Ukraine, BTA Belarus and BTA Russia would not exercise supposed pre-emption rights to block the proposed purchase by the Bank of shares in these three banks. The Bank contends that there was no legitimate commercial justification for the payments made under the Compensation Agreements and that they were simply a device used by the first three defendants, as officers of the Bank, for misappropriating funds from the Bank. The Bank also alleges that the fourth to seventh defendants (all incorporated or resident in England) facilitated or were used to facilitate the misappropriation.

The Bank is seeking to amend its claim in the Drey Proceedings to recover a further U.S.$ 106 million transferred by the Bank under purported share purchase agreements ("**SPAs**") relating to the acquisition of shares in BTA Russia and BTA Belarus that were connected to the Compensation Agreements. Under its amended claim, the Bank is seeking the return of the monies paid under both the Compensation Agreements and the SPAs plus profits and interest and/or delivery of the assets to which the monies were applied.

The Commercial Court has granted various asset freezing and disclosure orders against the defendants (including Mr. Ablyazov) in the Drey Proceedings up to a value of £175 million in respect of the defendants other than Mr. Ablyazov. This is the equivalent of the U.S. $295 million that was paid under the Compensation Agreements. In relation to Mr. Ablyazov, however, the injunction is in the amount of £252 million. This reflects not only the amount of the claim in respect of the Compensation Agreements, but also the separate claim against him in the Chrysopa Proceedings discussed below. The effect of the asset freezing order is that if the total value of the defendants' assets in England and Wales do not exceed £175 million, (or £252 million in the case of Mr. Ablyazov) the defendants (including Mr. Ablyazov) are prohibited from disposing or dealing with any of their assets outside England and Wales.

The Bank has applied for an increase in the freezing order in the Drey Proceedings by a further £68 million (in respect of Messrs Ablyazov, Solodchenko and Zharimbetov only) to reflect the additional claims that are being brought in relation to the SPAs. This application is due to be considered by the Court shortly.

The Bank has obtained various orders against the Defendants requiring the provision of information concerning their assets and other matters. The disclosures provided by the Defendants are subject to various confidentiality obligations imposed by the Court, including limitations on sharing of certain disclosures with the Bank itself.

In connection with the asset freezing orders, the Bank has provided corresponding cross-undertakings in damages as and when required. Under these cross undertakings in damages, the Bank is liable to compensate the defendants if the Court later finds that the asset freezing orders should not have been granted, have caused them loss and the Court concludes that the defendants should be compensated for that loss. The undertakings are unlimited in amount and are standard provisions in any English asset freezing orders.

Mr. Ablyazov has issued a defence in the Drey Proceedings contending *inter alia* that (i) there is no rule of law in Kazakhstan, (ii) Mr. Ablyazov held a majority stake in the Bank, and was the ultimate beneficial owner of all the selling and non-selling shareholders under the Compensation Agreements (through a series of nominee arrangements), (iii) given the alleged risk of assets being confiscated or extorted in Kazakhstan the use of such nominee holding arrangements is extensive, (iv) the Board of Directors knew of Mr. Ablyazov's interests in the Bank and the selling and non-selling shareholders,

and (v) the global consideration paid by the Bank under the Compensation Agreements and SPAs was reasonable.

The Bank is subject to a counterclaim in this matter from Mr. Zharimbetov. Mr. Zharimbetov's counterclaim is for KZT 108,378,000 (or £441,154). It is alleged to be monies due for the notice period for which he says he was entitled under his contract of employment (which he was not paid as he was summarily dismissed). The Bank is confident that its termination of Mr. Zharimbetov's contract was justified.

Mr. Ablyazov has recently applied to strike out the Drey Proceedings on the basis that, *inter alia*, they were brought in breach of international law, and that they constitute an abuse of process and an abuse of Mr. Ablyazov's human rights. They assert this partly on the basis that Mr. Ablyazov's majority shareholding in the Bank was allegedly misappropriated from him by Samruk-Kazyna in February 2009. It is understood that similar applications will be made in respect of the Chrysopa Proceedings and the Teckhinvest Proceedings.

### *Chrysopa Proceedings*

The Bank commenced further proceedings in the Commercial Court (Claim No 2010 Folio 93) in January 2010 against Mr. Ablyazov, Ildar Khazhaev, Anton Rybalkin, Chrysopa Holdings BV (a Dutch company ("**Chrysopa**")), Usarel Investments Limited (a Cyprus company ("**Usarel**")) and Lux Investing Limited (a British Virgin Islands company ("**Lux**")) (the "**Chrysopa Proceedings**").

In summary, the claim relates to a purported loan of U.S.$ 120 million by the Bank to Chrysopa (the "**Chrysopa Loan**") on terms highly unfavourable to the Bank (including the absence of any security). The Bank contends that the loan was a sham intended to conceal the theft of $120 million for the benefit of Mr. Ablyazov.

In summary, the background to the Chrysopa Loan is that on or around 1 August 2008, the Bank purportedly agreed to lend U.S.$ 120 million to Chrysopa for onward transmission to Usarel which appears to have been used by Usarel to acquire various companies who owned and/or operated the Vitino port facility on the White Sea in Russia.

Although the loan agreement provided for security such as a pledge over Usarel's shares and over the assets that Usarel was to acquire, this security was never granted. No interest has been paid on the purported loan.

In the Chrysopa Proceedings, the Bank contends that the purported loan was a sham to disguise the fact that the Defendants were engaged in misappropriating funds from the Bank for the benefit of Usarel and Lux which, together with Chrysopa, are alleged by the Bank to be controlled by Mr. Ablyazov. The Bank seeks, amongst other things, a declaration invalidating the Chrysopa Loan, repayment of the money transferred under the loan agreement and delivery up of all assets to which any of the funds were applied.

On 27 January and 30 March 2010, the Commercial Court granted freezing orders (and associated disclosure orders containing confidentiality obligations imposed by the Court similar in nature to those in the Drey Proceedings) against Messrs Ablyazov, Khazhaev, Rybalkin and Usarel and Lux in connection with this claim up to the value of U.S.$ 120 million. As noted above, the injunction against Mr. Ablyazov in the Drey Proceedings has been increased to reflect the claim against him in the Chrysopa Proceedings.

The Bank, as claimant, has given cross-undertakings in damages in respect of these freezing orders similar in nature to the undertakings in the Drey Proceedings. Defences have not yet been served.

*Tekhinvest Proceedings*

The Bank has recently issued proceedings in the Commercial Court (Claim No 2010 Folio 362) against Mr. Ablyazov, Ildar Khazhaev, Tekhinvest CJSC, Konvis LLC, PaladioExport LLC, Konvis LLC and Colligate Investments Limited.

In summary, the claim relates to a series of purported loan facilities amounting to over U.S.$ 300 million that were granted to Tekhinvest, Konvis, PaladioExoprt, and Konvis between 2004 and 2008 on terms that were highly unfavourable to the Bank. These funds were purportedly to be used in connection with the construction by Tekhinvest of the Eurasia Tower building in the Moscow City development in Russia.

The Bank contends that these were related-party transactions to affiliates of Mr. Ablyazov and that he failed to disclose (adequately or at all) his interests in those companies to the Bank. The Bank also contends that no adequate security was ever put in place and that Mr. Ablyazov, with the assistance of Mr. Khazhaev and Colligate Investments Limited, subsequently engineered the release of such security as had been obtained through an undated pledge release document in the full knowledge that to do so was contrary to the Bank's interests.

The Bank seeks, *inter alia*, a declaration invalidating the loans, repayment of the money transferred under the loan agreements and delivery up of all assets to which any of the funds were applied. In the alternative, the Bank seeks repayment of the amounts outstanding under the loans as at the date of the claim (plus interest).

The Bank has applied for permission to serve the claim out of the jurisdiction on the Second to Sixth Defendants because they are domiciled in Russia. The Court granted permission on 22 March 2010 and service of the proceedings pursuant to the Hague Convention is currently being effected on the Russian domiciled defendants. Mr. Ablyazov and Colligate Investments Limited have been served with the claim. No defences have yet been served and the Court has recently granted Mr. Ablyazov an extension of time for service of his defence to 11 June 2010.

*BVI Proceedings*

On 16 November 2009, the Bank brought a claim in the Commercial Division of the High Court of the British Virgin Islands against four defendants: REUEL Limited ("**REUEL**"), RIROil sarl (now known as TANIL sarl) ("**RIROil**"), Mr. Ablyazov and Mr. Khazhaev.

The background to the claim is as follows. On 6 August 2008, the Bank made a loan of U.S.$ 57.5 million to RIROil, a Swiss company and an existing customer of the Bank, which was secured, repayable on 5 August 2013, with interest at 18 per cent. per annum.

On 14 January 2009, the Bank purportedly assigned its rights under the loan to REUEL, a recently established BVI company, for consideration of U.S.$ 57.5 million plus U.S.$ 229,944.05 (apparently in respect of interest accrued on the loan as at the date of the purported assignment).

Under the terms of the purported assignment agreement, REUEL was not obliged to pay the consideration amount of U.S.$ 57,729,944.05 until 31 December 2015 (28 months later than the Bank would have been paid by RIROil under the terms of the loan agreement). REUEL had no obligation to pay interest on this amount, and no security was provided.

The Bank believes that the purported assignment to REUEL on such unfavourable terms was a fraud against the Bank for the benefit, *inter alia*, of the owners of REUEL.

On 18 November 2009, the Bank was granted *ex parte* freezing injunctions and ancillary disclosure orders against REUEL and Mr. Ablyazov, and disclosure orders against RIROil and REUEL's registered agent in the BVI. On the same date, the BVI court granted the Bank permission to serve the proceedings on RIROil, Mr. Ablyazov and Mr. Khazhaev out of the jurisdiction.

183

On 15 January 2010, Mr. Ablyazov applied for an order setting aside the court's permission to serve the proceedings on him out of the jurisdiction.  The application was heard on 22 and 23 March.  In a judgment handed down on 24 March 2010, The Honourable Justice Bannister granted the order applied for by Mr. Ablyazov and released the freezing injunction against him.  That judgment, including the reasons for the judge's decision, is confidential.

*Stepanov Litigation*

The Bank also obtained judgment in England on 14 October 2009 against Alexander Stepanov, the former General Director and major shareholder of Energomash (UK) Limited, in the amount of U.S.$ 468 million in an action commenced in May 2009.  The judgment was granted in connection with a guarantee given by Mr. Stepanov for a loan by the Bank to Rolls Finance Limited, an English company.

Mr. Stepanov resides in Russia and the English Court took jurisdiction over him based on an English jurisdiction clause in a charge he had granted to the Bank.  As part of the process of enforcing the judgment against Mr. Stepanov, Alan Bloom and Liz Bingham of Ernst & Young were appointed liquidators of Energomash (UK) Limited (which is an English company) by a Secretary of State appointment made on 29 October 2009.  Some of the shares of Energomash belonging to Mr. Stepanov had been pledged to the Bank as security for the loan to Rolls Finance Limited.  The Bank had to provide undertakings when obtaining the injunction orders following judgment against Mr. Stepanov to meet any losses that he might suffer if it proves that those injunctions were wrongfully granted.

On 31 March 2010, the High Court in England sentenced Mr. Stepanov (*in absentia*) to two years imprisonment for breaching various orders made by the Court in the proceedings initiated against him by the Bank, including a failure to disclose information on his assets.

The Bank has also obtained judgment in Russia in November 2009 against Mr. Stepanov in the amount of U.S.$ 411 million in relation to this matter.  That judgment is under appeal.

**Legal Proceedings**

Except as described in this Information Memorandum, the Group is not and has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which either of TuranAlem Finance or the Bank is aware) during the last twelve months which may have, or have had in the recent past, significant effects on the Group's financial position or profitability.

*Litigation in respect of BTA Kyrgyzstan*

The Bank is involved in a legal dispute with CJSC Investment Holding Company, a Kyrgyzstan registered entity.  The total amount of this dispute is £30,418,144.  In June 2009, Central Asia Investment Company, a Kyrgyzstan registered entity and a 100 per cent. subsidiary of CJSC Investment Holding Company, obtained a loan from its parent of £8,670,000 to purchase Kyrgyzstan state securities.  Central Asia Investment Company, in violation of the intended purpose of the loan from its parent, used these funds to purchase bonds of TuranAlem Finance at a significant discount on the market.  The nominal value of the purchased bonds was £28,395,000 and accrued interest was £2,023,144.  Central Asia Investment Company defaulted on its loan payable to CJSC Investment Holding Company.  As a result, CJSC Investment Holding Company filed a lawsuit against the Bank, BTA Kyrgyzstan and TuranAlem Finance claiming repayment of the full nominal value and interest accrued on bonds of TuranAlem Finance.  In accordance with the decision of Bishkek's district court, Bishkek's municipal court of appeals and the Supreme Court of Kyrgyzstan dated 11 September 2009 the Bank is obliged to pay the full amount and CJSC Investment Holding Company commenced enforcement of the decision against the Bank, which has guaranteed the obligations under bonds issued by TuranAlem Finance, including seeking the Bank's shares in BTA Kyrgyzstan and amounts due to the Bank by BTA Kyrgyzstan.  In December 2009, an officer of the court foreclosed on shares

held by the Bank in BTA Kyrgyzstan.  The current management of the Bank believes that the decision of the Kyrgyzstan courts was not in compliance with international laws and legislation between the Republic of Kazakhstan and Kyrgyzstan and was executed in violation of Kyrgyzstan law.  On 5 November 2009, the Bank filed a claim with the Kyrgyzstan government for compensation of £30,418,143 and an additional U.S.$38,891,000 representing damages incurred as a result of illegal acts of Kyrgyz legal and government entities.

### Litigation in respect of BTA Russia

The Bank holds 22.2589 per cent. of the participatory share in the charter capital of BTA Russia. Three petitions have been lodged during 2009 with the Moscow Arbitration Court disputing the results of general participants' meetings of BTA Russia held on 13 April 2009, 29 April 2009 and 11 August 2009.  The petitions in respect of the meetings held on 13 April 2009 and 29 April 2009 have been rejected by the court.  The court has accepted the petition in respect of the meeting held on 11 August 2009 and the hearing is to be held on 20 May 2010.

### Other Proceedings

The Bank has been notified of several separate arbitration proceedings (only one of which is active) commenced under various international treaties against, *inter alia*, the Government of Kazakhstan in connection with the actions taken in relation to the Bank in 2008 and early 2009, namely the various capital injections made into the Bank and described in "– *Background to the Restructuring*".  These proceedings do not name the Bank as a respondent and, indeed it is not possible to bring a claim against anyone other than a state under the relevant treaty.  In addition, certain creditors of the Bank have commenced proceedings against it and have sought to attach certain assets of the Bank including correspondent accounts in Switzerland and the shares of certain of the Finance Subsidiaries.  The Bank believes that these creditors will participate in the Restructuring and file Claim Forms. Accordingly, pursuant to the terms of the Restructuring Plan the relevant creditors will be obliged to terminate the proceedings they have commenced.

### Criminal Proceedings Against Former Management

Based on news reports, the Bank is aware of criminal investigations commenced against Mr. Ablyazov and other former management as well as entities connected to them in each of Kazakhstan, the Russian Federation and

Kyrgyzstan in respect of actions taken by these individuals and entities during the period in which Mr. Ablyazov was the Chairman of the Board of Directors of the Bank.

### Technology

The Bank's information technology strategy focuses on the integration of its business needs and information technology capabilities, while maintaining cost effective and safe systems.  In recent years, the Bank has built a highly productive and reliable technology environment, located in two data centers located in Almaty.  The Bank has also developed and implemented disaster recovery and backup strategy.  The Bank is certified under ISO 27001, an international quality certification.

The Bank now has a modern, reliable, secure, flexible and scalable information technology system that can support the business operations of the Bank, as well as provide business opportunities for income generation.  Information technology systems of the Bank are in a state of continuous improvement and change.  The Bank intends to continue to take advantage of modern technologies, which allow it to reduce capital and operating costs.  Due to the Bank's financial condition, the Bank stopped the work on the implementation of the new core banking system; however, the existing systems are expected to be able to handle the current volume of operations and have substantial reserves for processing.

As a part of its strategy going forward, the Bank plans to strengthen its Treasury department by automating its processes to provide real time risk management for a wide range of operations.  See

"— *Strategy — General Strategy of the Bank — Strengthen Treasury Operations*".  Furthermore, the Bank plans to build on its already strong information technology infrastructure to increase the quality of data produced, provide consistent classification and resolve data-reconciliation issues.  See "— *Strategy — General Strategy of the Bank — Improve Human Resources and Information Technology*".

**Employees and Training**

As at 30 September 2009, the Bank employed 5,085 full time employees, of whom 3,411 were employed at the Bank's branches outside Almaty, 525 were employed at the Almaty branch and the remainder were employed by the Head Office and by the Bank's subsidiaries.  As of 31 December 2008 and 2007, the Bank employed 6,608 and 7,185 full time employees, respectively.  The decrease in headcount is part of the Bank's optimisation strategy under the Restructuring.  See "*Strategy — General Strategies of the Bank — Improve Human Resources and Information Technology*".

Currently, there are no labour unions representing any employees of the Bank or its subsidiaries.  The Group has never experienced any industrial action or other work stoppages resulting from labour disputes.  The average age of the Group's employees as of 30 September 2009 was 33.4 years and 4,729 of the employees in professional positions hold university degrees.

In order to improve professional qualifications and efficiency of employees the Bank conducts staff training as part of its business plan.  During the nine months ending 30 September 2009, 726 employees participated in the Bank's training programme.

Until 6 May 2009, the Bank operated a training centre which included financial training and professional skills development programmes.  This programme was closed because of the Bank's financial condition.  The Bank currently conducts internal trainings for its employees in respect of different aspects of the business of the Bank including financial analysis and working with clients.  In addition, the Bank also engages external providers of training programmes including BACEE, RFCA Academy, ABS Training Centre, Deloitte, Network Academy Lanit-Kazakhstan, LLP E'LTC, Alliance Factors Kazakhstan, Specialised Training Centre of Association of Security Organisations of Kazakhstan, and the Institute of Professional Appraisers of Kazakhstan.  During the nine months ended 30 September 2009, 21 employees were trained by external providers.

**SELECTED CONDENSED CONSOLIDATED FINANCIAL DATA**

The summary information set out below has been extracted from, should be read in conjunction with, and is qualified in its entirety by, the Group's financial statements, including the notes thereto, contained elsewhere in this Information Memorandum. See "*Index to Financial Statements*" and "*Management's Discussion and Analysis of Results of Operations and Financial Condition*".

The Group's audited consolidated financial statements contained in this Information Memorandum including the notes thereto, as at and for the years ended 31 December 2008 and 2007 were prepared in accordance with the IFRS. The Group's audited consolidated financial statements contained in this Information Memorandum, including the notes thereto, as at and for the years ended 31 December 2008 and 2007 were audited by Ernst & Young, whose audit reports are included elsewhere in this Information Memorandum.

The Group's unaudited interim condensed consolidated financial statements contained in this Information Memorandum including notes thereto, as at and for the nine months ended 30 September 2009 were prepared in accordance with International Financial Reporting Standard IAS 34, Interim Financial Reporting. The Group's unaudited interim condensed consolidated financial including notes thereto, as at and for the nine months ended 30 September 2009 were reviewed by Ernst & Young, whose review report thereon is included on page F-3 of this Information Memorandum.

Prospective investors should read this selected consolidated financial information in conjunction with information contained in "*Risk Factors*", Schedule 1 (The Restructuring Plan), "*Capitalisation*", "*Management's Discussion and Analysis of Results of Operations and Financial Conditions*", "*Selected Statistical and Other Information*", "*The Bank*" and the Bank's audited consolidated financial statements including the notes thereto, as well as the other financial data appearing elsewhere in this Information Memorandum.

**Consolidated Balance Sheet Data**

| | As at 30 September | | As at 31 December | |
| --- | --- | --- | --- | --- |
| | 2009 | | 2008 | 2007 |
| | *(U.S. millions)*[(1)] | *(unaudited) (KZT millions)* | *(KZT millions)* | |
| **Assets** | | | | |
| Cash and cash equivalents .................................................... | 200 | 30,153 | 87,893 | 99,723 |
| Obligatory reserves............................................................... | 285 | 43,003 | 64,054 | 168,242 |
| Financial assets at fair value through profit or loss................. | 799 | 120,648 | 128,150 | 112,175 |
| Amounts due from credit institutions...................................... | 208 | 31,439 | 85,174 | 107,589 |
| Derivative financial assets.................................................... | 208 | 31,346 | 21,650 | 31,397 |
| Available-for-sale investment securities................................. | 147 | 22,244 | 20,482 | 26,422 |
| Loans to customers ............................................................... | 7,335 | 1,107,241 | 1,617,063 | 2,379,810 |
| SK Bonds............................................................................... | 3,386 | 511,097 | — | — |
| Investments in associates...................................................... | 532 | 80,372 | 72,371 | 67,767 |
| Property and equipment......................................................... | 81 | 12,252 | 13,704 | 13,433 |
| Goodwill................................................................................ | 30 | 4,556 | 37,421 | 37,557 |
| Current income tax assets...................................................... | 37 | 5,590 | 5,505 | 110 |
| Deferred tax assets................................................................ | 14 | 2,030 | 5,046 | 683 |
| Other assets............................................................................ | 306 | 46,156 | 35,688 | 19,709 |
| **Total assets** ...................................................................... | **13,568** | **2,048,127** | **2,194,201** | **3,064,617** |
| **Liabilities** | | | | |
| Amounts due to the NBK and the Government ...................... | 2,702 | 407,911 | 1,718 | 913 |
| Amounts due to credit institutions ........................................ | 4,986 | 752,636 | 803,366 | 835,304 |
| Derivative financial liabilities.............................................. | 15 | 2,308 | 18,789 | 652,508 |
| Amounts due to customers..................................................... | 4,527 | 683,281 | 886,052 | 5,528 |
| Debt securities issued............................................................ | 11,067 | 1,670,588 | 1,087,726 | 1,084,445 |
| Provisions.............................................................................. | 799 | 120,600 | 104,893 | 10,577 |
| Other liabilities..................................................................... | 231 | 34,822 | 34,436 | 23,311 |
| **Total liabilities**............................................................... | **24,327** | **3,672,146** | **2,936,980** | **2,612,586** |
| **Equity** | | | | |
| Issued capital: common shares.............................................. | 3,416 | 515,551 | 303,456 | 303,427 |
| Additional paid-in capital ..................................................... | | (257) | (38,798) | — |
| Treasury shares..................................................................... | (43) | (6,475) | (1,568) | (555) |
| Available-for-sale investment securities revaluation reserve.. | (19) | (2,868) | (1,112) | (195) |
| Foreign currency translation reserve...................................... | (2) | (260) | (948) | 104 |
| (Accumulated deficit)/retained earnings ............................... | (13,784) | (2,080,631) | (1,057,646) | (129,938) |
| **Equity attributable to shareholders of the parent**............ | **(10,689)** | **(1,613,481)** | **(757,818)** | **432,719** |
| Non-controlling interest........................................................ | (70) | (10,538) | 15,039 | 19,312 |
| **Total equity** ..................................................................... | **(10,759)** | **(1,624,019)** | **(742,779)** | **452,031** |
| **Total liabilities and equity**............................................. | **13,568** | **2,048,127** | **2,194,201** | **3,064,617** |

———————
Notes:
(1)   See "*Presentation of Financial and other Information*" for information as to the U.S. Dollar/Tenge exchange rate used to calculate U.S. Dollar amounts.

**Consolidated Income Statement Data**

| | For the 9 months ended 30 September 2009 | | For the year ended 31 December | |
| --- | --- | --- | --- | --- |
| | *(unaudited)* | | **2008** | **2007** |
| | *(U.S. millions)*[1] | | *(KZT millions)* | |
| Loans | 1,062 | 155,971 | 366,037 | 291,724 |
| SKBonds | 140 | 20,502 | — | — |
| Securities | 79 | 11,609 | 12,597 | 14,587 |
| Deposits with other banks | 40 | 5,852 | 17,833 | 17,137 |
| **Total interest income** | **1,321** | **193,934** | **396,467** | **323,448** |
| Debt securities issued | (755) | (110,878) | (95,888) | (85,683) |
| Deposits from customers | (252) | (36,949) | (55,748) | (39,935) |
| Deposits and loans from credit institutions | (328) | (48,128) | (56,745) | (53,661) |
| **Interest expense** | **(1,335)** | **(195,954)** | **(208,381)** | **(179,279)** |
| **Net interest (expense)/income before impairment charge** | **(14)** | **(2,021)** | **188,086** | **144,169** |
| Impairment charge | (4,368) | (641,604) | (1,094,300) | (67,810) |
| **Net interest (expense)/income** | **(4,382)** | **(643,625)** | **(906,214)** | **76,359** |
| Fees and commission income | 104 | 15,310 | 30,334 | 28,489 |
| Fee and commission expense | (8) | (1,114) | (1,179) | (1,057) |
| **Fees and commissions** | **96** | **14,196** | **29,155** | **27,432** |
| Net trading loss | (136) | (20,020) | (29,769) | 2,503 |
| Gains less losses from foreign currencies | | | | |
| — dealing | (65) | (9,513) | 1,665 | 2,512 |
| — translation differences | (2,406) | (353,377) | (10,870) | 19,884 |
| Fair value change of options | 135 | 19,837 | — | — |
| Income from insurance operations | 56 | 8,248 | 13,585 | 12,539 |
| Expenses from insurance operations | (42) | (6,202) | (11,485) | (9,222) |
| Share of income of associates | 28 | 4,169 | (15,448) | 4,234 |
| Loss on disposal of subsidiaries | — | — | (11,252) | (249) |
| Impairment charge for available-for-sale investment securities | (8) | (1,243) | (42,610) | — |
| Impairment charge for goodwill | (224) | (32,885) | (8,107) | — |
| Impairment charge for investments in associates | — | — | (19,138) | |
| Gain from purchase of own securities | 66 | 9,708 | — | — |
| Excess of acquirer's interest in the net fair value of acquiree's identifiable assets, liabilities and contingent liabilities over cost | — | — | — | (—) |
| Other income/(loss) | 16 | 2,294 | 212 | (62) |
| **Non-interest income** | **(2,580)** | **(378,984)** | **(133,217)** | **32,139** |
| Salaries and other employee benefits | (116) | (17,000) | (26,597) | (25,744) |
| Administrative and other operating expenses | (113) | (16,565) | (27,414) | (23,400) |
| Depreciation and amortisation | (25) | (3,704) | (4,435) | (2,314) |
| Taxes other than income tax | (20) | (2,932) | (4,163) | (3,469) |
| Obligatory insurance of individuals' deposits | (9) | (1,353) | (2,102) | (1,761) |
| Other provisions | 44 | 6,415 | (113,130) | (4,705) |
| Other expense | (16) | (2,358) | — | — |
| **Non-interest expense** | **(255)** | **(37,497)** | **(177,841)** | **(61,393)** |
| **(Loss)/Income before income tax expense** | **(7,121)** | **(1,045,910)** | **(1,188,117)** | **74,537** |
| Income tax expense | (25) | (3,628) | 67 | (9,832) |
| **Net (loss)/income after income tax expenses** | **(7,146)** | **(1,049,538)** | **(1,188,050)** | **64,705** |
| **Attributable to:** | | | | |
| Equity holders of the parent | (6,965) | (1,022,985) | (1,187,584) | 61,354 |
| Non-controlling interest in net income | (181) | (26,553) | (466) | 3,351 |
| **Net (loss)/income** | **(7,146)** | **(1,049,538)** | **(1,188,050)** | **64,705** |
| **Basic and diluted (loss)/earnings per share (in KZT)** | **(211)** | **(31,039)** | **(141,878)** | **8,143** |

Notes:

(1) See "*Presentation of Financial and other Information*" for information as to the U.S. Dollar/Tenge exchange rate used to calculate U.S. Dollar amounts.

**Selected Financial Ratios and Economic Data**

| | As at and for the nine-month period ended 30 September 2009 | As at and for the year ended 31 December | |
| --- | --- | --- | --- |
| | | **2008** | **2007** |
| **Profitability Ratios[1]** | | | |
| Return on average equity[9] .................................................. | N/A[11] | N/A[11] | 22.4% |
| Return on average total equity ........................................... | N/A[11] | N/A[11] | 22.4% |
| Return on average assets[2] ................................................. | N/A[11] | N/A[11] | 2.4% |
| Net interest margin[3] ......................................................... | (0.1)%[10] | 6.3% | 6.0% |
| Net interest spread[4] .......................................................... | 5.4%[10] | 5.4% | 5.2% |
| Non-interest expense/net interest income before impairment charge plus non-interest ............................................................. | N/A[11] | 208.7% | 30.0% |
| Non-interest expense as a percentage of net interest income before impairment ..................................................................... | N/A[11] | 94.6% | 42.6% |
| Non-interest expense as a percentage of average total assets........................... | 1.8% | 5.5% | 2.3% |
| **Loan Portfolio Quality[5]** | | | |
| Non-performing loans/gross loans[6] .................................. | 63.0% | 34.3% | 0.8% |
| Allowance for impairment/gross loans .............................. | 65.1% | 42.9% | 5.4% |
| Allowance for impairment/non-performing loans[6]........................ | 103.3% | 125.0% | 691.1% |
| **Balance Sheet Ratios and Capital Adequacy** | | | |
| Customer deposits as a percentage of total assets ............................ | 33.4% | 40.4% | 21.3% |
| Loans from other banks and financial institutions as a percentage of total assets.................................................................................. | 36.7% | 36.6% | 27.3% |
| Debt securities issued as a percentage of total assets....................................... | 81.6% | 49.6% | 35.4% |
| Net loans as a percentage of total assets ......................................................... | 54.1% | 73.7% | 77.7% |
| Total equity as a percentage of total assets .................................................... | N/A[11] | N/A[11] | 14.7% |
| Liquid assets as a percentage of total assets[7] ................................................ | 12.1% | 17.6% | 16.8% |
| Risk weighted total capital adequacy ratio[8] ................................................. | (128.9)% | (44.8)% | 17.6% |
| Risk weighted Tier I capital adequacy ratio[8] ............................................... | (122.9)% | (41.0)% | 16.9% |
| **Operating Data** | | | |
| Number of full time employees ........................................................ | 10,495 | 12,965 | 13,194 |
| Number of regional branches.......................................................... | 22 | 22 | 22 |
| Number of retail units.................................................................... | 237 | 279 | 289 |
| **Economic Data** | | | |
| Period-end exchange rate (KZT/U.S.$) ........................................... | 150.95 | 120.79 | 120.30 |
| Average exchange rate for period (KZT/U.S.$)................................ | 146.88 | 120.29 | 122.56 |
| Inflation rate (CPI).......................................................................... | 4.7% | 9.5% | 18.8% |
| GDP growth (real) ........................................................................... | (1.5)% | 3.3% | 8.9% |

_____

Notes:

(1)   Average balance in 2007 and 2008 and nine months ended 30 September 2009 of assets and liabilities were calculated based on monthly average. Average equity and total equity were calculated using monthly averages for all years presented in the table.

(2)   Return on average assets comprises net income less dividends on non-redeemable convertible preference shares divided by average period assets. Average period assets in 2007 and 2008 are calculated on a monthly basis.

(3)   Net interest margin comprises net interest income before impairment charge as a percentage of average earning assets.

(4)   Net interest spread comprises the difference between the average interest rate on interest earning assets and the average interest rate on interest bearing liabilities.

(5)   Calculate using gross loan balances, including accrued interest.

(6)   Non-performing loans comprise loans where past due payments exceed 90 days.

(7)   Liquid assets comprise securities plus cash and cash equivalents, obligatory reserves and due from other banks.

(8)   Calculated in accordance with BIS standards.

(9)   Total equity, excluding preferred shares.

(10)  Calculated using net total assets.

(11)  The ratio is not economically useful due to the Bank having negative equity in 2009.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS AND FINANCIAL CONDITION

*The following discussion should be read in conjunction with the Financial Statements and the notes thereto, prepared in accordance with IFRS and included elsewhere in this Information Memorandum. See "Presentation of Financial and Other Information". The forward-looking statements contained in this discussion and analysis are subject to a variety of factors that could cause actual results to differ materially from those contemplated by such forward-looking statements. Factors that may cause such a difference include, but are not limited to, those discussed in "Forward-Looking Statements" and "Risk Factors". Operating results for the nine-month period ended 30 September 2009 are not necessarily indicative of the results for the year ending 31 December 2009.*

### Introduction

**Investors should be aware that the Bank has not completed any financial statements with respect to any period, after 30 September 2009. The effect of local and global market conditions on the Bank and the Bank's customers and counterparties, as well as the effect of the other events both within and outside the Bank, may cause actual results of operations and financial condition of the Bank as at and for the financial year ended 31 December 2009 or in this Information Memorandum for any period thereafter to be materially and adversely different from the results presented as at and for the nine months ended 30 September 2009. Accordingly, investors should not assume that the results presented as at and for the nine months ended 30 September 2009 are an accurate indication of the actual results as at and for the financial year ended 31 December 2009 or as at any date or for any period thereafter.**

**The Bank is in the process of finalising its financial statements as at and for the year ended 31 December 2009 and if they are published prior to the Claimants' Meeting, the Bank, will publish, if practicable, a supplement to this Information Memorandum. However, there is no guarantee that the Bank will publish those financial statements prior to the Restructuring. If no such supplement is published, Claimants should understand that they are participating in the Restructuring on the basis of the information then available and that they are aware of the consequences thereof. See *"Risk Factors — Risks Relating to the Bank — The Bank's results as at and for the year ended 31 December 2009 may have a material and adverse impact on the market price of the New Notes and GDRs".***

### Overview

After following an aggressive growth strategy from 2004 to 2007 primarily funded by short term bank borrowings and debt securities issues in the international capital markets, the Bank's financial condition and liquidity position had severely deteriorated by February 2009. The Bank reported increasing levels of loan loss provisions on its loan portfolio throughout the first five months of 2009, beginning with provisions on its unconsolidated unaudited loan portfolio of KZT 214,777 million (based on FMSA Methodology), representing 9.2 per cent. of its total unconsolidated unaudited loan portfolio as at 1 January 2009, KZT 518,272 million (based on FMSA Methodology), representing 19.9 per cent. of the total unconsolidated unaudited loan portfolio as at 1 March 2009, and finally KZT 1,522,139 million (based on FMSA Methodology), representing 57.6 per cent. of its total unconsolidated unaudited loan portfolio as at 1 June 2009. This increase in provisions caused the Bank to breach its required capital adequacy ratios during 2009. As at 1 October 2009, the Bank had created KZT 1,958,899 million (based on FMSA Methodology) in provisions, representing 75.5 per cent. of its total unconsolidated unaudited loan portfolio.

Additional provisions were recognised in the Bank's consolidated financial statements as at 31 December 2008 in accordance with IFRS. The balance of loan loss provisions in its audited consolidated financial statements amounted to KZT 1,217,278 million as at 31 December 2008 (based on IFRS) and its unaudited consolidated financial statements amounted to KZT 2,068,923 million as at 30 September 2009 (based on IFRS). For a discussion of the differences between the determination

of loan loss provisions under FMSA Methodology and IFRS, see "*Asset and Liability Management – Provisioning Policy*".

On 2 February 2009, the Government accepted the recommendation by the FMSA to recapitalise the Bank, following which Samruk-Kazyna acquired a controlling shareholding of the Bank's total share capital for cash consideration of KZT 212,095 million.  As at 30 September 2009, Samruk-Kazyna held 75.1 per cent. of the issued share capital of the Bank.  Furthermore, the Government has provided additional liquidity support in the form of deposits and pursuant to loans under the State Finance Programmes.  As at the date of this Information

Memorandum, the Group has received liquidity support in the amount of KZT 805,596 million from SamrukKazyna and other state-owned entities to support the Group's financial stability and capitalisation.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — Liquidity Support*".

As at 30 September 2009, the Bank was the second largest bank in Kazakhstan by total assets with a market share of 17.7 per cent., compared to 24.5 per cent. as at 31 December 2008 and 24.7 per cent. as at 30 September 2008.

As at 30 September 2009, the Group's total assets were KZT 2,048,127 million compared to KZT 2,194,201 million as at 31 December 2008 and KZT 3,064,617 million as at 31 December 2007, representing a decrease of 6.7 per cent. and 28.4 per cent., respectively.  The Group's total equity was KZT (1,624,019) million as at 30 September 2009 as a result of the provisions against the Group's loan portfolio, compared to total equity of KZT (742,779) million as at 31 December 2008 and total equity of KZT 452,031 million as at 31 December 2007.

**Recent Developments**

On 14 October 2009, the Bank and Samruk-Kazyna signed an agreement on the transfer of 13,318,319 ordinary shares of Temirbank owned by the Bank, representing 100 per cent. of the Bank's interest in Temirbank, under a trust management agreement.  The purpose of the trust management agreement was to permit SamrukKazyna to exercise control over Temirbank for the purpose of Temirbank's financial restructuring.

Following the adoption of the Restructuring Law, which came into effect in August 2009, the Bank submitted an application on 7 October 2009 to the Court to formally initiate the restructuring process under the Restructuring Law.  The Bank's application was approved by the Court on 16 October 2009, which resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.  Pursuant to the terms of the decision of the Court, the Restructuring is to be completed by 5 September 2010. The High Court of Justice of England and Wales on 18 December 2009 and the United States Bankruptcy Court for the Southern District of New York on 9 March 2010 each issued orders recognising the restructuring proceedings in the Court as the main foreign proceeding for purposes of the Bank's assets located in Great Britain and the United States, respectively, pursuant to the Model Insolvency Law.  The Bank filed an Application to Moscow Court of Arbitration to obtain recognition in the Russian Federation of the ruling of the Court dated 16 October 2009 concerning the restructuring of the Bank.  The Solomensky District Court of Kiev on 17 February 2010 issued a decision which came into force on 23 February 2010 recognising the restructuring proceedings in the Court pursuant to the Convention of Legal Aid and Legal Relations on Civil, Family and Criminal Matters signed on 7 October, 2002 in Kishinev City, Republic of Moldova by ten CIS member states, including the Ukraine and Kazakhstan.

On 17 April 2009, the shareholders of Oranta NJSIC OJSC voted to issue new equity in the company. At that time, the Bank held 14.01 per cent. and BTA Securities (as a nominal holder on behalf of its clients) held 21.16 per cent. of Oranta NJSIC OJSC, respectively.  In order to avoid having its ownership interest diluted, in December 2009, the Bank purchased an additional 16.37 per cent. share in Oranta NJSIC OJSC for KZT 2,516 million.  As a result the Group's equity interest in Oranta NJSIC OJSC as of the date of this Information Memorandum is 30.39 per cent.

On 7 December 2009, the Bank and the Steering Committee signed the PCTS setting out key commercial terms of the Restructuring, the Restructuring Package and certain other arrangements, principally relating to the Bank's corporate governance and other aspects of its operations and business following completion of the Restructuring.  On 17 March 2010, the Bank and the Steering Committee entered into the PCTS Amendment Letter related to the Restructuring Packages and the conditions of the Restructuring process.

On 17 December 2009, Goldman Sachs LLC filed a suit in the Moscow Court of Arbitration against TuranAlemFinance (Russia) and the Bank seeking payment of principal and interest on bonds issued by TuranAlem Finance (Russia), which were guaranteed by the Bank, in the amount of RUB 3,178 million or approximately KZT 16 billion.

In January 2010 the Bank obtained a 74.99 per cent. share in Accumulated Pension Fund Ular-Umit JSC and 74.99 per cent. share in Zhetysu Pension Asset Management Company JSC in exchange for the discharge of the liabilities owed to the Bank by LLP Astana Stroiservice, LLP Kazakhstan Standart Invest and LLP Logistic

Technopark CM.  As of the date of this Information Memorandum, these entities are not considered subsidiaries of the Bank.

### *Going Concern*

During the fourth quarter of 2008 there was a significant deterioration in the consolidated financial position of the Group principally resulting from loss events related to the loan portfolio, which ultimately led to a breach by the Group of certain prudential requirements including those related to capital adequacy set by the FMSA.  See "*The Bank — Background to the Restructuring*".  In addition, in February 2009, the Tenge devalued against US Dollar, which negatively affected the Group and its customers, resulting in further deterioration of the Group's assets.  See "*The Bank — Background to the Restructuring*".  As a result of these loss events the Group's total liabilities as at 30 September 2009 exceeded its total assets by KZT 1,624,019 million and the Group has reported a net loss amounting to KZT 1,049,538 million for the nine-month period then ended.  This led to the Bank's noncompliance with certain regulatory ratios, including the capital adequacy ratio as calculated in accordance with the Basel Accord.

As at 30 September 2009, the amount drawn by the Group under bond programs and loan facilities amounted to KZT 2,423,224 million.  In accordance with the contractual terms of certain bond programs and loan facilities, the Bank is required to maintain certain financial ratios, particularly with regard to its liquidity, capital adequacy and lending exposures.  Furthermore, the Bank is required to maintain a certain level of credit rating from major international rating agencies.

The Bank was in breach of these capital adequacy and lending covenants on syndicated loans, bonds and certain other facilities as at 30 September 2009 and 31 December 2008.  In addition, in April 2009, the credit rating of the Bank from major international rating agencies decreased to default levels.  Accordingly, certain credit facilities are in default and have become callable by the lenders. The Bank's default under these covenants resulted in accelerations and cross-defaults under the terms of the respective agreements.

In April 2009, the Bank suspended its payments on principal and in July 2009 on interest payments. The Group, with the support of Samruk-Kazyna, is in the process of completing the Restructuring.

In light of the negative events described above, the Annual Financial Statements included a note indicating there was a material uncertainty which may cast significant doubt about the Bank's ability to continue as a going concern.

The Annual Financial Statements and Unaudited Interim Financial Statements do not include any adjustments relating to the recoverability and classification of recorded assets and classification of liabilities that might be necessary if the Restructuring is unsuccessful and adequate additional resources are not available and the Bank is unable to continue as a going concern.

**Factors Affecting the Bank's Results of Operations *Kazakhstan's Economy***

The unprecedented recent market and economic conditions have resulted in tighter credit conditions and slower growth.  Continued concerns about the health of the financial sector in many countries, possible inflation, energy costs, geopolitical issues and the availability and cost of credit have contributed to increased market volatility and diminished expectations for various economies.

The economy in Kazakhstan was particularly affected by the collapse of oil and gas prices beginning in the second half of 2008.  In addition, real estate prices in Kazakhstan have dropped sharply since June 2007.  See "*Risk Factors — Volatility in the real estate market in Kazakhstan has had and may continue to have an adverse effect on the Bank's asset quality and collateral value*".  Such volatility in the commodity prices and the real estate market has had an adverse effect on the country's economy.  These adverse economic conditions led to a decrease in GDP growth of 3.3 per cent. in 2008 compared to 8.9 per cent.  GDP growth in 2007.  According to preliminary NSA data, GDP increased by 1.2 per cent. in 2009.

Further, on 4 February 2009, the NBK reduced its level of support for the exchange rate from KZT 117 – KZT 123 to 1 U.S. Dollar to KZT 150 to 1 U.S. Dollar (+/- 3 per cent.) This devaluation was due in part to declines in Kazakhstan's balance of payments and foreign exchange reserves as a result of falls in commodity prices, in particular oil and gas, in the international markets.  From 5 February 2010 a new exchange rate corridor began to operate.  In light of the state of world trade and currency markets, and in order to make the setting of exchange rates more flexible, the NBK has indicated that it will widen the KZT corridor until 20 March 2011 to allow fluctuations from a base rate of KZT 150 to 1 U.S. Dollar of + 10 per cent. (i.e. up to KZT 165 to 1 U.S. Dollar) and - 15 per cent. (i.e. down to KZT 127.5 to 1 U.S. Dollar).

In addition, concern about the stability of the banking sector in Kazakhstan led to a material reduction in liquidity as wholesale funding has become more expensive and less available.  Funding from retail depositors also fell as a result of a public loss of confidence in the Kazakhstan banking sector.  To prevent deposit outflow and due to the deterioration in asset quality in 2009, Samruk-Kazyna has provided financial support to the banking sector totalling KZT 1,082.1 billion as at 18 February 2010, according to official data.  This support took a number of forms, including a direct equity investment as well as placing deposits with the banks, and in the case of the Bank the exchanging of Bank Bonds for SK Bonds.  Moreover, the Government has provided KZT 120 billion pursuant to each of the Mortgage State Finance Programme and SME State Finance Programme.  For more detailed information, see "*The Banking Sector in Kazakhstan — Introduction*".

***Loan Loss Provisions***

Before 1 May 2007, the FMSA provisioning policy in respect of SME borrowers and corporate borrowers was based on an analysis of eight criteria of asset quality and six criteria of contingent liability quality.  Each criterion was assessed a score and the class of an asset or contingent liability of a borrower was calculated by adding up the scores of each criterion of quality.

Effective 1 May 2007, the Bank changed its provisioning policies in order to comply with amended FMSA regulations on provisioning.  Under these new policies, loans are separated into two groups: loans for which provisions accrue on a case by case basis and homogeneous loans.  The Bank determines provisions for the former group, which includes corporate, SME loans and retail loans in excess of 0.02 per cent. of the Bank's equity, based on its analysis of historical losses and the supervision of its loan portfolio.  For loans assessed on an individual basis, the FMSA reduced the number of asset quality criteria from eight to five and the number of contingent liabilities quality criteria from six to three.  For the retail loans that are classified as homogeneous loans, the Bank decides on the level of provisions in respect of the entire group of homogenous retail loans rather than overdue loans only.  According to this policy, the Bank reviews historical data on a monthly basis and, if necessary, revises its provisioning rate to reflect changes in its losses and other relevant factors.

In July 2009, the Bank engaged an independent auditor to review the credit files of a portion of the borrowers in the Bank's corporate loan portfolio to assess the appropriate level of loan loss provisions as at 30 June 2009 based on FMSA Methodology. This review resulted in a report dated 3 September 2009. On 23 September 2009, the Bank and Steering Committee again engaged their independent auditors to supplement and expand on their previous review of the corporate loan portfolio by reviewing the credit files of all of the borrowers in the Bank's corporate loan portfolio. Pursuant to its report issued on 12 November 2009, the Bank's independent auditors advised that the appropriate level of loan loss provisions on the corporate loan portfolio of the Bank was KZT 1,965 billion (based on FMSA Methodology) as at 30 June 2009. For a discussion of the difference between FMSA Methodology and IFRS, see "*Pro Forma Financial Information*" and "*Asset and Liability Management — Provisioning Policy*".

Provisions as a percentage of gross loans based on IFRS increased to 65.1 per cent. as at 30 September 2009 compared to 42.9 per cent. as at 31 December 2008 and 5.4 per cent. as at 31 December 2007. For a discussion on recognition of provisions see "*Asset and Liability Management — Loan Supervision and Monitoring*". Provisions as a percentage of gross loans increased in the first nine months of 2009 as a result of a multitude of internal and external (both foreign and domestic) factors that materially influenced the worsening of the quality of the corporate loan portfolio.

The investigation of the FMSA and Samruk-Kazyna prior to Samruk-Kazyna's investment into the Bank in February 2009, and the Bank's internal due diligence conducted following the acquisition and the appointment of the new management team, have revealed a number of factors that the Bank believes led to the deterioration of the Bank's loan portfolio and significant net losses. For a complete discussion of these factors, see "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio*" and "*The Bank — Asset Recovery*".

In particular, a high number of purported loans granted to non-residents became problem loans. Such loans represented 49.5 per cent. of the gross portfolio of the Bank as at 30 September 2009. For the first nine months of 2009 provisions in respect of loans issued to non-resident borrowers rose 2.6 times as a result of the following factors:

- a number of such borrowers may have been connected with the former management of the Bank and potentially fraudulent schemes were used when issuing loans and transferring loaned funds outside Kazakhstan;

- former management used multi-layered credit schemes under which one company (usually offshore) would act as the borrower, then forward the loaned funds to a project manager (often a resident of Russia, Ukraine or another country), and a third person would provide security (if security was provided at all). Such schemes made it more difficult for the Bank to investigate and enforce its rights;

- many non-resident borrowers are not responding to the Bank's requests and communication with them has been lost, which leads to loss of control over the realisation of the project and ability to monitor the use of funds;

- the Bank has been unable to monitor the use of funds, security and results of financial activity of nonresident borrowers;

- the Bank has been unable to monitor and re-value pledged property; and

- certain security provided by certain borrowers has been inaccessible as a consequence of the borrowers having purportedly cancelled the pledge over the property in question and subsequently sold such property to third persons.

For the first nine months of 2009 provisions in respect of loans issued to resident borrowers rose 3.4 per cent.

The Bank has faced internal challenges identifying, analysing and dealing with problem loans since the Bank's management changed in early 2009 see "*Risk Factors — Risks Related to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*". The Bank has taken the actions in order to deal with the large volume of problem loans.   See "*Asset and Liability Management — Non-Performing Loans*".

In respect of external factors, the world financial crisis in 2008 and 2009 was accompanied by a fall in world prices for oil and gas, metals, raw materials and real estate.   In the domestic economy, there was a reduction in business activity, a fall in the volume of sales, a reduction of consumer demand in the population and a crisis in the construction sector, among other things.   The economic crisis led to a sharp loss of turnover for businesses (a liquidity crisis) which led to payment defaults.

As the financial condition of the Bank's borrowers worsened, this contributed to a reduction in the creditworthiness of clients and to an increase in defaults on their obligations to the Bank.   Late payment of indebtedness by corporate business borrowers rose 62 per cent. in the first nine months of 2009.   The number of loans for which the maturity date was extended rose by 20 per cent.

A reduction in real estate prices also contributed to a reduction in the value of pledged property and increased the risk of non-return of money under problem loans when enforcing against pledged property.   As at 30 September 2009, 31 December 2008 and 31 December 2007, the Group held retail mortgages   totalling   KZT 240,625 million,   KZT 234,130 million   and   KZT 254,417 million, respectively, which represented 7.6 per cent., 8.3 per cent. and 10.1 per cent., respectively, of its total gross loan portfolio.

Provisions on corporate loans as a percentage of gross corporate loans increased to 79.2 per cent. as at 30 September 2009 compared to 56.7 per cent. as at 31 December 2008 and 6.7 per cent. as at 31 December 2007.   On an unconsolidated basis, provisions on CIS loans of the Bank increased to 96.7 per cent. of CIS loans as at 30 September 2009 compared to 10.1 per cent. as at 31 December 2008 and provisions on investment loans increased to 82.7 per cent. of the investment loan portfolio as at 30 September 2009 from 4.5 per cent. as at 31 December 2008.

Provisions on SME loans as a percentage of gross SME loans increased to 23.4 per cent. as at 30 September 2009 compared to 8.2 per cent. as at 31 December 2008 and 7.7 per cent. as at 31 December 2007.

Provisions on retail loans as a percentage of gross retail loans increased to 15.6 per cent. as at 30 September 2009 compared to 4.3 per cent. as at 31 December 2008 and 0.4 per cent. as at 31 December 2007.

*Interest Rates*

As a significant portion of the Bank's assets and liabilities are interest-bearing, changes in prevailing interest rates, both in Kazakhstan and internationally, can materially affect its results.   As a general matter, because the Bank has both interest-earning assets and interest-bearing liabilities, rising interest rates can lead to higher or lower interest margins, depending on whether the Bank's interest-earning assets reprice at a faster rate than its interest-bearing liabilities.

From 2003 to early 2009, the NBK steadily raised refinancing interest rates, from 7 per cent. as at 7 July 2003 to 10 per cent. as at 1 January 2009.   As of 4 September 2009, the NBK has decreased the refinancing interest rate to 7 per cent.   Although the official refinancing rate of the NBK has, under normal conditions, a minimal effect on the cost of funding of Kazakhstan banks, its influence grows sharply during periods of constrained liquidity on the internal banking market, when most banks are forced to turn to the NBK for liquidity.

In addition, the Bank's securities portfolio, which consists of both Tenge and U.S. Dollar denominated assets, is affected by changes in interest rates.   Rising interest rates would, over time,

increase the Bank's income from its securities portfolio but may at the same time reduce the market value of its pre-existing fixed income investment portfolio.

*Mix of Funding Base*

Historically international sources of funding were less expensive than domestic sources of funding. Before 2008, the Bank relied heavily on raising funds through the international debt capital markets and through term facilities with international lenders.  As at 31 December 2007, 41.5 per cent. of the Group's funding base (i.e., the Group's total liabilities) consisted of debt securities issued and 32.0 per cent. was due to credit institutions, both of which derived primarily from international markets.  As at 31 December 2007, the remaining portion of the funding base was made up primarily of customer accounts (25.0 per cent.) and other liabilities (1.5 per cent.).

As a result of the global financial crisis, the Bank no longer had access to new international sources of funding.  Of international funding reflected on the Group's balance sheet as at 31 December 2008, 84.5 per cent. was obtained prior to 31 December 2007 and represented primarily debt securities issued and due to banks.  As at 30 September 2009, 45.5 per cent. of the Group's funding base consisted of debt securities issued and 20.5 per cent. was due to credit institutions, compared to 37.0 per cent. and 27.4 per cent. as at 31 December 2008, respectively.  If the Restructuring is successful the proportion of international funding reflected on the Group's balance sheet will significantly decrease.

The management of the Bank does not believe that new international funding will become available in the short term, so the Bank will increasingly rely on domestic funding sources, which historically has been more expensive than international funding.  Furthermore, the current management expects that the competition for domestic funding will increase among other banks in Kazakhstan, which will further increase the cost of such funding.

*Samruk-Kazyna's Support*

The Group has experienced significant outflows of customer deposits since January 2009.  The Group's retail deposits decreased by 40.3 per cent. from KZT 307,345 million as at 31 December 2008 to KZT 183,552 million as at 30 September 2009.  The Group has also experienced a significant outflow of private corporate and SME deposits (i.e., deposits from entities other than Samruk-Kazyna and its subsidiaries) during the same period.  Such deposits decreased by 64.9 per cent. from KZT 364,482 million as at 31 December 2008 to KZT 128,093 million as at 30 September 2009.  Due to deposits totalling KZT 157,411 million which were placed in February 2009 and March 2009 by Samruk-Kazyna and throughout the period by subsidiaries of Samruk-Kazyna, the deposits by Samruk-Kazyna and its subsidiaries (which includes amounts deposited pursuant to the State Finance Programmes) increased by 73.5 per cent. from KZT 214,225 million as at 31 December 2008 to KZT 371,636 million as at 30 September 2009 and the Group's total deposits decreased by only 22.9 per cent. from KZT 886,052 million as at 31 December 2008 to KZT 683,281 million as at 30 September 2009.  See also "*The Banking Sector in Kazakhstan — Introduction*".

**Critical Accounting Policies and Estimates**

The Group's accounting policies are integral to an understanding of the results of operations and financial condition presented in the consolidated financial statements and notes thereto.  The Group's significant accounting policies are described in Note 4 to the Annual Financial Statements appearing elsewhere in this Information Memorandum.  The preparation of these financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses during the relevant period.  On an on-going basis, management evaluates its estimates and judgments, including those related to impairment charges, reserves for insurance claims, the carrying values of property and investments, income taxes and deferred taxes, financing operations and contingencies, litigation and arbitration. Management bases its estimates and judgments on historical experience and on various other factors that are considered to be reasonable under the circumstances.  Actual results may differ from

estimates under different assumptions or conditions.  Please refer to "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*" for information regarding an increase in the Bank's loan loss provisions.

**Significant Accounting Judgements and Estimates**

In the process of applying the Group's accounting policies, management has made certain judgements and estimates set out in Note 5 to the Annual Financial Statements, appearing elsewhere in this Information Memorandum.

**Changes in accounting policies**

The accounting policies adopted in the preparation of the Unaudited Interim Financial Statements are consistent with those followed in the preparation of the Group's Annual Financial Statements for the year ended 31 December 2008, except for the adoption of new standards and interpretations, noted in Note 3 to the Unaudited Financial Statements:

**Principles of Consolidation**

The consolidated financial statements of the Group include the Bank and the companies that it controls (subsidiaries).  This control is normally evidenced when the Group owns, either directly or indirectly, more than 50 per cent. of the voting rights of a company's share capital and is able to govern the financial and operating policies of an enterprise so as to benefit from its activities.  All intragroup transactions, balances and unrealised gains on transactions between Group companies are eliminated in full.  Unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred.  Where necessary, accounting policies for subsidiaries have been changed to ensure consistency with the policies adopted by the Group.  Consolidated financial statements are prepared using uniform accounting policies for like transactions and other events in similar circumstances.  The equity and net income attributable to minority shareholders' interests are shown separately in the balance sheets and statements of income, respectively.

Subsidiaries are consolidated from the date on which effective control is transferred to the Group and are no longer consolidated from the date control ceases.

*Acquisition of Subsidiaries – 2008*

The purchase method of accounting is used to account for the acquisition of subsidiaries by the Group.  Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are measured initially at their fair values at the acquisition date, irrespective of the extent of any minority interest.

The excess of purchase consideration over the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities is recorded as goodwill.  If the cost of the acquisition is less than the Group's share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary acquired the difference is recognised directly in the consolidated statement of income.

Minority interest is the interest in subsidiaries not held by the Group.  Minority interest at the reporting date represents the minority shareholders' share in the net fair value of the identifiable assets, liabilities and contingent liabilities of the subsidiary at the acquisition date and the minorities' share in movements in equity since the acquisition date.  Minority interest is presented within equity.

Losses allocated to minority interest do not exceed the minority interest in the equity of the subsidiary unless there is a binding obligation of the minority to fund the losses.  All such losses are allocated to the Group.

The differences between the carrying values of net assets attributable to interests in subsidiaries acquired and the consideration given for such increases are charged or credited to goodwill.

*Acquisition of Subsidiaries – 2009*

Early adoption of amendments to IFRS "Business combinations" and amendment to IAS 27 "Consolidated and Separate Financial Statements". The revised standards were issued in January 2008 and have become effective for financial years beginning on or after 1 July 2009. Revised IFRS 3 introduces a number of changes in the accounting for business combinations that will impact the number of goodwill recognised, the reported results in the period that an acquisition occurs, and future reported results. Revised IAS 27 requires that a change in the ownership interest of a subsidiary is accounted for as an equity transaction. Therefore, such a change will have no impact on goodwill, nor will it give rise to a gain or loss. Furthermore, the revised standard changes the accounting for losses incurred by the subsidiary as well as the loss of control of a subsidiary. The changes introduced by the revised Standards must be applied prospectively and will affect only future acquisitions and transactions with non-controlling interests.

The Group has elected to early adopt these amendments starting from 1 January 2009. In accordance with these amendments total comprehensive loss is attributed to the owners of the parent and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance. As a result, total comprehensive loss of the Group's subsidiaries in the amount KZT 26,425 million were attributed to non-controlling interests.

*Investments in Associates*

Associates are entities in which the Group generally has between 20 per cent. and 50 per cent. of the voting rights, or is otherwise able to exercise significant influence, but which it does not control or jointly control. Investments in associates are accounted for under the equity method and are initially recognised at cost, including goodwill. Subsequent changes in the carrying value reflect the post-acquisition changes in the Group's share of net assets of the associate. The Group's share of its associates' profits or losses is recognised in consolidated statement of income, and its share of movements in reserves is recognised in other comprehensive income. However, when the Group's share of losses in an associate equals or exceeds its interest in the associate, the Group does not recognise further losses, unless the Group is obliged to make further payments to, or on behalf of, the associate.

Unrealised gains on transactions between the Group and its associates are eliminated to the extent of the Group's interest in the associates; unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred.

**Results of Operations for the Nine-Month Periods ended 30 September 2009 and 2008**

***Summary***

For the nine months ended 30 September 2009, the Group reported net loss of KZT 1,049,538 million or KZT 31,039 per diluted share, compared to net income of KZT 35,212 million or KZT 4,015 per diluted share for the nine months of 2008. The significant decrease in income in the nine months of 2009 compared to the nine months of 2008 was due primarily to the increase in impairment of assets and losses from foreign currency operations. See "*Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007 — Total Assets*" below. The impairment recognised on the Group's loans to customers and amounts due from credit institutions was KZT 641,604 million for the nine months of 2009 as compared to KZT 80,019 million for the nine months of 2008, which represents an increase of 701.8 per cent. The Group recognised losses from foreign currency operations of KZT 362,890 million for the period ended 30 September 2009 compared to gains of KZT 3,101 million for the period ended 30 September 2008.

*Interest Income, Interest Expense, Net Interest Income and Provision for Losses*

The following table sets out the principal components of the Group's net interest income for the periods indicated:

|  | Nine-month period ended 30 September | |
|---|---|---|
|  | 2009 | 2008 |
|  | *(KZT millions, unaudited)* | |
| Loans to customers | 155,971 | 274,806 |
| SKBonds | 20,502 | — |
| Securities |  |  |
| — Financial assets at fair value through profit or loss | 9,677 | 7,216 |
| — Available-for-sale investment securities | 1,932 | 2,201 |
| Deposits with other banks | 5,852 | 13,931 |
| **Total interest income** | **193,934** | **298,154** |
| **Interest expense** | **(195,955)** | **(160,422)** |
| Net interest (expense)/income before impairment | (2,021) | 137,732 |
| Impairment charge | (641,604) | (80,019 |
| **Net interest (expense)/income** | **(643,625)** | **57,713** |

*Total Interest Income*

Total interest income decreased by 35.0 per cent. to KZT 193,934 million for the nine months ended 30 September 2009 from KZT 298,154 million for the nine months ended 30 September 2008, largely as a result of a 43.2 per cent. period-to-period decrease in interest on loans to customers to KZT 155,971 million as at 30 September 2009 from KZT 274,806 million as at 30 September 2008 due to the decrease in the average amounts of loans provided to customers by 47.7 per cent. The decrease in total interest income was partially offset by interest on the SK Bonds in the amount of KZT 20,502 million earned over the nine-month period ended 30 September 2009. See "*The Bank — NBK Support*".

For the nine months ended 30 September 2009 the average yield on total interest earning assets was 14.0 per cent. compared to 14.4 per cent. for the same period in 2008.

Interest income on the Group's securities portfolio increased over the relevant period. During the nine months ended 30 September 2009, interest income earned on securities increased by 23.3 per cent. to KZT 11,609 million from KZT 9,417 million for the same period in 2008.

For the nine months ended 30 September 2009, the monthly average balance of the Group's securities portfolio was KZT 156,480 million, compared to KZT 190,299 million for the nine months ended 30 September 2008, reflecting a decrease of 17.8 per cent. The profitability of the securities portfolio increased to 9.9 per cent. as of 30 September 2009 from 6.6 per cent. as of 30 September 2008.

Interest earned on bank deposits decreased by 58.0 per cent. to KZT 5,852 million for the first nine months of 2009 from KZT 13,931 million for the first nine months of 2008. The decrease in interest earned on bank deposits for the first nine months of 2009 compared to the first nine months of 2008 was primarily attributable to the decrease in the average amounts of deposits with other banks by 51.5 per cent. The average interest rates on balances in other banks decreased to 7.4 per cent. over the first nine months of 2009 from 8.5 per cent. over the same period in 2008.

Tenge-denominated average deposits represented 27.1 per cent. of total average deposits for the first nine months of 2009, compared to 32.8 per cent. for the first nine months of 2008.

As at 30 September 2009, large deposits (i.e., in excess of U.S.$10,000), as a percentage of total deposits, also decreased compared to 30 September 2008 to 85.9 per cent. from 86.9 per cent. Deposits of an amount between U.S.$10,000 – U.S.$100,000 accounted for 13.8 per cent. of total deposits and deposits in excess of U.S.$100,000 accounted for 72.1 per cent. of total deposits as at 30 September 2009, compared to 14.5 per cent. and 72.4 per cent. of total deposits, respectively, as at 30 September 2008.

*Interest Expense*

The following table sets out certain information relating to the Group's interest expense for the periods indicated:

|  | Nine-month period ended 30 September | |
|---|---|---|
|  | 2009 | 2008 |
|  | *(unaudited)* | |
|  | *(KZT millions)* | |
| Debt securities issued | (110,878) | (72,867) |
| Deposits from customers | (36,949) | (39,687) |
| Deposits and loans from credit institutions | (48,128) | (47,868) |
| **Total** | **(195,955)** | **(160,422)** |

For the nine months ended 30 September 2009 interest expense increased by 22.1 per cent. to KZT 195,955 million from KZT 160,422 million for the nine months ended 30 September 2008. The increase in interest expense over the period was largely due to the issuances of debt securities in 2009, partially offset by reductions in average amounts of client deposits.

Average balances of the Group's interest-bearing customer deposits, including both corporate and retail deposits (calculated, in each case, by reference to the unaudited accounting records of the Bank as at the relevant year end based on the balances for the end of each month in the relevant year) were KZT 546,487 million for the nine months ended 30 September 2009, compared to KZT 609,591 million for the nine months ended 30 September 2008, reflecting a decrease of 10.4 per cent.

The lower balances for the period were largely attributable to the generally worsened economic conditions in Kazakhstan and the related deterioration in the level of customer confidence in Kazakhstan banks.

Average interest rates paid on interest-bearing customer deposits for the nine months ended 30 September 2009 and 2008 were 9.0 per cent. and 8.7 per cent., respectively.

For the nine months ended 30 September 2009, interest expense on issued debt securities increased by 52.2 per cent. to KZT 110,878 million from KZT 72,867 million for the nine months ended 30 September 2008. The primary reason for the increase was the higher average balances of debt securities outstanding by 34.3 per cent. and the increase of the effective rates from 8.8 per cent. over the nine months ended 30 September 2008 to 9.9 per cent. over the same period ended 30 September 2009. See "*Selected Statistical and other Information — Funding Sources — Debt Securities*".

*Net Interest (Expense)/Income before Impairment*

The Group had a net interest expense before impairment charge of KZT 2,021 million for the nine months ended 30 September 2009 compared to a net interest income before impairment charge of KZT 137,732 million for the nine months ended 30 September 2008, reflecting a decrease of 101.5 per cent.

The Group's net interest margin, defined as net interest income before impairment charge as a percentage of average interest-earning assets, was (0.1) per cent., for the nine months ended 30 September 2009 compared to 6.6 per cent. for the nine months ended 30 September 2008. This decrease was due to an increase in the average rate on attracted liabilities and a decrease in the earning assets rate under client loans. This tendency was observed in second tier banks in 2008 and the first half of 2009. The decrease was also due to a change in the structure of the Bank's financing sources for large international borrowers and issuances of debt securities. The Bank constantly monitors its interest rate margins and spreads.

*Impairment Charge*

The Group's impairment charge for the nine months ended 30 September 2009 increased by 701.8 per cent. to KZT 641,604 million from KZT 80,019 million for the nine months ended 30 September 2008.  This increase was primarily due to the deterioration of the loan portfolio.

Allowance for loan impairment increased more than nine-fold to KZT 2,068,923 million as at 30 September 2009 from KZT 204,774 million as at 30 September 2008.

As a result, the allowance for loan impairment as a percentage of gross loans increased to 65.1 per cent. as at 30 September 2009 compared to 6.8 per cent. as at 30 September 2008.  See "*Asset and Liability Management — Provisioning Policy*".

**Non-Interest Income**

The following table sets out certain information on the Group's non-interest income for the periods indicated:

| | Nine-month period ended 30 September | |
| --- | --- | --- |
| | 2009 | 2008 |
| | *(unaudited)* | |
| | *(KZT millions)* | |
| Net trading loss | (20,020) | (4,676) |
| Gains less losses from foreign currencies: | | |
| — dealing | (9,513) | 884 |
| — translation differences | (353,377) | 2,217 |
| Fair value change of options | 19,837 | — |
| Income from insurance operations | 8,248 | 11,030 |
| Expenses from insurance operations | (6,202) | (9,384) |
| Share of income of associates | 4,169 | 4,193 |
| Impairment charge for available-for-sale investment securities | (1,243) | — |
| Impairment charge for goodwill | (32,885) | — |
| Gain from purchase of own debt securities | 9,708 | — |
| Other income | 2,294 | 5,033 |
| **Total** | **(3,78,984)** | **9,297** |

*Net trading loss*

Net trading loss for the nine months of 2009 increased by 328.1 per cent. to KZT 20,020 million from KZT 4,676 million for the nine months of 2008.  This increase in net trading loss was due to losses from buying and selling, and changes in the fair value of financial assets at fair value through profit or loss and the effect of buying and selling of available-for-sale investment securities as well as changes in fair value of forward transactions with securities.

*Gains less Losses from Foreign Currencies*

Gains less losses arising from the translation of foreign currency-denominated assets and liabilities and from dealing, which are reported in the income statement as gains less losses from foreign currencies, comprised a loss of KZT 362,890 million for the nine months of 2009, compared to a gain of KZT 3,101 million for the nine months of 2008, reflecting a decrease due in large part to gains from a revaluation of foreign currency.  Losses from foreign currency revaluation are due to the U.S. Dollar exchange rate increase to KZT 150.95 per U.S.$1.00 as at 30 September 2009 from KZT 119.84 per U.S.$1.00 as at 30 September 2008.

*Fair Value Change of Options*

With respect to certain loans linked to foreign currencies, the Bank has the option to demand higher payments if the foreign currency specified in the contract appreciates above a certain floor (typically the level of spot rates prevailing on the loan issuance date).  The Bank believes this feature creates an embedded foreign currency option that should be recognised separately from the underlying loan.

The Group recognised income in respect of fair value change of options of KZT 19,837 million for the nine months ended 30 September 2009 compared to nil over the same period 2008.

*Income and Expenses from Insurance Operations*

Income from insurance operations decreased by 25.2 per cent. to KZT 8,248 million for the nine months ended 30 September 2009 from KZT 11,030 million for the nine months ended 30 September 2008, while expenses from insurance operations decreased as well by 33.9 per cent. to KZT 6,202 million from KZT 9,384 million.  Decreases in income were due to decreases in the amount of insurance premiums received, while the decreases in expenses were due to the proportional decrease of commissions paid and insurance payments, as well as optimisation of administrative expenses of insurance companies.

*Impairment Charge for Available-for-Sale Investment Securities*

The Group recognised an impairment charge for available-for-sale investment securities of KZT 1,243 million for the nine months ended 30 September 2009 compared to nil over the same period in 2008, which was due primarily to the increase in provision expenses on bonds of Astana-Finance and Alliance Bank held by the Bank.

*Impairment Charge for Goodwill*

An impairment charge for goodwill for the nine months ended 30 September 2009 was KZT 32,885 million compared to nil over the same period in 2008, as a result of the impairment test conducted with respect to Temirbank based on a comparison of the book value of the Bank's investment in Temirbank against the recoverable value of Temirbank.  Recoverable value was determined based on the discounted future cash flows of Temirbank.

*Gain from Purchase of Own Debt Securities*

The Group recognised a gain from purchase of own debt securities of KZT 9,708 million over the nine months ended 30 September 2009 compared to nil over the same period in 2008, due to the purchase by the Group of its own subordinated bonds with a carrying value of KZT 44,150 million for KZT 34,442 million.

*Other Income*

Other income decreased by 54.4 per cent. to KZT 2,294 million for the nine months ended 30 September 2009 compared to KZT 5,033 million for the nine months ended 30 September 2008, largely due to a decrease in operations of subsidiaries and affiliated companies.

**Non-Interest Expense**

The following table shows the composition of the Group's non-interest expense for the periods indicated:

| | Nine-month period ended 30 September | |
|---|---|---|
| | **2009** | **2008** |
| | *(unaudited)* | |
| | *(KZT millions)* | |
| Salaries and other employee benefits | (17,000) | (20,029) |
| Administrative and other operating expenses | (16,565) | (19,551) |
| Depreciation and amortization | (3,704) | (3,282) |
| Taxes other than income tax | (2,932) | (2,737) |
| Obligatory reserves of individuals' deposits | (1,353) | (1,725) |
| Other provisions | 6,415 | (476) |
| Other expenses | (2,358) | (1,886) |
| **Total** | **(37,497)** | **(49,686)** |

Non-interest expense for the nine months of 2009 decreased by 24.5 per cent. to KZT 37,497 million from KZT 49,686 million for the nine months of 2008.  The decrease in non-interest expense was mainly due to recoveries in other provisions, as well as decreases in amounts paid to salaries and benefits and administrative and operating expenses.

*Salaries and Benefits*

Salaries and benefits for the nine months of 2009 decreased by 15.1 per cent. to KZT 17,000 million from KZT 20,029 million for the nine months of 2008.  This decrease was primarily attributable to the decrease in staff levels and closure of cash offices.  The number of employees in the Group decreased by 28.2 per cent. to 10,495 employees as at 30 September 2009 compared to 14,608 employees as at 30 September 2008.

*Administrative and Other Operating Expenses*

The following table shows the composition of the Group's other administrative and operating expenses for the periods indicated:

|  | Nine-month period ended 30 September | |
|---|---|---|
|  | 2009 | 2008 |
|  | *(unaudited)* | |
|  | *(KZT millions)* | |
| Occupancy and rent | (4,349) | (5,338) |
| Legal services and consultancy | (3,317) | (1,076) |
| Repair and maintenance of property and equipment | (1,253) | (1,608) |
| Security | (1,047) | (1,166) |
| Communications | (1,019) | (1,230) |
| Plastic cards | (821) | (571) |
| Marketing and advertising | (759) | (2,483) |
| Encashment | (716) | (689) |
| Transportation expenses | (609) | (1,573) |
| Agency services | (426) | (366) |
| Penalties | (415) | (130) |
| Data processing | (331) | (250) |
| Business travel and related expenses | (318) | (801) |
| Office supplies | (193) | (339) |
| Mail and express services | (124) | (122) |
| State duty | (84) | (177) |
| Representation expenses | (31) | (82) |
| Insurance expense | (23) | (20) |
| Training | (13) | (73) |
| Loss on disposals of property and equipment | (12) | (11) |
| Participation in forums, seminars and conferences | (10) | (122) |
| Other | (695) | (1,324) |
| **Administrative and other operating expenses** | **(16,565)** | **(19,551)** |

Total administrative and other operating expenses for the nine months of 2009 decreased by 15.3 per cent. to KZT 16,565 million from KZT 19,551 million in the nine months of 2008.  Marketing and advertising, occupancy and rent and transportation expenses represented the largest contributing factors to the decrease, while expenses for legal services and consultancy significantly increased.

Marketing and advertising expenses decreased by 69.4 per cent. to KZT 759 million for the nine months of 2009, compared to KZT 2,483 million for the same period in 2008.  This decrease was mainly attributable to the decreased level of advertising conducted by the Group in line with the restructuring of its business.

Occupancy and rent decreased by 18.5 per cent. to KZT 4,349 million for the nine months ended 30 September 2009, compared to KZT 5,338 million for the nine months ended 30 September 2008.  This decrease primarily resulted from the closure of 42 cash offices in the nine months of 2009.  See "*The Bank — Strategy — General Strategies of the Bank — Optimise Branch Network*".

Transportation expenses decreased to KZT 609 million for the nine months ended 30 September 2009, compared to KZT 1,573 million for the same period in 2008, reflecting a decrease of 61.3 per cent.

Business travel and related expenses decreased by 60.3 per cent. from KZT 801 million for the nine months ended 30 September 2008 to KZT 318 million for the same period as at 30 September 2009.

Repair and maintenance expenses of property and equipment decreased by 22.1 per cent. to KZT 1,253 million as at 30 September 2009 from KZT 1,608 million as at 30 September 2008 due to the cash office closures in 2009.  See "*The Bank — Strategy — General Strategy of the Bank — Optimise Branch Network and Subsidiaries*".

Communication fees were KZT 1,019 million for the nine months ended 30 September 2009, compared to KZT 1,230 million for the same period in 2008, reflecting a decrease of 17.2 per cent. This decrease of communication fees for the nine months ended 2009 was mainly due to optimisation of the Bank's expenses, in particular the reduction in the total number of employees and number of employees that were allowed to use long distance telephone services.

Office supplies expenses decreased by 43.1 per cent. to KZT 193 million for the nine months ended 30 September 2009, compared to KZT 339 million for the same period in 2008.

Legal and consultancy fees increased by 208.3 per cent. to KZT 3,317 million for the nine months ended 30 September 2009, compared to KZT 1,076 million for the nine months ended 30 September 2008.  Higher legal and consultancy fees for the nine months ended 30 September 2009 were mainly due to the Bank's restructuring efforts.

Penalties increased by 219.2 per cent. to KZT 415 million for the nine months ended 30 September 2009 from KZT 130 million for the nine months ended 30 September 2008 reflecting penalties paid by the Group for taxes payable in the years of 2004 to 2006 as a result of due diligence undertaken by the Tax Committee of the Ministry of Finance and in respect of an adjustment in the benefits to the Bank of certain mortgage loans issued from 2005 to 2007.

*Depreciation and Amortisation*

Depreciation and amortisation expenses for the nine months of 2009 increased by 12.9 per cent. to KZT 3,704 million from KZT 3,282 million for the nine months of 2008.  This increase was mainly due to purchases in the second half of 2008 of calculation equipment, servers and certain other equipment for the call centres.

*Taxes other than Income Tax*

Taxes other than income tax were KZT 2,932 million for the nine months ended 30 September 2009, compared to KZT 2,737 million for the same period in 2008, reflecting an increase of 7.1 per cent. Despite a decrease in VAT from 13 per cent. to 12 per cent. during the period, the taxes other than income tax increased as result of increases in the tax base of the Group, including with respect to services provided to non-residents, additional land plots taken on to the Group's balance sheet over the period and an increase in the national monthly index used to calculate pension payments.

*Obligatory Insurance of Individuals' Deposits*

Certain members of the Group have a regulatory obligation to pay premiums for the insurance of individuals' deposits.  The Bank has an obligation to pay premiums to the KDIF in respect of its insured customer deposits.  Obligatory expenses for insurance of individuals' deposits for the nine months ended 30 September 2009 were KZT 1,353 million as compared to the same expenses for the nine months ended 30 September 2008 of KZT 1,725 million, a decrease of 21.6 per cent.

*Other Provisions*

The Group had a recovery of other provisions of KZT 6,415 million for the nine months ended 30 September 2009, compared to a charge for other provisions of KZT 476 million over the nine

months ended 30 September 2008, an increase in the recovery of other provisions of 1,447.7 per cent. Other provisions consist of recoveries or charges under guarantees and letters of credit and other assets. The Group had a recovery of other provisions of KZT 10,597 million for guarantees and letters of credit over the nine months ended 30 September 2009, compared to charges of other provisions of KZT 149 million over the nine months ended 30 September 2008, an increase in the recovery of other provisions of 7,212.1 per cent. This increase in recoveries of other provisions in respect of guarantees and letters of credit was due to recoveries of provisions due to the Bank satisfying the underlying obligations under the guarantees and letters of credit. The Group had charges of other provisions of KZT 4,182 million for other assets over the nine months ended 30 September 2009, compared to charges of other provisions of KZT 327 million over the nine months ended 30 September 2008, an increase in the charges of other provisions of 1,178.9 per cent. This increase in the charges of other provisions in respect of other assets is due to provisions on commissions of guarantees and letters of credit.

*Other Non-Interest Expenses*

Other non-interest expenses increased by 25.0 per cent. to KZT 2,358 million for the nine months ended 30 September 2009 from KZT 1,886 million for the nine months ended 30 September 2008 due the Bank's purchase of 553,185 common shares of BTA Pension Fund in February and March 2009.

*Income Tax*

The statutory corporate income tax rate in Kazakhstan for the year 2008 was 30.0 per cent. In November 2008, the Tax Code was enacted to reduce the corporate income tax from 30.0 per cent. to 20.0 per cent. effective from 1 January 2009, to 17.5 per cent. effective from 1 January 2013 and to 15.0 per cent. effective from 1 January 2014.

Due to the Bank's negative financial results for the nine months ended 30 September 2009, the Bank did not pay corporate income tax during this period. The Bank's effective tax rate was 16.3 per cent. for the nine months ended 30 September 2008 due to a decrease in the deferred tax assets of the Group during that period. Starting from 31 December 2008, deferred taxes are measured at the rates expected to apply to the period in which the asset is realised or the liability is settled.

**Results of Operations for the Years ended 31 December 2008 and 2007**

***Summary***

The Group reported net loss of KZT 1,188,050 million, equal to a loss per diluted share of KZT 141,878, for 2008, compared to net income of KZT 64,705 million, or income per diluted share of KZT 8,143, for 2007. The decrease in net income for 2008 compared to 2007 primarily reflected the increase of impairment charge of the Group's assets. Average balances of assets and liabilities for 2008 are calculated by adding closing monthly balances and dividing by twelve.

The return on average common shareholders' equity was negative 259.7 per cent. for year ended 31 December 2008, compared to 22.4 per cent. for 2007. The return on average common shareholders' equity in 2008 and 2007 is calculated based on monthly average balances of shareholders' equity.

***Interest Income, Interest Expense, Net Interest Income and Provision for Losses***

The following table sets out the principal components of the Group's net interest income for the periods indicated:

|  | 31 December | |
|---|---|---|
|  | **2008** | **2007** |
|  | *(KZT millions)* | |
| Loans to customers | 366,037 | 291,724 |
| Securities | 12,597 | 14,587 |
| Deposits with other banks | 17,833 | 17,137 |
| **Total interest income** | **396,467** | **323,448** |
| **Interest expense** | **(208,381)** | **(179,279)** |
| Net interest income before impairment | 188,086 | 144,169 |
| Impairment charge | (1,094,300) | (67,810) |
| **Net interest (expense)/income** | **(906,214)** | **76,359** |

*Total Interest Income*

Total interest income increased by 22.6 per cent. to KZT 396,467 million for 2008 from KZT 323,448 million for 2007. The increase in interest income in 2008 as compared to 2007 was due to the growth in interest-earning assets by 23.6 per cent. from KZT 2,412,615 million in 2007 to KZT 2,982,189 million in 2008.

The monthly average yield on total interest-earning assets decreased to 13.3 per cent., for the year ended 31 December 2008, compared to 13.4 per cent. for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Group as at 31 December 2008 and 2007.

Interest income on loans to customers increased by 25.5 per cent. to KZT 366,037 million for the year ended 31 December 2008, compared to KZT 291,724 million for the year ended 31 December 2007, as the average balance of outstanding loans in the Group's loan portfolio rose by 29.9 per cent. to KZT 2,579,135 million for the year ended 31 December 2008 from KZT 1,985,158 million for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the year ended 31 December 2008 and 2007, respectively.

As at 31 December 2008, interest rates charged to borrowers ranged from 12 per cent. to 20 per cent. on Tenge-denominated loans, with the average interest rate on Tenge-denominated loans being 17.8 per cent., while interest rates charged on foreign currency denominated loans ranged from 10 per cent. to 20 per cent. with the effective interest rate on foreign currency denominated loans being 12.1 per cent. The overall average yield earned on loans for the year ended 31 December 2008 decreased to 14.2 per cent. compared to 14.7 per cent. for the year ended 31 December 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007, respectively. These decreases largely reflected write offs, the balance of accrued interest of loans that were written off the balance.

For the year ended 31 December 2008, interest income earned on the Group's securities portfolio decreased by 13.6 per cent. to KZT 12,597 million from KZT 14,587 million for 2007 largely as a result of the decrease of the average balance of the Group's securities portfolio.

For the year ended 31 December 2008, the average balance of the Group's securities portfolio, including financial assets at fair value through profit or loss, available-for-sale and held-to-maturity securities, was KZT 190,908 million, compared to KZT 242,516 million for 2007, reflecting a decrease of 21.3 per cent., as calculated by the Bank according to the unaudited accounting records of the Bank as at 31 December 2008 and 2007. Average interest rates earned on the securities portfolio were 6.6 per cent. and 6.0 per cent. for 2008 and 2007, respectively, as calculated by the Bank according to the unaudited accounting records of the Bank as at 31 December 2008 and 2007, respectively.

Interest earned on bank deposits increased by 4.1 per cent. to KZT 17,833 million for the year ended 31 December 2008 from KZT 17,137 million for the same period in 2007, primarily as a result of the higher average balance of bank deposits maintained by the Group in 2008, which increased to KZT 212,146 million from KZT 184,941million in 2007, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007, respectively.

As at 31 December 2008 the average balance of Tenge-denominated deposits represented 31.2 per cent. of total deposits, compared to 32.5 per cent. as at 31 December 2007.

As at 31 December 2008 large deposits (i.e., in excess of U.S.$10,000), as a percentage of total deposits, also increased compared to 31 December 2007 to 88.0 per cent. from 85.0 per cent. In particular, deposits of an amount between U.S.$10,000 – U.S.$100,000 accounted for 13.5 per cent. of total deposits and deposits in excess of U.S.$100,000 accounted for 74.5 per cent. of total deposits as at 31 December 2008, compared to 17.5 per cent. and 67.5 per cent. of total deposits, respectively, as at 31 December 2007.

*Interest Expense*

The following table sets out certain information relating to the Group's interest expense for the periods indicated:

|  | Year ended 31 December | |
|---|---|---|
|  | **2008** | **2007** |
|  | *(KZT millions)* | |
| Debt securities issued | (95,888) | (85,683) |
| Customer accounts | (55,748) | (39,935) |
| Loans and advances from other credit institutions | (56,745) | (53,661) |
| **Total** | **(208,381)** | **(179,279)** |

For the year ended 31 December 2008, interest expense increased by 16.2 per cent. to KZT 208,381 million from KZT 179,279 million for the year ended 31 December 2007. The increase in interest expense over the period was largely due to the growth in the Group's deposit base, increased bank borrowings and issuances of debt securities in 2008 and 2007, partially offset by reductions in average rates paid on bank borrowings and debt securities.

Average balances of the Group's interest-bearing customer deposits, including both corporate and retail deposits (calculated, in each case, by reference to the unaudited accounting records of the Bank as at the relevant year end based on the balances for the end of each month in the relevant year) were KZT 639,666 million in 2008, compared to KZT 520,269 million in 2007, reflecting an increase of 22.9 per cent., as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007.

Average interest rates paid on interest-bearing customer deposits as at 31 December 2008 and 2007 were 8.7 per cent. and 7.7 per cent., respectively, as calculated by the Bank according to the unaudited accounting records of the Bank for the years ended 31 December 2008 and 2007. The increase in the average interest rates paid during the year ended 31 December 2008, compared to those during the year ended 31 December 2007, primarily reflected the growth in the volume of customer deposits having a term of more than a year from 39.5 per cent. to 29.5 per cent. of the total amount of deposits, as well as the increase in such deposits.

For the year ended 31 December 2008, interest expense on issued debt securities increased by 11.9 per cent. to KZT 95,888 million from KZT 85,683 million for the year ended 31 December 2007. The primary reason for the increase was the higher average balances of debt securities outstanding. See "*Selected Statistical and other Information — Funding Sources — Debt Securities*".

*Net Interest Income before Impairment Charge*

Net interest income before impairment charge increased by 30.5 per cent. to KZT 188,086 million for the year ended 31 December 2008 from KZT 144,169 million for the year ended 31 December 2007.

The Group's net interest margin was 6.3 per cent. for the year ended 31 December 2008, compared to 6.0 per cent. for 2007. The lower margin was attributable to decreases in cost of funding, since the rate of interest-bearing liabilities decreased to 7.9 per cent. in 2008 from 8.2 per cent. in 2007.

*Impairment Charge*

Impairment charges (including in respect of amounts due from credit institutions) taken by the Group for the year ended 31 December 2008 increased by 1,513.8 per cent. to KZT 1,094,300 million, compared to KZT 67,810 million in 2007. During 2008, the quality of the Group's loan portfolio significantly deteriorated as a result of circumstances and actions taken before the current management of the Bank were appointed by the controlling shareholder. Certain loan documentation, including collateral and associated additional agreements, primarily relating to financing of projects outside Kazakhstan, was no longer available. In addition, many loans were transferred to new borrowers that do not have adequate sources of repayment. Moreover, no collateral was provided by these new borrowers. Consequently all transferred loans were unsecured. A number of significant borrowers, primarily registered outside Kazakhstan, have ceased servicing their loans, have not allowed the Bank to monitor collateral or failed to provide information about their financial performance. While the Bank continues its efforts related to the recovery of the above loans, the Bank's management considers that loans where a borrower fails to service debt, monitoring of the borrowers has not been possible and there is neither properly registered collateral nor other necessary legal documentation, to be fully impaired and has created an allowance for the full carrying amount of such loans. In addition, the ongoing financial crisis has affected borrowers' ability to service their obligations and the value of collateral in 2008. As a result of the above the Group recorded an impairment charge for losses on loans to customers of KZT 1,090,127 million and an impairment charge on loans to credit institutions of KZT 4,173 million for 31 December 2008, compared to KZT 67,414 million and KZT 396 million respectively as at 31 December 2007. The Group's total allowance for loan impairment as at 31 December 2008 increased by 788.2 per cent. to KZT 1,217,278 million from KZT 137,043 million as at 31 December 2007.

During 2008 loan provisions as a part of total loan portfolio increased to 42.9 per cent. as at 31 December 2008 compared to 5.4 per cent. as at 31 December 2007.

**Non-Interest Income**

The following table sets out certain information on the Group's non-interest income for the periods indicated:

| | Year ended 31 December | |
|---|---|---|
| | **2008** | **2007** |
| | *(KZT millions)* | |
| Fees and commissions, net | 29,155 | 27,432 |
| Foreign exchange gains, net | (9,205) | 22,396 |
| Net trading loss/income | (29,769) | 2,503 |
| Loss/gain from insurance operations | 2,100 | 3,317 |
| Loss/income of associates | (15,448) | 4,234 |
| Loss on disposal of subsidiaries | (11,252) | (249) |
| Impairment charge for available-for-sale investment securities | (42,610) | — |
| Impairment charge for goodwill | (8,107) | — |
| Impairment charge for investments in associates | (19,138) | |
| Other income | 212 | (62) |
| **Total** | **(104,062)** | **59,571** |

*Fees and Commissions*

Fee and commission income increased by 6.5 per cent. for the year ended 31 December 2008 to KZT 30,334 million compared to KZT 28,489 million for 2007.  This increase was attributable to the increases in fees and commissions related to letters of credit and guarantees issued, asset management fees and transfer operations.

Fee and commission expense increased to KZT 1,179 million for the year ended 31 December 2008 compared to KZT 1,057 million, for the year ended 31 December 2007, representing the increases of 11.5 per cent.

Reflecting the foregoing, net fees and commissions increased by 6.3 per cent. for the year ended 31 December 2008 to KZT 29,155 million, compared to KZT 27,432 million for 2007.  The increases were primarily due to increases in the volume of transactions.

*Gains and Losses from Foreign Currencies*

Gains and losses arising from the translation of and dealing with foreign currency-denominated assets and liabilities, which are reported in the income statement as gains less losses from foreign currencies, comprised a loss, of KZT 9,205 million for the year ended 31 December 2008, compared to a gain of KZT 22,396 million for the year ended 31 December 2007 reflecting a decrease by 141.1 per cent., due to losses from currency revaluations in JPY (exchange rate increased from KZT 1,071 per JPY 1 to KZT 1,340 per JPY 1) since the Group had a large short position in this currency in amount of KZT 201 billion as at 31 December 2008.

*Insurance Income (Loss)*

The Group reported net insurance gains of KZT 2,100 million for the year ended 31 December 2008, compared to a net gain of KZT 3,317 million in 2007.  This decrease primarily reflected the increase in expenses of agent services and insurance.

*Loss/Income of Associates*

The Group reported a net loss in its share of income from associates of KZT 15,448 million for the year ended 31 December 2008, compared with a net gain of KZT 4,234 million as at 31 December 2007, reflecting a decrease of 464.9 per cent.  This resulted from changes in the Bank's equity share in BTA Russia.

*Loss on Disposal of Subsidiaries*

The Group reported a net loss on disposal of subsidiaries of KZT 11,252 million for the year ended 31 December 2008, compared with a net loss of KZT 249 million as at 31 December 2007 due to deemed disposal in equity share in BTA Russia.

*Impairment Charge for Available-for-sale Securities*

As at 31 December 2008, the Group reported an impairment charge on available-for-sale investment securities in the amount of KZT 42,610 million.  During 2008, the Bank placed certain available-for-sale securities with a carrying amount of KZT 35,402 million with a custodian in an offshore jurisdiction.  Subsequent to 31 December 2008, the Bank received a statement from its custodian, which indicated that these securities were disposed of in January 2009.  No consideration was received by the Bank from this disposal.  The Bank initiated an internal investigation with respect to the disposal and passed the information to the Procuracy of the Republic of Kazakhstan and FMSA. Management of the Bank believes that the circumstances above indicate that these securities were not recoverable as at 31 December 2008.  Therefore, these securities have been fully written-off as at 31 December 2008.  Also included in this figure is an impairment loss on equity securities in the amount of KZT 7,208 million which the Group recognised during 2008.

*Impairment Charge for Goodwill*

The Group recorded an impairment charge of KZT 8,107 million in respect of goodwill as at 31 December 2008, whereas no impairment charge was recorded as at 31 December 2007. The impairment is largely the result of uncertainties in the Kazakhstan economy, especially in the retail and mortgage sectors. Another key factor in the evaluation of goodwill is the discount rate used to determine the present value of projected cash flows.

*Impairment Charge for Investment in Associates*

As at 31 December 2008, the Group reported an impairment charge for investment in associates in the amount of KZT 19,138 million as a result of impairment of investments in BTA Ukraine.

*Other Income*

Other income increased by 441.9 per cent. to KZT 212 million for the year ended 31 December 2008, compared to KZT loss of 62 million for the year ended 31 December 2007, largely due to adjustments of difference between audited and unaudited reporting of subsidiaries.

***Non-Interest Expense***

The following table shows the composition of the Group's non-interest expense for the periods indicated:

|  | Year ended 31 December | |
|---|---|---|
|  | **2008** | **2007** |
|  | *(KZT millions)* | |
| Salaries and other employee benefits | (26,597) | (25,744) |
| Administrative and other operating expenses | (27,414) | (23,400) |
| Depreciation and amortization | (4,435) | (2,314) |
| Taxes other than income tax | (4,163) | (3,469) |
| Other provisions | (113,130) | (4,705) |
| Obligatory reserves of individuals' deposits | (2,102) | (1,761) |
| **Total** | **(177,841)** | **(61,393)** |

Non-interest expense increased by 189.7 per cent. to KZT 177,841 million for the year ended 31 December 2008, compared to KZT 61,393 million for 2007. This increase was due to the adjustment of provisions on contingent liabilities for 2008.

*Salaries and Benefits*

Salaries and benefits remained stable, increasing by only 3.3 per cent. to KZT 26,597 million for the year ended 31 December 2008, compared to KZT 25,744 million in 2007.

*Administrative and Other Operating Expenses*

The following table shows the composition of the Group's other administrative and operating expenses for the periods indicated:

|  | Year ended 31 December | |
|---|---|---|
|  | 2008 | 2007 |
|  | *(unaudited)* | |
|  | *(KZT millions)* | |
| Occupancy and rent | (7,056) | (4,797) |
| Marketing and advertising | (3,984) | (3,193) |
| Repair and maintenance of property and equipment | (2,548) | (1,750) |
| Transportation expenses | (2,077) | (1,411) |
| Communications | (1,639) | (1,522) |
| Security | (1,572) | (1,117) |
| Legal services and consultancy | (1,499) | (1,307) |
| Agency services | (1,047) | (1,035) |
| Business travel and related expenses | (1,041) | (1,033) |
| Encashment | (909) | (752) |
| Plastic cards | (767) | (786) |
| Office supplies | (445) | (358) |
| Penalties | (427) | (59) |
| Data processing | (346) | (298) |
| State duties and customs | (294) | (75) |
| Postal charges | (191) | (161) |
| Trainings | (100) | (117) |
| Representation | (99) | (80) |
| Insurance | (59) | (2,891) |
| Participation in forums, seminars and conferences | (43) | (54) |
| Loss on disposals of property and equipment | (12) | — |
| Other | (1,259) | (604) |
| **Administrative and other operating expenses** | **(27,414)** | **(23,400)** |

Total administrative and other operating expenses increased by 17.2 per cent. to KZT 27,414 million for the year ended 31 December 2008, compared to KZT 23,400 million for 2007. Occupancy and rent expenses, marketing and advertising costs and repair and maintenance of property and equipment represented the largest factors contributing to this increase.

Occupancy and rent increased by 47.1 per cent. to KZT 7,056 million for the year ended 31 December 2008, compared to KZT 4,797 million for the year ended 31 December 2007. This increase primarily resulted from increase of leased area due to business growth and the increase of rent tariffs on leased buildings.

Marketing and advertising expenses increased by 24.8 per cent. to KZT 3,984 million for the year ended 31 December 2008, compared to marketing and advertising expenses of KZT 3,193 million for 2007. This year-on-year increase was mainly attributable to the higher level of advertising conducted by the Group and to the rebranding campaign.

Business travel and related expenses increased to KZT 1,041 million for 2008, compared to KZT 1,033 million for 2007, reflecting an increase of 0.8 per cent.

Communication fees increased by 7.7 per cent. to KZT 1,639 million from KZT 1,522 million for the year ended 31 December 2008 compared to 2007. Increase of communication fees in 2008 was mainly due to business development and the spectrum of available services (services through internet) and accordingly network service (new cash settlement centres, offices and the Bank's expansion of staff).

Security charges increased by 40.7 per cent. to KZT 1,572 million for the year ended 31 December 2008, compared to KZT 1,117 million for the year ended 31 December 2007. The increase of security charges occurred partly due to an increase in post-hours (the number of hours worked by security personnel) and to a minor increase in hourly wages of security personnel. The costs increased in 2008 also due to the new requirements of the NBK regarding organisational safety and on arrangements of

accommodations of second-tier banks.  The buildings of branches were equipped with additional equipment, for which maintenance costs have increased correspondingly.

Legal and consultancy fees increased by 14.7 per cent. to KZT 1,499 million for the year ended 31 December 2008, compared to KZT 1,307 million for 2007.  The increase in 2008 compared to 2007 was mainly due to new borrowings and new developments in the Group's activities, including the costs to implement the IBS system, operational risk management system, and the business continuity management function.

In 2008 other expenses increased by 108.4 per cent. to KZT 1,259 million compared to KZT 604 million in 2007, primarily due to the increase of expenses related to deposit insurance.

*Depreciation and Amortisation*

Depreciation and amortisation expenses for the year ended 31 December 2008 increased by 91.7 per cent. to KZT 4,435 million for the year ended 31 December 2008 from KZT 2,314 million for 2007.  In the second half 2007 automated teller machines and computer and server equipments were transferred on the balance sheet of the Bank from "Alem Card" (processing centre) and "Force Technology".  This fact, in addition to further purchases by the Bank during 2008, were the primary factors underlying the increase.

*Taxes other than Income Tax*

Taxes (other than income taxes) increased to KZT 4,163 million for the year ended 31 December of 2008, compared to KZT 3,469 million for the year ended 31 December 2007, reflecting an increase of 20.0 per cent.  This increase in tax expenses was mainly attributable to higher value-added taxes, land taxes and other taxes, duties and mandatory payments required to be made under the national budget.

*Other Provisions*

Other provisions increased to KZT 113,130 million from KZT 4,705 million for 2007 largely due to the significant adjustment of provisions on contingent liabilities.  See "*Factors Affecting the Bank's Results of Operations — Loan Loss Provisions*".

*Obligatory insurance of individuals' deposits*

Expenses for deposit insurance increased by 19.4 per cent. to KZT 2,102 million for the year ended 31 December 2008 from KZT 1,761 million for the year ended 31 December 2007, due to the increase in the volume of the Bank's deposits that were required to be insured.

*Taxation*

Kazakhstan tax regulations do not provide for the filing of consolidated income tax returns.  Accordingly, the Bank and its subsidiaries file individual tax returns.  In 2008, the Group reported income tax benefit of KZT 67 million.

**Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007**

*Total Assets*

As at 30 September 2009 the Group's total assets were KZT 2,048,127 million, reflecting a decrease of 6.7 per cent. compared to KZT 2,194,201 million as at 31 December 2008.

As at 31 December 2008, the Group's total assets were KZT 2,194,201 million compared to KZT 3,064,617 million as at 31 December 2007, reflecting a decrease of 28.4 per cent.

The following table sets out a breakdown of the Group's total assets, excluding goodwill and property and equipment, by currency as at the dates indicated:

| | As at 30 September 2009 (unaudited) (KZT millions) | | | As at 31 December 2008 (KZT millions) | | | 2007 | | |
|---|---|---|---|---|---|---|---|---|---|
| | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total |
| Cash and cash equivalents | 10,912 | 19,241 | 30,153 | 25,011 | 62,882 | 87,893 | 46,050 | 53,673 | 99,723 |
| Obligatory reserves | 29,929 | 13,074 | 43,003 | 40,329 | 23,725 | 64,054 | 43,983 | 124,259 | 168,242 |
| Financial assets at fair value through profit or loss | 54,323 | 66,325 | 120,648 | 95,738 | 32,412 | 128,150 | 55,937 | 56,238 | 112,175 |
| Amounts due from credit institutions | 8,394 | 23,045 | 31,439 | 22,271 | 62,903 | 85,174 | 44,849 | 62,740 | 107,589 |
| Derivative financial assets | 30,145 | 1,201 | 31,346 | 701 | 20,949 | 21,650 | 12,287 | 19,110 | 31,397 |
| Available-for-sale securities | 16,829 | 5,415 | 22,244 | 16,350 | 4,132 | 20,482 | 15,705 | 10,717 | 26,422 |
| Loans to customers | 556,245 | 550,996 | 1,107,241 | 392,170 | 1,224,893 | 1,617,063 | 950,000 | 1,429,810 | 2,379,810 |
| SK Bonds | 511,097 | - | 511,097 | - | - | - | - | - | - |
| Investments in associates | 52,446 | 27,926 | 80,372 | 48,152 | 24,219 | 72,371 | 48,585 | 19,182 | 67,767 |
| Current income tax assets | 5,553 | 37 | 5,590 | 5,487 | 18 | 5,505 | 110 | — | 110 |
| Deferred income tax assets | 2,005 | 25 | 2,030 | 5,040 | 6 | 5,046 | 683 | — | 683 |
| Other assets | 28,970 | 17,186 | 46,156 | 26,839 | 8,849 | 35,688 | 14,539 | 5,170 | 19,709 |
| Total | 1306,848 | 724,471 | 2,031,319 | 678,088 | 1,464,988 | 2,143,076 | 1,232,728 | 1,780,899 | 3,013,627 |

214

Total assets decreased 6.7 per cent. as at 30 September 2009 compared to 31 December 2008 and 28.4 per cent. as at 31 December 2008 compared to 31 December 2007, due to significant decreases in loans to customers, cash and cash equivalents, amounts due from credit institutions, obligatory reserves, available-for-sale securities and financial assets at fair value through profit or loss.  The decreases were partially offset by increases in the Group's assets due to the SK Bonds, investments in associates and other assets.

The primary cause of the decrease in total assets was the decrease in loans to customers by 31.5 per cent. to KZT 1,107,241 million as at 30 September 2009 from KZT 1,617,063 million as at 31 December 2008 and by 32.1 per cent. as at 31 December 2008 from KZT 2,379,810 million as at 31 December 2007, due primarily to a deterioration of the loan portfolio quality and increases in loan loss provisions. See "– *Factors Affecting the Bank's Results of Operations – Loan Loss Provisions*".

As at 30 September 2009, obligatory reserves decreased by 32.9 per cent. to KZT 43,003 million compared to obligatory reserves of KZT 64,054 million as at 31 December 2008 and by 61.9 per cent. as at 31 December 2008 from KZT 168,242 million as at 31 December 2007, due to a decrease in the obligatory reserve requirements of the NBK from 6.0 per cent. to 1.5 per cent. of internal liabilities and 8.0 per cent. to 2.5 per cent. of other liabilities since 31 December 2007.

Cash and cash equivalents also decreased by 65.7 per cent. to KZT 30,153 million as at 30 September 2009 from KZT 87,893 million as at 31 December 2008 and by 11.9 per cent. as at 31 December 2008 from KZT 99,723 million as at 31 December 2007, due primarily to the decreases in cash held by the Group, current accounts with other financial organisations and reverse repurchase agreements.

Amounts due from credit institutions was KZT 31,439 million as at 30 September 2009 compared to KZT 85,174 million as at 31 December 2008, a decrease of 63.1 per cent., attributable primarily to an increase in the allowance for impairment due to the deterioration of the quality of the loan portfolio to financial organisations, in particular with respect to organisations focused in mortgages and leasing. Amounts due from credit institutions decreased 20.8 per cent. to KZT 85,174 million as at 31 December 2008 compared to KZT 107,589 million as at 31 December 2007.

SK Bonds represent an asset of KZT 511,097 million as at 30 September 2009 compared to no corresponding asset as at 31 December 2008 and 31 December 2007.  See "*The Bank — The Role of Samruk-Kazyna and the NBK*".

Investments in associates increased by 11.1 per cent. to KZT 80,372 million as at 30 September 2009 from KZT 72,371 million as at 31 December 2008 and by 6.8 per cent. as at 31 December 2008 from KZT 67,767 million as at 31 December 2007, primarily as a result of the investment of KZT 27,301 million into BTA Ukraine (representing 40.038 per cent. of the share capital of BTA Ukraine) in December 2008, as well as additional investments into Temirleasing.

Other assets increased to KZT 46,156 million as at 30 September 2009 from KZT 35,688 million as at 31 December 2008 and KZT 19,709 million as at 31 December 2007, due to the increase in the amount of collateral obtained by the Bank as a result of enforcement against the collateral of borrowers of non-performing loans.

### *Total liabilities*

As at 30 September 2009, the Group's total liabilities were KZT 3,672,146 million, an increase of 25.0 per cent. from KZT 2,936,980 million as at 31 December 2008.  The increase was primarily attributable to the increase in debt securities issued by the Group and the increase in amounts due to the Government and NBK held by the Group.

The Group's total liabilities increased by 12.4 per cent. to KZT 2,936,980 million as at 31 December 2008 from KZT 2,612,586 million as at 31 December 2007, due to the increase in debt securities issued by the Group by KZT 3,281 million and the increase in deposits held by the Group by KZT 233,544 million, and also to the increase in provisions on contingent liabilities in 2008.

Debt securities issued increased to KZT 1,670,588 million as at 30 September 2009 from KZT 1,087,726 million as at 31 December 2008, representing an increase of 53.6 per cent., due primarily to the issuance in March 2009 of the Bank Bonds with a nominal value of KZT 645,000 million.  Furthermore, amounts due to the Government and the central banks increased substantially to KZT 407,911 million from KZT 1,718 million, due to the BTA/NBK Repo Transactions.  See "*The Bank — NBK Support*".

The increases described above were partially offset by decreases in amounts due to customers to KZT 683,281 million as at 30 September 2009 from KZT 886,052 million as at 31 December 2008, representing a 22.9 per cent. decrease, and in amounts due to credit institutions to KZT 752,636 million as at 30 September 2009 from KZT 803,366 million as at 31 December 2008, a 6.3 per cent. decrease.  Amounts to customers decreased as a result of the decrease in term deposits of businesses and individuals in connection with the overall deterioration of the economic conditions in Kazakhstan.  Amounts due to credit institutions decreased due to a decrease in loans of institutions of OECD countries and from Kazakhstan banks and financial institutions.

|  | As at 30 September 2009 (unaudited) | | | As at 31 December | | | | | |
|  | | | | 2008 | | | 2007 | | |
|  | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total | KZT | Foreign Currency | Total |
|  | | | | | | *(KZT millions)* | | | |
| **Liabilities:** | | | | | | | | | |
| Amounts due to the Government and the central banks | 407,477 | 434 | 407,911 | 1,320 | 398 | 1,718 | 398 | 515 | 913 |
| Amounts due to credit institutions | 70,265 | 682,371 | 752,636 | 161,294 | 642,072 | 803,366 | 112,871 | 722,433 | 835,304 |
| Amount due to customers | 381,587 | 301,694 | 683,281 | 461,912 | 424,140 | 886,052 | 396,012 | 256,496 | 652,508 |
| Derivative financial liabilities | 2,269 | 39 | 2,308 | 1,246 | 17,543 | 18,789 | 5,467 | 61 | 5,528 |
| Debt securities issued | 714,475 | 956,113 | 1,670,588 | 211,531 | 876,195 | 1,087,726 | 179,224 | 905,221 | 1,084,445 |
| Provisions | 1,149 | 119,451 | 120,600 | 306 | 104,587 | 104,893 | 10,436 | 141 | 10,577 |
| Other liabilities | 21,444 | 13,378 | 34,822 | 21,748 | 12,688 | 34,436 | 19,101 | 4,210 | 23,311 |
| **Total liabilities** | **1,598,666** | **2,073,480** | **3,672,146** | **859,357** | **2,077,623** | **2,936,980** | **723,509** | **1,889,077** | **2,612,586** |

217

Other liabilities increased by 1.1 per cent. to KZT 34,822 million as at 30 September 2009 from KZT 34,436 million as at 31 December 2008 and by 47.7 per cent. to KZT 34,436 million as at 31 December 2008 from KZT 23,311 million as at 31 December 2007.  The increase in other liabilities in 2008 compared to 2007 primarily reflected higher balances due to creditors for banking.

### *Off-Balance Sheet Arrangements*

The Group enters into certain financial instruments with off-balance sheet risk in the normal course of business in order to meet the needs of its customers.  These instruments, which include guarantees, letters of credit, forward contracts and option contracts, involve varying degrees of credit risk and are not reflected in the Group's balance sheet.

The Group enters into swaps to hedge movements in interest and foreign currency rates.  The notional amount of interest rate swaps and currency swaps of the Group as at 30 September 2009 was KZT 238,800 million and KZT 1,122 million compared to KZT 462,318 million and KZT 136,115 million, respectively, as at 31 December 2008 representing decreases of 48.3 per cent. and 99.2 per cent.  These decreases were attributable to the Group closing out most of its interest rate and cross currency swap transactions.

Forwards and futures contracts are contractual agreements to buy or sell a specified financial instrument at a specific price and date in the future.  The Group entered into a notional amount of KZT 956 million in forwards and futures contracts as at 30 September 2009 compared to KZT 27,799 million as at 31 December 2008, a decrease of 96.6 per cent., due to the Group closing out most of its forwards and futures contracts.

As at 31 December 2008, the aggregate notional amount outstanding under forward and futures contracts was KZT 27,799 million, in comparison with KZT 204,128 million as at 31 December 2007. The Group had currency and interest rate swap contracts for a total amount of KZT 598,433 million as at 31 December 2008, compared to KZT 751,519 million as at 31 December 2007.

At 30 September 2009, the Group had certain loans that are foreign currency linked debt instruments with a floor feature, i.e., where interest and principal payments are linked to foreign currencies, in such a way that the Group has an option to demand higher payments if the foreign currency specified in the contract appreciates above a certain floor (which is generally set at the level of spot rates prevailing on the loan issue date).  At the same time, if foreign currency rates fall below the floor, interest and principal rates will remain at the original level.  The Group recorded this feature as a foreign currency option as at 30 September 2009 equal to KZT 175,196 million and did not record any amount for 31 December 2008.

As at 30 September 2009, the Group had issued letters of credit totalling KZT 57,402 million, guarantees in the amount of KZT 169,954 million and undrawn loan commitments in the amount of KZT 434,848 million.  As at 31 December 2008, the Group had issued letters of credit totalling KZT 139,524 million, guarantees in the amount of KZT 175,196 million and undrawn loan commitments in the amount of KZT 363,490 million.  The Group's maximum exposure to credit losses for guarantees and letters of credit is represented by the contractual amount of these transactions.  Since many of the commitments are expected to expire without being drawn upon, the total amount does not necessarily represent future cash requirements.

As at 31 December 2008, the Group had undrawn loan commitments totalling KZT 363,490 million, issued letters of credit totalling KZT 139,524 million and guarantees totalling KZT 175,196 million. As at 31 December 2007, the Group had undrawn loan commitments totalling KZT 334,171 million, issued letters of credit totalling KZT 150,644 million and guarantees totalling KZT 141,931 million. The Group's maximum exposure to credit losses for guarantees, loan commitments and letters of credit is represented by the contractual amount of these transactions.  Since many of the commitments are expected to expire without being drawn upon, the total amount does not necessarily represent future cash requirements.

The Group did not have any significant commitment as at 30 September 2009 other than as discussed above.

The Group applies the same credit control and management policies to its off-balance sheet commitments as it does to its on-balance sheet operations.

***Capital Adequacy***

The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA. See "*Risk Factors — Risks Relating to the Bank — Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank.*"

Due to the shareholding of Samruk-Kazyna, the Bank is subject to minimum level requirements of 5.0 per cent. for K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 10.0 per cent. for K2 (own capital to total assets weighted for risk ratio). Depending on the composition of the Bank's shareholders following the Restructuring, it will become subject to the general minimum level requirements of 6.0 per cent. for K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 12.0 per cent. for K2 (own capital to total assets weighted for risk) ratio or to the increased requirements of 7.0 per cent. for the K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) ratios and 14.0 per cent. for the K2 (own capital to total assets weighted for risk) ratio.  See "*Risk Factors — Risks Relating to the Bank — Any failure to reach and maintain the minimum capital adequacy ratios following the Restructuring could lead to conservation or liquidation of the Bank*".

As at 30 September 2009, the Group's total equity deficit was KZT 1,624,019 million, as a result of the factors discussed above.  This negative result was primarily due to the decrease in the asset quality and increase in loan loss provisions.  The Group was in breach with BIS capital adequacy ratios as at 30 September 2009 due to negative capital.

The Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and liquidity support to be provided by Samruk-Kazyna.  The following table gives certain information regarding the Group's Tier I and Tier II capital and risk weighted capital adequacy ratio calculated in accordance with the Basel Accord as at the dates indicated based on the Group's unaudited consolidated financial statements as at 30 September 2009, 31 December 2008 and 2007:

| | Nine month period ended 30 September 2009 | Year ended 31 December | |
|---|---|---|---|
| | | 2008 | 2007 |
| | *(unaudited)* *(KZT millions)* | *(KZT millions)* | |
| Tier I capital | (1,625,448) | (778,140) | 462,320 |
| Tier II capital | 0 | — | 85,168 |
| Gross available capital | (1,625,448) | (778,140) | 547,488 |
| Less investments | (80,372) | (72,371) | (67,767) |
| **Tier I + Tier II capital** | **(1,705,820)** | **(850,511)** | **479,721** |
| Risk weighted assets | 1,323,049 | 1,900,154 | 2,730,706 |
| **BIS Tier I capital adequacy ratio[1]** | **(122.86)%** | **(40.95)%** | **16.93%** |
| **BIS Tier I + Tier II capital adequacy ratio[2]** | **(128.93)%** | **(44.76)%** | **17.57%** |

_____

Notes:

(1)   Comprising Tier I capital divided by total risk weighted assets calculated in accordance with the Basel Accord.

(2)   Comprising Tier I + Tier II capital divided by total risk weighted assets calculated in accordance with the Basel Accord.

## SELECTED STATISTICAL AND OTHER INFORMATION

**Average Balances**

The following table sets out certain information as to average balances of the Group's assets and liabilities for the periods indicated based upon the monthly average balances of such periods, respectively:

| | For the nine months ended 30 September | For the years ended 31 December | |
| --- | --- | --- | --- |
| | **2009** | **2008**[1] | **2007**[1] |
| | | *(KZT millions)* | |
| **Average Assets:** | | | |
| Cash and cash equivalents | 72,814 | 133,444 | 125,895 |
| Obligatory reserves | 60,222 | 152,103 | 148,987 |
| Gross amounts due from credit institutions | 82,148 | 104,215 | 95,535 |
| Financial assets at fair value through profit of loss | 139,129 | 146,496 | 198,505 |
| Available-for-sale securities | 21,551 | 48,702 | 35,830 |
| Held-to-maturity securities | — | — | 11,247 |
| Gross loans to customers | 3,148,682 | 2,744,813 | 2,060,086 |
| Allowance for impairment of gross loans to customers and gross amounts due from credit institutions | (1,660,149) | (259,030) | (90,782) |
| SK Bonds | 358,258 | — | — |
| Property and equipment | 13,524 | 14,214 | 9,799 |
| Investments in affiliates | 76,964 | 63,340 | 40,245 |
| Goodwill | 34,002 | 42,715 | 28,198 |
| Asset as a current tax asset | 6,034 | 948 | 68 |
| Deferred tax income | 4,807 | 1,968 | 53 |
| Derivatives | 27,040 | 42,690 | 6,243 |
| Other assets | 45,610 | 37,254 | 34,739 |
| **Total average assets** | **2,430,636** | **3,273,872** | **2,704,648** |
| **Average liabilities and equity:** | | | |
| Amounts due to the Government and the NBK | 249,757 | 2,212 | 1,068 |
| Amounts due to credit institutions | 755,245 | 892,417 | 747,250 |
| Amounts due to customers | 781,114 | 815,328 | 659,520 |
| Debt securities issued | 1,523,886 | 1,124,936 | 934,996 |
| Corporate income tax payable | — | 699 | 1,477 |
| Deferred income tax | — | 571 | 529 |
| Derivatives | 25,949 | 9,161 | 1,106 |
| Reserves (provisions) against loss from notional liabilities | 136,249 | 8,069 | — |
| Other liabilities | 40,356 | 36,496 | 30,128 |
| **Total average liabilities** | **3,512,556** | **2,889,889** | **2,376,074** |
| Minority interest | 8,026 | 28,542 | 15,991 |
| Average equity | (1,089,946) | 355,441 | 312,583 |
| **Average liabilities and equity** | **2,430,636** | **3,273,872** | **2,704,648** |

————————
Notes:

(1)   Calculated based on the monthly averages.

The table below sets out the Group's consolidated average balances and interest rates for the periods indicated, as calculated by the Group according to the unaudited consolidated accounting records of the Group for the years ended 31 December 2008 and 2007, respectively and the unaudited consolidated accounting records of the Group for the nine months ended 30 September 2009.

| | For the nine months ended 30 September 2009[1] | | | For the years ended 31 December | | | | | |
| | | | | 2008[1] | | | 2007[1] | | |
| | Average Balance | Interest | Yield/ Rate | Average Balance | Interest | Yield/ Rate | Average Balance | Interest | Yield/ Rate |
| | | | | (KZT millions) | | | | | |
| **Assets** | | | | | | | | | |
| *Interest-earning deposits* | **105,743** | **5,852** | **7.4%** | **212,146** | **17,833** | **8.4%** | **184,941** | **17,137** | **9.3%** |
| KZT | 28,705 | 2,780 | 12.9% | 66,805 | 6,452 | 9.7% | 60,078 | 4,565 | 7.6% |
| Foreign currency | 77,038 | 3,072 | 5.3% | 145,341 | 11,381 | 7.8% | 124,863 | 12,572 | 10.1% |
| *Securities* | **156,480** | **11,609** | **9.9%** | **190,908** | **12,597** | **6.6%** | **242,516** | **14,587** | **6.0%** |
| KZT | 101,773 | 8,789 | 11.5% | 100,061 | 8,602 | 8.6% | 135,059 | 9,402 | 7.0% |
| Foreign currency | 54,707 | 2,820 | 6.9% | 90,847 | 3,995 | 4.4% | 107,457 | 5,185 | 4.8% |
| *Loans* | **1,232,936** | **155,971** | **16.9%** | **2,579,135** | **366,037** | **14.2%** | **1,985,158** | **291,724** | **14.7%** |
| KZT | 506,697 | 62,700 | 16.5% | 946,918 | 168,539 | 17.8% | 710,216 | 126,163 | 17.8% |
| Foreign currency | 726,239 | 93,271 | 17.1% | 1,632,217 | 197,498 | 12.1% | 1,274,942 | 165,561 | 13.0% |
| *SK Bonds* | **353,625** | **20,502** | **7.7%** | | | | | | |
| KZT | 353,625 | 20,502 | 7.7% | | | | | | |
| Total interest-earning assets | **1,848,784** | **193,934** | **14.0%** | **2,982,189** | **396,467** | **13.3%** | **2,412,615** | **323,448** | **13.4%** |
| Cash and non-interest deposits | 192,491 | | | 280,933 | | | 251,673 | | |
| Accrued interest | 291,891 | | | 172,706 | | | 80,206 | | |
| Allowance | — | | | (259,030) | | | (90,782) | | |
| Fixed assets | 13,524 | | | 14,214 | | | 9,799 | | |
| Other assets | 83,946 | | | 82,860 | | | 41,137 | | |
| Total average assets | **2,430,636** | **—** | | **3,273,872** | | | **2,704,648** | **—** | |
| **Liabilities and equity** | | | | | | | | | |
| *Due to the NBK and the Government* | **249,197** | **15,704** | **8.4%** | **2,191** | **82** | **3.7%** | **1,059** | **57** | **5.4%** |
| KZT | 248,756 | 15,686 | 8.4% | 978 | 40 | 4.1% | 759 | 44 | 5.8% |
| Foreign currency | 441 | 18 | 5.4% | 1,213 | 42 | 3.5% | 300 | 13 | 4.3% |
| *Due to other banks* | **747,997** | **32,424** | **5.8%** | **881,358** | **56,663** | **6.4%** | **738,061** | **53,604** | **7.3%** |
| KZT | 102,018 | 6,888 | 9.0% | 140,351 | 11,044 | 7.9% | 103,353 | 8,690 | 8.4% |
| Foreign currency | 645,979 | 25,536 | 5.3% | 741,007 | 45,619 | 6.2% | 634,708 | 44,914 | 7.1% |
| *Due to customers* | **546,487** | **36,949** | **9.0%** | **639,666** | **55,748** | **8.7%** | **520,269** | **39,935** | **7.7%** |
| KZT | 322,585 | 20,770 | 8.6% | 318,829 | 32,066 | 10.1% | 291,161 | 25,481 | 8.8% |
| Foreign currency | 223,902 | 16,179 | 9.6% | 320,837 | 23,682 | 7.4% | 229,108 | 14,454 | 6.3% |
| *Debt securities issued* | **1,488,867** | **110,78** | **9.9%** | **1,104,303** | **95,888** | **8.7%** | **917,672** | **85,683** | **9.3%** |
| KZT | 572,801 | 53,282 | 12.4% | 205,618 | 23,941 | 11.6% | 174,305 | 17,003 | 9.8% |
| Foreign currency | 916,066 | 57,596 | 8.4% | 898,685 | 71,947 | 8.0% | 743,367 | 68,680 | 9.2% |
| Total interest-bearing liabilities | **3,032,548** | **195,955** | **8.6%** | **2,627,518** | **208,381** | **7.9%** | **2,177,061** | **179,279** | **8.2%** |
| Non interest bearing customer accounts | 227,643 | | | 167,542 | | | 133,001 | | |
| Accrued interest | 49,810 | | | 39,831 | | | 32,836 | | |
| Other liabilities | 202,555 | | | 54,998 | | | 33,255 | | |
| *Minority interest* | 8,026 | | | 28,542 | | | 15,991 | | |

221

| | For the nine months ended 30 September 2009[1] | For the years ended 31 December | |
| --- | --- | --- | --- |
| | | 2008[1] | 2007[1] |
| *Equity* | (1,089,946) | 355,441 | 312,504 |
| **Total average liabilities and equity** | 2,430,636 | 3,273,872 | 2,704,648 |
| Net interest spread | 5.4% | 5.4% | 5.2% |
| Net interest income | (2,021) | 188,086 | 144,169 |
| Net interest margin | (0.1)% | 6.3% | 6.0% |

Notes:

(1)  Calculated based on the monthly averages.

**Analysis of Changes in Net Interest Income**

The following table provides a comparative analysis of changes in net interest income and expense by reference to changes in average volumes and rates for the periods indicated.  Changes in net interest income are attributed to either changes in average balances (volume change) or changes in average rates (rate change) for earning assets and sources of funds on which interest is received or paid. Volume change is calculated as change in volume multiplied by the previous rate, while rate change is change in rate multiplied by the current volume.  The rate/volume change (change in rate multiplied by change in volume) is allocated between volume change and rate change at the ratio each component bears to the absolute value of their total.

| | For the nine months ended 30 September | | | For the years ended 31 December | | |
|---|---|---|---|---|---|---|
| | 2009/2008 | | | 2008/2007 | | |
| | Increase/(decrease) due to changes in | | | Increase/(decrease) due to changes in | | |
| | Volume | Rate | Net Change | Volume | Rate | Net Change |
| | *(KZT millions)* | | | | | |
| **Interest Income** | | | | | | |
| Interest earning deposits: | | | | | | |
| KZT ...................................... | (3,245) | 606 | (2,639) | 511 | 1,376 | 1,887 |
| Foreign currency................... | (4,036) | (1,404) | (5,440) | 2,062 | (3,253) | (1,191) |
| Securities: | | | | | | |
| KZT ...................................... | 259 | 2,296 | 2,555 | (2,436) | 1,636 | (800) |
| Foreign currency................... | (1,302) | 939 | (363) | (801) | (389) | (1,190) |
| Loans: | | | | | | |
| KZT ...................................... | (47,862) | (3,335) | (51,197) | 42,048 | 328 | 42,376 |
| Foreign currency................... | (82,155) | 14,517 | (67,638) | 46,395 | (14,458) | 31,937 |
| SK Bonds: | | | | | | |
| KZT ...................................... | 20,502 | — | 20,502 | — | — | — |
| Foreign currency................... | — | — | — | — | — | — |
| **Total interest income** ........... | **(117,839)** | **13,619** | **(104,220)** | **87,779** | **(14,760)** | **73,019** |
| **Interest Expense** | | | | | | |
| Due to the Government and the NBK: | | | | | | |
| KZT ...................................... | 7,887 | 7,772 | 15,659 | 13 | (17) | (4) |
| Foreign currency................... | (16) | 4 | (12) | 40 | (11) | 29 |
| Due to other banks: | | | | | | |
| KZT ...................................... | (1,892) | 1,260 | (632) | 3,111 | (757) | 2,354 |
| Foreign currency................... | (5,171) | (9,584) | (14,755) | 7,522 | (6,817) | 705 |
| Due to customers: | | | | | | |
| KZT ...................................... | 434 | (2,766) | (2,332) | 2,421 | 4,164 | 6,585 |
| Foreign currency................... | (3,909) | 3,503 | (406) | 5,787 | 3,441 | 9,228 |
| Debt securities: | | | | | | |
| KZT ...................................... | 35,328 | (1,058) | 34,270 | 3,054 | 3,884 | 6,938 |
| Foreign currency................... | 449 | 3,292 | 3,741 | 14,350 | (11,083) | 3,267 |
| **Total interest expense** ....... | **33,110** | **2,423** | **35,533** | **36,298** | **(7,196)** | **29,102** |
| **Net change in net interest income**.............................. | **(150,949)** | **11,196** | **(139,753)** | **51,481** | **(7,564)** | **43,917** |

**The Group's Loan Portfolio**

Loans to customers represent the largest part of the Bank's business.  The Group's gross loan portfolio (including accrued interest) was KZT 2,516,853 million as at 31 December 2007, KZT 2,834,341 million as at 31 December 2008 and KZT 3,176,164 million as at 30 September 2009. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Total Assets*".  The average balance of the Group's gross loan portfolio (net of accrued interest) was KZT 1,985,158 million for 2007, KZT 2,579,135 million for 2008 and KZT 2,543,751 million for the nine months ended 30 September 2009.  Lending to corporate clients represented 76.9 per cent. of the Group's gross loan portfolio for the nine months ended 30 September 2009, compared to 73.1 per cent. as at 31 December 2008 and 66.3 per cent. as at 31 December 2007.  The Group's customer base includes many of Kazakhstan's leading industrial companies and trading corporations, as well as medium and small size enterprises.  Amounts due from credit institutions have also represented a small percentage of the Group's Gross Loan Portfolio including gross amounts due from

credit institutions (0.7 per cent. as at 30 September 2009, 2.8 per cent. as at 31 December 2008 and 4.1 per cent. as at 31 December 2007).

The following table sets out certain information relating to the amounts and composition of the Group's loan portfolio, its contingent liability exposure and loss allowances, respectively, as calculated by the Bank according to the unaudited accounting records of the Bank as at 30 September 2009, 31 December 2008 and 2007, respectively:

| | As at 30 September 2009 | As at 31 December | |
| --- | --- | --- | --- |
| | | 2008 | 2007 |
| | | *(KZT millions)* | |
| Loans | 2,898,123 | 2,622,783 | 2,400,649 |
| including: | | | |
| Non performing loans(1) | 2,002,505 | 973,551 | 19,829 |
| Accrued interest receivable | 278,041 | 211,558 | 116,204 |
| **Total gross loans** | **3,176,164** | **2,834,341** | **2,516,853** |
| Commercial letters of credit | 57,402 | 139,524 | 150,644 |
| Financial guarantees(2) | 169,954 | 175,196 | 141,931 |
| Undrawn loan commitments | 434,848 | 363,490 | 334,171 |
| **Total contingent liabilities** | **662,204** | **678,210** | **626,746** |
| Allowance for impairment of loans | 2,068,923 | 1,217,278 | 137,043 |
| Provision for off balance sheet items | 120,600 | 104,893 | 10,577 |
| Allowance for impairment on amounts due from credit institutions | 47,463 | 4,439 | 123 |
| Other | 4,572 | 1,387 | 360 |
| **Total** | **2,241,558** | **1,327,997** | **147,993** |
| Equity | (1,624,019) | (742,779) | 452,031 |
| Non performing loans/gross loans | 63.0% | 34.3% | 0.8% |
| Allowance for impairment of loans/non performing loans | 103.3% | 125% | 691.1% |
| Allowance for impairment of loans/gross loans | 65.1% | 42.9% | 5.4% |

Notes:

(1)  Non-performing loans comprise loans where past due payments exceed 90 days or are 100 per cent. provisioned.
(2)  Financial guarantees do not include the guarantees given by the Bank in favour of TuranAlem Finance in respect of its Euronotes issued from 2001 through 2006.

### *Loans by Type*

The Group provides financing for various purposes, although the majority of loans are for working capital purposes with a maturity of twelve months or less, for fixed asset purchases and for trade finance.

The following table sets out certain information relating to the Group's loan portfolio (including advances and accrued interest), by reference to the type of loan, as calculated by the Bank according to the unaudited accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Working capital finance | 1,516,326 | 47.7% | 1,297,743 | 45.8% | 1,305,560 | 51.9% |
| Construction and repair | 557,549 | 17.6% | 463,706 | 16.4% | 309,926 | 12.3% |
| Fixed asset purchase (excluding real estate) | 486,517 | 15.3% | 484,741 | 17.1% | 278,673 | 11.1% |
| Consumer loans | 256,731 | 8.1% | 271,387 | 9.6% | 292,463 | 11.6% |
| Real estate purchase | 61,010 | 1.9% | 60,405 | 2.1% | 69,912 | 2.8% |
| Other | 298,031 | 9.4% | 256,359 | 9.0% | 260,319 | 10.3% |
| **Total (including accrued interest)** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

***Loans by Type of Borrower***

The following table sets out certain information relating to the Group's commercial loan portfolio (including advances and accrued interest), by reference to the type of borrower, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
|---|---|---|---|---|---|---|
| Private companies....... | 2,670,926 | 84.1% | 2,321,272 | 81.9% | 1,963,281 | 78.0% |
| Individuals ................. | 497,356 | 15.7% | 505,517 | 17.8% | 546,880 | 21.7% |
| State companies .......... | 7,674 | 0.2% | 7,353 | 0.3% | 6,609 | 0.3% |
| Others ........................ | 208 | 0.0% | 199 | 0.0% | 83 | 0.0% |
| **Loans to customers, gross** ...................... | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

The Bank inherited a large corporate customer base from its predecessors, Alem Bank and Turan Bank, including many of the country's leading industrial companies engaged in a broad range of industries. Historically, a significant percentage of the Bank's predecessors' loans were extended to state-owned companies, but since the Bank's establishment in January 1997, this focus has been significantly reduced. Loans to private companies and individuals increased from 99.1 per cent. of total loans as at the time of the Bank's establishment to 99.8 per cent. of total loans as at 30 September 2009. The increase in loans to private companies and individuals reflects the overall growth of the economy and the resulting improvement in the general welfare of a large number of individuals across Kazakhstan, the privatisation of a number of State-owned enterprises by the Government in recent years as well as the policy of the Bank.

The Bank has identified certain sectors, including oil and gas, energy, trading and metals & metallurgy and construction, as key target areas in which it intends to expand its lending business. As at 30 September 2009, the Group's loan portfolio including accrued interest comprised KZT 3,168,282 million to private companies and individuals (99.8 per cent.) and KZT 7,674 million to state-owned companies (0.2 per cent.). As at 31 December 2008, the Group's loan portfolio including accrued interest comprised KZT 2,826,789 million to private companies and individuals (99.7 per cent.) and KZT 7,353 million to state-owned companies (0.3 per cent.). As at 31 December 2007, the Group's loan portfolio including accrued interest comprised KZT 2,510,161 million to private companies and individuals (99.7 per cent.) and KZT 6,609 million to state controlled companies (0.3 per cent.).

As at 30 September 2009, the Group's ten largest borrowers accounted for 15.2 per cent. of the total gross loan portfolio then outstanding (as compared to 14.0 per cent. as at 31 December 2008), although no single borrower accounted for more than 2 per cent. of the total loan portfolio.

*Loans by Sector*

The following table sets out the composition of the Group's loan portfolio (including advances and accrued interest), by reference to the economic sector of the borrower, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
|---|---|---|---|---|---|---|
| Real estate investments | 530,050 | 16.7% | 435,188 | 15.4% | 365,741 | 14.5% |
| Individuals | 497,356 | 15.7% | 505,517 | 17.8% | 546,880 | 21.7% |
| — including consumer loans | 256,731 | 8.1% | 271,387 | 9.6% | 292,463 | 11.6% |
| — including mortgage loans | 240,625 | 7.6% | 234,130 | 8.3% | 254,418 | 10.1% |
| Housing construction | 477,792 | 15.0% | 415,536 | 14.7% | 316,222 | 12.6% |
| Oil & gas | 383,517 | 12.1% | 314,970 | 11.1% | 173,948 | 6.9% |
| Wholesale trade | 324,833 | 10.2% | 298,573 | 10.5% | 415,817 | 16.5% |
| Construction of roads and industrial buildings | 275,543 | 8.7% | 206,066 | 7.3% | 154,495 | 6.1% |
| Agriculture | 154,722 | 4.9% | 142,819 | 5.0% | 139,615 | 5.5% |
| Energy | 72,016 | 2.3% | 84,266 | 3.0% | 7,971 | 0.3% |
| Chemical industry | 69,970 | 2.2% | 62,783 | 2.2% | 47,869 | 1.9% |
| Retail trade | 58,050 | 1.8% | 62,116 | 2.2% | 71,836 | 2.9% |
| Transport | 44,637 | 1.4% | 51,087 | 1.8% | 50,650 | 2.0% |
| Food industry | 40,941 | 1.3% | 40,152 | 1.4% | 48,401 | 1.9% |
| Mining | 36,803 | 1.2% | 35,580 | 1.3% | 30,325 | 1.2% |
| Telecommunication | 33,235 | 1.0% | 25,244 | 0.9% | 24,233 | 1.0% |
| Metallurgical industry | 30,795 | 1.0% | 25,374 | 0.9% | 11,174 | 0.5% |
| Hospitality | 17,200 | 0.5% | 13,903 | 0.5% | 10,689 | 0.4% |
| Financial services | 14,008 | 0.4% | 12,968 | 0.5% | 8,024 | 0.3% |
| Textile and leather | 13,802 | 0.4% | 11,241 | 0.4% | 4,134 | 0.2% |
| Production of machinery and equipment | 9,686 | 0.3% | 12,259 | 0.4% | 16,664 | 0.7% |
| Publishing | 845 | 0.0% | 1,059 | 0.0% | 3,072 | 0.1% |
| Production of rubber and plastic articles | 756 | 0.0% | 894 | 0.0% | 731 | 0.0% |
| Research and development | 590 | 0.0% | 818 | 0.0% | 724 | 0.0% |
| Other | 89,017 | 2.9% | 75,928 | 2.7% | 67,638 | 2.7% |
| **Total** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

*Loans by Maturity*

The Group predominantly lends to SMEs for terms ranging from one to three years and to large corporations for longer terms.  The Bank expects that demand for longer-term financing from existing customers and other high quality corporate credits will continue to increase and that the maturity profile of the Group's loan portfolio will, in turn, be lengthened.  The policy of the Bank in respect of the maturity profile of its loans depends on the Bank's strategic goals and the sources of funding available to the Bank, as well as on the current state of the Kazakhstan economy, overall market conditions and the financial standing of the borrower.

The following table sets out certain information relating to the maturity profile of the Group's loan portfolio (including advances and accrued interest) based on the accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| Less than 1 year | 246,015 | 7.8% | 509,045 | 18.0% | 392,622 | 15.6% |
| From 1 to 3 years | 633,175 | 19.9% | 707,869 | 25.0% | 697,990 | 27.7% |
| Over 3 years | 1,833,937 | 57.7% | 1,556,024 | 54.9% | 1,408,617 | 56.0% |
| Past Due | 463,037 | 14.6% | 61,404 | 2.1% | 17,624 | 0.7% |
| **Total** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

### Loans by Geographic Location

The following table sets out certain information relating to the Group's loan portfolio (including advances and accrued interest) by reference to the geographic location of the Borrower, based on the unaudited accounting records of the Bank as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| **Kazakhstan** | | | | | | |
| Almaty | 882,998 | 27.8% | 857,785 | 30.3% | 664,054 | 26.4% |
| Astana | 163,712 | 5.2% | 151,054 | 5.3% | 173,139 | 6.9% |
| West region | 166,431 | 5.2% | 189,366 | 6.7% | 243,283 | 9.7% |
| East region | 99,731 | 3.2% | 107,689 | 3.8% | 139,356 | 5.5% |
| North region | 98,381 | 3.1% | 104,405 | 3.7% | 131,596 | 5.2% |
| Central region | 69,875 | 2.2% | 88,687 | 3.1% | 84,687 | 3.4% |
| South region | 121,697 | 3.8% | 128,888 | 4.5% | 142,160 | 5.6% |
| **CIS and other countries** | 1,573,339 | 49.5% | 1,206,467 | 42.6% | 938,578 | 37.3% |
| **Total** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

Notes:

(1)   Excluding Astana.
(2)   Excluding Almaty.

### Collateralisation of Loan Portfolio

The Bank estimates that it holds collateral with a value in excess of the principal amount of its loan portfolio as a part of principal debt.  While Kazakhstan has passed a law on the foreclosure of assets such as property of a pledgee, historically the Bank has generally not been able to realise the full value of the collateral on its loans.  The following table sets out certain information relating to the collateralisation of the Group's loan portfolio, based on the unaudited accounting records of the Bank as at the dates indicated in the table.  For a description of the Bank's collateralisation policy, see "*Asset and Liability Management — Lending Policies and Procedures*".

| | As at 30 September 2009 | | As at 31 December | | | |
| | | | 2008 | | 2007 | |
| | (KZT millions) | (%) | (KZT millions) | (%) | (KZT millions) | (%) |
|---|---|---|---|---|---|---|
| Collateralised | 2,582,239 | 81.3% | 2,459,283 | 86.8% | 2,307,954 | 91.7% |
| Uncollateralised | 593,925 | 18.7% | 375,058 | 13.2% | 208,899 | 8.3% |
| **Total loans** | **3,176,164** | **100.0%** | **2,834,341** | **100.0%** | **2,516,853** | **100.0%** |

### Credit Exposure other than Loans

As at 30 September 2009, the Group had exposure to other credit risks consisting of financial instruments with off-balance sheet risk in the aggregate amount of KZT 662,204 million, including

commitments to extend credit of KZT 434,848 million, financial guarantees and promissory notes of KZT 169,954 million and commercial letters of credit of KZT 57,402 million.   As at 30 September 2009, the Bank held open forward contracts for KZT 103,030 million.

As at 30 September 2008, the Group was exposed to other credit risks consisting of financial instruments with off-balance sheet risk in the aggregate amount of KZT 829,223 million, including commitments to extend credit of KZT 460,848 million, financial guarantees and promissory notes of KZT 209,305 million and commercial letters of credit of KZT 159,070 million.   As at 30 September 2008, the Bank held open forward contracts for KZT 176,342 million.

As at 30 September 2009, 31 December 2008 and 2007, the Group had established provisions for losses with respect to off-balance sheet risks of KZT 120,600 million, KZT 104,893 million and KZT 10,577 million, respectively.   See also "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition for the Nine-Months ended 30 September 2009 and 2008 — Off-Balance Sheet Arrangements*" and "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition for the Years ended 31 December 2008 and 2007 — Off-Balance Sheet Arrangements*".

**Investments**

***Financial Assets at Fair Value through Profit or Loss***

Securities purchased with the intention of recognising short-term profits, which consist primarily of debt securities, but also include some equity securities, are classified as financial assets at fair value through profit or loss.   After initial recognition, securities which are classified as held for trading are measured at estimated fair value.   Changes in the estimated fair value are included in the accompanying consolidated statements of income within gains less losses from securities.   In determining estimated fair value, financial assets at fair value through profit or loss are valued at the last trade price, if quoted on an exchange, or the last bid price, if traded over-the-counter.

The following table sets out certain information relating to the Group's portfolio of financial assets at fair value through profit or loss as at the dates indicated:

| | As at 30 September 2009 | | | As at 31 December 2008 | | | As at 31 December 2007 | | |
|---|---|---|---|---|---|---|---|---|---|
| | KZT | % | Repayment term | KZT | % | Repayment term | KZT | % | Repayment term |
| | (millions) | | | (millions) | | | (millions) | | |
| Debt securities: | | | | | | | | | |
| Corporate bonds | 50,358 | 7.0%–12.0% | 2009-2018 | 59,979 | 7.0%–12.0% | 2009-2018 | 46,241 | 7.0%–8.9% | 2009-2015 |
| Treasury bills of Ministry of Finance of Kazakhstan | 21,218 | 3.5%–8.8% | 2009-2016 | 25,019 | 3.5%–18.7% | 2009-2015 | 19,156 | 5.5%–6.4% | 2008-2010 |
| Notes of NBK | — | | | 9,918 | 6.6%–8.0% | 2009 | 3,707 | 7.3% | 2008 |
| Bonds of Kazakhstan non-financial institutions | 4,795 | 8.0% | 2013 | 4,841 | 8.0% | 2013 | — | | |
| Sovereign bonds of OECD countries | 9,139 | 4.0% | 2037 | 3,793 | 4.0% | 2037 | 6,694 | 4.0% | 2037 |
| Bonds of Kazakhstan non-financial institutions | 4,984 | 6.0%–7.4% | 2013-2026 | 2,887 | 6.0% | 2026 | 6,881 | 6%–12.2% | 2013-2026 |
| Bonds of international financial organizations | 100 | 4.4%–5.5% | 2012-2013 | 80 | 4.4%–5.5% | 2012-2013 | 76 | 4.4%–5.5% | 2012-2013 |
| Treasury bills of Ministry of Finance of Russian Federation | 3 | 7.5% | 2030 | 2 | 7.5% | 2030 | 3 | 7.5% | 2030 |
| Municipal bonds | — | | | — | | | 264 | 8.5% | 2008 |
| **Total** | **90,597** | | | **106,519** | | | **83,022** | | |
| Equity securities | 30,051 | | | 21,631 | | | 29,100 | | |
| Shares of mutual funds | — | | | — | | | 53 | | |
| **Financial assets at fair value through profit or loss** | **120,648** | | | **128,150** | | | **112,175** | | |
| Subject to repurchase agreements | — | | | 65,472 | | | 60,129 | | |

229

***Available-for-Sale Investment Securities***

The Bank classifies investment securities based on the intention of management at the time of the purchase.

Shares of affiliates and subsidiaries held by the Bank for the purpose of future disposal are classified as available-for-sale. Available-for-sale securities are measured at fair value, which is equal to the market value at the relevant balance sheet date. When debt securities with fixed maturities are non-marketable or there is no available public information for similar instruments, fair value is estimated as discounted future cash flows using current interest rates.

As at 30 September 2009, the Group did not have any held-to-maturity securities in its portfolio of investment securities as all such securities were reclassified to available-for-sale securities due to "tainting rule" as at 31 December 2007 in line with IAS39.

The following table sets outs certain information in respect of the Group's securities classified as available-for-sale as at the dates indicated in the table.

| | As at 30 September | | | As at 31 December | | | | | |
| | 2009 | | | 2008 | | | 2007 | | |
| | Amount | % | Repayment term | Amount | % | Repayment term | Amount | % | Repayment term |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | (KZT millions) | | | (KZT millions) | | | (KZT millions) | | |
| Bonds of international financial organizations | — | | | 35,402 | 2.6%–5.5% | 2011-2014 | — | | |
| Corporate bonds | 13,230 | 8.1%–15.0% | 2009-2011 | 15,142 | 8.1%–20.7% | 2009-2014 | 14,179 | 8.5%–16.0% | 2008-2015 |
| Treasury bills of the Ministry of Finance of the Republic of Kazakhstan | 4,655 | 3.5%–6.0% | 2009-2017 | 2,129 | 5.5%–8.8% | 2009-2014 | — | | |
| Treasury bills of the Ministry of Finance of the Republic of Belorussia | 288 | 8.95%–9.1% | 2009 | 912 | 9.2%–10.3% | 2009 | — | | |
| Treasury bills of the Ministry of Finance of Kyrgyzstan | 481 | 3.0%–19.5% | 2009-2010 | 409 | 8.6%–25.0% | 2009-2010 | 410 | 5.7%–14.6% | 2008-2009 |
| Bonds of Kazakhstan financial institutions | 916 | 6.5%–7.4% | 2013-2020 | 312 | 7.4% | 2013 | 24 | 12.2% | 2014 |
| Nots of the NBK | 868 | 5.49% | 2009-2012 | 218 | 6.7% | 2009 | 1,165 | 7.3% | 2008 |
| Notes of National Bank of Kyrgyzstan | — | | | — | | | 1,390 | 8.2%–9.2% | 2008 |
| Bonds of OECD Countries | — | | | 8,536 | | | 3,697 | 5.3%–6.0% | 2008-2009 |
| Equity securities | 1,806 | | | 32 | | | 5,557 | | |
| Mutual fund shares | — | | | | | | — | | |
| **Securities available for sale** | **22,244** | | | **63,092** | | | **26,422** | | |
| Write-off | | | | (42,610) | | | | | |
| | 22,244 | | | 20,482 | | | 26,422 | | |

231

Bonds of international financial organisations are represented as securities of EBRD, CEDB, EuroFIMA, EIB (European Investment Bank) and IFC (International Finance Corporation).  Pursuant to the adjustments made to IAS 39 and IFRS 7, "Reclassification of financial assets", the Bank reclassified a number of financial assets purchased in order to control current liquidity from the category designed for trade which it did not intend to sell in the near future.  Reclassification was made as at 1 July 2008 at the fair value for this date.  The table below reflects this reclassification:

| | Trade financial assets were reclassified into financial assets, available for sale |
|---|---|
| | *(KZT millions)* |
| Fair value as at the date of reclassification ................................................................................ | 35,420 |
| Balance cost of assets reclassification as at 31 December 2008 ......................................................... | 35,402 |
| Write-off of reclassified assets............................................................................................................... | (35,402) |
| Fair value of reclassified assets as at 31 December 2008 ...................................................................... | — |
| Losses from change in a fair value of reclassified assets recognised prior to reclassification ended on 31 December 2008.......................................................................................................................... | (546) |
| Interest income recognised after reclassification in income and loss report per year ended on 31 December 2008.................................................................................................................................... | 728 |
| Effective interest rate as at the date of reclassification........................................................................ | 4.06% |
| Cash flow to be reimbursed by the date of reclassification.................................................................... | 41,376 |

**Funding Sources**

The Group's principal sources of funding include domestic customer deposits, amounts due from other banks and financial institutions and debt securities issued.

The following table sets out certain information relating to the Group's sources of funding as at the dates indicated in the table:

| | As at 30 September | | As at 31 December | | | |
|---|---|---|---|---|---|---|
| | 2009 | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Customer deposits....... | 683,281 | 18.6% | 886,052 | 30.2% | 652,508 | 25.0% |
| Time deposits.............. | 270,318 | 7.3% | 684,330 | 23.3% | 463,450 | 17.7% |
| Current accounts ......... | 399,171 | 10.9% | 179,658 | 6.1% | 165,685 | 6.3% |
| Guarantee and other deposits.................... | 13,792 | 0.4% | 22,064 | 0.8% | 23,373 | 1.0% |
| Amounts due to credit institutions ............... | 752,636 | 20.5% | 803,366 | 27.4% | 835,304 | 32.0% |
| Debt securities issued.. | 1,670,588 | 45.5% | 1,087,726 | 37.0% | 1,084,445 | 41.5% |
| Amounts due to the Government and the NBK ........................ | 407,911 | 11.1% | 1,718 | 0.0% | 913 | 0.0% |
| Deferred tax liability ... | — | — | — | — | — | — |
| Derivative financial liability .................... | 2,308 | 0.1% | 18,789 | 0.6% | 5,528 | 0.2% |
| Reserves...................... | 120,600 | 3.3% | 104,893 | 3.6% | 10,577 | 0.4% |
| Other liabilities .......... | 34,822 | 0.9% | 34,436 | 1.2% | 23,311 | 0.9% |
| **Total**............................ | **3,672,146** | **100%** | **2,936,980** | **100%** | **2,612,586** | **100%** |

***Funding from Samruk-Kazyna and the NBK***

As at 30 September 2009, the Group received liquidity support in the amounts of KZT 404,938 million through refinancing loans from the NBK under BTA/NBK Repo Transactions, against delivery of the SK Bonds, KZT 310,495 million in deposits of Samruk-Kazyna, KZT 113,562 million under the State Finance Programmes and KZT 212,095 million through a capital injection in consideration for 75.1 per cent. of the shares of the Bank.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — Liquidity Support*"

232

*Customer Deposits*

The Bank believes customer deposits are relatively insensitive to short term fluctuations in interest rates and more dependent on the Bank's ability to provide a good level of customer service and on the range of banking products and services according to information provided by the FMSA.  As at 30 September 2009, the Group had total customer deposits of KZT 683,281 million, representing 11.4 per cent. of the total deposits in the banking system.  As at 30 September 2009, 73.1 per cent. of deposits were made by corporate and governmental entities (including 54.4 per cent. by Samruk-Kazyna and its affiliates) and 26.9 per cent. of deposits were made by individuals.

As at 30 September 2009, the ten largest customers of the Group accounted for 57.3 per cent. of total customer deposits compared to 27.1 per cent. as at 30 September 2008.

The Group's deposits consist of customer current accounts and time deposits.  Customer current accounts generally bear no interest and can be withdrawn upon demand.  For time deposits, different interest rates are paid on the various types of accounts offered by the Group.  For the nine months ended 30 September 2009 rates on Tenge based time deposits offered by the Group ranged between 4.0 per cent. and 12.5 per cent., while interest rates paid on U.S. Dollar and Euro deposits ranged from 6.0 per cent. to 12.0 per cent.  For the year ended 31 December 2008, rates on Tenge based time deposits offered by the Group ranged between 2.0 per cent. and 12.9 per cent., while interest rates paid on U.S Dollar and Euro deposits ranged from 4.5 per cent. to 14.4 per cent.

*Deposits by Currency*

As at 30 September 2009, foreign currency deposits accounted for 44.2 per cent. of total customer deposits compared to 47.9 per cent. and 39.3 per cent. as at 31 December 2008 and 2007, respectively. Customer deposits in foreign currencies are substantially denominated in U.S. Dollars.

The following table sets out certain information relating to customer deposits in Tenge and foreign currency, by amount and as a percentage of the total amount owed to customers, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December 2008 | | 2007 | |
|---|---|---|---|---|---|---|
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Foreign currency | 301,694 | 44.2% | 424,140 | 47.9% | 256,496 | 39.3% |
| Tenge accounts | 381,587 | 55.8% | 461,912 | 52.1% | 396,012 | 60.7% |
| **Total** | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

*Deposits by Maturity*

The following table sets out certain information relating to the structure of the Group's deposits, based on the unaudited accounting records of the Bank, as at the dates indicated in the table:

| | As at 30 September 2009 | | As at 31 December 2008 | | 2007 | |
|---|---|---|---|---|---|---|
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| On demand | 405,810 | 59.4% | 67,194 | 7.6% | 165,211 | 25.3% |
| Savings: | | | | | | |
| Less than 1 month | 31,194 | 4.6% | 141,530 | 16.0% | 77,852 | 11.9% |
| Between 1 and 3 months | 13,796 | 2.0% | 90,188 | 10.1% | 110,360 | 16.9% |
| Between 3 months and 1 year | 46,374 | 6.8% | 237,390 | 26.8% | 106,380 | 16.3% |
| Between 1 and 3 years | 126,052 | 18.4% | 252,233 | 28.5% | 136,031 | 20.9% |
| Over 3 years | 60,055 | 8.8% | 97,517 | 11.0% | 56,674 | 8.7% |
| **Total savings** | **277,471** | **40.6%** | **818,858** | **92.4%** | **487,297** | **74.7%** |
| **Total (On demand + savings)** | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

*Deposits by Type of Accounts*

The following table sets out the balances of the Group's customer deposits, by type, as at the dates indicated in the table:

| | As at 30 September | As at 31 December | |
| --- | --- | --- | --- |
| | 2009 | 2008 | 2007 |
| | | *(KZT millions)* | |
| Corporate deposits ................................................ | 120,787 | 339,664 | 268,179 |
| Individual deposits (retail) ................................... | 183,552 | 307,345 | 280,425 |
| State and budgetary deposits................................. | 378,942 | 239,043 | 103,904 |
| **Total**................................................................... | **683,281** | **886,052** | **652,508** |

*Deposits by Sector*

The following table sets out the composition of the Group's customer deposits by reference to the economic sector of the deposit as at the dates indicated in the table:

| | As at 30 September | | As at 31 December | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2009 | | 2008 | | 2007 | |
| | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* | *(KZT millions)* | *(%)* |
| Individuals ................................. | 183,552 | 26.9% | 307,345 | 34.7% | 280,425 | 43.0% |
| Oil and gas................................. | 195,311 | 28.6% | 233,290 | 26.3% | 86,213 | 13.2% |
| State agencies ............................ | 174,287 | 25.5% | 28,501 | 3.2% | 11,071 | 1.7% |
| Construction............................... | 29,800 | 4.4% | 49,060 | 5.5% | 33,623 | 5.2% |
| Wholesale trade ......................... | 22,614 | 3.3% | 81,303 | 9.2% | 52,003 | 8.0% |
| Non-credit financial organisations ........................... | 17,229 | 2.5% | 19,226 | 2.2% | 38,578 | 5.9% |
| Transportation............................ | 8,966 | 1.3% | 33,113 | 3.7% | 41,388 | 6.3% |
| Research and development ........ | 4,122 | 0.6% | 11,594 | 1.3% | 6,622 | 1.0% |
| Education.................................... | 3,879 | 0.6% | 7,014 | 0.8% | 5,938 | 0.9% |
| Retail trade................................. | 3,371 | 0.5% | 4,265 | 0.5% | 8,691 | 1.3% |
| Mining ....................................... | 3,063 | 0.5% | 1,912 | 0.2% | 3,688 | 0.6% |
| Agriculture.................................. | 2,030 | 0.3% | 3,887 | 0.4% | 6,596 | 1.0% |
| Textile and leather industry ....... | 1,968 | 0.3% | 1,607 | 0.2% | 1,235 | 0.2% |
| Chemical processing.................. | 1,680 | 0.2% | 1,480 | 0.2% | 5,720 | 0.9% |
| Machinery and equipment production............................... | 1,650 | 0.2% | 5,873 | 0.7% | 6,652 | 1.0% |
| Food industry............................. | 1,525 | 0.2% | 1,091 | 0.1% | 3,620 | 0.6% |
| Energy industry.......................... | 1,358 | 0.2% | 30,788 | 3.5% | 3,978 | 0.6% |
| Metallurgy.................................. | 799 | 0.1% | 11,475 | 1.3% | 12,024 | 1.8% |
| Entertainment............................. | 796 | 0.1% | 1,241 | 0.1% | 1,207 | 0.2% |
| Communication.......................... | 412 | 0.1% | 5,425 | 0.6% | 2,429 | 0.4% |
| Hotel and hospitality.................. | 233 | 0.0% | 353 | 0.0% | 454 | 0.1% |
| Other.......................................... | 24,636 | 3.6% | 46,209 | 5.3% | 40,353 | 6.1% |
| **Total**......................................... | **683,281** | **100.0%** | **886,052** | **100.0%** | **652,508** | **100.0%** |

*Bank Loans and Similar Financings*

The following table sets out certain information relating to balances due to other banks and financial institutions based on the unaudited accounting records of the Group, as at the dates indicated in the table:

| | As at 30 September 2009 | As at 31 December 2008 | As at 31 December 2007 |
|---|---|---|---|
| | | *(KZT millions)* | |
| Loans from OECD based banks and financial institutions | 446,095 | 451,737 | 455,384 |
| Syndicated bank loans | 167,236 | 156,617 | 241,157 |
| Loans from Kazakh banks and financial institutions | 96,413 | 126,434 | 51,329 |
| Loans from other banks and financial institutions | 25,657 | 24,201 | 26,609 |
| Pass through loans | 16,033 | 17,278 | 9,482 |
| Interest bearing placements from Kazakh banks | 44 | 21,112 | 46,021 |
| Interest bearing placements from non OECD banks | 749 | 3,484 | 4,034 |
| Loro accounts | 409 | 2,503 | 1,288 |
| **Total** | **752,636** | **803,366** | **835,304** |
| **Subject to repurchase agreements** | 7,142 | 65,472 | 60,129 |

The Group has historically entered into various trade finance interbank facilities with foreign banks and Kazakhstan subsidiaries of foreign banks.  If the Restructuring is successful, the Bank's principal method of trade finance will be utilisation of the RCTFF.

As at 30 September 2009, the aggregate outstanding principal balance including overdue indebtedness under the Trade Finance Facilities was approximately U.S.$1,794 million; such facilities have maturities ranging between one and seven years, while off balance Trade Finance liabilities including overdue indebtedness as at 30 September 2009 were approximately U.S.$1,565 million.  The Bank intends to continue rending services to its customers and finance their trade activities following successful completion of the Restructuring.

In accordance with the contractual terms of loan facilities from foreign banks and with the terms of the debt securities issued, the Bank is required to maintain certain financial ratios, particularly with regard to its liquidity, capital adequacy and lending exposures.  Furthermore, the Bank is required to maintain a certain level of credit rating from major international rating agencies.  As at 30 September 2009 and 31 December 2008 the Bank was in breach of capital adequacy, lending exposure and cross default covenants on these loan facilities.

*Debt Securities*

*Eurobonds*

As of 30 September 2009, the Group had the following outstanding note issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| TuranAlem Finance | 3rd tranche of eurobonds | U.S. $ | 176,236,052 | 7.88 | 6/2/2010 |
| TuranAlem Finance | 3rd tranche of eurobonds (additional issue) | U.S. $ | 378,457,444 | 7.88 | 6/2/2010 |
| TuranAlem Finance | 4th tranche of eurobonds | U.S. $ | 380,507,224 | 8 | 24/03/2014 |
| TuranAlem Finance | 5th tranche of eurobonds | U.S. $ | 309,543,635 | 8.50 | 09/2/2015 |
| TuranAlem Finance | Program of Global Medium Term Notes, 2nd issue | PLZ | 199,786,055 | 6.25 | 30/03/2011 |
| TuranAlem Finance | Program of Global Medium Term Notes, 3rd issue | U.S. $ | 190,411,252 | 7.75 | 25/04/2013 |
| TuranAlem Finance | Program of Global Medium Term Notes, 5th issue | EUR | 499,326,288 | 6.3 | 27/09/2011 |
| TuranAlem Finance | Program of Global Medium Term Notes, 6th issue | £ | 199,983,744 | 7.1 | 20/12/2009 |
| TuranAlem Finance | Program of Global Medium Term Notes, 7th issue | JPY | 19,861,331,204 | 4.3 | 28/12/2016 |
| TuranAlem Finance | Program of Global Medium Term Notes, 8th issue | U.S. $ | 977,344,215 | 8.25 | 22/01/2037 |
| TuranAlem Finance | Program of Global Medium Term Notes, 10th issue | JPY | 28,719,121,341 | 3M LIBOR + margin of 2.85% annually | 31/05/2017 |
| TuranAlem Finance | Program of Global Medium Term Notes, 11th issue | JPY | 14,288,384,128 | 3M LIBOR + margin of 5,4% annually | 11/10/2017 |
| TuranAlem Finance | Program of Global Medium Term Notes, 12th issue | U.S. $ | 200,000,000 | 3M LIBOR + 9,5% or 11.50% | 10/4/2013 |
| TuranAlem Finance | Program of Global Medium Term Notes, 13th issue | U.S. $ | 100,000,000 | 3M LIBOR + 9,5% or 11.25% | 27/05/2014 |
| Bank | eurobonds in CHF | CHF | 200,000,000 | 3m CHF Libor+3,35% | 7/8/2017 |
| BTA Finance Luxembourg | Perpetual Bond | U.S. $ | 399,993,998 | 8.3 | 1/25/2016 |
| TurranAlem Finance (Russia) | 1 issue of documentary bonds | RUB | 3,000,000,000 | 7.8 | 10/5/2009 |
| Temir Capital B.V.[1] | 1st series of eurobonds | U.S. $ | 0 | 9.25 | 3/23/2009 |
| Temir Capital B.V.[1] | 2nd series of eurobonds | U.S. $ | 275,182,471 | 9 | 11/24/2011 |
| Temir Capital B.V.[1] | 3rd series of eurobonds | U.S. $ | 487,271,699 | 9.50 | 5/15/2014 |

Note:

(1)  The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The notes issued by Temir Capital B.V. are not subject to the Restructuring and will instead be restructured, if at all, under Temirbank's restructuring.

*Subordinated Bonds*

As of 30 September 2009, the Group had the following outstanding subordinated bond issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| Bank............................. | Subordinated coupon bonds, 2nd issue with indexing (tenge) | KZT | 3,698,787,500 | 9.0 | 29/04/2010 |
| Bank............................. | Subordinated coupon bonds, 3rd issue with indexing (tenge) | KZT | 7,500,000,000 | inflation rate+2% | 6/11/2013 |
| Bank............................. | Subordinated coupon bonds, 4th issue with indexing (tenge) | KZT | 14,000,000,000 | inflation rate+2% | 10/6/2014 |
| Bank............................. | Subordinated coupon bonds, 5th issue with indexing (tenge) | KZT | 15,685,950,000 | 7.0 | 30/12/2015 |
| Bank............................. | Subordinated coupon bonds, 7th issue with indexing (tenge) | KZT | 96,414,540,000 | 7.0 | 29/06/2036 |
| Bank............................. | Subordinated coupon bonds, 9th issue with indexing (tenge) | KZT | 51,412,043,000 | 11.0 | 16/06/2018 |
| BTA Ipoteka................ | Subordinated bonds (3rd bond program), 2nd issue | KZT | 4,120,000 | 7.0 | 8/4/2016 |
| BTA Ipoteka................ | Subordinated bonds (3rd bond program), 3rd issue | KZT | 10,000,000 | 7.0 | 12/28/2016 |
| Temirbank[1] ................ | Subordinated bonds (2nd bond program), 3rd issue | KZT | 928,000,000 | 9.5 | 4/14/2016 |
| Temirbank[1] ................ | Subordinated bonds (2nd bond program), 4th issue | KZT | 867,528,736 | 9.5 | 4/14/2016 |
| Temirbank[1] ................ | Preferred shares | KZT | 4,457,487,000 | 10 | |
| BTA Kyrgyzstan .......... | Subordinated Loan | KZT | 210,000 | 1.5 | 7/1/2015 |

Note:

(1)   The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The subordinated bonds issued by Temirbank are therefore not subject to the Restructuring and will be restructured, if at all, pursuant to Temirbank's restructuring.

*Senior Bonds*

As of 30 September 2009, the Group had the following outstanding senior bond issuances:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|--------|------|----------|---------------|-------------------|-----|
| Bank............................. | Bonds (1st bond program), 1st — 10th issue | KZT | 300,000,000,000 | 9.0 | Each 3 March from 2015 until 2024 |
| Bank............................. | Bonds (2nd bond program), 1st — 10th issue | KZT | 345,000,000,000 | 9.0 | Each 19 March from 2015 until 2024 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 1st issue | KZT | 602,600,000 | upon decision of Management Board depending on market situation, but not less than 5% | 7/6/2015 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 3rd issue | KZT | 3,989,070,000 | inflation rate+1% | 12/30/2012 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 4th issue | KZT | 2,992,000,000 | upon decision of Management Board depending on market situation, but not less than 5% | 6/1/2015 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 5th issue | KZT | 3,492,000,000 | 8.50 | 6/1/2012 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 7th issue | KZT | 2,478,283,000 | 9.00 | 11/29/2016 |
| Temirbank[(1)] ................ | Bonds (1st bond program), 8th issue | KZT | 3,962,620,000 | 9.00 | 11/29/2021 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 1st issue | KZT | 2,500,000,000 | 9.00 | 4/14/2010 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 2nd issue | KZT | 448,636,289 | 9.00 | 4/14/2012 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 5th issue | KZT | 448,636,289 | 8.50 | 4/14/2012 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 2nd issue | KZT | 7,423,108,773 | 8.50 | 4/14/2017 |
| Temirbank[(1)] ................ | Bonds (2nd bond program), 6th issue | KZT | 1,500,000,000 | upon decision of Management Board depending on market situation, but not less than 5% | 4/14/2017 |
| Temirbank[(1)] | Bonds, 3rd issue | KZT | 2,200,000,000 | Company has right to change interest rate once a year. Average rate for circulation period must not be less than 5% | 10/20/2012 |
| BTA Ipoteka................ | Mortgage bonds, 1st issue | KZT | 500,000,000 | inflation rate + 1.3% | 2/26/2010 |
| BTA Ipoteka................ | Mortgage bonds, 2nd issue | KZT | 1,500,000,000 | inflation rate + 1.0% | 10/21/2014 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 1st issue | KZT | 2,000,000,000 | inflation rate + 2% | 12/15/2011 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 2nd issue | KZT | 2,000,000,000 | inflation rate + 1.0% | 5/11/2010 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 3rd issue | KZT | 4,000,000,000 | inflation rate + 2% | 5/11/2015 |
| BTA Ipoteka................ | Mortgage bonds (1st bond program), 4th issue | KZT | 2,000,000,000 | inflation rate + 1.0% | 6/17/2010 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 1st issue | KZT | 1,417,000,000 | | 7/13/2012 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 2nd issue | KZT | 7,000,000,000 | inflation rate + 0.5% | 8/22/2013 |
| BTA Ipoteka................ | Mortgage bonds (2nd bond program), 3rd issue | KZT | 4,000,000,000 | inflation rate + 0.1% | 2/21/2016 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 1st issue | KZT | 1,004,120,000 | 15% inflation rate | 8/4/2016 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 5th issue | KZT | 3,895,540,000 | inflation rate + 0.1% | 4/3/2014 |
| BTA Ipoteka................ | Mortgage bonds (3rd bond program), 7th issue | KZT | 17,180,000 | inflation rate + 1.5% | 4/1/2018 |
| BTA Belarus................ | Bonds without collateral | U.S.$ | 732,428 | 12.00 | 8/27/2010 |
| BTA Belarus................ | Bonds without collateral | U.S.$ | 613,408 | 12.00 | 8/27/2010 |
| | | U.S.$ | 41,165,990 | 1M LIBOR + 1.25% | 3/29/2029 |

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| | Notes of Kazakh Mortgage | U.S.$ | 0 | 1M LIBOR + 2.00% | 3/29/2029 |
| | Backed Securities 2007 1 B.V. | U.S.$ | 0 | 1M LIBOR + 3.75% | 3/29/2029 |

_____

Note:

(1)    The Bank and Samruk-Kazyna signed an agreement on 14 October 2009 on the transfer of 100 per cent. of the Bank's shares in Temirbank to Samruk-Kazyna under a trust management agreement. See "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*". The senior bonds issued by Temirbank are therefore not subject to the Restructuring and will be restructured, if at all, pursuant to Temirbank's restructuring.

*Certificates of Deposit*

As of 30 September 2009, the Group had the following outstanding certificates of deposit:

| Issuer | Name | Currency | Nominal Value | Interest rate (%) | Due |
|---|---|---|---|---|---|
| BTA Belarus.................. | Certificate of Deposit | BYR | 200,000,000 | 22.50 | 3/26/2010 |
| BTA Belarus.................. | Certificate of Deposit | BYR | 14,000,000 | 18.50 | 10/26/2009 |
| BTA Belarus.................. | Certificate of Deposit | BYR | 60,000,000 | 20.50 | 10/26/2009 |

# ASSET AND LIABILITY MANAGEMENT

## Introduction

The Bank monitors its interest rate and exchange rate exposure and the maturities of its financial instruments in order to minimise the effect of market changes on the Bank's profitability and liquidity.  The Bank has a relatively liquid asset base, including substantial Tenge and U.S. Dollar demand deposits, comprised, as at 30 September 2009, of 95.0 per cent. of corporate deposits and 5.0 per cent. of retail deposits.  The volume of clients' assets, as at the same date, comprised 37.3 per cent. of term deposits and 62.7 per cent. of deposits on demand.  In addition, as at 30 September 2009, the Bank's loan portfolio comprised 91.4 per cent. of corporate loans and 8.6 per cent. of retail loans.  Accordingly, the Bank's interest rate risk is relatively low and, despite the size of the portfolio, adjusting the profile of the portfolio is relatively straightforward for the Bank.

## Asset and Liability Management Committee

The overall asset and liability position of the Bank is monitored by the Bank's Asset and Liability Management Committee ("**ALCO**"), which reports directly to the Management Board with respect to issues relating to the day-to-day operations of the Bank or, in the case of matters relating to the Bank's strategy, directly to the Board of Directors.  ALCO is chaired by the Chairman of Management Board or Deputy Chairman of Management Board or any person specifically appointed by Management Board.  The Committee consists of representatives of Department of Credit and Operational Risk, one of the corporate business departments, one of the SME business departments, one of the retail business departments, the international operations departments of the investment activities business, Treasury Department and Financial Controlling Department of the Bank.  ALCO meets on a weekly basis to review the Group's asset and liability position by reference to the following criteria, based on information provided by the Financial Controlling Department:

● size and maturity of assets and liabilities;

● the Bank's foreign currency position;

● operational ratios in terms of the regulations established by the FMSA; and

● exchange rates and other economic data.

Based on its review of this information, ALCO determines short-term policies for the forthcoming week with the aim of increasing interest and non-interest income for the Group while maintaining adequate liquidity, complying with prudential standards and regulations and minimising the impact of financial market risks so as to maintain the Group's attractiveness to depositors.  Policies proposed by ALCO are reviewed and approved by the Bank's senior management, which has overall responsibility for ensuring that the asset and liability maturity profiles are prudent considering prevailing market conditions, consistent with the Bank's strategy and in compliance with all of the FMSA's requirements and limitations.

## Liquidity Risk and Management of Funding Sources

The liquidity risk is the risk that the Group may not be able to meet its obligations when they fall due.  Managing the liquidity risk is one of the key components of the Group's risk management process.  This risk is managed by:

1.     compliance with the regulators' liquidity ratios; and

2.     managing liquidity by gap analysis and forecasting cash flows.

According to FMSA requirements, the Bank must meet certain liquidity ratios over each reporting period, including the K4, K4-1, K4-2, K4-3, K4-4, K4-5 and K4-6 ratios.  The K4 ratio is calculated as the ratio of average monthly highly liquid bank assets to the average size of on demand deposits,

taking into account accrued interest. The K4-2 ratio is calculated as the average size of liquid assets with a remaining maturity up to one month inclusive, including highly liquid assets, to the average size of fixed-term obligations with remaining maturity up to one month inclusive. The K4-3 ratio is calculated as the average size of liquid assets with a remaining maturity up to three months inclusive, including highly liquid assets, to the average size of fixed-term obligations with remaining maturity up to three months inclusive. The K4-4 ratio is calculated as the average size of highly liquid assets in foreign currency to the average size of fixed-term obligations in the same foreign currency with remaining maturity of up to seven days inclusive. The K4-5 ratio is calculated as the average size of liquid assets in foreign currency with a remaining maturity up to one month inclusive, including highly liquid assets, to the average size of fixed-term obligations in the same foreign currency with remaining maturity up to one month inclusive. The K4-6 ratio is calculated as the average size of liquid assets in foreign currency with remaining maturity up to three months inclusive, including highly liquid assets, to the average size of fixed-term obligations in the same foreign currency with remaining maturity up to three months inclusive. The minimum ratio values established by the FMSA are as follows: K4 (0.3), K4-1 (1.0), K4-2 (0.9), K4-3 (0.8), K4-4 (1.0), K4-5 (0.9) and K4-6 (0.8).

The gap analysis consists of comparing the maturity profiles of the Group's assets and liabilities to evaluate the absolute and relative gap between the flow of assets and liabilities at each of various intervals. The Bank then attempts to adjust the maturities of its assets and liabilities to reduce significant gaps in any given maturity interval.

In forecasting future cashflows, the Bank analyses the risk of changes in the urgency of the requirements and obligations of the Bank and unexpected withdrawals of deposits. The Bank undertakes this analysis on both a short-term and long-term basis to detect potential risks to such changes.

ALCO meets weekly to analyse operational data and make liquidity management decisions. If the situation warrants it, additional ALCO meetings are scheduled. ALCO reviews asset-liability gaps by maturity and currency, asset and liability durations and projected future cash flows. All business subdivisions, together with Risk Management, participate in the process of managing the liquidity of the Group so as to provide informational support.

The management regularly monitors highly liquid assets that can be sold at any time. The Group maintains a portfolio of highly liquid assets consisting mostly of debt instruments issued by governments with high credit ratings. On 30 November 2009, the NBK Management Board amended the obligatory reserve ratio requirement for the Bank to zero per cent. for both internal and external liabilities. The reduced ratio will remain in effect until Restructuring process is finalised.

As at 30 September 2009, the balance of funds borrowed by the Group via various bond issues, bilateral, syndicated-loan and other agreements totalled KZT 2,423,224 million. Under the terms of part of these bonds and loan agreements, the Bank has undertaken to maintain certain financial ratios, including, with respect to its liquidity, capital adequacy and credit exposure. In addition, the Bank is obliged to maintain a certain credit rating from leading rating agencies.

As at 30 September 2009 and since approximately 1 January 2009, the Bank was not in compliance with some of these requirements. Following the acquisition of shares in the Bank by Samruk-Kazyna, certain creditors accelerated their loans to the Bank in a total of U.S.$550 million or KZT 83 billion. In addition, in April 2009, the Bank had its credit ratings lowered to "default", which constituted yet another credit event under other credit agreements to which the Bank is a party.

Supported by the Government, the Group formally announced in April 2009 its intention to undergo a restructuring of its financial indebtedness. The Group is currently in the process of this restructuring.

*Analysis of Financial Liabilities by Reference to Maturity*

The table below summarises the Group's financial obligations as at 30 September 2009, with a breakdown by the time remaining until maturity on the basis of contractual undiscounted repayment obligation.

| | Maturity | | |
| | As at 30 September 2009 | | |
| | 1 year or less | More than 1 year | Total |
| --- | --- | --- | --- |
| Amounts due to the Government and National Bank | 407,271 | 1,677 | 408,948 |
| Amounts due to credit institutions | 592,694 | 186,825 | 779,519 |
| Derivative financial instruments | 1,475 | 833 | 2,308 |
| Amounts due to customers | 523,487 | 301,942 | 825,429 |
| Debt securities outstanding | 1,018,988 | 1,749,423 | 2,768,411 |
| Other liabilities | 43,028 | 326 | 43,354 |
| **Total undiscounted financial obligations** | **2,586,943** | **2,241,026** | **4,827,969** |

The table below summarises the Group's financial obligations as at 31 December 2008, with a breakdown by time remaining until maturity on the basis of contractual undiscounted repayment obligations.

| | Maturity | | |
| | As at 31 December 2008 | | |
| | 1 year or less | More than 1 year | Total |
| --- | --- | --- | --- |
| Amounts due to the Government and National Bank | 217 | 1,902 | 2,119 |
| Amounts due to credit institutions | 698,139 | 127,258 | 825,397 |
| Derivative financial instruments | 16,689 | 2,100 | 18,789 |
| Amounts due to customers | 680,055 | 300,393 | 980,448 |
| Debt securities outstanding | 769,514 | 637,713 | 1,407,227 |
| Other liabilities | 34,957 | 1,306 | 36,263 |
| **Total undiscounted financial obligations** | **2,199,571** | **1,070,672** | **3,270,243** |

The table below summarises the Group's financial obligations as at 31 December 2007, with breakdown by time remaining until maturity on the basis of contractual undiscounted repayment obligations.

| | Maturity | | |
| | As at 31 December 2007 | | |
| | 1 year or less | More than 1 year | Total |
| --- | --- | --- | --- |
| Amounts due to the Government and National Bank | 130 | 884 | 1,014 |
| Amounts due to credit institutions | 384,784 | 559,105 | 943,889 |
| Derivative financial instruments | 3,130 | 2,398 | 5,528 |
| Amounts due to customers | 489,668 | 225,075 | 714,743 |
| Debt securities outstanding | 164,010 | 1,473,570 | 1,637,580 |
| Other liabilities | 32,999 | 5,398 | 38,397 |
| **Total undiscounted financial obligations** | **1,074,721** | **2,266,430** | **3,341,151** |

The Group's financial condition deteriorated drastically in 2008, mainly due to losses from its loan portfolio, financial derivatives and securities uncovered by the Bank's new management in 2009. This effectively put both the Bank and the Group in breach of certain prudential ratios, including the FMSA's capital adequacy ratio. As a result of these losses, the Group's total liabilities, exceeded its total assets by KZT 742,779 million as at 31 December 2008, and the Group reported a net loss of KZT 1,049,538 million as at 30 September 2009 and of KZT 1,188,050 million for the year ended 31 December 2008.

The table below summarises the contractual maturities of the Group's financial and contingent liabilities.

| | On demand | 1 month or less | From 1 to 3 months | From 3 to 12 months | From 1 year to 3 years | More than 3 years | Total |
|---|---|---|---|---|---|---|---|
| Nine months to | | | | | | | |
| 30 September 2009 | 23,434 | 8,297 | 81,441 | 116,030 | 210,212 | 222,790 | 662,204 |
| 2008 | 14,694 | 21,095 | 39,854 | 192,546 | 249,788 | 160,233 | 678,210 |
| 2007 | 17,775 | 16,478 | 28,756 | 146,621 | 250,623 | 166,493 | 626,746 |

As mentioned above, as at 30 September 2009, the Bank was not in compliance with certain financial covenants undertaken pursuant to certain of its debt securities issues, a fact that led to a number of cross-defaults being triggered as well.  As a result, a total of KZT 1,097,023 million in amounts payable to lending institutions and outstanding debt securities have become and are currently due and payable.

The table below breaks down financial assets and liabilities by reference to their expected maturities:

| | Nine months to 30 September 2009 | | |
|---|---|---|---|
| | 1 year or less | More than 1 year | Total |
| | *(KZT millions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents | 30,153 | — | 30,153 |
| Obligatory reserves | 17,695 | 25,308 | 43,003 |
| Financial assets at fair value through profit or loss | 120,648 | — | 120,648 |
| Amounts due from credit institutions | 22,120 | 9,319 | 31,439 |
| Derivative financial assets | 12,043 | 19,303 | 31,346 |
| Available-for-sale investment securities | 5,971 | 16,273 | 22,244 |
| Loans to customers | 263,409 | 843,832 | 1,107,241 |
| SK Bonds | — | 511,097 | 511,097 |
| Other assets | 28,376 | 2,921 | 31,297 |
| | 500,415 | 1,428,053 | 1,928,468 |
| **Liabilities:** | | | |
| Amounts due to the Government and NBK | 406,430 | 1,481 | 407,911 |
| Amounts due to credit institutions | 453,892 | 298,744 | 752,636 |
| Derivative financial liabilities | 1,475 | 833 | 2,308 |
| Amounts due to customers | 485,540 | 197,741 | 683,281 |
| Debt securities issued | 733,866 | 936,722 | 1,670,588 |
| Provisions | 45,356 | 75,244 | 120,600 |
| Other liabilities | 32,370 | 2,452 | 34,822 |
| | 2,158,929 | 1,513,217 | 3,672,146 |
| **Net position** | (1,658,514) | (85,164) | (1,743,678) |
| **Accumulated gap** | (1,658,514) | (1,743,678) | |

| | 2008 | | |
|---|---|---|---|
| | 1 year or less | More than 1 year | Total |
| | *(KZT millions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents | 87,893 | — | 87,893 |
| Obligatory reserves | 24,173 | 39,881 | 64,054 |
| Financial assets at fair value through profit or loss | 128,150 | — | 128,150 |
| Amounts due from credit institutions | 71,925 | 13,249 | 85,174 |
| Derivative financial assets | 655 | 20,995 | 21,650 |
| Available-for-sale investment securities | 3,810 | 16,672 | 20,482 |
| Loans to customers | 851,289 | 765,774 | 1,617,063 |
| Other assets | 15,994 | 7,006 | 23,000 |
| | 1,183,889 | 863,577 | 2,047,466 |
| **Liabilities:** | | | |
| Due to government and central banks | 125 | 1,593 | 1,718 |
| Amounts due from credit institutions | 708,182 | 95,184 | 803,366 |
| Derivative financial liabilities | 16,689 | 2,100 | 18,789 |
| Amounts due to customers | 536,302 | 349,750 | 886,052 |
| Debt securities issued | 722,510 | 365,216 | 1,087,726 |
| Provisions | 54,294 | 50,599 | 104,893 |
| Other liabilities | 33,930 | 506 | 34,436 |
| | 2,072,032 | 864,948 | 2,936,980 |
| **Net position** | (888,143) | (1,371) | (889,514) |
| **Accumulated gap** | (888,143) | (889,514) | |

| | 2007 | | |
|---|---|---|---|
| | 1 year or less | More than 1 year | Total |
| | *(KZT minions)* | | |
| **Assets:** | | | |
| Cash and cash equivalents | 99,723 | — | 99,723 |
| Obligatory reserves | 52,266 | 115,976 | 168,242 |
| Financial assets at fair value through profit or loss | 112,175 | — | 112,175 |
| Amounts due from credit institutions | 59,091 | 48,498 | 107,589 |
| Derivative financial assets | 375 | 31,022 | 31,397 |
| Available-for-sale investment securities | 8,211 | 18,211 | 26,422 |
| Loans to customers | 558,562 | 1,821,248 | 2,379,810 |
| Other assets | 16,299 | 2,555 | 18,854 |
| | 906,702 | 2,037,510 | 2,944,212 |
| **Liabilities:** | | | |
| Due to government and central banks | 95 | 818 | 913 |
| Amounts due from credit institutions | 255,600 | 579,704 | 835,304 |
| Derivative financial liabilities | 1,908 | 3,620 | 5,528 |
| Amounts due to customers | 459,803 | 192,705 | 652,508 |
| Debt securities issued | 66,912 | 1,017,533 | 1,084,445 |
| Provisions | 5,276 | 5,301 | 10,577 |
| Other liabilities | 22,016 | 1,295 | 23,311 |
| | 811,610 | 1,800,976 | 2,612,586 |
| **Net position** | 95,092 | 236,534 | 331,626 |
| **Accumulated gap** | 95,092 | 331,626 | |

## Treasury Operations

The Bank's Treasury department provides open-market operations in order to ensure the efficient management of the Bank's funds (for the Bank as a whole). The Treasury department achieves this purpose using foreign exchange (FOREX) and money market operations, and operations with securities, taking into consideration the policy of efficient internal and external risk management.

The Bank is one of the leading traders of Government debt securities and one of the leading participants on the interbank money market. Other operations performed by the Treasury department include currency trade operations, swap operations, the execution of repurchase agreements, reverse repurchase agreements and forward, futures and options contracts.

The Bank's Treasury department also provides brokerage services on the local securities market to its clients.

**Foreign Currency Management**

Currency risk is the risk that the value of a financial instrument will fluctuate due to changes in exchange rates.  The Risk Committee's limits on foreign exchange positions are based on those of the FMSA.  The positions are monitored daily.

The following table sets out the KZT equivalent amount of the Group's financial assets and liabilities denominated in KZT and foreign currencies as at the dates indicated:

| | As at 30 September 2009 | | | As at 31 December | | | | | |
| | | | | 2008 | | | 2007 | | |
| | KZT | Other foreign currency | Total | KZT | Other foreign currency | Total | KZT | Other foreign currency | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | *(KZT millions)* | | | | |
| **Assets:** | | | | | | | | | |
| Cash and cash equivalents . | 10,912 | 19,241 | 30,153 | 25,011 | 62,882 | 87,893 | 46,050 | 53,673 | 99,723 |
| Obligatory reserves ........... | 29,929 | 13,074 | 43,003 | 40,329 | 23,725 | 64,054 | 43,983 | 124,259 | 168,242 |
| Financial assets at fair value through profit or loss ..... | 54,323 | 66,325 | 120,648 | 95,738 | 32,412 | 128,150 | 55,937 | 56,238 | 112,175 |
| Amounts due from credit institutions ................. | 8,394 | 23,045 | 31,439 | 22,271 | 62,903 | 85,174 | 44,849 | 62,740 | 107,589 |
| Available for sale securities | 16,829 | 5,415 | 22,244 | 16,350 | 4,132 | 20,482 | 15,705 | 10,717 | 26,422 |
| Loans to customers ........... | 556,245 | 550,996 | 1,107,241 | 392,170 | 1,224,893 | 1,617,063 | 950,000 | 1,429,810 | 2,379,810 |
| SK Bonds......................... | 511,097 | | 511,097 | | | | | | |
| Derivative financial assets. | 30,145 | 1,201 | 31,346 | 701 | 20,949 | 21,650 | 12,287 | 19,110 | 31,397 |
| Other assets..................... | 14,148 | 17,149 | 31,297 | 14,188 | 8,812 | 23,000 | 13,706 | 5,148 | 18,854 |
| **Total assets** ................... | **1,232,022** | **696,446** | **1,928,468** | **606,758** | **1,440,708** | **2,047,466** | **1,182,517** | **1,761,695** | **2,944,212** |
| **Liabilities:** | | | | | | | | | |
| Amounts due to the Government and the NBK... | 407,477 | 434 | 407,911 | 1,320 | 398 | 1,718 | 398 | 515 | 913 |
| Amounts due to credit institutions ................. | 70,265 | 682,371 | 752,636 | 161,294 | 642,072 | 803,366 | 112,871 | 722,433 | 835,304 |
| Amounts due to customers.. | 381,587 | 301,694 | 683,281 | 461,912 | 424,140 | 886,052 | 396,012 | 256,496 | 652,508 |
| Debt securities issued........ | 714,475 | 956,113 | 1,670,588 | 211,531 | 876,195 | 1,087,726 | 179,224 | 905,221 | 1,084,445 |
| Derivative financial obligations ..................... | 2,269 | 39 | 2,308 | 1,246 | 17,543 | 18,789 | 5,467 | 61 | 5,528 |
| Provisions........................ | 1,149 | 119,451 | 120,600 | 306 | 104,587 | 104,893 | 10,436 | 141 | 10,577 |
| Other liabilities................ | 21,444 | 13,378 | 34,822 | 21,748 | 12,688 | 34,436 | 19,101 | 4,210 | 23,311 |
| **Total liabilities**............. | **1,598,666** | **2,073,480** | **3,672,146** | **859,357** | **2,077,623** | **2,936,980** | **723,509** | **1,889,077** | **2,612,586** |
| **Net balance sheet position** | **(366,644)** | **(1,377,034)** | **(1,743,678)** | **(252,99)** | **(636,15)** | **(889,514)** | **459,008** | **(127,382)** | **331,626** |

246

The following table shows currencies, for which the Group had principal positions as at 30 September 2009 by cash assets and liabilities, and also by assumed cash flow. The analysis calculates the effect of a reasonably possible movement of the currency rate against the Tenge, with all other variables held constant on the income statement. Negative amounts reflect a potential net decrease in income and positive amounts reflect a potential net increase.

| Currency | Bank's forecast as at 30 September 2009 of the likely change in FX rate against KZT in % in 2010 | Effect on pre-tax income in as at 30 September 2009 | Bank's forecast as at 31 December 2008 of the likely change in FX rate against KZT in % in 2009 | Effect on pre-tax income as at 31 December 2008 forecast | Bank's forecast as at 31 December 2007 of the likely change in FX rate against KZT in % in 2008 | Effect on pre-tax income as at 31 December 2007 forecast |
|---|---|---|---|---|---|---|
| | | *(KZT millions)* | | *(KZT millions)* | | *(KZT millions)* |
| U.S.$ | +19.1 | (131,627) | +15.4 | (61,315) | -4 | (5,591) |
| Euro | +24.3 | (65,995) | +15.2 | (22,811) | -7 | 1,044 |
| RUB | +25.4 | (9,174) | +8.3 | (1,043) | -5 | (1,681) |
| CHF | +24.7 | (6,961) | +16.4 | (3,624) | -8 | 1,609 |
| JPY | +25.3 | (60,235) | +22.4 | (47,122) | -9 | 831 |
| KGS | — | — | +15 | 517 | — | — |
| FTO | +30.3 | (3,211) | — | — | -10 | 792 |
| £ | +26.7 | (13,608) | +23.2 | (10,892) | -8 | 3,476 |
| UAH | +37.1 | 8 | — | — | — | — |

Regulation and monitoring of the net foreign currency positions of banks in Kazakhstan are carried out by the FMSA.  The FMSA defines the net open foreign currency position as the difference between the Tenge equivalent of all foreign currency assets and all foreign currency liabilities. Foreign currency assets include all foreign currency claim accounts and the total value of its forward currency purchases.  Foreign currency liabilities include all foreign currency liability accounts and the total value of its forward foreign currency sales.  The Bank provides a report on the Bank's net currency positions to the FMSA on a weekly basis.

Since its establishment, the Bank's management has attempted to maintain a currency position within current standards.  At its weekly meetings, ALCO monitors the open foreign currency position in accordance with the prevailing market conditions and outlook, advises of the Bank's position and implements the Bank's strategy accordingly.  The Bank is permitted to maintain open positions in currencies of countries with sovereign ratings of "A" or better at a level not exceeding 12.5 per cent. of equity capital, with an overall limit on all currencies not exceeding 25 per cent. of equity capital.

The following table shows the net foreign currency positions of the Bank on an unconsolidated basis as at the dates indicated in the table:

|  | As at 30 September 2009 | As at 31 December | |
|---|---|---|---|
|  |  | 2008 | 2007 |
| Net long/(short) position (U.S.$ millions) | (5,900) | 298 | 286 |
| Net position as a percentage of risk weighted capital | 60.5% | 6.6% | 7.4% |
| Net position as a percentage of foreign currency liabilities | (47.9)% | 2.0% | 2.1% |

The Bank is a party to a number of forward contracts for the purchase or sale of certain amounts of foreign currency (typically U.S. Dollars) or precious metals at an agreed upon price in Tenge with delivery and settlement at a specified future date, which are used for hedging purposes in managing currency risks.

**Interest Rate Risk**

Risk resulting from changes in interest rates is caused by the fact that changes in interest rates will affect future cash flows or fair value of financial instruments.  The following table demonstrates the sensitivity of the income statement of the Group on changes in interest rates.  Other parameters are in constants.

By sensitivity of the income statement is meant the impact of forecasted changes in interest rates on net interest income for one year, calculated based on financial assets and liabilities with a floating interest rate for the nine months ended 30 September 2009.  The sensitivity of equity is calculated by revaluing available-for-sale financial assets with a fixed rate for the nine months ended 30 September 2009, taking into account forecasted changes in interest rates based on the assumption (for each of the following tables) that yield curve is parallel.

| Currency | (Decrease)/increase in basis points 30 September 2009 | Sensitivity of net interest income 30 September 2009 | Sensitivity of equity 30 September 2009 |
|---|---|---|---|
|  | *(basis points)* | *(unaudited)* | *(KZT millions)* |
| **LIBOR:** |  |  |  |
| U.S.$ | -20/+20 | 407/(407) | 10/(10) |
| KZT | -20/+20 | (322)/322 | 63/(63) |
| Euro | -20/+20 | 153/(153) | — |
| CHF | -20/+20 | 57/(57) | — |
| JPY | -20/+20 | 349/(349) | — |

| Currency | (Decrease)/increase in basis points 31 December 2008 | Sensitivity of net interest income 31 December 2008 | Sensitivity of equity 31 December 2008 |
|---|---|---|---|
| | *(basis points)* | *(KZT millions)* | |
| **LIBOR:** | | | |
| U.S.$ ......................................................... | -59/+59 | 2,372/(2,372) | 711/(711) |
| KZT ........................................................... | -59/+59 | 1,699/(1,699) | 217/(217) |
| Euro ........................................................... | -59/+59 | 1,080/(1,080) | — |
| CHF ........................................................... | -59/+59 | 177/(177) | |
| JPY ............................................................ | -59/+59 | 804/(804) | — |

| Currency | (Decrease)/increase in basis points 31 December 2007 | Sensitivity of net interest income 31 December 2007 | Sensitivity of equity 31 December 2007 |
|---|---|---|---|
| | *(basis points)* | *(KZT millions)* | |
| **LIBOR:** | | | |
| U.S.$ ......................................................... | -46/+46 | 1,570/(1,570) | 1/(1) |
| KZT ........................................................... | -46/+46 | 719/(719) | 168/(168) |
| Euro ........................................................... | -46/+46 | 427/(427) | — |
| CHF ........................................................... | -46/+46 | 90/(90) | — |
| JPY ............................................................ | -46/+46 | 806/(806) | — |

The following table sets out the effective average interest rates by currencies for interest earning financial instruments as at the dates indicated:

| | As at 30 September 2009 | | As at 31 December | | | |
|---|---|---|---|---|---|---|
| | | | 2008 | | 2007 | |
| | KZT % | Foreign Currency | KZT | Foreign Currency | KZT | Foreign Currency |
| Financial assets at fair value through profit or loss ................. | 11.1 | 6.7 | 8.1 | 5.1 | 6.6 | 5.9 |
| Amounts due from other credit institutions ................................. | 12.9 | 5.3 | 9.7 | 7.8 | 7.6 | 10.1 |
| Available for sale investment securities..................................... | 13.8 | 8.7 | 11.1 | 3.1 | 11.2 | 3.7 |
| Loans to customers ....................... | 16.5 | 17.1 | 17.8 | 12.1 | 17.8 | 13.0 |
| SK Bonds..................................... | 7.7 | — | — | — | — | — |
| Amounts due to the NBK and the Government ................................. | 8.4 | 5.4 | 4.1 | 3.5 | 5.8 | 4.3 |
| Amounts due to credit institutions . | 9.0 | 5.3 | 7.9 | 6.2 | 8.4 | 7.1 |
| Amounts due to customers............. | 8.6 | 9.6 | 10.1 | 7.4 | 8.8 | 6.3 |
| Debt securities issued.................... | 12.4 | 8.4 | — | 8.0 | 9.8 | 9.2 |

The Bank believes that its dependency on interest rates has increased as compared to that in 2008 and 2007, as interest rates across the world have become more volatile.

A number of external debts of the Group held during 2005-2008 had swap contracts focused on hedging against FX and interest rate risks.  During April and May 2009, LIBOR significantly dropped and since the Group pays variable interest rates linked to LIBOR on external debts, the Group assumes that the risk associated with interest rates on external debts will be immaterial in the near future.

Risk related to share price changes is the risk that the fair value of a share will decrease due to changes in the level of share price.  Risk related to share price changes pertains to investment and trade portfolios.

The risk of the Group relating to share instruments is measured using the capital asset pricing model which examines the profitability of shares depending on the behaviour of the market (or of the index influencing the share) as a whole.

The tables below demonstrate the effect on income and equity (due to changes in the fair value of equity instruments accounted by fair value through income and loss and available-for-sale) as a result of potential changes in share prices, with the usage of the capital assets determination model; other parameters are taken as constant.   In the first table the model assesses the effects of positive movements in the relevant indices.   In the second table the model assess the effects of negative movements in the relevant indices.

| | As at 30 September 2009 | | |
|---|---|---|---|
| Market index | Increase in indices | Effect on profit before tax and equity | Effect on profit before tax and equity |
| | % | *(unaudited), (KZT millions)* | % |
| KASE.................................................................................................. | 72.48 | 1,278 | 4.186 |
| MSCI World Index.............................................................................. | 16.58 | 3,526 | 11.550 |
| FTSE.................................................................................................. | 10.22 | 416 | 1.363 |
| MICEX............................................................................................... | 85.44 | 50 | 0.165 |
| NYSE.................................................................................................. | 13.70 | 44 | 0.143 |
| **Total of weighted average changes of all indices influencing the portfolio**............... | **30.15** | **5,314** | **17.41** |

| | As at 30 September 2009 | | |
|---|---|---|---|
| Market index | Decrease in indices, | Effect on profit before tax and equity | Effect on profit before tax and equity |
| | *(unaudited), %* | *(KZT millions)* | *(unaudited), %* |
| KASE.................................................................................................. | -72.48 | (898) | -2.940 |
| MSCI World Index.............................................................................. | -16.58 | (2,574) | -8.431 |
| FTSE.................................................................................................. | -10.22 | (488) | -1.599 |
| MICEX............................................................................................... | -85.44 | (50) | -0.165 |
| NYSE.................................................................................................. | -13.70 | (41) | -0.135 |
| **Total of weighted average changes of all indices influencing the portfolio**............... | **-29.03** | **(4,051)** | **-13.27** |

## Operational Risk

Operational risk includes risks related to a system failure, errors of personnel, fraud or external causes.  When control systems cease to function, operational risk can damage reputation and may lead to legal proceedings and/or financial losses.  The Group cannot eliminate operational risks, but it manages it by means of a control and track system.  This control system involves implementing effective allocation of responsibilities, rights of access, authorisation and verification procedures, personnel training and evaluation procedures, including internal audits.

The Bank introduced new operational risk management software in 2009 in order to build an effective risk management system in line with international standards.  The Bank further introduced new risk management tools, such as risk maps, a database for damages in order to measure operational losses, improved risk self-assessment in its various departments and detailed reports in respect of operational risks.  The new database allows the Bank to track in a timely manner the potential damages due to operational risks in order to prevent or mitigate such risks and to assess whether compensation is due for such risks from individuals or insurance companies.  The database also allows the Bank to track operational risks and analyse the possibility of future risks.  The Bank also hired outside consultants to develop and implement a business continuity management system, which was approved by the Board of Directors along with a crises management plan for the Bank, emergency situation action plan and activities recovery plans of each of the Bank's key departments.

## Lending Policies and Procedures

### General

The Bank's credit approval process is based on applicable NBK and the FMSA regulations, as well as internal procedures established by the Management Board as approved by the Board of Directors. The FMSA regulations limit the exposure to any single borrower or group of borrowers to 10 per cent. of a bank's equity for related parties and to 25 per cent. of a bank's equity for non-related parties. The Bank will agree additional restrictions on single party and related party exposures under the New Notes.

All applications for credit by corporate and retail customers must be submitted to the Bank on its standard forms. Depending on the type of borrower and industry sector, the application is reviewed at brand level if the borrower is an SME or an individual and by the Bank's credit analysis and corporate business departments, if the borrower is a large corporation.

After an application is received by the credit analysis and corporate business departments or the relevant branch (as the case may be) an expert opinion is prepared, which contains both a feasibility evaluation of the project to be financed and information on the financial standing, reputation and experience of the potential borrower. Simultaneously, the credit analysis and corporate business departments or the relevant branch make requests to the following departments for separate research:

- the Bank's Economic Security Department is asked to obtain references from other banks and information from criminal records of the Interior Ministry;

- an outside firm is asked to make an independent assessment of the collateral being offered; and

- the Legal Department is asked to examine the potential borrower's documents for compliance with current legislation.

On the basis of the expert opinion and other reports the relevant credit analysis and corporate business departments conduct an independent risk assessment.

All corporate customers of the Bank are assigned an internal credit rating by the Bank's credit analysis and corporate business departments.

Depending on the amount sought in the credit application, a credit application is examined by the appropriate credit decision-making body of the Bank for a final decision on the approval of the application as follows:

- the Credit Committee of each branch is authorised to take decisions within lending limits established for each branch by the Credit Committee of the Head Office; this authority varies depending on the size of the branch, quality of the loan portfolio and needs of the branch's business;

- the Retail Loans Credit Committee is responsible for improving the Bank's retail loan portfolio structure and is authorised to take decisions on retail loans applications for short and long term financings up to U.S.$1,000,000 (or the equivalent);

- the Branch Network Credit Committee is authorised to take decisions on financings of up to U.S.$5,000,000 (or the equivalent) for investments and up to U.S.$10,000,000 (or the equivalent) for the replenishment of working capital; and

- the Head Office Credit Committee is authorised to take decisions on large credit contracts in excess of U.S.$5,000,000 (or the equivalent) for investments and up to U.S.$10,000,000 (or the equivalent) for the replenishment of working capital.

***Credit Dossiers***

Under normal circumstances, the Bank creates a dossier of information for each loan that it provides, including original loan agreements, security and title documents as well as up to date financial statements supplied by borrowers, opinions prepared by internal Bank departments (*e.g.*, Risk Management Department, Department of Economic Security, Legal Department and Division of Collateral Expertise), and on-going confirmations that the loans are used for the purposes provided under the original loan agreements.

In the course of the management's review of the Group's loan portfolio in early 2009, it was discovered that several deficiencies existed in the existing credit dossiers. See "*Risk Factors — Risks Relating to the Bank — The Bank's credit dossiers have serious gaps and many documents are*

*missing"*.  In particular, the credit dossiers of loans provided to borrowers in the CIS businesses that were held by BTA Russia and BTA Ukraine have not been recovered or have exhibited deficiencies.

The Bank currently is developing an electronic dossiers system, which will allow it to minimise some of the operational risks associated with credit dossiers.  In addition, the Bank plans to store all original documents at a special storehouse with the Economic Security Department, and employees will work only with electronic dossiers to minimise risks of loss or substitution of client documents.  The transition to a system of electronic dossiers is planned to be implemented during 2010–2011.

**Loan Supervision and Monitoring**

The Bank's Department of Credit and Operational Risk, operates independently from the loan approval process and is responsible for monitoring the Group's loan portfolio and determining allowances and provisions.  In order to determine adequate allowances and provisions, loans are classified by their perceived risk in accordance with criteria set out in the Bank's policies and with the requirements of the FMSA and of IFRS.  The Department of Credit and Operational Risk also conducts evaluations of other assets and off balance sheet contingent liabilities.

In 2006, the Department of Credit and Operational Risk changed its methodology for the assessment of the quality of the Group's credit portfolio in line with FMSA requirements, reclassifying all loans in accordance with IAS 39 as at 31 December 2006.  The assessment procedure was divided into individual assessment of the loans and collective assessment of the "pool" of loans.  According to IAS 39, the losses relating to amortised financial assets are measured on the basis of the "incurred loss model" as opposed to the "expected loss model".  This means that the loss is recognised only if there is objective evidence of an event of loss.

For the purposes of individual loan assessment, objective evidence of the impairment resulting from the event of loss is required.  Thereafter, potential default risk is assessed and the amount due for repayment is calculated.

For the purposes of the collective assessment, loans having similar credit risk characteristics are pooled together by sector, type of product, region, or otherwise.  Reserves required to be made in respect of such pools of loans are estimated on the basis of the historic losses for the loans within the relevant pool over a specified period (the Bank currently uses the period from 2004 to 2008 as its base period).  "Historic losses" are defined by reference to the amounts of loans outstanding and written off during the base period.

The following table sets out certain information relating to the Group's loan portfolio, by classification as at 30 September 2009 in accordance with IAS 39 standards:

|  | As at 30 September 2009 | | | |
|  | Indebtedness | % of total loans | Provisions | Provisions/ Indebtedness |
| --- | --- | --- | --- | --- |
|  | *(KZT millions)* | | | |
| Individual loans | 2,389,390 | 75.2% | 2,022,616 | 84.6% |
| Pooled loans | 786,774 | 24.8% | 46,307 | 5.9% |
| **Total loan portfolio** | **3,176,164** | **100.0%** | **2,068,923** | **65.1%** |

In classifying the Group's loan exposure, the Department of Credit and Operational Risk performs detailed credit reviews and assesses the borrower's financial condition and operating results to determine if these have deteriorated since the origination of the loan, the current performance of the borrower with regards to the timely repayment of principal and interest and whether any extensions of interest or principal payments have been granted or other modifications have been made to the original loan agreement, the quality and quantity of any collateral provided, the purpose of the loan and whether there has been any unauthorised use of the loan proceeds.  In addition to these assessments, the Department of Credit and Operational Risk performs other analytical procedures and takes into consideration any macro and microeconomic factors specifically relating to the Kazakhstan economy and the relevant industry sector.

The Department of Credit and Operational Risk controls the execution of loan policy and establishes risk limits by products, counteragents, transactions, branches and persons authorised to make lending decisions.  The Department of Credit and Operational Risk provides weekly and monthly reports to the Bank's management detailing all aspects of the Bank's credit activity.  Immediate action is taken by the departments having responsibility for supervising and monitoring loan repayments if any issue arises with respect to repayment of principal or accrued interest.  The Bank's determination of whether a repayment issue has arisen is based on a number of objective and subjective criteria, including changes to the borrower's turnover in accounts held by the Group, changes to the borrower's economic and financial activity giving rise to the suspicion that a loan is not being used for its intended purpose, applications to change credit terms, failure of the borrower to fulfil the terms and conditions of its loan agreement and refusal of a borrower to cooperate in providing updated information.

The Bank's Department of Credit and Operational Risk is also involved in overseeing the risk management activities of the target banks in which the Group holds an interest, including BTA Belarus, BTA Kazan, BTA Georgia and BTA Armenia.  While these local banks maintain their own risk management division, their policies have been streamlined with those of the Bank and only the Bank has approval authority with respect to any loan in excess of defined limits.

The Bank adopted detailed anti-money laundering policies, including extensive "know-your-client" regulations, in 1995.  On 28 August 2009, the Government passed the law "On counter measures to legalisation of income received in illegal ways (money laundering) and to financing of terrorism", which came into force from 9 March 2010.  The Bank is currently reviewing its existing "know your client" and anti-money laundering, antiterrorism financing policies to ensure that its activities comply with the new law.

Any overall deterioration in the quality of the Group's loan portfolio or increased exposure relating to off-balance sheet contingent liabilities is brought to the attention of the Bank's Management Board.

**Non-Performing Loans**

Non-performing loans are loans where the payment of principal is past due and interest is past due for more than 90 days.  The percentage of non-performing loans to gross loans was 63.0 per cent. as at 30 September 2009 and 2.1 per cent. as at 30 September 2008.

As at 30 September 2009, the Group's gross loans increased by 5.2 per cent. to KZT 3,176,164 million from KZT 3,018,937 million as at 30 September 2008.  The provisions on loans increased more than six-fold to KZT 600,354 million as at 30 September 2009 from KZT 79,466 million as at 30 September 2008.  This increase principally reflected the increase in the volume of problem and overdue loans, and also due to the practical assessment of risks by the Bank and adequate reserves for coverage of potential losses.

The Bank undertakes the following actions with regards to non performing loans: (i) devises an action plan for collection of such loans; (ii) conducts an analysis of the relevant company's financial results and activities; (iii) approves a debt repayment schedule considered to be realistic by both the Bank and the borrower; (iv) continuously monitors cash flows of the relevant company; and (v) requires additional collateral to secure such loans.  As at 30 September 2009, the ratio of the Group's provisions to gross loans was 65.1 per cent. compared to 6.8 per cent. as at 30 September 2008.

The action plans may consist of any one or more of the following actions by the Bank: (i) negotiation with the borrower to restructure the underlying debt obligation; (ii) pursuit of out-of-court enforcement against the collateral; (iii) out-of-court enforcement against the collateral with simultaneous judicial enforcement; (iv) enforcement against debtors of the borrower for amounts owed to the borrower; (v) initiation of bankruptcy proceedings against the borrower; and (vi) pursuit of remedies through other legal bodies.  Ultimately, the Department of Problem Loans will decide on the appropriate action plan.  The Recovery Units contain certain covenants relating to Recoveries in

respect of non-performing Loans. (See Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*), Annex 4 (*Terms and Conditions of the Recovery Units*)).

In the event that the Bank pursues debt restructuring with the borrower, the Bank may take one or more of several actions in respect of the underlying loan agreement, including modifying or extending the repayment schedule, changing the interest rate on the loan, cancelling or suspending penalties and fines, providing a repayment grace period or exchanging the debt for an equity interest in the borrower.  The Bank may also pursue business restructuring, which may include negotiating with the borrower's debtors to encourage repayment, transferring its claims to third parties and assisting the borrower to find new participants in its business.  Finally, the Bank may assist the borrower with organisational restructuring, including transferring the borrower's fixed assets to leases to third parties or affiliates of the Bank and providing guidance on asset management.

In the course of the management's review of the Group's internal control processes in early 2009, it was discovered that deficiencies existed that may have contributed to increased levels of non-performing loans.  See "*Risk Factors — Risks Relating to the Bank — Internal Control Weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  Failure by the Bank to adhere to their current internal control processes could lead to similar issues in the future.

**Provisioning Policy**

The provisions calculated for regulatory purposes for unconsolidated Bank's compliance information forms are based on FMSA Methodology and differ from provisions calculated based on IFRS presented in the Group's consolidated Financial Statements.  In determining provisions, the main difference between FMSA Methodology and IFRS is the treatment of collateral.  According to the FMSA methodology, provisions are created against amounts of principal of outstanding loans without taking into account accrued interest and without taking into account the value of collateral in the case of collateralised loans.  With respect to the uncollateralised loans, banks must provide provisions equal to 5.0 per cent. of the loan amount in respect of each new loan.  With respect to collateralised loans, the provisioning rate is zero per cent. for loans classified as "standard", 5.0 per cent. for loans classified as "doubtful 1st category", 10.0 per cent. for loans classified as "doubtful 2nd category", 20.0 per cent. for loans classified as "doubtful 3rd category", 25.0 per cent. for loans classified as "doubtful 4th category", 50.0 per cent. for loans classified as "doubtful 5th category", and 100.0 per cent. for loans classified as "loss".  In addition, according to the FMSA methodology, banks are not required to create provisions against accrued interest.  Under the IFRS methodology applied by the Bank, provisions are created against amounts of loans including accrued interest but less the discounted value of collateral in the case of collateralised loans.  For IFRS, provisioning rates are determined based on the type of loan (retail or corporate) and the size of the loan.  For retail loans and corporate loans not exceeding KZT 5,000 million, the Bank determines provisions based on the "roll rate" approach applied to homogenous pools of retail and SME loans, which takes into account the historical performance of each pool and does not take into account collateral value, as under the FMSA approach.  See "*Loan Supervision and Monitoring*".  For corporate loans exceeding KZT 5,000 million, the Bank conducts an individual analysis of each borrower's cash flow and the market value of collateral in order to determine provisions.  For insignificant loans (i.e., loans of less than KZT 5,000 million) as at 30 September 2009, the Bank assessed the level of impairment of such loans on an individual basis for calculation of fair market value.

**Write-off Policy**

The Bank writes-off loans that are past due by 360 days or more or at such earlier time as it is evident that a loss has been sustained and no amounts will be collected, in accordance with the conclusions of the Security Department and the Legal Department.  Once a loan has been written-off or fully provisioned, the Security Department, the Problem Loans Department and Management for the Expert Assessment and Monitoring of Security for Credits will commence monitoring the loan and its collateral for a five year period.

The following table sets out an analysis of the Group's allowance for loan impairments, including allowance in respect of amounts due from credit institutions, for the periods indicated:

| | For the nine months ended 30 September | For the year ended 31 December | |
| | 2009 | 2008 | 2007 |
|---|---|---|---|
| | | (KZT millions) | |
| Beginning allowance balance | 1,221,717 | 137,166 | 70,270 |
| Impairment charge for losses | 641,604 | 1,094,300 | 67,810 |
| Write-offs | (37,826) | (10,529) | (6,891) |
| Recoveries | 1,730 | 4,712 | 5,723 |
| Foreign currency revaluation | 289,161 | (1,320) | 2 |
| Amounts arising on business combination | — | (2,612) | 252 |
| **Ending allowance balance** | **2,116,386** | **1,221,717** | **137,166** |
| Write-offs | (37,826) | (10,529) | (6,891) |
| Recoveries | 1,730 | 4,712 | 5,723 |
| **Net write-offs** | **(36,096)** | **(5,817)** | **(1,168)** |

Net write offs for the nine months ended 30 September 2009 increased by 130.1 per cent. to KZT 36,096 million, compared to net write offs of KZT 15,689 million as at 30 September 2008. The following table sets forth certain ratios of the Group's write-offs with respect to loans to customers for periods indicated:

| | For the nine months ended 30 September | For the year ended 31 December | |
| | 2009 | 2008 | 2007 |
|---|---|---|---|
| | | (%) | |
| Percentage of net write-offs to gross loans (excluding accrued interest) | 1.25% | 0.23% | 0.03% |
| Percentage of net write-offs to the opening reserve balance | 3.0% | 4.5% | 1.2% |
| Percentage of recoveries to write-offs | 4.6% | 41.8% | 87.6% |

Net write-offs as a percentage of gross loans increased from 0.03 per cent. for the year ended 31 December 2007 to 0.23 per cent. for the year ended 31 December 2008 and to 1.25 per cent. for the nine months ended 30 September 2009, reflecting the continuing deterioration in the Group's overall asset quality over the period.

The ratio of recoveries to write-offs fluctuated throughout each of the years ended 31 December 2008 and 2007 and during the nine months ended 30 September 2009. It is difficult to assess the reasons for this fluctuation due to the timing of a write-off and the date when a recovery is made. The discounting of bad loans is not permitted in Kazakhstan and accordingly the Bank must pursue other methods of recovery. There is no industry concentration in the Group's bad loans. The Bank continues to focus on improving its bad debt recovery ratio, although no assurance can be made that any significant improvement will be achieved in the future.

## MANAGEMENT AND CORPORATE GOVERNANCE

The General Meeting of Shareholders is the highest corporate governing body of the Bank.  The Charter provides that the Bank shall have a Board of Directors and a Management Board.  The JSC Law vests in the board of directors the final approval of the majority of corporate decisions, although the final approval of certain major corporate decisions is vested in the General Meeting of Shareholders.  In accordance with Kazakhstan legislation, members of the Board of Directors are elected and their powers may be terminated early at any time by the General Meeting of Shareholders. The Chairman of the Board of Directors and Members of the Management Board are elected and their term of office may be terminated early by the Board of Directors.  The appointment of the Chairman, members of the Board of Directors and members of the Management Board is subject to the consent of the FMSA.

### Management and Corporate Governance Following the Restructuring

The Bank intends to implement a number of changes to the Bank's management and corporate governance after the Restructuring Plan is approved. The structure of the Bank's management bodies will remain unchanged and will consist of the General Meeting of Shareholders, the Board of Directors and the Management Board.  However, approval matters, composition of certain management bodies and financial and information reporting will be amended to improve the Bank's corporate governance.

### *Board of Directors*[9]

The Bank expects that a new Board of Directors will be appointed following the Restructuring, consisting of nine members, including four directors nominated by Samruk-Kazyna, two Creditor Directors nominated by the Steering Committee (one appointed on behalf of the holders of the Senior Dollar Notes and one appointed on behalf of the holders of the OID Notes) and three Independent Directors nominated by the Corporate Management and Appointments Committee.

A director is considered "independent" only if he (unless, in the case of the initial Independent Directors, the Steering Committee otherwise agrees): (i) has not been a director or an employee of the Bank or Samruk Kazyna (or any Affiliate of either) within the five years prior to 6 March 2009; (ii) has not had, within the last three years, a material business relationship with the Bank or Samruk-Kazyna (or any Affiliate of either); (iii) has no close family ties with any of the (current or former) advisers, directors or senior employees of the Bank and; (iv) holds no cross-directorships or significant links with other directors through involvement in other companies or bodies. Notwithstanding this definition, Yurki Talvite and Konstantin Korishenko will be deemed to be "independent".

Where the current Creditor Director appointed by Senior Dollar Noteholders has resigned or has been removed:

(i)       the Bank shall give notice of such event to the relevant New Notes Trustee;

(ii)      promptly thereafter, a meeting of the Senior Dollar Noteholders shall be called and the quorum at such meeting shall be Senior Dollar Noteholders holding in aggregate not less than 5 per cent. of the total Senior Dollar Notes then outstanding;

(iii)     at such meeting any candidate nominated by any holder of Senior Dollar Notes shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

---

[9] If the Senior Tenge Notes are governed by English law then all references herein to "Senior Dollar Notes" and "Senior Dollar Noteholders" should be read as "Senior Notes" and "Senior Noteholders".

(iv)    provided the meeting of the Senior Dollar Noteholders is quorate:

    (A)    if the candidate nominated by any Senior Dollar Noteholders is approved by holders of Senior Notes present in person or by proxy holding 25 per cent. of the total number of Senior Notes held by all Senior Dollar Noteholders present in person or by proxy (or if greater, a simple majority of those voting) at the meeting then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect such person to the Board of Directors; or

    (B)    if such number of Senior Dollar Noteholders do not approve the candidate nominated by the Senior Dollar Noteholders (if any) then, unless by Senior Dollar Noteholders holding 25 per cent. or more of the Senior Notes reject the candidate nominated by the Bank, then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect the Bank's nomination to the Board of Directors.

Where the current Creditor Director appointed on behalf of holders of the OID Notes has resigned or has been removed:

(i)     the Bank shall give notice of such event to the New Notes Trustee;

(ii)    promptly thereafter, a meeting of the holders of the OID Notes shall be called and the quorum at such meeting shall be OID Noteholders holding in aggregate not less than 5 per cent. of the total Discounts Notes then outstanding;

(iii)   at such meeting any candidate nominated any holder of OID Notes shall be nominated to be the replacement Creditor Director and, in addition, the Bank shall nominate a candidate to be the replacement Creditor Director;

(iv)    provided the meeting of the holders of OID Notes is quorate:

    (A)    if the candidate nominated by any holder of OID Notes is approved by holders of OID Notes present in person or by proxy holding 25 per cent. of the total number of OID Notes held by all holders of OID Notes present in person or by proxy (or if greater, a simple majority of those voting) at the meeting then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect such person to the Board of Directors; or

    (B)    if such number of holders of OID Notes do not approve the candidate nominated by the holders of OID Notes (if any) then, unless by holders of OID Notes holding 25 per cent. or more of the OID Notes reject the candidate nominated by the Bank, then the New Notes Trustee shall instruct the Bank and Samruk Kazyna to elect the Bank's nomination to the Board of Directors.

In the event any meeting of the holders of the Senior Dollar Notes or OID Notes described above does not produce a candidate to be elected as the replacement Creditor Director, a further meeting(s) shall be called and held on the same basis.

The Trustee and Samruk-Kazyna, respectively, will have the right to remove and replace any respectively nominated directors.  In the case of the Creditor Director appointed by Senior Dollar Noteholders, such holders holding in aggregate more than 25 per cent. or more of the outstanding Senior Dollar Notes may by notice to the New Notes Trustee require the resignation of that Creditor Director.  In the case of the Creditor Director appointed on behalf of the holders of the OID Notes, such holders holding in aggregate more than 25 per cent. or more of the outstanding may by notice to the New Notes Trustee require the resignation of that Creditor Director.

Unless a Creditor Director resigns or is removed as described above, each will be appointed for a term lasting up to the later of Minority Protection Expiry Date.  Following such date, the Creditor Director

may be removed from the Board of Directors without the consent of the Trustee and no replacement Creditor Director will be appointed.

***Committees of the Board of Directors***

If the Restructuring Plan is approved and the new composition of the Board of Directors becomes effective, the Bank expects that the Audit Committee and the Risk Committee will be reconstituted so that at least one Creditor Director (if then appointed to the Board) shall on each.

***New Corporate Governance Code***

The Bank will implement a New Corporate Governance Code following the Restructuring.  The Bank expects that the New Corporate Governance Code will cover the following areas:

(i)     the Board of Directors' role and responsibilities, including independence of directors, and the audit committee establishment of a remuneration committee, clear policies for risks and controls and clear terms of reference for key Board committees;

(ii)    competence of Board members, including their selection and election criteria, training, individual and collective evaluation of performance, rotation and reappointment (subject to FMSA approval) and effective supervision;

(iii)   internal controls and risk management, including a sound system of internal controls and financial reporting, risk-based management approach and risk-based capital management, identification and control of risks, quality of management information, restrictions on related party transactions and approval structures and limitations;

(iv)    disclosure and reporting, including director remuneration, Board activities, financial reporting, communication with shareholders and external stakeholders, and evidence of embedded principles, standards and processes; and

(v)     relationship with and independence from major shareholders.

***Independent Compliance Audit***

Following the Restructuring, the Bank will arrange for an annual audit of the Bank's Corporate Governance Code and (or New Corporate Governance Code as relevant) internal procedures and controls to be conducted by an independent "big four" accounting firm and will endeavour to remedy any identified non-compliance within six months of the date of such audit report.

***New Charter***

The Bank is in the process of preparing a New Charter that will reflect changes to the approval matters and required majorities.  As currently proposed, the New Charter will indicate those matters that require the approval of: (a) a Supermajority of Shareholders (requiring (i) the approval of 75 per cent. or more of the total number of Shares and (ii) *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares then in issue and provided the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote); (b) a majority of the Board including both of the Creditor Directors and at least one Independent Director; or (c) a simple majority of the Management Board of the Bank.  See "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter*".  The draft New Charter, however, remains subject to further review of the Bank and the approval of the relevant governmental bodies and therefore the types of approval matters and the required majorities for approval of such matters may change after the New Charter is finalised and registered.  Although the Bank has discussed the New Charter with the FMSA and has received its in principle approval of certain provisions thereof, some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold

such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter.  Therefore, certain protections which the Bank is seeking for its shareholders may not be available and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.  See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum*".

**Current Management and Corporate Governance**

***Board of Directors***

The Board of Directors is a permanently functioning body involved in the general management of the Bank's activities during the period between General Meetings of Shareholders except for the matters specifically reserved by the legislation of the Republic of Kazakhstan and the Bank's Charter as being within the exclusive authority of the General Meeting of Shareholders.  The powers of the Board of Directors (subject to the overview of the General Meeting of Shareholders) include deciding on the strategy of the Bank, defining the investment, credit and other policies of the Bank, nominating the Chairman and members of the Management Board, approving material contracts, calling General Meeting of Shareholders approving the Bank's budget, establishing and closing branches and representative offices, adopting decisions of the Bank on the acquisition of 10 per cent. or more of the shares in another legal entity and increases in the Bank's liabilities in excess of 10 per cent. of its equity capital.  In addition, the JSC Law requires that at least one third of the members of a company's Board of Directors must be independent directors.  All members of the Board of Directors are elected for an indefinite term.

As at 1 February 2009, immediately prior to the acquisition by Samruk-Kazyna of control of the Bank, the Bank's Board of Directors consisted of Mukhtar Ablyazov, Yerlan Tatishev, Talgat Akhsambiyev, Yurki Talvitie (Independent Director), Akmaral Ablyazova, Roman Solodchenko, Yerkin Tatishev and Tatiana Paramonova (Independent Director).

As at the same date, the Management Board of the Bank consisted of Roman Solodchenko, Dmitriy Gladkov, Timur Sabyrbayev, Raimkhan Uzbekgaliyev, Kunsulu Kapbasova, Indira Izteleuova, Khalil Kamalov, Botagoz Jardemalie, Murat Yuldashev, Karlygash Yezhenova, Genrikh Kholodzinskiy, Bakhyt Otar bekov and Zhaksylyk Zharimbetov.

Certain members of the Board of Directors and the Bank's former management have fled Kazakhstan and the Bank has commenced legal proceedings in the High Court of Justice of England and Wales in London against Mukhtar Ablyazov, the former Chairman of its Board of Directors, Roman Solodchenko, the former Chairman of its Management Board and Zhaksylyk Zharimbetov, the former First Deputy Chairman of its Management Board.  See "*Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  In February and March 2009, eight of the nine members of the Board of Directors were replaced.

The Board of Directors consists of nine members.  The following persons are the members of the Board of Directors as at the date of this Information Memorandum:

| Name | Position | Director Since |
| --- | --- | --- |
| Arman Dunayev...................................... | Chairman | 2 February 2009 |
| Anvar Saidenov..................................... | Member | 2 February 2009 |
| Abay Iskandirov.................................... | Member | 6 March 2009 |
| Kairat Aitekenov.................................... | Member | 6 March 2009 |
| Aidan Karibzhanov ................................. | Member | 6 March 2009 |
| Ulf Wokurka ......................................... | Member, Independent Director | 6 March 2009 |
| Konstantine Korishchenko...................... | Member, Independent Director | 6 March 2009 |
| Yerlan Tatishev....................................... | Member | 6 March 2009 |
| Yurki Talvite........................................... | Member, Independent Director | 7 September 2006 |

The business address of all members of the Board of Directors is 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Republic of Kazakhstan.

*Arman Dunayev — Chairman, Board of Directors*.  Mr. Dunayev graduated from Kazakh State University named after Kirov in 1988, majoring in Political Economy, and received a Candidate of Economic Science degree at Moscow State University named after M. Lomonosov in 1991.  During the period from 1992 to 1993 Mr. Dunayev worked within local state executive bodies in management positions.  For the next seven years, he worked in the head offices of holdings and a commercial bank in positions of increasing responsibility.  Mr. Dunayev returned to state service in 2000.  He was appointed Director of the Department of State Borrowing, Finance Ministry of the Republic of Kazakhstan from 2000 until May 2001.  From May 2001 until September 2002, Mr. Dunayev held the post of Vice-Minister of Finance of Kazakhstan.  On 4 September 2002, Mr. Dunayev was appointed Vice-Minister of Economics and Budget Planning.  In June 2003 he was appointed Chairman of the "**National Innovation Fund**" CSC and First Vice-Minister of Finance from March to April 2004.  From January 2006 to January 2008, Mr. Dunayev was the Chairman of the FMSA.  From January until October 2008, Mr. Dunayev was Chairman of JSC "Sustainable Development Fund Kazyna" and from October 2008 until February 2009, Vice-Chairman of Samruk-Kazyna.  On 3 February 2009 Mr. Dunayev was appointed Chairman of the Board of Directors by the decision of the Board of Directors.

*Anvar Saidenov — Member of the Board of Directors*.  Mr. Saidenov graduated magna cum laude from the Economic Faculty of Moscow State University named after M. V. Lomonosov and received a qualification of Economist and Lecturer of Political Economy.  Mr. Saidenov further received a Master of Science degree in Financial Economics from London University in 1994 and a degree of Candidate of Economic Science degree from Moscow University.  Mr. Saidenov's started his professional career as a Lecturer and Head of Sector at the Social and Economic Disciplines at Dzhambul Irrigation and Construction Institute.  In 1994, Mr. Saidenov joined EBRD as a consultant and banker in London.  In 1996, he was appointed Deputy Governor of the NBK and in 1998 was appointed Executive Director of the State Investment Committee.  During the period from January to August 1999, Mr. Saidenov held the post of Chairman at the Investment Agency of the Republic of Kazakhstan that was followed by his appointment as Vice-Minister of Finance of Kazakhstan until August 2000 when he was appointed Chairman of the Executive Board at "National Savings Bank" JSC.  In June 2002 Mr. Saidenov joined the NBK first as Deputy Governor and then as of January 2004 as Governor.  On 2 February 2009 Mr. Saidenov was appointed Member of the Board of Directors.  On 16 February 2009 he was appointed acting Chairman of the Management Board of the Bank by a decision of the Board of Directors.  On 21 February 2009, he became Chairman of the Management Board.

*Abai Iskandirov — Member of the Board of Directors.*  Mr. Iskandirov received a law degree from the Kazakh State Law University in 2003, an LLM degree from Oxford Brookes University in 2004 and MSc IM from Oxford Brookes University in 2005.  Mr. Iskandirov's professional experience started in 2005 at the Ministry of Economics and Budget Planning where he held positions of increasing

responsibility, from Specialist to Deputy Director.  In October 2006 Mr. Iskandirov joined Fund for Sustainable Development "Kazyna" JSC as Director Systems Project, and then Director of Corporate Development, Director of Investment and Managing Director effective September 2007.  In 2008, Mr. Iskandirov was appointed Deputy Leader at the Centre of Strategic Development and Analysis at the President's Office.  In October 2008, he was appointed Managing Director of Samruk-Kazyna.  On 6 March 2009, he was appointed Member of the Board of Directors.

*Kairat Aitekenov — Member of the Board of Directors.*  Mr. Aitekenov graduated from Almaty Institute of National Economy and qualified as an Economist in 1985.  In 1997, Mr. Aitekenov graduated from the National Higher School of State Management under the auspices of the President's Office from the faculty of "Public Administration".  Mr. Aitekenov's professional experience includes positions at Kostanay Oblast Committee on Price and Antimonopoly Policy, Agency of Strategic Planning of the Republic of Kazakhstan and Ministry of Natural Resources and Environment Protection of the Republic of Kazakhstan.  During the period from August 2003 to February 2006, Mr. Aitekenov held the post of Vice-Minister of Economics and Budget Planning of the Republic of Kazakhstan and Vice-Minister of Tourism and Sports from August 2006 to August 2007.  In September 2007, Mr. Aitekenov was appointed Deputy Chairman on Government Affairs and Operations of Samruk-Kazyna.  On 6 March 2009, he was appointed Member of the Board of Directors.

*Aidan Karibzhanov — Member of the Board of Directors.*  Mr. Karibzhanov graduated from Moscow State Institute of International Relations under the auspices of the Ministry of Foreign Affairs of the Russian Federation from the faculty of "International Economic Relations".  Mr. Karibzhanov has professional experience as a consultant and top manager with the State Privatization Committee of the Russian Federation, Representative Office of Credit Commercial De France in Kazakhstan, as 1st Vice-Chairman at Investment Bank Global Kazkommerts CSC, as Director at Kazkommerts Securities and as Managing Director of Kazmunaygaz CJSC.  During the period from August 2005 to February 2007, Mr. Karibzhanov was President at "VISOR Investment Solutions" JSC.  In December 2008, Mr. Karibzhanov was appointed Managing Director at Samruk-Kazyna.  On 6 March 2009, he was appointed Member of the Board of Directors.

*Ulf Wokurka — Independent Member of the Board of Directors.*  Mr. Wokurka graduated from the University named after Martin Luther in Germany and from Moscow State Institute of International Relations under the auspices of the Ministry of Foreign Affairs of the Russian Federation from the faculty of International Relations.  Mr. Wokurka's professional experience started in 1990 at Deutsche Bank AG.  From 1993 until 1994 he headed the Representative Offices of Deutsche Bank AG and Morgan Grenfell & Co.  Limited in Kazakhstan.  In 1996 Mr. Wokurka worked in Deutsche Bank's Primary Commodities Group.  From 2006 until 2008 he held a post of Vice-Chairman and Member of the Executive Board at State Assets Management Holding Company "Samruk".  Mr. Wokurka has been a member of the International Council of the Regional Financial Centre Almaty since February 2007, Independent Director of the Board of Directors at Kazakhstan Development Bank since April 2007 and Independent Director of the Board of Directors of Kazyna Capital Management JSC since September 2007.  On 6 March 2009 Mr. Wokurka was appointed Independent Director of the Board of Directors.

*Konstantine Korishchenko — Independent Member of the Board of Directors.*  Dr. Korishchenko graduated from Moscow State University named after M. V. Lomonosov from the faculty of "Applied Mathematics".  Dr. Korishchenko holds a Ph.D. in Economics.  During the period from 1984 until 1988, Dr. Korishchenko worked at the Scientific Research Institute "Scientific Centre" as an engineer, then joined the All State Scientific Research Institute for polygraphic industry.  From 1992 to 1995, Dr. Korishchenko worked in the Securities Department of the Central Bank of the Russian Federation as Secondary Market Department Manager and as Deputy Head of the Exchange Department.  Over the next five years, Dr. Korishchenko served as the Deputy Director and the Director of Open Market Operations at the Securities Department of the Central Bank.  From 2000 to 2001, Dr. Korishchenko was the President at the Non-profit Partnership "RTS Exchange".  From 2001 to 2002 he held the post of Managing Director at "Investment Company Troika Dialog" CJSC.  From July 2002 until

September 2008 Dr. Korishchenko, was Vice-Chairman and Member of the Board of Directors of the Central Bank of the Russian Federation.  Since September 2008 Dr. Korishchenko has served as President of the Russian Exchange "Moscow Interbank Currency Exchange — Information Technologies".  On 6 March 2009, Dr. Korishchenko was appointed Independent Director of the Board of Directors.

*Yerlan Tatishev — Member of the Board of Directors*.  Mr. Tatishev graduated from Almaty Institute of National Economy in 1991, majoring in "Planning of National Economy" and received his qualification as an "economist".  In 1993-1994, he worked as Vice-Chairman of the Executive Board of JSC "Astana Holding".  From 1994 to 2000, he started work at Kazkommertsbank initially as the Saving Department Head and thereafter holding management positions, including as Director of Branches Management and Development Department and Director Strategic Development.  From 2000 to 2005 he was the Vice-Chairman of the Executive Board of Temirbank.  From 2005 he began working at JSC Bank TuranAlem as an Adviser to the Chairman.  Since June 2005, he has been a Member of the Board of Directors of JSC Bank TuranAlem.  On 6 March 2009, Mr. Tatishev was appointed as a Member of the Board of Directors.

*Yurki Talvite — Independent Member of the Board of Directors*.  In 1991 Mr. Talvite received a degree in International Finance and a Masters degree in Juridical Science from the University of Helsinki and an Executive MBA from the London Business School in 2002.  From 1990 to 1992, he worked as Manager in SCORP field in Helsinki.  From 1992 to 1993, he served as Vice-President of Union Bank of Finland, Helsinki.  From 1993 to 1995 he headed the Representative Office in Moscow and was Vice-President of Scandinavian Bank Partners (Merita Bank, Den Norske Bank, Skandinaviska Enskilda Banken, Unibank).  From 1995 to 1997, he was the Head of the Representative Office in Moscow and the Vice-President of New-York Bank.  From 1997 to 2000 he was Vice-President in charge of the Department of Eastern Europe of New-York Bank, in London, and simultaneously a member of the Executive Board of Registrar Company, Moscow.  From 2000 to 2003, he was Vice-President and Manager of New-York Group Bank, London.  In 2003 he was appointed Senior Vice-President of BNP Paribas Securities Services, Paris.  From 2003 to 2005 he served as the Head of International Trade and General Manager of Financial Corporation URALSIB, Moscow.  Since 2005, he has been Head of the Representative Office of East Capital, Moscow.  In 2006, he became a member of Board of Directors.

### Committees of the Board of Directors

The following is a description of the committees of the Board of Directors.  Currently, as the Bank pursues the Restructuring, the Bank expects that membership of the committees as reflected below may be subject to change until the completion of the Restructuring.

*Internal Audit Service*

The Internal Audit Service exercises control over the Bank's financial and economic activities.  Under the Charter, the Internal Audit Service monitors the following aspects of the Bank: (i) the Bank's internal control system; (ii) the completeness and effectiveness of the Bank's risk assessment methodology and the Bank's risk management procedures; (iii) the effective operation of information systems, including the integrity of databases and their protection from unauthorised access, as well as the availability of emergency plans (including a plan of business recovery, a plan for continuity of business and a plan of crisis management); (iv) the accuracy, completeness, objectivity and timing of accounting and reporting; (v) the accuracy, completeness, objectivity and timing of all filings under Kazakhstan law; (vi) the economic viability and effectiveness of the Bank's operations; (vii) the compliance of the Bank's internal documents with Kazakhstan laws; and (viii) the Bank's human resources department.

The Internal Audit Service has the following structure:

1.      Internal Audit Division:

- Head Office Audit Section;

- Branch Network Audit Section; and

- Subsidiary Companies and Banks Audit Section.

2.      Information Systems Audit Division, which includes the Information Security Audit Section.

The Internal Audit Service is appointed by and is directly accountable to the board of directors and is supervised by the Internal Audit Committee.

Pursuant to the Charter, the office of any member of the Internal Audit Service may be terminated at any time by a resolution of the Board of Directors.

*Internal Audit Committee*

The Internal Audit Committee: (a) discusses the Bank's financial statements with the Management Board and external auditor; (b) analyses the functioning and assessment of internal control system efficiency; (c) sets aggregate limits on transactions with financial instruments as well as limits accepted in the international practice; (d) performs occasional checks of the Bank's strategy; (e) issues recommendations to the Board of Directors on identifying, appointing and re-appointing the external auditor; (f) coordinates the work of external auditors; (g) considers audit results; (h) approves audit terms and remuneration for services; (i) assesses the external auditor's qualification, competence and independence; (i) assesses the efficiency of the audit processes; (j) monitors the activities of the Internal Audit Service; (k) assesses the efficiency of internal audit functions and observation of laws by the Bank; and (l) approves the register of persons affiliated to the Bank.

The Internal Audit Committee is comprised of at least three members, each with a term of office of three years.  The committee is headed by the Chairman and each member of the committee must be a member of the Board of Directors, an officer of the Bank or a person nominated by the Board of Directors.  At least one member of the Internal Audit Committee must be independent.  The Internal Audit Committee meets as necessary, but no less than once every three months.

As at the date of this Information Memorandum, the Internal Audit Committee consists of the following five members, as approved by a resolution of the Board of Directors dated 13 March 2009:

| Name | Position |
| --- | --- |
| Ulf Wokurka ............................... | Chairman, Member of Board of Directors (Independent Director) |
| Yerlan Tatishev ........................... | Member, Member of Board of Directors |
| Kairat Aitekenov ......................... | Member, Member of Board of Directors |
| Yurki Talvite ............................... | Member, Member of Board of Directors (Independent Director) |

For the biographies of Mr. Wokurka, Mr. Tatishev and Mr. Talvite, see "*Board of Directors*".

*Risk Committee*

The Risk Committee is an advisory and consultative body under the Board of Directors, engaged in analysis, assessment and control and risk minimisation in order to strengthen the Bank's financial stability.  The aim of the committee is to provide recommendations to the Board of Directors in relation to the creation and functioning of the Bank's risk management system.

The Risk Committee provides the Board of Directors with: (a) recommendations on improving the methodology for management, measurement, assessment and monitoring of risks; (b) approval of risk evaluation card, risk profile and risk reporting forms for further approval of the Board of Directors; (c) approval of internal normative documents related to the Bank's risk management;

(d) recommendations for the allocation of maximum acceptable equity losses under risk transactions and risk minimisation; and (e) approval of action plans to implement risk management principles under Basel II in the Bank. The committee is entitled to request any information related to risk management in the Bank.

The Chairman of the Risk Committee is a member of the Board of Directors who is approved by the Board of Directors. The committee consists of a minimum of two members of the Board of Directors and the Deputy Chairman of the Management Board supervising risk management issues in the Bank. The committee may also be composed of the Bank's department directors responsible for risks as well as other persons nominated by the Chairman of the Risk Committee.

The Risk Committee meets monthly. As at the date of this Information Memorandum, the members of the Risk Committee are:

| Name | Position |
| --- | --- |
| Yerlan Tatishev | Chairman, Member of Board of Directors |
| Ulf Wokurka | Member, Member of Board of Directors (Independent Director) |
| Yurki Talvite | Member, Member of Board of Directors (Independent Director) |
| Anvar Saidenov | Member, Member of Board of Directors |
| Abay Iskandirov | Member, Member of Board of Directors |

For the biographies of Risk Committee members, see "*Board of Directors*".

*Corporate Management and Appointments Committee*

The Corporate Management and Appointments Committee advises and consults with the Board of Directors in order to improve the Bank's management by developing guidelines as to the human resources policy and motivation policy.

The committee: (a) recommends qualification requirements to the Board of Directors in respect of the Bank's executives, managing directors and corporate secretary; (b) considers applicants for positions to be approved by the Board of Directors; (c) provides recommendations on early termination, remuneration and bonuses to persons to be approved by the Board of Directors; (d) provides recommendations in respect of the labour contract for the Chairman of the Management Board; (e) performs comparative analyses of the pay level and policy of chairman of members of the Management Board, Internal Audit Service employees, corporate secretary, and managing directors; (f) provides recommendations to the Board of Directors in relation to nominations to the boards of directors of subsidiaries and associates and their qualification requirements.

The Corporate Management and Appointments Committee is composed of at least three members of the Board of Directors, including at least two independent directors. The committee holds meetings as scheduled by the chairman of the committee. Extraordinary meetings are held pursuant to a decision of the chairman of the committee, at the request of a committee member, or at the request of the Board of Directors.

As at the date of this Information Memorandum, the members of the Corporate Management and Appointments Committee are:

| Name | Position |
| --- | --- |
| Dunayev Arman | Chairman, Chairman of Board of Directors |
| Ulf Wokurka | Member, Member of Board of Directors (Independent Director) |
| Anvar Saidenov | Member, Member of Board of Directors |
| Konstantine Korishchenko | Member, Member of Board of Directors (Independent Director) |

For the biographies of members of the Corporate Management and Appointments Committee, see "*Board of Directors*".

*Management Board*

The Management Board is responsible for the day-to-day management and administration of the Bank's activities.  The Management Board possesses all executive powers.  The Management Board's responsibilities include making executive business decisions, implementing the Bank's business strategy, appointing senior management and branch representatives of the Bank and dealing with all other matters not reserved to the Board of Directors or the General Meeting of Shareholders.

The internal by-laws of the Management Board are fixed by the Board of Directors, which also appoints the members of the Management Board.  The Management Board has a duty to fulfil decisions approved by the General Meeting of Shareholders and the Board of Directors.  Shareholders and employees (whether or not shareholders) are eligible to become members of the Management Board.  Members of the Management Board are permitted to act in other capacities for other entities only with the prior consent of the Board of Directors.

As at the date of this Information Memorandum, the members of the Management Board are:

| Name | Position |
| --- | --- |
| Anvar Saidenov | Chairman of the Management Board |
| Nikolay Varenko | The First Deputy Chairman of the Management Board |
| Berik Otemurat | Deputy Chairman of the Management Board |
| Sergey Yeltsov | Deputy Chairman of the Management Board |
| Abilakim Zhumakhmetov | Deputy Chairman of the Management Board, Director of Astana Branch |
| Natalya Loginova | Managing Director, Member of the Management Board |
| Kunsulu Kapbasova | Managing Director, Member of the Management Board |
| Saida Abuova | Managing Director, Member of the Management Board |

For a biography of Mr. Saidenov, see "*Board of Directors*".

*Nikolay Varenko — First Deputy Chairman of the Management Board.*  In 1994, Mr. Varenko graduated from Moscow State Institute of International Relations and qualified as Economist.  In 1995, he received a Banking and Finance degree from the London School of Economics and received an MBA from St. Anna College at Oxford University.  Mr. Varenko's professional experience started in 1994 first at the State Property Committee of the Russian Federation, then at the Russian Privatization Centre as well as at the Representative Office of Deloitte & Touche in Moscow.  During the period from 1997 until 2001, Mr. Varenko held the post of Director of Corporate Finance at "Kazkommerts Securities" JSC.  From 2003 to 2004, Mr. Varenko was a member of the board of directors of "Himpharm" JSC, chairman of the board of directors at "Central Asia Cement" JSC, and chairman and board member of "Compass" Investment Management Company.  Mr. Varenko has been the President of "Venture Fund Advant" SC since 2005 and chairman of the board of directors at "Visor Investment Solutions" JSC since 2001.  On February 9, 2009, Mr. Varenko was appointed Vice-Chairman of the Bank.  In August 2009, Mr. Varenko was appointed the First Deputy Chairman of the Management Board of the Bank.

*Berik Otemurat — Deputy Chairman of the Management Board.*  Mr. Otemurat graduated with honors from Zhambyl Kazakh-Turkish Accounting and Economics College in 1999 with a specialty in banking.  In 2003, he graduated from Kazakh Institute of Management, Economics and Strategic Research (KIMEP) with Bachelors of Science in Business Administration and Accounting with a specialisation in Finance.  He began his career in 2003 as an audit expert at Ernst & Young.  From 2005 to 2007, Mr. Otemurat worked as the CFO at Paragon Development.  From 2007 to 2008 he worked at "Sustainable Development Fund "Kazyna" JSC as a senior manager of Corporate Financing Department.  From 2008 to 2009, he served as Director of Corporate Financing Department in "National Welfare Fund "Kazyna" JSC and from October 2009 as Director of Corporate Finance Department at Samruk-Kazyna.  From June 2009 to March 2010, Mr. Otemurat was a Managing Director and member of the Management Board of the DBK.  On March 18, 2010, he was appointed Deputy Chairman of the Management Board of the Bank.

*Abilakim Zhumakhmetov — Deputy-Chairman of the Management Board.*  In 1981, Mr. Zhumakhmetov graduated from Karaganda Co-operative Institute, majoring in Accounting.  In 1984, he graduated from Moscow Cooperative Institute, specialising in Accounting and received a qualification as a teacher of cooperative technical school.  During the period of 1984-1989, he worked as an assistant, then as a Professor of Karaganda Cooperative Institute.  In 1993, he received a PhD in Economic Science.  In 1994, he worked as a specialist in the Branch Offices Management Department at Kazkommertsbank.  From 1995 until 1998, he served as the Director of the Kzylorda Branch office of Kazkommertsbank.  Since 1998, he has worked at the Bank, beginning in the position of Director of Kzylorda branch office.  Since August 2000, he has been Deputy-Chairman of the Management Board of the Bank.

*Sergey Yeltsov — Deputy Chairman of the Management Board.*  In 1997, Mr. Yeltsov graduated from the Kazakh Institute of Law and International Relations with an International Law specialty and qualification as a lawyer (international lawyer).  In 2005, he graduated from the Almaty Academy on Economics and Statistics, with a Finance and Credit specialty and qualification as an economist.  Mr. Yeltsov started his career in 1995 at the Ministry of Industry and Trade of the Republic of Kazakhstan.  From 1998 to 1999, he was a Senior Specialist at the non-commercial Legislation Section of the Financial Authorities Activity Maintenance Division, Legal Service Department and the Deputy Head of Claim Arrangement Division of the Finance Legal Service Department at the Ministry of Finance of Kazakhstan.  From 1999 to 2000, he worked at OJSC "Kazakhtelecom" and in CJSC "National Law Service" in the Ministry of Justice of the Republic of Kazakhstan.  From 2000 through 2007, he worked as a lawyer and as a Head of Legal Department in "Kazphosphate" LTD.  At the same time from 2002 to 2004 he held the position of the Chairman of the Board of Directors of OJSC "Vasilkovskiy GOK".  From 2007 through 2008 he was a Head of Legal Department, Managing Director-Head of the Unit under the President of OJSC "Vasilkovskiy GOK".  Since 2007, he has been an out-of-the-staff Advisor to the Chairman of the Management Board of JSC "IC"Kazkommerce-Polis".  From 2008 until 2009, Mr. Yeltsov served as the Legal Department Head and Chairman of the Management Board of JSC "Investment Fund of Kazakhstan".  In December 2003 he passed an examination for the position of Judge in the Qualification College of Justice of the Republic of Kazakhstan and was accepted to the reserve Judges of the Republic of Kazakhstan.  Since 2001 he has been a judge of the International Court of Arbitration.  On August 24, 2009, Mr. Yeltsov was appointed a Deputy Chairman of the Management Board of the Bank.  On October 7, 2009, by the decision of the Board of Directors, Mr. Yeltsov was appointed to the position of the Bank's Compliance-Controller.

*Natalya Loginova — Managing Director, Member of the Management Board.*  In 1986, Ms. Loginova graduated from the Kazakh Polytechnic Institute with a specialty in Automated Management Systems.  In 1997 she graduated from Almaty Banking School with a speciality in Banking.  She started her career in 1991 as an engineer-programmer in the Computer Center of Kazakh Republican Bank of USSR State Bank.  In the period from 1994 to 1997 she worked at the NBK, beginning as an Economist of the Improvement of Accounting and Reporting Group and ending as a Chief Economist.  In 1997, she started working for the Bank.  From 1997 to 2009 she worked as a Chief of the Budget Planning Division, then Director of the Financial Controlling Department.  In December 2009, she was appointed as a Managing Director of the Bank and in January 2010 Ms. Loginova was appointed a member of the Management Board of the Bank.

*Kunsulu Kapbasova — Managing Director, Member of the Management Board.*  In 1996, Ms. Kapbasova graduated from Kazakh State Economic University with a specialty in Finance and Credit.  In the period from 1995 to 1998, she worked as an expert at different levels at the Economic Analysis Department in Kazkommertsbank, Almaty.  In 1998, she headed the Financial Analysis Department of Kazkommertsbank.  In 1998, she received a diploma with honours from the Maastricht School of Management at the direction of Financial Management (Netherlands).  In 2000-2002, she served as deputy director of the Marketing Department of Kazkommertsbank.  In 2002, she headed the Marketing Department of Kazkommertsbank.  In 2005, she became Director of the former Retail Products Department of the Bank.  In July 2009, she was appointed a Managing Director of the Bank.

*Saida Abuova — Managing Director, Member of the Management Board.* In 1994, Ms. Abuova graduated from Kazakh State Academy of Management with a degree in Finance and Credit. In 2000, she graduated from the Kazakh Institute of Management, Economics and Strategic Research, receiving an MBA degree. Since 2000, she has worked in various leadership positions, including as Managing Director at JSC Kazinvestbank, Chairman of the Board of Directors of JSC "ATF Polis", Vice Chairman of the Management Board of JSC "Demir Bank Kazakhstan". In October 2009, she was appointed a Managing Director of the Bank.

### Committees of the Management Board

*Asset and Liability Management Committee*

ALCO is responsible for the execution of policy with respect to the asset and liabilities management of the Bank and for setting rates for banking products. See "*Asset and Liability Management — Asset and Liability Management Committee*". The committee meets weekly. The members of ALCO are:

| Name | Position |
| --- | --- |
| Tsurkan Oleg | Chairman, Managing Director |
| Kunsulu Kapbasova | Member, Managing Director, Member of the Management Board |
| Natalya Loginova | Member, Managing Director, Member of the Management Board |
| Baglana Toyganbaeva | Member, Director of Department of Asset Restructuring |
| Nurlan Mukhametzhanov | Member, Treasurer |
| Timur Sabyrbaev | Member, Managing Director |
| Gulnara Tleukulova | Member, Managing Director |
| Marina Tormasheva | Member, Managing Director |

*Product Committee*

The Product Committee is responsible for making decisions on issues related to the development, modification and implementation of new and modified competitive banking products in the market to ensure performance of sales plans, achievement of the given market positions and overall financial performance of the Bank. The committee meets weekly. The members of the Product Committee are:

| Name | Position |
| --- | --- |
| *Section for working with products for legal entities* | |
| Sergey Yeltsov | Chairman, Deputy Chairman of the Management Board |
| Ekaterina Prikhodko | Member, Deputy Director of the Department of Analysis and Corporate Business Development |
| Marlen Zhakezhanov | Member, Managing Director |
| Erik Iklasov | Member, Deputy Director of Department of Small and Medium Business |
| Luiza Satvoldinova | Member, Deputy Chief of Legal Corporate Business Support Division, Legal Department |
| Marina An | Member, Deputy Chief of Division of Small and Medium Business Credit Risks, an internal division of the Department of Credit and Operational Risks |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of the Department of Credit and Operational Risks |
| Akbota Temirbekova | Member, Chief of the Section of Development and Implantation of New Technologies of Corporate Business, internal division of Business Technologies Department |
| Natalya Loginova | Member, Managing Director, Member of the Management Board |
| Saule Yusupova | Member, Director of Main Operational Department |

| Name | Position |
|---|---|
| *Section for working with products for individuals* | |
| Ramazan Basibekov.................... | Member, Chief of Branch Network of Economic Security Division, an internal division of the Economic Security Department |
| Kunsulu Kapbasova .................... | Member, Managing Director, Member of the Management Board |
| Tatiana Fedorova ....................... | Member, Director of Retail Marketing Department |
| Bekbolat Isabaev......................... | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Adilzhan Nugmanov ................... | Member, Chief of Operational Risk Division, an internal division of the Department of Credit and Operational Risks |
| Evgeniya Lopatina ..................... | Member, acting Chief of the Division of Product Technologies, internal division of Business Technologies Department |
| Natalya Loginova........................ | Member, Managing Director, Member of the Management Board |
| Saule Yusupova .......................... | Member, Director of Main Operational Department |
| Rinat Shaibakov .......................... | Member, Chief of Information and Analytical Division, an internal division of Economic Security Department |
| Serik Kuzhamkulov .................... | Member, Deputy Chief of Division of SME Branch Network and Retail Business Legal Support, an internal division of the Legal Department |

*Credit Committee of Head Office*

The Credit Committee of the Head Office is responsible for the organisation, execution and control over the lending procedures of the Bank.  The committee makes decisions regarding issuing any types of financing, setting limits for financing the other credit committees and contractor banks.  The committee meets twice per week.  The members of the Credit Committee of the Head Office are:

| Name | Position |
|---|---|
| Nikolay Varenko.......................... | Chairman, First Deputy Chairman of the Management Board |
| Zhanat Asylbek ........................... | Member, Managing Director |
| Marina Tormasheva .................... | Member, Managing Director |
| Galym Omarov............................. | Member, Director of Department of Credit and Operational Risks |
| Irina Telegina ............................. | Member, Deputy Director of Legal Department |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |
| Zhamilya Maxatbek ................... | Member, Managing Director |

*Regional Credit Committee of Head Office*

The Regional Credit Committee of Head Office is responsible for executing and controlling the lending procedures of the Bank within the Russian Federation.  The committee meets weekly.

The members of the Regional Credit Committee of Head Office are:

| Name | Position |
|---|---|
| Nikolay Varenko.......................... | Chairperson, First Deputy Chairman of the Management Board |
| Zhamilya Maxatbek ..................... | Member, Managing Director |
| Gulnara Tleukulova .................... | Member, Managing Director |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |
| Zaure Kuatbekova....................... | Member, Chief of Legal Corporate Business Support Division, Legal Department |
| Baglana Toyganbaeva................. | Member, Director of Department of Asset Restructuring |

*Major Credit Committee for HO Retail Business*

The Major Credit Committee for HO Retail Business is responsible for ensuring compliance of retail financing with the credit policy of the Bank and making decisions on non-standard extra-limit retail loans as well as loan applications in amounts exceeding the limit of Minor Committee for HO Retail Business.  The committee also considers disputes related to the Bank's credit procedure.  The committee does not meet on a regular basis, but instead only when necessary.

The members of the Major Credit Committee for HO Retail Business are:

| Name | Position |
| --- | --- |
| Nikolay Varenko | Chairperson, First Deputy Chairman of the Management Board |
| Kunsulu Kapbasova | Member, Managing Director, Member of the Management Board |
| Bekbolat Isabaev | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |

*Minor HO Retail Business Credit Committee*

The Minor HO Retail Business Credit Committee is responsible for ensuring compliance of retail financing with the credit policy of the Bank within the limits set by the Credit Committee of Head Office.  The committee considers issues on improving credit procedures within the Bank, improving financial analysis of borrowers, structuring of transactions, cooperation of departments during application consideration and further monitoring.  The Minor HO Retail Business Credit Committee also considers and makes decisions on non-standard extra-retail loans as well as loan applications in amounts exceeding the limit of the Credit Committee of Branch Network.  Furthermore, the committee establishes the authority of persons and the limits of powers in the Bank's branches and approves the methodologies and instruments to assess the solvency of Borrowers.  The Minor HO Retail Business Credit Committee meets daily.

The members of the Minor HO Retail Business Credit Committee responsible for loan applications are:

| Name | Position |
| --- | --- |
| Kunsulu Kapbasova | Chairperson, Managing Director |
| Dosym Enkebaev | Member, Chief of Loan Division, an internal division of the Retail Sales Department |
| Serik Meirzhanov | Member, Head of the Division of Credit Applications Analysis of Retail Business Risk Department, an internal division of the Department of Credit and Operational Risks |

The members of the Minor HO Retail Business Credit Committee responsible for product applications are:

| Name | Position |
| --- | --- |
| Kunsulu Kapbasova | Chairperson, Managing Director |
| Dosym Enkebaev | Member, Chief of Loan Department, an internal division of the Retail Department |
| Bekbolat Isabaev | Member, Deputy Chief of Division of Retail Business Risks and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Madina Utegulova | Member, Head of Retail Products Development Section of Retail Products Development Division, an internal division of the Retail Marketing Department |

*Customer Committee of Corporate Business*

The Customer Committee of Corporate Business is responsible for monitoring the Bank's policies in respect of servicing corporate customers, corporate banking products and diversification of the corporate business customer base.  The committee meets weekly.

The members of the Customer Committee of Corporate Business are:

| Name | Position |
| --- | --- |
| Marina Tormasheva .................... | Chairperson, Managing Director |
| Zhanat Asylbek .......................... | Deputy Chairman, Managing Director |
| Darkhan Kaliev ........................... | Member, Director of Department of Credit Analysis of Corporate Business No. 2 |
| Kunsulu Kapbasova ................... | Member, Managing Director |
| Oleg Tsurkan............................... | Member, Managing Director |
| Dina Palymbetova....................... | Member, Director of Department of Analysis and Corporate Business Development |
| Timur Sabyrbaev......................... | Member, Managing Director |
| Tuleu Ashlyaev ........................... | Member, Director of Economic Security Department |

*Customer Committee of SME Business*

The main objective of the Customer Committee of SME Business is to maximise profitability from customer service, achieve sales growth of the Bank's products and increase the customer base of SMEs.  The Customer Committee of SME Business meets once per week.

The members of the Customer Committee of SME Business are:

| Name | Position |
| --- | --- |
| Marlen Zhakezhanov ................. | Chairman, Managing Director |
| Aigul Turebaeva.......................... | Member, Head of Analytics and Marketing Section of Support Division of Small and Medium Business, an internal division of Department of Small and Medium Business |
| Lasker Murzabekov ................... | Deputy Director of Department of Small and Medium Business |
| Meruert Zhunusova..................... | Member, Head of the Monitoring and Control Section, SME Division of the Department of Small and Medium Business |
| Madiyar Kasenov ........................ | Member, Head of Micro and Small Business Expertise Section of Credit Business Division, an internal division of the Department of Small and Medium Business |
| Asyl Dautbaev.............................. | Member, Chief of Client Operations Division, an internal division of the Treasury |
| Andrey Tskhay............................. | Member, Chief of Support Division for Small and Medium Business, an internal division of Department of Small and Medium Business |
| Shuhrat Tairov ............................ | Member, Chief of Non credit Business Section, an internal division of Department of Small and Medium Business |

*HO NPL Committee*

The HO NPL Committee is responsible for monitoring the Bank's loan portfolio to determine payment delays and makes decisions in order to minimise potential non-payment risks and increase non-performing loan recovery.  The committee meets weekly.

The members of the HO NPL Committee are:

| Name | Position |
|------|----------|
| Sergey Yeltsov | Chairman, Deputy Chairman of Management Board |
| Nikolay Varenko | Deputy Chairman of Committee, First Deputy Chairman of the Management Board |
| Timur Suleymanov | Member, Director of the Department for Working with Problem Loans |
| Sholpan Basambaeva | Member, Director of Legal Department |
| Marina Tormasheva | Member, Managing Director |
| Galym Omarov | Member, Director of the Department of Credit and Operational Risks |
| Ulukbek Maxatbekuulu | Member, Managing Director |
| Tuleu Ashlyaev | Member, Director of Economic Security Department |
| Svetlana Vitkovskaya | Member, Chief of Division of Expertise and Monitoring of Collateral |

*Retail Business NPL Committee*

The Retail Business NPL Committee monitors the Bank's retail loan portfolio to determine payment delays and makes decisions in order to minimise potential non-payment risks and increase retail non-performing loan recovery.  The committee meets weekly.

The members of the Retail Business NPL Committee are:

| Name | Position |
|------|----------|
| Timur Suleymanov | Member, Director of the Department for Working with Problem Loans |
| Syrim Adambaev | Member, Chief of Retail Business Problem Loans Division, an internal division of the Department of Problem Loans |
| Svetlana Kislashko | Member, Deputy Chief of Retail Business of the Department of Problem Loans |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of Department of Credit and Operational Risk |
| Dosym Enkebaev | Member, Chief of Loan Division, an internal division of the Retail Sales Department |
| Vyacheslav Zevenkov | Member, Head of Monitoring Section of Division of Risk of Retail Business and Underwriting, an internal division of the Department of Credit and Operational Risks |
| Aizhan Ershina | Member, Deputy Chief Accountant of Accounting and Reporting Department |
| Ermek Tulepov | Member, Chief of the Claim Work Division, an internal division of the Legal Department |
| Alpamys Kurmambaev | Member, Deputy Director of Economic Security Department |
| Gulzada Abdullina | Member, Head of Problem Loans Section an internal section of Division of Expertise and Monitoring of Collateral |

*Credit Committee of Branch Network*

The Credit Committee of Branch Network makes decisions regarding the financing of small and medium business of the Bank's branches.  The committee meets twice weekly.

The members of the Credit Committee of Branch Network are:

| Name | Position |
| --- | --- |
| Marlen Zhakezhanov | Chairman, Managing Director |
| Ernar Tashenov | Deputy Chairman, Director of Department of Small and Medium Business |
| Aset Amirbekov | Member, Chief of the Working with Collateral Sector of the Division of Expertise and Monitoring of Collateral |
| Erzhan Akzhanov | Member, Chief of Division of Credit Risks of Small and Medium Business, an internal division of the Department of Credit and Operational Risks |
| Igor Morozov | Member, Chief of the Division of Legal Support of SME of Branch Network and Retail Business of Legal Department |
| Ramazan Basibekov | Member, Chief of Branch Network of Economic Security Division, an internal division of the Economic Security Department |

*Ethics Committee*

The Ethics Committee is responsible for determining the Bank's corporate ethics standards in internal banking in respect of the relationships between the Bank and its affiliates and associates, customers and contractors of the Bank, authorised bodies and other third parties.  The Ethics Committee meets as necessary.

The members of the Ethics Committee are:

| Name | Position |
| --- | --- |
| Anvar Saidenov | Chairman, Chairman of the Management Board |
| Abilakim Zhumakhmetov | Member, Deputy Chairman of Management Board, Director of Astana branch |
| Sergey Yeltsov | Member, Deputy Chairman of Management Board |
| Aidar Alibaev | Member, Director of Internal Audit Service |
| Elvira Ankapova | Member, Chief of HR Division |
| Dana Zakirova | Member, Chief of Compliance Control Division |

*Information Committee*

The main purpose of Information Committee is to coordinate and control processes associated with the automation of the Bank, as well as the implementation of control and supervisory authority in the implementation of new technologies in the information structure of the Bank.  The Committee meets not less than once every two weeks.

The members of the Information Committee are:

| Name | Position |
| --- | --- |
| Sergey Yeltsov | Chairman, Deputy Chairman of Management Board |
| Sultan Doskhojayev | Member, Director of the Department of Technological Solutions |
| Ainura Kunkhozhayeva | Member, Director of the Department of sales channels' and bank cards' development |
| Yekaterina Prikhodko | Member, Deputy Director of the Department of analysis and corporate business development |
| Yliya Kim | Member, Director of the Business Technologies Department |
| Lasker Murzabekov | Deputy Director of Department of Small and Medium Business |
| Adilzhan Nugmanov | Member, Chief of Operational Risk Division, an internal division of Department of Credit and Operational Risk |
| Sergey Nasyrov | Member, Deputy Chief of the Division of Information and Technical Security, Security Department |

*Management Team*

The Management Team comprises the individuals responsible for the day-to-day management of their respective departments or divisions and who report regularly to the Management Board in relation to the status of their respective departments.  Any member of the Management Team can be called to sit at a meeting of the Board of Directors as appropriate.

As of the date of this Information Memorandum, the Management Team consists of nine members, including the following persons:

| Name | Position |
| --- | --- |
| Tsurkan Oleg................................ | Managing Director |
| Timur Sabyrbaev.......................... | Managing Director |
| Marlen Zhakezhanov ................. | Managing Director |
| Erken Shardarbekov.................... | Managing Director |
| Zhanat Asylbek ........................... | Managing Director |
| Zhamilya Maxatbek ................... | Managing Director |
| Ulukbek Maxatbekuulu............... | Managing Director |
| Gulnara Tleukulova .................... | Managing Director |
| Marina Tormasheva ................... | Managing Director |

The business address for all members of the Bank's Management Board and management team is 97 Zholdasbekov Street, "Samal 2" Microdistrict, Almaty 050051, Republic of Kazakhstan.

The name and certain other information about each of the current members of the management team are set out below:

*Oleg Tsurkan — Managing Director.*  In 1991, Mr. Tsurkan graduated from Kazakh State University named after S.M. Kirov with a specialty in Biology.  In 1994, he graduated from Kazakh Institute of Management, Economics and Strategic Research, Almaty, with an MBA.  From 1991 to 1992, he worked as an expert in the firm of "Eicos".  In 1994, he accepted the post of specialist at ABN AMRO Bank Kazakhstan.  He started as a senior dealer, treasurer to the Deputy Chairman of the Board of ABN AMRO Bank Kazakhstan.  From 2003 to 2004, Mr. Tsurkan acted as Managing Director, Deputy Chairman of the Board of JSC "Nauryz Bank Kazakhstan".  From 2004 to 2005, he worked as an adviser to the Chairman of the Board of the Bank.  Concurrently, in 2005, he served as Chairman of the Board of JSCB Transbank.  From 2006 to 2007, he served as Acting Chairman of the Board, Chairman of the Board of JSC Ukrainian Credit Commercial Bank.  Since 2007 he has been Managing Director of the Bank.

*Timur Sabyrbaev — Managing Director.*  In 2000, Mr. Sabyrbaev graduated from the University of Turan, Faculty of Business and Management.  In May 2004, he took a course to improve his skills of strategic management at the EBRD, Vienna, Austria.  He started his career in 2000 as a specialist in the operating department of ABN AMRO Bank Kazakhstan.  In the period from December 2000 to the present, he held various positions at the Bank in the Trade Finance Office of the International Relations Department and the Global Trade Finance and Financial Institutions Department, eventually serving as the Head of Global Trade Finance and Financial Institutions Department.  In May of 2008, he was appointed Managing Director of the Bank.  In December 2008, he was elected to the Management Board.  In March 2009, he resigned as a member of the Management Board.

*Marlen Zhakezhanov — Managing Director*.  In 1992, Mr. Zhakezhanov graduated from Army General Khrulev A.V. Yaroslavl Higher Military Financial Order of the Red Star College with a specialty in monetary-cash and credit-cash support of troops, and qualified as an economist.  In 2004, he graduated from the University of International Business and received a Masters in Business Administration.  In 2006, he graduated from the Satpaev K.I. Kazakh National Technical University with a specialty in the Development of Oil and Gas Fields and a qualification as an engineer.  He began his career in 1992, as a senior cashier of the field office of the State Bank.  In 1994, he worked as an accountant in the company "BIAL".  From 1994 to 2000, he worked at the NBK, in the

positions of Chief Economist, Head of the Balance Sheet and Financial Statements Division, Deputy Chief of Banking Supervision Division and the Deputy Director of Banking Supervision Department. From 2000 to 2006, he worked at the Halyk Bank, as Chief of Internal Audit Service, Chief of Internal Audit Division, Director of Internal Audit Division, Acting Director of the Akmolinsk regional branch and acting Director of the Taldycorgan regional branch.  From September 2006 to September 2008 worked as a Head of the Internal Audit Service of "National Company" Kazakhstan Temir Zholy" JSC.  From September 2008 to November 2008 has worked by the Head of the Internal Audit Service of "Sustainable Development Fund "Kazyna" JSC and from November to December 2008 as the Head of the Internal Audit Service of "National Welfare Fund "Kazyna" JSC.  From February 2009 to January 2010, Mr. Zhakezhanov was a Member of the Management Board and Deputy Chairman of the Management Board of Temirbank.  On 1 February 2010, Mr. Zhakezhanov was appointed Managing Director of the Bank.

*Erken Shardarbekov — Managing Director.*  In 1993, Mr. Shardarbekov graduated from V.I. Lenin Kazakh Polytechnic Institute with a specialty in conveying machinery and equipment.  In 1998, he earned a scientific degree of Candidate of Economic Sciences, St. Petersburg State University of Economics and Finance.  He has worked in various management positions at JSC "SWF Kazyna" as Director of the Department, Samruk-Kazyna and JSC "BDF "Damu" in the post of Deputy Chairman of the Management Board.  He was appointed a Managing Director of the Bank in July 2009.

*Zhanat Asylbek — Managing Director.*  In 1996, Mr. Asylbek graduated from Kazakh State Academy of Management with a degree in Finance and Credit, and a qualification as an economist.  From 1997 to 1998, he worked at Kazkommertsbank.  In 1998, he worked at JSC "Industrial Bank".  From 1998 to 1999, he worked at JSC "Businessbank".  Since 2000, he has worked at the Bank having risen from the Chief Specialist of the bill operations division to the Regional Director.  In 2007, he served as Chairman of the Management Board of "Gold Investment Group".  In June 2009 he was appointed Managing Director of the Bank.

*Zhamilya Maxatbek — Managing Director.*  In 1991, Ms. Maxatbek graduated from the Almaty Institute of National Economy with a degree in Labour Economics and a qualification as an economist.  She began her career in 1991 in the Almaty branch of the national office of the Pension Fund.  In the period from 1993 to 1994, she worked in JSB "Montazhbank".  From 1994 to 1997, she worked in Alem Bank Kazakhstan.  From 1997 to 2000, she worked at the Bank in the Documentary Account Division of Operational Department.  From 1997 to 2000, she worked in the Almaty Trade Finance Bank.  Since 2000, she worked at the Bank in various positions, including Head of Representative Office in Moscow, Managing Director, Executive Director, Advisor to the Chairman of the Board.  In May 2009, she was appointed Managing Director of the Bank.

*Ulukbek Maxatbekuulu — Managing Director.*  In 2001, Mr. Maxatbekuulu graduated from the Moscow State Institute of International Relations with a specialty in jurisprudence.  In 2006, he graduated from the Kazakh Humanitarian Law University, with a master's degree in jurisprudence.  In 2006, he earned a scientific degree of candidate of economic sciences of Russian State Agrarian University — Timiryazev K.A. Moscow Agricultural Academy.  From 2001 to 2003, he worked at the post of General Director Deputy of LLP Vimpeks.  From 2003 to 2005, he was the Assistant Chairman of the Board of Directors, Chief of Legal Department of LLC "Postnoff", Moscow.  From 2007 to 2008, he worked as the general partner of LLC "Forsyth".  In August 2009, he was appointed to the position of Managing Director of the Bank.

*Gulnara Tleukulova — Managing Director.*  In 1983, Ms. Tleukulova graduated from Lenin V.I. Kazakh Polytechnic Institute with a degree in Economics and Organization of the metallurgical industry.  In 1992, she earned a PhD in Economics from the Ordzhonikidze State Academy of Management.  She began her career in 1983 at the Kazakh Institute for Chemical Technology.  In 1992, she worked in the Staff of Heads of regional administration.  In 1993, she worked in Trade industrial firm "Shart".  From 1995 to 1998, she worked in the Kazakh holding company "Astana Holding".  Since 1998, she has been working at the Bank starting as the Chief of the Investment

Planning Division of Investment and International Programs Department and ultimately rising to the Managing Director, overseeing the Department of Credit and Operational Risks of the Bank.

*Marina Tormasheva — Managing Director*.  In 1986, Ms. Tormasheva graduated from the Jambyl Technological Institute of Light and Food Industry with a specialty in Accounting.  From 1987 to 1993, she worked in Almaty Polytechnic School.  In 1993, Ms. Tormasheva worked at the production and commercial firm "RION".  From 1993 to 2001, she worked in Kazkommertsbank.  From 2001 to 2004, she worked at Temirbank in different positions, including Director of Operational Department, Acting Director of a branch office and Director of a branch office in Almaty.  In 2004, she was appointed as a Managing Director in "Texakabank" JSC.  From 2004 to 2007, she worked as Deputy Chairman of the Management Board of "Eximbank Kazakhstan" JSC.  From July 2007 to September 2009, Ms. Tormasheva worked as an Advisor to the Chairman of the Management Board and First Deputy Chairman of the Management Board of "Eximbank Kazakhstan" JSC.  In December 2009, she was appointed to the position of Managing Director of the Bank.

### Corporate Governance

Corporate governance best practice in Kazakhstan is set out in the Kazakhstan Corporate Governance Code, which is based on existing international best practice in the area of corporate governance and sets out recommendations for the application of the principles of corporate governance by Kazakhstan joint stock companies.  The Code was developed in 2005 by the Association of Financiers of Kazakhstan and approved by the FMSA.  The Bank's current Corporate Governance Code was adopted by the shareholders of the Bank on 14 October 2005.  The Code incorporates provisions of the Kazakhstan Corporate Governance Code and otherwise complies with the JSC Law in all material respects.  During the due diligence process conducted by the Bank's new management team beginning in February 2009, certain irregular transactions were uncovered that indicated that the existing corporate governance procedures were ineffective.  See "*Risk Factors — Risks Relating to the Bank — Internal control weaknesses have been evidenced by several transactions in the past and other unusual transactions may be uncovered in the future*".  To remedy this situation, the Bank and the Steering Committee agreed to implement a number of changes to the Bank's corporate governance, including, amongst others, the adoption of a New Corporate Governance Code and changes to the configuration of the Bank's managing bodies.  See "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring*".

### Management Remuneration

In accordance with the Bank's Charter, the remuneration and compensation of all managing directors of the Bank are determined by the Management Board of the Bank.  The Bank paid KZT 303 million for the year ended 31 December 2009 and KZT 383 million in aggregate during the year ended 31 December 2008 to members of the Management Board (which figures include the payments made to Mr. Zharimbetov referred to in the paragraph below).  The Bank paid KZT 222 million for the year ended 31 December 2009 and KZT 263 million for the year ended 31 December 2008 to its managing directors other than members of the Management Board.  The Bank also made payments to members of the former management team upon termination of their employment contracts in an aggregate amount of KZT 45 million for the year ended 31 December 2009 and KZT 44 million for the year ended 31 December 2008  (which figures include the payments made to Mr. Zharimbetov referred to in the paragraph below).  The Bank has further committed to pay in aggregate KZT 54 million upon the termination of the employment contracts of the Bank's current management.  The Bank paid KZT 56 million in aggregate during the year ended 31 December 2009 compared to zero during the year ended 31 December 2008 to the independent directors on its Board of Directors.  The Bank paid KZT 117 million in aggregate during the year ended 31 December 2009 and KZT 240 million in aggregate during the year ended 31 December 2008 to the non-independent directors on its Board of Directors (which figures include the payments made to Messrs Ablyazov and Solodchenko referred to in the paragraph below).

During the year ended 31 December 2008 and the year ended 31 December 2009, the Bank paid in aggregate KZT 158 million and KZT 21 million to Mr. Ablyazov, Mr. Solodchenko and Mr. Zharimbetov.

*Conflicts of Interest*

There are no potential conflicts of interest between duties owed to the Bank by any of the members of the current management team and their private interests and/or other duties.

A director may not vote on or be counted in the quorum in relation to a resolution of the Board, or of any committee of the Board, concerning any contract, arrangement, transaction or proposal with the Bank or in which the Bank is otherwise interested and in which he, the Shareholders who appointed him, or any Affiliate, has an interest which may reasonably be regarded as likely to give rise to a material conflict of interest. For the avoidance of doubt, if the relevant provisions are incorporated in the Bank's Charter, the Creditor Directors shall not be prevented from being counted in the quorum of any Board meetings or committee meetings, and shall not be excluded from voting at such meetings on matters relating to recoveries (whether such recoveries shall be paid out under the Recovery Units or otherwise), owing only to the interest of the Restructuring Creditors who appointed them in such recoveries.

*Litigation Statement*

As at the date of this Information Memorandum, for at least the last five years, none of the current directors or members of the Management Board:

(i)     has had any convictions in relation to fraudulent offences;

(ii)    has held an executive function in the form of a senior executive officer or a member of the administrative, management or supervisory bodies, of any company at the time of or preceding any bankruptcy, receivership or liquidation; nor

(iii)   has been subject to any official public incrimination and/or sanction by any statutory or regulatory authority (including any designated professional body) or has ever been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of a company or from acting in the management or conduct of the affairs of any company.

## RELATED PARTY TRANSACTIONS

The Bank has uncovered a significant number of loans that at present appear to have been provided on preferred terms to companies which may be connected with the former management, and for which the security provided was inadequate or non-existent.  The current management suspects that these contracts were entered into on behalf of the Bank through actions of (and for the benefit of) the former management and their associates and in breach of legal duties and of the Bank's existing internal controls.  See "*The Bank — Background to the Restructuring — Factors Affecting Deterioration of Bank's Loan Portfolio — Internal Factors*".  In March 2010, news sources reported that the Investigating Committee at the Russian Ministry of Internal Affairs is conducting a preliminary investigation of a criminal case against Mr. Ablyazov and certain individuals and companies connected with him for allegations generally related to fraud during the period in which Mr. Ablyazov was Chairman of the Board of Directors of the Bank.  See "*The Bank — Criminal Proceedings against Former Management*".

The Bank's management continues to review the loan portfolio to determine if additional transactions were concluded with suspected related parties outside Kazakhstan.  The Bank has established substantial provisions relating to some of these transactions, primarily including purported loans concerning projects in CIS countries.  The Bank expects that following the Restructuring, the internal procedures relating to the approval of related party transactions will be improved by taking a number of measures, including adopting the New Corporate Governance Code and introducing periodic audits of the Bank's compliance with its governance policies.

For a description of the definition of related parties under IAS 24 "Related Party Disclosure" and quantitative disclosure on transactions with related parties, see Note 27 to the Unaudited Interim Financial Statements and Note 31 to the 2008 Annual Financial Statements included elsewhere in this Information Memorandum.

As at 30 September 2009 and 31 December 2008, the Group had the following transactions with related parties. (including affiliates and Samruk-Kazyna):

| | 30 September 2009 | 31 December 2008 |
|---|---|---|
| | *(unaudited)* | |
| | *KZT (millions)* | |
| **Loans outstanding, net** | 5,053 | 1,302 |
| — Companies under common control | 4,470 | — |
| — Key management personnel | 580 | 1,295 |
| — Other related parties | 3 | 7 |
| **Amounts due from credit institutions (deposits)** | 2,898 | 6,359 |
| — Associates | 2,898 | 6,359 |
| **Amounts due from credit institutions (loans)** | 2,728 | 3,646 |
| — Associates | 2,728 | 3,646 |
| **Amounts due to credit institutions** | 46,915 | 6,883 |
| — Companies under common control | 43,343 | — |
| — Associates | 3,572 | 6,883 |
| **Financial assets at fair value through profit or loss** | 74,087 | — |
| — Companies under common control | 74,087 | — |
| **Cash and cash equivalents** | 579 | 667 |
| — Associates | 579 | 667 |
| **SK Bonds** | 511,907 | — |
| — Shareholders | 511,907 | — |
| **Amounts due to customers** | 161,624 | 998 |
| — Shareholders | 161,593 | 6 |
| — Key management personnel | 27 | 705 |
| — Other related parties | 4 | 287 |
| **Commitments and guarantees issued** | 189,501 | 3,105 |
| — Associates | 189,501 | 3,105 |

## Loans Outstanding

As at 30 September 2009, the Group had net loans outstanding of KZT 4,470 million made to companies under common control, KZT 580 million to key management personnel and KZT 3 million to other related parties compared at 31 December 2009 to no net loans outstanding to companies

under common control, KZT 1,295 million to key management personnel and KZT 7 million to other related parties.  The sharp increase in net outstanding loans to companies under common control reflect loans from the Bank to subsidiaries, associates and companies under the control of Samruk-Kazyna, which are required to be recognised due to the fact that the Bank became a subsidiary of Samruk-Kazyna for purposes of IFRS.  The decrease in loans to key management personnel was primarily because of the change of management personnel in February 2009.

The sharp increase in net outstanding loans to companies under common control was due to the fact that from February 2009 the Bank became a subsidiary of Samruk-Kazyna, and in accordance with IFRS 24 "Disclosure of related parties" operations with all subsidiary, associate and jointly managed companies are included in report as operations with companies under common control.  The decrease in loans to key management personnel was primarily because of the fact that key management personnel changed in February 2009 and the amount of loans given to new management is significantly less.

**Amounts Due from Credit Institutions**

The amounts due from credit institutions as deposits decreased by 54.4 per cent. to KZT 2,898 million as at 30 September 2009 compared to KZT 6,359 million as at 31 December 2008, as a result of decreased deposits with the Group by due to the maturity of term deposits.  The amounts due from credit institutions as loans decreased by 25.2 per cent. to KZT 2,728 million as at 30 September 2009 from KZT 3,646 million as at 31 December 2008, due to translation differences in foreign currencies against the Tenge.

**Amounts Due to Credit Institutions**

The Group recognised KZT 43,343 million as at 30 September 2009 for amounts due to credit institutions in respect of companies under common control of the Group representing loans made by Samruk-Kazyna and its subsidiaries to the Group.  The amounts due to credit institutions in respect of associates decreased by 48.1 per cent. to KZT 3,572 million as at 30 September 2009 from KZT 6,883 million as at 31 December 2008, due to the maturity of term deposits of associates of the Bank.

**Financial Assets at Fair Value through Profit or Loss**

The Group recognised KZT 74,087 million as at 30 September 2009 for financial assets at fair value through profit or loss in respect of companies under common control of the Group in respect of securities that the Group holds in companies affiliated with Samruk-Kazyna, including Kazmunaigas, DKB and Kazkommertsbank.

**SK Bonds**

As at 30 September 2009, the Group recognised KZT 511,907 million in respect of the SK Bonds acquired by the Bank in March 2009.  See "*The Bank — The Role of Samruk-Kazyna and the NBK*".

**Amounts Due to Customers**

As at 30 September 2009, the Group had KZT 161,593 million in amounts due to its shareholder customers compared as at 31 December 2008 to KZT 6 million.  This sharp increase was due largely to deposits of Samruk-Kazyna pursuant to the State Finance Programmes.  See "*The Bank — The Role of Samruk-Kazyna and the NBK — State Finance Programmes*".

**Commitments and Guarantees Issued**

The commitments and guarantees issued as at 30 September 2009 totalled KZT 189,501 million compared as at 31 December 2008 to KZT 3,105 million, a six-fold increase, due in large part to guarantees provided in favour of BTA Belarus by Sekerbank.

The following table describes the income and expenses of the Group identified in respect of related party transactions as at 30 September 2009 and 2008:

| | Nine-month period ended | |
|---|---|---|
| | 30 September 2009 | 30 September 2008 |
| | *(unaudited)* | |
| | *KZT (minions)* | |
| **Interest income on deposits up to 90 days** ................................................................ | 193 | 64 |
| — Companies under common control ................................ | 2 | — |
| — Associates ................................................................ | 191 | 55 |
| — Other related parties ................................................ | — | 9 |
| **Interest income on loans** ................................................ | 808 | 536 |
| — Companies under common control ................................ | 773 | — |
| — Key management personnel ........................................ | 35 | 534 |
| — Other related parties ................................................ | — | 2 |
| **Interest income on SK Bonds** ........................................ | 20,502 | |
| — Shareholders ............................................................ | 20,502 | — |
| **Interest income on due from credit institutions** ............ | 961 | 2,851 |
| — Associates ................................................................ | 961 | 1,130 |
| — Other related parties ................................................ | — | 1,721 |
| **Interest expense on due to credit institutions** .............. | (2,714) | (155) |
| — Companies under common control ................................ | (2,503) | — |
| — Associates ................................................................ | (211) | (138) |
| — Other related parties ................................................ | — | (17) |
| **Interest expense on due to customers** .......................... | (4,214) | (117) |
| — Shareholders ............................................................ | (4,208) | — |
| — Key management personnel ........................................ | (1) | (93) |
| — Other related parties ................................................ | (5) | (24) |
| **Interest income on financial assets** .............................. | 1,541 | 110 |
| — Companies under common control ................................ | 1,541 | — |
| — Associates ................................................................ | — | 110 |
| **Fee and commission income** ........................................ | 86 | 237 |
| — Associates ................................................................ | 86 | 169 |
| — Other related parties ................................................ | — | 68 |
| **Other income** ................................................................ | — | 59 |
| — Associates ................................................................ | — | 58 |
| — Key management personnel ........................................ | — | 1 |
| **Other expenses** ............................................................ | (38) | (38) |
| — Associates ................................................................ | (38) | (38) |

## Interest Income

The Group's interest income on deposits up to 90 days increased by 201.6 per cent. to KZT 193 million over the nine month period ended 30 September 2009 compared to KZT 64 million over the nine month period ended 30 September 2008. This increase was primarily due to a 247.3 per cent. increase in interest income on deposits from associates to KZT 191 million for the nine months ended 30 September 2009 from KZT 55 million for the nine months ended 30 September 2008, due primarily to increases in such deposits of BTA Georgia.

The Group's interest income on loans increased by 50.7 per cent. to KZT 808 million for the period ended 30 September 2009 from KZT 536 million for the period ended 30 September 2008. This increase was largely attributable to the Group's recognition of KZT 773 million in respect of companies under common control, which was a result of recognition of Samruk-Kazyna's subsidiaries, associates and entities under its control. This amount was offset by the decrease to KZT 35 million over the nine months ended 30 September 2009 from KZT 534 million over the nine months ended 30 September 2008 for in respect of key management personnel as a result of the change in key management personnel in February 2009.

Interest income on amounts due from credit institutions decreased by 66.3 per cent. to KZT 961 million for the period ended 30 September 2009 from KZT 2,851 million over the period ended 30 September 2008, largely due to decreases in amounts due to associates and other related parties as a result of de-consolidation of BTA Russia.

Interest income on financial assets increased thirteen-fold to KZT 1,541 million from KZT 110 million over the nine months ended 30 September 2009 compared to the nine months ended

30 September 2008.  The increase was due to interest income earned on financial assets of companies under common control of Samruk-Kazyna, including Kazmunaigas, the DBK and Kazkommertsbank.

**Interest Expense**

Interest expense on amounts due to credit institutions increased sixteen-fold over the nine months ended 30 September 2009 compared to 30 September 2008, to KZT 2,714 million from KZT 155 million.  The large increase was due to loans provided to the Group by Samruk-Kazyna and its subsidiaries.

Interest expense on amounts due to customers increased sharply to KZT 4,214 million from KZT 117 million for the nine months ended 30 September 2009 and 30 September 2008, respectively.  The increase was primarily in respect of companies under common control, as a result of deposits by Samruk-Kazyna pursuant to the State Finance Programmes.

**Fee and Commission Income**

The Group had fees and commissions income of KZT 86 million for the nine months ended 30 September 2009 compared to KZT 237 million for the nine months ended 30 September 2008, a decrease of 63.7 per cent.  This decrease was attributable to de-consolidation of BTA Russia.

## PRINCIPAL SHAREHOLDERS

### The Bank's Shareholders Prior to the Restructuring

After having been recapitalised by the Government, the Bank was fully privatised by way of a competitive auction in March 1998 and on 17 December 1998 was reorganised from a closed joint stock company to an open joint stock company.  The consortium of investors that took control of the Bank at this time consisted of the following entities:

| Name | Percentage of Shares |
|---|---|
| YassiOJSC | 20.00 |
| SMKKOJSC | 20.00 |
| Maktaaral OJSC | 15.00 |
| Melkombinat LLC | 14.74 |
| Araltuz LLC | 10.00 |
| Kustanayasbest LLC | 10.00 |
| Shymkentskaya Makaronnaya Fabrika LLC | 10.00 |
| Bank CenterCredit OJSC | 0.13 |
| Temirbank OJSC | 0.13 |
| **Total** | **100.00** |

During the financial year ended 31 December 2006, the Bank issued 260,042 non-redeemable convertible preferred shares to seven entities—SMKK LLC (100,000), Makta Aral Company LLC (100,000), InvestCapital Company LLC (51,362), Orken Invest LLC (4,200), Agroinvest LLC (2,060), JSC Turanalem Securities (1,630) and Yassi Invest LLC (790)— which were subsequently converted into 1,134,432 common shares of the Bank.  During the period from 2006 to 2008, the shareholders of the Bank approved further issuances of the Bank's common shares.  As at 31 December 2008, the principal shareholders of the Bank were:

| Name | Percentage of Shares |
|---|---|
| KT Asia Investment Group B.V | 9.66 |
| Drey Associates Limited | 9.65 |
| Strident Energy Limited | 9.56 |
| Invest Capital Company LLC | 8.14 |
| SMKK LLC | 7.77 |
| Yassi Invest LLC | 7.19 |
| Agroinvest LLC | 7.15 |
| CP-CreditPrive SA | 6.74 |
| Makta Aral Company LLC | 6.67 |
| Others less than 5 per cent. | 27.47 |
| **Total** | **100.00** |

None of the Principal Shareholders were registered as a "major shareholder" under law.  The Bank is unable to verify whether any of these principal shareholders were affiliated with former management of the Bank as at 31 December 2008, however, based on statements made by Mr. Ablyazov, the Bank believes that, during the period that he was the Chairman of the Board of Directors, Mr. Ablyazov beneficially owned a significant portion of the shares of the Bank through intermediary companies, including Drey Associates Limited, Strident Energy Limited and InvestCapital Company LLC.  The Bank does not have evidence to support Mr. Ablyazov's statements.  Therefore, Mr. Ablyazov's beneficial interest in the Bank was not disclosed by Mr. Ablyazov or the Bank in the Bank's consolidated financial statements for the years 2006, 2007, 2008 and nine months ended 30 September 2009.

On 2 February 2009, Samruk-Kazyna acquired a controlling shareholding in the Bank through the Bank's issuance of 25,246,343 new common shares constituting 75.1 per cent. of the Bank's total share capital for cash consideration of KZT 212,095 million.

**The Bank's Shareholders Following the Restructuring**

Assuming satisfaction of relevant conditions precedent, the Shares will be held as follows after the completion of the Restructuring:

| Name | Percentage of Shares |
|---|---|
| Samruk-Kazyna (including any Residual Minority Shareholders) | 81.5 |
| Claimants allocated into Senior Packages 1 and 2 | 14.0 |
| Claimants allocated into Junior Package 2 | 4.5 |
| **Total** | **100.0** |

*Samruk-Kazyna*

Samruk-Kazyna is wholly owned by the Government and is the national managing holding company for substantially all state enterprises. Samruk-Kazyna was created in 2008 pursuant to the Presidential Edict No. 669, dated 13 October 2008, and the Resolution of the Government No. 962, dated 17 October 2008, by way of the merger of JSC "Kazakhstan Holding for Management of State Assets", "Samruk" and JSC "Sustainable Development Fund" "Kazyna". Samruk-Kazyna is a joint stock company whose shares are held by the Ministry of Finance's Committee of State Property and Privatisation On behalf of Kazakhstan.

Samruk-Kazyna's primary objective is to manage shares (participatory interests) of legal entities it owns with a goal of maximising long term value and increasing competitiveness of such legal entities in world markets.

The governance of Samruk-Kazyna's activities is subject to general corporate governance applicable to all joint stock companies in Kazakhstan. Accordingly, the corporate governance structure of Samruk-Kazyna is as follows: the Government, as the sole shareholder constitutes the supreme governing body, the Board of Directors constitutes the managing body, and the management board constitutes the executive body.

Members of Samruk-Kazyna's Board of Directors are appointed by the Government, and its members are, among others, the Minister of Economy and Budget Planning, the Minister of Finance, the Minister of Energy and Mineral Resources, the Minister of Industry and Trade, independent directors and the Chairman of the management board of Samruk-Kazyna. The Board of Directors is chaired by the Prime Minister of Kazakhstan.

On 2 February 2009, taking into account the growing deterioration of the Bank's financial condition, the Government approved the FMSA's plan for Samruk-Kazyna to acquire a controlling stake in the Bank. On the same day, the Bank issued and Samruk-Kazyna purchased 25,246,343 Shares of the Bank at a price of 8,401 Tenge per share. As a result the Bank received additional capital of KZT 212,095 million and Samruk-Kazyna obtained 75.1 per cent. of the Bank's authorised capital.

*Samruk-Kazyna Undertaking*

As a condition precedent to the Restructuring, Samruk-Kazyna will execute the Samruk-Kazyna Undertaking. The Samruk-Kazyna Undertaking will be in the form of a Deed Poll executed in favour of the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their transferees) and the New Notes Trustees, setting out the post-restructuring obligations of Samruk-Kazyna, which shall become effective on the Restructuring Date, and which will survive the Minority Protection Expiry Date in relation to the operation and management of the Bank and its relationship and obligations to the GDR Holders and other Restructuring Creditors. Pursuant to the Samruk-Kazyna Undertaking, Samruk-Kazyna undertakes to the GDR Holders, the Restructuring Creditors (and, for the avoidance of doubt, their direct and indirect transferees) and the New Notes Trustees that it will (*inter alia*):

(a)      exercise its voting rights in relation to the Shares held by it in order to procure that the Creditor Directors as nominated by the Steering Committee or in relation to any replacement

Creditor Director subsequently nominated by the New Notes Trustee are appointed to the Board;

(b)     not exercise its voting rights in relation to the Shares of the Bank held by it in order to remove either Creditor Director other than for incapacity or gross misconduct, in which event Samruk-Kazyna will use its reasonable endeavours to secure the prompt appointment of a replacement, nominated by the New Notes Trustee and no Qualified Majority decisions can be taken unless at least one Creditor Director is still a member of the Board; and

(c)     procure that no Samruk-Kazyna Director votes in respect of any item listed as requiring a Qualified Majority under "*Restructuring Creditors as Shareholders of the Bank — Shareholder/Board Approval Matters*" unless both Creditor Directors and at least one Independent Director have voted to approve the Qualified Majority Item, in which case the Samruk-Kazyna Directors may vote in favour of or against approving the Qualified Majority Item at their discretion.

For a further description of the Samruk-Kazyna Undertaking see "Undertakings by the Bank and Samruk Kazyna – The Samruk-Kazyna Undertaking".

## THE BANKING SECTOR IN KAZAKHSTAN

### Introduction

Since mid-1994, the Government has adhered to a strict macroeconomic stabilisation programme, combining tight budgetary discipline, stringent monetary policy and structural economic reforms, which have sharply reduced inflation and lowered interest rates.

Kazakhstan has a two-tier banking system with the central bank of Kazakhstan, the NBK, comprising the first tier and all other commercial banks comprising the second tier (with the exception of the DBK, which has a special status and belongs to neither tier).  Generally, all credit institutions in Kazakhstan are required to be licensed and regulated by the FMSA (prior to 2004 this licensing role was carried out by the NBK).

The Government, the NBK and the FMSA have undertaken significant structural reforms in the banking sector, aimed at promoting consolidation in the banking sector and improving the overall stability of the system.

Global financial instability and market dislocation have adversely affected the Kazakhstan banking sector, resulting in asset quality deterioration and reduced funding sources for Kazakhstan banks. Statistics published by the FMSA show the considerable asset quality deterioration in 2009, with non-performing loans in the banking sector increasing to 36.5 per cent. as at 1 January 2010 from 8.1 per cent. as at 1 January 2009.   In 2009, the banking sector overall showed a net loss of KZT 2,834 billion (by way of comparison, the aggregate financial result for the banking sector as at the end of 2008 was a profit of KZT 10.7 billion) and assets of the banking sector also declined in that period.   As of 1 March 2010 the share of bad loans in the Kazakhstan banking sector was 36.3 per cent., and the aggregate financial result for the banking sector for the first two months of 2010 was a loss of KZT 66.2 billion.

The Government has taken a number of steps to support the Kazakhstan banking sector including significant capital injections.  The Government's capital injections into the Kazakhstan banking sector are estimated at 1.9 per cent. of Kazakhstan's GDP in 2008 (although, assuming the completion of the restructurings of Alliance Bank and of the Bank, this figure could, as a result of the conversion of bonds into shares, reach 6.7 per cent.), compared, for example, to the United Kingdom and the United States where, according to the IMF, capital injections represented 3.9 per cent. and 2.2 per cent., respectively.  The total amount of capital injected into the Kazakhstan banking sector was U.S.$2,054 million as at 18 February 2010 (although, assuming the completion of the restructurings of Alliance Bank and of the Bank, this figure could, as a result of the conversion of bonds into shares, reach U.S. $7,214 million with a U.S.$/KZT exchange rate of 1:150).  The Bank has been the principal beneficiary of this capital injection, with funds injected to acquire equity amounting to approximately U.S.$1.4 billion (approximately KZT 212,000 million) and further liquidity support to be converted into equity following the Restructuring amounting to approximately U.S.$4.3 billion (approximately KZT 645,000 million).

The table below shows the amount of funds of the National Fund of the Republic of Kazakhstan allocated to putting into effect the Plan of Joint Actions of the Government of Kazakhstan, the NBK and the FMSA for the Stabilisation of the Economy and the Financial System for 2009-2010, as of 18 March 2010:

| No. | Destination of state support | Allocated | Appropriated[*] | % appropriated |
|-----|------------------------------|-----------|----------------|----------------|
| | | | *(KZT billions)* | |
| 1 | Capitalisation of banks ................................ | 332.1 | 308.1 | 92.8% |
| 2 | Resolving problems on the real estate market, incl.: ... | 360.0 | 190.3 | 52.9% |
| | Mortgage State Finance Programme ........................... | 120.0 | 120.0 | 100.0% |
| | Construction State Finance Programme ...................... | 240.0 | 70.3 | 29.3% |
| 3 | SME State Finance Programme, including:................. | 120.0 | 120.0 | 100.0% |
| | through second-tier banks............................................ | 117.0 | 117.0 | 100.0% |
| | through the Damu Fund.............................................. | 3.0 | 3.0 | 100.0% |
| 4 | Crediting of projects in the real sector of the economy | 144.0 | 144.0 | 100.0% |
| 5 | Industrial Innovation Programme................................ | 120.0 | 4.2 | 3.5% |
| 6 | Agricultural State Finance Programme........................ | 120.0 | 120.0 | 100.0% |
| **7** | **Total funds of the National Fund of the Republic of Kazakhstan allocated to putting into effect the Plan of Joint Actions of the Government of Kazakhstan, the National Bank of Kazakhstan and the FMSA for the Stabilisation of the Economy and the Financial System for 2009-2010 (1+2+3+4+5+6):** ............... | **1,196.1** | **886.6** | **74.1%** |
| 8 | Financial support (exchange of bonds between Samruk-Kazyna and banks to be restructured) from Samruk-Kazyna which upon completion of the restructurings will be converted into the shares of the Bank and of Alliance Bank, incl.: ............................ | 750.0 | 0.0 | 0.0% |
| | The Bank...................................................................... | 645.0 | 0.0 | 0.0% |
| | Alliance Bank.............................................................. | 105.0 | 0.0 | 0.0% |
| | **Total state support (7+8), incl.:** ................................ | **1,946.1** | **886.6** | **45.6%** |
| | financial sector (1+8) ................................................ | 1,082.1 | 308.1 | 28.5% |
| | **Total state support as % of GDP for 2008, incl.:** .... | **12.1%** | **5.5%** | |
| | financial sector ....................................................... | 6.7% | 1.9% | |

Note:

*       In the event of financial support from Samruk-Kazyna which upon completion of the restructurings will be converted into the shares of the Bank and of Alliance Bank, the amount is treated as appropriated after conversion.

*Sources: FMSA, data of banks.*

For a discussion of various risks associated with the banking sector and banking regulation in Kazakhstan, see "*Risk Factors — Risks Relating to Operating within the Kazakhstan Banking Sector*".

**The NBK and the FMSA**

The NBK is the central bank of Kazakhstan and although it is an independent institution, it is subordinate to the President of Kazakhstan.  The President has the power, among other things, to appoint (with the approval of the Senate (i.e., the higher chamber of the Parliament)) and remove the NBK's Chairman, to appoint and remove the NBK's Deputy Chairmen upon the proposal of the Chairman, to approve the annual report of the NBK, to approve the concept and design of the national currency, and to request information from the NBK.  Mr. Grigoriy Marchenko was appointed as Chairman of the NBK in January 2009.  The principal governing bodies of the NBK are the Executive Board and the Board of Directors.  The Executive Board, the highest governing body of the NBK, consists of nine members, including the Chairman, four other representatives of the NBK, a representative of the President, two representatives of the Government and the chairperson of the FMSA.

Currently, the principal task of the NBK is to ensure price stability in Kazakhstan.  The NBK is also empowered to develop and conduct monetary policy, organise banking settlement systems, conduct currency regulation and control, assist in ensuring stability of the financial system and protect the

interests of depositors with commercial banks.  Following legislative changes in July 2003, the FMSA was formed and, on 1 January 2004, took over responsibility for most of the supervisory and regulatory functions in the financial sector, which were previously performed by the NBK.

The FMSA is an independent institution reporting directly to the President.  The principal task of the FMSA is to regulate and supervise Kazakhstan's financial markets and financial institutions, including banks, insurance companies, pension funds and pension asset management companies, as well as professional participants in the securities market.  The FMSA is empowered, among other things, to license financial institutions, to approve prudential standards for them, to approve, jointly with the NBK, the scope of financial reporting for financial institutions and to monitor the activities of, to apply sanctions to (where necessary) and to participate in the liquidation of, financial institutions.

The administration of anti-monopoly legislation in Kazakhstan with respect to the banking sector was transferred from the FMSA to the Competition Agency.  However, certain issues of anti-monopoly regulation are under the jurisdiction of both the Competition Agency and the FMSA.  For example, certain transactions with a value exceeding certain thresholds require the prior consent of the Competition Agency.  Such thresholds for the purposes of regulated financial organisations are established jointly by the Competition Agency and the FMSA.

**Banking Supervision**

*Capital Adequacy*

The FMSA refined its capital adequacy and credit exposure standards in September 2005, when it set limits and rules for calculating capital adequacy, single party exposure, liquidity ratios and open currency positions.  In November 2005, the regulations regarding regulatory capital and risk management came into effect in Kazakhstan.  These regulations represented a substantial step towards the implementation of the Basel Accord.  In particular, these regulations introduced the concepts of hybrid capital eligible to be included in Tier I and Tier II capital, Tier III capital (qualified subordinated debt) and operational and market risks and included rules for calculating risk with respect to derivatives.

As at 1 July 2009, the FMSA required banks to maintain a K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) capital adequacy ratio of 6.0 per cent. (with the K1-1 ratio increasing to 8.0 per cent. from 1 July 2012 and to 9.0 per cent. from 1 July 2013 and K1-2 ratio increasing to 9.0 per cent. from 1 July 2011), compared with the BIS Guidelines' recommendation of 4.0 per cent.  The FMSA's K2 (own capital to total assets weighted for risk) capital adequacy ratio requirement is 12.0 per cent. compared with the BIS Guidelines' recommendation of 8.0 per cent.  For banks with a bank holding company among their shareholders, a bank parent company of which has a rating set forth by the FMSA, state-controlled banks and banks in which the Government or a national management holding company has acquired at least a 10.0 per cent. stake as the result of a breach of prudential or regulatory requirements by such bank, the FMSA's K1-1 (Tier 1 capital to total assets) and K1-2 (Tier 1 capital to total assets weighted for risk) capital adequacy ratio requirement is reduced to 5.0 per cent. of total assets (with the K1-1 (Tier 1 capital to total assets) ratio increasing to 7.0 per cent. from 1 July 2012 and to 8.0 per cent. from 1 July 2013 and K1-2 (Tier 1 capital to total assets weighted for risk) ratio increasing to 8.0 per cent. from 1 July 2011) while the K2 (own capital to total assets weighted for risk ratio) is reduced to 10.0 per cent. of risk weighted assets.

Furthermore, FMSA regulations require a bank which does not have amongst its shareholders a physical person holding at least 10.0 per cent. of such bank's shares to comply with higher capital adequacy ratios.  Such ratios are 7.0 per cent. for the K1 1 (Tier 1 capital to total assets) and K1 2 (Tier 1 capital to total assets weighted for risk) ratios (with K1-1 ratio increasing to 9.0 per cent. staring from 1 July 2012 and to 10.0 per cent. starting from 1 July 2013 and with K1-2 ratio increasing to 10 per cent. starting from 1 July 2011) and 14.0 per cent. for the K2 (own capital to total assets weighted for risk) ratio.

In February 2007, to reduce the risks associated with rapid growth in the external debt of Kazakhstan banks, the FMSA introduced amendments to the capital adequacy regulations which imposed limits on foreign borrowings or "external liabilities" which a bank can incur to a multiple of such bank's "own capital" as calculated both including and excluding debt securities issued.

These amendments mean that banks are not permitted to increase borrowings from non-domestic holders (subject to certain exceptions) to a level in excess of certain multiples of regulatory capital.  If banks exceed the prescribed ratios they would have to either repay foreign sourced debt or increase their regulatory capital.  The ratios that apply to the Bank currently are (i) two times own capital for external liabilities excluding debt securities issued by special purpose subsidiaries of the Bank guaranteed by the Bank (K8 ratio) and (ii) three times own capital for external liabilities including such debt securities issued (K9 ratio).

The FMSA monitors compliance with capital adequacy standards (in accordance with international standards set by the Basel Committee), current liquidity ratios, maximum credit exposures to single borrowers and related parties, maximum investments in fixed and other non-financial assets and limits on contingent obligations and foreign exchange positions.  Additionally, the FMSA regulates problem asset classification and contingent obligations (similar to the World Bank's Guidelines for Asset Classifications) and loan loss reserves.

### Reserve Requirements

Starting in the second half of 2008, the NBK adopted a number of measures aimed at providing additional liquidity to banks.  With effect from 3 March 2009, the minimum level at which second tier banks must maintain reserves has been decreased from 2.0 per cent. to 1.5 per cent. with respect to domestic liabilities and from 3.0 per cent. to 2.5 per cent. with respect to other liabilities.  On 30 November 2009, the NBK Management Board reduced the obligatory reserve ratio requirement for the Bank to zero per cent. for both internal and external liabilities.  The reduced ratio will remain in effect until the Restructuring process is finalised.

### Deposit Insurance

In December 1999, a self-funded domestic deposit insurance scheme, the KDIF, was established and as at 1 March 2010, 37 commercial banks, including subsidiaries of foreign banks and the Bank, were covered by the scheme.  The insurance coverage is presently limited to personal deposits in any currency up to a maximum amount per customer of KZT 5 million at any given bank.  Starting from 1 January 2012, the maximum guaranteed amount is scheduled to be reduced from KZT 5 million to KZT 1 million.  Only banks participating in the deposit insurance scheme are authorised to open accounts and take deposits from private individuals.  It is anticipated that participant banks will be called upon to make further contributions to the scheme as a result of payments made by the scheme to depositors of JSC Valut-Transit Bank as described below in "*The Banking Sector in Kazakhstan – Banking Supervision — Commercial Banks*".

### Acquisition of Interests in Kazakhstan Banks

Current legislation requires FMSA approval of any acquisition of a shareholding of 10.0 per cent. or more (whether held independently or jointly with another affiliated legal entity) in a Kazakhstan bank.  Furthermore, a foreign entity must obtain a credit rating from one of the rating agencies which are recognised by the FMSA in order to hold 10.0 per cent. or more of a Kazakhstan bank.  The rating of such an entity must be long term and not be less than (i) Kazakhstan's sovereign rating (or equivalent); or (ii) if the entity is a financial institution, "BB-" (by S&P) or the equivalent, *provided that* the country in which the entity is domiciled has a rating of not less than "BB-" (by S&P) or the equivalent and the regulator of that country has an agreement on information exchange with the FMSA.

*Other Regulations*

In addition, in June 2006 the FMSA implemented measures to restrict Kazakhstan banks from having outstanding external short-term financings which exceed a bank's regulatory capital. These measures may limit a bank's ability to extend the maturity of certain short-term facilities causing it to look to longer term financings or customer deposits to replace such short-term facilities. A failure to replace these facilities could lead to an increase in a bank's funding costs, an increase in its liquidity and interest rate risk or both. See *"Management's Discussion and Analysis of Results of Operations and Financial Condition — Financial Condition as at 30 September 2009 and as at 31 December 2008 and 2007 — Capital Adequacy"*.

To address concern about currency mismatches and more precisely, to manage banks' liquidity, the FMSA has also tightened requirements regarding open/net currency positions and introduced various limits on currency liquidity.

In December 2006, and with effect from 1 April 2007, the FMSA approved new rules on classification of assets and provisioning. While the principles of classification and provisioning remain largely unchanged, these rules, among others, introduced more stringent requirements regarding monitoring of credit files, developed a definition of financial soundness with respect to borrowers, provided for a more differentiated approach to various types of borrowers, loans and security and stipulated the right of the FMSA to demand that a bank increases its provisioning ratios.

*Commercial Banks*

In November 2001, the Government divested its remaining 33.3 per cent. stake in JSC Halyk Bank (formerly known as OJSC Halyk Bank) by means of privatisation through a public auction. In February 2004, the entire share capital of EximBank Kazakhstan, formerly a state-owned bank, was sold by tender to a consortium of 11 members for KZT 2,100 million. In June 2005, the banking licence granted to JSC Nauryz Bank was terminated by the FMSA and this bank has been in the process of liquidation since November 2005. On 24 December 2005, the FMSA adopted a resolution to suspend the banking licence granted to JSC Industrial Bank of Kazakhstan for six months due to violations of prudential standards. In December 2006, the FMSA revoked the banking licence of JSC Valut-Transit Bank due to the violation of Kazakhstan law, improper performance of contractual obligations and breach of prudential standards. A decision on the mandatory liquidation of JSC Valut-Transit Bank was adopted by the special inter-district economic court of Karaganda on 13 February 2007 and came into effect on 1 March 2007. As at 1 December 2009, the KDIF reported total payments of KZT 15,000 million to the depositors of JSC Valut-Transit Bank and JSC Nauryz Bank and money was returned to more than 67,000 depositors of those banks. As of 7 December 2009 the liquidation commission of JSC Valut-Transit Bank had satisfied claims of the KDIF (a creditor of the third priority) representing 23.6 per cent. of the total amount of indebtedness of the bank in respect of the third group of priority. As of 28 October 2009 the liquidation commission of JSC Nauryz Bank had satisfied claims of the KDIF (a creditor of the third priority) representing 88 per cent. of the total amount of indebtedness of the bank in respect of the third group of priority.

As at 1 March 2010, 24 of the 37 second-tier banks (excluding Zhilstroysberbank) had capital of over KZT 5,000 million and seven banks had a capital of KZT 2,000 million to KZT 5,000 million. Since 1 October 2009, any bank whose own capital (i.e. shareholders' equity) falls below KZT 5,000 million (or KZT 2,000 million for banks registered outside of Astana and Almaty) is required to apply to the FMSA for voluntary reorganisation into an organisation performing only limited banking operations. Starting from 1 July 2011 the minimum requirements for size of own capital are established at KZT 10 billion for banks, including newly-created banks, KZT 5 billion for residential construction savings banks and KZT 4 billion for banks registered and carrying out a significant part of their operations outside Astana and Almaty.

In 2001, the Government established the DBK to provide medium and long term financing for, and otherwise facilitate, industrial projects in Kazakhstan. The DBK was established with a charter capital of KZT 30,000 million. The DBK has its own legal status which does not fall within either tier

of the Kazakhstan banking system.  The DBK does not currently accept commercial or retail deposits or provide corporate settlement services.  However, the Bank expects that the DBK may become an important competitor in the corporate lending sector.  The DBK is not treated as a commercial bank for the purposes of market share data and ranking in this Information Memorandum.

The liberalisation of the economy in Kazakhstan in recent years has resulted in a number of foreign companies, including banks, establishing operations in Kazakhstan through direct investment and otherwise participating in the banking and financial services sector.  A foreign bank may not open a branch in Kazakhstan.  Accordingly, foreign banks must establish a Kazakhstan subsidiary or joint venture in order to operate as a bank in Kazakhstan.

While foreign-owned banks do not currently provide significant domestic competition and are not active in the retail banking sector, the Bank believes that in the long term such banks, some of which may have significantly greater resources and a cheaper funding base than the Bank, will, together with the larger local banks, become the Bank's primary competitors in the corporate banking sector. Foreign banks also bring international experience in servicing customers and target the most attractive corporate customers of Kazakhstan's domestic banks as well as foreign companies operating in Kazakhstan.

As at 1 March 2010, there were 19 banks with foreign participation operating in Kazakhstan, including RBS Kazakhstan, Citibank Kazakhstan and HSBC Bank Kazakhstan.  Under relevant Kazakhstan legislation, a bank with foreign participation is defined as a bank with more than one-third direct or indirect foreign ownership.  Banks with less than one-third direct or indirect foreign ownership are considered domestic banks.  A number of foreign banks have opened representative offices in Kazakhstan, including JPMorgan Chase Bank N.A., Deutsche Bank AG, Commerzbank AG, ING Bank N.V., Landesbank Berlin AG and Société Générale.

The total capital of commercial banks decreased to negative capital KZT 1,016 billion as at 1 March 2010 compared to negative capital of KZT 978 billion as at 1 January 2010 and KZT 1,453 billion as at 1 January 2009.  During such period, the total assets of such banks increased to KZT 11,745 billion as at 1 March 2010 from KZT 11,557 billion as at 1 January 2010 (compared to approximately KZT 11,890 billion as at 1 January 2009).  The aggregate liabilities increased to approximately KZT 12,761 billion as at 1 March 2010 from KZT 12,536 billion as at 1 January 2010 and KZT 10,437 billion as at 1 January 2009.  The aggregate net loss amounted to KZT 66,188 million for the first two months of 2010 compared to KZT 265,428 million for the same two months in 2009.

**Financial Stability and Restructuring Reforms**

*Financial Stability Laws*

On 23 October 2008, new legislation relating to the stability of the Kazakhstan financial system was adopted.

Under the new law, in the event of (i) a breach by a bank of capital adequacy or liquidity ratios; or (ii) two or more breaches by a bank in any twelve-month period of any other prudential or other mandatory requirements, the Government may, with the agreement of the FMSA, acquire, either directly or through a national management holding company (which is currently Samruk-Kazyna), the authorised shares of any bank in Kazakhstan to the extent necessary (but not less than 10.0 per cent. of the total amount of issued and outstanding shares of such bank, including those to be acquired by the Government or the national management holding company) to improve such bank's financial condition and ensure compliance with prudential or other mandatory requirements.  The new law provides that the management and shareholders of an affected bank do not have the right to approve any such acquisition, and any shares issued as part of any such acquisition may be issued without granting pre-emptive rights to existing shareholders.  Following such an acquisition, the state body authorised to manage state property or the national management holding company is authorised to appoint no more than 30.0 per cent. of the members of the board of directors and the management board of the affected bank.

The main objectives of the new financial system stability law are to improve early detection mechanisms for risks in the financial system, to provide powers to the Government to acquire shares in commercial banks that face financial problems and to improve the overall condition of financial institutions in Kazakhstan.  The law also consolidates authority to oversee large and second-tier Kazakhstan banks and provides additional mechanisms for supervising commitments made by banks and other financial institutions.

The Government or the national management holding company must sell the acquired shares within one year of their acquisition to a third party investor or investors by way of direct sale or through the stock exchange.  However, this term may be extended if the financial condition of the bank shows no sign of improvement.

On 2 February 2009, the FMSA agreed with the Government on the acquisition of approximately 75.1 per cent. of the Bank's Shares, which were subsequently acquired by Samruk-Kazyna within the new financial stability measures.  Also on 2 February 2009, Alliance Bank announced that its major shareholder had decided to sell 76.0 per cent. of the common shares of Alliance Bank to Samruk-Kazyna, and on the same date Samruk-Kazyna announced that it was considering such purchase.  Separately from the acquisition of the common shares of Alliance Bank, Samruk-Kazyna and Alliance Bank signed a deposit agreement for the deposit of KZT 24,000 million with Alliance Bank to support its financial stabilisation and further capitalisation.

The NBK decreased its refinancing rate from 10.5 per cent. to 10.0 per cent. effective from 1 January 2009, and the current refinancing rate is 7.0 per cent.  The stated reason for the rate cut was the shortage of liquidity in the market.

These measures proved to be insufficient and both the Bank and Alliance Bank defaulted on their debt in April 2009.  JSC Astana Finance, a diversified financial services company, defaulted and announced a moratorium on the repayment of its debt in May 2009, and other banks face increasing pressure due to the growing number of non-performing loans.  In response to the pressure faced by major banks in Kazakhstan in 2008-2009, Kazakhstan's parliament adopted the Restructuring Law with the twin aims of enabling consensual financial restructurings approved by a majority of creditors and of revising the existing framework for good bank/bad bank reorganisations.  See *"The Restructuring Law in Kazakhstan"*.  As at the date of this Information Memorandum, the Kazakhstan banking system remains under stress with banks starting to de-leverage through partial repayments and debt restructurings.

### The Restructuring Law in Kazakhstan

Prior to July 2009 when the Restructuring Law was adopted, there was no law in Kazakhstan which would allow for creditor claims to be restructured on a basis involving less than 100 per cent. consent of the affected creditors.  Creditors not wishing to participate in a restructuring had the ability to set off their claims against a bank's assets or bring litigation in any jurisdiction where any of these assets are located.

#### Financial Restructurings

The Restructuring Law introduced a procedure for restructuring the financial indebtedness of a bank in the following general format.  The bank decides to restructure its debt and enters into an agreement with the FMSA with respect to such restructuring.  The bank submits a restructuring plan to the FMSA for its consideration.  The restructuring plan should describe the process for and period of the restructuring, list the bank's assets and liabilities to be restructured, contain a *pro forma* balance sheet showing the bank's financial condition following the restructuring, and describe the bank's future activities and any limitations on them.  The bank applies to the Court to initiate the process described in the restructuring plan. If the Court approves the restructuring process then, with immediate effect, all relevant claims of the bank's creditors are stayed, the bank's property is protected from execution and attachment, and the bank's obligations under agreements for the sale of assets and any financial

commitments as either a lender (if the commitment carries any credit risk) or as a borrower, including contingent obligations such as guarantees, may be suspended in whole or in part.

The bank convenes a meeting of its relevant creditors to approve the restructuring plan.  If creditors holding at least two-thirds in value of the bank's obligations subject to restructuring vote in favour of the restructuring plan, the restructuring plan is approved.  The bank then submits the approved restructuring plan to the FMSA to establish its conformity with the restructuring plan originally submitted to the FMSA.  The restructuring plan is then submitted to the Court for final approval.  If the restructuring plan is approved by the Court, it becomes binding on all creditors with claims subject to the restructuring.

Completion of the bank's restructuring will be achieved when the restructuring plan has been carried out to the satisfaction of the Court and the FMSA.  Upon completion of the restructuring, the relevant liabilities of the bank are cancelled and any claims in relation to them are discharged and replaced by appropriate restructured claims.  Completion of the restructuring is confirmed by a decision of the Court upon the FMSA's application.

The restructuring process set out in the Restructuring Law is designed to be fair to the affected creditors and should ensure that a restructuring effected under it will be capable of international recognition in countries (such as the United Kingdom and the United States) which have adopted legislation based on the Model Insolvency Law.  However, as at the date of this Information Memorandum, the application of the Restructuring Law has been tested in practice just once, in the case of the restructuring of Alliance Bank.  See "*Risk Factors — Risks Relating to the Restructuring — The Restructuring Law has not been substantially tested in practice and there can be no assurance that any restructuring effected under such legislation, including the Restructuring, will be recognised internationally*".

*Good Bank/Bad Bank Reorganisations*

The second principal feature of the Restructuring Law is the amendment of the existing legislative framework allowing the segregation of the "good" assets and liabilities of a distressed bank and the transfer of them to another bank (or several banks) or to a specialised stabilisation bank.  The good bank/bad bank structure could be used in a number of different circumstances.  For example:

(i)     the process could be initiated by a bank itself if other efforts to restructure itself have failed or if it does not wish or cannot, for whatever reason, achieve a financial restructuring following the process described above;

(ii)    if a bank has already been placed in conservation, the reorganisation may be initiated by a temporary manager appointed by the FMSA; or

(iii)   if a bank's licence has been revoked, the reorganisation may be initiated by a temporary manager appointed by the FMSA to manage the bank's assets pending the court-ordered compulsory liquidation taking effect.

Any reorganisation under these new procedures requires the FMSA's consent and the consent of depositors and creditors.  Depositors and creditors are notified of the proposed reorganisation by an announcement published in Kazakhstan's mass media and any depositor or creditor may object to it by timely filing of a written objection.

*Stabilisation Banks*

The Restructuring Law also makes provision for the establishment of stabilisation banks.  These could be used as the "good" bank in the reorganisation into a good bank and bad bank of a bank which is in conservation.  A stabilisation bank would be a special purpose company established by the FMSA on an *ad hoc* basis and would have a special status under the Banking Law and a limited scope of business compared to ordinary commercial banks.  Due to its special status and purpose, a stabilisation bank would not be subject to normal capital adequacy and other prudential requirements.

Its main role would be to hold "good" assets while the segregation of the "good" and "bad" assets of the distressed bank was in progress.  Upon completion of the segregation process, the stabilisation bank would transfer the "good" assets to another bank designated by the FMSA, subject to the consent of the depositors and other creditors of the stabilisation bank.  The procedures for obtaining this consent would be similar to the procedures for obtaining the depositors' and creditors' consent to the initial transfer of "good" assets from the distressed bank.

The Restructuring Law provides that once the stabilisation bank passes on the assets to an acquiring bank, it may either be liquidated or be sold to an investor, provided the investor can procure a recapitalisation of the stabilisation bank and bring it into compliance with the requirements applicable to ordinary commercial banks because following a sale, the stabilisation bank would lose its special status and become subject to the general banking legislation applicable to an ordinary bank.

As at the date of this Information Memorandum, it is unclear whether one stabilisation bank can be used as a holding vehicle for "good" assets of several distressed banks.

**The FMSA's Compulsory Measures under the Banking Law**

Under the Banking Law, the FMSA may apply a number of compulsory restrictive measures to banks in financial distress or in breach of prudential or other mandatory regulations.  Articles 45, 46, 47 and 47-1 of the Banking Law allow the FMSA to apply, *inter alia*, the following compulsory measures to second tier banks (commercial banks) in Kazakhstan and their shareholders which are major participants or bank holding companies:

(i)     issuing a warning and mandatory written instructions to a bank;

(ii)    entering into an agreement with a bank setting out measures to be taken by the bank to remedy any identified breaches, including but not limited to breaches of prudential requirements;

(iii)   instituting the FMSA special regime in a bank and requiring the bank to develop an action plan to restore such bank's financial condition;

(iv)    suspending or revoking a bank's licence for all or certain banking operations;

(v)     mandatory purchase of a bank's shares;

(vi)    removing the management of a bank;

(vii)   forcing a bank to reorganise into a credit partnership;

(viii)  forcing a bank into conservation;

(ix)    forcing a bank into mandatory liquidation; and

(x)     forcing a bank into segregating such bank's "good" assets and liabilities and to mandatorily transfer such assets and liabilities to another bank or a specialised stabilisation bank, following the revocation of the bank's licence or the bank being put into conservation, pursuant to the Restructuring Law.

Where a bank's shareholders include a major participant or a bank holding company, the FMSA may require such shareholders to decrease their direct or indirect ownership of the relevant bank to less than 10.0 per cent. of the bank's voting shares in the case of a major participant and less than 25.0 per cent. of the bank's voting shares in the case of a bank holding company shareholder.  Such measures can be applied to a bank's shareholder when, for example, a bank is in breach of the FMSA's prudential requirements or the bank's shareholders which are major participants or bank holding companies are in an unstable financial condition which may negatively affect the bank concerned.  See "*Risk Factors — Risks Relating to the Restructuring — The Bank may face litigation if the FMSA applies any of its compulsory restrictive measures to the Bank*".

### The FMSA Special Regime

Article 45.2 of the Banking Law provides for "measures of early response" which the FMSA may apply to a bank under certain circumstances. These are discretionary measures that the FMSA may take with respect to a bank that is in financial distress. For example, if a bank's liquidity ratio is lower than usual, the FMSA may require such bank to develop and deliver to the FMSA for approval a plan of action which the bank must undertake to improve its financial stability. If the FMSA does not approve the plan, it may apply certain early response measures including replacing the bank's management and restructuring the bank's assets.

### Reorganisation into a Credit Partnership

Under Article 47 of the Banking Law, the FMSA may require a bank to reorganise into a credit partnership if the bank's capital adequacy ratios fall to a level below 50.0 per cent. of the minimum requirements. Shareholders of a bank being reorganised receive participation interests in a credit partnership in proportion to their shares in the reorganised bank. A credit partnership is not allowed to carry out normal banking activities and is allowed to carry out only certain limited banking operations and services for its participants.

### Mandatory Purchase of Shares

The Banking Law provides that the FMSA may, with the Government's consent, effect a mandatory purchase of all of a bank's shares (including shares underlying any global depositary receipts) from such bank's shareholders at a price determined by the FMSA in the event the bank's own capital (i.e. shareholders' equity) is negative. According to the Banking Law, after such purchase the FMSA must transfer the shares to a new investor which can procure an increase of the bank's regulatory capital and restore the bank's normal operations.

### Conservation

Conservation is a compulsory measure which may be applied by the FMSA to a Kazakhstan second tier bank (i.e., not upon such bank's discretion) when, among other things, such bank is in breach of prudential norms. When a bank is put into conservation, the authority to manage the bank is transferred to a temporary manager appointed by the FMSA. The bank put into conservation may carry out its operations in its regular manner, but specific restrictions may be imposed by the FMSA (for example suspending contingent liabilities of the bank). Under conservation the bank is granted statutory immunity from the decisions of the Kazakhstan courts and international arbitration awards. This immunity covers decisions and arbitral awards issued prior to the bank entering into conservation as well as those issued after the establishment of the conservation. Enforcement of court orders or arbitral awards against the bank in respect of its indebtedness (whether domestic or international) is not permitted. Accordingly, conservation protects the bank from the enforcement of any domestic or foreign court decisions as well as any arbitral awards in respect of its indebtedness that arose prior to or during the conservation period. There have not been many examples of banks being put into conservation in the Kazakhstan banking sector. Financial institutions that have gone through conservation include Nauryz Bank in 2004 (the successor to Kazagroprombank, which itself went through conservation in 2001) and JSC NP Valut Transit Fund. Both these institutions were unable to improve their financial condition during the conservation period. At present, these institutions are in the process of liquidation.

### Bankruptcy Regime

Any creditor has the right to initiate insolvency proceedings against a Kazakhstani entity (including a bank) if the entity has failed to pay its debt within three months after the debt became due and payable, *provided that* the amount owed by the debtor is more than 150 times the monthly calculation index (approximately U.S. Dollars 1,273). The court will declare the entity bankrupt if the entity fails to prove its solvency.

However, in respect of banks, it is not the court but the FMSA which will determine whether the bank is insolvent.  Thus, under the Banking Law, a court cannot declare a bank insolvent unless the FMSA consents.  The FMSA will determine whether the bank is solvent on the basis of its own calculations, taking into account the applicable capital requirements and other factors.

If the FMSA advised that the bank was not insolvent, then the bankruptcy proceedings would be effectively terminated and the bank could be put into conservation.  If the FMSA decided that the bank was indeed insolvent and this decision was confirmed by the court, then the court would have a liquidator appointed by the FMSA and there would be a liquidation of the bank's assets in accordance with the order of priority set out under the Banking Law which is as follows:

(i)      administrative and legal expenses of bankruptcy;

(ii)     payments for tort claims involving harm to life or health;

(iii)    payments due to employees as a result of their employment and related social security and mandatory pension payments;

(iv)    KDIF's claims related to insured deposits;

(v)     claims of individual depositors relating to deposits and transfers, deposits made from pension fund assets and deposits of life insurance companies;

(vi)    claims of non-profit organisations;

(vii)   claims of legal entities secured by pledges of the bank's property;

(viii)  tax liability settlements and repayment of borrowings from the state; and

(ix)    unsecured claims of creditors.

## DESCRIPTION OF SHARE CAPITAL AND CERTAIN MATTERS OF KAZAKHSTAN LAW

**Share Capital**

The Bank's authorised share capital consists of 38,286,050 Shares and 100,000 preference shares.  As at the date of this Information Memorandum, the Bank had 33,616,968 Shares issued and outstanding and zero preference shares issued and outstanding, all of which were all fully paid.

The holders of the Bank's Shares and preference shares can decide at a general meeting to convert the preference shares into Shares.

All Shares are in registered form in the share register of the Bank, maintained by an independent third party registrar.  The registrar is Centre "DAR" JSC and its address is 565/8, Seifullina Avenue, 050012, Almaty.  Ownership of the Shares is evidenced by an extract from the share register of the Bank.

**Summary of the Charter**

The Charter provides that the Bank's principal objective is to facilitate formation and further development of a market economy in the Republic of Kazakhstan, to conduct financial activities with the purpose of developing various sectors of economy, to earn profit and use the profits in the interests of shareholders and to conduct and expand the scope of banking services in accordance with international standards and legislation of the Republic of Kazakhstan.  The Bank's objects are set out in full in Article 4 of the Charter.

Subject to the provisions of the JSC Law and the Charter and without prejudice to any rights attached to any existing Shares or class of Shares, the Bank may issue Shares, preference shares and other securities convertible into Shares.

The General Meeting of Shareholders of the Bank has authority to determine the total number of authorised shares of the Bank, while the Board of Directors has the authority to decide to place (sell) such shares, to determine the selling price and other placement terms.

**New Charter**

The Bank is in the process of preparing a New Charter that will reflect changes to the composition of the Board of Directors, approval matters and required voting majorities.  Although the Bank has discussed the New Charter with the FMSA and has received its in principle approval of certain provisions thereof, the New Charter remains subject to official approval of the FMSA and other relevant governmental bodies.  Therefore, the types of approval matters and the required voting majorities for the approval of such matters as well as other provisions of the New Charter may not fully represent those set out in "*Share Distribution and Rights of Minority Shareholders — Shareholder/Board Approvals*".  Some of the provisions expected to be incorporated into the New Charter have never been tested under Kazakhstan law and the Bank gives no assurances that the applicable governmental and regulatory authorities will hold such provisions to be in compliance with Kazakhstan law.  If such provisions are not found to be in compliance with Kazakhstan law by the applicable governmental and regulatory bodies they may refuse to register the New Charter.  Therefore, certain protections which the Bank is seeking for its shareholders may not be available under the New Charter and there is the risk that the New Charter will not contain certain of the proposed amendments as described herein.  See "*Risk Factors — Risks Relating to the Restructuring — Certain provisions of the New Charter may not comply with the requirements of Kazakhstan law and shareholders of the post-restructured Bank may therefore not receive the protections afforded by the New Charter described in this Information Memorandum*".

*Composition of the Board of Directors*

Under the proposed terms of the New Charter, the Board of Directors will be comprised of nine directors. In accordance with the Term Sheet, the Board of Directors will be comprised of three Independent Directors, two Creditor Directors and four Samruk-Kazyna Directors. For a description of the approval and replacement procedures for the directors, see "*Management and Corporate Governance — Management and Corporate Governance Following the Restructuring — Board of Directors*".

*Voting*

As currently proposed, the New Charter will amend the existing Charter to provide that, *inter alia*, the following matters shall not have any effect unless and until such matters have been approved by the affirmative votes of:

(i)       Shareholders holding not less than 75 per cent. of the total number of Shares; and

(ii)      *provided that* the GDRs then in issue represent five per cent. or more of the total number of Shares then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two-thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote:

      (a)       alteration of the New Charter;

      (b)       any change to the New Corporate Governance Code;

      (c)       any change of the Bank's auditors or the auditors' terms of reference;

      (d)       adoption of a decision on the voluntary de-listing of the Shares from the list of any stock exchange or adoption of a decision to list the Shares;

      (e)       any increase in the Bank's authorised share capital;

      (f)       adoption of a decision to purchase of its share capital or other securities or conversion of any of its Shares or other securities other than as permitted under the terms of the New Instruments;

      (g)       adoption of a decision to change the absolute number of directors on the Board of Directors;

      (h)       approval of disposal by the Bank of any (i) assets, (ii) property, (iii) undertaking, (iv) business or (v) shares/participatory interests in the charter capital of any legal entity (excluding disposals made in the ordinary course of trading of the Bank) in any financial year (whether by one or more transactions) of more than 6.5 per cent. of the Bank's total consolidated gross assets;

      (i)       making any material change to the nature or scope of the Bank's or any Subsidiary's business;

      (j)       approval of entering into any scheme of arrangement, reorganisation, reconstruction or compromise or other arrangement with creditors; and

      (k)       approval of taking any step to dissolve or wind-up the Bank or any Material Subsidiary or to commence any other procedure an effect of which would be to create a general moratorium with respect to proceedings by its creditors.

In addition, as currently proposed, the New Charter will provide that, *inter alia*, the following matters will require the approval of a majority of the Board of Directors including both of the Creditor Directors and at least one Independent Director:

(i)     any change of the special auditor (whose functions are to audit compliance of the Bank with the New Corporate Governance Code and internal procedures and controls and implementation of the Bank's business plan) or any change to his terms of reporting and responsibilities;

(ii)    any change to the Bank's credit approval and decision-making procedures or lending policies or procedures;

(iii)   approval of any of the Bank's internal audit, risk management or compliance policies or procedures and amendments thereto;

(iv)    adoption of decision to issue any Shares or preference shares or securities or to grant any option to subscribe for Shares or equity-linked securities or to issue convertible securities or to enter into any agreement for the same;

(v)     approval of any prospectus or any amendments to the prospectus for the issue of any Shares or preference shares of the Bank;

(vi)    approval of borrowing other than in the ordinary course of business and borrowing at rates above market rates;

(vii)   appointing or removing the chairman of the Management Board, or any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer;

(viii)  approval of entering into and/or amending any contract of employment or appointment with the chairman of the Management Board, any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer and the setting of salaries, terms of work, bonuses, incentives, commissions and other emoluments of such persons;

(ix)    taking a decision on terminating the employment of the chairman of the Management Board or approving or allowing the termination of employment of any member of the Management Board, including the chief executive officer, chief operating officer, chief compliance officer, chief risk officer and/or chief financial officer;

(x)     approval of the Bank adopting any new business plan or budget or making any material change to the Bank's existing business plan or budget;

(xi)    otherwise than as required by law, materially amending its accounting or financial policies or reporting practices including but not limited to the provisioning, write-off policies and write-back practices;

(xii)   approval of entry into any lending arrangement on terms other than market terms;

(xiii)  approval of incurring or entering into any commitment to incur any capital expenditure if the estimated amount or aggregate value of capital commitments already incurred or contracted for by the Bank and all its Subsidiaries when considered as a whole in that financial year exceeds the budgeted annual amount for that year by more than five per cent.;

(xiv)   decision to commence or discontinue the prosecution or defence of, or settle any litigation or arbitration proceedings or claim, in each case where the amount claimed exceeds U.S. $30,000,000 (except in respect of debt collection in the ordinary course of business or applying for or defending an interim injunction where it is not practicable to obtain consent);

(xv)     adoption of a decision on disposal by any member of the Group in any financial year of more than 6.5 per cent. of the Bank's total consolidated gross assets;

(xvi)    approval of entry into or completion of any interested-party transaction, that is a transaction with an "Affiliate" of the Bank as that term is defined under Article 64 of the Kazakh Joint Stock Company Law;

(xvii)   approval of entry any Transaction involving Samruk-Kazyna or any of its Subsidiaries which involves aggregate payments or value of U.S.$75,000,000 or more; and

(xviii)  any Board decision to put a resolution before a general meeting of the Bank to approve the payment, making or declaring of any dividend in cash or in specie out of its profits, assets or reserves.

In addition, under the New Charter as currently proposed, *inter alia*, the following matters will require approval by either:

(i)      the Management Board, or

(ii)     a simple majority of the Board of Directors, or

(iii)    the majority of the Board of Directors including both of the Creditor Directors and at least one Independent Director, or

(iv)     Shareholders holding not less than 75 per cent. of the total number of Shares and, *provided that* the GDRs then in issue represent five per cent. or more of the total number of Shares then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least two thirds of the votes cast by the Depositary on behalf of GDR Holders eligible to vote,

depending on the value of the transaction, liabilities (individual or in aggregate), security interests or other changes to the Bank's or to the Bank's and each Subsidiary's business in comparison with the Bank's charter capital or net assets:

(a)      acquisition by the Bank of any assets or property or shares/participatory interests in the charter capital of other entities or persons;

(b)      increasing the Bank's liabilities;

(c)      creating or causing to be created any security upon the whole or any part of its present or future undertaking, assets or revenues (including uncalled capital) to secure any financial indebtedness or guarantee of Financial Indebtedness other than a Permitted Security (excluding under paragraph (j) of the definition of permitted security);

(d)      the Bank providing any form of financial support in connection with any Subsidiary increasing its liabilities or making an acquisition;

(e)      the Bank or any subsidiary of the Bank participating in, entering into, amending or varying any partnership, joint venture or profit/revenue sharing arrangement or agreement or any management contract;

(f)      the Bank or any Subsidiary entering into any merger; and

(g)      any sale of the whole or any part of the Bank's loan book at a discount.

### *Quorum for Shareholders and Board Meetings*

The current Charter of the Bank provides that the quorum for the General Meeting of Shareholders shall be one or more Shareholders together holding more than 50 per cent. of the voting rights at the

time any business is transacted.  Should any General Meeting of Shareholders be adjourned due to lack of quorum, the quorum at the subsequent adjourned General Meeting of Shareholders shall be one or more Shareholders holding 40 per cent. or more of the voting rights at the time any business is transacted.  The New Charter will set the same quorum requirements for the General Meetings of Shareholders.

The quorum for an ordinary meeting of the Board of Directors shall be at least half of the total number of directors including a director nominated by Samruk-Kazyna and a Creditor Director and for a meeting which is to consider a matter that requires the approval of a Qualified Majority of the Board of Directors the quorum shall be at least half of the total number of directors including a director nominated by Samruk-Kazyna and both Creditor Directors.  Should any meeting of the Board of Directors be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board of Directors meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.

### Other Provisions

Board of Directors meetings will be held at least ten times per year until the second anniversary of the Restructuring Date and thereafter four times per year.  Board of Directors meetings shall be convened by the chairman of the Board of Directors upon the request of any director, the Bank's internal auditor, the Bank's external auditor or any major shareholder.

As currently proposed, the New Charter will provide that at least one Creditor Director shall be appointed to sit on each committee of the Board of Directors (including, the Remuneration and Appointments Committee, the Recovery Sub-Committee, the Audit Committee and the Risk Management Committee).

### Voting Rights

Subject to any rights or restrictions attached to any class of Shares by or in accordance with the Charter every holder of Shares present in person or by proxy shall have one vote for each fully paid Share of which he is the holder.  No holder of preference shares shall be entitled to vote except in limited circumstances.

Supermajority matters as described in "*Description of Share Capital and Certain Matters of Kazakhstan Law New Charter — Voting*" shall not have any effect unless and until such matter has been approved by a resolution passed at a duly convened Shareholders' meeting at which a quorum is present, by the affirmative votes of:

(i)     Shareholders holding not less than 75 per cent. of the total Shares; and

(ii)    *provided that* the GDRs then in issue represent 5 per cent. or more of the total Shares of the Bank then in issue and *provided that* the Depositary casts at least one vote on the relevant resolution, the approval of at least 2/3 of the votes cast by the Depositary on behalf of GDR Holders eligible to vote.

No resolution of shareholders in writing shall be effective without a quorum being present (which is persons holding 50 per cent. or more of the voting share capital of the Bank) or, for an adjourned meeting called in absence of the 50 per cent. quorum, persons holding 40 per cent. or more of the voting share capital of the Bank.

### Dividends and Other Distributions

The JSC Law sets out the procedure for determining dividends that may be distributed by the Bank to its shareholders.  Subject to the provisions of the JSC Law, the General Meeting of Shareholders may declare dividends to be paid to holders of the Shares by simple majority vote.  Under the JSC Law and the Charter, the Bank may distribute dividends to the holders of its Shares annually or based on its

quarterly or semi-annual results (subject to all JSC Law requirements therefor) only on the basis of a decision of the General Meeting of Shareholders.

The JSC Law prohibits the accrual of dividends if a company's "own capital" is negative or would become negative as a result of such an accrual or if the Bank is insolvent under Kazakhstan bankruptcy legislation or would become so as a result of such an accrual.

Except as provided by the rights and restrictions attached to any class of shares, the holders of the Shares will, under the JSC Law, be entitled to participate in any surplus assets on a winding-up in proportion to their shareholdings.

The Bank and Samruk-Kazyna will, pursuant to the the Samruk-Kazyna Undertaking and the BTA Undertaking, agree that no dividends shall be paid other than Permitted Dividends.

**Variation of Rights**

Under the JSC Law, the rights of holders of common and preference shares may be extended by a company's charter (although the Charter does not extend such rights), but these rights cannot be restricted.

**Transfer of Shares**

To transfer a Share on the over-the-counter market, the holder (or its representative) must sign a written order and submit it to the registrar or its nominee for execution, or give suitable electronic instructions as permitted by Kazakhstan law.  The other party to the transaction or its nominee will execute a buy order by pairing it with a sell order.  Transfer of Shares on the organised securities market must be done in accordance with the rules of such market.

All dealings in the Shares must be registered by way of making entries in the personal accounts in the registry system or the nominee's books and also reflected in the "unified system of registers" maintained by KCD. Legal title to a Share vests from the moment when the transaction is so registered (unless each party to the transaction has a different nominee, in which case legal title transfers at the moment when the transaction is registered in the personal accounts of each nominee in the KCD).

An extract from the personal account of a shareholder in the registry system or a nominee's books is evidence of that holder's legal right to a Share.

A registrar or its nominee can refuse to register a transfer of Shares if the documents submitted do not conform to legal requirements and its internal requirements.

In addition, the FMSA has the right (by notifying the relevant issuer, the registrar and the KCD) to suspend trading in securities listed on the KASE by blocking all or certain personal accounts in the registry or nominee systems if legal requirements establishing (i) the rights and interests of investors when acquiring securities or (ii) the terms and procedures for trading securities have been violated.

A fee will ordinarily be payable to the registrar or nominee for registering the transfer, under contractual terms.

**Authority to Allot Shares**

Under the JSC Law, the Board of Directors may issue and place Shares by a resolution of the Board of Directors.  Any decision must state the number and the price of the Shares, the manner of subscription and qualification requirements to investors.  The New Charter of the Bank proposes that any placement (sale) of Shares shall require approval of a Qualified Majority of the Board.

**Alteration of Share Capital**

The Bank may from time to time by a Supermajority vote of holders of the voting share capital of the Bank at a General Meeting of Shareholders (but by no other method) increase its authorised share capital.

**Unpaid and Bought-Back Shares**

The JSC Law states that, until a Share is paid in full, the Bank must not instruct the registrar to credit the Share to the personal account of the would-be acquirer.  Instead, the Share will be credited to the account of the Bank itself with the registrar.  Therefore, a Share cannot be placed unless it is fully paid up.

Shares which have been bought back by the Bank are credited to another special account of the Bank with the registrar.

No dividends accrue or are payable on issued Shares that have not yet been placed or Shares bought back by the Bank.  Such Shares are not counted for the purposes of determining a quorum and do not carry the right to vote.

**Purchase of Own Shares**

Subject to the JSC Law and without prejudice to any relevant special rights attached to any class of shares, the Bank may purchase any of its own shares of any class in any way and at any price (whether at par or above or below par) using a valuation methodology which has been approved in advance by a General Meeting of Shareholders.  Any such purchase must be effected with the consent of the relevant Shareholder.  Shares purchased by the Bank will be credited to the Bank's account with the registrar.

The Bank cannot purchase any of its Shares which are being placed in a primary offering, and cannot purchase its own Shares before confirmation by the FMSA of the results of the placement of Shares.

In certain limited circumstances provided by the JSC Law, a Shareholder may request the Bank to buy back Shares belonging to the Shareholder, which the Bank must do within 30 days of receipt of a duly formalised request from the Shareholder.

In addition, the Bank will agree as a term of the New Notes that it will not buy back any of its Shares in circumstances which would result in any reduction of its share capital within the first 3 years following the Restructuring Date and, thereafter, by more than one per cent. in aggregate in any year.

Shares being bought back by the Bank cannot exceed 25 per cent. of the total number of issued Shares of the Bank, and the purchase price cannot exceed 10 per cent. of the size of the Bank's own capital.

**Pre-emption Rights**

Under the JSC Law, a Shareholder of the Bank has a pre-emptive right to acquire any newly placed Shares of the Bank (including newly issued Shares or Shares previously bought back).  Accordingly, holders of Shares have pre-emptive rights on newly issued Shares.  However, according to the Banking Law upon conversion of securities into the shares of a bank within the framework of its restructuring, the pre-emptive rights are not available to shareholders of a bank upon placement of its shares through conversion of securities and/or monetary obligations of a bank into its shares.

Subject to the above paragraph, within 10 days from the date upon which the Bank takes a decision to issue new Shares, it must make an offer to each existing shareholder (either by written notification or by way of publication in the mass media) to acquire the new Shares *pro rata* to its shareholding at the placement price established by the Bank in the decision.  Each shareholder then has 30 days from the date of such notification or publication to submit an application to acquire such Shares (i.e., to exercise its pre-emptive right).  Upon the expiry of such period, the right to submit such an application will lapse.

The FMSA has in the past taken the position that persons not holding Shares and therefore not disclosed in the register of the KCD, such as the holders of GDRs, are not entitled to the pre-emptive rights attaching to the underlying Shares.  Although the FMSA currently takes the position that holders of GDRs are entitled to such rights (and although there is nothing under current Kazakhstan law that would prevent GDR holders from exercising the pre-emptive rights that are attached to the underlying Shares), there is no guarantee that the FMSA will not reverse this position in the future.

**General Meeting of Shareholders**

The Board of Directors must convene and the Bank must hold extraordinary General Meetings of Shareholders and annual General Meetings of Shareholders in accordance with the requirements of the JSC Law.  The Board of Directors may call extraordinary General Meeting of Shareholders at such times as it determines.  In addition, an extraordinary General Meeting of Shareholders should be convened by the Board of Directors on the written request of any holder of Shares representing not less than 10 per cent. of the issued Shares.  According to the proposed amendments to the Charter any Shareholder or Shareholders holding in excess of 5 per cent. of the total number of issued and outstanding Shares shall be entitled to require the calling of an extraordinary General Meeting of Shareholders and propose resolutions to be put to the vote at the meeting.

Shareholders are entitled to receive not less than 30 (45 in the event of a meeting in absence pursuant to the absentee voting procedure) days' notice of any general meeting.

Under the JSC Law, the General Meeting of Shareholders has exclusive competence to determine certain matters, including, but not limited to, the following:

(a)     the introduction of amendments and supplements to, or the approval of new versions of, the Charter;

(b)     the voluntary reorganisation or winding up of the Bank, including any change in the Bank's status as a Kazakhstan joint stock company;

(c)     any increase in the amount of authorised Shares of the Bank or any change in the class of any authorised Shares of the Bank which have not been issued or placed;

(d)     the determination of the scope and the expiry dates of the powers of the Board of Directors, the selection of members of the Board of Directors and early termination of their powers, as well as determination of the amount and payment terms of remuneration to members of the Board of Directors;

(e)     the appointment of an auditor of the Bank;

(f)     approval of annual financial statements and the amount of the annual dividend paid on Shares, if any;

(g)     determination of conditions and procedures for converting the Bank's securities or amending the rights attached to such securities; and

(h)     if such decision may not be taken by the Board of Directors, decisions on behalf of the Bank to conclude any transaction by the Bank with any affiliate of the Bank.

The JSC law also requires that matters referred to in paragraphs (a) to (c) above shall require the approval by a Qualified Majority of shareholders.

The General Meeting of Shareholders has the right to cancel any decision made by any other management body of the Bank on issues related to the internal organisation of the Bank.

The proposed New Charter provides that matters (a), (b), (c), (e) and a number of other matters described in "*Description of Share Capital and Certain Matters of Kazakhstan Law — New Charter — Voting*" also require Supermajority Approval of Shareholders.

**Directors**

The Board of Directors must comprise no fewer than three persons, of which no fewer than one third must be independent directors.  Members of the Board of Directors are appointed by Shareholders by way of cumulative voting (whereby each Shareholder has a right to give the votes owned by such Shareholder completely to one candidate or to be distributed among several candidates to the Board of Directors).  Candidates receiving a majority of votes are appointed to the Board of Directors.  If two or more candidates gain an equal number of votes then an additional election is carried out with regard to such candidates.

The quorum required for a duly convened meeting of the Board of Directors shall be not less than half of the members of the Board of Directors.  The New Charter provides that the quorum required for a duly convened meeting of the Board of Directors shall be not less than half of the members of the Board of Directors including a Samruk-Kazyna Director, and a Creditor Director.  For any meeting which is to consider a matter specified as a "Qualified Majority" matter as described in "*New Charter — Voting*", the quorum for such Board meeting shall be at least half of the total number of directors including a Samruk-Kazyna Director and both Creditor Directors.  Should any meeting of the Board be adjourned due to lack of quorum, the quorum at the subsequent adjourned Board meeting shall be at least half the total number of directors provided all meeting notice requirements have been properly complied with by the Bank.  Each member of the Board of Directors has one vote.  Decisions of the Board of Directors are made by a simple majority of votes of the members present at the meeting except in relation to matters requiring Qualified Majority approval which require the consent of both Creditor Directors and at least one Independent Director.

A General Meeting of Shareholders has the right to terminate at any time the powers of all or any members of the Board of Directors and to remove any member of the Board of Directors from office except for decision in relation to Qualified Majority matters which require the consent of both Creditor Directors and at least one Independent Director.

The current Charter provides that the Board of Directors has exclusive competence to determine certain matters including the following:

(i)     the placement of Shares, including the price, number and the manner of subscription of the Shares to be placed and qualification requirements for investors;

(ii)    the powers of the Management Board, the selection of the chairman of the Management Board and members of the Management Board, and early termination of their powers;

(iii)   the remuneration and bonuses to be paid to the members of the Management Board;

(iv)    any agreements concerning major transactions of the Bank (being a transaction or combination of interrelated transactions which result or may result in the purchase or disposal by the Bank of assets representing 25 per cent. of the total value of the Bank's assets), transactions resulting in an increase of the Bank's liabilities by an amount equal to or exceeding 10 per cent. of the Bank's related party transactions and acquisitions of 10 per cent. or more of the voting shares of other legal entities;

(v)     the establishment of the general terms and conditions of the Bank's operations and approval of certain internal regulations; and

(vi)    the establishment of the Bank's strategic plan, annual operation plan, annual budget, business plan and investment plan.

The New Charter proposes that the Board of Directors have the competence to determine certain matters relating to major transactions in a number of ways depending on the size of the transaction.  In particular, the Board of Directors shall have the power to approve any agreements concerning major transactions of the Bank (being a transaction or combination of interrelated transactions which result or may result in the purchase or disposal by the Bank of assets representing between 10 per cent. and

25 per cent. of the total value of the Bank's Net Assets) or transactions resulting in an increase of the Bank's liabilities by an amount equal to or exceeding 10 per cent. but less than 25 per cent. of the Bank's charter capital.  Some related party transactions may also require Board Approval.  For transactions below 10 per cent. of the total value of the Bank's Net Assets the decision is within the powers of the management board of the Bank, and for transactions for those above 25 per cent., the decisions must receive shareholder approval.  For more information in relation to the competence of the Board of Directors as such is proposed under the New Charter, please refer to the "*Share Distribution and Rights of Minority Shareholders — Shareholder/Board Approvals*".

### Remuneration of Directors

The remuneration of the members of the Board of Directors shall be determined by the General Meeting of Shareholders.  The chairman of the Board of Directors should inform Shareholders of the amount and composition of the remuneration of directors and the members of the Management Board of the Bank.

### Conflicts of Interest of Directors

A member of the Board of Directors cannot participate in discussions or vote on any transaction between the Bank and:

● himself or any related persons;

● any legal entity in which she/he or any related persons has a material interest in, or is otherwise affiliated with; or

● any legal entity in which she/he or any related persons is a director or manager.

### Disclosure of Beneficial Ownership

A list of Shareholders that have the right to participate in a General Meeting of Shareholders and vote at the meeting will be prepared by the Bank's registrar on the basis of information recorded in the register of shareholders of the Bank.  However, any Shareholder holding Shares through a nominee and whose identity is not disclosed to the KCD shall not be entitled to vote at a General Meeting of Shareholders.  Holders of GDRs will be able to exercise their voting rights as described in "*The GDR Programme — Rights of GDR Holders in respect of Deposited Shares*".  These GDR holders will also be able to exchange GDRs for Shares.

Ownership of the Shares is also subject to certain restrictions under Kazakhstan law.  Specifically, (a) legal entities registered in any of the offshore jurisdictions specified below or which have affiliates registered in such jurisdictions or (b) individuals who are participants or shareholders in such legal entities may not directly or indirectly own voting shares in the capital of the Bank unless the Bank is a subsidiary bank of a foreign bank having a credit rating of "A" or above from certain rating agencies.  Accordingly, holders of GDRs falling under (a) or (b) above will not be entitled to vote through the Depositary at General Meetings of Shareholders, cannot exchange GDRs into Shares and cannot own, hold or dispose of the Shares.

The offshore jurisdictions referred to above are Andorra, Antigua and Barbuda, the Bahamas, Barbados, Belize, Brunei, China (Hong Kong and Macau Special Administrative Regions only), Comoros, Costa Rica, Cyprus, Djibouti, Dominican Republic, Grenada, Guatemala, Indonesia, Liberia, Liechtenstein, Malaysia (Labuan Enclave only), the Marshall Islands, Maldives, Malta, Mauritius, Monaco, Myanmar, Nauru, the Netherlands (Aruba and the Netherlands Antilles only), New Zealand (Cook Islands and Niue only), Nigeria, Palau, Panama, Portugal (Madeira only), Samoa, Saint Vincent and the Grenadines, Saint Kitts and Nevis, Saint Lucia, Spain (Canary Islands only), Seychelles, United Kingdom of Great Britain and Northern Ireland (Anguilla, Bermuda, British Virgin Islands, the Cayman Islands, the Channel Islands (Guernsey, Jersey, Sark and Alderney), the Isle of Man, Gibraltar, Montserrat and the Turks and Caicos Islands only), the United States of

America (the U.S. Virgin Islands, Guam and Puerto Rico only), the Philippines, Sri Lanka, Tonga and Vanuatu.

A holder of Shares that intends to participate in a General Meeting of Shareholders of the Bank should certify in writing that its is not and it does not have any affiliates registered in any of the offshore jurisdictions referred to above if the Bank does not have such information on file already.  A holder of Shares that does not provide such evidence will not be allowed to participate in a General Meeting of Shareholders of the Bank.

If such is determined to be untrue or if an individual participant in a holder of Shares is registered in any of the offshore jurisdictions referred to, the following consequences will ensue:

(i)     if a resolution of the meeting was passed by a majority of voting Shares (excluding the Shares in question) the resolution will be regarded as passed only if it would have been passed disregarding the votes of the Shares in question; and

(ii)    if disregarding the votes of the Shares in question means that the resolution would not have been passed, the resolution may be declared invalid by claim of the FMSA or other interested parties.

Although the Bank has been advised that such restrictions should not prevent a holder of GDRs registered in any such jurisdiction (or which has an affiliate registered in such jurisdiction) from exercising or benefiting from other rights (including the right to receive dividends and pre-emptive rights in respect of the non-voting Shares) there is no guarantee that the FMSA or any other relevant authority such as a Kazakhstan court will not take a different view thereby restricting all such holders of Shares from exercising or benefiting from such shareholder rights.  Moreover, there can be no assurance that the FMSA or any other relevant authority would not interpret the foregoing legislation as restricting such entities or persons from owning the GDRs. In addition, any natural person or legal entity becoming a "major shareholder" or, for legal entities, a "bank holding" company in relation to the Bank should obtain prior written permission of the FMSA.  A major shareholder or bank holding company means a person directly or indirectly owning or holding 10 per cent. or 25 per cent. respectively, of the voting Shares or who can otherwise influence the decisions of the Bank on the basis of an agreement or otherwise as set out by the FMSA regulations.

In addition, any person acquiring 10 per cent. or more of the voting shares of the Bank is considered an affiliate of the Bank and must disclose its identity to the Bank.  Information about the identity of an affiliate is public information.

**Mandatory Offers**

Under the JSC Law a person either alone or jointly with its affiliated persons who acquired 30 per cent. or more of the voting Shares is required to make an offer to the remaining shareholders to buy out their Shares at no less than the market price.  Any failure by the acquirer to make such an offer would result in the acquirer being obligated to reduce its shareholding to not more than 29 per cent.

**Related Party Transactions**

Interested party transactions as described under Article 73 of the JSC law should be approved by a majority of non-interested members of the Board of Directors or, if all directors are interested, by the decision of a General Meeting of Shareholders made by a majority of non-interested Shareholders or by a simple majority vote if all Shareholders are interested.

The New Charter proposes that other related party transactions which fall outside the JSC Law definition of Interested Party transaction and which have a value of over $5 million or, in the case of transactions involving Samruk-Kazyna or any of its affiliates, or its subsidiaries, which involves aggregate payments or value of U.S.$75 million or more, shall also require the approval of a Qualified

Majority of the Board.  See "*Distribution of Shares and Rights of Minority Shareholders — Shareholder/Board Approvals*"

## TAXATION

*The following summary covers only certain taxation matters in Kazakhstan and does not cover taxation matters in any other jurisdiction.*

*The following summary of certain Kazakhstan taxation matters is based on the laws and practice in force as at the date of this Information Memorandum and is subject to any changes in the law and the interpretation and application thereof, which changes could be made with retroactive effect. The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of New Notes and Shares, and does not purport to deal with the tax consequences applicable to all categories of Claimants, some of which may be subject to special rules. Save as otherwise indicated, this summary addresses only the position of Claimants who do not have any connection with Kazakhstan other than a holding of New Notes or Shares.*

*Each Claimant is urged to consult its own tax adviser as to the particular tax consequences to such Claimant relating to the Restructuring Plan, including the applicability and effect of tax laws or tax treaties in any relevant jurisdiction, and of pending or proposed changes in applicable tax laws as at the date of this Information Memorandum, and of any actual changes in applicable tax laws after such date, and to seek specialist Kazakhstan tax advice as necessary.*

This summary discusses the Kazakhstan tax consequences of the acquisition, ownership and disposal of New Notes and Shares. In general, Kazakhstan tax legislation with respect to the taxation of securities and financial instruments is not well developed, and in many cases the exact scope of Kazakhstan tax, compliance rules and enforcement mechanisms is unclear or open to different interpretations.

The only tax that may under certain circumstances apply in Kazakhstan to the above transactions is income tax. No other taxes or duties should be levied in Kazakhstan with respect to the above transactions. For all relevant purposes of this summary, except as noted below (*e.g.*, in relation to treaty relief in respect of dividends), legal entities and individuals are subject to similar income tax treatment.

**Shares**

*Tax Residence*

Non-resident persons will not become resident in Kazakhstan for Kazakhstan tax purposes by reason only of the acquisition, ownership or disposal of the Shares. Therefore, under Kazakhstan tax law, holders of the Shares should be taxed only on their income earned from sources in Kazakhstan, rather than their worldwide income.

References to holders of the Shares in this summary mean legal owners of such Shares. This summary assumes that no holders of the Shares are resident in Kazakhstan for tax purposes.

*Disposals of Shares*

The new Tax Code came into effect in Kazakhstan on 1 January 2009. Under the new Tax Code, generally all disposals and acquisitions of the Shares are exempt from any tax payment, reporting or compliance requirements in Kazakhstan. There is a risk that tax authorities in Kazakhstan may interpret applicable provisions of the Tax Code in a way to apply withholding tax to disposals to a Kazakhstan resident (or a non-resident with a permanent establishment in Kazakhstan) by a transferor registered in a country with a favourable tax regime (e.g., Cyprus, Liechtenstein, Luxembourg, Nigeria, Malta, Aruba, etc.). In this case, the applicable withholding tax rate will be in amount of 20 per cent. In addition, any income derived from the sale of the Shares through open trade on a Kazakhstan stock exchange or foreign stock exchange is tax exempt, *provided that* such Shares are admitted to the official lists of such stock exchanges at the time of sale.

*Taxable Disposals of Shares*

Non-resident buyers and their successors (including recipients of gifts or inheritances) of the Shares are not subject to Kazakhstan income tax upon acquisition of the Shares.  It is unclear from currently applicable tax regulations in Kazakhstan whether capital gains from the disposal of GDRs will be subject to taxation in Kazakhstan.  Therefore, independent tax advice should be sought in relation to each disposal of GDRs.

Holders of Shares who are resident in countries with which Kazakhstan has bilateral taxation treaties may be exempt from Kazakhstan withholding tax applicable to capital gains on the disposal of Shares.

*Taxation of Dividends*

Under the Tax Code, dividends paid on the Shares are exempt from any tax payment, reporting or compliance requirements in Kazakhstan if the Shares are admitted to the official list of a Kazakhstan stock exchange on the date of the accrual of such dividends.  In addition, if a holder of the Shares has been holding such Shares for longer than three years, dividends payable on the Shares become exempt from any withholding tax in Kazakhstan starting from the fourth year of holding such shares.

There is a risk that tax authorities in Kazakhstan may interpret applicable provisions of the Tax Code to apply withholding tax to dividends paid on GDRs which are not listed on a stock exchange operating in Kazakhstan at the date of accrual of such dividends.

If dividends paid on the Shares are not exempt, such dividends are subject to withholding tax at the rate of 15 per cent. or 20 per cent. if the recipient is registered in a country with a favourable tax regime.  The withholding tax is applied to the gross amount of dividends without allowance for any deductions and satisfies all Kazakhstan income tax obligations with respect to dividends.  Holders of Shares should not be subject to any other tax reporting, payment, registration or compliance requirements with respect to dividends paid on the Shares.

Holders of Shares who are resident in countries with which Kazakhstan has bilateral taxation treaties may be entitled to a reduced rate of withholding tax.  Depending on the country of residence and satisfaction of certain other conditions, the dividend withholding tax rates under Kazakhstan's bilateral tax treaties in effect as at the date of this Information Memorandum may be between 5 per cent. and 15 per cent.  Under bilateral tax treaties effective on the date of this Information Memorandum, reductions below 10 per cent. may be available only to beneficial owners that are legal entities.

In order to avail themselves of this relief, eligible holders must provide the Bank with a document (legalised or apostilled) issued by the tax authority of their country of residence confirming their tax residence in a treaty jurisdiction.

If the above document is not made available to the Bank prior to the date of payment of the dividends, then the Bank should apply withholding tax at a standard 15 per cent. rate and account for the withheld amounts to the relevant authority.  Holders who are eligible for a lower withholding tax rate should later be able to claim a refund of overpaid tax from the Government.  In doing so, they should provide the respective tax authority with a tax residence confirmation.

**New Notes**

Under Kazakhstan law as presently in effect, payments of interest on the New Notes to an individual who is a non-resident of Kazakhstan for tax purposes or to a legal entity that (i) is not established in accordance with the legislation of Kazakhstan, (ii) does not have its actual governing body (place of actual management) in Kazakhstan, (iii) does not maintain a permanent establishment in Kazakhstan and (iv) otherwise has no taxable presence in Kazakhstan (together, "**non-Kazakhstan holders**") will be subject to withholding tax at a rate of 15 per cent. the withholding tax on interest payable to any recipient, including but not limited to those, who are described above in this paragraph, will not apply where withholding tax on interest would not apply.  Payments of interest on the New Notes to

non-Kazakhstan holders registered in specified countries with a favourable tax regime (such as Cyprus, Liechtenstein, Luxembourg, Nigeria, Malta, Aruba and others) will be subject to the Kazakhstan withholding tax at a rate of 20 per cent. unless the New Notes are listed, as at the date of accrual of interest, on the official list of a stock exchange operating in the territory of Kazakhstan.

Non-Kazakhstan holders who are resident in countries with which Kazakhstan has bilateral taxation treaties may be entitled to a reduced rate of withholding tax.

In order to avail themselves of this relief, eligible holders must provide the Bank with a document (legalised or apostilled) issued by the tax authority of their country of residence confirming their tax residence in a treaty jurisdiction.

Gains realised by non-Kazakhstan holders derived from the disposal, sale, exchange or transfer of the New Notes will be subject to withholding tax at a rate of 15 per cent. unless such New Notes are listed as at the date of sale on the official list of a stock exchange operating in the territory of Kazakhstan or foreign stock exchange and sold through an open auction on such stock exchange.  If the disposal of the New Notes is made to a Kazakhstan resident (or a non-resident with a permanent establishment in Kazakhstan) and the transferor is registered in a country with a favourable tax regime, the net gain realised from such a disposal is subject to withholding tax in Kazakhstan at the rate of 20 per cent.. Any capital gains of non-Kazakhstan residents in relation to the New Notes which are listed as of the date of sale on the official list of a stock exchange operating in the territory of Kazakhstan or a foreign stock exchange and sold through open trades on such stock exchanges are exempt from the withholding tax.

**Debt Cancellation**

Partial cancellation of indebtedness, including as a result of an exchange of the existing debt instruments into new instruments, would generally be a taxable event for the Bank.  The Bank would be liable to pay tax at the rate of 20.0 per cent. (17.5 per cent. from 1 January 2013 and 15 per cent. from 1 January 2014 onwards) on the amount of the cancelled indebtedness.  However, the recent amendments to the Tax legislation provide that for the purposes of calculation of the taxable annual income; during 2010 the Bank can exclude the income from writing-off of the debt to creditors *provided that* such debt is included into the list of restructured liabilities contained in the Restructuring Plan approved by the court.  Starting from 1 January 2011, the Bank may be required to record amounts for cancelled debt recognised as a profit and may have to pay corporate income tax over such amount.

Under Kazakhstan law, an exchange of the existing debt instruments into new instruments of the Bank would not have any tax consequences for the Claimants.

**ISSUANCE AND TRANSFER RESTRICTIONS**

**United States**

The New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state of the United States or other jurisdiction and may not be offered, sold, pledged or otherwise transferred except (i) to a person who is located outside the United States and is not a U.S. Person, in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act or (ii) in a transaction exempt from, or not subject to, the registration requirements of the Securities Act, in each case in accordance with any applicable securities laws of any state of the United States.  Any future sale, offer, pledge or transfer of the New Notes, Shares and GDRs will also be subject to (i) and (ii) above.

Therefore, by electing to receive New Notes, Shares or GDRs, a Claimant will be required, unless in any instance the Bank otherwise agrees, to represent, acknowledge and agree that:

(1)     the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States;

(2)     unless so registered, the New Notes, Shares and GDRs may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws;

(3)     it is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and that it is either:

    (i)     not a U.S. Person or acting for the account or benefit of a U.S. Person, it is located outside the United States and it acknowledges that until the expiration of the period which expires on and includes the 40th day after the later of the commencement of the offering of the New Notes, Shares and GDRs and the Closing Date (the "**distribution compliance period**"), any offer or sale of these New Notes, Shares or GDRs shall not be made by it except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account or benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in each case, accordance with any applicable securities laws of any state of the United States or any other jurisdiction; or

    (ii)     an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

        (a)     is acquiring the New Notes, Shares and GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

        (b)     invests in or purchase securities similar to the New Notes, Shares and GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

        (c)     is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares and GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period; or

    (iii)     it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB;

(4)     it understands that the New Notes will bear a legend to the following effect:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES.   BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY,

EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT; OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("**AN ACCREDITED INVESTOR**") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**QIB**") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH,   REGULATION S   AND   (II) WITHIN   THE   UNITED STATES   IN   A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.    TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE.    NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY.   BY THE ACCEPTANCE OF THIS SECURITY.   THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

(5)     if it is a QIB or an Accredited Investor, it understands that the New Notes offered pursuant to an exemption from the Securities Act other than Regulation S will be represented by a Restricted Global Note.   Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws;

(6)     if it has elected to participate in compliance with Regulation S, it understands that the New Notes will be represented by an Unrestricted Global Note.   Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws; and

(7)     the Bank, the Registrar, the Trustee and the Principal Paying and Transfer Agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

*Transfer Restrictions*

The New Notes, Shares and GDRs issued to persons in the United States are transferable in the United States only to QIBs in a transaction meeting the requirements of Rule 144A or outside the United States under Regulation S. Because of the following restrictions, such persons are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of such New Notes, Shares and GDRs.

Each subsequent purchaser or transferee of New Notes, Shares and GDRs in the United States or that is a U.S. Person will be deemed to have represented, agreed and acknowledged as follows:

(i)     the purchaser (a) is a QIB, (b) is acquiring the New Notes, Shares and GDRs for its own account or for the account of such a QIB and (c) such person is aware that the sale of the New Notes, Shares and GDRs to it is being made in reliance on Rule 144A;

(ii)    the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States;

(iii)   unless so registered, the New Notes, Shares and GDRs may not be reoffered, resold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, except in accordance with the restrictions set forth above;

(iv)   it understands that the New Notes offered pursuant to an exemption from the Securities Act will be represented by a Restricted Global Note. Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws;

(v)    each Restricted Global Note and any Restricted Note Certificates issued in exchange for an interest in a Restricted Global Note will bear the same legend as set forth in above, unless the Bank determines otherwise in accordance with applicable law; and

(vi)   the Bank, the Registrar, the New Notes Trustee and the principal paying and transfer agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

Each subsequent purchaser or transferee of the New Notes or Shares in re-sales during the distribution compliance period will be deemed to have represented, agreed and acknowledged as follows:

(i)     it is, or at the time the New Notes, Shares and GDRs are purchased will be, the beneficial owner of such New Notes, Shares and GDRs and it is not a U.S. Person and it is located outside the United States (within the meaning of Regulation S);

(ii)    it understands that such New Notes, Shares and GDRs have not been and will not be registered under the Securities Act and that, prior to the expiration of the distribution compliance period, it will not offer, sell pledge or otherwise transfer such New Notes or Shares, except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account of benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in accordance with any applicable securities laws of any state of the United States or any other jurisdiction;

(iii)   it understands that the New Notes will be represented by an Unrestricted Global Note. Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes

delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws; and

(iv)     the Bank, the Registrar, the New Notes Trustee and the principal paying and transfer agent and their affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

If you wish to participate in the Restructuring Plan, and you are a Claimant who is a U.S. Person and are not an Eligible Investor, please contact the Bank on zhaisanov@bta.kz or +7 727 3124671.

This Information Memorandum is only addressed to and directed at persons in member states of the European Economic Area (the "**EEA**") who are "Qualified Investors" within the meaning of Article 2(1)(e) of the Prospectus Directive.  The New Notes, Shares and GDRs are only available to Qualified Investors, unless in any instance the Bank otherwise agrees.  This Information Memorandum and its contents should not be acted upon or relied upon in any member state of the EEA by persons who are not Qualified Investors.  The expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

### FORM OF THE NON-TENGE NEW NOTES AND PROVISIONS RELATING TO SUCH NOTES IN GLOBAL FORM

*The following information relates to the form of the Non-Tenge New Notes and to such Non-Tenge New Notes when in global form.  Appropriate information relating to Tenge New Notes will be set forth in a supplement to this Information Memorandum containing the Terms and Conditions of the Tenge New Notes.*

1.      **Form of the Non-Tenge New Notes**

All Non-Tenge New Notes will be in registered form, without interest coupons attached. Non-Tenge New Notes offered and sold outside the United States in reliance on Regulation S to persons who are not U.S. Persons will be represented by interests in an Unrestricted Global Note, in definitive fully registered form, without interest coupons attached, which will be deposited on or about the Closing Date with the Common Depositary, acting through its London branch, as common depositary for Euroclear and Clearstream, and registered in the name of its nominee, as nominee for such common depositary in respect of interests held through Euroclear and Clearstream.

Non-Tenge New Notes allocated to Eligible Investors will be represented by interests in a Restricted Global Note, in fully registered form, without interest coupons attached, which will be registered in the name of Cede & Co., as nominee for, and which will be deposited on or about the Closing Date with a custodian for DTC.  Each Restricted Global Note (and any Note Certificates issued in exchange therefor) will be subject to certain restrictions on transfer contained in a legend appearing on the face of such Note as set forth under paragraph (4) in the section entitled "*Issuance and Transfer Restrictions*".

*Each Unrestricted Global Note will have an ISIN number and a Common Code and each Restricted Global Note will have a separate CUSIP number.*

For the purposes of the Restricted Global Notes and the Unrestricted Global Notes, any reference in the Conditions to "Note Certificate" or "Note Certificates" shall, except where the context otherwise requires, be construed so as to include the Restricted Global Notes or, as the case may be, the Unrestricted Global Notes and interests therein.

2.      **Notices**

So long as any Non-Tenge New Note is represented by a Global Note and such Global Note is held on behalf of a clearing system, notices to the holder of such Non-Tenge New Note may be given by delivery of the relevant notice to that clearing system for communication by it to entitled account holders except that so long as the NonTenge New Notes are listed on an approved Stock Exchange or the KASE and the rules of such Exchange so require, notices shall also be published in a leading newspaper having general circulation in Luxembourg or Kazakhstan.

3.      **Payments**

Each payment in respect of a Global Note will be made to the person shown as the holder in the Register at the close of business (in the place of the relevant clearing system) on the business day before the due date for such payment.

4.      **Transfers between Global Notes**

On or prior to the 40th day after the Closing Date, a beneficial interest in any Unrestricted Global Note may be transferred to a person who wishes to take delivery of such beneficial interest through the Restricted Global Note only upon receipt by the Registrar of a written certification from the transferor (in the form provided in the Agency Agreement) to the effect that such transfer is being made to a person whom the transferor reasonably believes is a QIB,

in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. After such 40th day, such certification requirements will no longer apply to such transfers, but such transfers will continue to be subject to the transfer restrictions contained in the legend appearing on the face of such Note, as set out in "*Issuance and Transfer Restrictions*".

A beneficial interest in a Restricted Global Note may also be transferred to a person who wishes to take delivery of such beneficial interest through the corresponding Unrestricted Global Note only upon receipt by the Registrar of a written certification from the transferor (in the form provided in the Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144A (if available) under the Securities Act.

Any beneficial interest in either a Restricted Global Note or any Unrestricted Global Note that is transferred to a person who takes delivery in the form of a beneficial interest in the other Global Note will, upon transfer, cease to be a beneficial interest in such Global Note and become a beneficial interest in the other Global Note and, accordingly, will thereafter be subject to the transfer restrictions set out in the section entitled "*Issuance and Transfer Restrictions*" and other procedures applicable to a beneficial interest in such other Global Note for so long as such person retains such an interest.

5.       **Exchange of Interests in Global Notes for Note Certificates**

A Restricted Global Note will become exchangeable, free of charge to the holder, in whole but not in part, for Restricted Note Certificates if DTC (i) notifies the Bank that it is no longer willing or able to discharge properly its responsibilities as depositary with respect to a Restricted Global Note or ceases to be a "clearing agency" registered under the Exchange Act, or is at any time no longer eligible to act as such, and the Bank is unable to locate a qualified successor within 90 days of receiving notice of such ineligibility on the part of DTC or (ii) an Event of Default (as defined and set out in Condition 11 (*Events of Default*) of the relevant Non-Tenge New Notes) occurs. In such circumstances, such Restricted Note Certificates shall be registered in such names as DTC shall direct in writing, and the Bank will procure that the Registrar notify the holders as soon as practicable after the occurrence of the events specified in (i) and (ii).

An Unrestricted Global Note will become exchangeable, free of charge to the holder, in whole but not in part, for Unrestricted Note Certificates if (i) Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so or (ii) an Event of Default occurs. In such circumstances, such Unrestricted Note Certificates will be registered in such names as Euroclear and Clearstream shall direct in writing, and the Bank will procure that the Registrar notify the holders as soon as practicable after the occurrence of the events specified in (i) and (ii).

In the event that a Restricted Global Note is to be exchanged for Restricted Note Certificates or an Unrestricted Global Note is to be exchanged for Unrestricted Note Certificates, the relevant Global Note shall be exchanged in full for the relevant Note Certificates, and the Bank will, without charge to the holder or holders thereof, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatever nature that may be levied or imposed in connection with such exchange, cause sufficient Note Certificates to be executed and delivered to the Registrar for completion, authentication and dispatch to the relevant Noteholders.

On exchange, a person having an interest in a Global Note must provide the Registrar with (i) a written order containing instructions and such other information as the Bank and the Registrar may require to complete, execute and deliver such Note Certificates and (ii) in the case of a Restricted Global Note only, a fully completed, signed certification substantially to the effect that the exchanging holder is not transferring its interest at the time of such

exchange or, in the case of simultaneous sale pursuant to Rule 144A, a certification that the transfer is being made in compliance with the provisions of Rule 144A. Note Certificates issued in exchange for a beneficial interest in the Restricted Global Note shall bear the legends applicable to transfers pursuant to Rule 144A, as set out in "*Issuance and Transfer Restrictions*". Restricted Note Certificates issued as described above will not be exchangeable for beneficial interests in an Unrestricted Global Note, and Unrestricted Note Certificates issued as described above will not be exchangeable for beneficial interests in a Restricted Global Note.

In addition to the requirements described under "*Form of the Non-Tenge New Notes and Provisions Relating to Notes in Global Form – Transfer between the Global Notes*" above, the holder of a Note may transfer such Note only in accordance with the provisions of Conditions of the Non-Tenge New Notes.

Upon the transfer, exchange or replacement of a Restricted Note Certificate bearing the legend referred to in "*Issuance and Transfer Restrictions*", or upon specific request for removal of the legend on a Restricted Note Certificate, the Bank will deliver only Restricted Note Certificates that bear such legend, or will refuse to remove such legend, as the case may be, unless there is delivered to the Bank and the Registrar such satisfactory evidence, which may include an opinion of counsel, as may reasonably be required by the Bank that neither the legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.

The Registrar will not register the transfer of any Non-Tenge New Notes or exchange of interests in a Global Note for Note Certificates for a period of 15 days ending on the due date of any payment of principal or interest in respect of such New Notes.

6. **Euroclear, Clearstream and DTC Arrangements**

Custodial and depositary links have been established between Euroclear, Clearstream and DTC to facilitate the initial issue of the Non-Tenge New Notes and cross-market transfers of the New Notes associated with secondary market trading.

### *Euroclear and Clearstream*

Euroclear and Clearstream each hold securities for participating organisations and facilitate the clearance and settlement of securities transactions between their respective participants through electronic book-entry changes in accounts of such participants. Euroclear and Clearstream provide to their respective participants, among other things, services for safekeeping, administration, clearance and settlement of internationally-traded securities and securities lending and borrowing. Euroclear and Clearstream participants are financial institutions throughout the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organisations. Euroclear and Clearstream have established an electronic bridge between their two systems across which their respective customers may settle trades with each other. Indirect access to Euroclear or Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Euroclear or Clearstream participant, either directly or indirectly.

Payments with respect to book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream will be credited, to the extent received by the Principal Paying and Transfer Agent, to the cash accounts of Euroclear or Clearstream participants in accordance with the relevant system's rules and procedures.

### *DTC*

DTC has advised the Bank as follows: DTC is a limited purpose trust company organised under the laws of the State of New York, a "banking organisation" within the meaning of the

New York Banking Law, a member of the United States Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities for DTC participants (including Euroclear and Clearstream) and facilitates the clearance and settlement of securities transactions between DTC participants through electronic computerised book-entry changes in DTC participants' accounts.   DTC participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organisations.   Indirect access to the DTC system is also available to others, such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly.

Holders of book-entry interests in the New Notes holding through DTC will receive, to the extent received by the Principal Paying Agent, all payments with respect to book-entry interests in the Non-Tenge New Notes from the Principal Paying Agent through DTC and DTC participants. Distributions in the United States may be subject to relevant U.S. tax laws and regulations. ***Each Claimant and Euornoteholder is urged to consult its own tax adviser as to the particular tax consequences to such Claimant/Euronoteholder relating to the Restructuring Plan, including the applicability and effect of tax laws or tax treaties in any relevant jurisdiction.***

As DTC can act on behalf of DTC direct participants only, who in turn act on behalf of DTC indirect participants, the ability of beneficial owners who are indirect participants to pledge book-entry interests in the Non-Tenge New Notes to persons or entities that do not participate in DTC, or otherwise take actions with respect to book-entry interests in the New Notes, may be limited.

### General

So long as DTC or its nominee or Euroclear, Clearstream or the nominee of their common depositary is the registered holder of a Global Note, DTC, Euroclear, Clearstream or such nominee, as the case may be, will be considered the sole owner or holder of the Non-Tenge New Notes represented by such Global Note for all purposes under the paying agency agreement, the New Notes Trust Deed and the Non-Tenge New Notes.   Payments of principal, interest and additional amounts, if any, in respect of Global Notes will be made to DTC, Euroclear, Clearstream or such nominee, as the case may be, as the registered holder thereof.   None of the Bank, the Trustee, the paying and transfer agent or any agent or any affiliate of any of the above or any person by whom any of the above is controlled for the purposes of the Securities Act will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in the Global Notes or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Distributions of principal and interest with respect to book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream will be credited, to the extent received by Euroclear or Clearstream from the principal paying and transfer agent, to the cash accounts of Euroclear or Clearstream customers in accordance with the relevant system's rules and procedures.

The laws of some states of the United States require that certain persons take physical delivery of securities in definitive form.   Consequently, the ability to transfer interests in a Global Note to such persons will be limited.   Because DTC, Euroclear and Clearstream can only act on behalf of participants, who in turn act on behalf of indirect participants, the ability of a person having an interest in a Global Note to pledge such interest to persons or entities that do not participate in the relevant clearing system, or otherwise take actions in respect of such interest, may be affected by the lack of a physical certificate in respect of such interest.

The holdings of book-entry interests in the Non-Tenge New Notes in Euroclear, Clearstream and DTC will be reflected in the book-entry accounts of each such institution. As necessary, the Registrar will adjust the amounts of Non-Tenge New Notes on the Register for the accounts of the nominee of the Common Depositary to reflect the amounts of Non-Tenge New Notes held through Euroclear and Clearstream on the one hand and DTC, on the other. Beneficial ownership in Non-Tenge New Notes will be held through financial institutions as direct and indirect participants in Euroclear, Clearstream and DTC.

Interests in any Unrestricted Global Note and any Restricted Global Note will be in uncertificated book-entry form.

### Trading between Euroclear and/or Clearstream Account Holders

Secondary market sales of book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream to purchasers of book-entry interests in the Non-Tenge New Notes through Euroclear or Clearstream will be conducted in accordance with the normal rules and operating procedures of Euroclear and Clearstream and will be settled using the procedures applicable to conventional eurobonds.

### Trading between DTC Participants

Secondary market sales of book-entry interests in the Non-Tenge New Notes between DTC participants will occur in the ordinary way in accordance with DTC rules and will be settled using the procedures applicable to United States corporate debt obligations in DTC's Same Day Funds Settlement System.

### Trading between DTC Seller and Euroclear/Clearstream Purchaser

When book-entry interests in Non-Tenge New Notes are to be transferred from the account of a DTC participant holding a beneficial interest in a Restricted Global Note to the account of a Euroclear or Clearstream accountholder wishing to purchase a beneficial interest in an Unrestricted Global Note (subject to such certification procedures as are provided in the Agency Agreement), the DTC participant will deliver instructions for delivery to the relevant Euroclear or Clearstream accountholder to DTC by 12 noon, New York time, on the settlement date. Separate payment arrangements are required to be made between the DTC participant and the relevant Euroclear or Clearstream accountholder. On the settlement date, the Custodian will instruct the Registrar to decrease the amount of Non-Tenge New Notes registered in the name of Cede & Co. and evidenced by a Restricted Global Note and increase the amount of Non-Tenge New Notes registered in the name of the nominee of the Common Depositary for Euroclear and Clearstream and evidenced by an Unrestricted Global Note. Book-entry interests will be delivered free of payment to Euroclear or Clearstream, as the case may be, for credit to the relevant accountholder on the first business day following the settlement date.

### Trading between Euroclear/Clearstream Seller and DTC Purchaser

When book-entry interests in the Non-Tenge New Notes are to be transferred from the account of a Euroclear or Clearstream accountholder to the account of a DTC participant wishing to purchase a beneficial interest in the Restricted Global Note (subject to such certification procedures as are provided in the principal paying agency agreement), the Euroclear or Clearstream participant must send to Euroclear or Clearstream delivery free of payment instructions by 5.00 p.m. Brussels or Luxembourg time, one business day prior to the settlement date. Euroclear or Clearstream, as the case may be, will in turn transmit appropriate instructions to the common depositary for Euroclear and Clearstream, and the Registrar to arrange delivery to the DTC participant on the settlement date. Separate payment arrangements are required to be made between the DTC participant and the relevant Euroclear or Clearstream, account holder, as the case may be. On the settlement date, the common

depositary for Euroclear and Clearstream will transmit appropriate instructions to the Custodian who will in turn deliver such book-entry interest in the Non-Tenge New Notes free of payment to the relevant account of the DTC participant and instruct the Registrar to decrease the amount of Non-Tenge New Notes registered in the name of the nominee of the common depositary for Euroclear and Clearstream and evidenced by an Unrestricted Global Note and increase the amount of Non-Tenge New Notes registered in the name of Cede & Co. and evidenced by a Restricted Global Note.

Although the foregoing sets out the procedures of Euroclear, Clearstream and DTC in order to facilitate the transfers of interests in the Non-Tenge New Notes among participants of DTC, Clearstream, and Euroclear, none of Euroclear, Clearstream or DTC is under any obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time.

None of the Bank, the Trustee, the Principal Paying and Transfer Agent or any of the Agents or any affiliate of any of the above, or any person by whom any of the above is controlled for the purposes of the Securities Act, will have any responsibility for the performance by DTC, Euroclear and Clearstream or their respective direct or indirect participants or accountholders of their respective obligations under the rules and procedures governing their operations or for the sufficiency for any purpose of the arrangements described above.

7. **Central Securities Depositary, Tenge New Notes and Shares**

Central Securities Depository is a not-for-profit organisation established and registered in 1997 as the sole organisation in Kazakhstan that conducts depository activities. Its shares are held by professional securities market participants, trade organisations and international financial organisations. Central Securities Depositary conducts activities on the securities market, opens and maintains bank accounts for legal entities in Tenge and foreign currency, processes money transfer instructions and performs activities related to the use of encrypted means of information protection.

The Central Securities Depositary's main functions include providing nominee shareholder services for its participants, settling trades of financial instruments conducted on organised securities markets and over-the-counter transactions involving its participants, depository servicing of state issued securities in accordance with the Kazakhstan law and its code of conduct, providing consultancy, information and other services that do not contradict Kazakhstan law, clearing trades of financial instruments both in exchange for financial instruments and money, providing settlement between brokers and dealers, providing paying agent functions for income payment and redemptions of financial instruments, designating money transfers for trades with securities and other financial instruments and receipt of income payments and redemptions.

According to Kazakhstan law, the clients of Central Securities Depositary may be broker-dealers, custodian banks licensed by the authorised body dealing with the state regulation of securities market and foreign depositories and custodians.

Records of financial instruments held by Central Securities Depositary are maintained on personal accounts of depositors. In order to separate the financial instruments of the depositor and its clients, each depositor has sub-accounts in which the financial instruments of its clients are held.

Central Securities Depositary issues extracts in electronic or documentary form of the personal account of a depositor as proof of such depositor's ownership and nominal holding of its securities in accordance with the Code of Practice of Central Securities Depositary.

Central Securities Depositary also serves as a paying agent for short-term notes of the NBK by effecting payment on the primary market, as well as provides money transfers upon

repayment of such short-term notes.  It also acts as paying agent in respect of government bonds issued by the Ministry of Finance of Kazakhstan, as well as provides money transfers upon repayment of state treasury bills.

Central Securities Depositary also transfers money to the holders of securities upon interest payment and settlement of securities issued in accordance with the laws of other states.

The Bank will publish details regarding clearing and settlement of Tenge New Notes.

See "*Description of Share Capital and Certain Matters of Kazakhstan Law – Transfer of Shares*" for information regarding Clearing and Settlement of Shares.

8.     **Prescription**

Claims against the Bank in respect of principal and interest on a Non-Tenge New Note while such NonTenge New Note is represented by a Global Note will become void unless it is presented for payment within a period of ten years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in the relevant Non-Tenge New Notes).

9.     **Meetings**

The holder of a Global Note will be treated as being two persons for the purposes of any quorum requirements of, or the right to demand a poll at, a meeting of holders of Non-Tenge New Notes and, at any such meeting, as having one vote in respect of a principal amount to be determined in respect of Non-Tenge New Notes for which the Global Note may be exchanged.

10.     **Purchase and Cancellation; Prepayments**

Cancellation of any Note required by the Conditions to be cancelled following its purchase and any prepayment will be effected by a reduction in the principal amount of the relevant Global Note as provided in the New Notes Trust Deed.

11.     **Trustee's Powers**

In considering the interests of holders of Non-Tenge New Notes while a Global Note is held on behalf of a clearing system, the New Notes Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its account holders with entitlements to such Global Note and may consider such interests as if such account holders were the holder of the relevant Global Note.

12.     **Put Option**

The put option in the Conditions of the Non-Tenge New Notes (other than Recovery Units) may be exercised by the holder of the relevant Global Note giving notice to the principal paying and transfer agent of the principal amount of such Non-Tenge New Notes in respect of which the option is exercised and presenting the Global Note for endorsement of exercise within the time limits specified in such Condition and as otherwise provided in the principal paying agency agreement for the Non-Tenge New Notes.

# ADDITIONAL INFORMATION

**Significant Change**

Except as described under "*Management's Discussion and Analysis of Results of Operations and Financial Condition — Recent Developments*", there has been no significant change in the financial or trading position of the Bank since 31 December 2008.

**Costs of the Restructuring**

As at the date of this Information Memorandum, the Bank had incurred costs in relation to the Restructuring of approximately U.S.$33.53 million.

Assuming that the Restructuring Plan is implemented on the timetable contemplated in this Information Memorandum, the Bank estimates that the total costs and expenses payable by the Bank in relation to the Restructuring (including amounts payable to its advisers, advisers to the Steering Committee and to members of the Steering Commitee) in 2009 and in 2010 to the Restructuring Date, will be approximately U.S.$90.60 million.

As is customary in a financial restructuring of the nature proposed by the Bank, in addition to the costs and expenses of its own advisers, the Bank has agreed to pay the expenses of the Steering Committee and BNY Corporate Trustee Services Limited as Trustee and the professional fees and expenses of certain advisers, including those of the Steering Committee and BNY Corporate Trustee Services Limited.

**Governing Law and Jurisdiction**

The Restructuring Plan shall be governed by, and construed in accordance with, the laws of the Republic of Kazakhstan.  The Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of this Information Memorandum or any provisions of the Restructuring Plan or out of any action taken or omitted to be taken under the Restructuring Plan or in connection with the administration of the Restructuring Plan.

**Documents Available for Inspection**

Copies of certain documents are available for inspection during normal business hours on any weekday (Saturdays, Sundays and public holidays excepted) from the date of this Information Memorandum until the Restructuring Date at the registered office of the Bank and on the Bank's website at www.bta.kz.  These documents include:

- the New Charter;
- the New Corporate Governance Code;
- the Financial Statements;
- the Bank Creditor Loan Agreement;[10]
- this Information Memorandum and any supplement thereto; and
- drafts of the Deeds of Covenant and the Restructuring Documents,

in each case as and when they become available.

---

[10] Subject to the proviso that the Bank is provided with a copy of this document by the SPV and is authorised by the SPV to make it available to the public.

## SCHEDULE 1 — THE RESTRUCTURING PLAN

1.      **INTERPRETATION**

In this Restructuring Plan, unless the context otherwise requires or otherwise expressly provides for:

(a)     terms not otherwise defined herein shall have the meanings ascribed to them in the information memorandum (the "**Information Memorandum**") of the Bank dated 1 May 2010 (and as supplemented from time to time) under "*Key Terms and Definitions*";

(b)     references to Clauses, Annexes and Recitals are references to the Clauses, Annexes and Recitals respectively of this Restructuring Plan;

(c)     references to a "person" include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(d)     references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

(e)     the singular includes the plural and *vice versa* and words importing one gender shall include all genders; and

(f)     headings are for ease of reference only and shall not affect the interpretation of this Restructuring Plan.

2.      **RESTRUCTURING DATE AND IMPACT OF RESTRUCTURING**

2.1     This Restructuring Plan will come into effect on the date on which it is approved by the Court.

2.2     The process of the Restructuring is described below in Clauses 3 and 4.  Notional currency conversion shall be made in accordance with Annex 2.

2.3     The procedures as to voting, deemed voting and submission of Claims or otherwise the terms of the Restructuring Packages, details of the GDR Programme and the Deeds of Undertaking and the rights of minority shareholders of the Bank, each as described in the Information Memorandum form an integral part of the Restructuring and of this Restructuring Plan.  Each Claimant who receives GDRs as part of the Restructuring or Shares in submitting a Claim Form is deemed to agree to be bound by the drag-along provisions as set out in "*The GDR Programme – Drag-Along Rights*" (subject always to the conditions of exercise of the Drag-Along Rights as described in "*The GDR Programme – Drag-Along Rights*") and hereby irrevocably appoints the Bank as its true and lawful attorney with full power and authority in its name or otherwise and on its behalf to consider, settle, approve, execute, sign and deliver all agreements, documents, certificates and instruments (whether as a deed or not) which the Bank (acting reasonably) considers necessary or desirable in connection with the transfer of its Shares pursuant to the exercise of the Drag-Along Rights by Samruk-Kazyna.  In addition each Claimant in submitting a Claim Form is deemed to agree to execute and deliver any additional documents and instruments and perform any additional acts that may be reasonably necessary or appropriate to effectuate and perform its obligations in relation to the Drag-Along Rights and the transactions contemplated thereby.  For the avoidance of doubt, the Claimant will not be required to give any warranties (other than as to title, Shares being frees of encumbrances, authority and enforceability) or give any indemnity to any purchaser in respect of a transfer of its Shares.

2.4     Once the Court approves this Restructuring Plan Claimants, Related Parties and Shareholders of the Bank and their respective affiliates will be bound by its terms and conditions.

2.5     The expected financial consequences of the Restructuring are set out in the Information Memorandum.

2.6     The "**Restructuring Date**" shall have the meaning set out in the Information Memorandum and shall be notified by the Bank to the Claimants on its website as soon as possible after such date is notified by the Steering Committee to the Bank.

2.7     The "**Release Date**" shall be the later of (a) the Restructuring Date and (b) the date on which the Distribution Agent has confirmed in writing to the Bank and the Steering Committee that all cash, New Notes, Shares, GDRs and other deliverables in respect of Agreed Claims have been paid or distributed in accordance with all Settlement Instructions delivered to the Bank or the Distribution Agent and for such purpose defective, unlawful or incomplete Settlement Instructions shall be disregarded.

2.8     If the Restructuring Date does not occur on or before 5 September 2010, the Restructuring Plan will lapse and cease to have effect.

## 3.     THE RESTRUCTURING PLAN

3.1     **Release and acceleration of Claims**

(a)     In relation to any contingent Claim, demand for the outstanding amount payable thereunder shall be deemed to have been made immediately prior to the Restructuring Date and in relation to any Designated Financial Indebtedness constituted by an ISDA Master Agreement in respect of which an early termination date has not been designated or otherwise occurred, the agreements constituting the relevant Designated Financial Indebtedness shall be deemed terminated as at the Restructuring Date and the Restructuring Date shall be deemed to be the early termination date for purposes of those agreements and the applicable early termination amount shall be payable by or to the Bank and if payable by the Bank shall constitute an Agreed Claim.

(b)     Pursuant to this Restructuring Plan, on the Restructuring Date all Related Party Debt shall be cancelled and on the Release Date all Designated Financial Indebtedness (including but not limited to the financial indebtedness included in the Preliminary Debt List at Annex 1) shall be discharged and/or cancelled or restructured as set out herein and all Claims, actual and contingent, shall be cancelled and/or discharged fully and absolutely and treated as satisfied, released and paid in full, in each case so as to bind the Claimants, the Related Parties and any person who at any time acquires any interest in or arising out of a Claim.  For the avoidance of doubt, the discharge, release or restructuring of any Claims of Claimants against the Bank Group pursuant to the Restructuring will not in any way affect the obligations of a third party not a member of the Group (including without limitation any guarantor or co-obligor) under any guarantee or other credit support given in relation to such Claim.

(c)     In consideration of the discharge and/or cancellation referred to in Clause 3.1(b), each Agreed Claimant shall have transferred to it or to its Nominated Recipient cash, New Notes, Shares and/or GDRs in accordance with the relevant Entitlements and the procedures set out in this Restructuring Plan.  For the avoidance of doubt, where the Bank is ready, willing and able to distribute cash, New Notes, Shares and/or GDRs in accordance with the relevant Entitlements to a Claimant but is unable to make delivery due to a failure of that Claimant to supply (or supply correct) Settlement Instructions, that will not prevent the discharge and/or cancellation of all Designated Financial Indebtedness on the Release Date.

(d)     The Entitlement (or part thereof) of any Agreed Claimant and Samruk Kazyna referred to in Clause 3.1(c) shall be satisfied in accordance with the provisions of Clause 4.

(e)     Any Claim which has not been included in a Claim Form submitted to the Bank (other than Excluded Debt) shall be cancelled and/or discharged on the Restructuring Date and the relevant Claimant shall not be entitled to receive any Entitlements in respect of such Claim *provided that* the Bank may, in its role and absolute discretion, admit such Claims.

(f)     On the Restructuring Date, all Related Party Debt will be cancelled and/or discharged and the relevant Related Party shall have its Claim treated in accordance with Clause 3.2(c) below.

(g)     On the Release Date, Excluded Debt shall remain in full force and effect and shall not be cancelled and/or discharged.

(h)     On the Release Date, the SK Claims will be cancelled and/or discharged.

3.2     **Entitlements**

(a)     On the Restructuring Date (or as soon as practicably thereafter) the Bank shall procure the distribution of cash, New Notes Shares, GDRs and other deliverables in accordance with the Entitlements allocated to Agreed Claimants in accordance with the "*Terms of the Restructuring Packages*" in the Information Memorandum, which shall be paid or delivered to their Existing Accounts, Designated Accounts or Local Accounts.  For the avoidance of doubt, where a Claimant has not supplied any or correct details of its Existing Accounts, Designated Account or Local Account, it shall only receive its distribution of Entitlements after it has done so.

(b)     Samruk-Kazyna shall receive on the Restructuring Date such number of Shares so that its total shareholding in the Bank represents 81.5 per cent. (less the Residual Minority Shareholder Percentage).   In addition, on the Restructuring Date, in consideration of the guarantee issued by Samruk-Kazyna to the NBK, Samruk-Kazyna shall as from the Restructuring Date receive a guarantee fee from the Bank, payable semi-annually, equal to fifty per cent. of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by the Bank or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of completion of the Restructuring.   For the avoidance of doubt, Samruk-Kazyna will not be entitled to any other Distribution or Entitlement.

(c)     On the Restructuring Date, Related Party Debt (and to the extent not Related Party Debt, any Designated Financial Indebtedness owed to a Related Party other than the Subordinated Loan) shall be cancelled in full and no further payment on such Related Party Debt shall be made by the Bank Group, *provided that* in respect of domestic bonds owned by any person who was a member of the Bank's supervisory board or management board as at 31 December 2008 (and whether or not such domestic bonds are held in his own name or through any nominee, broker, proxy, trustee or agent, held solely or jointly with any other person, are owned legally, beneficially or otherwise, and including any bond over which he has the power directly or indirectly to dispose of or deal with as if it were his own and he shall be regarded as having that power if a third party holds or controls the bonds in accordance with his direct or indirect instructions), the Bank shall at its discretion (acting reasonably and in good faith) have the right to issue Entitlements to such person on the Restructuring Date or withhold such Entitlements and instead place such Entitlements in the Escrow Account pending resolution by the Bank of investigations into the validity of such person's Claim and/or whether any member of the Bank Group has any claim against such person (which shall be concluded within a reasonable time after the

Restructuring Date).  Following such time, the Entitlements shall (as applicable) either be returned to the Bank and cancelled or released to the relevant Related Party.

3.3    **Interest on Claims**

(a)    Accrued Interest calculated as provided in the Information Memorandum shall be included in the relevant Claim.

(b)    Default interest, penalties, breakage costs and the default element of Late Payment Donations under any Shariah-compliant instrument or arrangement may not be admitted as part of any Claim and shall be deemed to be cancelled and/or discharged on the Release Date.

3.4    **Release**[11]

(a)    Each Claimant and Related Party authorises the Bank from the Restructuring Date to enter into, execute and deliver the Deed of Release on behalf of each Claimant, Related Party and any person to whom a Claimant or Related Party has transferred any Claim, in substantially the form attached hereto as Annex 3.

(b)    On the Restructuring Date the Bank shall enter into and deliver the Deed of Release as principal and on behalf of all Claimants and Related Parties pursuant to the authority conferred by Clause 3.4(a).

3.5    **Finance Subsidiaries and TuranAlem Finance (Russia)**

Certain procedures applicable to indebtedness owed to or by the Finance Subsidiaries are described in "*Information for Claimants*" of the Information Memorandum and shall form part of this Restructuring Plan.  If the Restructuring Plan is approved at the Claimants' Meeting all claims of Rouble Noteholders in respect of the Rouble Notes (whether against TuranAlem Finance (Russia), the Bank or any other Subsidiary of the Bank shall be cancelled.

3.6    **No Proceedings**

Claimants and Euronoteholders understand and irrevocably agree that, without prejudice to their right to receive Entitlements, as of the Restructuring Date no Proceeding or other judicial or quasi-judicial, administrative or regulatory process whatsoever against the Bank or its property shall be commenced or continued in any jurisdiction whatsoever to recover any Claim or to establish the amount or existence of any Claim and any Claimant or Euronoteholder which has commenced any such Proceeding shall forthwith cease such Proceeding.[12]

4.    **VERIFICATION OF QUANTUM AND CLASSIFICATION AND ADMISSION OF CLAIMS**

4.1    **Overview**

The provisions of this section shall apply for the purposes of determining whether a Claim should become an Agreed Claim for the purposes of voting at the Claimant's Meeting and distribution of Entitlements.

---

[11] The form of the deed of release (including its scope) remains subject to discussion with the Steering Committee.

[12] This item is being discussed by BTA and the Steering Committee.

4.2 **Quantum and Classification of Claims**

(a) On 17 March 2010, the Bank issued a press release which is set out at "*Information for Claimants — Information for Trade Finance Creditors and Official Government Sector Creditors*" of the Information Memorandum announcing a process for the adjudication of trade finance Claims and published a list of all indebtedness which it believes constitutes the principal amount of trade finance indebtedness of the Bank Group, the purpose of which was to establish a process:

    (i) to determine which Claims against the Bank should be categorised as Non-OGSC Eligible Trade Finance Debt;

    (ii) in the case of Claims against the Bank which it determined should not be categorised as NonOGSC Eligible Trade Finance Debt to determine which of the exclusions in the definition of NonOGSC Eligible Trade Finance Debt is applicable; and

    (iii) to make determinations in respect of the principal amount of a disputed trade finance Claim, in advance of the Claimants' Meeting.

(b) On 22 April 2010 the Bank issued a further press release and published the Preliminary Debt List, which is reproduced (as subsequently updated on 30 April 2010) at Annex 1 *(Preliminary Debt List)* which included all Designated Financial Indebtedness (including contingent Designated Financial Indebtedness) which it then believed to be subject to the Restructuring, specifying in each case the total principal amount outstanding of each debt, as well as a calculation (or good faith estimate) of interest accrued or which will accrue to the Cut-off Date on the basis set out in "*Information for Claimants – Information for all Claimants – Interest*" of the Information Memorandum and Relevant Excluded Debt.

(c) The amounts published on the Preliminary Debt List were determined as at the Cut-off Date and by reference to the terms of agreements and/or arrangements between the member of the Bank Group and the relevant Claimant (or in the case of a contingent Claim, between the Claimant and the obligor of the underlying debt) in existence as at the Cut-off Date and include the principal amount plus Accrued Interest in each case as at the Cut-Off Date.  No interest or late payment owing is included other than Accrued Interest.

(d) If a Claimant has previously submitted documentation to the Adjudicator as part of the trade finance adjudication process referred to in paragraph 4.1(a) above, the principal component of its Agreed Claims will be the amount agreed or adjudicated by means of that process and it will not, subject to paragraph 4.4(a), otherwise be reviewed, rejected or disputed by the Bank pursuant to this paragraph 4.2.

(e) As explained in the press release of 22 April 2010, if any Claimant wished to dispute the amount applicable to its Claim stated in the Preliminary Debt List (including where additional unpaid claims under indemnities, guarantees and in respect of premium were not included) or its classification or non-classification as Relevant Excluded Debt or Direct Official Government Sector Debt, it had to notify the Bank and provide its own calculations by 28 April 2010.  If a Claimant failed to so notify the Bank by this date that it disputed the amount of the Claim or the category of debt into which it was classified, the amount or classification so stated in the Bank's Preliminary Debt List would (except in the case of a manifest error) be deemed to be the amount admitted in relation to the Claim or the correct classification, regardless of anything stated on any subsequent Claim Form delivered to the Bank.

(f)     A purported Claimant or Excluded Creditor who did not notify the Bank by 28 April 2010 that its Claim did not appear on the Preliminary Debt List may nevertheless submit a Claim Form in respect of its Claim but if the Bank disputes such Claim and the dispute is not resolved between the Bank and the Claimant by the Scheduled Supervisor Determination Date then that Claimant shall not (unless it is an Excluded Creditor) receive any Entitlement until such time as the dispute is resolved in its favour by the Supervisor or, if the Supervisor is unable to resolve the dispute, an arbitrator nominated by the LCIA.

(g)     Any such disputed amounts or classification, if not resolved between the Bank and the Claimant within three London business days (each a "**Disputed Claim**") shall be referred to the Supervisor for the purpose of adjudicating the dispute as to quantum or classification by 6 May 2010 (the "**Scheduled Supervisor Determination Date**"), it being understood that the Supervisor shall not be required to make any determination as to the validity of Claims.

(h)     The Supervisor shall be provided with copies of any relevant documentation and shall be entitled to send a notice by electronic mail to the Bank or the Claimant concerned requesting further information, which the Bank or the Claimant, respectively, must provide within three London business days.

(i)     The Supervisor shall review all relevant documentation with regard thereto provided by the relevant Claimant and the Bank Group and shall determine on the basis of the documentation provided to it whether Claims:

    (i)     should be admitted, in which case they shall be to that extent "**Agreed Claims**";

    (ii)    constitute Direct Official Government Sector Debt by assessing whether each such Claim is: (A) owed to an Official Government Sector Creditor; and (B) is by way of direct loan;

    (iii)   constitute Relevant Excluded Debt and, if so, into which category of Excluded Creditor the Claimant falls by reference to such Claim, and/or

    (iv)    whether they should be rejected.

(j)     The Supervisor may, based on the documentation provided to it, reject the whole or any part of a Claim and determine the classification of a Claim as Relevant Excluded Debt or Direct Official Government Sector Debt.  The Supervisor's determination shall be made in good faith.  The Supervisor shall, however, advise the relevant person of its decision by electronic mail.

(k)     If the Supervisor requires an extension of time in making his determination, he may, with the consent of the Bank (such consent not to be unreasonably withheld) extend the said period by such amount of time as he and the Bank shall agree.  In making his determination the Supervisor shall be entitled to consult with such advisers, including experts, as he may deem appropriate.

(l)     Where a Disputed Claim has been subject to adjudication by the Supervisor, the amount of the Claim which shall be admitted and its classification shall be the amount and classification determined by the Supervisor, regardless of any amount or classification included on any Claim Form.

(m)     The Supervisor's determination as to the quantum and classification of a Claim shall, to the extent permitted by law, be final and binding on the Bank and the Claimant concerned (but without prejudice to the Bank's right to dispute the validity of such Claim).

(n)    If by the Scheduled Supervisor Determination Date, the Supervisor is unable to resolve a particular Disputed Claim, to the extent that any discrepancy between a Claimant's and the Bank's calculations in relation to such Claim (a "**Discrepancy**") amounts to a difference that is equivalent to less than the lower of 5 per cent. of the amount submitted by the Bank and U.S.$100,000 (a "**Minor Quantum Discrepancy**"), then the Supervisor will use the average of the discrepant figures provided to the Supervisor by the relevant Claimant and the Bank in such circumstances for its final determination.

(o)    Where the Supervisor is unable to resolve all disputes as to quantum and classification by the Scheduled Supervisor Determination Date and:

   (i)    the aggregate amount of all Discrepancies, all Disputed Claims as to classification and all discrepancies arising as part of the trade finance adjudication process is less than U.S.$75 million (calculated for disputes as to quantum on a net basis by setting off the aggregate of Discrepancies indicating that the Bank owes them less than the amount claimed against the aggregate of Discrepancies indicating that the Bank owes them more than the amount claimed); and

   (ii)   there are fewer than 100 claims (when aggregated with any such claims arising as part of the trade finance adjudication process) in respect of which there are non-Minor Quantum Discrepancies or disputes as to classification,

   then the Bank and the Steering Committee shall negotiate in good faith to agree final and binding amounts by reference to all non-Minor Quantum Discrepancies and disputes as to classification by 23 May 2010.

(p)    Where the Supervisor is unable to resolve all disputes as to quantum by the Scheduled Supervisor Determination Date and:

   (i)    the aggregate amount of all Discrepancies, all Disputed Claims as classification and all discrepancies arising as part of the trade finance adjudication process is U.S.$75 million or more (calculated for disputes as to quantum on a net basis setting off the aggregate of Discrepancies indicating that the Bank owes less than the amount claimed against the aggregate of Discrepancies indicating that the Bank owes more than the amount claimed); or

   (ii)   there are 100 or more claims (when aggregated with any such claims arising as part of the trade finance adjudication process) in respect of which there are non-Minor Quantum Discrepancies or disputes as to classification, then such Disputed Claims will be settled by expert determination in accordance with a procedure the structure and terms of which will be settled by 23 May 2010, and in which case the various Euronoteholders' meetings and the Claimants' Meeting to approve the Restructuring may (and shall at the request of the Bank and/or the Steering Committee) be rescheduled.

(q)    For the avoidance of doubt, to the extent permitted by law, there shall be no right of appeal from a decision of the Supervisor.

(r)    The Supervisor is not liable for anything done or omitted to be done in the discharge or purported discharge of his functions as the Supervisor and there shall be no right to make any claim against the Supervisor in respect thereof except in the case of fraud or bad faith of the Supervisor.  This applies to an employee or agent of the Supervisor as it applies to the Supervisor himself.

## 4.3    Particulars of Claimant's Claim

(a)     All Claimants must submit a Claim Form (whether the Claim is actual or contingent) by the Claims Submission Date.    The Trustees acting on behalf of the Euronoteholders and BTA Finance Luxembourg must submit Claim Forms no later than 10.00 a.m. (Almaty time) on 26 May 2010.  The Bank may, at its discretion, accept a Claim Form at any time prior to the Claimants' Meeting.

(b)     Claimants with contingent off-balance sheet Claims against the Bank (which are not Excluded Debt) relating to one or more underlying arrangements or transactions the purpose of which were to provide finance to a third party ("**Relevant Contingent Claims**") may participate in the Restructuring by either:

(i)     electing to participate in the Restructuring Packages in respect of the outstanding principal amount (plus interest accrued but unpaid up to 30 June 2010) of the underlying debt (or part thereof) (and if they do so, such Claimants must submit a Claim Form for that amount and by doing so they will be deemed to have accelerated and made their Claim (if applicable, in respect of part thereof) against the Bank (regardless of whether the underlying debt has fallen due or is in default) and will agree to irrevocably assign to the Bank all of their rights in respect of the underlying debt (or the relevant part thereof) on the Restructuring Date and to notify, as soon as reasonably practicable, the assignment to the obligor of the underlying debt (or the relevant part thereof)), or

(ii)    electing to participate in the Restructuring but not under the Restructuring Packages in respect of the outstanding principal amount (plus accrued interest) of the underlying debt (or part thereof) and if they do so, such Claimants should submit a Claim Form confirming that they are not participating in the Restructuring Packages and in doing so agree that their contingent Claim (or the relevant part thereof) will be deemed to have been accelerated and made against the Bank (regardless of whether the underlying debt has fallen due or is in default) and will be cancelled (without prejudice to their rights against the obligor of the underlying debt).  In this case, such Claimants will not receive any cash or New Instruments under the Restructuring Packages in respect of the claim (or the relevant part thereof) and will not be required to assign their rights in respect of the underlying debt (or the relevant part thereof) but the Bank will on the Restructuring Date or as soon as reasonably practicable (as that Claimant's Entitlement) either (to the extent it is not legally or contractually prevented from doing so having made all reasonable endeavours to overcome the same)[13] assign to such Claimants any security rights or collateral which the obligor of the underlying debt conferred on or placed with the Bank in relation to that debt (or in the case of a claim hereunder of part only of the claim, a corresponding proportion thereof) or certify to such Claimants that no such security rights or collateral exists and to that effect the Bank shall make available to Claimants of Relevant Contingent Claims information relating to such collateral or security interest.

If such Claimants with Relevant Contingent Claims do not submit a Claim Form in relation to their Claims by the Claims Submission Date, they will be deemed to have made an election pursuant to paragraph (ii) above and will be treated accordingly.

---

[13] The wording in parenthesis is not agreed with the Steering Committee.

(c)    Claim Forms and accompanying documentation must include the following information:

    (i)    the Claimant's name and address, (if a company) its company registration number and contact details;

    (ii)    the principal amount and the Accrued Interest amount of its Claim as at the Cut-off Date (which should correspond with the adjudicated amount in the case of a Disputed Claim which has been adjudicated by the Supervisor);

    (iii)    to the extent indemnities, premia and fees have been agreed or adjudicated by the Supervisor as admissible, such amounts shall be included in the Claim Form[14];

    (iv)    whether or not that amount includes outstanding uncapitalised interest or late payment amounts which it may only do to the extent they constitute Accrued Interest;

    (v)    particulars of how and when the debt was incurred by the relevant member of the Group and, if relevant, purchased by the Claimant;

    (vi)    particulars of any rights of set-off available to the Claimant and the value of such set-off rights;

    (vii)    the name, address and authority of the person signing the Claim Form (if other than the Claimant himself);

    (viii)    whether the Claimant is an Official Government Sector Creditor;

    (ix)    whether the Claim relates to Ordinary Debt, Direct Official Government Sector Debt or Relevant Excluded Debt (and, if the latter, which category of Relevant Excluded Debt it falls within);

    (x)    whether the Claim is a Relevant Contingent Claim (see paragraph (b) above);

    (xi)    where an election with regard to Restructuring Packages is available to the Claimant, whether it wishes to make such election, in what way and with reference to what amount of its Claim;

    (xii)    where an election with regard to currency of Entitlements is available to the Claimant, which currency it wishes to elect;

    (xiii)    where an election with regard to receipt of New Notes by a Bank Creditor SPV is available, whether is wishes to make such election;

    (xiv)    where an election with regard to receipt of Shares or GDRs is available, which of those it wishes to receive;

    (xv)    details of any documents by reference to which the debt can be substantiated and, if available, a copy of such documents shall be attached to the proof or submitted with it; and

    (xvi)    all other relevant documentary or other evidence as the Bank shall require in order to carry out its determination.

The Claimant must also give certain representations and warranties including, *inter alia*, in relation to their status and the purpose for which they are acquiring New Notes, GDRs and/or Shares in connection with selling restrictions under applicable

---

[14] This is subject to further discussion with the Steering Committee.

securities laws and confirm whether the Claims submitted by it constitute Related Party Debt.

(d)     Claimants who submitted claims notices in the adjudication process for trade finance claims referred to in Clause 4.2(a) above must submit a Claim Form but shall be deemed to have submitted sufficient information and documentation with respect to the principal amount of those Claims and, if applicable, their status as an Official Government Sector Creditor but may nevertheless submit additional supporting information.

(e)     The Bank may, if it thinks it necessary, require a Claim Form to be verified by means of an affidavit or statutory declaration (or by such other analogous method as they may consider appropriate).

**4.4     Admission and rejection of Claims for voting and distribution of Entitlement**

(a)     The Bank reserves the right to dispute the validity of Claims at all times, including, for the avoidance of doubt, any Claim agreed as to quantum or classification with a Claimant or adjudicated as to quantum or classification by the Supervisor.

(b)     All Claims, whether actual (non-contingent) Claims or contingent Claims, must be made by submitting a Claim Form to the Bank.   In certain circumstances, as described herein, Claim Forms will be deemed to have been submitted.

(c)     Claims submitted after the Claims Submission Date will be cancelled but the Bank may, in its sole and absolute discretion, admit such Claims.

(d)     Subject to Clause 3.2(c) and Clause 3.5 above, Claims in respect of Related Party Debt (other than Excluded Debt) shall be expunged and reduced to zero on the Restructuring Date.

**4.5     Debt payable at a future time**

(a)     Where a Claimant has proved for a Claim, the payment of which is not due at the Claims Submission Date, he is entitled to Entitlements equally alongside other Claimants, but subject to paragraph (b) below.

(b)     For the purpose of such distribution of Entitlements (and no other purpose) the amount of the Claimant's Agreed Claim (or, if the Entitlement has previously been distributed to him, the amount remaining outstanding in respect of his Agreed Claim) shall be reduced by applying such discount rates as the Bank and the Steering Committee agree are appropriate and *provided that* Claimants shall in any event, be deemed to have accelerated such Claims on or before the Claims Submission Date regardless of whether they have done so.

**4.6     Reductions/Increases of amounts of proof**

(a)     If, after a Claimant's Claim has been admitted, the Claim is withdrawn or expunged, or the amount of it is reduced (in each case other than pursuant to the implementation of the Restructuring), the Claimant is liable to repay or otherwise return to the Bank any Entitlement overpaid or over distributed.

(b)     Each Claimant understands and irrevocably agrees that no Claimant shall have any right after the Claims Submission Date to increase the amount of its Claim (irrespective of whether such increase is based on real damage, any loss, moral damage, lost opportunity or otherwise).

(c)     Any Agreed Claim which is withdrawn, expunged, or the amount of which is reduced shall be extinguished, released or barred to the extent so withdrawn, expunged or reduced.

4.7     **Set-off**[15]

(a)     No Claimant may set off a Claim acquired (other than where acquired as a result of a merger or similar with any other entity) on or after 20 April 2009 ("**Acquired Claims**") against a Claim (whether actual or contingent) that the Bank or any Subsidiary has against it.

(b)     Any liability of a Claimant set off against a Claim by the Bank (other than set-offs made before 18 April 2010 against Claims which are not Acquired Claims as a result of any Claimant's enforcement of (i) Security or other cash collateralisation arrangement, (ii) rights of the Claimant under the terms and conditions of business delivered to a member of the Group in connection with the opening or operation of any account, (iii) any judicial, statutory, regulatory or common law right of such Claimant or (iv) any contractual set-off as may be allowed due to a set-off provision of a loan facility or similar agreement) will be treated as an advance distribution of the Entitlements and the relevant Entitlements under the Restructuring Plan actually distributed to the Claimant will be reduced accordingly.

(c)     Where a guarantee or surety of the Bank or its Subsidiaries is treated as satisfied, released and paid in full, the Bank shall be entitled to set off against any person's obligation to reimburse the Bank or its Subsidiary for payments made under such guarantee or surety any obligation of the Bank or its Subsidiary to such person as if the guarantee or surety had actually been paid in full.

(d)     In relation to any Claim or Designated Financial Indebtedness referred to in Clause 3.1(a), if the net amount payable thereunder by the Bank to the Relevant Claimant or any affiliate thereof is positive, such amount shall be treated as an Agreed Claim subject to the Restructuring and if the net amount is negative (in other words, an amount is deemed payable to the Bank), the amount payable shall be treated as an advance distribution of the Claimant's Entitlement under the Restructuring Plan and the Entitlement actually distributed to the Claimant will be reduced accordingly.

4.8     **Realisations following Claims Submission Date**

(a)     Subject to paragraph (b) below, where any Claimant obtains any proceeds in respect of any Claim on or following the Claims Submission Date, it shall be treated as an advance distribution of Entitlements under the Restructuring Plan and the Entitlements actually distributed to the Claimant shall be reduced accordingly.

(b)     For the avoidance of doubt, where any member of the Group receives any amount by reference to a Non-OGSC Eligible Trade Finance Debt or Indirect Official Government Sector Debt which would, were that member of the Group to pay the proceeds thereof to a Claimant, render a transaction to become in whole or in part, a Self-Liquidating Trade Finance Transaction, that member of the Group shall forthwith pay such sums to such Claimant both before as well as after the Claims Submission Date.  Any amounts to be paid shall not be treated as an advanced distribution of Entitlements but shall reduce *pro tanto* the Claim of such Claimant to be restructured or cancelled.

---

[15] This is subject to further discussion with the Steering Committee.

4.9    **No double proof**

Proofs of Claim with respect to essentially the same underlying debt shall not, when aggregated, be admitted for an amount in aggregate in excess of 100 per cent. of the underlying debt to which they relate.

4.10   **Assignments and transfers**

The Bank is not obliged to recognise transfers of any Claim made by Claimants after the Claims Submission Date (but may in its absolute discretion do so).

4.11   **Assignment of right to Entitlements**

(a)    If a Claimant with an Agreed Claim gives notice to the Bank before the Claims Submission Date that he wishes any Entitlements to which he is entitled to be paid or distributed to another person, or that he has transferred or assigned his entitlement to another person, the Bank shall pay or distribute the Entitlements to that other accordingly.

(b)    A notice given under this paragraph must specify the name and address of the person to whom payment is to be made.

(c)    To the extent that any Claimant transfers or assigns all or part of its Claim after it has submitted a Claim Form, the transfer by or on behalf of the Bank to the Claimant or the Claimant's Nominated Recipient named in any Claim Form submitted by such Claimant, or any assignee or transferee recognised by the Bank in accordance with Clause 4.10, of Entitlements shall be effective to discharge and extinguish any Liabilities as at the Restructuring Date or thereafter of the Bank to any transferee or assignee of such Claim in relation to the relevant Claim.

4.12   **Costs of Supervisor**

The Bank shall pay all reasonable costs, charges and expenses incurred by the Supervisor in the course of exercising and performing his powers, duties and functions under the Restructuring Plan.

**5.    DISTRIBUTION**

5.1    **Entitlement**

Each Agreed Claimant (including Euronoteholders) will be entitled to receive Entitlements assigned to it in accordance with the terms of the Restructuring Packages.

In determining a Euronoteholder or Agreed Claimant's Entitlement, fractions of New Notes, Shares and GDRs shall be disregarded and not transferred to the relevant Euronoteholder or Agreed Claimant.  Any fractions of New Notes, Shares and GDRs will instead be sold in accordance with Clauses 5.2.7 and 5.2.8 and the Bank shall account to the relevant Claimants who were entitled to such fractions for the Net Proceeds of Sale.

5.2    **Method of Distribution; Full and Final Settlement of Claims**

5.2.1   In order to make the Distribution, if any, to a Euronoteholder or Agreed Claimant, as the case may be, the Distribution Agent or the Bank, as the case may be, shall aggregate the total amount of cash, New Notes, Shares or GDRs attributable to each Euronoteholder or Agreed Claimant, as the case may be and shall transfer the same into the appropriate Existing Account, Designated Account or Local Account in accordance with the instructions set out in the Settlement Instructions and as determined by the terms of the Restructuring Packages or as otherwise set out in the Information Memorandum.

5.2.2    A Euronoteholder with an Agreed Claim will have its Entitlement and Distribution, if any, (or part thereof) credited to its Existing Account, Designated Account or Local Account or as otherwise set out in the Settlement Instructions.

5.2.3    A Claimant with an Agreed Claim who requires Distribution, if any, (or part thereof) to be transferred to a Nominated Recipient or credited to an Existing Account, Designated Account or Local Account shall make an Account Designation in its Settlement Instructions.

5.2.4    If a Claimant does not complete a Claim Form or does not complete it correctly, or if the Settlement Instructions do not include an Account Designation in respect of the relevant Entitlement, or if the operators of a Clearing System are unable or unwilling to provide clearing facilities in respect of the relevant New Notes, Shares and GDRs, or if for any other reason the Bank so wishes, the obligations of the Bank to transfer (or procure the transfer of) such Entitlement to a Claimant with an Agreed Claim shall be discharged by the Distribution to the relevant Claimant or its Nominated Recipient (as appropriate) by certified cheque or wire transfer, in the case of cash, or in certificated form, in the case of New Notes, Shares and GDRs.

5.2.5    If, for any reason, a Claimant with a Securities Entitlement does not wish to, or is unable to, hold the New Notes, Shares or GDRs to which it is entitled, it may direct the Distribution Agent or the Bank, as the case may be, to (i) sell its Securities Entitlement and account to such Claimant for the Net Proceeds of Sale thereof or (ii) transfer the same to a third party who is not so affected.  The price, terms, timing and manner of such sale, and any currency exchange effected by the Distribution Agent or the Bank, as the case may be, in connection with or related to such sale, or the Net Proceeds of Sale, shall be on the best terms reasonably available at the time using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date.

5.2.6    If in the opinion of the Bank (having taken appropriate legal advice), the allotment, issue or transfer of New Notes, Shares and GDRs pursuant to the Restructuring Plan to that Claimant or its Nominated Recipient may be prohibited by any relevant law, the Distribution Agent shall, if so directed by the Bank, or the Bank shall sell, or procure the sale of, the same and pay the Net Proceeds of Sale from such sale of them to that Claimant or its Nominated Recipient, as the case may be, in full satisfaction of that Claimant's rights under the Restructuring Plan.  Any such sale shall be deemed to have been undertaken at the request and authorisation of the relevant Claimant and the Distribution Agent and the Bank are irrevocably and unconditionally requested and authorised to (i) sell such New Notes, Shares and GDRs on behalf of such Claimant in the market on the best terms reasonably available at the time, using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date; (ii) transfer the document(s) of title in respect of such New Notes, Shares and GDRs; and (iii) remit the Net Proceeds of Sale as soon as reasonably practicable to the relevant Claimant or its Nominated Recipient, as the case may be.  The price, terms, timing and manner of the sale, and any currency exchange effected by the Bank or the Distribution Agent in connection with or related to the sale or the proceeds of the sale, shall be on the best terms reasonably available at the time using a transparent open market process for cash as soon as reasonably practicable after the Restructuring Date.

5.2.7    No Claimant shall have any entitlement to any distribution of Entitlement other than in accordance with this Clause 5.2 and Clause 4.3(b).

**6.      DISTRIBUTION AGENT ARRANGEMENTS**

6.1      **Consent to Distribution Agent Arrangements**

Each Claimant agrees to the New Notes, Shares and GDRs being delivered (to the extent necessary) to the Distribution Agent, and being held by the Distribution Agent such that on the Restructuring Date the Distribution Agent may distribute them to Agreed Claimants in accordance with the Distribution Agent Agreement and the Restructuring Plan.

6.2      **Distribution Agent Agreement**

Prior to the Restructuring Date, the Bank will enter into an agreement with the Distribution Agent setting out the terms on which the Distribution Agent will hold cash, participation in the RCTFF and New Notes, Shares and GDRs on behalf of eligible Claimants.

**7.      GENERAL PLAN PROVISIONS**

7.1      **Costs**

(a)      The Bank will pay in full all costs, charges, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of the Restructuring Plan as and when they arise, including, but not limited to, the costs of holding the Euronoteholders' Meetings and the Claimants' Meeting, the costs of obtaining the approval of the Court and the costs of placing the notices required by the Restructuring Plan.  For the avoidance of doubt, the Bank will not be liable for any costs of any Claimant in relation to the Euronoteholders' Meetings and the Claimants' Meeting.

(b)      Notwithstanding any other provision in this Restructuring Plan, the Bank shall not be released or waived from any Liability to pay the fees and expenses of the Steering Committee and their advisers and will pay the same promptly (and in any event within three Business Days) following request by the Steering Committee.

7.2      **Modifications of the Restructuring Plan**

(a)      Following the Claims Submission Date, the Bank will, in consultation with its advisers, the Steering Committee and the advisers to the Steering Committee, tabulate the elections of all Claimants in the Claim Forms and revise the discount rates, coupons, coefficients, etc. as set out in "*Terms of Packages*" of the Information Memorandum.  Each Agreed Claimant in respect of Official Government Sector Debt or Non-OGSC Eligible Trade Finance Debt will be notified of its allocation into the relevant Restructuring Packages made in accordance with the Allocation Mechanism and all Claimants will be notified of the changes to the discount rates, coupons, coefficients, etc. arising from this process.

(b)      The Bank may without the consent of the Claimants, Euronoteholders and the Related Parties but following consultation with the Steering Committee, make a modification to the Restructuring Plan or any procedures to complete the Restructuring, in each case which are of a minor or technical nature or to correct a manifest error and/or to postpone particular events or deadlines by which particular aspects of the Restructuring need to be completed so long as the postponement is not materially prejudicial to the interests of the Claimants, Euronoteholders or Related Parties and if it does do so will give appropriate notice to Claimants, Euronoteholders and Related Parties.

(c)      Save for amendments to the Restructuring Plan made in accordance with Clause 7.2(a) or (b), no other amendment to the Restructuring Plan will be effective

without the prior approval of two-thirds of Claimants and Related Parties (in aggregate) by value.

### 7.3 Payments on Days other than a Business Day

If any sum is due or obligation is to be performed under the terms of the Restructuring Plan on a date other than a business day in the relevant place, the relevant payment shall be made, or obligation performed, on the next such business day.

### 7.4 Actions and measures taken in the course of the Restructuring

A list of principal events, measures and activities which the Bank is subject to in the course of the Restructuring is set out in the Information Memorandum.

### 7.5 Governing Law and Jurisdiction

This Restructuring Plan shall be governed by, and construed in accordance with, the laws of the Republic of Kazakhstan and the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of any provision of this Restructuring Plan, or out of any action taken or omitted to be taken in connection with the administration of this Restructuring Plan and, for such purposes, the Claimants and Euronoteholders irrevocably submit to the jurisdiction of the Court, *provided*, *however*, *that* nothing in this Clause 7.5 shall affect the validity of other provisions determining governing law and jurisdiction as between the Bank and any of its Claimants and Euronoteholders, whether contained in any contract or otherwise.

## ANNEX 1 – PRELIMINARY DEBT LIST

The Preliminary Debt List in this Annex 1 is for illustrative purposes only.  This Preliminary Debt List includes any Guarantee and any surety provided by the Bank in respect of the Rouble Notes whether or not demand has been made under the relevant Guarantee or surety.

# BTA - Designated Financial Indebtedness

| Category | Registration Number | Description | Borrower/Issuer | Description | BTA Reference | Creditor / Beneficiary | Currency | Initial transaction principal amount relating to a particular transaction | Principal | Interest | Original maturities |
|---|---|---|---|---|---|---|---|---|---|---|---|



[1] Interest accrued through 30 June 2010 has been calculated in accordance with the methodology explained in the document entitled "Methodology for calculating interest to be included in the restructuring process" which can be found on the Bank's website at http://www.bank/dev/whatever... In the Restructuring, interest will be written off and is included in this table solely for the purpose of determining voting at the Claimants' Meeting and for reattribution between Packages

## ANNEX 2 — CALCULATION OF ENTITLEMENTS

As Claims are denominated in different currencies, to calculate the sharing of Entitlements between Restructuring Creditors allocated to a Restructuring Package, all Claims which are not denominated in Tenge will be notionally converted into Tenge at the average rate for the twenty-two trading days immediately preceding the Claimants' Meeting shown on the applicable Bloomberg pages for conversion of the relevant currency into Tenge[16].

Each Restructuring Creditor under Senior Package 1 and Senior Package 2 will, in respect of each of its Agreed Claims, receive Entitlements in accordance with the relevant Coefficients (as adjusted if applicable in accordance with the provisions of the Restructuring Packages).

All Restructuring Creditors will receive Entitlements in the currencies properly elected in their Claim Forms.

---

[16]     To be determined whether Entitlements will be calculated in Tenge or U.S. Dollars.

**ANNEX 3 — FORM OF DEED OF RELEASE**[17]

**THIS DEED** is made on _____ 2010

**BETWEEN**:

(1)     JSC BTA BANK, a company incorporated in the Republic of Kazakhstan under registered number 39031900 AO whose registered office is at 97 Dzholdasbekov Street, Samal-2, Almaty 050051, Kazakhstan (the "**Bank**");

(2)     **THE CLAIMANTS** acting by the Bank pursuant to the authority conferred upon the Bank by the Claimants pursuant to the Restructuring; and

(3)     **THE RELATED PARTIES** acting by the Bank pursuant to the authority conferred upon the Bank by the Claimants pursuant to the Restructuring.

**WHEREAS:**

Pursuant to the Restructuring Plan, each Claimant and Related Party has authorised the Bank to enter into and execute and deliver this Deed on its behalf.

**NOW IT IS AGREED** as follows:

1.      **INTERPRETATION**

1.1     In this Deed, unless the context otherwise requires, the following words and expressions shall have the following meanings:

"**Directors and Officers**" means any person who is an officer or director of the Bank or any of its Subsidiaries as at the Restructuring Date or such reduced class of individuals as the Bank may subsequently determine;

"**Information Memorandum**" means the information memorandum of the Bank dated 1 May 2010 as amended or supplemented from time to time relating to the Restructuring.

1.2     In this Deed, unless the context otherwise requires or expressly provides:

(a)     capitalised terms used herein and not otherwise defined shall have the meanings ascribed to them in the Information Memorandum;

(b)     references to any clause, without further designation, shall be construed as a reference to the clause of this Deed so numbered;

(c)     section headings are for convenience only and shall not be taken into account in the interpretation of this Deed;

(d)     reference to any act, statute or statutory provision shall include a reference to that provision as amended, re-enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(e)     words importing the plural shall include the singular and *vice versa;* and

(f)     reference to a person includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors.

---

[17]     The form of the Deed of Release remains subject to further discussion with the Steering Committee.

**2.      WAIVER, RELEASE AND CONFIRMATION**

2.1      The Claimants and the Related Parties hereby irrevocably and unconditionally release and/or waive on their own behalf and on behalf of any person to whom they may have transferred any of their Claims, in each case to the extent permitted by law, each and every claim (actual or potential) which they have or may have against:

(a)      the Bank;

(b)      the Subsidiaries;

(c)      Samruk-Kazyna;

(d)      the government of Kazakhstan;

(e)      the NBK;

(f)      the FMSA;

(g)      the Directors and Officers;

(h)      the Steering Committee;

(i)      the Trustee;

(j)      the Trade Finance Adjudicator;

(k)      the Supervisor; and

(l)      the Advisers,

arising out of or in connection with the Designated Financial Indebtedness and/or the implementation of the Restructuring with effect from the Release Date (in the case of Claimants) and the Restructuring Date (in the case of Related Parties).  This Clause 2.1 shall not apply to any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship.

2.2      The Claimants and the Related Parties hereby irrevocably and unconditionally release on their own behalf and on behalf of any person to whom they may have transferred any of their Claims, in each case to the extent permitted as a matter of law (and save in the case of any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship), each and all of:

(a)      the Bank;

(b)      the Subsidiaries;

(c)      Samruk-Kazyna;

(d)      the government of Kazakhstan;

(e)      the NBK;

(f)      the FMSA;

(g)      the Directors and Officers;

(h)      the Steering Committee;

(i)      the Trustee;

(j)      the Trade Finance Adjudicator;

(k)    the Supervisor; and

(l)    the Advisers,

from each and every Liability (actual or potential) which they or any of them may have to a Claimant or a Related Party, or any person to whom they may have transferred any of their Claims in relation to or arising out of Designated Financial Indebtedness and/or the implementation of the Restructuring with effect from the Release Date (in the case of Claimants) and the Restructuring Date (in the case of Related Parties).  This Clause 2.2 shall not apply to any claim a Steering Committee member may have against its advisers by virtue of any advisory relationship.

2.3    The Claimants and the Related Parties hereby irrevocably and unconditionally agree and understand that none of the members of the Steering Committee or their Advisers have verified any assertion contained in the Information Memorandum and that such persons have expressly disclaimed any responsibility for such assertions and that the members of the Steering Committee have not acted as fiduciary or adviser to any person and give no covenants and have no duties or obligations to any person in connection with the Restructuring.

2.4    Notwithstanding any other provision of this Deed, no person shall be released or waived from any Liability arising from gross negligence, fraud or wilful misconduct on the part of such person.

2.5    The Claimants hereby acknowledge that their receipt of cash, New Notes, Shares, GDRs and other deliverables in accordance with their Entitlements pursuant to the Restructuring is accepted in full and final settlement of all Claims for which Claim Forms have been submitted relating thereto.

**3.    CONFLICT**

If at any time there shall be any conflict between the provisions of this Deed and the provisions of the Restructuring Plan, the provisions of the Restructuring Plan shall prevail.

**4.    THIRD PARTIES**

A person who is not a party to this Deed shall have no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

**5.    GOVERNING LAW**

This Deed and any non-contractual obligations arising out of or in connection with this Deed shall be governed by and construed in accordance with English law.]

# SCHEDULE 2 — CLAIM FORM[18]

## FOR THE RESTRUCTURING PLAN

in respect of

### JSC BTA BANK

**THIS CLAIM FORM IS TO BE COMPLETED BY ALL CLAIMANTS IN RESPECT OF THEIR CLAIMS FOR DESIGNATED FINANCIAL INDEBTEDNESS.**

**EURONOTEHOLDERS, HOLDERS OF PERPETUAL SECURITIES AND HOLDERS OF CHF NOTES HELD THROUGH THE CLEARING SYSTEMS DO NOT NEED TO COMPLETE A CLAIM FORM.**

**Claimants must submit separate Claim Forms in relation to each Claim of the same type prior to the Claims Submission Date. The provisional date of the Claims Submission Date is 19 May 2010. Any change to this date will be notified by announcement on a Regulatory Information Service and on the Bank's website at www.bta.kz**

**Claimants (other than Excluded Creditors (to which the next paragraph shall apply) should submit a Claim Form prior to the Claims Submission Date and will have their Claims cancelled if they do not, but the Bank may, in its sole and absolute discretion, admit such Claims.**

**Claimants with respect to: (i) Self-Liquidating Trade Finance Transactions, (ii) Official Government Sector Creditors with contingent claims (or parts thereof) against the Bank that have not crystallised, matured or fallen due prior to 30 June 2010 and (iii) trade finance creditors which would be Non-OGSC Eligible Trade Finance Creditors but have received a determination from the Adjudicator that they are not in that category because the claim has not crystallised, matured or fallen due prior to 30 June 2010 (each being holders of Relevant Excluded Debt) are also required to submit a Claim Form by the Claims Submission Date in order to ensure the correct categorisation of their debts.**

Before completing and executing this Claim Form, you should read the instructions below and the detailed notes set out at the end of this Claim Form. If the Claim Form is not completed in its entirety and executed in accordance with the detailed instructions, you may not be eligible to attend and vote at the Claimants' Meeting or receive your Entitlement under the Restructuring Plan.

If you have any questions relating to the completion of this Claim Form, please contact the Bank at the address and telephone number set out below. If you require further copies of this Claim Form, the Information Memorandum or Form of Proxy referred to below, please visit the Bank's website at http://www.bta.kz/en/investor/

This Claim Form is to be read in conjunction with the Information Memorandum dated 1 May 2010 and the Restructuring Plan contained therein that has been prepared in connection with the Restructuring. The definitions contained in the Information Memorandum apply to this Claim Form.

**Instructions for completion and return of this Claim Form:**

1.  Detailed instructions regarding completion of this Claim Form are set out at the end of this form.

2.  If a Claimant is unable to make all of the representations and undertakings set out in Box 4 of this Claim Form, their Claim Form will be rejected.

    Claim Forms should be submitted initially by email or fax by 19 May 2010, with the originals to be received by the Bank at the address specified below by 26 May 2010.

    Bank details for return of Claim Forms and queries:

    | | |
    |---|---|
    | Contact: | Mr. Asset Zhaisanov, Investor Relations Department |
    | Tel: | +7 727 3124671 |
    | Fax: | +7 727 250 0224 |
    | Email: | zhaisanov@bta.kz |

---

[18] Note: This is the updated version of the Claim Form, in the form previously agreed and made available on the Bank's website.

| | |
|---|---|
| Contact: | Ms Dinara Adil, Loan and Capital Markets Department |
| Tel: | +7 727 266 2607 |
| Fax: | +7 727 250 0224 |
| Email: | d_adil@bta.kz |

Original Claim Forms should be sent to:

Mr. Asset Zhaisanov/Ms Dinara Adil,
117 Dostyk Avenue
6th floor
Almaty Business Centre "Khan-Tengri"
Republic of Kazakhstan, 050020.

THE CLAIMANT REPRESENTS THAT THE CLAIM TO WHICH THIS CLAIM FORM RELATES IS TRUE AND ACCURATE TO THE BEST OF THE CLAIMANT'S INFORMATION AND BELIEF.

---

**1. FULL NAME AND CONTACT DETAILS OF CLAIMANT** (BOX 1)

Claimant name (and, if applicable, company registration number):

_____

_____

Contact person with respect to this Claim Form:

_____

_____

Contact Telephone Number: _____

E-mail: _____

Full Address: _____

_____

   Kazakh Pension Fund: (*mark this box if you are a Kazakh Pension Fund*)

---

**2. CLAIM** (BOX 2)

1) Claim Registration Number (*which may be found in the Preliminary Debt List published on the Bank's website and in the Information Memorandum*):

   _____

2) Principal (*specify currency and amount*):_____

3) Accrued Interest (*specify currency and amount*) (*to be calculated in accordance with the provisions of the Information Memorandum under "Information for Claimants — Information for all Claimants"*):

   _____

4) Premia, Fees, Indemnities (*specify currency and amount*):_____

   _____

5) Total Claim (*specify currency and amount*) (*being the sum of 2), 3) and 4)*):

   _____

6) Description of Claim:

   _____

   _____

7) Date incurred by the Bank Group or (if later) purchased by the Claimant:

   _____

8) Details of set-offs effected against Claim (*specify dates and amounts*):

   _____

   _____

9) Details of underlying debt (*applicable to Relevant Contingent Claims only*) (*see paragraph 4.3(b) of the Restructuring Plan*)

   _____

If you are an Official Government Sector Creditor who has previously submitted documentation to the Adjudicator, please confirm if you are attaching any additional documentation with this Claim Form:

   Yes
   No

| CATEGORY OF CLAIM | RELEVANT EXCLUDED DEBT |
|---|---|
| Please mark the appropriate boxes in respect of this Claim:<br><br>   Non-OGSC Eligible Trade Finance Debt<br>   Official Government Sector trade finance<br>   Senior bilateral Official Government Sector Debt<br>   Subordinated bilateral Official Government Sector Debt<br>   participation under a syndicated loan<br>   bilateral loan (non-Official Government Sector)<br>   derivative contract<br>   Senior foreign securities (e.g. euronotes)<br>   Perpetual Securities<br>   Subordinated Securities denominated in Tenge<br>   Shariah-compliant instrument/arrangement<br>   any other form of financial indebtedness (*specify type and also mark below if this is a Relevant Contingent Claim*)_____<br>   Relevant Contingent Claim (*see section 4.3(b) of the Restructuring Plan and 3.A below*) |   If your Claim constitutes **Relevant Excluded Debt** (*see page 1*) as listed on the Designated Financial Indebtedness list published on the Bank's website, please tick this box. |
| | |

| 3. ELECTIONS | (BOX 3) |
|---|---|

A.   If your Claim is a Relevant Contingent Claim, please mark the appropriate box below (see Section 4.3(b) of the Restructuring Plan for further details):

    I wish to participate in the Restructuring and receive Entitlements under the Restructuring Packages, and hereby irrevocably assign with effect on the Restructuring Date, all my rights to the underlying debt described in Box 2, and hereby undertake to notify the obligor of such assignment as soon as practicable

    I wish to participate in the Restructuring and receive Entitlements outside the Restructuring Packages in accordance with Section 4.3(b)(ii) of the Restructuring Plan and understand that my Claim against the Bank will be cancelled on the Restructuring Date

B.   If your Claim is Non-OGSC Eligible Trade Finance Debt, please fill in the appropriate boxes below:

**First Choice Election**

Amount of Claim you wish to be allocated to Senior Package 1: _____

Amount of Claim you wish to be allocated to Senior Package 2: _____

Amount of Claim you wish to be allocated to Senior Package 3: _____

TOTAL (please ensure that the total of the amounts above equals the Total Claim specified in Box 2):_____

**Second Choice Election**

(Please indicate now by ticking the relevant box, your preference between Senior Package 1 or Senior Package 2, which will only be used in the event that First Choice Elections of Non-OGSC Eligible Trade Finance Creditors (in aggregate) electing Senior Package 3 exceed U.S. Dollars 700 million) Please note that you must tick only Senior Package 1 or Senior Package 2

    Senior Package 1

    Senior Package 2

and

    My Claim is denominated in Euro and, if any part of my Claim is allocated to Senior Package 2, I wish my OID Notes to be denominated in [Euro/U.S. Dollars]* and, if any part of my Claim is

allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and Subordinated Notes to be denominated in [Euro/U.S. Dollars/Tenge]*; or

My Claim is denominated in a currency which is neither Tenge nor Euro and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and I wish my Subordinated Notes to be denominated in [U.S. Dollars/Tenge]*;

or

My Claim is denominated in Tenge.

and

I wish to receive Entitlements that I may have to any of the following New Notes:

(i)   Senior Dollar Notes: [directly/Bank Creditor SPV]*

(ii)  Dollar OID Notes: [directly/Bank Creditor SPV]*

(iii) Euro OID Notes: [directly/Bank Creditor SPV]*

(iv) Subordinated Non-Tenge Notes: [directly/Bank Creditor SPV]*

C.   If your Claim is Senior Official Government Sector Debt, please mark the appropriate boxes below:

Amount of Claim you wish to be allocated to Senior Package 1: _____

Amount of Claim you wish to be allocated to Senior Package 2: _____

TOTAL (please ensure that the total of the amounts above equals the Total Claim specified in Box 2): _____

and

My Claim is denominated in Euro and, if any part of my Claim is allocated to Senior Package 2, I wish my OID Notes to be denominated in [Euro/U.S. Dollars]* and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and Subordinated Notes to be denominated in [Euro/U.S. Dollars/Tenge]*; or

My Claim is denominated in neither Tenge nor Euro and, if any part of my Claim is allocated to Senior Package 1, I wish my Senior Notes to be denominated in [U.S. Dollars/Tenge]* and I wish my Subordinated Notes to be denominated in [U.S. Dollars/Tenge]*; or

My Claim is denominated in Tenge.

and

I wish to receive Entitlements that I may have to any of the following New Notes:

(i)   Senior Dollar Notes: [directly/Bank Creditor SPV]*

(ii)  Dollar OID Notes: [directly/Bank Creditor SPV]*

(iii) Euro OID Notes: [directly/Bank Creditor SPV]*

(iv) Subordinated Non-Tenge Notes: [directly/Bank Creditor SPV]*

D.   If you are a creditor with an <u>Ordinary Claim</u> (not falling with B. or C. above), please mark the appropriate boxes below:

My Claim is denominated in a currency other than Tenge and I wish to receive any Entitlements in [U.S. Dollars/Tenge]*; or

My Claim is denominated in Tenge

and

I wish to receive Entitlements that I may have to any of the following New Notes:

Senior Dollar Notes: [directly/Bank Creditor SPV]*

Dollar Subordinated Notes: [directly/Bank Creditor SPV]*

E.   <u>Shares/GDR Election</u>

Please mark the appropriate box below:

I am a creditor who is resident in Kazakhstan; or

I am a creditor who is not resident in Kazakhstan and wish to receive any Entitlement to Shares in the form of [GDRs/Shares]*

* *Delete as applicable*

| 4. REPRESENTATIONS AND UNDERTAKINGS | (BOX 4) |
|---|---|

The Claimant represents and undertakes as follows:

(1)   The Claimant hereby authorises the Bank to execute and deliver on its behalf the Deed of Release substantially in the form contained in Schedule 1, Annex 3 (*Deed of Release*) of the Information Memorandum and agrees to be bound by the Restructuring Plan.

(2)   If a body corporate, the Claimant is duly organised and validly existing under the laws of the jurisdiction of its organisation and has full power and authority to execute this Claim Form.

(3)   The execution and delivery of this Claim Form in connection with the Restructuring Plan do not and will not violate any law or regulation applicable to the Claimant.

(4)   This Claim Form has been duly completed by the Claimant and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms hereof, subject to the general principles of equity and any applicable bankruptcy, insolvency, reorganisation or similar law in any jurisdiction affecting creditors' rights generally.

(5)   The Claimant is a creditor of the Bank Group and has not entered into any prior assignment, sale, grant, conveyance or other transfer of its rights in respect of the Claim to which this Claim Form relates and has good title to make the Claim to which this Claim Form relates (other than any assignment to an Official Government Sector Creditor by a policy holder making claims on their behalf).

(6)   The Claimant has adequate information concerning its Claim and the business and financial condition of the Bank to make an informed decision regarding the Restructuring Plan and the Entitlement to be received under the Restructuring Plan in exchange for cancellation or restructuring of its Claim, and no reliance has been made on any document other than the Information Memorandum.

(7)   The claimant understands that the New Notes, Shares and GDRs have not been and will not be registered under the Securities Act or any other securities laws and are being offered in transactions not involving any public offering in the United States and unless so registered, the New Notes, Shares and GDRs may not be offered, sold or otherwise transferred except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, and in each case in compliance with the conditions for transfer set forth in the first paragraph under the heading "Issuance and Transfer Restrictions" in the Information Memorandum.

(8)   It is not, nor is it acting on behalf of, an Affiliate of the Bank or acting on the Bank's behalf and it is either:

(i)   not a U.S. Person or acting for the account or benefit of a U.S. Person, it is located outside the United States and it acknowledges that until the expiration of the period which expires on and includes the 40th day after the later of the commencement of the offering of the New Notes, Shares and GDRs and the Closing Date (the "**distribution compliance period**"), any offer or sale of these New Notes, Shares or GDRs shall not be made by it except (a) to a person whom it reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A or (b) to a person that is not a U.S. Person or acting for the account or benefit of a U.S. Person in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; and, in each case, accordance with any applicable securities laws of any state of the United States or any other jurisdiction; or

(ii)   an Accredited Investor and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is an Accredited Investor, and it:

(a)   is acquiring the New Notes, Shares and GDRs for investment, in the normal course of its business, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act;

(b)   invests in or purchase securities similar to the New Notes, Shares and GDRs and it has such knowledge and experience in financial and business matters that makes it capable of evaluating the merits and risks of acquiring the New Notes, Shares and GDRs; and

(c)   is aware that it (or any of these investor accounts) may be required to bear the economic risk of an investment in the New Notes, Shares and GDRs for an indefinite period of time and it (or that investor account) is able to bear this risk for an indefinite period; or

(iii)   it is a QIB, and, if it is participating on behalf of one or more investor accounts, each of these investor accounts is a QIB.

(9)   It understands that the New Notes will bear a legend to the following effect:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S.

PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT; OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("**AN ACCREDITED INVESTOR**") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**QIB**") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S AND (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY. THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

(10)   If it is a QIB or an Accredited Investor, it understands that the New Notes offered pursuant to an exemption from the Securities Act other than Regulation S will be represented by a Restricted Global Note. Before any interest in any Restricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in an Unrestricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws.

(11)   If it has elected to participate in compliance with Regulation S, it understands that the New Notes will be represented by an Unrestricted Global Note. Prior to the expiration of the distribution compliance period, before any interest in any Unrestricted Global Note may be offered, sold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Restricted Global Note, it will be required to provide the Registrar with a written certification (in the form provided in the Agency Agreement) as to compliance with applicable securities laws.

(12)   The Bank, the Registrar, the Trustee and the Principal Paying and Transfer Agent and their Affiliates and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.

4. <u>EXECUTION</u> (BOX 4)

**PLEASE SEE NOTES AT THE BACK OF THIS CLAIM FORM REGARDING EVIDENCE TO BE ATTACHED TO THE CLAIM FORM.**

**EXECUTE A OR B BELOW**

(A) <u>Execution by a company (or a partnership or other entity which has a separate legal personality from its partners or members)</u>

EITHER (i) IF THE CLAIMANT'S SEAL IS TO BE AFFIXED

This Claim Form has been executed on _____ (date)

Executed by the Claimant named below:

_____

Name of Claimant                                                                          *(Affix company seal)*

_____      _____      _____
Name in full *(please print)*          Director/Authorised signatory          Signature

_____      _____      _____
Name in full *(please print)*          Director/Authorised signatory          Signature
*(if two signatories are required)*                                               *(if two signatories are required)*

OR (ii) IF THE CLAIMANT'S SEAL IS **NOT** TO BE AFFIXED

This Claim Form has been executed on _____

Executed by the Claimant named below:

Name of Claimant _____

Acting by the person (or persons) named below each of whom is duly authorised on behalf of the Claimant named above:

_____      _____      _____
Name in full *(please print)*          Director/Authorised signatory          Signature
                                       *(Delete as applicable)*

_____      _____      _____
Name in full *(please print)*          Director/Authorised signatory          Signature
*(if two signatures are required)*     *(Delete as applicable)*                *(if two signatures are required)*

(B) <u>Execution by individuals</u>

This Claim Form has been executed on _____ (date)

1. _____          _____

Name in full *(please print)*                      Signature

2. _____          _____

Name in full *(please print)*                      Signature
*(If two signatories are required)*                *(If two signatories are required)*

### NOTES FOR COMPLETION OF THIS CLAIM FORM

PLEASE FOLLOW THESE NOTES CAREFULLY WHEN COMPLETING THIS CLAIM FORM.
ALL BOXES MUST BE COMPLETED AS DESCRIBED IN THESE NOTES.

**1 FULL NAME AND CONTACT DETAILS OF CLAIMANT** (Box 1)

This Box must be completed by the Claimant. Please provide all information requested.

**2 CLAIM** (Box 2)

Full details of the Claim or Claims of the same type should be provided and a continuation sheet should be used, if necessary. If you are an Official Government Sector Creditor who has previously submitted documentation to the Adjudicator you need not submit such documentation with this Claim Form (but may do so) and may supply additional documents or information if you wish. Claimants should reference any specific agreement or document pursuant to which the Claim is being made. Claimants should also indicate the category of a Claim in the relevant box including, (where applicable, as determined by the Adjudicator or Supervisor).

The Claimant should set out the amount of the/each claim (being the principal amount of the Claim plus Accrued Interest plus any unpaid indemnities, premia and fees). If the amount of any Claim specified in a Claim Form has been reduced by reason of any set-off, the Claimant should provide the details of it and the date when such set-off was made.

Claimants should specify whether their claims are actual or contingent.

**3 ELECTIONS** (Box 3)

Claimants should complete only the appropriate sections of Box 3.

**4 REPRESENTATIONS AND UNDERTAKINGS** (Box 4)

Please read Box 4 carefully. If Box 4 is amended in any way, this Claim Form will be invalid. If the representations and undertakings cannot be made, please contact the Bank.

**5 EXECUTION** (Box 5)

Box 5 must be signed by each person who is named as a Claimant as explained below.

Insert the date on which this Claim Form is executed. This date must be the date on which the person who signs the Claim Form actually does so. Where more than one person signs the Claim Form, the date inserted should be the date on which the last person to sign the Claim Form actually does so.

As described in the notes below, in most cases evidence of the authority of the signatory(ies) to execute this Claim Form needs to be submitted with the Claim Form.

***Companies (and partnerships or other entities which have a separate legal personality):***

Where a person signing and executing Box 4 is a company (or partnership or other entity which has a separate legal personality), then section (A) must be executed as follows. Either:

(1) that company's seal may be affixed in accordance with the company's articles of association. The person(s) witnessing the affixing of the seal must also complete and sign Box 4 where indicated; or

(2) authorised signatories of the company may sign Box 4 on behalf of that company.

In either case, the persons signing on behalf of the company must specify their position in that company and must submit the evidence of their authority to sign as described in the notes below.

***Individuals:***

Where a Claimant is an individual or individuals, that person or persons must sign and complete Box 4, section (B).

If the person signing in section (B) as an individual is a Claimant who is not holding a Claim solely for his own account (for example, if he holds that Claim as a trustee, executor or personal representative or a partner in a partnership), evidence of his authority to sign the Claim Form must be submitted as described in the notes below.

Even where an attorney has been appointed to sign the Claim Form in Box 4 on behalf of a Claimant, the Claimant must be named in Box 1.

In all cases, the attorney must submit evidence of his, her or its authority to sign as described in the notes below.

*Powers of attorney:*

This note applies if a person named as Claimant in Box 1 has appointed someone else to execute the Claim Form on his, her or its behalf under a power of attorney. If the attorney so appointed is an individual, he or she must (i) sign and complete section (B) as an individual, as described above under "Individuals", and (ii) when he or she prints his or her name in section (B), also write the words "as attorney for X", X being the name of the Claimant who has granted the power of attorney. If the attorney so appointed is a company or a partnership or other entity having its own legal personality, then (i) section (A) must be completed and signed in the manner described above, and (ii) when the name of the company (or other entity) is inserted in section (A), the words "as attorney for X" must be inserted, X being the name of the Claimant who has granted the power of attorney.

Even where an attorney has been appointed to sign the Claim Form in Box 4 on behalf of a Claimant, the Claimant must be named in Box 1.

In all cases, the attorney must submit evidence of his, her or its authority to sign as described in the notes below.

*Evidence to be submitted:*

In all cases other than where an individual who signs the Claim Form is claiming as a Claimant solely for his own account, evidence of the authority of the signatory(ies) to execute the Claim Form on behalf of the Claimant must be submitted with the Claim Form.

Where the Claimant (or the person signing the Claim Form on behalf of the Claimant) is a company, partnership or other entity, this evidence must consist of:

(i)   copies of, or extracts from, the company, partnership or entity's constitutional documents (such as articles of association or partnership agreement) indicating which officers or bodies of the company, partnership or entity are authorised to execute documents, or have the capacity to delegate authority to execute documents, on behalf of that company; or

(ii)  (if applicable) copies of, or extracts from, minutes or resolutions of the appropriate officers or bodies of the company, partnership or entity, evidencing that such authority has been delegated to the person(s) completing and signing the Claim Form on behalf of that company, partnership or entity.

For other individuals (such as personal representatives or executors) this evidence should show that the relevant individual is authorised to sign the Claim Form.

The Bank reserves the right to request that evidence of a signatory(ies) authority to execute the Claim Form has been duly legalised and/or apostilled and is accompanied by a notarised translation into the Russian language but no such legalisation and/or apostille shall be required unless so requested by the Bank.

Where a Claimant has appointed an attorney, a copy of the power of attorney must be submitted with the Claim Form, together with any other evidence of authority required to be submitted as described in the notes above. The power of attorney must authorise the attorney to execute this Claim Form. If the power of attorney has been granted under English law, that power of attorney must be executed as a deed. If the power of attorney has been granted under Kazakhstan law, that power of attorney must be notarised when applicable, signed by the authorised officer of the Claimant and its chief financial officer and duly sealed and must contain the date of issuance and term of the power of attorney.

*Corrections and amendments:*

If, in completing this Claim Form, any corrections or amendments, however minor, are made, each person who signs in Box 5 must also sign his or her initials next to each correction or amendment. No amendment may be made to the wording in Box 4.

## SCHEDULE 3 — NOTICE OF CLAIMANTS' MEETING

## JSC BTA BANK

NOTICE IS HEREBY GIVEN that a meeting (the "**Claimants' Meeting**") be convened of the Claimants (as defined in the Information Memorandum referred to below (and, generally, being a person having a claim in respect of the financial indebtedness of JSC BTA Bank (the "**Bank**")) arising under or in connection with certain financial indebtedness of the Bank for the purpose of considering and, if thought fit, approving a restructuring plan proposed to be made between the Bank and the Claimants (the "**Restructuring Plan**").  The Claimants' Meeting will be held in Almaty on 28 May 2010 at or about 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36, Kurmangazy Street, Almaty, Republic of Kazakhstan, 050021 (Tel: +7 727 2582270), at which place and time all the Claimants, save for Euronoteholders, are requested to attend either in person or by proxy.  Each Claimant or his proxy will be required to register his attendance at the Claimants' Meeting prior to its commencement.  Registration will commence at 10:00 a.m. (Almaty time) on 27 May 2010 and will close at 10:00 a.m. (Almaty time) on 28 May 2010.

The agenda of the Claimants' Meeting is the consideration and, if thought fit, approval of the Restructuring Plan.  The quorum for the purposes of the Claimants' Meeting is established at two-thirds of the Bank's obligations by value subject to the Restructuring.

Claimants may vote in person at the Claimants' Meeting or they may appoint another person, whether a Claimant or not, as their proxy to attend and vote in their place.  Claimants are requested to submit their Form of Proxy to an agent whose details are included in the Form of Proxy included with the Information Memorandum.  Claimants or their proxies must be duly authorised to vote.

The text of the Restructuring Plan and of the Information Memorandum are incorporated in the Information Memorandum of which this notice forms part.  Additional copies of such Information Memorandum are available at www.bta.kz.  A blank Form of Proxy is enclosed with the Information Memorandum and can be obtained from the Bank's websites at www.bta.kz

It is requested that Forms of Proxy be lodged with the Bank by no later than 5:00 p.m. (Almaty time) on 19 May 2010[19], but if forms of proxy are not so lodged they may be accepted at the discretion of the Chairman at any time prior to the Claimants' Meeting if properly completed and executed.

By an order of the Specialised Financial Court of the Regional Financial Centre of Almaty (the "**Court**") dated 16 October 2009, the Court has authorised Mr. Anvar Saidenov to act as Chairman of the Claimants' Meeting.

DATED 1 May 2010

---

[19]      Except for trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute who have until 10:00 a.m. (Almaty time) on 26 May 2010.

**SCHEDULE 4 – FORM OF PROXY**

|  | **FORM OF PROXY FOR CLAIMANTS OF JSC BTA BANK** | **Voting Deadline: 19 May 2010** |
|---|---|---|

**Instructions for completing and transmitting this Form of Proxy:**

1. This form should only be completed by all Claimants.

2. **Box 1** is to be completed for each Claim held.  Complete part (i) and part (ii).

**PLEASE NOTE THAT A SEPARATE FORM OF PROXY MUST BE COMPLETED IN RESPECT OF EACH CLAIM.**

3. **Box 2** is the certification box.  Complete all the details and sign in the appropriate place.

4. **Box 3** is your voting instruction.

   (i) Detail at part (a) whether you would like to appoint the Chairman of the Meeting or yourself or another person as your proxy.

   (ii) If you would like to appoint the Chairman as your proxy, please indicate at (c) whether you would like the Chairman to vote for or against the Restructuring Plan.  The Chairman can only vote as directed and cannot be directed to vote at his discretion.  There is no need to complete (b) if you appoint the Chairman of the Claimants' Meeting as your proxy.

   (iii) If you do not wish to appoint the Chairman of the Claimants' Meeting as your proxy, please complete your own details (if you wish to attend) or the details of your chosen proxy at (a)(ii). You can detail at (b) either whether you wish your proxy to vote at his own discretion or to vote in accordance with your instructions for or against the Restructuring Plan.  If you do not want your proxy to vote at his own discretion, please also complete (c).

   (iv) The proxy must produce an appropriate proof of personal identity (for example, his or her passport or driving licence with photo-card) at the Claimants' Meeting in order to verify their identity and gain admission to the Claimants' Meeting.

5. THE DEADLINE FOR SUBMISSION OF PROXIES IS 5:00 P.M. (ALMATY TIME) ON 19 MAY 2010.[20]  PLEASE MAKE SURE YOU RETURN THIS FORM TO THE BANK IN SUFFICIENT TIME FOR YOUR VOTE TO BE CAST.

**General Instructions**

1. Forms of Proxy may be returned to the Bank by post, fax or electronic mail as set out below:

   | Contact: | Mr. Asset Zhaisanov, Investor Relations Department |
   |---|---|
   | Tel: | +7 727 3124671 |
   | Fax: | +7 727 250 0224 |
   | Email: | zhaisanov@bta.kz |

   | Contact: | Ms. Dinara Adil, Loan and Capital Markets Department |
   |---|---|
   | Tel: | +7 727 266 2607 |
   | Fax: | +7 727 250 0224 |
   | Email: | d_adil@bta.kz |

2. The person appointed under this Form of Proxy must attend the Claimants' Meeting in person to represent you.

---

[20]     Except for trustees on behalf of Euronoteholders and Claimants whose Claims remain in dispute until 10:00 am (Almaty time) on 26 May 2010.

3.   All references to defined terms in this Form of Proxy are to be given the same meaning as in the Information Memorandum and the Restructuring Plan.

1   CLAIM                                                                                    (BOX 1)

The Claimant, identified in Box 2, certifies that the undersigned holds a Claim arising out of an interest identified at (i) below in the amount set out in (ii) below:

**(i)   PLEASE PROVIDE DETAILS (including a reference to any agreement or document relating to the Claim):**

Please use a continuation sheet if necessary

(ii)  Claim amount (stating currency) (being the principal amount of the Claim plus Accrued Interest):

---

2   CERTIFICATION                                                                          (BOX 2)

**TO BE COMPLETED BY ALL CLAIMANTS**

By returning this Form of Proxy, the Claimant certifies that it:

(a)  is a Claimant;

(b)  has full power and authority to vote at the Claimants' Meeting with respect to the Claim listed in Box 1;

(c)  has received a copy of the Information Memorandum; and

(d)  has adequate information to make an informed decision regarding the Restructuring Plan.

Claimant:  _____

Signature:  _____

Name and title of signatory:  _____

Address:

Tel.  No:

Email:

Fax No:

Date:

---

| 3 | FORM OF PROXY AND VOTE | (BOX 3) |

**TO BE COMPLETED BY ALL CLAIMANTS**

The Claimant identified in Box 2 hereby:

(a)  appoints the following person as its proxy

|  | (i)  **THE CHAIRMAN** | **OR** | (ii)  **OTHER PROXY** |
|---|---|---|---|

| | | |
|---|---|---|
| **The** | instructed paragraph<br><br><br>**Chairman**, who is hereby to vote as marked in (c) below | the person whose details are given immediately below:<br><br>Name:<br>_____<br><br>Address:<br>_____<br>_____<br>_____<br><br>Tel. no.:<br>_____<br><br>Passport no.:<br>_____<br><br>and instructs its proxy to vote: |

| | | | |
|---|---|---|---|
| | using his own discretion (if you check this box do not complete (c)) | OR | in accordance with the instructions given in paragraph (c) below. |

| (c) | **(please check one box only):** | |
|---|---|---|
| | **FOR** the Restructuring Plan | **AGAINST** the Restructuring Plan |

| (d) | is not appointing a proxy and will attend in person |
|---|---|

**NB.** Complete this section if you have appointed the Chairman of the meeting as your proxy or if you have chosen to give specific instructions to your proxy in section (b) above.

If you are a lender with a Claim against TuranAlem Finance, by signing this Form of Proxy you hereby authorise each attorney (**advocaat**) of NautaDutilh N.V. to:

(1)  in the event that TuranAlem Finance offers the BV Scheme to its creditors, file your claim and vote the full amount of your claim in favour and/or against the BV Scheme at TuranAlem Finance's creditors meeting in accordance with your vote for or against the Restructuring Plan, as indicated in Section 3;

(2)  If you have voted in favour of the Restructuring Plan, release TuranAlem Finance from its obligations towards you upon written instruction of TuranAlem Finance unless TuranAlem Finance proposes a BV Scheme that does not become binding, in which case TuranAlem Finance shall not be so released.

**IF YOU HAVE ANY QUESTIONS**

If you have any questions regarding this Form of Proxy or the voting procedures or if you need a Form of Proxy or additional copies of the Information Memorandum or other enclosed materials, please contact the Bank as follows:

| | |
|---|---|
| Contact: | Mr. Asset Zhaisanov, Investor Relations Department |
| Tel: | +7 727 3124671 |
| Fax: | +7 727 250 0224 |
| Email: | zhaisanov@bta.kz |

| | |
|---|---|
| Contact: | Ms. Dinara Adil, Loan and Capital Markets Department |
| Tel: | +7 727 266 2607 |
| Fax: | +7 727 250 0224 |
| Email: | d_adil@bta.kz |

**SCHEDULE 5 — NOTICES OF EURONOTEHOLDERS' MEETINGS**

[TEXT TO BE INSERTED]

## ANNEX 1 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
of the holders of the
**U.S.$600,000,000 7.875% Notes due 2010 of the Issuer presently outstanding (the "Notes")**

and listed on the Luxembourg Stock Exchange
Common Code: 016884880 ISIN:  XS0168848801 U.S. ISIN:  US89989EAC12 CUSIP: 89989EAC1

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 2 June 2003 (the "**Original Trust Deed**") as supplemented by a supplemental trust deed dated 30 November 2004 (the "**Supplemental Trust Deed**" and together with the Original Trust Deed, the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P.  Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.$600,000,000 7.875% Notes due 2010 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 2 June 2003 as supplemented pursuant to a supplemental trust deed dated 30 November 2004 (together, the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)  instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)  instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)  in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)  assents to the termination of the Guarantee; and

    (ii)  instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)  authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)  discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)  authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 30 May 2003 and 29 November 2004 relating to the Notes;

(d)      the PCTS; and

(e)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.  Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

## General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

## Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and

in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

ANNEX

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$600,000,000 7.875% Notes due 2010, CUSIP: 89989EAC1 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 9:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations – Reorganisation Unit Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][21] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$_____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:………………

Account number of DTC Participant:…………………………..

Date: ……………………

---

[21]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
E mail:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**TABULATION AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com
Attention:  Corporate Trust Events Administration

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

and

**JSC BTA Bank**
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

15 April 2010

## ANNEX 2 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
#### of the holders of the
**U.S.$400,000,000 8% Notes due 2014 of the Issuer presently outstanding (the "Notes")**
and listed on the Luxembourg Stock Exchange
ISIN:  USN89065AF89 CUSIP:N89065AF8 U.S. ISIN:  US89989EAD94 CUSIP: 89989EAD9

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 24 March 2004 (the "**Original Trust Deed**") as amended and restated by the amended and restated trust deed dated 6 April 2004 (the "**Amended and Restated Trust Deed**" and together with the Original Trust Deed, the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. $400,000,000 8% Notes due 2014 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 24 March 2004 as amended and restated by the amended and restated trust deed dated 6 April 2004 (together, the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

     (i)     assents to the termination of the Guarantee; and

     (ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 19 March 2004 and 2 April 2004 relating to the Notes;

(d)     the PCTS; and

(e)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.  Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring.  The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

## General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

## Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and

in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$400,000,000 8% Notes due 2014, CUSIP:  N89065AF8/89989EAD9 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 9:10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit, Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

5.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

6.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][22] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

7.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

8.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$_____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………
Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:………………………………

Account number of DTC Participant:………………………………

Date:…………………..

---

[22]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 3 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the
**U.S.$350,000,000 8.5% Notes due 2015 of the Issuer presently outstanding (the "Notes")**
and listed on the Luxembourg Stock Exchange
Common Code: 021187305 ISIN:  XS0211873053 U.S. ISIN:  US89989EAF43 CUSIP: 89989EAF4

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule 3 (*Provisions for Meetings of Noteholders*) to the trust deed dated 10 February 2005 the ("**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. $350,000,000 8.5% Notes due 2015 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 10 February 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or

supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)  instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)  instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)  in the event the Restructuring Plan is approved at the Claimants' Meeting:

  (i)  assents to the termination of the Guarantee; and

  (ii)  instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)  authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)  discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)  authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the

Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectus dated 9 February 2005 relating to the Notes;

(d)     the PCTS; and

(e)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal,*

*financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule 3 (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote

in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate. The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting. The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given. Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**ANNEX**

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$350,000,000 8.5 per cent. Notes due 2015, CUSIP: 89989EAF4 (the "**Notes**")

of

**TuranAlem Finance B.V.** (the "**Issuer**")
presently outstanding
convened for 9:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn:  William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on
the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the
Principal Paying Agent nominated by it][23] of [ADDRESS] with [PASSPORT
NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the
Meeting on our behalf and to cast the votes in respect of the Notes described below in the
manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no
voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such
sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy
wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this
sub-proxy shall have the meanings given to them in such Notice.

Signed by a duly authorised officer on behalf of the DTC Participant Name of DTC Participant:

Account number of DTC Participant:………………………………….
Date:……………………

---

[23]      Please insert the name of the beneficial owner or another nominee or retain the reference to
"employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to
attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 4 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
#### of the holders of the

**U.S.$250,000,000 7.75% Notes due 2013 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 025188128 ISIN:  XS0251881289 U.S. ISIN:  US89989EAG26 CUSIP: 89989EAG2

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S. $250,000,000 7.75% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

(i)     assents to the termination of the Guarantee; and

(ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 7 April 2006 relating to the GMTN Programme;

(d)      the Final Terms dated 21 April 2006 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

## General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

## Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

ANNEX

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$250,000,000 7.75% Notes due 2013, CUSIP: 89989EAG2 (the "**Notes**")
of
**TuranAlem Finance B.V. (the "Issuer")**
presently outstanding
convened for 9:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn: William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][24] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………
Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:……………………………

Account number of DTC Participant:………………………………..

Date:…………………

---

[24]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 5 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
**of the holders of the**

**PLZ200,000,000 6.3% Notes due 2011 of the Issuer presently outstanding (the "Notes") issued pursuant**
**to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
ISIN:  XS0249842732 Common Code: 024984273

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:30 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the PLZ200,000,000 6.3% Notes due 2011 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

      (i)     assents to the termination of the Guarantee; and

      (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 7 April 2006 relating to the GMTN Programme;

(d)     the Final Terms dated 4 August 2006 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.  In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

## General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

## Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate. The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting. The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given. Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each PLZ50,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 6 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
**of the holders of the**

**EUR500,000,000 6.25% Notes due 2011 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 26926700 ISIN:  XS0269267000

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 9:50 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the EUR500,000,000 6.25% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)    approves the Restructuring Plan;

(2)    instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)    instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

      (i)     assents to the termination of the Guarantee; and

      (ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)      the Final Terms dated 22 September 2006 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes. Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it. If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded. A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote. On a poll every such person has one vote in respect of each EUR1,000 principal amount of Notes so produced or for which he is a proxy or representative. Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way. In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar. Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form. Neither the Issuer, the Guarantor nor the

Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 7 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
**of the holders of the**

**GBP 200,000,000 7.125% Notes due 2009 of the Issuer presently outstanding (the "Notes")
issued
pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN
Programme")**

and listed on the London Stock Exchange
Common Code: 0279181662 ISIN:  XS0279181662

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the GBP 200,000,000 7.125% Notes due 2009 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)      approves the Restructuring Plan;

(2)      instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)      instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)   instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)   instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)   in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)   assents to the termination of the Guarantee; and

    (ii)   instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)   authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)   discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)   authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 18 September 2006 and 8 December 2006 relating to the GMTN Programme;

(d)     The Supplemental Prospectus dated 8 December 2006 relating to the GMTN Programme;

(e)     the Final Terms dated 15 December 2006 relating to the notes;

(f)     the PCTS; and

(g)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do

so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each GBP £1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:_eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 8 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**

*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

**NOTICE OF MEETING**
of the holders of the

**U.S.$1,000,000,000 8.25% Notes due 2037 of the Issuer presently outstanding (the "Notes") issued
pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

and listed on the London Stock Exchange
Common Code: 028315627 ISIN:  XS0283156270 U.S. ISIN:  US8998X0AB68 CUSIP: 8998XOAB6

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10.20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.$1,000,000,000 8.25% Notes due 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued

by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's Statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)    the Trust Deed;

(b)    the Paying Agency Agreement;

(c)    the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)    the Supplemental Prospectuses dated 8 December 2006 relating to the GMTN Programme;

(e)    the Supplemental Prospectuses dated 9 January 2007 relating to the GMTN Programme

(f)    the Final Terms dated 18 January 2007 relating to the Notes;

(g)    the PCTS; and

(h)    following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do

so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes. Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it. If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded. A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote. On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative. Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way. In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar. Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form. Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**DTC Voting Procedures**

Record Date: 15 April 2010

Expiration Date: 5:00 p.m. (New York time) 4 May 2010

Notes represented by a Rule 144A Global Note are held by a custodian for The Depository Trust Company ("**DTC**").  Any Noteholder who, as at the Record Date holds Notes through DTC who wishes to attend and vote at the Noteholders' Meeting or appoint a Proxy to attend and vote at the Noteholders' Meeting on their behalf will be required to complete a form of sub-proxy (as set out in the Annex) and send it to the Principal Paying Agent so that it is received no later than the Expiration Date.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

ANNEX

**Form of Sub-proxy**

For use in connection with the meeting of the holders of those of the
U.S.$1,000,000,000 8.25% Notes due 2037, CUSIP: 8998XOAB6 (the "**Notes**")
of
**TuranAlem Finance B.V. (**the "**Issuer**"**)**
presently outstanding
convened for 10:20 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old
Broad
Street, London EC2N 1DW (the "**Meeting**")

*This form of sub-proxy should be completed in respect of a Noteholder who does not wish to attend and vote at the Meeting in person and who wishes to appoint a proxy to attend and vote on his behalf and signed by a DTC Participant and lodged with the Principal Paying Agent at The Bank of New York Mellon. 101 Barclay Street, New York NY 10286, United States of America, Attn: Corporate Trust Operations — Reorganisation Unit Attn: William Buckley (Tel: (212)-815-5788, Fax: (212)-298-1915) by 5:00 p.m. (New York time) on 4 May 2010 to appoint the beneficial owner or another nominee or employee(s) of the Principal Paying Agent (to be nominated by it) as a sub-proxy to attend and vote at the Meeting or adjourned Meeting.*

We hereby certify that:

1.      Notes in the aggregate principal amount specified below were held by the DTC Participant on the Record Date for the purposes of the Meeting.

2.      We appoint [INSERT NAME OF BENEFICIAL OWNER/NOMINEE/EMPLOYEE(S) of the Principal Paying Agent nominated by it][25] of [ADDRESS] with [PASSPORT NUMBER/DRIVING LICENCE NUMBER] to act as our sub-proxy and to attend the Meeting on our behalf and to cast the votes in respect of the Notes described below in the manner set out below.

3.      No other person has been appointed as a sub-proxy in respect of the above Notes and no voting instruction has been given in relation to such Notes.

4.      The aggregate principal amount of Notes in respect of which votes should be cast [by such sub-proxy IN FAVOUR OF/AGAINST the Extraordinary Resolution] [as the sub-proxy wishes in respect of the Extraordinary Resolution] are:

The aggregate principal amount of Notes:  U.S.$ _____

Terms defined in the Notice of Meeting in respect of the Notes dated 15 April 2010 and used in this sub-proxy shall have the meanings given to them in such Notice.

…………………………………
Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant:……………………………

Account number of DTC Participant:………………………..

Date:……………………

---

[25]      Please insert the name of the beneficial owner or another nominee or retain the reference to "employee(s) of the Principal Paying Agent nominated by it" (as appropriate) to be appointed as a sub-proxy to attend and vote at the Meeting.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

### ANNEX 9 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
**of the holders of the**

**JPY20,000,000,000 4.25% Notes due 2016 of the Issuer presently outstanding (the "Notes") issued**
**pursuant to the U.S.$3,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 028053177 ISIN:  XS0280531772

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10.10 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY20,000,000,000 4.25% Notes due 2016 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the trust deed dated 4 November 2005 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (formerly The Bank of New York) (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

     (i)     assents to the termination of the Guarantee; and

     (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 18 September 2006 relating to the GMTN Programme;

(d)      Supplemental Prospectuses dated 8 December 2006 relating to the GMTN Programme

(e)      the Final Terms dated 22 December 2006 relating to the Notes;

(f)      the PCTS; and

(g)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.

In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration.  The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution.  Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement)*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above.  The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below.  On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation

to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule 3 (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each JPY1,000,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

**ANNEX 10 — NOTICE OF MEETING**

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**

*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**

**of the holders of the
JPY 30,000,000,000 Floating Rate Puttable Notes due 2017 of the Issuer presently outstanding (the
"Notes") issued pursuant to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the
"GMTN Programme")**

Common Code: 030336160 ISIN:  XS0303361603

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (formerly J.P. Morgan Corporate Trustee Services Limited) (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:30 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY 30,000,000,000 Floating Rate Puttable Notes due 2017 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

    (i)     assents to the termination of the Guarantee; and

    (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 2 May 2007 and 22 May 2007 relating to the GMTN Programme;

(d)      the Final Terms dated 29 May 2007 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below.  In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

### General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

### Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each JPY 1,000,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email: eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

## ANNEX 11 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.

*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "**Issuer**")*

### NOTICE OF MEETING
of the holders of the

**JPY 15,000,000,000 Floating Rate Puttable Notes due 2017 of the Issuer presently outstanding (the
"Notes") issued pursuant to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the
"GMTN Programme")**

ISIN:  XS0323864313

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) to an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:40 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the JPY 15,000,000,000 Floating Rate Puttable Notes due 2017 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour

and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

(i)     assents to the termination of the Guarantee; and

(ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction. As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits. Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed. The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan. If the Extraordinary Resolution is passed and the Restructuring Plan is approved

at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(ii) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 2 May 2007 and 22 May 2007 relating to the GMTN Programme;

(d)      the Final Terms dated 19 September 2007 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "Financial Advisers") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "Steering Committee Advisers") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each JPY 1,000,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)    represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)    represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)    acknowledges that it has received and reviewed the terms of the notice described herein;

(d)    consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)    acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)    acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)    acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

ANNEX 12 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

**TURANALEM FINANCE B.V.**
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

**NOTICE OF MEETING**
of the holders of the

**USD 200,000,000 11.5% Notes due 2013 of the Issuer presently outstanding (the "Notes") issued pursuant
to the U.S.$8,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 035803548 ISIN:  XS0358035482

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J (*Provisions for Meetings of Noteholders*) of an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 10:50 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the USD 200,000,000 11.5% Notes due 10 April 2013 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)    approves the Restructuring Plan;

(2)    instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)    instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction

Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)      instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)      instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)      in the event the Restructuring Plan is approved at the Claimants' Meeting:

(i)      assents to the termination of the Guarantee; and

(ii)     instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)      authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)      discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)      authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.   Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.   The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will, subject to paragraph 6(2) of the Extraordinary Resolution, be extinguished in consideration of the

provision of the Entitlement by the Bank (as will be set out in the Information Memorandum).  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, of the Bank then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum).  Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*).  This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan.  Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors.  In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)      the Trust Deed;

(b)      the Paying Agency Agreement;

(c)      the Prospectuses dated 25 June 2007 and 8 October 2007 relating to the GMTN Programme (U.S.$8,000,000,000);

(d)      the Final Terms dated 22 April 2008 relating to the Notes;

(e)      the PCTS; and

(f)      following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| Noteholders' Meeting | Quorum Requirement |
|---|---|
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes. Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it. If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded. A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote. On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative. Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way. In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar. Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form. Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg


This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

### ANNEX 13 — NOTICE OF MEETING

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS.  IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD
TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS IMMEDIATELY**

### TURANALEM FINANCE B.V.
*(a private company with limited liability incorporated under the laws of The Netherlands)*
*(the "Issuer")*

### NOTICE OF MEETING
#### of the holders of the

**U.S.\$100,000,000 11.25% Notes due 2014 of the Issuer presently outstanding (the "Notes") issued
pursuant to the U.S.\$8,000,000,000 GMTN Programme of the Issuer (the "GMTN Programme")**

Common Code: 036669705 ISIN:  XS0366697059

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Schedule J(*Provisions for Meetings of Noteholders*) of an amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Bank**") and BNY Corporate Trustee Services Limited (the "**Trustee**") in respect of the above-referenced Notes, a meeting (the "**Noteholders' Meeting**") of the holders of the Notes (the "**Noteholders**") is being convened by the Issuer and will be held at or about 11:00 a.m. (London time) on 7 May 2010 at the offices of White & Case LLP at 5 Old Broad Street, London EC2N 1DW, United Kingdom for the purpose of considering and, if thought fit, passing the following resolution, which will be proposed as an Extraordinary Resolution in accordance with the provisions of the Trust Deed.  If within 15 minutes after such time the quorum prescribed by the Original Trust Deed is not present, the Noteholders' Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Noteholders' Meeting (including the Extraordinary Resolution) shall bear the meanings given to them in this Notice, the Trust Deed, the principal commercial terms sheet dated 7 December 2009, as amended by the amendment letter dated 17 March 2010 (together the "**PCTS**") and/or the information memorandum to be published by the Bank prior to the Noteholders' Meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**").

The terms of the Extraordinary Resolution are as follows:

"THAT this Meeting of the holders (the "**Noteholders**") of the U.S.\$100,000,000 11.25% Notes due 27 May 2014 (the "**Notes**") of TuranAlem Finance B.V. (the "**Issuer**") guaranteed by JSC BTA Bank (formerly JSC Bank TuranAlem) (the "**Guarantor**"), constituted by the amended and restated trust deed dated 2 May 2007 (the "**Trust Deed**") between the Issuer, the Guarantor and BNY Corporate Trustee Services Limited (the "**Trustee**") hereby:

(1)     approves the Restructuring Plan;

(2)     instructs the Trustee to vote the full principal amount of Notes outstanding and interest in relation thereto in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms;

(3)     instructs the Trustee, in the event that the Issuer offers the BV Scheme to its creditors, to vote the full principal amount of the Notes outstanding and interest in relation thereto in favour and/or against the BV Scheme at the Issuer's creditors' meeting in the same proportions as

votes are cast in favour of or against this Extraordinary Resolution in Electronic Instruction Forms (to the extent permitted by applicable law), *provided that*, if the competent court or supervisory judge does not allow the Trustee to cast a split vote, the Trustee will vote the full principal amount of the Notes outstanding in favour of the BV Scheme;

(4)     instructs the Trustee, upon the request of the Guarantor, to accelerate the Notes and demand payment under the Guarantee;

(5)     instructs the Trustee to submit a Claim Form in respect of the amounts which may be claimed under the Guarantee in accordance with the Restructuring Plan or following an acceleration of the Notes;

(6)     in the event the Restructuring Plan is approved at the Claimants' Meeting:

  (i)     assents to the termination of the Guarantee; and

  (ii)    instructs the Trustee to release the Issuer and the Guarantor from their respective obligations under the Trust Deed, *provided that* the Trustee shall only so release the Issuer upon written instruction of the Issuer unless the Issuer proposes a scheme of arrangement (*akkoord*) that does not become binding;

(7)     authorises, directs, and empowers the Issuer and the Guarantor to do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution and the Trustee to give its written consent thereto;

(8)     discharges and exonerates the Trustee from all liability to the Noteholders in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation; and

(9)     authorises and requests the Trustee to concur in the above matters and to do all things and take any action which is, in the reasonable opinion of the Trustee, necessary, expedient or desirable in connection with this Extraordinary Resolution,

all as provided in and subject to the conditions specified in the Restructuring Plan.

The Trustee shall not be obliged to take any of the steps set out in paragraph (4) of this Extraordinary Resolution until it has been indemnified or provided with security or pre-funded to its satisfaction.  As at the date of this notice, no such indemnity, security or pre-funding has been provided to the Trustee. The Extraordinary Resolution provides that the Bank can request acceleration of the Notes to facilitate set-off under Kazakhstan law and to otherwise facilitate the implementation of the Restructuring Plan.

The Trustee has had no involvement in the formulation or negotiation of the Restructuring Plan and expresses no view on its merits.  Furthermore, the Trustee makes no representation as to the admissibility of any Claim Form submitted by it in the event that the Extraordinary Resolution is passed.  The Trustee has not reviewed and will not review the Information Memorandum and expresses no view on its contents.

Terms used in this resolution and defined in or as provided in the Notice convening this Meeting are used herein as so defined."

**Background**

The Extraordinary Resolution forms part of an overall restructuring of certain of the financial indebtedness of the Bank as more fully described in the PCTS and/or the Information Memorandum. The Restructuring Plan includes seeking the instruction of all of the individual series of notes issued by the Issuer for the Trustee to vote at the Bank's statutory creditors' meeting in favour of the Restructuring Plan.  If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting, then the rights of the Noteholders against the Issuer will,

subject to paragraph 6(2) of the Extraordinary Resolution, be extinguished in consideration of the provision of the Entitlement by the Bank (as will be set out in the Information Memorandum). If the Extraordinary Resolution is passed and the Restructuring Plan is approved at the Bank's statutory creditors' meeting then the rights of the Noteholders against the Guarantor will be extinguished in consideration of the provision of the Entitlement from the Bank (as will be set out in the Information Memorandum). Further details of the rationale behind the restructuring and the consequences of agreeing to the restructuring are set out in the PCTS and will be described in the Information Memorandum.

In addition to the restructuring of certain of the financial indebtedness of the Bank, the Information Memorandum will describe the possibility of a Dutch scheme of arrangement (*akkoord*) (the "**BV Scheme**") being carried out in relation to the Issuer if the Restructuring Plan is approved at the Bank's statutory creditors' meeting but any financial indebtedness of the Issuer would otherwise remain outstanding making it necessary to declare the Issuer bankrupt (*failliet*). This is intended to avoid an insolvent liquidation of the Issuer in the event that either an extraordinary resolution of one or more of the series of notes issued by the Issuer is not passed or any of the other financial creditors of the Issuer do not vote in favour of the Restructuring Plan. Accordingly, the Issuer is seeking as part of the Extraordinary Resolution for the Noteholders to instruct the Trustee to vote in favour of the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution in the event that it becomes necessary or advisable for the Issuer to offer the BV Scheme to its creditors. In order to allow for this eventuality, the Trustee shall not release the Issuer from its liabilities to the Noteholders pending the successful passing of the BV Scheme, thereby permitting the Trustee to vote in the BV Scheme in the manner provided in paragraph 3 of the Extraordinary Resolution.

The Information Memorandum, a copy of which will be available as indicated below, will explain in further detail the background to and reasons for, the Noteholders' Meeting.

Beneficial Owners (as defined below) or Noteholders on their behalf may register their holding of the Notes with the Issuer's Financial Advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding. This will facilitate communication with participants in the Restructuring.

**Documents Available for Inspection**

Noteholders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Noteholders' Meeting, inspect at the offices of the Principal Paying Agent copies of the following documents:

(a)     the Trust Deed;

(b)     the Paying Agency Agreement;

(c)     the Prospectuses dated 25 June 2007 and 8 October 2007 relating to the GMTN Programme;

(d)     the Final Terms dated 26 May 2008 relating to the Notes;

(e)     the PCTS; and

(f)     following publication, the Information Memorandum and any supplements thereto.

Copies of the Information Memorandum will, prior to the Noteholders' Meeting, and the Form of Proxy (referred to below), be available for collection at the specified offices of the Principal Paying Agent may be inspected on the Guarantor's website at www.bta.kz.

**General**

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders'

Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

*Neither the Trustee nor Lazard Frères and UBS AG as the Guarantor's financial advisers (the "**Financial Advisers**") nor any member of the Steering Committee or the Steering Committee's legal, financial or tax advisers (the "**Steering Committee Advisers**") express any view or make any recommendations as to the merits of the Extraordinary Resolution or any view on whether the Noteholders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolution, but the Trustee has authorised it to be stated that it has no objection to the Extraordinary Resolution being put to Noteholders for their consideration. The Trustee has not been involved in formulating or negotiating the Extraordinary Resolution relating to the Notes and makes no representation that all relevant information has been disclosed to the Noteholders in or pursuant to the Information Memorandum and this Notice of Noteholders' Meeting. Neither the Trustee nor the Financial Advisers nor any member of the Steering Committee or the Steering Committee Advisers have verified any of the statements made in the Information Memorandum or in this Notice.*

*Nothing in the Information Memorandum or this Notice of the Noteholders' Meeting should be construed as a recommendation to the Noteholders from the Trustee, the Financial Advisers, the Steering Committee or the Steering Committee Advisers to vote for or against the Extraordinary Resolution. Accordingly, each of the Issuer, the Guarantor, the Trustee, the Financial Advisers, the Steering Committee and the Steering Committee Advisers recommends that Noteholders who are unsure of the consequences of the Extraordinary Resolution being passed or not being passed should seek their own financial and legal advice.*

*The members of the Steering Committee are not bound to accept or reject or recommend this or any subsequent proposal set out as part of the Restructuring. The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring (save as pursuant to obligations arising under any investment management agreement).*

## General

Noteholders should pay particular attention to the requirements in respect of a quorum for the Noteholders' Meeting and an adjourned Noteholders' Meeting (if applicable) which are set out below. In light of such requirements, Noteholders are strongly urged either to attend the Noteholders' Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Noteholders' Meeting.

## Voting Arrangements and Quorum

The provisions governing the convening and holding of the Noteholders' Meeting are set out in Schedule J (*Provisions for Meetings of Noteholders*) to the Original Trust Deed, a copy of which is available for inspection as described above. The Notes are currently represented by global certificates (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**"). Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Notes, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Noteholder for the purposes of the Noteholders' Meeting and will only be entitled to attend and vote at the Noteholders' Meeting or to cause the appointment of a proxy to do so in accordance with the procedures set out below. On this basis, the only Noteholder for the purposes of the Noteholders' Meeting will be the Registered Holder.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Noteholder need take no further action in relation to voting at the Noteholders' Meeting in respect of the Extraordinary Resolution. By submitting or

delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant instructs the Registered Holder of such Notes to complete and sign a Form of Proxy in accordance with Schedule J (*Provisions for Meetings of Noteholders*) of the Original Trust Deed and in such Form of Proxy to authorise and instruct the Principal Paying Agent to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolution and to take the steps referred to in the Extraordinary Resolution.

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Noteholders' Meeting (or any adjourned such meeting) to be the holder of the Notes to which such appointment relates and the Registered Holder of the Notes shall be deemed for such purposes not to be the holder.

Alternatively, Beneficial Owners who wish a different person to be appointed as their proxy to attend and vote at the Noteholders' Meeting (or any adjourned such meeting) should contact the relevant Clearing System to make arrangements for such person to be appointed as a proxy in respect of the Notes in which they have an interest for the purposes of attending and voting at the Noteholders' Meeting (or any adjourned such meeting).

In either case, Beneficial Owners must have made arrangements to vote with the relevant Clearing System by not later than 48 hours before the time fixed for the Noteholders' Meeting (or any adjourned such meeting) and within the relevant time limit specified by the relevant Clearing System and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of the Principal Paying Agent until the earlier of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting); (ii) the surrender to the Registrar of the voting certificate(s); or (iii) upon such Note(s) ceasing to be held to its order or under its control in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent (the "**Blocking Period**").

Any Note(s) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Noteholders' Meeting (or, if later, the adjourned Noteholders' Meeting) and (ii) upon such Note(s) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of the Principal Paying Agent to be held to its order or under its control.

The Extraordinary Resolution may only be considered at the Noteholders' Meeting if the Noteholders' Meeting is quorate.  The Noteholders' Meeting will be quorate if one or more persons being entitled to vote (whether as a Noteholder or as proxy) are present at the Noteholders' Meeting who together hold or represent the requisite principal amount of outstanding Notes satisfying the quorum requirement as set out below.

If, within fifteen minutes after the time appointed for the Noteholders' Meeting, a quorum is not present, the Noteholders' Meeting shall stand adjourned until a date which shall be not less than 14 days but not more than 42 days later as determined by the chairman of the Noteholders' Meeting prior to the adjournment of such Meeting.  The adjourned Noteholders' Meeting will be subject to lower quorum requirements as set out below.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Noteholders' Meeting save that at least 10 days' notice, containing the information required for the notice of the original meeting shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

The quorum requirements are as follows:

| **Noteholders' Meeting** | **Quorum Requirement** |
| --- | --- |
| Original Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 75 per cent. in principal amount of the Notes for the time being outstanding. |
| Adjourned Noteholders' Meeting | One or more persons present in person holding Notes or being proxies or representatives and holding or representing in the aggregate not less than 25 per cent. in principal amount of the Notes for the time being outstanding. |

Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Guarantor, the Trustee or one or more persons representing two per cent. of the Notes.  Unless a poll is demanded, a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact, without proof of the number or proportion of the votes cast in favour of or against it.  If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs.  The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken.  A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.  A poll demanded on the election of a chairman or on a question of adjournment, shall be taken at once.

Votes in favour of the Extraordinary Resolution must represent a majority of not less than 75 per cent. of the persons voting thereat upon a show of hands or, if a poll is duly demanded, then by a majority consisting of not less than 75 per cent. of the votes cast, for the Extraordinary Resolution to be duly passed.

On a show of hands every person who is present in person and who produces a Note of which he is the registered holder or is a proxy or representative has one vote.  On a poll every such person has one vote in respect of each U.S.$1,000 principal amount of Notes so produced or for which he is a proxy or representative.  Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.  In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

If any Electronic Instruction Form or other notice or communication (electronic or otherwise) addressed to the Issuer or the Registrar is communicated on behalf of a Noteholder (by an attorney-in-fact, custodian, trustee, administrator, director or officer of a corporation or any other person acting in a fiduciary or representative capacity) that fact must be indicated in the relevant communication, and a power of attorney or other form of authority, in a form satisfactory to the Issuer, must be delivered to the Registrar.  Failure to submit such evidence as aforesaid may result in rejection of the Electronic Instruction Form.  Neither the Issuer, the Guarantor nor the Registrar shall have any responsibility to check the genuineness of any such power of attorney or other form of authority so delivered and may conclusively rely on, and shall be protected in acting in reliance upon, any such power of attorney or other form of authority.

None of the Issuer, the Guarantor, the Trustee, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

All authority conferred or agreed to be conferred on the Registered Holder to appoint the Principal Paying Agent, or an employee thereof, to act as proxy as the Noteholders' Meeting and vote in respect of the Notes which are the subject of the Electronic Instruction Form shall be binding upon the

successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder.

By submitting or delivering an Electronic Instruction Form, the Noteholder:

(a)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Noteholders' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Guarantor, the Trustee and the Principal Paying Agent that the Notes which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of the Registrar in the securities account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity or holdings of Beneficial Owners) and Clearing Systems account details to the Issuer, the Guarantor, the Trustee and the Registrar at the time such Noteholder submits or delivers the Electronic Instruction Form;

(e)     acknowledges that none of the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolution, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon the successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives of the Noteholder and shall not be affected by, and shall survive, the death or incapacity of such Noteholder; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Guarantor, the Trustee, the Registrar, the Principal Paying Agent or any of their respective affiliates, directors or employees with regard to the tax consequences to Noteholders or beneficial owners of the Notes arising from voting in favour of the Extraordinary Resolution.

**Notice of results**

The Issuer will give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days, but failure to do so will not invalidate the resolution.

**Governing law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, English law.

**THE ISSUER**

TuranAlem Finance B.V.
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

**THE GUARANTOR**

JSC BTA Bank
97 Zholdasbekov Street, Samal-2 microdistrict
Almaty 480099
Kazakhstan

**THE TRUSTEE**

BNY Corporate Trustee Services Limited
One Canada Square
London E14 5AL
United Kingdom

**PRINCIPAL PAYING AGENT**

The Bank of New York Mellon
One Canada Square
London E14 5AL
United Kingdom
Email:  eventsadmin@bnymellon.com

**REGISTRAR**

The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Luxembourg

This notice is given by:

**TuranAlem Finance B.V.**
Schouwburgplein 30-34, 3012 CL Rotterdam
P.O. Box 21153, 3001AD
Rotterdam
The Netherlands

15 April 2010

**SCHEDULE 6 – BTA FINANCE LUXEMBOURG S.A. NOTICES**

[TEXT TO BE INSERTED]

**ANNEX 1 – NOTICE OF SHAREHOLDERS' MEETING**
**BTA FINANCE LUXEMBOURG S.A. Affiliated Company of JSC BTA Bank**
*société anonyme*

Registered Office: 46A, avenue John F. Kennedy, L-1855 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg B 112.100
(the "**Issuer**")

**CONVENING NOTICE OF EXTRAORDINARY GENERAL MEETING OF**
**SHAREHOLDERS ON**
**22 APRIL 2010**

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF**
**SHAREHOLDERS.  IF SHAREHOLDERS ARE IN ANY DOUBT AS TO THE ACTION**
**THEY**
**SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT ADVISERS**
**IMMEDIATELY**

NOTICE IS HEREBY GIVEN that, pursuant to the provisions of Chapter IV (General Meeting of Shareholders) of the articles of association of the Issuer (the "**Articles**"), the Board of Directors of the Issuer resolved to convene a meeting (the "**Extraordinary General Meeting**") of the shareholders of the Issuer (the "**Shareholders**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities (the "**Securities**") of the Issuer listed on the London Stock Exchange plc (the "**Holders**").

The Extraordinary General Meeting will be held at 12:00 noon (Central European Time) on 22 April 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  If within 15 minutes after such time the quorum prescribed by the Articles is not present, the Extraordinary General Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the Offering Memorandum or the principal commercial Term Sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

First Resolutions
(*not subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)      resolves to approve the Restructuring Plan;

(2)      resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)      resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

(4)     resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5)     resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6)     resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

Second Resolution

(*subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)     resolves to approve to amend the Issuer's Articles as follows:

(i)     to insert a paragraph in Article 37 (*Definitions*), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

(ii)    to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii)   to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv)    to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required)."

487

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Holders may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a)     the Support Agreement dated 25 January 2006;

(b)     the Offering Memorandum dated 20 January 2006 relating to the Securities;

(c)     the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d)     the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between BTA and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e)     the PCTS Amendment Letter;

(f)     following publication, the information memorandum intended to be published by BTA (as defined below) no later than 23 April 2010 (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g)     the form of Claim Form.

Copies of the Information Memorandum will be, and the PCTS Amendment Letter and forms of proxy (referred to below) are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz/en/investor.

**General**

Holders should pay particular attention to the requirements in respect of a quorum for the Extraordinary General Meeting and any adjourned Extraordinary General Meeting (if applicable) which are set out below.  In light of such requirements, Holders are strongly urged either to attend the Extraordinary General Meeting or to take the steps referred to below as soon as possible, in order to be represented by proxy at the Extraordinary General Meeting.

*Neither Lazard Frères and UBS AG as BTA's financial advisers (the "**Financial Advisers**") nor the Steering Committee express any view or make any recommendations as to the merits of the Extraordinary Resolutions or any view on whether the Holders, whether individually or as a class, would be acting in their best interests in voting for or against the Extraordinary Resolutions.  The Financial Advisers have not verified any of the statements made in the PCTS, Information Memorandum or in this Notice.*

*Nothing in the PCTS Amendment Letter or this Notice should be construed as a recommendation to the Holders from the Issuer or the Financial Advisers to vote for or against the Extraordinary Resolutions.  Accordingly, each of the Issuer, BTA and the Financial Advisers recommend that Holders who are unsure of the impact of the Extraordinary Resolutions should seek their own financial and legal advice.*

**Voting Arrangements and Quorum**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles.  The Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Holder for the purposes of the Extraordinary General Meeting.  On this basis, the only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

A holder of a Security wishing to attend and vote at the Extraordinary General Meeting in person must produce at the Extraordinary General Meeting a valid voting certificate or valid voting certificates issued by the Registrar relative to the Security(ies), in respect of which he wishes to vote.  Voting certificates will be available with and can be received from the Registrar.

The Registered Holder may by instrument in writing in the English language (a "**Form of Proxy**") in the form available from the office of the Registrar signed by the Registered Holder or, in the case of a corporation, executed under its seal or signed on its behalf by its duly appointed attorney or a duly authorised officer of the corporation and delivered to the specified office of the Registrar not less than 24 hours before the time fixed for the Extraordinary General Meeting (or any adjourned such meeting), appoint any person (a "**proxy**") to act on his or its behalf in connection with the Extraordinary General Meeting (or any adjourned such meeting).

A proxy so appointed shall so long as such appointment remains in force be deemed, for all purposes in connection with the Extraordinary General Meeting (or any adjourned or reconvened such meeting) to be the holder of the Securities to which such appointment relates and the Registered Holder of the Securities shall be deemed for such purposes not to be the holder.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Extraordinary General Meeting save that at least 8 days' notice shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

In accordance with the Articles, to validly deliberate on the Extraordinary Resolutions at the Extraordinary General Meeting the Extraordinary General Meeting must be quorate.  The Extraordinary General Meeting will be quorate if at least 50 per cent. of the outstanding Class A Shares and at least 50 per cent. of the outstanding Securities are represented at the Extraordinary General Meeting.

Votes in favour of the First Resolutions of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than $66^2/3$ per cent. of the Class A Shareholders present or represented and $66^2/3$ per cent. of the Holders present or represented, for these respective resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the Extraordinary General Meeting, a quorum is not present, the Extraordinary General Meeting shall stand adjourned until 24 May 2010.  The adjourned Extraordinary General Meeting will not be subject to a quorum requirement but the $66^2/3$ per cent. majority vote will still be required.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Security for which it is entitled to vote.

**Notice of Results**

The Issuer will give notice of the passing of an Extraordinary Resolutions to Class A Shareholders and to Holders within 14 days thereof, but failure to do so will not invalidate the resolutions.

**Governing Law**

This notice and any non-contractual obligations arising out of or in connection with it are governed by, and shall be construed in accordance with, Luxembourg law.

**THE ISSUER**
BTA Finance Luxembourg S.A.
46A, avenue John F. Kennedy
L-1855 Luxembourg
Grand Duchy Luxembourg

**REGISTRAR**
The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center
lA Hoehenhof
L-1736 Senningerberg
Grand Duchy Luxembourg

This notice is given by:

BTA Finance Luxembourg S.A.
46A, avenue John F. Kennedy
L-1855 Luxembourg
Grand Duchy Luxembourg


12 April 2010

### ANNEX 2 — NOTICE FROM REGISTERED HOLDER TO BENEFICIAL OWNERS OF PERPETUAL SECURITIES

### FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING U.S. $400,000,000 PERPETUAL PREFERRED SECURITIES OF BTA FINANCE LUXEMBOURG S.A.

**Common Code: 02401279**
**ISIN:  XS0242012796**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.  IT SHOULD BE READ TOGETHER WITH THE ATTACHED NOTICE OF BTA FINANCE LUXEMBOURG S.A. CONVENING AN EXTRAORDINARY GENERAL MEETING.**

On 12 April 2010 BTA Finance Luxembourg S.A. issued a notice convening an extraordinary general meeting of its shareholders and holders of the U.S. $400,000,000 perpetual preferred securities (the "**Securities**").

**Each owner ("Beneficial Owner") of a particular principal amount of the Securities as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants") will not be a Holder for the purposes of the Extraordinary General Meeting.  The only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.  However, Beneficial Owners are hereby requested to ensure that Direct Participants submit Electronic Voting Instructions by 12:00 CET on 21 April 2010.**

The Extraordinary General Meeting will be held at 12:00 noon (Central European Time) on 22 April 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  If within 15 minutes after such time the quorum prescribed by the Articles is not present, the Extraordinary General Meeting will be adjourned until 24 May 2010 (and will be held at the same time and location).  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the Offering Memorandum or the principal commercial Term Sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

<u>First Resolution</u>
(*not subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)     resolves to approve the Restructuring Plan;

(2)     resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)     resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

(4)     resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5)     resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6)     resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

Second Resolution

(*subject to the quorum and majority requirements of an amendment to the Issuer's Articles*)

(1)     resolves to approve to amend the Issuer's Articles as follows:

(i)     to insert a paragraph in Article 37 (*Definitions*), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

(ii)    to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii)   to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv)    to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required)."

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a)      the Support Agreement dated 25 January 2006;

(b)      the Offering Memorandum dated 20 January 2006 relating to the Securities;

(c)      the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d)      the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between BTA and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e)      the PCTS Amendment Letter;

(f)      following publication, the information memorandum intended to be published by BTA (as defined below) no later than 23 April 2010 (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g)      the form of Claim Form.

Copies of the Information Memorandum will be, and the PCTS Amendment Letter and forms of proxy (referred to below) are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Holder need take no further action in relation to the Extraordinary General Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant of the Securities instructs the Registered Holder of such Securities to complete and sign a Form of Proxy to authorise and instruct The Bank of New York Mellon to act as proxy and to vote in favour of (or against, as the case may be) the Extraordinary Resolutions at the Extraordinary General Meeting (and any adjournment thereof).

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Voting Instructions are received by not later than 12:00 CET on 21 April 2010 (or 12:00 the day before any adjourned meeting) and request or make arrangements for the Clearing System to block the Securities in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Extraordinary General Meeting (or, if later, the adjourned Extraordinary General Meeting) and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control.

**Voting Arrangements and Quorum for the Extraordinary General Meeting**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles.  The Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a Holder for the purposes of the Extraordinary General Meeting.  On this basis, the only Holder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

Notice of any adjourned meeting shall be given in the same manner as notice of the original Extraordinary General Meeting save that at least 8 days' notice shall be given.  Such notice shall also state the quorum required at such adjourned meeting.

In accordance with the Articles, to validly deliberate on the Extraordinary Resolutions at the Extraordinary General Meeting the Extraordinary General Meeting must be quorate.  The Extraordinary General Meeting will be quorate if at least 50 per cent. of the outstanding Class A Shares and at least 50 per cent. of the outstanding Securities are represented at the Extraordinary General Meeting.

Votes in favour of the First Resolution of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than $66^{2}/3$ per cent. of the Class A Shareholders present or represented and $66^{2}/3$ per cent. of the Holders present or represented, for these respective resolutions to be duly passed.

If, within fifteen minutes after the time appointed for the Extraordinary General Meeting, a quorum is not present, the Extraordinary General Meeting shall stand adjourned until 24 May 2010.  The adjourned Extraordinary General Meeting will not be subject to a quorum requirement but the $66^{2}/3$ per cent. majority vote will still be required.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Security for which it is entitled to vote.

None of the Issuer, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

By submitting or delivering an Electronic Instruction Form, each Beneficial Owner:

(a)       represents, warrants and undertakes to the Issuer, BTA and The Bank of New York Mellon that the Securities which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Extraordinary General Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)       represents, warrants and undertakes to the Issuer, BTA and The Bank of New York Mellon that the Securities which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the securities account to which such Securities are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)       acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     acknowledges that none of the Issuer, BTA, The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolutions, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(e)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, New Notes Trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(f)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, BTA, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to Holders or beneficial owners of the Securities arising from voting in favour of the Extraordinary Resolution.

Beneficial Owners may register their holding of Securities with the Issuer's financial advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

Yours sincerely,


The Bank of New York Depository (Nominees) Limited

**ANNEX 3 – CORRECTION TO NOTICE OF SHAREHOLDERS' MEETING**

**BTA FINANCE LUXEMBOURG S.A. affiliated company of JSC BTA Bank**
*société anonyme*

Registered Office: 46A, avenue John F. Kennedy, L-1855 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg B 112.100
(the "**Issuer**")

**FOR THE ATTENTION OF THE SHAREHOLDERS OF BTA
FINANCE LUXEMBOURG S.A.
AFFILIATED COMPANY OF JSC BTA BANK**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF
THE SHAREHOLDERS. IF SHAREHOLDERS ARE IN ANY DOUBT AS TO THE ACTION
THEY SHOULD TAKE, THEY SHOULD CONSULT THEIR OWN INDEPENDENT
ADVISERS IMMEDIATELY.**

On 23 April 2010 notice (the "**Adjournment Notice**") was given to hold an adjourned extraordinary
general meeting of shareholders (the "**Meeting**") of BTA Finance Luxembourg S.A. affiliated
company of JSC BTA Bank (the "**Issuer**"). Under the articles of association of the Issuer The Bank
of New York Depository (Nominees) Limited (the "**Registered Holder**") as registered holder of the
U.S. $400,000,000 perpetual preferred securities (the "**Perpetual Securities**") and JSC BTA Bank
each categorise as shareholder. In the Adjournment Notice reference was made to 24 May 2010 as
the date of the Meeting. Due to the public holiday on 24 May 2010 in the Grand Duchy of
Luxembourg, notice is hereby given that the Meeting will be held at 12.00 noon (Central European
Time) on 25 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855
Luxembourg, Grand Duchy of Luxembourg.

The terms of, and majority requirements for, the First Resolutions and Second Resolutions remain as
set out in the Original Notice (as referred to in the Adjournment Notice), without any quorum
requirement for the Meeting.

This notice and any non-contractual obligations arising out of or in connection with it are governed
by, and shall be construed in accordance with, Luxembourg law.

This notice is given by:

BTA Finance Luxembourg S.A.
46A, avenue John F. Kennedy
L-1855 Luxembourg
Grand Duchy Luxembourg

30 April 2010

**SCHEDULE 7 – TURANALEM FINANCE B.V. DRAFT PLAN OF COMPOSITION**

Rotterdam, _____ 2010

**PLAN OF COMPOSITION**

Plan of composition regarding the private company with limited liability **TURANALEM FINANCE B.V.**, having its corporate seat in Rotterdam, the Netherlands (hereafter:  the "**Company**").

**Considering:**

1.   On _____ the district court of Rotterdam (the "**Court**") has declared the Company bankrupt on its own motion.  The Company offers its creditors which are affected by the bankruptcy a plan of composition in the form of this draft plan of composition (the "**Plan of Composition**").

2.   The Company's creditors may be divided into four or, if BTA Finance Luxembourg II S.A. ("**BTA Lux**") was still a creditor of the Company on the date at which the Company was declared bankrupt, five groups:

   (i)     the holders (the "**Noteholders**") of the notes (the "**Notes**") of the following series: (1) the  U.S.$600 million  7,875 per cent. notes, (2) the  U.S.$400 million  8 per cent. notes,   (3) the   U.S.$350 million  8,5 per cent.  notes,  (4) the  PLZ  200 million 6,3 per cent.  notes,   (5) the  U.S.$250 million   7,75 per cent.  notes,   (6) the EUR 500 million  6,25 per cent.  notes,  (7) the  GBP  200 million  7,125 per cent., (8) the  JPY  20 billion  4,25 per cent. notes,  (9) the  U.S.$750 million  8,25 per cent. notes, (10) the JPY 30 billion floating rate puttable notes, (11) the U.S.$250 million 8,25 per cent. notes, (12) the JPY 15 billion floating rate puttable notes, (13) the U.S.$100 million  fixed  to  floating  rate  notes  on  10 April  2008,  (14) the U.S.$100 million  fixed  to  floating  rate  notes  on  23 April  2008  and  (15) the U.S.$100 million fixed to floating rate notes on 27 May 2008;

   (ii)    the syndicated lenders (the "**Syndicated Lenders**") of the following syndicated loans (the "**Syndicated Loans**"): (1) the term loan facility in the aggregate amount of U.S.$1,111 million and (2) the yen term loan facility in the aggregate amount of JPY 58,937,500,000;

   (iii)   if BTA Lux was still a creditor of the Company on the date at which the Company was declared bankrupt, BTA Lux as subordinated lender (the "**Subordinated Lender**") of the subordinated loan agreement (the "**Subsidiary Subordinated Loan**") with respect to the proceeds of the U.S.$400 million perpetual preferred securities issued by it ( the "**Securities**");

   (iv)    the other unsecured creditors (the "**Other Unsecured Creditors**"); and

   (v)     JSC BTA Bank (the "**Bank**") – which owns all the Company's shares and which guarantees the execution of the Plan of Composition – which has a conditional reimbursement claim against the Company in respect of the payment guarantees issued by it in favour of the Noteholders and the Syndicated Lenders.

3.   The Bank's conditional reimbursement claim is secured by a pledge on the claims the Company has against the Bank under the various deposit agreements under which the proceeds of the Notes and the Syndicated Loans were on-lent to the Bank.  Therefore, the Bank is not an unsecured creditor and is not affected by the bankruptcy.  After the execution of the Plan of Composition, the (then unconditional) claim of the Bank will be settled by means of a set-off against the Bank's debt to the Company under the various deposit agreements, whereby that claim and that debt shall be extinguished in their entirety.

4.     If BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, the following facts are relevant:  the Company has an intermediary role in the structure used by the Bank to raise Tier 1 capital.  Under that structure, BTA Lux issued the Securities.  The proceeds of the issuance of the Securities were on-lent by BTA Lux to the Company under the Subsidiary Subordinated Loan, and the proceeds of that loan were on-lent by the Company to the Bank by way of another subordinated loan (the "**Bank Subordinated Loan**").  BTA Lux's claims against the Company under the Subsidiary Subordinated Loan are subordinated in the event of a bankruptcy of the Company.

5.     The guiding principle of the Plan of Composition is that the Bank executes the restructuring plan (the "**Restructuring Plan**"), which has been approved at a creditor's meeting of the Bank, that the Noteholders and the Syndicated Lenders receive what they are entitled to receive under the Restructuring Plan and will thereby be deemed to have received the same entitlements under the Plan of Composition as well, that BTA Lux (if it was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt) receives the Restructuring Consideration, if any, which the Company may receive under the Restructuring Plan in respect of the Bank Subordinated Loan (except for any part of such Restructuring Consideration which relates to accrued interest under the Bank Subordinated Loan in excess of accrued interest under the Subsidiary Subordinated Loan (the "**Company's Margin**"), while the claims of the Other Unsecured Creditors are paid in full.  The Restructuring Plan is attached to the Plan of Composition as Schedule 1.

6.     The Restructuring Plan is laid down in Schedule 1 of an information memorandum (the "**Information Memorandum**") which the Bank has published on 1 May 2010 (and as supplemented from time to time).  The Information Memorandum, including all schedules, is attached to the Plan of Composition as Schedule 2.  Capitalised terms in this Plan of Composition, which are not defined in this Plan of Composition, have the meanings given thereto in the Information Memorandum.

7.     The Restructuring Plan offers the Claimants (including the Noteholders and the Syndicated Lenders) payment of their claims in the form of a cash payment by the Bank, new notes to be issued by the Bank and/or new shares of the Bank.  Upon execution of the Restructuring Plan, Claimants receive a cash payment or nominal value which in most cases is significantly lower than the nominal value of their current claims on the Company (for which the Bank acts as guarantor), the maturity of those claims will be extended substantially or those claims will be swapped for shares of the Bank.  The options offered by the Bank, the Allocation and Reallocation of Claims Mechanism in case of oversubscription of the limitedly available options and the terms and conditions of the new notes the Bank offers, are set out in more detail in the Information Memorandum.

8.     The Company will pay the Other Unsecured Creditors in full under this Plan of Composition.

9.     All claims that are not affected by the bankruptcy, being the Bank's reimbursement claims mentioned in item 2 (v), will be settled in full (in the manner described in item 3).

10.    Upon execution of this Plan of Composition and the Restructuring Plan, the Noteholders' claims in respect of the Notes and the Syndicated Lenders' claims in respect of the Syndicated Loans against both the Bank and the Company, and, if BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, BTA Lux's claim in respect of Subsidiary Subordinated Loan against the Company, will cease to exist.  The Company will have no more indebtedness and equity which is expected to be approximately U.S.$7.5 million.

11.    The Plan of Composition is conditional, in such a way that it comes into effect if the Restructuring Plan has been declared binding by the competent court in Kazakhstan and the

conditions mentioned in Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*) of the Information Memorandum have been met.

12.   The Bank guarantees the performance of the Plan of Composition and shall for that reason co-sign the Plan of Composition.

**OFFERS THE FOLLOWING PLAN OF COMPOSITION:**

A.   The Bank shall pay or transfer to the Noteholders and the Syndicated Lenders the Restructuring Consideration which they are entitled to be paid or transferred under the Restructuring Plan and by that payment or transfer the Noteholders and the Syndicated Lenders shall be deemed to have been paid or transferred that Restructuring Consideration under the Plan of Composition as well.

B.   If BTA Lux was still a creditor of the Company under the Subsidiary Subordinated Loan on the date at which the Company was declared bankrupt, the Company shall transfer to BTA Lux the Restructuring Consideration, if any, which the Company may be paid under the Restructuring Plan in respect of the Bank Subordinated Loan, less any part of such Restructuring Consideration which relates to the Company's Margin.

C.   Other Unsecured Creditors are paid in full.

D.   The Plan of Composition is conditional, in such a way that it comes into effect if the Restructuring Plan has been declared binding by the competent court in Kazakhstan and the conditions mentioned in [Schedule 12 (*Conditions Precedent to the Restructuring Plan Becoming Effective*)] of the Information Memorandum have been met.

E.   The Bank guarantees the performance of the Plan of Composition.

F.   In the event of a conflict or inconsistency between the English version of this Plan of Composition and any translation thereof, the English version prevails.

_____
TuranAlem Finance B.V.
Timur Sabyrbaev, managing director

Date: _____

Date: _____

_____
JSC BTA Bank
_____, chairman of the management board
managing director

Date: _____

_____
TuranAlem Finance B.V.
Equity Trust Co N.V.,

Date: _____

Rotterdam, _____ 2010

### SCHEDULE 8 – NOTICE TO BENEFICIAL OWNERS OF CHF NOTES

**FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING CHF200,000,000 FLOATING
RATE SENIOR NOTES DUE 7 AUGUST 2017 OF JSC BTA BANK (THE "NOTES")**

**Common Code: 031235260
ISIN:  XS0312352601**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.**

**Each owner ("Beneficial Owner") of a particular principal amount of the Notes as shown in the
records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants")
are hereby requested to submit Electronic Instructions in relation to the matters set our below
by no later than 19 May 2010.**

JSC BTA Bank (the "**Bank**") hereby notifies each Beneficial Owner that it will be holding a meeting
(the "**Claimants' Meeting**") of the Claimants (as defined in the Information Memorandum referred to
below (and, generally, being a person having a claim in respect of the financial indebtedness of the
Bank)) arising under or in connection with certain financial indebtedness of the Bank for the purpose
of considering and, if thought fit, approving a restructuring plan proposed to be made between the
Bank and the Claimants (the "**Restructuring Plan**").  The Claimants' Meeting will be held in Almaty
on 28 May 2010 at or about 10:00 a.m. (Almaty time) at The Dostyk Hotel, 36, Kurmangazy str.,
Almaty, Republic of Kazakhstan, 050021 (Tel: +7 727 2582270).

Beneficial Owners or Direct Participants are requested to submit Electronic Instructions appointing
The Bank of New York Mellon as proxy to vote as directed in such Electronic Instructions in relation
to the Restructuring Plan.  Electronic Instructions authorising The Bank of New York Mellon to vote
in favour of the Restructuring Plan at the Claimants' Meeting will also be deemed to include an
authorisation for The Bank of New York Mellon to submit to the Bank a Claim Form on behalf of the
holders of the Notes to which votes in favour of the Restructuring Plan have been submitted, all in
accordance with the Information Memorandum, as defined below.

**Background**

The Bank is undertaking an overall restructuring of certain of its financial indebtedness, as more fully
described in the principal commercial terms sheet dated 7 December 2009, as amended by the
amendment letter dated 17 March 2010 and as further amended by the indicative non-binding term
sheet signed by the Bank and the Steering Committee on 18 April 2010, outlining the terms of the
Bank's proposed financial restructuring (together the "**Term Sheet**") and as further described in the
information memorandum to be published by the Bank in due course (such information memorandum,
as supplemented from time to time, the "**Information Memorandum**").

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any
weekday (not including Saturdays, Sundays and bank and other public holidays), inspect at the offices
of the Bank copies of the following documents:

(a)       the Note Purchase Agreement relating to the Notes dated 7 August 2007;

(b)       the Agency Agreement relating to the Notes dated 7 August 2007;

(c)       the Term Sheet;

(d)       following its publication, the Information Memorandum; and

(e)       the Claim Form.

Copies of the Information Memorandum will be, and the Term Sheet and the Claim Form are, available for inspection on the Bank's website at www.bta.kz.

By submitting or delivering Electronic Instructions to the relevant Clearing Systems, the Direct Participant of the Notes instructs the Registered Holder of such Notes to complete and sign a Form of Proxy to authorise and instruct The Bank of New York Mellon to act as proxy and to vote in favour of (or against, as the case may be) the Restructuring Plan at the Claimant's Meeting.

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Instructions are received by not later than 10:00 CET on 19 May 2010 and request or make arrangements for the Clearing System to block the Notes in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Claimant's Meeting and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control (the "**Blocking Period**").

By submitting or delivering Electronic Instructions, each Beneficial Owner:

(a)     represents, warrants and undertakes to the Bank and The Bank of New York Mellon that the Notes which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Claimants' Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Bank and The Bank of New York Mellon that the Notes which are the subject of the Electronic Instructions have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the Notes account to which such Notes are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     consents and authorises the relevant Clearing System to disclose their holdings (provided, for the avoidance of doubt, that such disclosure shall relate only to the holdings of Direct Participants and there shall be no requirement to disclose the identity of holdings of Beneficial Owners) and Clearing Systems account details to the Bank and The Bank of New York Mellon at the time such Holder submits or delivers the Electronic Instruction;

(e)     acknowledges that none of the Bank and The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Restructuring Plan, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(f)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(g)     acknowledges that, other than as set out herein, no information has been provided to it by the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to Holders or beneficial owners of the Notes arising from voting in favour of the Restructuring Plan.

**Holders of Notes in Definitive Form**

Each registered holder of the Notes which are held in definitive form will be required to submit a Claim Form directly to the Bank in respect of such Notes and to make its own arrangements to vote in relation to the Restructuring Plan at the Claimants' Meeting.  Further details relating to the procedure for submitting Claim Forms and voting at the Claimants' Meeting will be set out in the Information Memorandum.

Yours sincerely,


JSC BTA Bank
29 April 2010

**FOR THE ATTENTION OF THE HOLDERS OF THE OUTSTANDING U.S.$400,000,000 PERPETUAL PREFERRED SECURITIES OF BTA FINANCE LUXEMBOURG S.A. AFFILIATED COMPANY OF JSC BTA BANK**

**Common Code: 02401279**
**ISIN:  XS0242012796**

**THIS INFORMATION IS IMPORTANT AND REQUIRES IMMEDIATE ATTENTION OF THE HOLDERS.**

On 12 April 2010 notice (the "**Original Notice**") was given to convene an extraordinary general meeting of shareholders (the "**Meeting**") of BTA Finance Luxembourg S.A. affiliated company of JSC BTA Bank (the "**Issuer**").  Under the articles of association of the Issuer The Bank of New York Depository (Nominees) Limited (the "**Registered Holder**") as registered holder of the U.S. $400,000,000 perpetual preferred securities (the "**Perpetual Securities**") and JSC BTA Bank (the "**Bank**") each categorise as shareholder.  The Meeting was convened to consider and if thought fit to pass an extraordinary resolution, *inter alia*, to approve the Restructuring Plan (see the "First Resolutions", as referred to below) and to amend the articles of association of the Issuer (see the "Second Resolutions", as referred to below).

During the Meeting the First Resolutions were adopted by simple majority thereby, *inter alia*, approving the Bank's Restructuring Plan and authorising the Issuer to vote in favour of the restructuring at the proposed creditors' meeting expected to be held on 28 May 2010.  The votes for the First Resolutions represented 98.9 per cent. of the votes cast and followed from instructions received and accepted by the Registered Holder from 23.10 per cent. of the Beneficial Holders.

The Meeting was inquorate in relation to the Second Resolutions and therefore the Meeting was adjourned to 24 May 2010.  At the adjourned Meeting, the shareholders of the Issuer (including the holders of the Perpetual Securities) are eligible to vote (again) on the First Resolutions by simple majority and on the Second Resolutions with a two-thirds majority required for an amendment to the articles of association of the Issuer, in both cases without a quorum requirement.   The First Resolutions are re-proposed because of, *inter alia*, the low percentage of instructions accepted by the Registered Holder for the meeting on 22 April 2010.  The terms of the First Resolutions and Second Resolutions remain as set out in the Original Notice and are included below for ease of reference. Notice of the re-proposed First Resolutions and the adjourned meeting has been given to the Registered Holder and the Bank on Friday 23 April 2010.

The adjourned Meeting will be held at 12.00 noon (Central European Time) on 24 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg.

**Each owner ("Beneficial Owner") of a particular principal amount of the Perpetual Securities as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("Direct Participants") will not be a shareholder for the purposes of the Extraordinary General Meeting.  The only shareholder for the purposes of the Extraordinary General Meeting with respect to the Perpetual Securities will be the Registered Holder.  However, Beneficial Owners are hereby requested to ensure that Direct Participants submit Electronic Voting Instructions by 12:00 CET on 21 May 2010.  Unless revoked, the Registered Holder will deem instructions which have been given and accepted by it for the meeting of 22 April 2010 to apply to the meeting of 24 May 2010 as well.**

The Extraordinary General Meeting will be held at 12.00 noon (Central European Time) on 24 May 2010 at the offices of the Issuer at 46A, avenue John F. Kennedy, L-1855 Luxembourg, Grand Duchy of Luxembourg, for the purpose of considering and, if thought fit, passing the following resolutions, which will be proposed as Extraordinary Resolutions in accordance with the provisions of the Articles.  Unless the context otherwise requires, terms used in this Notice of Extraordinary General Meeting (including the Extraordinary Resolutions) shall bear the meanings given to them in the

Offering Memorandum or the principal commercial term sheet amendment letter dated 17 March 2010 (the "**PCTS Amendment Letter**") between JSC BTA Bank and the Steering Committee of its financial creditors.

The Extraordinary General Meeting has the agenda to approve the terms of **EXTRAORDINARY RESOLUTIONS** as follows:

"THAT this Meeting of Shareholders of BTA Finance Luxembourg S.A. (the "**Issuer**"), including the holders of the U.S.$400,000,000 Perpetual Preferred Securities having the benefit of a support agreement from JSC BTA Bank (formerly JSC Bank TuranAlem) ("**BTA**") dated 25 January 2006 (the "**Support Agreement**"), hereby:

First Resolution
*(not subject to the quorum and majority requirements of an amendment to the Issuer's Articles)*

(1)      resolves to approve the Restructuring Plan;

(2)      resolves to authorise the board of directors of the Issuer (the "**Board of Directors**") to amend, waive all of the Issuer's rights concerning and terminate the Subsidiary Subordinated Loan in consideration of a transfer to the Issuer of TuranAlem Finance B.V.'s corresponding legal relationship with BTA concerning the Bank Subordinated Loan;

(3)      resolves to authorise the Board of Directors to submit to BTA a Claim Form on behalf of the Issuer;

(4)      resolves to authorise the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims the Issuer may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against this Extraordinary Resolution;

(5)      resolves to authorise the Board of Directors to (i) do all such other acts and things and to execute such other deeds, agreements or documents as may be necessary or desirable to give effect to this Extraordinary Resolution, including any amendment and/or restatement of the Support Agreement, the Bank Subordinated Loan and/or the Subsidiary Subordinated Loan, and (ii) terminate the Support Agreement if a restructuring plan has become binding on the financial creditors of BTA under the Restructuring Law; and

(6)      resolves, to the extent legally possible, to discharge and exonerate the Board of Directors from all liability in respect of the performance of its duties in connection with the Claimants' Meeting, the Restructuring and this Extraordinary Resolution and their implementation,

Second Resolution
*(subject to the quorum and majority requirements of an amendment to the Issuer's Articles)*

(1)      resolves to approve to amend the Issuer's Articles as follows:

(i)      to insert a paragraph in Article 37 (Definitions), immediately after the definition of "**Replacement Instruments**", which reads:

""**Restructuring Law**" means the Law of the Republic of Kazakhstan No. 18S-IV ZRK dated 11 July 2009 on Amendments and Additions to Certain Legislative Acts on Money Payments and Transfers, Accounting and Financial Reporting, Banking Activities, the National Bank of Kazakhstan and Other Legislation;"

506

(ii)    to add a sentence at the end of Article 7.2.4., which reads:

"For the avoidance of doubt, no Distributions shall be declared and paid on the Securities after a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law;"

(iii)    to add a paragraph at the end of paragraph (I) of Article 35, which reads:

"Notwithstanding the availability of sufficient assets of the Company to pay any Liquidation Distribution to the Holders, if, at the time such Liquidation Distribution is to be paid, a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, the Liquidation Distribution per Security paid to Holders thereof shall be equal to a proportionate share of the cash and/or securities and/or other entitlement which the Issuer receives under or as a result of such restructuring plan, which cash and/or securities and/or other entitlement shall, if the Board of Directors so elects, be distributed directly by the Bank to the Holders;" and

(iv)    to insert a sentence, immediately after the first sentence of paragraph (V) of Article 35, which reads:

"For the avoidance of doubt, if a restructuring plan has become binding on the financial creditors of the Bank under the Restructuring Law, under which plan the Bank Subordinated Loan has been restructured or cancelled, the Company may permit or take any action that would or might cause the liquidation or dissolution of the Company, subject only to the approval or non-objection by the FMSA (if then required)."

Finally, by voting on the above First Resolutions and notwithstanding whether such First Resolutions will be passed, each Holder authorises the Board of Directors to vote the entire principal amount of the Bank Subordinated Loan or any other claims it may have on BTA in connection with the Securities in favour of and/or against the Restructuring Plan at the Claimants' Meeting in the same proportions as the Shareholders vote in favour of and/or against such First Resolutions.

Terms used in these resolutions and defined in the Notice convening this Meeting or in the PCTS Amendment Letter are used herein as so defined."

**Documents Available for Inspection**

Beneficial Owners or Direct Participants may, at any time during normal business hours on any weekday (not including Saturdays, Sundays and bank and other public holidays) prior to the Extraordinary General Meeting, inspect at the offices of the Issuer copies of the following documents:

(a)    the Support Agreement dated 25 January 2006;

(b)    the Offering Memorandum dated 20 January 2006 relating to the Perpetual Securities;

(c)    the SA/BV Subordinated Loan Agreement dated 20 January 2006 between TuranAlem Finance BV and the Issuer (the "**Subsidiary Subordinated Loan**");

(d)    the BV/BTA Subordinated Loan Agreement dated 20 January 2006 between the Bank and TuranAlem Finance BV (the "**Bank Subordinated Loan**");

(e)    the PCTS Amendment Letter;

(f)    following publication, the information memorandum intended to be published by the Bank prior to the adjourned meeting (such information memorandum, as supplemented from time to time, the "**Information Memorandum**"); and

(g)    the form of Claim Form.

Copies of the Information Memorandum will be and the PCTS Amendment Letter are, available for collection at the specified offices of the Principal Paying and Transfer Agent and the Registrar and also on BTA's website at www.bta.kz.

Direct Participants (directly or on behalf of Beneficial Owners) who have submitted an Electronic Instruction Form to the Clearing Systems or to the Registered Holder need take no further action in relation to the Extraordinary General Meeting in respect of the Extraordinary Resolutions.  By submitting or delivering a duly completed Electronic Instruction Form to the relevant Clearing Systems, the Direct Participant of the Perpetual Securities instructs the Registered Holder of such Perpetual Securities to complete and sign a Form of Proxy to authorise and instruct a proxy to vote in favour of (or against, as the case may be) the Extraordinary Resolutions at the Extraordinary General Meeting.

Beneficial Owners must make arrangements with the relevant Clearing System so that Electronic Voting Instructions are received by not later than 12:00 CET on 21 May 2010 and request or make arrangements for the Clearing System to block the Perpetual Securities in the relevant Direct Participant's account and to hold the same to the order or under the control of The Bank of New York Mellon.

Any security(ies) so held or blocked for either of these purposes will be released to the Direct Participant by the relevant Clearing System on the earliest of: (i) the conclusion of the Extraordinary General Meeting (or, if later, the adjourned Extraordinary General Meeting) and (ii) upon such security(ies) ceasing in accordance with the procedures of the relevant Clearing System and with the agreement of The Bank of New York Mellon to be held to its order or under its control.

Unless revoked, the Registered Holder will deem instructions which have been given and accepted by it for the meeting of 22 April 2010 to apply to the meeting of 24 May 2010 as well.

**Voting Arrangements and Quorum for the Extraordinary General Meeting**

The provisions governing the convening and holding of the Extraordinary General Meeting are set out in Chapter IV (General Meeting of Shareholders) of the Articles.  The Perpetual Securities are currently represented by a global certificate (the "**Global Certificate**") held by and registered in the name of the Registered Holder as nominee for Euroclear and Clearstream, Luxembourg (the "**Clearing Systems**", each a "**Clearing System**").  Each person (a "**Beneficial Owner**") who is the owner of a particular principal amount of the Perpetual Securities, as shown in the records of Euroclear or Clearstream, Luxembourg or its accountholders ("**Direct Participants**"), should note that such person will not be a shareholder for the purposes of the Extraordinary General Meeting.  On this basis and in respect of the Perpetual Securities, the only shareholder for the purposes of the Extraordinary General Meeting will be the Registered Holder.

There are no quorum requirements for the First Resolutions or the Second Resolutions at the meeting on 24 May 2010.

Votes in favour of the First Resolution of the Extraordinary Resolutions must represent a simple majority, votes in favour of the Second Resolution of the Extraordinary Resolutions must represent a majority of not less than 66 2/3 per cent. of the Class A Shareholders present or represented and 66 2/3 per cent. of the holders of the Perpetual Securities present or represented, for these respective resolutions to be duly passed.

Each question submitted to a meeting shall be decided by a show of hands or a roll call.

Every person who is present in person or represented at the Extraordinary General Meeting shall have one vote in respect of the Class A Share or the Perpetual Security for which it is entitled to vote.

None of the Issuer, the Registrar or any of their respective affiliates, directors or employees accepts any responsibility for failure of submission or delivery of any Electronic Instruction Form or any other notice or communication.

By submitting or delivering an Electronic Instruction Form, each Beneficial Owner:

(a)     represents, warrants and undertakes to the Issuer, the Bank and The Bank of New York Mellon that the Perpetual Securities which are the subject of the Electronic Instruction Form are, at the time of submission or delivery of the Electronic Instruction Form, and will continue to be, until the end of the Extraordinary General Meeting or any adjournment thereof, held by it or on its behalf at Euroclear or Clearstream, Luxembourg;

(b)     represents, warrants and undertakes to the Issuer, the Bank and The Bank of New York Mellon that the Perpetual Securities which are the subject of the Electronic Instruction Form have been blocked (and will remain blocked) to the order of The Bank of New York Mellon in the securities account to which such Securities are credited in the relevant Clearing System for the duration of the Blocking Period;

(c)     acknowledges that it has received and reviewed the terms of the notice described herein;

(d)     acknowledges that none of the Issuer, the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees has made any recommendation as to whether, or how, to vote in relation to the Extraordinary Resolutions, and it represents that it has made its own decision with regard to voting based on any legal, tax or financial advice that it has deemed necessary to seek;

(e)     acknowledges that all authority conferred or agreed to be conferred pursuant to these acknowledgements, representations, warranties and undertakings shall be binding upon its successors, assigns, heirs, executors, trustees in bankruptcy and legal representatives and shall not be affected by, and shall survive, its death or incapacity; and

(f)     acknowledges that, other than as set out herein, no information has been provided to it by the Issuer, the Bank, The Bank of New York Mellon or any of their respective affiliates, directors or employees with regard to the tax consequences to legal or beneficial owners of the Perpetual Securities arising from voting in favour of the Extraordinary Resolution.

Beneficial Owners may register their holding of Securities with the Issuer's financial advisers by contacting btas.bondholders@lazard.fr and submitting details of their holding.  This will facilitate communication with participants in the Restructuring.

Yours sincerely,

The Bank of New York Depository (Nominees) Limited

**SCHEDULE 9 – TERMS AND CONDITIONS OF THE NEW NOTES AND THE RCTFF**

**ANNEX 1 – TERMS AND CONDITIONS OF THE SENIOR DOLLAR NOTES**

*The following is the text of the terms and conditions of the Senior Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Senior Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$ _____ step up notes due 2018 (the "**Senior Dollar Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.    **Form, Denomination and Title**

(a)    *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of U.S.$ _____ and integral multiples of U.S.$ _____ in excess thereof (each denomination an "**authorised denomination**").

(b)    *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

**3.     Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

**4.     Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

6.      **Interest**

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 to 1 January 2013 at the rate of 10.75 per cent. per annum, and 12.5 per cent. per annum thereafter (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.      **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.**     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2014 and the last such instalment being payable on _____ 2018.  The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including any instalment amount with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(b) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its principal amount, together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 8(b), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(b), may be withdrawn; *provided*, *however*, *that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(c)     *Redemption at the Option of the Bank*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders and the Trustee in accordance with Condition 14 (*Notices*) (which notice shall be irrevocable), at their principal amount, together with interest accrued but unpaid to the date fixed for redemption as well as, if positive, the Make-Whole Amount (if any).  Upon the expiry of any such notice as is referred to in this Condition 8(c), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(c).

(d)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

"**Called Principal**" means the principal amount of the Notes to be redeemed.

"**Change of Control**" means:

(A)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

(i)      the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

(ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)      any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

   (i)      appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

   (ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**Discounted Value**" means, with respect to the Called Principal of the Notes, the amount obtained by discounting the Remaining Scheduled Payments with respect to the Called Principal in accordance with accepted financial practice and at a discount factor (applied on the same periodic basis as that on which interest on the Notes is payable) equal to the Reinvestment Yield with respect to such Called Principal.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**Make-Whole Amount**" means an amount equal to the excess (if any) of:

(a)      the Discounted Value of the Remaining Scheduled Payments with respect to the Called Principal of the Notes; over

(b)      the Called Principal of the Notes. "**OECD**" means the Organisation

for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund of Russia, China, Hong Kong, Singapore or an OECD country or any other Country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent

from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and its successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Redemption Date**" means the date on which any Note is redeemed either in whole or part.

"**Reinvestment Yield**" means, with respect to the Called Principal:

(a)     250 basis points; plus

(b)     the yield to maturity implied by:

(i)     the yields reported as of 10:00 a.m. (New York City time) on the second Business Day preceding the Redemption Date with respect to such Called Principal, on the display designated as "**PX1**" on the Bloomberg Financial Markets Service (or such other display as may replace PX1 on Bloomberg Financial Markets Service) for actively traded U.S. Treasury securities having a maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date; or

(ii)    if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the second Business Day preceding the Redemption Date with respect to such Called Principal, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to the Remaining Average Life of such Called Principal as of such Redemption Date,

and such implied yield will be determined, if necessary, by (a) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (b) interpolating linearly between (1) the actively traded U.S. Treasury security with the duration closest to and greater than the Remaining Average Life and (2) the actively traded U.S. Treasury security with the duration closest to and less than the Remaining Average Life.

"**Relevant Event**" means:

(a)     a Change of Control; and/or

(b)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements produced using FSMA Methodology).

"**Remaining Average Life**" means, with respect to any Called Principal, the number of years (calculated to the nearest one-twelfth year) obtained by dividing:

(a)     such Called Principal; into

517

(b)      the sum of the products obtained by multiplying (i) the principal component of each of the Remaining Scheduled Payments with respect to such Called Principal by (ii) the number of years (calculated to the nearest one-twelfth of a year) that will elapse between the Redemption Date with respect to such Called Principal and the due date of each such scheduled redemption.

"**Remaining Scheduled Payments**" means, with respect to the Called Principal, all payments of such Called Principal and interest thereon of the Notes to be redeemed that would have been due after the Redemption Date with respect to such Called Principal from their respective scheduled due dates to the final Redemption Date with respect to such Called Principal, *provided that* if such Redemption Date is not a date on which an interest payment is due to be made on the relevant instrument, the amount of the next succeeding scheduled interest payment shall be reduced by the amount of interest accrued to and required to be paid on the Redemption Date.

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) in the Bank or receipts or similar securities representing such equity securities by way of flotation, public placing, listing or other public offering on any recognised international exchange.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)      presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, if a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such

beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

## 10.     Prescription

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.   Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)      *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)      *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by the Trustee, requiring the same to be remedied; or

(c)      *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)      *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)      *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f) **Creditors' Process**

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g) **Cessation of Business**

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h) **Compulsory Acquisition**

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i) **Invalidity or Unenforceability**

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

## 12.   Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.    Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").   A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)    *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of the Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.   **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register.  Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.   **Trustee**

(a)     *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and

assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     ***Enforcement; Reliance***

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on

such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)   *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)   *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)   *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.   Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17.   Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of

business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of

such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) **_Appropriate Forum_**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) **_Agent for Service of Process_**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) **_Consent to Enforcement, etc._**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (_Jurisdiction_)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h) **_Waiver of Immunity_**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

### ANNEX 2 – TERMS AND CONDITIONS OF THE DOLLAR ORIGINAL ISSUE DISCOUNT NOTES

*The following is the text of the terms and conditions of the Original Issue Discount Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Original Issue Discount Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.\$ _____ Original Discount Notes due 2021 (the "**Dollar OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.     **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ *(Negative Pledge)* of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.     **Form, Denomination and Title**

(a)     *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of U.S.\$ _____ and integral multiples of U.S.\$ _____ in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

**3.     Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

**4.     Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

**5.** **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

**6.** **Interest and Principal**

(a) *Accretion of Principal*

The principal amount in respect of the Notes shall accrete from _____ 2010 and every six months thereafter until _____ 2021 by U.S.$ _____. Such accretion shall be taken into account for all purposes with respect to the outstanding principal amount under these Conditions, including but not limited to calculating the interest payable on the outstanding principal amount in accordance with Conditions 6(d) (*Calculation of Interest for an Interest Period*) and 6(e) (*Calculation of Interest for any Other Period*), and calculating the instalments of principal to be paid in accordance with Condition 8(a) (*Scheduled Redemption*) *provided that* in the event of a redemption for tax reasons in accordance with Condition 8(b) (*Redemption for Tax Reasons*), the Notes will be redeemed at their Fully Accreted Principal Amount.

(b) *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) from 1 July 2010 up to but excluding _____ 2017 (the "**Amortisation Date**") at the rate of 3.70 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until _____ 2021 at the rate of 3.30 per cent. per annum (the "**Subsequent Rate of Interest**"). Interest is payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(c) *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d) *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the principal amount of such Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)), dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(e)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.      **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)   **Agents**

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.**   **Redemption and Purchase**

(a)   **Scheduled Redemption**

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2017 and the last such instalment being payable on _____ 2021.  The outstanding principal amount of each instalment of principal shall be equal to a fraction of the accreted principal amount as at the date of payment of the instalment, for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding principal amount of each Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)   **Redemption for Tax Reasons**

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [*date of the Claimants' Meeting*], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of

Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [*date of the Claimant's Meeting*] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due.  Prior to the publication of any notice of redemption pursuant to this Condition 8(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment.  The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.  Upon the expiry of any such notice as is referred to in this Condition 8(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b).

(c)   ***Redemption at the Option of the Noteholders***

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its then current accreted value together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 8(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)     *Purchase*

Subject to the covenant set out in the Trust Deed, entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

"**Change of Control**" means:

(a)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

   (i)      the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

   (ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank; or

(b)     Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a

Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)      appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)     give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee and the Creditor Directors have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a qualified majority of the Board of Directors of the Bank and (c) the "**manager**" is a Permitted Transferee.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Relevant Event**" means:

(a)     a Change of Control; and/or

(b)     any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with FSMA Methodology).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international Exchange.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, if a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)     to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)     where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

536

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)   ***Relevant Date***

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)   ***Additional Amounts***

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)   ***Taxing Jurisdiction***

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.   Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.**   **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their then accreted principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)      *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)      *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)      *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)      *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)      *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

538

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f) ***Creditors' Process***

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is neither discharged nor stayed within 45 days after commencement; or

(g) ***Cessation of Business***

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h) ***Compulsory Acquisition***

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i) ***Invalidity or Unenforceability***

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

## 12. Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.**    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR _____ Original Discount Notes due 2021 of the Bank (the "**EUR 2021 Notes**") and there shall be no provision for separate meetings of holders of the Notes and of holders of the EUR 2021 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2021 Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes" and "Noteholders" shall be deemed to include the EUR 2021 Notes and the holders of such notes as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").  A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

## 14.     Notices

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)    *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)    it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving

of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     **Failure to Act**

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     **Retirement and Removal**

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     **Substitution**

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.     Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts

of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     ***Jurisdiction***

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     ***Appropriate Forum***

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     ***Agent for Service of Process***

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     ***Consent to Enforcement, etc.***

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 3 – TERMS AND CONDITIONS OF THE EURO ORIGINAL ISSUE DISCOUNT NOTES**

*The following is the text of the terms and conditions of the Original Issue Discount Euro Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Original Issue Discount Euro Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR_____ Original Discount Notes due 2021 (the "**Euro OID Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions.  The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them.  Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent.  Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____.  References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause _____ *(Negative Pledge)* of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated, unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.    **Form, Denomination and Title**

(a)    *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of EUR_____ and integral multiples of EUR_____ in excess thereof (each denomination an "**authorised denomination**").

(b)    *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein,

any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)    Transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)    Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)    All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, conduct of business with related parties, acquisition and incorporation of subsidiaries, ability to enter into mergers and joint ventures, disposal of assets and payment of dividends.

6.      **Interest and Principal**

(a)      *Accretion of Principal*

The principal amount in respect of the Notes shall accrete from _____ 2010 and every six months thereafter until _____ 2021 by EUR_____.  Such accretion shall be taken into account for all purposes with respect to the outstanding principal amount under these Conditions, including but not limited to calculating the interest payable on the outstanding principal amount in accordance with Conditions 6(d) (*Calculation of Interest for an Interest Period*) and 6(e) (*Calculation of Interest for any Other Period*), and calculating the instalments of principal to be paid in accordance with Condition 8(a) (*Scheduled Redemption*) *provided that* in the event of a redemption for tax reasons in accordance with Condition 8(b) (*Redemption for Tax Reasons*), the Notes will be redeemed at their Fully Accreted Principal Amount.

(b)      *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) from 1 July 2010 to but excluding _____ 2017 (the "**Amortisation Date**") at the rate of 3.14 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until _____ 2021 at the rate of 2.74 per cent. per annum (the "**Subsequent Rate of Interest**") payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(c)      *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(d)      *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Initial or the Subsequent Rate of Interest (as the case may be) to the principal amount of such Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)), dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(e)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(d) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.      **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of partial payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).   No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of the Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign

currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.      **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in eight semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2017 and the last such instalment being payable on _____ 2021.  The outstanding principal amount of each instalment of principal shall be equal to a fraction of the accreted principal amount as at the date of payment of the instalment, for which the numerator is one and the denominator is the number of instalments (including the one in question) remaining until (and including) the last instalment.

The outstanding principal amount of each Note (as accreted in accordance with Condition 6(a) (*Accretion of Principal*)) shall be reduced by any repayment of principal in accordance with these Conditions with effect from the related instalment payment date, unless the payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)     *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their Fully Accreted Principal Amount, together with interest accrued but unpaid to the date fixed for redemption,

if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [*date of the Claimants' Meeting*], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax

therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [*date of the Claimant's Meeting*] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided, however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due.  Prior to the publication of any notice of redemption pursuant to this Condition 8(b), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment.  The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.  Upon the expiry of any such notice as is referred to in this Condition 8(b), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b).

(c)     **Redemption at the Option of the Noteholders**

Unless the Noteholders have previously by an Extraordinary Resolution (as defined in the Trust Deed) disapplied this Condition 8(c) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its then current accreted value together with interest accrued and unpaid to the Put Settlement Date.  In order to exercise the option contained in this Condition 8(c), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c), may be withdrawn; *provided, however, that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume, unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)     **Purchase**

Subject to the covenant set out in the Trust Deed, entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*", the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(e) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank or any member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     **Cancellation of Notes**

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in Share Capital and on the Repurchase of Securities*", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(f)     **Definitions**

As used in this Condition 8 (*Redemption and Purchase*):

"**acting in concert**" means a group of persons who, pursuant to an agreement or understanding (whether formal or informal), actively cooperate, through the direct or indirect acquisition by any member or members of such group of shares in the Bank or of any of the assets of any member or members of the group, to obtain or consolidate Control of the Bank.

"**Affiliate**" of a person means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, that person.

"**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York and if on that day a payment in or a purchase of Euro is made which is also a TARGET Day.

"**Change of Control**" means:

(A)     Samruk-Kazyna ceases to control the Bank (other than where it ceases to control the Bank (a) by transfer of control to a Permitted Transferee or (b) in connection with a Secondary Public Offering), where "**control**" of the Bank means:

      (i)     the holding beneficially of more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital); or

      (ii)     the power (whether by ownership of shares, proxy, contract, agency or otherwise) to cast, or control the casting of, more than 50 per cent. of the maximum number of votes that might be cast at a general meeting of the Bank, or

(B)     Any person or group of persons acting in concert (other than where (a) such person or persons are Permitted Transferees or (b) in connection with a Secondary Public Offering) gains control of the Bank where "**control**" means the power (whether by ownership of shares, proxy, contract, agency or otherwise) to:

(i)     appoint or remove all, or the majority, of the directors or other equivalent officers of the Bank; or

(ii)    give directions with respect to the operating and/or financial policies of the Bank with which the directors or other equivalent officers of the Bank are obliged to comply,

*provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of shares in the Bank by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own more than 50 per cent. of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), will not constitute a "**Change of Control**" if (a) the Trustee has been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of the issued share capital of the Bank (excluding any part of that issued share capital that carries no right to participate beyond a specified amount in a distribution of either profits or capital), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to "**control**" the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as majority shareholders (including in relation to the appointment of directors), (b) the terms of the management agreement have been approved by a Qualified Majority and (c) the "**manager**" is a Permitted Transferee.

"**FSMA Methodology**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**OECD**" means the Organisation for Economic Co-operation and Development.

"**Permitted Transferee**" means a person which: (A)(i) is a bank or other financial institution subject to financial regulation in Russia, China, Hong Kong, Singapore or an OECD country; or (ii) is a sovereign wealth fund from Russia, China, Hong Kong, Singapore or an OECD country or any other country which may otherwise be approved by a Qualified Majority of the Board; (B) has, in the case of a bank or other financial institution, a minimum credit rating from S&P of at least BBB or equivalent from Moody's or Fitch; (C) has, in the case of a bank or other financial institution, a minimum paid up share capital and reserves of at least U.S.$7 billion or, in the case of a sovereign wealth fund, assets of at least U.S.$7 billion; and (D) is not affiliated with any of the present or former shareholders or managers of the Bank.

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors.

"**Relevant Event**" means:

(A)     a Change of Control; and/or

(B)    any disposals (excluding those disposals made in the ordinary course of trading) in any financial year of more than 6.5 per cent. of the Group's total gross assets (determined by reference to the Bank's most recent consolidated financial statements calculated in accordance with FSMA Methodology).

"**Secondary Public Offering**" means any sale or public offering of any equity security (including any preference shares) of the Bank or receipts or similar securities representing such equity securities by way of flotation, public placement, listing or other public offering on any recognised international Stock Exchange.

9.    **Taxation**

(a)    *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to

the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)   *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)   *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)   *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.   Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.    **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and shall become due and repayable at their then accreted principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)    *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)    *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Senior Notes, the OID Notes, the Recovery Units or the Trust Deed (other than a default or breach specifically dealt with elsewhere in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank by the Trustee, requiring the same to be remedied; or

(c)    *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)    *Judgment Default*

any judgment, ruling, decree or surety bond for the payment of an aggregate amount of not less than U.S.$10,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against and is binding on any member of the Group or any part of its assets and is neither paid when due nor within any originally applicable grace period provided; or

(e)    *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its

556

Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement or any step or procedure contemplated in paragraph (c) of the definition of Permitted Transaction; or

(f)     ***Creditors' Process***

after the Restructuring Date, any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10,000,000, and is not discharged or stayed within 45 days after commencement; or

(g)     ***Cessation of Business***

the Bank or any of its Material Subsidiaries suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a material part of its business or its Banking Licence is revoked; or

(h)     ***Compulsory Acquisition***

the authority or ability of the Bank or any of its Material Subsidiaries to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction, vesting, divesting, compulsory acquisition or other action by or on behalf of any governmental, regulatory or other authority or other person in relation to any member of the Group or any of its assets; or

(i)     ***Invalidity or Unenforceability***

(a) the validity of the Notes or any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter is contested by the Bank or the Bank denies its obligations under the Senior Notes, the OID Notes or the Subordinated Notes (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in any document in relation to the Notes entered into pursuant to the Restructuring, the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid; or (b) the validity of the BTA Undertaking, the Samruk-Kazyna Undertaking or the New Charter, is contested by the Bank or Samruk-Kazyna, or either of the Bank or Samruk-Kazyna denies or fails to perform its obligations within any applicable grace period as stated under the BTA Undertaking or the Samruk-Kazyna Undertaking (as the case may be) including, for the avoidance of doubt, in relation to the appointment or removal of any Creditor Director and, following the occurrence of any of those events specified in this Condition 11(i), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders.

**12.     Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses

incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.**    **Meetings of Noteholders; Modification and Waiver**

(a)    *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$ _____ Original Discount Notes due 2021 of the Bank (the "**U.S Dollar 2021 Notes**") and there shall be no provision for separate meetings of holders of the Notes and of holders of the U.S. Dollar 2021 Notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the applicable Reference Rate applicable as at the date of issuance of the Notes.  Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "*Notes*" and "*Noteholders*" shall be deemed to include the U.S. Dollar 2021 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").   A meeting to consider proposals to approve or reject a candidate nominated by any Noteholder or by the Bank, as the case may be, for the position of Creditor Director or to require the resignation of any Creditor Director (each, a "**Creditor Director matter**") may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than 5 per cent. of the aggregate principal amount of the outstanding Notes and the quorum at any meeting convened to vote on a Creditor Director matter will be two or more persons being or representing not less than five per cent. of the aggregate principal amount of the Notes for the time being outstanding or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented. Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of the Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed, or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.   Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.   In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.   Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

**14.     Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.   In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed) and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of the Approved Stock Exchange.   Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)    *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)    it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving

of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)    ***Failure to Act***

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)    ***Retirement and Removal***

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)    ***Substitution***

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.    Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.     **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.     **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.     **Governing Law; Arbitration and Jurisdiction**

(a)     *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)     *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts

of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)   **Jurisdiction**

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.   Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)   **Appropriate Forum**

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)   **Agent for Service of Process**

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.   If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.   If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)   **Consent to Enforcement, etc.**

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)   **Waiver of Immunity**

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## ANNEX 4 – TERMS AND CONDITIONS OF THE RECOVERY UNITS[26]

*The following is the text of the terms and conditions of the Recovery Units which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Recovery Units and will be attached and (subject to the provisions thereof) apply to the relevant Global Note. As noted, certain provisions are still under discussion with the Steering Committee:*

The _____ Recovery Units (the "**Recovery Units**" or the "**Units**"), each of which has a nominal value [equal to the Reference Amount divided by such number of Units], issued by JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of, a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Units ("**Unitholders**") under the Trust Deed) and (b) the subject of (i) a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Units) and _____, as registrar (the "**Registrar**" which expression shall include any successor registrar appointed from time to time in connection with the Units) and (ii) a cash management agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Cash Management Agreement**") between the Bank, the Trustee and _____, as cash manager (the "**Cash Manager**" which expression shall include any successor cash manager appointed from time to time in connection with the Units). The Recovery Units shall be listed on the KASE.

Certain provisions of these Conditions are summaries of the Trust Deed, the Agency Agreement and the Cash Management Agreement and are subject to their detailed provisions. The Unitholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed, the Agency Agreement and the Cash Management Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

1.     **Definitions**

      Terms not defined in these Conditions shall have the meaning set out in the Trust Deed and for the purposes of these Conditions:

      "**Adjusted Principal Amount**" has the meaning given to it in Condition 9(c) (*Adjusted Principal Amount*);

      "**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

      "**Bank Group**" means the Bank, BTA Finance Luxembourg S.A., TuranAlem Finance B.V. and LLP "**TuranAlem Finance**".

      "**Base Case Model**" means the financial model titled "BTA BankBPRevised PCTS@18 04 2010 — Sent Deloitte" sent by Deloitte at 8.00 p.m. on 18 April 2010.

      "**Charged Property**" means all the property and rights of the Bank which are subject to the Charge and Assignment (as defined in Condition 2(c) (*Security*);

      "**Collection Account**" means the account controlled by the Trustee and with a bank in London, opened in the name of the Bank in accordance with the Trust Deed and into which

---

[26]     The Recovery Units are subject to further discussion with the Steering Committee.

the Bank shall pay the Specified Percentage of any and all Recoveries pursuant to Condition 6(a) (*Collection Account and Conversion*);

"**Deferred Settlement Date**" means, after a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*) 30 June 2022;

"**FMSA**" means the Agency of the Republic of Kazakhstan on the Regulation and Supervision of the Financial Market and Financial Organisations;

"**FMSA Methodology**" means IFRS adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Group**" means the Bank and its consolidated Subsidiaries from time to time;

"**Impaired Recovery Assets**" has the meaning given to it in the definition of Write-backs;

"**IFRS**" means international financial reporting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant statements;

"**Information Memorandum**" means the Information Memorandum dated 1 May 2010 published by the Bank in connection with the Restructuring (and as supplemented from time to time);

"**Initial Settlement Date**" means _____ 2020;

"**Issue Date**" means 1 July 2010;

"**KPMG Provisions Report**" means the report prepared by KPMG in relation to the Impaired Recovery Assets, dated 12 November 2009;

"**Litigation Recoveries**" means any cash recoveries from, and the net proceeds of any sale of, any asset recovered through the Recovery Programme (to the extent that such cash recoveries are not also Impaired Recovery Assets or Tax Assets);

"**Quarterly Recovery Assets Management Report**" means the quarterly management information report on the ongoing performance of the Recoveries Assets to be prepared by the Bank;

"**Recoveries**" means Write-backs, Litigation Recoveries, the recoveries on Tax Assets and interest on the Collection Account;

"**Recoveries Assets**" means the Impaired Recovery Assets, the Litigation Recoveries and the Tax Assets;

"**Recovery Assets Auditor**" means an auditor appointed by the Bank (whose identity and terms of appointment shall have received Qualified Majority Approval and retained amongst other things to review the Recoveries Assets Opening Report and the Quarterly Recovery Assets Management Reports;

"**Recovery Assets Opening Report**" means the initial due diligence report prepared by the Bank, based on the KPMG Provisions Report and other sources of information as necessary particularly in relation to the small and medium enterprises and retail loans portfolios and subject to review by the Recovery Assets Auditor for the purpose of, amongst other things, quantifying the Recoveries;

"**Recovery Assets Replacement Loans**" has the meaning given in the definition of Write-backs;

"**Recovery Payment Date**" has the meaning given to it in Condition 7 (Recovery Payments);

"**Recovery Payments**" means, in relation to the outstanding Units and in respect of all Recoveries arising during a Recovery Units Payment Period, the Specified Percentage of such Recoveries payable pursuant to Condition 7 (*Recovery Payments*);

"**Recovery Programme**" has the meaning provided in Condition 6(e) (*Pursuit of Recoveries*);

"**Recovery Units Payment Period**" means each period beginning on (and, including) 1 July 2010 or any Recovery Payment Date and ending on (but excluding) the next Recovery Payment Date;

"**Reference Amount**" means the aggregate principal amount of the Units, namely an amount equal to (i) the aggregate principal amount of Designated Financial Indebtedness subject to the Restructuring and in respect of which Recovery Units are issued minus the aggregate principal amount (converted into Dollars at the Spot Rate of Exchange two Business Days (as defined in Condition 6(a)(*Covenants – Collection Account and Conversion*)) before the Issue Date) of the Senior Notes and Subordinated Notes issued under Senior Packages 1 and 2 (as defined and described in the Information Memorandum) and the aggregate principal amount as at the Issue Date (converted into Dollars as aforesaid) of the OID Notes less (ii) the aggregate amount from time to time of all Recovery Payments made;

"**Residual Amount**" means (i) the value of any residual potential recoveries that may be made from the Impaired Recovery Assets and the Recovery Programme and (ii) any residual potential value in the Tax Assets, as at the Valuation Date and determined as such in accordance with Condition 9 (*Valuation*);

"**Restructuring**" means the restructuring of the indebtedness of the Bank Group as described in the Information Memorandum;

"**Security Interests**" means the security interests created in favour of the Trustee in relation to the Collection Account and the Cash Management Agreement pursuant to the Trust Deed;

"**Settlement Date**" means the Initial Settlement Date or, if a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the Deferred Settlement Date;

"**Specified Percentage**" means the following percentages in relation to the following Recoveries:

(i)     Cash and Accounting Recoveries, Litigation Recoveries and Tax Assets: 50 per cent.

(ii)    Interest on the Collection Account:                                100 per cent.

"**Spot Rate of Exchange**" means the spot rate of exchange quoted by SB HSBC Bank Kazakhstan JSC (or any other internationally recognised financial institution providing such quotations) for the purchase of United States Dollars with the relevant currency at or about 11:00 a.m. Almaty time on the relevant day;

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same);

"**Tax Assets**" means the benefit of any Reliefs obtained or deemed to have been obtained by the Bank where the Relief arises from a transaction or other event (including, without limitation, the recognition for accounting purposes of a loss or impairment in respect of any asset in the Recovery Units Opening Report or in relation to the Litigation Recoveries) occurring on or prior to the Restructuring but not including, for the avoidance of doubt, the exclusion from taxation (by virtue of Article 3.1 of the Law of the Republic of Kazakhstan On Enactment of the Code of the Republic of Kazakhstan on Taxes and Other Mandatory Payments to the Budget (Tax Code) dated 10 December 2008) of the gains resulting from

writing off and/or cancellation of indebtedness of the Bank effected pursuant to the Restructuring on the Restructuring Effective Date and for these purposes:

(i)    "**Relief**" shall include (without limitation) any relief, loss, allowance, credit, set off, deduction or exemption for any Tax purpose, any right to repayment of Tax (including any repayment supplement) and any reference to the "use" or "set-off" of a Relief shall be construed accordingly and shall include use or set off in part;

(ii)   the benefit of a Relief shall be deemed to have been obtained by the Bank in any case where: (a) a member of the Group receives a repayment of Tax as a result of the use of a Relief, or (b) an amount of Tax payable by a member of the Group is reduced as a result of the use or set-off of a Relief;

(iii)  the amount of any benefit of a Relief shall be deemed to be the amount of the repayment of Tax (in a case falling within paragraph (ii)(a) above) or the amount of Tax saved (in a case falling within paragraph (ii)(b) above);

(iv)   the benefit of a Relief shall be deemed to have been obtained on: (a) the date that the repayment is received (in a case falling within paragraph (ii)(a) above) or (b) the date on which that Tax would have been payable but for the use of the Relief (in a case falling within paragraph (ii)(b) above); and

(v)    to the extent that a payment in respect of a Tax Asset is made to the Recovery Unitholders in any period, the amount of such payment shall, if deductible, be deducted in the following period in computing the taxable profits of the Bank for the purposes of computing the amount of any Tax Assets arising in that later period [and, if not deductible, the amount to be paid pursuant to Condition 8(a) (*Recovery Payments*) shall be reduced by a percentage equal to the rate of Tax payable by the Bank (disregarding any applicable Relief) in relation to the relevant Recovery];[27]

and, for the purposes hereof, all benefits of a Relief shall be deemed to have been realised in cash,

"**Valuation Date**" means the date (the "**Initial Valuation Date**") falling three months prior to the Initial Settlement Date or, where a Valuation Rejection Notice has been delivered pursuant to Condition 9 (*Valuation*), the date (the "**Deferred Valuation Date**") falling three months prior to the Deferred Settlement Date;

"**Valuation Rejection Notice**" has the meaning given to it in Condition 9(b) (*Valuation Rejection Notice*); and

"**Write-backs**" means cash and accounting recoveries in relation to any provision or write-off of any asset (including any provision or write-off in respect of the principal amount of or interest on any asset written off or any provisioned asset) (each an "**Impaired Recovery Asset**") over and above net book value as at (or any such recovery where the asset has been written off as at or prior to) 30 June 2009 and by reference to all the Bank's assets (including collection agency receivables and Related Party Debt) and the release of any provisions and/or liabilities for less than their book value, where:

(i)    such cash and accounting recoveries shall be determined:

(A)    on a pooled basis in relation to assets described in paragraph (iii)(C) below *provided that* the assets so pooled do not exceed six per cent. of the aggregate amount of provisions or amounts written off in relation to the original Impaired Recovery Assets calculated by reference to the KPMG Provisions Report; and

---

[27]    Under discussion.

(B)      in all other cases on an asset-by-asset basis;

(ii)      the Impaired Recovery Assets shall be identified as at 30 June 2009 by reference to the KPMG Provisions Report;

(iii)      the amounts of Recoveries shall be calculated by reference to Impaired Recovery Assets by reference to cash or accounting recoveries over and above the net book value of such assets following provision or write-off calculated in accordance with FMSA Methodology and, in particular:

(A)      in relation to corporate loans by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 1,846 billion);

(B)      in relation to corporate off balance sheet exposures including by reference to the provisions (or amounts written off) as calculated and noted in the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 119 billion); and

(C)      in relation to loans to small and medium enterprises and retail loans, by reference to the provisions (or amounts written off) as calculated and noted by KPMG in Appendix 6 to the KPMG Provisions Report (which *provided that* such provisions (and amounts written off) amounted in aggregate to KZT 119 billion);

(iv)      Recoveries will include:

(A)      cash and accounting recoveries in respect of Impaired Recovery Assets (including, but not limited to, provisioned or written off amounts, interest, default and penalty interest, premiums, late payment amounts and principal payments, settlements and cash proceeds from assets (including amounts realised on collateral or security) and whether acquired by the Bank through litigation, settlement, auction or compromise, or write-backs of any amounts in accordance with or permitted by applicable accounting standards or applicable regulatory capital requirements and any amounts received by reference to Impaired Recovery Assets consisting of loans written off prior to 30 June 2009); and

(B)      amounts received with respect to new loans ("**Recovery Assets Replacement Loans**") entered into by way of amendment, restatement, novation of, or otherwise replacing, loans from time to time constituting Recoveries Assets and in determining whether a loan is a Recovery Assets Replacement Loan, all loans or arrangements entered into by the Bank after 30 June 2009 with borrowers or obligors with respect to Recoveries Assets (and/or with any of their Affiliates) shall constitute Recovery Assets Replacement Loans but only to the extent that such arrangements do not represent any amounts in addition to the amounts of existing loans; and

(v)      all such cash and accounting recoveries by reference to Impaired Recovery Assets shall, on a pooled or asset-by-asset basis (as appropriate in accordance with (i) above) only be treated as a "Recovery" to the extent that the aggregate amount of such recoveries by reference to such pool or asset exceeds the net book value of such pool or asset following provision or write-down as referred to in (ii) and (iii) above.

2.      **Status**

(a)       ***Status Prior to and Including the Settlement Date***

This Condition 2(a) applies to all amounts payable pursuant to the Units other than amounts specified in Condition 2(b) from and including the Issue Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date.  The Units constitute direct, general, unconditional and, subject to and in accordance with the Trust Deed, Condition 2(c) (*Security*) and Condition 6(b) (*Preservation of Security Interests*) and Condition 2 (a) (ii)(*Status of Adjusted Principal Amount*) secured obligations of the Bank.  The Units rank at all times without preference or priority *pari passu* among themselves.

(b)       ***Status of Adjusted Principal Amount***

*Provided that* the Reference Amount has previously not been reduced to zero, payment of the Adjusted Principal Amount shall constitute an unconditional, unsubordinated and secured obligation of the Bank which will at all times rank at least *pari passu* among themselves *and pari passu* in right of payment with all other present and future unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

(c)       ***Security***

This Condition 2(c) applies to the Units from and including the Issue Date up to and including the earlier of the date when the Reference Amount is reduced to zero and the Settlement Date.

As continuing security for the payment of all sums due under the Units, and subject always to Condition 2(a) (*Status Prior to and Including the Settlement Date*), the Bank will, in favour of the Trustee, for itself and on trust for the Unitholders, in accordance with the terms of the Trust Deed, charge with full title guarantee and by way of a first fixed charge all monies held from time to time in the Collection Account and assign with full title guarantee all its right, title and interest in, to and under the Cash Management Agreement and the Collection Account and all sums derived therefrom (the "**Charge and Assignment**").

In certain circumstances, the Trustee may (subject to it being indemnified, prefunded or secured to its satisfaction) be required by Unitholders holding at least 20 per cent. of the principal amount of the Units outstanding or by an Extraordinary Resolution of the Unitholders to exercise its powers under the Trust Deed arising under the Charge and Assignment.

If at any time, any Recovery Payment is due and payable but has not been paid, the Trustee may apply any balance standing to the credit of the Collection Account in and towards payment of such Recovery Payment.

3.      **Form, Denomination and Title**

(a)       ***Form and Denomination***

The Units are in registered form, without interest coupons attached, and shall be serially numbered.  Units shall be issued in integral multiples of one unit (each an "**authorised denomination**").

(b)       ***Title***

Title to the Units will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*).  The holder (as defined below) of any Units shall

(except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof), and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Unit is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Unitholders**" shall be construed accordingly.

**4.      Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Units in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Unitholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number, which will be recorded in the Register.

**5.      Transfers**

(a)      Subject to Conditions 5(d) and 5(e), a Unit may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Unit may not be transferred unless the number of Units transferred and (where not all of the Units held by a holder are being transferred) the number of Units not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)      Within five business days of the surrender of a Note Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Note Certificate in respect of a like number of the Units transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 5(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)      The transfer of a Unit will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature, which may be levied or imposed in connection with such transfer.

(d)      Unitholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or Recovery Payments in respect of the Units.

(e)      All transfers of Units and entries on the Register are subject to the detailed regulations concerning the transfer of the Units scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be

mailed (free of charge) by the Registrar to any Unitholder who requests in writing a copy of such regulations.

6.      **Covenants**[28]

The Unitholders will have the benefit of certain covenants in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends.  In addition, the Bank covenants as follows:

(a)      *Collection Account and Conversion*

Promptly following receipt of any Recoveries in US Dollars the Bank shall deposit the Specified Percentage of such amount into the Collection Account.

Promptly following receipt of the benefit of any Relief, the Bank shall pay an amount in US Dollars (effecting any necessary currency exchange at the Spot Rate of Exchange) equal to the Specified Percentage of such benefit of Relief into the Collection Account.

The Bank shall, within 10 Business Days of receipt of any Recoveries that are not in U.S. Dollars, convert the Specified Percentage of such Recoveries into U.S. Dollars at the Spot Rate of Exchange and deposit the net proceeds of conversion into the Collection Account, *provided that* the Bank shall be under no obligation to convert any such Recoveries into U.S. Dollars or deposit any amounts into the Collection Account until such net proceeds exceed U.S.$ 5 million (determined by reference to the Spot Rate of Exchange for the relevant currencies).

In this Condition 6(a) "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in Almaty, London and New York City.

The amount payable in respect of Recoveries shall (subject as provided in the definition of Tax Assets) be determined on a pre-tax basis and on an asset-by asset or pooled basis (as provided in the definition of Write-backs) by reference to the KPMG Provisions Report, the Recovery Assets Opening Report and the most recently delivered Quarterly Recovery Assets Management Report.

(b)      *Preservation of Security Interests*

The Bank shall ensure that the Security Interests created in the Trust Deed shall at all times be in full force and effect.  In addition, the Bank shall not take or omit to take any action that would have the result of materially impairing the Security Interests created in the Trust Deed, and the Bank will not grant any person other than the Trustee for the benefit of the Unitholders any interests whatsoever with respect to the Charged Property.

(c)      *No Netting Off*

Other than in respect of assets to be pooled in accordance with paragraph 2.1(a)(i) of the definition of Write-backs, Recoveries will not be netted off against any asset of the Bank which has been written off or in respect of which a provision has been created or increased.

---

[28]      Tax assets subject to further discussion with Steering Committee.

(d)     *Information and Review Covenants*

(i)     Production of Quarterly Management Information:  The Bank shall, within 30 days of the end of each financial quarter, provide to the Trustee and the Recovery Assets Auditor a quarterly management information report (the "Quarterly Recovery Assets Management Report") on the ongoing performance of Recoveries Assets such report to include (details of):

(A)     amounts paid out to Unitholders in the previous financial quarter;

(B)     the nature of the Recoveries made (including a loan-by-loan breakdown showing the loans by reference to which Recoveries were made) and the amount thereof (calculated in accordance with FMSA Methodology), including whether they constituted a payment of principal or interest;

(C)     reports from each of:

(1)     the Legal Department;

(2)     the Non-Performing Loan Department; and

(3)     the Department of Restructuring of Assets,

of the Bank as to Recoveries Assets and Recoveries and related activities by reference to the immediately preceding financial quarter, and planned during the subsequent two, financial quarters;

(D)     updating reports from international legal and financial advisers with respect to their continuing engagement by reference to in the Recovery Programme;

(E)     any Recovery Assets Replacement Loans made during the previous financial quarter or currently under negotiation or proposed; and

(F)     any other loans made or contracted to borrowers or other debtors with respect to Recoveries Assets (or parties connected with them) during the previous financial quarter or currently under negotiation or proposed.

(ii)     Quarterly independent review of ongoing operation and monitoring of the Recoveries Assets:  The Bank shall procure that the Recovery Assets Auditor will carry out an ongoing quarterly review covering:

(A)     independent sample testing of:

(1)     loans constituting Recoveries Assets and Recovery Assets Replacement Loans to confirm existence, completeness and accuracy of records; and

(2)     Recoveries made by reference to them including in the case of sales of portfolios of Recovery Assets, an audit of the attribution of consideration proceeds to particular assets and in particular whether values have been correctly ascertained or otherwise fixed by reference to individual assets in the context of portfolio sales;

(B)     loans to Related Parties;

(C)    quarterly Recoveries Assets' and Recoveries' valuations and appropriate accounting treatment of Recoveries Assets in accordance with FMSA Methodology, to include controls over the use of calculation models and spreadsheets, and regarding the use of third parties for any valuation services provided;

(D)    key controls over the Recoveries Assets and Recoveries, such as bank reconciliations, calculation of interest, provisions for losses and intercompany reconciliations;

(E)    controls (in particular in relation to compliance by the Bank with Section 6(a) (*Collection Account and Conversion*)) over the translation of foreign exchange assets and payments made in foreign exchange and controls over any foreign exchange hedging being performed including authorisation in each case in relation to the Recoveries Assets and Recoveries;

(F)    key systems controls in relation to the pursuit of Recoveries and Recoveries Assets including the set-up of new users and segregation of duties;

(G)    disaster recovery and business continuity plans;

(H)    review of management information reporting to Recovery Unit Trustee;

(I)    physical security of loan documentation relating to Recoveries Assets, including the controls in relation to access to documentation such as the use of logs for receipt and return of documentation;

(J)    dual control over payments relating to Recoveries Assets and Recoveries;

(K)    access controls over key payment systems relating to Recoveries Assets and Recoveries;

(L)    controls regarding, and review of, the calculation of payments due to each Unitholder and the Bank;

(M)    the clear and formal documentation of all material aspects of the activities noted above; and

(N)    review of any management letter from the Bank's Auditor to the Bank relating to any of the above.

The Bank shall comply with the recommendations of the Recovery Assets Auditor with respect to any of the above, including, in particular, any recommendations to the effect that Recoveries (accounting or cash) by reference to any Recoveries Assets (on an asset-by-asset basis) were, or should have been accounted for as having been, higher.

(e)    ***Pursuit of Recoveries***

(i)    The Bank shall with the full support of Samruk-Kazyna, use its reasonable endeavours to maximise the recovery of any valuable asset of the Bank (including any claims available to it) whether in respect of debtors, former management or any other party whatsoever (and in any event act in compliance with its duties under Kazakhstan law and regulation and with international best practice), it being understood and agreed that a vigorous

and transparent asset recovery programme (the "**Recovery Programme**") aimed at maximising recovery is of fundamental importance to the Bank, its shareholders and creditors and shall be pursued in their interests alone and, to the fullest extent possible, in a manner consistent with the Base Case Model.

(ii)     The Bank shall ensure that unless otherwise agreed by the Trustee it shall continue to engage appropriate professional advisers in respect of the Recovery Programme and that it will engage or continue to engage such other experts as are appropriate having regard to its duties as set out above.  It shall also ensure, without limitation, that it maintains a sufficient team of in-house experts and other staff to support the Recovery Programme;

(iii)    The Bank shall:

(A)     take all reasonable steps, including (without limitation) the making of any claims, elections, surrenders, notices or consorts necessary to ensure that Tax Assets are realised on the earliest date possible;

(B)     keep proper records and accounts in relation to Recoveries and Recoveries Assets, and actions taken to recover them;

(C)     make such records and accounts freely available to the Recovery Assets Auditor and provide to the Recovery Assets Auditor equivalent access to such records and accounts and to personnel of the Group regarding Recoveries Assets as it would to its auditors;

(D)     not further provide against or write off any Recoveries Asset without providing full justification thereof to the Recovery Assets Auditor (and the Recovery Assets Auditor approving such provision or write-off);

(E)     before entering into any Recovery Assets Replacement Loan, provide complete copies of all documentation relating thereto (and the Recovery Asset(s) it is to replace) to the Recovery Assets Auditor (together with supporting credit information, including a business plan and historic financial information relating to the debtor(s) and details of any security to be provided in connection therewith, for approval by the Recovery Assets Auditor;

(F)     not reschedule any Recovery Asset by way of amendment or replacement (by way of a Recovery Assets Replacement Loan or otherwise) or otherwise without the approval of the Recovery Assets Auditor; and

(G)     pay all costs and expenses of the Recovery Assets Auditor.

(f)     ***Recovery Sub-Committee***

(i)     Subject to the provision of confidentiality agreements in a form satisfactory to the Bank, members of the Recovery Sub-Committee of the Bank shall be provided with quarterly reports by the Bank in relation to the progress of the Recovery Programme and upon receipt of such reports the Recovery Sub-Committee shall have the opportunity to comment and/or make recommendations in respect of the Recovery Programme.  It is intended that the reporting process shall provide full transparency to the Recovery Sub-Committee.

574

(ii)     The Recovery Sub-Committee shall act solely as an advisory and consultative body in respect of the Recovery Programme and the Bank, acting through the Board, shall be obliged to consider the Recovery Sub-Committee's recommendations in good faith and shall not take any material decision regarding Recoveries without first having sought recommendations in that regard from the Recovery Sub-Committee.

(g)    ***Segregation***

The Impaired Recovery Assets will be segregated for accounting purposes in the Bank's financial statements and for servicing and monitoring purposes in the accounting books and records of the Bank.

**7.    Recovery Payments**

In the period commencing on the Issue Date and ending on the Settlement Date, the Bank shall make Recovery Payments *pro rata* to Unitholders on _____,_____,_____ and _____ of each year (each, a "**Recovery Payment Date**") *provided that*:

(i)     Recovery Payments will only be made if and to the extent that the balance standing to the credit of the Collection Account exceeds U.S.$30 million in which case, the whole such balance shall be paid to Unitholders;

(ii)    the aggregate of the Recovery Payments made by the Bank shall not exceed the Reference Amount; and

(iii)   notwithstanding any other provisions herein, no Recovery Payments will be made by the Bank in relation to Recoveries (other than in relation to interest on the Collection Account) realised in cash by the Bank in the period beginning on 1 July 2009 up to and including 31 December 2009, in 2010 and in 2011 until such Recoveries exceed the following amounts:

(A)    for the period beginning on 1 July 2009 up to and including 31 December 2009, KZT 36 billion;

(B)    for 2010, KZT 134 billion; and

(C)    for 2011, KZT 103 billion.

On the making of any Recovery Payment, the balance of the Reference Amount with respect to the Units shall be reduced by the amount of such Recovery Payment with effect from the relevant Recovery Units Payment Date, unless the Recovery Payment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such Recovery Payment.

The Bank shall calculate the Reference Amount and shall inform the Noteholders of the balance of the Reference Amount on each Recovery Units Payment Date.  The calculation by the Bank of the Reference Amount shall, absent manifest error, be final and binding on the Trustee and the Noteholders.

For the avoidance of doubt if the balance of the Reference Amount is reduced to zero:

(A)    no further Recovery Payments shall be made by the Bank after such date;

(B)    the Security Interest shall be released and discharged in accordance with the Trust Deed; and

(C)    the Bank shall have no further obligations in respect of the Recovery Units.

8.    **Payments**

(a)    *Recovery Payments*

Recovery Payments will be made from the Collection Account to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) at the Specified Office of the Registrar or of any Agent *pro rata* by reference to Units held respectively by the Unitholders.

(b)    *Adjusted Principal Amount*

Payments of the Adjusted Principal Amount in respect of the Units will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender of the relevant Unit Certificates at the Specified Office of the Registrar or of any Agent.

(c)    *Record Date*

Each payment in respect of a Unit will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**") in accordance with Condition 8(a) (*Recovery Payments*) or 8(b) (*Adjusted Principal Amount*) above, as the case may be.

(d)    *Payments*

Each payment in respect of the Units pursuant to Conditions 8(a) (*Recovery Payments*) and 8(b) (*Adjusted Principal Amount*) will be made by wire transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)    *Payments Subject to Fiscal Laws*

All payments in respect of the Units are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 11 (*Taxation*).  No commissions or expenses shall be charged to the Unitholders in respect of such payments.

(f)    *Payment on a Business Day*

If the due date for payment of any amount in respect of any Unit is not a business day in the place of the Specified Office of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Unit shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 8(g), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)    *Agents*

In acting under the Agency Agreement and in connection with the Units, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Unitholders.  The Bank reserves the right (with the prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times

maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Unitholders in accordance with Condition 16 (Notices).

9.    **Valuation**

(a)    *Valuation*

To the extent that on the Valuation Date there are any Units outstanding and the Reference Amount has not been reduced to zero in accordance with Condition 7 (*Recovery Payments*), the Bank shall during January or February 2020 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Initial Valuation Date) as at the Initial Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Initial Settlement Date.

(b)    *Valuation Rejection Notice*

Either of the Bank or the Trustee may, by no later than the date which falls 30 days prior to the Initial Settlement Date, serve to the other a notice (a "**Valuation Rejection Notice**") stating that it is dissatisfied with the outcome of the valuation of the Residual Amount.  If a Valuation Rejection Notice is served, the Bank shall during January or February 2022 appoint up to three independent valuers of recognised standing (and satisfactory to the Trustee) to value the Recoveries Assets and determine the Residual Amount (after taking into account any Recovery Payments actually made including on or after the Valuation Date) as at the Deferred Valuation Date.

The Bank shall notify the Trustee in writing of the identity of any person it approaches in connection with the performance of any such valuation and the identity and terms of appointment of each valuer prior to such appointment.  When more than one valuer has been appointed, the Residual Amount notified to the Trustee shall be the average value provided by such valuers.

The valuation shall be carried out on a discounted cash flow basis and the Valuation Date and the Residual Amount shall be communicated by the Bank to the Trustee in writing no later than 45 days prior to the Deferred Settlement Date.

(c)    *Adjusted Principal Amount*

After the valuation, the aggregate principal amount outstanding in respect of the Units shall be adjusted for all purposes (including for the purposes of Condition 10 (*Redemption and Purchase*)) to be an amount equal to the lesser of (i) the balance of the Reference Amount and (ii) the aggregate of the relevant Specified Percentages of the Residual Amount, any amounts required to be but not as yet paid to the Collection

Account and moneys standing to the credit of the Collection Account.  The principal amount of the Units as so adjusted, is referred to as the "**Adjusted Principal Amount**".

**10.**     **Redemption and Purchase**

(a)     *Scheduled Redemption*

The Adjusted Principal Amount of the Units will be redeemed in full on the Settlement Date.

(b)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in Share Capital and on the Repurchase of Securities*", the Bank may at any time purchase or procure others to purchase for its account the Units in the open market or otherwise and at any price. Units so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancelation at the option of the Bank, in compliance with Condition 10(c) (*Cancelation of Units*).  Any Units so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Unitholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c)     *Cancellation of Units*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or change in Share Capital and on Repurchase of Securities", all Units which are redeemed or surrendered for cancellation pursuant to this Condition 10 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

**11.**     **Taxation**

(a)     *Taxation*

All Recovery Payments as well as payments of principal (including the Adjusted Principal Amount) in respect of the Units shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Unitholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Unit:

(i)     of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Unit by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Unit; or

(ii)    presented for a payment of the Adjusted Principal Amount more than 30 days after the Relevant Date, except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Unit on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Unit; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 200348/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Unit (subject to the exclusions set out in (i), (ii) and (iii) above) that has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Unit.

(b)    ***Relevant Date***

As used in these Conditions, "**Relevant Date**" in respect of any Unit means the date on which payment in respect of such Unit first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Unitholders that such payment will be made, *provided that* payment is in fact made.

(c)    ***Additional Amounts***

Any reference in these Conditions to Recovery Payments, principal or the Adjusted Principal Amount shall be deemed to include any additional amounts in respect of the Recovery Payments, principal or Adjusted Principal Amount (as the case may be) which may be payable under this Condition 11 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 11 (*Taxation*) pursuant to the Trust Deed.

(d)    ***Taxing Jurisdiction***

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 11 (*Taxation*) to the Republic of

Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**12.   Prescription**

Claims for Recovery Payments and for the Adjusted Principal Amount on redemption shall become void unless the relevant Unit Certificates are surrendered for payment within ten years of the appropriate Relevant Date.

**13.   Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall:

(a)      give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to the higher of (1) the Reference Amount and (2) the aggregate of (A) amounts standing to the credit of the Collection Account and (B) amounts by reference to Recoveries realised in cash and required to be but not yet paid to the Collection Account; and/or

(b)      exercise or direct the Trustee to exercise any or all of its rights, remedies, powers or discretions under the Trust Deed in respect of the Collection Account,

if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(i)       *Non Payment*

the Bank fails to pay any amount due on the Units when the same becomes due and payable and such default continues for a period of ten Business Days; or

(ii)      *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any provision of the Units or in relation to the Charged Property (other than a default or breach specifically dealt with elsewhere in this Condition 13 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 calendar days after notice thereof has been given to the Bank, by a Unitholder or the Trustee, requiring the same to be remedied; or

(iii)     *Cross Acceleration*

any Financial Indebtedness of the Group is declared to be or otherwise becomes due and payable prior to the due date for the payment thereof by reason of an event of default (howsoever described), *provided that* the aggregate amount of Financial Indebtedness referred to above exceeds U.S.$10 million (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(iv)      *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and

prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement; or

(v) *Creditors' Process*

any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a member of the Group having an aggregate value of not less than U.S.$10 million, and is not discharged or stayed within 45 days after commencement; or

(vi) *Invalidity or Unenforceability*

the validity of the Units is contested by the Bank or the Bank denies its obligations under the Units (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise), or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in the Units or all or any of the obligations of the Bank provided therein shall be or become unenforceable or invalid.

**14.   Replacement of Units**

If any Unit is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and Stock Exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Units must be surrendered before replacements will be issued.

**15.   Meetings of Unitholders; Modification and Waiver**

(a)   *Meetings of Unitholders*

The Trust Deed contains provisions for convening meetings of Unitholders to consider any matters relating to the Units, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Unitholders holding not less than one-tenth of the aggregate principal amount of the outstanding Units.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Units for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Unitholders whatever the principal amount of the Units for the time being outstanding so held or represented; *provided*, *however*, *that* certain proposals (including any proposal to change any date fixed for payment of any amount in respect of the Units, to reduce any amount payable on any date in respect of the Units, to alter the method of calculating the

amount of any payment in respect of the Units or the date for any such payment, to change the currency of payment under the Units or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) (a "**special quorum resolution**") may only be sanctioned by an Extraordinary Resolution passed at a meeting of Unitholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Units form a quorum.  Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Unitholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Units with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Unitholders who for the time being are entitled to receive notice of a meeting of Unitholders under the Trust Deed or (ii) if such Unitholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three-quarters of the aggregate principal amount of the outstanding Units.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Unitholders.

(c)     *Modification Without Unitholders' Consent*

The Trustee may, without the consent of the Unitholders, agree (i) to any modification of the Units (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Unitholders and (ii) to any modification of the Units (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Unitholders, authorise or waive any proposed breach or breach of the Units or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Unitholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Unitholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Unitholders in accordance with Condition 16 (*Notices*).

**16.   Notices**

(a)     *To the Unitholders*

Notices to Unitholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Units are listed on an Approved Stock Exchange or the Kazakhstan Stock Exchange and the relevant Stock Exchange so requires, notices to the Unitholders shall be published in a leading newspaper having general circulation in the country of such Exchange. Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank _____ and clearly marked on their exterior _____ (or at such other addresses and for such

other attentions as may have been notified to the Unitholders in accordance with Condition 16(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)    *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

## 17.    Trustee

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Unitholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Unitholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Units or for the performance by the Bank of its obligations under or in respect of the Units or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including, but not limited to, those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Unitholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Unitholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Unitholder shall be entitled to claim, from the Bank (in the case of a Unitholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Unitholders.

(c)    *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Units, but it shall not be bound to do so unless:

(i)    it has been so requested in writing by the holders of a least one-fifth in principal amount of the outstanding Units or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre-funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the

Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 13 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Unitholder may proceed directly against the Bank or enforce the Security Interests unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement, and the Unitholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, notices thereof shall be published as provided in Condition 16(a) (*To the Unitholders*).

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Unitholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Units and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligation assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice

thereof shall be given by the Bank to the Unitholders in accordance with Condition 16 (*Notices*).

**18.   Currency Indemnity**

If any sum due from the Bank in respect of the Units under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Units or in respect thereof under the Trust Deed, the Bank shall indemnify each Unitholder, on the written demand of such Unitholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Paying and Transfer Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Unitholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

**19.   Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Units under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

**20.   Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Units, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Units or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)      *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 20(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 20(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)      *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 20(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Unitholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 20(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)      *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)      *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)      *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 20(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

586

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 5 – TERMS AND CONDITIONS OF THE DOLLAR SUBORDINATED NOTES**

*The following is the text of the terms and conditions of the Dollar Subordinated Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Dollar Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$ _____ 7.2 per cent. notes due 2025 (the "**Dollar Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Status**

It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount

owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

**2.**      **Form, Denomination and Title**

(a)      *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of U.S.$ _____ and integral multiples of U.S.$ _____ in excess thereof (each denomination an "**authorised denomination**").

(b)      *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

**3.**      **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

**4.**      **Transfers**

(a)      Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)      Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in

foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

**5.     Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

**6.     Interest**

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 7.2 per cent. per annum (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of

30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.   **Payments**

(a)   *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)   *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)   *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)   *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)   *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).   No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)   *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2020 and the last such instalment being payable on _____ 2025.  The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of final instalment amount.

(b)     *Purchase*

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(c) (Cancellation of Notes).  Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c)     *Cancellation of Notes*

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or Change in Share Capital and on the Repurchase of Securities", all Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (Redemption and Purchase) shall be cancelled and may not be reissued or resold.[29]

---

[29] Cancellation to be discussed.

9.    **Taxation**

(a)    *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

593

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b) *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c) *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d) *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.   Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.   Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a) *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b) *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally

applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     ***Insolvency***

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

**12.     Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

**13.     Meetings of Noteholders; Modification and Waiver**

(a)     ***Meetings of Noteholders***

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR–6.75 per cent.  Notes due 2025 of the Bank (the "**EUR 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes and holders of the EUR 2025 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2025 Notes shall be converted into U.S. Dollars at the Reference

Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 to "Notes and "Noteholders" shall be deemed to include the EUR 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

(a)    *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on the an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)    *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)    *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any

Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.     **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.     **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.     **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.     **Governing Law; Arbitration and Jurisdiction**

(a)     *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)     *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in

writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     ***Consent to Enforcement, etc.***

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 6 – TERMS AND CONDITIONS OF THE EURO SUBORDINATED NOTES**

*The following is the text of the terms and conditions of the Subordinated Euro Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Euro Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The EUR_____ 6.75 per cent. notes due 2025 (the "**Euro Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC BTA Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated _____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and _____ as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, _____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and _____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, _____. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

It is the intention of the Bank that the Notes shall be treated as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount

owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

**2.      Form, Denomination and Title**

(a)      *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of EUR_____  and integral multiples of EUR_____ in excess thereof (each denomination an "**authorised denomination**").

(b)      *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

**3.      Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

**4.      Transfers**

(a)      Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)      Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in

foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

## 5.     Covenants

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

## 6.     Interest

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 6.75 per cent. per annum (the "**Rate of Interest**"), payable in arrear on _____ and _____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of

30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.    **Payments**

(a)    *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)    *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) will be made as provided in these Conditions.

(c)    *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)    *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Euro account maintained by the payee with a bank in a city in which banks have access to the TARGET System.

(e)    *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)    *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Offices of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in the place of the Specified Offices of the Principal Paying Agent and which is a business day on which the TARGET System is operating and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note

Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)      ***Agents***

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

**8.      Redemption and Purchase**

(a)      ***Scheduled Redemption***

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be redeemed in ten equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2020 and the last such instalment being payable on _____ 2025. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed on due payment of final instalment amount.

(b)      ***Purchase***

Subject to the covenant set out in the Trust Deed entitled "*Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*" and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(c) (Cancellation of Notes). Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(c)      ***Cancellation of Notes***

Unless otherwise permitted pursuant to the covenant set out in the Trust Deed entitled "Restrictions on amendments to the Bank's Charter or Change in Share Capital and on the Repurchase of Securities", all Notes which are redeemed or surrendered for

cancellation pursuant to this Condition 8 (Redemption and Purchase) shall be cancelled and may not be reissued or resold.[30]

**9.    Taxation**

(a)    ***Taxation***

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note;

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days;

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or

---

[30] Cancellation to be discussed.

deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (Taxation) or any undertaking given in addition to or in substitution of this Condition 9 (Taxation) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (Taxation) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

**10.     Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

**11.     Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (ii) or (iii) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)     *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement, save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

**12.     Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.   **Meetings of Noteholders; Modification and Waiver**

(a)   *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the U.S.$ 7.2 per cent. Notes due 2025 of the Bank (the "**U.S. Dollar 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes and holders of the U.S. Dollar 2025 Notes and that for purposes of determining a quorum and for voting purposes the Notes shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 (*Meetings of Noteholders; Modification and Waiver*) to "Notes and "Noteholders" shall be deemed to include the U.S. Dollar 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)   *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)   *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In

addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.    **Notices**

(a)    ***To the Noteholders***

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)    ***To the Bank***

Notices to the Bank will be deemed to be validly given if delivered to the Bank at _____ and clearly marked on their exterior _____ (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)    ***To the Trustee and Agents***

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.    **Trustee**

(a)    ***Indemnification***

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)    ***Exercise of Power and Discretion***

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust

Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     ***Enforcement; Reliance***

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)      it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates.  The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

**16.     Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

**17.     Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.   **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.   **Governing Law; Arbitration and Jurisdiction**

(a)   *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)   *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)   *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)   *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

614

(e)    *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)    *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)    *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)    *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

### ANNEX 7 – SUMMARY OF TENGE NEW NOTES

Tenge New Notes held by or on behalf of persons who are not resident, domiciled or organised in the Republic of Kazakhstan may be held in one of the following ways:

1.      by opening an account with the Kazakhstan Central Securities Depositary;

2.      by opening an account with a broker within or outside the Republic of Kazakhstan who has an account with the Kazakhstan Central Securities Depositary; or

3.      by opening an account with a bank or depositary outside the Republic of Kazakhstan who has an account (whether directly or through another bank or broker) with the Kazakhstan Central Securities Depositary.

**Senior Tenge Notes**

The terms and conditions of the Senior Tenge Notes will be substantially the same as the terms and conditions of the Senior Dollar Notes, except that they will have a different principal amount and will bear interest at the rate of 14.75 per cent. per annum till _____ 2012 and 16.50 per cent. thereafter.

No holder of Senior Tenge Notes may take any acceleration action unless and until the holders of the Senior Dollar Notes have resolved to take any acceleration action under the Conditions of those Notes.

**Subordinated Tenge A Notes**

The terms and conditions of the Subordinated Tenge A Notes will be substantially the same as the terms and conditions of the Dollar Subordinated Notes, except that they will have a different principal amount and will bear interest at the rate of 11.20 per cent. per annum.

**Subordinated Tenge B Notes**

The terms and conditions of the Subordinated Tenge B Notes will be substantially the same as the terms and conditions of the Dollar Subordinated Notes, except that they will have a different principal amount and will bear interest at the rate of 8 per cent. per annum.

Payments of principal in respect of the Subordinated Tenge B Notes will commence on the fifteenth anniversary of the Restructuring Date and will be carried out in equal semi-annual instalments over five years.

No holder of Subordinated Tenge A Notes or Subordinated Tenge B Notes may take any acceleration action unless and until the holders of the Subordinated Non-Tenge Notes have resolved to take any acceleration action under the Conditions of those Notes.

**Covenants**

Holders of the Tenge New Notes will have the benefit of the same covenants as holders of the corresponding Non-Tenge New Notes.

The Terms and Conditions of the Tenge New Notes will need to comply with domestic Kazakhstan legislation and be approved by the FMSA.  As at the date of this Information Memorandum the Bank has not received such approval from the FMSA.  The main issue that needs clearance is amortisation of principal according to domestic legislation.  The Bank will publish a supplement to this Information Memorandum setting out the terms and conditions of the Tenge New Notes as approved by the FMSA.

**Governing Law and Jurisdiction[31]**

Tenge New Notes will be governed by Kazakhstan Law, with the courts of Kazakhstan having jurisdiction in relation to disputes arising out of or in connection with such Tenge New Notes.

---

[31]     The choice of Kazakhstan law as the governing law of the Notes remains subject to the approval of the FMSA. Absent this approval the Notes will be governed by English law and accordingly a number of consequential amendments will need to be made throughout the provisions of the Information Memorandum, including, amongst other things, (i) inserting cross references to the terms and conditions of the Notes alongside existing references to the equivalent Dollar and/or Euro denominated notes, where appropriate, to allow for them to be treated in the same way, and (ii) amending the terms and conditions of the equivalent Dollar and/or Euro denominated notes to provide for the Notes to be included in any meetings of the holders of such Dollar or Euro denominated notes.

**ANNEX 8 – TERMS AND CONDITIONS OF THE RCTFF**

*The following is a summary of the terms and conditions on the basis of which the RCTFF Agreement will be prepared and entered into prior to the Restructuring Date.*

1.  **DEFINITIONS**

Terms used but not defined in this Annex have the meaning given to them elsewhere in this Information Memorandum and, in addition, the following terms shall have the meaning set out opposite them below:

"**Approved Buyer**"        means such person as the Agent may from time to time approve, being a purchaser of exports from an Eligible Customer.

"**Approved Supplier**"        means such person as the Agent may from time to time approve, being a supplier of imports to an Eligible Customer.

"**BTA Correspondent Bank**"        means designated financial institutions located in CIS countries and/or Mongolia, subject in each case to the Agent:

(a)    having received:

(i)    an approval in respect of such financial institution from the Borrower's internal risk compliance department; and

(ii)    such financial information in respect of such financial institution as the Agent may reasonably request and in a form satisfactory to it; and

(b)    being satisfied with such financial institution's long term foreign currency debt rating.

"**BTA Group Bank**"        means:

(a)    each of the following financial institutions (for so long as they are under the Control of the Borrower): BTA Belarus; BTA Kazan; BTA Armenia; BTA Georgia; Sekerbank (Turkey); BTA Orix Leasing; Temir Leasing; BTA Ipoteka; and

(b)    any other financial institution that is from time to time under the Control of the Borrower.

For the purposes of this definition, "**Control**" shall mean the possession by the Borrower, either directly or indirectly, of (i) more than 50 per cent. of the voting capital or a similar right of ownership with respect to the relevant financial institution or (ii) the power, whether by contract or otherwise, to appoint the members of the management board of the relevant financial institution.

"**BTA Related Party**"        means:

(a)    any Holding Company of the Borrower;

(b)  any Subsidiary of the Borrower other than any BTA Group Bank;

(c)  any (i) officer, director or manager of the Borrower or any of the persons specified in paragraphs (a) and (b) above or (ii) any member of the management board or supervisory board of the Borrower as at 31 December 2008;

(d)  any spouse, parent, sibling and children of any of the persons specified in paragraph (c) above and which is a natural person; and

(e)  any other person who is "connected" to any of the natural persons identified in paragraphs (c) or (d) above within the meaning of the Insolvency Act 1986,

other than any Excluded Related Party.

| | |
|---|---|
| **"Eligible Bank"** | means a BTA Group Bank or a BTA Correspondent Bank. |
| **"Eligible Beneficiary"** | means, as the context may require, an Approved Buyer or an Approved Supplier for whom the Agent will process an Eligible Trade Transaction and with respect to whom the Agent, acting reasonably, is satisfied that all necessary KYC evidence has been provided[32]. |

**"Eligible Customer"**     Means either:

(a)  an importer or exporter that is a customer of the Borrower and that is:

  (i)  domiciled in a country that is not a prohibited jurisdiction for the purposes of Kazakhstani Banking Law (2009) and is not subject to sanctions by the United Nations or the United States; and

  (ii)  not a BTA Related Party; or

(b)  an Eligible Bank in respect of whom the Agent or BTA may consider advising, confirming and/or financing a letter of credit issued by such Eligible Bank.

| | |
|---|---|
| **"Eligible Trade Transaction"** | has the meaning given to it in paragraph (6) (*New Origination Criteria*) below. |
| **"Eligible Trade Transaction Agreement"** | means any export or import contract entered into by an Eligible Customer with an Approved Buyer or Approved Supplier (as the case may be) in relation to an Eligible Trade Transaction. |
| **"Eligible Trade Transaction Financing"** | means any loan, credit or other financial accommodation provided by the Borrower to an Eligible Customer and which is financed under the RCTFF Agreement and any |

---

[32]     Substance of KYC requirements to be set out in full in the RCTFF Agreement.

Security granted to the Borrower to secure such loan, credit or other financial accommodation.

| | |
|---|---|
| **"Legacy Loan"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |
| **"Maximum Exposure"** | means, in relation to any Eligible Customer and its Affiliates, the maximum principal amount of any New Origination(s) they may apply for, being: |

(a)   in the case of any Eligible Customer which is controlled by SK or the Republic of Kazakhstan, up to U.S.$140,000,000 (or its equivalent) in aggregate; and

(b)   in the case of any other Eligible Customer, up to U.S.$70,000,000 (or its equivalent) in aggregate,

and "control" for the purposes of paragraph (b) above shall mean the ownership, either directly or indirectly, of more than 50 per cent. of the voting capital or similar right of ownership in respect of the relevant Eligible Customer and/or its Affiliate.

| | |
|---|---|
| **"New Origination"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |
| **"RCTFF Agreement"** | means the agreement setting out the terms of the RCTFF on the basis of this Annex 8. |
| **"RCTFF Collection Account"** | means the account held by the Borrower into which all amounts owing to it by each Eligible Customer or Approved Buyer (or its bank) with respect to any Eligible Trade Transaction are to be credited. |
| **"Settlement Date"** | has the meaning given to it in paragraph (6) (*New Origination Criteria*) below. |
| **"Transaction Due Diligence Report"** | means a due diligence report issued by the Borrower in relation to each Eligible Customer in the form previously agreed with the Agent and which will be attached as a schedule to the RCTFF Agreement. |
| **"Utilisation"** | has the meaning given to it in paragraph (3) (*RCTFF Outline*) below. |

In addition, a reference to the Legacy Loan or a New Origination being "**repaid**" or "**prepaid**" (in full or in part) shall mean:

(a)   the Borrower providing cash cover for the Legacy Loan or New Origination (as the case may be);

(b)   the maximum amount payable under the Legacy Loan or New Origination being reduced or cancelled in accordance with its terms; or

(c)      the Lender being satisfied that it has no further liability under the Legacy Loan or New Origination,

and the amount by which the Legacy Loan is, or New Originations are, repaid or prepaid under paragraphs (a) and (b) above is the amount of the relevant cash cover or reduction.

## 2.    PARTIES

| | |
|---|---|
| **Borrower:** | The Bank. |
| **Lenders:** | Restructuring Creditors whose Claims are agreed as Non-OGSC Eligible Trade Finance Debt and whose Claims are allocated to Senior Package 3 as contemplated in "*Allocation Mechanism*". |
| **Agent:** | As agreed by the Borrower on or prior to the date of the RCTFF Agreement. |
| **Security Agent:** | As agreed by the Borrower on or prior to the date of the RCTFF Agreement. |

## 3.    RCTFF OUTLINE

| | |
|---|---|
| **Total Commitments:** | U.S.$700,000,000 (as repaid or prepaid from time to time). |
| **Purpose:** | The RCTFF is provided to: |

(a)      refinance the Borrower's existing indebtedness with respect to U.S.$700,000,000 Claims agreed as Non-OGSC Eligible Trade Finance Debt and which are allocated to Senior Package 3 as contemplated in "*Allocation Mechanism*" such that, as from the Restructuring Date:

    (i)    the terms applicable to such Non-OGSC Eligible Trade Finance Debt Claims shall be amended, restated in full and refinanced pursuant to the terms of the RCTFF Agreement, and thereafter such Claims shall remain outstanding on the terms set out in the RCTFF Agreement; and

    (ii)   such Claims shall be re-constituted and comprise a single loan obligation to be referred to as the "**Legacy Loan**"; and

(b)      provide new credit to finance Eligible Trade Transactions through Utilisations to be provided by the Lenders for the benefit of the Borrower (each a "**New Origination**").

| | |
|---|---|
| **Currencies:** | Legacy Loan:  USD; and |
| | New Originations:  USD, EUR, CHF, RUB, JPY or Tenge. |
| **Termination Date:** | 30 September 2013 unless previously cancelled or otherwise terminated in accordance with the RCTFF Agreement. |

| | |
|---|---|
| **Availability Period:** | For New Originations:  Up to and including 30 September 2012. |
| **Utilisation:** | The RCTFF will be capable of being utilised as follows: |

    (a)   by way of the Legacy Loan; and

    (b)   by way of New Originations in an aggregate principal amount (the "**Available Commitment**") not exceeding:

$$a - (b + c)$$

where:

    (i)   "a" is the amount of Total Commitments;

    (ii)   "b" is the principal amount of the Legacy Loan outstanding; and

    (iii)  "c" is the aggregate principal amount of New Originations outstanding.

Utilisations by way of New Originations may be made available by way of cash advances, guarantees, standby letters of credit, letter of credit confirmations, deferred payment letters of credit and/or post import financing of letters of credit, to the extent that the New Origination criteria (as set out in paragraph 6 (*New Origination Criteria*) below) are satisfied in the opinion of the Agent.

The aggregate amount of all outstanding Utilisations shall at no time exceed the Total Commitments.

| | |
|---|---|
| **Utilisation Amounts:** | The original amount of the Legacy Loan as at the Restructuring Date will be equal to the amount of the Total Commitments. |

The maximum amount of any New Origination Utilisation will be:  U.S.$70,000,000 (or its equivalent).

The minimum amount of any New Origination Utilisation will be:  U.S.$10,000 (or its equivalent).

| | |
|---|---|
| **Tenor and Repayment:** | The Legacy Loan shall be repaid[33] in accordance with the Amortisation Schedule set out below. |

A New Origination must be repaid within 24 months of the relevant Utilisation date and, in any case, by not later than the Termination Date.

---

[33]    Amounts repaid or prepaid on the Legacy Loan or by reference to funded Utilisations shall be held by the Agent subject to arrangements with the Lenders to facilitate with the making, and day-to-day management of, New Origination Utilisations under the RCTFF.

| | |
|---|---|
| **Cash Margin for FX Risk:** | Any Utilisation denominated in a currency other than USD shall be referenced in USD for the purposes of this section at the Agent's spot rate of exchange on or about the dates identified below. |

With respect to any Utilisation denominated in a currency other than USD and with a tenor of more than 12 months then, to the extent that, on the date falling 12 months after the date of such Utilisation, the USD equivalent amount of such Utilisation then outstanding is below 2 per cent. or more of the original USD equivalent amount of such Utilisation, the Borrower will provide cash cover in USD for the shortfall (to be credited to the RCTFF Collection Account or such other account as shall be agreed between the Borrower and the Agent).

On the repayment date for any Utilisation denominated in a currency other than USD, the Borrower shall indemnify the Agent for the amount that is equal to the difference between (i) the original USD equivalent amount of such Utilisation and (ii) the USD equivalent amount that is actually due to be repaid in respect of such Utilisation, in each case to compensate the Lenders for any adverse FX movements during the tenor of any such Utilisation.

| | |
|---|---|
| **Scheduled Repayments of the Legacy Loan:** | The Borrower shall repay the Legacy Loan in instalments in the amounts and by no later than the dates (each a "**Repayment Date**") as set out below: |

| **Repayment Date** | **Repayment Instalment** |
|---|---|
| by 31 March 2011 | U.S.$175,000,000 |
| by 30 September 2011 | U.S.$175,000,000 |
| by 31 March 2012 | U.S.$175,000,000 |
| by 30 September 2012 | U.S.$175,000,000 |
| **Total:** | U.S.$700,000,000 |

The Borrower may, on the last Business Day of each month, elect to repay an instalment in full or in part *before* the Repayment Date for that instalment as set out above, *provided that* it provides the Agent with not less than ten (10) Business Days' notice of such repayment and the amount of any such repayment is not less than U.S.$5,000,000.

## 4.   PRICING

| | |
|---|---|
| **Agent Fee:** | As agreed between the Agent and the Borrower. |
| **Security Agent Fee:** | As agreed between the Security Agent and the Borrower. |

| | |
|---|---|
| **Commitment Fee:** | Payable from 30 September 2010 to the end of the Availability Period, the Borrower will pay quarterly, on the Settlement Date next occurring after the end of each of its financial quarters, a commitment fee equal to 0.25 per cent. per annum on the Available Commitments. |
| **Interest Periods for funded Utiisations:** | 1, 2, 3 or 6 months or any other period agreed between the Borrower and the Lenders. |
| **Interest on funded Utiisations for New Originations:** | The aggregate of: |

(i)     the Margin;

(ii)    LIBOR, EURIBOR or the appropriate reference rate for New Originations funded in CHF, RUB, JPY or Tenge; and

(iii)   mandatory costs, if any,

payable on the last day of each Interest Period on the principal amount of each funded New Origination Utilisation.

The "**Margin**" in respect of funded Utilisations for New Originations:

(a)     with a tenor of up to 12 months, shall be 3.50 per cent. per annum; and

(b)     with a tenor of more than 12 months but not more than 24 months, shall be 4.50 per cent. per annum,

but if the Borrower has obtained and maintains a long term foreign currency debt rating from Moody's, Standard & Poor's or Fitch at or above the minimum rating specified in the table below, then the Margin will be the percentage rate per annum set out below opposite the rating then obtained or maintained by the Borrower[34]:

| Rating[35] | Margin in respect of funded Utiisations for New Originations with a tenor of up to 12 months (% *per annum*) | Margin in respect of funded Utiisations for New Originations with a tenor of more than 12 months but not more than 24 months (% *per annum*) |
|---|---|---|
| BBB- or higher | 1.00 | 2.00 |
| BB-, BB, BB+ | 2.00 | 3.00 |
| B-, B, B+ | 3.00 | 4.00 |

---

[34]     This pricing is agreed individually for BTA Bank only as a part of the restructuring of BTA and includes some expected projections.

[35]     Ratings are based on Standard & Poor's rating scale. Equivalent ratings will apply in the case of Moody's and Fitch.

| **Fees and commission on unfunded Utilisations for New Organizations:** | The fee in respect of unfunded Utilisations for New Originations shall be the greater of: |

(a)   U.S.$500; and

(b)   either:

     (i)   in the case of an unfunded Utilisation for a New Origination with a tenor of 12 months, 3.25 per cent. per annum; or

     (ii)   in the case of an unfunded Utilisation for a New Origination with a tenor of more than 12 months but not more than 24 months, 4.25 per cent. per annum,

and shall be paid quarterly in advance on the principal amount of each unfunded New Origination Utilisation, *provided that* if the Borrower has obtained and maintains a long term foreign currency debt rating from Moody's, Standard & Poor's or Fitch, then the applicable fee for the purposes of paragraph (b) above will be the percentage rate per annum set out below opposite the rating then obtained or maintained by the Borrower[36]:

| **Rating**[37] | **Fee in respect of unfunded Utilisations for New Originations with a tenor of up to 12 months (*% per annum*)** | **Fee in respect of funded Utiisations for New Originations with a tenor of more than 12 months but not more than 24 months (*% per annum*)** |
|---|---|---|
| BBB- or higher | 0.75 | 1.75 |
| BB-, BB, BB+ | 1.75 | 2.75 |
| B-, B, B+ | 2.75 | 3.75 |

## 5.    OTHER TERMS

| **Mandatory Prepayments:** | Mandatory prepayments in relation to (i) illegality and (ii) Change of Control and (iii) following any disposals (excluding disposals made in the ordinary course of trading of the Borrower and its Subsidiaries) in any Financial Year of more than 6.5 per cent. of the Borrower's total unconsolidated gross assets (determined by reference to the Borrower's most recent financial statements) (each a "**Relevant Disposal**"), each at the option of individual Lenders. |

| **Application of Mandatory** | All amounts mandatorily prepaid as a result of a Change of |

---

[36]    This pricing is agreed individually for BTA Bank only as a part of the restructuring of BTA and includes some expected projections.

[37]    Ratings are based on Standard & Poor's rating scale. Equivalent ratings will apply in the case of Moody's and Fitch.

| | |
|---|---|
| **Prepayments:** | Control or Relevant Disposal shall be paid to those Lenders who opt to be paid such prepayment. |
| | If there is an illegality in relation to any Lender, the Borrower shall procure that such Lender is repaid in full. |
| **Prepayments:** | Amounts repaid or prepaid, other than as a result of Mandatory Prepayments, may be redrawn. |
| | Any prepayment shall be made with accrued interest, fees, commission on the amount prepaid and subject to breakage costs, if any (which shall exclude margin), without premium or penalty. |
| **Representations:** | As set out in Schedule 10 (*Representations and Warranties of the Bank*) on a repeating basis. |
| **Information Covenants, Financial Covenants, General Covenants and Events of Default:** | As set out in Schedule 11 (*Covenants of the Bank*) and other additional covenants such as those set out in paragraph 7 (*Trade Finance related Covenants*) below, and with respect to Events of Default as set out in Condition 11 of Annex 1 (*Terms and Conditions of the Senior Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*). |
| **Miscellaneous Provisions:** | The RCTFF Agreement will contain provisions relating to, amongst other things, default interest (at 2 per cent. per annum), market disruption, breakage costs (if any), full tax gross up (in relation to any withholding tax and not limited to withholding taxes arising on any change of law or regulation or their application) and indemnities, increased costs and setoff. |
| **Majority Lenders:** | Lenders whose participations aggregate more than $66\frac{2}{3}$ per cent. of the Total Commitments then outstanding. |
| **Agency, Security Trustee and administration:** | Per current recommended form of investment grade LMA facility agreement. |
| **Assignments and Transfers by Lenders:** | A Lender may assign (without the consent of or needing to consult the Borrower) any of its rights or transfer by novation any of its rights and obligations to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets. |
| **Governing Law:** | English law. |
| **Dispute resolution:** | Arbitration in London under LCIA Rules or, at the option of the Agent, Borrower submission to the exclusive jurisdiction of the English courts for the benefit of the Lenders (without prejudice to the ability of a Lender to take proceedings in any other court with jurisdiction). |

6. **NEW ORIGINATION CRITERIA**

| | |
|---|---|
| **Conditions Precedent specific to particular New Origination:** | On any, but only once every, Business Day until (and including) the end of the Availability Period (each such date, a "**Settlement Date**"), the Borrower may set out all the transactions intended to be financed under New Originations in a settlement sheet in form and substance satisfactory to the Agent. The Lenders will only be required to provide financing for those transactions which are Eligible Trade Transactions. An Eligible Trade Transaction means the sale and purchase of goods and/or services to be financed by the Borrower for the benefit of Eligible Customers only in one of the following ways (together, the "**Eligible Trade Transactions**"): |

**Unfunded transactions:**   **Type of trade transaction:**

Import or export of goods and/or services.

**Applicable trade instruments used:**

1. Confirmation of sight, deferred payment import and export letters of credit issued under UCP 600;

2. Issuance of trade guarantees against the counter guarantee of the Borrower in relation to bid bonds, performance bonds, advance payments, warranty bonds and guarantees in support of payment of a purchase price in respect of an Eligible Trade Transaction;

3. Confirmation of standby letters of credit in relation to bid bonds, performance bonds, advance payments, warranty bonds and guarantees in support of payment of a purchase price in respect of an Eligible Trade Transaction; and

4. IRUs/irrevocable reimbursement undertakings,

together, the "**Trade Instruments**".

**Documents required:**   The following documents need to be presented to the Agent for approval prior to the issuance of a Trade Instrument:

1. a Utilisation request setting out all the details relating to the relevant Utilisation, including details of the relevant Trade Instrument, the relevant Eligible Trade Transaction, the Eligible Customer and the Eligible Beneficiary(ies);

2. a copy of the relevant Eligible Trade Transaction Agreement;

3. a draft copy of the relevant letter of credit/standby letter of credit/guarantee/irrevocable reimbursement undertaking; and

4. a Transaction Due Diligence Report.

| **Funded transactions:** | **Type of trade transaction and methods of funding used:** |
|---|---|

1. Discounting of confirmed issuance/deferred payment letters of credit, where the discounting charges are paid by the Eligible Customer or Eligible Beneficiary;

2. Post-import financing under confirmed letters of credit, where the funded Utilisation is paid directly to the Approved Supplier against presentation of credit conforming documents as called for under the relevant letters of credit, save that up to 20 per cent. of such Utilisation may be directed, subject to presentation of appropriate documentation to the Agent, towards the payment of any local mandatory costs to be incurred by the Eligible Customer in connection with such post-import financing;

3. Pre-export financing under a facility agreement and/or standby letter of credit/banker's acceptance/trade advance;

4. Post-export financing under a facility agreement and/or standby letter of credit/banker's acceptance/trade advance; and

5. Discounting of avalised bills of exchange or promissory notes issued by the Borrower supporting the import of goods and/or services into Kazakhstan.

| **Documents required:** | The following documents need to be presented to the Agent for approval prior to the making of the relevant funded Utilisation: |
|---|---|

1. a Utilisation request setting out all the details relating to the relevant Utilisation, including the relevant method of funding to be used, the relevant Eligible Trade Transaction, the Eligible Customer and the Eligible Beneficiary(ies);

2. a copy of the relevant Eligible Trade Transaction Agreement;

3. a copy of the purchase order (only in relation to pre-export financings);

4. a draft copy of the relevant letter of credit/standby letter of credit/guarantee;

5. in relation to a post-import financing, a copy of the relevant contract or other document with evidence of the local costs to be borne in connection with such transaction (if any);

6. in relation to a post-export financing, a copy of the relevant export letter of credit (if one is to be utilised); and

7. a Transaction Due Diligence Report.

| | |
|---|---|
| **All transactions:** | Such further conditions or documentation as the Agent may reasonably request and as may be suitable for such transactions. |
| | Payment will only be made on presentation of a full set of original documents or a duplicate original copy thereof, particularly in relation to shipment documents, such as bills of lading and airway bills, and the claim under a performance bond.  Such requirement must also be contained in the draft copy of the relevant letter of credit/stand by letter of credit. |

7.     **TRADE FINANCE RELATED COVENANTS**

| | |
|---|---|
| **Additional RCTFF Agreement covenants:** | In addition to those covenants set out in Schedule 11 (*Covenants of the Bank*), the RCTFF Agreement will include the further covenants as set out below. |

(i)     *RCTFF Collection Account.*

(A)   The Borrower shall procure that all amounts owing to it by an Eligible Customer, or by an Eligible Beneficiary to an Eligible Customer (including, in the case of an Approved Buyer, its bank), with respect to any Eligible Trade Transaction are credited directly to the RCTFF Collection Account.

(B)   The Borrower shall provide to the Agent copies of statements/a weekly reconciliation of amounts credited to the RCTFF Collection Account.

(ii)    *Eligible Trade Transaction Financings.*

(A)   The Borrower shall ensure that all funds received from an Eligible Customer under and in prepayment of any Eligible Trade Transaction Financing shall be treated as having satisfied that Eligible Customer's debt obligation under such Eligible Trade Transaction Financing.

(B)   Except for operational matters which do not adversely affect the interests of the Lenders, in respect of which the Borrower shall have complete discretion, the Borrower will not terminate, amend or vary, or acquiesce in any amendment or variation to any Eligible Trade Transaction Financing, release any party thereto from its obligations thereunder in any material respect or waive any material breach of any party's obligations thereto, or do or permit, or omit to do or permit the omission of, any act or thing as a result of which any Eligible Trade Transaction Financing is or may be frustrated or be lawfully terminated, or refuse to comply

with any of its obligations under any Eligible Trade Transaction Financing for any reason (other than due to the failure of any third party to comply with its obligations).

(C)  At the request of the Agent, the Borrower will provide every reasonable administrative and operational support in respect of the enforcement of any judgment or award given in respect of any Eligible Trade Transaction Financing following a default thereunder.

(D)  The Borrower will exercise any rights or discretions and/or give any notices which the Borrower may be entitled to exercise or give under any Eligible Trade Transaction Financing to ensure the due performance of the same and comply with all reasonable requests and reasonable instructions given by the Agent in respect of the exercise of such rights or discretions or the giving of such notices, and it will account to the Agent for any monies received or recovered by the Borrower as a result of it exercising any rights it may have under any Eligible Trade Transaction Financing.

(iii)  *Performance of obligations.*  The Borrower shall:

(A)  perform all its obligations in respect of each Eligible Trade Transaction Financing; *provided that*, no event of default shall arise in respect of this paragraph if the failure to comply is administrative or technical in nature and is capable of remedy, and the Borrower does so remedy such failure to comply as soon as reasonably practicable after the Agent giving notice to the Borrower or the Borrower becoming aware of the failure to comply;

(B)  take all practical measures to prevent or minimise loss arising in connection with each Eligible Trade Transaction Agreement;

(C)  provide every reasonable administrative and operational support with a view to achieving the smooth functioning of each Eligible Trade Transaction Agreement; and

(D)  promptly notify the Agent of (i) any material breach by it, or any Eligible Customer or any Eligible Beneficiary, of any Eligible Trade Transaction Agreement and (ii) any event affecting the performance of any Eligible Trade Transaction Agreement which might reasonably be expected to adversely affect the interests of the Lenders, and of which the Borrower has

been notified by such Eligible Customer or Eligible Beneficiary or of which the Borrower is otherwise aware.

(iv)   *Indemnity for set-off.*  The Borrower shall on demand by the Agent (acting on the instructions of the Majority Lenders), pay to the Agent any amount set-off by any Eligible Customer in respect of its obligations under an Eligible Trade Transaction Agreement.

(v)   *No Variation.*  The Borrower shall procure that no variation, waiver or forbearance is made to any of the terms of any Eligible Trade Transaction Agreement which might reduce the amounts due to it or extend the date of receipt of any amount due to it, or agree to any compromise or settlement with any Eligible Customer or Eligible Beneficiary which might adversely affect the interests of the Lenders.

## SCHEDULE 10 – REPRESENTATIONS AND WARRANTIES OF THE BANK

As a condition precedent to the Restructuring, the Bank will make the following representations and warranties, for the benefit of the Restructuring Creditors with respect to itself and its Material Subsidiaries only which shall be correct immediately before the Restructuring Date:

(a) **Status**

    (i) It is a joint stock company duly incorporated and validly existing under the laws of its jurisdiction of incorporation.

    (ii) Each of its Material Subsidiaries is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

    (iii) It and each of its Material Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(b) **Binding Obligations**

Subject to the Legal Reservations the obligations expressed to be assumed by it in the Deeds of Covenant and each Restructuring Document to which it is a party are legal, valid, binding and enforceable obligations.

(c) **Non-Conflict with other Obligations**

The entry into and performance by it of, and the transactions contemplated by, the Deeds of Covenant and the Restructuring Documents to which it is a party do not and will not conflict with:

    (i) any law or regulation applicable to it;

    (ii) the constitutional documents of any member of the Group; or

    (iii) any agreement or instrument binding upon it or any member of the Group or any of its or any member of the Group's assets or constitute a default or termination event (however described) under any such agreement or instrument, where the conflict has or is reasonably likely to have a Material Adverse Effect (provided, for the avoidance of doubt, the revocation of the banking licence of JSC "Mortgage organisation "BTA Ipoteka" shall not constitute a breach of this representation).

(d) **Power and Authority**

    (i) It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Deeds of Covenant and the Restructuring Documents to which it is or will be a party and the transactions contemplated by the Deeds of Covenant and the Restructuring Documents.

    (ii) No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Deeds of Covenant and the Restructuring Documents to which it is a party.

(e) **Validity and Admissibility in Evidence**

    (i) All Authorisations required or desirable:

        (A) to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Deeds of Covenant and the Restructuring Documents to which it is a party;

       (B)      to make the Deeds of Covenant and the Restructuring Documents to which it is a party admissible in evidence in Kazakhstan and, where the Deeds of Covenant and the relevant Restructuring Document is expressed to be governed by English law, also England, have been obtained or effected and are in full force and effect except for presentation of a certified Russian and/or Kazakh translation of the Deeds of Covenant and the Restructuring Documents and payment of any related state duty which will be promptly obtained or effected after the Restructuring Date.

(ii)     All Authorisations necessary for the conduct of the business, trade and ordinary activities of members of the Group have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or is reasonably likely to have a Material Adverse Effect.

(f)     **Governing Law and Enforcement**

(i)     Subject to the Legal Reservations, the choice of governing law of the Deeds of Covenant and the Restructuring Documents will be recognised and enforced in Kazakhstan and, where the Deeds of Covenant or the relevant Restructuring Document is expressed to be governed by English law, also England and the consent to arbitration under the LCIA rules and to the jurisdiction of the courts of England by the Bank Group in the Deeds of Covenant and the relevant Restructuring Documents is valid and binding upon it and not subject to revocation in any proceedings taken in Kazakhstan.

(ii)     Subject to the Legal Reservations, any judgment obtained in relation to a Deed of Covenant or a Restructuring Document in the jurisdiction of the governing law of that Deed of Covenant or Restructuring Document will be recognised and enforced in Kazakhstan and, where the Deed of Covenant or the relevant Restructuring Document is expressed to be governed by English law, also England.

(g)     **No Default under Terms of Restructuring Documents and Restructuring Plan**

(i)     No Default is continuing or is reasonably likely to result from the entry into, the performance of, or any transaction contemplated by, any Restructuring Document.

(ii)     No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Subsidiaries (including, without limitation, under the Restructuring Documents or the Restructuring Plan) or to which its (or any of its Subsidiaries') assets are subject which has or is reasonably likely to have a Material Adverse Effect.

(h)     **No Misleading Information**

Save as otherwise disclosed in the Information Memorandum:

(i)     the Information Memorandum contains all information with respect to the Group, the Restructuring, the Deeds of Covenant and the Restructuring Documents which is material in the context of the Restructuring (including, without limitation, all information required by applicable laws of Kazakhstan and details all material intra-group debt (if any));

(ii)     any factual information contained in the Information Memorandum was true and accurate in all material respects as at the date of the relevant report or document containing the information or (as the case may be) as at the date the information is expressed to be given;

(iii)    the Base Case Model has been prepared in accordance with the FMSA Methodology, and the financial projections contained in the Base Case Model have been prepared on the basis of recent historical information;

(iv)    both the Original Business Plan and the Base Case Model have been approved by the board of directors of the Bank; and

(v)    no event or circumstance has occurred or arisen and no information has been omitted from the Information Memorandum and no information has been given or withheld that results in the information, opinions, intentions, forecasts or projections contained in the Information Memorandum being untrue or misleading in any material respect.

(i)    **Accuracy of Financial Statements**

(i)    The Unaudited Interim Financial Statements were prepared in accordance with International Financial Reporting Standard IAS 34, Interim Financial Reporting.

(ii)    Save as disclosed in the Information Memorandum, there has been no material adverse change in its assets, business operations, property, prospects or condition (financial or otherwise) (or the assets, business, operations, property, prospects or consolidated condition (financial or otherwise) of the Group) since 30 September 2009.

(j)    ***Pari Passu* Ranking**

Its payment obligations under the Deeds of Covenant and the Restructuring Documents (save for those which are expressed to be subordinated or limited in recourse) rank at least *pari passu* with the claims of all its other unsubordinated and unsecured creditors, except for obligations mandatorily preferred by relevant law and which applies to companies generally.

(k)    **No Proceedings Pending or Threatened**

No litigation, arbitration, administrative proceedings or investigations of, or before, any court, arbitral body or agency which, if adversely determined, are reasonably likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started or threatened against it or any of its Subsidiaries save as expressly disclosed in the Information Memorandum and, save as so disclosed at the date of the Information Memorandum, any disputes between the Bank Group and a Restructuring Creditor in connection with the admission and adjudication of Claims in connection with the Restructuring.

(l)    **No Breach of Money Laundering, Corruption, Anti-Terrorist, Employment or other Laws**

Save as disclosed in the Information Memorandum:

(i)    It has not (and none of its Subsidiaries has) breached any law or regulation which breach has or is reasonably likely to have a Material Adverse Effect.

(ii)    No labour disputes are current or, to the best of its knowledge and belief (having made due and careful enquiry), threatened against any member of the Group which have or are reasonably likely to have a Material Adverse Effect.

(iii)    It has not (and none of its Subsidiaries has) engaged in, nor authorised any person acting on its behalf to engaged in:

(A)    Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices in connection with their respective business and operations,

including the procurement or the execution of any contract for goods or works relating to their respective business;

(B)   Obstructive Practices;

(C)   Money Laundering, or breached any applicable law relating to Money Laundering; or

(D)   the Financing of Terrorism.

(m)   **No Sovereign Immunity**

(i)   The execution by it of the Deeds of Covenant and each Restructuring Document to which it is a party constitutes, and its exercise of its rights and performance of its obligations thereunder will constitute, private and commercial acts done and performed for private and commercial purposes.

(ii)   It is capable of being sued in its own right and does not, nor do its assets generally, enjoy immunity from suit, execution, attachment or other legal process in any jurisdiction.

(n)   **No Winding Up**

Save for the Restructuring, or as described in the Information Memorandum, no:

(i)   corporate action, legal proceeding or other procedure or step described in paragraph (e) (*Insolvency*) of condition 11 (*Events of Default*) of Annex 1 *(Terms and Conditions of the Senior Dollar Notes)* of Schedule 9 (*Terms and Conditions of the New Notes and RCTFF*); or

(ii)   creditors' process described in paragraph (f) (*Creditors' Process*) of condition 11 (*Events of Default*) of Annex 1 *(Terms and Conditions of the Senior Dollar Notes)* of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*),

has been taken or, to the knowledge of the Bank, threatened in relation to the Bank or any Material Subsidiary; and none of the circumstances described in sub-paragraphs (A), (B) or (C) of paragraph (v) (*Insolvency*) of condition 11 (*Events of Default*) of Annex 1 (*Terms and Conditions of the Senior Dollar Notes*) of Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*) applies to the Bank or any Material Subsidiary.

(o)   **Share Capital and no Security**

(i)   There are no agreements in force which provide for the issue or allotment of, or grant to any person of the right to call for the issue or allotment of, any share or loan capital of any member of the Group (including any option or right of pre-emption or conversion) or which restrict or prohibit the issue of any securities save as contemplated by the Information Memorandum, the Restructuring Documents and/or Restructuring Plan.

(ii)   The Bank's share capital details as set out in the Information Memorandum are correct and up to date as at the date of the Information Memorandum.

(iii)   Save as disclosed in the Information Memorandum, or in any supplement thereto or in a public announcement by the Bank made after the date of the Information Memorandum, the Bank has no Subsidiaries other than TuranAlem Finance, Temir Capital B.V. (Netherlands), TuranAlem Finance Russia, BTA Ipoteka, BTA Insurance, BTA Zhizn, BTA Securities, JSC Subsidiary of JSC BTA Insurance Company London-Almaty, BTA Bank Belarus, BTA Zabota, BTA Finance Luxembourg, First Kazakhstan Securitisation Company (Netherlands), Second

Kazakhstan Securitisation Company (Netherlands) and BTA Pension Fund BTA Kazakhstan and JSC "Organisation realising investment management of pension assets "Zhetysu".

(iv)     The shares to be issued to, or for the benefit of, the Restructuring Creditors and to be placed in the GDR Programme are or will be, when issued, properly registered, fully paid up and not subject to any Security.

(v)      No Security other than a Permitted Security exists over all or any of the present or future assets of any member of the Group to secure any Financial Indebtedness save as disclosed to the contrary in the Information Memorandum.

(p)    **No Withholding Tax on Payments to be made to the Restructuring Creditors**

The Bank is not required to make any deduction for or on account of Tax from any payment it may make under any Deed of Covenant or Restructuring Document other than in respect of withholding tax on interest payments under the RCTFF and on dividends on the Shares.

(q)    **No Filing or Stamp Taxes**

Under the laws of its Relevant Jurisdiction, it is not necessary that the Deeds of Covenant or the Restructuring Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Deeds of Covenant or the Restructuring Documents or the transactions contemplated by the Deeds of Covenant or the Restructuring Documents except for the approval of the Restructuring Plan by the Court and the decision of the Court on termination of the Restructuring.

(r)    **Taxation and Arm's Length Basis of Restructuring Transactions**

(i)      It is not (and none of its Subsidiaries is) overdue in the filing of any Tax returns and it is not (and none of its Subsidiaries is) overdue in the payment of any amount in respect of Tax of U.S.$1,000,000 (or its equivalent in any other currency) or more.

(ii)     No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Subsidiaries) with respect to Taxes which have or are reasonably likely to have a Material Adverse Effect.

(iii)    It is a resident for Tax purposes only in the jurisdiction of its incorporation.

(iv)     Accumulated and other losses of the Bank and its Subsidiaries that are tax residents of Kazakhstan immediately prior to the Restructuring Date will be retained thereafter and will be available for set-off against future trading gains for 10 years after such losses were incurred.

(v)      Income from cancellation by the creditor of liabilities included in the list of restructured assets and liabilities in the Restructuring Plan approved by the court is excluded from the taxable income of the Group under the laws of Kazakhstan.

(vi)     Each transaction entered into by each member of the Group pursuant to the Restructuring have been entered into on arm's length (or better) terms and for full market value.

(s)    **Good Title to Assets**

(i)      Save as disclosed in the Information Memorandum, it and each of its Subsidiaries has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently

conducted save to the extent that failure so to do does not have and is not reasonably likely to have a Material Adverse Effect.

(ii)    The Bank (and no other member of the Group) is the beneficial owner of the Recovery Assets.

(t)    **No Adverse Consequences**

(i)    It is not necessary under the laws of its Relevant Jurisdictions:

(A)    in order to enable the New Notes Trustee or the Depositary to enforce its rights under any Restructuring Document; or

(B)    by reason of the execution of any Restructuring Document or the performance by it of its obligations under any Restructuring Document,

that the New Notes Trustee or Depositary should be licensed, qualified or otherwise entitled to carry on business in any of its Relevant Jurisdictions.

(ii)    None of the New Notes Trustees or the Depositary is or will be deemed to be resident, domiciled or carrying on business in its Relevant Jurisdictions by reason only of the execution, performance and/or enforcement of any Restructuring Document.

(u)    **Effectiveness/Validity of Acts**

(i)    The mandatory issuance of shares in the Bank to Samruk-Kazyna in February 2009 and the subsequent reallocation of the shares in the Bank to Samruk-Kazyna by the FMSA were legal, valid and binding acts under the law of Kazakhstan.

(ii)    The actions taken by the FMSA with respect to the Bank from and including the mandatory issuance of shares in the Bank to Samruk-Kazyna in February 2009 to and including the Restructuring Date and all subsequent actions to be taken by the FMSA as contemplated by this Information Memorandum are, or will be, legal, valid and binding acts under Kazakhstan's law.

(iii)    The Restructuring has been recognised in Kazakhstan, the United States, the United Kingdom and Ukraine.

(iv)    The New Charter as in effect on the Restructuring Date is legal, valid and binding under Kazakhstan's law.

Any certificate signed by two officers of the Bank and delivered to the New Notes Trustee in connection with the Restructuring Documents shall be deemed to be a representation and warranty by the Bank to the Restructuring Creditors as to the matters covered thereby.

**SCHEDULE 11 – COVENANTS OF THE BANK**

1.       **Financial and other information covenants**

So long as any amount is outstanding under the Senior Notes and the OID Notes (together, in this Schedule 11, the "**Senior Bonds**"), the Bank shall:

(a)       *Financial Statements*:  send to the New Notes Trustee and the Depositary at the time of their issue and, in any event:

(i)       (in the case of its audited annual consolidated and unconsolidated financial statements and auditor's report) within 150 days of the end of each Financial Year;

(ii)       (in the case of its half-yearly reviewed consolidated and unconsolidated financial statements and auditor's review opinion), within 120 days after the end of each half year; and

(iii)       (in the case of its quarterly consolidated and unconsolidated financial statements), within 45 days after the end of each quarter,

such number of copies in English of such financial statements as the New Notes Trustee or the Depositary may request, in each case prepared in accordance with FMSA Methodology, accompanied by the Relevant Information and certified by the Chairman of the Management Board as giving a true and fair view of (in the case of annual financial statements for any Financial Year), or fairly representing (in other cases), its financial condition and operations as at the date at which those financial statements were drawn up;

For the purpose of this Schedule 11:

"**Relevant Information**" means:

(a)       in the case of each set of annual financial statements, an auditor's report;

(b)       in the case of each set of semi-annual financial statements, an auditor's review opinion;

(c)       in the case of each set of annual financial statements and quarterly financial statements, a balance sheet, profit and loss account and cashflow statement;

(d)       in the case of each set of quarterly financial statements, a cashflow forecast in respect of the Group relating to the three-month period commencing at the end of the relevant financial quarter;

(e)       in the case of each set of annual and half-yearly financial statements, the following:

(i)       a statement by the directors of the Bank comparing actual performance for the period to which the financial statements relate to (x) the projected performance for that period set out in the Budget and (y) the actual performance for the corresponding period in the preceding Financial Year of the Group;

(ii)       a management discussion and analysis, including a discussion of results of operations, financial condition, liquidity and capital resources, segment analysis (detailing SME, corporate and retail business), asset recovery efforts and developments, and an overview of the Kazakhstan banking industry;

(iii)    appropriate footnotes and asset/liability analysis (including loans and advances to customers, economic sector and customer concentrations, investment securities, geographical risk, currency risk, liquidity risk, interest rate risk, derivatives positions, Related Party transactions, as well as segment analysis (detailing SME, corporate and retail business)); and

(iv)    a description of all material recent developments, Related Party transactions and material non-ordinary course transactions as well as any changes in senior management.

(b)    *Regulatory Accounts*:  send to the New Notes Trustee and the Depositary:

(i)    an "**Agreed Upon Procedures**" ("**AUP**") report addressing the accuracy of numbers found in the regulatory return "form 700H" and "Report on Prudential Norm Fulfilment" (including all appendices), performing procedures to agree values and calculations, where possible, back to audited financial statements; and

(ii)    an AUP report, addressing covenant compliance, performing procedures on adherence to each of the financial covenants by reference, where possible, to audited financial statements,

to be provided together with each set of annual financial statements delivered under paragraph (a)(i) and (ii) above;

(c)    *Compliance Certificate*:  send to the New Notes Trustee with each set of its annual and semi-annual consolidated financial statements and quarterly consolidated and unconsolidated financial statements, and at any other time within 10 days (or such longer period as the New Notes Trustee shall determine) of any request by a New Notes Trustee, a Compliance Certificate signed by the Chairman of the Management Board including confirmations that (having made all reasonable enquiries and to the best of his knowledge, information and belief) as at a date not more than five days prior to the date of the Compliance Certificate:

(i)    no Default or other breach of the New Notes Trust Deed has occurred, or is continuing, since the date of the last Compliance Certificate;

(ii)    based on computations to be included in the Compliance Certificate calculated (where appropriate) in accordance with FMSA rules, it is in compliance with all its financial covenants under the Restructuring Documents;

(iii)    no material litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have been started or threatened against it which would involve a liability or a potential or alleged liability exceeding U.S.$10,000,000 (or its equivalent in other currencies); and

(iv)    no other material formal regulatory disputes or other breaches of regulation are outstanding with respect to the Bank,

or giving details of any such instances of non-compliance (to the extent in the case of (iii) and (iv) that it does not breach any applicable confidentiality restrictions) or, in the Bank's reasonable determination, any such disclosure would be materially prejudicial to its position and (if any Default or other

breach of the New Notes Trust Deed has occurred, or is continuing) what action the Bank is taking or proposes to take with respect thereto;

(d)   *Notification of Default*:   promptly on becoming aware thereof inform the New Notes Trustee of any Default (and the steps, if any, being taken to remedy it) and, upon receipt of a written request to that effect from the New Notes Trustee, confirm to the New Notes Trustee that, save as previously notified to the New Notes Trustee or as notified in such confirmation, no Default has occurred;

(e)   *Notification of Non-Payment*:   use its reasonable endeavours to procure that the Principal Paying Agent notifies the New Notes Trustee forthwith in the event that it does not, on or before the due date for payment in respect of the Senior Bonds or any of them, receive unconditionally the full amount in the relevant currency of the monies payable on such due date on all such Senior Bonds;

(f)   *Notice of Late Payment*:   forthwith upon request by the New Notes Trustee give notice to the "**Holders**" (as defined in the Terms and Conditions of the relevant New Notes) of the Senior Bonds of any unconditional payment to the Principal Paying Agent or the New Notes Trustee of any sum due in respect of the Senior Bonds made after the due date for such payment;

(g)   *Change in Agents*:   give at least 14 days' prior notice to the Holders of the Senior Bonds of any future appointment, resignation or removal of any agent or of any change by any agent of its specified office and not make any such appointment or removal without the New Notes Trustee's written approval;

(h)   *Notes Held by the Bank, etc.*:   send to the New Notes Trustee as soon as practicable after being so requested by the New Notes Trustee a certificate of the Bank signed by the Chairman of the Management Board of the Bank stating the principal amount of Senior Bonds held at the date of such certificate by or on behalf of the Bank or any of its Subsidiaries;

(i)   *Further Information*:   promptly upon request, so far as permitted by applicable law, give the New Notes Trustee such other information as it reasonably requires:

(i)   regarding the financial condition, business and operations of any member of the Group; and

(ii)   to perform any of its functions and discharge the duties, trusts, powers, authorities and discretions vested in it under any of the Senior Note Restructuring Documents or by operation of law;

(j)   *Miscellaneous Information*:   promptly upon request of the New Notes Trustee send to the New Notes Trustee (in sufficient copies for all the relevant Holders of Senior Bonds, if the New Notes Trustee so requests):

(i)   so far as permitted by applicable law, a report with details of any Related Party Transaction described in paragraph (o)(ii)(A) of Clause 3 of this Schedule 11 (*Covenants of the Bank*);

(ii)   a report with details of any Default under any Senior Bond Restructuring Document (other than any cross-default which comprises an Event of Default as contemplated by paragraph (iii) (*Cross Default*) of condition 11 of each of the Terms and Conditions

of the Senior Bonds as set out at Schedule 9 (*Terms and Conditions of the New Notes and the RCTFF*));

(iii)    so far as permitted by applicable law and to the extent it does not breach any applicable confidentiality restrictions, details of any change in senior management and/or the auditors of the Bank and the reasons for such change;

(iv)    a copy of any report produced by the Independent Auditor; and

(v)    a report with details of any material corporate restructuring undertaken by any member(s) of the Group that is not in the ordinary course of business of the Group;

(k)    *Change in Accounting Principles or Practices*:  notify the New Notes Trustee if there has been a change in the FMSA Methodology or the accounting practices or any change to the last day of its Financial Year, and procure that its Auditors deliver to the New Notes Trustee:

(i)    a description of any change necessary for a comparison of the financial statements delivered by the Bank pursuant to paragraph (a) above against FMSA Methodology or accounting practices upon which the Base Case Model and Financial Statements were prepared; and

(ii)    sufficient information, in form and substance as may be reasonably required by the New Notes Trustee, to enable the Holders of the Senior Bonds to determine whether the financial covenants have been complied with and to make an accurate comparison between the financial position indicated in those financial statements and the Base Case Model and Financial Statements;

(l)    *Notices to be circulated to Holders*:  send to the New Notes Trustee for approval in English and at least seven days (or such longer period as the New Notes Trustee may determine) prior to publication the form of each notice to be given to Holders of New Notes in general and, once given, two copies of each such notice, such notice to be in a form approved by the New Notes Trustee.  For the avoidance of doubt, this clause shall not apply to any Relevant Information;

(m)    *Bank Website*:  make available on its website all non-confidential information delivered by it pursuant to this Clause 1 of Schedule 11 as soon as possible and, in any event, within five Business Days of sending such information to the New Notes Trustee; and

(n)    *Language*:  ensure that all information provided by it or on its behalf in connection with this Clause 1 of Schedule 11 is provided in the English language or, if that is not possible, provided together with a certified English translation.

**2.      Financial Covenants**

2.1.    **Financial Covenant Definitions**

For the purpose of the financial covenants in Clause 2.2 below, the following terms have the following meanings:

| Definition | Meaning |
| --- | --- |
| "**Adjusted Deposits**" | means the Bank's "Total Deposits from Customers" (which shall, for the avoidance of doubt, not include deposits which constitute Government Funding deposits) and "Correspondent Accounts and deposits of banks". |
| "**Adjusted Liabilities**" | means the Bank's (i) total liabilities (calculated by reference to the most recent financial statements of the Bank prepared in accordance with FMSA Methodology) excluding equity, minus (ii) Adjusted Deposits. |
| "**Aggregate Foreign Currency Open Position**" | means the aggregate of the Bank's Foreign Currency Open Positions in each Foreign Currency. |
| "**Capital**" | means the sum of the Bank's Tier 1 Capital and Tier 2 Capital, as such terms are defined in, calculated in accordance with, and subject to the limits, restrictions and deductions set forth in the FMSA Guidance. |
| "**Cash and Cash Equivalents**" | means cash in hand and Cash Equivalent Investments which are unrestricted and available for immediate withdrawal (excluding any amounts held for mandatory reserve requirements). |
| "**Excluded Related Party**" | means a person which is a Related Party solely by virtue of its relationship with or to Samruk-Kazyna. |
| "**Exposure**" | means, at any relevant time of calculation, with respect to one or more counterparties: |
| | (a)    the aggregate principal or nominal amount owed to the Bank, whether direct or contingent, by a Single Party in respect of money borrowed, equity or debt raised, guarantees, letters of credit or debt instruments issued or confirmed and other off-balance sheet engagements; less |
| | (b)    any amount referred to in paragraph (a) above which is fully secured by rights of off-set against: (i) cash; and/or (ii) Adjusted Deposits; all of the foregoing forms of security being in equivalent amounts and comparable maturities placed with the Bank. |
| "**FMSA Guidance**" | means "Instruction about norm values and calculation methodology of prudential norms for second tier banks" approved by Resolution of the Board of the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Market and Financial Organisations" dated 30 September 2005, #358, as amended, supplemented or updated from time to time. |

| Definition | Meaning |
| --- | --- |
| "**Foreign Currency**" | means any currency other than Tenge. |
| "**Foreign Currency Assets**" | means all assets of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Kazakhstan Tenge but in an amount determined by reference to any Foreign Currency index. |
| "**Foreign Currency Liabilities**" | means all liabilities of the Bank which are (i) denominated in Foreign Currency, (ii) payable by the terms of the agreement or other constitutive document providing for those assets or at the option of the payee in a Foreign Currency, or (iii) payable in Tenge but in an amount determined by reference to a Foreign Currency index. |
| "**Foreign Currency Open Positions**" | means, with respect to any Foreign Currency, the difference between Foreign Currency Assets and Foreign Currency Liabilities in that currency (whether that position is short or long), net of hedges through any foreign exchange cover, hedging facility or other similar arrangement. |
| "**Gross Loans**" | means the total principal amount of all loan facilities extended by the Bank to its customers (other than banks) in the ordinary course of business, before the deduction of any Loan Loss Reserves. |
| "**Loan Loss Reserves**" | means accumulated reserves required to be made under IFRS against the Gross Loans. |
| "**Net Loans**" | means the aggregate amount of all Gross Loans less Loan Loss Reserves. |
| "**Net Non-Performing Loans**" | means the aggregate amount of all Non-Performing Loans less the amount of aggregate Loan Loss Reserves. |
| "**New Net Loans**" | means Net Loans originated after the Restructuring Date (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date). |
| "**New Net Non-Performing Loans**" | means Non-Performing Loans originated after the Restructuring Date. |
| "**Non-Performing Loans or NPLs**" | means: |
| | (a) Gross Loans in respect of which any amounts have been outstanding for a period of more than 90 days after the relevant due dates provided for under the agreements providing for such Gross Loans; |
| | (b) Gross Loans restructured more than three times due to the applicable borrowers' inability to meet their payment obligations to the Bank provided for under the agreements providing for such Gross Loans; and |

| Definition | Meaning |
|---|---|
| | (c) Gross Loans which in the reasonable opinion of the Bank's management, with the passage of time or otherwise, may qualify as Non-Performing Loans under paragraph (a) or (b) above. |
| **"Operating Expenses"** | means the aggregate of: |
| | (a) staff costs (including salaries, bonuses, benefits in-kind and other staff payments and emoluments as well as related pension, insurance and other social contributions incurred by the Bank during the relevant period); |
| | (b) fees for professional services paid and/or incurred by the Bank during the relevant period (including any legal, audit, registrar, security and consultancy services); |
| | (c) depreciation and amortisation of fixed tangible and intangible assets and fixed asset maintenance costs (other than capitalised expenses) incurred by the Bank during the relevant period; |
| | (d) taxes on operating activities, income or property (other than corporate profit taxes) paid and/or incurred by the Bank during the relevant period; |
| | (e) travel, advertisement, representation, stationary, mail and telecommunication costs and expenses as well as cost of, and expenses on, the supplies of other goods and services (other than fixed assets, the cost of which has been capitalised) incurred by the Bank during the relevant period; and |
| | (f) any other costs and expenses incurred by the Bank during the relevant period which are attributable to the Group's operational activity and not related to the performance of any specific asset or asset class. |
| **"Operating Income"** | means: |
| | (a) gross interest income, gross fees and commissions income, dividend income, gross trading income and gains (including unrealised gains on holdings of securities and foreign exchange) and any other gross income from ordinary banking and financial activities of the Bank, less |
| | (b) interest expenses, fees and commissions expenses, trading losses (including unrealised losses through the diminution in value of holdings of securities). |
| **"Overhead Ratio"** | means the ratio of Operating Expenses to Operating Income. |
| **"Related Party Exposure"** | means the aggregate consolidated Exposure to all Related Parties excluding Excluded Related Parties (other than Excluded Related Parties). |

| Definition | Meaning |
|---|---|
| "**Risk Weighted Assets**" | means the aggregate of the Group's balance sheet assets and off-balance sheet engagements, weighted for credit risk in accordance with the FMSA Guidance. |
| "**Single Party**" | means any counterparty and all connected parties of such counterparty, if any. |
| "**Single Party Exposure**" | means the aggregate, consolidated Exposure to any Single Party (including any interbank exposure). |
| "**Tier 1 Capital**" | means the Bank's Tier 1 Capital as such term is defined in the FMSA Guidance. |
| "**Tier 2 Capital**" | means the Bank's Tier 2 Capital as such term is defined in the FMSA Guidance. |
| "**Total Assets**" | means, at any time, the total book value of the Bank's assets determined in accordance with the Accounting Principles. |
| "**Total Liabilities**" | means, at any time, the total liabilities of the Bank determined in accordance with FMSA Methodology. |

2.2.    **Financial Covenants**

The Bank shall:

(a)    at all times:

   (i)    maintain a ratio of Capital to Risk Weighted Assets expressed as a percentage that is in compliance with the FMSA Guidance prevailing at the date of the Term Sheet, that is, not less than 10 per cent.; and

   (ii)    comply with all prudential supervision and capital adequacy ratios as may from time to time be required under legislation, regulations, norms and guidelines in Kazakhstan, including, but not limited to, those regulations, norms and guidelines of the National Bank of Kazakhstan and/or the FMSA;

(b)    at all times from (and including) the date falling 180 days after the Restructuring Date, comply with the liquidity ratios required by the FMSA Guidance prevailing at the date of the Term Sheet being:

   (i)    *"Coefficient of Term Liquidity k4-1"* shall be no less than 1.0;

   (ii)    *"Coefficient of Term Liquidity k4-2"* shall be no less than 0.9; and

   (iii)    *"Coefficient of Term Liquidity k4-3"* shall be no less than 0.8;

(c)    not incur or allow to remain outstanding any Financial Indebtedness if (after taking into account such Financial Indebtedness) the ratio (expressed as a percentage) of Adjusted Liabilities to Total Assets is more than:

   (i)    70 per cent. (for year 2010);

   (ii)    67 per cent. (for year 2011);

   (iii)    64 per cent. (for year 2012);

   (iv)    56 per cent. (for year 2013); and

(v)     45 per cent. (for the year 2014 and at all times thereafter);

(d)     ensure that the ratio (expressed as a percentage) of New Net Non-Performing Loans to New Net Loans shall not exceed 20 per cent. as of 31 December 2013 and at all times thereafter;

(e)     at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) is in compliance with the FMSA Guidance prevailing at the date of the Term Sheet and specifically, that the ratio of Single Party Exposure to Capital should not exceed:

(i)     25 per cent. in relation to any Single Party; and

(ii)     200 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital (*provided that* for each amount of Single Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged a new amount of Single Party Exposure in the same amount may be incurred but *provided always that* at no time may the ratio of Single Party Exposure to Capital exceed 300 per cent. in relation to the total of all Single Parties in relation to which the Bank's Single Party Exposure exceeds 10 per cent. of Capital);

(f)     at all times, ensure that any new lending (which, for the avoidance of doubt, shall not include any rescheduling of, or capitalisation of interest on, loans originally made prior to the Restructuring Date) does not result in a Related Party Exposure, save that:

(i)     personal loans made on arm's length terms under existing product lines may be made to employees of the Group;

(ii)     personal loans not on arm's length terms may be made to employees of the Bank and Subsidiaries of the Bank incorporated in Kazakhstan up to an individual limit of U.S.$1,000,000 per employee and an aggregate limit at any time of U.S.$20,000,000; and

(iii)     the Bank may incur Related Party Exposures of no greater than 15 per cent. of Capital in aggregate to the following entities:   BTA Belarus, BTA Armenia, BTA Georgia, BTA Kazan, Russia, BTA Ukraine and Subsidiary and Associate Companies, BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company London-Almaty and JSC BTA Orix Leasing (*provided that* for each amount of Related Party Exposure which was outstanding as of the Restructuring Date which is repaid or otherwise discharged (other than by way of write-off) a new amount of Related Party Exposure in the same amount may be incurred but *provided always that* at no time may the ratio of Related Party Exposure to Capital exceed 50 per cent. in aggregate);

(g)     at all times ensure that Exposure to Samruk-Kazyna is limited to KZT677 billion, excluding accrued interest;

(h)     at all times from (and including) the date falling 180 days after the Restructuring Date, ensure that the ratio (expressed as a percentage) of the Aggregate Foreign Currency Open Position to Capital is compliant with the FMSA Guidance prevailing at the date of the Term Sheet;

(i)     ensure that the ratio (expressed as a percentage) of Adjusted Deposits to Adjusted Liabilities shall be greater than the following:

| Relevant Period | Ratio |
|---|---|
| From the Restructuring Date to (and including) 31 December 2010 | 43% |
| From 1 January 2011 to (and including) 31 December 2011 | 57% |
| From 1 January 2012 to (and including) 31 December 2012 | 78% |
| From 1 January 2013 to (and including) 31 December 2013 | 106% |
| From 1 December 2014 and at all times thereafter | 150% |

**3.     Other covenants**

The Bank shall:

(a)     *Authorisations; maintenance of any necessary regulatory and other approvals*: promptly (and shall procure that each member of the Group shall promptly) obtain, comply with and do all that is necessary to maintain in full force and effect and supply certified copies to the New Notes Trustee of, any Authorisation required under any law or regulation of a Relevant Jurisdiction to enable it to (i) perform its obligations under the Senior Bonds; (ii) ensure the legality, validity, enforceability or admissibility in evidence of any Restructuring Document; and (iii) carry on its business except in any such case where failure to do so is not reasonably likely to have a Material Adverse Effect;

(b)     *Compliance with laws and other regulatory requirements*:

(i)     comply, and shall ensure that each member of the Group will comply, in all respects with all laws and regulations to which it may be subject if failure so to comply has or is reasonably likely to have a Material Adverse Effect;

(ii)     not (and ensure that no member of the Group will), and shall not authorise any person acting on its behalf to, engage in any: (A) Corrupt Practices, Fraudulent Practices, Collusive Practices or Coercive Practices in connection with the Group's business and operations, including the procurement or the execution of any contract for goods or works relating to the Group's business; (B) Obstructive Practices; (C) Money Laundering, or act in breach of any law in any Relevant Jurisdiction relating to Money Laundering; or (D) the Financing of Terrorism, and the Bank shall institute, maintain and comply with internal procedures and controls following international best practice standards for the purpose of preventing any action in breach of the provisions of this paragraph (ii);

(iii)     inform the New Notes Trustee promptly if it should at any time obtain information in relation to any violation or potential violation of the provisions of paragraph (ii) above; and

(iv)     if the New Notes Trustee notifies the Bank of its concern that there has been a violation of any of the provisions of paragraph (ii) above, (A) co-operate in good faith with the New Notes Trustee and its representatives in determining whether such a violation has occurred; (B) respond promptly and in reasonable detail to any notice from the New Notes Trustee; and (C) furnish documentary support for such response upon request from the New Notes Trustee, and notwithstanding any other provision of the Senior Bonds, the Bank acknowledges that the New Notes Trustee may disclose to any competent national or international authority any information obtained by the New Notes Trustee in relation to any violation of any of the provisions of paragraph (ii) above;

(c)     *Taxation*: (i) pay and discharge (and ensure that each member of the Group will pay and discharge) all Taxes imposed upon it or its assets within the time period allowed

without incurring penalties unless and only to the extent that: (A) such payment is being contested in good faith and it will pay and discharge any such Taxes that are properly due and payable after having been finally determined or settled; and (B) adequate reserves are being maintained for those Taxes and the costs required to contest them pursuant to FMSA Methodology; and (ii) not permit any member of the Group to change its residence for Tax purposes, except that Subsidiaries of the Bank may change their residence for Tax purposes where to do so does not and could not reasonably be expected to have a Material Adverse Effect;

(d)     *Compliance with the Restructuring Plan and Bank's Charter*:

    (i)     comply (and shall procure that each member of the Group will comply) in all respects with all provisions of the Restructuring Plan and its Business Plan, save where otherwise approved by a Qualified Majority, and with all provisions set out in the Bank's Charter (as amended in accordance with the Deeds of Undertaking);

    (ii)     subject to paragraph (q) (*listings*) below, not take any decision on the de-listing of the New Instruments without obtaining the approval of a Qualified Majority of the Board; and

    (iii)     not take any decision to approve any public offering of equity securities of the Bank,

save where required otherwise pursuant to the Bank's Charter (as amended in accordance with the Deeds of Undertaking with Supermajority Approval, or the mandatory provisions of applicable law including, but not limited to, a governmental order, final and non-appealable court order or arbitral decision);

(e)     *Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities*:

    (i)     not amend, or take any action with a view to amending, any provision of its Charter (as amended in accordance with the Deeds of Undertaking), except in the case of any amendment which (A) does not contravene or result in contravention of any provision of the Senior Notes and (B) has been approved by the requisite constituency of shareholders as set out under "*Share Distribution and Rights of Minority Shareholders – Shareholder/Board Approvals*";

    (ii)     not amend, or take any action with a view to amending, its authorised share capital, or repurchase (or permit any member of the Group to purchase) any of its issued shares in circumstances which would result in any reduction of its share capital up until the third anniversary of the Restructuring Date and, thereafter by more than 1 per cent. in aggregate in any year; and

    (iii)     not repurchase (or permit any member of the Group to purchase) any New Instrument *except*:

        (A)     in the open market or by a private agreement by BTA Pension Fund, BTA Zhizn, BTA Zabota, BTA Insurance and/or JSC Subsidiary of JSC BTA Insurance Company LondonAlmaty;

        (B)     in the ordinary course of business of the Bank in connection with any BTA/NBK Repo Transaction or other transaction between the Bank and one of its customers where such Bonds are to be used as collateral;

(C)      for cancellation immediately following purchase; or

(D)      as part of its treasury operations in the ordinary course of business by the Bank and/or JSC "BTA Securities" (and not cancelled) *provided that* the outstanding principal amount of Senior Bonds so purchased does not exceed U.S.$50 million at any time pursuant to this paragraph (D),

*provided further that* any Senior Bonds held by the Bank or any member of the Group shall cease to carry the right to attend and vote at a meeting of the bondholders in respect of any such Senior Bonds and will not be taken into account, *inter alia*, for purposes of determining the quorum for such meetings and modification and waiver of the terms and conditions thereof as set out in the New Notes Trust Deed;

(f)      *Tax treatment*: (i) use its reasonable endeavours to ensure that all payments can be made under the Senior Bonds without any Tax Deduction; and (ii) use its reasonable endeavours to ensure that no Tax liability shall be incurred by itself, its Subsidiaries or any Holder of the Senior Bonds with respect to any cancellation pursuant to the Restructuring of any Financial Indebtedness owing by it to holders of the Senior Bonds;

(g)      *Establishment of GDR programme*: establish a GDR programme in respect of the Bank's shares and procure the listing of such GDRs on an Approved Stock Exchange within six months of the date of issue of the Senior Bonds;

(h)      *Use of proceeds*: not (and the Bank shall ensure that no member of the Group will) use the proceeds of any Financial Indebtedness raised after the date of issue of the Senior Bonds for any purpose other than in accordance with the Business Plan or to repay any amount under the New Notes and the RCTFF outstanding after the date of issue of the Senior Bonds;

(i)      *Disposals*: not (and the Bank shall ensure that no member of the Group will) enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset other than a sale, lease, transfer or other disposal (i) on arm's length in its ordinary course of trade, (ii) made on normal commercial terms and at fair market value, (iii) for cash on arm's length terms of any surplus or obsolete or worn out assets not required for the efficient operation of the business, (iv) for the purpose of securitisation of those assets, (v) to which the New Notes Trustee has given its consent or (vi) for another asset which, in the reasonable opinion of the Bank, is comparable or superior as to type, value and quality, and *provided further that* in the case of sub-paragraphs (i), (ii) and (iv) where either (A) the total consideration for such disposal is greater than U.S.$15,000,000, at least 50 per cent. of the consideration consists of Cash or Cash Equivalent Investments or (B) the total consideration for such disposal is greater than U.S.$75,000,000, at least 75 per cent. of the consideration for such disposal consists of Cash or Cash Equivalent Investments;

(j)      *Joint ventures*: not (and the Bank shall ensure that no member of the Group will): (i) enter into, invest in or acquire (or agree to acquire) any shares, stocks, securities or other interest in any Joint Venture; or (ii) transfer any assets or lend to or guarantee or give an indemnity for or give Security for the obligations of a Joint Venture or maintain the solvency of or provide working capital to any Joint Venture (or agree to do any of the foregoing), other than an acquisition of (or agreement to acquire) any interest in a Joint Venture or transfer of assets (or agreement to transfer assets) to a Joint Venture or loan made to or guarantee given in respect of the obligations of a

Joint Venture if such transaction is a Permitted Acquisition or a Permitted Joint Venture;

(k) *Acquisitions and incorporation of subsidiaries*:  not (and the Bank shall ensure that no member of the Group will): (i) acquire a company or any shares or securities or a business or undertaking (or, in each case, any interest in any of them); or (ii) incorporate a company, other than an acquisition of a company, of shares, securities or a business or undertaking (or, in each case, any interest in any of them) or the incorporation of a company which is a Permitted Acquisition or a Permitted Transaction;

(l) *Merger*:  not (and the Bank shall ensure that no member of the Group will) enter into any amalgamation, demerger, merger, consolidation or corporate reconstruction, unless:

(i) (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of the Bank and subject always to the provisions in the New Notes Trust Deed relating to Change of Control):

(A) the entity (if other than the Bank) formed by or resulting from any such consolidation or merger shall be duly incorporated, organised and existing under the laws of the Republic of Kazakhstan and shall assume the performance and observance of all of the obligations and conditions under the Senior Bonds to be performed or observed by the Bank;

(B) the Bank or such successor, as the case may be, shall not immediately thereafter be in default (or would, with the giving of notice or lapse of time, or both, be in default) in relation to any of its obligations under the Senior Bonds;

(C) there has been delivered to the New Notes Trustee one or more opinion(s) of counsel acceptable to the New Notes Trustee (x) to the effect that holders of the Senior Bonds will not recognise income gain or loss for U.S. federal income tax purposes as a result of such amalgamation, demerger, merger, consolidation or corporate reconstruction and will be subject to U.S. federal income tax in the same amount and in the same manner and at the same times as would have been the case if such amalgamation, demerger, merger, consolidation or corporate reconstruction had not occurred, and (y) addressing such other matters as the New Notes Trustee may deem necessary; and

(D) the Financial Indebtedness of the Bank or such successor shall at the time of the relevant event be rated by at least one internationally recognised rating organisation and the New Notes Trustee has been advised by such organisation which shall then be rating such senior debt (or if more than two, by a majority of them) that the relevant event will not result in a downgrade of such rating organisation's or organisations' rating of the Senior Bonds or the senior debt of the Bank or such successor; or

(ii) in the case of any amalgamation, merger, consolidation or corporate reconstruction in respect of the Bank, if the entity or entities with which the Bank has amalgamated, merged, consolidated or entered into a corporate reconstruction had been acquired, such acquisition would have constituted a Permitted Acquisition;

(iii) in the case of any demerger or corporate reconstruction in respect of the Bank which entails the disposal of any shares or assets, such disposal would have been permitted in accordance with Clause (i) (*Disposals*); and

(iv) (in the case of any amalgamation, demerger, merger, consolidation or corporate reconstruction in respect of any of the Bank's Subsidiaries), the relevant transaction constitutes a Permitted Transaction within the meaning of paragraph (c) of that definition;

(m) *Change of business*:  procure that no substantial change is made to the general nature of the business of the Bank or the Group taken as a whole from that carried on by them at the date of issue of the Senior Bonds or as otherwise contemplated by the Business Plan;

(n) *Pari passu ranking*:  ensure that its payment obligations under the Senior Bonds rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application, and that its payment obligations under the Subordinated Notes rank as provided in the applicable terms and conditions of such Subordinated Notes;

(o) *Arm's length basis and related party transactions*:

(i) not (and the Bank shall ensure that no member of the Group will), directly or indirectly, conduct any business, enter into or permit to exist any transaction or series of related transactions (including, without limitation, the sale, transfer, purchase, assignment, lease, conveyance or exchange of any property or the rendering of any service) with any person (including, without limitation, any Related Party) except on arm's length terms and for fair market value, other than a Permitted Transaction, and *provided that*, where such transaction is with a Related Party, the Bank has complied with the provisions of paragraph (ii) below;

(ii) a transaction or series of related transactions between a member of the Group and a Related Party (other than an Excluded Related Party or lending by the Bank to Subsidiary and Associate Banks (BTA Bank Belarus, BTA Armenia, BTA Georgia, BTA Kazan, BTA Russia, BTA Ukraine and Subsidiary and Associate Companies BTA Securities, BTA Pension Fund, BTA Ipoteka, BTA Zhizn, BTA Zabota, BTA Insurance, JSC Subsidiary of JSC BTA Insurance Company LondonAlmaty and JSC BTA Orix Leasing within the limits set out in Clause 2 (*Financial Covenants*) of this Schedule 11 (*Covenants of the Bank*) or transactions in relation to the Recovery Assets in accordance with the terms and conditions of the Recovery Units):

(A) which involves aggregate payments or value of U.S.$5,000,000 (or its equivalent) or less shall only be permitted if the terms of such transaction or series of related transactions have been notified in writing to the New Notes Trustee and a simple majority (comprised of disinterested directors with respect to such transaction or series of related transactions) of the Board shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board; or

(B) which involves aggregate payments or value in excess of U.S.$5,000,000 (or its equivalent) shall only be permitted if the terms of such transaction or series of related transactions have been notified

in writing to the New Notes Trustee and a Qualified Majority shall have determined in good faith that the transaction or series of related transactions will be on arm's length terms (or better) and for full market value and have approved the relevant transaction or series of transactions, as evidenced by a resolution of the Board, and, where the aggregate payments or value exceed U.S.$75 million, shall have obtained a confirmation from an independent investment bank, accountancy firm or other consultant of recognised standing selected by the Bank and approved by the New Notes Trustee that such transaction or series of related transactions will be on arm's length terms (or better) and for full market value;

(p)  *Maintenance of proper books and records*:  keep, and procure that each of member of the Group keeps, (i) proper books of account and accounting records (including, for the avoidance of doubt, the annual and semi-annual financial statements and quarterly management accounts required pursuant to Clause 1 (*Financial and Other Covenants*) of this Schedule 11 (*Covenants of the Bank*) in accordance with applicable law; and (ii) so far as permitted by applicable law, allow the New Notes Trustee and anyone appointed by it to whom the Bank has no reasonable objection, access to its books of account at all reasonable times during normal business hours;

(q)  *Listing*:  use its reasonable endeavours to procure the admission of the Tenge New Notes on the KASE and the Non-Tenge New Notes to trading on an Approved Stock Exchange and to maintain the listing of such notes on such exchanges (including by making all disclosures required by such exchanges), but if it is unable to do so having used such endeavours or if the maintenance of such listings is agreed by the New Notes Trustee to be unduly onerous and the New Notes Trustee is satisfied that the interests of the Holders of the Non-Tenge New Notes would not be materially prejudiced thereby, the Bank shall use its reasonable endeavours to procure and maintain the listing on another stock exchange or market agreed with the New Notes Trustee;

(r)  *Insurance*:  maintain (and ensure that each member of the Group will maintain) at its own expense with reputable independent insurance companies or underwriters of good standing insurances on and in relation to its business and assets against those risks and to the extent as is usual for businesses carrying on the same or substantially similar business;

(s)  *Remuneration of senior management and service and management contracts*: (i) ensure that the remuneration of members of the Board and of the management board of the Bank, and of the board of directors and management board of each of its Subsidiaries, are in accordance with commercially reasonable standards; (ii) ensure that there is in place in respect of each member of the Group qualified management with appropriate skills; and (iii) not enter into a Management Contract with any person unless such contact has been specifically authorised by a Qualified Majority;

(t)  *Treasury transactions*:

(i)  not (and will procure that no members of the Group will) enter into any Treasury Transaction, other than:

(A)  spot and forward delivery foreign exchange contracts entered into in the ordinary course of business and not for speculative purposes; or

(B)  any Treasury Transaction entered into for the hedging of actual or projected real exposures arising in the ordinary course of trading

activities of a member of the Group and not for speculative purposes; and

(C)    any Treasury Transaction entered into in the ordinary course of the Bank's trading activities for speculative purposes, *provided that* the aggregate notional amount of contingent or actual liabilities of the Bank under any such Treasury Transactions does not exceed the greater of 10 per cent. of the Capital of the Bank or U.S.$350,000,000 at any time (by reference to, in the first Financial Year following the Restructuring Date, the opening balance sheet delivered as a Condition Precedent and, thereafter, its most recent audited annual financial statements delivered in accordance with paragraph (a) of Clause 1 (*Financial and Other Information Covenants*) of this Schedule 11 (*Covenants of the Bank*)); and

(ii)    ensure that all exchange rate and interest rate hedging arrangements required to protect its open currency positions in compliance with paragraph (h) of clause 2.2 (*Financial Covenants*) of this Schedule 11 (*Covenants of the Bank*) are implemented, documented under appropriate market standard documents with the NBK or with other counterparties with a credit rating of at least BBB-or the Development Bank of Kazakhstan provided it has a credit rating of at least BB+ (or to the extent there is no such counterparty, such other counterparty with a lower credit rating with Qualified Majority approval) by Standard & Poor's or an equivalent rating by Fitch or Moody's, and that such arrangements are legal, valid, binding and enforceable obligations of such counterparty;

(u)    *Limitations on payment of dividends and share redemption*:  not: (i) declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital) other than a Permitted Dividend; (ii) repay or distribute any dividend or share premium reserve; (iii) pay or allow any member of the Group to pay any management, advisory or other fee other than the SK Guarantee Fee) to or to the order of any of the Shareholders of the Bank; or (iv) other than in accordance with paragraph (e) (*Restrictions or amendments to the Bank's Charter or change in share capital on the repurchase of securities*), redeem, repurchase, retire or repay any of its share capital or resolve to do so;

(v)    *Corporate governance*:  comply with (and will procure that each member of the Group complies with) each of the corporate governance requirements set out in "*Description of the Share Capital of the Bank and Minority Shareholder Rights Corporate Governance Code*";

(w)    *Compliance Audit*:  procure that the Independent Auditor investigates annually (with the first such investigation occurring on or about the date falling six-months after the Restructuring Date), and promptly reports on to the audit committee chaired by a Creditor Director, the Bank's compliance with the New Corporate Governance Code and internal procedures and controls, all at the Bank's cost.  Any non-compliance identified in that report shall be remedied by the Bank within six months of the date of the report and shall be noted in the Bank's annual financial statements;

(x)    *Negative Pledge*:  not, and not permit any Material Subsidiary to, create or permit to subsist any Security (other than Permitted Security) upon the whole or upon the whole or any part of its present or future undertaking, assets or revenues (including uncalled capital) to secure any Financial Indebtedness or guarantee of Financial Indebtedness without (i) at the same time or prior thereto securing the Senior Notes

equally and rateably therewith or (ii) providing such other security for the Senior Notes as may be approved by an Extraordinary Resolution of Holders of the Senior Bonds or as the New Notes Trustee in its absolute discretion shall deem to be not materially less beneficial to Holders of the Senior Bonds;

(y)     *Auditors*:  at all time maintain as its auditor, a "Big Four" accounting firm;

(z)     *Government Funding*:  for so long as any of the New Notes (save for the Recovery Units) remain outstanding it shall use its reasonable efforts to remain eligible for participation in programmes sponsored by the government of Kazakhstan or its agencies for funding the commercial banking sector and to participate in such programmes to the extent such funding is available on reasonable commercial terms; and

(aa)    *Further Acts*:  so far as permitted by applicable law, do such further things, including but not limited to the execution of any further documents, as may be necessary in the opinion of the New Notes Trustee to give effect to the New Notes Trust Deed in respect of the Senior Bonds.

[For the purposes of the covenants contained in this Schedule 11, the completion of the acquisition of and/or merger with Ular Umit SPF JSC, Zhetysu OOIUPA JSC, Atlanta Police IC JSC and Titan Inkassatsia LLP by any member of the Group shall be permitted and such acquisitions and/or mergers shall under no circumstances constitute or trigger a breach of any of the covenants contained herein.][38]

---

[38]     Subject to further discussion with the Steering Committee.

**SCHEDULE 12 – CONDITIONS PRECEDENT TO THE RESTRUCTURING PLAN
BECOMING EFFECTIVE**

1.      **Pre-Euronoteholders' meeting conditions precedent**

Certain conditions precedent listed below need to be satisfied (in form and substance satisfactory to at least two-thirds in number of the Steering Committee) or waived by at least two-thirds in number of the Steering Committee before the first Euronoteholder meeting is held and made available for inspection by the Relevant Creditors:

(a)     The Original Business Plan;

(b)     The Base Case Model;

(c)     The KPMG Provisions Report released to Restructuring Creditors who request it subject to the receipt of executed non-reliance letters in the form agreed with the Steering Committee from the recipients of its report;

(d)     Report from Deloitte MCS Limited ("**Deloitte**") in relation to joint assessment with KPMG on loan loss provisioning relating to corporate loans released to Restructuring Creditors who request it subject to the receipt of executed reliance letters in the form agreed with the Steering Committee from the recipients of its report;

(e)     Report from White & Case Kazakhstan LLP as previously released to the Restructuring Creditors who request it subject to the receipt of executed reliance letters from the recipients of its report;

(f)     Report(s) from PricewaterhouseCoopers ("**PwC**") and Lovells LLP ("**Lovells**") in relation to potential claims and recoveries as previously released to the Restructuring Creditors who request it subject to the receipt of executed hold harmless letters in the form agreed with the Steering Committee from the recipients of such reports;

(g)     Memorandum from White & Case setting out the position regarding recognition of the Restructuring Plan in the Material Jurisdictions being, Russia, Cyprus, United States, United Kingdom, Luxembourg, Netherlands, Seychelles, U.S. Virgin Islands and Kazakhstan;

(h)     Documentation in relation to the appointment of (i) the Supervisor and (ii) the Adjudicator;

(i)     Indemnities (from the Bank) to the New Notes Trustees, Supervisor and Adjudicator;

(j)     Execution to the extent necessary by all parties (other than Restructuring Creditors) of the Major Restructuring Documents;

(k)     Certified copies of the NBK Agreement and the SK Guarantee;

(l)     At least two-thirds in number of the Steering Committee being satisfied that all relevant listings of the New Notes, Shares and GDRs including on KASE and the Luxembourg Stock Exchange can be effected and, where appropriate, ratings be obtained and such relevant instruments are clearable through Euroclear/Clearstream/DTC (assuming for these purposes that the Restructuring Date had occurred);

(m)     Confirmation, payment instructions or other evidence of payment of all fees, costs and expenses then due from the Bank to the Steering Committee including the fees and expenses of the Steering Committee's advisers then due under the relevant appointment letters and any fees and expenses of independent third parties appointed to assist in connection with the Restructuring which are then due;

(n)   Corporate documentation (constitutional documents/relevant board resolutions/shareholder resolutions/specimen signatures/certificates) of the Bank Group has been provided to Baker & McKenzie (in relation to its legal opinion);

(o)   Confirmation from the FMSA (acceptable to the Steering Committee) that it supports the Restructuring and that it will treat the Bank no less favourably than other second-tier banks in Kazakhstan;

(p)   Confirmation from the NBK acceptable to the Steering Committee that it shall treat the Bank no less favourably than other second-tier banks in Kazakhstan and will waive any outstanding breaches under the Cooperation Agreement;

(q)   Irrevocable undertakings from BTA Finance Luxembourg that it will cast its vote at the Claimants' Meeting in favour of the Restructuring Plan;

(r)   Comfort letter from the Bank's auditors addressed to the Bank in relation to certain financial information in the Information Memorandum;

(s)   Evidence of any necessary regulatory and other approvals; and

(t)   No material adverse change in the business operations, property, condition (financial or otherwise), indebtedness or prospects of the Bank or in the international financial or capital markets compared to that envisaged by the Base Case Model or any relevant domestic financial or capital market (including devaluation of the Kazakhstan Tenge) or in the regulatory treatment as applied to the Bank.

2.   **Conditions precedent to the Restructuring becoming effective**

Conditions precedent to the Restructuring becoming effective will include the receipt by the Steering Committee of the documents and other evidence set out below, which are to be in form and substance satisfactory to at least two-thirds in number of the Steering Committee:

(a)   Following the date of the Term Sheet, no settlement of debts by any member of the Bank Group directly with the Relevant Creditors (whether by way of payment, voluntary set-off by a member of the Bank Group or otherwise), other than by means of the Restructuring and payments passed through by a member of the Bank Group to Restructuring Creditors in respect of Self-Liquidating Trade Finance Transactions.

(b)   All approvals required under the laws of Kazakhstan (including from the Claimants' Meeting, the Court, the FMSA and Samruk Kazyna) for the Deeds of Covenant and the Restructuring Documents to come into effect and be binding on the Bank Group and all Relevant Creditors and for the members of the Bank Group to be able to perform their obligations in the Restructuring Plan, the Deeds of Covenant and the Restructuring Documents.

(c)   Documentation in relation to the appointment of (i) the Independent Auditor, (ii) the Creditor Directors and (iii) the Recovery Assets Auditor.

(d)   Indemnities (from the Bank) to the Independent Auditor, Creditor Directors and the Recovery Assets Auditor.

(e)    Legal opinions from:

    (i)    White & Case, Almaty and London (as appropriate) addressed, as applicable, to the New Notes Trustee, the Depositary and the RCTFF Agent and each RCTFF Lender in relation to:

        (A)    the legal, valid and binding effect of the Bank's Charter under Kazakhstani law and the Deeds of Undertaking under Kazakhstani and English law; and

        (B)    the legality, validity and binding effect of the New Notes Trust Deed, the RCTFF Agreement, the RCTFF Collection Account Pledge, the Deposit Agreement and the Deeds of Undertaking under Kazakhstani and English laws; and

    (ii)    Baker & McKenzie addressed to the Steering Committee in relation to the Bank Creditor Loan Agreements (provided they have been executed), the RCTFF Agreement, the RCTFF Collection Account Pledge and the Deeds of Undertaking.

(f)    A ruling from Kazakhstani's tax authorities (including a certified English translation) confirming that:

    (i)    tax accumulated and other losses are retained to be set off against future trading gains for 10 years after such losses were incurred;

    (ii)    interest payments and other finance costs incurred by the Bank in respect of the New Notes and the Recovery Units will be deductible by the Bank in computing its taxable profits for Kazakhstani tax purposes, subject to any exceptions that would generally apply to the deductibility of interest payments and finance costs under the tax law of Kazakhstan; and

    (iii)    write-offs of Agreed Claims will not be treated as a taxable profit and will not negatively impact the retention of the losses described at (i) above.

(g)    Confirmation, payment instructions or other evidence that Samruk Kazyna has confirmed the appointment of the Creditor Directors and Independent Directors on the Board of Directors and other management bodies such appointments to take effect no later than the Restructuring Date.

(h)    Confirmation, payment instructions or other evidence that the Distribution Agent has received U.S.$1 billion to fund the cash payments to be made by the Bank to the Restructuring Creditors under Senior Package 1 on the Restructuring Date.

(i)    The Recoveries Assets Opening Report.

(j)    Amendments to the Bank's Charter (in accordance with "*Undertakings by the Bank and Samruk Kazyna and Description of the Bank's Share Capital and Minority Shareholder Rights*") duly registered with/approved by all appropriate authorities in Kazakhstan (including, following approval by the Shareholders, approved and accepted for registration by the FMSA).

(k)    If applicable, establishment of the Bank Creditor SPVs, and the appointment of directors and managers with respect thereto and pre-funding of their anticipated costs and expenses as contemplated by this Information Memorandum.

(l)    Entry into of the remaining Deeds of Covenant and Restructuring Documents by all parties thereto.

(m)     Court orders or other equivalent rulings have been obtained in Kazakhstan, Ukraine, the United States and the United Kingdom confirming recognition of the Restructuring Plan and the Restructuring under the laws of those jurisdictions.

(n)     A copy (with a certified English translation) of all applications and other papers filed with the Court, and all orders issued by the Court, in connection with the Restructuring (to and including the order approving the Restructuring Plan, the Deeds of Covenant and Restructuring Documents following the Claimants' Meeting), a copy of the official record of the outcome of the Claimants' Meeting.

(o)     Confirmation, payment instructions or other evidence of payment of all fees, costs and expenses then due from the Bank to the Steering Committee and its advisers under the relevant appointment letters and any other independent advisers appointed by the Steering Committee in connection with the administration of the Restructuring process.

(p)     No material adverse change in the business operations, property, condition (financial or otherwise), indebtedness or prospects of the Bank or in the international financial or capital markets compared to that envisaged by the Base Case Model or any relevant domestic financial or capital market (including devaluation of the Kazakhstan Tenge) or in the regulatory treatment as applied to the Bank.

(q)     Evidence of appointment (or confirmation of appointment) of one of the "Big Four" firms as auditor of the Bank.

(r)     Publication on the Bank's website, no earlier than three Business Days prior to the Restructuring Date, of a copy of an officer's certificate confirming that the representations to be given by the Bank immediately before the occurrence of the Restructuring Date (specified in Schedule 10 (*Representations and Warranties of the Bank*)) are true and correct.[39]

(s)     Evidence that any process agent(s) required under the Deeds of Covenant and the Restructuring Documents have been appointed and have accepted such appointments.

(t)     Adoption of the New Corporate Governance Code (to cover, without limitation, the matters set out in "*Description of Bank's Share Capital and Minority Shareholder Rights – Corporate Governance Code*").

(u)     The agreed form of the periodical report to be provided by the Independent Auditor with respect to the Bank's compliance with the Governance Code (as contemplated in "*Description of Bank's Share Capital and Minority Shareholder Rights – Corporate Governance Code*").

(v)     Evidence that the Bank has opened the Recovery Units Collection Account and the RCTFF Collection Account.

For the purposes of serving (or not serving) any notice on the Bank that the conditions precedent set out in this Schedule 12 are satisfied, the Steering Committee shall:

(a)     be entitled to rely on officers' certificates and any confirmation, statement or assurance provided by any other third party or other supporting evidence without further investigation;

(b)     have the right but not the obligation to request further detail or other documents and evidence reasonably required by the Steering Committee; and

---

[39]     Contents of certificate subject to further discussion with the Steering Committee.

(c)     have the right but not the obligation to determine that a condition precedent is not satisfied if it is not in form and substance satisfactory to two-thirds of the Steering Committee.

The Steering Committee shall be entitled to waive satisfaction of any condition precedent with the approval of at least two-thirds in number of its members.

## INDEX OF FINANCIAL STATEMENTS

**Consolidated Financial Statements for the year ended 31 December 2008** ...................... F-2

Independent Auditors' Report ............................................................... F-3

Consolidated Balance Sheet ................................................................ F-5

Consolidated Statement of Income .......................................................... F-6

Consolidated Statement of Changes in Equity ............................................... F-7

Consolidated Statement of Cash Flows ...................................................... F-9

Notes to the Consolidated Financial Statement ............................................. F-10

**Condensed Interim Consolidated Financial Information for the Nine-Month Period Ended
   30 September 2009** ..................................................................... F-71

Report on Review of Interim Condensed Consolidated Financial Statements ..................... F-72

Interim Condensed Consolidated Statement on Financial Position ............................. F-74

Interim Condensed Consolidated Income Statement ........................................... F-75

Interim Condensed Consolidated Statement of Comprehensive Income .......................... F-76

Interim Condensed Consolidated Statement of Changes in Equity ............................. F-77

Interim Condensed Consolidated Statement of Cash Flows .................................... F-79

Notes to Interim Condensed Consolidated Financial Statement ............................... F-81

# JSC BTA Bank and subsidiaries

## Consolidated Financial Statements

*Year ended 31 December 2008 together
with Independent Auditors' Report*