# Exhibit 11

**Form of Restricted Global Note**

ISIN: XS0532990750                          Common Code: 053299075

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. BY ACCEPTANCE OF THE SECURITY REPRESENTED HEREBY, EACH BENEFICIAL OWNER HEREOF REPRESENTS THAT (A) IT IS EITHER (I) NOT A U.S. PERSON AND IS LOCATED OUTSIDE THE UNITED STATES AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT OR (II) AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT ("AN ACCREDITED INVESTOR") OR (III) A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB") AND (B) THE SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS AS DEFINED IN, AND IN ACCORDANCE WITH, REGULATION S OR (II) WITHIN THE UNITED STATES IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB THAT IS PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB; AND IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THIS SECURITY.

THIS SECURITY AND ALL RELATED DOCUMENTATION MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME TO MODIFY THE RESTRICTIONS ON AND PROCEDURES FOR RESALES AND OTHER TRANSFERS OF THIS SECURITY TO REFLECT ANY CHANGE IN APPLICABLE LAW OR REGULATION (OR THE INTERPRETATION THEREOF) OR IN PRACTICES RELATING TO THE RESALE OR TRANSFERS OF RESTRICTED SECURITIES GENERALLY. BY THE ACCEPTANCE OF THIS SECURITY THE HOLDER HEREOF SHALL BE DEEMED TO HAVE AGREED TO ANY SUCH AMENDMENT OR SUPPLEMENT.

## "BTA BANK" JSC

*(incorporated with limited liability under
the laws of the Republic of Kazakhstan)*
(the "**Bank**")

### U.S.$ 496,631,368 7.20 per cent. Subordinated Notes due 2025

### RESTRICTED GLOBAL NOTE

1. **Introduction**: This Restricted Global Note is issued in respect of the U.S.$ 496,631,368 7.20 per cent. Notes due 1 July 2025 (the "**Notes**") of the Bank. The Notes are constituted by, are subject to and have the benefit of, a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited, as trustee (the "**Trustee**", which expression includes all persons for the time being appointed trustee or trustees under the Trust Deed) and are the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") and made between the Bank, The Bank of New York Mellon (Luxembourg) S.A., as registrar (the "**Registrar**", which expression includes any successor registrar appointed from time to time in connection with the Notes), The Bank of New York Mellon, London Branch, as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"), the other paying and transfer agents named therein and the Trustee.

2. **References to Conditions**: Any reference herein to the "**Conditions**" is to the terms and conditions of the Dollar Subordinated Notes attached hereto and any reference to a numbered "**Condition**" is to the correspondingly numbered provision thereof. If the Conditions endorsed on this Restricted Global Note are different from those appearing in the Schedule to the Trust Deed, the Conditions endorsed on this Restricted Global Note shall prevail.

3. **Registered holder**: This is to certify that The Bank of New York Depository (Nominees) Limited is, at the date hereof, entered in the register maintained by the Registrar in relation to the Notes (the "**Register**") as the duly registered holder (the "**Holder**") of U.S.$ 51,456,550 (**FIFTY ONE MILLION AND FOUR HUNDRED AND FIFTY SIX THOUSAND AND FIVE HUNDRED AND FIFTY UNITED STATES DOLLARS**) in aggregate principal amount of Notes or such other amount as is shown on the register of Noteholders as being represented by this Restricted Global Note and is duly endorsed (for information purposes only) in the third column of Schedule A to this Restricted Global Note.

4. **Promise to pay:** The Bank, for value received, hereby promises to pay such sum in respect of principal to the Holder on 1 July 2025 (or on such earlier date or dates as the same may become payable in accordance with the Conditions), and to pay interest on such sum of principal in arrear on the dates and at the rates specified in the Conditions, together with any additional amounts payable in accordance with the Conditions, all subject to and in accordance with the Conditions.

5. **Transfers:** Transfers of interests in the Notes represented by this Restricted Global Note for interests in the Unrestricted Global Note shall be made in accordance with the Agency Agreement and in accordance with the operating procedures of the relevant clearing system and any such transfers may only be made upon presentation of a transfer certificate as provided in the Agency Agreement.

