Brett D. Jaffe
bjaffe@cohengresser.com
Scott D. Thomson
sthomson@cohengresser.com
Alexis G. Stone
astone@cohengresser.com
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, NY  10022
Phone:  (212) 957-7600
Fax:  (212) 957-4514

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

|  |  |
|---|---|
| ATLANTICA HOLINDGS, INC., BALTICA INVESTMENT HOLDING, INC., BLU FUNDS, INC., Allan KIBLISKY, Anthony KIBLISKY, and Jacques GLIKSBERG, | Civ. No. 12 CV 8852 (JMF) **ECF CASE** |

                      Plaintiffs,

         – against –

SOVEREIGN WEALTH FUND "SAMRUK-KAZYNA" JSC,
a/k/a "National Welfare Fund 'Samruk-Kazyna,'"

                     Defendant.

-------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................6

    The Parties ...............................................................................................6

    The 2010 Restructuring ............................................................................6

    Plaintiffs' Purchases of The Subordinated Notes.........................................8

    Misstatements and Omissions in the Information Memorandum .....................9

    The Negative Carry Swap Comes to Light..................................................12

    S-K Fund's False and Misleading Statements in 2011 .................................12

    BTA Bank's Second Default in January 2012 .............................................13

    S-K Fund and BTA Bank Misrepresent BTA Bank's Liability for the Recovery
    Units .......................................................................................................13

ARGUMENT .....................................................................................................15

I.      THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE
      COMMERCIAL ACTIVITY EXCEPTION TO THE FSIA. ..............................15

    A.     S-K Fund Engaged In Commercial Activity In The United States. ........18

         1.     S-K Fund's Distribution of the Information Memorandum in the
            United States Is a Commercial Act Giving Rise to Plaintiffs' Claim........19

         2.     S-K Fund's Additional Efforts to Market the Subordinated Notes in
            the United States Are Commercial Acts Giving Rise to Plaintiffs'
            Claim.......................................................................................20

    B.     S-K Fund's Extraterritorial Commercial Activity Had a Direct Effect In The
        United States. ............................................................................21

         1.     Distribution of the Information Memorandum and S-K Undertaking
            Constituted Commercial Activity Having a Direct Effect In the
            United States................................................................................22

         2.     S-K Fund's 2011 Statements Constituted Commercial Activity
            Having a Direct Effect in the United States. .................................23

| | | | |
|---|---|---|---|
| | 3. | S-K Fund's Failure to Disclose BTA Bank's Increased Liability for the Recovery Units Constituted Commercial Activity Having a Direct Effect in the United States.................................................................24 | |
| C. | | Plaintiffs' Conduct and Status Is Irrelevant to the Application of the Commercial Activity Exception. ...............................................................24 | |
| D. | | This Court Has Personal Jurisdiction Over S-K Fund. ..............................27 | |
| II. | SECTION 10(B) OF THE EXCHANGE ACT APPLIES TO THE TRANSACTIONS AT ISSUE ...............................................................................28 | | |
| A. | | Plaintiffs Incurred Irrevocable Liability in the United States for Purchases of the Subordinated Notes in Connection with the 2010 Restructuring. ...................29 | |
| B. | | Plaintiffs Incurred Irrevocable Liability in the United States for Purchases of the Subordinated Notes in the Secondary Market. ....................................32 | |
| III. | PLAINTIFFS HAVE ADEQUATELY PLED RELIANCE ................................................35 | | |
| A. | | Atlantica and Baltica Reasonably Relied on the Information Memorandum In Connection with the 2010 Restructuring. .........................................36 | |
| B. | | Plaintiffs Reasonably Relied on S-K Fund and BTA Bank's Misstatements and Omissions of Material Facts in Connection with Secondary Market Purchases of the Subordinated Notes. ....................................................39 | |
| | 1. | Plaintiffs Reasonably Relied on the Information Memorandum. ..............39 | |
| | 2. | Plaintiffs Reasonably Relied on S-K Fund's 2011 Statements. ................39 | |
| | 3. | Plaintiffs Reasonably Relied on S-K Fund and BTA Bank's Omissions and Material Misstatements About the Recovery Units. .........40 | |
| IV. | PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION..................43 | | |
| V. | PLAINTIFFS HAVE ADEQUATELY ALLEGED SCIENTER ...............................44 | | |
| A. | | Plaintiffs Have Alleged Conscious Recklessness...................................45 | |
| B. | | Plaintiffs Have Alleged Motive and Opportunity....................................47 | |
| | 1. | Plaintiffs Have Alleged Motive In Connection with the Information Memorandum. .......................................................................48 | |
| | 2. | Plaintiffs Have Alleged Motive in Connection with S-K Fund's 2011-12 Misstatements and Omissions. ....................................................49 | |

**Page**

VI.     S-K FUND IS LIABLE AS A CONTROL PERSON. .......................................................49

CONCLUSION ..................................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto,*
No. 09 Civ. 8862 (GRD), 2013 WL 1286170 (S.D.N.Y. March 28, 2013) ................ 29, 30, 34

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
677 F.3d 60 (2d Cir. 2012) ......................................................................... *passim*

*Affiliated Ute v. United States,*
406 U.S. 128 (1972) ............................................................................. 40, 41

*Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co.,*
466 F. Supp. 1133 (S.D.N.Y. 1979) ...................................................................22

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ...........................................................................................22

*Braka v. Multibanco Comermex, S.A.,*
589 F. Supp. 802 (S.D.N.Y. 1984) ................................................................ 18, 19

*Bulgartabac Holding AD v. Republic of Iraq,*
1:08-CV-065020RJH, 2009 WL 3113252 (S.D.N.Y. Sept. 30, 2009) .....................................16

*Calder v. Jones,*
465 U.S. 783 (1984) ...........................................................................................27

*Cargill Int'l S.A. v. M/T Pavel Dybenko,*
991 F.2d 1012 (2d Cir.1993) ..................................................................... 15, 16

*Cornwell v. Credit Suisse Grp.,*
729 F. Supp. 2d 620 (S.D.N.Y. 2010) ................................................................34

*Daventree Ltd. v. Republic of Azerbaijan,*
349 F. Supp. 2d 736 (S.D.N.Y. 2004) ................................................17, 19, 20, 26

*Erica P. John Fund, Inc. v. Halliburton Co.,*
131 S. Ct. 2179 (2011) .......................................................................................36

*Fogarazzao v. Lehman Bros., Inc.,*
232 F.R.D. 176 (S.D.N.Y. 2005) ........................................................................41

*Friedl v. City of New York,*
210 F.3d 79 (2d Cir. 2000) ................................................................................31

**Page(s)**

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009) ..................................................................................16

*Ganino v. Citizens Util. Co.*,
    228 F.3d 154 (2d Cir. 2000) .......................................................................... 44, 45

*Glidepath Holding B.V. v. Spherion Corp.*,
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) ...................................................... 46, 47, 48

*Hanil Bank v. Pt. Bank Negara Indonesia*,
    148 F.3d 127 (2d Cir. 1998) .......................................................................... 17, 21

*Hansen v. Danish Tourist Bd.*,
    147 F. Supp. 2d 142 (E.D.N.Y. 2001) ..................................................................22

*In re Allstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................... 45, 46

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010) ........................................................... 41, 43

*In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011) ..................................................................43

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ..................................................................48

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    618 F. Supp. 2d 311 (S.D.N.Y. 2009)..................................................................37

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)........................................................... 43, 44

*In re Global Crossing Ltd. Sec. Litig.*,
    No. 02 Civ. 910 (GEL), 2005 WL 1907005 (S.D.N.Y. Aug. 5, 2005)....................50

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y 2003)..................................................................50

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    765 F. Supp. 2d 375 (S.D.N.Y. 2011)..................................................................46

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    851 F. Supp. 2d 512 (S.D.N.Y. 2012)..................................................................46

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004)....................................................................41

**Page(s)**

*In re Parmalat Sec. Litig.*,
  No. 04 MD 1653(LAK), 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)....................................41

*In re Prudential Sec. Ltd. P'ships Litiq.*,
  930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................................42

*In re SLM Corp. Sec. Litig.*,
  740 F. Supp. 2d 542 (S.D.N.Y. 2010).................................................................................47

*In re Smith Barney Transfer Agent Litig.*,
  No. 05 Civ. 7583 (WHP), WL 1150737 (S.D.N.Y. March 21, 2013) ....................................41

*In re Societe Generale Sec. Litig.*,
  No. 08 Civ. 2495, 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ..............................................34

*In re Stillwater Capital Partners Inc. Litigation*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2012)........................................................................... 37, 46

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................................................................... 39, 44

*In re The Leslie Fay Cos. Sec. Litig.*,
  No. 92 Civ. 8036 (WCC), 1993 WL 438927 (S.D.N.Y. Oct. 27, 1993)....................................49

*In re UBS AG Sec. Litig.*,
  No. 07 Civ. 11225 (RTS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..............................46

*In re Vivendi Universal, S.A. Sec. Litig.*,
  284 F.R.D. 144 (S.D.N.Y. 2012)................................................................................... 32, 33

*In re Worldcom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................................49

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
  708 F. Supp. 2d 334 (S.D.N.Y. 2010).................................................................................44

*Lapin v. Goldman Sachs Group, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)............................................................................ 45, 46

*Laser Mortg. Mgmt Inc. v. Asset Securitization Corp.*,
  No. 00 Civ. 8100 (NRB), 2001 WL 1029407 (S.D.N.Y. Sept. 6, 2011) ..................................35

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir.2005) ...............................................................................................44

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  861 F. Supp. 2d 262 (S.D.N.Y. 2012)........................................................................ *passim*

**Page(s)**

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990) ........................................................................37

*Mori v. Saito*,
  No. 10 Civ. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. April 19, 2013) ..............28, 29, 30, 34

*Morrison v. Nat'l Australia Bank Ltd.*,
  130 S. Ct. 2869 (2010) ........................................................................ *passim*

*Mortimer Off Shore Services, Ltd. v. Fed. Republic of Germany*,
  615 F.3d 97 (2d Cir. 2010) ................................................................ 15, 25

*Nathel v. Siegal*,
  592 F. Supp. 2d 452 (S.D.N.Y. 2008)....................................................35

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ........................................................ 45, 46, 47

*Plumbers Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*,
  753 F. Supp. 2d 166 (S.D.N.Y. 2010).....................................................34

*Press v. Quick & Reilly*,
  No. 96 CIV 4278 (RPP), 1997 WL 458666 (S.D.N.Y. Sept. 11, 1997) ....................................46

*Quail Cruises Ship Management Ltd. v. Agencia de Viagens CVC Tur Limitada*,
  645 F.3d 1307 (11th Cir. 2011) ........................................................ 30, 34

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992)..............................................................16, 17, 21, 25

*S.E.C. v. Amerindo Inv. Advisors*, Inc.,
  No. 05 Civ. 5231(RJS), 2013 WL 1385013 (S.D.N.Y. March 11, 2013) ................... 32, 33, 35

*S.E.C. v. Benger*,
  No. 09 C 676, 2013 WL 593952 (N.D. Ill. Feb. 15, 2013).........................................30

*Sable v. Southmark/Envicon Capital Corp*,
  819 F. Supp. 324 (S.D.N.Y. 1993)....................................................39

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993)............................................................................22

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*,
  989 F.2d 572 (2d Cir. 1993) ........................................................................27

*Shapiro v. Republic of Bolivia*,
  930 F.2d 1013 (2d Cir. 1991) ........................................................ *passim*

**Page(s)**

*Stevelman v. Alias Research Inc.*,
   174 F.3d 79 (2d Cir. 1999) ..................................................................45

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) ................................................23, 26, 39, 43

*Tanoga Ltd. v. Ministry of Public Works and Housing of the Kingdom of Saudi Arabia*,
   135 F. Supp. 2d 350 (N.D.N.Y. 2001) ...............................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ...........................................................................45

*Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*,
   647 F.2d 300 (2d Cir. 1981) ..............................................................16

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
   97 CIV. 6124 (JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999)
   *aff'd*, 199 F.3d 94 (2d Cir. 1999) ......................................................20

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
   241 F.3d 135 (2d Cir. 2003) ..............................................................27

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (2d Cir. 2011) ...................................................36

**Statutes**

15 U.S.C. § 78u-4(b)(2) ...........................................................................44

28 U.S.C. § 1330(b) .................................................................................27

28 U.S.C. § 1603(d) .................................................................................16

28 U.S.C. § 1605(a)(2) ...................................................................3, 16, 18

**Rules**

17 C.F.R. § 230.501(a) ............................................................................25

Plaintiffs Atlantica Holdings, Inc., Baltica Investment Holding, Inc., Blu Funds Inc.,
Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (collectively, "Plaintiffs") respectfully
submit this Memorandum of Law, together with the Declaration of Brett D. Jaffe dated June 10,
2013 ("Jaffe Declaration") and the exhibits annexed thereto, in opposition to the motion by
Defendant Sovereign Wealth Fund "Samruk-Kazyna" JSC, ("Defendant" or "S-K Fund") for
dismissal of the Amended Complaint.

