UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- X

ATLANTICA HOLDINGS, INC., et al.,                     :
                                                      :
                              Plaintiffs,             :
                                                      :
              -v-                                     :
                                                      :
SOVEREIGN WEALTH FUND SAMRUK-KAZYNA JSC,              :
                                                      :
                              Defendant.              :
                                                      :
------------------------------------------------------------------------- X

┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____       │
│ DATE FILED: 03/10/2014               │
└─────────────────────────────────────┘

12 Civ. 8852 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

The present case is brought on behalf of Plaintiffs Altantica Holdings, Inc. ("Atlantica"),

Baltica Investment Holding, Inc. ("Baltica"), and Blu Funds, Inc. ("Blu"), all Panamanian

corporations, and Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg, all United States

citizens.  Defendant Sovereign Wealth Fund Samruk-Kazyna ("S-K Fund") is a sovereign wealth

fund owned and operated by the Republic of Kazakhstan and the majority shareholder of non-

party BTA Bank JSC ("BTA Bank"), one of the largest banks in Kazakhstan.  Plaintiffs,

purchasers of subordinated debt securities issued by BTA Bank as part of a restructuring plan,

allege securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), 15 U.S.C. §§ 78j, 78u.

S-K Fund now moves to dismiss pursuant to (1) Federal Rule of Civil Procedure

12(b)(1), on the ground that the Court lacks subject-matter jurisdiction; (2) Federal Rule of Civil

Procedure 12(b)(2), on the ground that the Court lacks personal jurisdiction over S-K Fund; (3)

Federal Rule of Civil Procedure 12(b)(6), on the ground that the Amended Complaint fails to

state a claim; and (4) Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation

Reform Act ("PSLRA"), 15 U.S.C. §§ 78u-4(b)(1)-(b)(3)(A), on the ground that Plaintiffs fail to plead fraud with particularity.  S-K Fund also moves to dismiss Plaintiffs' control-person claims for failure to state a claim.  For the reasons discussed below, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, which are taken from the Amended Complaint and documents it references, are construed in the light most favorable to Plaintiffs.  *See, e.g.*, *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).  In considering Defendant's motion under Rule 12(b)(1), the Court has also considered facts set forth in affidavits submitted by the parties.  *See, e.g.*, *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

S-K Fund is a sovereign wealth fund owned and operated by the Republic of Kazakhstan. (Am. Compl. ¶ 14).  S-K Fund controls more than 500 companies in a diverse range of areas, including banking, oil and gas, mining, chemicals, transport, communications, and electricity. (*Id.*).  On February 3, 2009, S-K Fund invested 212 billion Kazakhstani Tenge, or approximately $1.5 billion, in BTA Bank.  (Am. Compl. ¶ 26).  In exchange, S-K Fund took a 75.1% stake in BTA Bank and gained a seat on BTA Bank's Management Board.  (Am. Compl. ¶ 26). Thereafter and at all times relevant to this case, S-K Fund controlled BTA Bank and directed its affairs.  (Am. Compl. ¶¶ 66-67; *see also* Decl. Francis Fitzherbert-Brockholes (Docket No. 18) ("F-B Decl."), Ex. A ("Informational Mem."), at 120).

In April 2009, BTA Bank announced that it had ceased payment of principal on its outstanding financial obligations.  (Am. Compl. ¶ 27).  In the aftermath of that announcement, and at S-K Fund's direction, BTA Bank began planning to restructure its debt; those efforts culminated in 2010 (the "2010 Restructuring"), when BTA Bank issued subordinated debt

2

securities (the "Notes").  (Am. Compl. ¶¶ 28, 32).  In connection with the 2010 Restructuring, BTA distributed an "Information Memorandum" — a document 669 pages in length, not including exhibits — detailing the proposed restructuring, the terms of the Notes, and the financial prospects of BTA Bank going forward.  (Am. Compl. ¶ 29).  The Information Memorandum was sent to all BTA Bank creditors — a group that included Atlantica and Baltica, but no other Plaintiffs.  (Am. Compl. ¶¶ 29, 33-34).  Although Defendant contends that the Information Memorandum was "available" only to those investors who affirmed that they were either (1) both outside the United States and were not United States residents or (2) United States persons permitted by the terms of the Notes to purchase them (*see* Mem. Law Supp. Def.'s Mot. To Dismiss Am. Compl. ("Def.'s Mem.") (Docket No. 17) 5-6; *accord* Information Mem. i-ii), the document is (and was) available on the Internet.  (F-B Decl. ¶ 10; Pls.' Mem. Law Opp'n Def.'s Mot. To Dismiss Am. Compl. ("Pls.' Mem.") (Docket No. 21) 7 n.1; *see* Information Mem., *available at* http://bta.kz/files/IM_2010.pdf).

