**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------- X
ATLANTICA HOLDINGS, INC., et al.,          :    Case No. 1:12-cv-8852 (JMF)
                                            :
                        Plaintiffs,     :
: 
                -against-            :
: 
SOVEREIGN WEALTH FUND SAMRUK-KAZYNA,   :
JSC,                                   :
                     Defendant.    :
---------------------------------------------------------------------- X
ATLANTICA HOLDINGS, INC., et al.,          :    Case No. 1:13-cv-5790 (JMF)
                                            :
                        Plaintiffs,     :
: 
                -against-            :
: 
BTA BANK JSC,                        :
                     Defendant.    :
---------------------------------------------------------------------- X

**DEFENDANTS' JOINT STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1 OF**
**UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.  THE PARTIES ................................................................................................ 1

II.  THE GLOBAL FINANCIAL CRISIS ........................................................... 3

    A.  Impact of the Crisis on Systemic Kazakhstan Banks .......................... 5

    B.  SK Fund's Role in the Stabilization Plan ............................................ 7

    C.  SK Fund Recapitalizes BTA ................................................................ 7

III.  FRAUD COMMITTED BY FORMER MANAGEMENT AGAINST BTA ................. 12

IV.  RECOVERY EFFORTS AGAINST FORMER MANAGEMENT .................... 14

V.  THE 2010 RESTRUCTURING ...................................................................... 15

    A.  Steering Committee Sophistication and Negotiations ........................ 18

    B.  The "Base Case Model" ...................................................................... 22

VI.  THE STEERING COMMITTEE AND BTA AGREED ON THE TERMS OF THE 2010 RESTRUCTURING ...................................................... 25

VII.  THE 2010 INFORMATION MEMORANDUM ............................................ 25

    A.  The SK Guarantee and Guarantee Fee ............................................... 32

VIII.  SK FUND'S PROVISION OF ADDITIONAL SUPPORT IN THE 2010 RESTRUCTURING ........................................................................... 34

    A.  Securities Issued Through the 2010 Restructuring ............................ 38

    B.  Creditor Approval of the 2010 Restructuring Plan ........................... 41

IX.  PLAINTIFFS' TRADING IN BTA SECURITIES ........................................ 42

    A.  Plaintiffs Opened Accounts at UBS ................................................... 42

    B.  Plaintiffs' Initial Investments in BTA ................................................ 44

    C.  Plaintiffs' Participation in Approval of the 2010 Restructuring ........ 48

    D.  Plaintiffs' Subsequent 2010 Transactions ......................................... 50

    E.  Background on BTA Bond Distribution and Clearing ....................... 53

X.  BTA'S POST-RESTRUCTURING OPERATIONS ....................................... 54

    A.  BTA's Performance Following the 2010 Restructuring ..................... 54

    B.  External Forces Affecting the Financial Health of BTA .................... 55

    C.  Analyst REPORTS And Purported negative carry swap ................... 60

XI.  PLAINTIFFS' ADVISORS ............................................................................ 62

XII.  SK FUND STATEMENTS REGARDING SUPPORT FOR BTA ................ 64

XIII.  PLAINTIFFS' ADDITIONAL TRANSACTIONS IN 2011 ......................... 66

XIV.  THE 2012 RESTRUCTURING ..................................................................... 67

    A.  Events Leading up to the 2012 Restructuring .................................... 67

B.    Recovery Unit Acceleration...............................................................69

C.    Plaintiffs Transactions in Early 2012, After Recovery Unit Acceleration Is Possible ..................................................................................................75

XV.    THE 2012 RESTRUCTURING........................................................................ 76

A.    Treatment of Various BTA Securities in the 2012 Restructuring and Plaintiffs' Actions Leading up to the 2012 Restructuring ........................76

B.    SK Fund's Support for the 2012 Restructuring ........................................77

C.    SK Fund's Losses in BTA ........................................................................78

XVI.    LOCATION OF SALES.................................................................................... 79

XVII.    PLAINTIFFS' CONDUCT IN LITIGATION .................................................. 82

Pursuant to Local Civil Rule 56.1, Defendants BTA Bank ("BTA") and Sovereign Wealth Fund "Samruk-Kazyna" ("SK Fund") (collectively "Defendants") respectfully submit the following statement of undisputed material facts in support of their Motion for Summary Judgment:

## I.    THE PARTIES

1.      Plaintiffs Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holdings, Inc. ("Baltica") and Blu Funds, Inc. ("Blu") (collectively, "Plaintiffs") are corporations formed under the laws of the Republic of Panama.  Vigna Decl. Ex.[1]  123 (Khamis Tr.) at 41:18-21, 42:7-9; Vigna Decl. Ex. 1 (Am. Compl., *Atlantica, et al. v. SK Fund*, Dkt No. 14 ("SK Fund Am. Compl.")) ¶¶ 7-9; Vigna Decl. Ex. 2 (Am. Compl., *Atlantica, et al. v. BTA Bank JSC*, Dkt No. 32 ("BTA Am. Compl.") ¶¶ 8-10).



---

[1] All references to "Vigna Decl. Ex.__" are to the exhibits attached to the Declaration of Jason Vigna, dated July 2, 2019.

7.      Defendant BTA Bank JSC ("BTA" or the "Bank") is a joint stock company formed under the laws of the Government of the Republic of Kazakhstan ("Kazakhstan" or the "Government").  Vigna Decl. Ex. 2 (BTA Am. Compl.) at ¶ 15.

8.      BTA does not have any offices or subsidiaries in the United States.  Vigna Decl. Ex.134 (Decl. of Francis Fitzherbert-Brockholes Dkt. No. 18 ("FFB Decl.")), ¶ 4.

9.      The Bank was incorporated on January 15, 1997 as part of a merger between "Alem Bank and Turan Bank, pursuant to the decision of the Government and the NBK."  Vigna Decl. Ex. 3 (2010 Information Memorandum of BTA ("2010 IM")) at 150.  It operated as Bank TuranAlem JSC until it changed its name to "BTA Bank JSC" on January 24, 2008.  Vigna Decl. Ex. 3 (2010 IM) 151.

10.      From May 20, 2005 to February 2, 2009, the Chairman of the Bank's Board of Directors was Mukhtar Ablyazov.  Vigna Decl. Ex. 3 (2010 IM) at151.

11.      Defendant Sovereign Wealth Fund "Samruk-Kazyna" JSC a/k/a "National Welfare Fund 'Samruk Kazyna,'" ("SK Fund" or the "Fund") is a joint stock corporation formed under the laws of Kazakhstan.  Vigna Decl. Ex. 2 (BTA Am. Compl.) at ¶ 17; Vigna Decl. Ex. 125 (Favale Tr.) at 48:5-12.

12.      Pursuant to decrees of the Kazakhstan Government, SK Fund was formed by the combination of two entities: Kazakhstan Holding Company for State Assets Management "Samruk" JSC and Sustainable Development Fund "Kazyna" JSC.  Vigna Decl. Ex. 12 (SK

Fund, Separate Financial Statements for the year ended December 31, 2009 ("SK Fund 2009 Financial Statement")) at 5.

13.     Prior to the formation of the Fund, Samruk's portfolio consisted of assets connected to operating businesses such as "railways, [the] Post Office, telecoms, electricity generation" as well as oil and gas entities. Vigna Decl. Ex. 124 (Howes Tr.) at 37:21-25.

14.     Kazyna's portfolio consisted of financially-oriented entities, including "the Development Bank of Kazakhstan" ("Damu").  Vigna Decl. Ex. 124 (Howes Tr.) at 38:3-7.

15.     During all relevant times, the Government was the sole shareholder of the Fund. BTA Am. Compl. ¶ 17; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5; Vigna Decl. Ex. 124 (Howes Tr.) at 43:8-13; Vigna Decl. Ex. 15 (SK Fund, Separate Financial Statements for the year ended December 31, 2014 ("SK Fund 2014 Financial Statement")) at 6.

16.     SK Fund does not have any offices or subsidiaries in the United States.  Vigna Decl. Ex. 135 (Sarsenbayev. Decl.) at ¶ 7.

## II.     THE GLOBAL FINANCIAL CRISIS

17.     In the fall of 2007, the U.S. subprime mortgage market "collapsed, unleashing a global contagion."  Vigna Decl. Ex. 108 (Andrew Ross Sorkin, *Too Big to Fail*, (Penguin Books 2010)) at 5.

18.     The adverse consequences of the U.S. financial crisis were suffered around the globe by large "commercial and investment banks, insurance companies and other financial institutions."  Vigna Decl. Ex. 3 (2010 IM) at 128.

19.     A chain reaction started that rippled around the world.  Shortly after Lehman Brothers failed in September 2008, Iceland faced a crisis as investors demanded that capital they had invested with the country be returned.  Vigna Decl. Ex. 109 (Michael Lewis, *Boomerang* (Norton 2011)) at 1-4.

- 3 -

20.     Greece's banking sector, already severely impacted by government mismanagement, teetered and then collapsed, overwhelmed by an avalanche of scandals.  Vigna Decl. Ex.109 (Michael Lewis, *Boomerang* (Norton 2011)) at 41-46.

21.     The Irish government nationalized the Anglo Irish Bank in January 2009 after it suffered losses of 34 billion Euros. Vigna Decl. Ex. 109 (Michael Lewis, *Boomerang* (Norton 2011)) at 83-84.

22.     Kazakhstan's economy was similarly impacted by this global crisis.

23.     As a member of the global economy, Kazakhstan was also vulnerable to these "market downturns and economic slowdowns elsewhere in the world."  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

24.      This resulted in the instability of Kazakhstan's capital markets, significant deterioration of liquidity in its banking sector, and tighter credit conditions within Kazakhstan. Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

25.     On November 25, 2008, the Government adopted Decree No. 1085 which set forth its joint plan of action with the National Bank of the Republic of Kazakhstan (the "NBK") and the Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Market and Financial Organizations ("FMSA") to stabilize "the economy and financial system for 2009-2010" (the "Stabilization Plan").  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

26.     The Kazakhstan banking crisis peaked shortly thereafter, in early 2009.  Vigna Decl. Ex. 3 (2010 IM) at 128.

27.     Kazakhstan responded in the same manner as governments of market economies around the world, by attempting to "inject liquidity into banking systems and to recapitalise their

- 4 -

banking sectors to reduce the risk of systemic failure and increase confidence in the financial markets."  Vigna Decl. Ex. 3 (2010 IM) at 128.

28.      The Government adopted a State Finance Programme in 2007 that allowed financial institutions to refinance existing loans made to small and medium sized entities.  Vigna Decl. Ex. 3 (2010 IM) at 176.

29.      Multiple banks received funds through this State Finance Programme, including ATF Bank, Alliance Bank, BTA, Kazkommertsbank ("KKB"), Halyk Bank, and Temirbank. Vigna Decl. Ex. 3 (2010 IM) at 176-77.

   A.      **Impact of the Crisis on Systemic Kazakhstan Banks**

30.      The Government viewed four of these banks—BTA, Alliance Bank, KKB, and Halyk Bank—as "'systemic' in the Kazakhstan financial system."  Vigna Decl. Ex. 3 (2010 IM) at 151.

31.      Three banks, Alliance Bank, Temirbank, and BTA, owned more than 35% of the "total assets of the banking system in Kazakhstan" in 2009.  Vigna Decl. Ex. 3 (2010 IM) at 128.

32.      Despite the Government's efforts to stabilize its financial sector, these three banks "defaulted on their contractual payments and breached certain regulatory requirements" between 2009 and 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

33.      As a result, each of these banks entered into restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 128.

34.      Alliance Bank completed its restructuring in April 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

35.      Temirbank's restructuring was similarly approved by its creditors on March 31, 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

34227987

36.     BTA also suffered as a result of the global financial crisis.  Vigna Decl. Ex. 3 (2010 IM) at 128.

37.     Following an aggressive growth strategy from 2004 to 2007, the Bank's financial condition and liquidity position had severely deteriorated by February 2009.  Vigna Decl. Ex. 3 (2010 IM) at 191.

38.     The Bank was forced to increase provisioning for non-performing loans and as a result breached its required capital adequacy ratios during 2009.  Vigna Decl. Ex. 3 (2010 IM) at 191.

39.     As of October 1, 2009, the Bank had created KZT 1.959 trillion in provisions, representing 75.5% of its total unconsolidated unaudited loan portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 191.

40.     Over the course of 2009, the Bank sank further into trouble; it had to continually write down its loan book, significant provisions were made in connection with non-performing loans, and it eventually went into negative equity.  Vigna Decl. Ex. 124 (Howes Tr.) at 47:23-48:10.

41.     Additionally, BTA's deposits decreased by more than KZT 200 billion in the first nine months of 2009, as part of a so-called "run to quality" by depositors.  Vigna Decl. Ex. 3 (2010 IM) at 155.

42.     BTA closed 15% of its cash offices during the same time period.  Vigna Decl. Ex. 3 (2010 IM) at 155.

43.     BTA initiated formal restructuring on October 16, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 6.

- 6 -

**B.**     **SK Fund's Role in the Stabilization Plan**

44.     On November 3, 2008, SK Fund was formed to get the Kazakhstani economy out of the financial crisis, specifically to bail out struggling banks.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20.

45.     SK Fund was the principal operator for the Government in the implementation of the Stabilization Plan.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

46.     As part of the Stabilization Plan, SK Fund was asked by the Government to secure equity stakes in the major Kazakhstani banks, including BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 41:15-42:3, 46:12-47:9.

47.     The Government allocated KZT 480 billion for this purpose.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20, 41:7-42:3, 105:15-106:17.

48.     On November 9, 2008, BTA, the NBK, FMSA, SK Fund and the Government (represented by the Ministry of Finance) entered into a Memorandum of Understanding to coordinate their efforts to stabilize the economy of Kazakhstan and assist in the stabilization of the financial system including the maintenance by the Bank of an adequate level of liquidity and quality of the credit portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 151.

