**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATLANTICA HOLDINGS, INC., et al., <br><br>               Plaintiffs, <br><br> v. <br><br> SOVEREIGN WEALTH FUND SAMRUK-KAZYNA, JSC, <br><br>               Defendant. | **12-CV-8852 (JMF)** |
| ATLANTICA HOLDINGS, INC., et al., <br><br>               Plaintiffs, <br><br> v. <br><br> BTA BANK, JSC, <br><br>               Defendant. | **13-CV-5790 (JMF)** |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
Attorneys for Defendant BTA Bank, JSC

CURTIS, MALLET-PREVOST,
  COLT & MOSLE, LLP
101 Park Avenue
New York, New York 10178
Attorneys for Defendant Sovereign Wealth
        Fund Samruk-Kazyna, JSC

BRUCE VANYO, ESQ.
JASON VIGNA, ESQ.
JONATHAN WALSH, ESQ.
  Of Counsel and On the Brief

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

LEGAL ARGUMENT .............................................................................................................. 12

I.     Defendants Are Entitled to Summary Judgment on Plaintiffs' Section 10(b) Claims as a Matter of Both Law and Fact ........................................................................ 12

     A.     There Is No Triable Issue of Material Misrepresentation ..................................... 12

           1.     Defendants Disclosed All Required Details of S-K Fund's Deposits ....... 15

           2.     Forward-Looking Statements in the IM Cannot Support Liability ........... 17

           3.     S-K Fund's 2011 Public Statements Were Not False and Misleading .................................................................................................. 19

           4.     The Potential for Recovery Unit Acceleration Was Disclosed ................. 20

     B.     There Is No Triable Issue of Reliance ................................................................... 22

           1.     The IM's Non-Reliance Provision Precludes Reliance as a Matter of Law ...................................................................................................... 23

           2.     Plaintiffs Did Not Read Most of the Claimed Misrepresentations and Cannot Establish Reliance as a Matter of Fact .................................... 25

           3.     Plaintiffs' Claimed Reliance Was Not Reasonable Following Defendants' Public Disclosures ................................................................. 27

     C.     There Is No Triable Issue of Scienter ................................................................... 29

           1.     Plaintiffs' Scienter Allegations Make No Sense ....................................... 30

           2.     There Is No Evidence S-K Fund's 2011 Statements Were Made in Bad Faith ................................................................................................... 31

           3.     Plaintiffs' RU Acceleration Allegations Cannot Establish Scienter ........ 32

     D.     There Is No Triable Issue of Proximate Cause ..................................................... 33

     E.     There Is No Triable Issue of Damages .................................................................. 37

           1.     Rescission Is Not a Permissible Remedy as a Matter of Law .................. 37

2.  Plaintiffs Have Not Demonstrated Out-of-Pocket Damages .................... 39

II.  Expert Discovery Confirms That Plaintiffs' Claims Are Barred by *Morrison* ................ 41

A.  The Trading Parties Did Not Incur Liability in the United States ........................ 42

B.  Plaintiffs Only Became Irrevocably Bound To Take and Pay for Securities at Settlement, in Europe ..................................................................................... 44

C.  Application of the Exchange Act Here Would Be Impermissibly Extraterritorial ................................................................................................... 45

III.  S-K Fund Is Entitled to Summary Judgment on Plaintiffs' § 20(a) Claim ...................... 48

A.  S-K Fund Did Not Have Actual Control Over BTA ........................................... 48

B.  S-K Fund Did Not Culpably Participate in Any Alleged Primary Violation by BTA .............................................................................................................. 49

CONCLUSION ............................................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbey v. 3F Therapeutics, Inc.*,
  No. 06 CV 409 (KMW), 2011 WL 651416 (S.D.N.Y. Feb. 22, 2011) ...................................27

*Absolute Activist Value Master Fund, Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)......................................................................................... *passim*

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)................................................................................................................38

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................................................................30

*Armony v. United Way of America*,
  254 F.3d 403 (2d Cir. 2001)....................................................................................................14

*Ashland Inc. v. Morgan Stanley & Co., Inc.*,
  652 F.3d 333 (2d Cir. 2011)....................................................................................................29

*Bank of America, N.A. v. Bear Stearns Asset Management*,
  969 F. Supp. 2d 339 (S.D.N.Y. 2013)....................................................................................22

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)....................................................................................................25, 27, 28

*Beleson v. Schwartz*,
  419 F. App'x 38 (2d. Cir. 2011) .............................................................................................17

*Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse
  Securities (USA) LLC*,
  752 F.3d 82 (1st Cir. 2014).....................................................................................................35

*Brown v. E.F. Hutton Group, Inc.*,
  991 F.2d 1020 (2d Cir. 1993)..................................................................................................29

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................................12

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
  164, 177 (1994). .....................................................................................................................15

*Citibank, N.A. v. Itochu International Inc.*,
  01 Civ. 6007 (GBD), 2003 WL 1797847 (S.D.N.Y. Apr. 4 2003)........................................24

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..................................................................................2

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)................................................................................22

*Dodona I, LLC v. Goldman Sachs & Co*,
    132 F. Supp. 3d 505 (S.D.N.Y. 2015)................................................................48

*Dura Pharmaceuticals, Inc. v. Broudo*,
    54 U.S. 336 (2005)......................................................................................34, 39

*Fait v. Regions Financial Corp.*,
    655 F.3d 105 (2d Cir. 2011)................................................................................18

*Freedman v. Value Health, Inc.*,
    34 F. App'x 408 (2d Cir. 2002) ..........................................................................30

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)................................................................................30

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................32

*Glazer v .Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992)................................................................................22

*Glickman v. Alexander & Alexander Services*,
    93 Civ. 7594 (LAP), 1996 U.S. Dist. LEXIS 2325 (S.D.N.Y. Feb. 27, 1996)........................31

*Gordon Partners v. Blumenthal*,
    02 Civ. 7377 (LAK)(AJP) (S.D.N.Y. Feb. 9, 2007), *adopted*, 2007 WL
    1438753 (S.D.N.Y. May 16, 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008)...............3, 35, 36

*Gross v. GFI Group, Inc.*,
    310 F. Supp. 3d 384 (S.D.N.Y. 2018), *appeal docketed*, No. 18-1527 (2d Cir.
    May 21, 2018)..........................................................................................30, 32, 4

*H&H Acquisition Corp. v. Financial Intranet Holdings, Inc.*,
    669 F. Supp. 2d 351 (S.D.N.Y. 2009)................................................................49

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)........................................................................3, 19, 20

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996)..........................................................................23, 25

*Hoxworth v. Blinder, Robinson & Co.*,
    903 F.2d 186 (3d Cir. 1990)..........................................................................7, 39

iv

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981) ........................................................................38, 39

*In re Alstom SA Securities Litigation*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005).....................................................................48

*In re Aluminum Warehouse Antitrust Litigation*,
   No. 13-md-2481 (KBF), 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016)....................22

*In re Barclays Bank PLC Securities Litigation*,
   756 F. App'x 41 (2d Cir. 2018) ........................................................................17, 0

*In re Bear Stearns Cos. Securities, Derivative & ERISA Litigation*,
   08 MDL 1963, 2016 WL 4098385 (S.D.N.Y. July 5, 2016) ...................................35

*In re Centerline Holding Co. Securities Litigation*,
   380 F. App'x 91 (2d Cir. 2010) .................................................................................6

*In re Crown American Realty Trust Securities Litigation*,
   No. Civ.A. 95-202J, 1997 WL 599299 (W.D. Pa. Sept. 15, 1997) .........................33

*In re Crystal Brands Securities Litigation*,
   862 F. Supp. 745 (D. Conn. 1994).........................................................................33

*In re DVI, Inc. Securities Litigation*,
   C.A. No. 2:03-cv-05336, 2010 WL 3522090 (E.D. Pa. 2010) ...............................36

*In re Express Scripts Holdings Co. Securities Litigation*,
   --- F. App'x ----, 2019 WL 2004302 (2d Cir. May 7, 2019) .....................20, 22, 32

*In re Fannie Mae Securities Litigation*,
   905 F. Supp. 2d 63 (D.D.C. 2012) .........................................................................30

*In re Flag Telecom Holdings, Ltd.*,
   308 F. Supp. 2d 249 (S.D.N.Y. 2004).....................................................................50

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   574 F.3d 29 (2d Cir. 2009)................................................................................33, 35

*In re Fortune Systems Securities Litigation*,
   680 F. Supp. 1360 (N.D. Cal. 1987) .................................................................37, 38

*In re Imperial Credit Industries, Inc. Securities Litigation*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*,
   145 F. App'x 218 (9th Cir. 2005) ...........................................................................35

*In re International Business Machines Corp. Securities Litigation*,
   163 F.3d 102 (2d Cir. 1998)....................................................................................18

*In re Merrill Lynch Auction Rate Securities Litigation*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010)........................................................................6

*In re Merrill Lynch Auction Rate Securities Litigation*,
    765 F. Supp. 2d 375 (S.D.N.Y 2011)..............................................................27, 28

*In re Moody's Corp. Securities Litigation*,
    07 Civ. 8375, 2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) ................................35

*In re Northern Telecom Ltd. Securities Litigation*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)............................................................. *passim*

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)...............................................................17, 35, 40, 41

*In re One Communications Corp.*,
    07 Civ 3905, 2009 WL 857535 (S.D.N.Y March. 31, 2009)....................................3

*In re Williams Securities Litigation – WCG Subclass*,
    558 F.3d 1130 (10 th Cir. 2009) ......................................................................36, 37

*In re World Wrestling Entertainment, Inc.*,
    180 F. Supp. 3d 157 (D. Conn. 2016)....................................................................33

*Janus Capital Group v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................................................15

*JSMS Rural LP v. GMG Capital Partners III, LP*,
    04 Civ. 8591, 2006 WL 1867482 (S.D.N.Y. July 6, 2006) .........................37, 38, 39

*Kelso Enterprises Ltd. v. M/V Diadema*,
    No. 09 Civ. 8226(SAS), 2009 WL 1788110 (S.D.N.Y. Jun. 23, 2009) ....................4

*Kleinman v. Elan Corp., PLC*,
    706 F.3d 145 (2d Cir. 2013)............................................................................16, 22

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)...................................................................................29

*Levine v. Seilon*,
    439 F.2d 328 (2d Cir. 1971)...................................................................................38

*Louisiana Pacific Corp. v. Money Market 1 Institutional Investment Dealer*,
    No. C 09-03529 (JSW), 2011 WL 1152568 (N.D. Cal. Mar. 28, 2011)...................6

*Martin v. Quartermain*,
    732 F. App'x. 37 (2d Cir. 2018) .............................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).................................................................................................16

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)................................................................................................12

*Morrison v. National Australia Bank, Ltd.*,
   561 U.S. 247 (2010).................................................................................................1

*Newman v. Family Management Corp.*,
   748 F. Supp. 2d 299 (S.D.N.Y. 2010)....................................................................30

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) ...........................................................................34, 35

*O'Connor v. Cory*,
   16-cv-01731, 2019 WL 95483 (N.D. Tex. Jan. 3, 2019), *appeal docketed*, No.
   19-10622 (5th Cir. May 31, 2019)......................................................................30, 34

*Parkcentral Global Hub, Ltd. v. Porsche Automobile Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)...........................................................................41, 45, 47

*Richter v. Achs*,
   962 F.Supp. 31 (S.D.N.Y. 1997)............................................................................22

*Rissman v. Rissman*,
   213 F.3d 381 (7th Cir. 2000) ..................................................................................24

*Rosen v. Bergman*,
   40 F.R.D. 19 (1966) ................................................................................................25

*Rudman v. Cowles Communications, Inc.*,
   30 N.Y.2d 1 (1972) .................................................................................................38

*S.E.C. v. Goldman Sachs & Co.*,
   790 F. Supp. 2d 147 (S.D.N.Y. 2011)....................................................................45

*Sable v. Southmark/Envicon Capital Corp*,
   819 F. Supp. 324 (S.D.N.Y. 1993) ....................................................................24, 25

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co.*,
   75 F.3d 801 (2d Cir. 1996)......................................................................................33

*Shields v. Citytrust Bancorp., Inc.*,
   25 F.3d 1124 (2d Cir. 1994)....................................................................................33

*South Cherry Street, LLC v. Hennessee Grp., LLC*,
   573 F.3d 98 (2d Cir. 2009)......................................................................................31

*Stackhouse v. Toyota Motor Company*,
   No. CV 10-0922 DSF AJWx), 2010 WL 3377409 (C.D. Cal. July 16, 2010) .......46

*Starr v. Georgeson Shareholder, Inc.*,
  412 F.3d 103 (2d Cir. 2005)..................................................................22

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 US. 148 (2008) ..................................................................12, 15

*Strougo v. Barclays PLC*,
  334 F. Supp. 3d 591 (S.D.N.Y. 2018)..................................................50

*Tellabs, Inc. v. Makor Issues & Rights*,
  551 U.S. 308 (2007)..................................................................29

*Tongue v. Sonofi*,
  816 F.3d 199 (2d Cir. 2016)..................................................................18

*Travelers Insurance Co. v. Lewis*,
  756 F. Supp. 172 (S.D.N.Y. 1991) ..........................................................49

*United States v. Litvak*,
  889 F.3d 56, 2018 WL 2049677 (2d Cir. May 3, 2018) ..................................43

*Valentini v. Citigroup, Inc.*,
  837 F. Supp. 2d 304 (S.D.N.Y. 2011)..................................................27

*Wilson v. Comtech Telecommunications Corp.*,
  648 F.2d 88 (2d Cir. 1981)..................................................................23

*Zaro v. Mason*,
  658 F.Supp. 222 (S.D.N.Y. 1987) ..........................................................26

**U.S. Statutes**

15 U.S.C. § 78j(b) ..................................................................1

15 U.S.C. § 78t..................................................................1

15 U.S.C. § 78u-4(b)(4) ..................................................................37

15 U.S.C. § 78u-4(c)(1) ..................................................................50

**U.S. Rules, Regulations and Congressional Records**

17 C.F.R. § 210 ..................................................................23

17 C.F.R. § 230.901 ..................................................................47

17 C.F.R. § 230.902(b) ..................................................................46

17 C.F.R. § 230.902(h) ..................................................................46

17 C.F.R. § 230.903 ...........................................................................................................46

17 C.F.R. § 230.904 ...........................................................................................................46

17 C.F.R. § 299 ..................................................................................................................23

Federal Rule of Civil Procedure 56(a) ...............................................................................12

55 F.R. 18322, Preliminary Note 6 (May 2, 1990, as amended at 62 F.R. 5354,
    Oct. 17, 1997, and at 63 F.R. 9642, Feb. 25, 1998) ..................................................46

**Foreign Statutes and Regulations**

Belgian Royal Decree no. 62 (Nov. 10, 1967) ...................................................................47

EU Settlement Finality Directive 98.26/EC ......................................................................47

"On the Securities Market," No 461-II (dated 2 July 2003) (as amended) ......................47

"On Joint Stock Companies" No 415-II (dated 13 May 2003) (as amended) ...................47

**Other Authorities**

A. Kent Davis, "*Pinter v. Dahl*:  The Supreme Court's Attempt To Redefine The
    'Statutory Sellor' Under Section 12 of the Securities Act of 1933," 4 *BYU J.
    Pub. L.* 97 (1990) .......................................................................................................38

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).........................14

*Dividends and Share Repurchases: Analysis*, CFA Institute (2019),
    https://www.cfainstitute.org/membership/professional-development/refresher-
    readings/2019/dividends-share-repurchases-analysis ...............................................14

https://www.merriam-webster.com/disctionary/dividend...............................................14

Defendants BTA Bank, JSC ("BTA" or the "Bank") and Sovereign Wealth Fund "Samruk Kazyna" JSC ("S-K Fund" and, together with BTA, "Defendants") respectfully submit this memorandum of law in support of their Motion for Summary Judgment.[1]

## PRELIMINARY STATEMENT

This is a case that never should have been brought, and that certainly should proceed no further.

