**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

ATLANTICA HOLDINGS, INC., et al.,                                      :     Case No. 1:12-cv-8852 (JMF)
                                                                       :
                                    Plaintiffs,                        :
                                                                       :
                 -against-                                             :
                                                                       :
SOVEREIGN WEALTH FUND SAMRUK-KAZYNA,                                   :
JSC,                                                                   :
                                    Defendant.                         :

------------------------------------------------------------------------ X

ATLANTICA HOLDINGS, INC., et al.,                                      :     Case No. 1:13-cv-5790 (JMF)
                                                                       :
                                    Plaintiffs,                        :
                                                                       :
                 -against-                                             :
                                                                       :
BTA BANK JSC,                                                          :
                                    Defendant.                         :

------------------------------------------------------------------------ X

**PLAINTIFFS' RESPONSE TO DEFENDANTS'**
**JOINT STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1 OF**
**UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT AND**
**ADDITIONAL UNDISPUTED MATERIAL FACTS**
**INTRODUCED BY PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUIMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION**
**<u>FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

PLAINTIFFS' GENERAL OBJECTIONS ...................................................................... 1

PLAINTIFFS' DEFENITIONS ...................................................................................... 2

PLAINTIFFS 56.1 RESPONSE STATEMENT .............................................................. 3

I.      THE PARTIES................................................................................................... 3

II.     THE GLOBAL FINANCIAL CRISIS............................................................... 6

        A.   Impact of the Crisis on Systemic Kazakhstan Banks.................................9

        B.   SK Fund's Role in the Stabilization Plan ................................................12

        C.   SK Fund Recapitalizes BTA .....................................................................13

III.    FRAUD COMMITTED BY FORMER MANAGEMENT AGAINST BTA ................. 22

IV.     RECOVERY EFFORTS AGAINST FORMER MANAGEMENT ................................. 24

V.      THE 2010 RESTRUCTURING......................................................................... 27

        A.   Steering Committee Sophistication and Negotiations ..............................31

        B.   The "Base Case Model"............................................................................37

VI.     THE STEERING COMMITTEE AND BTA AGREED ON THE TERMS OF
        THE 2010 RESTRUCTURING......................................................................... 47

VII.    THE 2010 INFORMATION MEMORANDUM................................................ 47

        A.   The SK Guarantee and Guarantee Fee......................................................60

VIII.   SK FUND'S PROVISION OF ADDITIONAL SUPPORT IN THE 2010
        RESTRUCTURING .......................................................................................... 62

        A.   Securities Issued Through the 2010 Restructuring ...................................75

        B.   Creditor Approval of the 2010 Restructuring Plan ...................................78

IX.     PLAINTIFFS' TRADING IN BTA SECURITIES .......................................... 80

        A.   Plaintiffs Opened Accounts at UBS..........................................................80

        B.   Plaintiffs' Initial Investments in BTA.......................................................84

        C.   Plaintiffs' Participation in Approval of the 2010 Restructuring ...............89

        D.   Plaintiffs' Subsequent 2010 Transactions.................................................92

        E.   Background on BTA Bond Distribution and Clearing ...............................96

X.      BTA'S POST-RESTRUCTURING OPERATIONS ......................................... 98

        A.   BTA's Performance Following the 2010 Restructuring .............................98

        B.   External Forces Affecting the Financial Health of BTA .........................100

        C.   Analyst Reports and Purported Negative Carry Swap.............................107

XI.     PLAINTIFFS' ADVISORS ........................................................................... 112

XII.    SK FUND STATEMENTS REGARDING SUPPORT FOR BTA .............................. 115

XIII.   PLAINTIFFS' ADDITIONAL TRANSACTIONS IN 2011 ......................................... 118

XIV.   THE 2012 RESTRUCTURING ................................................................. 120

      A.    Events Leading up to the 2012 Restructuring ......................................120

      B.    Recovery Unit Acceleration .............................................................122

      C.    Plaintiffs' Transactions in Early 2012, After Recovery Unit Acceleration Is Possible ..............................................................................135

XV.    THE 2012 RESTRUCTURING ................................................................. 138

      A.    Treatment of Various BTA Securities in the 2012 Restructuring and Plaintiffs' Actions Leading up to the 2012 Restructuring ......................138

      B.    SK Fund's Support for the 2012 Restructuring ....................................139

      C.    SK Fund's Losses in BTA .............................................................139

XVI.   LOCATION OF SALES ........................................................................ 141

XVII.  PLAINTIFFS' CONDUCT IN LITIGATION ................................................ 149

PLAINTIFFS 56.1 ADDITIONAL STATEMENT .................................................... 150

I.      THE 2010 RESTRUCTURING ................................................................. 150

II.     THE UNDISCLOSED SK DEPOSIT AND THE NEGATIVE CARRY SWAP .......... 153

      A.    The Undisclosed SK Deposit .........................................................153

      B.    The Negative Carry Swap .............................................................160

III.    THE INFORMATION MEMORANDUM .................................................... 162

IV.    SK FUND'S 2011 AND 2012 STATEMENTS REGARDING SUPPORT FOR BTA ................................................................................................ 163

V.     HINTON'S COMPARABLE BOND INDEX ................................................ 166

VI.    PLAINTIFFS' BTA SECURITIES TRANSACTIONS ..................................... 166

      A.    Plaintiffs' Incurred Irrevocable Obligations for their BTA Securities Trades in the United States .............................................................166

VII.   POST-2012 RESTRUCTRUING TRANSACTIONS RELATING TO BTA'S NPL PORTFOLIO ................................................ 172

Pursuant to Local Civil Rule 56.1, Plaintiffs Atlantica Holdings, Inc. ("Atlantica"),

Baltica Investment Holdings, Inc. ("Baltica"), and Blu Funds, Inc. ("Blu") (collectively,

"Plaintiffs") submit the following responses to Defendants' BTA Bank JSC ("BTA") and

Sovereign Wealth Fund "Samruk-Kazyna" JSC ("SK Fund") (collectively "Defendants")

statement of undisputed material facts in support of their Motion for Summary Judgment

("Plaintiffs' 56.1 Response Statement"), without admitting that any of Defendants statements are

material, and introduce additional undisputed material facts in opposition to Defendants' motion

for summary judgment and in support of Plaintiffs' motion for partial summary judgment

("Plaintiffs 56.1 Additional Statement"):

## PLAINTIFFS' GENERAL OBJECTIONS

1.      Plaintiffs dispute and object to Defendants' statements to the extent they are

argumentative, editorialize factual assertions, or call for a legal conclusion, rather than an

assertion of material fact under Local Rule 56.1(b) and (d).

2.      Plaintiffs dispute and object to Defendants' statements to the extent they call into

question documentary evidence without citing specific evidence or portions of the record as

required by Local Rule 56.1(d).

3.      Plaintiffs dispute and object to Defendants' statements to the extent Defendants

are unable to cite to any evidence in support of their statements that would be admissible as

required by Local Rule 56.1(d).

4.      Plaintiffs dispute and object to Defendants' statements to the extent they rely

upon deposition testimony, both in the form of the question posed and the lack of foundation to

answer, and further object to Defendants' reliance upon their 30(b)(6) witness, to the extent that

witness was wholly unprepared, amounting to a nonappearance, and should therefore be

excluded.

5.     Plaintiffs dispute and object to Defendants' statements to the extent that the evidence cited by Defendants does not support their assertions of fact as required by Fed. R. Civ. P. 56(c).

6.     Plaintiffs dispute and object to Defendants' statements to the extent that Plaintiffs have included facts that are not material to the issues upon which they have moved for summary judgment.  Where Plaintiffs have not disputed a particular fact, Plaintiffs do not concede the materiality, relevance, or admissibility of the statement or the supporting evidence.

## PLAINTIFFS' DEFENITIONS

Plaintiffs use the following terms, which are further defined in their 56.1 Additional Statement, in the their 56.1 Response Statement:

1.     The "Undisclosed SK Deposit" is three pre-planned bank deposit transactions beginning on May 13, 2010, whereby SK Fund placed term deposits into BTA in order to neutralize "the risk of [SK] Fund not meeting its obligations in 2024" to pay BTA principal and interest on the SK Bonds.

2.     "Undisclosed SK Deposit Omission" references Defendants' failure to disclose the Undisclosed SK Deposit, including its purpose and known detrimental effect, in the 2010 IM provided to BTA's creditors or otherwise prior to the 2010 Restructuring.

3.     "Negative Carry Swap" is a series of interrelated transactions between BTA and Kazak government entities, its 81.5% majority shareholder SK Fund, and NBK—resulting in a "negative carry," a net outflow of interest from BTA to these entities, that doomed the prospects of the 2010 Restructuring.  The components of the Negative Carry Swap are the (1) Undisclosed SK Deposit, (2) SK Bonds, (3) NBK Repo, and (4) SK Guaranty.

# I.    THE PARTIES

1.    Plaintiffs Atlantica Holdings, Inc. ("Atlantica"), Baltica Investment Holdings, Inc. ("Baltica") and Blu Funds, Inc. ("Blu") (collectively, "Plaintiffs") are corporations formed under the laws of the Republic of Panama.  Vigna Decl. Ex.[1] 123 (Khamis Tr.) at 41:18-21, 42:7-9; Vigna Decl. Ex. 1 (Am. Compl., *Atlantica, et al. v. SK Fund*, Dkt No. 14 ("SK Fund Am. Compl.")) ¶¶ 7-9; Vigna Decl. Ex. 2 (Am. Compl., *Atlantica, et al. v. BTA Bank JSC*, Dkt No. 32 ("BTA Am. Compl.") ¶¶ 8-10).

Plaintiffs:  Not disputed.

███████████████████████████████████

████████████████████████████████████

█████████████

████████████████

████████████████████████████████████

███████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████

███████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

---

[1] All references to "Vigna Decl. Ex.__" are to the exhibits attached to the Declaration of Jason Vigna, dated July 2, 2019.  All references to "Elkin Decl. Ex.__" are to the exhibits attached to the Declaration of Matthew L. Elkin, dated September 3, 2019.

LEGAL\42685072\1



7.     Defendant BTA Bank JSC ("BTA" or the "Bank") is a joint stock company formed under the laws of the Government of the Republic of Kazakhstan ("Kazakhstan" or the "Government").  Vigna Decl. Ex. 2 (BTA Am. Compl.) ¶ 15.

Plaintiffs:  Not disputed.

8.     BTA does not have any offices or subsidiaries in the United States.  Vigna Decl. Ex. 134 (Decl. of Francis Fitzherbert-Brockholes Dkt. No. 18 ("FFB Decl.")) ¶ 4.

Plaintiffs:  Not disputed.

9.     The Bank was incorporated on January 15, 1997 as part of a merger between "Alem Bank and Turan Bank, pursuant to the decision of the Government and the NBK."  Vigna Decl. Ex. 3 (2010 Information Memorandum of BTA ("2010 IM")) at 150.  It operated as Bank TuranAlem JSC until it changed its name to "BTA Bank JSC" on January 24, 2008.  Vigna Decl. Ex. 3 (2010 IM) 151.

Plaintiffs:  Not disputed.

10.     From May 20, 2005 to February 2, 2009, the Chairman of the Bank's Board of Directors was Mukhtar Ablyazov.  Vigna Decl. Ex. 3 (2010 IM) at 151.

Plaintiffs:  Not disputed.

11.     Defendant Sovereign Wealth Fund "Samruk-Kazyna" JSC a/k/a "National Welfare Fund 'Samruk Kazyna,'" ("SK Fund" or the "Fund") is a joint stock corporation formed under the laws of Kazakhstan.  Vigna Decl. Ex. 2 (BTA Am. Compl.) ¶ 17; Vigna Decl. Ex. 125 (Favale Tr.) at 48:5-12.

Plaintiffs:  Not disputed.

12.     Pursuant to decrees of the Kazakhstan Government, SK Fund was formed by the combination of two entities: Kazakhstan Holding Company for State Assets Management "Samruk" JSC and Sustainable Development Fund "Kazyna" JSC.  Vigna Decl. Ex. 12 (SK Fund, Separate Financial Statements for the year ended December 31, 2009 ("SK Fund 2009 Financial Statement")) at 5.

Plaintiffs:  Not disputed.

13.     Prior to the formation of the Fund, Samruk's portfolio consisted of assets connected to operating businesses such as "railways, [the] Post Office, telecoms, electricity generation" as well as oil and gas entities. Vigna Decl. Ex. 124 (Howes Tr.) at 37:21-25.

Plaintiffs:  Not disputed.

14.     Kazyna's portfolio consisted of financially-oriented entities, including "the Development Bank of Kazakhstan" ("Damu").  Vigna Decl. Ex. 124 (Howes Tr.) at 38:3-7.

Plaintiffs:  Not disputed.

LEGAL\42685072\1

15.     During all relevant times, the Government was the sole shareholder of the Fund. BTA Am. Compl. ¶ 17; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5; Vigna Decl. Ex. 124 (Howes Tr.) at 43:8-13; Vigna Decl. Ex. 15 (SK Fund, Separate Financial Statements for the year ended December 31, 2014 ("SK Fund 2014 Financial Statement")) at 6.

      Plaintiffs:  Not disputed.

16.     SK Fund does not have any offices or subsidiaries in the United States.  Vigna Decl. Ex. 135 (Sarsenbayev. Decl.) at ¶ 7.

      Plaintiffs:  Not disputed.

## II.     THE GLOBAL FINANCIAL CRISIS

17.     In the fall of 2007, the U.S. subprime mortgage market "collapsed, unleashing a global contagion."  Vigna Decl. Ex. 108 (Andrew Ross Sorkin, *Too Big to Fail*, (Penguin Books 2010)) at 5.

      Plaintiffs:  Not disputed that the cited book contains the quoted text.

18.     The adverse consequences of the U.S. financial crisis were suffered around the globe by large "commercial and investment banks, insurance companies and other financial institutions."  Vigna Decl. Ex. 3 (2010 IM) at 128.

      Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text.

19.     A chain reaction started that rippled around the world.  Shortly after Lehman Brothers failed in September 2008, Iceland faced a crisis as investors demanded that capital they had invested with the country be returned.  Vigna Decl. Ex. 109 (Michael Lewis, *Boomerang* (Norton 2011)) at 1-4.

      Plaintiffs:  Not disputed that the book cited contains language that is consistent with Defendants' statements.

20.     Greece's banking sector, already severely impacted by government mismanagement, teetered and then collapsed, overwhelmed by an avalanche of scandals.  Vigna Decl. Ex.109 (Michael Lewis, *Boomerang* (Norton 2011)) at 41-46.

Plaintiffs:  Not disputed that the book cited contains language that is consistent with Defendants' statements.

21.     The Irish government nationalized the Anglo Irish Bank in January 2009 after it suffered losses of 34 billion Euros. Vigna Decl. Ex. 109 (Michael Lewis, *Boomerang* (Norton 2011)) at 83-84.

Plaintiffs:  Not disputed that the book cited contains language that is consistent with Defendants' statements.

22.     Kazakhstan's economy was similarly impacted by this global crisis.

Plaintiffs:  Defendants provide no citation to the factual record to support their assertion, which violates Local Civil Rule 56.1(d) ("Each statement by the movant … must be followed by a citation to evidence which would be admissible….").  As such, no response is required.  However, as a general matter, Plaintiffs do not dispute this immaterial assertion.

23.     As a member of the global economy, Kazakhstan was also vulnerable to these "market downturns and economic slowdowns elsewhere in the world."  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

Plaintiffs:  Not disputed that the cited financial statements contains the quoted text.

24.      This resulted in the instability of Kazakhstan's capital markets, significant deterioration of liquidity in its banking sector, and tighter credit conditions within Kazakhstan. Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

<u>Plaintiffs</u>:  Not disputed that the cited financial statements contain language that is consistent with Defendants' statements.

25.     On November 25, 2008, the Government adopted Decree No. 1085 which set forth its joint plan of action with the National Bank of the Republic of Kazakhstan (the "NBK") and the Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Market and Financial Organizations ("FMSA") to stabilize "the economy and financial system for 2009-2010" (the "Stabilization Plan").  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

<u>Plaintiffs</u>:  Not disputed that the cited financial statement contains language that is consistent with Defendants' statements.

26.     The Kazakhstan banking crisis peaked shortly thereafter, in early 2009.  Vigna Decl. Ex. 3 (2010 IM) at 128.

<u>Plaintiffs</u>:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

27.     Kazakhstan responded in the same manner as governments of market economies around the world, by attempting to "inject liquidity into banking systems and to recapitalise their banking sectors to reduce the risk of systemic failure and increase confidence in the financial markets."  Vigna Decl. Ex. 3 (2010 IM) at 128.

<u>Plaintiffs</u>:  Not disputed that the cited 2010 IM contains the quoted text.

28.     The Government adopted a State Finance Programme in 2007 that allowed financial institutions to refinance existing loans made to small and medium sized entities.  Vigna Decl. Ex. 3 (2010 IM) at 176.

LEGAL\42685072\1

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

29.     Multiple banks received funds through this State Finance Programme, including ATF Bank, Alliance Bank, BTA, Kazkommertsbank ("KKB"), Halyk Bank, and Temirbank. Vigna Decl. Ex. 3 (2010 IM) at 176-77.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that supports Defendants' statements.

**A.     Impact of the Crisis on Systemic Kazakhstan Banks**

30.     The Government viewed four of these banks—BTA, Alliance Bank, KKB, and Halyk Bank—as "'systemic' in the Kazakhstan financial system."  Vigna Decl. Ex. 3 (2010 IM) at 151.

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

31.     Three banks, Alliance Bank, Temirbank, and BTA, owned more than 35% of the "total assets of the banking system in Kazakhstan" in 2009.  Vigna Decl. Ex. 3 (2010 IM) at 128.

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

32.     Despite the Government's efforts to stabilize its financial sector, these three banks "defaulted on their contractual payments and breached certain regulatory requirements" between 2009 and 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

33.     As a result, each of these banks entered into restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 128.

**Plaintiffs**:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' Statements

34.     Alliance Bank completed its restructuring in April 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

**Plaintiffs**:  Not disputed.

35.     Temirbank's restructuring was similarly approved by its creditors on March 31, 2010.  Vigna Decl. Ex. 3 (2010 IM) at 128.

**Plaintiffs**:  Not disputed.

36.     BTA also suffered as a result of the global financial crisis.  Vigna Decl. Ex. 3 (2010 IM) at 128.

**Plaintiffs**:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

37.     Following an aggressive growth strategy from 2004 to 2007, the Bank's financial condition and liquidity position had severely deteriorated by February 2009.  Vigna Decl. Ex. 3 (2010 IM) at 191.

**Plaintiffs**:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

38.     The Bank was forced to increase provisioning for non-performing loans and as a result breached its required capital adequacy ratios during 2009.  Vigna Decl. Ex. 3 (2010 IM) at 191.

**Plaintiffs**:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

39.     As of October 1, 2009, the Bank had created KZT 1.959 trillion in provisions, representing 75.5% of its total unconsolidated unaudited loan portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 191.

Plaintiffs:  Not disputed.

40.     Over the course of 2009, the Bank sank further into trouble; it had to continually write down its loan book, significant provisions were made in connection with non-performing loans, and it eventually went into negative equity.  Vigna Decl. Ex. 124 (Howes Tr.) at 47:23-48:10.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

41.     Additionally, BTA's deposits decreased by more than KZT 200 billion in the first nine months of 2009, as part of a so-called "run to quality" by depositors.  Vigna Decl. Ex. 3 (2010 IM) at 155.

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

42.     BTA closed 15% of its cash offices during the same time period.  Vigna Decl. Ex. 3 (2010 IM) at 155.

Plaintiffs:  Not disputed.

43.     BTA initiated formal restructuring on October 16, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 6.

Plaintiffs:  Not disputed.

LEGAL\42685072\1

## B. SK Fund's Role in the Stabilization Plan

44.     On November 3, 2008, SK Fund was formed to get the Kazakhstani economy out of the financial crisis, specifically to bail out struggling banks.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20.

Plaintiffs:  Not disputed.

45.     SK Fund was the principal operator for the Government in the implementation of the Stabilization Plan.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

Plaintiffs:  Not disputed.

46.     As part of the Stabilization Plan, SK Fund was asked by the Government to secure equity stakes in the major Kazakhstani banks, including BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 41:15-42:3, 46:12-47:9.

Plaintiffs:  Not disputed.

47.     The Government allocated KZT 480 billion for this purpose.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20, 41:7-42:3, 105:15-106:17.

Plaintiffs:  Not disputed.

48.     On November 9, 2008, BTA, the NBK, FMSA, SK Fund and the Government (represented by the Ministry of Finance) entered into a Memorandum of Understanding to coordinate their efforts to stabilize the economy of Kazakhstan and assist in the stabilization of the financial system including the maintenance by the Bank of an adequate level of liquidity and quality of the credit portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 151.

Plaintiffs:  Not disputed.

49.     Details of the Stabilization Plan were disclosed in SK Fund's financial statements. Vigna Decl. Ex. 124 (Howes Tr.) at 41:7-42:3; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

Plaintiffs:  Not disputed.

C.    **SK Fund Recapitalizes BTA**

50.    At the direction of the Government, SK Fund led a restructuring process pursuant to the Stabilization Plan for a number of banks in Kazakhstan, including BTA.  The Stabilization Plan included stabilization of the financial sector, resolution of real estate market issues, small and medium business support, development of agricultural sector, and implementation of innovation, industrial and infrastructure projects.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 5.

Plaintiffs:  Not disputed.

51.    Prior to the last quarter of 2008, SK Fund maintained some deposits in BTA, but had no shareholding in BTA and no major exposure to it.  Vigna Decl. Ex. 124 (Howes Tr.) at 46:12-47:9.

Plaintiffs:  Not disputed.

52.    In the autumn of 2008, SK Fund commenced negotiations with BTA regarding a potential capital injection by SK Fund into the Bank to support its liquidity following reports that the Bank was unable to meet withdrawal requests of customers and that the Bank failed to participate in rights offerings of two of its important subsidiaries, BTA Russia and BTA Ukraine. Vigna Decl. Ex. 3 (2010 IM) at 151.

Plaintiffs:  Not disputed.

53.    In accordance with the Stabilization Plan, SK Fund bought shares in other struggling Kazakhstani banks besides BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 38:18-39:20.

Plaintiffs:  Not disputed.

54.    SK Fund initially intended to acquire only a 25% equity stake in each of the ailing banks.  Vigna Decl. Ex. 124 (Howes Tr.) at 41:15-42:3.

- 13 -

Plaintiffs:  Not disputed.

55.　　In line with this intention, SK Fund purchased 21.28% and 20.97% equity stakes in KKB and Halyk Bank, respectively.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 23-24.

Plaintiffs:  Not disputed.

56.　　In early 2009, however, SK Fund "determined that it was necessary to acquire a supermajority interest in the Bank."  Vigna Decl. Ex. 3 (2010 IM) at 152.

Plaintiffs:  Not disputed.

57.　　Other than governmental entities, including SK Fund and NBK, there were no entities offering financial support to BTA at the time.  Vigna Decl. Ex. 124 (Howes Tr.) at 47:15-22, 300:22-15; Vigna Decl. Ex. 126 (Nartay Tr.) at 58:6-25.

Plaintiffs:  Not disputed.

58.　　On February 2, 2009, SK Fund, as representative of the Government, agreed to purchase 25,246,343 shares of BTA for KZT 8,401 per share, totaling roughly KZT 212 billion.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 21; Vigna Decl. Ex. 3 (2010 IM) at 5.

Plaintiffs:  Not disputed.

59.　　This purchase gave the Fund a controlling share of BTA, with a 75.1% interest in the Bank's capital.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 21; Vigna Decl. Ex. 124 (Howes Tr.) at 49:25-50:4; Vigna Decl. Ex. 3 (2010 IM) at 5.

Plaintiffs:  Not disputed.

60.　　Before providing this financing assistance, SK Fund conducted due diligence, but its investment in BTA was inevitable, as the transaction was mandated by the Stabilization Program.  Vigna Decl. Ex. 124 (Howes Tr.) at 56:5-58:20.

Plaintiffs: Not disputed.

61.     On February 2, 2009, Arman Dunayev and Anvar Saidenov, were appointed to the BTA Board of Directors by SK Fund. Vigna Decl. Ex. 3 (2010 IM) at 154; Vigna Decl. Ex. 24 (BTA Presentation dated August 18, 2009) at Atlantica 000001228.

Plaintiffs: Not disputed.

62.     Arman Dunayev is an experienced commercial and public banker, having previously served as Vice-Minister of Economics and Budget Planning, Chairman of the "National Innovation Fund" CSC and First Vice-Minister of Finance, Chairman of FMSA, Chairman of JSC "Sustainable Development Fund Kazyna" and Vice-Chairman of Samruk-Kazyna. Vigna Decl. Ex. 3 (2010 IM) at 260.

Plaintiffs: Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

63.     Saidenov was the chairman of the Management Board of the NBK at the time of his appointment and was a former senior official at the European Bank for Reconstruction and Development. Vigna Decl. Ex. 3 (2010 IM) at 260.

Plaintiffs: Not disputed.

64.     Saidenov was also appointed as Chairman of BTA's Management Board. Vigna Decl. Ex. 3 (2010 IM) at 265.

Plaintiffs: Not disputed.

65.     Nearly all of the other then-existing Directors were replaced by March 6, 2009. Vigna Decl. Ex. 3 (2010 IM) at 154.

Plaintiffs: Not disputed. For clarity, at this time, BTA's Board of Directors consisted of four SK Fund directors – Dunayev (the Vice-Chairman of SK Fund), Abay Iskandirov,

Kairat Aitekenov, and Aidan Karibzhanov – and a fifth director appointed by SK Fund,

Saidenov, who was also Chairman of BTA's Management Board. Vigna Decl. Ex. 3

(2010 IM) at 260; Vigna Decl. Ex. 24 (BTA Presentation dated August 18, 2009) at

Atlantica 000001229.

66.    Nevertheless, SK Fund was not involved with management of the bank at any

time. Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15.

Plaintiffs:  Plaintiffs do not dispute that Howes testified that SK Fund was not involved

with the management of BTA. However, Plaintiffs dispute that Howes is a competent

witness to testify about the management of BTA during the relevant period, *i.e.*, the

period leading up to the 2010 Restructuring through the 2012 Restructuring, and the

transactions relating to BTA's loan portfolio that followed the 2012 Restructuring

("Relevant Period"). Howes, SK Fund's 30(b)(6) deponent, had no personal involvement

with BTA during the Relevant Period, and he did not speak to anyone who did in

preparing for his deposition. Vigna Decl. Ex. 124 (Howes Tr.) at 17:3-20:3. He did not

review any contemporaneous SK Fund correspondence because the Fund did not preserve

such documents. *Id.* at 30:8-32:11 ("Q. And what was the Fund's practice in terms of

retaining e-mails during the 2009 to 2012 time period? A. The Fund's practice will

probably horrify you. In that, when an employee left, effectively, their hard drives were

wiped and because all the e-mails at the time were kept on hard drives, not through the

server, which is the normal practice you would expect, what happened was that with an

employee leaving, all record of their e-mails was lost. Not only their e-mails,

incidentally, but anything they had on their hard drive."). Nor did SK Fund search the

personal emails of now-former employees who were involved with BTA during the

- 16 -

relevant period. *Id.* at 34:22-35:21. Howes prepared for his 30(b)(6) deposition by reviewing, among other things: publicly available information, including the 2010 IM, restructuring presentations, and SK Fund and BTA financial statements; SK Fund documents marked DSP (for state purposes) retained in its archives in accordance with operative law, such as final decisions of its board of directors; and certain other documents produced in the litigation. *Id.* at 13:7-15:25, 19:2-13, 30:8-23. While these formal documents reflected Defendants' stated intent to preserve corporate formalities, the record indicates that SK Fund was in fact involved in important matters relating to BTA during the relevant period, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 1-5.

67.     BTA is primarily managed by a separate Management Board that is separate from the Board of Directors. Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15; Vigna Decl. Ex. 3 (2010 IM) at 265.

Plaintiffs: Not disputed. For clarity, however, BTA was not exclusively operated by the Management Board without SK Fund's control. SK Fund appointed the Chairman of the Management Board (Plaintiffs' 56.1 Response Statement, at ¶¶ 61, 64); the Board of Directors, which consisted of four SK Fund directors and a fifth director appointed by SK Fund (*Id.* at ¶ 65), voted on important BTA decisions (Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15); and the evidence available from the relevant period shows that SK Fund was involved in important matters relating to BTA, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 1-5. In fact, the 2010 IM recognized SK Fund's control over BTA in a risk factor: "The Bank will be controlled by Samruk-Kazyna,

Kazakhstan's sovereign wealth fund, whose interests may differ from the interests of the Bank or the Claimants." Vigna Decl. Ex. 4 (2010 IM) at 120.

68.     The Management Board was chiefly responsible for the day-to-day activities of the Bank, which included preparation of the Information Memorandum. Vigna Decl. Ex. 3 (2010 IM) at 5-12.

Plaintiffs: Not disputed. For clarity, however, SK Fund appointed the Chairman of the Management Board (Plaintiffs' 56.1 Response Statement, at ¶¶ 61, 64); the Board of Directors, which consisted of four SK Fund directors and a fifth director appointed by SK Fund (*Id.* at ¶ 65), voted on important BTA decisions (Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15); and the evidence available from the relevant period shows that SK Fund was involved in important matters relating to the 2010 Restructuring, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 1-5.

