**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ X

ATLANTICA HOLDINGS, INC., et al.,                      :     Case No. 1:12-cv-8852 (JMF)
                                                       :
                                   Plaintiffs,         :
                                                       :
                        -against-                      :
                                                       :
SOVEREIGN WEALTH FUND SAMRUK-KAZYNA,                   :
JSC,                                                   :
                                   Defendant.          :
------------------------------------------------------------------------ X
ATLANTICA HOLDINGS, INC., et al.,                      :     Case No. 1:13-cv-5790 (JMF)
                                                       :
                                   Plaintiffs,         :
                                                       :
                        -against-                      :
                                                       :
BTA BANK JSC,                                          :
                                   Defendant.          :
------------------------------------------------------------------------ X

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE*
TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERTS
SAHEED AWAN, HANS HUMES, JOSEPH MASON, AND PAUL HINTON**

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................... 1

Argument ....................................................................................................................... 2

    I.     Awan's Testimony Is Helpful to the Trier of Fact on the *Morrison* Issue
        and Independent of the Initially Uncited Background Source Materials
        Referred to in His Report ................................................................................ 2

        A.   The Alleged Plagiarism in the Original Awan Report Relates Only to
           Background Information; It Does Not Affect the Originality or Relevance of the
           Substantive Opinions Contained Therein ............................................... 4

        B.   The Alleged Plagiarism in the Original Awan Report Speaks to Awan's
           Credibility, an Issue That Is More Appropriately Addressed at Trial ................... 5

    II.    Humes' Testimony Relates to the Reasonableness of the 2010
        Restructuring Process, and His Extensive Experience Qualifies Him to
        Opine on That Process ................................................................................... 6

    III.   Mason's Testimony Is Reliable, as the "Errors" Plaintiffs Identify in His
        Analysis Are Either Minor or Nonexistent and Do Not Impact the
        Ultimate Conclusions .................................................................................... 9

    IV.   Hinton's Testimony Is within the Scope of Permissible Expert Testimony,
        Is Based on Reliable Data, and Was Disclosed in a Timely Manner ................... 13

        A.   Hinton's Opinions Are within the Scope of Permissible Expert Testimony
           and Do Not Invade the Province of the Judge or Jury ......................................... 13

        B.   The Trade Data Underlying Hinton's Analysis of Market Efficiency Is
           Reliable and Is the Best Available Data ............................................... 14

        C.   Hinton Introduced the "Confidence Effect" In a Timely Manner by
           Discussing It in His Report ............................................................... 16

Conclusion ................................................................................................................. 17

# TABLE OF AUTHORITIES

Cases

*Allen v. City of New York*, 466 F. Supp. 2d 545 (S.D.N.Y. 2006) .................................................. 14

*Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008) ................................................ 16

*Buchwald v. Renco Grp.*, 539 B.R. 31 (S.D.N.Y. 2015) ........................................................... 10, 12

*Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2000) ....................................... 15

*Daniels v. City of New York*, No. 16-cv-9080 (AJN), 2018 U.S. Dist. LEXIS 193084
    (S.D.N.Y. Nov. 13, 2018) .................................................................................................... 14

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 643 F. Supp. 2d 471 (S.D.N.Y.
    2009) .................................................................................................................................. 17

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, Nos. 1:00-1898, MDL 1358 (SAS),
    M21-88, 2008 U.S. Dist. LEXIS 37331 (S.D.N.Y. May 7, 2008) ...................................... 7, 14

*In re Theokary*, 468 B.R. 729 (Bankr. E.D. Pa. 2012) ................................................................. 4

*In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 (AWT), 2009 U.S. Dist. LEXIS 131761
    (D. Conn. Apr. 22, 2009) ................................................................................................... 14

*In re. Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016) .......................................................... 9

*Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95 (E.D.N.Y. 2019) ...................................... 6

*Jinan Yipin Corp. v. United States*, 971 F. Supp. 2d 1296 (U.S. Ct. Int'l Trade 2014) ............... 16

*Legier & Materne v. Great Plains Software, Inc.*, No. 03-0278, 2005 U.S. Dist. LEXIS
    17686 (E.D. La. Aug. 3, 2005) ........................................................................................... 6

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ....................................................... 6

*Moore v. BASF Corp.*, No. 11-1001, 2012 U.S. Dist. LEXIS 170411 (E.D. La. Nov. 30,
    2012) .................................................................................................................................. 4

*Morrison v. Nat'l Australian Bank*, 561 U.S. 247 (2010) ............................................................ 3

*Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120 (2d Cir. 2006) ................. 12

*Proteus Books Limited v. Cherry Lane Music Company, Inc.*, 873 F.2d 502 (2d Cir.
    1989). ................................................................................................................................. 7

*Raymo v. Sec'y of HHS*, No. 11-0654V, 2014 U.S. Claims LEXIS 162 (Fed. Cl. Feb. 24,
    2014) .................................................................................................................................. 4

*Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197 (Super. Ct. May 30, 2008) ............................................................................................... 13

*Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362 (U.S. Ct. Int'l  Trade 2013) ............................................................................................................... 15

*United States v. 14.38 Acres of Land, Mor or Less Sit. In Leflore County Miss.*, 80 F.3d 1074 (5th Cir. 1996) .................................................................................................... 6

