UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                :

ATLANTICA HOLDINGS, INC, et al.,          :

                                            :

                          Plaintiffs,        :                  12-CV-8852 (JMF)

                                            :

           -v-                        :

                                            :

SOVEREIGN WEALTH FUND SAMRUK-KAZYNA  :
JSC,                                        :

                                            :

                        Defendant.      :

                                            :

------------------------------------------------------------------------X
                                                :

ATLANTICA HOLDINGS, INC, et al.,          :

                                            :

                          Plaintiffs,        :                  13-CV-5790 (JMF)

                                            :

           -v-                        :

BTA BANK JSC,                          :         OPINION AND ORDER

                                            :

                        Defendant.      :

                                            :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In these long-pending related cases, three Panamanian corporations — Atlantica

Holdings, Inc. ("Atlantica"), Baltica Investment Holding, Inc. ("Baltica"), and Blu Funds, Inc.

("Blu") (collectively, "Plaintiffs") — bring suit against Sovereign Wealth Fund Samruk-Kazyna

("S-K Fund"), a sovereign wealth fund owned and operated by the Republic of Kazakhstan, and

BTA Bank JSC ("BTA Bank"), a Kazakhstani bank in which S-K Fund holds a majority stake.

Plaintiffs, purchasers of subordinated debt securities issued by BTA Bank as part of a

restructuring plan, allege securities fraud in violation of Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a).  Defendants

now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment

on all claims, and Plaintiffs move for partial summary judgment.  Both sets of parties also move

to exclude the others' experts.  For the reasons that follow, Defendants' motion for summary

judgment is GRANTED, and Plaintiffs' motion for partial summary judgment is DENIED.

Defendants' motion to strike a declaration filed by one of Plaintiffs' experts is GRANTED in

part, and the remainder of the motions to exclude are DENIED as moot.

## BACKGROUND

The relevant facts, taken from the admissible materials submitted by the parties, are

undisputed unless otherwise noted.  *See, e.g.*, *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

597 F.3d 84, 86 (2d Cir. 2010).

Until 2008, BTA Bank was one of the largest banks in Kazakhstan.  *See* ECF No. 216

("Pls.' UF Response"), ¶¶ 24-26, 30-31.[1]  In 2008, the global financial crisis arrived in

Kazakhstan and battered the country's banking sector, causing instability in the country's capital

markets, compromising liquidity among the country's banks, and leading to tighter credit

conditions.  *Id.* ¶ 24.  BTA Bank was not immune to these effects: According to some reports,

BTA Bank was unable to meet some customers' withdrawal requests.  *See id.* ¶ 52.

On November 25, 2008, the Kazakhstani government announced a plan to stabilize the

country's economy and financial system (the "Stabilization Plan").  *See id.* ¶ 25.  The Plan was

implemented in large part by S-K Fund, which had been formed less than a month earlier to bail

out struggling banks.  *See id.* ¶¶ 44-45.  Generally, the plan was for S-K Fund to inject

significant liquidity into the struggling banks in exchange for equity.  *See id.* ¶ 46.  But S-K Fund

was not alone.  The Kazakhstani government entered into an agreement with the National Bank

---

[1]      Unless otherwise noted, citations to the docket refer to 12-CV-8852 (JMF).

of the Republic of Kazakhstan ("NBK"), the Agency of the Republic of Kazakhstan on Regulation and Supervision of Financial Markets and Financial Organizations ("FMSA"), and BTA Bank to coordinate their efforts to stabilize the Kazakhstani economy.  *Id.* ¶ 48.

As part of the Stabilization Plan, the Kazakhstani government asked S-K Fund to secure an equity stake in BTA Bank.  *See id.* ¶ 46.  Negotiations between S-K Fund and BTA began in the fall of 2008 and continued into the first months of 2009, when the Fund invested 212 billion Kazakhstani tenge (the national currency of Kazakhstan, hereinafter abbreviated "KZT") in BTA Bank, in exchange for a 75.1% equity stake.  *See id.* ¶¶ 58-59.  After acquiring shares of BTA Bank, S-K Fund replaced the majority of BTA Bank's board of directors.  *See id.* ¶¶ 61-65.

BTA Bank, like other Kazakhstani banks, also agreed to sell securities to NBK and later buy them back at a slightly higher price.  *See id.* ¶¶ 70-71, 73-74.  This "repo transaction" (the "NBK Repo") was intended to provide BTA Bank with short-term liquidity.  *See id.* ¶ 73.  But BTA Bank was unable to offer NBK security for the financing, as it was a "defaulted bank" in early 2009, and its bonds were effectively worthless.  *See id.* ¶¶ 76-77.  In order to provide the necessary collateral, S-K Fund exchanged bonds with BTA Bank.  *See id.* ¶ 78.  S-K Fund gave BTA Bank bonds with a notional value of KZT 645 billion (the "S-K Bonds").  *See id.* ¶¶ 79-80.  The S-K Bonds had a four percent coupon, which was not accrued, but instead paid by S-K Fund to BTA.  *See id.* ¶ 80-81.  In the first nine months of 2009, S-K Fund paid BTA Bank more than KZT 20 billion on the S-K Bonds.  *See id.* ¶ 82.  BTA Bank issued its own bonds, whose notional value was also KZT 645 billion and which had a nine percent coupon, to S-K Fund (the "BTA Bonds").  *See id.* ¶¶ 79, 83.  Unlike the S-K Bonds, the BTA Bonds' interest accrued, so BTA Bank did not pay S-K Fund any interest on the BTA Bonds.  *See id.* ¶ 84.  Both the S-K Bonds and the BTA Bonds were to reach maturity in 2024.  *See id.* ¶ 218.  BTA Bank used the

S-K Bonds as collateral to obtain financing from NBK.  *See id.* ¶ 86.  S-K Fund also guaranteed the debt BTA Bank incurred in the NBK Repo (the "S-K Guarantee").  *See id.* ¶ 202.

At or about the same time, BTA Bank discovered certain irregularities in its loan portfolio.  *See id.* ¶ 88.  BTA Bank retained KPMG London to help investigate the suspicious loans.  *See id.* ¶¶ 91-92.  FMSA conducted its own investigation.  *See id.* ¶ 94.  These investigations revealed a significant number of loans to companies affiliated with BTA Bank's former management.  *See id.* ¶ 95.  The loan terms were favorable to those companies, the security was either inadequate or non-existent, and many records associated with the transactions were missing.  *See id.* ¶¶ 95-96.  BTA Bank estimates that its former management stole at least $6 billion in connection with this fraud.  *See id.* ¶ 109.

It was hoped that the infusion of capital and liquidity from S-K Fund and NBK would enable BTA Bank to maintain compliance with requirements imposed on Kazakhstani banks by FMSA regulation despite the financial crisis and the prior management's fraud.  Within months, however, BTA Bank had breached various FMSA requirements.  On April 1, 2009, BTA Bank "breached the FMSA requirement that [it] maintain an exposure of less than 10 [percent] of its equity capital with respect to any single borrower."  ECF No. 207-3 ("2010 IM"), at 156; Pls.' UF Response ¶ 110.  Later that month, BTA Bank announced that it would cease making payments on the principal of all of its debt obligations.  Pls.' UF Response ¶ 111.  BTA Bank then received notices from certain of its creditors that they were accelerating the debt owed to them and, in response, BTA Bank ceased all principal and interest payments on existing debt until it could reach agreement with its creditors on restructuring.  *Id.* ¶¶ 113-14.  Many borrowers stopped making payments to BTA Bank and, in May of 2009, BTA Bank breached FMSA's

liquidity requirements. *Id.* ¶ 116.  BTA Bank breached FMSA's capital adequacy ratio requirements on June 1, 2009.  2010 IM at 155.