6. **Exchange for Definitive Note Certificates:** This Restricted Global Note shall be exchanged in whole (but not in part) free of charge to the Holder for duly authenticated and completed Definitive Note Certificates ("**Definitive Note Certificates**") in substantially the form

(subject to completion) set out in Schedule 1 (*Form of Definitive Note Certificate*) to the Trust Deed if any of the following events occurs:

(a)     Euroclear and/or Clearstream, Luxembourg is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so; or

(b)     an Event of Default (as defined and set out in the Conditions on the Notes) occurs.

Such exchange shall be effected in accordance with paragraph 7 (*Delivery of Definitive Note Certificates*).   The Bank shall notify the Holder of the occurrence of any of the events specified in (a) and (b) as soon as practicable thereafter.

7.      **Delivery of Definitive Note Certificates:**   Whenever this Restricted Global Note is to be exchanged for Definitive Note Certificates, such Definitive Note Certificates shall be issued in an aggregate principal amount equal to the principal amount of this Restricted Global Note within five business days of the delivery, by or on behalf of the Holder, Euroclear and/or Clearstream, Luxembourg, to the Registrar of such information as is required to complete and deliver such Definitive Note Certificates (including, without limitation, the names and addresses of the persons in whose names the Definitive Note Certificates are to be registered and the principal amount of each such person's holding) against the surrender of this Restricted Global Note at the Specified Office (as defined in the Agency Agreement) of the Registrar.   Such exchange shall be effected in accordance with the provisions of the Agency Agreement and the regulations concerning the transfer and registration of Notes scheduled thereto and, in particular, shall be effected without charge to any Holder or the Trustee, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such exchange.  In this paragraph, **"business day"** means a day on which commercial banks are open for business (including dealings in foreign currencies) in the city in which the Registrar has its Specified Office.

8.      **Conditions apply:**   Save as otherwise provided herein, the Holder of this Restricted Global Note shall have the benefit of, and be subject to, the Conditions and, for the purposes of this Restricted Global Note, any reference in the Conditions to **"Note Certificate"** or **"Note Certificates"** shall, except where the context otherwise requires, be construed so as to include this Restricted Global Note.

9.      **Notices:**   Notwithstanding Condition 14 (*Notices*), so long as this Restricted Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an **"Alternative Clearing System"**), notices to Holders of Notes represented by this Restricted Global Note (**"Noteholders"**) may be given by delivery of the relevant notice to Euroclear or Clearstream or (as the case may be) such Alternative Clearing System; provided, however, that, so long as the Notes are admitted to trading on the Luxembourg Stock Exchange or the Kazakhstan Stock Exchange and the rules of such stock exchange so require, notices will also be published in a leading newspaper having general circulation in Luxembourg and on the website of the Luxembourg Stock Exchange (www.bourse.lu) as well as in a leading newspaper having general circulation in Kazakhstan.

10.     **Meetings:**   The Holder shall be treated at any meeting of Noteholders as having one vote in respect of each U.S.$ 1 principal amount of Notes for which this Restricted Global Note may be exchanged.

11.     **Contracts (Rights of Third Parties) Act 1999:**  No rights are conferred on any person under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Restricted Global

Note but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

12. **Payment:** Payments of principal and interest in respect of Notes represented by this Restricted Global Note shall be made against presentation for endorsement and if no further payment falls to be made in respect of the Notes, surrender of the Restricted Global Note to or to the order of The Bank of New York Mellon, London Branch.

13. **Determination of entitlement:** This Restricted Global Note is evidence of entitlement only and is not a document of title. Entitlements are determined by the Register and only the Holder is entitled to payment in respect of this Restricted Global Note.

14. **Trustee Powers:** In considering the interests of Noteholders while this Restricted Global Note is held on behalf of a clearing system, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders with entitlements to this Restricted Global Note and may consider such interests as if such accountholders were the holders of this Restricted Global Note.

15. **Prescription:** This Restricted Global Note shall become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in Condition 9 (*Taxation*)).