PRELIMINARY STATEMENT

This case arises out of false and misleading statements and omissions by Defendant S-K
Fund and BTA Bank (an entity dominated and controlled by S-K Fund) in connection with a
restructuring of BTA Bank (the "2010 Restructuring"), and for the two years following that
restructuring.  The core of Defendant's fraudulent scheme is simple.  In connection with the
2010 Restructuring, Defendant represented in a signed undertaking (the "S-K Undertaking") –
which was incorporated with Defendant's knowledge into an information memorandum (the
"Information Memorandum") distributed to investors, including Plaintiffs – that it would not
receive any dividends or distributions from BTA Bank so long as BTA Bank's other creditors
remained unpaid.  In reliance on that representation, Plaintiffs agreed to the 2010 Restructuring
and exchanged their pre-restructuring debt for U.S. dollar-denominated Subordinated Notes
issued by BTA Bank.

But the S-K Undertaking, as well as the disclosures contained in the Information
Memorandum, were false and misleading because they failed to properly disclose that Defendant
and BTA Bank had entered into a financial transaction – known as the "Negative Carry Swap" –
the net result of which was for Defendant to obtain hundreds of millions of dollars in payments
from BTA Bank at the expense of BTA Bank's other creditors, including Plaintiffs.  The

}

Negative Carry Swap had a catastrophic effect on BTA Bank's cash flow, ultimately dooming the 2010 Restructuring to failure and destroying the value of the Subordinated Notes.

Following the 2010 Restructuring, and before the existence of the Negative Carry Swap was revealed, Plaintiffs purchased millions of dollars of additional Subordinated Notes. Those purchases were also made in reliance on the false and misleading statements contained in the S-K Undertaking and the Information Memorandum, as well as false and misleading statements in 2011 by which S-K Fund publicly and falsely pledged that it would support BTA Bank and guarantee that it would not fail, all while siphoning hundreds of millions of dollars from BTA bank by way of the Negative Carry Swap.

Finally, Plaintiffs purchased additional Subordinated Notes in 2012, relying on an additional material omission by S-K Fund and BTA Bank. Despite being fully aware that an additional *$5 billion* of liabilities (the "Recovery Units") were almost certain to be accelerated and advanced in BTA Bank's capital structure to be senior to the Subordinated Notes, S-K Fund and BTA Bank kept Plaintiffs entirely in the dark. When the truth was revealed, the price of the Subordinated Notes again declined, ultimately settling at less than 10% of their face value.

Plaintiffs seek relief under Section 10(b) and Rule 10b-5 and Section 20(a) of the Securities Exchange Act.

*          *          *

As a threshold matter, Defendant moves to dismiss this action for lack of subject matter jurisdiction pursuant to F.R.C.P. 12(b)(1), on the basis that it is a foreign sovereign entity immune from suit in this Court pursuant to the Foreign Sovereign Immunities Act ("FSIA"). The FSIA, however, does not provide immunity where the foreign sovereign entity engages in commercial rather than sovereign acts. Here, S-K Fund – a purely commercial entity engaged in

undisputedly commercial conduct – falls within two separate prongs of the "commercial activity exception" to FSIA immunity.

Satisfying the first prong of the exception, Defendant engaged in commercial acts within the United States related to the fraudulent scheme giving rise to this lawsuit.  28 U.S.C. § 1605(a)(2) (clause one).  As described fully herein, Defendant's commercial acts in the United States include, among other things: (i) distribution of the Information Memorandum, including the S-K Undertaking, in the United States, to investors including Plaintiffs, (ii) Defendant's additional efforts to market the Subordinated Notes in the United States, including meetings in the United States with investors and potential investors for those securities.  *See* Section IA, *infra*.

In addition, Defendant engaged in commercial acts outside the United States that had a direct effect in the United States.  28 U.S.C. § 1605(a)(2) (clause three).  Those commercial acts included (i) execution of the S-K Undertaking, which included false and misleading statements concerning Defendant's receipt of dividends and distributions from BTA Bank, (ii) Defendant's false and misleading public statements in 2011, and (iii) Defendant's false and misleading disclosures regarding BTA Bank's dramatically increased liability for the Recovery Units.  Each of these acts had a direct effect in the United States because Plaintiffs relied on Defendant's statements to purchase Subordinated Notes in the United States, both during the 2010 Restructuring and in the secondary market.  *See* Section IB, *infra*.

Defendant also moves to dismiss this action pursuant to F.R.C.P. 12(b)(6) for failure to state a claim upon which relief may be granted.  Defendant offers five bases for that motion, each of which must be rejected.

*First*, Plaintiffs have pled, for each purchase of Subordinated Notes at issue, the existence of a domestic transaction as required by *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).  Under the settled law of this Circuit, the *Morrison* requirement is satisfied by pleading facts sufficient to allege that Plaintiffs incurred "irrevocable liability" for their securities transactions in the United States.  Here, the allegations of the Amended Complaint (which must be presumed to be true) and the plain language of the Information Memorandum (which may be considered on this motion) do just that.  As to purchases made in connection with the 2010 Restructuring, Plaintiffs incurred irrevocable liability by submitting an Electronic Instruction Form – *which Defendant and BTA Bank described as "irrevocable" on its face* – to its broker at UBS in Miami, Florida (the "UBS Miami Office").  As to purchases made in the secondary market, Plaintiffs incurred irrevocable liability by placing orders with their broker at the UBS Miami Office, which were subsequently filled by UBS in the United States.  *See* Section II, *infra*.

*Second*, Plaintiffs have adequately pled reliance.  Defendant challenges the reasonableness of that reliance, but that inquiry is premature; the question of reasonableness is not properly considered on a motion to dismiss.  In any event, Defendant's core argument – that plaintiffs could not have reasonably relied because the facts alleged to have been misstated or omitted were not, in fact, misstated or omitted – is without merit.  Defendant's false and misleading commitment in the S-K Undertaking, and the failure of Defendant and BTA Bank to accurately disclose the effect of the Negative Carry Swap and BTA Bank's increased liability for the Recovery Units are plainly actionable.  Plaintiffs relied on each of those false and misleading disclosures to their detriment.  Finally, to the extent Defendant and BTA Bank omitted to make

4

any disclosure in 2012 with regard to BTA Bank's liability for the Recovery Units, under the *Affiliated Ute* doctrine reliance is presumed.  *See* Section III, *infra*.

      **Third,** Plaintiffs have adequately pled loss causation by alleging that a "rough proportion" of the alleged loss arose from Defendant and BTA Bank's alleged misstatements and omissions.  Non-fraud explanations for the loss are factual matters to be decided at trial.  *See* Section IV, *infra*.

      **Fourth**, Plaintiffs have adequately pled scienter by alleging (in accordance with well-settled Second Circuit authority) facts giving rise to a strong inference of both Defendant and BTA Bank's conscious recklessness and motive and opportunity to commit fraud.  The Amended Complaint alleges that each of BTA Bank and Defendant knew the true facts surrounding the Negative Carry Swap and BTA Bank's liability for the Recovery Units; in light of that knowledge, failure to make accurate disclosure of those facts constitutes conscious recklessness. In addition, Defendant was plainly motivated to hide the existence and true effect of the Negative Carry Swap to insure that transaction – which put hundreds of millions of dollars into Defendant's pockets at the expense of other creditors – continued unabated.  *See* Section V, *infra*.

      **Finally,** Plaintiffs have adequately alleged that Defendant (BTA Bank's dominant 75% shareholder) controlled BTA Bank such that Defendant is liable pursuant to Section 20(a) of the Exchange Act for BTA Bank's violations of the securities laws. *See* Section VI, *infra*.

      For all of these reasons, Defendant's motion to dismiss should be denied in its entirety.

<u>S</u>TATEMENT OF <u>F</u>ACTS

### <u>The Parties</u>

Plaintiffs are three investment companies based in Panama, Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), and Blu Funds, Inc. ("Blu Funds") (collectively, the "Corporate Plaintiffs"), and three United States residents, Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg (the "Individual Plaintiffs").  Each of the Plaintiffs purchased, in various transactions between 2010 and 2012, Subordinated Notes issued by non-party BTA Bank.  Am. Compl. ¶¶ 7-12.  As described in detail below, each Plaintiff's purchases of Subordinated Notes were made by way of communications with, and orders executed by, Plaintiffs' broker located in the UBS Miami Office.  *Id.*

Defendant S-K Fund is a sovereign wealth fund owned entirely by the Republic of Kazakhstan.  *Id.* at ¶ 14.  S-K Fund's sole purpose is to engage in commercial activities.  *Id.* Defendant controls more than 500 companies "in the key areas of the national economy," including banking, oil and gas, mining, chemicals, transport, communication, and electricity.  *Id.*

Non-party BTA Bank is a joint-stock company organized under the laws of the Republic of Kazakhstan.  *Id.* at ¶ 16.  On February 3, 2009, in response to a liquidity crisis at BTA Bank, S-K Fund and acquired a supermajority (75.1%) of the Bank's stock.  *Id.* at ¶ 26; IM at 282.  In light of this control position, and at all relevant times, S-K Fund dominated BTA Bank's affairs. Am. Compl. ¶¶ 29, 66-67; IM at 120 (***"The bank will be controlled by Samruk-Kazyna . . ."***) (emphasis in original).

### <u>The 2010 Restructuring</u>

Just two months after Defendant acquired its dominant stake in BTA Bank, BTA Bank announced that it had ceased payment of principal on all outstanding BTA Bank financial

obligations. *Id* at ¶ 27. Thereafter, S-K Fund and BTA Bank proposed the 2010 Restructuring to BTA Bank's creditors, a group that included Plaintiffs Atlantica and Baltica. *Id.* at ¶ 29.

The 2010 Restructuring was carried out pursuant to the Information Memorandum, which was distributed to existing creditors of BTA Bank. The Information Memorandum was provided for the purpose of deciding whether to participate in the 2010 Restructuring**,** and was intended to provide disclosures as to the details of the proposed 2010 Restructuring and BTA Bank's financial condition. *Id.* at ¶¶ 2, 29. The Information Memorandum was mailed directly to Plaintiffs' broker at the UBS Miami Office. It was, at all relevant times, also publically available to creditors and potential investors on BTA Bank's website. Def. Mem. at 5.[1]

As part of the 2010 Restructuring, BTA Bank issued equity and debt securities to pre-restructuring holders of its debt, including Plaintiffs Atlantica and Baltica. Am. Compl. ¶ 32. It was expressly contemplated by Defendant and BTA Bank, and plainly reflected in the Information Memorandum, that debt securities issued in connection with the 2010 Restructuring (including the Subordinated Notes) would be acquired by certain eligible investors (such as Plaintiffs) within the United States:

> THE NEW NOTES. . . WILL BE ISSUED ONLY TO, CLAIMANTS (I) OUTSIDE THE UNITED STATES OR (II) ***WITHIN THE UNITED STATES (IN PRIVATE TRANSACTIONS PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT) THAT ARE EITHER ACCREDITED INVESTORS OR QIBs***…

IM at (i) (caps in original, emphasis added). The Information Memorandum (in a disclosure entitled "NOTICE TO CLAIMANTS IN THE UNITED STATES") similarly provided that the Subordinated Notes, once issued, could trade in the United States:

---

[1] Despite Defendant's contention that "[t]he Information Memorandum was available only to investors who certified on the website either that they (i) were outside the United States and non-U.S. residents; or (ii) were within the United States and were either 'Accredited Investors' . . . or 'Qualified Institutional Buyers ("QIBs")' as defined in Rule 144A," Def. Mem. at 5, the Information Memorandum is publicly available without limitation. *See* http://bta.kz/files/IM_2010.pdf (last visited June 6, 2013).

THE NEW NOTES . . .MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED *EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT* AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS.

IM at( iii) (caps in original, emphasis added).  To facilitate such transfers of the Subordinated Notes in the secondary market among qualified investors in the United States, the 2010 Restructuring provided that the Subordinated Notes could be transferred on the books of "Direct Participants" in the United States (including large financial institutions such as UBS), and that those transactions could be cleared through DTC in the United States.  IM at 90; Declaration of Francis Fitzherbert-Brockholes (the "FFB Declaration") ¶ 26 ("Of course, an interest in the [Subordinated Notes] could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in [Subordinated Notes] through a Direct Participant.").

Defendant and BTA Bank's efforts to structure the 2010 Restructuring in a manner that would attract U.S. investors to purchase BTA Bank's debt are plain.  In addition to providing a mechanism for transfer of the Subordinated Notes in the United States, the bulk of the Subordinated Notes were denominated in U.S. dollars, and all interest and principal payments on the Subordinated Notes were to be made to a New York City bank.  Am. Compl. ¶ 32.  At least 17% of the dollar-denominated Subordinated Notes issued in the 2010 Restructuring were purchased by U.S. investors.  Declaration of Joseph D. Pizzurro (the "Pizzurro Declaration"), Exhibit B at 15, 27.