By its terms, the 2010 Restructuring was not legally effective until approved by several classes of BTA Bank's creditors as well as a specialized financial court sitting in Almaty, Kazakhstan.  (F-B Decl. ¶¶ 16-20).  The creditors, including Atlantica and Baltica, approved the restructuring on May 28, 2010.  (Am. Compl. ¶ 30).  Thereafter, BTA Bank issued Notes to United States persons as an exempt offering, which meant that purchases of the Notes by United States persons were limited to certain "qualified buyers," as defined by Securities and Exchange Commission Rule 144A, as well as certain high net-worth individuals.  (Am. Compl. ¶¶ 32, 34).[1]

---

[1]     Defendant urges this Court to take note of the byzantine manner in which this exchange occurred: BTA Bank's old debt ("Euronotes") was held only by "Direct Participants" to the Euroclear Bank SA/NV or Clearstream Banking SA clearinghouses, both of which are located in Europe.  (F-B Decl. ¶¶ 21-22).  As Defendant would have it, when the Euronotes were

The Notes were also subject to transfer restrictions: They could be transferred only to "qualified buyers," as defined under Rule 144A, or to United States persons, as defined by Rule 902 of Regulation S.  *See* 17 C.F.R. § 230.902(k)(1).  (Information Mem. 311-12; F-B Decl. ¶¶ 23-27). By the terms of the Notes, any other transfer would be void *ab initio*.  (Information Mem. 311). Additionally, the Notes were listed only on the Kazakhstan and Luxembourg Stock Exchanges; they never traded on any United States exchange.  (F-B Decl. ¶ 23).  At all relevant times, the Notes themselves were held at the London offices of Bank of New York Mellon and could be transferred by beneficial owners only at the order of a Direct Participant.  (*See* F-B Decl. ¶¶ 22, 26-28).  Thus, although investors could place orders to purchase Notes from within the United States, such orders were cleared and settled by clearinghouses in Europe.  (F-B Decl. ¶ 21).

These overseas connections notwithstanding, eighty percent of all securities issued pursuant to the 2010 Restructuring — a set that included but was not limited to the Notes at issue in this case — were denominated in United States dollars.  (Am. Compl. ¶ 32).  Additionally, the Information Memorandum provided that principal and interest payments on the Notes would be made to the payee's bank in New York City.  (Am. Compl. ¶ 19).  Moreover, as a practical matter, it was relatively straightforward for United States investors to obtain the Notes.  For example, any Direct Purchaser — such as UBS, Plaintiffs' agent — could transfer beneficial

---

exchanged for the Notes after the consummation of the 2010 Restructuring, it was the Direct Participants, not individual investors, who received the newly issued Notes.  (F-B Decl. ¶ 21). But by Defendant's own admission, "Direct Participants held interests in the [Notes] either for their own accounts *or for the benefit of their customers*."  (*Id.* (emphasis added); Def.'s Mem. 7). As beneficial owners, Atlantica and Baltica — not UBS Financial Services ("UBS"), their agent and a Direct Participant — exercised their option to convert their Euronotes into Notes.  (Am. Compl. ¶¶ 7-8; *accord* Information Mem. 91).  Thus, there is neither a legal nor an economic reason to treat the Direct Participants as the exclusive owners of the Notes at the time of the 2010 Restructuring.

ownership of any Note held on its books from one of its customers to another.  Perhaps as a result of those facts, twenty-five percent of the Notes issued during the 2010 Restructuring were purchased by investors in the United States.  (Am. Compl. ¶ 32).

Separate and apart from these connections to the United States, Plaintiffs generally allege that Defendant marketed the Notes extensively in the United States.  (Am. Compl. ¶¶ 19-20).  In particular, Plaintiffs allege — and Defendant does not dispute — that S-K Fund sent representatives to the United States to meet with investors and to assure them of the health of BTA Bank's balance sheet in the wake of the 2010 Restructuring.  (*Id.*; *see* Def.'s Mem. 20; Pls.' Mem. 20).  Additionally, the Amended Complaint alleges that Defendant "established a subsidiary for the purpose of marketing [its] investment in BTA Bank to potential investors including . . . investors in the United States."  (Am. Compl. ¶ 19).  Defendant questions the relevance of that allegation to Plaintiffs' claims, but notably it does not dispute the allegation itself.  (*See* Stipulation (Docket No. 20), at 2).[2]