49.     Details of the Stabilization Plan were disclosed in SK Fund's financial statements. Vigna Decl. Ex. 124 (Howes Tr.) at 41:7-42:3; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

**C.**     **SK Fund Recapitalizes BTA**

50.     At the direction of the Government, SK Fund led a restructuring process pursuant to the Stabilization Plan for a number of banks in Kazakhstan, including BTA.  The Stabilization Plan included stabilization of the financial sector, resolution of real estate market issues, small and medium business support, development of agricultural sector, and implementation of

innovation, industrial and infrastructure projects.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

51.     Prior to the last quarter of 2008, SK Fund maintained some deposits in BTA, but had no shareholding in BTA and no major exposure to it.  Vigna Decl. Ex. 124 (Howes Tr.) at 46:12-47:9.

52.     In the autumn of 2008, SK Fund commenced negotiations with BTA regarding a potential capital injection by SK Fund into the Bank to support its liquidity following reports that the Bank was unable to meet withdrawal requests of customers and that the Bank failed to participate in rights offerings of two of its important subsidiaries, BTA Russia and BTA Ukraine. Vigna Decl. Ex. 3 (2010 IM) at 151.

53.     In accordance with the Stabilization Plan, SK Fund bought shares in other struggling Kazakhstani banks besides BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20.

54.     SK Fund initially intended to acquire only a 25% equity stake in each of the ailing banks.  Vigna Decl. Ex. 124 (Howes Tr.) at 41:15-42:3.

55.     In line with this intention, SK Fund purchased 21.28% and 20.97% equity stakes in KKB and Halyk Bank, respectively.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 23-24.

56.     In early 2009, however, SK Fund "determined that it was necessary to acquire a supermajority interest in the Bank."  Vigna Decl. Ex. 3 (2010 IM) at 152.

57.     Other than governmental entities, including SK Fund and NBK, there were no entities offering financial support to BTA at the time.  Vigna Decl. Ex. 124 (Howes Tr.) at 47:15-22, 300:22-15; Vigna Decl. Ex. 126 (Nartay Tr.) at 58:6-25.

58.     On February 2, 2009, SK Fund, as representative of the Government, agreed to purchase 25,246,343 shares of BTA for KZT 8,401 per share, totaling roughly KZT 212 billion. Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 21; Vigna Decl. Ex. 3 (2010 IM) at 5.

59.     This purchase gave the Fund a controlling share of BTA, with a 75.1% interest in the Bank's capital.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 21; Vigna Decl. Ex. 124 (Howes Tr.) at 49:25-50:4; Vigna Decl. Ex. 3 (2010 IM) at 5.

60.     Before providing this financing assistance, SK Fund conducted due diligence, but its investment in BTA was inevitable, as the transaction was mandated by the Stabilization Program.  Vigna Decl. Ex. 124 (Howes Tr.) at 56:5-58:20.

61.     On February 2, 2009, Arman Dunayev and Anvar Saidenov, were appointed to the BTA Board of Directors by SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 154; Vigna Decl. Ex. 24 (BTA Presentation dated August 18, 2009) at Atlantica 000001228.

62.     Arman Dunayev is an experienced commercial and public banker, having previously served as Vice-Minister of Economics and Budget Planning, Chairman of the "National Innovation Fund" CSC and First Vice-Minister of Finance, Chairman of FMSA, Chairman of  JSC "Sustainable Development Fund Kazyna" and Vice-Chairman of Samruk-Kazyna.  Vigna Decl. Ex. 3 (2010 IM) at 260.

63.     Saidenov was the chairman of the Management Board of the NBK at the time of his appointment and was a former senior official at the European Bank for Reconstruction and Development.  Vigna Decl. Ex. 3 (2010 IM) at 260.

64.     Saidenov was also appointed as Chairman of BTA's Management Board.  Vigna Decl. Ex. 3 (2010 IM) at 265.

65.     Nearly all of the other then-existing Directors were replaced by March 6, 2009. Vigna Decl. Ex. 3 (2010 IM) at 154.

66.     Nevertheless, SK Fund was not involved with management of the bank at any time.  Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15.

67.     BTA is primarily managed by a separate Management Board that is separate from the Board of Directors.  Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15; Vigna Decl. Ex. 3 (2010 IM) at 265.

68.     The Management Board was chiefly responsible for the day-to-day activities of the Bank, which included preparation of the Information Memorandum.  Vigna Decl. Ex. 3 (2010 IM) at 5-12.

69.     The effort to stabilize BTA had two elements:  (1) a capital contribution and (2) the restructuring in 2010 (the "2010 Restructuring").  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19; Vigna Decl. Ex. 3 (2010 IM) at 5.

70.     SK Fund's capital contribution included both the purchase of BTA shares and SK Fund's assistance in arranging liquidity to enable repurchase, or "repo," transactions with NBK. Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19; Vigna Decl. Ex. 3 (2010 IM) at 5.

71.     The SK Fund capital injection and the repo arrangement with NBK("NBK Repo") was the only financing available to BTA between 2009 and 2012.  Vigna Decl. Ex. 124 (Howes Tr.) at 300:22-15.

72.     Banks often use repurchase or "repo" transactions to provide short-term liquidity. Vigna Decl. Ex. 110 (John C. Hull, Options, *Futures and Other Derivatives*, (6th ed. 2005)) at 77.

- 10 -

73.     Through a repo transaction, the owner of securities agrees to sell them to a counterparty and buy them back later at a slightly higher price; in the interim, the seller holds cash, and thereby receives a source of short-term liquidity.  Vigna Decl. Ex. 110 (John C. Hull, Options, *Futures and Other Derivatives*, (6th ed. 2005)) at 77.

74.      NBK was providing liquidity to many Kazakhstani banks through repo transactions.  Vigna Decl. Ex. 21 (National Bank of the Republic of Kazakhstan, Annual Report 2009, December 31, 2009) at 15.

75.     NBD was able to offer repo financing to BTA at published interest rates that were well below those available from other sources.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 35; Vigna Decl. Ex. 3 (2010 IM) at 8, 15, 38, 121.

76.     While NBK was offering repo financing, BTA had no security to give to NBK. Vigna Decl. Ex. 124 (Howes Tr.) at 66:22-68:11.

77.     BTA could not enter into a repo with NBK using its own bonds, as BTA was a defaulted bank in early 2009 and its own bonds were essentially valueless as collateral at the time.  Vigna Decl. Ex. 125 (Favale Tr.) at 33:7-24; Vigna Decl. Ex. 3 (2010 IM) at 175.

78.     In order to provide security for the repo transaction, SK Fund entered into a transaction with BTA to provide appropriate collateral.  Vigna Decl. Ex. 125 (Favale Tr.) at 33:7-24; Vigna Decl. Ex. 3 (2010 IM) at 175, 178-79.

79.     BTA and SK Fund exchanged bonds with notional values of KZT 645 billion (the "Bond Swap").  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-63:21; Vigna Decl. Ex. 3 (2010 IM) at 175, 178.

80.     The bonds provided by SK Fund ("SK Bonds") were issued with a 4% coupon. Vigna Decl. Ex. 3 (2010 IM) at 41.

81.     This amount was not accrued, but was an actual expense incurred by SK Fund and paid to BTA.  Vigna Decl. Ex. 3 (2010 IM) at 200.

82.     BTA earned approximately KZT 20.5 billion from interest on the SK Bonds for the nine-month period ended September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 200.

83.     The bonds provided by BTA ("BTA Bonds") had a 9% coupon.  Vigna Decl. Ex. 3 (2010 IM) at 14.

84.     BTA did not pay out any interest on the BTA Bonds because they were to be capitalized as part of the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 146; Vigna Decl. Ex. 124 (Howes Tr.) at 222:20-223:6; Vigna Decl. Ex. 125 (Favale Tr.) at 197:11-198:14.

85.     Instead, all interest on the BTA Bonds (which amounted to approximately KZT 26 billion[2] as of the date of the 2010 Information Memorandum), was accrued.  Vigna Decl. Ex. 3 (2010 IM) at 41, 324; Vigna Decl. Ex. 124 (Howes Tr.) at 62:19-63:8.

86.     The exchange of bonds between BTA and SK Fund provided BTA appropriate collateral to access much-needed liquidity through repo transaction with NBK.  Vigna Decl. Ex. 124 (Howes Tr.) at 301:16-25.

87.     The immediate objective of the stabilizing BTA through the bailout set forth in the Stabilization Plan was successful in that not all deposits were withdrawn, there was not a run on the Bank, and BTA had a chance of survival.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24. It also permitted the 2010 Restructuring to be undertaken.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24.

---

[2] The "SK Claim" as defined in the 2010 Information Memorandum was KZT 671 billion.  Vigna Decl. Ex. 3 (2010 IM) at. 41.

III.     FRAUD COMMITTED BY FORMER MANAGEMENT AGAINST BTA

88.     As the Bank reviewed the provisioning for its non-performing loans during early 2008, it discovered certain irregularities in its loan portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 153.

89.     It would later be discovered that BTA was the victim of "massive fraud" perpetrated by Ablyazov, BTA's former Director, and others in BTA's former management. Vigna Decl. Ex. 124 (Howes Tr.) at 60:14; Vigna Decl. Ex. 3 (2010 IM) at 122.

90.     Ablyazov fled Kazakhstan in January 2009 and flew to the UnitedKingdom.   *See* Vigna Decl. Ex. 106 (Edward Robinson, Hugo Miller & Nariman Gizitdinov, *Was Trump SoHo Used to Hide Part of a Kazakh Bank's Missing Billions?*, Bloomberg, Dec. 11, 2017, *available at* https://www.bloomberg.com/news/features/2017-12-11/was-trump-soho-used-to-hide-part-of-a-kazakh-bank-s-missing-billions).

91.     In February 2009, the Bank conducted due diligence to identify and investigate suspicious loans.  Vigna Decl. Ex. 3 (2010 IM) at 122.

92.     On July 21, 2009, BTA retained KPMG London to assist with these due diligence efforts, including review of BTA's loan portfolio and other investments, and specifically loans issued by prior management.  Vigna Decl. Ex. 3 (2010 IM) at 6, 13, 23.

93.     This process revealed a number of "suspicious transactions," including "a significant number of loans" that had been granted on "preferential terms" to entities believed to be connected to Ablyazov.  Vigna Decl. Ex. 3 (2010 IM) at 122.

94.     FMSA conducted its own due diligence in November 2009.  Vigna Decl. Ex. 3 (2010 IM) at 151.

95.     The Bank uncovered a significant number of purported loans that appeared to have been provided on preferred terms to companies connected with former management and for

which the security provided was inadequate or non-existent.  Vigna Decl. Ex. 3 (2010 IM) at

126, 152; Vigna Decl. Ex. 126 (Nartay Tr.) at 52:17-53:3, 57:6-60:23.

96.     In connection with those transactions, there were "gaps" in BTA's records and

"many documents [were] missing."  Vigna Decl. Ex. 3 (2010 IM) at 126.

97.     Many of these suspicious loans were completed by foreign subsidiaries of the

Bank, including BTA Russia and BTA Ukraine.  Vigna Decl. Ex. 3 (2010 IM) at 126.

## IV.     RECOVERY EFFORTS AGAINST FORMER MANAGEMENT

98.     On August 27, 2009, the Bank began legal proceedings against Ablyazov and

other related parties.  Vigna Decl. Ex. 3 (2010 IM) at 6.

99.     The Bank filed numerous suits in an attempt to recover these assets, including in

the United Kingdom and the British Virgin Islands.  Vigna Decl. Ex. 3 (2010 IM) at 180.

100.     The Bank also filed proceedings in Russia and Ukraine.  Vigna Decl. Ex. 128

(Howell Tr.) 117:7-25.

101.     In the United Kingdom, the Bank brought a series of eleven suits to recover over

$5 billion.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High

Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 2; Vigna Decl. Ex. 128

(Howell Tr.) at 117:11-13.

102.     A judgment was scheduled to be declared in one of the United Kingdom

proceedings, but Ablyazov absconded instead of attending.  Vigna Decl. Ex. 82 (*BTA v.

Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division,

dated November 26, 2013) at ¶ 5.

103.     Ablyazov was sentenced to twenty-two months imprisonment in theUnited

Kingdom, but fled before being taken into custody.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*,

Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶¶ 2-3.

104.    While a fugitive, Ablyazov was located in the south of France on July 31, 2013. Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 6.  At least three countries sought his extradition.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 6.

105.    At least one court has found that Ablyazov's actions related to the non-performing loans amounted to fraud.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 93.

106.    On this basis, it granted the Bank an award of over $294 million.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 93.

107.    The Bank has received judgments for $4.9 billion in United Kingdom courts alone.  Vigna Decl. Ex. 107 (Stephen Bland, *The Ablyazov Affair: 'Fraud on an Epic Scale'*, The Diplomat, Feb. 23, 2018, *available at* https://thediplomat.com/2018/02/the-ablyazov-affair-fraud-on-an-epic-scale/).

108.    By September 2016, BTA had succeeded in executing judgments against assets worth $1.4 billion.  Vigna Decl. Ex. 36 (BTA Statement on Asset Recovery Results for the first half of 2016, dated May 9, 2016) at 11.

109.    BTA estimates that the total amount of the Ablyazov fraud is at least $6 billion, and could be as much as $10 billion.  Vigna Decl. Ex. 126 (Nartay Tr.) at 41:2-21.

## V.      THE 2010 RESTRUCTURING

110.      Despite SK Fund's capital injection, on April 1, 2009, the Bankbreached requirements put in place by FMSA.  Vigna Decl. Ex. 3 (2010 IM) at 156.

111.      Shortly thereafter, on April 23, 2009, BTA announced a moratorium, ceasing to make payments on the principal on all of its repayment obligations.  Vigna Decl. Ex. 3 (2010 IM) at 5.

112.      In April 2009, BTA retained UBS as restructuring advisors.  Vigna Decl. Ex. 139 (*BTA Bank appoints UBS as additional financial adviser*, Debtwire (Apr. 9, 2009)); Robertson Aff.[3] at ¶ 5.

113.      The next day, BTA announced that it had received notices from creditors accelerating the indebtedness owed to them.  Vigna Decl. Ex. 134 (FFB Decl.) at Ex, 3; Vigna Decl. Ex. 3 (2010 IM) at 5.

114.      As a result, BTA ceased all principal and interest payments on its existing indebtedness until it could reach agreement with creditors on a program for managing its debt position.  Vigna Decl. Ex. 134 (FFB Decl.) at Ex. 4; Vigna Decl. Ex. 3 (2010 IM) at 6.