Defendant BTA was once the largest bank in Kazkhstan – and one of many around the world battered by the global financial crisis triggered by Lehman Brothers' September 2008 collapse.  Unlike most such banks, however, BTA had the additional handicap of having been looted by its previous management – by more than US$6 billion.

With the help of the Kazakh government – and, in particular, Kazkhstan's Sovereign Wealth Fund Samruk-Kazyna JSC – BTA was able to restructure its debts in 2010 (the "2010 Restructuring"), but was not thereafter able to lend enough money at profitable enough rates to escape the Greek debt crisis that brought down all emerging markets in 2011.  It had to restructure once again in 2012.

Proceeding on the idiosyncratic belief that BTA's securities were worth far more than the rest of the market valued them, Plaintiffs – three Panamanian investment funds run out of Chile – repeatedly bought risky BTA subordinated notes (the "Notes") at discounts to face value ranging from 20% to *97%* as BTA headed toward and eventually entered its second restructuring.

When they learned that the proposed terms of the second restructuring would not return them even the highly discounted prices they had paid, Plaintiffs asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act," 15 U.S.C. §§ 78j(b), 78(t)

---

[1] The Court's April 29, 2019 scheduling order granted Defendants 40 pages of joint briefing and 5 pages each of individualized argument (50 pages total).  In the interest of efficiency, Defendants have included all arguments in this document, Section III of which is submitted solely on behalf of S-K Fund (and to which BTA takes no position).

in an apparent effort to force a renegotiation.  Defendants deemed Plaintiffs' claims baseless, and did not re-cut the restructuring overwhelmingly approved by the rest of BTA's creditors.

The chief assertion in Plaintiffs' complaints is that Defendants failed to disclose in the information memorandum for the 2010 Restructuring (the "IM") that "the real purpose of the 2010 Restructuring was to enable S-K Fund to siphon hundreds of millions of dollars from BTA Bank at the expense of BTA Bank's other creditors."  (Ex. 1 (SK AC) ¶ 41.[2])  Plaintiffs should have known that allegation was false when they made it and discovery has confirmed that S-K Fund did not siphon anything from BTA.  To the contrary, it ***contributed*** over KZT 1 trillion (approximately US$7.07 billion) to BTA prior to the second restructuring and received back financing fees of only KZT 26 billion (approximately US$173 million).  In total, S-K Fund ***lost*** over US$6 billion trying to stabilize BTA for the benefit of all stakeholders – including Plaintiffs.

This fact alone should require judgment in favor of Defendants.  It shows that Plaintiffs' lead "misstatement" allegation is baseless and fatally undercuts any allegation of scienter.

As shown more fully below, however, there are at least fifteen separate reasons why summary judgment should be granted, including that:  (i) everything Plaintiffs claim was omitted from the IM was, in fact, either disclosed there or in other public documents; (ii) Defendants' supposed affirmative misstatements were forward-looking opinions that Plaintiffs have not shown to be false and, further, were couched with sufficient risk disclosures to be non-actionable as a matter of law; (iii) Plaintiffs' claimed reliance on the IM for open-market trades months and years after its publication is barred by a non-reliance provision and unreasonable as a matter of law in light of the changed circumstances; (iv) rescission and "true value" damages – the only

---

[2] References in the form "Ex. [#]" are to exhibits to the accompanying Declaration of Jason Vigna in Support of Defendants' Motion for Summary Judgment.

theories Plaintiffs espouse – are unavailable as a matter of law; and (v) in all events, U.S. securities laws do not apply to cases such as this brought by foreign purchasers of foreign securities from foreign sellers through foreign clearing and settlement systems against foreign defendants.

While this Court can and should grant summary judgment on any one of those grounds, judgment is particularly required here because Plaintiffs have not even ***attempted*** to tie any actual declines in the value of their BTA Notes causally to anything Defendants said or did.  All they have done is try to show that they paid too much for the Notes.  In *Dura Pharmaceuticals, Inc. v. Broudo*, 54 U.S. 336 (2005), however, the Supreme Court held that, even if successful, such a showing cannot establish loss causation under Exchange Act.  *See id.* at 343-45; *see also, e.g.*, *Gordon Partners v. Blumenthal*, 02 Civ. 7377 (LAK)(AJP), 2007 WL 431864, (S.D.N.Y. Feb. 9, 2007), *adopted*, 2007 WL 143753 (S.D.N.Y. May 16, 2007), *aff'd*, 293 F. App'x 815 (2d Cir. 2008) (granting summary judgment in identical circumstances).

Ultimately, this case is like *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352 (2d Cir. 2002), which the Second Circuit summarized as "involv[ing] investors who by purchasing securities took a risk for the purpose of securing an economic advantage but, failing to exercise prudence, instead suffered a loss.  Plaintiffs claim defendants … defrauded them; when in fact what plaintiffs had done was to make a bad investment."  *Id.* at 354.  Like in *Halperin* and the other cases discussed throughout this brief, Plaintiffs' claims should be dismissed.

## FACTUAL BACKGROUND[3]

### The Parties

███████████████████████████████████████████████████████

---

[3] Additional relevant facts are set out in Defendants' Rule 56.1 Statement and/or discussed in the text below. References in the form "UF [#]" are to individual paragraphs in the Rule 56.1 Statement.



Plaintiffs were able to pay that little because BTA had suspended all of its debt repayments in July 2009 and was undergoing bankruptcy reorganization.  (UF 110-114, 117.)

BTA had been laid low by two things:  (i) the world financial crisis following the Lehman Brothers collapse (*see generally,* Ex. 109); and (ii) an unprecedented theft of over US$6 billion of BTA's assets by former management.  (UF 88-109.)

When Kazakh government auditors discovered in late 2008 that not only was BTA having difficulty covering withdrawals, but that it also lacked basic documentation for billions of dollars of "loans" former management had given to personally-affiliated companies (*see* Ex. 126 (Nartay Tr.) at 52:17-53:3, 57:6-60:23), the government directed S-K Fund to immediately infuse KZT 212 billion (then approximately US$1.43 billion) into the Bank, in exchange for 75.1% of the Bank's equity.[4]  (UF 58-59.)

Separately, the National Bank of Kazakhstan (NBK) agreed to lend hundreds of billions of tenge to BTA in "repo transactions" at published interest rates below those available from any other source.  (UF 71-75.)  By law, however, the NBK was required to obtain collateral for its loans, and could not accept notes issued by a defaulting entity such as BTA.  (UF 76-77.)  In order to provide it qualifying collateral, S-K Fund gave BTA KZT 645 billion of its own 4%

---

[4] The Kazakhtani tenge ("KZT") is the Kazakh currency.  It traded at varying rates during the relevant period.

notes (due in 2024) (the "SK Bonds"), in exchange for BTA notes of equal face value and maturity (the "BTA Bonds") and, further, guaranteed repayment to the NBK.  (UF 78-89, 202-212.)  This was a grossly unequal transaction for S-K Fund (since its notes were quite valuable, while BTA's were not) – and would soon become more so.

BTA's 2010 Restructuring

To begin to repair the damage done by former management, in 2009 S-K Fund hired Anvar Saidenov, the then-chairman of the NBK and a former senior official at the European Bank for Reconstruction and Development, to be BTA's CEO.  (UF 61.)  Mr. Saidenov and BTA's reconstituted board of directors, in turn, hired world-class teams from UBS AG and Lazard Ltd. to serve as BTA's restructuring financial advisors and White & Case LLP to serve as its restructuring legal advisor.  (UF 122, 124.)  They also hired KPMG International to do a forensic analysis of BTA's books.  (UF 92.)

In order to make the 2010 Restructuring as transparent as possible, BTA also assembled a highly-qualified steering committee ("Steering Committee") to negotiate on behalf of creditors such as Plaintiffs.[5]  (Ex. 3 (IM) at 6, 42.)  The Steering Committee consisted of representatives from:  (i) The Royal Bank of Scotland N.V.; (ii) Commerzbank Aktiengesellschaft; (iii) the D.E. Shaw Group; (iv) Euler Hermes Kreditverischerungs AG (acting for the Republic of Germany); (v) Fortis Investment Management UK Limited; (vi) Gramercy Advisors LLC; (vii) The Bank of Singapore Limited; (viii) KfW (representing its affiliates DEG – Deutsche Investitions-und Entwicklungsgesellschaft mbH and KfW IPEX-Bank GmbH); (ix) Standard Chartered Bank; (x)

---

[5] While a debtor can simply propose its own plan of reorganization and have creditors vote on it on a "take-it-or-leave-it" basis, some debtors try to form creditors' steering committees with whom to negotiate from the outset. Such a committee contains representatives of all creditor classes, is generally provided company-paid advisors, is granted access to the company's records and management and can make its own proposals.  While such a process can be more expensive and time-consuming than a debtor-driven one, it can help reduce avoidable problems in proposed plans, build inter-creditor consensus and lead to more successful outcomes.  (*See, e.g.*, accompanying Decl. of James Robertson ("Robertson Decl.") ¶ 10; Ex. 125 (Favale Tr.) at 77-78.)

Export-Import Bank of the United States; and (xi) Wells Fargo Bank N.A.  (*Id.*)

The Steering Committee retained (at BTA's expense) Deloitte Touche Tohmatsu Ltd. ("Deloitte") and Baker McKenzie as its own advisors.  (Ex. 3 (IM) at 13, *see also* accompanying Aff. of Robert Rauch ("Rauch Decl.") ¶t 4.)  They spent countless hours combing through BTA's finances and considering potential options for operating or selling subsidiaries, governance changes, risk management, managing a "troubled assets portfolio," recovery strategies and debt restructurings, among other things.  (*See* Rauch Decl. ¶ 7, Robertson Decl. ¶¶ 13-15; Ex. 23 (agenda).)  It was understood by all that BTA could not pay its existing debts in full and that its notes, in particular, would need to be exchanged for new, less financially burdensome, securities. (Ex. 26 (roadshow presentation) at 15, 17, 21.)

At the outset, BTA informed the Steering Committee that it intended to sue former management to recover as many improperly disbursed assets as possible.   (UF 139.)  The Steering Committee proposed – and BTA accepted – that the Bank's existing creditors share in such recoveries (if any) because the apparent uncollectibility of the management "loans" contributed to the "haircuts" the creditors were being asked to accept.  (Ex. 125 (Favale Tr.) at 247:13-248:20. 252:16-253:2; Rauch Decl. ¶ 9; Robertson Decl. ¶ 14(c).)  This formed the basis of the recovery units ("RUs") in the final restructuring plan.

Another issue raised by the Steering Committee was whether S-K Fund would agree to less advantageous terms than the rest of BTA's creditors – in particular, whether it would accept a small amount of additional BTA equity in exchange for forgiveness of the KZT ***645 billion*** in BTA Bonds that S-K Fund then held (the other creditors would receive not only equity, but also RUs, new notes and cash) and whether S-K Fund would forego dividends on that equity other than in highly circumscribed situations.  (Ex. 124 (Howes Tr.) at 62:19-64:13. 156:5-157:18; Ex. 125 (Favale Tr.) at 191:9-193:19.)

S-K Fund agreed but reported that, for accounting purposes, it could not guarantee BTA's NBK loans for no consideration whatsoever.[6]  (UF 202-212.)  S-K Fund therefore proposed that BTA pay a "guarantee fee" equal to one half of the interest payments S-K Fund was scheduled to make on the SK Bonds, subject to a cap.  (*Id.*; *see also* Ex. 3 (IM) at 42.)  The Steering Committee requested – and S-K Fund accepted – that, in that situation, S-K Fund receive a smaller amount of equity than originally planned and that the other creditors receive a larger amount.  (*See* Ex. 124 (Howes Tr.) at 303:14-304:15; Rauch Decl. ¶ 9; Ex. 85 (press report).)

The Steering Committee also requested – and was granted – the right to appoint two members to BTA's board of directors, with veto power over matters relating to:  (i) auditors, advisers and procedures; (ii) securities issuance or amendments; (iii) additional debt; (iv) board, management board and executives; (v) business plan and accounts; (vi) contracts; (vii) lending practices; (viii) capital expenditures; (ix) dividends; and (x) litigation.  (UF 129-132.)  Because BTA already had three independent directors, this would leave S-K Fund with minority representation on BTA's nine-person board of directors.  (UF 130.)

Negotiations between BTA, the Steering Committee and S-K Fund concluded on April 18, 2010.  (UF 167.)

The terms of the negotiated restructuring were set out in a detailed information memorandum that was published on May 1, 2010, supplemented twice in May 2010 and re-bound in consolidated form on June 2, 2010 (the "IM").  (Ex. 3.)  The sole purpose of the IM was to provide creditors information needed to vote for or against the proposed restructuring on May 28, 2010, as the inside cover of the document expressly stated:

---

[6] S-K Fund separately came to realize that, once the BTA Bonds were cancelled, S-K Fund might not have enough cash in 2024 to pay BTA the KZT 645 billion then due on the SK Bonds.  It therefore planned to deposit a smaller amount in an interest-bearing account at BTA that could eventually grow to KZT 645 billion when that obligation was due.  (UF 219-220.)  This was discussed with the Steering Committee no later than April 2010.  (UF 221.)