69.     The effort to stabilize BTA had two elements: (1) a capital contribution and (2) the restructuring in 2010 (the "2010 Restructuring"). Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19; Vigna Decl. Ex. 3 (2010 IM) at 5.

Plaintiffs: Not disputed.

70.     SK Fund's capital contribution included both the purchase of BTA shares and SK Fund's assistance in arranging liquidity to enable repurchase, or "repo," transactions with NBK. Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19; Vigna Decl. Ex. 3 (2010 IM) at 5.

Plaintiffs: Not disputed.

71.     The SK Fund capital injection and the repo arrangement with NBK ("NBK Repo") was the only financing available to BTA between 2009 and 2012. Vigna Decl. Ex. 124 (Howes Tr.) at 300:22-15.

Plaintiffs:  Not disputed.

72.     Banks often use repurchase or "repo" transactions to provide short-term liquidity. Vigna Decl. Ex. 110 (John C. Hull, Options, *Futures and Other Derivatives*, (6th ed. 2005)) at 77.

Plaintiffs:  Not disputed that the book cited contains language that is consistent with Defendants' statements.

73.     Through a repo transaction, the owner of securities agrees to sell them to a counterparty and buy them back later at a slightly higher price; in the interim, the seller holds cash, and thereby receives a source of short-term liquidity.  Vigna Decl. Ex. 110 (John C. Hull, Options, *Futures and Other Derivatives*, (6th ed. 2005)) at 77.

Plaintiffs:  Not disputed that the book cited contains language that is consistent with Defendants' statements.

74.      NBK was providing liquidity to many Kazakhstani banks through repo transactions.  Vigna Decl. Ex. 21 (National Bank of the Republic of Kazakhstan, Annual Report 2009, December 31, 2009) at 15.

Plaintiffs:  Not disputed.

75.     NBK was able to offer repo financing to BTA at published interest rates that were well below those available from other sources.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 35; Vigna Decl. Ex. 3 (2010 IM) at 8, 15, 38, 121.

Plaintiffs:  Plaintiffs do not dispute that NBK offered repo financing to BTA at published interest rates.  However, Plaintiffs dispute that the NBK interest rates were "well below those available from other sources."  The interest rate for the NBK Repo was high and, in particular, it was higher than the corresponding interest BTA received from the SK Bonds

(4%) that secured the repo transaction, which was effectively reduced to 2% by the SK Guarantee (2%). Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 21, 61; Vigna Decl. Ex. 132 (Hrycay Tr.) at 76:6-77:25; Vigna Decl. Ex. 45 (JP Morgan Report dated May 18, 2011) at 1 ("the cost of the repo with the NBK is 7.5% … which [is] significantly above the bank's average yield on its assets"); Vigna Decl. Ex. 88 (Fitch Ratings for BTA Bank dated January 18, 2011) at 4 (SK Bonds that carried "an interest rate of 4%, which is significantly lower than the cost of the Kazakh sovereign debt," and thus, "gave rise to significant negative equity adjustments under both IFRS and local GAAP.").

76.    While NBK was offering repo financing, BTA had no security to give to NBK. Vigna Decl. Ex. 124 (Howes Tr.) at 66:22-68:11.

Plaintiffs:  Not disputed.

77.    BTA could not enter into a repo with NBK using its own bonds, as BTA was a defaulted bank in early 2009 and its own bonds were essentially valueless as collateral at the time.  Vigna Decl. Ex. 125 (Favale Tr.) at 33:7-24; Vigna Decl. Ex. 3 (2010 IM) at 175.

Plaintiffs:  Not disputed.

78.    In order to provide security for the repo transaction, SK Fund entered into a transaction with BTA to provide appropriate collateral.  Vigna Decl. Ex. 125 (Favale Tr.) at 33:7-24; Vigna Decl. Ex. 3 (2010 IM) at 175, 178-79.

Plaintiffs:  Not disputed.

79.    BTA and SK Fund exchanged bonds with notional values of KZT 645 billion (the "Bond Swap").  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-63:21; Vigna Decl. Ex. 3 (2010 IM) at 175, 178.

Plaintiffs:  Not disputed.

80.     The bonds provided by SK Fund ("SK Bonds") were issued with a 4% coupon. Vigna Decl. Ex. 3 (2010 IM) at 41.

Plaintiffs:  Not disputed.

81.     This amount was not accrued, but was an actual expense incurred by SK Fund and paid to BTA.  Vigna Decl. Ex. 3 (2010 IM) at 200.

Plaintiffs:  Not disputed.

82.     BTA earned approximately KZT 20.5 billion from interest on the SK Bonds for the nine-month period ended September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 200.

Plaintiffs:  Not disputed.

83.     The bonds provided by BTA ("BTA Bonds") had a 9% coupon.  Vigna Decl. Ex. 3 (2010 IM) at 14.

Plaintiffs:  Not disputed.

84.     BTA did not pay out any interest on the BTA Bonds because they were to be capitalized as part of the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 146; Vigna Decl. Ex. 124 (Howes Tr.) at 222:20-223:6; Vigna Decl. Ex. 125 (Favale Tr.) at 197:11-198:14.

Plaintiffs:  Plaintiffs do not dispute that BTA did not pay out interest on the BTA Bonds and that they were later capitalized as part of the 2010 Restructuring.  However, the Bond Swap and the capitalization as part of the 2010 Restructuring were two separate transactions executed at separate times.  Vigna Decl. Ex. 130 (Kapoor Tr.) at 47:2-53:12; Vigna Decl. Ex. 3 (2010 IM) at 14, 41, 154, 175, 176, 178 (Bond Swap in March 2009); Vigna Decl. Ex. 3 (2010 IM) at 8, 146-47 (SK Fund exchanges BTA Bonds for BTA equity as part of 2010 Restructuring); *see also* Defs. 56.1 Statement, at ¶¶ 214-215.

85.     Instead, all interest on the BTA Bonds (which amounted to approximately KZT 26 billion[2] as of the date of the 2010 Information Memorandum), was accrued.  Vigna Decl. Ex. 3 (2010 IM) at 41, 324; Vigna Decl. Ex. 124 (Howes Tr.) at 62:19-63:8.

Plaintiffs:  Not disputed.

86.     The exchange of bonds between BTA and SK Fund provided BTA appropriate collateral to access much-needed liquidity through repo transaction with NBK.  Vigna Decl. Ex. 124 (Howes Tr.) at 301:16-25.

Plaintiffs:  Not disputed.

87.     The immediate objective of the stabilizing BTA through the bailout set forth in the Stabilization Plan was successful in that not all deposits were withdrawn, there was not a run on the Bank, and BTA had a chance of survival.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24. It also permitted the 2010 Restructuring to be undertaken.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24.

Plaintiffs:  Not disputed.  For clarity, however, that Howes characterized the bailout as successful prior to the 2010 Restructuring is immaterial.

### III.     FRAUD COMMITTED BY FORMER MANAGEMENT AGAINST BTA

88.     As the Bank reviewed the provisioning for its non-performing loans during early 2008, it discovered certain irregularities in its loan portfolio.  Vigna Decl. Ex. 3 (2010 IM) at 153.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

---

[2] The "SK Claim" as defined in the 2010 Information Memorandum was KZT 671 billion.  Vigna Decl. Ex. 3 (2010 IM) at 41.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

89.     It would later be discovered that BTA was the victim of "massive fraud" perpetrated by Ablyazov, BTA's former Director, and others in BTA's former management. Vigna Decl. Ex. 124 (Howes Tr.) at 60:14; Vigna Decl. Ex. 3 (2010 IM) at 122.

Plaintiffs:  Not disputed that the statements accurately reflect Howes' testimony and that the cited 2010 IM contains language that is consistent with Defendants' statements.

90.     Ablyazov fled Kazakhstan in January 2009 and flew to the United Kingdom.  *See* Vigna Decl. Ex. 106 (Edward Robinson, Hugo Miller & Nariman Gizitdinov, *Was Trump SoHo Used to Hide Part of a Kazakh Bank's Missing Billions?*, Bloomberg, Dec. 11, 2017, *available at* https://www.bloomberg.com/news/features/2017-12-11/was-trump-soho-used-to-hide-part-of-a-kazakh-bank-s-missing-billions)*.*

Plaintiffs:  Not disputed that the cited Bloomberg article contains language consistent with Defendants' statements.

91.     In February 2009, the Bank conducted due diligence to identify and investigate suspicious loans.  Vigna Decl. Ex. 3 (2010 IM) at 122.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

92.     On July 21, 2009, BTA retained KPMG London to assist with these due diligence efforts, including review of BTA's loan portfolio and other investments, and specifically loans issued by prior management.  Vigna Decl. Ex. 3 (2010 IM) at 6, 13, 23.

Plaintiffs:  Not disputed.

93.     This process revealed a number of "suspicious transactions," including "a significant number of loans" that had been granted on "preferential terms" to entities believed to be connected to Ablyazov.  Vigna Decl. Ex. 3 (2010 IM) at 122.

- 23 -

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

94.     FMSA conducted its own due diligence in November 2009.  Vigna Decl. Ex. 3 (2010 IM) at 151.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

95.     The Bank uncovered a significant number of purported loans that appeared to have been provided on preferred terms to companies connected with former management and for which the security provided was inadequate or non-existent.  Vigna Decl. Ex. 3 (2010 IM) at 126, 152; Vigna Decl. Ex. 126 (Nartay Tr.) at 52:17-53:3, 57:6-60:23.

Plaintiffs:  Not disputed that the cited 2010 IM and testimony contains language that is consistent with Defendants' statements.

96.     In connection with those transactions, there were "gaps" in BTA's records and "many documents [were] missing."  Vigna Decl. Ex. 3 (2010 IM) at 126.

Plaintiffs:  Not disputed that the cited 2010 IM contains the quoted text and language that is consistent with Defendants' statements.

97.     Many of these suspicious loans were completed by foreign subsidiaries of the Bank, including BTA Russia and BTA Ukraine.  Vigna Decl. Ex. 3 (2010 IM) at 126.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

**IV.     RECOVERY EFFORTS AGAINST FORMER MANAGEMENT**

98.     On August 27, 2009, the Bank began legal proceedings against Ablyazov and other related parties.  Vigna Decl. Ex. 3 (2010 IM) at 6.

Plaintiffs:  Not disputed.

99. The Bank filed numerous suits in an attempt to recover these assets, including in the United Kingdom and the British Virgin Islands. Vigna Decl. Ex. 3 (2010 IM) at 180.

Plaintiffs: Not disputed.

100. The Bank also filed proceedings in Russia and Ukraine. Vigna Decl. Ex. 128 (Howell Tr.) at 117:7-25.

Plaintiffs: Not disputed.

101. In the United Kingdom, the Bank brought a series of eleven suits to recover over $5 billion. Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 2; Vigna Decl. Ex. 128 (Howell Tr.) at 117:11-13.

Plaintiffs: Not disputed.

102. A judgment was scheduled to be declared in one of the United Kingdom proceedings, but Ablyazov absconded instead of attending. Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 5.

Plaintiffs: Not disputed.

103. Ablyazov was sentenced to twenty-two months imprisonment in the United Kingdom, but fled before being taken into custody. Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶¶ 2-3.

Plaintiffs: Not disputed.

104. While a fugitive, Ablyazov was located in the south of France on July 31, 2013. Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of

Justice, Chancery Division, dated November 26, 2013) at ¶ 6.  At least three countries sought his extradition.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 6.

> Plaintiffs:  Not disputed.

105.    At least one court has found that Ablyazov's actions related to the non-performing loans amounted to fraud.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 93.

> Plaintiffs:  Not disputed.

106.    On this basis, it granted the Bank an award of over $294 million.  Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 93.

> Plaintiffs:  Not disputed.

107.    The Bank has received judgments for $4.9 billion in United Kingdom courts alone.  Vigna Decl. Ex. 107 (Stephen Bland, *The Ablyazov Affair: 'Fraud on an Epic Scale'*, The Diplomat, Feb. 23, 2018, *available at* https://thediplomat.com/2018/02/the-ablyazov-affair-fraud-on-an-epic-scale/).

> Plaintiffs:  Not disputed.

108.    By September 2016, BTA had succeeded in executing judgments against assets worth $1.4 billion.  Vigna Decl. Ex. 36 (BTA Statement on Asset Recovery Results for the first half of 2016, dated May 9, 2016) at 11.

> Plaintiffs:  Not disputed.

109.    BTA estimates that the total amount of the Ablyazov fraud is at least $6 billion, and could be as much as $10 billion.  Vigna Decl. Ex. 126 (Nartay Tr.) at 41:2-21.

<u>Plaintiffs</u>:  Not disputed that this is BTA's estimate.

## V.    THE 2010 RESTRUCTURING

110.    Despite SK Fund's capital injection, on April 1, 2009, the Bank breached requirements put in place by FMSA.  Vigna Decl. Ex. 3 (2010 IM) at 156.

<u>Plaintiffs</u>:  Not disputed.

111.    Shortly thereafter, on April 23, 2009, BTA announced a moratorium, ceasing to make payments on the principal on all of its repayment obligations.  Vigna Decl. Ex. 3 (2010 IM) at 5.

<u>Plaintiffs</u>:  Not disputed.

112.    In April 2009, BTA retained UBS as restructuring advisors.  Vigna Decl. Ex. 139 (*BTA Bank appoints UBS as additional financial adviser*, Debtwire (Apr. 9, 2009)); Robertson Aff.[3] at ¶ 5.

<u>Plaintiffs</u>:  Not disputed.

113.    The next day, BTA announced that it had received notices from creditors accelerating the indebtedness owed to them.  Vigna Decl. Ex. 134 (FFB Decl.) at Ex. 3; Vigna Decl. Ex. 3 (2010 IM) at 5.

<u>Plaintiffs</u>:  Not disputed.

114.    As a result, BTA ceased all principal and interest payments on its existing indebtedness until it could reach agreement with creditors on a program for managing its debt position.  Vigna Decl. Ex. 134 (FFB Decl.) at Ex. 4; Vigna Decl. Ex. 3 (2010 IM) at 6.

<u>Plaintiffs</u>:  Not disputed.

---

[3] All references to "Robertson Aff." are to the Affidavit of James Robertson, dated July 2, 2019.

115.    A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank was unable to monitor the collateral or the financial performance of the borrowers.  Vigna Decl. Ex. 3 (2010 IM) at 153.

Plaintiffs:  Not disputed.

116.    In May 2009, the Bank breached FMSA's liquidity requirements.  Vigna Decl. Ex. 3 (2010 IM) at 156.

Plaintiffs:  Not disputed.

117.    After the Bank breached its regulatory requirements, it entered into an agreement with FMSA on May 22, 2009 to develop a plan of restructuring and recapitalization by June 10, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 156.

Plaintiffs:  Not disputed.

118.    BTA presented a preliminary plan on June 10, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 156.

Plaintiffs:  Not disputed.

119.    While in most countries it is always a debtor's right simply to propose a plan of reorganization and to have creditors vote on it on a "take-it-or-leave-it" basis, some debtors try to form creditors' steering committees with whom to negotiate from the outset.  Such a committee generally contains representatives of all creditor classes, is provided company-paid financial and legal advisors, is granted access to the company's financial records and management and is empowered to make its own restructuring proposals.  While such a process can be more expensive and time-consuming than a debtor-driven process, it can help reduce avoidable problems in proposed plans, build inter-creditor consensus, bolster non-participants' confidence

in the result and lead to higher approval rates and more successful post-restructuring outcomes. Rauch Decl.[4] at ¶¶ 5-7, 9-10; Robertson Aff. at ¶ 10; Vigna Decl. Ex. 125 (Favale Tr.) at 77-78.

Plaintiffs: Plaintiffs do not dispute Defendants' general assertions about restructuring steering committees, their purpose, and the potential benefits of the same (*i.e.*, a steering committee "*can* help reduce avoidable problems … and lead to … more successful post-restructuring outcomes"). However, the process was unsuccessful in the case of the 2010 Restructuring because BTA did not disclose the Undisclosed SK Deposit Omission, as part of the Negative Carry Swap, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40. Also, Plaintiffs were not members of the Steering Committee. Vigna Decl. Ex. 3 (2010 IM) at 42.

120. On July 23, 2009, BTA met with certain of its creditors in London to establish a steering committee of creditors (the "Steering Committee"). Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 6; Vigna Decl. Ex. 3 (2010 IM) at 6.

Plaintiffs: Not disputed.

121. The Steering Committee was established to transparently negotiate the BTA restructuring on behalf of all creditors. Vigna Decl. Ex. 3 (2010 IM) at 6, 42.

Plaintiffs: Plaintiffs do not dispute that the Steering Committee was established to negotiate the restructuring on behalf of all creditors or the Steering Committee's intent was to do so transparently. As set forth in Plaintiffs' Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, however, this process was not transparent in the case of the 2010 Restructuring due to the Undisclosed SK Deposit Omission as part of the Negative Carry Swap.

---

[4] All references to "Rauch Decl." are to the Declaration of Robert Rauch, dated July 2, 2019.

122.     Additionally, Lazard Fréres and UBS were the Financial Advisors to BTA in the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at I; Vigna Decl. Ex. 125 at (Favale Tr.) at 77:6-21, 84:17-85:9; Robertson Aff. at ¶ 6.

Plaintiffs:  Not disputed.

123.     The independent auditors who assisted on the 2010 Restructuring included Deloitte Touche Tohematsu Ltd. ("Deloitte"), PricewaterhouseCoopers ("PWC"), KPMG, and Ernst & Young LLP.  Vigna Decl. Ex. 3 (2010 IM) at. 26.

Plaintiffs:  Not disputed.

124.     The parties' counsel included White & Case LLP, Baker & McKenzie LLP, Field Fisher Waterhouse LLP, Lovells, and Allen & Overy LLP. Vigna Decl. Ex. 3 (2010 IM) at 13; Vigna Decl. Ex. 125 (Favale Tr.) at 125:3-12; Rauch Decl. at ¶ 10.

Plaintiffs:  Not disputed.

125.     All of BTA's formal presentations to the Steering Committee or other investor groups were made available to the public.  Vigna Decl. Ex. 125 (Favale Tr.) at 125:13-20.

Plaintiffs:  Not disputed that Favale testified BTA's formal presentations to the Steering Committee or other investor groups were made available to the public on BTA's website.

126.     Robert Rauch, head of the Steering Committee in the 2010 Restructuring, testified that the sole purpose of the 2010 Restructuring was to restructure BTA's crushing debt load so it could have an opportunity to try to create value for Plaintiffs and all of BTA's other stakeholders.  Rauch Decl. at ¶ 2, 6-7; Vigna Decl. Ex. 3 (2010 IM) at 10.

Plaintiffs:  Not disputed that Rauch testified as to the intended purpose of the 2010 Restructuring.

A.     **Steering Committee Sophistication and Negotiations**

127.    The Steering Committee for the 2010 Restructuring was composed of some of the most sophisticated creditors in the world, including:  (i) The Royal Bank of Scotland N.V. (formerly known as ABN AMRO Bank N.V.); (ii) Commerzbank Aktiengesellshaft; (iii) D.E. Shaw Oculus International, Inc.; (iv) Euler Hermes Kreditversicherungs AG (acting for and on behalf of the Federal Republic of Germany); (v) Fortis Investment Management UK Limited; (vi) Gramercy Advisors LLC; (vi) The Bank of Singapore Limited Investment Management UK Limited; (vii) KfW (representing its affiliates DEG – Deutsche Investitions – und Entwicklungsgessellschaft mbH and KfW IPEX-Bank GmbH); (viii) Standard Charter Bank; (ix) Export-Import Bank of the United States; and (x) Walls Fargo Bank N.A.  Vigna Decl. Ex. 3 (2010 IM) at 42; Robertson Aff. at ¶ 11; Rauch Aff. at 3.

Plaintiffs:  Not disputed.

128.    The Steering Committee was advised by Baker & McKenzie, a world-class law firm, and Deloitte, one of the Big Four accounting firms, as its financial advisor to ensure that the restructuring was financially sound and compliant with relevant law.  Vigna Decl. Ex. 3 (2010 IM) at 13, 655, 657; Robertson Aff. at 12; Rauch Decl. at ¶ 4, 10.

Plaintiffs:  Plaintiffs do not dispute that the Steering Committee and its advisors' stated intention was to ensure that the restructuring was financially sound and compliant with relevant law.  However, Plaintiffs dispute that they did so.  As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap—which resulted in a restructuring that was not financially sound or compliant with relevant law.

129.     The Steering Committee succeeded in negotiating several significant creditor protections, including obtaining two long-term creditor designee appointments to BTA's board of directors.  Vigna Decl. Ex. 3 (2010 IM) at 8; Vigna Decl. Ex. 127 (Prosyankin Tr.) at 60:18-20; Robertson Aff. at ¶ 14; Rauch Decl. at ¶ 6-8.

Plaintiffs:  Not disputed.

130.     The new board of directors was composed of nine members: two creditor directors, three independent directors, and four directors from SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 256.

Plaintiffs:  Not disputed.

131.     These creditor directors could not be removed from the board by SK Fund for at least three years following the 2010 Restructuring.  Vigna Decl. Ex. 3 (2010 IM) at 28, 257.

Plaintiffs:  Not disputed.

132.     The creditor directors were granted veto powers over all "Qualified" matters, including decisions related to: (i) Auditors, Advisers and Procedures; (ii) Securities Issuance or Amendments; (iii) Additional Debt; (iv) Board, Management Board and Executives; (v) Business Plan and Accounts; (vi) Contracts; (vii) Lending Practices; (viii) Capital Expenditures; (ix) Dividends; and (x) Litigation.  Rauch Decl. at ¶ 8; Robertson Aff. at ¶ 14; Vigna Decl. Ex. 3 (2010 IM) at 8, 19, 71, 76-83.

Plaintiffs:  Not disputed.

133.     The creditor directors that joined the BTA board were able to ensure that creditor views were considered in all BTA corporate decision-making going forward – including how to implement BTA's business plan post-restructuring, how to manage BTA's asset recovery efforts

and, ultimately, whether to seek a second restructuring. Vigna Decl. Ex. 3 (2010 IM) at 259; Rauch Decl. at ¶ 8-9.

> Plaintiffs:  Not disputed.

134.    On August 19, 2010 the Shareholders of the Bank approved a new regulation on the Board of Directors and amended the membership of the Board of Directors to include the creditor directors: Mr. Christoph Schoefboeck and Mr. Maarten Leo Pronk.  Vigna Decl. Ex. 10 (BTA Bank Prospectus, dated February 14, 2011) at BTA_00003072; Rauch Decl. at ¶ 8.

> Plaintiffs:  Not disputed.

135.    Mr. Shoefboeck is an experienced operating and risk officer with experience that includes Member of the Management Board and president of the Management Board of at Erste & Steiermärkische Bank d.d., Chief Operating Officer and a Member of the Management Board of ZAO Raiffeisenbank, Chief Risk Officer and Chief Operating Officer of HVB Splitska banka, authorized Representative and a Member of the Management Board of HVB Croatia d.d.  Vigna Decl. Ex. 111 (Bloomberg Executive Profile Christoph Schoefboeck, *available at* https://www.bloomberg.com/research/stocks/private/person.asp?personId=25938877&privcapId =13292262.); Rauch Decl. at ¶ 8.

> Plaintiffs:  Not disputed that the cited website and declaration contain language that is consistent with Defendants' statements.

136.    Mr. Pronk has previously held positions of Regional Manager-Russia at Coöperatieve Rabobank UA, Country Manager-Russia at Coöperatieve Rabobank UA, Director-Europe Region & Managing Director-London at Banco Santander Río SA, Acting Chairman at Nikoil Investment Banking Group, Chairman of Fortis Life Insurance Russia, General Manager of ING Bank NV, and Regional Manager-Russia & Ukraine at Fortis Bank (Nederland) NV.

Vigna Decl. Ex. 112 (Maarten Leo Pronk – Biography, *available at*

https://www.marketscreener.com/business-leaders/Maarten-Pronk-0B0S5L-E/biography/);

Rauch Decl. at ¶ 8.

>  Plaintiffs:  Not disputed that the cited website contains language that is consistent with
>
>  Defendants' statements.

137.    From September 14-17, 2009, the Steering Committee held meetings with Bank

advisers in London.  Vigna Decl. Ex. 3 (2010 IM) at 6.

>  Plaintiffs:  Not disputed.

138.    The Steering Committee and its advisors spent thousands of hours combing

through BTA's finances and considering potential options for operating or disposing of

subsidiaries, governance changes, risk management, human resources, management of a

"troubled assets portfolio," recovery strategies, trade finance and debt restructurings, among

other things.  *See* Rauch Decl. at ¶ 7-9; Robertson Aff. at ¶¶ 12-15; Vigna Decl. Ex. 23 (BTA

August 18, 2009 Presentation Agenda) at Gramercy-BTA 005982.

>  Plaintiffs:  Plaintiffs do not dispute that the Steering Committee reviewed BTA's finances
>
>  and considered potential options for BTA.  However, Plaintiffs dispute that they were
>
>  provided with all material financial information as part of this process.  As set forth in
>
>  Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted
>
>  material financial information—the Undisclosed SK Deposit Omission as part of the
>
>  Negative Carry Swap.

139.    At the outset of negotiations, BTA informed the Steering Committee that it

intended to sue members of former management – most prominently, former chairman Muktar

Ablyazov – to attempt to recover as many improperly disbursed assets as possible. Vigna Decl. Ex. 23 (BTA August 18, 2009 Presentation Agenda) at Gramercy-BTA 005982.

> Plaintiffs: Not disputed.

140. The Steering Committee also successfully negotiated for the creditors' ability to participate in BTA's asset recovery process going forward through the receipt of "Recovery Units." Vigna Decl. Ex. 5 (Memorandum of Understanding as to Certain Restructuring Principles, September 21, 2009) Schedule C at 20; Vigna Decl. Ex. 125 (Favale Tr.) at 248:2-20; Robertson Aff. at 14; Rauch Decl. ¶ 6-9.

> Plaintiffs: Not disputed.

141. The Steering Committee proposed – and BTA accepted – that the Bank's existing creditors share in such recoveries (if any) because the apparent uncollectibility of the management "loans" contributed to the "haircuts" the Bank's creditors were being asked to accept. Vigna Decl. Ex. 125 (Favale Tr.) at 247:13-248:20; 252:16-253:2; Robertson Aff. at ¶ 14; Rauch Decl. at ¶ 9.

> Plaintiffs: Not disputed.

142. The Steering Committee also negotiated to have SK Fund agree to less advantageous terms than the rest of BTA's creditors. In particular, the Steering Committee sought to have SK Fund accept a small amount of additional BTA equity in exchange for forgiveness of the KZT 645 billion in BTA Bonds that SK Fund then held and agree not to accept any dividends on that equity other than in highly circumscribed situations. Rauch Decl. at ¶ 8-9; Vigna Decl. Ex. 124 (Howes Tr.) at 62:19-64:13; 156:5-157:18; Rauch Decl. at ¶ 6.

> Plaintiffs: Plaintiffs do not dispute that the Steering Committee and SK Fund negotiated that SK Fund would agree to less advantageous terms than the rest of BTA's creditors.

However, Plaintiffs dispute that SK Fund actually abided by these negotiated terms. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA omitted material financial information from the Steering Committee—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap—and SK Fund circumvented the dividend restriction and received the benefit of the same.

143. In addition to negotiating the terms of the 2010 Restructuring itself, the Steering Committee actively sought changes to the Information Memorandum and signed off on the Information Memorandum. Vigna Decl. Ex. 124 (Howes Tr.) at 145:22-146:10, 147:16-148:8.

Plaintiffs: Plaintiffs do not dispute that the Steering Committee sought changes to the Information Memorandum and signed off on the Information Memorandum. However, Plaintiffs dispute that BTA disclosed to the Steering Committee and in the Information Memorandum all material financial information as part of this process. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap.

144. In light of the foregoing, the 2010 IM was a product of substantial negotiations among some of the world's most sophisticated parties and advisors. *See* Robertson Aff. at ¶ 11-15; Rauch Decl. at ¶ 7-8; Vigna Decl. Ex. 125 (Favale Tr.) at 31-32, 74, 168, 191-93, 252-53.

Plaintiffs: Plaintiffs do not dispute that the 2010 IM was a product of substantial negotiations among the parties and advisors. However, Plaintiffs dispute that these negotiations were had on a level playing field. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap.

LEGAL\42685072\1

145.     Throughout the process of negotiating with the Steering Committee, it was understood that BTA could not pay its existing debts in full and that its notes, in particular, would need to be exchanged for new, less financially burdensome, securities. Vigna Decl. Ex. 26 (BTA Restructuring Update ("Road Show"), dated May 17-21, 2010) at 15, 17, 21.

Plaintiffs:  Not disputed.

146.     The agreement with the Steering Committee also put significant limited on SK Fund's ability to control BTA, as SK Fund could not remove the three independent directors as a matter of Kazakhstani corporate law, and could not remove the two creditor-appointed directors for the first three years as a matter of contract. Vigna Decl. Ex. 3 (2010 IM ) at 72, 257.