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................................... 14

Statutes

Fed. R. Evid. 702 ...................................................................................................................... 5

Other Authorities

Evan Tarver, *Capitalize Accrued Interest*, INVESTOPEDIA.COM (Nov. 19, 2018), https://www.investopedia.com/ask/answers/040915/what-does-it-mean-capitalize-accrued-interest.asp .................................................................................................... 11

Defendants BTA Bank ("BTA") and Sovereign Wealth Fund "Samruk-Kazyna" ("S-K Fund") (collectively "Defendants") respectfully submit this Memorandum of Law in opposition to Plaintiffs' omnibus motion *in limine* to exclude the testimony of Defendants' experts Saheed Awan, Paul Hinton, Hans Humes, and Joseph Mason.

## PRELIMINARY STATEMENT

Plaintiffs have filed a broad-sweeping "omnibus" motion to exclude the testimony of four of Defendants' experts on multiple grounds. Yet their criticisms of these experts are mostly based on tangential issues, having little to do with the actual opinion testimony to be proffered. For example, Plaintiffs attack Saheed Awan, Defendants' expert on how securities transactions are executed through Euroclear, because he failed to cite the source material for general background issues in his expert report. Plaintiffs make no attempt to attack his qualifications, the relevance of his testimony, the reliability of his sources, or the reliability of his application of principles to facts. Rather, Plaintiffs improperly seek to exclude Awan's testimony because he failed to properly footnote his sources in his report. On this basis alone, they contend that Awan is merely parroting the opinions of other experts and that he is untrustworthy. This is simply not the case. Awan offers original opinions that do not hinge on the background materials he reviewed in preparing his report.

Plaintiffs similarly challenge the testimony of Defendants' restructuring expert, Hans Humes, on meritless grounds. They contend his testimony should be excluded because he lacks sufficient expertise to offer testimony on the topics of accounting and loan loss provisioning. But Humes is not being offered as an expert on these issues. Rather Humes plans to testify about the 2010 Restructuring, which is at issue in this case and which he is undoubtedly qualified to address. Humes will opine that the procedures that BTA Bank and the Steering Committee put in place as part of Restructuring were reasonable and appropriate given the dire circumstances

facing the Bank at the time.  His testimony acts as a practical counterpoint to the smoke-and-mirrors approach taken by Michael Clark, Plaintiffs' purported restructuring expert.

Plaintiffs also seek to strike the testimony of Joseph Mason, a finance expert who rebuts the testimony of Plaintiffs' expert, Vikram Kapoor, regarding the existence of the alleged "negative carry swap" and the impact of SK Fund's deposits on the Bank's financial projections. Plaintiffs assert Mason's testimony is unreliable by pointing to a handful of alleged errors in his financial model.  Upon closer review, however, each of these "errors" is exposed as minor or not an error at all.  In addition, Plaintiffs attempt to cast Mason as an advocate who will go to any lengths to "accomplish his view" of the case, but they fail to proffer any real evidence to substantiate this claim.

Finally, Plaintiffs seek to exclude parts of the testimony of Paul Hinton, Defendants' damages expert.  They contend that he improperly offers legal conclusions in his review of alleged corrective disclosures made after the Restructuring and that his discussion of tax offsets and gains offsets are contrary to controlling law.  Plaintiffs further argue that Hinton's analysis of market efficiency is crippled by his reliance on Euroclear and Bloomberg trade data, but they do not dispute the reputability of those sources.  Finally, Plaintiffs argue that Hinton introduced his opinions on the "confidence effect," created by SK Fund's support of the Bank during the Restructuring, in an untimely manner, despite the fact that those opinions were included in his expert report.

## ARGUMENT

### I.  Awan's Testimony Is Helpful to the Trier of Fact on the *Morrison* Issue and Independent of the Initially Uncited Background Source Materials Referred to in His Report

As discussed more fully in Defendants' Motion for Summary Judgment, there is indisputable evidence that Plaintiffs' purchases of BTA securities occurred outside of the United

States.   Accordingly, Plaintiffs' claims should be dismissed under *Morrison v. National Australian Bank*, 561 U.S. 247 (2010).   To assist the trier of fact on this issue, Awan analyzes Plaintiffs' purchases of BTA securities, which were processed by Euroclear, to determine exactly when and where they became irrevocable.   He does so by explaining the regulatory framework that applies to these transactions and then analyzing the transactions at each stage.   He ultimately concludes that the trades became irrevocable at the final stage, called settlement, which occurred outside of the United States.

Plaintiffs make no objection to the relevance of Awan's testimony.   They do not object to Awan's qualifications either.[1]   Nor do they assert that Awan's testimony is based on insufficient facts or data or that Awan fails to reliably apply the principles and methods of his field to the facts of the case.   Plaintiffs instead attempt to exclude his *entire* testimony because Awan did not correctly cite certain sources in his original report.   Plaintiffs' Omnibus Motion *in Limine* to Exclude the Reports and Testimony of Defendants' Purported Experts ("Pl. Daubert Br.") at 4-8. Plaintiffs point out missing quotation marks and citations in background portions of Awan's expert report (the "Original Awan Report") to reach the conclusion that Awan offers no opinions of his own and that he has attempted to mislead the Court as to the origin of his report.   *Id.*   But this failure to cite to background source materials has no impact on the opinions offered by Awan.   Nor does it suggest that Awan attempted to mislead the Court, as Plaintiffs allege. Awan's opinions are helpful to the trier of fact and should be allowed.