       The upshot is that BTA Bank needed to restructure its debt, and it endeavored to do so in 2009 and 2010 (the "2010 Restructuring").  It presented a preliminary restructuring plan on June 10, 2009, in accordance with an agreement into which it had entered with FMSA after it had breached the regulatory requirements. *See* Pls.' UF Response ¶¶ 117-18.  In July 2009, BTA Bank formed a "Steering Committee" consisting of certain creditors who would negotiate the restructuring on behalf of all creditors. *See id.* ¶ 121.  BTA Bank hired an assortment of advisors to assist in its restructuring.  It hired Lazard Fréres & Co. ("Lazard") and UBS AG as financial advisors; Deloitte Touche Tohematsu Ltd. ("Deloitte"), PricewaterhouseCoopers ("PwC"), KPMG, and Ernst & Young LLP as independent auditors; and White & Case LLP, Baker & McKenzie LLP, Field Fisher Waterhouse LLP, Lovells, and Allen & Overy LLP as its legal counsel.  Together with its advisors and the creditors on the Steering Committee, BTA Bank worked on a restructuring plan throughout the remainder of 2009 and into 2010. *See id.* ¶¶ 122-24.

       It was at about this time that Plaintiffs — who share a principal, Claudio Khamis, *see id.* ¶¶ 269, 281-83 — began discussing purchasing BTA Bank securities. *See id.* ¶ 292.  On August 3, 2009, Atlantica paid just $1,068,755.25 for TuranAlem (which had by that time become BTA Bank) bonds with a face value of $5,000,000. *See id.* ¶ 294.  The same day, Baltica purchased TuranAlem bonds with a face value of $4,000,000 at a similarly discounted price — just $855,005.25. *See id.* ¶ 295.  Atlantica and Baltica again purchased TuranAlem bonds at significantly discounted rates in September 2009 and January and April 2010,

collectively accumulating bonds with a face value of $21,200,000, for which the two companies paid less than $6,000,000.  *See id.* ¶¶ 306-07, 309-12.

Negotiations regarding the restructuring plan concluded later in April 2010.  *See id.* ¶ 167.  On May 1, 2010, the plan's terms were described in an information memorandum (the "2010 IM"), which was supplemented twice and consolidated on June 2, 2010.  *See id.* ¶¶ 170, 173-74.  The 2010 IM was distributed to BTA Bank's creditors and was intended to provide information they needed to cast an informed vote on the restructuring plan.

Several elements of the plan are relevant here.  First, S-K Fund forgave the BTA Bonds it then held, which had a face value of KZT 645 billion, in exchange for an additional six-plus percent of BTA Bank equity.  *See id.* ¶¶ 79, 142, 214-15.  Second, and relatedly, S-K Fund continued to guarantee the debt BTA Bank incurred in the NBK Repo, but because the BTA Bonds had been forgiven, S-K Fund instead received consideration in the form of a "guarantee fee" equal to half of the interest S-K Fund paid on the S-K Bonds.  *See id.* ¶¶ 202-12.  Third, S-K Fund created and distributed to BTA Bank's creditors "recovery units" (or "RUs"), which entitled their holders to a share of any funds recovered in lawsuits related to the fraud allegedly perpetrated by the Bank's former management. *See id.* ¶ 253.  Half of the recovery would be distributed to creditors through the RUs, except that the total amount distributed was not to exceed $5.22 billion, which was the estimated recovery and face value associated with the RUs. *See id.* ¶¶ 254, 256.  If BTA Bank were to default on any of its other debt, the entire face value of the RUs would be accelerated and immediately due and payable upon the vote of twenty percent of RU holders.  *See id.* ¶ 257; ECF No. 207-8 ("RU Terms"), § 13.  Fourth, S-K Fund agreed in a "Deed of Undertaking" that "no dividend other than a Permitted Dividend [as defined in the 2010 IM] shall be paid on [S-K Fund's] shares."  Pls.' UF Response ¶¶ 195-96.  No

"Permitted Dividend" could take place unless at least four years had passed since the restructuring and BTA Bank met certain criteria. *See id.* ¶ 197. Finally, the restructuring plan provided BTA Bank's creditors the right to appoint two directors to the company's nine-person board, and it prohibited S-K Fund from removing these directors for at least three years after the 2010 Restructuring. *See id.* ¶¶ 129-31. Because the board already contained three independent directors, S-K Fund had minority representation on the board after the 2010 Restructuring. *See id.* ¶ 130. Each of these elements was disclosed in the 2010 IM. *See id.* ¶¶ 129-31, 195, 209-10, 214-15, 253-58.

But there is one transaction that the 2010 IM did not disclose, and that omission forms the core of Plaintiffs' claims. Because S-K Fund had forgiven BTA Bonds in the restructuring plan, S-K Fund could no longer use those bonds to cancel its obligation to pay BTA Bank the face value of the S-K Bonds when they reached maturity. That meant that it now faced the prospect of paying BTA Bank the full face value of the S-K Bonds. *See id.* ¶ 219. S-K Fund planned to satisfy that obligation by creating a "sinking fund" — a term deposit that, as a result of the initial deposit and the interest rate, would increase in value until it matured in 2024, at which point it would equal KZT 645 billion, the face value of the S-K Bonds (the "S-K Deposit"). *See id.* ¶¶ 219-20. In accordance with this plan, on May 13, 2010, S-K Fund transferred KZT 97 billion from a current deposit account it maintained with BTA Bank to a term deposit account, which had an interest rate of eleven percent, capitalized annually rather than paid. *See id.* ¶ 230. Between June and September 2010, S-K Fund deposited an additional KZT 78 billion into the term deposit account, bringing the value of the account to KZT 175 billion. *See id.* ¶ 231. And in December 2010, S-K Fund deposited an additional KZT 29.3 billion, to account for interest payments that were legally owed to S-K Fund. *See id.* ¶ 232. The

latter deposit had a nine percent interest rate, and the interest was not capitalized.  *See id.* ¶ 233, 238.  As a result of these transactions, BTA Bank was given the net present value of the payment due on the S-K Bonds in 2024.  *See id.* ¶ 239.

The transactions between BTA Bank, S-K Fund, and NBK — each of which was disclosed in the 2010 IM, except for the S-K Deposit — caused a "negative carry" for BTA Bank.  That is, BTA Bank's outflows of interest to S-K Fund and NBK were greater than its inflows of interest from S-K Fund.  *See* ECF No. 235 ("Defs.' UF Reply"), ¶¶ 43, 45.  According to Plaintiffs, "the vast majority" of the negative carry was caused by the S-K Deposit.  *See* ECF No. 250 ("Pls.' Reply"), at 4.  Plaintiffs argue, and Defendants vigorously dispute, that the negative carry doomed the 2010 Restructuring effort to fail.  *See* Defs.' UF Reply ¶ 41.

Armed with the information in the 2010 IM, Plaintiffs, through a UBS broker in Miami, elected to participate in the 2010 Restructuring and exchange their TuranAlem bonds for newly issued subordinated notes (the "Restructuring Notes"), along with other senior notes, RUs, and other securities.  *See* Pls.' UF Response ¶¶ 318-22; Defs.' UF Reply ¶¶ 62-63.  In September 2010, after Plaintiffs had received those securities, Plaintiffs purchased additional newly issued subordinated notes and RUs on the secondary market (the "2010 Purchased Notes"), at discounts ranging from nineteen to ninety-seven percent.  *See* Pls.' UF Response ¶¶ 323, 328-29, 333-34, 336-38.  Plaintiffs also sold the senior notes they had received in the restructuring.  *See id.* ¶¶ 330-31.  The 2010 Restructuring was completed on September 16, 2010.  *See id.* ¶ 335.

BTA Bank resumed regular banking operations, and the price of BTA's bonds remained relatively stable following completion of the restructuring.  *See id.* ¶¶ 346-48.  BTA Bank reported that, at the end of 2010, it passed capital adequacy requirements by a wide margin.  *See id.* ¶¶ 157-58, 353.  But, as early as December 1, 2010, BTA Bank's total liabilities exceeded its

total assets.  *See id.* ¶ 367.  On April 29, 2011, Ernst & Young, BTA Bank's independent auditor,

issued a "going concern" warning revealing that fact and cautioning investors that there existed a

"material uncertainty which may cast significant doubt about [BTA Bank's] ability to continue

as a going concern."  *Id.* ¶¶ 367-68.