16. **Purchase and Cancellation:** Cancellation of any Note required by the Conditions to be cancelled following its purchase shall be effected by reduction in the principal amount of this Restricted Global Note.

17. **Authentication:** This Restricted Global Note shall not be valid for any purpose until it has been authenticated for and on behalf of the Registrar.

18. **Governing law:** This Restricted Global Note and any non-contractual obligations arising out of or in connection herewith are governed by, and shall be construed in accordance with, English law.

**AS WITNESS** the manual or facsimile signature of a duly authorised person on behalf of the Bank.

**"BTA BANK" JSC**

By:.............................................
    [*manual or facsimile signature*]
    (duly authorised)

**ISSUED ON 25 August 2010**

**AUTHENTICATED for and on behalf of**
**The Bank of New York Mellon (Luxembourg) S.A.**

By:.............................................
    [*manual or facsimile signature*]

(duly authorised)

## SCHEDULE A

## SCHEDULE OF INCREASE OR REDUCTION IN PRINCIPAL AMOUNT OF THE NOTES REPRESENTED BY THIS RESTRICTED GLOBAL NOTE

The following increases or reductions in the principal amount of the Notes represented by this Restricted Global Note have been made as a result of (i) redemption or purchase and cancellation of Notes or (ii) transfer of Notes (including transfers of interests between the Global Notes):

| Date of  Transfer/ Redemption/ Purchase and cancellation (stating which) | Amount of increase or decrease of in principal amount of Notes represented by this Restricted Global Note | Principal Amount of Notes Represented by this Restricted Global Note following such increase or decrease | Notation made by or on behalf of the Principal Paying and Transfer Agent |
|---|---|---|---|

**Terms and Conditions of the Dollar Subordinated Notes**

*The following is the text of the terms and conditions of the Dollar Subordinated Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Subordinated Dollar Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note:*

The U.S.$496,631,368 7.2 per cent. notes due 2025 (the "**Dollar Subordinated Notes**" or the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of "BTA BANK" JSC (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated 25 August 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of an agency agreement dated 25 August 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes), Joint-Stock Company "Citibank Kazakhstan" (the "**Kazakhstan Paying and Transfer Agent**"; which expression includes any successor or additional Kazakhstan paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Status**

It is the intention of the Bank that the Notes be regarded as Tier 2 capital for the purposes of the FMSA Guidance.

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotstvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.      **Form, Denomination and Title**

(a)     *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of U.S.$1 and integral multiples of U.S.$1 in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.      **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.      **Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new

Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 calendar days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions.  The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar.  A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.     **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed.

6.     **Interest**

(a)     *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount from 1 July 2010 at the rate of 7.2 per cent. per annum (the "**Rate of Interest**"), payable in arrear on 1 January and 1 July in each year (each, an "**Interest Payment Date**" and with the first Interest Payment Date falling on 1 January 2011), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) 1 July 2010 or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)      *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(d)      *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.   **Payments**

(a)      *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)      *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Condition 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)      *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the close of business (in the place of the Registrar's specified office) on the business day before the due date for such payment (the "**Record Date**").

(d)      *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(e)      *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)       *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of Specified Officer of the Principal Paying Agent, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)       *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 *{Notices}*.

**8.        Redemption and Purchase**

(a)       *Scheduled Redemption*

Unless previously redeemed as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be  redeemed in ten equal semi-annual instalments on 1 January and 1 July of each year, with the first such instalment being payable on 1 January 2021 and the last such instalment being payable on 1 July 2025.   The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed on due payment of the final instalment amount.