### Plaintiffs' Purchases of The Subordinated Notes

*Atlantica and Baltica Agree to the 2010 Restructuring.*  Pre-2010 Restructuring creditors of BTA Bank, including Atlantica and Baltica, were required to deliver an "Electronic Instruction Form" providing their assent to (or dissent from) the 2010 Restructuring.  IM at 91.

Relying on the representations made in the Information Memorandum, both Atlantica and Baltica approved the 2010 Restructuring, and thus, agreed to receive the Subordinated Notes in exchange for their existing BTA Bank debt.  Am. Compl. ¶¶ 7-8.  Atlantica and Baltica communicated their commitment to participate in the 2010 Restructuring by sending their completed Electronic Instruction Forms to their broker in the UBS Miami Office.  The Electronic Instruction Form provided, in part:

> **Electronic Instruction Forms from Beneficial Owners . . . shall be irrevocable** *provided, however, that* in the event that the Bank, in its sole discretion, amends, terminates or withdraws the Restructuring Plan, . . . in a manner that is materially adverse to affected Euronoteholders in the opinion of the Trustee, Euronoteholders shall be permitted, subject to the conditions set out herein, to revoke any Electronic Instruction Forms delivered in relation thereto for a period of two business days. . .

IM at 91 (italics in original, bold added).  As made clear by the form itself, once Atlantica and Baltica provided the Electronic Instruction Form to UBS, they were irrevocably bound to the transaction.  IM at 91; Am. Compl. ¶¶ 7-8.

     ***Plaintiffs' Secondary Market Purchases.***  Plaintiffs' secondary market purchases of the Subordinated Notes were also facilitated through UBS.  Am. Compl. ¶¶ 7-12.  In connection with each such secondary market transaction, Plaintiffs first placed an order to purchase Subordinated Notes with their broker in the UBS Miami Office.  *Id*.  Next, UBS Financial Services transmitted the order to UBS's U.S. broker-dealer.  *Id*.  Finally, to effectuate the trades, funds were transferred from Plaintiffs' accounts maintained at the UBS Miami Office to UBS's back office in the United States where the orders were ultimately filled and the transaction were completed.

### Misstatements and Omissions in the Information Memorandum

     Much of Defendant and BTA Bank's success in attracting investors to participate in the 2010 Restructuring and maintaining an active secondary market for the Subordinated Notes can be attributed to material misstatements concerning BTA Bank's post-restructuring prospects, and

the role that Defendant would play in ensuring BTA Bank's future viability. *Id*. at ¶ 36.  While S-K Fund represented that its "primary objective is to manage [BTA Bank] with a goal of maximizing long term value and increasing competitiveness of such legal entit[y] in world markets," that was far from the truth. *Id*.

    ***The S-K Undertaking.***  The Information Memorandum incorporated the S-K Undertaking, a deed of undertaking executed by S-K Fund "in favour of" BTA Bank's creditors. *Id*. at ¶ 2.  Pursuant to the S-K Undertaking, Defendant promised creditors (including "their direct and indirect transferees") that S-K Fund would not accept any dividend or distribution from BTA Bank for seven years after the Restructuring, unless creditors (including holders of the Subordinated Notes) had been paid in full. *Id*. at ¶ 39.  Despite this express representation, the Information Memorandum concealed from creditors that Defendant used its position as BTA Bank's dominant shareholder to extract hundreds of millions of dollars of net annual distributions in the form of payments from BTA Bank through the undisclosed "Negative Carry Swap" arrangement. *Id*. at ¶ 44.

    ***The Negative Carry Swap.***  Under the terms of the 2010 Restructuring, BTA Bank was directed to purchase KZT 645 billion ($4.3 billion) of bonds issued by S-K Fund paying a nominal return of 4% per year to BTA Bank. *Id*. at ¶ 41.  BTA Bank also was required to pay 2% on this sum in exchange for a guarantee from S-K Fund, so that the effective interest rate on the S-K Bonds was only 2%. *Id*.  This minimal return was more than offset by two extremely unfavorable related transactions.  Shortly before the 2010 Restructuring, S-K Fund deposited KZT 245 billion ($1.6 billion) with BTA Bank (the "S-K Deposit"). *Id*.  The S-K Deposit earned variable but extremely high rates of interest, reaching 10.9%. *Id*.  In addition, at S-K Fund's direction, BTA Bank entered into a repo transaction with NBK on approximately KZT 400

billion ($2.7 billion) that required it to pay 7% interest to the national bank. *Id*. The net result of the Negative Carry Swap was that S-K Fund received interest from BTA Bank on its deposits far above market rates in the period following the 2010 Restructuring, while BTA Bank received minimal interest payments from S-K Fund. *Id*. This Negative Carry Swap resulted in material declines in BTA Bank's cash flow. *Id*.

Additional disclosures in the Information Memorandum further obscured the Negative Carry Swap and the deleterious effect of that transaction on BTA Bank's cash flow and prospects. *Id*. at ¶ 43. In the Information Memorandum, BTA Bank stated that as of September 30, 2009, BTA Bank's interest income on the bonds it purchased from S-K Fund for the nine months prior was KZT 20,502,000,000 ($137 million), and that its interest expense on amounts due to customers (principally S-K Fund) for the nine months prior was KZT 4,214,000,000 ($28 million). *Id*. This statement was false and misleading because, as discussed above with respect to the Negative Carry Swap, at the time that the 2010 Restructuring was approved, interest expenses due to S-K Fund far exceeded interest income received from S-K Fund. *Id*.

Similarly, the Information Memorandum falsely and misleadingly disclosed that "current accounts generally bear no interest," when in fact S-K Fund had current account deposits in excess of KZT 245 billion with BTA Bank, and was receiving interest payments as high as 10.9%. *Id*. at ¶ 44. On an annual basis, BTA Bank paid approximately KZT 68 billion ($453 million) in interest on S-K deposits, the S-K guarantee, and the NBK repo transaction, while receiving only KZT 26 billion ($173 million) in bond interest payments from S-K Fund, resulting in an annual negative carry of KZT 42 billion ($280 million). *Id*.

11

## The Negative Carry Swap Comes to Light

Information about the Negative Carry Swap began to be leaked to the marketplace in mid-May 2011. *Id*. at ¶ 48. BTA Bank issued a set of PowerPoint slides entitled the "Investor Call Presentation" on May 17, 2011, in which it disclosed on page 24 of the 24-page presentation that one of the outstanding issues that needed to be addressed was "negative carry." *Id*. Even then, however, BTA Bank disclosed only that its yield on all assets averaged 5.5% while its average cost for all liabilities was 8.6% – but it did not disclose that the driving force behind its overall negative carry was the Negative Carry Swap. *Id*.

The following day, May 18, 2011, J.P. Morgan published a research report providing limited additional details concerning the Negative Carry Swap. *Id*. at ¶ 49. Specifically, J.P. Morgan reported that on a conference call with investors on May 17, 2011, BTA Bank disclosed that the average interest rate on deposits held by Defendant was 9.8%, which was significantly more than the interest rate BTA Bank earned on its assets. *Id*.

In response to these disclosures, the price of BTA Bank debt, including the Subordinated Notes, plummeted. *Id*. at ¶ 50. The Subordinated Notes, which had been trading for approximately 70% of face value prior to the May 17 and 18 disclosures, immediately fell to less than 60% of face value and continued their downward slide to approximately 40% of face value by the end of June 2011. *Id*.

## S-K Fund's False and Misleading Statements in 2011

After the sharp drop in the price of its debt following the initial disclosure of the Negative Carry Swap in May 2011, Defendant made numerous additional public misstatements that were published internationally, directed at holders and potential purchasers of the Subordinated Notes, in an effort to provide the market with comfort that Defendant (as BTA Bank's controlling shareholder) would ensure that the 2010 Restructuring would succeed. *Id*. at ¶ 51. These false

12

and misleading statements included statements by a Deputy Chief Executive Officer at S-K Fund to several financial news sources between July 7, 2011 and November 30, 2011, assuring the public that S-K Fund would "sort out the situation with the bonds;" that Defendant would "not let [BTA Bank] get into trouble;" and that Defendant was working to develop "a clear plan for restoring BTA Bank's capital." *Id.* at ¶ 52. The Chairman of S-K Fund similarly stated in an article published by *Bloomberg* on October 4, 2011, that "BTA Bank will certainly be supported by the government." *Id.*

### BTA Bank's Second Default in January 2012

In January 2012 (less than 18 months after the 2010 Restructuring was finalized), BTA Bank signaled for the first time that it might be unable to continue as a going concern and that it would not be able to satisfy its debt obligations. *Id.* at ¶ 57. BTA Bank is currently in the process of completing its second restructuring in less than two years (the "2012 Restructuring").[2] As a key part of the 2012 Restructuring, Defendant's equity interest in BTA Bank has increased to 97%. *Id.*

### S-K Fund and BTA Bank Misrepresent BTA Bank's Liability for the Recovery Units

Under S-K Fund's control, BTA Bank continued to make misrepresentations regarding its financial condition in 2012. *Id.* at ¶ 59. Most significantly, BTA Bank misrepresented the impact Recovery Units issued in connection with the 2010 Restructuring would have on its total liabilities. *Id.*

The purpose of the Recovery Units, issued to various creditors in connection with the 2010 Restructuring, was to provide those creditors an interest in BTA Bank's efforts to recover approximately $10 billion in BTA Bank assets stolen from BTA Bank by its former management

---

[2] In connection with the 2012 Restructuring, BTA Bank filed a petition under Chapter 15 of the Bankruptcy Code in the bankruptcy court in the Southern District of New York. *Id.* at ¶ 14.

prior to the 2010 Restructuring. *Id.* at ¶ 60. Under the terms of the Recovery Units, holders of the Recovery Units and BTA Bank would each be entitled to 50% of all funds recovered (net of expenses) from BTA Bank's previous management. *Id.* Additionally, in the event of BTA Bank's default on its senior debt issued in the 2010 Restructuring, the Recovery Units (which bore a notional $5 billion reference amount, representing approximately 50% of the assets sought to be recovered from BTA Bank's prior management) could be accelerated by holders of the Recovery Units and become an unconditional $5 billion obligation of BTA Bank. *Id.* at ¶ 61.

BTA Bank defaulted on its senior debt in January 2012. *Id.* at ¶ 57. As a result, acceleration of the Recovery Units became a virtual certainty. *Id.* at ¶ 62. Nonetheless, in two PowerPoint presentations made in connection with the 2012 Restructuring, Defendant and BTA Bank continued to mislead investors about BTA Bank's liability for the Recovery Units. *Id.* at ¶¶ 62-64. First, in a January 2012 PowerPoint presentation made in connection with the 2012 Restructuring, BTA Bank identified its *total* external liabilities – which included approximately $2 billion in senior debt and $850 million in Subordinated Notes – as approximately $4.8 billion. *Id.* at ¶ 63. Despite knowing of BTA Bank's default on its senior debt, Defendant and BTA Bank made no mention at all of increased liability for the Recovery Units or that upon acceleration, the full $5 billion notional value of the Recovery Units would become *pari passu* to BTA Bank's senior debt. *Id.* at ¶¶ 61, 63.

Similarly, as late as March 19, 2012, BTA Bank represented in a PowerPoint presentation to the Steering Committee for the 2012 Restructuring that its total liability for debt securities issued – including the senior debt and Subordinated Notes, as well as the Recovery Units – *declined* by 6.5% in its preliminary audited financial statements from previously issued estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion). *Id.* at ¶ 64.

BTA Bank further misrepresented that this purported decrease in its liabilities was the result of a KZT 46 billion ($310 million) decrease in its liability on the Recovery Units. *Id.* While that same presentation disclosed that acceleration of the Recovery Units was possible, BTA Bank continued to omit a fundamental fact:  in light of BTA Bank's default, it was almost *certain* to be liable for the full $5 billion reference amount of the Recovery Units. *Id.* at ¶ 64.

Once the true facts concerning BTA Bank's liability for the Recovery Units were disclosed, the price of the Subordinated Notes declined even further, to less than 10% of face value. *Id.* at ¶ 65.  Plaintiffs – who purchased more than $76 million face amount of Subordinated Notes in reliance on Defendant and BTA Bank's many false and misleading statements and material omissions – were severely injured. *Id.* at ¶ 77.