Plaintiffs purchased or otherwise obtained the Notes between 2010 and 2012.  (Am. Compl. ¶¶ 7-12, 24; *id.* Ex. A).  As noted, Atlantica and Baltica — the only Plaintiffs who were creditors of BTA Bank in 2010 — participated in the 2010 Restructuring by exchanging their existing BTA Bank-issued debt for the Notes.  (Am. Compl. ¶ 33).  The rest of the Plaintiffs, along with Atlantica and Baltica, acquired Notes *after* the 2010 Restructuring through purchases on the secondary market.  (Am. Compl. ¶ 34).  For example, Atlantica and Baltica simply placed an order in Florida with UBS, which in turn transmitted the order to its broker-dealer in New

---

[2]     Defendant originally asserted that it "does not have any offices or subsidiaries in the United States" (Def.'s Mem. 23) (an assertion that differs from saying that it has no subsidiaries that have engaged in marketing securities inside the United States), but that assertion has been withdrawn — apparently to avoid discovery of certain "accounting records"  (Stipulation 2).

York, which sent client funds to its back office (the location of which is not referenced in the Amended Complaint), where the order was filled and the Notes were transferred. (Am. Compl. ¶¶ 7-8). Notably, Plaintiffs acquired the Notes even though they were either not qualified buyers or were United States persons — that is, even though they were not within the universe of investors eligible to buy the Notes pursuant to the terms of the Information Memorandum.

Despite the Information Memorandum's rosy projections, BTA Bank's financial position continued to deteriorate after the 2010 Restructuring. (*See* Am. Compl. ¶¶ 35-50). Meanwhile, Defendant — through its officers and agents — and BTA Bank made various public statements, which Plaintiffs allege were false and misleading. (*See* Am. Compl. ¶¶ 51-56). In January 2012, BTA Bank again defaulted on its debt obligations, prompting another round of restructuring (the "2012 Restructuring"). (Am. Compl. ¶ 57). According to Plaintiffs, Defendant and BTA Bank made additional false and misleading statements after this default. In July 2012, BTA Bank filed a bankruptcy petition, pursuant to Chapter 15 of the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of New York. (Docket No. 1, No. 12-13081-jmp, Bankr. S.D.N.Y.).[3]

In their Amended Complaint, Plaintiffs claim that several categories of Defendant's statements were false or misleading. First, Plaintiffs contend that the Information Memorandum contained false or misleading statements regarding both (1) BTA Bank's general financial outlook (Am. Compl. ¶¶ 35-37) and (2) what Plaintiffs call the "Negative Carry Swap," a series of loosely related transactions between S-K Fund and BTA Bank that Plaintiffs allege allowed S-

---

[3]     In light of BTA Bank's bankruptcy filing, it was not named as a Defendant in this case. On July 17, 2013, however, the bankruptcy stay was lifted (Docket No. 25, No. 12-13081-jmp, Bankr. S.D.N.Y.), and on August 16, 2013, Plaintiffs filed a separate suit against the bank. (Docket No. 1, 13 Civ. 5790).

K Fund to receive undue dividends disguised as interest payments (Am. Compl. ¶¶ 38-50).

Second, Plaintiffs claim that Defendant made false or misleading public statements between the

2010 Restructuring and the 2012 Restructuring regarding BTA Bank's financial prospects.  (Am.

Compl. ¶¶ 51-57).  Finally, Plaintiffs allege that Defendant concealed the magnitude of

obligations that BTA Bank promised to some of its creditors in connection with the 2010

Restructuring, concerning the recovery of funds that were "unlawfully diverted" from BTA Bank

by its former officers (the "Recovery Units").  (Am. Compl. ¶¶ 59-65).

## LEGAL STANDARDS

Citing the Foreign Sovereign Immunities Act ("FSIA"), Title 28, United States Code,

Section 1605, Defendant moves first to dismiss for lack of subject-matter jurisdiction.  In

considering such a motion, a court "must look at the substance of the allegations to determine

whether one of the exceptions to the FSIA's general exclusion of jurisdiction over foreign

sovereigns applies."  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (internal

quotation marks omitted).  This review includes both the pleadings as well as the evidence

submitted by the parties.  *See id.*  Once a defendant has established a *prima facie* case that it is a

sovereign, the burden of production shifts to the plaintiff, who must provide "evidence showing

that, under exceptions set forth in the FSIA, immunity should not be granted."  *Id.* at 141

(internal quotation marks omitted).  If the plaintiff meets that burden, a court resolves disputed

facts to determine whether any of the FSIA's exceptions apply.  *See, e.g.*, *Smith Rocke Ltd. v.

Republica Bolivariana de Venezuela*, No. 12 Civ. 7316 (LGS), 2014 WL 288705 (S.D.N.Y. Jan.

27, 2014).  The burden of persuasion on the motion to dismiss remains at all times with the

defendant.  *See id.* (quoting *Robinson*, 269 F.3d at 141).