115.      A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank was unable to monitor the collateral or the financial performance of the borrowers.  Vigna Decl. Ex. 3 (2010 IM) at 153.

116.      In May 2009, the Bank breached FMSA's liquidity requirements.  Vigna Decl. Ex. 3 (2010 IM) at 156.

117.      After the Bank breached its regulatory requirements, it entered into an agreement with FMSA on May 22, 2009 to develop a plan of restructuring and recapitalization by June 10, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 156.

---

[3] All references to "Robertson Aff." are to the Affidavit of James Robertson, dated July 2, 2019.

118.   BTA presented a preliminary plan on June 10, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 156.

119.   While in most countries it is always a debtor's right simply to propose a plan of reorganization and to have creditors vote on it on a "take-it-or-leave-it" basis, some debtors try to form creditors' steering committees with whom to negotiate from the outset.  Such a committee generally contains representatives of all creditor classes, is provided company-paid financial and legal advisors, is granted access to the company's financial records and management and is empowered to make its own restructuring proposals.  While such a process can be more expensive and time-consuming than a debtor-driven process, it can help reduce avoidable problems in proposed plans, build inter-creditor consensus, bolster non-participants' confidence in the result and lead to higher approval rates and more successful post-restructuring outcomes.  Rauch Decl.[4] at ¶¶ 5-7, 9-10; Robertson Aff. at ¶ 10; Vigna Decl. Ex. 125 (Favale Tr.) at 77-78.

120.   On July 23, 2009, BTA met with certain of its creditors in London to establish a steering committee of creditors (the "Steering Committee").  Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 6; Vigna Decl. Ex. 3 (2010 IM) at 6.

121.   The Steering Committee was established to transparently negotiate the BTA restructuring on behalf of all creditors.  Vigna Decl. Ex. 3 (2010 IM) at 6, 42.

122.   Additionally, Lazard Fréres and UBS were the Financial Advisors to BTA in the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at I; Vigna Decl. Ex. 125 at (Favale Tr.) at 77:6-21, 84:17-85:9; Robertson Aff. at ¶ 6.

123.   The independent auditors who assisted on the 2010 Restructuringincluded Deloitte Touche Tohematsu Ltd. ("Deloitte"), PricewaterhouseCoopers ("PWC"), KPMG, and Ernst & Young LLP.  Vigna Decl. Ex. 3 (2010 IM) at. 26.

---

[4] All references to "Rauch Decl." are to the Declaration of Robert Rauch, dated July 2, 2019.

124.    The parties' counsel included White & Case LLP, Baker & McKenzie LLP, Field

Fisher Waterhouse LLP, Lovells, and Allen & Overy LLP. Vigna Decl. Ex. 3 (2010 IM) at 13;

Vigna Decl. Ex. 125 (Favale Tr.) at 125:3-12; Rauch Decl. at ¶ 10.

125.    All of BTA's formal presentations to the Steering Committee or other investor

groups were made available to the public.  Vigna Decl. Ex. 125 (Favale Tr.) at 125:13-20.

126.    Robert Rauch, head of the Steering Committee in the 2010 Restructuring, testified

that the sole purpose of the 2010 Restructuring was to restructure BTA's crushing debt load so it

could have an opportunity to try to create value for Plaintiffs and all of BTA's other

stakeholders.  Rauch Decl. at ¶ 2, 6-7; Vigna Decl. Ex. 3 (2010 IM) at 10.

### A.    Steering Committee Sophistication and Negotiations

127.    The Steering Committee for the 2010 Restructuring was composed of some of the

most sophisticated  creditors in the world, including:  (i) The Royal Bank of Scotland N.V.

(formerly known as ABN AMRO Bank N.V.); (ii) Commerzbank Aktiengesellshaft; (iii) D.E.

Shaw Oculus International, Inc.; (iv) Euler Hermes Kreditversicherungs AG (acting for and on

behalf of the Federal Republic of Germany); (v) Fortis Investment Management UK Limited;

(vi) Gramercy Advisors LLC; (vi) The Bank of Singapore Limited Investment Management UK

Limited; (vii) KfW (representing its affiliates DEG – Deutsche Investitions – und

Entwicklungsgessellschaft mbH and KfW IPEX-Bank GmbH); (viii) Standard Charter Bank; (ix)

Export-Import Bank of the United States; and (x) Walls Fargo Bank N.A.  Vigna Decl. Ex. 3

(2010 IM) at 42; Robertson Aff. at ¶ 11; Rauch Aff. at 3.

128.    The Steering Committee was advised by Baker & McKenzie, a world-class law

firm, and Deloitte, one of the Big Four accounting firms, as its financial advisor to ensure that

the restructuring was financially sound and compliant with relevant law.  Vigna Decl. Ex. 3

(2010 IM) at 13, 655, 657; Robertson Aff. at 12; Rauch Decl. at ¶ 4, 10.

129.    The Steering Committee succeeded in negotiating several significant creditor protections, including obtaining two long-term creditor designee appointments to BTA's board of directors.  Vigna Decl. Ex. 3 (2010 IM) at 8; Vigna Decl. Ex. 127 (Prosyankin Tr.) at 60:18-20; Robertson Aff. at ¶ 14; Rauch Decl. at ¶ 6-8.

130.    The new board of directors was composed of nine members: two creditor directors, three independent directors, and four directors from SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 256.

131.    These creditor directors could not be removed from the board by SK Fund for at least three years following the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 28, 257.

132.    The creditor directors were granted veto powers over all "Qualified" matters, including decisions related to: (i) Auditors, Advisers and Procedures; (ii) Securities Issuance or Amendments; (iii) Additional Debt; (iv) Board, Management Board and Executives; (v) Business Plan and Accounts; (vi) Contracts; (vii) Lending Practices; (viii) Capital Expenditures; (ix) Dividends; and (x) Litigation Rauch Decl. at ¶ 8; Robertson Aff. at ¶ 14; Vigna Decl. Ex. 3 (2010 IM) at 8, 19, 71, 76-83.

133.    The creditor directors that joined the BTA board were able to ensure that creditor views were considered in all BTA corporate decision-making going forward – including how to implement BTA's business plan post-restructuring, how to manage BTA's asset recovery efforts and, ultimately, whether to seek a second restructuring. Vigna Decl. Ex. 3 (2010 IM) at 259; Rauch Decl. at ¶ 8-9.

134.    On August 19, 2010 the Shareholders of the Bank approved a new regulation on the Board of Directors and amended the membership of the Board of Directors to include the

creditor directors: Mr. Christoph Schoefboeck and Mr. Maarten Leo Pronk.  Vigna Decl. Ex. 10

(BTA Bank Prospectus, dated February 14, 2011) at BTA_00003072; Rauch Decl. at ¶ 8;

135.    Mr. Shoefboeck is an experienced operating and risk officer with experience that

includes Member of the Management Board and president of the Management Board of at Erste

& Steiermärkische Bank d.d., Chief Operating Officer and a Member of the Management Board

of ZAO Raiffeisenbank, Chief Risk Officer and Chief Operating Officer of HVB Splitska banka,

authorized Representative and a Member of the Management Board of HVB Croatia d.d.  Vigna

Decl. Ex. 111 (Bloomberg Executive Profile Christoph Schoefboeck, *available at*

https://www.bloomberg.com/research/stocks/private/person.asp?personId=25938877&privcapId

=13292262.); Rauch Decl. at ¶ 8.

136.    Mr. Pronk has previously held positions of Regional Manager-Russia at

Coöperatieve Rabobank UA, Country Manager-Russia at Coöperatieve Rabobank UA, Director-

Europe Region & Managing Director-London at Banco Santander Río SA, Acting Chairman at

Nikoil Investment Banking Group, Chairman of Fortis Life Insurance Russia, General Manager

of ING Bank NV, and Regional Manager-Russia & Ukraine at Fortis Bank (Nederland) NV.

Vigna Decl. Ex. 112 (Maarten Leo Pronk – Biography, *available at*

https://www.marketscreener.com/business-leaders/Maarten-Pronk-0B0S5L-E/biography/);

Rauch Decl. at ¶ 8.

137.    From September 14-17, 2009, the Steering Committee held meetings with Bank

advisers in London.  Vigna Decl. Ex. 3 (2010 IM) at 6.

138.    The Steering Committee and its advisors spent thousands of hours combing

through BTA's finances and considering potential options for operating or disposing of

subsidiaries, governance changes, risk management, human resources, management of a

"troubled assets portfolio," recovery strategies, trade finance and debt restructurings, among other things. *See* Rauch Decl. at ¶ 7-9; Robertson Aff. at ¶¶ 12-15; Vigna Decl. Ex. 23 (BTA August 18, 2009 Presentation Agenda) at Gramercy-BTA 005982.

139.    At the outset of negotiations, BTA informed the Steering Committee that it intended to sue members of former management – most prominently, former chairman Muktar Ablyasov – to attempt to recover as many improperly disbursed assets as possible. Vigna Decl. Ex. 23 (BTA August 18, 2009 Presentation Agenda) at Gramercy-BTA 005982.

140.    The Steering Committee also successfully negotiated for the creditors' ability to participate in BTA's asset recovery process going forward through the receipt of "Recovery Units." Vigna Decl. Ex. 5 (Memorandum of Understanding as to Certain Restructuring Principles, September 21, 2009) Schedule C at 20; Vigna Decl. Ex. 125 (Favale Tr.) at 248:2-20; Robertson Aff. at 14; Rauch Decl. ¶ 6-9.

141.    The Steering Committee proposed – and BTA accepted – that the Bank's existing creditors share in such recoveries (if any) because the apparent uncollectibility of the management "loans" contributed to the "haircuts" the Bank's creditors were being asked to accept. Vigna Decl. Ex. 125 (Favale Tr.) at 247:13-248:20; 252:16-253:2; Robertson Aff. at ¶ 14;  Rauch Decl. at ¶ 9.

142.    The Steering Committee also negotiated to have SK Fund agree toless advantageous terms than the rest of BTA's creditors. In particular, the Steering Committee sought to have SK Fund accept a small amount of additional BTA equity in exchange for forgiveness of the KZT 645 billion in BTA Bonds that SK Fund then held and agree not to accept any dividends on that equity other than in highly circumscribed situations. Rauch Decl. at ¶ 8-9; Vigna Decl. Ex. 124 (Howes Tr.) at 62:19-64:13; 156:5-157:18; Rauch Decl. at ¶ 6.

- 21 -

143.    In addition to negotiating the terms of the 2010 Restructuring itself, the Steering Committee actively sought changes to the Information Memorandum and signed off on the Information Memorandum.  Vigna Decl. Ex. 124 (Howes Tr.) at 145:22-146:10, 147:16-148:8.

144.    In light of the foregoing, the 2010 IM was a product of substantial negotiations among some of the world's most sophisticated parties and advisors.  *See* Robertson Aff. at ¶ 11-15; Rauch Decl. at ¶ 7-8; Vigna Decl. Ex. 125 (Favale Tr.) at 31-32, 74, 168, 191-93, 252-53.

145.    Throughout the process of negotiating with the Steering Committee, it was understood that BTA could not pay its existing debts in full and that its notes, in particular, would need to be exchanged for new, less financially burdensome, securities.  Vigna Decl. Ex. 26 (BTA Restructuring Update ("Road Show"), dated May 17-21, 2010) at 15, 17, 21.

146.    The agreement with the Steering Committee also put significant limited on SK Fund's ability to control BTA, as SK Fund could not remove the three independent directors as a matter of Kazakhstani corporate law, and could not remove the two creditor-appointed directors for the first three years as a matter of contract.  Vigna Decl. Ex. 3 (2010 IM ) at 72, 257.

## B.    The "Base Case Model"

147.    The parties to the 2010 Restructuring used a financial model called the "Base Case Model" in discussions regarding the terms of the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 136.

148.    This Base Case Model was prepared by the financial advisors of the Bank, Lazard Freres and UBS.  Vigna Decl. Ex. 6 (BTA Bank Business Plan – Preliminary Analysis, dated April 18, 2010 ("Base Case Model")) at Cover Page; Vigna Decl. Ex. 3 (2010 IM) at 23.

149.    The Base Case Model was also thoroughly reviewed and revised, as appropriate, by Deloitte.  Vigna Decl. Ex. 3 (2010 IM) at 14.

- 22 -

150.     The Base Case Model needed to be finalized at a certain point.  Robertson Aff. at ¶ 17.

151.     The Base Case Model was not expected to be completely up-to-date at the date of its dissemination, and its underlying assumptions could change rapidly, as the IM expressly warned.  Robertson Aff. at ¶¶ 17-18; Vigna Decl. Ex. 3 (2010 IM) at 130.

152.     The final iteration of the Base Case Model was dated April 18, 2010.  Vigna Decl. Ex. 9 (Base Case Model) at cover page; Vigna Decl. Ex. 3 (2010 IM) at 4.

153.     The Base Case Model was merely intended to guide negotiations between the Steering Committee and the Bank.  Robertson Aff. at 16-18.

154.     The Base Case Model was not intended to be "plug-and-play" with respect to individual inputs.  Significant new inputs would, at the least, require reexamination of model assumptions and require re-tuning of the model.  Robertson Aff. at 17.

155.     In addition, the Base Case Model was conservative by nature.  Robertson Aff. at 16-18.

156.     For example, the Base Case Model predicted that BTA would have a K1-1 regulatory capital ratio of 5.34% in 2010.  Vigna Decl. Ex. 9 (Base Case Model) at Key Assumptions, G93.

157.     For the same year, BTA's *actual* K1-1 capital ratio was 13.8%, nearly tripling the expectation.  Vigna Decl. Ex. 16 (2010 BTA Financial Statements) at 67.

158.     Similarly, the K1-2 capital ratio was predicted to be 6.40%.  Vigna Decl. Ex. 9 (Base Case Model) at Key Assumptions, G94.  For the same year, BTA's *actual* K1-2 capital ratio was 15.0%, more than doubling the expectation.  Vigna Decl. Ex. 16 (2010 BTA Financial Statements) at 67.

- 23 -

159.     Furthermore, the 2010 IM expressly warned investors that the financial advisors' "Base Case Model" "is a tool used by the Bank for illustrative modelling purposes, and no amounts included in it or derived from it should be construed as a forecast by the Bank or any other person of any results of the Bank."  Vigna Decl. Ex. 3 (2010 IM) at 136.