> Nothing in this Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan.  In particular and without limitation, nothing in this Information Memorandum or any other document issued with or appended to it should be relied on in connection with the purchase of any shares (other than under the Restructuring Plan), or assets of the Bank.

(Ex. 3 (IM) at (ii).)  Among other things, the IM set out the terms of the RUs, including that their full US$5.2 billion "Reference Amount" could be accelerated following a separate debt default if 20% of the RU holders so voted and agreed to indemnify the Recovery Unit Trustee for costs and damages from doing so.  (*Id.* at 564-587; *see also* Ex. 8 (RU terms).)  The IM also disclosed extensive risks that the restructuring might fail, or that BTA could collapse after even a successful restructuring.  (*See generally* Ex. 3 (IM) at 119-44 (risk factors).)



*see also* Ex. 117 (Hinton Rpt.) at Workpapers 1-3.)

<u>Plaintiffs' Additional Purchases and BTA's 2012 Restructuring</u>

While 2010 was a period of some optimism in Kazakhstan and BTA finished the year with regulatory capital ratios more than twice what was required (UF 156-157), economic recovery ultimately did not come that year and 2011 was worse.  Among other things, in May

2011 yields on Greek sovereign debt exceeded 15% for the first time, deepening the emerging markets financial crisis that existed at the time (UF 356-59); BTA and others announced that bank lending in Kazakhstan had decreased 6% over the previous year (24% at BTA) and faced difficulties going forward since corporate borrowers remained "distressed and cannot offer tangible collateral" (UF 360); bond prices for *all* the major Kazkh banks started decreasing (Ex. 117 (Hinton Rpt.) at 42-44); and the Kazakhstan Stock Exchange as a whole continued its almost straight-line free fall from the beginning to the end of 2011, losing over 30% of its total market value over that time (UF 363.)

Against this backdrop, on April 29, 2011, BTA issued its 2010 audited financial statements.  (Ex. 16 (2010 Financials).)  Despite the 2010 Restructuring, they showed a total equity *deficit* of KZT 104.5 billion.  (*Id.* at 1.)  BTA's auditor (Ernst & Young) highlighted this fact in its short accompanying report under the heading "***Emphasis of Matter***," warning:  "This condition, along with other matters described in Note 2, indicate the existence of a material uncertainty which may cast significant doubt about the Group's ability to continue as a going concern."[7]  (*Id.* at auditors' report.)  On May 12, 2011, analysts from Commerzbank and Auerbach Greyson reported that BTA might need a second restructuring.  (Exs. 91; 92.)

On May 17, 2011, Mr. Saidenov held an investor call to discuss the results and other Bank matters.  (Ex. 31 (Tr.).)  He specifically discussed, among other things:  (i) the interest that was accruing on S-K Fund's deposits at the bank, and (ii) the fact BTA was experiencing a "negative carry," as "the result of high cost of funding of the bank as compared to the income generated by our loan portfolio."  (*Id.* at 5, 8; *see also* Ex. 30 (presentation) at 24).  While Plaintiffs contend this was the first time all of BTA's government financing costs were known to

---

[7] Note 2 further warned that "there is still a material uncertainty with respect to achieving targets and objectives in the Bank's new business model."  (*Id.*)

the market, in reality every aspect had earlier been disclosed either in BTA's May 2010 Restructuring IM (*see* Ex. 3 at 15, 41, 42, 154-55, 174-75, 178-79) or in S-K Fund's 2009 audited financial statements issued in June 2010 (*see* Ex. 12 at 40)) – and had been dissected in professional analyst reports publicly circulated by UBS in September 2010 (Ex. 87) and by Fitch Ratings in January 2011 (Ex. 88.)   At none of those earlier times did BTA's bond prices waver. (*See* Ex. 117 (Hinton Rpt.) at 25, 51-55.)

The remainder of 2011 was not good for Kazkhstan, or BTA.  With speculation about BTA's longevity increasing, on July 7, 2011, a S-K Fund representative reportedly told a *Blommberg* reporter, "I don't think BTA Bank will have to restructure debt or face bankruptcy, but we will provide financing to BTA Bank if needed." (Ex. 1 (SK AC) ¶ 52.)  The first part of his statement proved over-optimistic.  In November 2011 BTA issued its third quarter interim financials, showing that its loan income had decreased over KZT 20 billion from the same period in 2010, and that its total equity deficit had grown to KZT 318 billion.  (Ex. 17 at 1, 2.)  As a result, on December 7, 2011, Moody's reduced its bond ratings for the Notes from Caa3 (which was already the third-lowest of its 21 possible ratings, representing "poor quality and very high credit risk") to C (the lowest possible rating, meaning, "lowest quality, usually in default and low likelihood of recovering principal or interest").   (Ex. 97.)   On December 22, 2011, BTA succumbed to the inevitable and issued a press release announcing its intention to seek a second restructuring.  (Ex. 32.)  The market price for BTA's Notes declined to less than 10% of face value.  (Ex. 117 (Hrycay Rpt.) at 16.)



Mr. Khamis was partially right but mostly wrong.   When the terms of the second restructuring were announced in October 2012, subordinated Noteholders were offered new securities worth only approximately 2.5% of the face value of the old Notes, leaving Plaintiffs with an expected loss.   (Ex. 60.)   RU holders, however, were offered more than the market expected:  cash representing 14% of the RUs' Reference Amount (which would give Plaintiffs an anticipated profit of over US$2 million on their RUs).  (Ex. 4 (2012 (IM) at 26.)



Defendants did not renegotiate.

## LEGAL ARGUMENT

I.  **Defendants Are Entitled to Summary Judgment on Plaintiffs' Section 10(b) Claims as a Matter of Both Law and Fact**

In a Section 10(b) case, "plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Rule 56(a) of the Federal Rules of Civil Procedure mandates summary judgment against a plaintiff who fails to present evidence sufficient to establish every element of such a claim.[8] *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

As shown below, Plaintiffs have not presented and cannot present evidence sufficient to meet their burdens.

### A.  **There Is No Triable Issue of Material Misrepresentation**

The core theory of Plaintiffs' Complaints is that, "wholly undisclosed in the Information Memorandum was that the real purpose of the 2010 Restructuring was to enable S-K Fund to siphon hundreds of millions of dollars from BTA Bank at the expense of BTA Bank's other creditors" in supposed violation of a Dead of Undertaking providing that "'[n]o dividend other than a Permitted Dividend shall be paid on the Shares'" S-K Fund then owned in BTA.  (Exs. 1 (SK AC) ¶¶ 3, 4, 38, 41, 45; 2 (BTA AC) ¶¶ 3, 4, 40, 41, 43.)

That contention was baseless when Plaintiffs first asserted it in 2012, and has been

---

[8] In this regard, the evidence provided by the nonmovant must raise more than "some metaphysical doubt as to the material facts"; it must show there is a "genuine" basis on which judgment could be entered in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

proven to be after seven years of litigation.

No less an authority than Robert Rauch, the distinguished head of the Steering Committee tasked with representing creditors such as Plaintiffs in the 2010 Restructuring, has testified that the sole purpose of the 2010 Restructuring "was to restructure BTA's debts." (Rauch Decl. ¶ 2.)  Not an iota of evidence suggests otherwise.

Nor did S-K Fund "siphon" anything from BTA.  It *contributed* KZT 212 billion to BTA in February 2009 (Ex. 3 (IM) at 5); *contributed* another KZT 671 billion in September 2010 (*id.* at 8, 146); *contributed* yet a further KZT 180 billion in December 2012 (Ex. 4 (2012 IM) at 20, 29, 40, 207); *paid* BTA over KZT 77 billion in bond interest between 2010 and 2012 (*see* accompanying Decl. of Aidur Ryskulov ("Ryskulov Decl.") at Exs A and B; UF 466-467); and *guaranteed* over KZT 449 billion in loans from the NBK to BTA (Ex. 18 at 35).  Ultimately, it *lost* almost all of that money – over US$6 billion in total.  (Ex. 124 (Howes Tr.) at 156:23-157:11.)  In all that time, the only money S-K Fund received from BTA was KZT 28.22 billion in semi-annual fees charged on the NBK loan guarantees.  (Ryskulov Decl. at Exs. A and B; UF 466-467).  Those fees were disclosed in the IM[9] and had been specifically agreed-to by the Steering Committee.  (Ex. 125 (Favale Tr.) at 32:3-13; Rauch Decl. ¶ 9.)

Finally, by no tortured reading of the English language could those fees (or the interest S-K Fund was set to accrue but never actually received on its deposits at the Bank) be deemed a "dividend" violative of the Deed of Undertaking.[10]  In common parlance, a dividend is "an

---

[9] The IM expressly stated that the "SK Guarantee Fee" was a "semi-annual fee to be paid by the Bank to Sakruk-Kazyna equal to fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any, *provided that* this guarantee fee will not exceed KZT 6.45 billion in 2010 and thereafter KZT 12.9 billion annually, such fee to cease to become payable on the fourteenth anniversary of the date of the completion of the Restructuring."  (Ex. 3 (IM) at 42; *see also id.* at 8, 15, 29.)

[10] The Deed of Undertaking states that "Sakruk-Kazyna will undertake that no dividend other than a Permitted Dividend shall be paid on the shares."  (Ex. 3 (IM) at 74.)  "Permitted Dividend" is defined as one paid more than

individual share of something distributed: such as (a) a share in a pro rata distribution (as of profits) to stockholders."[11]  From a financial perspective, "[d]ividends **represent a distribution of corporate earnings** to company shareholders and usually take place in one of two forms – cash or stock.  Each organization's board of directors determines the actual dividend amount that the firm will pay out."[12]  The CFA Institute expressly contrasts a dividend, which is discretionary and may be limited by debt contract provisions, with "payment of interest and principal," which is not.[13]  "Dividend payments and interest payments in many jurisdictions are subject to different tax treatment at both the corporate and personal levels."[14]  Guarantee fees and deposit interest are **not** dividends.

Further, even if S-K Fund's Guarantee Fee or deposit interest could be considered a dividend (and they cannot), they clearly were not payable "on [BTA's] Shares" and, therefore, would not violate the Deed of Undertaking.  If there were any possibility of confusion on this point, it was eliminated by the portions of the IM expressly stating that S-K Fund would be charging the SK Guarantee Fee and earning interest on its deposits.  (*See, e.g.*, Ex. 3 (IM) at 41, 174-75.)  As a matter of law, these specific statements would control.  *See Armony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (citing Restatement (Second) of Contracts § 203(c) (1981)); *Kelso Enters. Ltd. v. M/V Diadema*, No. 09 Civ. 8226(SAS), 2009 WL 1788110, at *3 (S.D.N.Y. Jun. 23, 2009) ("When specific and general phrases conflict, the specific phrases determine the meaning of the contract."); *accord* A. Scalia & B. Garner, *Reading Law: The*

---

four years after the 2010 Restructuring if the Bank met certain criteria of financial health, or after the Bank's new notes had been paid in full.  (*Id.* at 32.)  "Shares" mean "common shares of the Bank."  (*Id.* at 41.)

[11] https://www.merriam-webster.com/disctionary/dividend.

[12] *Id.* (emphasis added).

[13] *Dividends and Share Repurchases:  Analysis*, CFA Institute (2019), available at: https://www.cfainstitute.org/membership/professional-development/refresher-readings/2019/dividends-share-repurchases-analysis.

[14] *Id.*

*Interpretation of Legal Texts* (2012) at 51.

Plaintiffs have nonetheless continued to pursue this case, arguing that:  (i) the IM did not disclose sufficient details about a so-called "negative carry swap" (specifically, the size of S-K Fund's BTA deposits and the interest earned thereon)[15] (Exs. 1 (SK AC) ¶¶ 41-44; 2 (BTA AC) ¶¶ 43-46); (ii) the IM misrepresented the Bank's "future viability" (*id. at* ¶ 36 and ¶ 54); (iii) S-K Fund representatives misleadingly downplayed the prospect of a second BTA restructuring in 2011[16] (Ex. 1 (SK AC) ¶¶ 52, 54); and (iv) BTA did not disclose its full RU liability prior to the RUs' formal acceleration in April 2012.  (Exs. 1 (SK AC) ¶¶ 58-64; 2 (BTA AC) at ¶¶ 59-64.) Each argument is baseless as a matter of fact and barred as a matter of law.

## 1.    Defendants Disclosed All Required Details of S-K Fund's Deposits

The IM disclosed that S-K Fund was BTA's overwhelmingly largest depositor (KZT 310 billion of BTA's total KZT 683 billion in deposits as of September 30, 2009) (*see* Ex. 3 (IM) at 175, 232), its deposits were made on standard commercial terms (*id.* at 175) and BTA paid depositors between 4% and 12.5% interest on term deposits as of 2009 (*id.* at 233).  Plaintiffs contend, however, that the IM failed to disclose that at unspecified points after the publication of the IM, S-K Fund intended to move approximately KZT 97 billion from low-interest "current" accounts to higher-interest "term" accounts and to deposit up to KZT 80 billion more at the Bank

---

[15] Plaintiffs contend that the SK Guarantee Fee, the interest BTA paid on its loans from the NBK and the interest S-K Fund accrued (but never received) on its deposits at BTA (*i.e.*, the total cost of BTA's government funding) exceeded the amount of interest BTA received from S-K Fund in bond interest and, therefore, constituted a "negative carry swap."  (*E.g.*, Ex. 2 (BTA AC) ¶ 43.)  To do so, Plaintiffs disregard that that the government funding was in no way "swapped" for SK bonds (Ex. 117 (Hinton Rpt.) at 16, 69) and can only be considered a "negative carry" if one entirely ignores the productive uses to which the government funding was intended to be put, including lending, funding remunerative litigation and investing in marketable securities.  (*Id.* at 69-71.)  Defendants have moved to exclude the testimony of Plaintiffs' so-called "negative carry" expert on that ground, among others.  In all events, Plaintiffs' experts concede that all the details of BTA's government funding were disclosed in the IM except, in their view, the total size and interest rate of S-K Fund's deposits at BTA.  (Ex. 132 (Hrycay Tr.) at 157:10-158:8.)