Plaintiffs:  Not disputed. However, SK Fund still controlled BTA in significant respects. SK Fund appointed the Chairman of the Management Board (Plaintiffs' 56.1 Response Statement, at ¶¶ 61, 64); the Board of Directors, which consisted of four SK Fund directors and a fifth director appointed by SK Fund (Vigna Decl. Ex. 24 (BTA Presentation) at Atlantica 000001227-28), voted on important BTA decisions (Vigna Decl. Ex. 124 (Howes Tr.) at 54:10-15); and the evidence that is available during the relevant period shows that SK Fund was involved in important matters relating to BTA, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40. Indeed, the 2010 IM recognized SK Fund's control over BTA in a risk factor: "The Bank will be controlled by Samruk-Kazyna, Kazakhstan's sovereign wealth fund, whose interests may differ from the interests of the Bank or the Claimants." Vigna Decl. Ex. 3 (2010 IM) at 120.

**B.     The "Base Case Model"**

147.     The parties to the 2010 Restructuring used a financial model called the "Base Case Model" in discussions regarding the terms of the 2010 Restructuring. Vigna Decl. Ex. 3 (2010 IM) at 136.

<u>Plaintiffs</u>: Not disputed.

148. This Base Case Model was prepared by the financial advisors of the Bank, Lazard Freres and UBS. Vigna Decl. Ex. 6 (BTA Bank Business Plan – Preliminary Analysis, dated April 18, 2010 ("Base Case Model")) at Cover Page; Vigna Decl. Ex. 3 (2010 IM) at 23.

<u>Plaintiffs</u>: Plaintiffs dispute Defendants' assertion that the Base Case Model, also known as the "Lazard Model," was prepared by UBS. It was prepared by Lazard, alone, as expressly stated in the Declaration of UBS's co-lead investment banker for the 2010 Restructuring. *See* Robertson Aff. at ¶ 16 ("Lazard created a financial model in this way for BTA, which was referred to as, the 'Lazard Model' of [sic] the 'Base Case Model.' I refer to it in this statement as the 'Lazard Model.'"). UBS's role in the 2010 Restructuring was focused on "liability management," which "entails managing the maturities of the assets and liabilities of a company to maintain a healthy balance sheet and liquidity." *Id.* at ¶¶ 2, 5. "Liability management was where UBS's expertise lay." *Id.* at ¶ 5. On the other hand, "Lazard was a market leader in terms of restructuring." *Id.* at ¶ 6. Notably, Defendants did not offer a declaration from Lazard in support of their motion for summary judgment.

149. The Base Case Model was also thoroughly reviewed and revised, as appropriate, by Deloitte. Vigna Decl. Ex. 3 (2010 IM) at 14.

<u>Plaintiffs</u>: Plaintiffs do not dispute that the Base Case Model was reviewed and revised by Deloitte. However, Plaintiffs dispute that BTA provided Deloitte with all material financial information as part of its review. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial

information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap—from Deloitte.

150.    The Base Case Model needed to be finalized at a certain point.  Robertson Aff. at ¶ 17.

Plaintiffs:  Not disputed.

151.    The Base Case Model was not expected to be completely up-to-date at the date of its dissemination, and its underlying assumptions could change rapidly, as the IM expressly warned.  Robertson Aff. at ¶¶ 17-18; Vigna Decl. Ex. 3 (2010 IM) at 130.

Plaintiffs:  Defendants' citations to the factual record do not support their assertions, which violates Local Civil Rule 56.1(d) ("Each statement by the movant … must be followed by a citation to evidence which would be admissible … .").  As such, no response is required.

Nevertheless, Plaintiffs respond as follows:  Plaintiffs do not dispute that the Base Case Model's forward-looking assumptions and forecasts were not guaranteed to come to fruition, and that this was disclosed in the 2010 IM.  However, the Base Case Model was built on BTA's historical and current financial information as a baseline.  Vigna Decl. Ex. 113 (Clark Report) at 7-9; Vigna Decl. Ex. 129 (Clark Tr.) at 90-91, 102, 400; Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 51-52; Vigna Decl. Ex. 130 (Kapoor Tr.) at 159, 237, 239-240.  From there, the Bank's performance was forecasted into the future.  *Id.* Plaintiffs dispute Defendants' assertion to the extent it suggests that historical data in the Base Case Model was not expected to be complete and accurate as of the date the model was finalized.  *Id.*; Vigna Decl. Ex. 130 (Kapoor Tr.) at 239:2-240:24 ("You don't build a

model for it to fail. You build a model and negotiate the terms such that it passes. Though, the disclosure -- though, the disclosure is what it is. The restructuring would never have taken place under those terms if these ratios were failing. And they wouldn't have been an information memorandum that states the ratios fail and are projected to continue failing."). Nor could BTA disclaim away an inaccurate historical information with risk disclosures about future assumptions and projections. Vigna Decl. Ex. 129 (Clark Tr.) at 100:13-25 ("Q. … And you are aware there are also several risk disclosures about the model and whether it would be achievable? You have reviewed those? A. The risk disclosures disclose risks about the future, about the uncertainty and the factors which determine the uncertainty of the future. As I think -- I hope I was clear in saying, I was not talking about the future. I was talking -- referring to the past -- what is in the past."); *id.* at 90-91, 102, 400. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap—in the Base Case Model.

152.    The final iteration of the Base Case Model was dated April 18, 2010. Vigna Decl. Ex. 9 (Base Case Model) at cover page; Vigna Decl. Ex. 3 (2010 IM) at 4.

Plaintiffs:  Not disputed.

153.    The Base Case Model was merely intended to guide negotiations between the Steering Committee and the Bank. Robertson Aff. at 16-18.

Plaintiffs:  Plaintiffs do not dispute that the Base Case Model was intended to guide negotiations between the Steering Committee and the Bank. However, the Base Case Model was built on BTA's historical and current financial information as a baseline,

which was expected to be correct.  *See* Plaintiffs' 56.1 Response Statement, at ¶ 151.  The

Base Case Model also served as a basis for the 2010 Restructuring itself, and it was

incorporated into the 2010 IM accordingly, because it was used to negotiate the

"haircuts" BTA's creditors would take.  Vigna Decl. Ex. 125 (Favale Tr.) at 122:2-19.

154.    The Base Case Model was not intended to be "plug-and-play" with respect to

individual inputs.  Significant new inputs would, at the least, require reexamination of model

assumptions and require re-tuning of the model.  Robertson Aff. at 17.

Plaintiffs:  Defendants' citation to the factual record does not support this assertion,

which violates Local Civil Rule 56.1(d) ("Each statement by the movant … must be

followed by a citation to evidence which would be admissible … .").  Paragraph 17 of

Mr. Robertson's declaration does not discuss the functionality of the Base Case Model at

all.  Nor would Mr. Robertson be competent to testify to the same, because he admits that

the model, which he himself calls the Lazard Model, was prepared by Lazard and not

UBS.  (Robertson Aff. at ¶ 16.)  As such, no response is required.

155.    In addition, the Base Case Model was conservative by nature.  Robertson Aff. at

16-18.

Plaintiffs:  Defendants' citation to the factual record does not support this assertion,

which violates Local Civil Rule 56.1(d) ("Each statement by the movant … must be

followed by a citation to evidence which would be admissible … .").  Paragraphs 16-18

of Mr. Robertson's declaration do not state the Base Case Model was conservative by

nature.  Nor would Mr. Robertson be competent to testify to the same, because he admits

that the model, which he himself calls the Lazard Model, was prepared by Lazard and not

UBS.  (Robertson Aff. at ¶ 16.)  As such, no response is required.

LEGAL\42685072\1

156.    For example, the Base Case Model predicted that BTA would have a K1-1 regulatory capital ratio of 5.34% in 2010.  Vigna Decl. Ex. 9 (Base Case Model) at Key Assumptions, G93.

Plaintiffs:  Not disputed.

157.    For the same year, BTA's *actual* K1-1 capital ratio was 13.8%, nearly tripling the expectation.  Vigna Decl. Ex. 16 (2010 BTA Financial Statements) at 67.

Plaintiffs:  Plaintiffs do not dispute that BTA's 2010 financial statements reported its K1-1 capital ratio was 13.8%.  However, BTA's reported capital ratio was the product, at least in part, of accounting machinations.  In a June 2011 presentation comparing Base Case Model projections to BTA's 2010 financial statements, Lazard noted that "[i]nterest income is artificially inflated by accrued interests on NPLs which were not written-off from the balance sheet.  In particular, interests continue to accrue on problem loans ….  In total, actual accrued interests exceed projected accrued interests by more than KZT 120 billion, which artificially reduces the real income gap between interest income and expenses."  Elkin Decl. Ex. 12 (Lazard Comparison Model/ Actual Results dated June 2011) at 3; Vigna Decl. Ex. 130 (Kapoor Tr.) at 227:1-230:24.  Plaintiffs could not investigate the 2010 audit further because BTA did not produce a 30(b)(6) deponent with any knowledge of BTA's annual audits, including Ernst & Young's audit of BTA's 2010 financial statements.  Vigna Decl. Ex. 126 (Nartay Tr.) at 96:17-97:6 ("Q.  I said as you sit here today do you have any basis to provide testimony about E&Y's audit of the 2010 financial statements?  A.  Yes, but from the financial statement itself -- Q.  Well --  A.  -- I just looked through the financial statements.  Q.  So what I'm asking you is putting aside what they wrote in the financial statements, do you have any information about the

discussions that occurred within the bank with E&Y concerning the preparation of the 2010 financial statements? A. No, I do not have any information.")

158. Similarly, the K1-2 capital ratio was predicted to be 6.40%. Vigna Decl. Ex. 9 (Base Case Model) at Key Assumptions, G94. For the same year, BTA's *actual* K1-2 capital ratio was 15.0%, more than doubling the expectation. Vigna Decl. Ex. 16 (2010 BTA Financial Statements) at 67.

> Plaintiffs: Plaintiffs do not dispute that BTA's K1-2 capital ratio was predicted to be 6.40% and the 2010 financial statements reported its K1-2 capital ratio was 15.0%. However, BTA's reported capital ratio was the product, at least in part, of accounting machinations, as discussed in Plaintiffs' 56.1 Response Statement, at ¶¶ 157.

159. Furthermore, the 2010 IM expressly warned investors that the financial advisors' "Base Case Model" "is a tool used by the Bank for illustrative modelling purposes, and no amounts included in it or derived from it should be construed as a forecast by the Bank or any other person of any results of the Bank." Vigna Decl. Ex. 3 (2010 IM) at 136.

> Plaintiffs: Plaintiffs do not dispute that the 2010 IM makes this disclosure. However, the Base Case Model was built on BTA's historical and current financial information as a baseline, which was expected to be correct. The Base Case Model also served as a basis for the 2010 Restructuring itself, and it was incorporated into the 2010 IM accordingly, because it was used to negotiate the "haircuts" BTA's creditors would take. *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 151, 153.

160. The Bank accepted no responsibility for the Base Case Model or the business plan prepared as of September 4, 2009. Vigna Decl. Ex. 3 (2010 IM) at 136.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM makes this disclosure.  However, the Base Case Model was built on BTA's historical and current financial information as a baseline, which was expected to be correct.  The Base Case Model also served as a basis for the 2010 Restructuring itself, and it was incorporated into the 2010 IM accordingly, because it was used to negotiate the "haircuts" BTA's creditors would take.  *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 151, 153.

161.    Those with claims against the Bank were instructed not to "form any decisions based upon either of these documents." Vigna Decl. Ex. 3 (2010 IM) at 136.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM makes this disclosure.  However, the Base Case Model was built on BTA's historical and current financial information as a baseline, which was expected to be correct.  The Base Case Model also served as a basis for the 2010 Restructuring itself, and it was incorporated into the 2010 IM accordingly, because it was used to negotiate the "haircuts" BTA's creditors would take.  *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 151, 153.

162.    The 2010 IM also noted that the "lack of accurate statistical, corporate and financial information in Kazakhstan may limit the ability of the Bank to assess its credit risks accurately."  Vigna Decl. Ex. 3 (2010 IM) at 129.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM makes this disclosure.  However, the Base Case Model was built on BTA's historical and current financial information as a baseline, which was expected to be correct.  The Base Case Model also served as a basis for the 2010 Restructuring itself, and it was incorporated into the 2010 IM accordingly, because it was used to negotiate the "haircuts" BTA's creditors would take.  *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 151, 153.

LEGAL\42685072\1

163.     Relatedly, the 2010 IM disclosed that if "circumstances arise that the Bank has not identified or anticipated in developing its statistical models, its losses could be greater than expected." Vigna Decl. Ex. 3 (2010 IM) at 125.

> Plaintiffs:  Plaintiffs do not dispute that the 2010 IM makes this disclosure.  However, the Base Case Model was built on BTA's historical and current financial information as a baseline, which was expected to be correct.  The Base Case Model also served as a basis for the 2010 Restructuring itself, and it was incorporated into the 2010 IM accordingly, because it was used to negotiate the "haircuts" BTA's creditors would take. *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 151, 153.

164.     On May 7, 2010, after the Base Case Model was finalized, BTA announced that it had entered into certain material transactions with SK Fund, namely the bond capitalization and deposit agreements contemplated in the 2010 IM.  Vigna Decl. Ex. 44 (Email correspondence from Ian Jack dated May 7, 2010) at GRAMERCY-BTA 012149.

> Plaintiffs:  Disputed.  The press release cited in this email merely provides that BTA entered into a "major transaction" with SK Fund and does not reference the bond capitalization or the Undisclosed SK Deposit (or its purpose and effect) at all.  Nor is the Undisclosed SK Deposit disclosed in the Base Case Model or the 2010 IM, which was republished as of June 2, 2010.  Vigna Decl. Ex. 9 (Base Case Model); ███████████ ████████████████████████████████████████ ██████████████████████████ Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20 ("Q.  So are you aware of there being a supplement to this Information Memorandum that disclosed the deposits relating to the S-K bonds, the 11% deposits?  A.  No."); Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10

(Does the Information Memorandum disclose the fact that S-K Fund intended to repay the S-K bonds with funds that accumulated in the term deposit accounts? [Objections.] A. I don't recall that specifically.").

165.     From May 17 through 21, 2010, BTA held a "road show" in Almaty, Hong Kong, Singapore, Zurich and London where investors could ask questions in person, including about the base case model, and also made the "road show" presentation available on its website, and held investor calls where smaller creditors could ask questions.  Vigna Decl. Ex. 26 (BTA Restructuring Update ("Road Show"), dated May 17-21, 2010) at BTA_00054688; Robertson Aff. at ¶ 21-23.

        Plaintiffs:  Not disputed.

166.     Consistent with the disclosures regarding the Base Case Model, the Bank announced in the "road show," after preparation of the Base Case Model but before the vote on the 2010 Restructuring, that it was already falling behind some of the projections in the Base Case Model and business plan.  Vigna Decl. Ex. 26 (BTA Restructuring Update ("Road Show"), dated May 17-21, 2010) at 12.

        Plaintiffs:  Plaintiffs do not dispute that BTA disclosed that it was falling behind on some of its some of the forward-looking loan restructuring projections in the Base Case Model and business plan.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA updated or corrected the previous Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶ 13-40, which were never updated or corrected by BTA.  Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 44.

## VI.  THE STEERING COMMITTEE AND BTA AGREED ON THE TERMS OF THE 2010 RESTRUCTURING

167.    Negotiations between BTA and the Steering Committee ended on April 18, 2010. Vigna Decl. Ex. 3 (2010 IM ) at 7; Vigna Decl. Ex. 6 (Summary of Key Terms and Conditions of Restructuring, dated April 18, 2010).

Plaintiffs:  Not disputed.

168.    Following months of discussions in London and Kazakhstan, BTA and the Steering Committee agreed on terms of a proposed restructuring of BTA's $16.7 billion of financial indebtedness (the "Restructuring Plan").  Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 7 and Ex. 8; Vigna Decl. Ex. 8 (Summary of Key Terms and Conditions of Restructuring, dated April 18, 2010); Robertson Aff. at ¶ 13.

Plaintiffs:  Plaintiffs do not dispute BTA and the Steering Committee agreed on the Restructuring Plan.  However, Plaintiffs dispute that the Restructuring Plan was agreed on a level playing field.  As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap.

169.    The Restructuring Plan was the second of a two-part effort to stabilize BTA, the first having been the initial injection of KZT 212 billion in capital and exchange of SK Fund and BTA bonds.  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-19.

Plaintiffs:  Not disputed.

## VII.  THE 2010 INFORMATION MEMORANDUM

170.    The terms of the Restructuring Plan were set forth in an Information Memorandum.  *See generally* Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 123 (Khamis Tr.) at 156:19-23.

Plaintiffs:  Plaintiffs do not dispute that the Restructuring Plan was set forth in the 2010
IM.  However, Plaintiffs dispute that the Restructuring Plan included all material
financial information known by BTA.  As set forth in Plaintiffs' 56.1 Affirmative
Statement, at ¶¶ 13-40, BTA misrepresented and omitted material financial
information—the Undisclosed SK Deposit Omission as part of the Negative Carry Swap.

171.    The 2010 IM was prepared by BTA's Management Board with the input of the
Steering Committee, and with the advice of various professionals, including legal, financial, and
banking professionals.  Vigna Decl. Ex. 124 (Howes Tr.) at 147:14-148:8; Vigna Decl. Ex. 3
(2010 IM) at 5-12 (section entitled "Letter from the Chairman of the Management Board of the
Bank").

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM was prepared by BTA's
Management Board with the input of the Steering Committee, and with the advice of
various professionals.  However, Plaintiffs dispute that the Steering Committee and the
professionals were given all material financial information known by BTA as part of this
process.  As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, BTA
misrepresented and omitted material financial information—the Undisclosed SK Deposit
Omission as part of the Negative Carry Swap.

172.    The Steering Committee met with its advisors and White & Case in London to
negotiate the terms of the 2010 Restructuring and the contents of the 2010 IM.  Vigna Decl. Ex.
3 (2010 IM) at Cover Page, 6-7.

Plaintiffs:  Plaintiffs do not dispute that Steering Committee met with its advisors and
White & Case in London to negotiate the terms of the 2010 Restructuring and the
contents of the 2010 IM.  However, Plaintiffs dispute that these negotiations were had on

- 48 -

a level playing field.  As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40,

BTA misrepresented and omitted material financial information—the Undisclosed SK

Deposit Omission as part of the Negative Carry Swap.

173.     The initial Information Memorandum was dated May 1, 2010.  Vigna Decl. Ex. 3

(2010 IM) at 353.  BTA published the Information Memorandum to holders of existing

indebtedness by making it available on the BTA website. The Information Memorandum was

only available to individuals who certified on the website that they were either (i) outside the

U.S. and non-U.S. residents or (ii) within the United States and Accredited Investors or QIBs.

*See* Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 10.

Plaintiffs:  Not disputed that Defendants' statements are consistent with the FFB

Declaration.

174.     A consolidated, revised version on the Information Memorandum was issued on

June 2, 2010, and published on BTA's website. Access to that version of the 2010 Information

Memorandum was similarly restricted.  *See* Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 10; Vigna

Decl. Ex. 3 (2010 IM) at cover page.

Plaintiffs:  Not disputed.

175.     SK Fund had no role in preparing the 2010 IM, did not review it before it was

finalized, did not provide any input on its contents, and had no role in crafting or issuing any

representation made by BTA in connection with the restructuring.  Vigna Decl. Ex. 124 (Howes

Tr.) at 145:5-146:18, 150:16-19.

Plaintiffs:  Plaintiffs do not dispute that Howes testified SK Fund had no role with the

preparation of the 2010 IM.  However, Plaintiffs dispute that Howes is a competent

witness to testify about this.  The evidence in the record also reflects that SK Fund had

- 49 -

control over BTA and was involved in key aspects of negotiating the 2010 Restructuring and communicating with the Steering Committee, as well as the post-2010 Restructuring operations of BTA.  *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 61, 64; Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40.

176.    The 2010 IM disclosed, among other things:

    a.    The SK Guarantee and Guarantee Fee. Vigna Decl. Ex. 3 (2010 IM) at. 8, 42.

    b.    The NBK Repo. Vigna Decl. Ex. 3 (2010 IM) at 8.

    c.    The SK Bonds. Vigna Decl. Ex. 3 (2010 IM) at 155.

    d.    The cancellation of the BTA Bonds. Vigna Decl. Ex. 3 (2010 IM) at 8, 324.

    e.    The Recovery Units and all material terms thereto.  Vigna Decl. Ex. 3 (2010 IM) 7, 37, 564.

    f.    That BTA paid depositors between 4% and 12.5%. Vigna Decl. Ex. 3 (2010 IM) at 233.

    g.    That BTA held large amounts of deposits from SK Fund, as much as KZT 310 billion as of September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 175, 232.

    h.    SK Fund deposits were made on standard commercial terms. Vigna Decl. Ex. 3 (2010 IM) at 175.

    i.    BTA held KZT 683 billion of total deposits as of September 30, 2009.  Vigna Decl. Ex. 3 (2010 IM) at 175, 232.

<u>Plaintiffs</u>:  Plaintiffs do not dispute that the 2010 IM makes these disclosures.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Affirmative Statement,

at ¶¶ 13-40.  Defendants admitted that it was not disclosed in the 2010 IM.  *See generally* Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20 ("Q.  So are you aware of there being a supplement to this Information Memorandum that disclosed the deposits relating to the S-K bonds, the 11% deposits?  A.  No."); Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10 (Does the Information Memorandum disclose the fact that S-K Fund intended  to repay the S-K bonds with funds that accumulated in the term deposit accounts?  [Objections.]  A. I don't recall that specifically.")

177.    The IM provided its deposit disclosure as of September 30, 2009 and did not limit the possibility of any depositor increasing the size of its deposit.  *See generally* Vigna Decl. Ex. 3 (2010 IM).

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM discloses certain SK Fund deposits at BTA.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Response Statement, at ¶ 176.

178.    The 2010 IM also disclosed that the average interest rate on deposits (current account and term deposits combined) for NBK and the Government was 8.4%. Vigna Decl. Ex. 3 (2010 IM) at 221.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM discloses this information about SK Fund deposits at BTA.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Response Statement, at ¶ 176.

179.    The average interest paid on BTA debt securities was 12.4%.  Vigna Decl. Ex. 3 (2010 IM) at 221.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM discloses this information about SK Fund deposits at BTA.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Response Statement, at ¶ 176.

180.    In addition, SK Fund estimated the market rate for valuing BTA credit risk at 12.3% when it purchased the KZT 645 billion in bonds in March 2009.  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 30.

<u>Plaintiffs</u>:  Not disputed that the cited financial statements makes this disclosure.

181.    The 2010 IM also disclosed myriad risks that would impact the Bank through the Restructuring, whether or not the Restructuring was successful.  Vigna Decl. Ex. 3 (2010 IM) at 119-44.

<u>Plaintiffs</u>:  Plaintiffs do not dispute that the 2010 IM disclosed various risk.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in Plaintiffs' 56.1 Response Statement, at ¶ 176.  Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures.  Vigna Decl. Ex. 129 (Clark Tr.) at 100:13-25, 90-91, 102, 400.

182.    The 2010 IM noted that Kazakhstan is an Emerging Market.  Vigna Decl. Ex. 3 (2010 IM) at 130.  As stated in the 2010 IM, "Kazakhstan is subject to the risks associated with emerging markets generally," which included "rapid change" that could make the information in the information memorandum "outdated relatively quickly."  Vigna Decl. Ex. 3 (2010 IM) at 130.  For this reason, those with claims against the bank were instructed to "exercise particular care in evaluating the risks involved."  Vigna Decl. Ex. 3 (2010 IM) at 130.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM disclosed various risks.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

183.    The 2010 IM lists the manifold risks present in emerging markets, including: uncertain government support going forward, deficient information reporting systems; economic volatility and uncertainty; otherwise questionable business prospects; existing and emerging competition; personnel challenges and corruption risk; regulatory uncertainty; and less predictable legal enforcement than we are used to in the most established economies.  Vigna Decl. Ex. 3 (2010 IM) at 119-44.

Plaintiffs:  Plaintiffs do not dispute that the 2010 IM disclosed various risks.  However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

184.    The risk disclosures BTA issued in connection with the 2010 Restructuring expressly warned that that the Bank's financial statements had not been audited in some time, that the Bank's proposed new business model was unproven and uncertain, that BTA faced significant competition by domestic and foreign banks, that the Kazakhstani economy was in distress and might not recover, that efforts to recover assets from prior management could not be

predicted, and that the Bank ultimately might not be able to maintain minimum capital adequacy ratios or otherwise continue as a going concern. Vigna Decl. Ex. 3 (2010 IM) at 119-41.

Plaintiffs: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

185.    Specifically, the 2010 Information Memorandum States:

> The Bank is currently in breach of the minimum capital adequacy ratios established by the FMSA [the Kazakh bank regulator]. If the Restructuring is completed as planned, the Bank estimates that its Tier I and total capital adequacy ratios calculated in accordance with FMSA regulations will be 5.3 per cent. and 11.2 per cent, retrospectively, as at 31 December 2010, compared to the minimum [required] levels of 5.0 per cent. and 10.0 per cent . . . . Any further deterioration in the quality of the Bank's loan portfolio after the Restructuring and the consequent need to make impairment provisions may cause the Bank's capital adequacy ratios to fall below the minimum levels . . . . Any failure to comply with the minimum capital adequacy ratios, whether because of the deterioration in the quality of the Bank's loan portfolio or an increase in the minimum capital adequacy requirements, could lead to sanctions and other measures being applied by the FMSA, including forcing the Bank into conservation or mandatory liquidation.

Vigna Decl. Ex. 3 (2010 IM) at 119-20.

Plaintiffs: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim

away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

186.    The 2010 IM describes additional risks relating to why "[t]he effect of local and global conditions on the Bank and the Bank's customers and counterparties, as well as the effect of other events both within and outside the Bank" might negatively affect BTA's loan book and business more generally, including the following:

> The ongoing crisis in the global financial markets and deterioration of general economic conditions have adversely affected the Bank's results of operations and financial condition and could continue to cause them to decline;
>
> A number of significant borrowers, primarily registered outside of Kazakhstan, stopped making payments in 2009 and the Bank has been unable to monitor the collateral (if any) or their financial performance. Many of these borrowers have also ceased to communicate with the Bank and some have unlawfully transferred the collateral securities by the loans;
>
> Given the internal control weaknesses in the Bank, related party transactions with unusual terms not known as at the date of this Information Memorandum may be uncovered in the future and may have further adverse effects on the Bank's financial condition and recovery prospects;
>
> a gradual seasoning of the Group's loan portfolio … may increase the proportion of loan defaults;
>
> As a result of the ongoing financial crisis, the Bank faces greater competition from other banks as larger banks in more stable financial positions will aim to increase their market shares in all sectors of the market; and
>
> The government expects the growth of Kazakhstan's GDP to remain show throughout 2010 as a result of the slow economic recovery, unpredictable commodity prices, volatility in the real estate market, reduced access to credit for both corporates and households and the general weakening of business and consumer confidence in Kazakhstan.  The Bank expects that lower GDP growth will put increasing pressure on the ability of its current borrowers to repay their existing loans and could therefore increase the Bank's losses from non-performing loans, which could

adversely affect the Bank's business, financial condition, results of operations and prospects.

Vigna Decl. Ex. 3 (2010 IM) at 119-41.

> <u>Plaintiffs</u>: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

187.    The IM also stated

> Claimants should also note that emerging economies such as that of Kazakhstan are subject to rapid change and that the information contained in this Information Memorandum may become outdated relatively quickly. Accordingly, claimants should exercise particular care in evaluating the risks involved and must decide for themselves whether, in light of those risks, their decision is appropriate. Claimants are urged to consult with their own legal and financial advisors before making any decision with respect to the Restructuring.

Vigna Decl. Ex. 3 (2010 IM) at 130.

> <u>Plaintiffs</u>: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However, Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176. Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim away knowingly inaccurate historical financial information with forward-looking risk disclosures as set forth in 56.1 Response Statement, at ¶ 181.

188.    The 2010 IM further warned that the forward-looking statements therein were "not guarantees of future performance and that the Bank's actual results of operations, financial

condition and liquidity and the development of the industry in which it operates may differ

materially from those statements made in or suggested by the forward-looking statements

contained in this Information Memorandum." Vigna Decl. Ex. 3 (2010 IM) at 114.

> Plaintiffs: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However,
>
> Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the
>
> Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176.
>
> Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim
>
> away knowingly inaccurate historical financial information with forward-looking risk
>
> disclosures as set forth in 56.1 Response Statement, at ¶ 181.

189.    Consequently, the 2010 IM warned that:

> Nothing in this Information Memorandum or any other document
> issued with or appended to it should be relied on for any purpose
> other than to make a decision on the Restructuring Plan. In
> particular, and without limitation, nothing in this Information
> Memorandum or any other document issued with or appended to it
> should be relied on in connection with the purchase of any shares
> (other than under the Restructuring Plan), or assets of the Bank.
> This Information Memorandum has been prepared in connection
> with the proposal in relation to the Restructuring Plan of the Bank
> under the Restructuring Law.

Vigna Decl. Ex. 3 (2010 IM) at ii; Vigna Decl. Ex. 123 (Khamis Tr.) at 525:18-526:5.

> Plaintiffs: Plaintiffs do not dispute that the 2010 IM disclosed various risks. However,
>
> Plaintiffs dispute this assertion to the extent it suggests that BTA disclosed the
>
> Undisclosed SK Deposit Omission, as set forth in 56.1 Response Statement, at ¶ 176.
>
> Plaintiffs also dispute this assertion to the extent it suggests that BTA could disclaim
>
> away knowingly inaccurate historical financial information with forward-looking risk
>
> disclosures as set forth in 56.1 Response Statement, at ¶ 181.