---

[1] Indeed, Awan is eminently qualified to opine on the topic of securities trade processing. He has spent nearly forty years working in the financial services industry, with 18 of those years spent at Euroclear and Clearstream, the two securities clearinghouses through which the relevant trades were processed.   Vigna Decl. Ex. 119 (Am. Awan Report), at ¶ 1.   He spent much of that time designing financial services to bridge the gap between buyer and seller, including settlement and collateral management services.   *Id.* at ¶ 4-7, 9-10.   Awan's contributions to European securities process markets were ultimately recognized by trade publication Global Custodian which inducted him into their "Hall of Fame" in 2010 and awarded him a Lifetime Achievement Award in 2014.   *Id.* at ¶ 8.

**A.    The Alleged Plagiarism in the Original Awan Report Relates Only to Background Information; It Does Not Affect the Originality or Relevance of the Substantive Opinions Contained Therein**

Plaintiffs claim that Awan adopts the opinions of others instead of offering his own because of alleged plagiarism in parts of the Original Awan Report.  This is simply wrong.  The initial failure to cite only affects certain sections of his report that address general principles of securities trade processing.  The documents initially omitted from the Original Awan Report's reference list were not necessary for Awan to understand or form his opinions.[2]  Vigna Decl. Ex. 131 (Awan Tr.), at 265:10-13.  Rather, these materials were used only to help Awan more concisely articulate background information entirely consistent with his 39+ years of bond trading experience, i.e. to "say it better than I could put into plain English."  *Id.* at 265:2-8.  And of course, it bears noting that Plaintiffs were easily able to locate the source materials on their own, and questioned Awan extensively about them at his depositions.[3]  *See, e.g.*, *id*. at 194:14-195:5.

Moreover, the alleged plagiarism has no effect on Awan's *application* of background principles to the facts of this case, i.e. his actual opinions.  In one section of his report captioned "BTA's Eurobond," Awan identifies the regulations and procedures that would be applicable to certain BTA bond purchases, analyzing trade confirmations, the 2010 Information Memorandum, and the bonds' ISIN number in the process.  Vigna Decl. Ex. 119 (Am. Awan

---

[2] None of the cases Plaintiffs cite for exclusion of expert testimony on the basis of plagiarism are on point.  In each case, the plagiarism therein relates to *substantive opinions* taken from *other experts* rather than background information pulled from texts or treatises.  *Moore v. BASF Corp.*, No. 11-1001, 2012 U.S. Dist. LEXIS 170411, at *22-23 (E.D. La. Nov. 30, 2012) ("defendant submitted evidence that Dr. Kura's conclusions…were copied verbatim from the report of another expert"); *Raymo v. Sec'y of HHS*, No. 11-0654V, 2014 U.S. Claims LEXIS 162, at *45 (Fed. Cl. Feb. 24, 2014) ("There is preponderant evidence that Dr. Becker plagiarized his expert report from one authored by Dr. Douglas Kerr and filed in another Vaccine Act case."); *see also In re Theokary*, 468 B.R. 729, 734, 740 (Bankr. E.D. Pa. 2012) (excluding testimony where debtor plagiarized parts of report from filing prepared by its own counsel and finding "On the Debtor's behalf, [its counsel] Rutenberg drafted the JPS Damages Section…The Debtor prepared the 2 Reports by plagiarizing the JPS Damages Section and, knowing that the content of the 2 Reports was not Paparo's work product, attempted to pass off the 2 Reports as Paparo's work product.").

[3] Any alleged plagiarism concerns in the Original Awan Report were remedied in an amended expert report issued before the close of expert discovery.  *See generally* Vigna Decl. Ex. 119 (Am. Awan Report).

Report), at ¶ 30-44.  Elsewhere, in explaining the various stages of the trade life cycle, Awan

provides a technical summary of each stage of the cycle for context followed by a targeted

analysis that explains the clearing and settlement processes for Plaintiffs' BTA bond purchases at

each stage.  For instance, Awan describes the "sale" stage of the life cycle as the process of

introducing clients to various investment products.  *Id*. at ¶ 52.  He then analyzes various case

documents, including emails between Khamis and his advisors, to reach the inference that the

decision to purchase BTA bonds was at least partially initiated by the Plaintiffs.  *Id*. at ¶ 53-56.

Indeed, the Awan Report is replete with instances of this principle-then-application approach.