       The banking business in Kazakhstan as a whole deteriorated in 2011 — bank lending

decreased by six percent compared to the prior year, bond prices for major Kazakhstani banks

declined, and stocks trading on the Kazakhstan Stock Exchange plummeted in value.  *See id.*

¶¶ 360, 363-64.  BTA Bank's troubles, however, were greater than its peers.  Its lending

decreased by twenty-four percent (in part due to rigorous loan requirements imposed by the

bank's foreign creditors in the wake of prior management's fraud), *see id.* ¶¶ 360-61, the price of

its bonds declined more than other banks', *see id.* ¶ 364 & fig. 6, and, in May 2011, BTA Bank

announced that its equity value had turned negative under International Financial Reporting

Standards ("IFRS"), *see id.* ¶ 362.  Following Ernst & Young's going concern warning, analysts

began to speculate that BTA Bank might need to undergo a second restructuring.  *See id.* ¶ 369.

Later that month, BTA Bank disclosed the negative carry and the fact that S-K Fund maintained

deposits with BTA Bank with an average interest rate of 9.3%.  *See id.* ¶¶ 382-83.

       On June 13, June 27, and July 1, 2011, Plaintiffs executed more trades in BTA Bank

securities, again through a UBS broker in Miami.  *See id.* ¶¶ 399-401.  In June and July 2011,

Atlantica purchased RUs (the "2011 Purchased RUs") with a face value of $25 million for less

than $1.5 million, and it sold subordinated notes with a face value of $500,000 for over

$200,000.  *See id.* ¶¶ 399, 401-02.

       The market grew increasingly concerned about BTA Bank's financial health over the

course of 2011.  S-K Fund representatives made certain public statements that, in Plaintiffs'

view, "provide[d] the market with false comfort that SK Fund would ensure that the 2010

Restructuring would succeed," ECF No. 219 ("Pls.' Opening Br."), at 9, to wit:

- On July 5, 2011, S-K Fund's Deputy Chief Executive Officer, who was also a member of BTA Bank's board of directors, stated that he "[didn't] think BTA Bank will have to restructure debt or face bankruptcy, but we will provide financing to BTA Bank if needed," referred to a request to increase the interest payment on the S-K Bonds by stating that S-K Fund would "sort out th[at] situation," and stated that S-K Fund would "not let [BTA Bank] get into trouble." Pls.' Response UF ¶ 397a.

- In a press release published by BTA Bank on October 5, 2011, the Chairman of S-K Fund was quoted as stating that "BTA Bank will certainly be supported by the government" and represented that S-K Fund "is ready to provide more state aid if the troubled lender requires financing." *Id.* ¶ 397b.

- In November 2011, S-K Fund's Deputy CEO stated that "[t]he decision on support measures has not been taken yet" and that it would "depend on the bank's current business plan and on the proposals to be made by its management." *Id.* ¶ 397c. He noted that BTA Bank's management was "working on a business plan and a restructuring scheme for the bank" and that, "[j]udging from the bank's capital deficit, there is no doubt about" the need for additional investment. *Id.* He further stated that S-K Fund was "looking at all options" and "hope[d] in the near future [to] have a clear plan of restoring BTA's capital." *Id.* He made similar statements in an article published later that month, also noting the need "to make sure additional injections don't fall into a bottomless pit." *Id.* ¶ 397d.

- On December 15, 2011, an article quoted S-K Fund's managing director responsible for risk, governance, and strategy as stating that, although S-K Fund "ha[d] not mulled a bankruptcy scenario for BTA," "[t]he situation" at BTA Bank "is much worse than [S-K Fund] expected." *Id.* ¶ 397e. He insisted, however, that "management is very strong and it works hard to resolve the issues" and that S-K Fund had "invested a lot of money and effort into putting this bank back on track." *Id.*; ECF No. 207-124 ("Howes Dep."), at 8-9. The article also quoted S-K Fund's Deputy CEO as stating that "[t]he decision on support measures has not been taken yet" and that any decision would "depend on the bank's current business plan and on the proposals to be made by its management." Pls.' UF Response ¶ 397e.

BTA Bank's outlook continued to worsen. In November 2011, BTA Bank also issued its

third quarter interim financial statements, which showed that its total equity deficit grew to more

than KZT 318 billion. *Id.* ¶ 405. On November 14, 2011, Fitch downgraded BTA Bank's credit

rating from B- to CCC. *See id.* ¶ 406. On December 7, 2011, Moody's reduced its bond ratings

for BTA Bank's subordinated notes to the lowest possible rating. *See id.* ¶ 409. On December

22, 2011, BTA Bank stated that it would propose another restructuring at the upcoming shareholder meeting. *See id.* ¶ 410. The market value of the subordinated notes fell to less than ten percent of their face value. *See id.* ¶ 414. In January 2012, BTA Bank defaulted on its coupon payments for senior debt and publicly disclosed this default no later than January 20, 2012. *See id.* ¶¶ 418-19.

The default created the possibility that BTA Bank's creditors would accelerate the RUs, which was widely discussed by the press. *See id.* ¶¶ 421-23; RU Terms § 13. During a presentation to creditors on January 27, 2012, BTA Bank estimated its RU liability was $887 million, based on assumptions from October 2010. *See* ECF No. 207-34 ("January 2012 Presentation"), at 15. BTA Bank also noted that "[t]he IFRS book value varies as it is re-valued based on updated recovery and discount rate assumptions" and that its "value is highly dependent upon any change of IFRS liability component parameters." *Id.* BTA Bank also warned that its "capital deficit could further deteriorate in 2012, leading to a capital shortfall of [$5.1 billion]" — a number which did not include any accelerated RU debt. *Id.* at 19.

In early February 2012, BTA Bank received a letter from attorneys representing more than twenty percent of the RU holders, which informed the Bank that the RU holders expected that the full face value of the securities would be treated on equal footing with senior noteholders, and only then would they refrain from accelerating the debt. *See* Pls.' UF Response ¶ 429; ECF No. 207-59 ("RU-Holders Letter"). BTA Bank responded on February 10, 2012, urging the RU holders not to accelerate the debt because such acceleration could foreclose a consensual restructuring, cause NBK to place the Bank in conservancy, and generally compromise the interests of BTA Bank and its creditors and shareholders. *See* Pls.' UF Response ¶ 431. On March 19, 2012, BTA Bank publicly circulated a presentation that

estimated its liability on the RUs was approximately $600 million, but it noted that the balance sheet "does not include a potential uplift for the value of the [RUs]."  ECF No. 207-35 ("March 2012 Presentation"), at 42.  BTA Bank further disclosed that "[t]he IFRS value of the RUs liability is subject to auditors' opinion" and that "[i]f auditors consider that the IFRS value should be $5.2bn [the full face value of the RUs], the Tier 1 capital shortfall would then be further negatively impacted."  *Id.* at 45.

Plaintiffs purchased additional subordinated notes (the "2012 Purchased Notes") between February and April 2012, before the creditors accelerated the RUs.  *See* Pls.' UF Response ¶ 443. Between February 3 and March 7, 2012, Atlantica purchased subordinated notes with a face value of nearly $36.5 million for less than $4.5 million.  *See id.* ¶ 444.  Between March 28 and April 4, Atlantica purchased subordinated notes with a face value of $21 million for less than $2 million and sold RUs with an equal face value for less than $1.5 million.  *See id.* ¶¶ 445-47. Between April 10 and April 18, 2012, Blu purchased subordinated notes with a face value of $3 million.  *See id.* ¶ 448.

On April 27, 2012, BTA Bank received a notice of acceleration from the RU holders. *See id.* ¶ 439.  The RU holders had not warned BTA Bank that they were likely to seek acceleration since their letter in early February.  *See id.* ¶ 441.  The additional $5.2 billion liability on BTA Bank's balance sheet caused the bank to fall out of compliance with capital adequacy requirements.  *See id.* ¶¶ 353, 440.