(b)       *Purchase*

Subject to the covenant set out in the Trust Deed entitled *"Restrictions on amendments to the Bank's Charter or change in share capital and on the repurchase of securities"* and the Bank obtaining all necessary approvals and consents and compliance with all applicable laws and regulations, the Bank may purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws).  Any Notes so purchased, while held by or on behalf of the Bank or any other member of the Group, shall not entitle the holder

to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

9.    **Taxation**

(a)    *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)    presented for payment by or on behalf of a holder who is liable for such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note; or

(iv)    where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced to conform to such Directive.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would

not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that such payment will be made, *provided that* payment is in fact made.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan, references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.     **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.   **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)    *Non Payment*

the Bank fails to pay any amount of principal or interest in respect of the Notes when the same becomes due and payable and such default continues for a period of ten Business Days; or

(b)    *Cross Default*

any Financial Indebtedness of any member of the Group is declared to be or otherwise becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due nor within any originally applicable grace period, *provided that* the aggregate amount of, or commitment for, Financial Indebtedness referred to above exceeds U.S.$10,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)    *Insolvency*

(A) the Bank or any of its Material Subsidiaries: (1) is unable or admits its inability to pay its debts as they fall due or is deemed or declared to be unable to pay its debts under applicable law; (2) suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties; or (3) commences negotiations with one or more of its creditors with a view to rescheduling its Financial Indebtedness generally; (B) the value of the assets of the Bank or any of its Material Subsidiaries is less than its liabilities (taking into account contingent and prospective liabilities); (C) a moratorium is declared in respect of any Financial Indebtedness of the Bank or any of its Material Subsidiaries; or (D) any corporate action, legal proceedings or other procedure or step is taken in relation to: (1) the suspension of payments or a moratorium in relation to the indebtedness of or the winding-up, bankruptcy, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Bank or any of its Material Subsidiaries; (2) a composition, compromise, assignment or arrangement with the creditors of the Bank or any of its Material Subsidiaries; or (3) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Bank or any of its Material Subsidiaries or any of their assets, or any analogous procedure or step is taken in any jurisdiction, *provided that* sub-paragraph (D) shall not apply to any winding-up petition which is frivolous or vexatious and is discharged, stayed or dismissed within 45 days after commencement,

save that on the occurrence and continuation of an event specified in Condition 11(b) (*Cross Default*), *provided that* action has been taken (whether by the Trustee or the Senior Noteholders or the OID Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Financial Indebtedness which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by

an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

## 12. Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 13. Meetings of Noteholders; Modification and Waiver

(a) *Meetings of Noteholders*

The Trust Deed provides that all meetings of holders of the Notes will include holders of the EUR28,237,359 6.75 per cent. Notes due 2025 of the Bank (the "**EUR 2025 Notes**") and the KZT7,396,248,930 11.20 per cent. Notes due 2025 of the Bank (the "**KZT 2025 Notes**") and there shall be no provision for separate meetings of holders of the Notes, holders of the EUR 2025 Notes and holders of the KZT 2025 Notes and that for purposes of determining a quorum and for voting purposes the EUR 2025 Notes and the KZT 2025 shall be converted into U.S. Dollars at the Reference Rate applicable as at the date of issuance of the Notes. Accordingly, all references in this Condition 13 to "Notes and "Noteholders" shall be deemed to include the EUR 2025 Notes and the KZT 2025 Notes and the holders of such notes, as the case may be.

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error.  In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby.  Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

## 14.     Notices

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register.  Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on the an Approved Stock Exchange (as defined in the Trust Deed), and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in the jurisdiction of such Approved Stock Exchange.  Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 97, Dzholdasbekov str., md Samal-2, Almaty, 050051, Kazakhstan and clearly marked on their exterior "Loan and Capital Markets Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified

Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

**15.**     **Trustee**

(a)     *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction.  The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder), the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do so unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's

determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by the Chairman of the Management Board that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions or the Trust Deed and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d) *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e) *Retirement and Removal*

Any Trustee may retire at any time on giving at least two months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any

Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the jurisdiction of the Approved Stock Exchange.

(f) *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.  This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non-contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two-party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a

national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*).  Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)    *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)    *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)    *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)    *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever

(irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     ***Waiver of Immunity***

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**PRINCIPAL PAYING
AND TRANSFER AGENT**
The Bank of New York Mellon, London
Branch
One Canada Square
London E14 5AL
United Kingdom

**REGISTRAR**
The Bank of New York Mellon (Luxembourg) S.A.
Aerogolf Center, 1A, Hoehenhof
L-1736 Senningberg
Luxembourg