**ARGUMENT**

**I.    THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE COMMERCIAL ACTIVITY EXCEPTION TO THE FSIA.**

On a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction under the Foreign Sovereign Immunity Act, "[t]he burden is on the defendant" to seek immunity by demonstrating that it is a foreign sovereign. *Mortimer Off Shore Services, Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 105 (2d Cir. 2010) (internal quotations and citation omitted). In light of that initial burden, a plaintiff has no obligation to plead in the complaint any bases for an exception to sovereign immunity.  Nor are plaintiffs confined to the allegations contained in the complaint.  Rather, once the defendant claims to be a sovereign immune from suit, the plaintiff then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted," *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir.1993).  "Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties,

and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on

this issue – resolution of disputed issues of fact." *Bulgartabac Holding AD v. Republic of Iraq*,

1:08-CV-065020RJH, 2009 WL 3113252 at *6 (S.D.N.Y. Sept. 30, 2009) *aff'd*, 451 F. App'x 9

(2d Cir. 2011) (internal quotations omitted).   Ultimately, however, the "burden of persuasion

remains with the alleged foreign sovereign." *Cargill*, 991 F.2d at 1016.

The FSIA provides an exception to immunity if a foreign sovereign engages in

"commercial" as opposed to "sovereign" acts.   Specifically, pursuant to 28 U.S.C. § 1605(a)(2),

a foreign sovereign will not be immune from suit where:

> [T]he action is based [1] upon a commercial activity carried on in the United
> States by the foreign state; or . . .[3] upon an act outside the territory of the United
> States in connection with a commercial activity of the foreign state elsewhere and
> that act causes a direct effect in the United States.

*Id*.   In enacting the FSIA, Congress was "concern[ed] with providing access to the courts to those

aggrieved by the commercial acts of a foreign sovereign . . ." *Texas Trading & Milling Corp. v.*

*Fed. Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir. 1981) (internal quotations and citation

omitted), *overruled on other grounds*, *Frontera Resources Azerbaijan Corp. v. State Oil Co. of*

*Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009).   The point of the commercial activity

exception is clear:   while Congress sought to immunize foreign sovereign entities when they

engage in activity typical of a sovereign state, those same entities must be subject to suit when

they are engaged in activity typical of a *private business*.   *Republic of Argentina v. Weltover,*

*Inc.*, 504 U.S. 607, 614 (1992) ("when a foreign government acts, not as a regulator of a market,

but in the manner of a private player within it, the foreign sovereign's actions are 'commercial'

within the meaning of the FSIA.").   *See* 28 U.S.C. § 1603(d) (defining commercial activity to be

"a regular course of commercial conduct or a particular commercial transaction or act.").

Here, Defendant does not dispute that it is regularly engaged in commercial activity.  Nor could it.  Defendant is a wealth fund whose *sole purpose* is commercial activity.  *See* Jaffe Declaration, Exhibit B at 3 ("The Fund' [sic] mission is to increase the national wealth of the Republic of Kazakhstan by increasing the long term value (cost) of companies, effective management of assets belonging to [Defendant]").  Defendant itself trumpets its vast commercial experience, noting its control of more than 500 companies – only one of which is BTA Bank.  Am. Compl. ¶ 14.  By every measure, each and every action Defendant takes in connection with the conduct of its business is commercial, and not sovereign, in nature.  *Weltover*, 504 U.S. at 614 (a sovereign is engaged in "commercial activity" when "the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'") (citation omitted); *see also Hanil Bank v. Pt. Bank Negara Indonesia*, 148 F.3d 127, 131 (2d Cir. 1998) ("A state engages in 'commercial activity' for purposes of the FSIA where it acts not in its governmental or public role, but rather like a private player in the marketplace.").

Nor can Defendant dispute that every act or activity at issue in this litigation is a commercial (and not sovereign) act or activity.  This case arises out of Defendant's (i) investment in and control of BTA Bank, (ii) participation in the 2010 Restructuring and subsequent financial affairs of BTA Bank, and (iii) solicitation of and interactions with BTA Bank's creditors and other stakeholders.  These are quintessentially commercial acts and activities; there is nothing about Defendant's conduct that could ever be considered a sovereign act.  *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 750 (S.D.N.Y. 2004); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) ("It is self-evident that

issuing public debt is a commercial activity"); *Braka v. Multibanco Comermex, S.A.*, 589 F.

Supp. 802, 805 (S.D.N.Y. 1984) (sale of securities is commercial activity).

Because it is undisputed that Defendant's alleged conduct is "commercial activity" within

the scope of the commercial activity exception, sovereign immunity will not attach if

Defendant's commercial acts were carried on (i) in the United States (§1605(a)(2) – clause one),

or (ii) outside the United States, but having a direct effect felt in the United States (§1605(a)(2) –

clause three).  Here, both the first and third clauses of the commercial activity exception apply.

The Court has subject matter jurisdiction over this action; Defendant's motion to dismiss

pursuant to F.R.C.P. 12(b)(1) should be denied.

### A.    S-K Fund Engaged In Commercial Activity In The United States.

The first clause of the FSIA's commercial activity exception provides that the Court will

have subject matter jurisdiction to the extent the dispute relates to "*commercial activity carried*

*on in the United States by the foreign state*."  28 U.S.C. § 1605(a)(2) (emphasis added).  For the

commercial activity exception to apply, the foreign state need not have "generally engage[d]" in

commercial activity in the U.S. on a regular basis; rather "conduct giving rise to the claim [must

be simply] a part of commercial activity having substantial contact with the United States."

*Shapiro*, 930 F.2d at 1018 ("The United States has a strong interest in capital-raising activities

within its borders.").

Here, Defendant's conduct, which Defendant itself characterizes as "multiple acts, all of

which are alleged to have occurred in the United States" (Def. Mem. at 18; *see also id.* at 16, 21)

are more than sufficient to implicate the commercial activity exception.

1.      S-K Fund's Distribution of the Information Memorandum in the United
States Is a Commercial Act Giving Rise to Plaintiffs' Claim.

The distribution of the Information Memorandum, including the S-K Undertaking, in the

United States constituted a commercial act in the United States giving rise to Plaintiffs' claim.

Am. Compl. ¶ 13.  The S-K Undertaking was a key element of the proposed 2010 Restructuring,

as it assured investors, including Plaintiffs, that Defendant (BTA Bank's dominant 75%

shareholder) would not use its control position to obtain dividends or distributions until BTA

Bank's other creditors had been repaid.  *Id.* at ¶¶ 13-14.  Critically, with S-K Fund's knowledge

and consent, the S-K Undertaking was distributed to BTA Bank creditors in the United States.

BTA Bank made the Information Memorandum (including the S-K Undertaking) available to

U.S. investors by, with Defendant's knowledge and assent (i) mailing it directly to BTA Bank's

creditors, (ii) providing it to U.S. brokers (including Plaintiffs' broker at UBS), and (iii) making

the Information Memorandum available on BTA Bank's website.  *Id.* at ¶¶ 29-30.

The commercial activity exception applies where a foreign sovereign engages in capital-

raising activities in this country in connection with an illegal act giving rise to plaintiff's claim.

*Daventree*, 349 F. Supp. 2d at 751 (finding a "significant nexus" between the privatization of

Azerbaijan's government-owned oil company and the United States where sovereign defendants

allegedly extorted vouchers, options, and shares from plaintiffs and solicited prospective buyers

of those vouchers in the U.S.); *see also Braka*, 589 F. Supp. at 805 (sale of unregistered

securities and misstatements made in connection with that sale is commercial activity).  Here,

there can be no doubt that this activity gave rise to Plaintiff's claims; the Information

Memorandum and the S-K Undertaking are alleged to be false and misleading, and distribution

of that document in the United States gives rise to Plaintiffs' claims under the Exchange Act.  *Id.*

at 804.

Defendant argues that the "issuance" of the Subordinated Notes did not take place in the United States, but instead took place in Europe.  Def. Mem. at 17.  Even if true, this misses the point.  Regardless of where the securities were ultimately issued, they were marketed for sale by Defendant and BTA Bank in the United States.  The Information Memorandum – to which Defendant contributed the critically important S-K Undertaking – was intended to solicit Plaintiffs' participation in the 2010 Restructuring.  Under settled law, this constitutes commercial activity in the United States.  *See Shapiro*, 930 F.2d at 1019 (commercial activity exception applied where promissory notes introduced into the United States to raise capital); *Daventree*, 349 F. Supp. 2d at 751 (commercial activity exception applied where "solicitation of prospective buyers took place in the United States").

> 2.   S-K Fund's Additional Efforts to Market the Subordinated Notes in the United States Are Commercial Acts Giving Rise to Plaintiffs' Claim.

The Amended Complaint alleges that Defendant's representatives, along with BTA Bank representatives, traveled to the United States following the 2010 Restructuring to meet with investors and describe BTA Bank's activities.  Am. Compl. ¶ 19.  Defendant does not dispute that these meetings occurred, or that they are commercial acts in the United States (in fact, they expressly admit this to be the case).  Def. Mem. at 20.  Instead, Defendant argues that these acts are somehow "irrelevant" to the Plaintiff's claims.  *Id.*  It is not only commercial conduct that itself forms an element of the asserted claim which can be considered for these purposes.  Rather, the commercial activity exception is implicated where "conduct giving rise to the claim is ***a part of*** commercial activity having substantial contact with the United States."  *Shapiro*, 930 F.2d at 1018 (emphasis added); *see also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 97 CIV. 6124 (JGK), 1999 WL 307666 at *12 (S.D.N.Y. May 17, 1999) *aff'd*, 199 F.3d 94 (2d Cir.

1999).  Each relevant commercial act need not, standing alone, give rise to plaintiffs' claim.  *See Shapiro*, 930 F.2d at 1018.

Defendant's undisputed efforts to travel the country to reassure investors as to BTA Bank's stability are *fundamental* to the alleged fraudulent scheme.  Defendant's  marketing trips helped maintain the artificially inflated value of BTA Bank's securities.  Plaintiffs were subsequently injured when the Subordinated Notes they purchased at these inflated prices declined upon the market's realization of the Subordinated Notes' true value following disclosure of the Negative Carry Swap in 2011, and later BTA Bank's true liability for the Recovery Units in 2012.  Am. Compl. ¶¶ 50, 65.  These trips to the United States and meetings within the United States are, together with Defendant's other commercial acts, sufficient to invoke the commercial activity exception to FSIA immunity.

**B.**      **S-K Fund's Extraterritorial Commercial Activity Had a Direct Effect In The United States.**

The Court also has subject matter jurisdiction under the third clause of 28 U.S.C. § 1605(a)(2), which provides an exemption to sovereign immunity where the foreign sovereign entity engages in (i) acts outside the territory of the United States; (ii) in connection with a commercial activity of the foreign state elsewhere; and (ii) those acts caused a direct effect in the United States.  *Weltover,* 504 U.S. at 611.  To establish a "direct effect in the United States," the United States "need not be the location where the *most* direct effect is felt, simply a direct effect."  *Hanil Bank*, 148 F.3d at 133 (emphasis added).  The "direct effects" prong of the commercial activity exception is satisfied where, as here, plaintiff's claim is "based upon" the act alleged to have caused the direct effect in the United States; the term "based upon" is "read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief

under his theory of the case." *Hansen v. Danish Tourist Bd.*, 147 F. Supp. 2d 142, 149

(E.D.N.Y. 2001) (internal citations and quotations omitted).

       1.     <u>Distribution of the Information Memorandum and S-K Undertaking Constituted Commercial Activity Having a Direct Effect In the United States.</u>

While the Information Memorandum and S-K Undertaking were distributed in the United

States (*see supra* at 6-7), it is undisputed that they were prepared, and the S-K Undertaking was

executed by Defendant, outside the United States. Def. Mem. at 5. But those documents – and

the material misstatements and omissions contained in them – plainly had a direct effect in the

United States: Plaintiffs relied on the Information Memorandum and incorporated S-K

Undertaking in connection with purchases of Subordinated Notes in the United States, both

during the 2010 Restructuring and in secondary market purchases in 2011 and 2012. Am.

Compl. ¶¶ 7-12. Because Plaintiffs' reliance on Defendant and BTA Bank's material

misstatements and omissions in the Information Memorandum constitutes a necessary element of

the securities fraud claim asserted in the Amended Complaint, those statements resulted in a

legally significant direct effect in the United States. *See Basic Inc. v. Levinson*, 485 U.S. 224,

243 (1988) (reliance is a necessary element of a securities fraud claim brought under section

10(b)).[3]

Defendant's extensive reliance on *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) is

misplaced. In *Nelson*, an American employee of a Saudi hospital brought suit against the

Kingdom of Saudi Arabia seeking damages for injuries he allegedly suffered while detained and

tortured by the Saudi government. 507 U.S. at 351. The employee argued that the commercial

---

[3] It is meaningless that, as a technical matter, the Subordinated Notes were "issued" outside the United States. Def. Mem. at 16-17. The alleged claim arose not from the issuance of the Subordinated Notes, but from Plaintiffs' purchases of those securities in the United States. Thus, Defendant's authority (which stands for the unremarkable proposing that issuance of a security "refers to the first delivery [of the security] to a holder") – has no application here. *See Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit & Trust Co.*, 466 F. Supp. 1133, 1144 (S.D.N.Y. 1979).

activity exception applied because the hospital recruited him in the United States.  The Supreme

Court held that because the employee had no need to demonstrate the hospital recruited him in

order to prevail on the merits, the hospital's recruiting activities provided no basis for his suit.