By contrast, "[i]n reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012) (citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)).  The Court will not dismiss any claims pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Further, if a plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

Finally, because they allege securities fraud, Plaintiffs must also satisfy the heightened pleading requirements of both Rule 9(b), which requires that the circumstances constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the PSLRA, which requires that scienter — that is, a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with particularity, *Tellabs, Inc. v Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "'with respect to each act or

omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u-4(b)(2)).

## DISCUSSION

Defendant moves to dismiss on the grounds that (1) the Court lacks subject-matter jurisdiction under the FSIA; (2) the Court lacks personal jurisdiction over S-K Fund; (3) the Amended Complaint fails to allege a domestic transaction, reasonable reliance, or loss causation; and (4) Plaintiffs fail to plead fraud with the requisite degree of particularity.  Defendant also moves to dismiss Plaintiffs' control-person claim.  The Court will discuss each issue in turn.

**A.      Sovereign Immunity**

It is well established that "[t]he FSIA is the sole source for subject matter jurisdiction over any action against a foreign state."  *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (internal quotation marks omitted).  Specifically, the FSIA provides that a "foreign state" — defined to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a) — "shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  *Id.* § 1604; *see Kensington Int'l*, 505 F.3d at 153.  As there is no dispute that S-K Fund is a "foreign state" for purposes of the FSIA (*see* Am. Compl. ¶ 14; Def.'s Mem. 13), the threshold question in this case is thus whether any of the FSIA's statutory exemptions apply.  "'[U]nless a specified exception applies,'" the Court lacks subject-matter jurisdiction over the case.  *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 80 (2d Cir. 2008) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).

9

Here, Plaintiffs rely on the "commercial activities" exception set forth in Section 1605(a), which provides in relevant part that a foreign state is not immune from jurisdiction in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a). "Commercial activity," for purposes of the statute, is defined "as 'either a regular course of commercial conduct or a particular commercial transaction or act.'" *Human Rights in China v. Bank of China*, No. 02 Civ. 4361 (NRB), 2003 WL 22170648, at *4 (S.D.N.Y. Sept. 18, 2003) (quoting 28 U.S.C. § 1603(d)).  On a motion to dismiss in a case such as this, involving the acquisition of securities, "the particular circumstances surrounding [the plaintiffs'] acquisition of [the securities at issue] are irrelevant.  The issue, rather, is the nature of the activity engaged in by [the defendant]." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991).

In this case, Plaintiffs seek to rely on the first and third clauses of the commercial-activity exception.  (Pl.'s Mem. 18-27).  The first clause applies "if the plaintiff's action is 'based upon a commercial activity carried on in the United States by the foreign state.'" *Kensington Int'l*, 505 F.3d at 155 (quoting 28 U.S.C. § 1605(a)(2)).  For the third clause to apply, two conditions must be met: "(1) there must be an act outside the United States in connection with a commercial activity of the foreign state that causes a direct effect in the United States and (2) the plaintiff's suit must be based upon that act." *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 388 (2d Cir. 2000).  By its terms, therefore, that exception is limited to acts taking place outside the United States.  Further, those acts must have a "direct effect" in the United States, defined as "an effect . . . [that] follows 'as an immediate consequence of the

defendant's . . . activity.'"  *Weltover, Inc. v. Republic of Argentina*, 504 U.S. 607, 618 (1992)

(second alternation in original) (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145,

152 (2d Cir. 1991)).  "The effect need not be substantial or foreseeable, but it must be something

more than trivial or incidental."  *Kensington Int'l*, 505 F.3d at 157 (citation omitted).  Moreover,

the fact that an American citizen or entity "suffers some financial loss from a foreign tort" does

not, "standing alone," constitute a "direct effect."  *Id.* at 158 (internal quotation marks omitted).

For both the first and third clauses of the commercial-activity exception to apply, the

plaintiff's suit must also be "based upon" the defendant's act or activity.  *See id.* at 155-56

(discussing the "based upon" element of each clause and holding that the phrase should be given

the same meaning for each clause).  In *Transatlantic*, the Second Circuit explained that,

> [a]t a minimum, that language implies a causal relationship.  Thus, at the least, the
> "act that caused a direct effect in the United States" ("the Act") must be a "but
> for" cause of the judgments that are the ground of this suit.  That is, it must be
> true that without the Act, there would be no judgments on which to sue.  But this
> is not enough . . . .  "[B]ased upon" requires a degree of closeness between the
> acts giving rise to the cause of action and those needed to establish jurisdiction
> that is considerably greater than common law causation requirements.