160.     The Bank accepted no responsibility for the Base Case Model or the business plan prepared as of September 4, 2009. Vigna Decl. Ex. 3 (2010 IM) at 136.

161.     Those with claims against the Bank were instructed not to "form any decisions based upon either of these documents." Vigna Decl. Ex. 3 (2010 IM) at 136.

162.     The 2010 IM also noted that the "lack of accurate statistical, corporate and financial information in Kazakhstan may limit the ability of the Bank to assess its credit risks accurately."  Vigna Decl. Ex. 3 (2010 IM) at 129.

163.     Relatedly, the 2010 IM disclosed that if "circumstances arise that the Bank has not identified or anticipated in developing its statistical models, its losses could be greater than expected."  Vigna Decl. Ex. 3 (2010 IM) at 125.

164.     On May 7, 2010, after the Base Case Model was finalized, BTA announced that it had entered into certain material transactions with SK Fund, namely the bond capitalization and deposit agreements contemplated in the 2010 IM.  Vigna Decl. Ex. 44 (Email correspondence from Ian Jack dated May 7, 2010) at GRAMERCY-BTA 012149.

165.     From May 17 through 21, 2010, BTA held a "road show" in Almaty, Hong Kong, Singapore, Zurich and London where investors could ask questions in person, including about the base case model, and also made the "road show" presentation available on its website, and held investor calls where smaller creditors could ask questions.  Vigna Decl. Ex. 26 (BTA

- 24 -

Restructuring Update ("Road Show"), dated May 17-21, 2010) at BTA_00054688; Robertson Aff. at ¶ 21-23.

166.    Consistent with the disclosures regarding the Base Case Model, the Bank announced in the "road show," after preparation of the Base Case Model but before the vote on the 2010 Restructuring, that it was already falling behind some of the projections in the Base Case Model and business plan.  Vigna Decl. Ex. 26 (BTA Restructuring Update ("Road Show"), dated May 17-21, 2010) at 12.

## VI.    THE STEERING COMMITTEE AND BTA AGREED ON THE TERMS OF THE 2010 RESTRUCTURING

167.    Negotiations between BTA and the Steering Committee ended on April 18, 2010. Vigna Decl. Ex. 3 (2010 IM ) at 7; Vigna Decl. Ex. 6 (Summary of Key Terms and Conditions of Restructuring, dated April 18, 2010).

168.    Following months of discussions in London and Kazakhstan, BTA and the Steering Committee agreed on terms of a proposed restructuring of BTA's $16.7 billion of financial indebtedness (the "Restructuring Plan").  Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 7 and Ex. 8; Vigna Decl. Ex. 8 (Summary of Key Terms and Conditions of Restructuring, dated April 18, 2010); Robertson Aff. at ¶ 13.

169.    The Restructuring Plan was the second of a two-part effort to stabilize BTA, the first having been the initial injection of KZT 212 billion in capital and exchange of SK Fund and BTA bonds.  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19.

## VII.    THE 2010 INFORMATION MEMORANDUM

170.    The terms of the Restructuring Plan were set forth in an Information Memorandum.  *See generally* Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 123 (Khamis Tr.) at 156:19-23.

171.    The 2010 IM was prepared by BTA's Management Board with the input of the Steering Committee, and with the advice of various professionals, including legal, financial, and banking professionals.  Vigna Decl. Ex. 124 (Howes Tr.) at 147:14-148:8; Vigna Decl. Ex. 3 (2010 IM) at 5-12 (section entitled "Letter from the Chairman of the Management Board of the Bank").

172.    The Steering Committee met with its advisors and White & Case in London to negotiate the terms of the 2010 Restructuring and the contents of the 2010 IM.  Vigna Decl. Ex. 3 (2010 IM) at Cover Page, 6-7.

173.    The initial Information Memorandum was dated May 1, 2010.  Vigna Decl. Ex. 3 (2010 IM) at 353.  BTA published the Information Memorandum to holders of existing indebtedness by making it available on the BTA website. The Information Memorandum was only available to individuals who certified on the website that they were either (i) outside the U.S. and non-U.S. residents or (ii) within the United States and Accredited Investors or QIBs. *See* Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 10.

174.    A consolidated, revised version on the Information Memorandum was issued on June 2, 2010, and published on BTA's website. Access to that version of the 2010 Information Memorandum was similarly restricted.  *See* Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 10; Vigna Decl. Ex. 3 (2010 IM) at cover page.

175.    SK Fund had no role in preparing the 2010 IM, did not review it before it was finalized, did not provide any input on its contents, and had no role in crafting or issuing any representation made by BTA in connection with the restructuring.  Vigna Decl. Ex. 124 (Howes Tr.) at 145:5-146:18, 150:16-19.

176.    The 2010 IM disclosed, among other things:

    a.   The SK Guarantee and Guarantee Fee. Vigna Decl. Ex. 3 (2010 IM) at. 8, 42.

    b.   The NBK Repo. Vigna Decl. Ex. 3 (2010 IM) at 8.

    c.   The SK Bonds. Vigna Decl. Ex. 3 (2010 IM) at 155.

    d.   The cancellation of the BTA Bonds. Vigna Decl. Ex. 3 (2010 IM) at 8, 324.

    e.   The Recovery Units and all material terms thereto.  Vigna Decl. Ex. 3 (2010 IM) 7, 37, 564.

    f.   That BTA paid depositors between 4% and 12.5%. Vigna Decl. Ex. 3 (2010 IM) at 233.

    g.   That BTA held large amounts of deposits from SK Fund, as much as KZT 310 billion as of September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 175, 232.

    h.   SK Fund deposits were made on standard commercial terms. Vigna Decl. Ex. 3 (2010 IM) at 175.

    i.   BTA held KZT 683 billion of total deposits as of September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 175, 232.

177.    The IM provided its deposit disclosure as of September 30, 2009 and did not limit the possibility of any depositor increasing the size of its deposit.  *See generally* Vigna Decl. Ex. 3 (2010 IM).

178.    The 2010 IM also disclosed that the average interest rate on deposits (current account and term deposits combined) for NBK and the Government was 8.4%. Vigna Decl. Ex. 3 (2010 IM) at 221.

179.    The average interest paid on BTA debt securities was 12.4%.  Vigna Decl. Ex. 3 (2010 IM) at 221.

- 27 -

180.    In addition, SK Fund estimated the market rate for valuing BTA credit risk at 12.3% when it purchased the KZT 645 billion in bonds in March 2009.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 30.

181.    The 2010 IM also disclosed myriad risks that would impact the Bank through the Restructuring, whether or not the Restructuring was successful.  Vigna Decl. Ex. 3 (2010 IM) at 119-44.

182.    The 2010 IM noted that Kazakhstan is an Emerging Market.  Vigna Decl. Ex. 3 (2010 IM) at 130.  As stated in the 2010 IM, "Kazakhstan is subject to the risks associated with emerging markets generally," which included "rapid change" that could make the information in the information memorandum "outdated relatively quickly."  Vigna Decl. Ex. 3 (2010 IM) at 130.  For this reason, those with claims against the bank were instructed to "exercise particular care in evaluating the risks involved."  Vigna Decl. Ex. 3 (2010 IM) at 130.

183.    The 2010 IM lists the manifold risks present in emerging markets, including: uncertain government support going forward, deficient information reporting systems; economic volatility and uncertainty; otherwise questionable business prospects; existing and emerging competition; personnel challenges and corruption risk; regulatory uncertainty; and less predictable legal enforcement than we are used to in the most established economies.  Vigna Decl. Ex. 3 (2010 IM) at 119-44.

184.    The risk disclosures BTA issued in connection with the 2010 Restructuring expressly warned that that the Bank's financial statements had not been audited in some time, that the Bank's proposed new business model was unproven and uncertain, that BTA faced significant competition by domestic and foreign banks, that the Kazakhstani economy was in distress and might not recover, that efforts to recover assets from prior management could not be

- 28 -

predicted, and that the Bank ultimately might not be able to maintain minimum capital adequacy

ratios or otherwise continue as a going concern.  Vigna Decl. Ex. 3 (2010 IM) at 119-41.

185.    Specifically, the 2010 Information Memorandum States:

> The Bank is currently in breach of the minimum capital adequacy
> ratios established by the FMSA [the Kazakh bank regulator].  If the
> Restructuring is completed as planned, the Bank estimates that its
> Tier I and total capital adequacy ratios calculated in accordance
> with FMSA regulations will be 5.3 per cent. and 11.2 per cent,
> retrospectively, as at 31 December 2010, compared to the
> minimum [required] levels of 5.0 per cent. and 10.0 per cent . . . .
> Any further deterioration in the quality of the Bank's loan portfolio
> after the Restructuring and the consequent need to make
> impairment provisions may cause the Bank's capital adequacy
> ratios to fall below the minimum levels . . . . Any failure to comply
> with the minimum capital adequacy ratios, whether because of the
> deterioration in the quality of the Bank's loan portfolio or an
> increase in the minimum capital adequacy requirements, could lead
> to sanctions and other measures being applied by the FMSA,
> including forcing the Bank into conservation or mandatory
> liquidation.

Vigna Decl. Ex. 3 (2010 IM) at 119-20.

186.    The 2010 IM describes additional risks relating to why "[t]he effect of local and

global conditions on the Bank and the Bank's customers and counterparties, as well as the effect

of other events both within and outside the Bank" might negatively affect BTA's loan book and

business more generally, including the following:

> The ongoing crisis in the global financial markets and deterioration
> of general economic conditions have adversely affected the Bank's
> results of operations and financial condition and could continue to
> cause them to decline;
>
> A number of significant borrowers, primarily registered outside of
> Kazakhstan, stopped making payments in 2009 and the Bank has
> been unable to monitor the collateral (if any) or their financial
> performance. Many of these borrowers have also ceased to
> communicate with the Bank and some have unlawfully transferred
> the collateral securities by the loans;

- 29 -

> Given the internal control weaknesses in the Bank, related party transactions with unusual terms not known as at the date of this Information Memorandum may be uncovered in the future and may have further adverse effects on the Bank's financial condition and recovery prospects;
>
> a gradual seasoning of the Group's loan portfolio … may increase the proportion of loan defaults;
>
> As a result of the ongoing financial crisis, the Bank faces greater competition from other banks as larger banks in more stable financial positions will aim to increase their market shares inall sectors of the market; and
>
> The government expects the growth of Kazakhstan's GDP to remain show throughout 2010 as a result of the slow economic recovery, unpredictable commodity prices, volatility in the real estate market, reduced access to credit for both corporates and households and the general weakening of business and consumer confidence in Kazakhstan.  The Bank expects that lower GDP growth will put increasing pressure on the ability of its current borrowers to repay their existing loans and could therefore increase the Bank's losses from non-performing loans, which could adversely affect the Bank's business, financial condition, results of operations and prospects.

Vigna Decl. Ex. 3 (2010 IM) at 119-41.

187.    The IM also stated

> Claimants should also note that emerging economies such as that of Kazakhstan are subject to rapid change and that the information contained in this Information Memorandum may become outdated relatively quickly.    Accordingly, claimants should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their decision is appropriate.  Claimants are urged to consult with their own legal and financial advisors before making any decision with respect to the Restructuring.

Vigna Decl. Ex. 3 (2010 IM) at 130.

188.    The 2010 IM further warned that the forward-looking statements therein were

"not guarantees of future performance and that the Bank's actual results of operations, financial

condition and liquidity and the development of the industry in which it operates may differ

materially from those statements made in or suggested by the forward-looking statements

contained in this Information Memorandum."  Vigna Decl. Ex. 3 (2010 IM) at 114.

189.    Consequently, the 2010 IM warned that:

> Nothing in this Information Memorandum or any other document
> issued with or appended to it should be relied on for any purpose
> other than to make a decision on the Restructuring Plan.   In
> particular,  and  without  limitation,  nothing  in  this  Information
> Memorandum or any other document issued with or appended to it
> should be relied on in connection with the purchase of any shares
> (other than under the Restructuring Plan), or assets of the Bank.
> This  Information  Memorandum  has  been  prepared  in  connection
> with the proposal in relation to the Restructuring Plan of the Bank
> under the Restructuring Law.

Vigna Decl. Ex. 3 (2010 IM) at ii; Vigna Decl. Ex. 123 (Khamis Tr.) at 525:18-526:5.

191.    The 2010 IM also highlighted the fact that BTA faced difficulties with its loan

book.  Vigna Decl. Ex. 3 (2010 IM) at 122, 126.

192.    For these reasons and others, the very first sentence in the 2010 Information

Memorandum states:  "An investment in the New Notes, Shares and GDRs involves a high

degree of risk."  Vigna Decl. Ex. 3 (2010 IM) at i.

193.    Due to the extreme risks involved, in the United States the securities issued in

BTA's 2010 restructuring could only be purchased by "Qualified Institutional Buyers" or

"QIBs." Vigna Decl. Ex. 3 (2010 IM) at 311.

194.    QIBs are investment companies, insurance companies and other institutional

investors that own and invest a minimum of US$ 100 million on a discretionary basis, or

- 31 -

registered securities dealers that hold at least US$ 10 million in other companies' securities at any given time.  17 CFR § 144A(a)(1)(i).

195.    The 2010 IM also incorporated by reference a Deed of Undertaking executed by SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 40.

196.    The Deed of Undertaking provided that SK Fund "will undertake that no dividend other than a Permitted Dividend [as defined in the 2010 IM] shall be paid on the shares."  Vigna Decl. Ex. 3 (2010 IM) at 74.

197.    "Permitted Dividend" is defined as one paid to its *shareholders* more than four years after the 2010 Restructuring if the Bank met certain criteria of financial health or after the Bank's new notes had been paid in full.  Vigna Decl. Ex. 3 (2010 IM) at 32.

198.    "Shares" mean "common shares of the Bank."  Vigna Decl. Ex. 3 (2010 IM) at 41.

199.    SK Fund agreed to this Undertaking because it was a fair treatment for creditors given SK Fund's payment of normal operational expenses and because of its efforts to protect creditors in the Restructuring.  Vigna Decl. Ex. 124 (Howes Tr.) at 156:5-157:18.

200.    The Deed of Undertaking did not prohibit SK Fund from receivingother payments, including, without limitation, interest on its deposits.  Vigna Decl. Ex. 124 (Howes Tr.) at 158:16-160:5.