[16] This allegation is not pled in the Complaint against BTA (*see generally* Ex. 2 (BTA AC)) and, as a matter of law, BTA cannot be held liable for statements by S-K Fund representatives.  *See, e.g.*, *Janus Capital Grp. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011); *Stoneridge*, 552 US. at 159; *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

to ensure that it had enough money on hand in 2024 to pay BTA the KZT 645 billion face value of the SK Bonds BTA had been given to hold as collateral for the NBK Loans.  (Exs. 132 (Hrycay Tr.) at 157:10-158:8; 115 (Kapoor Rpt.) at 22-26.)   Plaintiffs also contend that Defendants did not disclose the specific interest S-K Fund might earn on those deposits.  (*Id.*)

Particularly considering that:  (i) attracting deposits is a primary goal of any bank (Exs. 132 (Hrycay Tr.) at 87:20-88:3; 130 (Kapoor Tr.) at 340:17-341:6); (ii) these particular planned deposits would be particularly beneficial for BTA because S-K Fund did not intend to withdraw any interest at all until 2024 and at that point would simply turn the principal and interest over to BTA upon redemption of the SK Bonds (meaning that, in effect, BTA would be given the net present value of that bond payment in 2010 and be free to use the money as it saw fit from that point forward) (Exs. 117 (Hinton Rpt.) at 15-18; 132 (Hrycay Tr.) at 110:7-111:16); and (iii) the IM limited its deposit discussion to the historical 3Q2009 period and nowhere suggested S-K Fund (or anyone else) would ***not*** be making additional deposits (*see generally* Ex. 3 (IM)), there is no legal reason why Defendants would have had to disclose their deposit plans in the IM.  *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (because "'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5,'" "companies can control what they have to disclose … by controlling what they say to the market" (citation omitted)); *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 154-55 (2d Cir. 2013) (finding no duty to disclose in absence of a previous "statement to the contrary"); *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93-4 (2d Cir. 2010) ("Defendants … had no clear duty to disclose their plans").

Moreover, S-K Fund ***did*** publish the deposit details in its 2009 audited financial statements, which it posted to its website in June 2010 – more than two months before Plaintiffs

acquired the first Note on which they are suing.[17]  Defendants are therefore entitled to summary judgment on Plaintiffs' "deposit" allegations.  *See, e.g.*, *In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 51 (2d Cir. 2018) (affirming summary judgment; disclosure breaks any possible "chain of causation" for Exchange Act claims); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (affirming judgment; Exchange Act claims cannot be premised on previously-disclosed information).

### 2. Forward-Looking Statements in the IM Cannot Support Liability

Plaintiffs' "viability" allegations are premised on forward-looking opinions in the IM that "[t]he Bank believes that the Restructuring will allow the Bank to continue as a going concern" and "[t]he Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring by virtue of the economic gain it will achieve from the reduction of the principal amount of the Bank's indebtedness, conversion of certain debt into Shares and liquidity support to be provided by [Fund S-K]."  (*E.g.*, Ex. 2 (BTA AC) ¶ 54.) Summary judgment should be granted as to those allegations for three reasons.

*First*, each prediction indisputably came true.  BTA *did* continue to operate hundreds of branches as a going concern until its eventual combination with Kazkommertzbank in late 2014, serving tens of thousands of customers.  (Exs. 18 (2011 Financials) at 8; 19 (2012 Financials) at 8; 20 (2013 Financials) at 8.)  And it maintained its regulatory capital adequacy ratios until April 2012, when RU holders voted to accelerate the due date of the RUs' full approximately $5 billion reference amount.  (Exs. 18 (2011 Financials) at 36; 4 (2012 IM) at 3.)  Summary judgment is required for this reason alone.  *See Beleson v. Schwartz*, 419 F. App'x 38, 39-40 (2d.

---

[17] S-K Fund's published financials stated:  "On May 13, 2010 the Fund placed deposit of 97 billion Tenge with BTA Bank JSC with maturity on December 30, 2024 and bearing interest of 11%; interest is capitalized annually. Deposit was in place for the purpose of accumulation of funds for future settlement of Fund's bonds issued to BTA Bank JSC with nominal value of 645 billion Tenge."  (Ex. 12 at 40.)

Cir. 2011); *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (each affirming summary judgment where predictions initially came to pass).

*Second*, there is no evidence the opinions in the IM were not honestly held at the time, as Plaintiffs generally must also show to prove them "untrue." *E.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011). As stated in the IM itself, the 2010 Restructuring's reorganization of over US$11 billion in debts should have (and did) permit BTA to meet its regulatory requirements and continue as a going concern. (Ex. 3 (IM) at 10, 145.) Where, as here, an opinion is supported by a reasonable basis, there is no potential liability. *See Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (rejecting 10(b) claim based on statement of opinion where defendant set forth supporting facts); *Tongue v. Sonofi*, 816 F.3d 199, 212 (2d Cir. 2016) ("Defendants were only tasked with making statements that 'fairly align[ed] with the information in the issuer's possession at the time.'" (citation omitted)).

*Third*, the opinions were not phrased as guarantees. To the contrary, the IM expressly warned that in the future BTA might ***not*** meet its capital adequacy ratios or survive as a going concern, depending on business developments:

> The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA [the Kazakh bank regulator]. If the Restructuring is completed as planned, the Bank estimates that its Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations will be 5.3 per cent. and 11.2 per cent, retrospectively, as at 31 December 2010, compared to the minimum [required] levels of 5.0 per cent. and 10.0 per cent … Any further deterioration in the quality of the Bank's loan portfolio after the Restructuring and the consequent need to make impairment provisions may cause the Bank's capital adequacy ratios to fall below the minimum levels … Any failure to comply with the minimum capital adequacy ratios, whether because of the deterioration in the quality of the Bank's loan portfolio or an increase in the minimum capital adequacy requirements, could lead to sanctions and other measures being applied by the FMSA, including forcing the Bank into conservation or mandatory liquidation.

(Ex. 3 (IM) at 119-20.) The IM further detailed dozens of risks that could negatively affect

18

BTA's loan book and business more generally.[18]  No misrepresentation claim can be premised on forward-looking statements accompanied by such cautionary language.  *See, e.g.*, *Halperin*, 295 F.3d at 360 (affirming dismissal where investors were on notice future event was "not guaranteed" and was contingent on business developments).

### 3.    S-K Fund's 2011 Public Statements Were Not False and Misleading

Plaintiffs also allege that S-K Fund representatives made misleading statements regarding its willingness to support BTA and the likelihood of a second restructuring.  (Ex. 1 (SK AC) at ¶ 52.)  But those statements were neither false nor misleading.  S-K Fund ***did*** continue to provide support pursuant to the terms of the 2010 Restructuring and also contributed over KZT 200 billion in the second restructuring, decreased the Guarantee Fee and increased the interest rate on the SK Notes.   (Exs. 4 (2012 IM) at 20, 29, 40, 207; 124 (Howes Tr.) at 156:23-157:11.)   And, BTA (which was then under majority independent and creditor directorship) certainly tried to

---

[18] Among other things, the IM warned:  (i) "The ongoing crisis in the global financial markets and deterioration of general economic conditions have adversely affected the Bank's results of operations and financial condition and could continue to cause them to decline"; (ii) "A number of significant borrowers … stopped making payments in 2009 and the Bank has been unable to monitor the collateral (if any) or their financial performance. Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral securities by the loans"; (iii) "Given the internal control weaknesses in the Bank, related party transactions with unusual terms not known as at the date of this Information Memorandum may be uncovered in the future and may have further adverse effects on the Bank's financial condition and recovery prospects"; (iv) "a gradual seasoning of the Group's loan portfolio … may increase the proportion of loan defaults"; (v) "As a result of the ongoing financial crisis, the Bank faces greater competition from other banks as larger banks in more stable financial positions will aim to increase their market shares in all sectors of the market"; and (vi) "The government expects the growth of Kazakhstan's GDP to remain show throughout 2010 as a result of the slow economic recovery, unpredictable commodity prices, volatility in the real estate market, reduced access to credit for both corporates and households and the general weakening of business and consumer confidence in Kazakhstan.  The Bank expects that lower GDP growth will put increasing pressure on the ability of its current borrowers to repay their existing loans and could therefore increase the Bank's losses from non-performing loans, which could adversely affect the Bank's business, financial condition, results of operations and prospects."  (Ex. 3 (IM) at 119-41.)

The IM further expressly stated that the April 18, 2010 "Base Case Model" from which the estimates were derived "is a tool used by the Bank for illustrative modelling purposes, and no amounts included in it or derived from it should be construed as a forecast by the Bank or any other person of any results of the Bank.  The Bank accepts no responsibility for the Base Case Model or the Original Business Plan, and Claimants or investors should not form any decisions based upon either of these documents."  (EX. 3 (IM) at 14, 136.)  "Claimants should also note that emerging economies such as that of Kazakhstan are subject to rapid change and that the information contained in this Information Memorandum may become outdated relatively quickly.  Accordingly, claimants should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their decision is appropriate."  (*Id.* at 130.)

avoid a second restructuring.  (*See, e.g.* Exs. 31 (transcript) at 3, 5-6; 95 (article).)  The fact that those efforts failed does not make S-K Fund's earlier statements false.  *See, e.g.*, *In re Express Scripts Holdings Co. Sec. Litig.*, --- F. App'x ----, 2019 WL 2004302, at *3 (2d Cir. May 7, 2019) ("Defendants statements 'suggest only the hope ... that the talks would go well' and 'did not become materially misleading when the talks did not proceed well.'" (citation omitted)).

Indeed, the statements were personal opinions not contained in any formal document, which generally cannot rise to the level of a material misrepresentation.  Moreover, the statements, such as "I don't think BTA Bank will have to restructure debt or face bankruptcy," by their very nature showed uncertainty and the possibility of error.  *See, e.g.*, *Express Scripts*, 2019 WL 2004302, at *3.  Plaintiffs cannot show and have not shown that the statements were not honestly believed when made or were irreconcilable with information known at the time. (Notably Plaintiffs elected to depose only one of the purported speakers, Mr. Howes, and did not even ask him about his statements.  (*See generally* Ex. 124 (Howes Tr.).)  Further, the statements were accompanied by meaningful warnings that future results were subject to ongoing negotiations.[19]  They cannot form the basis of a material misrepresentation or omission.  *See, e.g.*, *Halperin*, 295 F.3d at 360.

### 4.      The Potential for Recovery Unit Acceleration Was Disclosed

As disclosed in the IM, the RU trust deed provided:

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security pre-funded to its satisfaction) shall:  (a) give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to ... the Reference Amount ... if any of the following events (each, an "**Event of Default**") occurs and is

---

[19] For example, the November 30, 2011 statement attributed to Karibzhanov includes qualifiers such as "[t]he decision on support measures has not been taken yet", "[i]t will depend on the bank's current business plan", and "we are looking at all options."  (Ex. 95.)

continuing: … (iv)(2) [BTA] suspends or threatens to suspend making payments on any of its debts by reason of actual or anticipated financial difficulties.

(Ex. 3 (IM) at 580.)   The "Reference Amount" was publicly disclosed as US$5,221,494,216. (Ex. 8 (RU terms) at 1.)

When BTA announced in December 2011 that it intended to restructure its debts a second time, numerous reports discussed the possibility of RU acceleration – including several specifically reviewed by Mr. Khamis.[20]   He received those reports before purchasing additional Notes in 2012.  (UF 412-413. 417, 443-451.)

Once BTA formally suspended bond payments in January 2012, the number of such reports increased[21] and, on March 19, 2012, BTA publicly noted that the Bank's "[e]xisting balance sheet does not include a potential uplift for the value of the Recovery Units."[22]   (Ex. 35 at 42.)   The presentation stated (under the "Solvency Situation:  Key Observations" heading), "The [International Financial Reporting Standards] value of the RUs liability is subject to auditors opinion.  If auditors consider that the IFRS value should be $5.2 billion, the Tier 1 capital shortfall would then be further negatively impacted."  (*Id.* at 45.)  On April 27, 2012, the Recovery Unit Trustee sent BTA an acceleration notification (Ex. 58) and, consistent with International Accounting Standard 37, BTA increased the RU liability on its books to U.S. $5.221 billion.  (*See* Ex. 116 (Floyd Rpt.) at 30-32.)

Plaintiffs do not contend BTA's accounting for the acceleration was improper, but their "restructuring" expert stated at deposition that he thought BTA should have said more about the

[22] There is no evidence S-K Fund was involved in any public discussion of the RUs.

risk of acceleration earlier.[23]  (Ex. 129 (Clark Tr.) at 169-80.)  Not having spoken on that subject at all, however, BTA was under no duty to attempt to quantify the risk,[24] *see, e.g.*, *Kleinman*, 706 F.3d at 154-55, and "tell me more" is not a cognizable theory of securities fraud.  *See, e.g.*, *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014).  Plaintiffs do not and cannot contend that they purchased BTA securities ignorant of the risk of acceleration and their "Recovery Unit" allegations should be dismissed as a matter of both fact and law.  *See, e.g.*, *Dalberth*, 766 F.3d at 188 (affirming judgment where information was in market).

## B.     There Is No Triable Issue of Reliance

"[E]ven if a corporation were to make statements which it knew to be false, a plaintiff could not recover in a 10b–5 action unless it can be shown that he or she … directly … relied on misstatements in purchasing or selling the securities."[25]  *Richter v. Achs*, 962 F.Supp. 31, 34 (S.D.N.Y. 1997) (granting judgment where "there is simply no evidence that plaintiffs relied on any [allegedly misrepresented] facts to their detriment").  Further, a plaintiff must do more than show that it actually relied on a misstatement or omission; it must also demonstrate that such reliance was justified in the circumstances.  *See, e.g.*, *Starr v. Georgeson S'holder, Inc.,* 412 F.3d 103, 109 (2d Cir. 2005).  Because Plaintiffs cannot make either showing, their claims should be dismissed.  *See, e.g.*, *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 94 (2d Cir. 1981)

---

[23] Plaintiffs' expert also attempted to espouse theories of liability never even hinted at in the complaints.  (*See generally* Motion to Exclude Testimony of Michael Clark.)  Those theories cannot be considered in connection with this motion, and Defendants do not address them here.  *See, e.g.*, *In re Aluminum Warehouse Antitrust Litig.*, No. 13-md-2481 (KBF), 2016 WL 5818585, at *7 (S.D.N.Y. Oct. 5, 2016) ("While this theory is possible to develop, it is not the theory on which this case has been litigated.  [It] would require a fundamental alteration in their theory of the case – and it is too late for that"); *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 352 (S.D.N.Y. 2013) ("although not a new 'claim' pursuant to Rule 15, this new theory was not pled as required by Rule 9(b) and is therefore waived").