█████████████████████████████████████

██████████████████████████████████████████

██████████████████

██████████████████

191.     The 2010 IM also highlighted the fact that BTA faced difficulties with its loan

book.  Vigna Decl. Ex. 3 (2010 IM) at 122, 126.

Plaintiffs:  Not disputed.

192.     For these reasons and others, the very first sentence in the 2010 Information

Memorandum states:  "An investment in the New Notes, Shares and GDRs involves a high

degree of risk."  Vigna Decl. Ex. 3 (2010 IM) at i.

Plaintiffs:  Plaintiff does not dispute that the quoted language appears in the 2010 IM.

193.     Due to the extreme risks involved, in the United States the securities issued in

BTA's 2010 restructuring could only be purchased by "Qualified Institutional Buyers" or

"QIBs." Vigna Decl. Ex. 3 (2010 IM) at 311.

Plaintiffs:  Disputed.  Securities issues in the 2010 Restructuring could be purchased in

the United States by QIBs or Accredited Investors.  Vigna Decl. Ex. 3 (2010 IM) at 310-

11.

194.     QIBs are investment companies, insurance companies and other institutional

investors that own and invest a minimum of US$ 100 million on a discretionary basis, or

registered securities dealers that hold at least US$ 10 million in other companies' securities at

any given time.  17 CFR § 144A(a)(1)(i).

Plaintiffs:  Not disputed.

195.    The 2010 IM also incorporated by reference a Deed of Undertaking executed by

SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 40.

Plaintiffs:  Not disputed.

196.    The Deed of Undertaking provided that SK Fund "will undertake that no dividend

other than a Permitted Dividend [as defined in the 2010 IM] shall be paid on the shares."  Vigna

Decl. Ex. 3 (2010 IM) at 74.

Plaintiffs:  Plaintiff does not dispute that the quoted language appears in the 2010 IM.

197.    "Permitted Dividend" is defined as one paid to its *shareholders* more than four

years after the 2010 Restructuring if the Bank met certain criteria of financial health or after the

Bank's new notes had been paid in full.  Vigna Decl. Ex. 3 (2010 IM) at 32.

Plaintiffs:  Not disputed, but Plaintiffs further note that a Permitted Dividend is defined

as "a dividend *or distribution* by the Bank to its Shareholders."  Vigna Decl. Ex. 3 (2010

IM) at 32 (emphasis added).

198.    "Shares" mean "common shares of the Bank."  Vigna Decl. Ex. 3 (2010 IM) at

41.

Plaintiffs:  Not disputed.

199.    SK Fund agreed to this Undertaking because it was a fair treatment for creditors

given SK Fund's payment of normal operational expenses and because of its efforts to protect

creditors in the Restructuring.  Vigna Decl. Ex. 124 (Howes Tr.) at 156:5-157:18.

Plaintiffs:  Plaintiffs do not dispute that Howes testified that the purpose of the Deed of

Undertaking was the fair treatment of creditors in the 2010 Restructuring.  However,

Plaintiffs dispute that Howes is a competent witness to testify about the negotiation of,

purpose for, or SK Fund's contemporaneous understanding of the Undertaking, including

the meaning of "distribution" within the definition of Permitted Dividend.  *See* Plaintiffs' 56.1 Response Statement, at ¶¶ 66.

200.    The Deed of Undertaking did not prohibit SK Fund from receiving other payments, including, without limitation, interest on its deposits.  Vigna Decl. Ex. 124 (Howes Tr.) at 158:16-160:5.

Plaintiffs:  Plaintiffs do not dispute that the Deed of Undertaking did not specifically prohibit SK Fund from receiving other payments, including, without limitation, interest on its deposits.  As Howes testified, his understanding of the Deed of Undertaking (which is completely speculative and without basis (*see* Plaintiffs' 56.1 Response Statement at ¶ 66) was that it would not affect the terms of existing deposits.  Vigna Decl. Ex. 124 (Howes Tr.) at 161:5-162:21.  However, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, the planned Undisclosed SK Deposit, which was not a pre-existing deposit, was contrived to transfer interest income from BTA to SK Fund for a specific purpose and, therefore, circumvented this restriction.

201.    SK Fund always had the intention to sell BTA once it stabilized.  Managing and profiting from banks was not within the ambit of SK Fund's competency and not within its intentions.  This objective was stated to the Steering Committee.  Vigna Decl. Ex. 125 (Favale Tr.) at 237:24-238:16.

Plaintiffs:  Not disputed.

A.    **The SK Guarantee and Guarantee Fee**

202.    In addition to providing the underlying collateral for the NBK Repo, SK Fund was also required to guarantee the repo ("SK Guarantee") because NBK was not permitted to enter into a repo transactions with defaulted banks.  Vigna Decl. Ex. 3 (2010 IM) at 8, 42; Vigna Decl. Ex. 125 (Favale Tr.) at 32:24-33:24; Vigna Decl. Ex. 124 (Howes Tr.) at 165:10-24.

Plaintiffs:  Not disputed.

203.     SK Fund was required to charge a fee for the SK Guarantee because it could not provide a guarantee for no consideration at all under IFRS rules (the "Guarantee Fee").  Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-13.

Plaintiffs:  Not disputed.

204.     The Guarantee Fee was negotiated with the Steering Committee, and was specifically agreed to by the Steering Committee.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15; Vigna Decl. Ex. 125 (Favale Tr.) at 31:23-32:13; Vigna Decl. Ex. 25 (Steering Comm. Presentation, dated March 4, 2010); Rauch Decl. at ¶ 9.

Plaintiffs:  Not disputed.

205.     The Steering Committee agreed that SK Fund could receive the Guarantee Fee, but requested that SK Fund receive a smaller distribution of BTA equity to compensate for the fee than originally planned.  Vigna Decl. Ex. 25 (Steering Comm. Presentation, dated March 4, 2010) at LZ008215; Vigna Decl. Ex. 124 (Howes Tr.) at 303:14-304:15.

Plaintiffs:  Not disputed.

206.     SK Fund agreed with the Steering Committee to direct an additional 3.5% of BTA equity to BTA creditors in exchange for the Guaranty Fee.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:20-304:15; Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-13.

Plaintiffs:  Not disputed.

207.     In an initial term sheet issued in December 2009, SK Fund was to receive additional shares of BTA leading to a total equity position of 85% of the Bank.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15.

Plaintiffs:  Not disputed.

208.     After the Guarantee Fee was added, SK's equity stake was reduced to 81.5% of BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 303:24-304:15.

Plaintiffs:  Not disputed.

209.     SK Fund therefore issued a guarantee on behalf of BTA in exchange for a Guaranty Fee (disclosed in the 2010 IM) in the amount of "fifty per cent. (50 per cent.) of the interest paid from time to time by Samruk-Kazyna to the Bank in relation to any outstanding SK Bonds (i) held by BTA or (ii) which are the subject of a BTA/NBK Repo Transaction, if any . . ." Vigna Decl. Ex. 3 (2010 IM) at 8, 15, 29, 42; Vigna Decl. Ex. 124 (Howes Tr.) at 66:22-68:11.

Plaintiffs:  Not disputed.

210.     The 2010 IM also disclosed that the SK Guarantee had a maximum cost of KZT 6.45 billion in 2010, and KZT 12.9 billion for all of the remaining years of the NBK Repo. Vigna Decl. Ex. 3 (2010 IM) at 41-42.

Plaintiffs:  Not disputed.

211.     SK Fund guaranteed KZT 449 billion in NBK loans to BTA.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 35.

Plaintiffs:  Not disputed.

212.     The liquidity generated as the result of the guarantee was greater than the small fee charged to provide the guarantee.  Vigna Decl. Ex. 125 (Favale Tr.) at 32:3-33:24.

Plaintiffs:  Not disputed.

**VIII.   SK FUND'S PROVISION OF ADDITIONAL SUPPORT IN THE 2010 RESTRUCTURING**

213.     In addition to the initial KZT 212 billion million capital injection made in February 2009, SK Fund also agreed to increase its deposits with BTA in connection with the restructuring.  Vigna Decl. Ex. 124 (Howes Tr.) at 165:6-166:14.

Plaintiffs:  Not disputed, however, Plaintiffs note that these deposits were for the "State Finance Programmes" and not the Undisclosed SK Deposit.  Vigna Decl. Ex. 124 (Howes Tr.) at 166:8-167:1 ("Q.  And so these deposits do not refer to the deposits you were talking about earlier that were related to the repayment of the S-K bonds; is that correct? A.  That's correct.").

214.    As part of the 2010 Restructuring, BTA and the Fund agreed to cancel BTA's $645 million obligation under the BTA Bonds.  Vigna Decl. Ex. 3 (2010 IM) at 8, 324.

Plaintiffs:  Not disputed.

215.    In exchange, SK Fund received more common shares of BTA, increasing its shareholding of BTA to 81.5%.  Vigna Decl. Ex. 124 (Howes Tr.) at 62:15-63:8; Vigna Decl. Ex. 3 (2010 IM) at 8, 176.

Plaintiffs:  Not disputed.

216.    At the time of the cancellation, the BTA Bonds had already accrued KZT 26 billion in coupon payments owed to SK Fund.  Vigna Decl. Ex. 3 (2010 IM) at 8.

Plaintiffs:  Not disputed.

217.    The cancellation of the BTA Bonds therefore amounted to an additional KZT 671 billion that was put into the capital of BTA.  Vigna Decl. Ex. 124 (Howes Tr.) at 302:3-8. Vigna Decl. Ex. 3 (2010 IM) at 8, 146.

Plaintiffs:  Not disputed.

218.    This cancellation changed the terms of the Bond Swap, which had initially been structured so that the same notional amount of bonds would be held by the counterparties until their respective maturity dates in 2024. Vigna Decl. Ex. 124 (Howes Tr.) at 64:16-24.

Plaintiffs:  Not disputed.

LEGAL\42685072\1

219. With one side of the swap cancelled, the Fund had not only provided BTA with hundreds of billions of tenge, but was also facing the prospect of having a KZT 645 billion bond payment due in 2024. Vigna Decl. Ex. 124 (Howes Tr.) at 64:16-65:11.

Plaintiffs: Not disputed.

220. To prepare for this eventuality, SK Fund created what was essentially a "sinking fund," or, in other words, an amount deposited that would earn interest to cancel out a bond obligation at maturity. Vigna Decl. Ex. 124 (Howes Tr.) at 63:19-65:11; Vigna Decl. Ex. 118 (Mason Expert Report) at ¶ 51.

Plaintiffs: Not disputed.

221. SK's deposit was expressly discussed with the Steering Committee no later than April 2010. Vigna Decl. Ex. 42 (Correspondence between Lazard and Deloitte dated April 16, 2010) at BTA_00053509.

Plaintiffs: Disputed. It is unclear what state funding the email from Deloitte to Lazard cited by Defendants—with the subject "$300m government funding," and referencing unspecified government funding of "108 billion KZT or 37 billion KZT"—is referring to. Vigna Decl. Ex. 42 (Correspondence between Lazard and Deloitte dated April 16, 2010) at BTA_00053509. It was not the Undisclosed SK Deposit, which was a KZT 97 billion transfer from a current account to a term deposit account, term deposits of KZT 78 billion, and a term deposit of KZT 29.3 billion. Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40. The email advises that "[i]t certainly is not obvious to me that we or the SC were aware that Kazak government funding of this magnitude was being excluded from the restructuring. As you can imagine, this has caused a great deal of concern." Vigna Decl. Ex. 42 (Correspondence between Lazard and Deloitte dated April 16, 2010) at

BTA_00053509.  There is no evidence in the record that BTA or its advisors ever responded to the Steering Committee's concern.  Instead, BTA discussed Deloitte's inquiry with its advisors Lazard and White & Case over the next two days.  *See generally id.*  Although these communications are protected by the attorney-client privilege, it is clear that BTA understood the amount of government funding subject to Deloitte's inquiry was actually USD 740 million, as someone changed the subject of the email along the way from "$300m government funding" to "Government funding totals US$ 740 million."  Elkin Decl. Ex. 8 (Correspondence between Lazard and Deloitte dated April 16-17, 2010) at  BTA_00292131.  There is no evidence that BTA communicated this revised state funding figure to the Steering Committee.  Moreover, the Undisclosed SK Deposit was never included in the Base Case Model or disclosed in the 2010 IM. Vigna Decl. Ex. 9 (Base Case Model; Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 44-47;

███████████████████████████████████████████████████████

██████████████████████████████████████████ Vigna

Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

222.    On April 29, 2010, BTA's board of directors approved a proposed transaction that SK Fund would deposit up to KZT 180 billion in May or June 2010.  Vigna Decl. Ex. 37 (Extract from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633.

Plaintiffs:  Not disputed, however, Plaintiffs also note that the Undisclosed SK Deposit was contemplated as early as January 2010, and it was never incorporated into the Base Case Model or, as Defendants admit, disclosed (the transaction, its purpose, or its effect)

in the 2010 IM.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 44-47; Vigna Decl. Ex. 9

(Base Case Model); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit

Warning Email); Elkin Decl. E█████████████████████████████████████████

████████; Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex. 125 (Favale

Tr.) at 208:3-10.

223.     The interest would accrue, so that the deposits at maturity, less taxes, would equal

KZT 645 billion, the amount of the SK Bonds.  Vigna Decl. Ex. 37 (Extract from the minutes of

in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at

BTA_00104633.

Plaintiffs:  Not disputed, however, Plaintiffs also note that the purpose for and effect of

the Undisclosed SK Deposit was not disclosed in the 2010 IM.  Vigna Decl. Ex. 115

(Kapoor Report) at ¶¶ 44-47; Vigna Decl. Ex. 9 (Base Case Model); Elkin Decl. Ex. 4

(January 27, 2010 Undisclosed SK Deposit Warning Email); █████████████████

███████████████████████████████████████ Vigna Decl. Ex. 124 (Howes

Tr.) at 167-168; Vigna Decl. Ex. 125 (Favale Tr.) at 208; Vigna Decl. Ex. 3 (2010 IM).

224.     SK Fund did not intend to withdraw any interest at all until 2024, and intended to

turn over all the principal and interest in its deposit accounts to BTA at that time for redemption

of the SK Bonds. Vigna Decl. Ex. 124 (Howes Tr.) at 226:24-227:7; Vigna Decl. Ex. 37 (Extract

from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29,

2010) at BTA_00104633; Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 40.

Plaintiffs:  Not disputed, however, Plaintiffs also note that interest on the Undisclosed SK

Deposit was transferred from BTA to SK Fund's account and that this interest was an

expense item on BTA's income statement.  Vigna Decl. Ex. 124 (Howes Tr.) at 310:4-13

- 66 -

("Q. And I actually do have a follow-up question then, Mr. Howes. Are you certain that actually there was a transfer, whether it's within the bank or not, of any of the interest payments to the Fund S-K account at BTA prior to the end of 2012? THE WITNESS: The balances definitely showed an increase from accumulation of the interest on the accounts, within the deposit account quite specifically, so yes."); Vigna Decl. Ex. 125 (Favale Tr.) at 204:7-11 ("Q. From the bank's perspective, despite the fact that it was accrued, it was still an interest expense that it was paying? A. I should think so, yes."); Vigna Decl. Ex. 125 (Favale Tr.) at 300. Plaintiffs also note that the purpose for and effect of the Undisclosed SK Deposit was not disclosed in the 2010 IM. *See general* Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 167-168; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

225. The account would accrue between 10-12% interest and have a maturity in 2024. Vigna Decl. Ex. 37 (Extract from the minutes of in-person meeting of Board of Directors of BTA No. 4-5, dated April 29, 2010) at BTA_00104633.

Plaintiffs: Not disputed. For clarity, under the terms of the deposit agreements, SK Fund could withdraw substantially all of the funds on deposit at any time without penalty. Vigna Decl. Ex. 38 (Corporate Bank Deposit Contract No. 1489 dated May 13, 2010); Vigna Decl. Ex. 39 (Corporate Bank Deposit Contract No. 1566 1137-u, dated December 20, 2010 (Original and Translation)).

226. These proposed interest rates were actually lower than some interest BTA was paying on much shorter term deposits. Vigna Decl. Ex. 124 (Howes Tr.) at 181:12-184:4.

Plaintiffs: Disputed. As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, the interest rate for the Undisclosed SK Deposit was unreasonably high in the context of

the 2010 Restructuring (Vigna Decl. Ex. 132 (Hrycay Tr.) at 76:6-77:25, 82-83, 86, 112-114; Vigna Decl. Ex. 130 (Kapoor Tr.) at 104:6-22; Vigna Decl. Ex. 45 (JP Morgan Report dated May 18, 2011) at 1**;** Vigna Decl. Ex. 88 (Fitch Ratings for BTA Bank dated January 18, 2011) at 4; Elkin Decl. Ex. 14 (Troika July 2011 Report) at 30), and the interest rate of 11% being paid on the majority of the Undisclosed SK Deposit was higher than the projected interest rates for all other term deposits in the Base Case Model. Vigna Decl. Ex. (Kapoor Report) at ¶ 26; Vigna Decl. Ex. 9 (Base Case Model).

227.    They were also lower than those charged by some other Kazakhstani banks, such as Halyk Bank, on their deposit accounts for the same period.  Vigna Decl. Ex. 124 (Howes Tr.) at 63:19-66:5.

Plaintiffs:  Disputed.  As set forth in Plaintiffs' 56.1 Response Statement, at ¶ 226, the interest rate for the Undisclosed SK Deposit was unreasonably high in the context of the 2010 Restructuring.

228.    The interest on SK Fund's deposit that was to accrue (and eventually return to BTA) was consistent with prevailing rates for deposits in Kazakhstan at the time; the rate reported for time deposits over five years of Nonbanking Legal Entities in April 2010 was 10.5%.  Vigna Decl. Ex. 22 (National Bank of Kazakhstan, Statistical Bulletin, No. 04 (185), April 2010) at 49.

Plaintiffs:  Plaintiffs do not dispute that National Bank of Kazakhstan, Statistical Bulletin, No. 04 reported rate for deposits over five years of Nonbanking Legal Entities in April 2010 was 10.5%.  However, as set forth in Plaintiffs' 56.1 Response Statement, at ¶ 226, the interest rate for the Undisclosed SK Deposit was unreasonably high in the context of the 2010 Restructuring.   Moreover, because SK Fund could withdraw substantially all of

the funds on deposit without penalty at any time comparison to the five year rate for

Nonbanking Legal Entities is inappropriate. Vigna Decl. Ex. 130 (Kapoor Tr.) at 59:23-

60:9; *see also* Vigna Decl. Ex. 38 (Corporate Bank Deposit Contract No. 1489 dated May

13, 2010); Vigna Decl. Ex. 39 (Corporate Bank Deposit Contract No. 1566 1137-u, dated

December 20, 2010 (Original and Translation)).

229.    On May 7, 2010, BTA announced in a press release that it had entered into a

"great deal" with SK Fund, in reference to SK Fund's agreement to convert the SK Bonds into

equity and the creation of the aforementioned deposits, although it did not make specific mention

of the deposits. Vigna Decl. Ex. 138 (Email correspondence from M. Bark-Jones, Dated May

10, 2010) at BTA_00017708-09.

Plaintiffs: Disputed. The press release cited in the email merely provides that BTA

entered into a "great deal" and "major transaction" with SK Fund, and does not reference

the bond capitalization or the Undisclosed SK Deposit (or its purpose and effect) at all.

Vigna Decl. Ex. 138 (Email correspondence from M. Bark-Jones, Dated May 10, 2010)

at BTA_00017708-09. When an attorney for the Steering Committee inquired about the

"major transaction," BTA's attorney responded three days later and only disclosed that it

included the bond capitalization and "the placing of existing SK funds currently held in

BTA current accounts into term deposits," which was a "major transaction" requiring

"board approval" under Kazakh law because "the amounts in the current accounts were

more than KZT 100 billion." *Id.* BTA's attorney did not provide any specifics about the

funds transfer, the additional components of the Undisclosed SK Deposit, or the purpose

and effect of the same. *Id.* Moreover, at no time was any component of the Undisclosed

SK Deposit disclosed in the 2010 IM provided to all creditors, including the Plaintiffs.

Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; *see generally* Vigna Decl. Ex. 3 (2010 IM). Moreover, the term deposit account to which the funds were transferred was a newly created account for that purpose. Vigna Decl. Ex. 124 (Howes Tr.) at 310:4-13.

230. As part of these planned deposits, on May 13, 2010, SK Fund transferred KZT 97 billion from a current account to a term deposit which had an 11% interest rate. Vigna Decl. Ex. 38 (Corporate Bank Deposit Contract No. 1489, dated May 13, 2010 (Original and Translation)) at SK0002264_EN; Vigna Decl. Ex. 12 (SK 2009 Financial Statements) at 40.

Plaintiffs: Not disputed, however, Plaintiffs also note that the Undisclosed SK Deposit was contemplated as early as January 2010, and it was never incorporated into the Base Case Model or disclosed (the transaction, its purpose, or its effect) in the 2010 IM. Vigna Decl. Ex. 9 (Base Case Model); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email); ███████████████████████████████

███████████████████; Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 44-47; Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

231. Between June and September 2010, SK Fund deposited an additional KZT 78 billion, bringing the total amount of the term deposits to KZT 175 billion. Vigna Decl. Ex. 55 (Email correspondence, dated February 7, 2012) at BTA_00105397; Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

Plaintiffs: Not disputed, however, Plaintiffs also note that the Undisclosed SK Deposit was contemplated as early as January 2010, and it was never incorporated into the Base Case Model or disclosed (the transaction, its purpose, or its effect) in the 2010 IM. Vigna Decl. Ex. 9 (Base Case Model); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email); ███████████████████████████████

- 70 -

████████████████████ Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 44-47; Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

232.    In December 2010, to account for interest payments that would legally be owed to SK Fund, the Fund deposited an additional KZT 29.3 billion.  Vigna Decl. Ex. 39 (Corporate Bank Deposit Contract No. 1566 1137-u, dated December 20, 2010 (Original and Translation)) at SK_0002280_EN; Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

> Plaintiffs:  Not disputed, however, Plaintiffs also note that the Undisclosed SK Deposit was contemplated as early as January 2010, and it was never incorporated into the Base Case Model or disclosed (the transaction, its purpose, or its effect) in the 2010 IM.  Vigna Decl. Ex. 9 (Base Case Model); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email); ██████████████████████
>
> ████████████████ Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 44-47; Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

233.    This deposit had a 9% interest rate, which was intended to be paid out in cash to the Fund.  Vigna Decl. Ex. 13 (SK 2010 Financial Statements) at 27.

> Plaintiffs:  Not disputed.

234.    The week following the May 7 announcement and May 13 initial deposit, BTA held a May 18, 2010 investor call at which investors could inquire about, among other things, the deposits made by SK Fund.  Vigna Decl. Ex. 28 (BTA Press Release announcing Conference Call addressing 2010 Restructuring, dated May 17, 2010) at BTA_00002834; Vigna Decl. Ex. 27 (BTA Restructuring Update ("Road Show") with script, dated May 17-21, 2010) at BTA_00117217, BTA_00117227.

<u>Plaintiffs</u>: Not disputed, however, Plaintiffs note that the Undisclosed SK Deposit was not disclosed in the Road Show presentation and there is no evidence in the record that any investors inquired about the SK Deposit.

235. In June 2010, SK Fund's published 2009 financials stated: "On May 13, 2010 the Fund placed deposit of 97 billion Tenge with BTA Bank JSC with maturity on December 30, 2024 and bearing interest of 11%; interest is capitalized annually. Deposit was in place for the purpose of accumulation of funds for future settlement of Fund's bonds issued to BTA Bank JSC with nominal value of 645 billion Tenge." Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statement) at 40.

<u>Plaintiffs</u>: Not disputed, however, Plaintiffs note that the Undisclosed SK Deposit was not disclosed by BTA—the entity undergoing the 2010 Restructuring and making representations to the market in connection with the same—in the 2010 IM or otherwise. Vigna Decl. Ex. 9 (Base Case Model); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email); ███████████████████████████████████████ ████████████████████ Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 125 (Howes Tr.) at 167-168; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10. Nor was this purported disclosure in SK Fund's 2009 financial statements picked up by the analysts who covered BTA, as none of the analyst reports in the record contemplate the full details and purpose of the Undisclosed SK Deposit as part of the Negative Carry Swap. *See generally* Vigna Decl. Ex. 45 (JP Morgan Report dated May 18, 2011); Elkin Decl. Ex. 11 (JP Morgan, Kazakhstan Trip Notes dated May 25, 2011); Elkin Decl. Ex. 14 (Troika July 2011 Report); Vigna Decl. Ex. 94 (Troika September 2011 Report); Vigna Decl. Ex. 89 (HSBC Global Research, *EMEA Banks*, dated March 2011); Vigna Decl. Ex. 114

LEGAL\42685072\1

(Hrycay Report) at ¶ 82(a) ("BTA Bank's opaque financial reporting made it difficult for financial analysts to understand the financial effects of the Negative Carry Swap").

236.    For the duration of BTA's restructuring, SK Fund's deposit remained at BTA and provided much-needed liquidity.  Vigna Decl. Ex. 124 (Howes Tr.) at 226:24-227:7.

Plaintiffs:  Disputed.  There is no evidence in the record that the purpose of the Undisclosed SK Deposit was to provide liquidity to BTA or that the Undisclosed SK Deposit was put to productive use by BTA.  As set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, the purpose of the Undisclosed SK Deposit was to manage SK Fund's risk of bankruptcy at the 2024 maturity of the SK Bonds and the Base Case Model projected that BTA had excess liquidity beyond any recognized lending opportunities available to BTA at the time.

237.    The deposits made a substantial quantity of cash available to BTA.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 33.

Plaintiffs:  Plaintiffs do not dispute that the Undisclosed SK Deposit made cash available to BTA.  However, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, Plaintiffs dispute that the purpose for the Undisclosed SK Deposit was to provide liquidity to or that the Undisclosed SK Deposit was put to productive use by BTA.

238.    The interest on the deposits had no cash implication for BTA. Vigna Decl. Ex. 117 (Hinton Report) at ¶ 33.

Plaintiffs:  Disputed.  There is a cash implication for the Undisclosed SK Deposit because BTA paid a tax expense on the deposit (Vigna Decl. Ex. 130 (Kapoor Tr.) at 181:3:10; 207:10-17) and the interest on the December 2010 deposit of KZT 29.3 billion was not capitalized.  Vigna Decl. Ex. 39 (Corporate Bank Deposit Contract No. 1566 1137-u,

dated December 20, 2010 (Original and Translation)); Vigna Decl. Ex. 115 (Kapoor Report) at 7. Plaintiffs also note that interest on the Undisclosed SK Deposit was transferred from BTA to SK Fund and that this interest was an expense item on BTA's income statement. Vigna Decl. Ex. 124 (Howes Tr.) at 310:4-13; Vigna Decl. Ex. 125 (Favale Tr.) at 300.

239.     Because Fund SK did not intend to withdraw any interest at all until 2024 and then intended to turn over all the principal and interest in its deposit accounts to BTA for redemption of SK Bonds, BTA was given the net present value of the 2024 bond payment in 2010 and was free to use the money as it saw fit from that point forward. Vigna Decl. Ex.117 (Hinton Report) at 15-18, 69-61; Vigna Decl. Ex. 132 (Hrycay Tr.) at 110:7-111:16; Vigna Decl. Ex. 118 (Mason Report) at 106, 117-18.

> Plaintiffs:  Plaintiffs do not dispute that BTA was given the net present value of the 2024 bond payment in 2010 and was free to use the money as it saw fit from that point forward.  However, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, Plaintiffs dispute that the purpose for the Undisclosed SK Deposit was to provide liquidity to or that the Undisclosed SK Deposit was put to productive use by BTA.

240.     The liquidity from the deposits, and government aid as a general matter, provided funding for BTA's use in productive activities such as lending.  Vigna Decl. Ex. 117 (Hinton Report) at 16, 69; Vigna Decl. Ex. 118 (Mason Report) at 106, 117-18.

> Plaintiffs:  As a general matter, Plaintiffs dispute the Defendants' suggestion that the Undisclosed SK Deposit and the other government funding should be conflated. Plaintiffs do not dispute that SK Fund provided liquidity to BTA through the State Finance Programme and the SK Bonds, which BTA used as collateral for the NBK repo.

*See generally* Vigna Decl. Ex. 3 (2010 IM). However, as set forth in Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40, Plaintiffs dispute that the purpose for the Undisclosed SK Deposit was to provide liquidity to or that the Undisclosed SK Deposit was put to productive use by BTA.

241.    Plaintiffs' expert concedes that all elements of government support for BTA were fully disclosed in the 2010 IM, except, in his contention, the total size of SK Fund's deposits and the rate of interest thereon. Vigna Decl. Ex. 132 (Hrycay Tr.) at 157:10-158:8.

Plaintiffs:  Disputed. Hrycay testified that the Undisclosed SK Deposit, which was the most material component of the Negative Carry Swap, was not disclosed in the 2010 IM. Vigna Decl. Ex. 132 (Hrycay Tr.) at 157:10-158:8. Nor was the purpose and effect of the Undisclosed SK Deposit disclosed in the 2010 IM. *See generally* Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 167:3-168:25; Vigna Decl. Ex. 125 (Favale Tr.) at 208:3-10.