*See, e.g.*, *id*. at ¶ 59-70, 126-39.  In the face of these plainly original and case-specific opinions,

Plaintiffs cannot reasonably contend that Awan is merely "parrot[ing]" another expert's

opinions.[4]

### B.      The Alleged Plagiarism in the Original Awan Report Speaks to Awan's Credibility, an Issue That Is More Appropriately Addressed at Trial

Having established that Awan's testimony contains his own original opinions, Plaintiffs'

plagiarism argument shows its true form – an attack on Awan's credibility.  This attack is plainly

meritless, as the fact that numerous third parties agree with Awan's articulation of the governing

principles of bond trading only *bolsters* the reliability of his opinions, and in no way undermines

them.  *See, e.g.*, *Sec. & Exch. Comm'n v. Revelation Capital Mgmt.*, 215 F. Supp. 3d 267, 278

(S.D.N.Y. 2016).  In all events, a witness's supposed lack of credibility does not warrant

exclusion of his testimony under Federal Rule of Evidence 702.  *See* Fed. R. Evid. 702; *Legier &*

---

[4] Plaintiffs agree that Awan did not simply adopt the opinions in his source materials without question or modification.  In defining the term "trade" in his report, Awan uses language which Plaintiffs flagged as similar, but not identical, to that in Peter Norman's *Plumbers and Visionaries*.  Pl. Daubert Br. at 5.  But Awan's initial failure to cite to *Plumbers and Visionaries* was reasonable given that he did not agree with and did not intend to use its definition of a "trade."  In this instance and otherwise, Plaintiffs have failed to show that Awan had any intent to mislead the Court in his report, precluding the application of sanctions.  This also demonstrates that Awan did not blindly rely on source materials but instead tempered his reliance on these materials based on his wealth of experience in this field.

*Materne v. Great Plains Software, Inc.*, No. 03-0278, 2005 U.S. Dist. LEXIS 17686, at *5 (E.D. La. Aug. 3, 2005) (denying motion to strike testimony based in part on allegations that portions of expert report were plagiarized and noting that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration" (quoting *United States v. 14.38 Acres of Land, Mor or Less Sit. In Leflore County Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996))).

Such issues are weighed by the jury at trial, which is the appropriate recourse here for Plaintiffs.  *See Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 111 (E.D.N.Y. 2019) (noting that evaluation of witness credibility is the "ageless role of the jury" (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995))).  If Plaintiffs believe they can attack Awan based on the citation errors in his report, they may do so on cross-examination.  They may not, however, preclude Awan from even presenting his evidence to the jury.  *See id.*

## II.    Humes' Testimony Relates to the Reasonableness of the 2010 Restructuring Process, and His Extensive Experience Qualifies Him to Opine on That Process

Plaintiffs contend that Humes' testimony should be excluded because he lacks sufficient expertise to opine on the topics of accounting and loan loss provisioning.  But Humes is not being offered as an expert on these issues.  Rather, Humes will testify that the actions taken by the Bank and the Steering Committee during the 2010 Restructuring were reasonable in light of the economic and environmental circumstances facing the Bank at the time.  Humes—the principal of one of the largest emerging market bond funds in the world and the co-chair of the Global Committee of Argentina Bondholders, among other prominent debt restructurings—is unequivocally qualified to opine on these issues.

Alongside these affirmative opinions, Humes also rebuts specific testimony of Michael Clark, Plaintiffs' purported restructuring expert.[5]  Rather than meet Clark's opinions head-on from a technical perspective (which Clark himself did not do), Humes evaluates those opinions with the measured caution of an experienced investor.  Clark's opinions, which introduce brand new allegations about the Lazard Model, supposed misaligned interests created by the Recovery Units, and the specter of wrongdoing in post-2012 transactions, rely on taking a myopic view of various elements of the Bank's restructurings and press reports of events occurring years later. Humes provides a more appropriately focused perspective than Clark by helping the factfinder understand what a sophisticated investor would expect, look for, and do in the circumstances faced by the Steering Committee and other creditors during and immediately following the Bank's 2010 restructuring.  In broad strokes, Humes makes the following rebuttal arguments:

- The Lazard Model and models like it are not considered by creditors to be "perfect predictor[s]" of future events or outcomes;

- London was a reasonable venue for BTA to conduct its asset recovery efforts and a bank trying to provision for those assets would rely on its auditor's and regulator's advice;

- The Recovery Units did not create misaligned incentives and were, in fact, requested by the Steering Committee;

---

[5] Plaintiffs also assert that Humes' personal animus towards Clark's opinions warrants exclusion of his testimony, citing *Proteus Books Limited v. Cherry Lane Music Company, Inc.*, 873 F.2d 502 (2d Cir. 1989).  Pl. Daubert Br. at 11.  But that case is easily distinguishable.  In *Proteus*, the Second Circuit affirmed exclusion of expert testimony where the trial court found the expert to be an "interested party…a party in the case."  873 F.2d at 515.  Humes is not a party here and his animus towards Clark is clearly not a basis for his disqualification.  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, Nos. 1:00-1898, MDL 1358 (SAS), M21-88, 2008 U.S. Dist. LEXIS 37331, at *48 (S.D.N.Y. May 7, 2008) ("Many witnesses are biased to some degree, and lack of bias is not required for expert testimony to be admissible").  Humes simply thinks that Clark is dead wrong and that his ideas are dangerous to a well-functioning market.  Bloor Decl. Ex. 9 (Humes Report), at ¶ 18-20.