BTA Bank began a second restructuring, which was completed in December 2012 (the "2012 Restructuring").  *See id.* ¶ 455.  Holders of subordinated notes received equity in the restructured BTA Bank, in an amount equal to 2.5% of the face value of the subordinated notes plus other cancelled claims.  *See id.* ¶ 452.  Holders of RUs received 14.2% of the par value of

their units, paid in cash and new notes.  *See id.* ¶ 453.  In connection with the 2012

Restructuring, S-K Fund provided BTA Bank with a loan of KZT 239.77 billion, which had an

interest rate of four percent and would mature in 2024.  *See id.* ¶ 456.  S-K Fund also reduced the

fee for the S-K Guarantee to one-sixteenth of its prior level, *see id.* ¶ 457, increased the coupon

on the S-K Bonds from four percent to six percent, *see id.* ¶ 459, and acquired additional shares

of BTA Bank for KZT 176.38 billion, *see id.* ¶ 458.

Plaintiffs, like many of BTA Bank's creditors (including S-K Fund, *see id.* ¶ 460), lost a

portion of their investments in BTA Bank.  On December 5, 2012, Plaintiffs filed suit against S-

K Fund, alleging violations of the federal securities laws.  *See* ECF No. 1.  Plaintiffs filed suit

against BTA Bank on August 16, 2013.  *See* 13-CV-5790, ECF No. 1.  Since then, the Court has

decided multiple rounds of motions in the two cases.  *See Atlantica Holdings, Inc. v. Sovereign

Wealth Fund Samruk-Kazyna JSC*, No. 12-CV-8852 (JMF), No. 13-CV-5790 (JMF), 2018 WL

922191 (S.D.N.Y. Feb. 15, 2018) (denying motion for reconsideration and motion to dismiss);

*Atlantica Holdings, Inc. v. BTA Bank JSC* ("*Atlantica III*"), No. 12-CV-8852 (JMF), No. 13-CV-

5790 (JMF), 2017 WL 3731948  (S.D.N.Y. Aug. 29, 2017) (denying motion for judgment on the

pleadings and summary judgment); *Atlantica Holdings, Inc. v. BTA Bank JSC* ("*Atlantica II*"),

No. 13-CV-5790 (JMF), 2015 WL 144165 (S.D.N.Y. Jan. 12, 2015) (denying motion to dismiss

in large part); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*

("*Atlantica I*"), 2 F. Supp. 3d 550 (S.D.N.Y. 2014) (denying motion to dismiss in large part),

*aff'd*, 813 F.3d 98 (2d Cir. 2016).

Defendants now move for summary judgment, and Plaintiffs cross-move for partial

summary judgment.  *See* ECF Nos. 206, 215.  Each side also moves to strike or exclude

testimony of the other's experts.  *See* ECF Nos. 197, 200, 203, 221, 237.

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where, as here, both sides move for summary judgment, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). To defeat a motion for

summary judgment, the non-moving party must advance more than a "scintilla of evidence,"

*Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading,

or on conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).

## DISCUSSION

Plaintiffs seek to hold Defendants liable for securities fraud under Sections 10(b) and

20(a) of the Exchange Act and Securities Exchange Commission Rule 10b-5.  To state a claim

that Defendants made material misrepresentations or omissions in violation of Section 10(b) and

Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)

(internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity

Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  Relatedly, to state a

claim for controlling-person liability under Rule 20(a), Plaintiffs must, at a minimum, plead a

plausible "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1472 (2d Cir. 1996); *Total Equity Capital, LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF),

2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).  The parties dispute nearly all of these

elements — and whether the Exchange Act even applies to the transactions at issue at all.  But

the Court need not and does not resolve most of these disputes, as it finds that the evidence does

not suffice to support at least two essential elements of Plaintiffs' claims.

## A.  Material Misrepresentation or Omission

The Court begins with Plaintiffs' need to prove a material misrepresentation or omission by Defendants.  Plaintiffs' claims are based on four statements or categories of statements: (1) Defendants' representation that S-K Fund would not receive a dividend; (2) Defendants' representations regarding the expected viability of BTA Bank as a result of the 2010 Restructuring; (3) S-K Fund's public statements in 2011 and 2012 regarding its support for BTA Bank and the likelihood of a second restructuring; and (4) Defendants' representations in early 2012 regarding BTA Bank's liability on the RUs.  As explained below, no reasonable factfinder could conclude that any of these statements were material misstatements or omissions.

### 1.  The Permitted Dividend Statement

First, Plaintiffs argue that disclosing the Deed of Undertaking in the 2010 IM — which provided that "no dividend other than a Permitted Dividend [would] be paid on [S-K Fund's] shares" — was false or misleading because S-K Fund in fact received a dividend, in the form of the negative carry from BTA Bank.  *See* Pls.' Opening Br. 17-18.  "The economic reality," Plaintiffs allege, is that above-market interest rates were paid to S-K Fund and amounted to a "distribution" of bank assets.  *Id.* at 18.

Even casual investors are familiar with dividends and distributions, and Plaintiffs' claims stretch those terms beyond their limits.  When a company makes a profit, it can either reinvest that money in the company or distribute it to its shareholders.  The portion of profits that a company chooses to pay to its shareholders is a dividend.  *See Dividend*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "dividend" as "[a] portion of a company's earnings or profits distributed pro rata to its shareholders").  A distribution is similar, but it may also be a return to shareholders of capital that had previously been locked into the entity.  *See Corporate*

*Distribution*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "corporate distribution" as "[a] corporation's direct or indirect transfer of money or other property, or incurring of indebtedness to or for the benefit of its shareholders, such as a dividend payment out of current or past earnings").  In both cases, shareholders receive the funds because they are owners of the corporation, not because they perform a service or provide goods.  Here, by contrast, S-K Fund received payments in exchange for financial services it provided to BTA Bank.  S-K Fund was paid a fee in exchange for its guarantee of the NBK Repo financing.  *See* Pls.' UF Response ¶¶ 202-12.  And BTA Bank accounted for interest on the S-K Deposit because that deposit was made with BTA Bank, rather than some other bank.  In other words, any negative carry arose because S-K Fund provided BTA Bank with financing, not because S-K Fund owned BTA Bank equity.  Thus, it was not a dividend or distribution.

The situation here is somewhat complicated by the fact that, because S-K Fund owned most of BTA Bank's equity, these were related-party transactions.  In such circumstances, the shareholder can conceivably circumvent a restriction on dividends and distributions by including extra compensation in contracts for goods or services between the shareholder and the corporation.  But Plaintiffs here identify no evidence that the guarantee fee or interest rate on the S-K Deposit were a disguised dividend or distribution.  There is no evidence, for example, that directly ties the interest rate to S-K Fund's equity stake or the Deed of Undertaking, or that otherwise suggests a relationship between the interest rate and the restriction on dividends.

Plaintiffs suggest that the Deed of Undertaking was misleading because, in their view, the interest rate on the S-K Deposit was "unreasonably high" and "above-market."  Pls.' Opening Br. 5, 17-18.  That is not enough.  First, Plaintiffs point to no evidence that investors understand statements regarding dividends or distributions to encompass other transactions between a

corporation and its shareholders.  Second, if adopted, Plaintiffs' argument would incorporate

much of the law of corporations, which is typically the domain of the states, into the federal

securities laws.  After any related-party transaction between a shareholder and a corporation,

minority shareholders could argue that the consideration given by the corporation was

"unreasonably high" and thereby rendered misleading any statement regarding the amount or

apportionment of dividends and distributions.  The Court declines to interpret the federal

securities laws to require a fairness-style inquiry into the reasonableness of such transactions, at

least absent evidence that the transaction and the statement were linked in some way.  *See Santa

Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Absent a clear indication of congressional

intent, we are reluctant to federalize [a] substantial portion of the law of corporations . . . .");

*Field v. Trump*, 850 F.2d 938, 948-49 (2d Cir. 1988) (describing a distinction "between conduct

that is 'reasonable' and 'unreasonable'" as "the hallmark of state fiduciary law" and affirming

the grant of a motion to dismiss because there was "no allegation . . . of willful misconduct of a

self-serving nature"); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1, 4 (2d Cir.