*See id.* at 358.  Here, by contrast, Plaintiffs' reliance on Defendant's misstatements and

omissions in the Information Memorandum, the purchases in the U.S. in reliance on those

misstatements and omissions, and the damages incurred as a result of that reliance, are facts

necessary to prove Plaintiffs' securities laws claims.  *See Suez Equity Investors, L.P. v. Toronto-*

*Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (to establish loss causation, "a plaintiff must

allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss

suffered.").

        2.        <u>S-K Fund's 2011 Statements Constituted Commercial Activity Having a</u>
                    <u>Direct Effect in the United States.</u>

The Amended Complaint describes at length various false and misleading statements

Defendant made in 2011 upon which Plaintiffs relied in purchasing additional Subordinated

Notes in the secondary market.  Am. Compl. ¶¶ 7-12.  It is undisputed that these statements were

commercial in nature, and that they were widely distributed in the United States.  Plaintiffs'

reliance on those statements constituted a direct effect in the United States, sufficient to satisfy

the commercial activity exception.

Defendant makes no attempt to argue that these statements – the existence of which are

not in dispute – did not constitute commercial activity having a direct effect in the United States.

Rather, Defendant argues that certain Plaintiffs could not have relied on these statements because

certain of Plaintiffs' purchases of the subordinated notes were made prior to the date of the

statements at issue.  Def. Mem. at 22.  In so arguing, Defendant ignores the undisputed fact that

Plaintiffs purchased more than $60 million of Subordinated Notes *after* these statements were made. *See* Am. Compl. Ex. A.

> 3. <u>S-K Fund's Failure to Disclose BTA Bank's Increased Liability for the Recovery Units Constituted Commercial Activity Having a Direct Effect in the United States.</u>

As alleged in the Amended Complaint, Defendant – which had complete access to BTA Bank's financial records – was aware by January 2012 that as a result of BTA Bank's default on its senior debt, it had become virtually certain that the Recovery Units would become an additional $5 billion liability, senior to the Subordinated Notes and *pari passu* to BTA Bank's senior debt. *Id.* at ¶¶ 62-64, 66-67.  Despite that knowledge, Defendant failed to inform any BTA Bank creditor – including any Plaintiff – of this material change in BTA Bank's financial condition, nor did Defendant direct BTA Bank (which it controlled) to do the same.  To the contrary, Defendant participated in various meetings and presentations outside the United States in 2012 which obscured that precise liability. *Id.* at ¶¶ 19, 62-65, 67.  This conduct – fundamental to Defendant's scheme to defraud BTA Bank's creditors – had a direct effect in the United States when plaintiffs purchased additional Subordinated Notes in 2012 while completely unaware of BTA Bank's true financial condition. *Id.* at ¶ 58.  Again, the commercial activity exception to FSIA immunity is satisfied.

**C.**   **<u>Plaintiffs' Conduct and Status Is Irrelevant to the Application of the Commercial Activity Exception.</u>**

In an effort to distance itself from its prominent role in the sale of the Subordinated Notes to Plaintiffs, Defendant attempts to shift the focus from the acts that it has taken in the United States, or which caused a direct effect in the United States.  Instead, Defendant focuses on *Plaintiffs'* status and conduct.  Under settled law, each of its arguments is wholly without merit.

*First*, Defendant contends that because the Individual Plaintiffs "are not QIBs," they

"therefore could not be the targets of marketing in the United States." Def. Mem. at 19.  This is

a red herring.  The commercial activity exception is concerned only with "the conduct of the

foreign state and not the allegedly aggrieved party." *Mortimer*, 615 F.3d at 108.  On a motion to

dismiss under the FSIA, "the particular circumstances surrounding" Plaintiffs' acquisition of

securities "are irrelevant." *Shapiro*, 930 F.2d at 1019.  The relevant issue is the nature of the

activity engaged in by the foreign sovereign. *Id.*  As alleged in the Amended Complaint and

discussed *supra*, Defendant engaged in commercial acts both inside and outside the United States

in connection with the sale of the Subordinated Notes. *See* Sections IA, IB, *supra*.  This is

sufficient commercial activity in the United States to establish subject matter jurisdiction. *See*

*Shapiro,* 930 F.2d at 1019; *Weltover*, 504 U.S. at 611.[4]

*Second*, Defendant argues that because "Individual Plaintiffs and Blu Funds were not

creditors of BTA Bank prior to the 2010 Restructuring and thus would not have received the

Information Memorandum in connection with the Restructuring," and "the Information

Memorandum makes clear that it should [be] [sic] relied upon for no purpose other the 2010

Restructuring Plan," the "dissemination of the Information Memorandum cannot constitute

marketing of the Subordinated Notes in any regard[.]" Def. Mem. at 19.  But how each Plaintiff

came into possession of the Information Memorandum – and whether Plaintiffs appropriately

relied on its misrepresentations and omissions – is irrelevant for the purposes of this

jurisdictional motion. *See Shapiro*, 930 F.2d at 1019.  In any event, as discussed *infra*,

---

[4] In any event, Defendant is simply wrong:  BTA Bank's sale of the Subordinated Notes pursuant to Rule 144A was not limited to QIBs.  Those sales were also targeted towards "Accredited Investors," as defined in Regulation D of the Securities Act to include, among other things, "natural persons whose net worth, or joint net worth with that person's spouse . . . exceeds $1,000,000." 17 C.F.R. § 230.501(a).  As alleged in the Amended Complaint, Plaintiffs were qualified to purchase the Subordinated Notes pursuant to Rule 144A, and did in fact purchase the notes in the United States in reliance of the Information Memorandum and other statements made by Defendant and BTA Bank. Am. Compl. ¶¶ 32, 34.

25

Defendant cannot disclaim reliance on the Information Memorandum while simultaneously distributing it widely and making it available to investors on BTA Bank's website. *See infra* at 39; *Suez Equity Investors,* 250 F.3d at 102.

*Third*, Defendant argues that the Corporate Plaintiffs are all organized under Panamanian law and "therefore would not have received the Information Memorandum in the United States." Def. Mem. at 19. This argument also improperly distorts the jurisdictional question by shifting the focus from Defendant's comtellmercial acts in the United States to Plaintiffs' acts. The critical question is whether Defendant's marketing efforts were directed at the United States, not where Plaintiffs were located. *See Daventree*, 349 F. Supp. 2d at 750-51.

*Daventree* is instructive. In that case, in connection with its privatization effort, Azerbaijan sold vouchers to a number of investors, including plaintiffs – a Cyprus corporation and two Virgin Island corporations. Thereafter, Azerbaijan allegedly engaged in an extortionate scheme to obtain additional funds, and ultimately the vouchers themselves, from plaintiffs. Representatives of Azerbaijan traveled to the U.S. in an effort to re-sell the vouchers that they had extorted from the plaintiffs to non-plaintiff U.S. investors. The court found that the solicitation of prospective buyers in the U.S. was commercial activity with a "significant nexus" to the conduct underlying plaintiffs' extortion claims. 349 F.Supp. 2d at 751. That the Plaintiffs were not incorporated or located in the United States, and did not purchase the vouchers in the United States, was irrelevant to the jurisdictional analysis.[5]

*Finally*, Defendant argues that because the Corporate Plaintiffs are domiciled outside the United States, they could not have suffered injury in the United States. Def. Mem. at 24. But this argument is belied by the undisputed facts. As alleged in the Amended Complaint, each of

---

[5] Moreover, Defendant's argument is factually inaccurate. As described *infra*, Plaintiffs committed to each alleged purchase of Subordinated Notes in the United States via UBS offices in the United States. *See* page 9, *supra*.

Plaintiffs' purchases of the Subordinated Notes was made in the United States through UBS, utilizing funds in Plaintiffs' UBS accounts *in the United States*. Am. Compl. ¶¶ 7-12. When Defendant's fraud was revealed and the Subordinated Notes declined in value, Plaintiffs suffered a loss in those same, domestic UBS accounts. The direct effect of Defendant's misstatements was Plaintiffs' purchases of the Subordinated Notes; those purchases ultimately resulted in an injuries to all Plaintiffs in the United States.

### D.   This Court Has Personal Jurisdiction Over S-K Fund.

Under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 579 (2d Cir. 1993) (internal quotations omitted). *See* 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under subsection (a) where service has been made under [28 U.S.C. § 1608].").  Defendant does not dispute that service has been effectively made. Instead, Defendant suggests that due process precludes the Court's exercise of personal jurisdiction in this action. That argument is without merit.

The due process clause permits a forum to exercise personal jurisdiction over a non-resident defendant when the defendant has "minimum contacts" with the forum, such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Tanoga Ltd. v. Ministry of Public Works and Housing of the Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 358 (N.D.N.Y. 2001) (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)). Where the action arises from defendant's contact with the forum state, minimum contacts exist where the "defendant purposefully availed" itself of the privilege of doing business in the forum. *Id.* (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2003)).

Here, Defendant "purposely availed itself" of the United States by (as described above) engaging in myriad commercial acts in connection with its dominating control position with regard to BTA Bank.  Those acts included both distributing the Information Memorandum and S-K Undertaking to investors and brokers in the United States, as well as traveling to the United States in support of BTA Bank.  Notably, the "significant nexus" required to satisfy the first prong of the commercial activity exception is a closer nexus than the "minimum contacts" necessary for due process.  *Shapiro*, 930 F.2d at 1020.  Thus, the same commercial acts within the United States that provide a basis for subject matter jurisdiction under the FSIA constitute "minimum contacts" sufficient to satisfy due process.  *Id*.

## II.    SECTION 10(B) OF THE EXCHANGE ACT APPLIES TO THE TRANSACTIONS AT ISSUE

Section 10(b) of the Securities Exchange Act and Rule 10b-5 apply to "transactions in securities listed on domestic exchanges[ ] and *domestic transactions in other securities*." *Morrison*, 130 S. Ct. at 2884 (emphasis added).  A transaction will be deemed domestic where either (i) irrevocable liability was incurred in the United States or (ii) title passed within the United States.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012).  These requirements are disjunctive; either the passing of title or the incurring of irrevocable liability in the United States satisfies *Morrison*.  *See, e.g.*, *Mori v. Saito*, No. 10 Civ. 6465 (KBF), 2013 WL 1736527 at *5 (S.D.N.Y. April 19, 2013); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) (because irrevocable liability was incurred in the United States, the court "need not reach the question of where title was transferred").

As the Second Circuit explained in *Absolute Activist*, a plaintiff may satisfy the irrevocable liability prong by alleging facts that show "the purchaser incurred irrevocable

liability within the United States to take and pay for a security, *or* that the seller incurred irrevocable liability within the United States to deliver a security." 677 F.3d at 68 (emphasis added). Allegations in the Amended Complaint as to the incurring of irrevocable liability must be presumed to be true, and all reasonable inferences must be drawn in Plaintiffs' favor. *See*, *e.g.*, *Absolute Activist*, 677 F.3d at 65; *see also Absolute Activist Master Value Fund, Ltd. v. Ficeto*, No. 09 Civ. 8862 (GRD), 2013 WL 1286170 at *1 n.1 (S.D.N.Y. March 28, 2013) (factual allegations concerning domestic transactions "are deemed to be true for the purposes of a motion to dismiss"); *Mori*, 2013 WL 1736527 at *2.

Here, the Amended Complaint alleges that Plaintiffs incurred irrevocable liability for the securities purchases at issue in the United States. These allegations are more than "mere assertion that transactions 'took place in the United States.'" Def. Mem. at 27-28; *Absolute*, 677 F.3d at 70. Rather, the Complaint contains factual allegations in support of the conclusion that, in connection with each of (i) the 2010 Restructuring and (ii) Plaintiffs' subsequent purchases of BTA Bank securities in 2011 and 2012, Plaintiff's incurred irrevocable liability for their securities purchases in the United States. Under *Morrison* and its progeny, this is sufficient to sustain Plaintiffs' federal securities law claims. *See*, *e.g.*, *Mori*, 2013 WL 1736527 at *5.

A. <u>**Plaintiffs Incurred Irrevocable Liability in the United States for Purchases of the Subordinated Notes in Connection with the 2010 Restructuring.**</u>

As alleged in the Amended Complaint, in connection with the 2010 Restructuring, Plaintiffs Atlantica and Baltica collectively acquired BTA Bank Subordinated Notes with a face value of $946,000. Am. Compl. ¶¶ 7-8 and Ex. A. Irrevocable liability for these purchases was incurred when each of Atlantica and Baltica unconditionally committed to the 2010 Restructuring by a communication to their broker in the UBS Miami Office, and thereby

incurred irrevocable liability to accept subordinated debt in the 2010 Restructuring in the United States.  *Id.* at ¶¶ 7-8.