204 F.3d at 390.  Elsewhere, the Court of Appeals has explained "that 'based upon' requires 'a

*significant nexus* . . . between the commercial activity in this country upon which the exception

is based and a plaintiff's cause of action."  *Kensington Int'l*, 505 F.3d at 157 (alteration in

original) (internal quotation marks omitted).

Applying those standards here, the Court concludes that Plaintiffs' suit is based upon an

act or acts outside the United States in connection with commercial activity of S-K Fund

elsewhere, with direct effects inside the United States — thereby satisfying the third clause of the

commercial-activity exception.  As an initial matter, there is no dispute that the nature of the

activity engaged in by Defendant was "commercial," as opposed to sovereign, in nature.  (*See*

Pls.' Mem. 17 (noting this fact)).  In addition, Plaintiffs' claims are based upon a course of conduct by Defendant that created the direct effects within the United States.  Defendant plainly contemplated investment by United States persons and indeed successfully subscribed twenty-five percent of the Notes offering with individuals within the United States.  (Am. Compl. ¶ 32). Defendant also created a subsidiary to market the Notes to, among others, United States investors.  (*Id.*)  Additionally, Defendant created the Information Memorandum outside the United States and sent it to both qualified buyers in the United States and Direct Purchasers who acted as broker-dealers for smaller investors in the United States (not to mention, made it accessible to anyone in the United States via the Internet, where the Memorandum was freely available).  (*See* Am. Compl. ¶ 29; F-B Decl. ¶ 10; Def.'s Mem. 5).  And finally, according to the Amended Complaint, Defendant made a series of false or misleading statements about the financial health of BTA Bank that, when the dust settled, left holders of the Notes — including many United States investors — with assets worth less than ten percent of their face value.  (Am. Compl. ¶¶ 50, 65).[4]  Combined, Plaintiffs have come forward with sufficient evidence, unrebutted by Defendant, to show that their claims are based upon Defendant's commercial activity outside the United States having direct effects within this country.  Under the FSIA, that is sufficient to create subject-matter jurisdiction.  *See, e.g.*, *Weltover*, 504 U.S. at 620; *see also Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 743-47, 750 (S.D.N.Y. 2004) (holding that the third clause of the commercial-activity exception applied where United States

---

[4]     Defendant argues that many of the foregoing are "acts" rather than "direct effects," and thus irrelevant to the jurisdictional inquiry.  (Def.'s Mem. 16-23).  Even assuming Defendant's characterizations are accurate, its argument is unavailing.  The Court, mindful that Defendant bears the ultimate burden on this motion, has no difficulty discerning the effects Plaintiffs implicitly allege from their detailed and direct allegations of Defendant's acts.

12

investors allegedly "sent more than $100 million to the Sovereign defendants to purchase [assets] allegedly extorted from plaintiffs" outside the United States, as "[t]hat allegation identifie[d] an immediate and legally significant effect in the United States of [the defendants' alleged conduct].").

In any event, even if the direct-effects exception did not apply, the Court concludes that Defendant's alleged conduct within the United States would be sufficient to create jurisdiction under the first prong of the commercial-activity exception.  *See Kensington Int'l*, 505 F.3d at 154 ("A plaintiff need only show that one of [the clauses is satisfied] for the commercial activities exception to apply.").  Defendant sent its agents to the United States to meet with investors as part of the course of the fraudulent activity alleged in the Amended Complaint.  (Am. Compl. ¶ 19).  Additionally, Defendant sent copies of the Information Memorandum to all Euronote holders in the United States, including UBS, which was Plaintiffs' broker-dealer.  (Am. Compl. ¶ 29; *see also* F-B Decl. ¶ 10; *cf.* Reply Mem. Law Supp. Def. Sovereign Wealth Fund "Samruk Kazyna" JSC's Mot. To Dismiss Compl. (Docket No. 23) 4 n.3).  These efforts in the United States induced investment by, among others, Plaintiffs Allan Kiblisky, Anthony Kiblisky, and Jacques Gliksberg.  (Am. Compl. ¶¶ 10-12).  That the Information Memorandum purported to limit its applicability to only certain purchases or investors is of no moment: Those limitations may go to the reasonableness of Plaintiffs' reliance, but they do not go to whether Plaintiffs would prevail *if* they demonstrate that they received the Information Memorandum and that they reasonably relied on it in purchasing the Notes.  Accordingly, this Court concludes that jurisdiction would also be proper under the first clause of the commercial-activity exception.  *Cf. Daventree*, 349 F. Supp. 2d at 751 (concluding that the first prong of the commercial-activity

exception applies where a sovereign expropriated plaintiffs' assets outside the United States and attempted to resell them to third-party investors in the United States).[5]

## B.    Applicability of Section 10(b)

Next, Defendant argues that Plaintiffs fail to state a claim upon which relief can be granted because, even accepting their factual allegations as true, they do not identify a securities transaction that occurred in the United States.  (Def.'s Mem. 26-32).  In particular, Defendant relies on *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869, 2884 (2010), in which the Supreme Court held that Section 10(b) of the Exchange Act applies only to "transactions in securities listed on domestic exchanges" and "domestic transactions in other securities."  *Id.* at 2884.  Plaintiffs do not contend that this case falls within the first category, as the Notes were listed only on stock exchanges in Kazakhstan and Luxembourg.  Thus, the question is whether the Amended Complaint plausibly alleges that the Notes were purchased or sold in the United States.  *See id.* at 2885 ("With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . .").