201.    SK Fund always had the intention to sell BTA once it stabilized.  Managing and profiting from banks was not within the ambit of SK Fund's competency and not within its intentions.  This objective was stated to the Steering Committee.  Vigna Decl. Ex. 125 (Favale Tr.) at 237:24-238:16.

A.   **The SK Guarantee and Guarantee Fee**

202.   In addition to providing the underlying collateral for the NBK Repo, SK Fund was also required to guarantee the repo ("SK Guarantee") because NBK was not permitted to enter into a repo transactions with defaulted banks.  Vigna Decl. Ex. 3 (2010 IM) at 8, 42; Vigna Decl. Ex. 125 (Favale Tr.) at 32:24-33:24; Vigna Decl. Ex. 124 (Howes Tr.) at 165:10-24.

203.   SK Fund was required to charge a fee for the SK Guarantee because it could not provide a guarantee for no consideration at all under IFRS rules (the "Guarantee Fee").  Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-13.

204.   The Guarantee Fee was negotiated with the Steering Committee, and was specifically agreed to by the Steering Committee.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15; Vigna Decl. Ex. 125 (Favale Tr.) at 31:23-32:13; Vigna Decl. Ex. 25 (Steering Comm. Presentation, dated March 4, 2010); Rauch Decl. at ¶ 9.

205.   The Steering Committee agreed that SK Fund could receive the Guarantee Fee, but requested that SK Fund receive a smaller distribution of BTA equity to compensate for the fee than originally planned.  Vigna Decl. Ex. 25 (Steering Comm. Presentation, dated March 4, 2010) at LZ008215; Vigna Decl. Ex. 124 (Howes Tr.) at 303:14-304:15.

206.   SK Fund agreed with the Steering Committee to direct an additional 3.5% of BTA equity to BTA creditors in exchange for the Guaranty Fee.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:20-304:15; Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-13.

207.   In an initial term sheet issued in December 2009, SK Fund was to receive additional shares of BTA leading to a total equity position of 85% of the Bank.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15.

208.   After the Guarantee Fee was added, SK's equity stake was reduced to 81.5% of BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15.

209.    SK Fund therefore issued a guarantee on behalf of BTA in exchange for a Guaranty Fee (disclosed in the 2010 IM) in the amount of "fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any . . ." Vigna Decl. Ex. 3 (2010 IM) at 8, 15, 29, 42; Vigna Decl. Ex. 124 (Howes Tr.) at 66:22-68:11.

210.    The 2010 IM also disclosed that the SK Guarantee had a maximum cost of KZT 6.45 billion in 2010, and KZT 12.9 billion for all of the remaining years of the NBK Repo. Vigna Decl. Ex. 3 (2010 IM) at 41-42.

211.    SK Fund guaranteed KZT 449 billion in NBK loans to BTA.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 35.

212.    The liquidity generated as the result of the guarantee was greater than the small fee charged to provide the guarantee.  Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-33:24.

## VIII.   SK FUND'S PROVISION OF ADDITIONAL SUPPORT IN THE 2010 RESTRUCTURING

213.    In addition to the initial KZT 212 billion million capital injection made in February 2009, SK Fund also agreed to increase its deposits with BTA in connection with the restructuring.  Vigna Decl. Ex. 124 (Howes Tr.) at 165:6-166:14.

214.    As part of the 2010 Restructuring, BTA and the Fund agreed to cancel BTA's $645 million obligation under the BTA Bonds.  Vigna Decl. Ex. 3 (2010 IM) at 8, 324.

215.    In exchange, SK Fund received more common shares of BTA, increasing its shareholding of BTA to 81.5%.  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-63:8; Vigna Decl. Ex. 3 (2010 IM) at 8, 176.

216.    At the time of the cancellation, the BTA Bonds had already accrued KZT 26 billion in coupon payments owed to SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 8.

217.     The cancellation of the BTA Bonds therefore amounted to an additional KZT 671 billion that was put into the capital of BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 302:3-8. Vigna Decl. Ex. 3 (2010 IM) at 8, 146.

218.     This cancellation changed the terms of the Bond Swap, which had initially been structured so that the same notional amount of bonds would be held by the counterparties until their respective maturity dates in 2024. Vigna Decl. Ex. 124 (Howes Tr.) at 64:16-24.

219.     With one side of the swap cancelled, the Fund had not only provided BTA with hundreds of billions of tenge, but was also facing the prospect of having a KZT 645 billion bond payment due in 2024.  Vigna Decl. Ex. 124 (Howes Tr.) at 64:16-65:11.

220.     To prepare for this eventuality, SK Fund created what was essentially a "sinking fund," or, in other words, an amount deposited that would earn interest to cancel out a bond obligation at maturity.  Vigna Decl. Ex. 124 (Howes Tr.) at 63:19-65:11; Vigna Decl. Ex. 118 (Mason Expert Report) at ¶ 51.

221.     SK's deposit was expressly discussed with the Steering Committee no later than April 2010.  Vigna Decl. Ex. 42 (Correspondence between Lazard and Deloitte dated April 16, 2010) at BTA_00053509.

222.     On April 29, 2010, BTA's board of directors approved a proposed transaction that SK Fund would deposit up to KZT 180 billion in May or June 2010.  Vigna Decl. Ex. 37 (Extract from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633.

223.     The interest would accrue, so that the deposits at maturity, less taxes, would equal KZT 645 billion, the amount of the SK Bonds.  Vigna Decl. Ex. 37 (Extract from the minutes of

in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633.

224.     SK Fund did not intend to withdraw any interest at all until 2024, and intended to turn over all the principal and interest in its deposit accounts to BTA at that time for redemption of the SK Bonds. Vigna Decl. Ex. 124 (Howes Tr.) at 226:24-227:7; Vigna Decl. Ex. 37 (Extract from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 40.

225.     The account would accrue between 10-12% interest and have a maturity in 2024. Vigna Decl. Ex. 37 (Extract from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633.

226.     These proposed interest rates were actually lower than some interest BTA was paying on much shorter term deposits.  Vigna Decl. Ex. 124 (Howes Tr.) at 181:12-184:4.

227.     They were also lower than those charged by some other Kazakhstani banks, such as Halyk Bank, on their deposit accounts for the same period.  Vigna Decl. Ex. 124 (Howes Tr.) at 63:19-66:5.

228.     The interest on SK Fund's deposit that was to accrue (and eventually return to BTA) was consistent with prevailing rates for deposits in Kazakhstan at the time; the rate reported for time deposits over five years of Nonbanking Legal Entities in April 2010 was 10.5%.  Vigna Decl. Ex. 22 (National Bank of Kazakhstan, Statistical Bulletin, No. 04 (185), April 2010) at 49.

229.     On May 7, 2010, BTA announced in a press release that it had entered into a "great deal" with SK Fund, in reference to SK Fund's agreement to convert the SK Bonds into equity and the creation of the aforementioned deposits, although it did not make specific mention

of the deposits.  Vigna Decl. Ex. 138 (Email correspondence from M. Bark-Jones, Dated May 10, 2010) at BTA_00017708-09.

230.    As part of these planned deposits, on May 13, 2010, SK Fund transferred KZT 97 billion from a current account to a term deposit which had an 11% interest rate.  Vigna Decl. Ex. 38 (Corporate Bank Deposit Contract No. 1489, dated May 13, 2010 (Original and Translation)) at SK0002264_EN; Vigna Decl. Ex. 12 (SK 2009 Financial Statements) at 40.

231.    Between June and September 2010, SK Fund deposited an additional KZT 78 billion, bringing the total amount of the term deposits to KZT 175 billion.  Vigna Decl. Ex. 55 (Email correspondence, dated February 7, 2012) at BTA_00105397; Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

232.    In December 2010, to account for interest payments that would legally be owed to SK Fund, the Fund deposited an additional KZT 29.3 billion.  Vigna Decl. Ex. 39 (Corporate Bank Deposit Contract No. 1566 1137-u, dated December 20, 2010 (Original and Translation)) at SK_0002280_EN; Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

233.    This deposit had a 9% interest rate, which was intended to be paid out in cash to the Fund.  Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

234.    The week following the May 7 announcement and May 13 initial deposit, BTA held a May 18, 2010 investor call at which investors could inquire about, among other things, the deposits made by SK Fund.  Vigna Decl. Ex. 28 (BTA Press Release announcing Conference Call addressing 2010 Restructuring, dated May 17, 2010) at BTA_00002834; Vigna Decl. Ex. 27 (BTA Restructuring Update ("Road Show") with script, dated May 17-21, 2010) at BTA_00117217, BTA_00117227.

235.     In June 2010, SK Fund's published 2009 financials stated:  "On May 13, 2010 the Fund placed deposit of 97 billion Tenge with BTA Bank JSC with maturity on December 30, 2024 and bearing interest of 11%; interest is capitalized annually.  Deposit was in place for the purpose of accumulation of funds for future settlement of Fund's bonds issued to BTA Bank JSC with nominal value of 645 billion Tenge."  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 40.

236.     For the duration of BTA's restructuring, SK Fund's deposit remained at BTA and provided much-needed liquidity.  Vigna Decl. Ex. 124 (Howes Tr.) at 226:24-227:7.

237.     The deposits made a substantial quantity of cash available to BTA.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 33.

238.     The interest on the deposits had no cash implication for BTA. Vigna Decl. Ex. 117 (Hinton Report) at ¶ 33.

239.     Because Fund SK did not intend to withdraw any interest at all until 2024 and then intended to turn over all the principal and interest in its deposit accounts to BTA for redemption of SK Bonds, BTA was given the net present value of the 2024 bond payment in 2010 and was free to use the money as it saw fit from that point forward. Vigna Decl. Ex.117 (Hinton Report) at 15-18, 69-61; Vigna Decl. Ex. 132 (Hrycay Tr.) at 110:7-111:16; Vigna Decl. Ex. 118 (Mason Report) at 106, 117-18.

240.     The liquidity from the deposits, and government aid as a general matter, provided funding for BTA's use in productive activities such as lending.  Vigna Decl. Ex. 117 (Hinton Report) at 16, 69; Vigna Decl. Ex. 118 (Mason Report) at 106, 117-18.

241.     Plaintiffs' expert concedes that all elements of government support for BTA were fully disclosed in the 2010 IM, except, in his contention, the total size of SK Fund's deposits and the rate of interest thereon.  Vigna Decl. Ex. 132 (Hrycay Tr.) at 157:10-158:8.

242.     Plaintiff's expert calculates the interest flow resulting from the negative carry swap to total KZT 87 billion.  Vigna Decl. Ex. 115 (Kapoor Report) at Ex. 1.

A.     **Securities Issued Through the 2010 Restructuring**

243.     Under the 2010 Restructuring Plan, claimants were entitled to exchange their existing Turanalem securities for new securities issued by BTA.  Vigna Decl. Ex. 3 (2010 IM) at 7.

244.     The 2010 Restructuring included a number of different packages available to claimants depending on their investments in BTA.  Vigna Decl. Ex. 3 (2010 IM) at 46-60.

245.     These included Senior Notes, which had an "eight-year tenor with  a four-year grace period on amortization of principal."  Vigna Decl. Ex. 3 (2010 IM) at 48.

246.     The Senior Notes accrued interest at 10.75% for 2.5 years, and 12.5% per year afterwards.  Vigna Decl. Ex. 3 (2010 IM) at 48.

247.     Certain claimants were also entitled to receive Subordinated Notes.  Vigna Decl. Ex. 3 (2010 IM) at 49.

248.     These Subordinated Notes accrued interest at 7.2%.  Vigna Decl. Ex. 3 (2010 IM) at 49.

249.     None of the new indebtedness and shares were registered in the United States under the U.S. Securities Act.  Vigna Decl. Ex. 3 (2010 IM) at 310.

250.     Claimants receiving these Subordinated Notes were required, unless the Bank otherwise agreed, to represent that they (i) were not U.S. Persons, (ii) were an Accredited

Investor, or (iii) were a Qualified Institutional Buyer, as each defined under the Securities Act and rules promulgated thereunder. Vigna Decl. Ex. 3 (2010 IM) at 310.

251.    Claimants receiving Subordinated Notes also agreed that they would not offer or sell the notes except pursuant to Rule 144A or Regulation S.  Vigna Decl. Ex. 3 (2010 IM) at 312.

252.    The Subordinated Notes also included transfer restrictions, that provided  that the beneficial owner of the note could not be "offered, sold, pledged or otherwise transferred except" (i) outside of the U.S. pursuant to Regulation S and (ii) within the United States under the requirements of Rule 144A.  Vigna Decl. Ex. 3 (2010 IM) at 311.

253.    As part of the 2010 Restructuring, BTA also issued "Recovery Units," which entitled unitholders to receive a portion of the funds recovered from BTA's former management. Vigna Decl. Ex. 3 (2010 IM) at 49.

254.    These units – distributed to all eligible creditors who elected to receive them – provided the holders with the right to receive 50% of the actual cash proceeds BTA received from recovered assets that prior to the 2010 Restructuring had been considered impaired for accounting purposes (up to a maximum face amount of US$ 5.221 billion, subject to various hurdles and reductions).  Vigna Decl. Ex. 3 (2010 IM) at Annex 4; Vigna Decl. Ex. 8 (Terms and Conditions of the Recovery Units) at BTA_00118327.

255.    Recovery Unit holders would not receive payment on accounting recoveries "until the Bank receive[d] the cash benefit thereof."  Vigna Decl. Ex. 3 (2010 IM) at 50.

256.    The Recovery Units Terms and had a reference amount of $5,221,494,216, the expected recoveries.  Vigna Decl. Ex. 3 (2010 IM) at 566; Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010) at BTA_00118311.

- 40 -

257. The 2010 IM and subsequent final terms and conditions of the Recovery Units disclosed the conditions under which the Units could be accelerated:

> Trustee in its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall:  (a) give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to the higher of (1) the Reference Amount and (2) the aggregate of (A) amounts standing to the credit of the Collection Amount and (B) amounts by reference to Recoveries realized in cash and required to be but not yet paid to the Collection Account; and/or (b) exercise or direct the Trustee to exercise any or all of its rights, remedies, powers or discretions under the Trust Deed in respect of the Collection Account.