[24] It is well-established that there is no duty to disclose discussions with parties like the RU Holders, even if they could have a material impact on a company.  *See In re Express Scripts*, 2019 WL 2004302, at *3; *Glazer v .Formica Corp.*, 964 F.2d 149, 156-57 (2d Cir. 1992).

[25] Plaintiffs have not alleged, and indeed are not entitled to, a presumption of indirect reliance based on a fraud-on-the-market theory.

("[b]ecause we find that [appellant] has failed to demonstrate his reliance on any actions by appellees, we need not reach the other elements of his 10b–5 claim").

### 1.     The IM's Non-Reliance Provision Precludes Reliance as a Matter of Law

The IM governing BTA's 2010 Restructuring, and primarily underpinning Plaintiffs' claims, contained a detailed disclaimer of reliance on the IM for any purpose other than voting on the Restructuring, and specifically disclaiming reliance on the IM for purchasing securities in the aftermarket:

> Nothing in this Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan.  In particular, and without limitation, nothing in this IM or any other document issued with or appended to it should be relied on in connection with the purchase of any shares (other than under the Restructuring Plan), or assets of the Bank.  This IM has been prepared in connection with the proposal in relation to the Restructuring Plan of the Bank under the Restructuring law.

(Ex. 3 (IM), at (ii).)  This limitation was reasonable in light of the IM's limited purpose, the absence therein of disclosures required to register securities for trading, *cf.* 17 C.F.R. §§ 210, 299, and the passage of time between issuance of the IM in May 2010 and any party's possible securities transactions (which in Plaintiffs case occurred as late as October 2012).  (*See* UF 443-451.)  It precludes Plaintiffs' claimed reliance on the IM as a matter of law.  *See, e.g.*, *Harsco Corp. v. Segui*, 91 F.3d 337, 342-44 (2d Cir. 1996) (affirming dismissal).

Courts routinely enforce reliance limitation provisions such as this, particularly where, as here, they are the product of negotiations between sophisticated parties.[26]  *See Harsco*, 91 F.3d at 342-44; *see also In re One Commc'ns Corp.*, 07 Civ 3905, 2009 WL 857535, at *9-10 (S.D.N.Y

---

[26] Indeed, in its opinion addressing S-K Fund's Motion To Dismiss (12-cv-8852 Dkt. No.15), this Court previously recognized the enforceability of reliance-minimizing provisions.  (12-cv-8852 Dkt. No. 28, pp. 19-20.)  At that time, however, the Court thought that the IM's provision might be unenforceable because it did not appear to be the product of negotiation.  (*Id.*)  The evidence now shows that it was.

March. 31, 2009); *Citibank, N.A. v. Itochu Int'l. Inc.*, 01 Civ. 6007 (GBD), 2003 WL 1797847 (S.D.N.Y. Apr. 4 2003).

As discovery has made indisputably clear, BTA's 2010 Restructuring, and the IM governing the same, were the product of extensive negotiations between BTA and the Steering Committee. (*See* Robertson Decl. ¶¶ 12-15; Rauch Decl. ¶¶ 5, 7, 8, 9; Ex. 125 (Favale Tr.) at 31-32, 74, 168, 191-93, 252-53.) Representing every category of creditor (including Turen Alem noteholders, as Plaintiffs were at the time) were some of the largest and most sophisticated financial institutions in the world, including: Royal Bank of Scotland; Commerzbank; Wells Fargo; D.E. Shaw; KfW; Euler Hermes (on behalf of the nation of Germany); Fortis; Gramercy; The Bank of Singapore; and the Export-Import Bank of the United States. (Ex. 3 (IM) at 42; *accord* Robertson Decl. ¶ 11.) The Steering Committee members and their constituencies were further represented in those negotiations by Baker McKenzie and Deloitte. (UF 128.) The Plaintiffs themselves are also sophisticated parties and forthrightly admit non-reliance provisions "are very general practice." (Ex. 136 (Khamis Dep. Ex. 47); 123 (Khamis Tr.) at 524:23-526:12.)

Accordingly, there is no basis in law or reason to disregard the non-reliance provision. As Judge Easterbrook held in *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), when enforcing an anti-reliance clause in a stock purchase agreement, the "[s]ecurities law does not permit a party to a stock transaction to disavow [its] representations – to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." *Id.* at 383.

Similarly, a plaintiff cannot reasonably rely on a document for matters beyond its intended purpose. In *Sable v. Southmark/Envicon Capital Corp,* 819 F. Supp. 324 (S.D.N.Y. 1993), for example, the court rejected a securities fraud claim predicated on allegedly misstated

projections in a tax opinion issued separately from the offering of the partnership interests at issue.  *See id.* at 338-39.  The court held that "the medium in which the fair market value statement was made – a tax opinion – prohibits plaintiffs' reliance for a general purpose clearly different from the limited purpose intended."  *Id.*; *see also Harsco*, 91 F.3d at 343 ("Th[e] writing, we conclude, defines the boundaries of the transaction.  [Plaintiff] brings this suit principally alleging conduct that falls outside those boundaries").  Here too, the IM was issued for a limited purpose – to aid creditors in deciding how to vote – and Plaintiffs cannot reasonably rely on it for any later, unintended (and specifically disclaimed) purpose.

### 2.  Plaintiffs Did Not Read Most of the Claimed Misrepresentations and Cannot Establish Reliance as a Matter of Fact

Not only were Plaintiffs barred as a matter of law from claiming reliance on the IM, but discovery has also proven as a matter of fact that Plaintiffs did not read, let alone rely on, the portions of the IM (or any other document) primarily alleged to be misleading.

"Reliance provides the requisite causal connection between a defendant's misrepresentation and plaintiff's injury."  *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988).  "In order to recover for a violation of § 10(b) and Rule 10b–5, it is necessary for the plaintiff to show that [allegedly] untrue statements 'influenced'... or 'induce[d]' ... him to purchase the [security]."  *Rosen v. Bergman*, 40 F.R.D. 19, 21 (1966) (citing *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir. 1965), and *Smith v. Bear*, 237 F.2d 79, 88 (2d Cir. 1956)).  Here, with the possible exception of the Deed of Undertaking (which is inactionable for reasons discussed elsewhere), Plaintiffs cannot demonstrate that any allegedly untrue statement "induced" them to purchase BTA securities, because their principal admittedly did not even read them.



Courts routinely grant judgment as a matter of law where, as here, plaintiffs did not read the allegedly misleading material and, therefore, cannot establish reliance.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 399 (S.D.N.Y. 2010) ("Plaintiffs do not allege that they read the research reports cited in the Complaint and therefore cannot use the reports to establish direct reliance."); *Zaro v. Mason*, 658 F.Supp. 222, 228–29 (S.D.N.Y. 1987) (denying motion to reinstate plaintiffs who "did not read, and did not rely on" prospectus); *Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer*, No. C 09-03529 (JSW),

because, among other things, there was no misrepresentation of S-K Fund's promise not to take a dividend.

[28] Plaintiffs similarly did not rely on Defendants' alleged misstatements outside the IM.

2011 WL 1152568, at *9 (N.D. Cal. Mar. 28, 2011) (dismissing 10(b) claim where "[p]laintiff has not alleged that it reviewed, read, or relied upon any of DBSI's disclosures directly"); *see also Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 319 (S.D.N.Y. 2011) ("[I]t is the buyer's responsibility to carefully read the offering documents" (*citing Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 103 (2d Cir. 2005), and *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032-33 (2d Cir. 1993))); *Abbey v. 3F Therapeutics, Inc.*, No. 06 CV 409 (KMW), 2011 WL 651416, at *8 (S.D.N.Y. Feb. 22, 2011) (granting summary judgment and finding Plaintiff had failed to establish reliance due to, among other things, "his failure to read the materials made available to him").  Defendants here are similarly entitled to judgment.

### 3. Plaintiffs' Claimed Reliance Was Not Reasonable Following Defendants' Public Disclosures

Finally, even if the IM contained actionable misstatements or omissions regarding BTA's future or purported "negative carry swap" (which it did not), Plaintiffs could not have ***reasonably*** relied on them after May 2011, by which time BTA's auditor had issued a going-concern warning, and BTA's CEO had expressly highlighted BTA's funding costs on a call widely discussed in the press.

Courts are clear:  a plaintiff who purchases securities after the "true facts" are disclosed cannot have done so in reasonable reliance on a supposed misrepresentation.  As stated in the seminal case *Basic v. Levinson:*  "Any showing that severs the link between the alleged misrepresentation and … the price received (or paid) by the plaintiff … will be sufficient to rebut the presumption of reliance"; therefore, "those who traded … shares after the corrective statements would have no direct or indirect connection with the fraud." *Id.* 485 U.S. at 248-49; *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 765 F. Supp. 2d 375, 384 n.9 (S.D.N.Y 2011).

Here, there can be no dispute that the supposed misstatements and omissions alleged by

Plaintiffs were fully disclosed and/or clarified well before Plaintiffs made many of their purchases.[29]  Indeed, while the Court can and should find that all material facts concerning the "negative carry swap" were public knowledge months before Plaintiffs purchased even a single Note (*see* discussion § I(A), *supra*), even Plaintiffs do not allege new information disclosures after May 2011 (*see generally* Exs. 1 (SK AC); 2 (BTA AC)) and their damages expert concedes that the 17, 2011 investor call permitted the market to "see all that information."[30]

During that call, BTA's CEO discussed, among other things:  (i) the interest accruing on S-K Fund's deposits, and (ii) the fact BTA was experiencing a "negative carry."  (Ex. 31 (Tr.) at 5, 8; *see also* Ex. 30 (Presentation) at 24).  Plaintiffs concede the call was well-reported.  (Exs. 1 (SK AC) ¶¶ 48-50; 2 (BTA AC) ¶¶ 50-52.)  Critically, the May 2011 disclosures came months before Plaintiffs purchased the majority of their Notes (over 80% by face value).  (*Id.* at Ex. A.)  Accordingly, the Court should find that no Note transaction after May 17, 2011 (at the latest) could have been made in reasonable reliance on any alleged misstatement or omission regarding the "negative carry swap."  *See, e.g.*, *In re Merrill Lynch*, 765 F. Supp. 2d at 384 n.9 ("if [plaintiff] allegedly relied on earlier misstatements or omissions when making later purchases, its claims were 'negate[d]' once it received the PPM").).

Similarly, Plaintiffs' contention that they relied on alleged misstatements made *in 2010* about the "success" of BTA's restructuring and BTA's continuing viability to make purchases *in*

---

[29] Prior to BTA's May 17, 2011 investor call, Plaintiffs' purchased $11,903,859 aggregate face value of BTA's 7.2% subordinated Notes, paying roughly 80% of face (a total of $9,504,372).  After that May 17, 2011 investor call Plaintiffs' purchased $72,758,000 aggregate face value of the Notes, paying roughly 6.9% of face (or a total of $5,013,462).  (See Ex. 117 (Hinton Rpt.) at Workpapers 1-3).  They also sold Notes at various times.  (See id.)

[30] Q. [A]re there any facts about the actual transactions constituting the negative carry swap that you believe the market did not know after May 17, [2011]? A. . . . that investor presentation represented the first time to see all that information in the market.  (Ex. 132 (Hrycay Tr.) at 152:5-24.)

*2012*[31] is unreasonable as a matter of law, given the passage of time and clear disclosures in April 2011 that BTA BTA could be headed toward a second restructuring and in December 2011 that it was.[32]  *See, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157-58 (2d Cir. 2007) (going-concern warning was an "ominous alarm" that "certainly provided 'substantial indicia of the risk that' Warnaco would file for bankruptcy").

As a matter of settled law, Plaintiffs could not shut their eyes to the reality of BTA's situation and claim to rely on equivocal statements made nearly two years earlier (particularly where, as here, their latest purchases were made at a small fraction of the Notes' face value, indicating a very high risk of default).[33]  *See Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 338 (2d Cir. 2011) (affirming dismissal of Section 10(b) claims where public statements disclosed risks about which plaintiffs claimed to have been misled); *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993).  Accordingly, Defendants are entitled to summary judgment as to all claims premised on Plaintiffs' 2012 purchases.

## C.    There Is No Triable Issue of Scienter

Plaintiffs also have not shown that BTA and S-K Fund acted with fraudulent intent – another required element of their claims.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 318-19 (2007).  Rather, the evidence shows that BTA and S-K Fund went to great length (and expense) to ensure that the 2010 Restructuring was conducted to the standards of the most sophisticated experts in the world and had nothing to gain from misrepresentations.

███████████████████████████████████████████████

---

[32] Specifically, E&Y warned on April 29, 2011, that the bank's "total liabilities exceeded its total assets by KZT 104,513 million as at 1 December 2010," indicating "a material uncertainty which may cast significant doubt about [BTA's] ability to continue as a going concern" (Ex. 16 (2010 Financials) at Auditors' Report), and, on December 22, 2011, the Bank issued a press release declaring, "Restructuring is an urgently needed measure[.]"  (Ex. 32.)

[33] "Q. In your experience as a financial professional, is it that the bonds that trade at significant discount to face value are more risky than trade near at or above face value? A. That's correct."  (Ex. 132 (Hrycay Tr.) at 176:22-177:3; *see also id.* at 29:3-16.)

Summary judgment is appropriate where, as here, there is no evidence defendants acted with scienter.  *See Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 395 (S.D.N.Y. 2018), *appeal docketed*, No. 18-1527 (2d Cir. May 21, 2018); *In re Fannie Mae Sec. Litig.*, 905 F. Supp. 2d 63, 71 (D.D.C. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) ("state of mind" may be addressed on summary judgment).

### 1. Plaintiffs' Scienter Allegations Make No Sense

Where, as here, there is no "strong circumstantial evidence of conscious misbehavior," a plaintiff must at minimum provide genuine evidence of a particularized motive to defraud in order to avoid summary judgment.[34]  *E.g.*, *Freedman v. Value Health, Inc.*, 34 F. App'x 408, 410 (2d Cir. 2002).

With specific respect to the deposit interest, S-K Fund did not stand to benefit[35] from non-disclosure because, among other things,[36] the interest was not – and was never intended to be – withdrawn from BTA.[37]  (Ex. 124 (Howes Tr.) at 226:24-227:7.)  Defendants intended the deposits simply to accrue until 2024 so S-K Fund would have cash on hand to pay BTA the face value of the maturing SK Bonds.  (*Id.*)  The effect of the term deposits was ***not*** to siphon money from BTA, but to provide an advance payment of principal and interest that provided immediate

---

[34] Ordinary business motivations such as maintaining access to capital, reducing borrowing rates, or maintaining a business as a going concern are insufficient to demonstrate a fraudulent motive or intent as a matter of law.  *See, e.g.*, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463-64 (S.D.N.Y. 2000).