242.    Plaintiff's expert calculates the interest flow resulting from the negative carry swap to total KZT 87 billion. Vigna Decl. Ex. 115 (Kapoor Report) at Ex. 1.

Plaintiffs:  Disputed. Plaintiff's expert Vikram Kapoor calculates the interest flow resulting from the negative carry swap to total approximately KZT 819.7 billion. Vigna Decl. Ex. 115 (Kapoor Report) at ¶ 38.

## A.    Securities Issued Through the 2010 Restructuring

243.    Under the 2010 Restructuring Plan, claimants were entitled to exchange their existing Turanalem securities for new securities issued by BTA. Vigna Decl. Ex. 3 (2010 IM) at 7.

Plaintiffs:  Not disputed.

244.     The 2010 Restructuring included a number of different packages available to claimants depending on their investments in BTA.  Vigna Decl. Ex. 3 (2010 IM) at 46-60.

Plaintiffs:  Not disputed.

245.     These included Senior Notes, which had an "eight-year tenor with  a four-year grace period on amortization of principal."  Vigna Decl. Ex. 3 (2010 IM) at 48.

Plaintiffs:  Not disputed.

246.     The Senior Notes accrued interest at 10.75% for 2.5 years, and 12.5% per year afterwards.  Vigna Decl. Ex. 3 (2010 IM) at 48.

Plaintiffs:  Not disputed.

247.     Certain claimants were also entitled to receive Subordinated Notes.  Vigna Decl. Ex. 3 (2010 IM) at 49.

Plaintiffs:  Not disputed.

248.     These Subordinated Notes accrued interest at 7.2%.  Vigna Decl. Ex. 3 (2010 IM) at 49.

Plaintiffs:  Not disputed.

249.     None of the new indebtedness and shares were registered in the United States under the U.S. Securities Act.  Vigna Decl. Ex. 3 (2010 IM) at 310.

Plaintiffs:  Not disputed.

250.     Claimants receiving these Subordinated Notes were required, unless the Bank otherwise agreed, to represent that they (i) were not U.S. Persons, (ii) were an Accredited Investor, or (iii) were a Qualified Institutional Buyer, as each defined under the Securities Act and rules promulgated thereunder. Vigna Decl. Ex. 3 (2010 IM) at 310.

Plaintiffs:  Not disputed.

251.    Claimants receiving Subordinated Notes also agreed that they would not offer or sell the notes except pursuant to Rule 144A or Regulation S.  Vigna Decl. Ex. 3 (2010 IM) at 312.

Plaintiffs:  Not disputed.

252.    The Subordinated Notes also included transfer restrictions, that provided  that the beneficial owner of the note could not be "offered, sold, pledged or otherwise transferred except" (i) outside of the U.S. pursuant to Regulation S and (ii) within the United States under the requirements of Rule 144A.  Vigna Decl. Ex. 3 (2010 IM) at 311.

Plaintiffs:  Not disputed.

253.    As part of the 2010 Restructuring, BTA also issued "Recovery Units," which entitled unitholders to receive a portion of the funds recovered from BTA's former management. Vigna Decl. Ex. 3 (2010 IM) at 49.

Plaintiffs:  Not disputed.

254.    These units – distributed to all eligible creditors who elected to receive them – provided the holders with the right to receive 50% of the actual cash proceeds BTA received from recovered assets that prior to the 2010 Restructuring had been considered impaired for accounting purposes (up to a maximum face amount of US$ 5.221 billion, subject to various hurdles and reductions).  Vigna Decl. Ex. 3 (2010 IM) at Annex 4; Vigna Decl. Ex. 8 (Terms and Conditions of the Recovery Units) at BTA_00118327.

Plaintiffs:  Not disputed.

255.    Recovery Unit holders would not receive payment on accounting recoveries "until the Bank receive[d] the cash benefit thereof."  Vigna Decl. Ex. 3 (2010 IM) at 50.

Plaintiffs:  Not disputed.

256.     The Recovery Units Terms and had a reference amount of $5,221,494,216, the expected recoveries.  Vigna Decl. Ex. 3 (2010 IM) at 566; Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010) at BTA_00118311.

Plaintiffs:  Not disputed.

257.     The 2010 IM and subsequent final terms and conditions of the Recovery Units disclosed the conditions under which the Units could be accelerated:

> Trustee in its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Units then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall:  (a) give notice to the Bank that the Units are and they shall become due and repayable in an aggregate amount equivalent to the higher of (1) the Reference Amount and (2) the aggregate of (A) amounts standing to the credit of the Collection Amount and (B) amounts by reference to Recoveries realized in cash and required to be but not yet paid to the Collection Account; and/or (b) exercise or direct the Trustee to exercise any or all of its rights, remedies, powers or discretions under the Trust Deed in respect of the Collection Account.

Vigna Decl. Ex. 3 (2010 IM) at 580; Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010) at § 13.

Plaintiffs:  Not disputed.

258.     Thus, the Bank disclosed at the time of the 2010 Restructuring that there was a 20% threshold for the Recovery Units to be accelerated.  Vigna Decl. Ex. 3 (2010 IM) at 564-580; Vigna Decl. Ex. 8 (Terms and Conditions of the Recovery Units) at BTA_00118327.

Plaintiffs:  Not disputed.

**B.     Creditor Approval of the 2010 Restructuring Plan**

259.     Creditors of BTA were required to meet and vote on the proposed Restructuring Plan.  Vigna Decl. Ex. 3 (2010 IM) at 86.

Plaintiffs:  Not disputed.

260.    On May 28, 2010, the Restructuring Plan was approved at a meeting of creditors in London and at a meeting of other creditors held in Almaty, Kazakhstan.  Vigna Decl. Ex. 134 (FFB Decl.) at ¶¶ 18-19; Vigna Decl. Ex. 3 (2010 IM) at 364.

Plaintiffs:  Not disputed.

261.    Over 92% percent of creditors voted in favor of the Restructuring.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:16; Vigna Decl. Ex. 29 (BTA Press Release announcing approval of restructuring, dated May 28, 2010.); Robertson Aff. at ¶ 24.

Plaintiffs:  Not disputed.

262.    Following the vote, the Restructuring Plan was approved by a Kazakhstan Court, Kazakhstan's financial regulator, AFN, and other bankruptcy courts in multiple jurisdictions. Vigna Decl. Ex. 125 (Favale Tr.) at 182:21-183:18; Vigna Decl. Ex. 3 (2010 IM) at 3-4, 11; Vigna Decl. 134 (FFB Decl.) at ¶¶ 20-21.

Plaintiffs:  Not disputed.

263.    The 2010 Restructuring was completed on September 16, 2010.  Vigna Decl. Ex. 4 (2012 IM) at 3.

Plaintiffs:  Not disputed.

264.    The 2010 Restructuring's reorganization of over $14 billion in debts was intended to permit BTA to meet its regulatory capital adequacy requirements and to continue as a going concern.  Vigna Decl. Ex. 3 (2010 IM) at 10, 145.

Plaintiffs:  Plaintiffs do not dispute that this was the stated intent of the 2010 Restructuring's reorganization of debts.

265.    At the time, it was considered a success as it prevented a total withdrawal of deposits and a run on the Bank, thus leaving it with a chance of survival.  Vigna Decl. Ex. 124 (Howes Tr.) at 59:19-24; Vigna Decl. Ex. 125 (Favale Tr.) at 182:21-183:18.

Plaintiffs:  Plaintiffs do not dispute that the 2010 Restructuring was considered a success at the time by Defendants.

266.    Indeed, the Restructuring was lauded all over the world including by institutions such as the Paris Club.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:13.

Plaintiffs:  Plaintiffs do not dispute that the 2010 Restructuring was considered a success at the time by Defendants and in an article written by BTA's restructuring advisor, Favale.

267.    The Restructuring was the subject of an Oxford University case study.  Vigna Decl. Ex. 125 (Favale Tr.) at 215:24-216:13.

Plaintiffs:  Not disputed.

268.    Advisors for the 2010 Restructuring were awarded Euromoney's 2010 "deal of the year" award.  Vigna Decl. Ex. 90 (*White & Case Transactions Awarded Euromoney 2010 Deals of the Year*, *available at* https://www.whitecase.com/firm/awards-rankings/award/white-case-transactions-awarded-euromoney-2010-deals-year).

Plaintiffs:  Not disputed.

### IX.    PLAINTIFFS' TRADING IN BTA SECURITIES

### A.    Plaintiffs Opened Accounts at UBS

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████





LEGAL\42685072\1



**B.**     <u>**Plaintiffs' Initial Investments in BTA**</u>







[REDACTED]

308.     On December 8, 2009, Renaissance Capital issued a report stating that there was "surprising upside" for BTA bond investors.  Vigna Decl. Ex. 84 (Renaissance Capital analyst report, dated December 8, 2009) at P00000581.  Khamis received this report.

Plaintiffs:  Not disputed.

[REDACTED]

**C.** **Plaintiffs' Participation in Approval of the 2010 Restructuring**



**[REDACTED]**

**[REDACTED]**

316.    The Restructuring Plan provided that holders of Euronotes (the "Euronote holders"), including Plaintiffs Atlantica and Baltica, would receive New Notes in exchange for the cancellation or restructuring of certain existing indebtedness of BTA.  Vigna Decl. Ex. 134 (FFB Decl.) at ¶ 12.

Plaintiffs:  Not disputed.

317.    On April 20, 2010, Plaintiffs' UBS brokers performed an analysis to see what they would receive in the 2010 Restructuring if he exchanged Turalem notes for BTA notes. Vigna Decl. Ex. 122 (Kiblisky Tr.) at 117:4-118:14; Vigna Decl. Ex. 43 (Email correspondence from Igal Yacher dated April 20, 2010) at Atlantica 000002357.

Plaintiffs:  Not disputed.

**[REDACTED]**

**D.** **Plaintiffs' Subsequent 2010 Transactions**

324.    On September 2, 2010, UBS issued an analyst report entitled "Buy BTA Bonds" that discussed the 2010 Restructuring.  Vigna Decl. Ex. 87 (UBS Investment Research Report dated September 2, 2010) at P00002006.

Plaintiffs:  Not disputed.

███████████████████████████████████

████████████████████████████████████████

██████████████████████

█████████████████.

326.     This report discusses negative quarterly net interest margins for BTA and notes

the rapidly deteriorating performance of BTA, falling from -6% to -8% by the second quarter of

2010.  Vigna Decl. Ex. 87 (UBS Investment Research Report dated September 2, 2010) at

P00002006.

> Plaintiffs:  Disputed.  This analyst report comments on BTA's "successful completion" of
>
> the 2010 Restructuring, that BTA is "well positioned to capitalize on a restructured
>
> balance sheet," and that BTA's "paper should tighten to reflect quasi-sovereign status."
>
> Vigna Decl. Ex. 87 (UBS Investment Research Report dated September 2, 2010) at
>
> P00002006.  The report also notes BTA's *pre*-2010 Restructuring negative interest
>
> margin only, which does not reflect on its post-2010 interest margin.  *See id.*

327.     BTA's bond prices did not decline after the UBS Investment Research Report

dated September 2, 2010 was released.  Vigna Decl. Ex. 117 (Hinton Report) at 25, 51-55.

> Plaintiffs:  Not disputed.

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████

████████████████



335.    BTA completed the 2010 Restructuring on September 16, 2010.  Vigna Decl. Ex. 4 (2012 IM) at 3.

Plaintiffs:  Not disputed.

**E.  Background on BTA Bond Distribution and Clearing**

340.     Regulation S provides an exclusion from the Section 5 registration requirements of the Securities Act of 1933.  Vigna Decl. Ex. 119 (Am. Awan Report) at ¶ 33.

> Plaintiffs:  Not disputed.  However, Plaintiffs note that the basis for Awan's citation is Wikipedia, which is not a reputable source.

341.     Regulation S requires that the offer and sale of the relevant securities must be made to investors that are outside the United States.  Vigna Decl. Ex. 119 (Am. Awan Report) at ¶ 33.

> Plaintiffs:  Disputed.  "Although Regulation S Eurobonds are not registered in the United States, they are issued to and invested in by non-U.S. investors in the United States market through U.S. broker-dealers.  In the initial issuance market, these types of bonds are freely and routinely purchased through U.S. broker-dealers from their offices in the United States through the submission of syndicate orders or subscriptions.  These bonds

- 96 -

are also freely and routinely purchased and traded on the secondary market by non-U.S.

investors through U.S. broker-dealers, particularly where non-U.S. investors are based in

Latin America.   This type of trading is exactly what happened in this case.   The

Exchange Plaintiffs elected to commit to the Exchange Offer and all three Plaintiffs

traded BTA bonds in the secondary market through UBS Financial and UBS Securities,

both of which are U.S. broker-dealers located and actively conducting business in the

United States securities market."  Elkin Decl. Ex. 30 (Palzer Report) at ¶ 29(a).  Plaintiffs

also note that the basis for Awan's citation is Wikipedia, which is not a reputable source.

342.    BTA deposited its non-Tenge Eurobonds at Bank of New York Mellon's London

branch, which contracted to transfer book-entry ownership of those notes only through Euroclear

(in Brussels) or Clearstream (in Luxembourg).  Vigna Decl. Ex. 3 (2010 IM) at 314.

Plaintiffs:  Not disputed.

343.    BTA limited the permissible "future sale, offer, pledge or transfer of the New

Notes" to only an otherwise qualified "person who is located outside the United States and is not

a U.S. Person, in an offshore transaction in accordance with Rule 903 or 904 of Regulation S

under the Securities Act."  Vigna Decl. Ex. 3 (2010 IM) at 310.

Plaintiffs:  Not disputed that the cited 2010 IM contains language that is consistent with

Defendants' statements.

344.    BTA further specifically provided that any "TRANSFER IN VIOLATION OF

THE FOREGOING WILL BE OF NO FORCE OR EFFECT, WILL BE VOID *AB INITIO*,

AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE."

Vigna Decl. Ex. 3 (2010 IM) at 311.

<u>Plaintiffs</u>: Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

345. Additionally, BTA provided:

> Secondary market sales of book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream to purchasers of book-entry interests in the Non-Tenge New Notes through Euroclear or Clearstream will be conducted in accordance with the normal rules and operating procedures of Euroclear and Clearstream and will be settled using the procedures applicable to conventional Eurobonds.

Vigna Decl. Ex. 3 (2010 IM) at 318.

<u>Plaintiffs</u>: Not disputed that the cited 2010 IM contains language that is consistent with Defendants' statements.

## X. <u>BTA'S POST-RESTRUCTURING OPERATIONS</u>

### A. <u>BTA's Performance Following the 2010 Restructuring</u>

346. BTA's bond prices remained relatively stable after the 2010 Restructuring where there was substantial disclosure of BTA's finances, including each component of the purported negative carry swap. Vigna Decl. Ex. 117 (Hinton Report) at 25-27.

<u>Plaintiffs</u>: Disputed. At no time did BTA disclose the purpose and effect of the Undisclosed SK Deposit, nor was the Negative Carry Swap fully understood by the market. Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 67-71. However, Plaintiffs do not dispute that composite price data shows that the price of BTA bonds remained relatively stable after the 2010 Restructuring.

347. Following completion of the 2010 Restructuring, BTA resumed regular banking operations. Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at 8.

<u>Plaintiffs</u>: Not disputed.

348.    Indeed, BTA continued operating 22 regional branches and 227 cash settlement units throughout Kazakhstan as of December 31, 2010.  Vigna Decl. Ex.16 (BTA 2010 Financial Statement) at 8.  By the end of 2011, BTA was still operating 22 regional branches and maintained 220 cash settlement units throughout Kazakhstan.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 8.

Plaintiffs:  Not disputed.

349.    BTA continued to operate branches as a going concern until 2014.  Vigna Decl. Ex. 19 (BTA 2012 Financial Statement) at 8; Vigna Decl. Ex. 20 (BTA 2013 Financial Statement) at 8.

Plaintiffs:  Not disputed.

350.    BTA also maintained representative offices in Shanghai, Moscow, Dubai, and London throughout 2010 and 2011.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at 8; Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 8.

Plaintiffs:  Not disputed.

351.    In addition, BTA maintained KZT 683 billion in deposits from customers in 2010, and 754 billion of the same in 2011.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statements) at BTA_00002127.

Plaintiffs:  Not disputed.

352.    The Bank also had over KZT 650 billion in outstanding loans to customers by 2011.  Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 1.

Plaintiffs:  Not disputed.

LEGAL\42685072\1

353.     BTA maintained its regulatory capital adequacy ratios until April 2012.  Vigna

Decl. Ex. 16 (BTA 2010 Financial Statements) at 10, 69; Vigna Decl. Ex. 18 Ex (BTA 2011

Financial Statement) at 36; Vigna Decl. Ex. 4 (2012 IM) at 3.

> Plaintiffs:  Plaintiffs do not dispute that BTA reported it maintained its capital adequacy
>
> ratios until April 2012.  However, BTA's reported capital ratio was the product, at least
>
> in part, of accounting machinations.  In a June 2011 presentation comparing Base Case
>
> Model projections to BTA's 2010 financial statements, Lazard noted that "[i]nterest
>
> income is artificially inflated by accrued interests on NPLs which were not written-off
>
> from the balance sheet.  In particular, interests continue to accrue on problem loans … .
>
> In total, actual accrued interests exceed projected accrued interests by more than KZT
>
> 120 billion, which artificially reduces the real income gap between interest income and
>
> expenses."  Elkin Decl. Ex. 12 (Lazard Comparison Model/Actual Results dated June
>
> 2011) at 3; Vigna Decl. Ex. 130 (Kapoor Tr.) at 227-230.  Plaintiffs could not investigate
>
> the 2010 audit further because BTA did not produce a corporate deponent with any
>
> knowledge of BTA's annual audits, including Ernst & Young's audit of BTA's 2010
>
> financial statements.  Vigna Decl. Ex. 126 (Narty Tr.) at 96:17-97:6

## B.     External Forces Affecting the Financial Health of BTA

354.     A number of factors unrelated to BTA's cost structure had a significant impact on

the Bank's financial health throughout 2010 and 2011.

> Plaintiffs:  Defendants provide no citation to the factual record to support their assertion,
>
> which violates Local Civil Rule 56.1(d) ("Each statement by the movant … must be
>
> followed by a citation to evidence which would be admissible … .")  As such, no
>
> response is required.

- 100 -

355.    The Greek debt crisis caused a global banking slowdown, and had an especially negative impact on emerging markets. *See* Vigna Decl. Ex. 86 (Eswar Prasad, *Why the Greek Debt Crisis is a Problem for the Entire World Economy*, Brookings (May 24, 2010), *available at* https://www.brookings.edu/opinions/why-the-greek-debt-crisis-is-a-problem-for-the-entire-world-economy/).

> Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.  However, there is no evidence in the record connecting the Greek debt crisis to the financial performance of BTA or the price of its securities.

356.    The yield on Greek ten-year bonds exceeded 10% for the first time on June 23, 2010, approximately one month after the 2010 Restructuring was approved.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

> Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.  However, there is no evidence in the record connecting the Greek debt crisis to the financial performance of BTA or the price of its securities.

357.    By the end of 2010, the yield on the Greek bonds had increased to 12.54%.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

> Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.  However, there is no evidence in the record connecting the Greek debt crisis to the financial performance of BTA or the price of its securities.

358.    In rapid succession, the yield on the Greek bonds exploded to 17.36% on May 23, 2011, 24.83% on September 13, 2011, and 32.36% on November 4, 2011.  Vigna Decl. Ex. 120

(Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

> Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.  However, there is no evidence in the record connecting the Greek debt crisis to the financial performance of BTA or the price of its securities.

359.     By the end of 2011, yields on Greek government debt were over 35%.  Vigna Decl. Ex. 120 (Greece Government Bond 10Y, *available at* https://tradingeconomics.com/greece/government-bond-yield).

> Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.  However, there is no evidence in the record connecting the Greek debt crisis to the financial performance of BTA or the price of its securities.

360.     BTA and others announced that bank lending in Kazakhstan had decreased 6% over the previous year (24% at BTA) and faced difficulties going forward since corporate borrowers in the country remained "distressed and cannot offer tangible collateral."  Vigna Decl. Ex. 30 (BTA Investor Call Presentation, dated May 17, 2011) at P00001942-43.

> Plaintiffs:  Not disputed.

361.     BTA's lending decreased even more than comparable banks, in part due to new rigorous loan requirements required by the Bank's foreign creditors after the Ablyazov scandal. Vigna Decl. Ex. 124 (Howes Tr.) at 117:21-118:8; Vigna Decl. Ex. 3 (2010 IM) at 152-53.

> Plaintiffs:  Not disputed.

362.     BTA announced that its equity value had turned negative under International Financial Reporting Standards. Vigna Decl. Ex. 30 (BTA Investor Call Presentation, dated May 17, 2011) at P00001954.

<u>Plaintiffs</u>:  Not disputed.

363.     The Kazakhstan Stock Exchange as a whole continued its almost straight-line free

fall from approximately 1800 in February 2011 to 1199.65 in December 2011.



Kazakhstani Stock Exchange Index KASE, *available at*

:https://tradingeconomics.com/kazakhstan/stock-market

LEGAL\42685072\1

**Figure 6: Relative Performance of BTA Bonds vs. Peer Benchmark**



BTA 7.2 Bond and Comparable Bank Bonds

Source: Bloomberg and Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab.
BTA 7.2 bond price is from Average 7.2 price in Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab. The
Comparable Bank Bond Index is constructed from the equal-weighted average of the returns from Alliance Bank,
Kazkommertsbank, Halyk Bank, and Bank Centercredit comparable bonds. All bond prices are indexed to $100 as of September 6,

Plaintiffs:  Not disputed.

364.    Bond prices for all major Kazakhstani banks decreased during this period.  Vigna

Decl. Ex. 117 (Hinton Report) at 42-44.

Plaintiffs:  Not disputed, however, the bond prices for all major Kazakhstani banks

decreased a negligible amount compared to BTA's Subordinated Notes during this

period.  Hinton's Comparable Bond Index is "highly misleading … particularly with his

use [of] two different sets of axis to measure what's going on with two different bonds."

Vigna Decl. Ex. 132 (Hrycay Tr.) at 268:22-269:2.

- 104 -

365.   Throughout 2010 and 2011, BTA's bond prices moved in tandem (and generally downward) with the rest of Kazakhstan's major banks, as shown in the chart above.  Vigna Decl. Ex. 117 (Hinton Report) at 44.

> Plaintiffs:  Disputed.  The bond prices for all major Kazakhstani banks decreased a negligible amount compared to BTA's Subordinated Notes during this period.  Hinton's Comparable Bond Index is "highly misleading … particularly with his use [of] two different sets of axis to measure what's going on with two different bonds."  Vigna Decl. Ex. 132 (Hrycay Tr.) at 268:22-269:2.

366.   The high costs of BTA's litigation against Ablyazov and his unprecedented level of obstruction added further strain to BTA's finances.  Vigna Decl. Ex. 83 (*BTA v. Ablyazov*, *et al.*, Decision of Mr. Justice Popplewell in the High Court of Justice, Queens Bench Division, dated August 8, 2014) at ¶¶ 7-39 (describing Ablyazov's evasion of justice and many breaches of freezing order); Vigna Decl. Ex. 82 (*BTA v. Ablyazov*, Decision of Mr. Justice Henderson in the High Court of Justice, Chancery Division, dated November 26, 2013) at ¶ 2 ("Behind the brief introduction which I have just given, there lies a background of ever-increasing, and at times bewildering, complexity.").

> Plaintiffs:  Not disputed that the judgments quoted and cited contain language that is consistent with Defendants' statements.  However, Defendants do not cite any evidence connecting the Ablyazov litigation to a strain on BTA's finances.

367.   In its April 29, 2010 Independent Auditors' Report, BTA's auditor Ernst & Young even gave an express "going concern" warning.  Vigna Decl. Ex. 16 (BTA 2010 Financial Statement) at Independent Auditor's Report, Heading: Emphasis of Matter.

> Plaintiffs:  Not disputed.

368.     Ernst & Young stated that BTA's financial statements show that the bank's "total liabilities exceeded its total assets by KZT 104,513 million as at 1 December 2010" and warned that "[t]his condition, along with other matters described in Note 2, indicates the existence of a material uncertainty which may cast significant doubt about [BTA's] ability to continue as a going concern."  Vigna Decl. Ex.16 (BTA 2010 Financial Statement) at Independent Auditors' Report.

Plaintiffs:  Not disputed.

369.     On May 12, 2011, analysts from Commerzbank and Auerbach Greyson reported that BTA might need to restructure its debts once again.  Vigna Decl. Ex. 91 (Auberbach Grayson and Visor analyst reports, dated May 12, 2011); Vigna Decl. Ex. 92 (Commerzbank analyst report, dated May 12, 2011).

Plaintiffs:  Not disputed that the analyst reports cited contain language that is consistent with Defendants' statements.

370.     BTA bond prices dropped on May 13, 2011.  (*See* figure below.)

**Figure 7: BTA Bond Price Movements May 2011**

Price Response of BTA 7.2 Bond - May 17, 2011

Source: Bloomberg and Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab.
BTA 7.2 bond price is from Average 7.2 price in Hrycay Report "Exhibit 7,8,10,11,12,13,14,15,16,17.xlsx", "Prices and Inflation" tab. The
Comparable Bank Bond Index is constructed from the equal-weighted average of the returns from Alliance Bank,
Kazkommertsbank, Halyk Bank, and Bank Centercredit comparable bonds. All bond prices are indexed to $100 as of September 6,

<u>Plaintiffs</u>:  Not disputed that "composite" price data shows that the price of BTA bonds dropped on May 13, 2011.

**C.    <u>Analyst Reports and Purported Negative Carry Swap</u>**

371.    In January 2011, Fitch issued an analyst report on BTA.  Vigna Decl. Ex. 88 (Fitch Ratings analyst report, dated January 18, 2011 ("2011 Fitch Report")).

<u>Plaintiffs</u>:  Not disputed.

372.    The 2011 Fitch Report noted that "BTA's capital needs proved to be far larger than SK's initial injection of KZT212bn."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 3.

<u>Plaintiffs</u>:  Not disputed that the analyst report cited contains the quoted language.

373.    The 2011 Fitch Report acknowledged that SK Fund provided KZT 719 billion in "fresh capital" to BTA.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 3.

<u>Plaintiffs</u>:  Not disputed that the analyst report cited and quoted contains language that is consistent with Defendants' statements.  However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA.  The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a "negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

374.    In addition to the much-needed recapitalization, Fitch also noted a large infusion of deposit funding from SK Fund of KZT 330 billion.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

<u>Plaintiffs</u>:  Not disputed that the analyst report cited contains language that is consistent with Defendants' statements.  However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA.  The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a "negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

375.    The 2011 Fitch Report noted that these deposits received "relatively high" interest rates of up to 10%.  Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

<u>Plaintiffs</u>:  Not disputed that the analyst report cited and quoted contains language that is consistent with Defendants' statements.  However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA.  The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a

"negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

376. The 2011 Fitch Report described the interest rate on the deposits, taken in conjunction with the 2% Guarantee Fee, as "put[ting] considerable negative pressure on BTA's core revenue." Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

Plaintiffs: Not disputed that the analyst report cited and quoted contains language that is consistent with Defendants' statements. However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA. The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a "negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

377. The 2011 Fitch Report contained the section heading "SK Role: Crucial Funding and Capital Support But Its Terms Kill Profit." Vigna Decl. Ex. 88 (2011 Fitch Report) at 4.

Plaintiffs: Not disputed that the analyst report cited contains the quoted language. However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA. The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a "negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

378. The 2011 Fitch Report noted that "SK bonds are likely to stay on the balance sheet for as long as SK remains the majority shareholder. The options of renegotiation of terms

on these or/and on BTA's newly issued debt are not being considered by management at present."  Vigna Decl. Ex. 88 (2011 Fitch Report) at 5.

Plaintiffs:  Not disputed that the analyst report cited contains the quoted language. However, Plaintiffs note that the 2011 Fitch Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA.  The 2011 Fitch Report also did not disclose the actual 11% interest rate that BTA paid on the Undisclosed SK Deposit or assess that BTA has a "negative carry" as a result of the Undisclosed SK Deposit and other aspects of the Negative Carry Swap.

379.    The information contained in the Fitch report did not result in a decline in BTA's bond prices.  Vigna Decl. Ex. 117 (Hinton Report) at 25-27, 51-55.

Plaintiffs:  Plaintiffs do not dispute that composite price data shows that the Fitch Report did not result in the decline of BTA's bond prices.  Elkin Decl. Ex. 35 (Declaration of William P. Hrycay, CFA dated September 3, 2019, at ¶ 4-5); Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 36-38).

380.    In March 2011, HSBC issued an analyst report on UBS establishing an underweight recommendation for BTA.  Vigna Decl. Ex. 89 (HSBC Global Research, *EMEA Banks*, dated March 2011) at P00003153.

Plaintiffs:  Not disputed that the analyst report cited contains language that is consistent with Defendants' statements.

381.    Khamis received the HSBC report and reviewed it around the time it was issued. Vigna Decl. Ex. 123 (Khamis Tr.) at 196:4-9.

Plaintiffs:  Not disputed.