- BTA's actions leading up to formal Recovery Unit acceleration were consistent with industry practice, and sophisticated creditors should have anticipated that the Recovery Units could be accelerated regardless of BTA's limited disclosures regarding the same; and

- There was nothing unusual about the series of transactions following the Bank's 2012 restructuring, and, in any event, insufficient record evidence has been produced to substantiate any of Clark's opinions on this matter. Bloor Decl. Ex. 9 (Humes Report), at ¶ 21-26, 56.[6]

Humes' expertise (and value to the factfinder) lies in his vast experience as an investor in emerging markets restructured debt, and his opinions on the 2010 Restructuring are based on this experience. From the outset of his career, with early stints at Manufacturers Hanover and Banco Santander, Humes has been involved in emerging market debt restructurings. Bloor Decl. Ex. 9 (Humes Report), at ¶ 4. Since 1995, Humes has headed Greylock Capital, a prominent investment firm specializing in emerging markets distressed debt with nearly $1 billion in assets under management. *Id.* at ¶ 1-2, 4-5. In the past thirty years, Humes has sat on creditor committees for or otherwise been involved with sovereign debt restructurings in countries including Argentina, Nicaragua, Yugoslavia, and Liberia. *Id.* at ¶ 4-8. Notably, in 2014, Humes sat on the steering committee for the second debt restructuring of Alliance Bank, another Kazakhstani bank. *Id.* at ¶ 8. Humes plainly possesses specialized knowledge that would be helpful to the trier of fact to understand the decisions that the Bank and the Steering Committee made during the 2010 Restructuring. Moreover, his testimony reaches only those matters that are within his expertise.

---

[6] Defendants note their continued objection to the relevance of Clark's testimony, which impermissibly adds new claims of omissions and misrepresentations that appear nowhere in Plaintiffs' pleadings.

Plaintiffs sidestep these opinions, which predominate in Humes' testimony, and instead point to excerpts from Humes' deposition in which he disclaims expertise in areas in which he never purported to be an expert.  Pl. Daubert Br. at 8-10.  Humes never claimed to be an expert in provisioning or accounting.  He references these topics only to contextualize them, i.e. to show that the issues Clark identified in the Lazard Model and in the Bank's asset recovery process were not material to the Bank's restructuring or long-term viability.  Indeed, Plaintiffs' objections regarding Humes' qualifications touch only a fraction of his testimony.  Even if Plaintiffs were correct that every aspect of that fraction should be excluded—which Defendants dispute since they primarily go to show how badly Clark misses the "forest for the trees"[7]—the remainder is unaffected, is easily identifiable, and should be admitted.  *See In re. Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) ("When the unreliable portion of an opinion can easily be distinguished from testimony that could help the jury, it may be an abuse of discretion to throw the good out with the bad") (internal citations omitted).

Because Humes is offering opinions on matters within his expertise, his testimony should be admitted at trial in its entirety.

### III.  Mason's Testimony Is Reliable, as the "Errors" Plaintiffs Identify in His Analysis Are Either Minor or Nonexistent and Do Not Impact the Ultimate Conclusions

Plaintiffs' purported financial economics expert, Vikram Kapoor, quantifies the alleged "negative carry swap" by tallying the interest inflows and outflows of the transactions comprising the "swap."  But his quantification fails to account for interest revenue and ignores the fact that most of the transactions he identifies as problematic were disclosed prior to the 2010

---

[7] For example, Clark opines that BTA improperly accounted for loans underlying the Recovery Units, implying an effort to prevent creditors from participating in loan recoveries until the Units were wiped out in the 2012 Restructuring.  Vigna Decl. Ex. 113 (Clark Report), at 9-14.  However, as Humes explains, the Recovery Unit holders received $660 million in the 2012 Restructuring, more than they would have earned if they had held the Units until present day.  Bloor Decl. Ex. 9 (Humes Report), at ¶ 78.

restructuring.   He also attempts to manipulate the Base Case Model (also called the "Lazard Model"), a projection of the Bank's restructuring plan prepared by its financial advisors, to argue that inclusion of the SK Deposits would have caused the Bank to breach its regulatory capital ratios.   In doing so, he overstates this impact by a significant margin.

Defendants' finance expert Joseph Mason fills the gaps in Kapoor's testimony by, among other things, identifying environmental factors that contributed to BTA's post-2010 struggles (including hostile market conditions and poor loan growth) and cataloguing Kapoor's haphazard tinkering with the Lazard Model.   Vigna Decl. Ex. 118 (Mason Report), at ¶ 13-17.   One of Mason's chief conclusions is that the "negative carry swap" does not exist when one accounts for the revenue that could be earned by deploying capital infusions from SK Fund, an essential component of any meaningful valuation.   *Id*. at ¶ 15.   Mason also determines, through more faithful application of accounting principles, that inclusion of the SK Deposits in the Base Case Model would not have caused the Bank to breach any of its regulatory capital ratios.   *Id*. at ¶ 17. At each stage, and quite unlike Kapoor, Mason details the steps he takes to reach his conclusions, so that his results can be reproduced and tested.   *See, e.g.*, *id*. at ¶ 81-90.