1983) ("The gravamen of the claim advanced here is a breach of management's fiduciary duty to

shareholders, a matter traditionally committed to state law, which, if entertained, would

unquestionably embark us on a course leading to a federal common law of fiduciary obligations.

We decline to embark on such a course . . . .").

     Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims

regarding the Deed of Undertaking.

### 2.  The Viability Statements

     Next, Plaintiffs challenge Defendants' statements, made in the 2010 IM, that "[t]he Bank

believe[d] that the Restructuring will allow the Bank to continue as a going concern" (the "Going

Concern Statement"), 2010 IM at 10, and that "[t]he Bank expects that the necessary levels of capital ratios will be achieved following the successful completion of the Restructuring" (the "Capital Adequacy Statement" and, together with the Going Concern Statement, the "Viability Statements"), *id.* at 219.  Plaintiffs argue that these statements were false because the S-K Deposit, undisclosed in the 2010 IM, ensured that BTA Bank would *not* continue as a going concern and would *not* achieve the necessary levels of capital ratios.  *See* Pls.' Opening Br. 18-22.  The record, however, does not support that argument.

The Viability Statements "are classically forward-looking — they address what [D]efendants expected to occur in the future."  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *see also* 15 U.S.C. § 78u-5(i)(1)(C) (defining a "forward-looking statement" as, among other things, "a statement of future economic performance").  Under the PSLRA, such statements are not actionable if they are "identified and accompanied by meaningful cautionary language *or* [are] immaterial *or* the plaintiff fails to prove that [they were] made with actual knowledge that [they were] false or misleading."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  Thus, to prevail, Plaintiffs must prove "that the statement of opinion is both objectively and subjectively false."  *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (Lynch, J.) (internal quotation marks omitted) (referring to claims based on opinions regarding future outcomes); *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (same).

Applying these standards here, the Court finds that Defendants must be awarded summary judgment with respect to the Viability Statements because Plaintiffs fail to establish that they were objectively false.  As an initial matter, Plaintiffs' challenge to the Going Concern

Statement does not make much sense.  The S-K Deposit, as all agree, was a "sinking fund," not to be touched until maturity in 2024, at which point it would be used to satisfy S-K Fund's obligation to pay BTA Bank KZT 645 billion on the S-K Bonds.  *See* Pls.' UF Response ¶¶ 220, 224.  The S-K Deposit affected how money changed hands between S-K Fund and BTA Bank only in that, instead of paying BTA Bank KZT 645 billion in 2024, it paid BTA Bank KZT 175 billion in 2010.  *See id.* ¶¶ 224, 236-239.  Because the interest was never to be paid to S-K Fund, whether the interest rate was above market is basically irrelevant to whether BTA Bank was able to remain a going concern, at least in the short-term.[2]  The principal was new money that BTA Bank could use to generate revenue from interest-accruing loans, or pay debts, or put to any other use it saw fit.  *See* Pls.' UF Response ¶ 240.  This additional cash made it *more likely* that the corporation would continue as a going concern.  *See* Fin. Accounting Standards Bureau, Accounting Standards Update No. 2014-15, at 5, *available at* https://bit.ly/36lo0W5 (under Generally Accepted Accounting Principles ("GAAP") there is "[s]ubstantial doubt about the entity's ability to continue as a going concern," when "it is . . . probable . . . that the entity will be unable to meet its obligations as they become due").

---

[2]     The interest rate *would* affect BTA Bank's outlook after 2024, when BTA Bank would have received a KZT 645 billion payment from S-K Fund.  To illuminate the principle, consider payday loans — "short-term, high-interest, single-payment credit for which the lender requires a post-dated check that can be cashed after the borrower's next payday."  *Brown v. Payday Check Advance, Inc.*, 202 F.3d 987, 989 (7th Cir. 2000).  When someone takes out a payday loan, she immediately has access to cash that she would not have had.  The money might allow her to make a rent payment that she otherwise would have been unable to make.   But when she later receives her paycheck, the lender might take a sizeable portion — or even all of it.  It is only at that point that the borrower feels the ill effects of a predatory interest rate.  (And, indeed, the effects are so pernicious that many states have outlawed high-interest payday loans.  *See, e.g.*, N.Y. Banking Law § 373.)  So it is here, except the term of the deposit was quite long.  Regardless of whether the interest rate on the S-K Deposit was above-market, BTA Bank would feel the ill effects only after 2024, when the S-K Bonds would become due.  The long-term effects are discussed in greater detail below.

To be sure, an above-market interest rate might negatively affect BTA Bank's outlook after 2024, when BTA Bank would have otherwise received a KZT 645 billion payment from S-K Fund.  Even assuming that a reasonable investor would credit projections of BTA Bank's finances fourteen years into the future, however, Plaintiffs do not assert how much money BTA Bank lost by setting an interest rate that was above market as opposed to one that was at the market rate, let alone how losing those funds would cause BTA Bank to cease operating as a going concern.[3]

Plaintiffs make two principal counterarguments.  First, Plaintiffs argue that BTA Bank actually paid interest into the S-K Deposit account, which had a tangible effect on BTA Bank's income statement.  *See* Pls.' Reply 11 n.12.  But it is not as though BTA Bank transferred funds into a locked vault.  Although the interest increased the balance of the account, BTA Bank could still use those funds to make loans or payments, just as it could use any other deposit.  *See* Howes Dep. at 308-09 ("[BTA Bank] didn't pay [the interest] outside of BTA. . . . S-K never benefitted from any cash inflows to S-K itself which it could actually use for any purposes whatsoever.").  Regardless of how BTA Bank counted or characterized the interest on the S-K Deposit, the amount "paid" remained accessible to the bank.  As a practical matter, BTA Bank's cash position did not change as interest accumulated.  *See* Pls.' UF Response ¶ 238 (only "not[ing]" that the interest on the S-K Deposit "was an expense item on BTA's income statement" in response to the assertion that there was "no cash implication").  Second, Plaintiffs argue that the S-K Deposit did have "a cash implication" for BTA Bank because of a "tax

---

[3]     As discussed in further detail below, Plaintiffs' claims would still fail even if the evidence would allow a reasonable jury to conclude that the S-K Deposit would eventually cause BTA Bank to cease to operate as a going concern and to find scienter because Plaintiffs fail to show that the revelation of any long-term risk caused their losses.

expense" on the deposit and because "the interest on the . . . KZT 29.3 billion [deposit] was not capitalized." *Id.* But Plaintiffs do not describe the size of these payments and in no way indicate that they exceeded the size of the deposit, let alone threatened the bank's viability.

Moreover, BTA Bank continued as a going concern until 2014, when it combined with Kazkommertzbank. *See* Pls.' UF Response ¶ 349; ECF No. 212 ("Defs.' Opening Br."), at 17. To the extent that the Going Concern Statement might have been reasonably understood as a representation that BTA Bank would not undergo another restructuring, Plaintiffs do not identify sufficient evidence that the alleged negative carry substantially caused BTA Bank to enter the 2012 Restructuring. In fact, the evidence in the record suggests the opposite. *See* January 2012 Presentation 19 (estimating that BTA Bank's *overall* negative net interest margin — including transactions with entities other than S-K Fund — would account for just $200 million of the expected $2.1 billion growth in BTA Bank's capital shortfall during the last quarter of 2011 and all of 2012); *id.* at 17 (disclosing that approximately one-fifth of BTA Bank's overall interest expenses in the first nine months of 2011 were attributable to funding provided by S-K Fund and that the total size of that interest expense was nearly equaled by interest income received on the S-K Bonds); *see also* ECF No. 207-114 ("Hrycay Report"), ¶¶ 58-59 (identifying other factors that "contributed to BTA Bank's precarious financial position," including, among other things, its high "loan-to-deposit ratio," the continuing decrease in performing loans, and "[h]igh costs and thin operating margins").