Defendant's arguments in opposition are unavailing.  Defendant asserts that no acquisition of the Subordinated Notes in connection with the 2010 Restructuring could have been effective until creditors of the bank had voted in London and Kazakhstan to approve the plan of the Restructuring and a court in Kazakhstan had approved it.  Def. Mem. at 28.  Accordingly, Defendant argues, irrespective of whether the Plaintiffs committed to the transaction in the United States, the existence of a subsequent foreign "step" necessarily renders the purchase a foreign transaction.  *Id., citing S.E.C. v. Benger*, No. 09 C 676, 2013 WL 593952 at *12 (N.D. Ill. Feb. 15, 2013).  But Defendant's reliance on *Benger* – a summary judgment decision – as its sole authority is misplaced.  In that case, the Court had before it a full factual record detailing the manner in which the plaintiff's acquisition of the securities at issue was accomplished.  *Benger*, 2013 WL 593952 at *12 ("[h]ere, of course, we are beyond the pleading stage and we need not accept as true statements in the Second Amended Complaint that the stock transaction at issue closed in the United States.").  On this motion to dismiss, however, the Court must accept the factual allegations of the Amended Complaint as true.  *See Absolute Activist*, 677 F.3d at 65; *Absolute Activist*, 2013 WL 1286170 at *1 n.1; *Mori*, 2013 WL 1736527 at *2; *see also Quail Cruises Ship Management Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307, 1310 (11th Cir. 2011) (court must accept as true allegation that "the transaction for the acquisition. . . closed in Miami, Florida. . . by means of the parties submitting the stock transfer documents by express courier into this District. . . ").

Defendant further contends that Atlantica and Baltica "could only have acquired their interests in BTA Bank's Subordinated Notes in a transaction occurring in Europe."  Def. Mem. at

29.[6]   However, while certain steps in the transaction were to occur in Europe, *Plaintiffs'
commitment to the transaction* was complete upon delivery to their broker at UBS in New York
the documents necessary to secure their participation in the 2010 Restructuring.  *See Liberty
Media*, 861 F. Supp. 2d at 269 (irrevocable liability incurred for *Morrison* purposes when parties
entered into binding merger agreement, even though closing conditions had yet to be satisfied).
The Information Memorandum details the procedure by which Atlantica and Baltica were
required to submit in order to commit to the 2010 Restructuring.  As described in the Amended
Complaint, this commitment to participate was made by a communication by Atlantica and
Baltica to UBS in the United States.  Am. Compl. ¶¶ 7-8.

Atlantica and Baltica were required to deliver an "Electronic Instruction Form" providing
their assent to (or dissent from) the restructuring transaction and receipt of the Subordinated
Notes.  IM at 91.  That form made plain on its face that from the purchaser's perspective,
commitment to the transaction was irrevocable:

> **Electronic Instruction Forms from Beneficial Owners . . . shall be irrevocable**
> *provided, however, that* in the event that the Bank, in its sole discretion, amends,
> terminates or withdraws the Restructuring Plan, . . . in a manner that is materially
> adverse to affected Euronoteholders in the opinion of the Trustee,
> Euronoteholders shall be permitted, subject to the conditions set out herein, to
> revoke any Electronic Instruction Forms delivered in relation thereto for a period
> of two business days. . .

*Id.* (italics in original, bold added).  Thus, once Atlantica and Baltica communicated their
willingness to receive the Subordinated Notes to UBS in the United States and UBS executed
those instructions by submission of the Electronic Information Form, Atlantica and Baltica were

---

[6] This argument rests entirely on a declaration submitted by an attorney who represented BTA Bank in connection with the 2010 Restructuring, Francis Fitzherbert-Brockholes, and documents that were neither incorporated by reference into the Amended Complaint nor otherwise integral to the Amended Complaint.  They cannot be considered here.  *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) ("a district court errs when it considers affidavits or documents submitted by defendants") (citation and internal punctuation omitted).

irrevocably bound to the transaction.[7]  *See S.E.C. v. Amerindo Inv. Advisors, Inc.*, No. 05 Civ. 5231(RJS), 2013 WL 1385013 at *6 (S.D.N.Y. March 11, 2013) (purchaser could incur "irrevocable liability" to take and pay for a stock when he mailed notice of election even though payment and delivery were to be delayed) (citation omitted); *cf. Liberty Media*, 861 F. Supp. 2d at 269.

      For these reasons, upon communication to UBS, Atlantica and Baltica incurred irrevocable liability for the transaction at issue.  Am. Compl. ¶¶ 7-8.  As to the 2010 Restructuring, Plaintiffs have adequately pled the existence of a domestic transaction.

**B.**      <u>Plaintiffs Incurred Irrevocable Liability in the United States for Purchases of the Subordinated Notes in the Secondary Market.</u>

      The Amended Complaint plainly alleges facts giving rise to the inference that Plaintiffs incurred irrevocable liability in the United States for their purchases of BTA Bank Subordinated Notes (transactions totaling in excess of $75 million) in the secondary market.  In connection with each such secondary market transaction, the Amended Complaint alleges that (i) Plaintiffs placed an order to purchase Subordinated Notes with their broker in the UBS Miami Office; (ii) the UBS Miami Office transmitted the order to UBS's U.S. broker-dealer; (iii) funds from Plaintiffs' UBS accounts were transferred internally to UBS's back office; and (iv) the order was filled and the transaction completed.  *Id*. at ¶¶ 7-12.  On the basis of these allegations Plaintiffs have plainly pled the existence of a domestic transaction consistent with *Morrison* and *Absolute Activist*.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 153 n.34 (S.D.N.Y. 2012) (purchases of stock in off-exchange transactions in the United States were domestic transactions

---

[7] Per the terms of the 2010 Restructuring, Atlantica and Baltica's Electronic Information Form could only be submitted by a "Direct Participant" acting on their behalf.  Defendant describes Direct Participants to be "generally large financial institutions which held interests in the New Notes for their own accounts ***or for the accounts of their customers***."  Def. Mem. at 7 (emphasis added).  Nowhere does Defendant suggest that UBS's broker-dealer was not such a Direct Participant.

as defined in *Absolute Activist*, despite shares also trading on European exchange).  Defendant makes three basic arguments to support its motion, each of which is without merit.

First, Defendant suggests that the Amended Complaint is "deliberately phrased" and "purposefully ambiguous" in that it does not identify the location of additional details surrounding the execution of the trades at issue, including the "location of UBS's back office." Def. Mem. at 30.  Defendant suggests that these details, concerning UBS's inner workings and back office operations, were something Plaintiffs could "easily obtain." *Id.*  But even if Plaintiffs could have compelled UBS to disclose the details of its internal operations in advance of filing their complaint (and they could not), the facts alleged to be missing or "ambiguous" are irrelevant to the inquiry.  Plaintiffs incurred irrevocable liability for their purchases when they placed their order with their broker at the UBS Miami Office, and that broker passed the order to UBS's U.S. broker-dealer for execution.  *See*, *e.g.*, *Amerindo*, 2013 WL 1385013 at *6 (purchaser incurred irrevocable liability by having an agent in Illinois send a $1 million payment to a Bear Stearns & Co. account in New York); *Vivendi*, 284 F.R.D. at 153 n.34.  The remaining steps in the process that Defendant claims to be missing are, as Defendant admits, relevant only to "where title passed" (Def. Mem. at 30) – the alternative standard articulated by the Second Circuit in *Absolute Activist*.  *See Absolute Activist*, 677 F. 3d at 68; *Liberty Media*, 861 F. Supp. 2d at 269 (finding *Morrison* satisfied under irrevocable liability prong and declining to consider passing of title prong).[8]

Second, Defendant speculates wildly that "the most plausible inference to draw" is that Plaintiffs' orders were filled "on a foreign exchange in Kazakhstan or Luxembourg,"  Def. Mem.

---

[8] In any event, Defendant will have ample opportunity in discovery to explore the mechanics by which UBS executed the trades at issue.  And when it does, Defendant will be sorely disappointed:  since filing the Amended Complaint, Plaintiffs have learned that UBS's "back office" in which the orders at issue were filled is located in Stamford, Connecticut.

at 31.  But there is no allegation in the Amended Complaint, or any document incorporated in the Amended Complaint, to support this conclusion.  In fact, the Subordinated Notes were tradable in the United States among accredited investors pursuant to exemptions from registration under the Securities Act.  The Information Memorandum provides expressly that "New Notes" (which included the Subordinated Notes at issue) could be sold to "Eligible Investors" (defined as either Accredited Investors or QIBs) in private transactions in the United States.  *See* IM at (i).  To facilitate such transactions, New Notes were represented by a Restricted Global Note, "registered in the name of Cede & Co., as nominee for, and which will be deposited on or about the Closing Date with a custodian for DTC" in New York.  IM at 314; *see* FFB Declaration ¶ 13; *see also* IM at 318.  As such, when the allegations contained in the Amended Complaint are read in the light most favorable to the Plaintiffs, the obvious conclusion that must be drawn is that Plaintiffs' purchases were accomplished by a private, U.S. based-transaction among qualified investors.  *See Absolute Activist*, 677 F.3d at 65; *Absolute Activist*, 2013 WL 1286170 at *1 n.1; *Mori*, 2013 WL 1736527 at *2; *Quail Cruises*, 645 F.3d at 1310.  Notably, even the FFB Declaration acknowledges this very plausible inference.  *See* FFB Declaration ¶ 26 ("Of course, an interest in the New Notes could also be transferred on the books of a Direct Participant or on the books of a third party holding a beneficial interest in the New Notes through a Direct Participant.").[9]

Finally, Defendant speculates that the secondary market transactions at issue must have settled through Euroclear Bank and Clearstream Banking, both of which are non-U.S. entities.  Def. Mem. at 31.  These speculations are unavailing, for several reasons.  First, they go to the

---

[9] For this reason, Defendant's authority related to the purchase of publicly traded securities on a foreign exchange is inapposite.  *See, e.g., Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010) (common stock at issue purchased on foreign exchange); *In re Societe Generale Sec. Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 at *6 (S.D.N.Y. Sept. 29, 2010) (purchase of defendant's "ordinary shares" on a foreign exchange); *Plumbers Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010) (common stock purchased on foreign exchange).

ultimate passage of title, and not the acts – far earlier in the relevant chain of events – by which

Plaintiffs incurred irrevocable liability.  *See Liberty Media*, 861 F. Supp. 2d at 269 (finding a

domestic transaction based on the incurring of irrevocable liability and declining to consider

transfer of title); *Amerindo*, 2013 WL 1385013 at *6 (*Morrison* test satisfied based on incurrence

of irrevocable liability).  Second (as admitted in the FFB Declaration), the Information

Memorandum provides expressly that the Subordinated Notes could be sold "within the United

States (in private transactions…)" and, further, that a U.S. clearing system, DTC, was available

for that purpose.  *See* FFB Declaration ¶ 26; IM at (i); *see also* IM at 314-15.

Plaintiffs have adequately alleged that they incurred "irrevocable liability" in the United

States in connection with all purchases of the securities at issue; these transactions constitute

"domestic transactions" under *Morrison*.  Defendant's motion should be denied.

III.    **PLAINTIFFS HAVE ADEQUATELY PLED RELIANCE**

At the pleading stage, a plaintiff need only allege that it reasonably relied on defendant's

alleged misrepresentation or omission in making its investment.  *See Laser Mortg. Mgmt. Inc. v.*

*Asset Securitization Corp.*, No. 00 Civ. 8100 (NRB), 2001 WL 1029407 at *9 (S.D.N.Y. Sept. 6,

2011).  Whether that reliance was actually reasonable is a question of fact to be adjudicated

following discovery.  *Nathel v. Siegal*, 592 F. Supp. 2d 452, 466 (S.D.N.Y. 2008) ("[t]he

question of whether Plaintiffs' reliance was reasonable is fact-intensive and not suited for

resolution on a motion to dismiss.").  The Amended Complaint alleges both that (i) Atlantica and

Baltica participated in the 2010 Restructuring, and acquired the Subordinated Notes, in

reasonable reliance on material misstatements and omissions contained in the Information

Memorandum and (ii) that all Plaintiffs made subsequent aftermarket purchases in reasonable

reliance on subsequent misstatements and omissions by both Defendant and BTA Bank.  Am.

Compl. ¶¶ 7-12.  Under the law of this Circuit, these allegations are more than sufficient to

sustain Plaintiffs' claims.  Defendant's motion to dismiss should be denied.