Although the *Morrison* Court provided little guidance on what constitutes a domestic purchase or sale, the Second Circuit addressed that issue directly in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).  Looking to the statute and its prior decisions, among other sources, the Circuit held that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange, . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United

---

[5]     The FSIA provides that district courts have personal jurisdiction over any "foreign state" whenever one of the Section 1605(a) exceptions applies.  28 U.S.C. § 1330(b); *see also Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993).  Accordingly, it follows from the discussion above that the Court has personal jurisdiction over Defendant in this case.

14

States." *Id.* at 68.  With respect to the former prong of this test, the Court explained further that

"it is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the

purchaser incurred irrevocable liability within the United States to take and pay for a security, *or*

that the seller incurred irrevocable liability within the United States to deliver a security." *Id.*

(emphasis added).  As examples of the types of allegations that might satisfy its test for what

qualifies as a domestic securities transaction, the Court cited "facts concerning the formation of

the contracts, the placement of purchase orders, the passing of title, or the exchange of money."

*Id.* at 70.  A plaintiff's "mere assertion that transactions 'took place in the United States,'"

however, "is insufficient to adequately plead the existence of domestic transactions."  *Id.*

   Notably, in the Amended Complaint, Plaintiffs hew closely to the language of *Absolute*

*Activist*.  For example, with respect to all purchases of the Notes, Plaintiffs allege that they

"incurred irrevocable liability to pay for the securities in the United States."  (Am. Compl. ¶ 8;

*see also id.* ¶¶ 7, 9-12).  They further describe the process by which such liability was incurred:

Each Plaintiff purchased the Notes by placing an order with a broker in the Miami, Florida,

office of UBS.  (*Id.* ¶ 8).  UBS "then transmitted the order to its broker-dealer in New York, New

York, where funds from [Plaintiff's] account . . . maintained with UBS were transferred

internally to UBS's back office, where the order was filled and the transaction was completed."

(*Id.*).  In addition, to purchase the Notes in the 2010 Restructuring, Atlantica and Baltica had to

send an "Electronic Instruction Form" (which is included in the Information Memorandum,

which the Court may consider under Rule 12(b)(6), *see, e.g.*, *Taveras v. UBS AG*, 708 F.3d 436,

442 (2d Cir. 2013)).  That Form provided that an investor's purchase of the Notes was

> irrevocable *provided*, *however*, *that* in the event that [BTA Bank], in its sole
> discretion, amends, terminates or withdraws the [2010] Restructuring Plan . . . in a
> manner that is materially adverse to affected [holders of Euronotes] in the opinion

> of [BNY Corporate Trustee Services Limited], [holders of Euronotes] shall be
> permitted . . . to revoke any Electronic Instruction Forms . . . for a period of two
> business days.

(Information Mem. 91-92).

Those allegations are sufficient to survive Defendant's motion to dismiss.  Admittedly, with respect to Plaintiffs' purchases on the secondary market, the allegations are somewhat thin, but they qualify as more than a "mere assertion that transactions 'took place in the United States,'" *Absolute Activist*, 677 F.3d at 70, as Plaintiffs also allege that they placed orders with their agent, UBS, within the United States; that UBS transmitted their orders to its broker-dealer in New York; and that, in New York, Plaintiffs' funds at UBS were transferred to UBS's back office, where the order was filled and the transaction was completed.  It may well be that discovery will reveal that Plaintiffs did not incur irrevocable liability at any of those stages in the transaction (or, to the extent they did incur irrevocable liability when the transaction was completed in UBS's back office, that such office was located outside the United States).  But the question at this stage of the litigation is whether Plaintiffs have alleged facts "suggesting that irrevocable liability was incurred" in the United States.  *Id.* at 68.  The answer is that Plaintiffs have done enough to survive another day.  *Cf. S.E.C. v. Benger*, No 09 C 676, 2013 WL 593952, at *12 (N.D. Ill. Feb. 15, 2013) (granting *summary judgment* to defendants because allegations from the complaint were not ultimately supported by record evidence).[6]