Vigna Decl. Ex. 3 (2010 IM) at 580; Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010) at § 13.

258. Thus, the Bank disclosed at the time of the 2010 Restructuring that there was a 20% threshold for the Recovery Units to be accelerated.  Vigna Decl. Ex. 3 (2010 IM) at 564-580; Vigna Decl. Ex. 8 (Terms and Conditions of the Recovery Units) at BTA_00118327.

### B. Creditor Approval of the 2010 Restructuring Plan

259. Creditors of BTA were required to meet and vote on the proposedRestructuring Plan.  Vigna Decl. Ex. 3 (2010 IM) at 86.

260. On May 28, 2010, the Restructuring Plan was approved at a meeting of creditors in London and at a meeting of other creditors held in Almaty, Kazakhstan.  Vigna Decl. Ex. 134 (FFB Decl.) at ¶¶ 18-19; Vigna Decl. Ex. 3 (2010 IM) at 364.

261. Over 92% percent of creditors voted in favor of the Restructuring.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:16; Vigna Decl. Ex. 29 (BTA Press Release announcing approval of restructuring, dated May 28, 2010.); Robertson Aff. at ¶24.

- 41 -

262.     Following the vote, the Restructuring Plan was approved by a Kazakhstan Court, Kazakhstan's financial regulator, AFN, and other bankruptcy courts in multiple jurisdictions. Vigna Decl. Ex. 125 (Favale Tr.) at 182:21-183:18; Vigna Decl. Ex. 3 (2010 IM) at 3-4, 11; Vigna Decl. 134 (FFB Decl.) at ¶¶ 20-21.

263.     The 2010 Restructuring was completed on September 16, 2010.  Vigna Decl. Ex. 4 (2012 IM) at 3.

264.     The 2010 Restructuring's reorganization of over $14 billion in debts was intended to permit BTA to meet its regulatory capital adequacy requirements and to continue as a going concern.  Vigna Decl. Ex. 3 (2010 IM) at 10, 145.

265.     At the time, it was considered a success as it prevented a total withdrawal of deposits and a run on the Bank, thus leaving it with a chance of survival.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24; Vigna Decl. Ex. 125 (Favale Tr.) at 182:21-183:18.

266.     Indeed, the Restructuring was lauded all over the world including by institutions such as the Paris Club.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:13.

267.     The Restructuring was the subject of an Oxford University case study.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:13.

268.     Advisors for the 2010 Restructuring were awarded Euromoney's 2010 "deal of the year" award.  Vigna Decl. Ex. 90 (*White & Case Transactions Awarded Euromoney 2010 Deals of the Year*, *available at* https://www.whitecase.com/firm/awards-rankings/award/white-case-transactions-awarded-euromoney-2010-deals-year).

## IX.     PLAINTIFFS' TRADING IN BTA SECURITIES

### A.     Plaintiffs Opened Accounts at UBS

███████████████████████████████████████████████████████████



34227987



34227987



**B.**     <u>Plaintiffs' Initial Investments in BTA</u>



34227987



34227987



308.     On December 8, 2009, Renaissance Capital issued a report stating that there was "surprising upside" for BTA bond investors.  Vigna Decl. Ex. 84 (Renaissance Capital analyst report, dated December 8, 2009) at P00000581.  Khamis received this report.

C.      **Plaintiffs' Participation in Approval of the 2010 Restructuring**



316.    The Restructuring Plan provided that holders of Euronotes (the "Euronote holders"), including Plaintiffs Atlantica and Baltica, would receive New Notes in exchange for the cancellation or restructuring of certain existing indebtedness of BTA.  Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 12.

317.    On April 20, 2010, Plaintiffs' UBS brokers performed an analysis to see what they would receive in the 2010 Restructuring if he exchanged Turalem notes for BTA notes. Vigna Decl. Ex. 122 (Kiblisky Tr.) at 117:4-118:14; Vigna Decl. Ex. 43 (Email correspondence from Igal Yacher dated April 20, 2010) at Atlantica 000002357.



**D.      Plaintiffs' Subsequent 2010 Transactions**

324.    On September 2, 2010, UBS issued an analyst report entitled "Buy BTA Bonds" that discussed the 2010 Restructuring.  Vigna Decl. Ex. 87 (UBS Investment Research Report dated September 2, 2010) at P00002006.

- 50 -

326.    This report discusses negative quarterly net interest margins for BTA and notes the rapidly deteriorating performance of BTA, falling from -6% to -8% by the second quarter of 2010.  Vigna Decl. Ex. 87 (UBS Investment Research Report dated September 2, 2010) at P00002006.

327.    BTA's bond prices did not decline after the UBS Investment Research Report dated September 2, 2010 was released.  Vigna Decl. Ex. 117 (Hinton Report) at 25, 51-55.

328.    Plaintiffs bought all secondary-market bonds at discounts ranging from 19% to 97%.  Vigna Decl. Ex. 117 (Hinton Workpapers) at Workpapers 1 &2;



335.    BTA completed the 2010 Restructuring on September 16, 2010.  Vigna Decl. Ex.

4 (2012 IM) at 3.



**E.      Background on BTA Bond Distribution and Clearing**

340.      Regulation S provides an exclusion from the Section 5 registration requirements of the Securities Act of 1933.  Vigna Decl. Ex. 119 (Am. Awan Report) at ¶ 33.

341.      Regulation S requires that the offer and sale of the relevant securities must be made to investors that are outside the United States.  Vigna Decl. Ex. 119 (Am. Awan Report) at ¶ 33.

342.      BTA deposited its non-Tenge Eurobonds at Bank of New York Mellon's London branch, which contracted to transfer book-entry ownership of those notes only through Euroclear (in Brussels) or Clearstream (in Luxembourg).  Vigna Decl. Ex. 3 (2010 IM) at 314.

343.      BTA limited the permissible "future sale, offer, pledge or transfer of the New Notes" to only an otherwise qualified "person who is located outside the United States and is not a U.S. Person, in an offshore transaction in accordance with Rule 903 or 904 of Regulation S under the Securities Act."  Vigna Decl. Ex. 3 (2010 IM) at 310.

344.      BTA further specifically provided that any "TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE."  Vigna Decl. Ex. 3 (2010 IM) at 311.

345.  Additionally, BTA provided:

> Secondary market sales of book-entry interests in the Non-Tenge
> New Notes held through Euroclear or Clearstream to purchasers of
> book-entry interests in the Non-Tenge New Notes through
> Euroclear or Clearstream will be conducted in accordance with the
> normal rules and operating procedures of Euroclear and
> Clearstream and will be settled using the procedures applicableto
> conventional Eurobonds.

Vigna Decl. Ex. 3 (2010 IM) at 318.

## X.  BTA'S POST-RESTRUCTURING OPERATIONS

### A.  BTA's Performance Following the 2010 Restructuring

346.  BTA's bond prices remained relatively stable after the 2010 Restructuring where
there was substantial disclosure of BTA's finances, including each component of the purported
negative carry swap.  Vigna Decl. Ex. 117 (Hinton Report) at 25-27.

347.  Following completion of the 2010 Restructuring, BTA resumed regular banking
operations.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at 8.

348.  Indeed, BTA continued operating 22 regional branches and 227 cash settlement
units throughout Kazakhstan as of December 31, 2010.  Vigna Decl. Ex.16 (BTA 2010 Financial
Statement) at 8.  By the end of 2011, BTA was still operating 22 regional branches and
maintained 220 cash settlement units throughout Kazakhstan.  Vigna Decl. Ex. 18 (BTA 2011
Financial Statement) at 8.

349.  BTA continued to operate branches as a going concern until 2014.  Vigna Decl.
Ex. 19 (BTA 2012 Financial Statement) at 8; Vigna Decl. Ex. 20 (BTA 2013 Financial
Statement) at 8.

350.  BTA also maintained representative offices in Shanghai, Moscow, Dubai, and
London throughout 2010 and 2011.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at 8;
Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 8.

351.     In addition, BTA maintained KZT 683 billion in deposits from customers in 2010, and 754 billion of the same in 2011.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statements) at BTA_00002127.

352.     The Bank also had over KZT 650 billion in outstanding loans to customers by 2011.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 1.

353.     BTA maintained its regulatory capital adequacy ratios until April 2012.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statements) at 10, 69; Vigna Decl. Ex. 18 Ex (BTA 2011 Financial Statement) at 36; Vigna Decl. Ex. 4 (2012 IM) at 3.

## B.     External Forces Affecting the Financial Health of BTA

354.     A number of factors unrelated to BTA's cost structure had a significant impact on the Bank's financial health throughout 2010 and 2011.

355.     The Greek debt crisis caused a global banking slowdown, and had an especially negative impact on emerging markets.  *See* Vigna Decl. Ex. 86 (Eswar Prasad, *Why the Greek Debt Crisis is a Problem for the Entire World Economy*, Brookings (May 24, 2010), *available at* https://www.brookings.edu/opinions/why-the-greek-debt-crisis-is-a-problem-for-the-entire-world-economy/).

356.     The yield on Greek ten-year bonds exceeded 10% for the first time on June 23, 2010, approximately one month after the 2010 Restructuring was approved.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

357.     By the end of 2010, the yield on the Greek bonds had increased to 12.54%.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

358.    In rapid succession, the yield on the Greek bonds exploded to 17.36% on May 23, 2011, 24.83% on September 13, 2011, and 32.36% on November 4, 2011.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

359.    By the end of 2011, yields on Greek government debt were over 35%.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

360.    BTA and others announced that bank lending in Kazakhstan had decreased 6% over the previous year (24% at BTA) and faced difficulties going forward since corporate borrowers in the country remained "distressed and cannot offer tangible collateral."  Vigna Decl. Ex. 30 (BTA Investor Call Presentation, dated May 17, 2011) at P00001942-43.

361.    BTA's lending decreased even more than comparable banks, in part due to new rigorous loan requirements required by the Bank's foreign creditors after the Ablyazov scandal. Vigna Decl. Ex. 124 (Howes Tr.) at 117:21-118:8; Vigna Decl. Ex. 3 (2010 IM) at 152-53.

362.    BTA announced that its equity value had turned negative under International Financial Reporting Standards. Vigna Decl. Ex. 30 (BTA Investor Call Presentation, dated May 17, 2011) at P00001954.

363.    The Kazakhstan Stock Exchange as a whole continued its almost straight-line free fall from approximately 1800 in February 2011 to 1199.65 in December 2011.



Kazakhstani Stock Exchange Index KASE, *available at*

:https://tradingeconomics.com/kazakhstan/stock-market



**Figure 6: Relative Performance of BTA Bonds vs. Peer Benchmark**

Source: Bloomberg and Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab.
BTA 7.2 bond price is from Average 7.2 price in Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab. The
Comparable Bank Bond Index is constructed from the equal-weighted average of the returns from Alliance Bank,
Kazkommertsbank, Halyk Bank, and Bank Centercredit comparable bonds. All bond prices are indexed to $100 as of September 6,

364.    Bond prices for all major Kazakhstani banks decreased during this period.  Vigna
Decl. Ex. 117 (Hinton Rep.) at 42-44.

365.    Throughout 2010 and 2011, BTA's bond prices moved in tandem (and generally
downward) with the rest of Kazakhstan's major banks, as shown in the chart above.  Vigna Decl.
Ex. 117 (Hinton Report) at 44.

366.    The high costs of BTA's litigation against Ablyazov and his unprecedented level
of obstruction added further strain to BTA's finances.  Vigna Decl. Ex. 83 (*BTA v. Ablyazov*, *et
al.*, Decision of Mr. Justice Popplewell in the High Court of Justice, Queens Bench Division,
dated August 8, 2014) at ¶¶ 7-39 (describing Ablyazov's evasion of justice and many breaches of
freezing order); Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the

High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 2 ("Behind the brief introduction which I have just given, there lies a background of ever-increasing, and at times bewildering, complexity.").

367.    In its April 29, 2010 Independent Auditors' Report, BTA's auditor Ernst & Young even gave an express "going concern" warning.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at Independent Auditor's Report, Heading: Emphasis of Matter.

368.    Ernst & Young stated that BTA's financial statements show that the bank's "total liabilities exceeded its total assets by KZT 104,513 million as at 1 December 2010" and warned that "[t]his condition, along with other matters described in Note 2, indicates the existence of a material uncertainty which may cast significant doubt about [BTA's] ability to continue as a going concern."  Vigna Decl. Ex.16 (BTA 2010 Financial Statement) at Independent Auditors' Report.

369.    On May 12, 2011, analysts from Commerzbank and Auerbach Greysonreported that BTA might need to restructure its debts once again.  Vigna Decl. Ex. 91 (Auberbach Grayson and Visor analyst reports, dated May 12, 2011); Vigna Decl. Ex. 92 (Commerzbank analyst report, dated May 12, 2011).

370.    BTA bond prices dropped on May 13, 2011.  (*See* figure below.)



Source: Bloomberg and Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab.
BTA 7.2 bond price is from Average 7.2 price in Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab. The Comparable Bank Bond Index is constructed from the equal-weighted average of the returns from Alliance Bank, Kazkommertsbank, Halyk Bank, and Bank Centercredit comparable bonds. All bond prices are indexed to $100 as of September 6,

### C.   Analyst Reports and Purported Negative Carry Swap

371.    In January 2011, Fitch issued an analyst report on BTA.  Vigna Decl. Ex. 88 (Fitch Ratings analyst report, dated January 18, 2011 ("2011 Fitch Report")).

372.    The 2011 Fitch Report noted that "BTA's capital needs proved to be far larger than SK's initial injection of KZT212bn."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 3.

373.    The 2011 Fitch Report acknowledged that SK Fund provided KZT 719 billion in "fresh capital" to BTA.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 3.

374.     In addition to the much-needed recapitalization, Fitch also noted a large infusion of deposit funding from SK Fund of KZT 330 billion.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

375.     The 2011 Fitch Report noted that these deposits received "relatively high" interest rates of up to 10%.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

376.     The 2011 Fitch Report described the interest rate on the deposits, taken in conjunction with the 2% Guarantee Fee, as "put[ting] considerable negative pressure on BTA's core revenue."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

377.     The 2011 Fitch Report contained the section heading "SK Role: Crucial Funding and Capital Support But Its Terms Kill Profit."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

378.     The 2011 Fitch Report noted that "SK bonds are likely to stay on the balance sheet for as long as SK remains the majority shareholder.  The options of renegotiation of terms on these or/and on BTA's newly issued debt are not being considered by management at present."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 5.