[35] Plaintiffs have never even attempted to show how ***BTA*** would benefit from any alleged misrepresentations.

[36] Evidence demonstrates that the interest S-K Fund was to accrue (and eventually return to BTA) on its deposits was consistent with prevailing deposit rates in Kazakhstan at the time; the rate reported for time deposits over 5 years of Nonbanking Legal Entities in April 2010 was 10.5%.  (Ex. 22 (NBK Statistical Bulletin) at 49.)  Plaintiffs cannot demonstrate motive because they "fail to allege facts that demonstrate these [interest rates] are exorbitant or at all in excess of the industry standard."  *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 309 (S.D.N.Y. 2010) (dismissing, in part, because unsupported allegations of "exorbitant and unique fees and commissions" were insufficient to show motive).  In any event, mere receipt of financial benefits does not demonstrate scienter.  *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("General allegations that the defendants acted in their economic self-interest are not enough.").

[37] Plaintiffs cannot establish any corresponding damages for the same reason.  *See, e.g.*, *O'Connor v. Gary*, 16-cv-01731, 2019 WL 95483, at *16 (N.D. Tex. Jan. 3, 2019) ("[B]ecause the obligation to Farb was never paid, Ahteril's value could not have been affected by it"), *appeal docketed*, No. 19-10622 (5th Cir. May 31, 2019).

cash to BTA.  (Ex. 117 (Hinton Rpt.) at 15-18, 69-71; Ex. 118 (Mason Rpt.) at 106, 117-18.)

Plaintiffs' scienter allegations regarding the "negative carry swap" in general also make no economic sense and should be disregarded.  *See In re N. Telecom*, 116 F. Supp. 2d 446, 462-64 (S.D.N.Y. 2000) (granting judgment where "no individual defendant could have benefitted from the alleged misrepresentations"); *Glickman v. Alexander & Alexander Servs.*, 93 Civ. 7594 (LAP), 1996 U.S. Dist. LEXIS 2325, at *38 (S.D.N.Y. Feb. 27, 1996).  S-K Fund gave more than KZT 1.061 trillion to BTA in 2009-10,[38] and planned to receive a fraction of that amount in fees and interest,[39] most of which would remain in the Bank.  It defies logic that Defendants would try to defraud anyone for such a minimal "profit."[40]  *See, e.g.*, *Glickman*, 1996 U.S. Dist. LEXIS 2325, at *38 (finding allegation of scienter inadequate where "[t]he benefits which this slight scheme helped [defendant] realize – the preferred placement and the Mexican acquisition – pale when compared to the risks to [defendants] of engaging in securities fraud.'").

Finally, as shown above, the details of the alleged "negative carry swap" were fully disclosed in the IM and in S-K Fund's public financials.  Plaintiffs cannot "rely on information generally known or available to the public to support circumstantial scienter allegations."  *Glaser v The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011).

## 2. There Is No Evidence S-K Fund's 2011 Statements Were Made in Bad Faith

Plaintiffs also cannot establish scienter with respect to S-K Fund's 2011 statements about

---

[38] KZT 212 billion (initial infusion for 75% equity stake) + KZT 645 billion (conversion of BTA Bonds to increase SK Fund equity to 81%) + KZT 175 billion (deposits to match SK Bonds at maturity in 2024) + KZT 29.3 billion (deposits to match interest paid to BTA on SK Bonds).  (Exs. 3 (IM) at 5, 8, 146; 4 (2012 IM) at 20, 29, 40, 207; 12 (S-K 2009 Financials) at 40.)

[39] The cumulative net interest outflow through end-of-year 2012 as (improperly) calculated by even Plaintiffs' purported expert is only KZT 87 billion.  (Ex. 115 (Kapoor Rpt.) at Ex. 1.)

[40] Plaintiffs cannot establish that there were other "concrete benefits that could be realized" by the alleged fraud they allege or that Defendants had a "likely prospect of achieving" those benefits by means of the alleged deception.  *South Cherry St., LLC v. Hennessee Grp.*, LLC, 573 F.3d 98, 108 (2d Cir. 2009).

the Bank.   (*See* Ex. 1 (SK AC) at 18-19.)   As shown above, to the extent S-K Fund representatives stated that it would support BTA, those statements were true.   And the alleged statements regarding the likelihood of a second restructuring accurately reflected the opinions of the S-K Fund representatives at the time.   *See In re Express Scripts*, 2019 WL 2004302, at *4. Hindsight may show that the representatives were wrong, but "the fact that Defendants' optimism turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness."   *Id.* (*citing Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)).[41]

### 3.      Plaintiffs' RU Acceleration Allegations Cannot Establish Scienter

The allegation that BTA failed to disclose the risk of RU acceleration adequately prior to its occurrence also lacks scienter.   At all times, the potential RU liability was public, and readily discernible by the market.   (Exs. 3 (IM) at 580; 8 (RU Terms) at 17; 53 (Khamis corresp.); 103 (article); 105 (article).)   And even if a failure to disclose a supposedly increased likelihood of acceleration could be considered an actionable omission (which it cannot), "a short respite from an [allegedly] inevitable day of reckoning" (as Plaintiffs contend acceleration represented (*see* Ex. 113 (Clark Rpt.) at 19) cannot demonstrate scienter because, at worst, the omission would merely have delayed realization of the liability.   *Gross*, 310 F. Supp. 3d at 395; s*ee also Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994); *In re Crown Am. Realty Trust Sec. Litig.*, No. Civ.A. 95-202J, 1997 WL 599299, at *13 (W.D. Pa. Sept. 15, 1997) ("Thus, while plaintiffs can and do allege that defendants' misstatements 'fooled' the Wall Street analysts for a few months, they do not allege that there existed any opportunity to continue the deception permanently, nor ... that defendants could obtain any benefit ... from perpetrating this alleged fraud on a short-term basis.").   Plaintiffs cannot demonstrate that BTA had a motive to benefit

---

[41] Additionally, summary judgment is appropriate for S-K Fund's 2011 statements for the same reasons stated above; Plaintiffs can present "no evidence" of any "concrete benefits that could [have been] realized by one or more of the false statements and wrongful nondisclosures alleged."   *In re N. Telecom,* 116 F. Supp. 2d at 462.

from the purported omission, except potentially the ordinary business goal of maintaining its capital adequacy ratios a while longer, for the benefit of all the Bank's stakeholders.[42]

Furthermore, the mere existence of an acceleration threat by certain RU Holders[43] has no bearing on BTA's scienter – particularly where, as here, BTA did not think acceleration was likely (because of the indemnification costs and the negative consequences for all creditors, including RU Holders) and was actively attempting to convince the RU Holders **not** to accelerate.  (Exs. 56 (Feb 10, 2012 letter)); 57 (Apr. 27, 2012 letter)); 11 (memo) at 4-5; 57 (attorney e-mail) at 6; 102 (article).)  *See In re World Wrestling Entm't, Inc.*, 180 F. Supp. 3d 157, 188 (D. Conn. 2016) (no scienter where nondisclosure was based on internal assessment that undisclosed facts would not have major effect on negotiation; "[t]he mere allegation that defendants failed to disclose … does not in and of itself constitute strong evidence that they did so with scienter")).

### D.    There Is No Triable Issue of Proximate Cause

The Private Securities Litigation Reform Act provides that "'the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(4)).  Plaintiffs have attempted to do so here by purporting to show that omissions concerning the "negative carry swap" caused Plaintiffs to pay more than "true value" for the Notes, which, in their view, were

---

[42] Again, ordinary business motivations such as maintaining access to capital, reducing borrowing rates, or maintaining a business as a going concern are insufficient to demonstrate fraudulent intent as a matter of law.  *See In re N. Telecom*, 116 F. Supp. 2d at 463-64; *In re Crystal Brands Sec. Litig.*, 862 F. Supp. 745, 749 (D. Conn. 1994) (cited with approval in *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud …").

[43] That certain RU holders were considering acceleration was well known to the market.  (*See* Ex. 99, 103, 105.)

worth little or nothing when purchased.[44]   (*See* Ex. 114 (Hrycay Rpt.) at 8, 24, 37-44 ("I estimated damages as the purchase or acquisition price of the securities, less the price of the securities adjusted for the true financial condition of BTA Bank.")).   They have not evaluated the Notes' price at any relevant point following purchase, or tried to explain what caused any decrease.   (*See generally id.*)

The U.S. Supreme Court has squarely rejected that methodology, holding that merely attempting to show an inflated purchase price is insufficient to establish loss causation because, "[w]hen the purchaser subsequently resells such [securities], even at a lower price, that price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of the lower price."   *Dura Pharms.*, 544 U.S. at 343-44.   As the Court explained, securities laws are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually ***cause***."   *Id.* at 345 (emphasis added).

"[T]o establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events,' from disclosures of the truth behind the alleged misstatements" using an event study or other reliable methodology.[45]   *In re Flag Telecom*, 574 F.3d at 36.   Courts in this district do not hesitate to grant summary judgment where, as here, plaintiffs have failed to perform this required task.   *See Gross*, 310 F. Supp. 3d at

---

[44] As demonstrated in the accompanying motion to exclude Plaintiffs' expert William Hrycay, Plaintiffs have made no such showing.   Their analysis depends entirely on impermissibly double-counting funding costs admittedly known to the market at the times of purchase and failing to account for revenues generated with that funding.

[45] "[T]he need to reliably distinguish among the tangle of factors affecting a security's price is no less urgent in inefficient markets" as in efficient ones.   *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013); *see also O'Connor*, 2019 WL 95483, at *14.

398-99; *In re Moody's Corp. Sec. Litig.*, 07 Civ. 8375, 2013 WL 4516788, at *12 (S.D.N.Y. Aug. 23, 2013); *In re N. Telecom*, 116 F. Supp. 2d at 460.

Thus, plaintiffs may not simply claim – as Plaintiffs have here (Ex. 114 (Hrycay Rpt.) at 28-30, 38-44) – that the "real" value of a security was essentially zero or that it would have been unmarketable had the "truth" been disclosed earlier and not tie those supposed facts to actual security price movements.[46]  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015-16 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005); *see also Nuveen*, 730 F.3d at 1119; *In re Bear Stearns Cos. Sec., Derivative & ERISA Litig.*, 08 MDL 1963, 2016 WL 4098385, at *10 (S.D.N.Y. July 5, 2016) (rejecting as inconsistent with *Dura* "backwardization [loss causation] method" of estimating a stock's "true" value, rather than demonstrating fraud's genuine impact on trading prices, as plaintiffs' method impermissibly "has the mechanical result … of attributing almost all of the actual declines in [defendant's] stock price to the alleged fraud, despite the actual effects" of other factors).

Indeed, this case is nearly identical to *Gordon Partners v. Blumenthal*, where an investor likewise claimed damages for the entire decrease in the value of securities he repeatedly purchased as a company headed toward bankruptcy, arguing that, at all relevant times, their actual value was zero.  *See id.*, 2007 WL 431864, at *6.  Defendants' expert (a principal at

---

[46] Plaintiffs' attempt to claim losses after May 2011, when their expert concedes all material facts about the "negative carry swap" were known to the market (Ex. 132 (Hrycay Tr.) at 152:5-24) yet the Notes' trading price remained above 55 (Ex. 114 (Hrycay Report) at 16), is barred for the additional reason that, as a matter of law, loss causation cannot be premised on further price declines after initial disclosure of a previously-concealed fact, *see, e.g.*, *In re Omnicom*, 597 F.3d at 511-12, and Plaintiffs do not even attempt to quantify losses related to anything other than the "negative carry swap." (*See generally* Ex. 114 (Hrycay Report).)  While at his deposition Plaintiffs' expert speculated that a similar quantum of loss could be attributed to "uncertainty" about whether S-K Fund would "bail out" BTA (*see* Ex. 132 (Hrycay Tr.) at 253:11-257:12, 259:18-262:10), "a subjective analysis without any methodological constraints does not satisfy the [admissibility] requirements of *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)]," *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 95 (1st Cir. 2014), and "[d]isaggregation requires that a cause be assigned to each piece of a stock price decline and precludes assigning two different causes to the same quantum of loss."  *In re Flag Telecom*, 574 F.3d at 36.

NERA Economic Consulting, which also employs Plaintiffs' expert) explained that plaintiffs' theory did not demonstrate causation and "lacks any reliable basis.  More specifically, the method makes no adjustment for market, industry or company-specific factors that were affecting [the issuer's securities] price during the relevant period but were unrelated to the fraud. … Reliable principles and methods, adopted in numerous judicial decisions, require that this type of unrelated price decline be removed from any estimate of alleged damages."  The district court (affirmed by the Second Circuit) agreed and granted summary judgment for defendants.  *See id.* at *13-14.

The court applied the same reasoning in excluding the plaintiffs' damages/loss causation expert in *In re DVI, Inc. Securities Litigation*, C.A. No. 2:03-cv-05336, 2010 WL 3522090 (E.D. Pa. 2010).  There, the plaintiffs' expert asserted (like Plaintiffs' here) that, unbeknownst to them, the issuer was functionally insolvent at the start of the putative class period due to allegedly miscalculated loss reserves and other problems, *see id.* at *5, and that, therefore, "any downward movement in the stock price which brought the market price more in line with the 'uninflated price' is recoverable."  *Id.* at *10.  The court held that plaintiffs' theory was "in obvious conflict with the basic requirements of loss causation and must be excluded as unreliable and unfit."  *Id.*

As the *DVI* court explained, at most, such a theory shows that the value of the security was inflated at the time of purchase.  It does not – as required by *Dura* – show how much (if at all) the security's market price declined upon revelation of the "true facts" or attempt to remove the effects of any non-fraudulent revelations or market conditions from security price movements.  *Id.*, 2010 WL 352090, at *12.  "If we were to admit [plaintiffs'] theory, we [would] open the door for Plaintiffs to recover for all losses, regardless of cause, which 'turns securities laws into just the sort of 'broad insurance against market losses' that *Dura* rejected."  *Id.* at *11 (quoting *Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1139 (10 th Cir. 2009) (quoting,

in turn, *Dura*, 544 U.S. at 345)); *see also In re Williams*, 558 F.3d at 1139 (rejecting as factually, legally and methodologically unsupported plaintiffs' argument that because defendant's asserted "true value was at the level the company was trading on the day it declared bankruptcy, any decline in price before bankruptcy must have resulted from the draining of the fraud premium").