382.     On May 17, 2011, BTA's CEO, Mr. Saidenov held an investor call to discuss the

audited financial results and other Bank matters.  Vigna Decl. Ex. 16 (BTA 2010 Financial

Statement); Vigna Decl. Ex. 31(May 17, 2011 Bloomberg Investor Call Transcript).

        Plaintiffs:  Not disputed.

383.     He specifically discussed the following

        BTA disclosed that Fund SK maintained three types of deposits
        with BTA, with an average interest rate of 9.3%.  Vigna Ex. 31
        (May 17, 2011 Bloomberg Investor Call Transcript) at 5, 8; Vigna
        Decl. Ex. 30 (May 17, 2011 Investor Call Presentation) at 24.

        BTA was experiencing a "negative carry," which he described as
        "the result of high cost of funding of the bank as compared to the
        income generated by our loan portfolio" that it hoped to correct by,
        among other things, negotiating with the NBK to reduce the
        funding costs on the repos.  Vigna Decl. Ex. 31 (May 17, 2011
        Bloomberg Investor Call Transcript) at 5; Vigna Decl. Ex. 30 (May
        17, 2011 Investor Call Presentation) at 24.

        Plaintiffs:  Not disputed, however, the transcript did not disclose the Undisclosed SK

Deposit Omission, or its purpose or known detrimental effect on BTA.

384.     Plaintiffs' expert agrees that the "negative carry swap" was fully disclosed to the

market after May 17, 2011 at latest.  Vigna Decl. Ex. 132 (Hrycay Tr.) at 152:5-24.

        Plaintiffs:  Disputed.  Defendants mischaracterize Hrycay's testimony, which only

references the individual legs of the Negative Carry Swap transaction and none of the

details of the Undisclosed SK Deposit.  At no time did BTA disclose the purpose and

known detrimental effect of the Undisclosed SK Deposit, nor was the Negative Carry

Swap fully understood by the market.

385.     On May 18, 2011, J.P. Morgan published a research report ("J.P. Morgan

Report") highlighting BTA's cost of funding.  Vigna Decl. Ex. 45 (Email from P. Kiblisky dated

May 18, 2011 attaching J.P. Morgan Report) at P00001754.

Plaintiffs:  Not disputed that the analyst report cited contains language that is consistent with Defendants' statements.  However, the J.P. Morgan Report did not disclose the Undisclosed SK Deposit Omission, or its purpose or known detrimental effect on BTA.

386.    Khamis received and read the J.P. Morgan Report carefully around the time it was issued.  Vigna Decl. Ex. 123 (Khamis Tr.) at 210:19-3.

Plaintiffs:  Not disputed.

387.    To the extent BTA had any "negative carry," all deposits above 5.5% interest contributed, and all loans which were yielding less than 8.6% were also contributing.  Vigna Decl. Ex. 124 (Howes Tr.) at 219:11-24.

Plaintiffs:  Not disputed.

## XI.    PLAINTIFFS' ADVISORS

███████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████

█████████████████████████████████████████

█████████████████████████████████████

████

███████████████

█████████████████████████████████████████

█████████████████████████████████████████





## XII.   SK FUND STATEMENTS REGARDING SUPPORT FOR BTA

397.   The following statements were attributed to SK Fund employees in 2011:

a.   In a July 5, 2011 interview that served as a basis for a July 7, 2011 article about BTA, Aidan Karibzhanov stated, "I don't think BTA Bank will have to restructure debt or face bankruptcy, but we will provide financing to BTA Bank if needed."  He also stated that SK Fund would "sort out the situation with the bonds," referencing a request to increase the interest payment on SK Fund's bonds and that SK Fund would "not let [BTA] get into trouble." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(a); Vigna Decl. Ex. 93 (Nariman Gizitdinov, *Kazakhs to Protect BTA Bank From Default, Wealth Fund Says*, Bloomberg, (July 7, 2011)).

Plaintiffs:  Not disputed.  Plaintiffs further note that Karibzhanov is quoted in this article in his capacity as SK Fund's Deputy Chief Executive Officer, and he was also a member of BTA's Board of Directors.  Vigna Decl. Ex. 3 (2010 IM) at 260; Vigna Decl. Ex. 24 (BTA Presentation dated August 18, 2009) at Atlantica 000001229.

b.   Timur Kulibayev, Chairman of SK Fund, was quoted in an October 5, 2011 BTA press release as stating "BTA Bank will certainly be supported by the government."  Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(b); Vigna Decl. Ex. 49 (Email Correspondence from Igal Yacher to Claudio Khamis dated October 4, 2011 (transmitting *Kazakh Wealth Fund 'Certainly' Ready to Support BTA, Chief Says*, BTA Bank (Oct. 4, 2011))).

<u>Plaintiffs</u>: Not disputed. Plaintiffs also note that this article clarifies that Kulibayev represented SK Fund "is ready to provide *more* state aid if the troubled lender requires financing." Vigna Decl. Ex. 49 (Email Correspondence from Igal Yacher to Claudio Khamis dated October 4, 2011 (transmitting *Kazakh Wealth Fund 'Certainly' Ready to Support BTA, Chief Says*, BTA Bank (Oct. 4, 2011)) (emphasis added). The article further referenced a September 1 interview from BTA Chairman Saidenov where he advised that BTA is "seeking to cut the cost of state funding made available to the lender and increase the interest payments it gets on the wealth fund's notes used as collateral in repo agreements with the central bank." *Id.*

c.      Karibzhanov made statements concerning support measures for BTA. He stated "[t]he decision on support measures has not been taken yet. It will depend on the bank's current business plan and on the proposals to be made by its management." He also stated, "At present BTA Bank's management is working on a business plan and a restructuring scheme for the bank. The scheme will pursue two objectives: to restore assets stolen by the former owner and to make the bank competitive in the market." He stated "Judging from the bank's capital deficit, there is no doubt about [the need for additional investment]." Finally, he stated "We are looking at all options. We hope in the near future we will have a clear plan of restoring BTA's capital." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(c); Vigna Decl. Ex. 95 (*SAMRUK-KAZYNA TO HAMMER OUT SUPPORT MEASURES FOR BTA BANK AFTER REVIEWING BUSINESS PLAN*, Interfax (Nov. 30, 2011)).

<u>Plaintiffs</u>:  Not disputed.  Plaintiffs further note that despite this statement, SK Fund admitted through its 30(b)(6) witness Howes that SK Fund was not preparing to inject more capital into the bank at this time.  Vigna Decl. Ex. 124 (Howes Tr.) at 239:4-23.

      d.      In an article titled "Kazakh wealth fund nears decision on BTA rescue," Karibzhanov stated "Management is preparing a business plan and model to reload the bank," and the plan is based on two things: recovering those assets stolen by its previous owners and making the bank competitive in banking services and lending."  He added "We hope that, in the near future, we will have a clear business plan on how to restore capital."  He also stated "[u]ndoubtedly, judging by its capital deficit. The issue is to make sure additional injections don't fall into a bottomless pit." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52(d); Vigna Decl. Ex. 1 (*Kazakh wealth fund nears decision on BTA rescue,* Reuters (Nov. 29, 2011)).

<u>Plaintiffs</u>:  Not disputed.

      e.      A December 15, 2011 article quoted Peter Howes (incorrectly identified therein as Peter House) stating, "We are not selling or announcing It a bankrupt. The bank certainly has problems.  The situation is much is much worse than we expected.  It is taking the three banks (BTA, Alliance Bank and Temirbank) too long to recover.  But the management is very strong and it works hard to resolve the issues.  We have invested a lot of money and effort into putting this bank back on track."  The article also quoted Karibzhanov stating "[t]he decision of support measures has not been taken yet.  It will depend on the bank's current business plan and on the proposals to be made

by its management." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52; Vigna Decl. Ex. 98 (*Samruk-Kazyna rejecting BTA bankruptcy option*, Interfax (Dec. 16, 2011)).

Plaintiffs: Not disputed. Plaintiffs also note that in this article Howes stated "Samruk-Kazyna has not mulled a bankruptcy scenario for BTA." Vigna Decl. Ex. 1 (SK Fund Am. Compl.) at ¶ 52; Vigna Decl. Ex. 98 (*Samruk-Kazyna rejecting BTA bankruptcy option*, Interfax (Dec. 16, 2011)). BTA announced the need for a second restructuring shortly thereafter. Vigna Decl. Ex. 32 (BTA Press Release Announcing Second Restructuring dated December 22, 2011).

## XIII. PLAINTIFFS' ADDITIONAL TRANSACTIONS IN 2011

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████



██████████████████████████████████

██████████████████████████████████████

████████████████████████

## XIV.   THE 2012 RESTRUCTURING

### A.   Events Leading up to the 2012 Restructuring

███████████████████████████████████

████████████████████████████████████

████████; Vigna Decl. Ex. 94 (Troika Report, BTA Bank, In the State We (Have to) Trust,

dated September 13, 2011) at BTA_00218179.

Plaintiffs:  Not disputed that the analyst reports cited contain language that is consistent

with Defendants' statements.

405.    In November 2011, BTA publicly issued its third quarter interim financial

statements, showing that its loan income had decreased over KZT 20 billion from the same

period in 2010, and that its total equity deficit had grown to over KZT 318 billion. Vigna Decl.

Ex. 17 (BTA Interim Consolidated Financials as of Sept. 30, 2011) at BTA_00001771-72.

Plaintiffs:  Not disputed.

406.    On November 14, 2011, Fitch downgraded BTA's credit rating from B- to CCC,

in part because of an "apparent readiness of the bank and the Kazakh authorities to consider a

range of options, including less creditor-friendly ones." (Paul Abelsky, "BTA Bank Cut to CCC

by Fitch on Increased Probability of Default," November 14, 2011 (cited in Vigna Decl. Ex. 114

(Hrycay Report) at ¶ 83)

Plaintiffs:  Not disputed that the article cited and quoted contains language that is

consistent with Defendants' statements.

407.    On November 26, 2011, the CEO of BTA made statements to employees of the Bank regarding the grim financial status of the bank.  Vigna Decl. Ex. 141 (Nariman Gizitdinov, *BTA CEO Comments on Bank Debt Restructuring Reports* (Nov. 26, 2011) (cited in Hrycay Report ¶83)).

Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.

408.    On November 30, 2011, SK Fund noted that it couldn't continue to infuse money "into a bottomless pit."  Vigna Decl. Ex.96 (Nariman Gizitdinov, *Kazakh Wealth Fund Considers Aid, Bond Buyback to Reboot BTA*, Bloomberg (November 30, 2011) (cited in Hrycay Report ¶83)).

Plaintiffs:  Not disputed that the article cited and quoted contains language that is consistent with Defendants' statements.

409.    On December 7, 2011, Moody's reduced its bond ratings for the Notes held by Plaintiffs from Caa3 (which was already the third-lowest of its twenty-one possible ratings, representing "poor quality and very high credit risk") to C (the lowest possible rating, meaning, "lowest quality, usually in default and low likelihood of recovering principal or interest").  Vigna Decl. Ex. 97 (Moody's Investor services Ratings Action – Downgrade BTA, dated December 7, 2011).

Plaintiffs:  Not disputed that the analyst report cited and quoted contains language that is consistent with Defendants' statements.

410.    On December 22, 2011, BTA announced that it would propose a second debt restructuring at the next shareholder meeting.  Vigna Ex. 32 (BTA Press Release Announcing Second Restructuring, dated December 22, 2011).

<u>Plaintiffs</u>:  Not disputed.

411.    On December 23, 2011, BTA issued a press release declaring that "Restructuring is an urgently needed measure."  Vigna Decl. Ex. 32 (BTA December 23, 2011 Press Release).

<u>Plaintiffs</u>:  Not disputed.



414.    The market price for BTA's Notes collapsed to less than 10% of face value. Vigna Decl. Ex. 114 (Hrycay Report) at 16.

<u>Plaintiffs</u>:  Not disputed that the market price for BTA Notes was less than 10% of face value.

**B.**      **<u>Recovery Unit Acceleration</u>**

415.    In early 2012, BTA's financial condition continued to worsen.  Vigna Decl. Ex. 4 (2012 IM) at 3.

<u>Plaintiffs</u>:  Not disputed.

LEGAL\42685072\1

416.    As BTA's condition worsened, the possibility that the Recovery Units could be accelerated was reported on by the financial press.  Vigna Decl. Ex. 99 (Yulianna Vilkos, *BTA Bank creditors divided over acceleration option ahead of expected coupon nonpayment and restructuring talks*, Debtwire (Dec. 29, 2011, 12:41)).

>    Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ .

418.    In January 2012, BTA defaulted on its coupon payments for senior debt.  Vigna Decl. Ex. 4 (2012 IM) at 3.

>    Plaintiffs:  Not disputed.

419.    BTA disclosed this default no later than January 20, 2012.  Vigna Decl. Ex. 33 (BTA Press Release dated January 20, 2012).

>    Plaintiffs:  Not disputed.

420.    The market was aware of this default.  *See, e.g.*, Vigna Decl. Ex. 104 (TIMELINE-Debt restructuring at Kazakh bank BTA, *available at* https://www.reuters.com/article/kazakhstan-bta-timeline-idUSL6E8CA5WA20120126.)

>    Plaintiffs:  Not disputed that the article cited contains language that is consistent with Defendants' statements.

421. In fact, the market was aware of the potential for Recovery Unit acceleration even before the default occurred. Vigna Decl. Ex. 99 (Yulianna Vilkos, *BTA Bank creditors divided over acceleration option ahead of expected coupon nonpayment and restructuring talks*, Debtwire (Dec. 29, 2011, 12:41)).

Plaintiffs: Not disputed that the article cited contains language that is consistent with Defendants' statements.

422. There were a number of articles written between January and April 2012 regarding the potential for (and steps taken towards) acceleration of the Recovery Units including the following:

> a. Vigna Decl. Ex.105 (Yulianna Vilkos, *BTA Bank's recovery note holders seek pari passu treatment in restructuring, amass enough notes for acceleration*, Debtwire (Feb. 17, 2012, 12:01)) (noting that an ad hoc creditors' committee holding over 20% of the Recovery Units had expressed its intentions to accelerate);
>
> b. Vigna Decl. Ex. 103 (Yulianna Vilkos, *BTA Bank steering committee nominees emerge; recovery-note holders working with legal advisor Milbank*, Debtwire (Jan. 24, 2012, 8:56));
>
> c. Vigna Decl. Ex. 101 (Yulianna Vilkos, *BTA Bank creditors take to the field for second restructuring; rules of engagement have changed – sources*, Debtwire (Jan. 16, 2012)).

Plaintiffs: Not disputed that the articles cited contain language that is consistent with Defendants' statements.

423. An article appeared on January 10, 2012 in the Financial Times describing BTA's missed coupon payment, the informal organization of creditors' groups, and stating:

> BTA this month missed a coupon payment on bonds, including a $2.1bn obligation due in 2018. If the bank does not make an estimated $160m of coupon payments by January 18, it will be in formal default. If this happens, payment of $5.2bn so-called recovery notes issued by the bank will also be accelerated.

Vigna Decl. Ex. 100 (Robin Wigglesworth, *BTA creditors gear up for restructuring battle*, Financial Times (Jan. 10, 2012)).

Plaintiffs: Not disputed that the article cited and quoted contains language that is consistent with Defendants' statements.

424. BTA publicly disclosed the potential liability on the Recovery Units in the January 2012 road show presentation. Vigna Decl. Ex. 34 (BTA Presentation to Creditors, dated January 2012) at BTA_00002408.

Plaintiffs: Disputed. There is no disclosure of the potential U.S. $5.22 billion liability for the Recovery Units on BTA's balance sheet in the January 27, 2012 road show presentation even though BTA had disclosed a default on the coupon payment for its senior debt no later than January 20, 2012, and thus the Recovery Units were subject to cross-acceleration. *See* Defendants' 56.1 Statement at ¶ 418; Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010). Page 15, "Specific Accounting Considerations – Focus on RU liability computation" references the Recovery Unit liability as $887m as of 30-Sep-2011, and states that it is "highly dependent upon any change of IFRS liability component parameters." This slide does not reference the U.S. $5.22 billion notional value of the Recovery Units, that they were subject to cross-acceleration, and that this would more than double BTA's total liabilities. Vigna Decl. Ex. 34 (BTA Presentation to Creditors, dated January 2012) at BTA_00002422. Page 19, "Capital Shortfall at YE 2012," also states that the "Bank's capital deficit could further deteriorate in 2012, leading to a capital shortfall of ca. USD(5.1)bn," and makes no reference to the U.S. $5.22 billion potential liability for the Recovery Units although this was a very real possibility. Vigna Decl. Ex. 34 (BTA Presentation to Creditors, dated

January 2012) at BTA_00002426.  With regard to this disclosure, Plaintiffs' expert Michael Clark opines:  "At this point, BTA Bank understood that the Recovery Unit holders would call a default because only 20% of the unitholders were required to do so to initiate such a credit event and the effect of the default would be to inflate the Recovery Unit rights by a factor of nine times greater than the current fair value (KZT 81 billion to KZT 769 billion)."  Vigna Decl. Ex. 113 (Clark Report) at 19.  Clark further notes:  "BTA Bank engaged in a strategy of 'Ensuring Uncertainty About the RUs.'  The 'key element of BTA's strategy and inter-creditor dynamics is to ensure that the RUs remain uncertain as to their position in a restructuring.'  The advice was to maintain ambiguity on this topic until formal negotiations began in order to reduce the likelihood that Recovery Unit holders would indeed call a default.  It appears that one of the ways that BTA Bank sought to advance this strategy was to not disclose this potential huge increase in the RU liability to creditors and the market. BTA Bank did not disclose the balance sheet impact of this liability in a January 2012 Creditor Presentation."  Vigna Decl. Ex. 113 (Clark Report) at 19.  At this time, "[t]he bank should have -- it was a probability what I am saying.  The bank should have signaled that it was probable they were going to need to fill a ten billion hole. … They didn't necessarily say it's going to be via acceleration, but they should have indicated there was a probability that it's not going to be a 5 billion hole.  It's going to be a ten billion hole."  Vigna Decl. Ex. 129 (Clark Tr.) at 145:2-21.

425.    BTA immediately assessed the likelihood that the Recovery Unit holders would vote to accelerate the Recovery Units was remote because the holders would be required to indemnify the trustee in connection with the acceleration and would have to rely on an

insolvency event of default. Additionally, the acceleration would be disastrous for all creditors. Instead, BTA believed that it could work with Senior Noteholders to bring the Recovery Unitholders into a consensual restructuring process that would benefit all creditors. Vigna Decl. Ex. 11 (BTA's Debt Restructuring Strategy, dated January 10, 2012) at BTA_0034211-12.

> Plaintiffs: Not disputed, however, this assessment was part of BTA's strategy of "Ensuring Uncertainty About the RUs," with the "key element of BTA's strategy and inter-creditor dynamics is to ensure that the RUs remain uncertain as to their position in a restructuring," as referenced in Plaintiffs' 56.1 Response Statement, at ¶¶ 425.

426. BTA's internal memorandum states "As part of the overall strategy, we would also suggest that at the appropriate time BTA (and Senior Noteholders if possible) send a letter to the Trustee for the creditors explaining that so long as there is a prospect for a consensual restructuring it is in none of the stakeholders' interests to accelerate any of the Notes or the RUs and that if the Trustee were to agree to accelerate this would cause stakeholders substantial damage." Vigna Decl. Ex. 11 (BTA's Debt Restructuring Strategy, dated January 10, 2012) at BTA_0034212.

> Plaintiffs: Not disputed. This was part of BTA's strategy of "Ensuring Uncertainty About the RUs," with the "key element of BTA's strategy and inter-creditor dynamics is to ensure that the RUs remain uncertain as to their position in a restructuring." Vigna Decl. Ex. 11 (BTA's Debt Restructuring Strategy, dated January 10, 2012) at BTA_0034211. BTA's assessment was that this strategy would "buy BTA valuable time," and "[a]t best, it would result in a stalemate between the creditors and the Trustee." *Id.* at BTA_0034212.

LEGAL\42685072\1

427.    Consistent with this strategy, BTA "extended an overture to recovery note (RN) holders to join its proposed creditor steering committee."  A creditor holding Recovery Units stated "It's still early days and no decision has been taken on any [legal action], but it helped that the bank sent the message about its willingness to engage the RN holders on the committee." Vigna Decl. 102 (*BTA Bank acceleration threats quieten down as noteholders focus on steering-commitee formation; 'dovish' camp prevails – creditors*, Debtwire, (Jan. 18, 2012); Vigna Decl. 56 (Correspondence from BTA to Milbank, dated February 10, 2012) at BTA_00174049 – BTA_00174050.

Plaintiffs:  Not disputed that the analyst report cited and quoted contains language that is consistent with Defendants' statements.

428.    As early as February 2012, an Ad Hoc Committee of Recovery Unit Holders ("Ad Hoc RU Committee") informed BTA that it might accelerate the Recovery Units.  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174449.

Plaintiffs:  Not disputed.

429.    The Ad Hoc RU Committee sent a letter dated February 1, 2012, which indicated that the Ad Hoc RU Committee viewed plans for a fair restructuring that considered its interests to be adequate for its own purposes, referencing efforts by SK Fund.  Vigna Decl. Ex. 56 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174450.

Plaintiffs:  Disputed.  While the Ad Hoc RU Committee assessed BTA's past restructuring and certain efforts of SK Fund favorably, they were also "deeply disturbed by" BTA's calculation of the Recovery Unit liability as a matter of IFRS accounting.

Rather, "[i]n any restructuring, Members expect to see both the voting rights and the economic status of the $5.22bn RU issue being treated in line with their *pari passu* status." Vigna Decl. Ex. 56 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174450. The Ad Hoc RU Committee continued that "[i]f BTA and Samruk-Kazanya and their advisors are able to confirm that, for purposes of any restructuring, the RUs will be treated on a *pari passu* basis with the senior noteholders for the full $5.22bn face value, the Ad Hoc RU Committee will consider carefully whether they can refrain from technical acceleration of the RUs." *Id.* at BTA_00174451.

430. The letter stated: "In the interests of maintaining a constructive dialogue between the Ad Hoc RU Committee and BTA and Samruk-Kazyna, the Ad Hoc RU Committee will refrain from requiring acceleration of the RUs during this time (but subject to there being no unforeseen developments and to the paragraph below) and hope that resolution can be reached with each of BTA, Samruk-Kazyna and their advisors." Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_001744451.

Plaintiffs: Not disputed, however, Defendants' citation to the Milbank letter is incomplete. The Ad Hoc RU Committee would refrain from technical acceleration for the time being only. Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_001744451. "In any restructuring, Members expect to see both the voting rights and the economic status of the $5.22bn RU issue being treated in line with their *pari passu* status." *Id.* at BTA_00174450. The Ad Hoc RU Committee continued that "[i]f BTA and Samruk-Kazanya and their advisors are able to confirm that, for purposes of any restructuring, the RUs will be treated on a *pari*

*passu* basis with the senior noteholders for the full $5.22bn face value, the Ad Hoc RU

Committee will consider carefully whether they can refrain from technical acceleration of

the RUs." *Id.* at BTA_00174451.

431.    BTA responded by letter dated February 10, 2012.  BTA formally informed the

Ad Hoc RU Committee of the restructuring process, the appointment of a new steering

committee, and its commitment to resolve creditors' concerns through that process.  BTA also

stated:

> if you believe that an Event of Default has occurred under the
> Recovery Units (a position we do not accept), not only is there no
> need to attempt to accelerate the Recovery Units at this time
> (especially given that the Recovery Units holders are adequately
> represented on the Steering Committee) but any such attempt runs
> the risk of preventing a consensual restructuring of the Bank which
> in turn is likely to result in the National Bank of Kazakhstan
> placing BTA into conservation under Kazakh law.  This outcome
> would be prejudicial to BTA and all of its stakeholders, including
> its financial creditors and shareholders, since a conservation
> scenario financial creditors and equity holders are likely to lose
> their entire or substantially all of their interests.

Vigna Decl. Ex. 56 (Correspondence from BTA to Milbank re: RUs, dated February 10, 2012) at

BTA_00174049.

Plaintiffs:  Not disputed.

432.    On March 19, 2012, BTA publicly circulated a presentation noting that the Bank's

"[e]xisting balance sheet does not include a potential uplift for the value of the Recovery Units."

Vigna Decl. Ex. 35 (BTA Presentation for Steering Committee Meeting, dated March 19, 2012)

at 42.

Plaintiffs:  Plaintiffs do not dispute the presentation says that the Bank's "[e]xisting

balance sheet does not include a potential uplift for the value of the Recovery Units," but

this statement is couched as an accounting issue.  Vigna Decl. Ex. 35 (BTA Presentation

for Steering Committee Meeting, dated March 19, 2012) at 42 ("The auditors may seek

that the Bank makes this accounting adjustment.")  However, BTA did not disclose that

the Ad Hoc RU Committee had threatened acceleration and was demanding that the

Recovery Unit claim in the 2012 Restructuring be treated at its U.S. $5.22 billion

notional value and not as an IFRS fair value accounting calculation of U.S. $887 million.

Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU

Acceleration) at BTA_00174450-51.  Rather than disclosing the full potential liability,

BTA actually discloses that as an accounting matter the Recovery Unit liability actually

*decreased* over the 4th quarter of 2011.  Vigna Decl. Ex. 35 (BTA Presentation for

Steering Committee Meeting, dated March 19, 2012) at 42; Vigna Decl. Ex. 129 (Clark

Tr.) at 154-55.

433.    The March 19, 2012 presentation had a "Solvency Situation:  Key Observations"

heading, which stated, "The [International Financial Reporting Standards] value of the RUs

liability is subject to auditors opinion.  If auditors consider that the IFRS value should be $5.2

billion, the Tier 1 capital shortfall would then be further negatively impacted."  Vigna Decl. Ex.

35 (BTA Presentation for Steering Committee Meeting, dated March 19, 2012) at 45.

Plaintiffs:  Plaintiffs do not dispute the presentation makes this representation, but it is

couched as an accounting issue.  BTA did not disclose that the Ad Hoc RU Committee

had threatened acceleration and was demanding that the Recovery Unit claim in the 2012

Restructuring be treated at its U.S. $5.22 billion notional value.  Vigna Decl. Ex. 59

(Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at

BTA_00174450-51.  According to Plaintiffs' restructuring expert Michael Clark, this

disclosure was inadequate because it did not warn of the risk caused by the Ad Hoc RU

Committee's position.  Vigna Decl. Ex. 129 (Clark Tr.) at 154:2-8 ("At that date [BTA] received [the Milbank letter] there should have been at the very least a very big sticker on this saying, watch out.  We are having difficulties persuading the recovery unit holders about this and it could be a lot more."); *id.* at 160:14-161:12 ("Q.  Isn't BTA there disclosing the impact of acceleration on BTA's solvency situation?  A.  Using jargon term here, these are weasel words.  These are words to say something and not say something. Let's go through it.  If the IFRS value of the RUs liability is subject to auditor's opinion -- you know, if auditor's opinion -- it's not -- it's not that we have these lawyers from London holding a gun to our head.  It's all subject to the auditors making an opinion, which it doesn't explain here why they make that opinion.  Then it says, if that happens, the capital shortfall would then be further negatively impacted.  Again, this is weasel words.  This is not a clear presentation of apparently pretty -- an actual and close risk.")

434.    Acceleration of the Recovery Units would convert a KZT 81 billion liability (approximately US$560 million) into a KZT 769 billion liability (approximately US $5.2 billion) and nearly doubling BTA's overall economic shortfall.  Vigna Decl. Ex. 8 (Terms and Conditions of RUs, dated October 28, 2010); Vigna Decl. Ex. 35 (BTA Presentation for Steering Committee Meeting, dated March 19, 2012) at 42.

Plaintiffs:  Not disputed.

███████████████████████████████████████

█████████████

436.    BTA also disclosed the potential liability on the Recovery Units in a March 2012

presentation, under the heading "Focus on Solvency." Vigna Decl. Ex. 35 (BTA Presentation for

Steering Committee Meeting, dated March 19, 2012) at 44-45.

> Plaintiffs:  Plaintiffs do not dispute the presentation references the potential liability on
>
> the Recovery Units, but it is couched as an accounting issue.  BTA did not disclose that
>
> the Ad Hoc RU Committee had threatened acceleration and was demanding that the
>
> Recovery Unit claim in the 2012 Restructuring be treated at its $5.22 billion notional
>
> value.  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re:
>
> RU Acceleration) at BTA_00174450-51.  According to Plaintiffs' restructuring expert
>
> Michael Clark, this disclosure was inadequate because it did not warn of the risk caused
>
> by the Ad Hoc RU Committee's position.  Vigna Decl. Ex. 129 (Clark Tr.) at 154, 160-
>
> 161.

437.    SK Fund was not involved in the management or oversight of the Recovery Units,

or negotiations with Recovery Unit holders.  Vigna Decl. Ex. 124 (Howes Tr.) at 263:22-264:11.

> Plaintiffs:  Plaintiffs do not dispute that Howes testified SK Fund had no role with the
>
> management or oversight of the Recovery Units, or negotiations with Recovery Unit
>
> holders.  However, Plaintiffs dispute that Howes is a competent witness to testify about
>
> this.  Plaintiffs' 56.1 Response Statement, at ¶¶ 61.  The evidence in the record also
>
> reflects that SK Fund was involved in the series of related-party transactions following
>
> the 2012 Restructuring that transferred the non-performing loan assets underlying the

Recovery Units to oligarch Kenes Rakishev. Plaintiffs' 56.1 Affirmative Statement, at ¶¶ 13-40.