Plaintiffs argue that Mason's methodology is unreliable because of supposed errors in his analysis (Pl. Daubert Br. at 11-17), but the mistakes they identify are minor at most and have no material impact on Mason's central conclusions.   Trivial errors such as these do not warrant exclusion of expert testimony.   *See, e.g., Buchwald v. Renco Grp.*, 539 B.R. 31, 43 (S.D.N.Y. 2015) ("Minor flaws in reasoning and 'slight modification[s]' of reliable methods do not, on their own, require exclusion.") (internal citations omitted).   Moreover, as detailed below, some of these supposed "mistakes" are not really mistakes at all:

- Plaintiffs argue that Mason fails to account for interest expense on the SK Deposits in his analysis of the Base Case Model (Pl. Daubert Br. at 13-14) but their criticism is premised on a misunderstanding of a basic accounting concept: capitalized interest. The deposit agreement governing the SK Deposits required "annual capitalization of interest." Vigna Decl. Ex. 38 (Deposit Agreement), at 1. This meant that the interest accrued on the term deposits would go directly into the deposit account at the end of each year and would thereafter be considered part of the principal of deposit. *Id.* Under the accrual basis of accounting, when interest is capitalized, it is ***not*** recognized as an interest expense in the current accounting period. Evan Tarver, *Capitalize Accrued Interest*, INVESTOPEDIA.COM (Nov. 19, 2018), https://www.investopedia.com/ask/answers/040915/what-does-it-mean-capitalize-accrued-interest.asp. Instead, as Mason showed, in this case these expenses were expected to be recognized in 2024, when the SK Deposits reached maturity and cancelled out the SK Bonds. Def. UF ¶ 219-221. Therefore, Mason's omission of interest expenses from 2010-2014 was the ***only*** reliable method he could have used as a matter of accounting.

- Plaintiffs assert that Mason misidentified the Base Case Model rows that accounted for the SK Bonds, but those line items were titled "SK Bonds" and had amounts exactly matching the principal of the SK Bonds (~KZT 645 billion). Vigna Decl. Ex. 9 (Base Case Model), at Business Plan tab, row 538; *id.* at Balance Sheet tab, row 78.

- Plaintiffs contend that Mason's unbalanced balance sheet renders his opinion unreliable. Pl. Daubert Br. at 15. In doing so, they conveniently fail to mention

that **neither Kapoor's initial edits to the Lazard Model, nor even the unedited Lazard Model had balanced balance sheets**.  Walsh Decl. Ex. 1 (Kapoor Report, Original Exhibit 2), at Balance Sheet tab, I-48, I-127;[8] Vigna Decl. Ex. 9 (Base Case Model), at Balance Sheet tab, I-48, I-127.  The marginally larger imbalance present in Mason's version of the model is merely a vindication of one of his preliminary conclusions – these models were not designed to be tampered with.  Vigna Decl. Ex. 118 (Mason Report), at ¶ 81.  As Mason points out with respect to Kapoor's contrived placement of a KZT 8.1 billion interest expense, even small adjustments may create disproportionate, unintended effects in the model.  *Id*.

- Plaintiffs also mischaracterize the divergence between Mason and Hinton's calculated break-even points (4.35% and 4.9% respectively) as a "direct[] contradict[ion]."  Pl. Daubert Br. at 16.  In fact, these figures are complementary to one another.  Both experts reach the same general conclusion: that BTA needed to deploy less than 5% of the capital made available to it through the SK-related transactions to break even on its cost of carry from those transactions.

These issues affect Mason's testimony in trivial ways and are appropriately addressed in cross-examination (should Plaintiffs even choose to do so, in light of the obvious rejoinders).  *See, e.g., Buchwald*, 539 B.R. at 43 (citing *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006)).  Mason's testimony is reliable notwithstanding the supposed "errors," and it should be admitted at trial.[9]

---

[8] Indeed, Kapoor's original Exhibit 2 shows an asset-liability imbalance of KZT 94 billion in 2010.  Walsh Decl. Ex. 1 (Kapoor Report, Original Exhibit 2), at Balance Sheet tab, I-48, I-127.  By 2014, that gap had grown to KZT 174 billion.  *Id.* at M-48, M-127.

[9] Plaintiffs have also seized on *Segovia* in an attempt to cast Mason as an advocate in expert's clothing who "offer[s] his own inferences to accomplish his view of [his client's] purpose."  Pl. Daubert Br. at 13 (internal quotations and citation omitted).  But the *Segovia* court admonished Mason for inferring contractual terms even though the contract was *unambiguous*.  *Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 Del. Super. LEXIS 197, at

## IV.   Hinton's Testimony Is within the Scope of Permissible Expert Testimony, Is Based on Reliable Data, and Was Disclosed in a Timely Manner

Hinton conducts a comprehensive loss causation and rescission analysis to determine that Plaintiffs suffered no damages from the alleged misrepresentations made by Defendants.  He also rebuts the opinions of Plaintiffs' damages expert, William Hrycay, that Plaintiffs are entitled to the full amount of their losses.  Plaintiffs seek to exclude portions of Hinton's testimony because, in their view, (i) his opinions invade the province of the judge and jury, (ii) he uses unreliable data, and (iii) he introduced new opinions after issuing his expert report.  Each of Plaintiffs' objections should be rejected.