In any event, Plaintiffs present absolutely no evidence that Defendants actually knew that the Going Concern Statement was misleading, as they must. The only evidence Plaintiffs cite relates to BTA Bank's compliance with capital adequacy ratios, not to its ability to continue as a going concern. *See* Plfs.' Opening Br. 20 (arguing that the Viability Statements "could not have

been honestly held when made" because of a January 27, 2010 email that, in their view, "warn[ed] that . . . the Undisclosed SK Deposit would cause post-restructuring BTA to breach Capital Adequacy").

Plaintiffs' claims regarding the Capital Adequacy Statement are also insufficient to survive summary judgment. Defendants argue, and Plaintiffs do not dispute, that the 2010 IM described several risks that could cause BTA Bank to fail to meet capital adequacy ratios and harm BTA Bank's business more generally. *See* Defs.' Opening Br. 18-19; Pls.' Opening Br. 20-21; *see also* 2010 IM at 119-41.[4] Instead, Plaintiffs argue that the Capital Adequacy Statement is actionable because the risk disclosures "do not account for the fact that BTA knew that the Undisclosed SK Deposit would cause" BTA Bank to have inadequate capital and to fail to survive as a going concern, and therefore "misrepresent[] existing facts." Pls.' Opening Br. 20-21 (emphasis omitted) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)). Plaintiffs argue that this failure would happen immediately. *See* ECF No. 207-115 ("Kapoor Rep."), at ¶¶ 49, 52 ("[T]he incorporation of the S-K Deposit and the associated interest expense causes BTA Bank to fail at least one of all three Key Capital Ratios for every year in the Lazard Model's five-year projection [which began in 2010]."). Plaintiffs' argument is hard to credit, however, given that BTA Bank actually complied with capital adequacy requirements until the RU holders accelerated their notes on April 27, 2012. *See* Pls.' UF Response ¶ 353; ECF No. 207-4 ("2012 IM"), at 3; ECF No. 207-16, at 10, 69; ECF No. 207-18, at 36. That is, the fact

---

[4]     Plaintiffs characterize the risk disclosures in the 2010 IM as "boilerplate," Pls.' Opening Br. 20, but only offhandedly, and they choose not to develop any such argument. Accordingly, any such argument is waived. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 441 (S.D.N.Y. 2015) ("[T]he Court will not evaluate arguments that are so drastically underdeveloped . . . .").

that the challenged prediction came true "largely eviscerates any . . . claim that the . . . projection was false or misleading." *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 587 (S.D.N.Y. 2007); *see also Shemian v. Research In Motion Ltd.*, No. 11-CV-4068 (RJS), 2013 WL 1285779, at *22 (S.D.N.Y. Mar. 29, 2013) (Sullivan, J.) ("[T]he fact that a majority of these predictions were correct easily defeats [the] claim."); *St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, No. 10-CV-427 (VMK), 2011 WL 814932, at *9 (N.D. Ill. Feb. 28, 2011) (dismissing claims regarding "specific predictions that [the defendant's] earnings per share from continuing operations would be in [a certain] range" because the prediction was "accurate[]").

Plaintiffs argue that BTA Bank was able to report compliance with capital adequacy requirements and continue as a going concern only because of "accounting machinations in 2010," Pls.' Opening Br. 19, but they identify no more than a "scintilla" of evidence to support the allegation, *Anderson*, 477 U.S. at 252. In particular, their only evidence is a Lazard presentation from 2011, which discloses that, in the income statement encompassing data through December 31, 2010, "[i]nterest income is artificially inflated" because the figures include "interests . . . on problem loans" that may not be collected. ECF No. 217-11, at 4; *see* Pls.' Opening Br. 19. But Plaintiffs do not explain whether recognizing such interests is improper or inconsistent with the methodology to calculate capital adequacy ratios. Nor do they explain whether removing such interests from BTA Bank's balance sheet would cause a breach of the requirements.[5] Plaintiffs' conjecture about the true nature of BTA Bank's finances is

---

[5]  Plaintiffs attempt to bolster this argument by claiming that they "could not investigate the 2010 audit further because BTA did not produce a [Rule] 30(b)(6) deponent with any knowledge of BTA's annual audits, including Ernst & Young's audit of BTA's 2010 financial statements." Pls.' UF Response ¶ 157. Plaintiffs' insinuation that a negative inference is warranted is, in essence, a legal argument for sanctions, and it is not properly raised in a statement of undisputed

insufficient to overcome Defendants' motion for summary judgment. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (citation omitted)).  Moreover, the Lazard presentation relates only to BTA Bank's balance sheet as of December 31, 2010; it does not bear on BTA Bank's compliance with capital adequacy requirements or lack thereof in 2011.

Plaintiffs analogize their claims to those in *In re Vivendi Universal, S.A. Sec. Litig.* ("*Vivendi II*"), 765 F. Supp. 2d 512, 569-70 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016), but that case is readily distinguishable.  There, the defendant had announced a growth target that depended on recognizing "a huge one-time purchase accounting benefit," which was not disclosed to the market.  *Id.* at 569.  The plaintiffs argued that, without disclosing that the projected growth was a result of accounting rather than "improved operations," the announcement of the target gave the "illusion of business growth." *Id.* at 569 & n.48 (internal quotation marks omitted).  No matter what growth rate was projected or ultimately reported, it was allegedly based on "accounting magic" that analysts and shareholders were unlikely to notice.  *Id.* at 569 (internal quotation marks omitted).  The illusion created was a "non-forward-looking element" of the defendant's projection because its "misleading nature . . . could be verified the moment it was made, and did not depend on any

---

fact.  *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015) (holding that statement of undisputed facts "contain[ed] impermissible argument or legal conclusion").  Regardless, Plaintiffs should have raised any dispute regarding the adequacy of the deposition before fact discovery closed on January 18, 2019, *see* ECF No. 175; ECF No. 126, ¶ 11 ("[I]f a party waits until near the close of discovery to raise an issue that could have been raised earlier, the party is unlikely to be granted the relief that it seeks, let alone more time for discovery.") — nearly six months before the present motions were filed.

future events." *Id.* at 569-70.  Here, by contrast, Plaintiffs do not challenge an illusion inherent

in Defendants' projection that BTA Bank would meet the required capital adequacy ratios, but

rather the projection itself.  The accuracy of the projection could "only be verified after [it was]

made." *Id.* at 569; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97-98 (2d Cir.

2004) (finding that "projections of sales and revenues" did not "involve[e] present or historical

fact" even though they were allegedly "totally without foundation").  And, as already explained,

Plaintiffs do not identify evidence in the record that would allow a reasonable jury to conclude

that the projection ultimately proved "objectively false."  *Podany*, 318 F. Supp. 2d at 154; *see*

*also Shemian*, 2013 WL 1285779, at *22.

In sum, the evidence does not permit a reasonable jury to find that that the Viability

Statements were objectively false.  Accordingly, Defendants must be granted summary judgment

on Plaintiffs' claims regarding the Viability Statement.

### 3.  Press Statements

Third, Plaintiffs challenge various public statements made by S-K Fund representatives

during 2011 and 2012.  These statements generally fall into two categories: (1) statements

predicting that BTA Bank would not need to undergo a second restructuring or enter bankruptcy,

*see, e.g.*, Pls.' Response UF ¶ 397a (statement that S-K Fund representative did not "think BTA

Bank [would] have to restructure debt or face bankruptcy"); and (2) suggestions that S-K Fund

would support BTA Bank if its finances were to collapse, *see, e.g.*, *id.* ¶ 397b (statement that

"BTA Bank will certainly be supported by the government" and that S-K Fund "is ready to

provide more state aid if the troubled lender requires financing").

Like the Viability Statements, these statements are forward-looking, and they are

therefore not actionable either if they are accompanied by meaningful cautionary language or if

Plaintiffs fail to prove that they were made with actual knowledge that they were false and misleading.  *See Slayton*, 604 F.3d at 766.  Plaintiffs' claims regarding the likelihood of a second restructuring must fail because Plaintiffs identify no evidence that these statements were made with actual knowledge of falsity.  *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) (holding that, where a counseled non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," that response "may be deemed an abandonment of the unmentioned claims"); *see also* Pls.' Opening Br. 34 (arguing only that S-K Fund knew that it would not bail out BTA Bank); ECF No. 239, at 29 n.23.[6]  Without evidence of such knowledge, the Court must conclude that the statements are not actionable.  *See Slayton*, 604 F.3d at 776 & n.9 ("[P]laintiffs may not plead fraud by hindsight . . . .  [E]ven if . . . the risk . . . was so obvious that defendants must have been aware of it, this would not avail the plaintiffs.  (internal quotation marks, citations, and alterations omitted)).