A.   **Atlantica and Baltica Reasonably Relied on the Information Memorandum In Connection with the 2010 Restructuring.**

The Amended Complaint alleges that (i) the Information Memorandum contained

material misstatements and omissions by both Defendant (in particular, the S-K Undertaking,

which was expressly incorporated by reference in the Information Memorandum) and BTA Bank

(for which Defendant – BTA Bank's then seventy-five percent shareholder – is liable as a control

person) (*id*. at ¶ 2-3); (ii) in support of the 2010 Restructuring, the Information Memorandum

was distributed to Plaintiffs (*id*. at ¶ 7-12); and (iii) in reliance on those material misstatements

and omissions contained in the Information Memorandum, Plaintiffs (specifically those who

participated in the 2010 Restructuring), approved the 2010 Restructuring and acquired the

Subordinated Notes.  *Id*. at ¶¶ 7-12, 30, 33-34.  In addition, the Amended Complaint contains

allegations explaining *why* Plaintiffs' reliance was reasonable, alleging that Defendant and BTA

Bank's misstatements and omissions concerned information that would have influenced the

decision of a reasonable investor to acquire the Subordinated Notes.  *Id*. at ¶ 76.  These

allegations are more than adequate to satisfy the requirements for pleading reliance under the

Exchange Act.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2185 (2011);

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 318 (S.D.N.Y. 2011) (reasonableness of

plaintiff's reliance turns on an analysis of "the entire context of the transaction") (internal

citations and quotations omitted).[10]

---

[10] Defendant does not deny that the Information Memorandum, including the S-K Undertaking, was intended to be relied upon by creditors evaluating whether to participate in the 2010 Restructuring – including Atlantica and Baltica.  *See* Def. Mem. at 33, n.12.  Nor could they; the Information Memorandum provides on its face that it is intended to be relied upon by potential investors in connection with that transaction.  IM at (ii).

Defendant argues that Plaintiffs' reliance on the Information Memorandum was unreasonable because the misstatements and omissions alleged in the Amended Complaint concerning the Negative Carry Swap were not, in fact, misstated or omitted. Def. Mem. at 33-34. Critically, Defendant does not – and cannot – assert that the details and net effect of the Negative Carry Swap were disclosed in a way that permits a potential investor to clearly and reasonably understand the Negative Carry Swap and its deleterious effect on BTA Bank. *See McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("The central issue on [a section 10(b)] claim[] is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor"). Rather, Defendant argues that the various discrete components of the Negative Carry Swap were separately disclosed in scattered financial tables throughout the 699-page Information Memorandum. Def. Mem. at 34-35. But even if true, such scattershot disclosure cannot serve to refute Plaintiff's allegations of reasonable reliance. *In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287 (S.D.N.Y. 2012) ("scattered disclosures are not sufficient for defendants to prevail at the motion to dismiss stage" and "allegations of incomplete disclosures . . . satisfy the pleading requirements for material omissions.") (internal quotations omitted); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 324 (S.D.N.Y. 2009) (same).

But even more fundamentally, Defendant's claim of fulsome disclosure in the Information Memorandum is *factually untrue*. At its core, the Amended Complaint alleges three actionable misstatements or omissions:

- The Information Memorandum disclosed (in the S-K Undertaking, a document expressly incorporated in the Information Memorandum and executed by Defendant "in favour of" BTA creditors – including Plaintiffs) that absent certain conditions, Defendant would not receive *any*

dividends or distributions from BTA Bank.   Am. Compl. ¶¶ 38-40.
Despite that express representation, the Information Memorandum failed
to disclose that, as a result of the Negative Carry Swap transaction,
Defendant was in fact receiving hundreds of millions of dollars of net
annual distributions in the form of interest payments from BTA Bank.  *Id.*
at ¶¶ 41, 43-44;

- The Information Memorandum disclosed that BTA Bank's interest
expense due to customers (principally Defendant) was far outweighed by
interest income received by BTA Bank from Defendant, when in fact BTA
Bank's interest expense to Defendant far outweighed its interest income
from Defendant (*id*. at ¶ 43); and

- The Information Memorandum disclosed that "current accounts generally
bear no interest" when, in fact, BTA Bank was paying Defendant interest
at rates as high as 10.9% on current account deposits in excess of KZT
245 million.  *Id*. at ¶ 44.

None of these allegations are refuted by disclosures in the Information Memorandum.  In

fact, Defendant makes no argument at all to how disclosures in the Information Memorandum

renders unreasonable Plaintiffs' alleged reliance on either (i) the S-K Undertaking, and the

failure to disclose that Defendant's commitment not to receive dividends or distributions from

BTA Bank was rendered meaningless by the Negative Carry Swap and (ii) the Information

Memorandum's disclosure of BTA Bank's net interest obligations.  As to the exorbitant rate of

interest paid by BTA Bank to Defendant, Defendant relies on the general disclosures (again,

spread throughout the Information Memorandum) that Defendant's "deposits consisted of both

current and term accounts" and that "*term accounts* paid interest rates ranging from 4% to

12.5%."  Def. Mem. at 35 (emphasis added).  But this does nothing to refute the allegation in the

Amended Complaint that BTA Bank disclosed that its "*current accounts* generally bear no

interest" while paying Defendant interest at rates as high as 10.9% on its *current account*

*deposits*.  Am. Compl. ¶ 44 (emphasis added).

Plaintiffs have adequately alleged reasonable reliance on the misstatements and

omissions in the Information Memorandum.

**B.      Plaintiffs Reasonably Relied on S-K Fund and BTA Bank's Misstatements and Omissions of Material Facts in Connection with Secondary Market Purchases of the Subordinated Notes.**

Plaintiffs have also alleged reasonable reliance in connection with Plaintiffs' secondary market purchases of Subordinated Notes.

1.      Plaintiffs Reasonably Relied on the Information Memorandum.

Until the public disclosure of the Negative Carry Swap in May 2011 (and the resulting collapse in the value of the Subordinated Notes), Plaintiffs continued to reasonably rely on the misstatements and omissions contained in the Information Memorandum. *Id*. at ¶¶ 7-12, 33-34, 47. [11]  Defendant does not argue that Plaintiffs could not have received, reviewed, and relied upon the Information memorandum in connection with their secondary market purchases. Rather, Defendant asserts that Plaintiffs' reliance is rendered void by the Information Memorandum's purported disclaimer of reliance for purchases made other than in connection with the 2010 Restructuring.  Def. Mem. at 33 n. 12.  However, it is well settled that an issuer cannot simply immunize itself from reliance by a class of investors by including waiver language in a widely disseminated and publicly available offering memorandum. *Cf. Suez Equity Investors*, 250 F.3d at 102 (defendants cannot escape liability "when a fraudulent document that had been prepared with one intended victim in mind later was used to defraud another."). [12]

2.      Plaintiffs Reasonably Relied on S-K Fund's 2011 Statements.

Plaintiffs also reasonably relied on Defendant's misleading statements during 2011 that it would assure the continued capitalization of BTA Bank.  Am. Compl. ¶ 52.  These statements

---

[11] It is worth noting that if the Negative Carry Swap had been disclosed in the Information Memorandum, as Defendant contends that it was, J.P. Morgan's report disclosing the details of the Negative Carry Swap would not likely have resulted in an immediate dramatic drop in the price of the Subordinated Notes.  Am. Compl. ¶ 49-50. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008) (fall in market price is indicative of an earlier failure to disseminate the full truth about the alleged misstatement).

[12] Defendant's reliance on *Sable v. Southmark/Envicon Capital Corp*, 819 F. Supp. 324 (S.D.N.Y. 1993) is misplaced.  That case involved a standard disclosure of the risky nature of the potential investment, and did not involve a stated disclaimer of reliance at all.

were directed at potential purchasers of the Subordinated Notes in an effort to prop up their price and the price of other BTA Bank securities.  *Id*. at ¶ 51.  Defendant argues that reliance on these statements is not justifiable because Plaintiffs did not buy any Subordinated Notes until after BTA Bank's second default in early 2012.  Def. Mem. at 36 ("Plaintiffs could not have reasonably relied on statements from 2011 that a second restructuring was not necessary.").  But even in connection with those 2012 purchases, Plaintiffs reasonably relied on Defendant's assurances that it would, among other things "sort the situation out with the bonds."  Am. Compl. ¶ 52.  That proved not to be the case; in the 2012 Restructuring, Defendant secured 97% of BTA Bank for itself, while the Subordinated Notes were rendered virtually worthless.

### 3.   Plaintiffs Reasonably Relied on S-K Fund and BTA Bank's Omissions and Material Misstatements About the Recovery Units.

Plaintiffs reasonably relied on Defendant and BTA Bank's public statements in 2012 which failed to disclose BTA Bank's true liability for the Recovery Units following BTA Bank's default on its senior debt obligations in January 2012.  As alleged in the Amended Complaint, upon default of BTA Bank on its senior debt, the Recovery Units could be accelerated such that the entire $5 billion reference amount of the Recovery Units would become an unconditional obligation of BTA Bank, *pari passu* to its senior debt.  *Id*. at ¶¶ 60-62.  Yet despite BTA Bank's default on its senior debt in January 2012, and the virtual certainty that the Recovery Units would be accelerated, BTA Bank made no meaningful disclosure at all of this enormous increased liability.  *Id*. at ¶¶ 62-64.

As a threshold matter, to the extent that Plaintiffs relied on Defendant and BTA Bank's failure to disclose this dramatic change in BTA Bank's liability, reliance is presumed.  As the Supreme Court established in *Affiliated Ute v. United States*, where material facts are omitted, "positive proof of reliance is not a prerequisite to recovery."  406 U.S. 128, 153 (1972); *see also*

*Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 185 (S.D.N.Y. 2005) ("[i]n securities fraud cases, reliance is presumed when the claim rests on the omission of a material fact."). The *Affiliated Ute* presumption will apply where Plaintiffs show that the omission was material and the party principally liable for the omission had a duty to make a disclosure. *See In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2013 WL 1150737 at *6 (S.D.N.Y. March 21, 2013).

Here, there can be little doubt that an increase in BTA Bank's indebtedness of more than $5 billion was material. *See In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 25 (S.D.N.Y. 2004) (failure to disclose accumulation of excessive debt was material). Defendant and BTA Bank were also subject to a duty to disclose. A duty to disclose fully and accurately arises if there is a partial disclosure of risk that omits material information relevant to the risk. *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("*In re AIG*") ("generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks"; warnings "do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *see also Fogarazzao*, 232 F.R.D. at 185 (applying *Affiliated Ute* presumption to material omissions where plaintiffs' claims were based on a combination of misstatements and omissions); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539 at *8 (S.D.N.Y. Aug. 21, 2008) (applying *Affiliated Ute* presumption where plaintiffs alleged failure to disclose material facts that made the reporting of certain information and transactions misleading).

The disclosures BTA Bank made in 2012 underscore that omission. For example, in a January 2012 PowerPoint presentation, BTA Bank identified its total external liabilities–described to include only approximately $2 billion in senior debt and $850 million in

41

Subordinated Notes–as approximately $4.8 billion.  Am. Compl. ¶ 63.  Despite knowing that the full approximately $5 billion reference amount of the Recovery Units almost certainly would be accelerated and due and owing as a result of its default on BTA Bank's senior debt, Defendant and BTA Bank intentionally concealed BTA Bank's increased risk of liability for the Recovery Units.  *Id.*

Similarly, in a March 2012 PowerPoint presentation to the Steering Committee for the 2012 Restructuring, BTA Bank merely advised that it *could potentially* become liable for the full reference amount of the Recovery Units.  Am. Compl. ¶ 64; Def. Mem. at 42.  In light of the fact that BTA Bank's default on its senior debt had already occurred, such disclosure was plainly inadequate.  *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").  In that same presentation, BTA Bank further represented that its total liability for debt securities issued – including the senior debt and Subordinated notes, as well as the Recovery Units – *declined* by 6.5% in its preliminary audited financial statements from previously issued estimates, from KZT 702 billion ($4.68 billion) to KZT 656 billion ($4.37 billion).  Am. Compl. ¶ 64.  Incredibly, BTA Bank offered that this purported decrease in its liabilities was the result of a KZT 46 billion ($310 million) decrease in its liability on the Recovery Units.  *Id.*  On this record, Plaintiffs' allegations of reliance are plainly sufficient.

*Finally*, Defendant claims that BTA Bank's potential liability on the Recovery Units was "specifically disclosed" in the Information Memorandum.  Def. Mem. at 42.  However, nowhere in the 26 pages of "Risk Factors" in the Information Memorandum, which purport to include specific risk factors associated with the Subordinated Notes, is there any disclosure at all about

the risk of acceleration of the Recovery Units and the resulting $5 billion liability senior to the Subordinated Notes.  In fact, the only discussion of the potential for acceleration of the Recovery Units is in Annex 4 to Schedule 9 of the Information Memorandum, one of the 26 exhibits to the 699-page Information Memorandum.  Even that disclosure fails to note that upon acceleration the Recovery Units will be a liability of BTA Bank senior to the Subordinated Notes – an enormous but undisclosed risk faced by holders of those securities.  In any event, the disclosure of a theoretical source of liability in the Information Memorandum in 2010 is a far cry from the reality of an imminent $5 billion liability once the 2012 default had already occurred.  *See In re AIG*, 741 F. Supp. at 531 ("generic risk disclosures are inadequate to shield defendants from liability for known specific risks") (citation omitted); *In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ("to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.") (citation omitted).  Plaintiffs have adequately pled conscious recklessness.