---

[6]     Relying on *S.E.C. v. Tourre*, No. 10 Civ. 3229 (KBF), 2012 WL 5838794, at *2 (S.D.N.Y. Nov. 19, 2012), Defendant argues that the transactions in this case were non-domestic for purposes of Section 10(b) because they were cleared through clearinghouses located outside the United States.  (Def.'s Mem. 29; *see also* F-B Decl. ¶¶ 21, 26).  That argument, however, is premised on facts that are neither found in the Amended Complaint nor detailed explicitly in the Information Memorandum, and thus is improper on a motion to dismiss.  Further, this case is distinguishable from *Tourre*, as there was no allegation in that case that any of the purchasers at issue incurred irrevocable liability in the United States.  *See* 2012 WL 5838794, at *2 ("It is

Whether the facts alleged are sufficient to suggest that Atlantica and Baltica incurred irrevocable liability in the United States for their initial purchase of the Notes is a more interesting question given the terms of the Electronic Instruction Form.  As noted above, that Form provided that Atlantica's and Baltica's purchases were "irrevocable *provided*, *however*, *that* in the event that" BTA Bank took certain actions deemed adverse to affected holders of the Notes, they "shall be permitted . . . to revoke any Electronic Instruction Forms."  (Information Mem. 91-92).  Citing that language, among other things, Defendant argues that Atlantica and Baltica did not incur irrevocable liability until the 2010 Restructuring was approved by creditors and by the Kazakhstani court in Almaty.  (Def.'s Mem. 28).  As Defendant would have it, Atlantica's and Baltica's "liability to purchase the [Notes] became irrevocable only after all of the conditions precedent . . . . were met in Europe and Kazakhstan."  (*Id.*).

The Court disagrees for two reasons.  First, in interpreting the standards enunciated in *Absolute Activist*, district courts have held that the existence of conditions precedent to the closing of a deal do not render the transaction non-domestic.  *See, e.g.*, *Arco Capital Corp. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-43 (S.D.N.Y. 2013) (holding that liability was irrevocable when party "no longer had the discretion to revoke acceptance," notwithstanding that the transaction was not completed until other conditions were met); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Although there were conditions to be satisfied before closing and the eventual performance of the Merger Agreement was effectuated by the transfer of a different security than originally intended, this is insufficient

---

undisputed, however, that Loreley did not acquire irrevocable liability to purchase the ABACUS notes in the United States."); *accord S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 158 (S.D.N.Y. 2011) (noting in a related proceeding that the S.E.C. had conceded that no party to the transaction at issue in *Tourre* incurred irrevocable liability in the United States).

to establish that irrevocable liability occurred later.").  Second, for all practical purposes, Atlantica and Baltica were committed to the transaction when they submitted the Electronic Instruction Form.  Whether the circumstances allowing them to revoke their purchases would come to pass was an outcome out of their control — it turned solely on actions taken by BTA Bank, "in its sole discretion."  (Information Mem. 91).  In light of that, it could be argued that BTA Bank (and S-K Fund) were not irrevocably bound upon submission of the Electronic Instruction Form.  But, as a practical matter, Atlantica's and Baltica's liability was irrevocable *by them*, which is sufficient to satisfy the *Absolute Activist* test.  *See Absolute Activist*, 677 F.3d at 68 ("[I]t is sufficient for a plaintiff to allege facts leading to the plausible inference that . . . the purchaser incurred irrevocable liability within the United States to take and pay for a security, *or* that the seller incurred irrevocable liability within the United States to deliver a security." (emphasis added)).

## C.    Reliance

Next, Defendant moves to dismiss on the ground that Plaintiffs have failed to adequately plead reliance, as required.  *See, e.g.*, *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005).  First, with respect to the Information Memorandum's statements and omissions regarding the Negative Carry Swap, Defendant argues that Plaintiffs' reliance was unreasonable because "each aspect of the alleged [transaction] was set forth in the Information Memorandum, which described the financial relationship between S-K Fund and BTA Bank in detail."  (Def.'s Mem. 34).  It is well established, however, that "scattershot" disclosures spread across different sections of a disclosing document are insufficient to defeat a Rule 12(b)(6) motion.  *See In re Stillwater Capital Partners Inc. Litig.*, 858 F. Supp. 2d 277, 287 (S.D.N.Y. 2012) ("Such scattered disclosures are not sufficient for defendants to prevail at the

motion to dismiss stage." (internal quotation marks omitted)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 324 (S.D.N.Y. 2009) (denying Defendants' motion for summary judgment on this basis); *see also United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[E]ven information actually sent to shareholders need not be considered part of the total mix reasonably available to them if 'the true' is 'buried' in unrelated discussions . . . ."). Thus, Plainitffs' failure to discover the exact nature of a complex financial transaction buried in a scattershot fashion in a tome-length "memorandum" does not render their reliance unreasonable as a matter of law.  (Def.'s Mem. 34-35).