379.     The information contained in the Fitch report did not result in a decline in BTA's bond prices.  Vigna Decl. Ex. 117 (Hinton Report) at 25-27, 51-55.

380.     In March 2011, HSBC issued an analyst report on UBS establishing an underweight recommendation for BTA.  Vigna Decl. Ex. 89 (HSBC Global Research, *EMEA Banks*, dated March 2011) at P00003153.

381.     Khamis received the HSBC report and reviewed it around the time it was issued. Vigna Decl. Ex. 123 (Khamis Tr.) at 196:4-9.

382.     On May 17, 2011, BTA's CEO, Mr. Saidenov held an investor call to discuss the audited financial results and other Bank matters.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement); Vigna Decl. Ex. 31(May 17, 2011 Bloomberg Investor Call Transcript).

383.     He specifically discussed the following

> BTA disclosed that Fund SK maintained three types of deposits with BTA, with an average interest rate of 9.3%.  Vigna Ex. 31

(May 17, 2011 Bloomberg Investor Call Transcript) at 5, 8; Vigna Decl. Ex. 30 (May 17, 2011 Investor Call Presentation) at 24.

BTA was experiencing a "negative carry," which he described as "the result of high cost of funding of the bank as compared to the income generated by our loan portfolio" that it hoped to correct by, among other things, negotiating with the NBK to reduce the funding costs on the repos.  Vigna Decl. Ex. 31 (May 17, 2011 Bloomberg Investor Call Transcript) at 5; Vigna Decl. Ex. 30 (May 17, 2011 Investor Call Presentation) at 24.

384.    Plaintiffs' expert agrees that the "negative carry swap" was fully disclosed to the market after May 17, 2011 at latest.  Vigna Decl. Ex. 132 (Hrycay Tr.) at 152:5-24.

385.    On May 18, 2011, J.P. Morgan published a research report ("J.P.Morgan Report") highlighting BTA's cost of funding.  Vigna Decl. Ex. 45 (Email from P. Kiblisky dated May 18, 2011 attaching J.P. Morgan Report) at P00001754.

386.    Khamis received and read the J.P. Morgan Report carefully around the time it was issued.  Vigna Decl. Ex. 123 (Khamis Tr.) at 210:19-3.

387.    To the extent BTA had any "negative carry," all deposits above 5.5% interest contributed, and all loans which were yielding less than 8.6% were also contributing.  Vigna Decl. Ex. 124 (Howes Tr.) at 219:11-24.

## XI.    <u>PLAINTIFFS' ADVISORS</u>





34227987



**XII.   SK FUND STATEMENTS REGARDING SUPPORT FOR BTA**

397.   The following statements were attributed to SK Fund employees in 2011:

a.   In a July 5, 2011 interview that served as a basis for a July 7, 2011 article

about BTA, Aidan Karibzhanov stated, "I don't think BTA Bank will have to

restructure debt or face bankruptcy, but we will provide financing to BTA

Bank if needed."  He also stated that SK Fund would "sort out the situation

with the bonds," referencing a request to increase the interest payment on SK

Fund's bonds and that SK Fund would "not let [BTA] get into trouble."

Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(a); Vigna Decl. Ex. 93

(Nariman Gizitdinov, *Kazakhs to Protect BTA Bank From Default, Wealth*

*Fund Says*, Bloomberg, (July 7, 2011)).

b. Timur Kulibayev, Chairman of SK Fund, was quoted in an October 5, 2011
BTA press release as stating "BTA Bank will certainly be supported by the
government." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(b); Vigna
Decl. Ex. 49 (Email Correspondence from Igal Yacher to Claudio Khamis
dated October 4, 2011 (transmitting *Kazakh Wealth Fund 'Certainly' Ready to
Support BTA, Chief Says*, BTA Bank (Oct. 4, 2011))).

c. Karibzhanov made statements concerning support measures for BTA. He
stated "[t]he decision on support measures has not been taken yet. It will
depend on the bank's current business plan and on the proposals to be made
by its management." He also stated, "At present BTA Bank's management is
working on a business plan and a restructuring scheme for the bank. The
scheme will pursue two objectives: to restore assets stolen by the former
owner and to make the bank competitive in the market." He stated "Judging
from the bank's capital deficit, there is no doubt about [the need for additional
investment]." Finally, he stated "We are looking at all options. We hope in
the near future we will have a clear plan of restoring BTA's capital." Vigna
Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(c); Vigna Decl. Ex. 95( *SAMRUK-
KAZYNA TO HAMMER OUT SUPPORT MEASURES FOR BTA BANK
AFTER REVIEWING BUSINESS PLAN*, Interfax (Nov. 30, 2011)).

d. In an article titled "Kazakh wealth fund nears decision on BTA rescue,"
Karibzhanov stated "Management is preparing a business plan and model to
reload the bank," and the plan is based on two things: recovering those assets
stolen by its previous owners and making the bank competitive in banking

services and lending."  He added "We hope that, in the near future, we will

have a clear business plan on how to restore capital."  He alsostated

"[u]ndoubtedly, judging by its capital deficit. The issue is to make sure

additional injections don't fall into a bottomless pit." Vigna Decl. Ex. 1 (SK

Fund Am. Compl.) at ¶ 52(d); Vigna Decl. Ex. 1 (*Kazakh wealth fund nears*

*decision on BTA rescue,* Reuters (Nov. 29, 2011)).

e.  A December 15, 2011 article quoted Peter Howes (incorrectly identified

therein as Peter House) stating, "We are not selling or announcing It a

bankrupt. The bank certainly has problems.  The situation is much is much

worse than we expected.  It is taking the three banks (BTA, Alliance Bank and

Temirbank) too long to recover.  But the management is very strong and it

works hard to resolve the issues.  We have invested a lot of money and effort

into putting this bank back on track."  The article also quotedKaribzhanov

stating "[t]he decision of support measures has not been taken yet.  It will

depend on the bank's current business plan and on the proposals to be made

by its management."  Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52;

Vigna Decl. Ex. 98 (*Samruk-Kazyna rejecting BTA bankruptcy option*,

Interfax (Dec. 16, 2011)).

### XIII.   PLAINTIFFS' ADDITIONAL TRANSACTIONS IN 2011

XIV.   **THE 2012 RESTRUCTURING**

A.      **Events Leading up to the 2012 Restructuring**

 Vigna Decl. Ex. 94 (Troika Report, BTA Bank, In the State We (Have to) Trust,

dated September 13, 2011) at BTA_00218179.

- 67 -

405.    In November 2011, BTA publicly issued its third quarter interimfinancial statements, showing that its loan income had decreased over KZT 20 billion from the same period in 2010, and that its total equity deficit had grown to over KZT 318 billion. Vigna Decl. Ex. 17 (BTA Interim Consolidated Financials as of Sept. 30, 2011) at BTA_00001771-72.

406.    On November 14, 2011, Fitch downgraded BTA's credit rating from B- to CCC, in part because of an "apparent readiness of the bank and the Kazakh authorities to consider a range of options, including less creditor-friendly ones." (Paul Abelsky, "BTA Bank Cut to CCC by Fitch on Increased Probability of Default," November 14, 2011 (cited in Vigna Decl. Ex. 114 (Hrycay Report) at ¶ 83)

407.    On November 26, 2011, the CEO of BTA made statements to employees of the Bank regarding the grim financial status of the bank.  Vigna Decl. Ex. 141 (Nariman Gizitdinov, *BTA CEO Comments on Bank Debt Restructuring Reports* (Nov. 26, 2011) (cited in Hrycay Report ¶83)).

408.    On November 30, 2011, SK Fund noted that it couldn't continue to infuse money "into a bottomless pit."  Vigna Decl. Ex.96 (Nariman Gizitdinov, *Kazakh Wealth Fund Considers Aid, Bond Buyback to Reboot BTA*, Bloomberg (November 30, 2011) (cited in Hrycay Report ¶83)).

409.    On December 7, 2011, Moody's reduced its bond ratings for the Notes held by Plaintiffs from Caa3 (which was already the third-lowest of its twenty-one possible ratings, representing "poor quality and very high credit risk") to C (the lowest possible rating, meaning, "lowest quality, usually in default and low likelihood of recovering principal or interest").  Vigna Decl. Ex. 97 (Moody's Investor services Ratings Action – Downgrade BTA, dated December 7, 2011).

410.     On December 22, 2011, BTA announced that it would propose a second debt restructuring at the next shareholder meeting.  Vigna Ex. 32 (BTA Press Release Announcing Second Restructuring, dated December 22, 2011).

411.     On December 23, 2011, BTA issued a press release declaring that"Restructuring is an urgently needed measure."  Vigna Decl. Ex. 32 (BTA December 23, 2011 Press Release).



414.     The market price for BTA's Notes collapsed to less than 10% of face value. Vigna Decl. Ex. 114 (Hrycay Report) at 16.

**B.     Recovery Unit Acceleration**

415.     In early 2012, BTA's financial condition continued to worsen.  Vigna Decl. Ex. 4 (2012 IM) at 3.

416.     As BTA's condition worsened, the possibility that the Recovery Units could be accelerated was reported on by the financial press.  Vigna Decl. Ex. 99 (Yulianna Vilkos, *BTA Bank creditors divided over acceleration option ahead of expected coupon nonpayment and restructuring talks*, Debtwire (Dec. 29, 2011, 12:41)).

418.    In January 2012, BTA defaulted on its coupon payments for senior debt.  Vigna

Decl. Ex. 4 (2012 IM) at 3.

419.    BTA disclosed this default no later than January 20, 2012.  Vigna Decl. Ex. 33

(BTA Press Release dated January 20, 2012).

420.    The market was aware of this default.  *See, e.g.*, Vigna Decl. Ex. 104

(TIMELINE-Debt restructuring at Kazakh bank BTA, *available at*

https://www.reuters.com/article/kazakhstan-bta-timeline-idUSL6E8CA5WA20120126.)

421.    In fact, the market was aware of the potential for Recovery Unit acceleration even

before the default occurred.  Vigna Decl. Ex. 99 (Yulianna Vilkos, *BTA Bank creditors divided*

*over acceleration option ahead of expected coupon nonpayment and restructuring talks*,

Debtwire (Dec. 29, 2011, 12:41)).

422.    There were a number of articles written between January and April 2012

regarding the potential for (and steps taken towards) acceleration of the Recovery Units

including the following:

> a. Vigna  Decl. Ex.105 (Yulianna Vilkos, *BTA Bank's recovery*
> *note holders seek pari passu treatment in restructuring, amass*
> *enough notes for acceleration*, Debtwire (Feb. 17, 2012, 12:01))
> (noting that an ad hoc creditors' committee holding over 20% of
> the Recovery Units had expressed its intentions to accelerate);
>
> b. Vigna Decl. Ex. 103 (Yulianna Vilkos, *BTA Bank steering*
> *committee nominees emerge; recovery-note holders working with*
> *legal advisor Milbank*, Debtwire (Jan. 24, 2012, 8:56));
>
> c. Vigna Decl. Ex. 101 (Yulianna Vilkos, *BTA Bank creditors take*
> *to the field for second restructuring; rules of engagement have*
> *changed – sources*, Debtwire (Jan. 16, 2012)).

423.    An article appeared on January 10, 2012 in the Financial Times describing BTA's missed coupon payment, the informal organization of creditors' groups, and stating:

> BTA this month missed a coupon payment on bonds, including a $2.1bn obligation due in 2018. If the bank does not make an estimated $160m of coupon payments by January 18, it will be in formal default. If this happens, payment of $5.2bn so-called recovery notes issued by the bank will also be accelerated.

Vigna Decl. Ex. 100 (Robin Wigglesworth, *BTA creditors gear up for restructuring battle*, Financial Times (Jan. 10, 2012)).

424.    BTA publicly disclosed the potential liability on the Recovery Units in a January 2012 road show presentation.  Vigna Decl. Ex. 34 (BTA Presentation to Creditors, dated January 2012) at BTA_00002408.

425.    BTA immediately assessed the likelihood that the Recovery Unit holders would vote to accelerate the Recovery Units was remote because the holders would be required to indemnify the trustee in connection with the acceleration and would have to rely on an insolvency event of default.  Additionally, the acceleration would be disastrous for all creditors.  Instead, BTA believed that it could work with Senior Noteholders to bring the Recovery Unitholders into a consensual restructuring process that would benefit all creditors.  Vigna Decl. Ex. 11 (BTA's Debt Restructuring Strategy, dated January 10, 2012) at BTA_0034211-12.

426.    BTA's internal memorandum states "As part of the overall strategy, we would also suggest that at the appropriate time BTA (and Senior Noteholders if possible) send a letter to the Trustee for the creditors explaining that so long as there is a prospect for a consensual restructuring it is in none of thestakeholders' interests to accelerate any of the Notes or the RUs and that if the Trustee were to agree to accelerate this would cause stakeholders substantial damage." Vigna Decl. Ex. 11 (BTA's Debt Restructuring Strategy, dated January 10, 2012) at BTA_0034212.

427.    Consistent with this strategy, BTA "extended an overture to recovery note (RN) holders to join its proposed creditor steering committee."  A creditor holding Recovery Units stated "It's still early days and no decision has been taken on any [legal action], but it helped that the bank sent the message about its willingness to engage the RN holders on the committee." Vigna Decl. 102 (*BTA Bank acceleration threats quieten down as noteholders focus on steering-commitee formation; 'dovish' camp prevails – creditors*, Debtwire, (Jan. 18, 2012); Vigna Decl. 56 (Correspondence from BTA to Milbank, dated February 10, 2012) at BTA_00174049 – BTA_00174050.

428.    As early as February 2012, an Ad Hoc Committee of Recovery Unit Holders ("Ad Hoc RU Committee") informed BTA that it might accelerate the Recovery Units.  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174449.

429.    The Ad Hoc RU Committee sent a letter dated February 1, 2012, which indicated that the Ad Hoc RU Committee viewed plans for a fair restructuring that considered its interests to be adequate for its own purposes, referencing efforts by SK Fund.  Vigna Decl. Ex. 56 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174450.