To the extent Plaintiffs may argue that they do not need to show that any specifically complained-of act or omission caused them quantifiable losses because they intend to seek "rescission" damages, that argument has properly been rejected by prior courts as a "non-sequitur." *JSMS Rural LP v. GMG Capital Partners III, LP*, 04 Civ. 8591, 2006 WL 1867482, at *4 (S.D.N.Y. July 6, 2006). "Regardless of whether rescission might be an appropriate *remedy* in this case, plaintiff must still prove the elements of its Rule 10b-5 claim, including that it suffered an economic loss caused by defendant's alleged misconduct." *Id.* (emphasis in original); *see also In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1369 (N.D. Cal. 1987) (rejecting identical argument); 15 U.S.C. § 78u-4(b)(4) (codifying loss causation requirement).

Having failed to establish a genuine issue of material fact as to the required loss causation element of their claims, summary judgment should be entered against Plaintiffs.

### E.      There Is No Triable Issue of Damages

#### 1.      Rescission Is Not a Permissible Remedy as a Matter of Law

Even if Plaintiffs had established loss causation (which they have not), any claim for rescission damages would be barred as a matter of law.

The traditional measure of damages in an Exchange Act case – and the only one approved by the Supreme Court – is the "out-of-pocket" measure of damages. Under that measure, "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got." *Levine v. Seilon*, 439 F.2d 328, 334 (2d Cir. 1971) (Friendly, J.); *see also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972); *Hoxworth v.*

*Blinder, Robinson & Co.*, 903 F.2d 186, 204 n. 25 (3d Cir. 1990).

Even if rescission were a conceptually available remedy in such a case, it would only be available if:  (1) the transaction sought to be rescinded involved privity between plaintiffs and defendants who could be returned to the *status quo ante*; and (2) no other adequate remedy existed at law.  *See, e.g.*, *Rudman v. Cowles Comm'cns, Inc.*, 30 N.Y.2d 1, 13-14 (1972); A. Kent Davis, "*Pinter v. Dahl*:  The Supreme Court's Attempt To Redefine The 'Statutory Sellor' Under Section 12 of the Securities Act of 1933," 4 BYU J. Pub. L. 97, 98 (1990) ("At common law, the privity requirement means that only the immediate seller is liable to his purchaser when rescission is granted.").  Here, neither of those criteria can be met, since Plaintiffs made all their loss-inducing Note purchases in the open market (*see* UF 328, 473-476) and they can be compensated with traditional damages.[47]  *See, e.g.*, *In re Fortune Sys.*, 680 F. Supp. at 1369 (granting summary judgment on similar facts).

Moreover, the great weight of authority holds that rescission is ***never*** an appropriate remedy in Exchange Act cases.  *See JSMS*, 2006 WL 1867482, at *4; *Fortune Sys.*, 680 F. Supp. at 1369 (each collecting cases and following majority rule).  As the Fifth Circuit Court of Appeals explained long ago:

> [T]he rescissional measure permits the defrauded securities buyer to place upon the defendant the burden of any decline in the value of the securities between the date of purchase and the date of sale even though only a portion of that decline may have been proximately caused by the defendant's wrong.  The decline in value of the securities … may have also resulted from other factors like market forces and events unrelated to the deceit that had an economic effect on the enterprise ….  Under these circumstances, the rescissional measure is unjust insofar as it compensates an investor for the nonspecific risks which he assumes by entering the market.  Losses thus accruing have no relation to either the benefits derived by the defendants from the fraud or to the blameworthiness of their conduct.

---

[47] The Fifth Circuit has cited this principle as a basis for denying rescissory damages in ***all*** open market securities cases:  "The defendants cannot, in effect, return the purchase price they never received or rescind a transaction to which they were not party."  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 555 (5th Cir. 1981).

*Huddleston*, 640 F.2d at 555 (5th Cir. 1981); *see also Hoxworth*, 903 F.2d at 203 n.25 ("[T]his court has expressed clear disapproval of a damage theory that would insure defrauded buyers against downside market risk unrelated to the fraud, which is exactly what a rescissionary measure is designed to accomplish.").

The Supreme Court's more recent *Dura* holding, discussed above, only reinforces the majority rule. To reiterate: the securities laws are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345. Any damages award in this case must abide by that principle.[48] Accordingly, Defendants are entitled to summary judgment finding that Plaintiffs damages, if any, must be measured by the traditional out-of-pocket rule, and not rescission. *See, e.g.*, *JSMS*, 2006 WL 1867482 at *4 (discussing *Dura*, finding that "permitting rescission would almost certainly compensate [plaintiff] for losses suffered for reasons *other than* the alleged fraud" and granting summary judgment).

### 2. Plaintiffs Have Not Demonstrated Out-of-Pocket Damages

As previewed above, Plaintiffs have not attempted to demonstrate out-of-pocket damages in any reliable way, and judgment should be entered against them for this reason, as well.

In this regard, Plaintiffs' damages report conclusorily asserts that details about the "negative carry swap" were not understood by the market at various times (Ex. 114 (Hrycay Rpt.) at 30-32), but fails to identify: (i) what those details were, (ii) when they eventually were understood by the market; or (iii) how that understanding materialized into losses. (*See generally* Ex. 114 (Hrycay Rpt.); Ex. 117 (Hinton Rpt.).) All Plaintiffs have done is show that

---

[48] Having purchased their BTA Notes at discounts to face value of approximately 20% to **97%** (UF 328), there can be no question that Plaintiffs accepted market risk in making their purchases and would be over-compensated by a risk-free measure of damages such as rescission.

BTA's bond price generally declined after May 2011. (Ex. 114 (Hrycay Rpt.) at 16 & *ff.*) Criticially, Plaintiffs have not offered any explanation why BTA's bond prices did *not* decline in September 2010 and January 2011, when most (and, in Defendants' view, all) information about the "negative carry swap" was openly discussed in the market – including that BTA's cost of funding exceeded its yield on assets. (*Cf.* Ex. 117 (Hinton Rpt.) at 25-27 (showing lack of price movement).) The logical conclusion is that revelations about the so-called "negative carry swap" did *not* cause out-of-pocket damages, and Plaintiffs have presented no evidence to the contrary.

In this way, Plaintiffs' case is like *In re Omnicom*, 597 F.3d 501. In that case, plaintiffs claimed losses related to revelations that Omnicom engaged in financial engineering to move losses from underperforming subsidiaries to an unconsolidated joint venture. *See generally id.* Defendants prepared an event study showing that the company's stock price did not decrease when material facts concerning the transaction were initially discussed in the press. *See id.* at 505. In response, all Plaintiffs did was show that Omnicom's stock price decreased following a Wall Street Journal article that explored the issue in depth, drew negative comparisons to *Enron* and raised ominous questions about Omnicom's accounting generally. *See id.* at 506-08. What plaintiffs did *not* show is that the Journal article revealed new information or that the price declines related to such information as opposed to the broader, unspecified accounting questions raised in the article, the overall negative view of the company at the time, or anything else (including a contemporaneous director resignation). *See id.* at 511-512. In light of the previous failure of the market to react to revelations concerning the alleged fraud, the Second Circuit affirmed summary judgment, holding that plaintiffs had done no more than identify a price decline, which is not the same thing as establishing fraud damages. *See id.* at 512; *see also In re Barclays*, 756 F. App'x at 51 (affirming judgment where no statistically significant price movement occurred at time of initial disclosure).

The same is true here.  Having failed to demonstrate any Note price movements in response to prior disclosures about the "negative carry swap," that any new material information about it was revealed for the first time in May 2011, or that the Note price movements observable after that time related to new "swap" information as opposed to anything else, Plaintiffs have no damages evidence to present at trial.  *See In re Omnicom*, 597 F.3d at 512-13.

## II.   Expert Discovery Confirms That Plaintiffs' Claims Are Barred by *Morrison*

Defendants are mindful that this Court has previously considered whether *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), barred Plaintiffs from moving forward with this case.  Recent expert discovery not available at that time has shed significant light on where Plaintiffs' trades actually occurred, however, and how the Eurobond market regulations at issue impact the *Morrison* analysis (which the Court has not previously considered).  Defendants respectfully contend that the now-complete record shows there is no genuine issue of fact: Plaintiffs' Note purchases occurred outside the U.S. and, therefore, are not subject to U.S. law.

7788In *Morrison*, the Supreme Court held that, pursuant to the presumption against extraterritorial application of U.S. laws, the Exchange Act only applies to:  (i) "transactions in securities listed on domestic exchanges," and (ii) "domestic transactions in other securities." *Id.*, 561 U.S. at 267.  To qualify under the second prong, a plaintiff must show both that:  (a) "irrevocable liability is incurred or title passes within the United States" "to take and pay for a security," *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 67, 68 (2d Cir. 2012); and (b) the transaction is not "so predominantly foreign" as to render the application of section 10(b) "impermissibly extraterritorial."  *Parkcentral Global Hub, Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014).

The complete record shows that Plaintiffs cannot satisfy these requirements, for three reasons:  (i) the transacting parties did not incur *any* contractual or other liability in the U.S

because offer acceptance always occurred either in Europe (where the sellers were located) or in Chile (where Plaintiffs' principal was located); (ii) irrevocable liability to take and pay for the Notes never attached until the point of settlement in Europe (prior to which the transactions could have been cancelled mutually or unilaterally); and (iii) in all events, the Eurobond transactions at issue were as both a matter of fact and law offshore ones subject to Belgian and Luxeumbourgish law specifically designed to avoid U.S. regulation.

### A.     The Trading Parties Did Not Incur Liability in the United States

As a starting principle, both industry experts agreed that no transactional liability of any sort could be incurred until *both* buyer and seller agreed to terms.  (Exs. 119 (Awan Rpt.) at 12; 133 (Palzer Tr.) at 148:24-149:2, 149:13-18, 189:18-20.)  As Plaintiffs' expert testified:  "Trade execution [(the point at which he contended liability attached)] requires a buyer and seller" (Ex. 133 (Palzer Tr.) at 149:13-18); "that's how a trade is done.  You have got a buyer and a seller and they agree on a price and a quantity."  (*Id.* at 148:23-149:2.)  Prior to that point, when Plaintiffs' principal told his U.S. broker he wished to purchase Notes, "[t]hat's, at most, an order … And sometimes not even that.  It could just be an inquiry."  (*Id.* at 152:25-153:23.)  *Accord City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 n.33 (2d Cir. 2014) ("We have never held that the placement of a purchase order, without more, is sufficient to incur irrevocable liability."); *Absolute Activist*, 677 F.3d at 68 ("Commitment … in the classic contractual sense [is] a meeting of the minds of the [trading] parties[.]").[49]

████████████████████████████████████████████

---

[49] Therefore, the Court's prior focus on UBS's receipt of purchase orders in Miami (12-cv-8852 Dkt. No. 113 at 3), no matter how potentially "binding" on Plaintiffs vis-à-vis UBS (a point for which Plaintiffs have presented no evidence), was, respectfully, not the relevant point of inquiry.  *See also Absolute Activist*, 677 F.3d at 62, 70-71 (finding purchases "brokered through a U.S. broker-dealer" insufficient to establish irrevocable liability here).

██████████████████████████████████████████████   Plaintiffs have

presented no evidence where any seller was located, but Defendants' expert has shown from the

records that the ultimate counterparties were large European trading houses that were either

acting as dealers selling from inventory or brokers selling on behalf of undisclosed clients (Ex.

131 (Awan Tr.) 210:14-214:18, 216:24-219:9), and further testified that he knows from personal

experience that the individual traders at those broker-dealers responsible for Eurobond trading

decisions are located in Europe.  (*Id.*) at 210:14-214:18; 216:24:-219:9.)  Plaintiffs' expert did

not disagree.  (*See* Ex. 133 (Palzer Tr.) at 304:18-308:3.)  Accordingly, the "meeting of minds"

to enter into the Note transactions, *Absolute Activist*, 67 F.3d at 68, almost certainly occurred in

Europe.

At his deposition, Plaintiffs' expert agreed that, for regulatory purposes, the transactions

would be considered unified ones between Plaintiffs and the ultimate sellers – and "offshore"

ones, at that.[50]  Nonetheless, based on the notation "principal" on many UBS trade confirms, he

opined that, as a technical matter, the transactions involved two legs:  first, from the ultimate

seller to UBS and, second, from UBS to Plaintiffs.  (Ex. 133 (Palzer Tr.) at 150:6-24, 151:17-

152:13, 157:24-158:12, 313:19-314:3.)  Even if that were true, however, it would not show a

relevant meeting of minds in the U.S.  In that scenario, as a matter of settled law Plaintiffs'

purchases could not be executed until ***Plaintiffs*** agreed ██████████████████████

███████████████████████████████████████   to the final price and

amount of any Notes UBS purchased with the intention of passing on to Plaintiffs.  *See, e.g.*,

*United States v. Litvak*, 889 F.3d 56, 2018 WL 2049677, at *3 (2d Cir. May 3, 2018) (where "the

---

[50] "Q.  Do you agree that these transactions were offshore transactions?  A.  Yes, these transactions in particular were offshore transactions, yes, I do for purposes of Regulation S, yes." (Ex. 133 (Palzer Tr.) at 279:22-24.)  "Q.  In your opinion, were these securities sold in the United States?  A.  Under Reg. S?  No, they weren't."  (*Id.* at 293:21-25.)

broker-dealer acts solely in its own interest as a principal … [t]he broker-dealer assumes the risk of buying the bond, and an institutional investor can refuse to purchase a bond held by the broker-dealer even when the investor caused the broker-dealer to purchase it by an expression of interest").   At his deposition Plaintiffs' expert volunteered this point without prodding.[51] Accordingly, no liability of any sort could ever have attached in the U.S.

### B.   Plaintiffs Only Became Irrevocably Bound To Take and Pay for Securities at Settlement, in Europe

Moreover, in a Eurobond trade – which is a multi-step, days-long process (*see* Ex. 119 (Awan Rpt.) at 9-18) – an initial execution agreement is never irrevocable and, therefore, is not sufficient to determine transaction location for purposes of *Morrison*.  *See Absolute Activist*, 677 F.3d at 68 (requiring "irrevocable" liability "to take and pay for a security").

As Defendants' expert showed – and Plaintiffs did not contest – "Trade settlement is the process of simultaneous exchange of cash versus securities for a security trade.  It is only at the point of settlement that a [Eurobond] trade becomes final and irrevocable."[52]   (Ex. 119 (Awan Rpt.) at 18.)   In this case, no Note settlement occurred in the U.S.; it occurred at Euroclear in Brussels or, in one instance, possibly at Clearstream in Luxembourg.  (Exs. 119 (Awan Rpt.) at ¶¶ 95-96, 114; 133 (Palzer Tr.) at 311:13-21, *see also id.* at 183:14-21, 253:21-254:5.)