438.    As BTA worked towards a consensual restructuring, it remained ever-mindful of the Ad Hoc RU Committee's position, and communications between Baker McKenzie and White & Case relating to negotiation of a consensual restructuring plan, and continued to inquire about the Committee's position until the day before the Recovery Units were accelerated. Vigna Decl. Ex. 57 (Email correspondence between White and Case and Baker re: RUs, dated April 27, 2012) at BTA 00325880-81.

Plaintiffs:  Not disputed.

439.    On April 27, 2012, BTA received a notice of acceleration from the Recovery Unit Trustee. Vigna Decl. Ex. 58 (Correspondence from BNYM to BTA re: RU Acceleration, dated April 27, 2012).

Plaintiffs:  Not disputed.

440.    Consistent with International Accounting Standard 37, BTA increased the stated RU liability on its financial statements to U.S. $5.221 billion at that time.  *See* Vigna Decl. Ex. 115 (Floyd Report) at 30-32.

Plaintiffs:  Not disputed.

441.    There were no documents before the April 27, 2012 notice indicating that Recovery Unit holders would accelerate the Recovery Units. Vigna Decl. Ex. 115 (Floyd Report) at 30.

Plaintiffs:  Disputed. The February 1, 2012 letter from Milbank on behalf of the Ad Hoc RU Committee made clear that it would only temporarily refrain from technical acceleration and their deference was contingent on BTA treating their 2012 Restructuring

claim at its full U.S. $5.22 billion notional value, which – as Milbank clarified in its April 27, 2012 letter – was the "basic requirement of an agreement that the Recovery Units will be treated as if they had been accelerated."  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration) at BTA_00174447); *see also id.* at BTA_00174450-51.

442.    On April 28, 2012, BTA received a communication dated April 27, 2012 explaining the acceleration from counsel for the Ad Hoc Group.  Vigna Decl. Ex. 59 (Correspondence from Milbank, Tweed to White and Case re: RU Acceleration, dated April 27, 2012) at BTA_00174446.

Plaintiffs:  Not disputed.

**C.**    **Plaintiffs' Transactions in Early 2012, After Recovery Unit Acceleration Is Possible**

S

LEGAL\42685072\1



LEGAL\42685072\1

█████████████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

## XV.    THE 2012 RESTRUCTURING

### A.    Treatment of Various BTA Securities in the 2012 Restructuring and Plaintiffs' Actions Leading up to the 2012 Restructuring

452.    On November 1, 2012, BTA announced the terms of the second restructuring for the treatment of Subordinated Notes. The holders of Subordinated Notes would receive equity in the bank after the restructuring, representing a conversion of 2.5% of the nominal principal amount of such notes with the rest of the holders' claims to be cancelled. Vigna Decl. Ex. 61 (Email correspondence from Igal Yacher dated November 1, 2012) at P00013236; Vigna Decl. Ex. 4 (2012 IM) at 26 (indicating 2.4% of nominal principal).

Plaintiffs: Not disputed.

453.    The Recovery Unit holders, however, received $660 million of the total $5.2 billion nominal value of the notes, or approximately 14.2% of the par value paid in cash and new note. Vigna Decl. Ex. 4 (2012 IM) at 26.

Plaintiffs: Not disputed.

454.    Plaintiffs recovered at least $2.029 million trading their Recovery Unit investments between 2010 and 2012. Vigna Decl. Ex. 117 (Hinton Workpaper) at Workpaper 6.

Plaintiffs: Not disputed, however, Plaintiffs re-invested the proceeds of these sales into Subordinated Notes and lost this investment.

### B.     SK Fund's Support for the 2012 Restructuring

455.     In December 2012, BTA completed the second restructuring process.  SK Fund undertook a number of measures aimed to support the restructuring of BTA.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

Plaintiffs:  Not disputed.

456.     On December 19, 2012, SK Fund provided BTA with a loan of KZT 239.77 billion maturing in 2024 with an interest rate of 4%.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

Plaintiffs:  Not disputed.

457.     On December 20, 2012 SK Fund changed the Guarantee Fee for BTA from 2% to 0.125% per annum, starting from September 1, 2012.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

Plaintiffs:  Not disputed.

458.     On December 21, 2012, SK Fund acquired additional shares of BTA for KZT 176.38 billion.  Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

Plaintiffs:  Not disputed.

459.     SK Fund modified the terms of SK Bonds held by BTA to increase the coupon rate from 4% to 6%. Vigna Decl. Ex. 14 (SK Fund 2013 Financials) at 7.

Plaintiffs:  Not disputed.

### C.     SK Fund's Losses in BTA

460.     In total, SK Fund invested approximately KZT 1.1 trillion in BTA, and has lost nearly all of its investment.  Vigna Decl. Ex. 117 (Hinton Report) at ¶ 14.

Plaintiffs:  Not disputed.

461.     SK Fund had KZT 160 billion in deposits at BTA as of December 2009.  Vigna Decl. Ex. 4 (2012 IM) at 139.

Plaintiffs:  Not disputed.

462.     During the 2010 restructuring, SK Fund provided $212 billion in return for 75% of BTA's equity.  Vigna Decl. Ex. 124 (Howe Tr.) at 56:12-14.

Plaintiffs:  Not disputed.

463.     SK Fund made two additional deposits of KZT 175 billion and KZT 29.3 billion in 2010.  Vigna Decl. Ex. 13 (SK Fund 2010 Separate Financial Statement) at 27.

Plaintiffs:  Not disputed.

464.     SK Fund also received additional equity in BTA in return for cancellation of BTA bonds with principal and accrued interest in the amount of KZT 671 billion held by SK Fund, bringing SK Fund's equity stake to 81.5%.  Vigna Decl. Ex. 3 (2010 IM) at 8.

Plaintiffs:  Not disputed.

465.     SK Fund contributed an additional KZT 180 Billion to BTA in December 2012. Vigna Decl. Ex. 4 (2012 IM) at 20, 29, 40, 207.

Plaintiffs:  Not disputed.

466.     During the same period, SK Fund also paid BTA KZT 77.4 billion in bond interest.  Ryskulov Decl. Ex. B.

Plaintiffs:  Not disputed.

467.     During this period, SK Fund only received KZT 28.22 billion in semi-annual fees charged on the NBK loan guarantees in return for guaranteeing KZT 449 billion in loans from NBK to BTA.  Ryskulov Decl. Ex. A; Vigna Decl. Ex. 18 (BTA 2011 Financial Statement) at 35.

Plaintiffs:  Not disputed.

468.    On July 4, 2014, SK completed a transaction to sell virtually all of its remaining stake in BTA for total consideration equaling KZT 144.15 billion.  Vigna Decl. Ex. 15 (SK 2014 Financials) at 20-21.

Plaintiffs:  Not disputed.

469.    In total, SK Fund recovered approximately KZT 144.15 billion from its total investment in BTA, resulting in a loss of over KZT 900 billion, or approximately $6 billion. Vigna Decl. Ex. 124 (Howes Tr.) at 156:23-157:11.

Plaintiffs:  Not disputed.

## XVI.  LOCATION OF SALES

470.    The parties agree that no transactional liability is incurred until both buyer and seller agree to terms.  Vigna Decl. Ex. 119 (Am. Awan Report) at 59-60; Vigna Decl. Ex. 133 (Palzer Tr.) at 148:24-149:2, 149:13-18, 189:18-20.

Plaintiffs:  Not disputed.

471.    Plaintiff's expert stated "Trade execution [[(the point at which he contended liability attached)] requires a buyer and seller" - "that's how a trade is done.  You have got a buyer and a seller and they agree on a price and a quantity."  Vigna Decl. Ex. 133 (Palzer Tr.) at 148:23-149:18.

Plaintiffs:  Not disputed.

472.    Execution of the trades occurred "when Khamis agreed to the price and amount of the bonds." Vigna Decl. Ex. 133 (Palzer Tr.) at 148:17-20.

Plaintiffs:  Not disputed.  Trade execution occurred when Khamis agreed to the terms of the trade with UBS Securities.  Elkin Decl. Ex. 30 (Palzer Report) at ¶¶ 6, 47-50, appendix A; Vigna Decl. Ex. 133 (Palzer Tr.) at 137-138, 141-143.

473.     Before that time, such as when Khamis told his broker that he wanted to purchase BTA notes, "[t]hat's, at most, an order … And sometimes not even that.  It could just be an inquiry."  Vigna Decl. Ex. 133 (Palzer Tr.) at 152:25-153:23.

Plaintiffs:  Not disputed.

474.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

████████████████████

475.     The ultimate counterparties in Plaintiffs' trades were large European trading houses that were either acting as dealers selling from their own inventory or brokers selling on behalf of undisclosed clients.  Vigna Decl. Ex. 131 (Awan Tr.) 210:14-214:18, 216:24-219:9.

Plaintiffs:  Disputed.  Plaintiffs dispute this assertion to the extent that it suggests Plaintiffs purchased Subordinated Notes directly from a counterparty other than UBS Financial, whether European or not.  Plaintiffs purchased Subordinated Notes from UBS Financial after UBS Financial procured the bonds from a counterparty in a separate transaction, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 474.

476.     Individual traders at broker-dealers responsible for making Eurobond trading decisions are physically located in Europe.  Vigna Decl. Ex. 131 (Awan Tr.) at 210:14-214:18, 216:24:-219:9; Vigna Decl. Ex. 133 (Palzer Tr.) at 304:18-308:3.

Plaintiffs:  Plaintiffs dispute this assertion to the extent that it suggests Plaintiffs purchased Subordinated Notes directly from European counterparties.  Plaintiffs purchased Subordinated Notes from UBS Financial after UBS Financial procured the

bonds from a counterparty in a separate transaction, as referenced in Plaintiffs' 56.1

Response Statement, at ¶ 474.

477.    At least, for regulatory purposes, Plaintiffs' expert agrees that the transactions

would be considered unified ones between Plaintiffs and the ultimate sellers – and "offshore"

ones. Vigna Decl. Ex. 133 (Palzer Tr.) at 279:22-24, 293:21-25.

Plaintiffs:  Disputed.  Defendants mischaracterize Mr. Palzer's testimony.  He testified

that transactions between Plaintiffs and UBS Securities, which are not transactions

between Plaintiffs and UBS Securities' other counterparty, are offshore for purposes of

Regulation S.  Vigna Decl. Ex. 133 (Palzer Tr.) at 279:22-24, 293:21-25.

478.    No note settlement for BTA Bonds at issue in this case occurred in the United

States.  Note settlement occurred at Euroclear in Brussels or, in one instance, possibly at

Clearstream in Luxembourg.  Vigna Decl. Ex. 119 (Am. Awan  Rpt) at 95-96, 114; Vigna Decl.

Ex. 133 (Palzer Tr.) at 311:13-21, 183:14-21, 253:21-254:5.

Plaintiffs:  Not disputed.  However, settlement is irrelevant to the incurring of irrevocable

liability for a Eurobond trade.  Elkin Decl. Ex. 30 (Palzer Report) at ¶ 29(d) ("Mr.

Awan's conclusion that the transactions became irrevocable under the rules of the

clearing and settlement systems at the back-end of the trade life-cycle ignores the fact

that under international capital markets standards, all the Exchange Transactions and

Secondary Transactions became binding (and thus irrevocable) at the front-end execution

of the transactions in the United States through Plaintiffs' U.S. broker-dealer, UBS.");

Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment

on the pleadings and summary judgment dated August 29, 2017) at 3-4 (As the Court

noted in its earlier Opinions, the *Absolute Activist* test is in the disjunctive: *Either* the passage

of title (that is, clearing and settling) *or* the incurring of irrevocable liability in the United States is sufficient to establish a domestic securities transaction).

479.    "Trade settlement is the process of simultaneous exchange of cash versus securities for a security trade.  It is only at the point of settlement that a [Eurobond] trade becomes final and irrevocable."  Vigna Decl. Ex. 119 (Am. Awan Report) at 18.

Plaintiffs:  Disputed.  Settlement is irrelevant to the incurring of irrevocable liability for a Eurobond trade, which becomes final and irrevocable upon execution, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 478; *see also* Elkin Decl. Ex. 1  (Plumbers and Visionaries) at 10 (A trade is the "binding agreement between two counterparties to exchange securities and cash at a future date.").[5]

480.    At Euroclear, trades can be cancelled at any time before settlement by submitting a particular form.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 23 & Appendix 4.

Plaintiffs:  Not disputed.  However, Plaintiffs had no ability to unilaterally cancel any trade prior to settlement; as to Plaintiffs, the commitment to purchase was irrevocable, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 474.  Also, the hypothetical ability to cancel a trade does not affect the Plaintiffs' irrevocably liability for the trade.  Elkin Decl. Ex. 30 (Palzer Report) at FN 42 ("The fact that Plaintiffs *could* have chosen not to settle the Secondary Transactions, does not make the transactions "revocable" or non-binding.  It only means that the choice to "fail" on settlement would result in the failing counterparty being responsible for losses to the other party on the failed trade.")

---

[5] Defendants' expert Awan misleadingly cites to Plumbers and Visionaries by omitting the word "binding" from his quotation of *Plumbers and Visionaries*.  Plaintiffs' have moved to disqualify Awan for, among other reasons, plagiarizing material aspects of his expert witness report.

481.    Cancellation procedures can be invoked penalty-free by mutual consent of the parties at any point prior to settlement.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 17; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

> Plaintiffs:  Not disputed.  However, Plaintiffs had no ability to unilaterally cancel any trade prior to settlement; as to Plaintiffs, the commitment to purchase was irrevocable, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 480.

482.    Trades can be cancelled unilaterally without penalty if:  (i) the submitted trade instructions contained an error; (ii) the trade would benefit one party unfairly (for example, in fast-moving markets); or (iii) other circumstances justified doing so.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 14; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

> Plaintiffs:  Not disputed.  However, there is no evidence in the record that these rare circumstances occurred in this case, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 480.

483.    Either party can unilaterally invoke the organization's "buy in" rules and cancel the trade upon an offer to pay the intended counterparty its anticipated profit if it cannot not find an equivalent trading partner.  *See* Vigna Decl. Ex. 119 (Am. Awan Report) at 14-15; Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

> Plaintiffs:  Not disputed, however, the hypothetical ability to cancel a trade does not affect the Plaintiffs' irrevocably liability for the trade, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 480.

484.    By invoking the "buy in" rules the contemplated trade will not be completed.  A party is not bound to accept or pay for the security; instead, the trade "just won't happen . . . it won't clear."  Vigna Decl. Ex. 133 (Palzer Tr.) at 266:23-267-17.

LEGAL\42685072\1

Plaintiffs:  Not disputed, however, the hypothetical ability to cancel a trade does not affect the Plaintiffs' irrevocably liability for the trade, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 480.

485.    Trades may occasionally be rescinded *after* settlement.  Vigna Decl. Ex. 133 (Palzer Tr.) at 283:14-264:3.

Plaintiffs:  Not disputed, however, the hypothetical ability to cancel a trade does not affect the Plaintiffs' irrevocably liability for the trade, as referenced in Plaintiffs' 56.1 Response Statement, at ¶ 480.

486.    In Plaintiffs' transactions, no offer was made to anyone in the U.S., the buyers were located abroad and the other requirements of Regulation S were satisfied.  Vigna Decl. Ex. 133 (Palzer Tr.) at 282:21-283:19, 293:21-25.

Plaintiffs:  Disputed.  Defendants mischaracterized Mr. Palzer's testimony.  With respect to 282:21-283:19, after counsel's objection that Defendants' counsel was asking Mr. Palzer legal questions about Regulation S, Mr. Palzer testified "I don't think [the secondary market transactions] were made pursuant to Regulation S at all" and the transactions "did not conflict with Regulation S."  Vigna Decl. Ex. 133 (Palzer Tr.) at 283.  With respect to 293:21-25, Mr. Palzer testified that the Subordinated Notes were not sold in the United States subject to Regulation S, the trades were executed in the United States, and that Regulation S "has very limited application of the secondary market."  Vigna Decl. Ex. 133 (Palzer Tr.) at 293-294:22.

487.    Plaintiffs' transactions were not subject to U.S. interest rate restrictions, U.S. tax withholding from coupon payments or other U.S. rules that foreign bond purchasers such as Plaintiffs seek to avoid.  *See, e.g.*, Vigna Decl. Ex. 119 (Am. Awan Report) at 4-6.

Plaintiffs: Not disputed.  However, Plaintiffs' Subordinated Notes transactions are subject United States' state contract law (here, New York or Florida law) (Elkin Decl. Ex. 30 (Palzer Report) at FN 31) and, as the Court has already held, to United States securities laws.  Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment on the pleadings and summary judgment dated August 29, 2017) at 3-4.

488.    On the contrary, Plaintiffs transactions were subject to European regulation.  The IM provided that:

> Secondary market sales of book-entry interests in the Non-Tenge New Notes held through Euroclear or Clearstream to purchasers of book-entry interests in the Non-Tenge New Notes through Euroclear or Clearstream will be conducted in accordance with the normal rules and operating procedures of Euroclear and Clearstream and will be settled using the procedures applicable to conventional Eurobonds.

Vigna Decl. Ex. 3 (2010 IM) at 318.

Plaintiffs: Not disputed.  However, Plaintiffs' Subordinated Notes transactions are also subject United States' state contract law (here, New York or Florida law) (Elkin Decl. Ex. 30 (Palzer Report) at FN 31) and, as the Court has already held, to United States securities laws.  Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment on the pleadings and summary judgment dated August 29, 2017) at 3-4.

489.    Among those "normal rules" are not only the organizational buy-in rules discussed above, but also Belgian Royal Decree no. 62 (Nov. 10, 1967) (governing the deposit, transfer and pledge of securities) and EU Settlement Finality Directive 98.26/EC (specifically addressing the contractual irrevocability of transfer orders).  *See, e.g.*, Vigna Decl. Ex. 119 (Am. Awan Report) at 20-21 (citing CPSS, International Payment Arrangements 463, 465 (2003)).

Plaintiffs:  Not disputed.  However, Plaintiffs' Subordinated Notes transactions are also subject United States' state contract law (here, New York or Florida law) (Elkin Decl. Ex. 30 (Palzer Report) at FN 31) and, as the Court has already held, to United States securities laws.  Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment on the pleadings and summary judgment dated August 29, 2017) at 3-4.

490.    Further, Plaintiffs' transactions were subject to supervision by the Belgian Banking and Finance Commission and/or the Luxembourg Commission de Surveillance du Secteur Financier.  Vigna Decl. Ex. 119 (Am. Awan Report) at 20-21 (citing CPSS at 463-64).

Plaintiffs:  Not disputed.  However, Plaintiffs' Subordinated Notes transactions are also subject United States' state contract law (here, New York or Florida law) (Elkin Decl. Ex. 30 (Palzer Report) at FN 31) and, as the Court has already held, to United States securities laws.  Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment on the pleadings and summary judgment dated August 29, 2017) at 3-4.

491.    In addition, Defendants were at all times subject to the securities laws of Kazakhstan.

Plaintiffs:  Defendants provide no citation to the factual record to support their assertion. As this is in violation of Local Civil Rule 56.1 (d) ("Each statement by the movant . . . must be followed by a citation to evidence which would be admissible … "), no response is required.

## XVII.  PLAINTIFFS' CONDUCT IN LITIGATION

**ADDITIONAL UNDISPUTED MATERIAL FACTS INTRODUCED BY PLAINTIFFS
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUIMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, Plaintiffs introduce the following additional

undisputed material facts in opposition to Defendants' motion for summary judgment and in

support of Plaintiffs' cross-motion for partial summary judgment.

## I.  THE 2010 RESTRUCTURING

1.  SK Fund communicated with investors regarding the 2010 Restructuring.  Elkin

Decl. Ex. 2 (Investor Call with Mr. Kelimbetov and Mr. Saidenov dated March 24, 2009) at

BTA_00345493.

2.  SK Fund communicated with the Steering Committee regarding the 2010

Restructruing.  Elkin Decl. Ex. 3 (July 2009 Restructuring email) at BTA_00184346.

3.  SK Fund negotiated changes to the 2010 Restructuring.  Elkin Decl. Ex. 5 (March

2010 Restructuring email) at BTA_00004325.

4.  SK Fund participated in the meeting of the claimants to approve the 2010

Restructuring.  Elkin Decl. Ex. 9 (Minutes of the Meeting of the Claimants of Joint Stock

Company "BTA Bank" Dedicated to the Approval of the Restructuring Plan of Joint Stock

Company "BTA Bank" dated May 28, 2010).

5.  Contemporaneous analyst reports demonstrate that BTA's Management Board

was beholden to SK Fund in its ongoing operations of BTA following the 2010 Restructuring.

*See* Elkin Decl. Ex. 14 (Troika July 2011 Report) at 27 ("We have the impression that the bank's

current management adopted a very passive approach, preferring not to do things that have not

been specifically suggested by Samruk-Kazyna."); Vigna Decl. Ex. 94 (Troika September 2011

Report) at 6 ("[W]e expect Samruk-Kazyna to continue running BTA Bank in the current manner

– supporting its liquidity and funding, likely at a high cost to the bank – until it sees substantial recoveries to close the capital hole. SK Finance (officially established in June, according to Samruk-Kazyna) was instructed to come up with an updated plan for the bank (and the other two restructured banks)."); Elkin Decl. Ex. 11 (JP Morgan, Kazakhstan Trip Notes dated May 25, 2011) at 2 ("S-K is trying to rebuild the business model of the bank, in order to simplify the relations between S-K and BTA … .")

      6.     The Base Case Model formed the basis for the financial terms of the 2010 Restructuring. Although the model was not public, it was used to derive the restructuring package that BTA's creditors received through the 2010 Restructuring. As such, the Base Case Model was incorporated into the 2010 IM. Vigna Decl. Ex. 3 (2010 IM) at 136; Vigna Decl. Ex. 125 (Favale Tr.) at 122:2-19 ("Q. Was Lazard the one calculating the haircut for the creditors? A. Yes, that was their main responsibility, is to make sure that with all the inputs and provisions and business plan, that the model would come out with the right haircut for the capitalization to hit the cap adequacy. Q. What was your role, if any, in working with Lazard on their haircut estimation? A. Well, not in terms of coming to the final number, right, but as an overall -- looking for the implementation, making sure this was done correctly -- I wasn't responsible for the model. The people responsible for the model were Lazard and Deloitte."); *See also* Vigna Decl. Ex. 113 (Clark Report) at 8-9; Vigna Decl. Ex. 129 (Clark Tr.) at 90-91, 99-100, 102, 400; Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 39-41, 51-52; Vigna Decl. Ex. 130 (Kapoor Tr.) at 159:2-21, 237:2-24, 239:2-240:7 ("You don't build a model for it to fail. You build a model and negotiate the terms such that it passes. Though, the disclosure -- though, the disclosure is what it is. The restructuring would never have taken place under those terms if these ratios were failing.

And they wouldn't have been an information memorandum that states the ratios fail and are projected to continue failing.")

7.      The historical and current financial information forming the baseline of the Base Case Model was expected to be correct.  Vigna Decl. Ex. 129 (Clark Tr.) at 90-91, 102, 400; Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 51-52; Vigna Decl. Ex. 130 (Kapoor Tr.) at 159:2-21, 237:2-24, 239:2-240:7.

8.      The 2010 IM did not contain risk disclosures regarding the accuracy of material historical and current financial information in the Base Case Model.  *See generally* Vigna Decl. Ex. 3 (2010 IM).

9.      Nor could BTA disclaim away inaccurate historical information with risk disclosures about future assumptions and projections.  Vigna Decl. Ex. 129 (Clark Tr.) at 100:13-25 ("Q.  … And you are aware there are also several risk disclosures about the model and whether it would be achievable?  You have reviewed those?  A.  The risk disclosures disclose risks about the future, about the uncertainty and the factors which determine the uncertainty of the future.  As I think -- I hope I was clear in saying, I was not talking about the future.  I was talking -- referring to the past -- what is in the past.").

10.     While the Steering Committee negotiated the Restructuring Plan, the 2010 IM made abundantly clear that the Steering Committee did not act as an agent for BTA's other creditors.  Vigna Decl. Ex. 3 (2010 IM) at iii ("The members of the Steering Committee are not acting as fiduciary or adviser to any person, give no covenants and have no duties or obligations to any person in connection with the Restructuring.").

██████████████████████████████████████████████

██████████████████████

[████████████████████████████]

[████████████████████████████]

[████████████████████████████]

[████████████]

## II.   THE UNDISCLOSED SK DEPOSIT AND THE NEGATIVE CARRY SWAP

### A.   The Undisclosed SK Deposit

13.     The Undisclosed SK Deposit was three pre-planned bank deposit transactions beginning on May 13, 2010, whereby SK Fund placed term deposits into BTA in order to neutralize "the risk of [SK] Fund not meeting its obligations in 2024" to pay BTA principal and interest on the SK Bonds.  Vigna Decl. Ex. 124 (Howes Tr.) at 276-280; Elkin Decl. Ex. 7 ("Overview of financial stability of the Fund Samruk-Kazyna and measures to maintain it," April 2010) at 23; Vigna Decl. Ex. 124 (Howes Tr.) at 274:22, 277:4-5; Defendants' 56.1 Statement, at ¶ 224; Vigna Decl. Ex. 115 (Kapoor Report) at 6-7; Vigna Decl. Ex. 13 (S-K 2010 Audited Financial Statements, filed June 20, 2011) at 27, note 10 ("The deposit was placed to accumulate funds for future settlement of the Fund's bonds currently held by BTA Bank JSC with a nominal value of 645,000 million Tenge").

14.     SK Fund prepared an internal risk management presentation called (as translated into English) "Overview of financial stability of the Fund Samruk-Kazyna and measures to maintain it."  Elkin Decl. Ex. 7; Vigna Decl. Ex. 124 (Howes Tr.) at 274:22, 277:4-5.

15.     SK Fund's 30(b)(6) witness Howes testified that a presentation like this "was produced in the Fund" and it "exists, or existed in some sort of form."  Vigna Decl. Ex. 124 (Howes Tr.) at 274:22, 277:4-5.  However, SK Fund did not disclose this presentation in this litigation, despite repeated requests to do so.

16.     SK Fund required the Undisclosed SK Deposit because "[t]he main factor *negatively* impacting the long-term *sustainability* of the Fund is *redemption* bonds *for 750 billion tenge* to the banks BTA and Alliance [KZT 645 billion to BTA]."  Elkin Decl. Ex. 7 (Overview of financial stability of the Fund Samruk-Kazyna and measures to maintain it, April 2010) at 19 (emphasis in original); Vigna Decl. Ex. 124 (Howes Tr.) at 274:22, 277:4-5.

17.     The solution to mitigate this catastrophic risk was that the "Fund *must ensure the following payments:* … BTA:  *12.8 billion tenge annually until 2024 and 645 billion tenge* to pay for the principal in 2024."  *Id.* at 19 (emphasis in original).

18.     SK Fund proposed the solution, which included to "*place deposits* in BTA … at a rate of *10.5%*, which *accumulates* up to 2024 up to the amount if 645 [] billion tenge."  *Id.* at 22 (emphasis in original).

19.     Put another way, SK Fund made the Undisclosed SK Deposit "to make sure that we didn't bankrupt ourselves."  "[T]herefore, following an analysis, which I believe you have as well, we decided that the best way to do this, which was to the benefit of BTA Bank as well as allowing us to meet our requirements, was to put a deposit in BTA Bank."  Vigna Decl. Ex. 124 (Howes Tr.) at 182:25-183:7.

20.     The purpose of the Undisclosed SK Deposit was not to provide liquidity for BTA.  SK Fund separately provided liquidity to BTA through the the State Finance Programme and the SK Bonds, which BTA used as collateral for the NBK repo.  *See generally* Vigna Decl. Ex. 3 (2010 IM).

21.     There is also no evidence in the record that the Undisclosed SK Deposit was ever put to productive use by BTA.  To the contrary, the Base Case Model projected that BTA had excess liquidity, including more liquidity than lending opportunities available to BTA at the

time.  Vigna Decl. Ex. 130 (Kapoor Tr.) at 220:20-221:7 ("So all the Lazard plan is doing is

projecting the certain number of loans will be made, and that's all that will be made, you know.")

Vigna Decl. Ex. 130 (Kapoor Tr.) at 328:19-329:5 ("Q.  Why is it your belief that Lazard would

not have adjusted this optimal allocation if they had presumed that there was going to be a larger

amount of deposits?  A.  Because had other opportunities been available to lend out money at,

the repo, for example, would be fully drawn on the Lazard model, which it wasn't.  So there was

excess liquidity available that the Lazard model could draw on, which it  wasn't, and, therefore,

the Lazard model had a set number of opportunities that it could invest -- that BTA Bank would

invest in."); Vigna Decl. Ex. 132 (Hrycay Tr.) at 105:12-22 ("I also understand in the economic

environment of 2010 that the Lazard model, for example, showed that the company already had

excess liquidity and it was an economic environment in which there were not a large number of

loan opportunities were available.").

22.     In addition, if BTA's concern was liquidity then the rational economic decision

would have been to "sell the [SK] bonds.  Get the cash.  You don't need all these transactions."

Vigna Decl. Ex. 130 (Kapoor Tr.) at 138:11-14.