### A.  Hinton's Opinions Are within the Scope of Permissible Expert Testimony and Do Not Invade the Province of the Judge or Jury

Plaintiffs argue that a number of Hinton's opinions impermissibly usurp the role of the judge and jury.  For instance, they claim that Hinton impermissibly states a legal conclusion when he opines that there were no "disclosure failures" relating to government support or the Recovery Units.  Pl. Daubert Br. at 17-20.   In fact, Hinton synthesizes substantial record evidence to determine that the details in the alleged corrective disclosures flagged by Hrycay had already been made available to the market during the restructuring process or otherwise prior to these disclosures.  *See, e.g.,* Vigna Decl. Ex. 117 (Hinton Report), at ¶ 26-47, 53.[10]  His opinion

---

*63-64 (Super. Ct. May 30, 2008) ("Indeed, even though he never once suggests that the language EFH used to express the rights and obligations of the parties is ambiguous, he nevertheless infers contractual terms whenever he sees the need to justify his interpretation of the transaction with contractual language.").  Here, there is significant factual ambiguity, especially with respect to the inclusion of SK Deposits in the Base Case Model.  Therefore, Mason's inferences in this case are acceptable and distinguishable from those in *Segovia*.  Moreover, that case is over 10 years old.  *See generally id.*  It is an outdated portrayal of Mason which fails to account for his significant development as an expert witness since 2008, and Plaintiffs' reliance on this case obviates the fact that they are grasping at straws.  Vigna Decl. Ex. 118 (Mason Report), at Appendix 2 (identifying his expert testimony in over twenty cases in the past four years alone).

[10] Plaintiffs also imply that Hinton's theory would require the market to "piece[] together buried information from distinct parts of financial statements" to reach his conclusion that the SK Deposits were substantially disclosed during the restructuring process.  Pl. Daubert Br. at 19.  In particular, they emphasize the fact that the SK Deposits were substantially disclosed in SK Fund's 2009 financial statements as opposed to BTA's.  *Id.*  But Hinton's inference that the market would be looking to SK Fund for information related to BTA is justified given the

is not that these disclosures were immaterial (as Plaintiffs contend) but rather that they did not

actually "disclose" any previously unknown information.[11]   This is a permissible *factual*

conclusion, not a legal one.   *Allen v. City of New York*, 466 F. Supp. 2d 545, 549 (S.D.N.Y.

2006) ("An expert may properly give evidence stating a factual conclusion even if it 'embraces

an ultimate issue to be decided by the jury'" (citing *United States v. Bilzerian*, 926 F.2d 1285,

1294 (2d Cir. 1991))); *see also, e.g., In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 (AWT),

2009 U.S. Dist. LEXIS 131761, at *16-17 (D. Conn. Apr. 22, 2009) (admitting expert testimony

on loss causation that contained factual conclusions about content of alleged corrective

disclosures); *Daniels v. City of New York*, No. 16-cv-9080 (AJN), 2018 U.S. Dist. LEXIS

193084, at *14-15 (S.D.N.Y. Nov. 13, 2018); *Methyl Tertiary*, 2008 U.S. Dist. LEXIS 37331 at

*53.

Plaintiffs also assert that Hinton's application of tax offsets and offsets for gains on other

securities obtained throughout the 2010 Restructuring process are inappropriate in light of

controlling law.  Pl. Daubert Br. at 20-24.  This is not a ground to exclude Hinton's testimony.

To the extent the Court determines that there a legal basis for application of these offsets, expert

testimony would be helpful to the trier of fact in determining their impact.

### B.  The Trade Data Underlying Hinton's Analysis of Market Efficiency Is Reliable and Is the Best Available Data

Plaintiffs also argue that Hinton's analysis of the trading volume of the Subordinated

Notes market is based on unreliable trade data (the "Trading Volume Data").  Pl. Daubert Br. at

---

market's focus on the supposedly close SK Fund-BTA relationship at the time.  Indeed, Plaintiffs' own expert dedicates an entire section of his expert report to proving this (however misguided) market perception.  Vigna Decl. Ex. 114 (Hrycay Report), at ¶ 72-82.  Nor can this disclosure be reasonably characterized as "buried information," given that it was placed under the conspicuous heading "Placement of deposit with BTA Bank."  Vigna Decl. Ex. 12 (SK Fund 2009 Financial Statements), at 40.

[11] Because Hinton is opining on the novelty of the alleged corrective disclosures, and not their materiality, the cases Plaintiffs cite barring expert testimony on disclosure materiality are not applicable here.  *Cf.* Pl. Daubert Br. at 18-19.

22-24.  They contend that the Trading Volume Data does not accurately reflect actual market trades in the Notes.  Their arguments, however, amount to nothing more than conclusory assertions.