      With respect to statements regarding the likelihood that S-K Fund would provide further support, at least some of those statements made clear that such support would occur during the course of a second restructuring.  *See* ECF No. 207-95.  But S-K Fund did in fact provide support during the 2012 Restructuring.  *See* 2010 IM at 20, 29, 40, 207.  Accordingly, those statements are not misleading.  Even assuming that reasonable investors would interpret the remainder of the second category of statements to mean that S-K Fund would bail out BTA Bank

---

[6]      Plaintiffs also attempt to support this claim by noting that S-K Fund's Rule 30(b)(6) deponent was unable to testify to the basis for the challenged statements.  *See* Pls.' Opening Br. 24 n.14.  But the deponent's lack of knowledge regarding the basis for the challenged statements does not support a conclusion that the statements were known to be false.  To the extent that Plaintiffs seek to raise any dispute regarding the sufficiency of the Rule 30(b)(6) deposition, their argument is untimely.  *See supra* note 5.

before, rather than in the course of, a second restructuring,[7] Plaintiffs fail to identify sufficient evidence that S-K Fund knew it would not.  Plaintiffs argue that "SK Fund had no actual intention of modifying the terms of the Undisclosed SK Deposit because doing so would bankrupt SK Fund."  Pls.' Opening Br. 23.  But S-K Fund could bail out BTA Bank without altering the terms of the S-K Deposit, and it actually did so during the 2012 Restructuring.  *See* Pls.' UF Response ¶¶ 456-59 (S-K Fund substantially reduced the fee for guaranteeing the NBK Repo, advanced a substantial loan with a moderate interest rate, purchased additional shares of BTA Bank, and increased the coupon on the S-K Bonds).  For the same reason, S-K Fund's "reluctance" to alter the terms of the S-K Deposit is not evidence that S-K Fund was not considering providing support in advance of a second restructuring.  *See* Pls.' Opening Br. 23; Howes Dep. 226 (describing S-K Fund's response to BTA Bank's request to lower the interest rate on the S-K Deposit between May and July 2011).

### 4. RU Statements

Finally, Plaintiffs argue that Defendants misled investors during presentations made in January and March 2012 by calculating BTA Bank's liability on the RUs without reference to their value in the event of acceleration.  *See* Pls.' Opening Br. 24-27.  According to Plaintiffs, Defendants knew that acceleration was inevitable, making BTA Bank liable for the RUs' full face value — $5.2 billion.  *See id.*  Instead of reporting that value, Defendants calculated their RU liability as if it were based on the expected recoveries from litigation from former management, which was substantially lower.  *See id.* at 25.

---

[7]     To the extent that reasonable investors would interpret the statements to mean that a bail out could occur during a second restructuring, S-K Fund's statements were true and are therefore not actionable.  *See* 2012 IM at 20, 29, 40, 207.

Viewed in context, however, neither presentation was misleading.  A reasonable investor would not interpret the RU liability projections to reflect any assessment of the likelihood of acceleration.  The January 2012 presentation plainly disclosed that the only two inputs into the calculation of potential RU liability were expected recoveries from litigation against former management and a discount rate.  *See* January 2012 Presentation at 15 ("$1.1bn of cash flows from 50% of recoveries expected until 2020 . . . [d]iscounted back at 9.41% . . . [e]quates to balance sheet liability of $887m as of 30-Sep-2011").  The presentation also clearly stated that the estimated RU liability was "[b]ased on 2010 estimates."  *Id.*  No reasonable investor could find the presentation anything but silent regarding the probability of acceleration on the date of the presentation.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

To the extent Plaintiffs argue that liability for the January 2012 presentation is premised on an omission, they are wrong — all facts then in existence were disclosed to the market.  As Plaintiffs acknowledge, for example, that "the 2010 IM disclosed the requirements for acceleration and cross-acceleration."  Pls.' Opening Br. 24.  Plaintiffs also acknowledge that BTA Bank disclosed the default before the January 2012 presentation.  *See* Pls.' UF Response ¶ 424.  On the date of the January 2012 presentation, then, Defendants were in no better position to determine whether acceleration was "inevitable" than were Plaintiffs or the market writ large.  BTA Bank thus had no duty to say more.  *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) ("[W]here information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose."); *Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 356 (S.D.N.Y. 2014) ("There is no duty

to disclose the subjective views of a third party, or to predict the likelihood of future events, if such information is equally available to the public.").

The March 2012 presentation also is not actionable, as it plainly warned investors that there was "a potential uplift for the value of the Recovery Units" and clarified that it is "not include[d]" in the projections.  March 2012 Presentation at 42.  Regardless of whether the disclaimer was "couche[d] as a matter of auditor opinion," Pls.' Opening Br. 25 (internal quotation marks omitted), it adequately informed investors of the risk of acceleration and that the projections did not reflect that possibility.  No reasonable investor could have been misled by the March 2012 presentation into believing that there was no risk of acceleration.  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("The touchstone of the inquiry . . . [is] whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor."); *FIH, LLC v. Found. Capital Partners LLC*, 176 F. Supp. 3d 52, 84 (D. Conn. 2016) ("[N]o reasonable investor reading the statement in the context [of the materials in which they appear] could have been misled into thinking that the risk . . . did not actually exist."  (internal quotation marks omitted)).

Nor does the evidence establish that acceleration was inevitable.  It is true that on February 1, 2012, more than twenty percent of the RU holders threatened to accelerate unless BTA Bank guaranteed that the full face value of the RUs would be treated on an equal footing with senior debt.  *See* RU-Holders Letter.  But there were strong reasons to believe that the RU holders were bluffing.  Accelerating the debt would cause BTA Bank to breach its capital adequacy requirements, which could lead to the bank being placed into conservancy and thereby preclude a consensual restructuring of BTA Bank, potentially to the detriment of all creditors.

*See* ECF No. 207-56 ("BTA RU Letter Response").  RU holders would also be required to

indemnify the trustee in connection with the acceleration, which might be difficult.  *See* ECF No.

207-11.  BTA Bank declined to make the guarantee demanded by the RU holders on February

10, 2012 and informed the RU holders of the downsides of acceleration.  *See* BTA RU Letter

Response.  When BTA Bank circulated the March 2012 presentation more than a month later,

the RU holders still had not accelerated the debt.  On that date, acceleration was far from certain.

Indeed, the RU holders did not decide to accelerate until more than a month later.  *See* ECF No.

207-58 (letter regarding acceleration dated April 27, 2012).

Plaintiffs insist that, because BTA Bank "chose to speak about its RU liability and its

potential capital shortfall for 2012, it had an obligation" to disclose the risk of acceleration,

which would increase those figures.  Pls.' Opening Br. 24-25.  But the obligation to disclose

extends "only . . . to facts necessary to render what was revealed to not be so incomplete as to

mislead."  *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 226 (S.D.N.Y. 2018)

(internal quotation marks and alterations omitted).  And as already explained, the challenged

statements were not misleading.  BTA Bank had already disclosed to the market, and the market

understood, that there were two potential sources of liability on the RUs — proceeds from

litigation and acceleration.[8]  Against that backdrop, the presentations were not misleading,

because they made clear that the liability projections were based only upon the estimated net

present value of litigation recoveries.  Having informed investors that the projections reflected

only one of the two potential sources of RU liability, BTA Bank was under no obligation to

provide information about the other potential source.  *See Abely v. Aeterna Zentaris Inc.*, No. 12-

---

[8]     There is no dispute that Khamis was aware of the potential for acceleration.  *See* Pls.' UF
Response ¶ 417.