## IV.   PLAINTIFFS HAVE ADEQUATELY ALLEGED LOSS CAUSATION

To establish loss causation, "a plaintiff must allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Suez Equity Investors,* 250 F.3d at 95.  Plaintiff is only obligated to plead facts sufficient to "ascribe some rough proportion of the whole loss" to defendants' fraud.  *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 398 (2d Cir. 2012) (citation omitted).

Here, Plaintiffs sufficiently alleged that Defendant's material misstatements and omissions (both in the Information Memorandum and thereafter), upon which they relied in purchasing the Subordinated Notes, were the cause of Plaintiff's injury.  As alleged in the Amended Complaint, when information about the Negative Carry Swap was disclosed in May

2011, the price of the Subordinated Notes dropped significantly.  Am. Compl. ¶ 50.  Similarly,

Plaintiffs allege that, upon disclosure of BTA Bank's true liability for the Recovery Units, the

Subordinated Notes further declined in value.  *Id.* at ¶ 65.  These allegations are sufficient to

plead a cause of action under Rule 10b-5.  *See Take-Two Interactive*, 551 F. Supp. 2d at 282

("[a] plaintiff can plead loss causation only by alleging that the defendant's misstatements or

omissions 'concealed something from the market that, when disclosed, negatively affected the

value of the security.'") (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir.

2005)).

     In support of its motion, Defendant points to a number of factors unrelated to

Defendant's alleged misconduct that Defendant claims caused the decline in the value of the

Subordinated Notes.  Def. Mem. at 37.  The existence of other factors, however, is not sufficient

to disprove loss causation at the pleading stage if plaintiffs allege that "some rough proportion of

the whole loss" is ascribed to defendant's misstatements.  *Gen. Elec.*, 857 F. Supp. 2d at 398.

The law does not "impose[ ] on plaintiffs the heavy burden of pleading facts sufficient to exclude

other non-fraud explanations."  *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F.

Supp. 2d 334, 342 (S.D.N.Y. 2010).  Determination as to whether plaintiffs' loss was actually

caused by an intervening event "is a matter of proof to be decided at trial."  *Lentell*, 396 F.3d at

174 (citation omitted).

## V.    __PLAINTIFFS HAVE ADEQUATELY ALLEGED SCIENTER__

     The Private Securities Litigation Reform Act ("PSLRA") requires that a securities fraud

complaint "state with particularity facts giving rise to a strong inference that the defendant acted

with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  Although speculation and conclusory

allegations will not suffice, neither do courts require "'great specificity' provided the plaintiff

alleges enough facts to support 'a strong inference of fraudulent intent.'"  *Ganino v. Citizens*

*Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)).  In evaluating allegations of scienter, the court "must accept all factual allegations in the complaint as true" and must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard."  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (citations omitted).

In the Second Circuit, facts giving rise to a strong inference of scienter may be pled by allegations of either "strong circumstantial evidence of conscious misbehavior or recklessness" or "motive and opportunity to commit fraud."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Here, the Amended Complaint satisfies both pleading standards.

### A.     Plaintiffs Have Alleged Conscious Recklessness.

Scienter may be pled by identifying circumstances indicating the defendant's conscious recklessness.  *Ganino*, 228 F.3d at 169.  To allege recklessness, plaintiff can either allege (i) defendant's knowledge of facts or access to information contradicting defendant's public statements, or (ii) that defendant failed to check facts it had a duty to monitor.  *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 241 (S.D.N.Y. 2006) (citing *Novak*, 216 F.3d at 308, 311); *In re Allstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) ("where scienter is pled in part by alleging that defendants knew facts or had access to information suggesting that their public statements were not accurate, the scienter analysis is closely aligned with the analysis as to misleading statements") (citation and internal quotation marks omitted).  If a complaint adequately pleads that defendants acted recklessly, the court need not consider the defendant's motive and opportunity to commit the alleged fraud.  *See Ganino*, 228 F.3d at 170.

The Amended Complaint adequately pleads conscious recklessness by both Defendant and BTA Bank.  Recklessness is adequately alleged where a plaintiff alleges defendants'

knowledge of facts or access to information contradicting their public statements.  *See Novak*, 216 F.3d at 308; *Allstom*, 406 F. Supp. 2d at 456.  Here, BTA Bank and Defendant are alleged to have known (i) the details of the undisclosed Negative Carry Swap (Am. Compl. ¶ 42), (ii) Defendant's true intentions with regard to BTA Bank (*id*. at ¶ 45), and (iii) BTA Bank's true liability for the Recovery Units.  *Id*. at ¶¶ 63-64.  Defendant and BTA Bank's failure to make accurate disclosure of these facts constituted conscious recklessness.

On its motion, Defendant makes two arguments against Plaintiffs' allegations of conscious recklessness; neither is viable.  First, Defendant contends that the facts concerning the Negative Carry Swap and Recovery Units were both fully disclosed in the Information Memorandum.  Def. Mem. at 39-40.  But for the reasons discussed in Section IIIA *supra*, these disclosures are inadequate to negate the inference of scienter.  *See Stillwater*, 858 F. Supp. 2d at 287.[13]

Second, as to Defendant's misstatements during 2011 concerning Defendant's intention to support BTA Bank (Am. Compl. ¶¶ 51-52), Defendant argues that those misstatements were merely "[s]tatements of corporate optimism" or "puffery" and hence cannot support a strong inference of scienter.  Def. Mem. at 41-42.  But while mere statements of optimism are not actionable, statements of future intent by the speaker, if false when made, do support an inference of scienter.  *See Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 455 (S.D.N.Y. 2007) (statements were not puffery where they included specific detail and were alleged to be knowingly false); *Lapin*, 506 F. Supp. 2d at 239 ("optimistic statements may be

---

[13] For that reason, Defendant's authorities – all of which involve actual, clear disclosure of the alleged misrepresented or omitted fact – are inapposite.  *See In re Merrill Lynch Auction Rate Sec. Litig*., 765 F. Supp. 2d 375, 387 (S.D.N.Y. 2011) (scienter not alleged where defendant's auction rate securities bidding practices clearly disclosed); *In re Merrill Lynch Auction Rate Sec. Litig*., 851 F. Supp. 2d 512, 529 (S.D.N.Y. 2012) (same); *Press v. Quick & Reilly*, No. 96 CIV 4278 (RPP), 1997 WL 458666 at *5 (S.D.N.Y. Sept. 11, 1997) (clear disclosure of allegedly undisclosed commissions sufficient to negate any inference of scienter); *In re UBS AG Sec. Litig*., No. 07 Civ. 11225 (RJS), 2012 WL 4471265 at *15 (S.D.N.Y. Sept. 28, 2012) (same).

actionable upon a showing that defendants did not genuinely or reasonably believe the positive opinions they touted"). Here, Defendant did more than express optimism concerning BTA Bank's prospects. It stated that Defendant "would not let [BTA Bank] get into trouble" and that it would "sort out the situation with the bonds," (Am. Compl. ¶ 52a) while having no intention of doing so. These allegations are sufficient to infer scienter.

### B. Plaintiffs Have Alleged Motive and Opportunity.

Scienter may also be pled by alleging "motive and opportunity to commit fraud." *Novak*, 216 F.3d at 311. Motive entails concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged, while opportunity entails the likely prospect of achieving concrete benefits by the means alleged. *Id.* at 307; *Glidepath*, 590 F. Supp. 2d at 455. Opportunity is generally presumed; courts frequently recognize that corporations and corporate insiders have the opportunity to commit fraud. *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557 (S.D.N.Y. 2010).

Defendant does not dispute – nor could it – that both Defendant and BTA Bank had the opportunity to commit fraud. Def. Mem. at 39-42. BTA Bank (the corporation itself) and Defendant (BTA Bank's controlling shareholder) had complete control of BTA Bank's financial information and the controlled disclosure of that information in connection with the 2010 Restructuring and thereafter. Am. Compl. ¶¶ 3, 66-67; *see also* IM at 120. Opportunity has been adequately pled.

As to motive, the Amended Complaint plainly articulates Defendant and BTA Bank's motive to commit fraud in connection with each of the Information Memorandum and Defendant and BTA Bank's post-restructuring misstatements and omissions.

1.      Plaintiffs Have Alleged Motive In Connection with the Information
Memorandum.

The Amended Complaint alleges that in connection with the Information Memorandum

(i) BTA Bank was motivated – by its own desire for survival – to obtain creditor approval of the

2010 Restructuring by hiding the existence and extent of the Negative Carry Swap and

(ii) Defendant was motivated to use its control position to increase its own recovery in

connection with the 2010 Restructuring and thereafter by negotiating terms that appeared fair to

creditors and investors, but in fact assured that S-K Fund would receive hundreds of millions of

dollars from the Negative Carry Swap at the expense of other creditors.  *Id.* at ¶¶ 46, 68.  *See*

*Glidepath*, 590 F. Supp. 2d at 455 (desire to avoid debt and induce a favorable sale sufficient to

allege motive to commit fraud).  These allegations are sufficient to allege Defendant and BTA

Bank's motive, and thus scienter.

In its motion, Defendant does not argue that Plaintiffs have failed to allege motive and

opportunity in connection with the Information Memorandum.  Rather, Defendant argues that as

to Defendant's false and misleading disclosures concerning the Negative Carry Swap, Plaintiff's

alleged motive "made no economic sense."  Def. Mem. at 40.  But that inquiry is not

appropriately conducted on a motion to dismiss.  *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp.

2d 266, 288 (S.D.N.Y. 2006) ("it should go without saying that, at the motion to dismiss stage, it

is rarely proper for a court to decide that a plaintiff's allegations make no sense.").  In any event,

the alleged motive is entirely rational.  As a sovereign wealth fund and BTA Bank's dominant

shareholder, Defendant was in a position to prevent BTA Bank from failing.  Indeed, as Plaintiffs

allege, in connection with the 2010 Restructuring, Defendant did just that.  Am. Compl.

¶ 31.  Thus while the 2010 Restructuring was ultimately doomed to failure, Defendant was in a

position to reap profits from the Negative Carry Swap for as long as it saw fit.

48

2.   Plaintiffs Have Alleged Motive in Connection with S-K Fund's 2011-12 Misstatements and Omissions.

Defendant and BTA Bank's motives in connection with its subsequent misstatements and omissions in 2011 and 2012 are plainly alleged in the Amended Complaint.  Throughout the relevant period, BTA Bank was motivated to perpetuate its survival by not disclosing its actual financial condition (including both the true nature of the Negative Carry Swap and its true liability for the Recovery Units).  Am. Compl. ¶ 46.  Defendant was motivated to continue to receive the benefit of the Negative Carry Swap, and maintain market support for the Subordinated Notes.  *Id.* ¶ 68.  Defendant makes no effort to challenge the sufficiency of these allegations.

## VI.   S-K FUND IS LIABLE AS A CONTROL PERSON.

To plead a cause of action for "control person" liability under Section 20(a) of the Exchange Act, a plaintiff must plead (i) the existence of a primary violation; and (ii) control by the defendant over the primary violator.  *See In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003).  Defendant does not dispute that (as a holder of more than 75% of the Bank's shares) it exercised the requisite control over BTA Bank.  *See In re The Leslie Fay Cos. Sec. Litig.*, No. 92 Civ. 8036 (WCC), 1993 WL 438927, *5 (S.D.N.Y. Oct. 27, 1993) ("plaintiffs need only allege that defendants either directly or indirectly held the power to exercise control over the primary violator."); *see also* IM at 120.  Moreover, as described above, Plaintiffs have adequately alleged that BTA Bank violated Section 10(b) and Rule 10b-5.  *See* Section III, *supra*.

Defendant contends that Plaintiffs must plead "culpable participation" by Defendant in BTA Bank's violation and scienter, *i.e.* "facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator…was engaged in

fraudulent conduct." Def. Mem. at 43, citing *In re Global Crossing Ltd. Secs. Litig.*, No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 5, 2005).  However, other courts in this Circuit have held to the contrary, holding that Section 20(a) requires merely that the plaintiff allege a primary violation and control, in accordance with Rule 8(a)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 396 (S.D.N.Y 2003) (holding that a Section 20(a) claim is pled "in accordance with Rule 8(a).").  In any event, Plaintiffs have adequately alleged that Defendant was in a position to, and did in fact, participated extensively in the 2010 Restructuring and BTA Bank's subsequent disclosures.  Am. Compl. ¶¶ 29, 36, 88.  Plaintiffs have adequately pled a Section 20(a) cause of action.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendant's motion to dismiss the Amended Complaint.

Dated:  June 10, 2013
        New York, New York

**COHEN & GRESSER LLP**

By:_____/s/_____
        Brett D. Jaffe
        bjaffe@cohengresser.com
        Scott D. Thomson
        sthomson@cohengresser.com
        Alexis G. Stone
        astone@cohengresser.com
        800 Third Avenue, 21st Floor
        New York, NY  10022
        Phone:  (212) 957-7600
        Fax:  (212) 957-4514

        *Attorneys for Plaintiffs*