Similarly unavailing are Defendant's other arguments concerning the statements or omissions in the Information Memorandum: that Plaintiffs could not reasonably rely on them both because they were contradicted by a report from J.P. Morgan and because the Memorandum expressly warned parties not to rely on it for purposes other than the 2010 Restructuring.  (Def's Mem. 33 & n.12; *see also* Am. Compl. ¶¶ 48-50).  With respect to the first argument, Defendant cannot rely on others to clarify its own alleged misrepresentations unless Plaintiffs' failure to act on the third party's disclosures rose to the level of "recklessness."  *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 398-99 (S.D.N.Y. 2010).  Here, taking Plaintiffs' version of the facts as true and drawing all reasonable inference in their favor, their failure to discover the truth about the Negative Carry Swap was not reckless.  With respect to the second point, "[c]ourts can give effect to no-representations clauses that disclaim reliance on a specific set of representations and thus effect only a partial waiver of liability under § 10(b)," but only "when these clauses are the product of negotiations between 'sophisticated business entities' of roughly equal bargaining power."  *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 318 (S.D.N.Y. 2011)

(quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 343-344 (2d Cir. 1996)).  In this case, the language invoked by Defendant could not have been the product of such negotiations.

Defendant's remaining challenges — to the reasonableness of Plaintiffs' reliance on its statements from 2011 and its statements regarding the Recovery Units — are without merit to the extent they concern Atlantica and Blu Funds.  Defendant argues that Altantica's and Blu's alleged reliance on the 2011 statements was unreasonable because they did not purchase more Notes in the window between the 2011 statements and the 2012 Restructuring and that neither Atlantica nor Blu reviewed the presentations containing the allegedly misleading statements about the Recovery Units.  (Def.'s Mem. 36-37).  But both arguments are contrary to allegations in the Amended Complaint, which the Court must credit for purposes of this motion.  (Am. Compl. ¶¶ 52, 76).  Defendant's arguments with respect to Baltica and the individual Plaintiffs, on the other hand, have more merit, as "[o]nly Atlantica and Blu Funds purchased [the Notes] after these alleged misstatements."  (Def.'s Mem. 36; *see* Am. Compl. ¶ 52, Ex. A).  To the extent the Amended Complaint can be read to state claims arising out of statements in 2011 or later on behalf of Baltica and the individual Plaintiffs, therefore, such claims are dismissed.

### D.   Defendant's Remaining Arguments

Defendant's remaining arguments can be disposed of quickly.  First, Defendant contends that Plaintiffs have not adequately pleaded loss causation because they have not alleged facts sufficient to show that "it was the defendant's alleged fraud and not other market factors that caused the plaintiff's loss."  (Def.'s Mem. 38).  But Plaintiffs have alleged that disclosure of each of the purportedly false or misleading statements was followed by a decrease in the price of the Notes.  (*See* Am. Compl. ¶¶ 50, 65).  Such allegations are sufficient at this stage of the litigation. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008).

Second, Defendant argues that Plaintiffs have failed to plead scienter with particularity, as required by the PSLRA.  (Def.'s Mem. 39-42).  That argument, however, is premised on the same assumption that underlay Defendant's contentions with respect to reliance: that the Information Memorandum disclosed the fraudulent or misleading facts.  Further, a plaintiff may satisfy the PSLRA's requirements by pleading "motive and opportunity to commit fraud." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (internal quotation marks omitted).  Here, Plaintiffs plead both (Am. Compl. ¶¶ 3, 46, 66-68), which suffices to survive Defendant's motion to dismiss.

Finally, Defendant argues that it should not be held liable as a "control person" of BTA Bank both because such claims are "wholly derivative" of Plaintiff's 10(b) allegations and because Plaintiffs have not sufficiently alleged that Defendant culpably participated in the alleged fraud.  (Def.'s Mem. 42-43).  The former argument is without merit in light of this Court's decision not to dismiss the 10(b) claims.  *See In re Worldcom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003).  The latter argument fails because, whether or not such a showing is required, Plaintiffs' allegations on this point are adequate to state a claim under Section 20(a).  (*See* Am. Compl. ¶¶ 39, 36, 88).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED in part and GRANTED in part.  Specifically, the motion is DENIED except insofar as the Amended Complaint states claims arising out of statements in 2011 or later on behalf of Baltica and the individual Plaintiffs.

SO ORDERED.

Dated: March 10, 2014
       New York, New York

_____
JESSE M. FURMAN
United States District Judge