430.    The letter stated: "In the interests of maintaining a constructive dialogue between the Ad Hoc RU Committee and BTA and Samruk-Kazyna, the Ad Hoc RU Committee will refrain from requiring acceleration of the RUs during this time (but subject to there being no unforeseen developments and to the paragraph below) and hope that resolution can be reached with each of BTA, Samruk-Kazyna and their advisors."  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_001744451.

431.    BTA responded by letter dated February 10, 2012.  BTA formally informed the

Ad Hoc RU Committee of the restructuring process, the appointment of a new steering

committee, and its commitment to resolve creditors' concerns through that process.  BTA also

stated:

> if you believe that an Event of Default has occurred under the
> Recovery Units (a position we do not accept), not only is thereno
> need to attempt to accelerate the Recovery Units at this time
> (especially given that the Recovery Units holders are adequately
> represented on the Steering Committee) but any such attempt runs
> the risk of preventing a consensual restructuring of the Bank which
> in turn is likely to result in the National Bank of Kazakhstan
> placing BTA into conservation under Kazakh law.  This outcome
> would be prejudicial to BTA and all of its stakeholders, including
> its financial creditors and shareholders, since a conservation
> scenario financial creditors and equity holders are likely to lose
> their entire or substantially all of their interests.

Vigna Decl. Ex. 56 (Correspondence from BTA to Milbank re: RUs, dated February 10, 2012) at

BTA_00174049.

432.    On March 19, 2012, BTA publicly circulated a presentation noting that the Bank's

"[e]xisting balance sheet does not include a potential uplift for the value of the Recovery Units."

Vigna Decl. Ex. 35 (BTA Presentation for Steering Committee Meeting, dated March 19, 2012)

at 42.

433.    The March 19, 2012 presentation had a "Solvency Situation:  KeyObservations"

heading, which stated, "The [International Financial Reporting Standards] value of the RUs

liability is subject to auditors opinion.  If auditors consider that the IFRS value should be $5.2

billion, the Tier 1 capital shortfall would then be further negatively impacted."  Vigna Decl. Ex.

35 (BTA Presentation for Steering Committee Meeting, dated March 19, 2012) at 45.

434.    Acceleration of the Recovery Units would convert a KZT 81 billion liability

(approximately US$560 million) into a KZT 769 billion liability (approximately US $5.2 billion)

and nearly doubling BTA's overall economic shortfall.  Vigna Decl. Ex. 8 (Terms and

Conditions of RUs, dated October 28, 2010); Vigna Decl. Ex. 35 (BTA Presentation for Steering

Committee Meeting, dated March 19, 2012) at 42.

████████████████████████████████████████████████████████████████████

436.    BTA also disclosed the potential liability on the Recovery Units in a March 2012

presentation, under the heading "Focus on Solvency." Vigna Decl. Ex. 35 (BTA Presentation for

Steering Committee Meeting, dated March 19, 2012) at 44-45.

437.    SK Fund was not involved in the management or oversight of the Recovery Units,

or negotiations with Recovery Unit holders.  Vigna Decl. Ex. 124 (Howes Tr.) at 263:22-264:11.

438.    As BTA worked towards a consensual restructuring, it remained ever-mindful of

the Ad Hoc RU Committee's position, and communications between Baker McKenzie and White

& Case relating to negotiation of a consensual restructuring plan, and continued to inquire about

the Committee's position until the day before the Recovery Units were accelerated. Vigna Decl.

Ex. 57 (Email correspondence between White and Case and Baker re: RUs, dated April 27,

2012) at BTA 00325880-81.

439.    On April 27, 2012, BTA received a notice of acceleration from the Recovery Unit

Trustee.  Vigna Decl. Ex. 58 (Correspondence from BNYM to BTA re: RU Acceleration, dated

April 27, 2012).

440.    Consistent with International Accounting Standard 37, BTA increased the stated

RU liability on its financial statements to U.S. $5.221 billion at that time.  *See* Vigna Decl. Ex.

115 (Floyd Report) at 30-32.

441.    There were no documents before the April 27, 2012 notice indicating that Recovery Unit holders would accelerate the Recovery Units.  Vigna Decl. Ex. 115 (Floyd Report) at 30.

442.    On April 28, 2012, BTA received a communication dated April 27,2012 explaining the acceleration from counsel for the Ad Hoc Group.  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration, dated April 27, 2012) at BTA_00174446.

**C.    Plaintiffs' Transactions in Early 2012, After Recovery Unit Acceleration Is Possible**





451.    Plaintiffs' trading in Recovery Units between 2010 and 2012 resulted in a $2.029 million profit.  Vigna Decl. Ex. 117 (Hinton Workpapers) at Workpapers 6 and 11.

## XV.   THE 2012 RESTRUCTURING

### A.   Treatment of Various BTA Securities in the 2012 Restructuring and Plaintiffs' Actions Leading up to the 2012 Restructuring

452.    On November 1, 2012, BTA announced the terms of the second restructuring for the treatment of Subordinated Notes.  The holders of Subordinated Notes would receive equity in

the bank after the restructuring, representing a conversion of 2.5% of the nominal principal amount of such notes with the rest of the holders' claims to be cancelled. Vigna Decl. Ex. 61 (Email correspondence from Igal Yacher dated November 1, 2012) at P00013236; Vigna Decl. Ex. 4 (2012 IM) at 26 (indicating 2.4% of nominal principal).

453.     The Recovery Unit holders, however, received $660 million of the total $5.2 billion nominal value of the notes, or approximately 14.2% of the par value paid in cash and new note.  Vigna Decl. Ex. 4 (2012 IM) at 26.

454.     Plaintiffs recovered at least $2.029 million trading their Recovery Unit investments between 2010 and 2012.  Vigna Decl. Ex. 117 (Hinton Workpaper) at Workpaper 6.

**B.     SK Fund's Support for the 2012 Restructuring**

455.     In December 2012, BTA completed the second restructuring process.  SK Fund undertook a number of measures aimed to support the restructuring of BTA.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

456.     On December 19, 2012, SK Fund provided BTA with a loan of KZT 239.77 billion maturing in 2024 with an interest rate of 4%.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

457.     On December 20, 2012 SK Fund changed the Guarantee Fee for BTA from 2% to 0.125% per annum, starting from September 1, 2012.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

458.     On December 21, 2012, SK Fund acquired additional shares of BTA for KZT 176.38 billion.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

459.     SK Fund modified the terms of SK Bonds held by BTA to increase the coupon rate from 4% to 6%. Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

C.      **SK Fund's Losses in BTA**

460.    In total, SK Fund invested approximately KZT 1.1 trillion in BTA, and has lost nearly all of its investment.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 14.

461.    SK Fund had KZT 160 billion in deposits at BTA as of December 2009. Vigna Decl. Ex. 4 (2012 IM) at 139.

462.    During the 2010 restructuring, SK Fund provided $212 billion in return for 75% of BTA's equity.  Vigna Decl. Ex. 124 (Howe Tr.) at 56:12-14.

463.    SK Fund made two additional deposits of KZT 175 billion and KZT 29.3 billion in 2010.  Vigna Decl. Ex. 13 (SK Fund 2010 Separate Financial Statement) at 27.

464.    SK Fund also received additional equity in BTA in return for cancellation of BTA bonds with principal and accrued interest in the amount of KZT 671 billion held by SK Fund, bringing SK Fund's equity stake to 81.5%.  Vigna Decl. Ex. 3 (2010 IM) at 8.

465.    SK Fund contributed an additional KZT 180 Billion to BTA in December 2012. Vigna Decl. Ex. 4 (2012 IM) at 20, 29, 40, 207.

466.    During the same period, SK Fund also paid BTA KZT 77.4 billion in bond interest.  Ryskulov Decl. Ex. B.

467.    During this period, SK Fund only received KZT 28.22 billion in semi-annual fees charged on the NBK loan guarantees in return for guaranteeing KZT 449 billion in loans from NBK to BTA.  Ryskulov Decl. Ex. A; Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 35.

468.    On July 4, 2014, SK completed a transaction to sell virtually all of its remaining stake in BTA for total consideration equaling KZT 144.15 billion.  Vigna Decl. Ex. 15 (SK 2014 Financials) at 20-21.

469.    In total, SK Fund recovered approximately KZT 144.15 billion from its total investment in BTA, resulting in a loss of over KZT 900 billion, or approximately $6 billion. Vigna Decl. Ex. 124 (Howes Tr.) at 156:23-157:11.

## XVI.   LOCATION OF SALES

470.    The parties agree that no transactional liability is incurred until both buyer and seller agree to terms.  Vigna Decl. Ex. 119 (Am. Awan Report) at 59-60; Vigna Decl. Ex. 133 (Palzer Tr.) at 148:24-149:2, 149:13-18, 189:18-20.

471.    Plaintiff's expert stated "Trade execution [(the point at which he contended liability attached)] requires a buyer and seller" - "that's how a trade is done.  You have got a buyer and a seller and they agree on a price and a quantity."  Vigna Decl. Ex. 133 (Palzer Tr.) at 148:23-149:18.

472.    Execution of the trades occurred "when Khamis agreed to the price and amount of the bonds." Vigna Decl. Ex. 133 (Palzer Tr.) at 148:17-20.

473.    Before that time, such as when Khamis told his broker that he wanted to purchase BTA notes, "[t]hat's, at most, an order … And sometimes not even that.  It could just be an inquiry."  Vigna Decl. Ex. 133 (Palzer Tr.) at 152:25-153:23.

474.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

475.    The ultimate counterparties in Plaintiffs' trades were large European trading houses that were either acting as dealers selling from their own inventory or brokers selling on behalf of undisclosed clients.  Vigna Decl. Ex. 131 (Awan Tr.) 210:14-214:18, 216:24-219:9.

476.    Individual traders at broker-dealers responsible for making Eurobond trading decisions are physically located in Europe.  Vigna Decl. Ex. 131 (Awan Tr.) at 210:14-214:18, 216:24:-219:9; Vigna Decl. Ex. 133 (Palzer Tr.) at 304:18-308:3.

477.    At least, for regulatory purposes, Plaintiffs' expert agrees that the transactions would be considered unified ones between Plaintiffs and the ultimate sellers – and "offshore" ones. Vigna Decl. Ex. 133 (Palzer Tr.) at 279:22-24, 293:21-25.

478.    No note settlement for BTA Bonds at issue in this case occurred in the United States.  Note settlement occurred at Euroclear in Brussels or, in one instance, possibly at Clearstream in Luxembourg.  Vigna Decl. Ex. 119 (Am. Awan  Rpt) at 95-96, 114; Vigna Decl. Ex. 133 (Palzer Tr.) at 311:13-21, 183:14-21, 253:21-254:5.

479.    "Trade settlement is the process of simultaneous exchange of cash versus securities for a security trade.  It is only at the point of settlement that a [Eurobond] trade becomes final and irrevocable."  Vigna Decl. Ex. 119 (Am. Awan Report) at 18.

480.    At Euroclear, trades can be cancelled at any time before settlement by submitting a particular form.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 23 & Appendix 4.

481.    Cancellation procedures can be invoked penalty-free by mutual consent of the parties at any point prior to settlement.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 17; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

482.    Trades can be cancelled unilaterally without penalty if:  (i) the submitted trade instructions contained an error; (ii) the trade would benefit one party unfairly (for example, in fast-moving markets); or (iii) other circumstances justified doing so.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 14; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

483.    Either party can unilaterally invoke the organization's "buy in" rules and cancel the trade upon an offer to pay the intended counterparty its anticipated profit if it cannot not find an equivalent trading partner.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 14-15; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

484.    By invoking the "buy in" rules the contemplated trade will not be completed.  A party is not bound to accept or pay for the security; instead, the trade "just won't happen . . . it won't clear."  Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

485.    Trades may occasionally be rescinded *after* settlement.  Vigna Decl. Ex. 133 (Palzer Tr.) at 283:14-264:3.

486.    In Plaintiffs' transactions, no offer was made to anyone in the U.S., the buyers were located abroad and the other requirements of Regulation S were satisfied.  Vigna Decl. Ex. 133 (Palzer Tr.) at 282:21-283:19, 293:21-25.

487.    Plaintiffs' transactions were not subject to U.S. interest rate restrictions, U.S. tax withholding from coupon payments or other U.S. rules that foreign bond purchasers such as Plaintiffs seek to avoid.  *See, e.g.*, Vigna Decl. Ex. 119 (Am. Awan Report) at 4-6.

488.    On the contrary, Plaintiffs transactions were subject to European regulation.  The IM provided that:

> Secondary market sales of book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream to purchasers of book-entry interests in the Non-Tenge New Notes through Euroclear or Clearstream will be conducted in accordance with the normal rules and operating procedures of Euroclear and Clearstream and will be settled using the procedures applicableto conventional Eurobonds.

Vigna Decl. Ex. 3 (2010 IM) at 318.

489.    Among those "normal rules" are not only the organizational buy-in rules discussed above, but also Belgian Royal Decree no. 62 (Nov. 10, 1967) (governing the deposit,

transfer and pledge of securities) and EU Settlement Finality Directive 98.26/EC (specifically addressing the contractual irrevocability of transfer orders).  *See, e.g.*, Vigna Decl. Ex. 119 (Am. Awan Report) at 20-21 (citing CPSS, International Payment Arrangements 463, 465 (2003)).

490.    Further, Plaintiffs' transactions were subject to supervision by the Belgian Banking and Finance Commission and/or the Luxembourg Commission de Surveillance du Secteur Financier.  Vigna Decl. Ex. 119 (Am. Awan Report) at 20-21 (citing CPSS at 463-64).

491.    In addition, Defendants were at all times subject to the securities laws of Kazakhstan.

## XVII.  PLAINTIFFS' CONDUCT IN LITIGATION



KATTEN MUCHIN ROSENMAN

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: /s/ Jason Vigna
    Jason Vigna
    Brian Muldrew

By: /s/ Jonathan Walsh
    Joseph D. Pizzurro
    Jonathan Walsh
    Ed Combs

575 Madison Avenue
New York, New York 10022
(212) 940-8800

101 Park Avenue
New York, New York  10178
(212) 696-6000

*Attorneys for Defendant BTA Bank
JSC*

*Attorneys for Defendant Sovereign
Wealth Fund "Samruk-Kazyna"*

- 83 -

34227987