Prior to settlement, all trading organizations have procedures for cancelling proposed transactions.  At Euroclear, it involves submitting a particular form.  (*See* Ex. 119 (Awan Rpt.) at 23 & Appx. 4.)   These procedures can be invoked penalty-free by consent of the parties at any point before settlement.  (*See id.* at 17.)   They also can be invoked unilaterally without penalty if: (i) the trade instructions contained an error; (ii) the trade would benefit one party unfairly (for

---

[51] "Q.  At what point is execution happening?  A. When Khamis agrees to the price and the amount of bonds."  (Ex. 133 (Palzer Tr.) at 148:17-20.)

[52] Indeed, Plaintiffs' expert opined that trades may occasionally be rescinded *after* settlement.  (Ex. 133 (Palzer Tr.) at 283:14-264:3.)

example, in fast-moving markets); or (iii) other circumstances justified doing so.  (*See id.* at 14.)

Finally, either party can unilaterally invoke the organization's "buy in" rules and cancel the trade

upon an offer to pay the intended counterparty the difference between the intended price and the

then-prevailing price, if lower.  (*Id.* at 14-15.)  Plaintiffs' expert concedes that, in any of those

situations, the party in Plaintiffs' position would ***not*** be bound to accept or pay for the security;

instead, the trade "just won't happen … it won't clear."  (Ex. 133 (Palzer Tr.) at 266:23-267-17.)

Because cancellation (by either side) was always a possibility prior to Plaintiffs' trade

settlements in Europe, as a matter of both law and fact Plaintiffs cannot show that their

transactions were "domesticated" through any imposition of irrevocable liability to take and pay

for securities in the U.S.  *See, e.g.*, *S.E.C. v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 158-59

(S.D.N.Y. 2011) (dismissing Exchange Act claim where plaintiff could not articulate basis for

finding irrevocable liability to take and pay for securities occurred in the U.S. for transactions

settled abroad) (cited with approval in *Absolute Activist*, 677 F.3d at 68).

### C.     Application of the Exchange Act Here Would Be Impermissibly Extraterritorial

Finally, U.S. securities laws do not apply to Plaintiffs' transactions because they were

predominantly foreign ones specifically designed ***to avoid*** U.S. regulation.

In interpreting *Morrison's* "domestic transaction" element, the Second Circuit held in

*Parkcentral* that:

> A rule making [the Securities Exchange Act] applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine *Morrison's* insistence that § 10(b) have no extraterritorial application.  It would require courts to apply the statute to wholly foreign activity clearly subject to regulation by foreign authorities solely because a plaintiff in the United States made a domestic transaction, even if the foreign defendants were completely unaware of it.  Such a rule would inevitably place § 10(b) in conflict with the regulatory laws of other nations.

*Parkcentral*, 763 F.3d at 215.

Here, as in *Parkcentral*, Defendants were unaware of Plaintiffs' aftermarket trading and had taken steps to ensure that BTA's securities were ***not*** traded in the U.S. (except, potentially, to "qualified institutional buyers" that manage a minimum of $100 million on a discretionary basis or are registered broker-dealers – a fact pattern not at issue here).   Specifically, BTA deposited its non-tenge Eurobonds at Bank of New York Mellon's London branch, which contracted to transfer book-entry ownership of those notes only through Euroclear (in Brussels) or Clearstream (in Luxembourg).  (Ex. 3 (IM) at 314.)  BTA then limited the permissible "future sale, offer, pledge or transfer of the New Notes" to only an otherwise qualified "person who is located outside the United States and is not a U.S. Person, in an offshore transaction in accordance with Rule 903 or 904 of Regulation S under the Securities Act."  (*Id.* at 310.)

"Regulation S" provides an exemption from U.S. securities registration "available only for offers and sales of securities outside the United States."  55 F.R. 18322, Preliminary Note 6 (May 2, 1990, as amended at 62 F.R. 5354, Oct. 17, 1997, and at 63 F.R. 9642, Feb. 25, 1998). Rules 903 and 904 of that Regulation provide that such exempted securities may only be sold in "offshore transaction[s]."[53]  17 C.F.R. §§ 230.903, 904.

Plaintiffs' expert confirmed that, in Plaintiffs' transactions, no offer was made to anyone in the U.S., the buyers were located abroad and the other requirements of Regulation S were satisfied.  (Ex. 133 (Palzer Tr.) at 282:21-283:19, 293:21-25.)   Accordingly, the transactions

---

[53] For this purpose, an "offshore transaction" is one in which "[t]he offer is not made to a person in the United States" AND "[a]t the time the buy order is originated, the buyer is outside the United states, or … the transaction is executed in, on or through the facilities of a designated offshore securities market[.]"  17 C.F.R. § 230.902(h). Among the specifically-"designated offshore securities market[s]" in Regulation S is "[t]he Eurobond market."  17 C.F.R. § 230.902(b).  As Judge Fischer found in *Stackhouse v. Toyota Motor Company*, No. CV 10-0922 DSF AJWx), 2010 WL 3377409 (C.D. Cal. July 16, 2010), "Regulation S – which governs offers and sales outside of the United States without registration – may be relevant to discerning what the Supreme Court meant by 'domestic transactions.'  Regulation S does not define 'domestic transaction' but it does define 'offshore transaction[s],' which include anonymous transactions through 'designated offshore securities market[s].'"  *Id.* at *2 n.2 (quoting 17 C.F.R. § 230.902(h)).  As suggested by Judge Fischer, it is doubtful that the Supreme Court intended in *Morrison* to bring within U.S. securities law regulation transactions the SEC has long deemed "offshore transactions."

were not subject to U.S. securities registration requirements.  *See* 17 C.F.R. § 230.901.  Nor were

they subject to U.S. interest rate restrictions, U.S. tax withholding from coupon payments or

other U.S. rules that foreign bond purchasers such as Plaintiffs seek to avoid.  (*See, e.g.*, Ex. 119

(Awan Rpt.) at 4-6.)

> The transactions *were*, however, subject to European regulation.  The IM provided that:

> Secondary market sales of book-entry interests in the Non-Tenge New Notes held
> through Euroclear or Clearstream to purchasers of book-entry interests in the
> Non-Tenge New Notes through Euroclear or Clearstream will be conducted in
> accordance with the normal rules and operating procedures of Euroclear and
> Clearstream and will be settled using the procedures applicable to conventional
> Eurobonds.

(Ex. 3 (IM) at 318.)  Among those "normal rules" are not only the buy-in rule discussed above,

but also Belgian Royal Decree no. 62 (Nov. 10, 1967) (governing the deposit, transfer and

pledge of securities) and EU Settlement Finality Directive 98.26/EC (addressing the contractual

irrevocability of transfer orders).  (*See, e.g.*, Ex. 119 (Awan Rpt.) at 20-21.)  Further, Plaintiffs'

transactions were subject to supervision by the Belgian Banking and Finance Commission and/or

the Luxembourg Commission de Surveillance du Secteur Financier.  (*See id.* at 20-21.)  In

addition, Defendants were at all times subject to the securities laws of Kazakhstan.  *See, e.g.*,

"On the Securities Market," No 461-II (dated 2 July 2003) (as amended), and the Law of the

Republic of Kazakhstan "On Joint Stock Companies" No 415-II (dated 13 May 2003) (as

amended).

Where, as here, a court is presented with securities transactions "clearly subject to

regulation by foreign authorities," the Second Circuit has held that it should not apply U.S.

securities laws to foreign defendants on the basis of largely foreign conduct for losses suffered

by foreign plaintiffs.  *Parkcentral*, 763 F.3d at 201, 207-08, 215-16.  The Second Circuit held

that, in that situation, "the application of § 10(b) to the defendants would so obviously implicate

the incompatibility of U.S. and foreign laws that Congress could not have intended it *sub*

*silentio*." *Id.* at 216 (citing *Morrison*, 561 U.S. at 269).  Here, it is clear that foreign Defendants have been sued by foreign Plaintiffs for largely foreign conduct to which foreign laws and regulations apply.  Respectfully, it would therefore violate the principles articulated in *Morrison* and *Park Central* to apply U.S. securities laws to this case.  Defendants are entitled to summary judgment dismissing Plaintiffs' claims for this reason, as well.

## III.   S-K Fund Is Entitled to Summary Judgment on Plaintiffs' § 20(a) Claim

Plaintiffs have also asserted a claim under § 20(a) of the Exchange Act against S-K Fund. In order to prevail on a § 20(a) claim, Plaintiffs must show:  (i) a primary securities law violation; (ii) defendant actually controlled the alleged primary violator; and (iii) the defendant was a culpable participant in the alleged misrepresentations or omissions.  *See, e.g.*, *Dodona I, LLC v. Goldman Sachs & Co*, 132 F. Supp. 3d 505, 511-12 (S.D.N.Y. 2015).  Because Plaintiffs cannot make these showings, S-K Fund is entitled to summary judgment on this claim as well.

### A.    S-K Fund Did Not Have Actual Control Over BTA

S-K Fund was the majority shareholder of BTA during the relevant time period.  But this alone is not sufficient to establish "actual control" for purposes of § 20(a).[54]  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486-487 (S.D.N.Y. 2005).  The "actual control" inquiry considers not just abstract control over the primary violator but also actual control over the relevant transaction.  *See id.* at 487; *see also In re Flag Telecom Holdings, Ltd.*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) (allegations that defendant controlled three of nine board seats, had close corporate relationship with primary violator, and approved strategic decisions inadequate to demonstrate control).  Plaintiffs have failed to adduce any evidence to establish that S-K Fund controlled the 2010 Restructuring or that S-K Fund directed any relevant disclosure in the IM or

---

[54] To the extent that summary judgment is granted with respect to the purported primary violations that underlie Plaintiffs' Section 20(a) allegations, the Court must grant summary judgment with respect to the § 20(a) claim as well.  *See, e.g.*, *Dodona*, 132 F. Supp. 3d at 518.

elsewhere.  To the contrary, BTA Bank had a Management Board and a Board of Directors who managed the business of the bank (including the restructuring process) and who, with the assistance of outside experts and approval of the Steering Committee, prepared the IM.[55]  (UF 66-68, 171, 172; Ex. 124 (Howes Tr.) at 147:14-148:8; Ex. 3 (IM) at 5-12.)

As part of the 2010 Restructuring, the governance of the Bank was amended to favor creditors.  The new board of directors was composed of two creditor directors, three independent directors and four directors from S-K Fund.  (*See* Ex. 3 (IM) at 256.)  Despite being the majority shareholder of BTA Bank following the restructuring, S-K Fund could not remove the independent directors as a matter of Kazakh law, or the creditor-appointed directors as a matter of contract.  (*See id.* at 257 ("[T]he JSC Law requires that at least one third of the members of a company's Board of Directors must be independent directors."); *id.* at 72 ("Each Creditor Director shall be appointed for a term lasting up to the later of Minority Protection Expiry Date …."). )  Thus, S-K Fund did not even have majority representation on BTA's board of directors.  Accordingly, Plaintiffs cannot establish that S-K Fund had actual control of BTA or the transactions at issue, and their § 20(a) claim should be dismissed.  *See H&H Acquisition Corp. v. Fin. Intranet Holdings, Inc.*, 669 F. Supp. 2d 351, 361-62 (S.D.N.Y. 2009) (granting judgment where plaintiff did not show actual control of transaction); *Travelers Ins. Co. v. Lewis*, 756 F. Supp. 172, 177 (S.D.N.Y. 1991) (granting judgment to director who didn't control transaction).

**B.     S-K Fund Did Not Culpably Participate in Any Alleged Primary Violation by BTA**

Plaintiffs' § 20(a) claim should also be dismissed because S-K Fund did not culpably

---

[55] The Management Board is distinct from the Board of Directors.  (*See* Ex. 124 (Howes Tr.) at 54:10-15 ("Q: And as a practical matter how involved was S-K Fund in the management of the bank at this point in time?  A: S-K Fund wasn't involved in the management of the bank.  S-K Fund was involved in the board of the bank."); Ex. 3 (IM) at 265.)  The Management Board was responsible for day-to-day activities of the Bank, including preparation of the IM.  (*See* Ex. 3 (IM) at 5-12 (section entitled "Letter from the Chairman of the Management Board of the Bank").)

participate in any alleged misrepresentation by BTA.  "Culpable participation," which is a required element of a § 20(a) claim in this Circuit, is established by a showing of scienter that would satisfy § 10(b).  *See, e.g.*, *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018).  As shown above, Plaintiffs cannot establish that S-K Fund acted with scienter with respect to any alleged misrepresentation.  In fact, Plaintiffs cannot show S-K Fund even ***participated*** in the preparation, presentation, or dissemination of the IM or any other alleged statement by BTA.

The IM was prepared by the Bank, with the assistance of outside counsel and financial advisors and the approval of the Steering Committee.  (UF 171-172.)  S-K Fund had no role in preparing the IM.  (*See* Ex. 124 (Howes Tr.) at 145:5-13.)  Similarly, discovery has not revealed any evidence that S-K Fund had any role in the other statements attributed to BTA, including any presentations regarding the RUs.  Because Plaintiffs have not proffered and cannot proffer any evidence that S-K Fund culpably participated in any primary violation of § 10(b), Plaintiffs' § 20(a) claim should be dismissed for this reason, as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted, and Plaintiffs' claims dismissed in their entirety with prejudice.  Pursuant to 15 U.S.C. § 78u-4(c)(1), Defendants should also be granted their attorneys' fees and costs.

Dated: New York, New York
　　　July 2, 2019

KATTEN MUCHIN ROSENMAN, LLP

By:＿＿＿/s/ Jason C. Vigna＿＿＿＿＿＿＿
Bruce G. Vanyo
Jason C. Vigna
Brian L. Muldrew
575 Madison Avenue
New York, NY 10022
(212) 940-8800

*Attorneys for Defendant BTA Bank, JSC*

Curtis, Mallet-Prevost, Colt & Mosle, LLP

By:＿＿＿/s/ Jonathan J. Walsh＿＿＿＿＿＿＿
Joseph D. Pizzurro
Johnathan J. Walsh
101 Park Avenue
New York, New York 10178
(212) 696-6000

*Attorneys for Defendant, Sovereign Wealth*
*Fund Samruk-Kazyna, JSC*