23.     Consistent with the Base Case Model projections regarding lending opportunities,

BTA reported a 24% decrease in loans to customers in 2010.  Vigna Decl. Ex. 30 (BTA Investor

Call Presentation, dated May 17, 2011), at P00001952.

24.     In the Explanatory Note regarding the approval of part of the Undisclosed SK

Deposit, the deposit was "recognized as being large because the amount paid upon the expiration

of the Deposit will be more than 25% of the total value of the Bank's assets at the current

moment."  Elkin Decl. Ex. 6 (April 2010 Explanatory Note) at BTA_00236731.

25.     Although the Undisclosed SK Deposit was not formally approved by BTA's board of directors until April 29, 2010, this transaction was contemplated as early as January 2010.  Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email) at BTA_00303204.

26.     On January 27, 2010, BTA's financial controller Rimma Ilyassova sent an email to Lazard bankers, copying the Chairman of BTA's Management Board Saidenov and independent restructuring consultant Marcia Favale (Vigna Decl. Ex. 125 (Favale Tr.) at 63:20-64:4), warning that ***"[a]dditional interest expenses of [the then-considered iteration of the Undisclosed SK Deposit] appears that are not considered in the model, and there is SHORTAGE of capital for compliance with norms, ratios ARE IN BREACH."***  Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email) at BTA_00303204 (emphasis added).

27.     As part of SK Fund's plan to cover their obligations becoming due in 2024 to BTA, SK Fund:  (i) converted their current deposit account established in February 2009 at BTA of KZT 97 billion on May 13, 2010, to a term deposit account with an annual interest rate of 11% and a maturity date of December 30, 2024, with the accrued interest on the term deposit to be capitalized at the end of each year; (ii) by September 22, 2010, increased the term deposit amount by KZT 78 billion to KZT 175 billion, with the same interest rate of 11%; and (iii) on December 20, 2010, made an additional deposit of KZT 29.3 billion at a rate of 9%, maturing in 2024.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 22-25; Defendants' 56.1 Statement, at ¶¶ 223-225, Elkin Decl. Ex. 6 (April 2010 Explanatory Note) at BTA_00236731; Vigna Decl. Ex. 38 (Corporate Bank Deposit Contract No. 1489 dated May 13, 2010).

28.     By December 31, 2010, the term deposit accrued interest of KZT 8.1 billion was capitalized, increasing the total term deposit amount from KZT 175 billion to KZT 183.1 billion.

████████████████████████████████████████████

███████████████████████████████

29.     On December 31, 2011, accrued interest in the amount of KZT 17.4 billion was capitalized, increasing the term deposit amount to KZT 200.5 billion.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 23-24; ████████████████████████████

███████████████

30.     By December 30, 2024, at an income tax rate of 15% and a term deposit rate of 11%, the KZT 175 billion term deposit was projected to be KZT 651.3 billion.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 23-24; ████████████████████████████

███████████████

31.     The interest rate for the Undisclosed SK Deposit was substantially higher than the average cost of deposit funding at BTA's peers.  Vigna Decl. Ex. 132 (Hrycay Tr.) at 76-77, 82-83, 86, 112-114; Vigna Decl. Ex. 130 (Kapoor Tr.) at 104; Vigna Decl. Ex. 88 (Fitch 2011 Report) ("Undisclosed SK Deposits bear relatively high interest rates of up to 10%, substantially higher than the average cost of deposit funding at BTA's peers"); Elkin Decl. Ex. 14 (Troika July 2011 Report) at 30 (SK Fund deposits, which "accounted for around 75% of the bank's overall deposits" had an "average interest rate for this money [of] 9.8%, which is quite expensive given current competitive market rates (as of early summer 2011, most Kazakh banks paid zero interest on current account balances of corporate clients and 4-5% interest for term corporate deposits)."); Vigna Decl. Ex. 45 (JP Morgan Report dated May 18, 2011) at P0001754 ("the cost

of the Samruk-Kazyna deposits averages 9.8% … which [is] significantly above the bank's average yield on its assets").

32.     In addition, the interest rate of 11% being paid on the majority of the Undisclosed SK Deposit was higher than the projected interest rates for all other term deposits in the Base Case Model (interest rates on term deposits in the range from 6.7% to 10.6%, and including the Undisclosed SK Deposit increased the weighted average interest rate from 7.5% to 9.7% for 2010 and from 7.5% to 9.6% in 2011). Vigna Decl. Ex. 115 (Kapoor Report) at ¶ 26; Vigna Decl. Ex. 9 (Base Case Model).

33.     The effect of the Undisclosed SK Deposit was that the 2010 Restructuring would produce a restructured BTA that did not comply with requisite capital adequacy ratios to operate as a licensed Kazakhstani bank.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶ 52.

34.     Accordingly, the 2010 Restructuring would not have occurred on these terms if BTA had included the Undisclosed SK Deposit in the Base Case Model.  Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 51-52; Vigna Decl. Ex. 130 (Kapoor Tr.) at 159, 237, 239-240 ("You don't build a model for it to fail.  You build a model and negotiate the terms such that it passes.  Though, the disclosure -- though, the disclosure is what it is.  The restructuring would never have taken place under those terms if these ratios were failing.  And they wouldn't have been an information memorandum that states the ratios fail and are projected to continue failing."); Vigna Decl. Ex. 125 (Favale Tr.) at 181:6-15 ("[Y]ou [are] restructuring a bank to recapitalize a bank so the bank can have capitalization ratios to allow it to perform its function as a bank.  Number one thing for a bank, if you don't meet cap adequacy, your license is pulled."); Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email).

39.     Defendants admit that the Undisclosed SK Deposit, including its purpose and known detrimental effect, was not disclosed in the 2010 IM provided to all creditors, including the Plaintiffs (the "Undisclosed SK Deposit Omission").  Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20 ("Q.  So are you aware of there being a supplement to this Information Memorandum that disclosed the deposits relating to the S-K bonds, the 11% deposits?  A.  No."); Vigna Decl.

Ex. 125 (Favale Tr.) at 208:3-10 ("Q.  Does the Information Memorandum disclose the fact that

S-K Fund intended  to repay the S-K bonds with funds that accumulated in the term deposit

accounts?  [Objections.]  A. I don't recall that specifically.").

40.     Nor is there any evidence in the record demonstrating that the purpose and known

detrimental effect was later disclosed to the market.  Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶

44.

## B.     The Negative Carry Swap

41.     The Undisclosed SK Deposit was only part of the "Negative Carry Swap"—a

series of interrelated transactions between BTA and Kazak government entities, its 81.5%

majority shareholder SK Fund, and NBK—resulting in a "negative carry," a net outflow of

interest from BTA to these entities, that doomed the prospects of the 2010 Restructuring.  Vigna

Decl. Ex. 115 (Kapoor Report) at ¶¶ 31-32; Elkin Decl. Ex. 14 (Troika July 2011 Report).

42.     The components of the Negative Carry Swap were the (1) Undisclosed SK

Deposit, (2) SK Bonds, (3) NBK Repo, and (4) SK Guaranty, all of which are defined, *supra*.

Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 31, 31; Elkin Decl. Ex. 14 (Troika July 2011 Report).

43.     These transactions were interrelated.  BTA required the SK Bonds and the SK

Guaranty to enter the NBK Repo, and the Undisclosed SK Deposit was made to repay the

principal and a portion of the interest on the SK Bonds.  The SK Bonds provided a stream of

interest inflows to BTA Bank, while the SK Repo, the SK Guaranty and the Undisclosed SK

Deposit resulted in a stream of interest outflows from BTA Bank.  Vigna Decl. Ex. 115 (Kapoor

Report) at ¶¶ 31-32; Elkin Decl. Ex. 14 (Troika July 2011 Report); Vigna Decl. Ex. 9 (Base Case

Model); Vigna Decl. Ex. 16 (BTA 2010 Financial Statements).

44.     The Kazakh government through SK Fund and NBK, who were the primary

lenders to and the majority shareholders of BTA, effectively swapped with BTA one set of

interest flows for another set of interest flows, resulting in a "negative carry". Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 31-32; Elkin Decl. Ex. 14 (Troika July 2011 Report); Vigna Decl. Ex. 9 (Base Case Model); Vigna Decl. Ex. 16 (BTA 2010 Financial Statements).

45. The projected negative carry for BTA was approximately KZT 7.5 billion (U.S. $49.4 million) for 2010 and KZT 39.1 billion (U.S. $259.3 million) for 2011. The total projected negative carry from May 2010 to December 2024 is KZT 819.7 billion (U.S. $5.4 billion). Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 31-32; Vigna Decl. Ex. 9 (Base Case Model); Vigna Decl. Ex. 16 (BTA 2010 Financial Statements); Vigna Decl. Ex. 114 (Hrycay Report) at ¶ 22; Vigna Decl. Ex. 132 (Hrycay Tr.) at 112-14; Elkin Decl. Ex. 14 (Troika July 2011 Report).

46. Interest on the Undisclosed SK Deposit was transferred from BTA to SK Fund's account at BTA. Vigna Decl. Ex. 124 (Howes Tr.) at 310 ("Q. And I actually do have a follow-up question then, Mr. Howes. Are you certain that actually there was a transfer, whether it's within the bank or not, of any of the interest payments to the Fund S-K account at BTA prior to the end of 2012? THE WITNESS: The balances definitely showed an increase from accumulation of the interest on the accounts, within the deposit account quite specifically, so yes.").

47. As discussed *supra*, the Undisclosed SK Deposit component of the Negative Carry Swap alone resulted in a restructuring of BTA that could not meet the requisite capital adequacy ratios to operate as a viable Kazakh bank. Vigna Decl. Ex. 115 (Kapoor Report) at ¶¶ 51-52; Vigna Decl. Ex. 130 (Kapoor Tr.) at 159, 237, 239-240; Vigna Decl. Ex. 125 (Favale Tr.) at 181:2-182:4; Elkin Decl. Ex. 4 (January 27, 2010 Undisclosed SK Deposit Warning Email) at BTA_00303204."

### III. THE INFORMATION MEMORANDUM

48.     As Defendants admit, the 2010 IM did ***not*** disclose the Undisclosed SK Deposit,

nor its purpose or known detrimental effect on BTA and the 2010 Restructuring.  *See generally*

Vigna Decl. Ex. 3 (2010 IM); Vigna Decl. Ex. 124 (Howes Tr.) at 168:16-20; Vigna Decl. Ex.

125 (Favale Tr.) at 208:3-10.

49.     SK Fund circumvented the Deed of Undertaking restriction on a Permitted

Dividend with the Negative Carry Swap, and particularly the Undisclosed SK Deposit.  The

Undisclosed SK Deposit was a planned transaction (not a pre-existing deposit) that was designed

to transfer interest income—projected at approximately KZT 7.5 billion (U.S. $49.4 million) for

2010 and KZT 39.1 billion (U.S. $259.3 million) for 2011—for the purpose of enabling SK Fund

to meet its massive future liability on the SK Bonds to BTA.  Vigna Decl. Ex. 115 (Kapoor

Report) at  6-7, ¶ 38; Vigna Decl. Ex. 114 (Hrycay Report) at ¶ 22; Vigna Decl. Ex. 132 (Hrycay

Tr.) at 112:13-114:25; Elkin Decl. Ex. 14 (Troika July 2011 Report); Vigna Decl. Ex. (Howes

Tr.) at 276-280, 310; Elkin Decl. Ex. 7 ("Overview of financial stability of the Fund Samruk-

Kazyna and measures to maintain it," April 2010) at 23; Vigna Decl. Ex. 124 (Howes Tr.) at

274:22, 277:4-5; Defendants' 56.1 Statement, at ¶ 224; Vigna Decl. Ex. 13 (S-K 2010 Audited

Financial Statements, filed June 20, 2011) at 27, note 10.

50.     Although interest on the Undisclosed SK Deposit was not a dividend per se, it

was like a dividend.  Vigna Decl. Ex. 132 (Hrycay Tr.) at 69:5-22 ("[E]ven though we have

economic benefits that are not structured in the form of dividends, they're still substantial

economic benefits that accrue to SK Fund.").

51.     Moreover, interest on the Undisclosed SK Deposit—which was transferred from

BTA to SK Fund, as "balances definitely showed an increase from accumulation of the interest

on the accounts, within the deposit account quite specifically"—was a distribution, which falls

into the 2010 IM's definition of Permitted Dividend. Vigna Decl. Ex. 124 (Howes Tr.) at 310:4-13; Vigna Decl. Ex. 3 (2010 IM) at 32; Vigna Decl. Ex. 132 (Hrycay Tr.) at 68:7-20 ("'Distribution payments' here could mean interest payments as discussed, which would be in some way substantively similar.").

IV.  **SK FUND'S 2011 AND 2012 STATEMENTS REGARDING SUPPORT FOR BTA**

52.     On June 21, 2010, Fitch Ratings issued a report qualifying its "B-" rating of BTA, among other things, on its assessment of Kazakh government support. The rating "Reflect[ed] Fitch's assessment of the possibility of support from the Kazakh authorities. The banks' government ownership and the reputational risk for the Kazakh authorities of repeated default of any of these banks create incentives to provide support, in Fitch's view. However, in its assessment of potential support, the agency also considers the fact that neither of these banks represents a strategic investment for the Kazakh authorities, as well as the absence of any clear statements on support from senior Kazakh government officials." Elkin Decl. Ex. 36 (Fitch Ratings analyst report, dated June 21, 2010).

53.     On June 29, 2011, a Credit Suisse analyst report commented that we expect that the bank will end up getting some help from its controlling shareholder, Samruk-Kazyna (SK), during the aforementioned time horizon. However, until SK comes out and shows such support, BTA's bonds may continue to experience a high degree of volatility, similar to the pattern we have seen during the past month." Elkin Decl. Ex. 12 (Credit Suisse Fixed Income Research report titled "BTA Bank – Living Dangerously," dated June 29, 2011).

54.     Despite SK Fund's public statements of support for BTA and its bondholders (including by Karibzhanov on July 5, 2011 and in late November 2011, and Kulibayev on October 5, 2011), SK Fund had no actual intention of modifying the terms of the Negative Carry Swap, and particularly the Undisclosed SK Deposit, as it could not do so. Vigna Decl. Ex. 124

(Howes Tr.) at 226:12-223:3 ("Q. Were there discussions at this time about accepting lower interest rates?  A. BTA had asked the Fund to lower the interest rate.  Q. And when did BTA ask the Fund to lower the interest rate?  A. I think sometime between May 17 and July 7.  Q. And what was the Fund's response to that request?  A. Reluctance.  Q. And why was the Fund reluctant?  A. Because the deposits were designed to repay the liabilities that we had to BTA and for us to be prudent, we would need to accumulate the money.")

55.     Nor did SK Fund ever disclose to the market that it was reluctant to raise the interest rate on the Undisclosed SK Deposit.  Vigna Decl. Ex. 124 (Howes Tr.) at 227:8-19 ("Q. And based on, you know, at least as of July 7, had the Fund made any announcements to the market that it was reluctant to lower the interest rate?  A. I don't think the Fund had said anything on the subject.  Q. Do you know if the Fund ever disclosed its reluctance to lower the interest rate?  A.  I don't think it disclosed whether it was reluctant or unreluctant to either raise or lower the interest rates on the deposits.")

56.     Immediately following Karibzhanov's late-November 2011 interview, BTA's Deputy Chairman Askhat Beisenbayev criticized Karibzhanov's statement as misleading in an internal email:  as translated by Howes, "Aidan, not only does not help but also spoils the picture."  Elkin Decl. Ex. 15 (BTA Comment on Reuters dated December 1, 2011).

57.     Following this article, SK Fund officials had internal conversations regarding message discipline and the need to speak accurately to the press.  Vigna Decl. Ex. 124 (Howes Tr.) at 247:11-248:24.  There is no evidence in the record that SK Fund ever corrected or updated this statement.

58. In addition, SK Fund's 30(b)(6) witness Howes testified that, contrary to Karibzhanov's statements, SK Fund was not preparing to inject more capital into the bank at this time. Vigna Decl. Ex. 124 (Howes Tr.) at 239:4-23.

59. On February 3, 2012, although BTA had already announced the need for a second debt restructuring, SK Fund's Chairman Umirzak Shukeyev stated that SK Fund "will discuss [the proposed debt restructuring] with the creditors and first of all we should make the principal decision about the necessity of this restructuring with them." Elkin Decl. Ex. 16 (*Samruk-Kazyna To Support BTA Debt Restructuring, Shukeyev Says*, Bloomberg News (Feb. 3, 2012)). He also said "Samruk-Kazyna is ready for injections into BTA, but creditors must do it too" and that "[w]e must support the bank, which means opening new deposits and accounts there." *Id.*

60. The perception of SK Fund support, which was buttressed by SK Fund's 2011 and 2012 public statements, mitigated the effect of the Negative Carry Swap on BTA's securities prices. Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 72-82, 74 ("Following the publication of partial information related to the Negative Carry Swap, several market participants specifically stated that they believed that the terms of the Negative Carry Swap arrangement would be amended."); *id.* at ¶ 82(b) ("To the extent that the Negative Carry Swap was understood, analysts believed that the Negative Carry Swap would be corrected, which would make it a short-term issue."); Elkin Decl. Ex. 35 (Declaration of William P. Hrycay, CFA dated September 3, 2019, at ¶¶ 6,7, 9, 10). Vigna Decl. Ex. 45 (JP Morgan Report dated May 18, 2011); Elkin Decl. Ex. 11 (JP Morgan, Kazakhstan Trip Notes dated May 25, 2011); Elkin Decl. Ex. 14 (Troika July 2011 Report); Vigna Decl. Ex. 94 (Troika September 2011 Report); Elkin Decl. Ex. 10 (Morgan Stanley, "EM Credit Trading Desk View," May 13, 2011); Vigna Decl. Ex. 87 (UBS Investment

Research Report dated September 2, 2010); Elkin Decl. Ex. 13 ("BTA Bank – Living Dangerously," Credit Suisse Fixed Income Research, June 29, 2011).

## V.     HINTON'S COMPARABLE BOND INDEX

61.     The price of Hinton's Comparable Bond Index Index declined by only $7.74 between September 3, 2010 ($77.00) – the date Plaintiffs' received their Subordinated Notes in the 2010 Restructuring – and December 22, 2011 ($69.27) – the date BTA announced the need for a second restructuring – when the index is appropriately anchored to $77.00.  Elkin Decl. Ex. 35 (Declaration of William P. Hrycay, CFA dated September 3, 2019, at ¶ 5).  Based on "composite" price data, the price of the Subordinated Notes declined by $67.16 (from $77.00 to $9.84) during this same period.  Elkin Decl. Ex. 35 (Declaration of William P. Hrycay, CFA dated September 3, 2019, at ¶¶ 4-5); Vigna Decl. Ex. 114 (Hrycay Report) at ¶¶ 36-38).

## VI.     PLAINTIFFS' BTA SECURITIES TRANSACTIONS

**A.     Plaintiffs' Incurred Irrevocable Obligations for their BTA Securities Trades in the United States**









77.     Settlement is irrelevant to the incurring of irrevocable liability for a Eurobond trade.  Elkin Decl. Ex. 30 (Palzer Report) at ¶ 29(d) ("Mr. Awan's conclusion that the transactions became irrevocable under the rules of the clearing and settlement systems at the back-end of the trade life-cycle ignores the fact that under international capital markets standards, all the Exchange Transactions and Secondary Transactions became binding (and thus irrevocable) at the front-end execution of the transactions in the United States through Plaintiffs' U.S. broker-dealer, UBS.");  Elkin Decl. Ex. 28 (Memorandum Opinion and Order, Defendants' motion for judgment on the pleadings and summary judgment dated August 29, 2017) at 3-4 (As the Court noted in its earlier Opinions, the *Absolute Activist* test is in the disjunctive: *Either* the passage of title (that is, clearing and settling) *or* the incurring of irrevocable liability in the United States is sufficient to establish a domestic securities transaction.").

---

<hr />

[6] Defendants' 56.1 Statement also identifies these transactions at ¶¶ 318-322, 323, 324, 328-330, 333, 334, 336-338, 444-446, and 448.



## VII. POST-2012 RESTRUCTRUING TRANSACTIONS RELATING TO BTA'S NPL PORTFOLIO

79.     Between January 2014 and July 2017, Defendants engaged in a series of related-party transactions with other Kazakh state controlled entities that resulted in the transfer of BTA's now valuable NPL portfolio assets to Kenes Rakishev (the 97.5% shareholder of BTA) and BTA's banking assets to Timur Kulibayev (a majority owner of Halyk Bank). Vigna Decl. Ex. 113 (Clark Report) at 20-28.

80.     These transactions are all described in publicly issued financial statements audited by "Big Four" accounting firms, as noted in the following paragraphs. *Id.*

81.     Rakishev, who has been described by *Bloomberg* as a "tycoon," is a Kazakh businessman with close ties to the government. Vigna Decl. Ex. 113 (Clark Report) at 21-22; Elkin Decl. Ex. 32 ("A Crypto Tycoon, Banking Heir and the Mysterious Fight for Gold," May 14, 2018); ("The Tech Company That Couldn't Invest Straight," *Barrons*, April 27, 2018).

82.     Kulibayev, who has been described by the *Financial Times* as a "powerful oligarch," is the son-in-law of Kazakhstan's then-long-time President Nursultan Nazarbayev. Kulibayev and his wife Dinara Nazarbayev are the majority owners of Halyk Bank. Vigna Decl. Ex. 113 (Clark Report) at 22; Elkin Decl. Ex. 14 (Troika July 2011 Report) at P00001570.

83.     In 2018, *Forbes Magazine* jointly ranked Kulibayev and his wife as the 729th richest people in the world, with a combined fortune of approximately U.S. $6.4 billion. Kulibayev was also the Chairman of SK Fund in 2011. Elkin Decl. Ex. 34 (Forbes Profile of Timur Kulibayev).

84.     In 2014, SK Fund sold 93% of its BTA shareholding to competitor bank KKB (of which SK Fund was a 21.8% shareholder) and Rakishev (46.5% each) in a closed bidding process. SK Fund retained the 4% balance of its BTA shares in trust. KKB and Rakishev

intended to merge BTA and KKB into a single bank. Vigna Decl. Ex. 113 (Clark Report) at 23-24; Elkin Decl. Ex. 22 (SK Consolidated Financial Statements 2014) at 41-43; Elkin Decl. Ex. 21 (Kazkommertsbank JSC Consolidated Financial Statements for 2015, 2014, and 2013) at 15.

85. The total sale price was KZT 122,690 million, with KZT 69,750 million received at closing and 52,940 million "during three years following the execution of the sale." *Id.* However, SK Fund never received the full deferred consideration. Vigna Decl. Ex. 113 (Clark Report) at 24; Elkin Decl. Ex. 29 (Kazkommertsbank JSC Consolidated Financial Statements 2017) at 18.

86. Rakishev paid his first installment to SK Fund by transferring shares of another company, Shalkiya Zinc JSC, which owned a non-operational zinc mine ("Zinc Mine"). The Zinc Mine shares were valued at KZT 31 billion. Vigna Decl. Ex. 113 (Clark Report) at 24, Ex 3; Elkin Decl. Ex. 22 (SK Fund Consolidated Financial Statements 2014) at 41-43.

87. In years prior to this transaction, the Zinc Mine – although non-operational – had become more valuable under Rakishev's ownership as a result of BTA restructuring debts on favorable terms, including extending the maturity of a loan from June 2013 to July 2016 and lowering the interest rate from 16% to 7.5%. Vigna Decl. Ex. 113 (Clark Report) at Ex. 3; Elkin Decl. Ex. 19 (SAT & Company JSC Consolidated Financial Statements December 31, 2012) at 63.

88. Rakishev next exchanged his BTA shares for KKB shares in a series of related-party transactions that gave him a controlling interest in KKB by the end of 2016. Vigna Decl. Ex. 113 (Clark Report) at 24-25; Elkin Decl. Ex. 21 (Kazkommertsbank JSC Consolidated Financial Statements for 2015, 2014, and 2013) at 19.

89.     In June 2015, BTA temporarily merged with KKB.  As part of this transaction, BTA transferred to KKB its operating bank assets in exchange for KKB's NPL portfolio.  Vigna Decl. Ex. 113 (Clark Report) at 25-26; Elkin Decl. Ex. 21 (Kazkommertsbank JSC Consolidated Financial Statements for 2015, 2014, and 2013) at 19.

90.     BTA also gave up its banking license and became an asset holding company.  *Id.*

91.     In February 2016, KKB and BTA deconsolidated.  KKB sold BTA to Rakishev and KKB's other controlling shareholder, Nurzhan Subkhanberdin (and other minority shareholders) for total consideration of KZT 6 million, a price of KZT 0.00001 per share.  Vigna Decl. Ex. 113 (Clark Report) at 26; Elkin Decl. Ex. 26 (Kazkommertsbank JSC Consolidated Financial Statements for 2016, 2015, and 2014) at 24-25.

92.     KKB sold the shares at this discount even though the KKB's financial statements calculated the fair value of BTA's net assets at KZT 23,871 million.  *Id.*  BTA's net assets were comprised of KZT 1,573,109 million total assets and KZT 1,549,238 million total liabilities, with the largest part being loans to customers of KZT 789,038 million, with KZT 2.4 trillion plus interest due. *Id.*

93.     As part of this transaction, KKB also made two significant loans to BTA: KZT 630 million at a 9% interest rate and U.S. $5.3 billion at an 8% interest rate, both due 2024, with BTA to make quarterly repayments of principal and interest.  Vigna Decl. Ex. 113 (Clark Report) at 26; Elkin Decl. Ex. 26 (Kazkommertsbank JSC Consolidated Financial Statements for 2016, 2015, and 2014) at 69.

94.     This series of related-party transactions concluded in July 2017 when Rakishev and SK Fund sold their collective 96% shareholding in KKB to Halyk Bank for ***KZT 1 (U.S.***

***$0.07) each***.  Vigna Decl. Ex. 113 (Clark Report) at 27-28; Elkin Decl. Ex. 29 (Kazkommertsbank JSC Consolidated Financial Statements 2017) at 17-19, 55.

95.     This transaction was supported by Kazakhstan's Problem Loan Fund, which acquired certain BTA and KKB NPL assets for the purchase price of KZT 2.6 trillion through a framework entered into on June 2, 2017 between the Kazakh government, NBK, SK Fund, the Problem Loan Fund, KKB, Halyk Bank, and Rakishev.  Vigna Decl. Ex. 113 (Clark Report) at 27; Elkin Decl. Ex. 29 (Kazkommertsbank JSC Consolidated Financial Statements 2017) at 55.

96.     The Problem Loan Fund purchased non-Ablyazov NPLs, including loan receivables and repossessed real estate, from BTA's NPL portfolio.  Vigna Decl. Ex. 129 (Clark Tr.) at 211:14-23.

97.     The results of this final transaction were:

     a.     Halyk Bank, which is controlled by Kulibayev, acquiring KKB's assets for pennies free and clear of distressed assets;

     b.     Rakishev acquiring a 97.5% shareholding of BTA;

     c.     SK Fund and NBK being repaid their exposure to BTA's NPL assets; and

     d.     The Problem Loan Fund owning certain of BTA and KKB's non-Ablyazov NPL assets.  Vigna Decl. Ex. 113 (Clark Report) at 27-28; Elkin Decl. Ex. 29 (Kazkommertsbank JSC Consolidated Financial Statements 2017) at 17-19, 55.

98.     In a May 2018 interview, Rakishev disclosed that BTA still controls considerable Ablyazov-related NPL assets, including logistics parks, shopping centers, and development projects in Russia, as well as valuable real estate in London.  Vigna Decl. Ex. 113 (Clark Report) at  28; Elkin Decl. Ex. 33 ("Russia and Kazakhstan have to take into account political risks").

Rakishev clarified that BTA controls these assets free and clear of BTA's former creditors and that it is continuing to pursue collection of judgments around the world.  *Id.*

99.     On May 7, 2019, in an unrelated litigation involving SK Fund, the Amsterdam Court of Appeals affirmed a preliminary court's decision to allow attachment on the property of SK Fund in furtherance of enforcement of a U.S. $497,685,101 arbitration award against the Republic of Kazakhstan.  Elkin Decl. Ex. 37 (Judgment of the Amsterdam Court of Appeals in the matter of *Samruk-Kazyna JSC et al. v. Anatolie Stati, et al.*, Case No. 200.234.096/01 KG, dated May 7, 2019).

100.    The "primary key question" addressed by the Amsterdam Court of Appeals was "whether the seizure should be lifted . . . since it was not imposed upon an asset of the debtor (Kazakhstan) but on an asset of a third party (Samruk)."  *Id.* at ¶ 3.8.  The Amsterdam Court of Appeals answered affirmatively, and held "Samruk lacks factual and economic independence in its relationship with Kazakhstan," and that "[o]n this basis, and in the absence of any other evidence, it must be assumed that Samruk was established by Kazakhstan with the aim (at least in part) of keeping its assets out of the control of Kazakh creditors."  *Id.* at ¶ 3.10-11.


Dated:  New York, New York
        September 3, 2019

                              COZEN O'CONNOR


                              Martin S. Bloor
                              Matthew L. Elkin
                              277 Park Avenue
                              New York, NY 10172
                              212-883-4900
                              *Attorneys for Plaintiffs Atlantica Holdings,*
                              *Inc., Baltica Investment Holdings, Inc.,*
                              *and Blu Funds, Inc.*