Plaintiffs cannot even show that the Trading Volume Data is inaccurate.  Their primary objection to the data is that it contains "identical dollar figure trades for several consecutive days, on multiple occasions" (Pl. Daubert Br. at 23).  But Plaintiffs never show that the identical trades were *actually* inaccurate.  Moreover, Hinton offered a practical explanation as to why such identical trades might exist, which Plaintiffs have not even attempted to rebut.  Walsh Decl. Ex. 2 (Hinton Tr.), at 234:9-20 ("A: I can certainly imagine reasons why you would see the same trade amount repeated.  If a trade was broken up into tranches to buy a large position over multiple days you might do that.  Q: Is it possible this data is showing both sides of the trade?  A: Unlikely because they're not in the same day, right?").[12]

Furthermore, the Trading Volume Data is from Euroclear, an independent and reputable source.  Vigna Decl. Ex. 117 (Hinton Report), at 30, Figure 2; *see Since Hardware (Guangzhou) Co., Ltd. v. United States*, 911 F. Supp. 2d 1362, 1377-78 (U.S. Ct. Int'l Trade 2013) (finding World Bank data to be reputable because it was prepared by an independent organization).  Hinton also validated this data by comparing it against data from other reputable sources, including Bloomberg data and UBS trade statements.  Walsh Decl. Ex. 2 (Hinton Tr.), at 238:11-21.  Plaintiffs do not dispute the reputability of any of these sources.

Indeed, the Trading Volume Data is the ***best available data***; because the Bank's Subordinated Notes traded on over-the-counter markets, which (unlike traditional exchanges) do

---

[12] Plaintiffs' reliance on *Cayuga* is similarly off base.  In that case, the issue was not that the data itself was unreliable but that the expert had compiled the data in an unreliable way.  *Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318, 325 (N.D.N.Y. 2000) ("Apparently Mr. Havemeyer did not have in place adequate checks and controls on the reliability of the data collected by his assistants…").  Here, Plaintiffs have failed to show that Hinton inaccurately compiled or processed the data.

not maintain a centralized repository of trade history, data must be pulled together from various intermediaries.  Walsh Decl. Ex. 2 (Hinton Tr.), at 237:25-238:21.  Moreover, Plaintiffs do not suggest any alternative or better source from which to gather the relevant data.  Plaintiffs would rather discard this data, which comes with sufficient indicia of reliability, in favor of no data at all.  There is no justification in law or reason to support this outcome.  *See, e.g., Jinan Yipin Corp. v. United States*, 971 F. Supp. 2d 1296, 1308 (U.S. Ct. Int'l Trade 2014) (explaining that "perfect data is virtually non-existent in the real world"); *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 41 (D.D.C. 2008) (discussing an agency's duty to use "the most reliable data available to produce figures that can be considered sufficiently accurate") (internal citations and quotations omitted).

The trade data underlying Hinton's analysis of market efficiency is the best available data to assess market efficiency in this case, and it is sufficiently reliable to support his opinions.

### C.  Hinton Introduced the "Confidence Effect" In a Timely Manner by Discussing It in His Report

Finally, Plaintiffs argue that Hinton should be precluded from testifying about the "confidence effect" incorporated into the restructuring plan because he allegedly introduced the concept for the first time at his deposition.  Pl. Daubert Br. at 24.  This argument is based on a misreading of the record; in fact, Hinton discusses this concept in detail in his expert report.[13]

Despite Plaintiffs' contentions to the contrary, Hinton discusses this topic in his expert report.  Specifically, Hinton notes that one of the goals of the 2010 Restructuring was to revamp funding from the government with the following objectives:"***1) stop deposit outflow from***

---

[13] A "confidence effect" (a convenient moniker rather than a term of art) is a counteracting market force that, as its name suggests, restores confidence in a bank so that depositors avoid making a run on the bank.  Bloor Decl. Ex. 6 (Hinton Tr.), at 166:10-12.  In 2009, BTA Bank was hemorrhaging deposits because of an acute lack of confidence in the bank due to market factors (*see* Vigna Decl. Ex. 3 (2010 IM), at 155), and restoring confidence in the Bank was essential to its long-term viability.  Ultimately, it was SK Fund's majority ownership of the Bank and its injections of capital that restored confidence in the Bank and stabilized its deposit outflow.  *See, e.g., id.* at 10, 128.

*clients*, 2) continue to participate in State funds, as well as 3) attract new and stable client funds."

Vigna Decl. Ex. 117 (Hinton Report), at 45, n. 144 (emphasis added).   This is plainly a

description of the "confidence effect" in this case, notwithstanding its omission of that specific

term.  Because Hinton raised this opinion in a timely fashion through his expert report, he should

be allowed to offer it at trial.  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 643 F. Supp.

2d 471, 482 (S.D.N.Y. 2009) (admitting expert testimony where expert report was "substantially

complete" and did not impose "unfair surprise" on opposing party).

<u>**CONCLUSION**</u>

For all the reasons set forth herein, Defendants respectfully request that Plaintiffs'

omnibus motion to exclude Defendants' experts be denied in its entirety.

Dated:   October 18, 2019
          New York, NY


KATTEN MUCHIN ROSENMAN                         CURTIS, MALLET-PREVOST,
                                                 COLT & MOSLE LLP


By: /s/ Jason Vigna                            By: /s/ Jonathan Walsh
    Jason Vigna                                    Joseph D. Pizzurro
    Brian Muldrew                                  Jonathan Walsh

    575 Madison Avenue                             101 Park Avenue
    New York, New York 10022                       New York, New York 10178
    (212) 940-8800                                 (212) 696-6000

    *Attorneys for Defendant BTA Bank*             *Attorneys for Defendant Sovereign*
    *JSC*                                          *Wealth Fund "Samruk-Kazyna"*