CV-4711 (PKC), 2013 WL 2399869, at *10-11 (S.D.N.Y. May 29, 2013) (holding that disclosure of results of a drug trial in one subgroup of patients did not require additional disclosures regarding the "overall patient population" or another subgroup of patients).

## B.  Loss Causation

In short, Plaintiffs fail to identify a material misrepresentation or omission.  Even if they did, however, Plaintiffs would also have to prove "loss causation" — "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (internal quotation marks omitted).  A misstatement or omission "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed investor."  *Id.* (citations, internal quotation marks, and alterations omitted).  The loss causation requirement "exists because private securities fraud actions are 'available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'"  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).  Plaintiffs cannot make the necessary showing here.

In order to prove loss causation, Plaintiffs must show that the concealed information later reached the market and caused their loss.  The Second Circuit has articulated several methods for showing loss causation, the most common being the "corrective disclosure" theory and the "materialization of risk" theory.  *See id.* at 511.  Under the "corrective disclosure" theory, a plaintiff must show that "the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y.

2007).   Under the "materialization of risk" theory, the plaintiff must show that "the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss."   *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).   Under both theories, plaintiffs must show more than "an inflated purchase price."   *Dura Pharm.*, 544 U.S. at 342.   Plaintiffs must "disaggregate" losses caused by "disclosures of the truth behind the alleged misstatements" from losses caused by other factors, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events."   *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (quoting *Dura Pharm.*, 544 U.S. at 342-43).

In order to prove loss causation and damages, Plaintiffs rely on the testimony of an expert, William P. Hrycay.   *See* Pls.' Opening Br. 37-42; Hrycay Report.   Plaintiffs argue that the omission of the S-K Deposit caused their loss because the risk concealed — that BTA Bank would cease to operate as a going concern or breach its capital adequacy ratios — actually materialized.   *See* Pls.' Opening Br. 39-40 (arguing that the market "realiz[ed]" the omission upon "materialization of the concealed risk").   But the record suggests otherwise.   As already explained, because the S-K Deposit was a sinking fund intended to satisfy S-K Fund's obligation on the S-K Notes upon their maturity in 2024, the risk was to materialize in the long-term, when BTA Bank would not receive the payment on the S-K Notes.   In the short-term, the S-K Deposit provided BTA Bank with additional capital that it was free to use to make loans and generate income.   Indeed, the record reflects that BTA Bank's financial collapse in 2012 was due to factors other than the S-K Deposit and negative carry with S-K Fund.   BTA Bank projected that its overall negative net interest margin — in transactions with all counterparties, not only S-K Fund — would amount to approximately one-tenth of the increase in BTA Bank's capital

shortfall.  *See* January 2012 Presentation at 19.  And in the first nine months of 2011, interest payments to S-K Fund accounted for just one fifth of BTA Bank's interest expenses, and that figure was approximately equal to the interest income BTA Bank received from S-K Fund.  *See id.* at 17.  Further, BTA Bank breached capital adequacy ratios when the RU holders accelerated their debt.  *See* Pls.' UF Response ¶¶ 353, 440.  In short, Plaintiffs are akin to homeowners who sue arsonists for setting a fire that was still on the horizon when their home was destroyed by a different cause.  Without sufficient evidence tying the interest paid to S-K Fund to the second restructuring, no jury could find that either risk materialized.

Although Plaintiffs insist that "this is not a corrective disclosure case," Pls.' Opening Br. 43, out of an abundance of caution, the Court also reviews Plaintiffs' case under that theory.  In his report, Hrycay measures damages using three reference points regarding the value of the subordinated notes: his assessment of their value upon issuance (zero), their price on the date that BTA Bank announced the need for a second restructuring, and their price on the date that BTA Bank filed to restructure.  Hrycay Report ¶¶ 93-96.  But because the second restructuring was not caused by the S-K Deposit or negative carry with S-K Fund, related announcements would not reveal new information to the market.

Moreover, Plaintiffs fail to disaggregate losses caused by non-fraud factors.  Instead, Plaintiffs' expert opines that, "because BTA was at all times insolvent" as a result of the undisclosed S-K Deposit, all losses are attributable to the alleged fraud.  *See* Pls.' Opening Br. 40.  But Hrycay does not explain why the S-K Deposit's effect on BTA Bank's insolvency means that all losses are attributable to the alleged fraud.  A debtor is insolvent if its "liabilities exceed the value of [its] assets."  *Insolvent*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The calculation is not limited by any time horizon.  Here, the S-K Deposit affected the value of

liabilities and assets only in the long term and, as discussed, the record reflects that the risk concealed was not a substantial factor causing BTA Bank's financial collapse. But Hrycay does not even attempt to identify or calculate losses from other causes. The mere fact that Plaintiffs' expert offers a "general statement that any . . . information [about other causes] was insignificant" cannot save their claims. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 423 (7th Cir. 2015).

Perhaps recognizing these deficiencies, Plaintiffs also filed a new "reply declaration" that they claim apportions damages between those caused by the alleged fraud and those caused by other factors. *See* Pls.' Opening Br. 41-42; ECF No. 217-33 ("Hrycay Reply Decl."). The declaration was drafted and filed after the close of discovery, and it is therefore excludable if it "exceed[s] the bounds of the expert's report." *Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Revlon Consumer Prods. Corp. v. Estee Lauder Cos., Inc.*, No. 00-CV-5960 (RMB) (AJP), 2003 WL 21751833, at *4-5 (S.D.N.Y. July 30, 2003) (excluding an expert affidavit on summary judgment). That is plainly the case here. For the first time, Hrycay quantifies damages resulting from some other factors, as well as intermediate changes in price. *See* Hrycay Reply Decl. ¶¶ 5-9. The reply declaration is not "consistent" with Hrycay's original report, as Plaintiffs contend, *see* ECF No. 249 at 6, because it calculates losses from market-wide factors and non-fraud BTA-specific factors, *see* Hrycay Reply Decl. ¶¶ 5, 8, while Hrycay's original report attributed all losses to the fraud. Plaintiffs do not adequately explain their prior failure to produce a report that disaggregates losses, and Defendants are prejudiced by their inability to develop deposition testimony about Hrycay's new analysis. *See Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988) (identifying relevant factors to consider on motion to strike untimely expert

report).  Accordingly, Defendants' motion to strike Hrycay's reply declaration is granted to the extent that it disaggregates losses.[9]

In sum, Plaintiffs' claims also fail because the record does not support their assertion that the risk materialized, they do not proceed under a corrective disclosure theory, and they fail to disaggregate losses.

## CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment with respect to Plaintiffs' claims under Section 10(b) and Rule 10b-5.  It follows that they are also entitled to summary judgment with respect to Plaintiffs' controlling-person liability claims under Section 20(a).  *See, e.g.*, *First Jersey Sec., Inc.*, 101 F.3d at 1472 ("In order to establish a prima facie case of [under Section 20(a)], a plaintiff must show a primary violation . . . .").  Accordingly, Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion for partial summary judgment is DENIED.  In addition, Defendants' motion to strike the Hrycay reply declaration is GRANTED in part.  All other motions are DENIED as moot.

One housekeeping matter remains:  By letter-motions, both Plaintiffs and Defendants sought to file certain documents under seal.  *See* ECF Nos. 213, 220, 243.  The Court granted the letter-motions temporarily, pending its decision on the underlying motions.  It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  Moreover, the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption.  *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No.

---

[9]     The Court exercises its discretion not to award monetary sanctions.

12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (citing cases).  Thus,

any party that believes any materials currently under seal should remain under seal or be

redacted is ORDERED to show cause in writing, no later than **two weeks from the date of this**

**Opinion and Order**, why doing so would be consistent with the presumption in favor of public

access.  If, by that deadline, no party contends that any particular documents should remain

under seal or in redacted form, then the parties shall promptly file such documents publicly on

ECF.

The Clerk of Court is directed to terminate ECF Nos. 197, 200, 203, 206, 215, 221, and

237 and to close the case.

SO ORDERED.

Dated: August 5, 2020
      New York, New York

                                                JESSE M. FURMAN
                                     United States District Judge